**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SDAHRIE HOWARD, et al., | ) | |
| | ) | Case No. 17-cv-8146 |
| Plaintiffs, | ) | |
| | ) | Judge Matthew F. Kennelly |
| v. | ) | |
| | ) | |
| COOK COUNTY SHERIFF'S OFFICE et al., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT**
**OF THEIR MOTION FOR CLASS CERTIFICATION**

# TABLE OF CONTENTS

I. INTRODUCTION ....................................................................................................................... 1

II. FACTUAL SUMMARY ........................................................................................................... 2

    A.   The Complex is a Single, Centrally Administered Facility ............................................. 2

        1.   The Jail, Cermak, and Leighton Courthouse Are a Single Complex ........................... 2

        2.   The Hierarchically Organized CCSO Centrally Controls Detainees ........................... 2

        3.   Class Members Work Throughout the Complex in Non-Policy-Making Positions...................... 3

    B.   The Pervasive Sexual Harassment Ranges from Verbal Sexual Abuse to Targeted Masturbation and Sexual Assault ......................................................................................................... 5

        1.   Every day inmates direct gender-based epithets, sexual comments and threats, and lewd sexual gestures at Plaintiffs and Class Members............................................................................. 6

        2.   Inmates expose their genitals to, masturbate at, and sexually assault Plaintiffs and Class Members ......................................................................................................................... 8

    C.   Rates of Reported Sexual Misconduct Exceed Rates at Similar Facilities ..................... 11

    D.   All Class Members Are Subjected to Inmate Sexual Harassment .................................. 13

        1.   Direct harassment occurs throughout the Complex and to Plaintiffs and Class Members in all types of jobs .................................................................................................................... 13

        2.   All Class Members are also subject to ambient harassment ...................................... 15

    E.   Defendants Were Aware of the Widespread Sexual Harassment .................................... 16

    F.   Defendants Maintained Complex-Wide Policies and Practices That Enabled the Sexual Harassment and Can Be Addressed Through a Complex-Wide Injunction........................... 17

        1.   CCSO failed to adopt reasonable measures throughout the Complex to reduce harassment that have been effective at other institutions or are common- sense solutions to rampant sexual harassment.................................................................................................................... 18

        2.   CCSO's Disciplinary System Fails to Appropriately Punish or Deter Sexual Harassment by Inmates ........................................................................................................................ 21

III. ARGUMENT ....................................................................................................................... 25

    A.   The Proposed Class Is Ascertainable .......................................................................... 25

    B.   The Proposed Class Satisfies the Requirements of Rule 23(a) ..................................... 25

        1.   The Proposed Class Satisfies the Numerosity Requirement ...................................... 25

        2.   The Proposed Class Satisfies the Commonality Requirement .................................... 26

        3.   Plaintiffs Satisfy the Typicality Requirement ........................................................... 32

        4.   Plaintiffs and Their Counsel Are Adequate Representatives ...................................... 33

i

    C.      The Proposed Class Satisfies the Requirements of Rule 23(b)(3) ..............................................34

        1.     Questions Common to Class Members Predominate Over Questions Affecting Only Individual Members .......................................................................................................................................34

        2.     A Class Action Is Superior to Other Methods for Adjudicating the Matter ..............................34

    D.      The Class Meets the Requirements for Issue Certification Under Rule 23(c)(4) ..........................35

IV.     CONCLUSION ...................................................................................................................................35

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Adams v. RR Donnelley & Sons*, 98 C 4025, 96 C 7717, 2001 U.S. Dist. LEXIS 4247 (N.D. Ill. Apr. 6, 2001) .................................................................................................................................. 28

*Alexander v. Casino Queen, Inc.*, 739 F.3d 972 (7th Cir. 2014) .................................................. 26

*Andrews v. City of Philadelphia,* 895 F.2d 1469 (3d Cir. 1990) .................................................. 29

*Bolden v. Walsh Constr. Co.*, 688 F.3d 893 (7th Cir. 2012)......................................................... 28

*Brand v. Comcast Corp.*, 302 F.R.D. 201 (N.D. Ill. 2014)....................................................passim

*Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013) ...................................................................... 34

*E.E.O.C. v. Int'l Profit Assocs., Inc.*, 654 F. Supp. 2d 767 (N.D. Ill. 2009) ................................ 27

*Eddy v. City & Cty. of Denver*, No. 15-cv-02539-MSK-STV, 2018 U.S. Dist. LEXIS 49428 (D. Col. Mar. 26, 2018) ...................................................................................................................... 30

*EEOC v. Int'l Profit Assocs.*, 647 F. Supp. 2d 951 (N.D. Ill. 2009)............................................. 30

*Fournigault v. Indep. One Mort. Corp.*, 234 F.R.D. 641 (N.D. Ill. 2006)................................... 33

*Freitag v. Ayers*, 463 F.3d 838 (9th Cir. 2006)...................................................................... 28, 30

*Hale v. AFNI, Inc.*, 264 F.R.D. 402 (N.D. Ill. 2009) ................................................................... 26

*Healy v. IBEW, Local Union No. 134*, 296 F.R.D. 587 (N.D. Ill. 2013) .............................. 26, 32

*Henson v. City of Dundee*, 682 F.2d 897 (11th Cir. 1982) .......................................................... 29

*Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977) ...................................... 35

*Los Angeles Dep't of Water & Power v. Manhart,* 435 U.S. 702 (1978) ..................................... 32

*Markham v. White,* 171 F.R.D. 217 (N.D. Ill. 1997) ................................................................... 33

*Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802 (7th Cir. 2012) ................................ 26

*Mullen v. GLV, Inc.*, No. 18 C 1465, 2019 U.S. Dist. LEXIS 9034 (N.D. Ill. Jan. 18, 2019)...... 25

*Mullins v. Direct Dig., LLC*, 795 F.3d 654 (7th Cir. 2015) ......................................................... 25

*Muro v. Target Corp.* 580 F.3d 485 (7th Cir. 2009) ..................................................... 32

*Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002) ....................................... 27

*Powell v. Morris*, 37 F. Supp. 2d 1011 (S.D. Ohio 1999) ........................................... 28

*Rosario v. Livaditis*, 963 F.2d 1013 (7th Cir. 1992) ................................................... 33

*Scruggs v. Garst Seed Co.*, 587 F.3d 832 (7th Cir. 2009) ........................................... 26

*Van v. Ford Motor Co.*, No. 14-cv-8708, 2018 U.S. Dist. LEXIS 166755 (N.D. Ill. Sep. 27, 2018)................................................................................................................... 26

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) .......................................... 26, 31

## Other Authorities

Fed. R. Civ. P. 23 .................................................................................... 1, 25, 33, 34

Newberg, Class Actions § 1115(b) (1977) ............................................................... 32

# I.  <u>INTRODUCTION</u>

At the Cook County Jail and the adjoining George N. Leighton Criminal Courthouse (together "the Complex"), male detainees regularly masturbate at and expose their genitals to female employees. They bombard women with sexual threats and sexualized epithets, insults, and gestures. The level of sexual harassment far exceeds that at comparable correctional institutions and pervades the entire Complex. And for too many years, the women's employers – Cook County and the Cook County Sheriff's Office ("CCSO") (collectively the "Defendants") – have failed to take adequate steps reasonably calculated to curtail that harassment. Defendants' Complex-wide policies and practices, not discretionary decisions of a few rogue managers, facilitated detainees' sexual harassment of female employees.

Ten female employees now seek leave to litigate their claims against the Defendants pursuant to Fed. R. Civ. P. 23(b)(3) or alternatively Rule 23(c)(4) on behalf of themselves and members of a proposed Class of about 2,000 women employed by Defendants since April 23, 2015. Notably, Plaintiffs present herein documented evidence of sexual harassment of more than 500 unique Class Members and almost 2000 separate complaints of sexual harassment by Class Members during the liability period.

The proposed Class consists of women employed during the liability period by either Defendant at the Complex, except for certain high-level employees. Defendants' failure to take adequate steps to curtail the harassment violates Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq*.; the Illinois Civil Rights Act, 740 ILCS 23/5(a)(1); and the Equal Protection Clause of the United States Constitution. Plaintiffs seek injunctive relief to improve Defendants' policies going forward and monetary relief to compensate themselves and Class Members for the harm already suffered.

## II.  <u>FACTUAL SUMMARY</u>

**A.      The Complex is a Single, Centrally Administered Facility**

### 1.        The Jail, Cermak, and Leighton Courthouse Are a Single Complex

The Cook County Department of Corrections ("DOC") houses pretrial detainees at the Complex, which includes housing divisions, health care facilities ("Cermak"),[1] and a receiving and classifications unit ("RCDC").[2] The Jail adjoins the Leighton Criminal Courthouse ("Leighton") externally and via underground tunnels through which hundreds of detainees are transported each day to appear for hearings in their criminal cases. CCSO's Court Services Department ("CSD") secures detainees and provides security for Courthouse personnel.[3] The Jail, Cermak, and Leighton together constitute a single-site Complex over which CCSO is charged with control of detainees.[4]

### 2.        The Hierarchically Organized CCSO Centrally Controls Detainees

CCSO promulgates rules, regulations, policies and procedures governing the conduct of inmates and the protection of employees throughout the Complex.[5] CCSO's policies regulating inmate conduct, such as the disciplinary code, apply to all inmates and are described in an Inmate Information Handbook.[6] Policies and procedures regulating inmate treatment, including use of

---

[1] Cermak Health Services, a division of Cook County Health previously known as Cook County Health and Hospitals System ("CCHHS"), provides daily health care to detainees at the Jail. *See* Cook County Health, *Locations*, https://cookcountyhealth.org/locations/cermak-health-services-of-cook-county/ (visited 5/2/19). Healthcare is provided throughout the Complex and is not confined to Cermak.

[2] *See* Cook County Sheriff's Office, *Corrections*, https://www.cookcountysheriff.org/cook-county-department-of-corrections (visited 4/17/19); Cook County Health Services, *About Us*, https://www.cookcountyhhs.org/locations/cook-county-jail-health-services/about-us/(4/18/19).

[3] Ex. 3, Declaration of Brad Curry in *Brown, et al. v. Cook Co., et al*, 17-cv-08085, Dkt. 24-1 (Nov. 15, 2017) ("Curry Decl.") at ¶¶ 3-4.

[4] CCSO Answer and Affirmative Defenses to Consolidated Complaint, Dkt. 147 ("CCSO Answer"), ¶31

[5] CCSO Answer ¶ 32.

[6] Ex. 3, Curry Decl. ¶ 7. *See also,* Ex. 7, DOC Inmate Information Handbook, 2d Edition effective July 2017, CCSO_Howard_0000126-169, at 0000141-147.

force and restraints and inmate grievances, apply to all personnel, regardless of the division or location of work.[7]

CCSO maintains control of the Complex through a hierarchical reporting structure. Each CCSO department reports up to Sheriff Thomas J. Dart, including the DOC and CSD which, since 2015, have been overseen by Bradley Curry. [8] Several Assistant Executive Directors and Superintendents oversee inmate housing divisions, RCDC, and other units including Inmate Services, External Operations, and Transportation and report to senior administrators. Under them are Lieutenants, Sergeants, and Correctional Officers.[9] The CSD is similarly hierarchical, as is Cermak.[10] Class Members, like all other personnel, must follow the chain of command.[11]

### 3. Class Members Work Throughout the Complex in Non-Policy-Making Positions.

Class Members work throughout the Complex, including in each of the housing divisions, RCDC, Cermak, and Leighton.[12] For example, Plaintiffs Correctional Officers Hobbs, Howard, Crawford-Alexander, and Altman collectively have worked in Divisions 2, 3, 4, 5, 6, 8, 9, 10, 11, the Administrative Relief Team Unit, the Residential Treatment Unit ("RTU"), the Strategic Operations and Information Unit, Central Kitchen, RCDC, Cermak, and External Operations –

---

[7] CCSO Answer ¶31. *See also*, Ex. 4, DOC Procedures Manual dated Nov. 1, 2017, Policy 704, Inmate Disciplinary Procedure, CCSO_Howard_0061376-82; Ex. 3, Curry Decl. ¶¶ 16-24; Ex. 6, January 11, 2019 Deposition of Brad Curry ("Curry Dep.") at 294:14-20.

[8] Ex. 3, Curry Decl. ¶ 1.

[9] Ex. 11, DOC Organizational Chart dated Feb. 2018, CCSO_Howard_0078538-539.

[10] Ex. 13, CCHHS Organizational Chart dated September 5, 2014, CCSO_Howard_0000241-245.

[11] *Id.*; Ex. 12, DOC General Order 1.15, eff. Jan. 29, 2007, re. Chain of Command, at III(B)(7), CCSO_Howard_0073686-87.

[12] *See generally* Ex. 1, Group Declaration Exhibit (includes declarations of 142 class members who have experienced sexual harassment at the Complex (organized alphabetically by class member last name, indexed, and bookmarked). Declarations cited herein, unless otherwise specified, are included in this Group Declaration Exhibit and are cited by class member name.).

virtually every location in the Jail and Cermak.[13] Plaintiffs Deputies Jones, Plasencia, Wilson, and Ranney collectively have been assigned to numerous courtrooms, the front door, the CR team (which works all over Leighton), bond court, the 10th floor psychiatric clinic, and the forensic clinic.[14] Plaintiff Burroughs, a paramedic employed as a Correctional Medical Technician and Emergency Response Technician, has had long-term assignments in Divisions 2 and 10 and has been "borrowed out" to Divisions 9, 11 and RCDC. [15] Plaintiff Freeman, a Correctional Rehabilitation Worker ("CRW") has worked in Divisions 2, 3, 4, 5, 9, 11, 17, RTU, Division 6 Annex, the law library and Cermak. [16] Class Members similarly have worked in multiple assignments throughout the Complex.[17]

Regardless of their specific assignments, Class Members move around the Complex and regularly interact with inmates. For example, many correctional officers' duties require them to transport inmates to locations throughout the Jail.[18] Deputies have been required to travel from the

---

[13] Ex. 14, Deposition of Sdahrie Howard ("Howard Dep.") at 98:8-112:8; Ex. 33, Deposition of Kimberly Crawford-Alexander Moreci ("Crawford-Alexander Dep.") at 7:22-12:25; Ex. 17, Deposition of Ellenor Altman ("Altman Dep.") at 120:19-147:22; Ex. 16, Deposition of Denise Hobbs ("Hobbs Dep.") at 90:5-96:23, 106:19-23, 108:17-19.

[14] Ex. 23, Deposition of Esther Jones ("Jones Dep.") at 32:17-33:23; Ex. 38, Deposition of Susana Plasencia ("Plasencia Dep.") at 32:15-25, 34:3-13, 37:8-42:5; Ex. 39, Deposition of Tawanda Wilson ("Wilson Dep.") at 18:20-20:3, 25:8-25, 36:15-37:3; Ex. 37, Deposition of Balvina Ranney ("Ranney Dep.") at 26:22-27:18.

[15] Ex. 9, Deposition of Tavi Burroughs ("Burroughs Dep.") at 125:23-126:13.

[16] Ex. 15, Deposition of Dominique Freeman ("Freeman Dep.") at 96:16-97.

[17] *See, e.g.*, R. Williams Decl. ¶ 1 (CRW, in Divisions 1, 9, 4, 8/RTU, and 6 since 2013); Ponce Decl. ¶¶ 1-2 (CO in Divisions 4, 10, 11, Receiving, and RTU since 2012); Green Decl. ¶ 1 (nurse in Divisions 2, 3-North, 10, and 11 since 2015); C. Lopez Decl. ¶ 1 (CO in Divisions 3, 8 and Cermak, the Kitchen, and Receiving since 2012).

[18] *See, e.g.,* McCoy Decl. ¶ 2 (CO assigned to criminal courts detainee transportation team, transporting detainees from their divisions to and from court); Simon-Hall Decl. ¶ 2 (CO assigned to movement team, transporting detainees from their divisions to and from the bridge); Hill-Shumpert Decl. ¶ 2 (CO was assigned to Receiving, transported detainees from their divisions to and from Receiving).

Courthouse to the bridge and work in locations other than their assignments.[19] Medical and mental health personnel also work all over the Complex. In housing divisions, they distribute medication, provide routine care, and respond to emergencies.[20] They enter onto housing tiers, work in clinics ("dispensaries") in housing divisions, conduct assessments in the intake unit, and deliver medical and mental health services to inmates housed in Cermak and the RTU.[21] Class Members also work overtime and special assignments in divisions other than their routine assignments.[22]

Plaintiffs' and Class Members' positions do not entail policymaking.[23] All are subject to relevant CCSO and County policies developed by persons above them in the hierarchy.

**B.     The Pervasive Sexual Harassment Ranges from Verbal Sexual Abuse to Targeted Masturbation and Sexual Assault**

Inmate sexual harassment permeates the Jail, the Courthouse and Cermak. Female employees are subjected to it regardless of the division or department to which they are assigned or the position they hold. As demonstrated by the deposition testimony of Plaintiffs, the 142 declarations submitted by Class Members, and analysis of Defendants' own records, Plaintiffs have documented that **at least 500 unique Class Members** have been subjected to sexual harassment.[24] Plaintiffs' expert Dr. Kathleen Lundquist and Defendants' expert Dr. Benjamin Wilner, identified **between 1745 and 2200 written complaints** of sexual harassment between

---

[19] *See* Correa Decl. ¶¶ 1-2; Herrera Decl. ¶¶ 1-2; Mlinarcik Decl. ¶ 3; Nelson Decl. ¶¶ 2-3; P. Scott Decl. ¶¶ 1-2; Shields Decl. ¶ 1; Trejo Decl. ¶ 1.

[20] *See, e.g.* B. Taylor Decl. ¶¶ 1-2; Lanier Decl. ¶¶ 1-2.

[21] *See* D. Thomas Decl. ¶¶ 1-2; Neylon Decl. ¶¶ 1-2; McBride Decl. ¶¶ 1-2.

[22] *See, e.g.,* Anderson Decl. ¶ 2; Lanier Decl. ¶ 2; Mercherson Decl. ¶ 1; Braxton Decl. ¶ 2; Healy Decl. ¶1.

[23] Individuals with policy-making authority are not part of the Class. *See* Third Consolidated Compl. (Dkt. No. 143) ¶ 68 and Exhibit A to same. *See also*, Ex 6, Curry Dep. 81:5-20.

[24] *See generally,* Ex. 1, Group Declaration Exhibit.

January 2015 and September 2018.[25] Plaintiffs' expert Louise Fitzgerald, who specializes in the study of sexual harassment and workplace mistreatment, described the Complex as "the most sexually toxic work environment I have encountered in over 30 years of research and practice."[26]

### 1. Every day inmates direct gender-based epithets, sexual comments and threats, and lewd sexual gestures at Plaintiffs and Class Members

On a daily basis, inmates degrade female employees with sexual threats and comments, gender-based epithets, remarks about their appearance, and lewd sexual gestures.[27] Inmates address Class Members with slurs like "bitch," "ho," and "cunt."[28] They subject female employees to sexual propositions and comments about their bodies and physical appearance, such as: "You're nice and thick," "Betty Big Boobs," "big sexy ass," and "Look at that pregnant bitch! You know what they say about pregnant pussy, it's real good!"[29]

Inmates make graphic and violent sexual threats, often while masturbating, such as: "I want to suck your pussy," "I'm gonna fuck the shit out of you," "I'm going to fuck you," "Put my dick

---

[25] Ex. 20, Expert Rebuttal Report of Kathleen Lundquist, Ph.D. ("Lundquist Rep."), April 12, 2019 at ¶ 7; Ex. 24, Expert Report of Benjamin S. Wilner, Ph.D., March 7, 2019, ("Wilner Rep.") at Exhibit 3.

[26] Ex. 22, Expert Report of Louise F. Fitzgerald, Ph.D ("Fitzgerald Rep."), Feb. 4, 2019, at 8.

[27] *See, e.g.,* McCoy Decl. ¶ 4 ("The sexual harassment by detainees happens every day … I walk past different male detainees all day. Every time I walk past [one] I hear things like, "God damn, look at that big ass" and other comments, like calling me a "hoe" or a "bitch."); Ponce Decl. ¶ 4 ("Every day, inmates catcall me and make comments about my appearance and my body"); C. Muhammad Decl. ¶ 3 ("Inmates [make] sexual comments toward me on a daily basis, including threats about how they want to sexually assault me."); Myart Decl. ¶¶ 3, 10 ("[Inmates make] crude or sexual comments on a daily basis, including regular comments about my appearance and how they want to sexually assault me, now and after they are released," "You know you want some of this," and "I'm going to find you and give you what you need'"); Bowen Decl. ¶¶ 3, 8 (daily comments like, "I'm gonna fuck the shit out of you," "Look at this dick," and "Just wait and let me cum"); Taylor Decl. ¶¶ 3, 8 (daily comments like, "I want to suck your pussy," and, "Let me lick your ass"); J. Brown Decl. ¶ 10 ("The vulgar comments are part of my daily routine").

[28] *See, e.g.,* Ex. 39, Wilson Dep. 162:5-18, 167:17-20 (Detainee exposed his penis and said, "'Bitch, just put a cracker on it and eat it.'"); Ex. 9, Burroughs Dep. 148-50, 293-94 (cunt, bitch); Correa Decl. ¶ 7 (bitch, cunt, whore); C. Muhammad Decl. ¶ 4 (bitch, whore, cunt).

[29] L. Anderson Decl. ¶ 4; Insley Decl. ¶ 11; D. Thomas Decl. ¶ 10; Henderson Decl. ¶ 12.

in your ass," "I'm going to find you and give you what you need," "I'll bend you over and fuck the shit out of you with your fat ass," "I could rip that ass open," "I hope you get fucked up the ass, I hope this bus flips and you fucking die and someone rapes your dead body," "I'd like to rape you in your mouth," and "I will rape you."[30] Inmates also direct lewd sexual gestures at female employees, for example, making licking motions with their tongues, simulating oral sex, and hand movements near or on their genitals, to mimic masturbating.[31]

Plaintiffs have documented hundreds of incidents of incessant and vulgar verbal harassment directed at Class Members.[32] This evidence likely illustrates just a fraction of the daily verbal harassment and assaults directed at women. Most verbal harassment was not reported because Defendants' policies and institutional culture of tolerating inmate sexual harassment of female staff resulted in widespread underreporting of inmate sexual harassment, especially of the graphic and extreme verbal harassment.[33] All three Plaintiffs' experts believe verbal sexual harassment is prevalent and severely underreported.[34]

---

[30] S. Taylor Decl. ¶ 8; Bowen Decl. ¶ 8; Ellis Decl. ¶ 5; Myart Decl. ¶10; C. Lopez Decl. ¶ 10; Ex. 38, Plasencia Dep. 236: 13-14; Strickland Decl. ¶ 14; Cribbs Decl. ¶ 8. *See also,* Ex. 37, Ranney Dep. 238:12-241:10 (testifying to numerous sexual threats such as, "I'll fuck the shit out of you," "I'm going to fuck you in your ass," "I'm going to put my dick on you if you come in here," "I'll rape you and your kids," etc.); Insley Decl. ¶ 4 (Detainee "was physically confrontational and aggressive towards me while masturbating…every time I went [in the lockup] he threatened me.").

[31] *See, e.g.,* Hunter Decl. ¶8 (detainees "lick their tongue at me or make hand movements as if masturbating"); J. Brown Decl. ¶ 8 ("[T]he detainee was walking with his hands in the front of his pants, making hand gestures as if he was masturbating").

[32]*See generally,* Ex. 2 (Exhibit 2 provides a summary of evidence of verbal and physical sexual harassment incidents that have been documented in Defendants' incident reports, class member declarations, and Plaintiff testimony. The summary includes evidence of sexual harassment experienced by over 500 class members who are assigned to positions throughout the Complex.)

[33] *See infra* Section II.C.

[34] Ex. 18, Expert Report of Jeanne S. Woodford ("Woodford Rep."), February 1, 2019 at ¶ 36 ("severely underreported"); Ex. 20, Lundquist Rep. ¶ 25 ("many, possibly a huge majority" were not reported); Ex. 22, Fitzgerald Rep. 7-8 ( "profound under-estimate").

## 2. Inmates expose their genitals to, masturbate at, and sexually assault Plaintiffs and Class Members

In addition to vulgar sexual epithets, gestures, and threats, inmates, on a daily basis, expose their genitals to and masturbate at Plaintiffs and Class Members. Plaintiffs' expert counts 1,745 *reported* incidents of indecent exposure or masturbation from January 2015 to October 2018, in locations all over the Complex.[35]

On housing tiers, inmates masturbate through the food ports of their cell doors (the "chuckholes") and in the showers (positioning themselves intentionally in view of female staff) and dayrooms, often in coordination.[36] They thrust their penises at nurses delivering medication, laundry workers passing uniforms, and social workers collecting grievances.[37] They climb on tables to masturbate at female employees and masturbate at them in front of the officers' security "bubbles."[38] In 2014, two naked detainees chased Officer Sharon Robinson with their penises in their hands, while masturbating and yelling, "Come in here bitch…Come suck this dick and I'm

---

[35] Ex. 20, Lundquist Rep. 13; Ex 49, Plaintiffs 001477-1494.

[36] *See, e.g.,* Ray ¶ 8 (6-8 inmates simultaneously masturbating through chuckholes); Henderson Decl. ¶ 6, (social worker approaching an inmate's cell for signature and inmate stuck his penis out of the chuckhole and said "Grieve that, bitch!"); C. Muhammad Decl. ¶5 (two inmates masturbating out of their chuckholes, side by side, staring at correctional officer while she supervised the tier from the bubble, purposely in her line of vision, for an hour); Winter Decl. ¶4 (while doing the count on a night shift: "Once, I flashed the light into the cell and put my face near the chuckhole and the inmate had his penis in the chuckhole, two inches from my face"); Burge Decl. ¶ 7 (inmates would masturbate through chuckholes in Div. 6, almost always more than one at a time); Calvin Decl. ¶ 18 (every single detainee on the entire tier exposing themselves out of their chuckholes); McCord Decl. ¶ 6 (describing incident in 2015 when three inmates purposely masturbated at her from the shower) Healy Decl. ¶ 6, ("While I was waiting to distribute medicine, I would sit in the "bubble," an enclosed glass area between the tiers where the officers sit. Inmates who were in the day room would see me walk into the bubble, and then walk over to the glass and expose themselves—occasionally doing the 'helicopter,' i.e. twirling their penises around in a circular motion").

[37] *See also* Dunmars Decl. ¶ 4; Harms Decl. ¶ 6; Hunter Decl. ¶ 6.

[38] Ellis Decl. ¶ 7; Esquivel Decl. ¶ 8; Bryant Decl. ¶ 7; Harris Decl. ¶ 4; Healy Decl. ¶¶ 6, 8, 11, 13; Hill-Shumpert Decl. ¶ 5, 15.

going to fuck you."[39] In 2015, an inmate rushed at Officer Rita McCoy while she opened a tier door, began masturbating, and blocked her in.[40]

Outside housing tiers, inmates masturbate at female employees from the "bullpens" (group holding cells), in the tunnels, medical clinics, mental health offices, law libraries, visiting cages, and on buses used to transport them.[41] In 2017, Sergeant Latarsha Anderson was loading inmates onto a bus when one called her over to a nearby holding cell. When she arrived, five or six inmates were lined up, masturbating at her, and one ejaculated.[42] Approximately two years ago, Nurse Maxie Simon was dressing a detainee's wound that was right above his groin area. He pulled out his penis, slathered it with ointment, and began masturbating. She had to dress the wound while he had an erection.[43] Inmates masturbate at Mental Health Specialists in closet-sized offices with no panic buttons.[44]

Throughout Leighton, inmates masturbate at female Deputies, including Plaintiffs Jones, Plasencia, Wilson and Ranney, in the lockup areas behind the courtrooms and during transport within the building.[45] Until after this lawsuit was filed, Deputies were required to transport detainees between the bridge and courtroom lockups and were frequently subjected to multiple

---

[39] Ex. 21, Deposition of Sharon Robinson ("Robinson Dep") 97:24-99:25.
[40] McCoy Decl. ¶ 6.
[41] *See, e.g.,* Insley Decl. ¶¶ 4, 5; Herrera Decl. ¶ 4; Wright Decl. ¶ 9; McBride Decl. ¶ 4 (detainees masturbated in medical treatment rooms or lab); Bowie Decl. ¶ 9 (detainees masturbated in mental health clinic); Delegan Decl. ¶ 3 (detainees masturbated in law libraries); Champ Decl. ¶7-8 (detainees masturbated in visiting cage); Hatten Decl. (detainees masturbated on buses).
[42] Anderson Decl. ¶ 8.
[43] Simon Decl. ¶ 7.
[44] Bowie Decl. ¶¶ 9-10; Hogueisson Decl. ¶ 4; Jacobowski Decl. ¶ 9; Mercherson Decl. ¶¶ 5-6.
[45] *See* Ex. 23, Jones Dep. 111:15-112:4; Ex. 38, Plasencia Dep. 95:3-9; Ex. 39, Wilson Dep. 162:5-18; Ex. 37, Ranney Dep. 96:9-19.

inmates exposing themselves or masturbating.[46] Plaintiff Ranney had to transport a prisoner who began masturbating right next to her. When she arrived on the bridge minutes later, several inmates were masturbating right there.[47]

Exhibitionist group masturbation by inmates is common. Officer Sharon Taylor would encounter "as many as ten to fifteen detainees masturbating in the same bullpen at the same time." And, Officer Alexis Taylor recounted an incident where "[s]ix or more detainees were standing there with their penises in their hands and aggressively masturbating as I walked by."[48]

The brazen sexual harassment of female employees includes sexual assault. Inmates rub themselves against female employees, touch their breasts, and grab their rear ends.[49] In 2017, an inmate with a history of faking medical emergencies to expose himself to female medical staff faked a seizure. While ERT Shirley McBride placed him in a wheelchair, he rubbed his head against her breasts. Class Member Griggs testified, "[d]aily, inmates grab my butt and brush up against my breasts."[50] Inmates also ejaculate at and on female employees.[51] Lieutenant Hazel

---

[46] *See e.g.*, Jagielski Decl. ¶ 6; Ex. 37, Ranney Dep. 41:13-42:7; Nelson Decl. ¶ 3.

[47] Ex. 37, Ranney Dep. 75:3-20.

[48] S. Taylor Decl. ¶ 4; Cribbs Decl. ¶ 4; A. Taylor Decl. ¶ 7.

[49] B. Taylor Decl. ¶ 9 (detainee "rubbed up" against her backside); C. Brown Decl. ¶ 5 (detainee grabbed her hand); Spencer Decl. ¶ 7 (detainee groped her butt while she was dispensing medication in the interlock); ¶ 10 (every time she had to pass a group of detainees on the stairwell, one of them would touch her); Ex. 14, Howard Dep. 127:12-17; 139:12-140:14; Ex. 9, Burroughs Dep. 130:4-13; 132:20-133:2.

[50] Griggs Decl. ¶ 11.

[51] *See, e.g.,* Ex. 9, Burroughs Dep. 129:12-18, 261:6-262:1 (detainee ejaculated onto the glass in front of her); Garner Decl. ¶ 4 (same, and she had to move away to avoid being hit with semen); McClelland Decl. ¶ 5 (inmate ejaculated on the observation bubble window); Krzyzowski Decl. ¶ 8 (inmate masturbated and ejaculated in front of her); M. Brown Decl. ¶ 4 (inmate put his exposed penis up against the glass, masturbated, and ejaculated in front of her and other female employees); *see also*, Ex. 14, Howard Dep. 283:23-284: 7; Y. Wilson Decl. ¶ 8; Bowen Decl. ¶ 5; L. Anderson Decl. ¶ 8; B. Jones Decl. ¶ 6; Crump Decl. ¶15, 17; Nelson Decl. ¶ 4; Trejo Decl. ¶ 3; Hunter Decl. ¶ 6; Long Decl. ¶ 11; B. Taylor Decl. ¶ 15; Keys Decl. ¶ 8; Holmes-Miller Decl. ¶ 6.

Derden encountered three inmates masturbating at her simultaneously out of their chuckholes, and one of them ejaculated, projecting fluid at her. Nurse Patricia Dianne Green witnessed an inmate ejaculate on her female coworker's hands.[52]

C.    **Rates of Reported Sexual Misconduct Exceed Rates at Similar Facilities**

Detainee sexual misconduct occurs at a staggering frequency. Plaintiffs' expert, Dr. Kathleen Lundquist, identified 1,745 incidents in the CCSO data between January 2015 and September 2018.[53] CCSO's own statistician (who included incidents directed at the Assistant Public Defenders) identified more than 2,000 incidents in the same period.[54]

Sexual misconduct at the Complex exceeds that in California prisons, the only other correctional institutions with published data.[55] Plaintiffs' expert Jeanne Woodford used the data of CCSO's statistician to calculate that guilty determinations on sexual misconduct incidents in the Jail's "high security" Divisions 8, 9, and 10, were from 4.14 to 7.04 times greater than comparable California high security prisons, while the incident rate outside of the high security divisions was 4.17 times greater than California general population prisons. [56] The actual number of inmate sexual misconduct incidents is much higher than reported because Defendants' policies and practices have led to severe underreporting. CCSO precludes non-uniform staff – including two Plaintiffs and hundreds of Class Members employed as social workers, law librarians, and in

---

[52] Derden Decl. ¶ 7; Green Decl. ¶ 11.

[53] Ex. 20, Lundquist Rep. 7.

[54] Ex. 24, Wilner Rep. Exhibit 3; Ex. 20, Lundquist Rep. 7. To put this in perspective, the plaintiffs in *Berndt v. California Dept. of Corrections* complained of 2,000 documented incidents of masturbation in the *entire California prison system* from 1997 to 2010. *See* Case No. C03-3174 PJH (BZ), Dkt. 407 (Fifth Amended Complaint filed 1/31/11).

[55] Ex. 19, Expert Rebuttal Report of Jeanne Woodford (Corrected) April 30, 2019, ("Woodford Rebuttal Rep.") at 5-6; Ex. 41, April 26, 2019 Deposition of Benjamin Wilner ("Wilner Dep.") at 232:21-233:9.

[56] Ex. 19, Woodford Rebuttal Rep. 5-6.

healthcare positions – from reporting incidents in the Jail's reporting system that triggers discipline for inmates.[57] These women, who had to rely on sworn staff to submit incident reports, encountered various obstacles.[58] Plaintiffs' expert Woodford, whose experience spans decades, emphasized that it is "not customary or reasonable for a correctional facility to have no system for civilians to directly report inmate misconduct."[59] Deputies similarly had no access to CCOMS until November 2017, after Plaintiffs filed suit and until then had to hand write reports and ask their supervisors to process them.[60]

Moreover, many Class Members stopped reporting inmate sexual misconduct because of direct deterrence, misinformation, or their reasonable belief that reports would not result in meaningful consequences. Supervisors dismissed Class Members' complaints with statements like, "this is the job you took so you should accept it," and "[t]hat's why you get paid how much you get paid to work here."[61] Supervisors failed to follow through on filing reports, discouraged

---

[57] Ex. 26, January 14, 2019 Deposition of Amar Patel ("Patel Dep.") at 86:23-87:5, 103:13-104:11; Ex. 15, Freeman Dep. 116:16-117:12; Merriweather Decl. ¶ 10; Sangster Decl. ¶ 13; Kryzyzowski Decl. ¶ 9; D. Muhammad Decl. ¶ 12; Neylon Decl. ¶ 11; Smith Decl. ¶ 14.

[58] *See, e.g.,* G. Henderson Decl., ¶¶ 7, 11, 14 (describing incidents where male correctional officers either refused to write incident reports about masturbation or indecent exposure because they "did not see it," or their incident reports were incorrect); Ex. 15, Freeman Dep. 145:20-146:24 (Correctional Rehabilitation Worker testifying that officers claimed to have not seen anything when they were writing incident report for inmate indecent exposure, even though they were present); Bowie Decl. ¶ 3 (mental health specialist describing after detainee made "extremely sexualized threats of harm" and shouted he was going to "fuck" her, officers just stood there, and despite reporting the behavior to a lieutenant, receiving no indication he wrote a report).

[59] Ex. 19, Woodford Rebuttal Rep. 16.

[60] Ex. 30, Wilensky Dep. 175:3-21; Ex. 26, Patel Dep. 86:23-88:12, 102:9-103:12.

[61] Pitts-Doss Decl. ¶ 11; Bertrand (Pryor) Decl. ¶ 13. *See also* Muhammad Decl., ¶ 9 (supervisors have asked "if I provoked" detainees' sexual behavior); Hill-Shumpert Decl.¶ 13 (superintendent said that inmates were men and asked her what she expected).

Class Members from filing reports, or refused to sign off on reports altogether.[62] They instructed officers that an inmate could not be written up for indecent exposure if his penis was not visible on security camera footage or if he was masturbating in his cell, even if he was purposely masturbating at a female employee.[63] Other victims were accused of provoking the harassment.[64]

## D.     All Class Members Are Subjected to Inmate Sexual Harassment

### 1.  Direct harassment occurs throughout the Complex and to Plaintiffs and Class Members in all types of jobs

Although the frequency may vary, Class Members who work in all parts of the Complex are subjected to verbal sexual harassment, indecent exposure, and masturbation.[65] Even when assigned to divisions which house females, Class Members encounter and are harassed by male

---

[62] *See* Ex. 14, Howard Dep. 238:19-241:25 (supervisors discouraged her from writing incident reports); Ex. 17, Altman Dep. 135:25-136:13, 138: 20-139:3, 142 (supervisors challenged her claims that inmates masturbated at her and questioned whether she could "prove" it and said they would not sign off on her reports); Ex. 16, Hobbs Dep. 162: 18-163:18 (several superiors discouraged her from filing disciplinary reports); Macklin Decl. ¶ 9 (supervisors have told her 'There's nothing we can do…It's part of the job.")

[63] *See, e.g.,* Sangster Decl. ¶ 8 (was told she could not write up an inmate for exposure because his penis was not visible in the video); Correa Decl. ¶ 10, (told could not write incident report because the detainee masturbated out of the view of the security camera); T. Brown Decl., ¶ 7 (heard she could not write up inmates for masturbating in their cells because "They're allowed to do that in their living units."); Ray Decl. ¶ 15 (told inmates can masturbation at her cell because it is his "private living area.").

[64]*See, e.g.* Bertrand Decl. ¶ 11, ("I recall hearing male officers making comments like, 'Well, she had those tight pants on…' … There was a lot of victim blaming."); T. Anderson Decl. ¶ 18 (supervisor told her she acts like she's never seen a dick before and to "stop being so sensitive"); C. Brown Decl. ¶ 12 (was told by her supervisor "you're a woman. That's what they like.")

[65] Ex. 2. *See also, e.g.,* L. Anderson Decl. ¶ 12, (in Division 11, detainee pulled his penis out and stuck it out of the chuckhole and said, "Come here, Sarge."); McCoy Decl. ¶ 11, (in the tunnel, detainee in holding cell pulled down his green jumpsuit and masturbated); Winter Decl. ¶¶ 7-9 (officer working in Central Kitchen describing inmate workers masturbating in the Kitchen and seeing inmate from Division 6 with his penis exposed in the tunnel); Myart Decl. ¶ 21 (describing bidding out of Receiving because of harassment, but continuing to experience it in External Operations); Henderson Decl. ¶ 5, (inmates masturbated at her weekly in Division 6 and monthly in Division 2); Collazo Decl. ¶ 5 (describing weekly masturbation incidents in the Division 11 dispensary).

inmates regularly, including during their movements throughout the Jail.[66] The harassment occurs throughout the Jail and Courthouse, including such areas as dayrooms, medical dispensaries, transport tunnels, 'bullpens' and even the law library. Inmates masturbate on the transport buses and in the Emergency Room, in the courtyard, and on the recreation cage patio, singly and in groups; they masturbate in the Central Kitchen, on the bridge, and in Receiving.[67]

Further, Class Members in all types of jobs are sexually harassed. For instance, inmates masturbated at: Nurse Shonnita Lanier every day as she dispensed medicine in the tiers of Division 8 while male officers laughed and shook their heads; Mental Health Specialist Alishia Mercherson when she did rounds throughout the Jail and Cermak; Plaintiff Burroughs, a CMT, on housing tiers and in clinics and tunnels; and Plaintiff Freeman, a CRW, on tiers while she collected inmate grievances.[68] Officer Jacqueline Brown in External Operations has experienced inmates masturbating in the Jail courtyard as she goes in and out of the office and when she's been assigned to guard them at Stroger Hospital.[69] Correctional Medical Technician Lorna Spencer described that, repeatedly, as she arrived on the tier, detainees would line up naked in the shower area, look at her, and masturbate.[70] Officer Catrina Brown, who works in Central Kitchen, encounters

---

[66] *See, e.g.*, Henderson Decl. ¶¶ 3-4, ("Even when I was assigned to Division 3 (which was all women at the time), my office was still in Division 2" and she was harassed as she walked past male inmates); Altman Dep. 134-36 (although she was primarily assigned to female tiers in Division 8, a medical building that houses both male and female inmates, she was subjected to indecent exposure and masturbation by male inmates);

[67] *See supra*, Section II.B.2.

[68] Lanier Decl. ¶ 4; Mercherson Decl. ¶ 1-4; McClelland Decl. ¶ 9; Ex. 9, Burroughs Dep. 52: 19-22, 112-13, 129-30, 142-43, 145, 157, 190; Ex. 15, Freeman Dep. 122:22-123:4

[69] J. Brown (CO) Decl. ¶ 4, 7-11.

[70] Spencer Decl. ¶ 5.

inmates exposing themselves to her at the gate of the kitchen, in the kitchen itself, and as she uses the tunnels to deliver food.[71]

### 2. All Class Members are also subject to ambient harassment

Sexually threatening and degrading harassment happens throughout the Complex across job types and other demographics.[72] The atmosphere is so toxic that all Class Members experience ambient harassment. As Plaintiffs' expert Dr. Fitzgerald explains, ambient harassment "refers to the experience of working in an environment permeated with sexually offensive and degrading behavior, that is a highly sexualized atmosphere in which crude and offensive sexual behavior is common and employees see that it is normative, whether specifically directed at them or not." Its impact is akin to "second hand smoke" and leads to "bystander stress," the "negative job-related, psychological, and health-related consequences that result from witnessing or hearing about sexually offensive experiences of other women in one's work environment."[73] Dr. Fitzgerald's review of Class Member accounts has led her to conclude that ambient harassment is "omnipresent," through the Class, and "affect[s] even those who have not been exposed directly. . .to the extent that any such women exist. . .and compound[s] the distress of those who have."[74]

---

[71] C. Brown Decl. ¶¶ 4-6; Y. Wilson Decl. ¶¶ 4-5, 10

[72] *See, e.g.*, *supra* Sections II.B.-D.; Myart Decl. ¶ 8 ("Everyone I work with has had to deal with male detainees masturbating and exposing their penises"); Thomas-Carter Decl. ¶ 5 (the harassment "happens to women across the Jail regardless of their appearance, age or body type," making her feel "like all of us constantly are at risk").

[73] Ex. 22, Fitzgerald Rep. at 5-6;.*Id.* at 6, 23.

[74] *Id.* at 8.

## E. Defendants Were Aware of the Widespread Sexual Harassment

Since at least 2015, Defendants have been aware of the extraordinarily high levels of detainee sexual harassment toward female staff at the Complex.[75] Between January of 2015 and October of 2018, CCSO's own data from formal incident reports in CCOMS reflects between 1,750 to more than 2,000 incidents of sexual misconduct directed at Defendants' female staff.[76] Every incident report was reviewed and approved by supervisors and reported to senior staff.[77] An internal analysis created by CCSO showed there were 881 incidents of indecent exposure and masturbation in the Jail and 205 incidents in the Courthouse – a combined 1,086 reported incidents during a 22-month period in 2016-2017.[78] CCSO also was aware—or should have been aware—that these numbers underrepresented the true number of incidents. *See supra* Section II.C. [79]

CCSO acknowledged a dramatic increase in the number of incidents of detainee sexual misconduct toward staff as early as 2015.[80] From 2015 to 2017, senior leadership, including Curry, Chief of Operations Jeff Johnson, and Director of Operations Tarry Williams, met regularly to discuss the increasing number of incidents of detainee indecent exposure and masturbation.[81] CCSO also was aware that there was a "pervasive" masturbation and indecent exposure problem

---

[75] Ex. 6, Curry Dep. 45:19-23; Ex. 47 Declaration of Michael Holmes, Former First Assistant Executive Director ("Holmes Decl.") at ¶¶ 6-11.

[76] Ex. 41, Wilner Dep. Exhibit 7, 137:3-6; Ex. 20, Lundquist Rep. ¶ 16, Table 1.

[77] *See* Calvin Decl. ¶ 11; Ex. 35 CCSO_Howard_0000911-26; Ex. 10 CCSO_Howard_0001676-77, 1690-91.

[78] Ex. 28, CCSO_Howard_0145831-38 at Table 2.

[79] Teamster's Local 700 also alerted CCSO in June 2016 that "the reporting of these incidents is being suppressed. Officers are discouraged from writing incident, officer battery, and/or inmate disciplinary reports on these occurrences. The supervising personnel, after being made aware, deter the officers from writing the reports and/or declines to assess digitally written reports so that the reports remain in the digital system as incomplete." Ex. 25, June 23, 2016 Teamsters Local 700 OSHA Notice.

[80] Ex. 6, Curry Dep. 44:14-45:23.

[81] *Id.* at 42:20-43:8; Ex. 47, Holmes Decl. ¶¶ 10, 11.

in the Courthouse between 2015 and 2017.[82] Curry noted, in contrast, that sexual misconduct was *not* a problem at other correctional institutions where he had previously worked, for more than 25 years.[83]

Jail supervisors, including superintendents, assistant directors, directors, and even Executive Director Jones, witnessed sexual harassment.[84] First Assistant Executive Director Michael Holmes reviewed video footage of masturbation and indecent exposure directed at female staff on a daily basis.[85]

Teamster Local 700 (representing the Correctional Officers) also alerted management, by complaining on November 12, 2015, about 118 recent masturbation incident reports.[86] Then in June 2016, the Local filed an Illinois OSHA complaint describing that "detainees are sexually harassing female officers by way of explicit verbal sexual propositions, exposing their genitalia, masturbating in close proximity up to and including ejaculation"; and, "Union Representatives have presented concerns and express notifications of these issues to administration on multiple occasions and in multiple forums, but have been met with a steadfast refusal to implement any remedial measures for officer safety."[87]

## F. Defendants Maintained Complex-Wide Policies and Practices That Enabled the Sexual Harassment and Can Be Addressed Through a Complex-Wide Injunction

Defendants' failed practices are responsible for the pervasive sexual harassment of Plaintiffs and Class Members. Former First Assistant Executive Director Michael Holmes

---

[82] Ex. 6, Curry Dep. 83:10-84:6.
[83] *See Id.* at 15:17-20 (characterizing it as "very, very, very sporadic…").
[84] *See e.g.*, K. Black Decl. ¶ 16; T. Anderson Decl. ¶ 13; Hill-Shumpert Decl. ¶¶ 14-15.
[85] Ex. 47, Holmes Decl. ¶ 8.
[86] Ex. 8, CCSO_Howard_0252791-795.
[87] Ex. 25, June 23, 2016 Teamsters Local 700 OSHA Notice, Pl 00751-54.

explained that, despite the dramatic rise in masturbation incidents, senior administrators failed to take the problem "seriously" and "[a]s a result, no effective measures were implemented to stop it."[88] Well-managed correctional facilities take measures to minimize inmate sexual misconduct.[89] As Dr. Fitzgerald has emphasized, "an organization with strong management norms and an organizational climate that does not tolerate sexual harassment can inhibit harassment, even on the part of those who would otherwise do so."[90]

### 1. CCSO failed to adopt reasonable measures throughout the Complex to reduce harassment that have been effective at other institutions or are common- sense solutions to rampant sexual harassment

CCSO acknowledges that data reflecting a "significant number" of sexual misconduct incidents in 2015 warranted "a systematic response."[91] It further acknowledged that neither a Consent Decree with the Department of Justice (governing various aspects of Jail operations) nor budgetary issues constrained it from implementing remedial steps to address the problem.[92] Nevertheless, CCSO failed to adopt measures reasonably calculated to curtail harassment, including measures proven to be effective at other institutions.[93] The basic remedial measures ordered in the Court's November 28, 2017 Preliminary Injunction (Dkt. No.15), (*e.g.* behind the back handcuffing, use of a transport team for known masturbators) reduced sexual misconduct incidents *30%* from 2017 to 2018. [94]

---

[88] Ex. 47, Holmes Decl. ¶¶6-8; 11.
[89] *See generally,* Ex. 18, Woodford Rebuttal Rep.
[90] Ex. 22, Fitzgerald Rep. 9.
[91] Ex. 6, Curry Dep. 87:4-93:24; *see also* Ex. 45, CCSO_Howard_0329174-176, Memorandum, October 26, 2017 (public indecency incidents "are growing" and "occurring almost anywhere in the jail" and in the Courthouse).
[92] Ex. 6, Curry Dep. 29:3-11, 33:2-35:17.
[93] Ex. 18, Woodford Rep. ¶ 13.b.
[94] Ex. 6, Curry Dep. 129:8-133:8; Ex. 41, Wilner Dep. Exhibit 7 (demonstrating reductions of incidents post-injunction).

In addition to other failed policies and practices, CCSO failed to implement the following remedial measures, or did so only after Plaintiffs filed this lawsuit:

(a) CCSO had no formal policy with an institutional response to detainee sexual misconduct until the November 2017 directive implementing the Preliminary Injunction.[95]

(b) Except for the limited measures in the above directive, CCSO has no emergency response or other protocol for responding to inmate sexual misconduct.[96]

(c) CCSO has never trained employees on how to respond to inmate sexual harassment, decrease opportunities for inmates to repeat the behavior, or respond to attempted assaults.[97]

(d) CCSO does not have a zero-tolerance policy against inmate sexual harassment. Plaintiffs and Class Members are told sexual harassment by inmates is part of their jobs, and that cells are inmates' "private domains." *See, supra*, Section II.C.[98]

(e) CCSO fails to provide adequate orientation to inmates entering the Jail regarding behavioral expectations.[99]

(f) CCSO has no alarm system. Meeting spaces, even tiny ones, do not have panic buttons. Other than yelling for help, civilian staff have no means to call for assistance—not even whistles.[100]

(g) CCSO failed to implement effective restraint systems for movement and in response to exposure and masturbation until 2017.[101]

---

[95] Ex. 6, Curry Dep 262:12-263:3; *see* Ex. 29, Policy 166, CCSO_Howard_0097010-012.

[96] Ex. 18, Woodford Rep. ¶ 97.

[97] Ex. 6, Curry Dep. 263:4-265:22; *see generally* Ex. 1, Group Declaration Exhibit.

[98] Cara Smith, CCSO policy director publicly stated that masturbation and indecent exposure to female staff "is something that happens in custodial environments, period." *See* https://chicago.suntimes.com/chicago-politics/cook-county-inmates-masturbating-publicdefenders.

[99] Ex. 18, Woodford Rep. ¶¶ 85-86.

[100] *Id.* at ¶¶ 94-97; *see also* Bertrand Decl. ¶ 16; Braxton Decl. ¶ 10; Hogueisson Decl. ¶ 4; Hunter Decl. ¶ 7.

[101] Ex. 3, Curry Decl. ¶¶ 17, 18.

(h) CCSO fails to use modesty screens or panels in the showers and toilets, despite the prevalence of exposure and masturbation in these locations and their being *required* by the Prison Rape Elimination Act.[102]

(i) CCSO has used tinted/one-way windows in limited areas only, despite their effectiveness in deterring indecent exposure and masturbation.[103]

(j) CCSO has failed to secure chuckholes to prevent detainees from inserting their penises through them and masturbating and ejaculating at female employees.[104]

Finally, as early as 2015, CCSO knew that other institutions had implemented specially designed exposure control uniforms and hand mitts to combat masturbation and indecent exposure.[105] But, rather than invest in products proven to be effective, CCSO elected to use its in-house seamstress to modify existing jumpsuits.[106] These modified jumpsuits were ineffective because: (a) detainees rip the jumpsuits to expose themselves; (b) the front Velcro closures easily open; (c) detainees wear the jumpsuits open down to their crotches and can access their penises; (d) CCSO failed to consistently enforce the requirement to wear them; and (e) there were not enough jumpsuits for all detainees supposed to wear them.[107] Only in 2018 did CCSO even begin

---

[102] Ex. 18. Woodford Rep. ¶ 100; Ex. 32, Frasier Rep. 22 (acknowledging PREA non-compliance). Frasier also admitted that a) the work conditions at the jail and Courthouse constituted a sexually hostile work environment, and b) that such work conditions were not part of the job or something female employees had to endure simply because they chose to work in a correctional setting. April 23, 2019 Deposition of Margo Frasier ("Frasier Dep.") at 149:2-13, 207:3-17.

[103] Ex. 6, Curry Dep. 231:24-236:15, 239:17-240:13.

[104] *Id.* at 238:5-39:16.

[105] Ex. 31, CCSO_Howard_0251470-471; Ex. 6, Curry Dep. 186:10-188:14, 195:13-196:2.

[106] *See* Ex. 47, Holmes Decl. ¶¶ 23-24.

[107] Ex. 18, Woodford Rep. ¶¶ 80, 89, 90; Ex. 47, Holmes Decl. ¶¶ 25; *See also, e.g.,* Ex. 21, Robinson Dep. 168:6-169:2; Winter Decl. ¶ 8, Pl. (describing inmate wearing green jumpsuit, unsnapped all the way down the front, with his penis exposed and masturbating, and the male officer escorting him laughing); Correa Decl. ¶¶ 12-13 (detainees who share a cell with a non-green jumpsuit detainee will switch jumpsuits with their cellmate): Trejo Decl. ¶ 14 ("The Velcro closure on the green jumpsuits does not stay closed … Sometimes detainees have a hole in their . . . crotch area, which they use to remove their penises.").

acquisitions for effective exposure control jumpsuits; in contrast, California correctional systems have been using such jumpsuits since *2007*.[108]

## 2. CCSO's Disciplinary System Fails to Appropriately Punish or Deter Sexual Harassment by Inmates

CCSO has a centralized disciplinary system that governs inmate misconduct across the Complex. The disciplinary code defines and classifies offenses and establishes disciplinary procedures.[109] Code infractions, wherever they occur, are adjudicated pursuant to the same procedures. Since at least 2015, CCSO has used individual hearing officers instead of a hearing committee.[110] The hearing officers report to the Director of Inmate Discipline, currently Steven Wilensky.[111] This centralized hearing unit administers all inmate discipline.[112] CCSO's disciplinary system does not impose consistent or effective discipline on inmates who sexually harass staff.[113]

### a. CCSO Permitted Sexual Misconduct Complaints to Expire, Allowing Inmates to Avoid Consequences

To initiate discipline, sworn staff file an incident report, triggering a disciplinary ticket. That report must be filed within 72 hours of the incident and a hearing held within eight days.[114] Failure to timely serve written notification on the detainee or to conduct the hearing results in the

---

[108] Ex. 6, Curry Dep. 186:10-211:1; Ex. 18, Woodford Rep. ¶¶ 92-93.

[109] *See, e.g.* Ex. 36, CCSO_Howard_0078551-556; Ex. 51, CCSO_Howard_0281113-119, Inmate Disciplinary Codes.

[110] Ex. 52, CCSO_Howard_0000909-910.

[111] Ex. 30, January 9, 2019 Deposition of Steven Wilensky (Wilensky Dep.) at 15:18-16:4. Prior to that, CCSO used a disciplinary hearing team comprised of dedicated lieutenants and civilian staff. Ex. 34, Burke Dep. 24:16-25:10.

[112] Ex. 46, CCSO_Howard_0281586-588; Ex. 4, CCSO_Howard_0064470-474, Policy 704.

[113] *See* Ex. 18, Woodford Rep. ¶¶45-82.

[114] 730 ILCS § 130/3.1; Ex. 30, Wilensky Dep. 115:8-22.

expiration of the ticket and bars imposition of any discipline.[115] Defendants' expert calculates that between January 2015 and August 2016, 28% of sexual misconduct incidents were allowed to expire, while an internal CCSO analysis showed that the expiration rate was 24% between January 2016 and October 2017.[116] After CCSO initiated a system-wide change to the disciplinary process (which was not fully implemented until 2018), the expiration rate for sexual misconduct incidents improved to 9%.[117]  In addition to the problem with expiring tickets, when discipline was issued, it was not implemented because CCSO failed to create sufficient disciplinary housing. At one point, there was a 200-inmate waiting list to enter disciplinary housing.[118]

### b. The Directors of Discipline and Their Staff Lack Corrections Background

Individuals in charge of discipline were untrained and inexperienced. Steve Wilensky, Director of Discipline beginning in September 2016, had no corrections background and received no formal training.[119] His supervisor, Mathew Burke, Chief of Staff from June of 2014 to July of 2018, also had no corrections discipline background.[120] None of the hearing officers reporting to Wilensky or Burke have been formally trained.[121] Due to this lack of experience or training, hearing officers failed to properly adjudicate tickets or decide effective sanctions--one threw out a ticket filed on behalf of medical staff as "hearsay."[122] Wilensky found an inmate not guilty of masturbation based on a "gut feeling" that he was not masturbating, despite the sworn statement

---

[115] *Id.* at 46:8-47:8.
[116] Ex. 41, Wilner Rep. 15-16; Ex. 28, CCSO_Howard_0145831 at Table 2.
[117] Ex. 41, Wilner Rep. 15-16.
[118] Ex. 47, Holmes Decl. ¶¶18-19.
[119] Ex. 30, Wilensky Dep. 8:22-11:7, 14:20-15:17, 209:8-17.
[120] Ex. 34, Burke Dep. 9:15-17:11.
[121] Ex. 30, Wilensky Dep. 112:11-114:12.
[122] Ex. 19, Woodford Rebuttal Rep. 20.

of the officer.[123] Uniformed staff at the level of lieutenant or higher, who understand detainee behavior, must participate in the disciplinary process for it to function properly.[124]

### c. Hearing Officers Fail to Impose Progressive Discipline

Despite written policies providing for progressive discipline of repeat perpetrators, CCSO's data and documents reflect a widespread failure to impose more severe sanctions for repeat offenses. A significant number of inmates have been issued multiple disciplinary tickets for masturbating at female staff with no increased sanctions.[125] CCSO's disciplinary data shows inmates with up to 30 or more documented incidents.[126] "When a prior sanction was ineffective in changing the inmate's behavior, there is no reason to believe that the same or a lesser sanction will be effective."[127]

### d. CCSO downgraded sanctions for masturbation, indecent exposure and sex harassment

The explosion in sexual misconduct coincided with CCSO's decision to downgrade the coinciding offenses. Under the November 2011 code, Indecent Exposure, Sexual Harassment, and Masturbation were all punishable by 25 to 60 days in disciplinary segregation and additional sanctions.[128] But in December 2013, CCSO reduced the sanctions for indecent exposure and sexual harassment to 5 to 15 days in segregation and for masturbation to 5 to 25 days. CCSO's 30(b)(6) witness on inmate discipline could not explain why CCSO reduced the sanctions available for sexual offenses.[129]

---

[123] Ex. 30, Wilensky Dep. 226:8-228:10.
[124] Ex. 19, Woodford Rebuttal Rep. 20.
[125] Ex. 18, Woodford Rep. ¶ 73-76
[126] Ex. 48, Charles Decl. ¶ 4; Ex. 19, Woodford Rebuttal Rep. 12.
[127] Ex. 18, Woodford Rep. ¶ 73.
[128] Ex. 34, Burke Dep. 18:1-21:20; Ex. 50, CCSO_Howard_0000930-933.
[129] Ex. 34, Burke Dep. 18:1-21:20; Ex. 36 CCSO_Howard_0078544-550, 545-546, 550.

### e. The CCSO Failed to Arrest Detainees for Criminal Indecent Exposure

If CCSO does not arrest detainees for indecent exposure, they cannot be charged and prosecuted. In Illinois, this conduct constitutes a Class A Misdemeanor of Public Indecency; a third conviction will be punished as a Class 4 Felony. 720 ILCS 5/11-30. On a first or second offense, the individual can be fined up to $2,500 and sentenced to a year in prison. 730 ILCS 5/5-4.5-55; 730 ILCS 5/5-4.5-45. But, when Jail inmates commit the crime of public indecency, they are rarely arrested and prosecuted.[130]

### f. Cook County Failed to Take Steps Reasonably Calculated to Protect Its Employees and Acquiesced in CCSO's Inadequate Measures

Cook County has failed to protect both its own employees and CCSO employees in its capacity as overseer and administrator of the CCSO.[131] The County was aware of the pervasive sexual harassment at the Complex but took no meaningful steps to curtail it. It routinely failed to act on complaints filed by Cermak employees through the limited channels that were available to them.[132] MHS Mercherson's supervisors told her *not to document* incidents of sexual misconduct by repeat masturbators in Cook County's system because "the issue was known."[133] Ms. Mercherson's manager, Dr. Gomez, told her and other Cermak employees during a meeting, "[Y]ou make good money because you're being subjected to this" and "get another job if you don't like it here."[134] The County simply washed its hands of the problem leaving it to CCSO.

---

[130] Ex. 6, Curry Dep. 244:4-246:19; Ex. 27, CCSO_Howard_0281582-583 (Curry Dep. Exhibit 30).

[131] *See* https://www.cookcountyil.gov/agency/bureau-human-resources-0, (last visited April 2019), The Cook County website states: "Courts – Cook County oversees one of the nation's largest unified criminal and civil justice system, and administers the largest single jail site in the country."

[132] *See e.g.,* Polo Decl. ¶ 17-19; Ex. 9, Burroughs Dep. 111:7-117:19; Bowie Decl. ¶ 22.

[133] Mercherson Decl. ¶¶12-13. *See also* Taylor Decl. ¶ 18 (for a while, her supervisor would not let her document incidents in EMERS because it would go on the detainee's medical record).

[134] Mercherson Decl. ¶12.

### III.  ARGUMENT

Plaintiffs seek to represent a Class of all women who have been employed by the CCSO at the Jail or as Court Services deputies at the Courthouse, or by the County in positions with Cermak Health Services, at any time since April 23, 2015, excluding women who held the high-level positions identified in Exhibit A to the Complaint, during the time they held any such position. To proceed on behalf of the Class, the Plaintiffs must first satisfy the four prerequisites of Rule 23(a): numerosity; commonality; typicality; and adequacy of representation. *Brand v. Comcast Corp.*, 302 F.R.D. 201, 216 (N.D. Ill. 2014) (citing Fed. R. Civ. P. 23(a)(1)-(4)). Plaintiffs seek certification under Rule 23(b)(3), which requires that "the common questions predominate and class treatment is superior," or alternatively, under Rule 23(c)(4). *Id.* Plaintiffs meet all the relevant requirements of Rules 23(a), (b), and (c).

**A.     The Proposed Class Is Ascertainable**

As a threshold matter, "the members of a proposed class must be ascertainable, which means that the class must be 'defined clearly and based on objective criteria.'" *Mullen v. GLV, Inc.*, No. 18 C 1465, 2019 U.S. Dist. LEXIS 9034, at \*4-5 (N.D. Ill. Jan. 18, 2019) (quoting *Mullins v. Direct Dig., LLC*, 795 F.3d 654, 659 (7th Cir. 2015)). The Class definition meets these criteria. It consists only of objective facts such as gender, the relevant time period, and job titles excluded from the Class. It therefore satisfies the ascertainability requirement.

**B.     The Proposed Class Satisfies the Requirements of Rule 23(a)**

**1.     The Proposed Class Satisfies the Numerosity Requirement**

The Class contains almost 2,000 members, easily satisfying the numerosity requirement. This Court recently explained that "'[a]lthough there is no 'magic number' of class members for numerosity purposes, when a class numbers at least 40, joinder will be considered impracticable.'" *Mullen*, 2019 U.S. Dist. LEXIS 9034, at \*4-5 (quoting *Hale v. AFNI, Inc.*, 264 F.R.D. 402, 404

(N.D. Ill. 2009)). The number of class members here makes joinder "highly impracticable." *Healy v. IBEW, Local Union No. 134*, 296 F.R.D. 587 592-93 (N.D. Ill. 2013).

### 2.      The Proposed Class Satisfies the Commonality Requirement

To show commonality after the Supreme Court's decision in *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011), plaintiffs must raise "'a common contention that is capable of classwide resolution'" and "show that 'determination of [the contention's] truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Brand*, 302 F.R.D. at 217 (quoting *Wal-Mart*, 564 U.S. at 350)). "'Even a single [common] question' will do." *Wal-Mart*, 564 U.S. at 359 (internal citation omitted). The question must be capable of a common resolution. *Id.* at 350; *see Van v. Ford Motor Co.*, No. 14-cv-8708, 2018 U.S. Dist. LEXIS 166755, at *24 (N.D. Ill. Sep. 27, 2018) ("'[i]f the same evidence will suffice for each member to make a prima facie showing, then it becomes a common question'") (quoting *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 815 (7th Cir. 2012)). To satisfy the common answer criterion if there are multiple employment decisions, plaintiffs must identify "'some glue holding the alleged reasons for all those [employment] decisions together.'" *Brand*, 302 F.R.D. at 217 (quoting *Wal-Mart*, 564 U.S. at 352)).

The glue in a hostile environment case typically comes from common proof of one or more of the elements of such a claim:

> A hostile work environment may be experienced differently from one person to the next, but it is nonetheless "a single unlawful practice under Title VII." *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840 (7th Cir. 2009). The multi-factor test for hostile work environment requires a showing "(1) that the work environment was both subjectively and objectively offensive; (2) that the harassment was based on membership in a protected class; (3) that the conduct was severe or pervasive; and (4) that there is a basis for employer liability." *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014) (internal quotation marks omitted).… A court examining such a claim must "look to all the circumstances" in a particular workplace, because the claim "is composed of a series of separate acts that

collectively constitute one 'unlawful employment practice.'" *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116-17 … (2002). *Brand*, 302 F.R.D. at 218.

In this case, Plaintiffs can demonstrate that the elements underlying a hostile environment claim raise common questions capable of class-wide resolution based on common evidence.

### a. Whether the Work Environment Has Been Objectively Offensive Is Capable of Classwide Resolution Based on Common Evidence

An offensive sexually hostile environment can include "sexual assaults; other physical contact, whether amorous or hostile, for which there is no consent express or implied; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures; pornographic pictures". *E.E.O.C. v. Int'l Profit Assocs., Inc.*, 654 F. Supp. 2d 767, 783 (N.D. Ill. 2009) (internal cite omitted). To show objective offensiveness in a class hostile environment case, plaintiffs do not need to present evidence of harassment from all or even most class members. In *Brand*, for example, the plaintiffs presented evidence from about 10% of the class members of use of "nigger" or other racially hostile terms. 302 F.R.D. at 219. The Court concluded that the showing was "sufficient to establish 'significant proof' of the common question of whether a hostile work environment existed for African-American employees …." *Id.*

Here, Plaintiffs offer statistical, documentary and anecdotal evidence that the work environment at the Complex was objectively offensive for all women. First, they present testimony and declarations from more than 150 Plaintiffs and Class Members that, on a regular and often daily basis, male detainees masturbate, expose themselves, hurl disgusting sexual epithets and sexual threats against them. In addition, Plaintiffs present evidence of harassment for more than 500 individual Class Members. Finally, Plaintiffs' Expert Dr. Lundquist identified 1745 written complaints of sexual harassment from January 2015 through October 2018. In total, Plaintiffs submit specific evidence of harassment from more than 25% of the proposed class.

The environment was objectively offensive to all Class Members even though it may have been worse in some parts of the Complex than others.[135]  This case differs from *Bolden v. Walsh Constr. Co*., 688 F.3d 893, 896 (7th Cir. 2012) (rejecting commonality when the construction work "sites had different superintendents, with different policies" leading to "materially different working conditions") and *Adams v. RR Donnelley & Sons*, 98 C 4025, 96 C 7717, 2001 U.S. Dist. LEXIS 4247, at *48-49 (N.D. Ill. Apr. 6, 2001), (declining to certify company-wide class because of lack of evidence that corporate management condoned offensive behavior but certifying classes in several divisions) for the following reasons:

- CCSO was organized on a centralized, paramilitary model and Defendants implemented the same policies throughout the Complex, *see supra* at 2-3;

- All divisions and departments experienced sexual harassment, *see supra* at 5-10, 13-15;

- Women worked and moved throughout the Complex encountering inmates, *see supra* 3-5;

- Women frequently were reassigned to different divisions, given special assignments, and assigned overtime outside their assigned positions, *see supra* at 3-5;

- All women experienced ambient harassment, *see supra* at 13-15.

For all these reasons, Plaintiffs' contention that the Complex was objectively offensive raises common issues

> **b.    Common Evidence Will Resolve the Issue of Whether Detainees Harassed Class Members Because of Their Sex on a Classwide Basis**

---

[135] Notably, the fact that Class Members worked in a jail instead of an office does not prevent common evidence from establishing objective offensiveness. While "'[i]t is absurd to expect that a prison can actually stop all obscene comments and conduct from its detainees … we can expect and require prisons … to implement and enforce policies reasonably calculated to minimize such harassment and protect the safety of its employees.'" *Freitag v. Ayers*, 463 F.3d 838, 848 (9th Cir. 2006) (quoting *Powell v. Morris*, 37 F. Supp. 2d 1011, 1017 (S.D. Ohio 1999)) (affirming verdict for female prison guard who was exposed to "a constant barrage of sexual abuse" from detainees).

The issue of whether detainees harassed Class Members because of their sex also can be established based exclusively on common evidence. Sexual epithets, sexual threats, indecent exposure of genitalia, masturbation, and sexual assaults are all sexual in nature and hence satisfy the "because of sex" element without the need for other evidence of detainees' motivations. *See Andrews v. City of Philadelphia,* 895 F.2d 1469, 1482 n.3 (3d Cir. 1990) ("[T]he intent to discriminate on the basis of sex in cases involving sexual propositions, innuendo, pornographic materials, or sexual derogatory language is implicit, and thus should be recognized as a matter of course."); *Henson v. City of Dundee*, 682 F.2d 897, 902-04 (11th Cir. 1982) (unlike other disparate treatment claims, cases of sexual harassment creating a hostile environment do "not present a factual question of intentional discrimination which is at all elusive").

Additionally, common evidence in the form of expert testimony can resolve the issue of whether the detainees engaged in the harassment because of Class Members' sex. Plaintiffs' expert Dr. Louise Fitzgerald opines that the detainees' harassment "essentially constitute[s] a 'once-removed' form of sexual assault, often accompanied by graphic and violent threats of the 'real thing'" and reflect "contempt" toward women and "the need for power and control."[136] In other words, these acts are performed because of Class Members' sex. Defendants' expert Margo Frazier agrees that sexual harassment of female employees was a purpose for inmates' sexual misconduct.[137]

Finally, CCSO's 30(b)(6) witness admitted that the masturbation and indecent exposure was directed largely at just the female staff[138] and the common evidence reflected in incident reports shows this behavior was overwhelmingly directed at female staff. This evidence supports

---

[136] Ex. 22, Fitzgerald Rep. at 7 & n.4.
[137] Ex. 43, Frasier Dep. 188:1-12.
[138] Ex. 6, Curry Dep. 313:5-8.

the contention that the harassment was "because of sex"; if the inmates' motivation was only to disrupt the environment they would have directed the behavior at both sexes.

      c.      **The Issue of Whether Detainees' Conduct Was Severe or Pervasive Is Capable of Classwide Resolution Based on Common Evidence**

The third requirement for establishing a hostile environment claim, "severe or pervasive" conduct, can be established through common evidence as well. The common evidence showing that the environment has been objectively offensive also will establish that the harassment has been severe. The types of verbal threats and epithets directed at Class Members, even without more, are severe. *See EEOC v. Int'l Profit Assocs.*, 647 F. Supp. 2d 951, 989 (N.D. Ill. 2009) (harassment may be severe or pervasive when women were exposed to "widespread, daily use of gender specific terms of abuse such as 'bitch,' 'slut,' and 'whore,' [and] to harassing workplace conduct such as bottom slapping.").

The same reasoning applies in the context of claims by female employees against correctional institutions. *See Eddy v. City & Cty. of Denver*, No. 15-cv-02539-MSK-STV, 2018 U.S. Dist. LEXIS 49428, at *21-22 (D. Col. Mar. 26, 2018) (holding that testimony that plaintiff "has been exposed to constant lewd and offensive comments from detainees for more than a decade, as well as less frequent exposure to public masturbation" is sufficient to meet severe or pervasive requirement). Moreover, the common evidence shows that the harassment went beyond words to exhibitionist masturbation, indecent exposure, and, less frequently, sexual assaults. A single instance of any of these incidents is severe; repeated instances are more so. *See Freitag,* 468 F.3d at 540 (affirming that jury had substantial basis for concluding that the inmate harassment was severe and pervasive when female prison employee was exposed to five incidents of exhibitionist masturbation.).

With respect to whether the harassment was pervasive, Plaintiffs' evidence showing that the harassment was objectively offensive, including the overwhelming evidence that more than 25% of Class Members have experienced the same inmate harassment, is more than sufficient to meet the pervasiveness standard.

> **d.** **The Issue of Whether There Is a Basis for Employer Liability Is Capable of Classwide Resolution Based on Common Evidence**

Defendants' liability for the hostile environment rests on whether they were aware of the harassment and whether they "[f]ail[ed] to respond to and remedy complaints." *Brand*, 302 F.R.D. at 221. Both these sub-issues can be resolved through common evidence.

Defendants admit they were aware of the sexual harassment. *Supra* Section II.E. Despite that knowledge, Defendants failed to take adequate remedial measures to reduce or significantly address the harassment. *Wal-Mart* requires plaintiffs challenging multiple employment decisions to identify "'some glue holding the alleged reasons for all those [employment] decisions together.'" *Brand*, 302 F.R.D. at 217 (quoting *Wal-Mart*, 564 U.S. at 352)). Here, Plaintiffs provide that glue in several ways.

First, CCSO has a hierarchical, paramilitary structure. Policies and practices are centralized; managing officers do not run their divisions as separate fiefdoms. *See supra* at 2-3.

Second, Plaintiffs have presented common evidence that Defendants failed to adopt reasonable policies to address the harassment by male detainees. These Complex-wide failures included: failure to adopt a policy regarding detainee sexual misconduct, failure to train employees to deal with sexual misconduct, failure to provide adequate orientation to new detainees, failure to implement a zero-tolerance policy for detainee sexual harassment, failure to properly restrain detainees, failure to install modesty screens, failure to use tinted/one way windows, failure to secure chuckholes, and failure to use exposure control jumpsuits. *See supra* at 17-21.

Third, Plaintiffs have presented substantial common evidence that Defendants' disciplinary system contributed to the hostile environment. CCSO allowed detainee sexual misconduct tickets to expire which resulted in no discipline; it hired unqualified individuals to administer the detainee discipline system; it failed to involve sworn personnel in the discipline process; it failed to impose progressive discipline for repeat offenders in violation of its written policies; it downgraded the offenses of masturbation, indecent exposure and sexual harassment in 2013 and waited until a hostile environment had existed for several years before re-elevating the penalties; and it failed to consistently arrest or pursue criminal charges against violators. *See supra* at 21-24.

Finally, the evidence that Cook County should be liable for the harassment is completely common in nature. Despite the County's knowledge of the harassment that its employees suffered, it relied completely on CCSO to protect the officers and address the hostile environment. An employer, however, cannot escape liability by putting its faith in a non-employer to create an environment in compliance with federal law. *See Los Angeles Dep't of Water & Power v. Manhart,* 435 U.S. 702, 718 n. 33 (1978) ("We do not suggest… that an employer can avoid his responsibilities [under Title VII] by delegating discriminatory programs to corporate shells.").

### 3. Plaintiffs Satisfy the Typicality Requirement

The typicality requirement primarily directs the district court to focus on "whether the named representatives' claims have the same essential characteristics as the claims of the class at large." *Healy*, 296 F.R.D. at 592 (citing *Muro v. Target Corp.* 580 F.3d 485, 492 (7th Cir. 2009)). "A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *Id*. (quoting NEWBERG, CLASS ACTIONS § 1115(b) (1977)). Typicality may be satisfied in a class case involving sexual harassment "even though varying fact patterns support the claims or defenses of individual class members or there is a disparity in the damages claimed by the

representative parties and the other members of the class." *Markham v. White,* 171 F.R.D. 217, 223 (N.D. Ill. 1997).

The named Plaintiffs' claims are typical because they have the same essential characteristics as the claims of other Class Members. Plaintiffs faced the same sexual harassment as the putative Class Members arising out of the same course of conduct by Defendants. Plaintiffs, like other Class Members, worked in an environment saturated with sexual harassment and experienced verbal and physical sexual harassment by detainees due to Defendants' failure to adopt policies and practices reasonably calculated to address the harassment. *See supra* at 5-15. That is all that is needed.

### 4. Plaintiffs and Their Counsel Are Adequate Representatives

Rule 23(a)(4) requires class representatives and their counsel to "fairly and adequately protect the interests of the class." Fed. R. Civ. Pro. 23(a)(4). Class representatives must not have antagonistic or competing interests to those of the putative class members, *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992), must possess general knowledge of the case, and must participate in the discovery process. *Fournigault v. Indep. One Mort. Corp.*, 234 F.R.D. 641, 646 (N.D. Ill. 2006) (internal citation omitted). Plaintiffs do not have claims antagonistic to or conflicting with those of Class Members. They were subject to the same type of sexual harassment and seek remedies beneficial to all Class Members. Plaintiffs have fully participated in the discovery process, including document production, interrogatories, and depositions. Additionally, Plaintiffs' counsel have significant experience representing plaintiffs in employment discrimination class actions.[139] They have litigated numerous sexual harassment matters, and one

---

[139] *See* Ex. 44, Attorney Declarations.

firm successfully represented a class of female employees who endured sexual harassment by inmates at a federal prison.[140]

## C. The Proposed Class Satisfies the Requirements of Rule 23(b)(3)

A class may be certified under Rule 23(b)(3) if "the questions of law or fact common to class members predominate over any questions affecting only individual members, and [] a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The proposed Class meets both requirements.

### 1. Questions Common to Class Members Predominate Over Questions Affecting Only Individual Members

In this case, as explained in the commonality section above, all liability issues, except subjective offensiveness, may be resolved based solely on common evidence. Subjective offensiveness should be rebuttably presumed, and hence, is only a minor issue in this case. Although individualized damages may vary, differences in damages "do not undermine the fact that the fundamental question that predominates is a common question, namely whether there was a hostile work environment in plaintiffs' workplace." *Brand*, 302 F.R.D. at 223-24. Granted, at some point a proposed class may be so large that individualized damages issues overwhelm liability issues, *see, e.g., Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1434-35 (2013) (rejecting 23(b)(3) certification for class of over 2 million customers), but that is not true here.

### 2. A Class Action Is Superior to Other Methods for Adjudicating the Matter

A class action would be superior to other means of adjudicating this case for the same reasons as in *Brand*: litigating common issues one time instead of many individual suits "would enable greater efficiency." 302 F.R.D. at 224. Plaintiffs are unaware of any litigation commenced

---

[140] Ex. 44, attached thereto class certification decision in *White v. Holder*, EEOC Case No. 510-2012-00077X.

by any Class Members, except *Ramos v. Cook County Sheriff's Office*, Case No. 18-cv-00274.

The Supreme Court established the model for trying class discrimination cases in *International Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977). Common issues are decided in the first stage of a trial. If plaintiffs prevail, they are entitled to injunctive relief and to move to the second stage of trial in which individualized issues, including damages, for each class member who elects to participate are decided in a series of "mini-trials" in which defendants have the burden of proof. *Id.* at 361. Several district courts in the Seventh Circuit have adapted this model to hostile environment cases in slightly varying ways. The Court need not decide at this time how it would adapt the *Teamsters* model to a hostile environment case, but must merely conclude that, with use of the model, the class action would indeed be manageable.

**D.     The Class Meets the Requirements for Issue Certification Under Rule 23(c)(4)**

If the Court concludes that the Class does not satisfy the requirements of Rule 23(b)(3) it should certify the Class to litigate all common liability issues under Rule 23(c)(4). *See Brand*, 302 F.R.D. at 224 (stating that, "if damages questions ultimately prove to present significant manageability or similar problems, the Court could modify the certification to limit its scope to liability only, which would appropriately be an issues class under Rule 23(c)(4)"). However, counsel anticipates that, if this happens, almost all of their approximately 400 clients, and likely other members of the proposed Class, would intervene in the case. It is unclear that manageability concerns would decline significantly under this scenario.

## IV.     CONCLUSION

The proposed Class satisfies all requirements for class certification under Rule 23(a) and Rule 23(b)(3). The Court should grant Plaintiffs' motion.

Dated:  May 3, 2019

Respectfully Submitted,

/s/ *Noelle Brennan*_____
One of the Attorneys for Plaintiffs


Marni Willenson
marni@willensonlaw.com
Samantha Kronk
skronk@willensonlaw.com
WILLENSON LAW, LLC
542 S. Dearborn St., Suite 610
Chicago, IL 60605
312.508.5380

Caryn C. Lederer
clederer@hsplegal.com
Kate E. Schwartz
kschwartz@hsplegal.com
Emily R. Brown
ebrown@hsplegal.com
HUGHES SOCOL PIERS
RESNICK & DYM, LTD.
70 W. Madison St., Suite 4000
Chicago, Il 60602
312-604-2630

Shelly B. Kulwin
skulwin@kmklawllp.com
Jeffrey Kulwin
jkulwin@kmklawllp.com
Rachel A. Katz
rkatz@kmklawllp.com
KULWIN, MASCIOPINTO & KULWIN,
LLP
161 N. Clark Street, Suite 2500
Chicago, IL 60601
312.641.0300

Attorneys for Plaintiffs

Noelle Brennan
nbrennan@nbrennan-associates.com
Kristin Carter
kcarter@nbrennan-assocites.com
Naomi Frisch
nfrisch@nbrennan-associates.com
NOELLE BRENNAN & ASSOCIATES,
LTD.
20 S. Clark St., Suite 1530
Chicago, IL 60603
312.422.0001

Cyrus Mehri
cmehri@findjustice.com
Ellen Eardley
eeardley@findjustice.com
Michael Lieder
mlieder@findjustice.com
MEHRI & SKALET, PLLC
1250 Connecticut Ave., NW, Suite 300
Washington, D.C. 20036
202.822.5100

1

**CERTIFCATE OF SERVICE**

I hereby certify that on May 3, 2019, I electronically filed the foregoing **PLAINTIFFS'**

**MEMORANDUM IN SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION**

with the Clerk of the Court using the CM/ECF system. All counsel of record are registered

CM/ECF users and service will be accomplished by the CM/ECF system.

Date: May 3, 2019                                    Respectfully submitted,

                                                     */s/ Noelle Brennan*
                                                     One of Plaintiffs' Attorneys