Exhibit 6

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


SDAHRIE HOWARD, DENISE HOBBS,     )
ELLENOR ALTMAN, TAVI BURROUGHS,   )
DOMINIQUE FREEMAN, KIMBERLY       )
CRAWFORD-ALEXANDER, ESTHER        )
JONES, BALVINA RANNEY, TAWANDA    )  No. 17-cv-8146
WILSON, and SUSANA PLASENCIA,     )
on behalf of themselves and all   )
others similarly situated,        )
                                  )
          Plaintiffs,             )
                                  )
          vs.                     )
                                  )
COOK COUNTY SHERIFF'S OFFICE      )
and COUNTY OF COOK,               )
                                  )
          Defendants.             )


     The deposition of BRADLEY CURRY, called by

the Plaintiffs for examination, taken pursuant to

notice and pursuant to the Federal Rules of Civil

Procedure for the United States District Courts

pertaining to the taking of depositions, taken

before Karen Fishella, Certified Shorthand

Reporter, at 161 North Clark Street, Suite 2550,

Chicago, Illinois, commencing at 9:40 a.m. on

January 11, 2019.

Page 13

1    A.  Sure.  I was a correctional officer from
2 1989 to 1994.  In 1994, I got promoted to lieutenant.
3 From 1994 to, I believe, 1997, I was a general
4 lieutenant working in -- what I mean by that is I
5 worked a cell house, ran the shift, had a zone,
6 was responsible for cell houses, different zones.
7    In 1997, I took over as the chief
8 investigator for internal affairs.
9    Q.  Did your rank change?
10    A.  I was still a lieutenant at that time.
11    Q.  Okay.
12    A.  Stayed a lieutenant in Internal Affairs
13 as the chief investigator until 1999 and then
14 went to Intel and investigations for the northern
15 part of the state.  Became responsible for
16 District 2, which has five different prisons for
17 intelligence.  Stayed in that role until I took
18 over for the whole northern part of the state,
19 which basically was from Springfield north.
20 Remained a captain until I was promoted to a
21 public service administrator, what they call a
22 deputy commander of intelligence where I --
23    Q.  Let me stop you there for one second.
24 You said you remained a captain.  When did you

Page 14

1 become a captain?
2    A.  I became a captain in 1999.  I believe I
3 said that.
4    Q.  Go ahead.
5    A.  So I stayed a captain until 1999.  It
6 might have been 2000.  It was 1999 or 2000.
7    Q.  You became a captain?
8    A.  Became a captain.  And then I got made
9 into a public service administrator I want to say
10 in like 2001, which is a deputy commander of
11 investigations.
12    Q.  All right.
13    A.  Do you want me to stop there?  I'm not
14 done.
15    Q.  No.  Finish up.  I was just going to ask
16 you some specific questions about your resume,
17 but I think we might get to them.
18    A.  Okay.  So I stayed there until 2011.
19 Actually, I was in charge of investigations and
20 intelligence for the northern part of the state.
21 Stayed there until 2011.  Became the chief of the
22 parole division for the Illinois Department of
23 Corrections.  Was the chief of parole from 2011
24 until I believe like 2013, I believe.  Whatever

Page 15

1 my resume says is -- then I became the chief of
2 public safety where I was responsible for the
3 oversight of all corrections, all operations
4 right underneath the director, and then left in
5 January of '15 and came to the Cook County
6 Sheriff's Office.
7    Q.  Just a few questions about your
8 employment, and then we'll move on.  From '89
9 to '01, you were with the Illinois River
10 Correctional Center.  If I understand that,
11 that was a 1,900-inmate medium security?
12    A.  That's correct.
13    Q.  And while you were there, did you have
14 any experience with or deal with any issues
15 involving inmate sexual misconduct towards female
16 correctional officers of any kind?
17    A.  I don't want to say we didn't have any.
18 I'm sure we did, but it was very, very, very
19 sporadic because the inmates didn't tolerate that
20 kind of behavior even among themselves.
21    Q.  Okay.
22    A.  And they would police themselves and
23 make sure that -- like, if you did that in those
24 days, the inmates wouldn't tolerate it.

Page 16

1    Q.  You talk about 2000 to 2011 being a
2 deputy commander of intelligence, and you kind of
3 described some of the things you were responsible
4 for.  But I guess what I'm asking is what is the
5 intelligence department charged with?
6    A.  It's charged with making sure that the
7 facilities are running safely and securely.
8 You're basically a support mechanism to
9 operations.  You work on identifying problematic
10 issues in prisons, whether it be inmate behavior,
11 whether it be staff not doing their job, or
12 whether it be improper searching and improper
13 techniques of not following our proper policy.
14    Q.  During that time period, it says that
15 you were supervising or you were charged with
16 overseeing seven adult facilities.  What were
17 they?
18    A.  They were Illinois River, Hill,
19 East Moline, Dixon, Sheridan, Pontiac, and
20 Stateville.  I believe those were it.
21    Q.  I'm familiar with Pontiac and
22 Stateville.  Those are both medium and
23 maximum security institutions, correct?
24    A.  Yes.

**7 (Pages 13 to 16)**

Page 29

1  based on, you know, what they saw, but it wasn't
2  part of that consent decree.
3      Q.  Okay.  Then let me just ask you this
4  follow-up question:  My question is, was there
5  anything in the consent decree that you felt at
6  that time boxed you in, for lack of a better
7  term, or precluded you from taking appropriate
8  action to deal with the detainee sexual
9  misconduct, like masturbation, indecent exposure,
10  verbal assaults, or anything like that?
11      A.  No.
12      MR. PHILLIPS:  Object to the form of the
13  question.  You can answer.
14  BY MR. KULWIN:
15      Q.  And then you moved up to chief operating
16  officer.  Other than kind of just being now the
17  overall guy as opposed to one of many bureau
18  chiefs, how did your job change?
19      A.  I'm still one of many bureau chiefs.
20      Q.  Okay.  But you're also --
21      A.  But I'm also like -- so there's a chief
22  policy officer, a chief executive officer.  So
23  I'm the chief operating officer.  So, you know,
24  operations falls under my realm pretty much for

Page 30

1  the whole office except for court services.
2      Q.  What do you mean by chief of operations?
3  What does that involve?
4      A.  Well, that involves being responsible
5  for the operations of the entire office.  That's
6  the police department, corrections, investigations,
7  and intelligence, training or -- I don't have
8  training.  I'm sorry.  IT, Information Service,
9  Information Technology.
10      Q.  Who is the chief policy officer?
11      A.  Cara Smith is the chief policy officer.
12      Q.  This is good because I was going to ask
13  you who some of these people were that I've seen.
14      Can you tell me who the other bureau
15  chiefs are?
16      A.  Chief executive officer is Dana Wright.
17  I'm not sure what Helen's title is.  Helen Burke
18  is another chief, but I'm not sure of her --
19  she's responsible for legal, but her title is not
20  chief legal officer.  But I don't remember what
21  her title is.
22      Q.  Okay.
23      A.  I think that's it.
24      Q.  And just while I'm on the structure

Page 31

1  thing, in the structure of the CCSO, is it like
2  the bureau chiefs and then there's directors?
3  Are there directors under bureau chiefs?
4      A.  There's executive directors under bureau
5  chiefs.
6      Q.  And then are there directors under them?
7      A.  It depends on what the role is, but yes.
8      Q.  All right.  We'll get into more of that
9  later.  The last question on your resume I think
10  for now.  What is your role in managing the
11  budget?
12      A.  Well, operations is -- you know, most
13  of the budget is either personnel related or
14  operations related, so we work hand in hand with
15  the other chiefs to work on identifying budget
16  deficiencies, budget areas that we can make --
17  you know, we can identify to save money and be
18  fiscally responsible.
19      Q.  Is it also part of the work to determine
20  whether or not additional monies need to be
21  expended to appropriately respond to issues that
22  are arising in a correctional setting?
23      A.  It could be.
24      MR. PHILLIPS:  Object to the form.  You can

Page 32

1  answer the question.
2  BY MR. KULWIN:
3      Q.  This is by way of example.  If there
4  were difficulties with a need for a certain type
5  of equipment or a need for additional staffing or
6  things of that nature to respond to a particular
7  issue, is that something the bureau chiefs would
8  consider and discuss about we need to allocate
9  more funds or we need to go get more funds to see
10  if we can get more funds for this?
11      A.  It could be, but I don't remember ever
12  having any such conversation.  Usually, we don't
13  have that problem.
14      Q.  So to be clear, during the three years
15  that you've been with the CCSO, you do not recall
16  any conversations about insufficient funding for
17  equipment, staffing, or anything like that to
18  deal with the issues at the Cook County Jail or
19  in the outlying courthouses or the actual
20  Leighton Courthouse itself, as you recall,
21  correct?
22      A.  No.  What I believe is that if there are
23  issues that need to be addressed, we find a way
24  to address it in the most fiscally responsible

11 (Pages 29 to 32)

Page 33

1  way.

2  **Q.** I understand that, but I guess my
3  question is during that time period while you
4  were there in '15 to '18, was there ever a time
5  that you recall any discussions saying the budget
6  won't allow for additional staffing to deal with
7  this problem?

8  **A.** I don't think that we've ever had a
9  discussion about staffing that we needed to hire
10  that we didn't feel -- there were -- I mean, we
11  went through budget crises, and we had budget
12  issues. I don't remember staffing ever being one
13  of the issues that we couldn't sufficiently
14  address.

15  **Q.** Okay. Good. And what about -- well,
16  maybe it's easier to do this: When you say
17  you had budget crises or budget issues, what
18  budgetary issues do you recall arising during
19  that three-year period?

20  **A.** Well, we got told in 2017 by the County
21  Board that we had to cut 60-some million dollars
22  from our budget in order to, you know, be at
23  budget, and so that was a challenging time. We
24  had to lay people off. We had to make decisions

Page 34

1  to identify positions that would be less
2  impactful in the office, and those decisions
3  weren't easy.

4  **Q.** Did any of those decisions at the time
5  in your view or the views of the Cook County
6  Sheriff -- and when I say "your view," you're
7  here as the Cook County Sheriff's Office.

8  **A.** I understand.

9  **Q.** Did any of those decisions at the time
10  in your view preclude the CCSO from having
11  sufficient staff at the jail or in the
12  courthouses to deal with the control and, you
13  know, a safe working environment of the inmates
14  or for the officers? Horrible question. Let me
15  restate that. Okay?

16  At any time as a result of that in 2017,
17  did the CCSO feel it had insufficient funding to
18  properly staff the jail, the courthouse, the
19  outlying courthouses in a manner that could deal
20  with any misconduct by the detainees?

21  MR. PHILLIPS: Object to the form of the
22  question. Brad, you may answer.

23  BY THE WITNESS:

24  **A.** I don't believe that the Cook County

Page 35

1  Jail has ever had a lack of staffing.

2  **Q.** And during that time period, did you
3  have any concerns from 2017 going forward that as
4  a result of these required budget cuts you had
5  insufficient funds to provide adequate supplies
6  or anything else that was nonpersonnel related
7  that would be needed, like handcuffs, blue boxes,
8  things of that nature, to properly control the
9  detainee population in a safe and effective
10  manner?

11  MR. PHILLIPS: Object to the form of the
12  question.

13  MR. KULWIN: You may answer the question.

14  MR. PHILLIPS: You may answer.

15  BY THE WITNESS:

16  **A.** No. We've always bought cuffs when we
17  needed to buy cuffs.

18  **Q.** Just a couple of form questions here
19  just so we're clear about what the purpose of
20  this is.

21  You've been designated to testify about
22  the Cook County Sheriff's Office's systematic
23  efforts to prevent inmate sexual misconduct
24  between the years 2014 and 2018. Have I

Page 36

1  correctly stated what you've been designated to
2  do?

3  **A.** Yes, sir.

4  MR. KULWIN: And in particular, let me show
5  you Exhibit 2.

6  (Curry Exhibit No. 2 marked.)

7  BY MR. KULWIN:

8  **Q.** I've handed you what I've marked as
9  Curry Exhibit 2. It's the Defendant Cook County
10  Sheriff's Office's Third Amended Objections and
11  Witness Designations to Plaintiffs' Notice of
12  Rule 30(b)(6) Deposition Concerning Defendants'
13  Steps Taken to Combat Inmate Sexual Misconduct.
14  You've seen this before, I take it, Mr. Curry?

15  **A.** Yes, sir.

16  **Q.** And in addition to what you've already
17  said, you've also been designated to respond to
18  paragraphs -- and let's go through them together
19  just slowly starting on page 2 and 3 -- 1(b)
20  through (e), (g) through (i), (n) through (r),
21  and parts of (k) and (l). Do I have it right?

22  **A.** Yes.

23  **Q.** And as a result, you're prepared to
24  provide all information known or reasonably

**12 (Pages 33 to 36)**

Page 41

1  MR. KULWIN: All right. Let me just respond
2  to that objection, okay, because I think it's
3  important because I'm going to ask him some more
4  questions about this.
5      I'm not asking him for recordkeeping.
6  That's another individual according to your
7  response. What I am asking him is what they use
8  to respond systematically to problems and how
9  they came up with remedial ideas, and one of
10  the ways they would do that is to look at the
11  information.
12  MR. PHILLIPS: I agree with you. I don't
13  disagree with that. Some of this was getting
14  into I think the topics that Amar is going to
15  testify on concerning data collection. That was
16  the basis of my objection.
17  BY MR. KULWIN:
18  Q. All right. I want to fine-point what
19  the question is. Who was charged at the CCSO
20  between '15 and '17 with reviewing that
21  information about sexual misconduct incidents?
22  By "sexual misconduct," I always mean
23  masturbation, indecent exposure, verbal assault,
24  things of that nature. Who is charged with

Page 42

1  reviewing that on a regular basis to ascertain if
2  there's a problem and what the response should
3  be?
4      A. So 3 percent of the incidents are mostly
5  the masturbation, public indecency incidents of
6  the overall incidents at the jail. So one of the
7  things that -- the whole operations team and
8  actually everybody in the jail should be looking
9  at their incidents and what is going on to
10  identify, you know, systematic problems, trends,
11  which I can tell you, you have all my panel
12  review documents there, so you know I look at
13  them.
14  Q. I understand that, but was there a
15  specific task force of any kind or a working
16  group that was charged with focusing on the
17  sexual misconduct data and trying to develop
18  coordinated responses within the jail and at
19  the courthouse? Was there anything like that?
20  A. No. We all worked -- I mean, we asked
21  staff. We asked all of our leadership team. We
22  asked the correctional officers. We asked for
23  input from everybody on the best ways to handle
24  these type of issues. We didn't limit it to one

Page 43

1  particular task force.
2  Q. When you say "we," who is we?
3  A. We, being myself, the executive director
4  of the jail, you know, Jeff Johnson, the chief
5  of -- well, Tarry Williams, who was chief of
6  operations, Jeff Johnson, all the superintendents
7  all the way to the lieutenants, to the
8  correctional officers.
9  Q. I guess what I'm getting at is -- and
10  we're going to get into it more -- given the
11  nature of the problem and the extent of it,
12  at any time between 2015 and 2017 did anyone
13  promulgate the idea of we need a specific
14  workforce among the entire leadership that's
15  just focusing on this issue, watching the
16  data, watching the reports, interacting with
17  supervisors, and developing solutions? Was there
18  anything like that formed?
19  A. Again, we focus on all issues. All
20  issues of staff safety are important to us.
21  Q. Prior to this 2015, so in 2011, '12,
22  '13, '14, was there any way for the Sheriff's
23  Office to analyze the data about how frequent
24  sexual misconduct, like the masturbation and all

Page 44

1  these other things, was occurring within the jail
2  given that there was no centralized tracking
3  system?
4      A. Well, the superintendents were
5  responsible for reviewing their incidents, and we
6  did have monthly meetings with our leadership
7  team, actually, weekly meetings with the
8  leadership team and also monthly to talk about
9  the incidents occurring in their divisions.
10      It wasn't -- between '11 and '15, it did
11  happen, but it didn't happen very often. And it
12  was something, again, that the inmates kind of
13  made sure that they police themselves and said
14  that's not appropriate behavior. And I don't
15  know what changed after 2015, but the behavior
16  completely changed.
17  Q. Would you say that 200 incidents of
18  public indecency that rise to the level of
19  justifying criminal charges would be a
20  significant number of sexual misconduct incidents
21  to require a coordinated response from the
22  Sheriff's Office?
23  MR. PHILLIPS: Object to the form of the
24  question, but you may answer the question.

14 (Pages 41 to 44)

Page 45

1 BY THE WITNESS:
2    A. I'm going to answer it again: Every
3 incident we take seriously.
4    Q. I know that.
5    A. So I think that to say -- I don't put a
6 number on like 200 it hit a threshold, and we're
7 going to deal with it. We dealt with it as we
8 identified the problems.
9    Q. I understand that, but here's what
10 I'm saying: I asked you about what were they
11 tracking prior to 2015, and you said, well, it
12 wasn't very prevalent. It happened but not that
13 often.
14    A. Right.
15    Q. There was a sea change in 2015.
16    MR. KULWIN: Off the record.
17       (Discussion off the record.)
18 BY MR. KULWIN:
19    Q. So there was a sea change in 2015 when
20 the number of incidents rose dramatically, right?
21    A. Uh-huh.
22    Q. Is that correct?
23    A. I believe that's correct, yeah.
24    Q. And my question to you is, when you

Page 46

1 say it wasn't happening that often or it was
2 sporadic, would you say that 200 incidents of
3 indecent exposure or public indecency, which
4 includes masturbation, would be more than just
5 a sporadic number of events at the Cook County
6 Jail alone, not including the courthouse, not
7 including verbal assault, just masturbation and
8 indecent exposure?
9    A. I think, again, one incident is too
10 much.
11    Q. I understand that, but we're talking
12 about --
13    A. What time frame are you talking about?
14    Q. I'm talking about in 2014, for example.
15    A. Okay.
16    Q. You had said that up to 2014 it was
17 sporadic. By sporadic, I interpret you to
18 mean -- and correct me if I'm wrong -- you know,
19 we would get a couple here, a few here, you know,
20 kind of like you were talking about when you were
21 at the Illinois Department of Corrections. It
22 happened, but it was very infrequent. Do I
23 understand your definition of sporadic correctly?
24    A. Well, I -- I don't know that -- if there

Page 47

1 were 200 incidents in 2014, I would say that
2 that's something that would not really be -- we
3 should have been -- it should have been something
4 that is a little -- I guess when you look at
5 overall incidents, and I don't know all the
6 totality of the incidents in 2014, but you want
7 to -- you've got to always weigh what's happening
8 throughout the whole population. So I don't
9 know -- when I say "sporadic," I'm talking about
10 it wasn't something you heard about all the time.
11 Now, I don't know whether it was something I
12 didn't hear about because people weren't
13 reporting it, weren't saying anything. But if
14 there were 200 incidents in '14, according to
15 you, I would be shocked at that.
16    Q. And by the way, what I'm saying is
17 that when you say sporadic prior to 2015, we're
18 talking a handful; is that fair to say?
19    A. No, I wouldn't say that.
20    Q. Would you say 50?
21    A. I'm saying that it wasn't enough that
22 you heard about it being -- so if you have to
23 put a number on it --
24    Q. I do.

Page 48

1    A. You do have to put a number on it?
2    Q. I do.
3    MR. PHILLIPS: He's asking if you could put
4 a number on it.
5    THE WITNESS: On sporadic?
6    MR. PHILLIPS: Yes.
7 BY MR. KULWIN:
8    Q. Yes. You used the word "sporadic."
9 What do you mean?
10    A. I would say like sporadic to me is --
11 there's 365 days in a year. Maybe 50 to a
12 hundred a year.
13    Q. And you would consider that a
14 sporadic -- if there were 50 to a hundred
15 incidents of inmates masturbating publicly and
16 exposing themselves to female employees, that to
17 you would be sporadic?
18    MR. PHILLIPS: Objection. Asked and
19 answered.
20    MR. KULWIN: I just want to be clear.
21    THE WITNESS: I'm sorry?
22    MR. PHILLIPS: I objected to it being asked
23 and answered, but you can answer the question
24 again.

Page 81

1  they had an indecent exposure, and I know that we
2  added courts to the administrative line to make
3  the notifications. But I don't remember exactly
4  the time frame of when that was.
5      Q. I understand that. Maybe my question is
6  not clear, so I'll try to make it clearer.
7      My understanding from reading everything
8  and from listening to your testimony today was
9  that there was a core group of administrators
10  charged with ensuring -- among other things, one
11  of their tasks was to ensure that the facility,
12  the jail, the courthouses were run properly and
13  kept safe and that the detainees maintain a
14  proper code of conduct. Do I understand that
15  correctly?
16      A. Yes.
17      Q. And another part of the task was to
18  make sure that the employees, the correctional
19  officers, and their supervisors worked in a safe
20  environment. Do I understand that correctly?
21      A. Yes.
22      Q. And so my question is, why didn't the
23  CCSO charge those people in '15, '16, '17 to go
24  to the courts and say, look, we need written

Page 82

1  reports sent to us on a weekly or monthly basis
2  of what's going on with your masturbation and
3  indecent exposure incidents so that we can
4  respond to this problem or analyze it?
5      A. Well, in January of 2016, we began
6  handcuffing all detainees in the courthouse
7  lockups because of this problem in courts. So I
8  wouldn't have done that without knowing there was
9  a problem in courts. So my point is that we were
10  obviously tracking it. I just don't remember if
11  there were any reports that point it out. So we
12  started identifying the problem in the courts by
13  handcuffing them.
14      Q. So the answer, if I've got it correctly,
15  is that no one was ever charged to get that
16  information from the courts?
17      A. No, that's not what I said. What I said
18  is that we did obviously know there was a problem
19  or we wouldn't have started -- you just don't
20  start handcuffing people in the lockup if you
21  don't realize there's a problem. So we did that
22  for some reason.
23      What I'm saying is that we were keeping
24  track of it. We did know that there was a

Page 83

1  problem. I'm just not aware of a specific report
2  that identified that problem.
3      Q. And I guess just to wrap this up if I
4  can, perhaps I'm not being clear.
5      A. No. You're clear. I'm just answering
6  the question because --
7      Q. Let me see if I can put a finer point on
8  it. Okay?
9      A. Okay.
10      Q. We agree, do we not, that the CCSO was
11  aware that there was a masturbation/indecent
12  exposure problem going on in the courthouses
13  between '15 and '17? We're in agreement on that,
14  correct?
15      A. Yes.
16      Q. And there's a number of ways that that
17  information can come to the administration.
18  You've talked about that before, right?
19      A. Uh-huh.
20      Q. Is that correct?
21      A. That's correct.
22      Q. And one of the ways that I think you
23  identified was that you hear about it because
24  it's being talked about because it's so

Page 84

1  pervasive. It's percolating up through the
2  correctional officers to the staff to the
3  superintendent to your meetings; isn't that true?
4  That's one of the ways you can find out about
5  this, correct?
6      A. Correct.
7      Q. And it's one of the ways you did find
8  out about it, correct?
9      A. Correct.
10      Q. So we're in agreement on that. I know
11  you knew about it, and I know you started taking
12  steps regarding it.
13      My question is very specific. Is
14  there a reason why the CCSO did not charge its
15  administrators who were charged with keeping the
16  facility safe and properly run to get formal
17  written summaries on a weekly or monthly or
18  quarterly basis from the courthouse like they
19  were getting from the jail that tracked
20  masturbation and indecent exposure incidents?
21  Do you know of any reason?
22      A. Well, they were charged with writing
23  reports. They had to write an offense incident
24  report every time this happened.

24 (Pages 81 to 84)

Page 85

1  **Q.** Summary, sir.  Summary reports that can
2 be given like the ones we've shown you before
3 that analyze all of the events, all the incidents
4 between periods of time, monthly, weekly,
5 quarterly.  Why wasn't that done?  Do you know?
6  **A.** I don't know.
7  MR. KULWIN:  Let's go to Exhibit 7 if we
8 could.  These are Bates-stamped at the bottom
9 but in very small amounts.
10    (Curry Exhibit No. 7 marked.)
11  MR. KULWIN:  Off the record.
12    (Discussion off the record.)
13 BY MR. KULWIN:
14  **Q.** I'm showing you what's marked as
15 Exhibit 7.  It's Bates-stamped at the very bottom
16 281589, and actually I think the whole thing is
17 281589 because this came to us as one Excel
18 document that we had to break up into pages.  But
19 if you look, they're not duplicate pages.  You
20 can see they're different.  Okay?  Do you see
21 what I'm saying?
22  **A.** Yes, sir.
23  **Q.** And this was given to us just last
24 Wednesday, a couple days ago, from your counsel.

Page 86

1 And it is a summary of incidents, misconduct
2 incidents that were on CCOMS apparently from
3 October 26, '17 through, if you look to the last
4 page, December 31st, '17.  Okay?  And to be fair,
5 and I want to let you know this, we edited this
6 document in our office to eliminate anything that
7 wasn't indecent exposure, sexual harassment, or
8 public indecency.  We took out anything like
9 battery or anything like that.  We focused on
10 the ones that dealt with the issue in this case.
11 Now, have you ever seen this document before?
12  **A.** No.
13  **Q.** Do you know whether CCSO has information
14 like this that predates October 26, 2014 in
15 summary fashion?
16  MR. PHILLIPS:  Objection.  Outside the
17 scope.
18 BY MR. KULWIN:
19  **Q.** If you know.  If you don't know, you
20 don't know.
21  **A.** Prior to 2016 you said?  I'm sorry.
22  **Q.** Prior to October 26, 2014.
23  **A.** Well, I believe this is -- I'm not sure
24 how this information was collected, but I believe

Page 87

1 this is just a summary of what was taken off of
2 incident reports.  And so I would assume that,
3 yes, it was something that they would have.
4  **Q.** I went through this and counted up the
5 number of masturbation and indecent exposure
6 during that two-month period.  And eliminating
7 multiple reports for the same inmate on the same
8 day and time, it added up to 36 incidents in two
9 months.
10    Earlier you said that you would be
11 shocked if there was a significant number of
12 indecent exposure and masturbation incidents in
13 the jailhouse in 2014.  This is 36 in two months.
14 Does that indicate to you that there was a
15 significant number in that year?
16  **A.** It would indicate to me that there were
17 36 in two months.
18  **Q.** Would that indicate to you that if you
19 averaged it out for the whole year there would be
20 at least 200?
21  **A.** Well, it might be if you average it
22 out.  I don't know.  The question -- if you're
23 asking -- I don't know what the other incidents
24 were because I haven't looked at the other data.

Page 88

1 But I would say that if this is 36 in two months,
2 I don't know that it's fair to average it out for
3 the whole year at 36.
4  **Q.** Would you say that 36 in two months is
5 a significant number of indecent exposure and
6 masturbation incidents?
7  **A.** Yes.
8  **Q.** And then in addition, if you look at the
9 column J, if you go through here, while a number
10 of these incidents were in Division 9, it
11 also shows that it was also in Division 2,
12 Division 10, 6, or a number of them in Division 6
13 if you look at the fourth page and fifth page and
14 sixth page.  Do you see that?
15  MR. PHILLIPS:  I'm sorry.  What's the
16 question?
17 BY MR. KULWIN:
18  **Q.** They weren't just happening in 2014 in
19 Division 9 or 10.  They were happening in other
20 divisions as well.  Isn't that what this
21 reflects?
22  **A.** Yeah, it does reflect they were
23 happening in other divisions.
24  MR. KULWIN:  Let me show you Exhibit 8.

Page 89

1      (Curry Exhibit No. 8 marked.)
2  BY MR. KULWIN:
3    Q.  This is a memo from Sergeant Richard
4  Velasquez of the Cook County Sheriff's Department
5  Correctional Information and Investigations
6  Division.  And it's part of a longer chain that
7  I'm going to get into later, but I wanted to ask
8  you about it in this context.  And it starts with
9  May 31, 2015, and this one goes to June 1st,
10  2015.  I will tell you that there are other pages
11  of this that we're going to get into later about
12  a different incident that this goes to.
13      But what I want to focus your attention
14  on is if you look at this, Mr. Velasquez is
15  telling -- did I give you the Bates-stamp on
16  this?  251124.  He's telling, Mr. Velasquez,
17  that he has gone over ███████ criminal case --
18  that's the inmate in question -- and he's
19  responding to why a further investigation
20  hasn't been done.
21      If you look at four sentences up, it
22  says, "In 2014, I assigned 200 public indecency
23  cases."  Do you see that?
24    A.  Which line is that?

Page 90

1    Q.  Four lines up from the bottom.
2    A.  Yes, I see it.
3    Q.  And we're talking about in 2014.  Now,
4  given that document and given the document you
5  just saw, Exhibit 7, does that indicate to you
6  that there were numerous, at least a couple of
7  hundred, sexual misconduct incidents in the
8  Cook County Jail in 2014?
9    A.  It shows me that there were -- he's
10  saying there were 200 public indecency cases.
11    Q.  Public indecency is a coverall, is it
12  not, for masturbation or indecent exposure,
13  right?
14    A.  Well, I don't know what Rich Velasquez
15  meant by public indecencies, but I'm assuming
16  that's what he meant.
17    Q.  And all I'm saying is if you look at
18  that document in the context of Exhibit 7, which
19  shows 36 masturbation and indecent exposures just
20  in two months in '14, wouldn't that indicate to
21  the Cook County Sheriff's Office that there was a
22  large number, at least possibly as many as 200,
23  if not more, of public indecency, masturbation,
24  indecent exposure incidents that occurred in the

Page 91

1  jail during that 2014, not even counting the
2  courthouse?
3    A.  Well, I don't know if he doesn't mean
4  the courthouse here because he was charged with
5  handling the investigations in the courthouse
6  also.  So I can't answer whether he meant
7  courthouses here, but I can tell you that, you
8  know, based on this, there were 200 public
9  indecency cases.  So I don't know -- I believe
10  he would have counted courts in this.
11    Q.  And we know from Exhibit 7 that at least
12  that document shows there were 36 just in two
13  months.  We've already established that, correct?
14    A.  Correct.
15    Q.  And that was just in the jail, not in
16  the courthouse, correct, in Exhibit 7?
17    A.  Yeah.  Based on this spreadsheet, yes.
18    Q.  Exhibit 7?
19    A.  Yes.
20    Q.  I know you weren't there in 2014, but
21  you're speaking for the CCSO.  If that were true,
22  if there were 200 incidents, at least 36 in two
23  months, that certainly put the CCSO on notice
24  that there was a widespread problem involving

Page 92

1  masturbation and indecent exposure in the
2  jailhouse, if nowhere else, in all the divisions
3  in 2014, true?
4    MR. PHILLIPS:  Object to the form of the
5  question.
6  BY MR. KULWIN:
7    Q.  You can answer.
8    MR. PHILLIPS:  You can answer the question.
9  BY THE WITNESS:
10    A.  I believe that we did start implementing
11  measures early '15, in July, June.  In '15, I
12  actually met with Velasquez and said this is a
13  top priority of the office and pushed making sure
14  that we were charging these offenders and going
15  after them.
16    Q.  Right.  And that just goes to my point
17  that part of that was because this problem was
18  already existent in 2014, and the CCSO knew it.
19    MR. PHILLIPS:  Object to the form.
20  BY THE WITNESS:
21    A.  Well, I believe what I'm saying is
22  that I knew that in '15, at least the six months
23  prior that I had been there, that I had seen the
24  incidents seemed to be increasing, so we made it

26  (Pages 89 to 92)

Page 93

1 a top priority of the office to identify that
2 problem.
3     **Q.** But my question is, just to be clear and
4 not to beat it into the ground --
5     **A.** Right.
6     **Q.** -- these two exhibits would indicate
7 that the CCSO knew that in 2014 at least in the
8 jailhouse that there was a widespread problem
9 involving masturbation/indecent exposure starting
10 at the latest October of 2014, correct?
11     MR. PHILLIPS: Object to the form of the
12 question.
13 BY THE WITNESS:
14     **A.** Well, I'm not quite sure what you mean
15 by widespread problem. I can tell you that they
16 knew. Obviously, there were 36 during those two
17 months and 200 in '14.
18     **Q.** Well, that would --
19     **A.** That's your definition of widespread
20 problem.
21     **Q.** Pursuant to our earlier discussion,
22 though, that would have been sufficient to
23 require a systematic response, correct?
24     **A.** Correct.

Page 94

1     **Q.** Now, if you could go back to Exhibit 7
2 for a second.
3     **A.** Okay.
4     **Q.** If you could look at page 7 of 8.
5     **A.** I'm sorry. You said 7 of 8. You mean
6 7 --
7     **Q.** In Exhibit 7.
8     **A.** Page 7 of Exhibit 17?
9     **Q.** Page 7 of Exhibit 7.
10     **A.** Okay. Gotcha.
11     **Q.** You see that they're also tracking
12 verbal threats to staff. Okay? Do I have
13 that correct?
14     **A.** Yes.
15     **Q.** I just wanted to make sure I was reading
16 that right. Okay. Let's go to the next one.
17     I guess my follow-up question on that
18 was do you know why comparable tracking of verbal
19 threats wasn't done in '15 to '18?
20     **A.** Well, I believe you created this
21 document. You took out things that -- did you
22 edit -- were there other things in this document?
23 It wasn't just -- you asked specifically probably
24 for this particular stuff. Did you ask to see if

Page 95

1 there were batteries to staff or --
2     **Q.** Maybe I misstated my question or you
3 didn't hear it correctly. What I'm asking for is
4 in this document, Exhibit 7, they're tracking
5 verbal threats. They've also got a column for
6 sexual harassment, which is also going to verbal
7 threats.
8     My question is subsequently in '15,
9 '16, '17, I did not see any tracking for verbal
10 assault/sexual harassment. Is there a reason
11 CCSO did not have tracking like that in those
12 subsequent reports, if you know?
13     MR. PHILLIPS: Object to the form of the
14 question. Are you referring to the monthly panel
15 review reports, or are you referring to something
16 else?
17     MR. KULWIN: Any reports.
18 BY MR. KULWIN:
19     **Q.** I haven't seen any reports that deal
20 with summary reports, statistical reports that
21 track sexual harassment or verbal threats. Were
22 they tracking them?
23     **A.** They do track it, but I don't have a
24 summary report.

Page 96

1     **Q.** Without those type of summary reports
2 to track where such verbal threats are occurring
3 and how often and how frequently, how did CCSO
4 analyze in 2011 to 2017 how widespread the
5 problem was and how to respond to it?
6     **A.** Well, we do track it. We have a
7 research department that takes the data and does
8 track it. So if there was a systemic problem or
9 something that would rise to the level that it
10 needed to be tracked, I would think that that
11 information would be made aware through the
12 research department and also through the DOC
13 command.
14     **Q.** Do you ever recall getting any type of
15 summary reports from the research department
16 dealing with verbal assaults or --
17     **A.** Verbal?
18     **Q.** You have to let me finish.
19     -- dealing with verbal assaults or
20 sexual harassment --
21     **A.** With verbal --
22     **Q.** -- by detainees against female
23 employees? Do you want to hear it again?
24     **A.** No. I was making sure you were done

Page 129

BY MR. KULWIN:
2    **Q.** My question is this: You've listed all
3 these generalized things that you were doing.
4 These are specific instances where two years
5 after this epidemic started you have an inmate
6 standing on top of a table and waving his penis
7 around.
8    Did the CCSO as a remedial measure
9 consider, for example, taking inmates who engage
10 in that and either precluding them from being
11 out of their cells or handcuffing them in the
12 facility when they were out of their cells?
13    MR. PHILLIPS: I'll object to that as
14 compound, but you can answer that question.
15 BY MR. KULWIN:
16    **Q.** You can break it down if you want,
17 either/or.
18    **A.** And we did. They were supposed to go
19 to segregation, to SMU. And they were supposed
20 to be cuffed when they come out of the cell when
21 they're in SMU, and they're supposed to be put
22 in the green jumpsuit. And there was a lot of
23 things that we did to put in place.
24    **Q.** Do you know if any of those were ever

Page 130

1 implemented on a regular basis since it keeps
2 going on?
3    **A.** Well, I don't know if this was this
4 man's first attempt. I don't know if this was
5 his -- you know, after they -- you can't put
6 somebody in a green jumpsuit until they offend.
7 And so I'm not sure who this individual is that
8 we're talking about, but, yeah, those steps were
9 in place for everybody.
10    **Q.** My question to you is, if the CCSO was
11 implementing all of these for, quote, unquote,
12 everybody, did it do any analysis or keep track
13 of how frequently they were doing it? For
14 example, how frequently were they locking people
15 up who engaged in this conduct when they were
16 outside of their cell?
17    **A.** Yeah. That was the point of the panel
18 reviews that we already talked about. We went
19 through like what did you do with this offender,
20 what did you do to correct the behavior, what
21 have you done -- did you make sure that the
22 tickets -- we looked at the disciplinary tickets
23 to make sure they were being written. We made
24 sure -- like I said, I met with investigations to

Page 131

1 push them to make sure they were charging them,
2 that they charged them immediately, that they
3 didn't sit back and wait on it. Those were all
4 things that we put in place.
5    **Q.** If all that was being put in place,
6 how do you explain the fact that this conduct
7 continued to go on?
8    **A.** I can't explain it. I don't know why it
9 continues to go on.
10    **Q.** So you're telling me that the CCSO was
11 unable to come up with any form of remedial
12 efforts whatsoever that could have stopped this?
13    **A.** No, that's not what I'm saying. I'm
14 saying we've come up with a lot of remedial
15 measures, and the incidents have declined.
16    **Q.** When did they start to decline?
17    **A.** They're down almost over 30 percent
18 during --
19    **Q.** Since --
20    MR. PHILLIPS: Let him finish his answer.
21 You've got to let him finish his answer.
22    THE WITNESS: You keep interrupting me.
23 BY MR. KULWIN:
24    **Q.** Go ahead. We're down 30 percent.

Page 132

1 Go ahead.
2    **A.** Yeah, in 2019 they're down 30 percent,
3 so we have put in remedial measures to make it
4 better. We've continued to do it. This isn't
5 just a Cook County DOC problem. This is a
6 nationwide problem. This is something that the
7 Illinois Department of Corrections calls us for
8 advice on what to do. That will be the next
9 lawsuit; you watch. These are things that is a
10 problem nationwide. How do you deal with a grown
11 man who wants to do such terrible behavior?
12    **Q.** Let me deal with that one step at a time
13 if I could. You say there's been a 30 percent
14 decline in 2019. There was a decline in 2018 and
15 2017 as well, correct?
16    **A.** I thought you said before there --
17    MR. PHILLIPS: I think you're misstating
18 what he's saying.
19 BY MR. KULWIN:
20    **Q.** I thought you said there was a
21 30 percent decline. You meant in 2018 from
22 2017, is that right, because you said 2019?
23    **A.** I'm sorry.
24    **Q.** That's okay.

36 (Pages 129 to 132)

Page 133

1    A.  Yes.
2    Q.  It's getting a little heated in here.  I
3  just want to be sure.
4    A.  I mean that there's --
5    Q.  A 30 percent decline --
6    A.  During 2018.
7    Q.  -- from 2017?
8    A.  Yes.
9    Q.  And that coincides with additional
10 measures that were put in place subsequent to
11 the lawsuit being filed; is that correct?
12   A.  No.
13   MR. PHILLIPS:  Can you say that again?  I'm
14 sorry.
15   MR. KULWIN:  He answered it no.
16   MR. PHILLIPS:  Can you read that question
17 back?
18   MR. KULWIN:  Sure.
19   MR. PHILLIPS:  I just want to make sure I
20 understood.
21        (Record read as requested.)
22   MR. PHILLIPS:  Did you get his answer?  I
23 think he did answer it.
24   MR. KULWIN:  I think his answer was no.

Page 134

1  BY MR. KULWIN:
2    Q.  Your answer is no?
3    A.  My answer is no.
4    Q.  Were there any additional efforts to put
5  together remedial efforts by CCSO to implement
6  the measures that had been previously put in
7  place prior to the lawsuit being filed in 2018?
8    MR. PHILLIPS:  Object to the form.
9    THE WITNESS:  Say that again.  I'm sorry.
10 BY MR. KULWIN:
11   Q.  Did the CCSO as part of its systematic
12 remedial efforts to eliminate this problem do
13 anything to ensure that prior remedial measures
14 were actually being implemented in 2018 that had
15 not been effectively done in '17, '16, or '15?
16   MR. PHILLIPS:  Object to the form of the
17 question.  You can answer the question.
18 BY MR. KULWIN:
19   Q.  Do you understand the question?
20   A.  No.  I didn't answer it.  You're
21 answering for me.
22   Q.  No.  I'm asking you -- you've got a look
23 on your face that you don't understand the
24 question.

Page 135

1    A.  Yeah, I don't understand the question.
2  I'm not sure what you're getting at.
3    Q.  My question is, did CCSO undertake any
4  efforts to ensure that prior remedial efforts
5  that it had tried but failed to abate the problem
6  were more adequately enforced in 2018 than they
7  had been previously?
8    A.  Again, like I've said before, we were
9  constantly evolving this process.  So the answer
10 would be we've never stopped changing and making
11 sure that our measures are better.  That was
12 the whole goal.  We have done that since the
13 beginning.  If that didn't work, we would go
14 to another plan.  We would try something else.
15   MR. PHILLIPS:  Shelly, it's 12:45.  Is it a
16 good time for lunch?
17   MR. KULWIN:  A couple more questions, and
18 then we can tie it up because I'm going to go
19 to another topic.
20 BY MR. KULWIN:
21   Q.  All I'm saying is you had set out a
22 bunch of remedial efforts before 2018.  Did you
23 make any specific efforts to say, look, we've had
24 all these remedial efforts; we've really got

Page 136

1  to ensure that they're being enforced now?  Was
2  there any additional push in 2018 that hadn't
3  occurred previously?
4    A.  There was always a push.
5    Q.  Was there an additional push?
6    A.  And I said there was always a push.
7  There wasn't an additional push.  There was
8  always a push for the measures we put in place.
9  Why would we put them in place if we're not going
10 to push for them?
11   Q.  Not to put them in place, sir.  The
12 question was in 2018 was there any additional
13 efforts made by CCSO to ensure that prior
14 remedial measures that they had put in place
15 were being fully enforced in 2018?
16   A.  And like I said before, we were
17 constantly putting things out to enforce the
18 remedial measures put in place.  We never
19 stopped.  And when you say "additional" isn't
20 when you change and you continue to push
21 something that we continued to evolve and push
22 out remedial measures and make sure that we
23 were -- we added -- continued to add and change
24 depending on what was happening.

37 (Pages 133 to 136)

Page 185

1  make sure we're --
2  **Q.** It's in your answer.
3  **A.** I understand that. I'm asking what your
4  definition is of it so we're speaking the same
5  language.
6  **Q.** When you said in your notice 30(b)(6)
7  response that you were going to testify to the
8  CCSO's systemic response, what did you mean?
9  **A.** I mean that the measures -- the remedial
10  measures that we've taken over and over to
11  address this problem.
12  **Q.** Systemwide?
13  **A.** Systemwide, yes.
14  **Q.** So my question to you is the same.
15  Okay? What systemwide effort did you take
16  to remediate the specific problem of improper
17  cuffing that was helping people to masturbate
18  inappropriately? That's all.
19  MR. PHILLIPS: Other than what he has
20  already testified to.
21  BY MR. KULWIN:
22  **Q.** Other than what you've already said, was
23  there anything?
24  **A.** Well, we -- for SMU tier, we put a

Page 186

1  loophole in place for them to be connected to
2  that tier when they're out for their hours out
3  in SMU.
4  **Q.** Does that mean they were locked up on
5  that tier?
6  **A.** They were put to that eye bolt, and they
7  were cuffed to that eye bolt so they couldn't
8  move around. Other than that, I can't think of
9  anything else.
10  **Q.** At some point in time -- we talked about
11  this. It's my understanding that the first time
12  that the CCSO looked at a special type of uniform
13  to deal with this masturbation/indecent exposure
14  issue would have been sometime in mid-2015; is
15  that accurate?
16  **A.** I believe so, yes.
17  **Q.** And you reached out to other institutions
18  to see if they had used such uniforms?
19  **A.** Yes, we reached out to other facilities,
20  other correctional institutions.
21  **Q.** As a result of that in your efforts to
22  remediate this problem, did you learn that other
23  institutions had acquired uniforms that were
24  effective in dealing with the problem?

Page 187

1  **A.** We did. I don't know about effective
2  with dealing with the problem, but we learned
3  that they had acquired uniforms that had the
4  same type of issues that we experienced with our
5  jumpsuits where they could rip them and open up
6  the crotch.
7      They were tied to the back. A lot of
8  the ones that we found tied to the backs, they
9  secured from the back where inmates can't go to
10  the bathroom without the assistance of staff, and
11  they were mostly in correctional centers where
12  they had been convicted and found guilty of a
13  crime. And so our challenge was do you risk
14  allowing the staff to have to help them and
15  assist them to go to the bathroom versus
16  different alternatives. And so we tried to
17  come up with different alternatives.
18      (Curry Exhibit No. 21 marked.)
19  BY MR. KULWIN:
20  **Q.** I show you what I have marked as 21,
21  251470 through 251474. You've seen this before,
22  correct?
23  **A.** I have.
24  **Q.** It's an e-mail from Debbie Boecker,

Page 188

1  B-O-E-C-K-E-R, to you concerning indecent
2  exposure, uniforms that were used in California
3  to control masturbation and indecent exposure.
4  Was this uniform considered?
5  **A.** It was.
6  **Q.** And it was rejected why?
7  **A.** Well, it was what I just said. We found,
8  one, it's in the Department of Corrections, not
9  in a jail. It could easily be opened at the
10  groin area, ripped at the groin area, which
11  creates a problem, and it's secured from the back
12  where the inmates would have to have assistance
13  with even going to the bathroom.
14  **Q.** Let me take those one step at a time if
15  I could. The fact that it was in a correctional
16  center as opposed to a jail, are there limits
17  that the jail can restrict inmates who engage in
18  conduct --
19  **A.** We're not --
20  **Q.** Let me finish.
21      -- who engage in conduct that violate
22  the policies of what type of uniforms they can
23  wear? You weren't restricted, were you?
24  **A.** We're restricted in that they can't have

**50 (Pages 185 to 188)**

Page 189

1 on like a straightjacket or anything like that.
2    **Q.**  You weren't restricted just because you
3 were the county jail using a uniform like this,
4 correct?
5    **A.**  Well, there were legal concerns with the
6 fact that they were restricted.  I don't know
7 if this is any different than a straightjacket.
8 How do you go to the bathroom?  How do you
9 relieve yourself without the assistance of staff?
10    **Q.**  Did you get some type of legal opinion
11 that this was illegal?
12    MR. PHILLIPS:  You can answer that question
13 yes or no as to whether you got legal advice
14 about this but not as to the content of any
15 legal advice you got.  Do you understand my
16 instruction?
17    THE WITNESS:  Yes.
18    MR. PHILLIPS:  Okay.
19 BY THE WITNESS:
20    **A.**  Yes.
21    **Q.**  You got legal advice?
22    **A.**  We talked --
23    MR. PHILLIPS:  Not who you talked to, not
24 what you talked about.  Just yes or no.

Page 190

1 BY MR. KULWIN:
2    **Q.**  Who counseled you legally about the
3 legalities of this uniform?
4    MR. PHILLIPS:  You can disclose the name of
5 the attorney as long as you don't disclose the
6 content of any advice you received from that
7 attorney, if you know the name of the attorney.
8 BY THE WITNESS:
9    **A.**  I don't exactly know if it was Nick
10 Scouffas or another lawyer in the office, but
11 it was one of our legal representatives in the
12 office that had concerns with it.
13    **Q.**  In house?
14    **A.**  Yes.
15    **Q.**  Did he put that in writing anywhere?
16    **A.**  I don't know.
17    MR. KULWIN:  Is it on a privilege log
18 anywhere?  Because I haven't seen it.
19    MR. PHILLIPS:  I don't know if it's on a
20 privilege log.  I don't know if it's in writing.
21    MR. KULWIN:  So to the best of your
22 knowledge, there's nothing in writing to that
23 effect if it's not in a privilege log as we sit
24 here today?

Page 191

1    MR. PHILLIPS:  Well, that's not exactly what
2 I said, Shelly.
3    MR. KULWIN:  Okay.  As we sit here today,
4 unless it's on a privilege log --
5    MR. PHILLIPS:  Well, if your question is, is
6 it in writing, I can look into whether there's
7 anything in writing, but I'm not aware of
8 anything in writing.
9 BY MR. KULWIN:
10    **Q.**  You said that it can be ripped at the
11 crotch.  How did you determine that?
12    **A.**  We talked to California, and they said
13 that's what -- if I remember right, that's what
14 they had reported back to us.
15    **Q.**  Any e-mail to that effect?
16    **A.**  Not that I'm aware of.
17    **Q.**  Because it talks about interest in the
18 recent conference.  Was that an ACA conference;
19 do you know?  It says, "Good afternoon - during
20 the recent conference."
21    **A.**  I don't know.  I believe it was, but I
22 don't know for sure.
23    **Q.**  There's nothing in this e-mail that
24 indicates anything about it being able to be

Page 192

1 ripped easily.  They're just recommending it.
2 Do you know if that's in writing anywhere?
3    **A.**  No, I don't.
4    **Q.**  And then the last thing is about
5 assisting people to go to the bathroom.  If
6 an inmate is in the lockup at the courthouse
7 awaiting their court appearance and they have
8 to go to the bathroom, how do they do that?
9    **A.**  (No response.)
10    **Q.**  If they're in the lockup waiting for
11 their court call --
12    **A.**  Yes.
13    **Q.**  -- how do they go to the bathroom if
14 they need to?
15    **A.**  There's a bathroom in the lockup.
16    **Q.**  In the lockup?
17    **A.**  Yes.
18    **Q.**  So if they were wearing one of these
19 uniforms, they would either have to wait, or they
20 would have to come out and be assisted?  They
21 would have to be undone so they could go to the
22 bathroom, and they would have to come back out to
23 get it put back on, correct?
24    **A.**  Correct.

51 (Pages 189 to 192)

Page 193

1    Q. Would that be some type of impediment
2 to the administration of the lockup on those
3 occasions where that occurred?
4    A. Impediment as far as to the staff or to
5 the --
6    Q. Disrupt the whole procedure. Was it a
7 big deal?
8    A. No. I don't think that was the reason
9 for the...
10    Q. And then if they had to wear them at the
11 jail and they had to go to the bathroom, they
12 would go to their cells, right? They have a
13 bathroom in their cell, correct?
14    A. They could go to their cell or to the
15 dayroom, yes.
16    Q. If you were going to use this uniform at
17 all, they would have to be assisted into it and
18 out of it every day regardless, right --
19    A. Yes.
20    Q. -- to get it on and off, right?
21    A. Right.
22    Q. So going to the bathroom really isn't a
23 big deal, right? That's not a big disruption?
24    A. Well, on and off, period, is a

Page 194

1 disruption, I guess, is an issue.
2    Q. Is that a bigger disruption than having
3 them drop trou and masturbate in front of the
4 female employees?
5    MR. PHILLIPS: Object to the form of the
6 question.
7 BY MR. KULWIN:
8    Q. Sir?
9    A. Well, I think that we developed our own
10 jumpsuit, and although it doesn't close in the
11 back, it models a lot of the same things that it
12 does here. So our goal was to create something
13 that we thought would serve the same purpose but
14 not invite our staff to have to assist them with
15 going to the bathroom.
16    Q. Did you look into the cost of acquiring
17 these uniforms?
18    A. I didn't. I'm sure that it was looked
19 at, but I don't know what they cost.
20    Q. But they were available for purchase,
21 correct?
22    A. Yes, I believe so.
23    Q. Did you look into whether other
24 institutions had used them effectively?

Page 195

1    A. We had checked with institutions, but I
2 don't know all of them off the top of my head. I
3 think -- I know they talked to California.
4    Q. With respect to 313s, in the fall of
5 '15, you also looked at -- strike that question.
6    MR. PHILLIPS: Shelly, if we're moving on to
7 jumpsuits, is this a good time to take a break?
8    MR. KULWIN: Sure, if you want to. We're
9 not moving on to jumpsuits, though.
10    MR. PHILLIPS: Okay. Why don't you finish
11 up that one then, and then we'll take a break.
12 BY MR. KULWIN:
13    Q. Did CCSO as part of a remedial effort to
14 stop this conduct, in particular masturbation,
15 consider arm and hand mitts?
16    A. We did.
17    Q. When?
18    A. I don't remember the day off the top of
19 my head.
20    Q. Would it have been as early as 2015?
21    A. It could have been.
22    Q. Why was that rejected?
23    A. Because it didn't stop their range
24 of motion. It didn't appear that it would

Page 196

1 effectively stop their range of motion and
2 stop the behavior.
3    MR. KULWIN: Let me show you what we'll mark
4 as 22.
5       (Curry Exhibit No. 22 marked.)
6    MR. KULWIN: This is a lengthy -- it's a
7 group exhibit actually. It's a lengthy memo.
8 Mike, I gave you a copy, right?
9    MR. PHILLIPS: I have a copy of this.
10 BY MR. KULWIN:
11    Q. It's a lengthy several page -- it
12 starts with CCSO 268949 and goes through 951, and
13 in the middle of it -- and I apologize -- is a
14 three-pager that is 925 through 928.
15       So the first question I have is, if you
16 look at the one that's dated 11/9/2017 within
17 this Group Exhibit 925 through 927, these were
18 directed to you. Is this the type of mitts that
19 you looked at?
20    A. Yes.
21    Q. They were available for purchase,
22 correct?
23    A. Yes.
24    Q. $54 apiece, correct?

52 (Pages 193 to 196)

Page 197

1    A.  That's correct.
2    Q.  The way these are pictured, it would
3  look like the mitts would be cuffed to the
4  waistband, and the hands would be completely
5  enclosed, correct?
6    A.  Yes.
7    Q.  Wouldn't that be a serious deterrent
8  to masturbating, exposing yourself and
9  masturbating in public if your hands are covered
10  like that and hooked --
11    A.  You don't think a man can masturbate
12  with mitts on their hands?
13    Q.  -- with mitts on their hands while it's
14  cuffed to their belt?
15      My question to you is do you think so?
16    A.  Yes, I do.
17    Q.  Okay.  Let me ask you, was the cost
18  of -- let me withdraw that.  I apologize.
19      Is that why you say on page 268951,
20  "I am not sure this will help?"
21    A.  Yes, that's why I said that.
22    Q.  And then Ms. Jones Tapia says, "Order a
23  sample to test."  Was that done?
24    A.  I don't know if it was done.

Page 198

1    Q.  Did the cost have any influence as to
2  why this was not considered as a remedial effort?
3    A.  Not for me.  I see that somebody else
4  did.
5    Q.  It says here, yes, on page 268949,
6  this is from Kunz to Ms. Tapia.  "Good
7  Afternoon."  This is on November 9th, 2017.
8  Who is Joan Kunz?
9    A.  She was, like, in charge of purchasing
10  at that time.
11    Q.  I did reach out to Handcuff Warehouse,
12  but due to the cost of these mitts ($54.90), they
13  are unable to send samples."  Then the response
14  is, "There goes that idea."  And then Brogan
15  says, "Of course."  Was that indicating that
16  because of the cost this --
17    A.  Well, I think this is indicating that
18  because we couldn't try them and we didn't know
19  if they would work and they wouldn't give us a
20  sample that they weren't going to move forward.
21    Q.  Did the CCSO consider purchasing one
22  sample to see if it would work for $55?
23    A.  No, I didn't.
24    Q.  Are you aware of anybody at CCSO doing

Page 199

1  that?
2    A.  Not that I'm aware of.
3    Q.  Recently in 2018, starting --
4    MR. KULWIN:  I'm still on uniforms.  I'm
5  almost done with uniforms.
6    MR. PHILLIPS:  That's fine.
7    MR. KULWIN:  We can break before I finish.
8    MR. PHILLIPS:  Ask your question.  Go ahead.
9  BY MR. KULWIN:
10    Q.  Recently in 2018, CCSO starting working
11  with a company called Bob Barker.  I only laugh
12  because it's Bob Barker.
13    A.  I did too.
14    Q.  It's not the same Bob Barker, is it?
15    A.  I think it is actually, but I'm not
16  sure.
17    Q.  Wow.
18    A.  I think it is, but don't quote me on
19  that.
20    Q.  That would be wild, wouldn't it?
21      In any event, you started working with a
22  company that's a product specialist on jumpsuits
23  for the 313 inmates, correct?
24    A.  I'm sorry.  Say that one more time.

Page 200

1    Q.  In early 2018, as a remedial effort to
2  help eliminate this masturbating, you started
3  working with Bob Barker to design a jumpsuit
4  specifically for 313 and 323 violators, correct?
5    A.  I think we purchased a jumpsuit, but we
6  did modifications on our own.
7    Q.  I'm talking about in '18.
8    A.  Oh, sorry.
9    Q.  Starting in '18, did you start working
10  with a company called Bob Barker to design a
11  specific jumpsuit to eliminate masturbation and
12  indecent exposure?
13    A.  Yes.  I remember I was trying to.
14    Q.  They ultimately presented a design to
15  you in mid-'18, correct, June?
16    A.  I believe so, yes.
17    Q.  And what came of that effort?
18    A.  I don't remember.  I have to look at the
19  design.  I don't remember what happened.
20    Q.  But it was not purchased?
21    A.  I don't believe so.
22    Q.  Did the cost have anything to do with
23  it?
24    A.  No, not that I'm aware of.

53 (Pages 197 to 200)

Page 201

1    Q.  Do you recall what the defects in it
2  were at all?
3    A.  I don't.  I would have to look at it.
4    Q.  I see.  I'm almost done with this issue.
5      Were you aware that early on in 2016 --
6  strike that.
7      CCSO, however, had also looked at two
8  companies to design such uniforms in January of
9  2016, Bob Barker and the Ferguson Group, true?
10   A.  I don't remember.
11     MR. KULWIN:  Let's see if I can refresh your
12  recollection.
13       (Curry Exhibit No. 23 marked.)
14  BY MR. KULWIN:
15   Q.  This is a multipage document e-mail
16  from Debbie Boecker.  It's the interagency
17  coordinating committee meeting minutes, and it
18  starts at Bates 252933.  If you turn to page
19  Bates 252938, you'll see in the middle paragraph
20  safety garment in Level 10.  They're talking
21  about that.
22   A.  What's the page number again?  I'm
23  sorry.
24   Q.  It's 252938, the second bracket where

Page 202

1  it says, "Dr. Nunez."  You'll see that Barker and
2  Ferguson were consulted back then.
3    A.  I think this is discussing suicide
4  smocks and blankets.
5    Q.  But at that time, CCSO in their efforts
6  to do remediation became aware that there were
7  companies that they could go to that would sell
8  them specifically designed uniforms to deal with
9  exposure and masturbation, correct?
10   A.  Correct.
11   Q.  And then after you looked at that in
12  '15 -- you can put that one aside -- you decide
13  to move to retrofitting your own uniforms, true,
14  in '16?
15   A.  True.
16   Q.  And that would have been about June '16?
17  Here, you don't have to look at that.  I'll give
18  you the document.
19       (Curry Exhibit No. 24 marked.)
20  BY MR. KULWIN:
21   Q.  This is 24.  This is an e-mail between
22  Jeffrey Metzner, who is a doctor in Colorado,
23  and Nneka Jones Tapia, Bates-stamped 256858 and
24  859.  This indicates that you're looking at

Page 203

1  inmate uniforms to minimize issues with
2  masturbation from staff, correct?
3    A.  Correct.
4    Q.  Why were they consulting with
5  Dr. Metzner in Colorado; do you know?
6    A.  Dr. Metzner was part of the medical --
7  he was a medical monitor with the Department of
8  Justice.
9    Q.  I see.  Okay.
10   A.  So I don't know if -- they were asking
11  him if like -- I think he had given them
12  recommendations of stuff he had seen at other
13  places.
14   Q.  That was effective?
15   A.  Yes, I believe.  That's why they were
16  talking to him.
17   Q.  I see.  Okay.
18     Now, this happened in June of '16, and
19  then they started producing them in July of '16;
20  is that right?
21     Here, I'll just go through it.  I'm just
22  trying to speed things along, but here you go.
23  Here's the next exhibit.
24   A.  It says they were designed in August of

Page 204

1  '16.  So it looks like we started developing in
2  June, and then we designed them in August.
3    MR. KULWIN:  I think you're off.  Look at
4  this exhibit.  Can you mark it?
5       (Curry Exhibit No. 25 marked.)
6  BY MR. KULWIN:
7    Q.  This is Exhibit 25, an e-mail dated
8  July 1st, 2016, Bates-stamped 257114.  It
9  indicates that by July 1st of 2016 you had
10  25 retrofitted uniforms from sizes 5 XL to
11  4 medium ready to be used.  Do you see that?
12   A.  I do.
13   Q.  Is that accurate?
14   A.  Based on this, it appears to be.
15   Q.  Okay.  But then, as I understand
16  it, these were not distributed until October
17  of '15, correct, if you know?
18   A.  Well, according to my affidavit, they
19  were distributed in October.
20   Q.  October?
21   A.  Yes.
22   Q.  So we're in agreement on that?
23   A.  Yeah.
24   Q.  There was a delay between July and

Page 205

1 October before they were distributed?
2 MR. PHILLIPS: Object to the form.
3 BY MR. KULWIN:
4 Q. Is that right?
5 MR. PHILLIPS: You can answer the question.
6 I just made an objection.
7 BY THE WITNESS:
8 A. Yes.
9 Q. Now --
10 MR. PHILLIPS: Why don't we take a break
11 now. We've been going an hour and a half. Okay?
12 MR. KULWIN: Sure.
13 (Short recess.)
14 MR. PHILLIPS: The witness would like to
15 correct some of his prior testimony about the
16 Bob Barker uniforms.
17 MR. KULWIN: Okay. Before he does, let the
18 record reflect that -- I'm not implying anything,
19 but I do think it's important to put on the
20 record that we had a break. And the witness
21 consulted with his counsel. Now he wants to
22 correct something. Go ahead.
23 THE WITNESS: I just want to point out that
24 we've been working with Bob Barker. I didn't

Page 206

1 know that they were continually working with
2 them. And they actually have delivered a
3 prototype of a jumpsuit to us of 70 that are
4 in testing right now.
5 BY MR. KULWIN:
6 Q. Do they look like the ones I showed you?
7 A. I don't know what they look like.
8 Sorry.
9 Q. Then that opens up an important point
10 for me. CCSO was aware that Barker and Ferguson
11 were out there available to design these type
12 of jumpsuits as early as '15, though. We've
13 established that.
14 So is there any reason why CCSO waited
15 until 2018 to work with this company to design a
16 special protective suit?
17 A. Well, I think that, again, we've always
18 tried to evolve in making things better. And the
19 jumpsuit that we had -- if this is something
20 better than what we're using, we'll use it. So
21 they actually custom-made this. We are the
22 prototype for this jumpsuit. They didn't have
23 anything like this, so we'll just have to see how
24 this works.

Page 207

1 Q. So the answer is you wanted to wait to
2 see how the retrofitted ones worked first before
3 you went outside to purchase anything, fair?
4 A. No. The answer is that we have a
5 jumpsuit that if it's appropriately placed on and
6 fitted appropriately, it does delay. It never
7 was designed to prohibit the behavior. It was
8 designed to give staff the time to respond, to
9 get out of the area, and to be able to address
10 the situation. That's the same thing with
11 the other -- like the other jumpsuits, they can
12 be ripped, and they can be torn the same way.
13 So, again, it was the jumpsuit is designed to be
14 a deterrent.
15 Q. It was CCSO's view that they could not
16 design a jumpsuit or acquire a jumpsuit that
17 could actually prevent the behavior but only slow
18 it down; is that what your testimony is?
19 A. What I'm saying is that the jumpsuits
20 that we have seen so far, none of them would have
21 stopped the behavior if they all easily could
22 be manipulated to still allow the behavior to
23 happen. I haven't seen anything that's foolproof
24 that's been developed.

Page 208

1 Q. And other than the one you saw from
2 California and the one you just got from Barker,
3 what have you looked at?
4 A. We looked at the mitts. We looked at --
5 you know, we've looked at other -- jumpsuits I've
6 seen for 20 years. I mean, I've been in this
7 business for 30 years now. I've seen all kinds
8 of different jumpsuits but nothing that would
9 ever stop this behavior.
10 Q. Well, not to beat it into the ground,
11 Mr. Curry, but when this behavior started
12 becoming a problem in 2014, did CCSO ever
13 undertake to remediate the problem a study of
14 various companies that offer these type of
15 uniforms and do testing with in-the-back
16 fastening combined with mitts and properly sized
17 and fitted for violators of this conduct? Did
18 they do that at any time?
19 MR. PHILLIPS: Object to the form as to the
20 term "study." You can answer that question.
21 BY THE WITNESS:
22 A. I believe I have answered that question.
23 We have continually evolved with the different
24 things, like, to try to fight this. The jumpsuit

55 (Pages 205 to 208)

Page 209

1 was one part of the measure that we put into
2 place, one part of many, many different things we
3 put into place.
4 **Q.** I understand that, but my question
5 is very specific. In '14 and '15, you had
6 already confronted a serious problem with this
7 masturbation and exposure. Did you ever order a
8 test uniform, mitts, purchase one, purchase a
9 uniform, purchase mitts, try it on, try it in the
10 field? Did you do anything like that to see if
11 it would work?
12 MR. PHILLIPS: Object to the form of the
13 question. Compound. You can answer the
14 question.
15 BY THE WITNESS:
16 **A.** We did not order a jumpsuit.
17 **Q.** Now, ultimately you -- by the way, these
18 jumpsuits that were just delivered, what do they
19 cost?
20 **A.** I don't know what they cost. I don't
21 think there is a cost to them because they're a
22 prototype. I don't think they put a price tag on
23 them yet.
24 **Q.** They're not giving them to you for free?

Page 210

1 **A.** Yeah.
2 **Q.** You're just getting them for free?
3 **A.** We're trying them right now, yeah. It's
4 a prototype.
5 **Q.** They haven't told you what the cost is
6 going to be?
7 **A.** No. I just answered that question. No.
8 **Q.** So the CCSO is trying out a prototype
9 uniform without knowing what the cost would be
10 if they actually decide to use it?
11 **A.** Yeah. It shows you we really don't
12 worry about the cost, do we?
13 **Q.** It doesn't show me that at all actually.
14 It shows me a lot of things but not that.
15 So let me ask you this question, sir:
16 Once you retrofitted this uniform on your own,
17 you ultimately concluded that there were
18 problems; is that correct?
19 **A.** Well, as I've already said, we -- the
20 jumpsuit -- any jumpsuit that I've seen can be
21 manipulated. This one can be manipulated. They
22 can tear it apart. They could not put it on
23 appropriately if staff allow them to. They
24 cannot fasten it all the way to the top if staff

Page 211

1 allow them to.
2 **Q.** What systematic efforts did the CCSO
3 undertake to ensure that inmates -- by the way,
4 are you looking at notes to yourself right now,
5 Mr. Curry?
6 **A.** These are notes, yeah.
7 **Q.** I would ask you to put them aside. You
8 shouldn't be reading your answers off of notes.
9 MR. PHILLIPS: He can read his notes to
10 refresh his recollection if he wants to.
11 MR. KULWIN: Then I would like a copy of the
12 notes.
13 MR. PHILLIPS: Yes, that's fine.
14 MR. KULWIN: But I would like him to answer
15 the questions.
16 MR. PHILLIPS: Sure. I don't think he was
17 using the notes to answer the questions.
18 MR. KULWIN: All right. Good.
19 BY MR. KULWIN:
20 **Q.** What systematic efforts did CCSO take
21 first to ensure that inmates were only given
22 protective uniforms that were appropriate in
23 size for them between 2015 and 2018?
24 **A.** Well, as I've said before, we had the

Page 212

1 video monitoring the unit and watching the
2 televisions. We had -- I had one staff member
3 who continually did audits of the tier to make
4 sure they were in proper uniform, and if they
5 weren't in proper uniform, we disciplined the
6 staff for them not being in proper uniform.
7 We had different -- you know, again,
8 it's the supervisor's job to make sure they're
9 in uniform. All those steps were in place to
10 make sure that they were being appropriately
11 equipped with the uniform and that they were
12 wearing the uniform.
13 **Q.** That didn't answer my question with all
14 respect.
15 A person is found violating 313 or 323,
16 and they're required to put on one of these
17 uniforms, correct?
18 **A.** Correct.
19 **Q.** They come to get the uniform, correct?
20 **A.** They --
21 **Q.** The uniform is brought out to be put on
22 them, correct?
23 **A.** Right.
24 **Q.** What steps did CCSO undertake to ensure

**56 (Pages 209 to 212)**

Page 229

1    which basically is the best way to put it. So if
2    they violated in courts, courts was treating it
3    as they violated, and that communication between
4    courts and corrections was not going back and
5    forth.
6        Q.   What efforts did CCSO undertake to
7    ensure in order to remediate this problem that
8    courts and the jail were coordinating efforts
9    between 2014 and 2017 to identify all violators
10   that needed these uniforms?
11       A.   That's one of the reasons that we put
12   the alerts into CCOMS, and that's also one of
13   the -- we also, before we got the alert put into
14   CCOMS, started having them share information back
15   and forth based on a spreadsheet or some type
16   of -- I think it was a spreadsheet that they kept
17   between the two. And they would communicate that
18   information back every day as to who was coming
19   to court the following day, from DOC to courts,
20   that was a 313 or 323 violator.
21       Q.   And that first occurred, though, in late
22   2017, correct?
23       A.   The communication?
24       Q.   Yes. What you just discussed. Before

Page 230

1    you keep looking, if you don't recall, let me see
2    if I can help you.
3        A.   Okay.
4        Q.   Director Morales, was he the fellow or
5    woman that was in charge of the courts?
6        A.   She was with at the time -- I believe
7    at the time it was Executive Director Avant or
8    either Executive Director Kelly Jackson. Avant
9    retired during this time frame.
10       Q.   So Morales covered the courts?
11       A.   Morales and either Avant or Jackson.
12   Both were the same role.
13       Q.   Isn't it, in fact, that CCSO first
14   learned about the separate list that the court
15   was keeping in November of 2017?
16       A.   (No response.)
17       Q.   Let me see if I can refresh your
18   recollection. I assume you don't recall.
19       A.   Well, I know that in October of '17 we
20   started holding them at the bridge, so that would
21   probably fit the timeline.
22            (Curry Exhibit No. 26 marked.)
23   BY MR. KULWIN:
24       Q.   Is that correct --

Page 231

1        A.   Yes.
2        Q.   -- that the CCSO first learned that the
3    court was keeping a separate list of detainees
4    that had engaged in 313 or 323 behavior in
5    November of '17?
6        A.   That courts was keeping a separate list,
7    yes.
8        Q.   And that allowed multiple individuals
9    who had violated 313 or 323 not to be placed in
10   uniform when they should have been placed in
11   protective uniforms, correct?
12       A.   Well, I think what was happening is, is
13   courts -- yes, I believe that's correct.
14       Q.   Okay. And what systematic effort did
15   CCSO take prior to '17, in '16, and '15 and in
16   '14 to ensure that this coordination was taking
17   place, if any?
18       A.   Well, I don't think that anybody
19   realized that they weren't communicating back and
20   forth, and when we found out about it, we took
21   steps to make sure that they were.
22       Q.   Moving to a different subject. Put that
23   aside.
24            Did there come a point in time that

Page 232

1    the CCSO determined that putting film or using a
2    glazier, G-L-A-Z-I-E-R, to treat windows at the
3    jail would be an effective strategy to prevent
4    masturbation and exposure?
5        A.   Yes, sir. I know we talked about it.
6        Q.   Did you begin talking about it as early
7    as May of 2015?
8        A.   I don't recall.
9            (Curry Exhibit No. 27 marked.)
10   BY MR. KULWIN:
11       Q.   I'm showing you what's marked as 27.
12   This is Bates-stamped 251098, and then there's a
13   separate page 251101 that I'm asking you about.
14   This shows that in May of 2015, CCSO was using
15   paper to cover the windows in Tier 1A to prevent
16   the inmates from seeing out to the attorneys as a
17   step to avoid masturbation, correct?
18       A.   Yes.
19       Q.   And then if you turn to the next page,
20   the 101 page, this shows that it was a fix until
21   Debbie got us the tints that Sal asked for back
22   in May of, I assume, 2014. Do you see that?
23       A.   I see that.
24       Q.   So a couple questions about this. First

**61 (Pages 229 to 232)**

Page 233

1  of all, this indicates that the masturbation
2  problem was serious enough in May of 2014 that
3  they were asking for the windows to be tinted,
4  correct?
5      MR. PHILLIPS:  Object to the form of the
6  question.  You can answer the question.
7  BY THE WITNESS:
8      A.  It appears that way, yes.
9      Q.  And Debbie is the person who is in
10  charge of supplies and things of that nature?
11      A.  I think you're getting her confused with
12  Joanie.
13      Q.  Okay.
14      A.  But Debbie -- Joanie reports to Debbie.
15      Q.  Okay.  Great.  And what's Debbie's last
16  name?
17      A.  Boecker.
18      Q.  So a year later we still haven't gotten
19  these tints.  Ultimately, though, did they get
20  the tints in '15, '16, or '17 for these windows?
21      A.  I believe they did.
22      Q.  Do you know when they were first
23  installed?
24      A.  I do not.

Page 234

1          (Curry Exhibit No. 28 marked.)
2  BY MR. KULWIN:
3      Q.  This is a memo from Superintendent
4  Walsh.  Do you know who he is?
5      A.  Yes.
6      Q.  Who was he?
7      A.  He's --
8      Q.  I mean, from Lieutenant Galan to
9  Superintendent Walsh.  Who is Walsh?
10      A.  Walsh is the superintendent over
11  Division 10.
12      Q.  And did you know Lieutenant Galan?
13      A.  I do, yes.
14      Q.  And he worked in 10?
15      A.  Yes.
16      Q.  Now, this seems to be a memo that he
17  writes seeking solutions to the problems that
18  he's seeing in Division 10.  Okay?  It says,
19  "I wanted to take the opportunity to share some
20  personal recommendations regarding the Incidents
21  of behavior that have arisen within the last few
22  months in Division Ten."
23          I want to go to the last paragraph on
24  that page of 252408.  He says, "Plexi-glass has

Page 235

1  been placed on tier 1A on the first 8 cells and
2  it stopped."  He's referring to the masturbation,
3  I believe.  "I hear that there is only one window
4  glazier on the compound and where he can only get
5  to it whenever he can.  This should be a priority
6  where installation should not stop until the job
7  is complete."  This is in 2015.
8          What systematic effort did CCSO
9  undertake between '15 and now to get a glazier
10  in to glaze the windows to preclude the detainees
11  from being able to see out and then discourage
12  masturbation and exposure?
13      MR. PHILLIPS:  Object to the form of the
14  question.
15  BY MR. KULWIN:
16      Q.  If any.
17      A.  I believe the glazier was an employee
18  of the department of facility management.  So it
19  would have been up to them to hire additional
20  people to get the job done, and we would have
21  obviously pushed for them to do that.  But they
22  don't work for us.  They work for -- I believe
23  this glazier was an employee of facilities
24  management and not an employee of the Sheriff's

Page 236

1  Office.
2      Q.  You mean the county facilities
3  management?
4      A.  Yes, sir.
5      Q.  What efforts did CCSO make to get the
6  glazier to do that throughout the system during
7  that three-year period?
8      MR. PHILLIPS:  Object to the form.
9  BY MR. KULWIN:
10      Q.  If any.
11      A.  I don't know what -- I'm not aware of
12  anything that -- I don't know if Nneka would have
13  talked to facilities management.  She talked to
14  them all the time, but I don't remember anything
15  off the top of my head.
16      Q.  He indicates that it effectively stopped
17  this behavior.  Given how serious the behavior
18  is in the institution, wouldn't that be a bell
19  ringer that CCSO would want to undertake if this
20  works?
21      MR. PHILLIPS:  Object to that question.
22  Misstates the document.
23      MR. KULWIN:  All right.  Let me rephrase it
24  then.

62 (Pages 233 to 236)

Page 237

1      MR. PHILLIPS: I'm not quite sure what the
2  question is.
3      MR. KULWIN: Let me rephrase it.
4  BY MR. KULWIN:
5      **Q.**  Did the CCSO determine that the
6  Plexiglas placed on Tier 1 helped stop
7  masturbation, as I believe this indicates?
8      MR. PHILLIPS: Make sure you read the
9  document, Brad.
10      MR. KULWIN: I'm not reading it right?
11      MR. PHILLIPS: No, I don't think so.
12      MR. KULWIN: Do you think it goes to him
13  being spit on and having urine thrown on him?
14      MR. PHILLIPS: Yes, that's what the
15  paragraph is.
16      MR. KULWIN: How do you do that through a
17  window?
18      MR. PHILLIPS: That's what the paragraph
19  above is.
20  BY THE WITNESS:
21      **A.**  The Plexiglas was put in place to stop
22  that, and Plexiglas was just so that it couldn't
23  be projected out of the cells.
24      **Q.**  I see.  Okay.

Page 238

1      **A.**  I believe that's what he's talking
2  about.
3      **Q.**  Okay.  That's what he's talking about.
4  All right.  I stand corrected, and I apologize.
5      You're familiar with the idea that one
6  of the things that was happening from '15 to '17
7  was that inmates were sticking their penises out
8  of the chuckholes.  Are you aware of that?
9      **A.**  Yeah.  I had heard of that happening,
10  yes.
11      **Q.**  It happened on a somewhat regular basis.
12  Are you aware of that?
13      MR. PHILLIPS: Object to the form.
14  BY MR. KULWIN:
15      **Q.**  You don't know?
16      **A.**  Not on a regular basis, no.
17      **Q.**  Detective Galan indicates that "every
18  chuck hole can be easily kicked open.  To place
19  a dead bolt or a lock and key device (as in
20  division 9) would eliminate this issue."
21      Did CCSO undertake to put in that
22  equipment to preclude chuckholes from being
23  opened by the detainees so they could stick
24  their penises out of them?

Page 239

1      MR. PHILLIPS: Object to the form.  You can
2  answer.
3  BY THE WITNESS:
4      **A.**  I know that we pushed for facilities
5  management to affix the chuckholes, whether that
6  was putting on a dead bolt or affixing an actual
7  locking mechanism.  I know that we pushed for
8  that.  But, again, they work for facilities
9  management.  They didn't work for us.
10      **Q.**  Do you know whatever happened?
11      **A.**  I believe they were fixed where they
12  work appropriately.  I don't remember it not
13  happening.
14      **Q.**  But you don't know right now when it
15  happened between '15 and '17, if at all?
16      **A.**  I do not, no, sir.
17      **Q.**  Ultimately in 2017, material was placed
18  on the windows in Division 9 on the doors and
19  windows that would preclude the detainees from
20  seeing out of the windows.  Are you familiar
21  with that, that CCSO undertook to do that as a
22  remedial measure?
23      **A.**  And this was?
24      **Q.**  In late '17.

Page 240

1      **A.**  I'm sorry.  Where?
2      **Q.**  Division 9.
3      **A.**  On the actual tier windows you're
4  talking about?
5      **Q.**  Yes, I think so.  Division 9 doors and
6  windows.
7      **A.**  Yes.
8      **Q.**  Okay.  You're aware of that?
9      **A.**  Yes.
10      **Q.**  And you're aware that it was effective
11  in stopping masturbation and indecent exposure to
12  a certain degree?
13      **A.**  I believe it was.
14      MR. KULWIN: Let me show you this one.
15          (Curry Exhibit No. 29 marked.)
16  BY MR. KULWIN:
17      **Q.**  Earlier you mentioned that in '18 the
18  masturbation incidents were down by 30 percent.
19  This material was put in Division 9 where some
20  of the most frequent occurrences occurred in late
21  '17.  Was this one of the reasons why it dropped
22  30 percent, if you know?
23      **A.**  Again, I think it was a lot of the stuff
24  that we put in place was the reason that they

**63 (Pages 237 to 240)**

Page 241

1 dropped. So I would say --
2 Q. Was this one of them?
3 A. -- this would have been one of them,
4 yes.
5 Q. In this e-mail Bates-stamped 270376
6 through 378, Ms. Jones asks whether it would be
7 possible also to cover officers' windows on each
8 of the tiers. Has that been done?
9 A. The officers' windows on each of the
10 tiers? I'm not sure.
11 Q. It says, "Would it be possible to also
12 cover the Officer's window to each of the tiers?"
13 The officer's window.
14 A. I'm not sure that I know what they're
15 talking about. Let me read this here.
16 Q. Sure.
17 A. I don't know. I know that you could
18 see -- Mike Carberry says that the material
19 was not as effective as desired. Regina Wagner,
20 the DFM foreman, which is facilities management
21 like we talked about earlier, was investigating
22 an alternative. And then I see that Nneka says
23 that she believes it's working on Division 9
24 doors. I don't know if it was ever installed on

Page 242

1 the officer's window.
2 Q. My question is, after Ms. Jones Tapia
3 determined that these type of treatments were
4 working effectively on Division 9, did CCSO
5 undertake to put it in other divisions, and your
6 answer is you don't know; is that correct?
7 A. I know we painted the dayroom lines. I
8 know that, but I don't remember whether we did
9 all the tinting or not.
10 Q. If I understand it correctly, another
11 remedial effort that CCSO -- well, strike that.
12 Let me put it to you this way: Did CCSO
13 undertake to ensure that 313, 323 violators were
14 criminally charged? Did they take steps to that
15 effect?
16 A. Yes. As I said earlier, I met with
17 investigations and told them that this was a top
18 priority of the office and made sure that they
19 understood that this was something that had to be
20 addressed immediately when they heard about it.
21 We made it part of an automatic notification
22 from the division to what we call the
23 administrative officer line to make sure that the
24 supervisors in DOC knew of a masturbation event

Page 243

1 and that it was addressed immediately.
2 Q. Now, 313, 323 violators cannot be
3 criminally prosecuted until they're first
4 arrested, is that correct, by the Sheriff's
5 police?
6 A. Right.
7 Q. They have to be arrested, correct?
8 A. They have to be arrested, yes.
9 MR. KULWIN: Let me show you this one.
10 (Curry Exhibit No. 30 marked.)
11 MR. PHILLIPS: You have two things stapled
12 together, Shelly, that I think are unrelated.
13 It's the third and fourth pages specifically. I
14 think it's something else.
15 MR. KULWIN: This is how we got them.
16 MR. PHILLIPS: Okay. Well, they were just
17 produced consecutively, but they're not part of
18 the same document.
19 MR. KULWIN: I don't know. This is how I
20 got them.
21 MR. PHILLIPS: Okay.
22 BY MR. KULWIN:
23 Q. So this is 30. This is Bates-stamped
24 02582 through 85. There has been an indication

Page 244

1 that they're not related by CCSO's counsel. I
2 don't know. But let me ask you some questions
3 about this.
4 John Vega, he's the head of the
5 investigations unit that would be charged with
6 making sure that violators were arrested?
7 A. Yes.
8 Q. By violators, I mean 313 and 323
9 violators. You understand that, right?
10 A. Yes.
11 Q. So am I reading this correctly? First
12 of all, on the first page it says, "Subject: PI
13 Numbers." Do you see that?
14 A. Yes.
15 Q. And that's public indecency?
16 A. Yes.
17 Q. And it's dated just a short time ago,
18 January 4th, 2019?
19 A. Right.
20 Q. And this indicates that in 2015 only
21 30 percent of the 313, 323 violators were
22 arrested. Did I read that right?
23 A. Yes.
24 Q. And in '16, 47 percent were arrested?

**64 (Pages 241 to 244)**

Page 245

1    A.  Yes.
2    Q.  And in '17, only 47 percent were
3  arrested?
4    A.  Correct.
5    Q.  And in '18, only 50 percent were
6  arrested.
7       How does CCSO undertake as a remedial
8  measure to make sure that 313 and 323 violators
9  are going to be prosecuted if they have such low
10  percentages of arrests?
11    MR. PHILLIPS:  Object to the form of the
12  question.  You can answer the question.
13  BY THE WITNESS:
14    A.  Well, some of the reasons for no arrest
15  are the felony review rejected the arrest, the
16  victim.
17    Q.  Wait a second.  Felony review doesn't
18  reject an arrest.  They reject the charge.
19    A.  They have to approve the charge, yes.
20    Q.  This is arrests.  They're not even being
21  arrested.  I'm not even sure you understand the
22  question.
23    A.  No.  I understand the question.
24    Q.  This is indicating that only 30 percent

Page 246

1  of the people who engaged in the conduct were
2  even arrested as a first step towards criminal
3  prosecution, and in the subsequent years
4  47 percent, 50 percent.
5       My question to you, sir, is, how does
6  CCSO undertake as a remedial measure to stop
7  masturbation to prosecute these people criminally
8  if they themselves are not arresting all the
9  people who are engaging in the conduct?
10    MR. PHILLIPS:  Object to the form of the
11  question.  You can answer the question.
12  BY THE WITNESS:
13    A.  Well, I believe that what is being
14  said here is that there were 255 total incidents,
15  and of those, 127 arrests because of -- they were
16  arrested because the victim cooperated.  They had
17  sufficient evidence.  There was enough to move
18  forward.  So I believe that that's what they're
19  referring to.
20    Q.  And earlier we talked about a backup in
21  CIID, a lack of staffing, and that got corrected
22  by 2018 you said, correct?
23    A.  Yes.
24    Q.  Wouldn't the backup in '15, '16, and '17

Page 247

1  also contribute to the low arrest levels?
2    MR. PHILLIPS:  Object to the form.  You can
3  answer the question.
4  BY THE WITNESS:
5    A.  It wasn't that they weren't arrested.
6  They just weren't processed as fast as we would
7  like.
8    Q.  Going back to that exhibit, is it the
9  CCSO's position that the reason that there were
10  low percentages of arrests in those years of 313,
11  323 violators was because there was insufficient
12  evidence or lack of cooperation of witnesses?
13    A.  Insufficient evidence, lack of
14  cooperation, or felony review denying the charge.
15    Q.  But, again --
16    A.  I understand what you're saying.
17    Q.  You understand felony review has nothing
18  to do with arrests?
19    A.  Right.  I understand that, but I think
20  that's what he was trying to point out is that
21  of those, that these were the ones that moved
22  forward with the cases.
23    Q.  But CCSO was aware that individuals
24  wanted to press charges but were unable to do so?

Page 248

1    A.  But were what?  I'm sorry?
2    Q.  Unable to do so.  Female employees at
3  the jail and civilian employees wanted to press
4  charges but couldn't.  They were unable to.
5    A.  Why?
6    Q.  That's what I'm asking you.
7    A.  I'm not aware that they couldn't.
8       (Curry Exhibit No. 31 marked.)
9  BY MR. KULWIN:
10    Q.  I show you Curry 31.  It's Bates-stamped
11  253556.  It's an e-mail dated 2/24/16.  This is
12  just an example of a discussion of individuals
13  who want to bring criminal charges, but no one
14  has contacted them.
15       Was CCSO aware of any problems in female
16  employees being able to effectuate pressing
17  charges against 313 and 323 violators?
18    MR. PHILLIPS:  Object to the form of the
19  question.
20  BY THE WITNESS:
21    A.  Sorry.  What's your question again?
22    Q.  I just handed you an example of a
23  situation where an employee wanted to press
24  charges, and nobody contacted them.

**65 (Pages 245 to 248)**

Page 261

1  **Q.** In any event, this one that says Sexual
2  Misconduct By Detainees Directive, November 28,
3  2017, do you see that it says -- and you're
4  holding one in front of you that's different.
5  **A.** I gotcha.
6  **Q.** I'll pull that one out too just to make
7  things easier. Hold on. I've got it here. Yes,
8  that's the one.
9  (Curry Exhibit No. 33A marked.)
10 BY MR. KULWIN:
11 **Q.** I've given you two exhibits, 33 and
12 33A. Both are Policy 166. One is from the
13 Cook County Court Services Illinois Policy
14 Manual. One is from the Cook County Sheriff's
15 Policy Manual. I'll tell you there's another
16 one I think called 165 that's the custody manual.
17 The bottom line of it is that these
18 were issued on I believe November 28, 2017 or
19 December 1st, 2017. They're dated November 28,
20 2017, but apparently they were issued on
21 December 1st, 2017 according to 33A. You're
22 familiar with these, correct?
23 **A.** Yes.
24 **Q.** And by the way, this policy applies to

Page 262

1  all Cook County officers, correctional officers,
2  court deputy clerks?
3  **A.** 33A?
4  **Q.** Yes, 33A.
5  **A.** Yes.
6  MR. PHILLIPS: Do you have a copy of 33A?
7  MR. KULWIN: Yes.
8  MR. PHILLIPS: Did you give it to me?
9  MR. KULWIN: Yes.
10 (Discussion off the record.)
11 BY MR. KULWIN:
12 **Q.** What I want to get to is if you look
13 at 166.2.2 of this policy, this directs officers
14 on how to deal with specifically detainees
15 engaging in masturbation, indecent exposure,
16 or other physical aggression directed at other
17 people. Do you see that?
18 **A.** I do.
19 **Q.** Prior to this date, did the Cook County
20 Sheriff's Office in an effort to preclude this
21 type of behavior from occurring ever issue a
22 policy that specifically advised its officers
23 how to handle this type of behavior?
24 MR. PHILLIPS: Object to the form of the

Page 263

1  question.
2  BY THE WITNESS:
3  **A.** I'm not aware of another policy.
4  **Q.** Prior to this time period or at any
5  time, did CCSO undertake after it started seeing
6  this problem any specific training courses on
7  how to deal -- and I mean original training
8  courses, academy training courses, supplemental,
9  remedial courses for its employees on how to
10 specifically deal with masturbation, indecent
11 exposure, sexual misconduct in the manner
12 described in Policy 166?
13 MR. PHILLIPS: Object to the form. You can
14 answer the question.
15 BY THE WITNESS:
16 **A.** In the manner described in here, no.
17 But I'm going to tell you go back to the training
18 and going through the academy and starting with,
19 you know, they're taught how to handle difficult
20 situations.
21 **Q.** But isn't it true, sir, that even though
22 they go through the training and they're taught
23 how to handle difficult situations, officers
24 were, in fact, confused about how to handle

Page 264

1  inmates engaging in this type of masturbation and
2  indecent exposure? They didn't know what to do?
3  MR. PHILLIPS: Object to the form.
4  MR. KULWIN: I'll rephrase the question.
5  BY MR. KULWIN:
6  **Q.** Isn't it true, sir, that as late as
7  December of '15, if not later, trained officers
8  were uncertain about what type of force, if any,
9  they could use in dealing with masturbating
10 inmates?
11 **A.** We had staff who had used OC spray on
12 detainees. And I can think of one off the top
13 of my head, and that employee was -- that was
14 totally justified use of force. The employee
15 was not disciplined, and that was before this
16 directive came out.
17 **Q.** Well, my question is different. My
18 question is isn't it true, sir, that as late as
19 December of '15 officers were unsure of what
20 level of force they could use with masturbating
21 incidents and whether they could even use OC
22 spray?
23 MR. PHILLIPS: Object to the form. You can
24 answer the question.

69 (Pages 261 to 264)

Page 265

1  BY THE WITNESS:
2    A.  Going back again to what I said earlier,
3  that's why there's supervisors in the building
4  for direction to ask what are we allowed to do,
5  what aren't we allowed to do, what can we do.
6  And we have a use-of-force review unit just
7  specifically to handle uses of force that they
8  interact with daily.
9    Q.  My question, though, is that you seem to
10  be answering it with your answer.
11    The CCSO was aware that its officers
12  were confused about the level of force they
13  could use in dealing with masturbating inmates,
14  including whether they could use OC spray; isn't
15  that true?  They didn't know.
16    MR. PHILLIPS:  The same objection.
17  BY THE WITNESS:
18    A.  What was the last part?
19    Q.  They didn't know.  They weren't sure.
20    A.  If they didn't know, they had
21  appropriate ways to address it and bring it up
22  through their chain of command.
23    Q.  I understand that.  My question to you
24  is, was CCSO aware that they didn't know?

Page 266

1    A.  I would say that, again, like if
2  something was brought to us that they were
3  confused, we would have put things in place
4  to address it.
5    Q.  You said earlier that they got academy
6  training that dealt generally with subjects like
7  this.  Did you think that training was effective
8  in training people on how to deal with these
9  masturbating inmates in '15, '16, '17?
10    MR. PHILLIPS:  Object to the form of the
11  question.  You can answer the question.
12  BY THE WITNESS:
13    A.  I think that the -- you know, again, the
14  things that are put in place in the academy are
15  how to deal with stressful situations.  Is every
16  issue that we encounter as a correctional officer
17  addressed in the academy?  No, it's not.  So it's
18  just -- does that answer your question?
19    Q.  Not really, so I'll just ask it again.
20  We've just gone over a policy that was issued
21  specifically to advise officers specifically what
22  to do when confronted with masturbating inmates
23  or inmates engaged in indecent exposure, correct?
24    A.  Correct.

Page 267

1    Q.  That was issued pursuant to the
2  injunction that was received in this lawsuit in
3  late November of 2017.  That's what the policy
4  says, correct?
5    A.  Where do you see that in the policy?
6    Q.  The very first paragraph.  It describes
7  the lawsuit.
8    A.  Okay.  I'm with you.
9    Q.  Are you all right?
10    A.  Yes, sir.
11    Q.  Great.  Okay.
12    Now, what I'm trying to get at is in
13  2015, '16, and '17 before this policy was issued,
14  as we've just established, CCSO was confronting a
15  lot of this masturbation and indecent exposure.
16  We've established that, correct?
17    A.  Yes.
18    Q.  You've told me that the academy trains
19  people on how to deal with stressful situations,
20  how to deal with use of force, and how to use
21  OC spray.  You've told me about that, correct?
22    A.  That's correct.
23    Q.  Was CCSO aware that its officers were
24  not trained or effectively trained on what

Page 268

1  type of force they could use in dealing with
2  masturbation and public indecent exposure?
3    MR. PHILLIPS:  Objection to the form.  You
4  can answer the question.
5  BY MR. KULWIN:
6    Q.  Was CCSO aware?
7    A.  I think -- and I don't need you to do
8  the whole question again.  Just say the last part
9  again.
10    Q.  Was CCSO aware that despite all of the
11  general training prior to the issuance of this
12  policy its officers did not know what level of
13  force they were allowed to use in confronting
14  masturbating or exposing inmates?
15    MR. PHILLIPS:  The same objection.
16  BY THE WITNESS:
17    A.  I don't necessarily agree with that.  I
18  will tell you that this helped clarify to staff
19  what they could do and what they couldn't do, but
20  I don't necessarily agree that they didn't know
21  what they could do.
22    Q.  So I'll ask you this question.
23    A.  Okay.
24    Q.  Were they allowed to use OC spray in

70 (Pages 265 to 268)

Page 293

1  to a different area to work for a while. So we
2  do have an early intervention team that meets
3  with them. Some of the females refuse to talk
4  to them.
5     **Q.** We've gone over these discrimination
6  policies. Did CCSO ever have or does it have
7  today any specific sexual harassment policy that
8  deals with conduct by detainees towards its
9  female employees?
10    **A.** This prohibited sexual policy? Are you
11  talking about -- rephrase that again. I'm sorry.
12    **Q.** Did CCSO ever have a policy dealing
13  with detainees' sexual harassment towards its
14  employees other than what we have talked about
15  today that you're aware of, a specific policy?
16    **A.** Other than what we've already talked
17  about?
18    **Q.** Yes.
19    **A.** I'm not aware.
20    **Q.** Under its sexual harassment policy,
21  are supervisors required to report -- in order
22  to prevent sexually harassing conduct, are
23  supervisors required to report sexually harassing
24  conduct that they observe?

Page 294

1    **A.** Everyone is responsible for reporting
2  it.
3    **Q.** CCSO has a policy on remedial training.
4  You're familiar with that policy?
5    **A.** Yes.
6    **Q.** And by the way, again, that policy
7  applies -- let me rephrase that.
8      This in-service training that we just
9  went over, that's administered to all employees
10  regardless of whether they're in the court
11  service or the jail, whether they're male or
12  whether they're female, correct?
13    **A.** Correct.
14    **Q.** Okay. And just to get it out of the
15  way, I know I've asked this already, but all of
16  the policies that CCSO issues apply equally to
17  all of its employees regardless of what division
18  they work in, courthouse or jail; is that
19  correct?
20    **A.** That's correct.
21    **Q.** Do you know who the director of training
22  was between 2014 and 2018 at the CCSO?
23    **A.** Scott Kurdovich was, I believe, in '14,
24  and '15 would have been Tom Fleming. And it's

Page 295

1  currently Marie Rangle.
2      (Curry Exhibit No. 39 marked.)
3  BY MR. KULWIN:
4    **Q.** This is the training policy, Policy 301.
5  I think it's -- is it the same one?
6    **A.** I have 300.
7  MR. PHILLIPS: You gave me 204.
8  MS. CHRISTY: I have 301.
9  THE WITNESS: I have 300.
10      (Discussion off the record.)
11  BY MR. KULWIN:
12    **Q.** Here again, we have three policies on
13  training. It's 301 from the Cook County Court
14  Services Illinois Policy Manual, 204 from the
15  Cook County Court Services Illinois Policy
16  Manual, and 300 from the Cook County Department
17  of Corrections Custody Manual. To the best of my
18  knowledge, they're all the same. They just start
19  with different numbers. Is that what you have
20  there?
21    **A.** That's what I have here, yes.
22    **Q.** Since they're all the same, if you could
23  just look at the 301 Illinois Policy Manual.
24    **A.** Okay.

Page 296

1    **Q.** Again, since they're all the same, I'm
2  just going to have it all apply together.
3      If you turn to page 97035, which is the
4  second page of the document, it indicates that
5  you're required to give your officers training
6  on sexual assault and sexual abuse response and
7  report writing. Do you see that? It's in the
8  middle of the page.
9    **A.** Yes, I see it.
10    **Q.** And it also indicates -- your policy
11  indicates that both the training academy and the
12  director of training -- well, let's start with,
13  in 301.5 the policy says that the training
14  academy will conduct an annual training needs
15  assessment of the department and that that will be
16  reviewed by staff and that that will be the basis of
17  the training plan for the year. Do you see that?
18    **A.** I do.
19    **Q.** 301.6 says, "The Director of Training
20  shall establish a Training Committee, which will
21  serve to assist with identifying training needs
22  for the Department." Do you see that?
23    **A.** I do.
24    **Q.** My question to you is between 2014 and

77 (Pages 293 to 296)

Page 313

1    **Q.** Toward that same end, this was something
2    that was being directed at both males and
3    females, correct?
4    **A.** Yes.
5    **Q.** The masturbation that we talked about,
6    however, was directed largely at females; isn't
7    that true?
8    **A.** I would say that's true, yes.
9    **Q.** And the public indecency exposure was
10   directed largely at females, correct?
11   **A.** Yes, that's correct.
12   MR. KULWIN: I'm done. Thank you.
13   MR. PHILLIPS: We're certainly going to read
14   and sign, so we'll reserve signature.
15   THE REPORTER: Do you want your transcript
16   expedited too?
17   MR. PHILLIPS: I want whatever they're
18   getting.
19        (Signature reserved.)
20
21
22
23
24

Royal Reporting Services, Inc.
312.361.8851