Exhibit 9

```
 1                    TAVI BURROUGHS
 2        IN THE UNITED STATES DISTRICT COURT
 3           NORTHERN DISTRICT OF ILLINOIS
 4                  EASTERN DIVISION
 5   SDAHRIE HOWARD, DENISE HOBBS    )
 6   and ELLENOR ALTMAN, et. al.,    )
 7                                   )
              Plaintiffs,            )
 8                                   )
 9       vs.                         ) Case No.
10                                   ) 17-cv-8146
11   COOK COUNTY SHERIFF'S OFFICE,   )
12   and COUNTY OF COOK,             )
13                                   )
14              Defendants.          )
15
16         DEPOSITION OF TAVI BURROUGHS
17          Wednesday, September 26, 2018
18                Chicago, Illinois
19
20
21
22   Reported By:
23   TRICIA J. FLASKA, CSR, RPR
24   JOB NO. 147717
25
```

Page 42

TAVI BURROUGHS

BY MS. ORI:

Q I'm going to interject. When you say they come down, does that mean a correctional officer from the Sheriff's Office is bringing them down?

A Many times they are escorted. Sometimes they are not.

Q Okay.

A And they bring them to the dispensary area where I am. And then, yeah, they have to wait because they usually bring a group of them and I don't get to do them as a group, so it's a -- one-by-one situation. So, yeah, they end up waiting.

Q Where do they wait?

A There's a couple places. There's a waiting room in the dispensary itself. And then the work area that I'm usually at is down the hall from the actual dispensary. It's a clinical room where the nurses have their clinic, and that's where I am. And there's a hallway between the dispensary and my clinical room and that's where they wait.

Q How big is the dispensary area?

A I don't know.

Q We are in a conference room right now. Is

Page 43

TAVI BURROUGHS

it bigger than this room? Smaller than this room?

A It has several rooms.

Q Okay.

A It's like one big area, and then there's doctors offices and dental and mental health. So I don't know the exact.

Q How big is your work area?

A My work area is probably about the size of this room.

Q Okay. And you said nurses have a clinic?

A Yes.

Q How big is their clinic?

A They're with me in this room.

Q With you. You guys are working together?

A In a room this size, yes.

Q About how many people are working together at a given time?

A It's usually three of us.

Q One CMT and two nurses?

A In my daily situation, yes.

Q How many detainees can come into your work area at a time?

A Three. Because one for each of us.

Q Okay. And are they detainees handcuffed?

Page 44

TAVI BURROUGHS

A Not all the time.

Q Okay. Do you have any role in deciding if a detainee can be handcuffed or not handcuffed?

A Yes. I can ask the officer to handcuff a detainee if I feel uncomfortable.

Q Have you done that in the past?

A Yes.

Q Has an officer ever said no?

A No.

Q So when you're doing triage with these detainees, you're working on one detainee and the nurses are also doing triage on the other detainees?

A Yes.

Q And are you determining what needs to be done by the doctors? What sort of things are you doing in triage?

A Well, like I said, taking their vitals, maybe changing their bandages, maybe dressing wounds if they are there from a fight or something like that. I check their blood sugar. So those are the things that I do. I don't decide what the doctor does, no.

Q Then you said you also follow up on tasks that nurses and doctors give to you that you're able

Page 45

TAVI BURROUGHS

to do?

A Yes.

Q What sort of tasks are those?

A Mostly what I just described. Blood pressures. Accu-Check, which is the blood sugar. Any kind of wound care that I can do within my scope of practice, because some I can't. EKGs, if need be.

Q I have no medical background, so when you say you can't do some things in your scope of practice, what sort of things can't you do?

A Lots. There's a difference between like what paramedics can do and nurses can do and doctors can do. They have more education. They can do a lot more stuff than I can. So there are some types of -- for example, when I say wound care, there are some types of dressings that I can't do because I am a paramedic and not a nurse or a doctor.

For an example, when you have to pack a wound, actually shove gauze inside of a wound, I'm not licensed to do that. That's not in my description as a paramedic, even through the state, so I can't do that.

Q And you said that you also, in triage,

TAVI BURROUGHS

A Correct.

Q Is there anyplace else you would go to treat detainees?

A If an emergency happens anywhere else in the area, yes.

Q Where else would an emergency happen?

A A bathroom, an office. Like I said, the yard, the gym. Anywhere.

Q And do you typically -- is it common for you to be treating detainees in a bathroom, office, yard or gym?

A No, it's not.

Q It's mostly in the tiers or in the dispensary?

A Correct.

Q Okay. How many calls, on average, do you respond to on each shift? And I want to break it down to how many people you see in the dispensary versus --

A Emergencies?

Q -- emergencies.

A On an average shift, I would say probably two to three emergencies.

Q And then how many detainees do you see in

TAVI BURROUGHS

the dispensary?

A Depends on the day, but I would say an average would be -- well, let me have you clarify that question.

Do you mean patients that I physically see, like just in my vision or --

Q I mean, patients that you are treating with triage or following up on tasks in the dispensary.

A Okay. Usually, that's about 30 to 40 a day.

Q And when you say you treat two to three emergencies, typically what are the emergencies?

A Typically, they're self-harm or trauma from a fight.

Q So you said that, in the dispensary, it's usually two CMTs and one nurse -- one CMT and two nurses?

A That's correct, one CMT and two nurses.

Q When you go to emergencies, are you working with a partner?

A What do you mean by "a partner"?

Q Another medical staff -- anyone --

A Usually a nurse comes with me because I'm the only CMT in the building.

TAVI BURROUGHS

Q Would you ever consider Sheriff officers or correctional officers as part of a team, or do you consider them separate?

MS. WILLENSON: Object to the form.

A They are part of my team. When I need help, they help me.

BY MS. ORI:

Q Okay. Have you ever been in a situation where you needed help from a correctional officer or another Sheriff's employee and you asked for help and they didn't help?

A Not in an emergency.

Q Have there been instances where it's not an emergency and you ask for help in the Sheriff's Office employee and they don't help?

A Yes.

Q When would that happen?

A There have been times where I've had detainees say something to me, some kind of off-colored remark or threaten me or masturbate in front of me or show me their genitalia. And I bring it to the officer's attention and ask them to stop the detainee from doing it, and they don't always do that.

TAVI BURROUGHS

Q Do you ever follow up with them later on to find out why they didn't?

A That's not my job. If I feel strongly enough about it, I will go to their supervisor and tell them that they didn't help me when I asked for it.

Q And have you followed up with supervisors?

A I have.

Q Have you ever followed up with your own employer, with CCHHS or Cermak Health Services, to report that?

A I have advised my supervisor, yes.

Q How many times have you advised your supervisor?

MS. WILLENSON: Object to the form.

A Countless times.

BY MS. ORI:

Q Countless times. And who is your supervisor?

A Her name is Pulverenti.

Q Paul?

A Pulverenti. P-U-L-V-E-R-E-N-T-I.

Q Do you know what Pulverenti's job title is?

A I don't want to give you something

Page 110

TAVI BURROUGHS

Going back to 105 for a second. Do you think that the hospital could have prevented this ▓▓▓▓▓▓▓▓ from exposing himself to you?
  MS. WILLENSON: Object to the form.
  A  The hospital?
BY MS. ORI:
  Q  Or your supervisor. Could your employer have done something to prevent ▓▓▓▓▓▓ from exposing himself to you?
  MS. WILLENSON: Object to the form.
  A  I don't think I can answer that kind of question. That's above my pay grade. There are apparently policies and things in place for them to deal with these kind of things, and that's up to them whether they follow it or not.
BY MS. ORI:
  Q  As you sit here today, is there anything that could have prevented -- that you think could have prevented ▓▓▓▓▓▓▓▓ from exposing himself to you in January of 2018?
  MS. WILLENSON: Object to the form.
  A  I mean, that's a pretty general -- generalized question. Him as a person?
BY MS. ORI:

Page 111

TAVI BURROUGHS

  Q  Yes. Specifically, ▓▓▓▓▓▓▓▓
  A  No, because nobody can control what somebody else does in the moment. I can't control whether you're going to pick up your glass of water and -- no.
  Q  If you look at 106, this is a Staff Safety Incident Report filled out this time, right, by you?
  A  Uh-huh.
  Q  Exhibit is Bates CCHHS132 and 133. Exhibit you filled out this form, correct?
  A  Yes, I did.
  Q  And it looks like you filled it out roughly a monthly after the form was implemented, right?
  A  Correct.
  Q  Is this the first time you filled out a Staff Safety Incident Report?
  A  I don't recall because, like I said, there have been some others that I've filled out.
  Q  I believe your testimony was you think you filled out at least two, but you're not sure if there were more?
  A  Right. And I don't remember when the first one was.
  Q  What was the first -- here is the one Staff

Page 112

TAVI BURROUGHS

Safety Incident Report that I'm showing you, 106 --
  A  Uh-huh.
  Q  -- this deals with ▓▓▓▓▓▓, detainee.
  A  Yes.
  Q  What was the other incident report that you can recall filling out?
  A  The other that I recall filling out had to do with a detainee being brought into the dispensary without handcuffs, and he was supposed to be handcuffed because he was considered especially dangerous.
  Q  So can you think of -- so those are the two -- you talked about, two --
  A  Those are the two that I can recall right now.
  Q  You can't recall any others?
  A  Not right now.
  Q  Okay. So this was July 19, 2016. The narrative says, "While tending to two attempted self-hangings in Cell 7 on Tier 1D in Division 10, Detainee ▓▓▓▓▓▓ stood at his window and pulled his penis out of his pants and stroked it in plain view through the open chuckhole throughout the entire incident. When I backed up out of the Cell 7

Page 113

TAVI BURROUGHS

doorway, Detainee ▓ backed up towards his bed and pulled his penis completely out of his pants and continued to masturbate. I notified Sergeant Rocco. Returned to assisting my two patients."
  Is that a complete description of what happened in Cell 7 on Tier 1D?
  A  It's complete in reference to Detainee ▓▓▓▓ I'm not going to put the entire incident of what I was doing with the other patients because that's patient privileged information.
  Q  And you've had good training on that, I'm sure.
  A  Yes.
  Q  But that's all of the conduct of ▓▓▓▓▓▓ is that correct?
  A  Yes.
  Q  Did you tell ▓▓▓▓▓▓ to stop stroking his penis?
  A  No, I did not.
  Q  Did you ask him to put his penis away?
  A  No, I did not.
  Q  Why not?
  A  Because I was busy tending to patients. It's not my job when I'm doing something like that.

Page 114

TAVI BURROUGHS

It's the sergeant's job, which is why I alerted him.
   Q  And when you were attending to these self-hangings, was it just you and Sergeant Rocco in Cell 7?
   A  No. There were other officers.
   Q  Okay. How many other officers?
   A  I don't recall.
   Q  Do you know if -- any of the names of the other officers?
   A  No.
   Q  Do you know if the other officers saw [redacted] conduct?
   A  I don't know.
   Q  Did anyone tell Detainee [redacted] to stop what he was doing?
   A  I don't recall.
   Q  Did Sergeant Rocco see [redacted] conduct?
   A  I don't know.
   Q  So is it fair to say you told Sergeant Rocco about this after --
   A  No. I said I told him while he was doing it and went back to my job.
   Q  How I'm reading it, it says, you know,

Page 115

TAVI BURROUGHS

"Detainee [redacted] had his penis completely out of his pants and continued to masturbate. Period. I notified Sergeant Rocco and returned to assisting my two patients."
     When you notified Sergeant Rocco, was Detainee [redacted] still doing the stroking of his penis?
   A  I don't recall. I would assume so, but I don't know.
   Q  Did Sergeant Rocco say anything to Detainee [redacted]?
   A  I don't remember.
   Q  On page 1, on the top part of the document, it says, "Already in EMERS."
     Do you see that?
   A  I see that.
   Q  Does that mean that you also filled out an EMERS report?
   A  I did.
   Q  Did you ask any of the officers that were accompanying you in Cell 7 on the tier to fill out a CCOMS report?
   A  Not that I recall.
   Q  Do you know if a CCOMS report was filled out?

Page 116

TAVI BURROUGHS

   A  No, I don't know.
   Q  Who was your supervisor in July of 2016?
   A  I believe that would have been Laura Seerman.
   Q  Did you talk to Laura Seerman about this incident?
   A  No.
   Q  Did you talk to your union about this incident?
   A  No.
   Q  Did you talk to anyone -- any of your coworkers about this incident?
   A  I most likely did, but I don't recall specific incidents. You know, when you come back from -- when I came back from the incident or the call and came back to the dispensary, there were nurses there, and I'm sure I spoke to them about it because you always -- you always pass along information like that when you are involved in the incident.
   Q  Similar to the [redacted] incident, do you think that the hospital could have prevented Detainee [redacted] from pulling out his penis?
     MS. WILLENSON: Object to the form.

Page 117

TAVI BURROUGHS

   A  I don't know what you mean by the hospital preventing.
BY MS. ORI:
   Q  Would there have been a way to prevent [redacted] from pulling out his penis and stroking it?
     MS. WILLENSON: Object to the form.
   A  I don't know -- I'm not -- I don't know that.
BY MS. ORI:
   Q  Do you know if Sergeant Rocco conducted an investigation about this matter?
   A  No, I don't know.
   Q  Do you know if Detainee [redacted] suffered any disciplinary -- or had any discipline against him because of this?
   A  I do not know.
   Q  Can you recall any other incidents like Detainee [redacted] or [redacted] that you would have filled out in EMERS?
     MS. WILLENSON: Object to the form.
   A  There are so many incidences of this happening that, no, I can't recall any specific incident.

Page 122

TAVI BURROUGHS

investigations are done. I don't know whether charges are brought. I don't know what charges stick. I don't know any disciplinary action that happens. I don't know any of that. That would be considered being visible to me, if I were told or allowed to, perhaps, participate in some of it.

What was the other part of the question?

Q You said consistently and visibly?

A Consistency would be -- being consistent would be doing it the same every single time. If something -- if something were to happen like this, I don't get any kind of response. But when I tell you that I had to clear 12 people and I had to stay late to clear 12 people because I didn't have anybody else there to help me, so I had to stay over an extra hour of overtime, and you're calling me because you're concerned about the overtime that I'm collecting as opposed to how I was effected by having to treat and clear 12 people by myself, that's not consistent.

Q Has the conduct of the detainees -- you've been there for almost four years. Has the conduct been consistent or has it gotten better or worse?

MS. WILLENSON: Object to the form and

Page 123

TAVI BURROUGHS

foundation.

A I can't answer that kind of question in a -- that's too broad of a question.

BY MS. ORI:

Q Have you seen more incidents of detainees masturbating over time?

MS. WILLENSON: Object to form.

A I would say it's the same.

BY MS. ORI:

Q The same. Are you aware that an injunction was put in place in December of 2017?

A I'm aware of that, yes.

Q In your experience, has the injunction done anything to make the conduct better or worse?

A No, I don't believe it's changed at all.

Q Okay. Now we can go on to 107, which we have had.

A Okay.

Q This Exhibit 107, I believe it's an amended charge as well as an initial charge, if you look at 145.

Do you see that? So it's Howard 139 through 163 -- oh, you know what, I broke it -- it's not consistent pages.

Page 124

TAVI BURROUGHS

But you see two charges?

A I'm not sure what you're talking about.

Q If you look at the bottom of the page, you see CCHHSHoward139 is the first page, and then if you -- six pages later --

A Okay.

Q -- you see 145?

A Yes, I see that.

Q So it looks like these are two charges of discrimination with the EEOC?

A I -- I don't know the difference between the two.

Q And this was before I got involved in the case, so I don't know the difference either.

Have you -- prior to this case, have you ever filed an EEOC charge?

A Yes, I have.

Q Is the other EEOC charge dealing with the Chicago Fire Department?

A Correct.

Q No others?

A Correct, no others.

Q And it looks like you filed -- if you look at page 145 -- on December 7, 2017?

Page 125

TAVI BURROUGHS

A Yes.

Q Is that the initial charge that you had for this case?

A Well, it looks like there's an earlier one from January of 2015. I don't know what the difference is there.

Q That just says the dates the discrimination took place. But if you look at the file stamp, received December 7, 2017.

A Okay.

Q Do you see that?

A Yeah, I see that.

Q Okay. Do you know if you filed anything with the EEOC prior to December 7, 2017?

MS. WILLENSON: Related to this case.

MS. ORI: Related to this case, yes.

A No, I don't know that.

BY MS. ORI:

Q And you have a description with your charge, if you look at page 146.

A Uh-huh.

Q So you're currently assigned to Division 10, but it also states you've been in Division 9, Division 2, Division 11 and Receiving?

Page 126

TAVI BURROUGHS

Q Are those all divisions you've been assigned to?

A I have not been assigned to them. I was borrowed out to them, I guess you could say. My assignment is Division 10, but I have worked in those other buildings on occasion, yes.

Q Have you always been assigned Division 10?

A No. When I first started my employment with the county, I was assigned to Division 2. And then I was reassigned to Division 10 in October or November 2015.

Q If you look at paragraph 5 --

A Uh-huh.

Q -- you state that, "In performing our jobs, I and all other members of the proposed class of female health care personnel are chronically subjected to sexually hostile work environment resulting from CCHHS', the County's and the Sheriff's acquiescence in extreme forms of sexual harassment by male detainees who" -- and before I get to that second part, what acquiescence are you referring to?

A By not doing anything about it. By not

Page 127

TAVI BURROUGHS

responding to it. By not consistently following up with it. By not taking reports when I ask them to.

Q And we talked previously about responding, which I believe you want acknowledgement, feedback and repercussions to the inmate, correct?

A Yes, those are things I would like to see.

Q And it's your opinion that CCHHS, the County and the Sheriff have acquiesced this conduct?

A It is my opinion, yes.

Q And what's the basis for that?

A Based, again, on the fact that I don't get consistent responses to my complaints.

Q Do you think they could prevent the detainees' conduct?

MS. WILLENSON: Object to the form and foundation. Competence.

A I think there's things they could do to significantly reduce it.

BY MS. ORI:

Q What?

MS. WILLENSON: Objection to the form. Foundation. Competence.

A I'm not a security person, so I don't know all the things that they can do, but I feel like

Page 128

TAVI BURROUGHS

there's more they could do when it comes to supervision of inmates when they're in my area. They could change ways that they handcuff them. They could change uniforms. They could change disciplinary action that they receive if something -- if they do something like this. I'm sure there's other things they can do, but those are things I can think of off the top of my head.

BY MS. ORI:

Q You would agree that the hospital doesn't supervise the inmates, correct?

A The hospital, meaning what?

Q Cermak Health Services or CCHHS.

A They do not supervise inmates, no. That's officers.

Q And the hospital and CCHHS don't handcuff the detainees, correct?

A No. That's an officer.

Q And the hospital and CCHHS, Cermak Health Services -- when I refer to those words, I mean --

A I understand what you're saying.

Q Okay. They don't put detainees in uniforms, correct?

A No, they don't put them in uniforms.

Page 129

TAVI BURROUGHS

Q And the hospital is not in charge of discipline of detainees, correct?

A Not that I'm aware of.

Q So continuing on to paragraph 5. "They routinely expose the genitalia to us, brazenly masturbate in front of us, including, at times, aiming ejaculations at us."

Neither 105 nor 106, the two reports that I have, talk about ejaculation, correct?

A They don't.

Q Has a detainee ejaculated -- has he aimed ejaculations at you?

A There was a time where one ejaculated onto the glass in front of me, but I was on the other side of the glass.

Q When was that?

A I don't recall.

Q "They grope" -- continuing on -- "grope and grab us."

Neither 105 nor 106 talk about groping or grabbing.

A Not in those reports, no.

Q Do you have reports that you filled out?

A I do not. There have been instances, but I

Page 130

TAVI BURROUGHS

did not formally report them.
Q Why not?
A The one instance that I was groped, nobody witnessed it, so reporting it wouldn't have done any good.
Q Are you told that if no one else saw it, not to fill out the report?
A Not formally, but if -- I mentioned it after it happened and the officer that was closest to me said, well, I didn't see anything, so that was my answer to whether it was going to be reported or not.
Q Does the officer have any say on what can be reported or not?
A Yeah, because they're the ones that write the reports.
Q Did you fill out an EMERS report?
A I don't recall.
Q And you did not fill out a Staff Safety Incident Report, correct?
A No.
Q "The detainees subject us to sexually degrading insults and slurs."
A Yes.

Page 131

TAVI BURROUGHS

Q And you filled out reports stating that the detainees have subjected you to sexually degrading insults and slurs?
A I don't recall if I've put anything like that in EMERS. There's not really a place in that reporting system to do something like that. Like I said, there's boxes that you check that lead you into different areas of the form that you fill out based on what you answered prior, and I don't believe there's anything like that for verbal abuse.
And, again, that is something that is so prevalent, that nobody even takes it seriously when you talk about it.
Q Could you have filled out a Staff Safety Incident Report about if the detainee subjected you to degrading insults and slurs?
MS. WILLENSON: Object to the form.
A I could have. But if I did that, I'd be filling those out all day. I wouldn't have time to do my work because I hear them all day long.
BY MS. ORI:
Q The paragraph finishes, "and threatens us with sexual violence."
A Yes.

Page 132

TAVI BURROUGHS

Q Has a detainee threatened you with sexual violence?
A Yes.
Q When?
A Several times.
Q What was the threat?
A I've heard, "I'll bend you over a table and rape you 'til you bleed." I've heard, "I'll find you and your family and kill you all and your dogs." I've heard so many other things, I can't even tell you.
Q Have you submitted a report about these threats?
A No. Again, there's no point because nothing gets done. And if I did, I'd be writing these reports all day long because it's something that's so prevalent, that you -- you can't even differentiate between them anymore.
Q If you look at paragraph 9. "In addition to reported incidents, I have been assaulted by an inmate who grabbed my behind when I walked into a room."
When did this happen?
A That's the incident we were just talking

Page 133

TAVI BURROUGHS

about.
Q Okay. And you didn't fill out a report, correct, because you said no one saw it?
A Correct. And I said that right there. I didn't report it because no one else saw it and nothing is ever taken seriously when they can't prove it.
Q And you would acknowledge that if you don't report an incident, there is going to be nothing further that gets done about the incident, correct?
MS. WILLENSON: Object to the form.
A I can't say that. I don't know.
BY MS. ORI:
Q If you don't make a report?
A If I don't make a report, I don't know that anything will be done? I did say something to an officer. And because nothing was witnessed by anybody else, nothing was done. But I don't know what -- I don't know -- I don't know that.
Q If you look at paragraph 11, "I have witnessed and heard about similar sexual misconduct and aggression directed at other female healthcare personnel at the jail."
What have you witnessed?

34

Page 142

TAVI BURROUGHS

to. And this is something that I heard in passing. This is not -- this wasn't -- this didn't have anything to do with me personally.
BY MS. ORI:
Q Have you ever been present in a situation where Dr. Gomez disregarded safety concerns?
A I don't deal with Dr. Gomez at all. I don't even know what he looks like.
Q So, no?
A So, no.
Q As a CMT, do you attend mental health town hall meetings?
A No, I do not.
Q Is it fair to say that you have no personal knowledge of what happened and what was said at this meeting?
A What meeting?
MS. WILLENSON: The town hall meeting.
THE WITNESS: Oh, that they're talking about in here?
MS. ORI: Yeah.
A No, I don't have personal knowledge of it because I wasn't there.
BY MS. ORI:

Page 143

TAVI BURROUGHS

Q So you filed the initial EEOC charge December 7th, and then you filed an amended charge; is that correct?
A Yes.
Q Why did you file an amended charge?
MS. WILLENSON: Object to foundation.
A I don't know. That's something that my lawyer would have to answer direct -- I'd have to direct you to her.
BY MS. ORI:
Q If you go to Paragraph 18 on Bates stamp 143.
    Do you know who Kelly Polo is?
A Where are you at?
Q Paragraph 18.
A No, I don't know her personally.
Q If you look at Paragraph 9 -- sorry, I'm jumping over a little bit -- it says, "In one recent incident that occurred in November 2017, I was walking through the tunnel near the old receiving area of the jail. An inmate in a green jumpsuit -- which designates him as a sexual offender -- lunged towards me as I passed me and asked me if I wanted to fuck him."

Page 144

TAVI BURROUGHS

Did you submit a report about this?
A No.
Q Why not?
A As I said right there, there was a female sergeant nearby. I don't know if she witnessed it. I don't know where he was from. I don't know who he was. There's no basis really to report it.
Q And you didn't put it in EMERS?
A I don't recall.
Q And the Staff Safety Incident Report, you didn't fill out, correct?
A Not for that, no.
MS. ORI: I think we're at a good stopping point for lunch.
    (Recess held.)
BY MS. ORI:
Q Before we talk about the Second Consolidated Complaint, prior to filing the EEOC charges, you had a chance to review them, correct?
A I don't recall.
Q If you look at the first page of Exhibit 107.
    That's your signature?
A Yes.

Page 145

TAVI BURROUGHS

Q Okay. And it says right above your name, "I declare, under penalty of perjury, the above is true and correct."
    Correct?
A Yes, it does.
Q And if you look at 145, you signed this EEOC charge too?
A Yes, I did.
Q Right below where it says, "I declare, under penalty of perjury, the above is true and correct"?
A Yes.
Q So is it your testimony today that everything in the charging EEOC documents are complete and correct -- or true and correct?
A Well, you asked if I had a chance to review them. And, yes, I did.
Q And is everything that you submitted to the EEOC true and correct?
A For what's in here, yes.
Q Now, I'll look at the Second Consolidated Complaint.
    Did you review the Second Consolidated Complaint before it was filed?

TAVI BURROUGHS
A I believe partially, yes.
Q Is everything in the Second Consolidated Complaint regarding allegations that pertain to you true and correct and complete?
A From what I can recall, yes.
Q And if you want to take a minute to look at it.
MS. WILLENSON: You might direct her to the paragraphs that pertain to her.
BY MS. ORI:
Q Yeah. Paragraph 37. Actually, prior to paragraph 37, let's look at paragraph 26 on page 7. "Plaintiff Tavi Burroughs is a civilian female paramedic to who works at the jail providing medical services to detainees."
A Yes.
Q When it says "a civilian female paramedic," you are a -- is that correct?
A Yes, that's correct.
Q Okay. And civilian just means you're not a sworn officer?
A It means I'm not sworn personnel, correct.
Q And it states that you're jointly employed by the CCSO and Cook County Health & Hospital

TAVI BURROUGHS
Systems and/or the county.
Do you understand how the employment works, who your employer is?
MS. WILLENSON: Object to the form. Foundation.
A I understand that my employer is the Cook County Health & Hospital Systems, who places me inside the jail. So when I'm inside the jail, I have to follow rules and regulations that are set forth by the Sheriff's Office, as well as my own employer's rules and regulations. So, yes, I would consider that a joint employment.
BY MS. ORI:
Q Who told you you had to follow the rules and regulations of the Sheriff's Office?
A When you're orientated there, you are told you have to follow certain directives and orders and regulations when you're inside the jail for security purposes.
Q Did anyone tell you that you're jointly employed by the CCSO?
A I mean, they're all part of the county, so that's what I assume, that we're all under the same employer because we're all county employees. Just

TAVI BURROUGHS
because I'm not sworn doesn't mean I don't work for the county. So we all work for the county.
Q Did anyone tell you that you are jointly employed by the CCSO?
A That's never been specifically said, no.
Q Now, let's look at paragraph 37. Please read the whole paragraph before we --
MS. WILLENSON: To herself?
BY MS. ORI:
Q To yourself.
A Okay.
Q Is everything in paragraph 37 accurate?
A So far, yes.
Q Okay.
A Yes.
Q In the middle of the paragraph, it states, "On a near-daily basis, detainees call her a cunt, bitch, whore, dumb-ass bitch and other sexually degrading epithets."
 Have you ever filed an incident report about these sexually degrading epithets?
MS. WILLENSON: Do you mean any kind of report?
BY MS. ORI:
Q Any kind of report about verbal epithet --

TAVI BURROUGHS
A What do you consider a report? Because I have said something to officers like, this guy is over here talking, can you get him out of here? That's a form of a report. But formally writing a report, no, because, again, that would take all day long and I wouldn't get any work done because it happens all day.
Q So you have never submitted a written report?
A On any type of -- well, threats, yes. But just calling me names, not that I recall.
Q So you have never written a written report about being called names by detainees; is that correct?
A None that I can recall.
Q And you stated that you have verbally asked an officer to move a detainee; is that correct?
A To remove him from the area based on what was going on, yes, I have.
Q Have you told your employer, the hospital, about these verbal names being called to you?
A Not that I can recall specifically, but in -- in the moment, when I'm telling an officer what's going on, that's me reporting to someone above me

Page 150

TAVI BURROUGHS

that something's happening. It's not -- I'm not calling my boss, Ms. Pulverenti, and saying, this guy called me a bitch. But I am telling an officer that something happened. So from there is where I expect some sort of, you know, reaction or something along those lines.

Q Is the chain of command you reporting to officers?

A Yes and no. The chain of command on the medical side is my charge nurse and then my nursing supervisor, who is Ms. Pulverenti. But for my security reason, my first person that I go to is an officer; and if the officer can't or won't help me, then I move up to his sergeant or lieutenant or beyond.

Q Have you ever told your charge nurse about these verbal epithets?

MS. WILLENSON: Do you mean a specific one?

MS. ORI: Ever.

BY MS. ORI:

Q Have you ever told your charging -- your charge nurse --

A Yes.

Q -- that a detainee has --

Page 151

TAVI BURROUGHS

A Yes, I have.

Q Okay. When?

A Several -- several times.

Q Several times?

A It's another one of those things that's countless times because, most of the time, my charge nurse is sitting in the same room with me and they hear it or witness it.

Q When you tell the charge nurse about these epithets or the nurse hears the epithet, what happens?

A Nothing.

Q Do you ask the nurse to do something?

A No. Technically, in that situation, the nurse can't do anything because it's a security issue and that needs to be an officer that needs to take care of it.

When you have someone that's making me uncomfortable, I want them out of the room or I want whatever they're doing to stop, a nurse can't tell the inmate to leave or make them leave. It has to be an officer because it's a security issue.

Q When you ask the officer to remove the detainee due to the verbal epithets, does the

Page 152

TAVI BURROUGHS

officer comply sometimes?

MS. WILLENSON: Objection to form and foundation.

A It does not always happen, no.

BY MS. ORI:

Q When does it not happen?

MS. WILLENSON: Object to the form.

A That's -- I mean, that's too broad of a question.

BY MS. ORI:

Q Can you provide an example of when you asked an officer to remove a detainee due to the detainee saying an epithet to you and the officer telling you no?

A There was a specific detainee that would harm himself quite often, and he would come down to the dispensary for harming himself several times in a shift. And at one time, he called me a blue-eyed white devil, and said that he refused to deal with me.

So the sergeant and a couple of officers were standing there watching this, and when he said that, I looked at them. And the detainee refused to look me in the face, and I'm like, can -- this is

Page 153

TAVI BURROUGHS

done. There's no reason for me to deal with him if he's not going to let me touch him or do anything. And the sergeant just stood there and looked at me and said, well, doesn't he need anything else? No. He just insulted me, called me names and said he doesn't want to deal with me, can you get him out of here.

So it took me nudging him once or twice to get him out of there.

Q But the sergeant removed him?

A After I said something twice, yes.

Q Okay. Can you remember an example of a time where you asked a correctional officer or sergeant to remove a detainee and the sergeant or correction officer refused?

A Like said, no, I won't?

Q Yes.

A I don't recall a time when they specifically said, no, I'm not doing that.

Q Okay.

A However, that doesn't mean they didn't ignore my request or brush it off or say something like, you know, well, what's the point, nothing's going to happen anyways. There's a difference

Page 154

TAVI BURROUGHS
there, in my eyes.
    Them refusing to do it, just flat out refusing, or saying something like, what's the point, or ignoring my request, that's a little different in my eyes.
    Q  Paragraph 37 continues, "She has been assaulted by an inmate who grabbed her buttocks when she entered a room and lunged at by an inmate who asked if she wanted to fuck him."
    Is that referring to two incidences or one incidence?
    A  Two separate instances.
    Q  The first instance we talked about already, correct?
    A  Yes.
    Q  And you did not file a report on the first incident, correct?
    A  Correct. Because no one witnessed it.
    Q  Okay. The second incident. You were lunged at by an inmate who asked if you wanted to fuck him.
    When did that happen?
    A  We also talked about that instance. That was the one in the hallway that I put in the

Page 155

TAVI BURROUGHS
Complaint.
    Q  In the EEOC charge?
    A  In the charge, yes.
    Q  I believe you said you were in a hallway?
    A  Yeah.
    Q  And you did not file a report, correct?
    A  I did not.
    Q  You have been threatened with violence and death, the paragraph continues.
    A  Uh-huh.
    Q  Have we talked about all incidences where detainees threatened you with violence and death?
    MS. WILLENSON: Object to the form.
    A  Can't talk about all the instances because there's so many of them.
BY MS. ORI:
    Q  Have we talked about all instances you can recall?
    A  Ones that I can recall, yes. But they've been recounted in there.
    Q  And you're saying -- in here, you're referring to the Complaint or the EEOC charge?
    A  Both.
    Q  If they are in the EEOC charge or the

Page 156

TAVI BURROUGHS
Complaint, that encompasses all of the times that you can recall that you've been threatened with violence or death?
    A  That I can recall specifically, yes.
    Q  The paragraph continues, a detainee said to you "Bitch, I'll kill your ass. I'm going to find you when I get out of here. You and your family."
    Have we talked about that incident before?
    A  No.
    Q  Okay. When did this happen?
    A  I don't recall.
    Q  Were you in dispensary or in the tier?
    A  I don't recall specifically, but that was most likely in the dispensary.
    Q  Did you submit a report -- a written report?
    A  No. Again, because that was something that was so prevalent -- is so prevalent, if I wrote down every single time someone said something like that to me, I wouldn't get any other work done.
    Q  Did anyone hear the detainee say that to you?
    MS. WILLENSON: Object to foundation.
    A  I don't know.

Page 157

TAVI BURROUGHS
BY MS. ORI:
    Q  Do you know who the detainee is?
    A  No, I don't recall.
    Q  The paragraph continues, "She filed incident reports after male detainees exposed themself and masturbated in front of her."
    We looked at two incident reports, correct?
    A  That's correct.
    Q  Are there any other incident reports that you can recall that -- in CCOMS or on the Staff Safety Incident Report regarding detainees exposing themselves and masturbating in front of you?
    A  I don't know because I don't have access to those reports, without looking in the system. And I don't have access to CCOMS or EMERS.
    Q  So you're not aware of any CCOMS reports?
    A  I don't know. It could be that officers filed something on my behalf without saying something. I don't know.
    Q  And my question is: You're not aware of any other CCOMS reports, correct?
    A  No, I'm not aware of it.
    Q  Not saying they don't exist, just that you're not aware of them?

40

Page 158

TAVI BURROUGHS

A Yeah. I understand what you're saying now.
Q The paragraph continues, "The Sheriff's police investigator assigned to investigate one of these reports asked if she had provoked the inmate and told her that she should have looked away."
Do you know who the Sheriff's police investigator was?
A I don't recall her name.
Q It was a woman?
A It was a woman.
Q Do you remember which report she was asked to investigate?
A No, I don't remember. Don't remember. It was over the phone, so I don't -- I don't recall.
Q When she asked you if you had provoked the inmate, how did you respond?
A I said, "No."
Q And she told you that you should have looked away.
How did you respond?
A I kind of ignored that question because I felt insulted by that.
Q Did you do anything to report the Sheriff's police investigator's statements to you?

Page 159

TAVI BURROUGHS

A No, I didn't. At least not at that time. Can I continue on with that for just a moment?
Q Continue on with what?
A My answer. Because now I'm thinking about it. I didn't -- I didn't do something right away. I was a little hurt and offended by the way she answered, but this, that we're doing now --
Q Paragraph 37?
A No. This whole charge -- this whole lawsuit is about that.
Q Is about the Sheriff's police officer --
A Not that specific investigator. Just in general. Just one instance of indifference and -- it's just one instance of the indifference and the degradation that we get from both the inmates and the Sheriff's Office and my employer.
Q And just to follow up with paragraph -- from paragraph 37, the Sheriff's police investigator does not work for the hospital, correct?
A No, because she's a Sheriff's police investigator.
Q And you didn't report to the hospital the statements from the Sheriff's police investigator, correct?

Page 160

TAVI BURROUGHS

A No, I did not.
Q So prior to filing this lawsuit, I'm sure you and your attorney -- I don't want discussions about what you talked about -- brought claims, right? You know there's claims in this lawsuit? There's a Title 7 claim for a hostile work environment, if you look at page 29.
Do you see that?
MS. WILLENSON: Object to the form. Except for "Do you see that" is a clear question. We'll go with that. What paragraph are we on? I'm sorry.
MS. ORI: Paragraph 74.
MS. WILLENSON: 74?
MS. ORI: It starts on paragraph 74, is the first allegation under first claim for relief, Title 7, hostile work environment.
BY MS. ORI:
Q Do you see that?
A I see it, yeah.
Q Do you know what you need to prove to establish a hostile work environment?
A No, I do not. That is something that my lawyer would have to explain.
Q Okay. Do you know what deliberate

Page 161

TAVI BURROUGHS

indifference is?
A I don't have complete knowledge of that, no.
Q Okay. If you look at the next page, on page 30. The second claim for relief is equal protection, 42 U.S.C. 1983.
A I see that.
Q Do you know what is necessary to prove a 1983 claim?
A No, I do not.
Q Who do you allege at the hospital knew about what the detainees were doing?
MS. WILLENSON: Object to foundation. Competence.
A I'm not -- I'm really not privileged to know everybody that would see my information. I don't know who all up above me sees whatever I write. I don't know.
BY MS. ORI:
Q If you look at the next page, page 31. Illinois Civil Rights Act.
Do you see that?
A I do see that.
Q Do you know what is necessary to prove an

TAVI BURROUGHS

A  Everybody knows who ▇▇▇ is, so, yes, she heard about all the instances.
Q  Did you ask her to do something about ▇▇▇
A  No, because she couldn't do anything about it.
Q  Are those all the instances regarding ▇▇▇ you just testified to?
MS. WILLENSON: Object to the form.
A  No. Like I said, there's several, so many that I couldn't even tell you each one specifically. He was one that was down there -- down in the dispensary so often that I can't even recount all the times.
BY MS. ORI:
Q  Did he ever masturbate in front of you?
A  Yes, he did.
Q  And did you file a report about that?
A  I don't remember.
Q  Do you know if he was ever disciplined for his conduct towards you?
A  I don't know.
Q  Okay. Anything else about ▇▇▇ that I should know about?

TAVI BURROUGHS

MS. WILLENSON: Object to the form.
A  I don't know what else you're looking for.
BY MS. ORI:
Q  Any other conduct that he has done to you?
A  There's so much of it. Again, I can't give you anything else specific. It was a lot.
Q  So there were verbal threats?
A  Yes.
Q  He masturbated one time in front of you, or multiple times?
A  More than once, but I don't know a specific number.
Q  Anything else?
A  Name calling, verbal threats and masturbation. That's pretty much all he can do. He never laid hands on me. That's about the only thing he didn't do.
Q  And you can't recall right now if you submitted any written reports, correct?
A  No, I don't remember.
Q  Are there any other detainees like ▇▇▇ that you can recall right now we have not talked about?
MS. WILLENSON: Object to the form.

TAVI BURROUGHS

A  I mean, there's so many instances, I can't even -- like, you know, like the guy in the tunnel, that's a random person that I don't know who he is, where he was from, where he was going, and that kind of stuff happens all the time, too.
I walk in the tunnel every morning to go get labs, and there's hundreds of detainees moving back and forth between court and wherever they're going and there's always comments thrown out. So, no, I can't tell you that we've discussed every single instance of every single time that's happened.
BY MS. ORI:
Q  Can you recall any other specific instances right now?
MS. WILLENSON: Of what? I mean, this is very unspecific. Of what?
BY MS. ORI:
Q  Of detainee misconduct.
MS. WILLENSON: That's way too broad.
A  Yeah. There's too many instances for me to recount.
BY MS. ORI:
Q  I'm just trying to learn the universe of

TAVI BURROUGHS

the conduct that has occurred to you.
A  I understand. Like I said, there's always comments thrown out when you walk by. I remember one time, I was walking down the hall and there was a detainee in a green jumpsuit walking down the hall with his penis hanging out of his uniform while he was handcuffed to the back, just walking with this penis just swinging side so side, free for everyone to see.
Q  Did you file a report about that?
A  No, I did not.
Q  Have we talked about all the reports that you can recall?
MS. WILLENSON: I'm sorry. All the?
MS. ORI: The reports.
A  What do you mean by "reports"? Do you mean EMERS or do you mean CCOMS or both?
BY MS. ORI:
Q  Both.
A  That I can recall that I had filed -- yes, we probably have covered those.
MS. ORI: Well, then, I will turn it over to Mr. Leishman.
(Recess held.)

Page 258

TAVI BURROUGHS

Q Anything else specifically that you recall telling the investigator?
A No.
Q Do you remember anything that the investigator said to you in the interview?
A Other than asking me what happened, no.
Q Last page I'm going to ask you to look at is Bates stamp 919.
   Have you ever seen this document before?
A No, I have not.
Q Do you see that this is a -- this document is titled Misdemeanor Complaint at the very top left?
A Yes.
Q And the second line where information is filled in says that the complainant is Investigator Arias, No. 6194, for Paramedic Burroughs Complainant.
   You see that?
A I see that.
Q And below that, it says: "              ," and it gives his address, "has on or about January 24, 2018, at the location of the Cook County Jail, committed the offense of public

Page 259

TAVI BURROUGHS

indecency."
A I see that.
Q So do you have any basis to dispute that this is a criminal complaint that was filed against Detainee         for exposing himself to you on January 24, 2018?
A I have no basis to dispute that, no.
Q You don't know one way or the other?
A Honestly, you're right, I don't know one way or the other if this is a criminal complaint or not.
Q Have you been asked to testify at a criminal proceeding against Detainee         ?
A No, I have not.
Q Have you heard anything in follow-up to the incident report dated January 24, 2018?
A I knew that he had been removed from the building.
Q And he was removed from Division 10 and sent to segregation?
A I knew that he was removed from the building. I didn't exactly know where he went.
Q Other than that he was removed from the building, you haven't heard anything further in

Page 260

TAVI BURROUGHS

follow-up to the incident from January 24, 2018?
MS. WILLENSON: You mean, other than the interview? She went to the interview.
MR. LEISHMAN: That's fair.
BY MR. LEISHMAN:
Q Subsequent to the interview, have you ever heard anything further about what happened to Detainee         ?
A No.
Q Do you remember if you asked Deputy Etapa to file an incident report about Detainee         conduct?
A I don't recall specifically asking him to do it, but when I alerted him to what was going on, I assumed that he took that as his cue to file a report.
Q May I ask you to please take out Exhibit 107, the EEOC charge again. Referring to paragraph 5 --
MS. WILLENSON: I think there's two charges, Dave, so which --
MR. LEISHMAN: Go with the amended charge, please, so the second one.
MS. WILLENSON: No, I think -- wait -- the

Page 261

TAVI BURROUGHS

amended one is the first one on top.
MR. LEISHMAN: Okay. Let's go with the first one, then. Thank you.
BY MR. LEISHMAN:
Q You testified earlier that on one occasion, you saw a detainee ejaculate on a pane of glass, correct?
A Yes.
Q Do you remember when that occurred?
A I do not recall specifically, no.
Q Do you know whether any officer or deputy or Sheriff saw that conduct?
A There was an officer next to me in the interlock area, but I don't know that he actually saw it. No, I don't know that.
Q Do you know the name of that officer?
A No, I don't.
Q And this occurred, to the best of your recollection, more or less than a year ago?
A I couldn't honestly say one way or the other. Probably more than a year ago, but I can't say for sure.
Q Do you remember if it happened in Division 10?

Page 262

TAVI BURROUGHS

A It was in Division 10.
Q I wanted to ask you a question about paragraph 9 also. Paragraph 9, in the first sentence, you state that you have been assaulted by an inmate who grabbed your behind when you walked into a room.
You've identified that detainee elsewhere as ▮▮▮▮▮▮▮; is that correct?
A That is correct.
Q How did you identify ▮▮▮▮▮▮▮ as the one who grabbed your behind?
A Because he was coming in to sit down to see me. He was my patient.
Q Did you know him by name at that point or did you have to look his name up?
A I knew him by name.
Q Did he have any special medical needs that require your attention more frequently than other detainees?
A No. I don't recall what he was there for. Maybe -- I don't recall what he was there for, but he would have been on my normal task list.
Q You say that he grabbed your behind when you walked into the room.

Page 263

TAVI BURROUGHS

What room were you walking into?
A I was walking into the nurse clinic area where I normally work.
Q And he was already there?
A He followed me in the door. Like I walked in -- the officer walked in. I walked in. He walked in behind me.
Q Was an officer escorting him from the tier to your nurse clinic area?
A I don't know if he was escorted there or not.
Q So the officer proceeded first into the nurse clinic area?
A Yes.
Q And then you?
A Yes.
Q And then Detainee ▮▮▮▮?
A Yes.
Q And describe for me what he said.
A He brushed his hand against my buttocks as he walked by.
Q And you believe that was intentional?
A Yes.
Q Did you say anything to Detainee ▮▮▮▮?

Page 264

TAVI BURROUGHS

A At the moment, no.
Q Did you ever say anything to Detainee ▮▮▮ about him touching your buttock?
A No, I did not.
Q Did he say anything to you?
A He smiled at me when he sat down. But, no, he didn't say anything.
Q When did this occur?
A Earlier this year, but I don't recall when.
Q Do you know who the officer was that was in the nurse clinic area at the time?
A Etapa.
Q Did you tell Officer Etapa that Detainee ▮▮▮▮ had grabbed your butt?
A I did after the detainee left the room.
Q What did you say to Officer Etapa and what did he say to you?
A I said, "Did you see him touch my ass when he walked by me?"
Q And what did he say?
A He said, "No, I didn't."
Q Did you ask Officer Etapa to file an incident report?
A I don't recall if I asked him to file

Page 265

TAVI BURROUGHS

specifically an incident report. I just remember him asking me why I didn't say something when it happened.
Q How long after Detainee ▮▮▮▮ grabbed your behind did you tell Officer Etapa that it had happened?
A Within five or ten minutes. As long as it took for me to complete whatever task I had with the patient and then he left the room.
Q Anything else you said to Officer Etapa or he said to you that you can recall from that conversation?
A I remember saying, "Do you think they could have seen that on camera?"
Q Do you remember his response?
A No. I don't remember what he said.
Q To the best of your knowledge, are there cameras on the area of the nurse clinic where this occurred?
A There is a camera in that room, yes.
Q Did Officer Etapa say anything to you that indicated he did not believe that Detainee ▮▮▮▮ had grabbed your buttocks?
A No, he did not.

67

TSG Reporting - Worldwide    877-702-9580

Page 282

TAVI BURROUGHS

work in the jail that cause you emotional distress? For example, does having urine or feces thrown at you cause you emotional distress?

A It does.

Q Does responding to attempted self-hanging cause you emotional distress?

A Yes.

Q Are there any other types of conduct you experience when you're working in a jail that you believe cause you emotional distress?

A Conduct by who?

Q Anyone. Other than what you've already told me about today.

A No.

MR. LEISHMAN: I would like to take a few minutes, just review my notes and we can wrap up.

(Recess held.)

MR. LEISHMAN: Ms. Burroughs, I have just a few follow-up questions for you.

BY MR. LEISHMAN:

Q Are you aware one way or the other whether Detainee ▇▇▇▇▇▇, who you testified about earlier, has any type of mental illness?

A No, I'm not aware.

Page 283

TAVI BURROUGHS

Q Are you aware one way or the other whether Detainee ▇▇▇▇▇▇, who you testified grabbed your buttocks, has any type of mental illness?

A No, I'm not aware.

Q You testified many hours ago, I think, that you did not see any inmates exposing their penises or masturbating when you worked in the McHenry County Jail; is that correct?

A That is correct.

Q But you don't have any personal knowledge of whether that conduct occurred to any other medical personnel in McHenry Jail?

A No, I don't.

Q And you don't have any personal knowledge whether that conduct goes on today in the McHenry Jail?

A No, I don't.

Q And, likewise, you don't know whether or not, one way or the other, whether inmates in the Lake County Jail, at this point in time, exposed themselves and masturbated --

A Do you mean Kane County?

Q Yes, I meant Kane.

A No, I don't have any knowledge of that.

Page 284

TAVI BURROUGHS

Q You testified that you have yearly in-service trainings?

A Yes.

Q Do you have any -- strike that.

Do any of your yearly in-service trainings -- strike that again.

Are any of your yearly in-service trainings provided by the Cook County Sheriff's Office?

A I don't recall.

MR. LEISHMAN: I think Mrs. Ori has a couple question for you as well.

MS. ORI: Just very quickly.

RE-EXAMINATION

BY MS. ORI:

Q You talked about you have a second job as a paramedic in Tinley Park?

A Yes.

Q Do you have a -- is there a prohibition in Cook County regarding secondary employment?

A No.

Q Do you have to fill out a secondary employment form?

A Yes.

Q Have you done so?

Page 285

TAVI BURROUGHS

A Yes.

Q You mentioned there were probably two or three other incidents in addition to Detainee ▇▇ touching your buttocks where a detainee touched you, correct?

A Yes.

Q Did you tell your employer at the hospital about these incidents?

A No, I did not.

Q And then you stated for ways to make conduct -- suggestions you were providing about having access to reports in EMERS, do you know why you don't have access to reports in EMERS?

A No, I don't.

Q Do you know if you are prohibited from having access to reports in EMERS?

A Nobody has access to those reports, as far as I know, at least on the frontlines. Nurses, other paramedics, we don't have access to that. Once you put a report in, it goes off into space.

Q And do you know the reason why you don't have access?

A No, I don't know the reason.

MS. ORI: Marni might have some questions.

Page 290

1  TAVI BURROUGHS
2   Q  Are -- so despite the entry of the
3  preliminary injunction, not all detainees are
4  handcuffed at their medical appointments, correct?
5   MR. LEISHMAN:  Objection to form.
6   A  Most of them are not.
7  BY MS. WILLENSON:
8   Q  Most of the inmates -- I'll ask a better
9  question.
10   Currently, are all inmates handcuffed
11  during that medical appointments?
12   MR. LEISHMAN:  Object to form.
13   A  No, they're not.
14  BY MS. WILLENSON:
15   Q  Can you estimate what percentage of
16  detainees are currently handcuffed at their medical
17  appointments when they see you?
18   A  One percent.
19   Q  So it's been your observation that the
20  provision of the injunction related to the
21  handcuffing of detainees at medical appointments is
22  not being followed?
23   A  Yes.
24   Q  Now, Mr. Leishman asked you some questions
25  about symptoms of emotional distress.

Page 291

1  TAVI BURROUGHS
2   Do you recall that?
3   A  Yes.
4   Q  And I believe you didn't understand those
5  questions?
6   A  Correct.
7   Q  But you did testify to your feelings and --
8  how you feel in response to incidents of detainee
9  sexual harassment?
10   A  Yes.
11   Q  In addition to those feelings and reactions
12  that you have to detainee sexual harassment, what
13  emotional distress have you suffered as a result of
14  detainee sexual harassment at the jail?
15   A  Well, I would say that it has changed my
16  outlook on a lot of things I do as a paramedic.
17  I've noticed that my bedside manner is not as
18  cordial as it used to be.  I find myself being
19  really standoff-ish and quick to anger in dealing
20  with patients and people in my normal life.  I don't
21  like going to work.  I don't enjoy my job.  I don't
22  want to stay there.  I don't even want to retire
23  from there.
24   I find myself being more of a hermit.  I
25  don't go out as much because I don't want to run

Page 292

1  TAVI BURROUGHS
2  into people that I may have dealt with in the jail.
3  I don't socialize with people at work because I
4  don't want to talk about that place when I'm not
5  there.  I avoid going anywhere near there when I'm
6  not working.  If I have to go to a certain store or
7  doctor's office or whatever, I make sure it's
8  nowhere near the jail.
9   I just feel like -- being a paramedic, in
10  my eyes, has always been about helping people at
11  their worst moment.  I'm the cavalry.  I come to
12  save you and take care of you and pull you out of
13  whatever you've gotten yourself into.  And at the
14  jail, that is rarely something that I have to do.
15   However, the reason that I'm there is the
16  reason they hired me:  Because I can do that.  And
17  when you're there all day being berated and insulted
18  and threatened and degraded and humiliated, it
19  really makes you rethink why you even got into this
20  job.  Why am I calling myself a paramedic anymore?
21  Because I don't do paramedic stuff at the jail.
22  Rarely.  I can't even tell you the last time I did a
23  paramedic skill, like starting an IV, which is basic
24  skill that we do on the ambulance.
25   So just the whole devaluation of my entire

Page 293

1  TAVI BURROUGHS
2  career and the way that I've always prided myself on
3  my bedside manner.  That's always been something
4  that I've always gotten compliments on in previous
5  jobs, previous patients.  Had people come back and
6  thank me, you know, months or years later for
7  helping them in a situation on the ambulance.
8   And in the jail, that kind of thing doesn't
9  happen.  It's quite the opposite.  If I helped
10  someone one day, next day I'm a bitch because I'm
11  not giving them what they want.  And it's just the
12  demanding nature of the requests that I get and the
13  way that things are just thrown at you and not --
14  not responded to.
15   If I have an inmate saying something to me
16  or having a normal conversation about something that
17  happened to him, and then he gets upset because I'm
18  not telling him what he wants to hear, all of a
19  sudden I'm a fucking bitch, and he stands up and
20  he's taking a defensive posture.  And, you know,
21  that's scary.  I shouldn't have to go to work and be
22  scared.
23   I understand it's a jail.  I understand I
24  work with dangerous people.  But I work with
25  dangerous people on the street, too.  I pick up

TAVI BURROUGHS

someone after a car accident that they were driving drunk and rammed right into somebody else. I never had somebody on the street stand up and get in my face and call me a cunt and tell me they're going to kill me. That just doesn't happen. At least not to me.

And having that happen every day at my job is exhausting, and -- it's just exhausting. I find that it bleeds over into my personal life quite often. I go home from work and I have headaches all the time and I'm tired. I don't want to go out. I just want to sit on the couch with my dogs. I don't want to see people. I don't want to talk to anybody. I don't even want to leave the house. I just want to stay in one area and not have people just barraging me with insults. And it's taken quite a toll. That's all I want to say.

MS. WILLENSON: And those are all my questions.
MS. ORI: I have a couple of follow-ups. Do you want to take a moment?
THE WITNESS: No. I'm okay.
MS. ORI: Tell me when you're ready.
THE WITNESS: I'm ready.

RE-EXAMINATION

TAVI BURROUGHS

BY MS. ORI:
Q So just to follow up to your attorney's questions. You agree that nothing -- the hospital couldn't have done anything in the moment to stop the detainees from pulling out their penises, correct?
A In that specific moment, no, they could not have reached out and stopped them.
Q But you were saying there were steps that the hospital could have done to make it less likely to happen?
A Yes.
Q What steps?
A There's any number of things they could have done, and I've already spoken about those several times.
Q So I'm looking at my notes about what steps the hospital could have done, and the notes show you would have wanted a follow-up and access to EMERS. What else could the hospital have done to prevent this conduct -- to make it less likely to happen?
A I also said that they should communicate more with the security side and they should

TAVI BURROUGHS

conjunctively come up with things that will prevent that, including whatever kind of re-training system and punishment and response to, and things like that that would deter that kind of behavior.
Q You would agree that the hospital cannot restrain the detainees, correct?
A CCHHS does not restrain detainees, correct. However, because I work in the jail at the direction of CCHHS, they should be able to have some say in what happens in my workplace because that is my workplace for both places.
Q Do you believe the hospital can tell the Sheriff's Office what to do?
A I don't think that's a proper way to say it. I think they can say, our employees deserve this when they're in your area and we want you to enforce whatever they ask them to enforce.
Q And I'm just trying to get to the bottom of what do you want the hospital to have the Sheriff's Office enforce?
A I've already said. Different types of restraint. Different types of punishment. Different types of deterrents to prevent this kind of stuff from happening.

TAVI BURROUGHS

Q Do you think the Sheriff's Office has the ability to prevent this conduct from happening?
A Yes, I do. Or at least significantly reduce it.
Q What's your basis for that knowledge?
MS. WILLENSON: Object to the form.
A I don't have any type of basis for that knowledge. I'm not a law enforcement official.
BY MS. ORI:
Q Do you believe anyone at the hospital is a law enforcement official who would have the ability to know what would cause the conduct to become less likely to happen?
MS. WILLENSON: Object to form.
A I don't think I understand your question.
BY MS. ORI:
Q So you're saying that the hospital could have taken steps to make the detainee masturbation and exhibition less likely to happen, correct?
A No. I'm saying that the hospital in conjunction with the Sheriff's Office can come together and take steps to prevent this behavior.
Q And so I want to know specifically what the hospital could have done.

75