Exhibit 14

```
            IN THE UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF ILLINOIS
                       EASTERN DIVISION
```

SDAHRIE HOWARD, DENISE HOBBS, ELLENOR ALTMAN, TAVI BURROUGHS, SHADONNA DAVIS, SHARON WILSON, KIMBERLY CRAWFORD-ALEXANDER, ESTHER JONES, BALVINA RANNEY, TAWANDA WILSON, SUSANA PLASENCIA, and PATRICIA JAGIELSKI, on behalf of themselves and all others similarly situated,

    Plaintiffs,

  vs.

COOK COUNTY SHERIFF'S OFFICE, and COUNTY OF COOK,

    Defendants.

Case No. 17-cv-8146

Judge Matthew J. Kennelly

Mag. Judge Sidney I. Schenkier

-------------------------------

VIDEOTAPED DEPOSITION OF SDAHRIE HOWARD

Chicago, Illinois

Friday, September 7, 2018

Reported by:
JANICE M. KOCEK, CSR, CLR
JOB NO. 146868

S. HOWARD

So you started in August of 2003. You went through a period of training between 11, 13 weeks, correct?
A. Correct.
Q. Okay. And then where were you assigned?
A. Straight out of the academy I went to division 2.
Q. At that time what types of detainees were housed in division 2?
A. Minimum/medium.
Q. Males?
A. Yes.
Q. How long were you in division 2?
A. From 2003 to sometime in 2006. I'm not sure exactly what month. But I do remember it being in '06.
Q. You were transferred to another division?
A. I bidded to another division.
Q. And you bid under the collective bargaining agreement?
A. Correct.
Q. My understanding is that you all

Page 99

S. HOWARD
have seniority-based bidding?
A. Yes.
Q. And is there a process where you as a correctional officer can bid for open assignments?
A. Open details.
Q. Open details?
A. Yes.
Q. And are they posted somewhere currently?
A. Maybe a few weeks prior to the bid we get in an e-mail what all openings are available. And then whatever that bid -- whatever day you go in to bid, we -- you go and you look up on the wall and you see what is left. And if you have the seniority to get it, then you just bid for it.
Q. So you bid out of Division 2. What -- what job did you bid into?
A. I bid into Division 10.
Q. And at that time what types of detainees were housed in Division 10?
A. Max -- medium/max.
Q. Males, I assume.

Page 100

S. HOWARD
A. Yes.
Q. Why did you choose to bid from Division 2 to Division 10?
A. Division 2, I couldn't get day shift and I needed day shift for my kids. I didn't have enough seniority for Division 2. So I had to go to where my seniority took me for the shift that I wanted, that was, you know, conducive for me and my family.
Q. So were you able to get days on Division 10?
A. Days. I -- I still couldn't get decent off days but I was able to at least get day shift.
Q. How long were you in Division 10?
A. From that bid, which took place in '06, until I want to say maybe May -- May of 2013.
Q. What happened in May of 2013?
A. So when I came back off of duty injury/maternity leave, they just placed me back into Division 10 and I had off days of Wednesday and Thursday. And then one day I came in into roll call and they said, here,

Page 101

S. HOWARD
since you're not bidded here, this is where you're going. Because technically I wasn't bidded there anymore. I lost my bid because I was off work.
And then that's when they informed me I have been transferred to a unit called ART, administrative relief team. And I went there and I had Tuesday/Wednesdays off, which was a detail 4, which is still crappy off days but I still had day shift. And so in this unit you go all over the jail. Wherever they send you, you go.
Q. ART is administrative relief team?
A. Yes.
Q. And does that mean that you were relieving -- strike that.
Does that mean that you were filling in where officers were absent?
A. Where they were short.
Q. Right.
A. Yeah.
Q. So you could on a given day or week you could be assigned to any area in the jail?
A. Anywhere.

26

TSG Reporting - Worldwide    877-702-9580

Page 102

S. HOWARD

Q. Okay. You mentioned being on leave. For how long were you on leave?

A. So I got hurt I think in like May or June of July -- May or June of 2009. Because I had my daughter in July of 2009. And so I didn't come back until January of 2013, I think. Approximately. I'm not good with dates.

Q. That's the best to your recollection, right?

A. That is the best of my recollection.

Q. If it helps you, it seems to be consistent with what our records are. So...

So your recollection is you were off work from the summer of 2009 until January of 2013?

A. Correct.

Q. And was that the time when you filed the workers' comp claim that we talked about before?

A. Correct.

Q. How long were you in the ART?

A. So from -- I think that was in -- I think it was in May. May of 2013 until that

Page 103

S. HOWARD

September we had bids. And I ended up bidding to ART because I was able to get my first Sunday/Monday day off.

Q. So you stayed in the ART but you had better off days?

A. I had better off days with the -- with day shift.

Q. When you were in ART, were you sometimes assigned to positions where you did not have contact with detainees?

A. The most I can recall to that is majority of the time I was assigned to detainees.

Q. So you were the majority of the time assigned to one of the divisions of the -- of the jail?

A. Right. And when I would get over there, they would disburse me and tell me where to go.

Q. Right. All right.

So you stayed in ART. How long did you stay in ART?

A. From -- I don't know the date. But the next bid that came around, I bidded to

Page 104

S. HOWARD

Division 08 RTU.

Q. And I've got in my notes that that was in November of 2014. Does that sound about right to you?

A. No.

Q. When do you think it was?

A. Maybe '15.

Q. Was Division 8 at that time the RTU?

A. 08?

Q. 08.

A. Yes, that was RTU. And so according to the bid sheet -- I bidded over there because I was able to get the same off days, which were Sunday/Monday. But the thing is is that that was considered a psyche building. And so according to the contract, within six months of being over there, I was supposed to be trained -- psyche trained because I've never been psyche trained since I been at the County. And they never trained me for psyche detainees but I was still allowed to stay over there in that building.

Q. So were those the types of detainees housed in Division 8 at that time,

Page 105

S. HOWARD

08, psyche --

A. Some of them were.

Q. Psyche -- psyche -- I don't know how would you call it but inmates receiving psychological treatment?

A. Yes.

Q. Okay.

A. Some -- some of them did receive psyche medications and some didn't, just like a mixture.

Q. Was it classified at a certain security level?

A. I can't recall. You know what, I can recall. It was everything in that building. Minimum, medium, and max. P3s and P4s, P2s, M1 -- I mean M2s. Yeah, everything that was in that building.

Q. And what -- what was your job in the RTU?

A. I had a series of jobs. I was either a tier officer. Movement officer. Fire and safety officer. Clothing, sometimes I would do clothing. I would be a clothing officer. I ran the beauty shop for the

27

Page 106

1  S. HOWARD
2  females. So I supervised that.
3  Q. So both male and female inmates in
4  Division 08?
5  A. Yes.
6  Q. I'm assuming a tier officer is
7  responsible for guarding the tiers; is that
8  correct?
9  A. Correct.
10  Q. Does a -- is a movement officer
11  responsible for inmate movement within the
12  building?
13  A. Within the building, yes, and
14  outside the building. You may have to
15  transport them to Cermak. So you may have to
16  transport them outside or through the tunnels.
17  Q. What does a fire and safety officer
18  do?
19  A. Basically I would just go around and
20  check the -- make sure the doors and every --
21  the fire signs were lit up on the tiers, stuff
22  like -- I mean, that's basically how much -- I
23  can't remember. Oh, make sure the chemicals
24  were where they were supposed to be. Like you
25  couldn't have bleach and, you know, other

Page 107

1  S. HOWARD
2  hazardous liquids around the detainees. They
3  to be always locked up and secured. And then
4  whoever, you know, I issued them out to, they
5  had to sign this log -- sign the log stating
6  that they got it and I received it back from
7  them.
8  Q. Does the clothing officer issue
9  clothing to go the detainees?
10  A. Yes.
11  Q. And then the beauty shop is fairly
12  self-explanatory. That was -- that was running
13  the beauty shop or being an officer in the
14  beauty shop?
15  A. Yes.
16  MS. WILLENSON: Wasn't doing the
17  styling.
18  MR. PHILLIPS: I didn't see
19  cosmetology in your background.
20  BY MR. PHILLIPS:
21  Q. Any other jobs that you had in
22  Division 8 that you can recollect?
23  A. I mean, I did everything over there.
24  I did east control, west control. That means
25  you control all the doors. You let people in

Page 108

1  S. HOWARD
2  and out of the building. I did everything.
3  I'm not the one to just sit down and just
4  become complacent with what I'm -- what I do.
5  I'm always trying to learn something new. So I
6  did pretty much everything in that building.
7  Q. How long were you in Division 08?
8  A. Until -- okay. Let me say this. I
9  was assigned to Division 8 RTU, but at that
10  time a position had became -- became available,
11  the FTO program. So I had applied for that and
12  I got accepted. And so technically I was still
13  assigned to Division 8 RTU but I was working
14  for the FTO program, which is based in Moraine
15  Valley College. So I didn't leave that program
16  -- I think it may have been September or
17  October of 2016 and then that's when went to
18  case review.
19  Q. Do you remember how long you were an
20  FTO?
21  A. I think from May -- May of 2016.
22  I'm still currently an FTO. I still could
23  train PCOs. But I left the -- the program when
24  they asked me did I want to go to case review.
25  So that was October of 2016.

Page 109

1  S. HOWARD
2  Q. As an FTO were you responsible for
3  training other correctional officers?
4  A. Probationary correction officers,
5  right.
6  Q. That's what you referred to as PCOs,
7  right?
8  A. Yes.
9  Q. Were you involved in doing any
10  classroom training or solely on-the-job
11  training?
12  A. Solely on the job.
13  Q. So would you be assigned a PCO?
14  A. I would be assigned several PCOs.
15  Q. All in Division 8 or --
16  A. Uh-uh.
17  Q. Or in other places? Okay.
18  A. So this is the thing. No -- I
19  didn't mean to shake my head no. The FTO, when
20  I did it, they would -- assigned to different
21  places. So we would be in Division 8 RTU.
22  Some days I would come in and get my assignment
23  and me and my PCOs would have to go over to
24  Division 11. Or we'd be in Division 5. Or we
25  be in Division 6. Or we be in Division 9. And

Page 110

S. HOWARD
then at some point, because the staffing that was -- we were so low in Division 9, they started sending us over to Division 9, every single day in Division 9.
Q. So where -- which division you were in depended day to day essentially?
A. The most?
Q. Uh-huh -- no. In other words, could you be in a different division every day of the week? In other words, did you receive a daily assignment of where -- what division were you to be in when you were at FTO?
A. Oh, it could change daily.
Q. Okay.
A. Changed daily. Like there's been times when we would start out in one division -- like one time they sent me and my PCOs to Division 8 RTU. Then the supervisor called over there and said, okay, I need to take your PCOs over to Division 11. They short officers. Well, you got four PCOs so you need to take them over there. And then we would go -- leave, hop in our cars, and we would drive down to Division 11.

Page 111

S. HOWARD
Q. And what were you training PCOs to do?
A. Everything that the -- the job details, just basic -- basic tier officer responsibilities. Check --
Q. I'm sorry. Go ahead.
A. Checking the locks and doors of the cells. Counting the detainees. Writing all their movement down. You know, make -- making sure that they know they need to know where all their detainees are at all given times of the day, just -- I made sure I trained them how to feed the tier. You know, how to run reg. How to escort your detainees to and from. I mean, it's a lot -- it's a lot of things I had to train them on.
Q. Did it include writing incident reports?
A. Incident reporting writing, I had to train them. Well, they pretty much knew that from the academy. But if they needed help I would be there to help them.
Q. Inmate discipline?
A. Inmate discipline as well.

Page 112

S. HOWARD
Q. You told me that you moved to case review in October of 2016; is that correct?
A. Approximate. Because I'm not good with dates.
Q. Approximately. Have you been in case review ever since that time?
A. Case review, which is now SOIU. So it's case -- it's everything. It's case review, BIU, BMU, TMU, which I forgot to say that. Telephone monitoring unit is part of our unit as well, too.
Q. In case review or SOIU, I think you said that's occurred --
A. That's now.
Q. All right. Well, let's talk about now. In SOIU do you have regular contact with detainees?
A. It's fun that you say that. At least I was -- maybe a couple months ago they were dispatching us out to divisions. So when the divisions would be short staffed, they would make us leave our assignments and we would have to go fill in for them in civilian clothing.

Page 113

S. HOWARD
Q. Okay. So that was occasionally?
A. Well, they was --
MS. WILLENSON: Objection.
THE WITNESS: They was doing that every week. Every week we would have to go one -- one day out of our work week we would have to -- you know, first -- when they first started doing it, which was a few -- maybe last year sometime, we would get the day of the week that we would have to be assigned to the jail. So we would have to call external ops that morning, find out what assignment we're on, and then we would go to that division.
And then they stopped it for a while. And then it just -- it has just started back up recently when I guess they would have like high medical call-ins, then we would go. The difference is is that we were having to go in our civilian clothes.
BY MR. PHILLIPS:
Q. You wear civilian clothes usually to work now?
A. Now I do.

29

Page 126

S. HOWARD
1  S. HOWARD
2  Seth?  Yes.  This is a male.  I don't remember
3  the female's name.  It will probably come to
4  me.
5     Q.   All right.  If you remember it, let
6  me know.
7           If you look towards the bottom of
8  Exhibit 8, there's a section that starts
9  "Sexual Harassment."  Do you see that?
10    A.   Okay.  Oh, I remember her name.
11 Allison Fish --
12    Q.   Allison?
13    A.   Fisher or Fitcher.  Fisher.
14    Q.   When you were interview by the EEOC
15 investigators, did you understand that it was
16 important to be truthful with them?
17    A.   I did.
18    Q.   Okay.  And you were truthful with
19 them, I assume, right?
20    A.   I was.
21    Q.   Under "Sexual Harassment" it says
22 (as read):  Inmates touch your breast and your
23 bottom.  They masturbate in front of you.
24         Did you tell that to the
25 investigators?

Page 127

1  S. HOWARD
2     A.   Yes.
3     Q.   Then below it says (as read):  C.P.
4  clarified she herself had never been grabbed by
5  an inmate.
6     A.   That is not my statement.
7     Q.   You didn't say that to the
8  investigators?
9     A.   No.
10    Q.   And that's not true?
11    A.   That's not true.
12    Q.   When have you been grabbed by an
13 inmate?
14    A.   The very first incident, his name
15 was ███████████, when I came back to work
16 off of maternity/duty injury, whatever, that
17 guy did.
18    Q.   Okay.  And you -- and you wrote a
19 report on that, I believe, right?
20    A.   I wrote a report.
21    Q.   Any experience of being grabbed by
22 an inmate other than that?
23    A.   No -- me?
24    Q.   You personally.
25    A.   Me personally, no.  Just him and --

Page 128

1  S. HOWARD
2  yeah.
3     Q.   And then it goes on to say (as
4  read):  Three or four inmates have masturbated
5  in front of me since 20 -- December 2015.
6         Correct?
7     A.   That I wrote up.
8     Q.   Well, it doesn't say here "that I
9  wrote up."
10    A.   Well, okay, this is -- her -- her
11 verbiage isn't correct.
12    Q.   Let me -- let me -- let me ask you
13 that then.
14         First of all, did you tell that --
15 did you make that statement to the
16 investigator, "three or four inmates have
17 masturbated in front of me since December of
18 2015"?
19    A.   No, I told her I had written up
20 three to four.
21    Q.   And that's truthful, that you writ
22 up -- you had written up three to four?
23    A.   Correct.
24    Q.   And then you go on -- strike that.
25         The document goes on to say (as

Page 129

1  S. HOWARD
2  read):  Then they say, quote, I'm going to fuck
3  you.  Come here with your pretty ass.  You know
4  you want this.
5          Did you tell the investigator that
6  those were comments that detainees made to you?
7     A.   Those were some of the comments that
8  I told her.
9     Q.   When detainees made those comments
10 to you, did you write those up?
11    A.   No.  And let me tell you why.
12 Because when they yell out this stuff, it's so
13 many of them, you can't pinpoint which one of
14 them said it.  You understanding what I'm
15 saying?
16    Q.   You just can't tell who said it.
17    A.   You can't tell who said it.  They
18 say all type of stuff, you know you want this
19 -- I -- it's just all type of stuff in -- and
20 this is like the cleanest, you know, version
21 that I could give her.
22    Q.   Next page if you would.  According
23 to these notes, it says (as read):  Every time
24 an inmate masturbated in front of C.P., she
25 wrote reports and requested to press charges.

Page 138

1 S. HOWARD
2 to Lieutenant Debro.
3 Q. Who do you report to today?
4 A. John Cornier.
5 Q. Is he a sworn officer or is he a
6 civilian?
7 A. Civilian.
8 Q. Have you reported to a civilian ever
9 since you were transferred to case review?
10 A. No.
11 Q. Are any of your peers in case review
12 civilians or are they all officers?
13 A. All officers.
14 Q. But some of the supervisors are
15 civilians?
16 A. Yes.
17 Q. Let me show you what we'll mark as
18 Exhibit 9.
19 (Howard Deposition Exhibit 9
20 was marked for identification.)
21 THE WITNESS: I think I may have to
22 take something for my head because it's
23 feeling like I'm start to get a migraine.
24 MS. WILLENSON: Do you want to do
25 that now?

Page 139

1 S. HOWARD
2 THE WITNESS: Yes.
3 MR. PHILLIPS: All right. Let's go
4 off the record.
5 THE VIDEOGRAPHER: Time is 12:06
6 p.m. We're off the record.
7 (Whereupon, a recess was taken
8 from 12:06 p.m. to 12:21 p.m.)
9 THE VIDEOGRAPHER: Time is 12:21
10 p.m. We are on the record.
11 BY MR. PHILLIPS:
12 Q. Ms. Howard, before the break I
13 showed you Exhibit 9. Is this an incident
14 report that you wrote?
15 A. Yes.
16 Q. On this is an incident involving
17 detainee                    ?
18 A. Yes.
19 Q. According to your description of the
20 incident, you were in Division 10, tier 4A, and
21 detainee         touched you in the lower of
22 your back when he walked past you, correct?
23 A. Yes. You're asking me is this what
24 I'm looking at?
25 Q. Well, let's start there. Is that

Page 140

1 S. HOWARD
2 what you wrote?
3 A. This is what I wrote.
4 Q. Is there anything you recall about
5 the incident as you sit here today other than
6 what's in your report?
7 A. I do.
8 Q. What do you recall about the
9 incident today that's not in your report?
10 A. This -- this incident report was
11 actually watered down. He actually while pass
12 -- when he walked behind me, he grabbed me
13 around my waist and he -- I actually felt his
14 penis on my -- my anus.
15 Q. That seems like a pretty important
16 fact.
17 A. Exactly.
18 Q. So why is that not in the report?
19 A. So this is when I had just come back
20 to work. Originally in report writing they
21 would teach us that we had to use -- it was
22 called KISS, K-I-S-S. And when you wrote your
23 reports KISS meant "keep it simple stupid."
24 And so they never wanted us to go into full
25 detail. CCOMS, when I came back to work, I

Page 141

1 S. HOWARD
2 hadn't been trained in this. I had to teach
3 myself how to do this. I had never been
4 trained in CCOMS. I had just came back to
5 work. I hadn't went to in-service since the
6 last time I had went. And I don't even know
7 when that was because I went out when I was
8 pregnant with the baby in 2009. And so I was
9 writing this under the old -- the old format.
10 And then, too, it was just like I couldn't
11 believe that it happened. I could not believe
12 that it was okay for an inmate to do this.
13 And it was two male officers in
14 there and a sergeant, Sergeant Crump, Officer
15 Lacey, Officer Appleberry. All of them seen
16 that when it happened. And the sergeant, she
17 immediately had him escorted out of the
18 recreation room. They were highly upset about
19 what had happened.
20 Q. Okay. But you had been trained in
21 report writing; hadn't you?
22 A. Uh-huh.
23 Q. That's a yes?
24 A. Yes.
25 Q. Before you had CCOMS, would you

Page 166

S. HOWARD

(Howard Deposition Exhibit 11 was marked for identification.)

BY MR. PHILLIPS:

Q. Ms. Howard, is Exhibit 11 an incident report that you filed?

A. Yes.

Q. This is an incident that occurred on August 31, 2016, correct?

A. Correct.

Q. And it occurred in Division 9, correct?

A. Correct.

Q. What was your job assignment at this time?

A. I was the FTO for my probationary officers. And it says I was providing backup. So that means I was actually working that tier with my PCO.

Q. According to your report, you were standing in the tier bubble. Can you explain what that is?

A. That's the interlock. Basically where the officers sit. So the setup in Division 9, you have two tiers, one to the

Page 167

S. HOWARD

right, one to the left. And in the interlock you have two desks -- officers' desks, one for the tier on the right, one for the tier on the left.

Q. And it -- it sounds like you didn't regularly guard that tier; is that correct?

A. That is correct.

Q. You were there because you had a PCO that was assigned to that tier?

A. That is correct.

Q. You were standing in the tier bubble when the detainee moved from the rear shower to the first shower and then pulled his penis out of his pants and began to stroke it back and forth; is that correct?

A. That is correct.

Q. Was the detainee taking a shower at that time?

A. It didn't appear that he was taking a shower. He was just in the shower room.

Q. Area?

A. Room, yeah.

Q. And that shower area I assume is visible from the bubble?

Page 168

S. HOWARD

A. Yes.

Q. According to this you ordered him to stop and he did not stop; is that correct?

A. That's correct.

Q. Okay. And then when he continued to masturbate, that's when you told him he would be receiving a disciplinary for his behavior?

A. That is correct.

Q. And you wrote up this report, correct?

A. That is correct.

Q. Anything else you recall about this incident other than the -- what's listed on your report?

A. I mean, this incident report reminded me of a time when I couldn't write up -- one, two, three -- it was six -- it was six detainees. So I had three -- three on the phone and like three or four in the day room. And the ones that was on the phones, they had the sheets over their heads draping down over their bodies and they was pretending like they was on the phone but they were masturbating towards me. And I had like three to four

Page 169

S. HOWARD

standing right in the day room doing it. I couldn't write that up.

Q. Because why?

A. There was the end of the shift and they had already said that you cannot stay to write up reports because they wasn't paying any overtime, which I wasn't trying to get any overtime. But then the next day when I came in, it just -- you -- you -- the same supervisor wasn't there. And then I think that they didn't even want to take the time to look at it on video, the supervisors. And so I just said -- I just said forget it. And I know -- I knew that nothing would even become of it. So it didn't even make any sense. I just said forget it. I'm going to just start repositioning myself on these tiers. And that's what I started to do. I had to reposition myself.

Q. We'll -- we'll ask you a few more questions about this after we take a break. Let me ask you a couple more things. Where did this happen?

A. I -- I can't remember the exact

1  S. HOWARD
2  tier.
3  Q. Do you remember the division?
4  A. 9.
5  Q. 9. And when did it happen?
6  A. I don't remember the exact date but
7  it was around this time frame when was doing
8  the training of the PCOs.
9  Q. So this is when you were an FTO?
10  A. Yes.
11  MR. PHILLIPS: Why don't we go off
12  the record.
13  THE VIDEOGRAPHER: Time is 12:53
14  p.m. We are off the record.
15  (Whereupon, a lunch recess was taken
16  from 12:53 p.m. to 1:49 p.m.)

1  S. HOWARD
2  AFTERNOON SESSION
3  (Time noted: 1:49 p.m.)
4  THE VIDEOGRAPHER: Time is 1:49 p.m.
5  We are on the record.
6  S D A H R I E   H O W A R D,
7  resumed and testified as follows:
8  CONTINUED EXAMINATION BY
9  MR. PHILLIPS:
10  Q. Ms. Howard, before the break you had
11  described an incident where you witnessed
12  inmates masturbating in Division 9 and did not
13  write it up.
14  A. Correct.
15  Q. I didn't quite understand why you
16  couldn't have written up the incident the next
17  day?
18  MS. WILLENSON: Object to the form.
19  BY MR. PHILLIPS:
20  Q. Could you tell us that?
21  A. Again?
22  Q. Yes, please.
23  A. The supervisors refused to look at
24  the -- the video. I can't recall which
25  supervisors were there that day. And then a

1  S. HOWARD
2  lot of times the issues that we run into is --
3  it's just not enough time or there's too many
4  detainees. And my main focus was to properly
5  train those PCOs because I didn't want anything
6  to fall back on me with them saying it was
7  something that they did not know.
8  Q. You don't need video to write up a
9  report, right?
10  A. No. You don't -- you don't need
11  video.
12  Q. All right. And you just -- you
13  don't need your supervisor's permission to
14  write up a report; do you?
15  A. You're supposed to get it.
16  Q. Can you just type your report into
17  CCOMS?
18  A. You do.
19  Q. Okay. And if you're training PCOs,
20  isn't part of the training for them to properly
21  document incidents that they observe?
22  A. Yes, it is.
23  Q. So by you not writing up this
24  incident, was that providing proper training to
25  the PCOs?

1  S. HOWARD
2  A. If you're told that they're not
3  paying overtime, then no. I -- I can't -- I
4  can't stay and do a report if the supervisor
5  said no.
6  Q. You told me earlier that reports are
7  supposed to be submitted within 72 hours,
8  correct?
9  A. Uh-huh.
10  Q. Is that yes?
11  A. Yes. I'm sorry.
12  Q. It's okay. You agree with me that
13  you could have completed the report the next
14  day that you were working, correct?
15  A. Correct.
16  Q. But you didn't do that, correct?
17  A. Correct. Oh, I can tell you what I
18  did do.
19  Q. What did you do?
20  A. I sent the e-mail to Lieutenant
21  Debro.
22  Q. We're going to get to that e-mail in
23  a little bit.
24  A. Uh-huh.
25  Q. Let's go back to [redacted] for

Page 238

S. HOWARD
A. Yes.
Q. If you go please to Number 6 -- paragraph 6, rather, paragraph 6 states (as read): There's been a rise in incidents relating to the intentional flinging of urine and feces as well as exposure to sexual advances from detainees. In Division 9, for example, detainees daily throw bodily fluids at officers.
 You told me before that you've seen that happen?
A. Yes.
Q. And you've seen it happen to both male and female officers, correct?
A. I have not seen it happen to a female officer. I only seen it happen to male officers.
Q. Paragraph 9 on the next page states (as read): Further, the reporting of these incidents is being suppressed. Officers are often discouraged from writing incident officer battery and/or inmate disciplinary reports on these occurrences.
 Has anyone ever discouraged from you

Page 239

S. HOWARD
writing an incident report about an occurrence of any kind?
A. Yeah.
Q. Who has done that?
A. There's been plenty of people who -- I mean, supervisors who discourage you from writing an incident report. It could be anything for the reason of, well, it's 2:30. We leaving at 3:00. It's too late to write that. They're not going to do anything with it. I heard that multiple times. You wasting your time. Nothing is going to become of it. I mean, it's just the norm.
Q. And that relates to all kinds of incident reports?
A. Yeah.
Q. Is there any specific person, any specific supervisor, who you can recall discouraging you from writing an incident report about anything?
A. I had one -- well, he -- I don't take it as discouraging. He was just stating fact.
Q. Who is that?

Page 240

S. HOWARD
A. That was Lieutenant Ross.
Q. Okay. What did Lieutenant Ross tell you?
A. He said you can write -- write them up as much as you want to but they're not going to do anything about it.
Q. Who's "they"?
A. Executive staff, administration.
Q. Lieutenant Ross, was he referring specifically to masturbation and exposure --
A. Yeah.
Q. -- or was he referring to something else?
A. Masturbation because that was -- that was the topic of our conversation.
Q. Where did you work with Lieutenant Ross?
A. In RTU.
Q. Was he the watch commander in RTU?
A. Yeah.
Q. You said you didn't take his comments at being discouragement; is that right?
A. You know, I don't -- when it's a

Page 241

S. HOWARD
rule that I know I can follow, you can tell me not to do it but I still do it. I basically take the responsibility off of me and place it on them. Now, once I -- I completed it, it's in your lap. You -- you do what you want to do with it. But at least I know I done what I was supposed to do.
Q. So you've never not filed an incident report because a supervisor discouraged you?
A. I haven't but it's a lot of females who have.
Q. Anyone else besides Lieutenant Ross who said anything that discouraged you from filing an incident report about a masturbation or exposure incident?
A. They -- they -- they all said. I -- I can't remember right now. If it does come back to my memory, I will definitely let you know. But it's just -- it's the practice. It's the norm there.
Q. You don't recall any specific person other than Ross, correct?
A. Right now, no.

Page 250

S. HOWARD
2014 stated to you words to the effect of the de- -- "detainee conduct is not going to stop." And stated something to you similar to "until you get a sex change, there's nothing I can do about it."
A. Yep.
Q. Is there anything else you remember from that conversation with Commander Page?
A. Not -- not at this time. I said -- I mean, we were just talking and I was just telling him how tired I was of, you know, these inmates just out of control with this masturbation and touching, you know, females and stuff. And everybody -- he even knows the norm of the jail. It -- it's not going to stop because it's a totally hands-off policy. We all know this.
Until we can get gain -- regain order, it's just like they've taken the power away from us and given our power to detainees. But he -- he said until I get a sex change, it's not going to stop. I guess once I became a male, then I stop being masturbated towards.
Q. The -- did you disagree with the

Page 251

S. HOWARD
first part of that, that it's not going to stop?
A. Do I disagree?
Q. Yeah, did you disagree with that statement or do you agree with it?
MS. WILLENSON: Object to the -- object to the form.
BY MR. PHILLIPS:
Q. Did you agree with him that the detainee conduct was not going to stop?
A. No, I -- I didn't agree with that. I -- I -- it can stop. It's just we have to be allowed to stop it. We have to regain our power back. It -- it can be stopped. The detainees just to stop having so much power and control inside that jail.
It's like their rights are more important than ours. I don't go to work to get masturbated towards or beat on or have feces and urine thrown -- I don't go to work for that. I never signed up for that. No one told me in the application process that this is something that I would have to do. The only thing I was told was how you may have to defend

Page 252

S. HOWARD
yourself, you know, when a fight occur or they may attack you. You have to fight back. That's what a mock -- the mock moves come in at.
Q. Isn't it part of your job as a correctional officer to -- to control the inmate behavior?
A. Yes, it is.
Q. Let me show you -- I'll show you what we'll mark as Exhibit 18.
(Howard Deposition Exhibit 18 was marked for identification.)
BY MR. PHILLIPS:
Q. Ms. Howard, have you seen Exhibit 18 before?
A. No.
Can I say something?
Q. Let me ask you one more thing and then you can say something.
A. Okay.
Q. Does this appear to be a job description for the job of correctional officer?
A. I haven't -- I have not read through

Page 253

S. HOWARD
all of this. So if you want me to read through, it I can.
Q. Would you read the key responsibilities and duties section?
A. Sure.
(Witness reviewing document.)
THE WITNESS: Okay.
BY MR. PHILLIPS:
Q. Would you agree those are all duties that a correctional officer is required to perform in Cook County Jail?
A. That's some of them.
Q. There's others that aren't listed here?
A. It could be orders that you receive from a supervisor that's not listed here.
Q. In other words, if you receive a general order, you have to follow that general order?
A. Yes.
Q. And if you receive an order from a supervisor to do something, then you have to follow your supervisor's direction as long as it's reasonable, correct?

S. HOWARD

Q. Have you posted anything on the CCDOC Speaks page relating to this lawsuit?
A. Relating to this lawsuit?
Q. Yes. Correct.
A. I can't remember offhand.
Q. Nothing that you can recall?
A. Nothing that I can recall right now. If you have anything you want to show me, you can.
Q. I --
MS. WILLENSON: Mike, you have them.
MR. PHILLIPS: Oh, no. I -- I'm not questioning that.
MS. WILLENSON: Okay.
BY MR. PHILLIPS:
Q. What -- do you know what damages you're claiming in this case?
A. I know monetary.
Q. What kind of monetary damages are you claiming?
A. Due -- due to the -- the severity of this with these detainees and the part of the law that I do know is that you can receive up to $300,000 for sexual harassment, civil

S. HOWARD

lawsuits. I guess it all depends on, you know, how each one of us were affected. That's about it for right now. My brain is fried.
Q. Okay. You're doing the best you can.
You're not -- you're not seeking any damages for lost wages in this lawsuit; are you?
A. Not to my recollection.
Q. How has this affected you?
A. Oh, it's bad. You know, I thought that -- I thought that being outside of there and -- and not having myself not being in there -- I'm sorry.
MS. WILLENSON: Do you want to take a break?
THE WITNESS: I just know if this is not under control one of us going to get raped in there. It's like they send all type of kites around, you know, what they going to do. And I just don't want to see it happen. Every -- every time I have to look at the video of this -- like one of the female officers, she was escorting an

S. HOWARD

inmate to -- to dispensary. And he was handcuffed but his handcuffs was too far down and he was masturbating while she was walking him. And then he said that he ejaculated all over the floor. And they recorded it with the camera.
It's just like -- it's ridiculous that you have to keep going through this. I have to keep reliving the fact that -- I just -- every -- every -- every day because every day it's a masturbation incident. And I have sit up, I have to recant it, rethink about what happened to me as a child. I don't -- I -- I have to keep doing this because I have a job that I have to do. I never had to -- I never, ever went through this with the -- with Sheriff Sheahan. It's just like this stuff has just become crazy, utterly ridiculous.
I can give you incident after incident after incident where our female lives are in danger. And there was points in time where I just sat there and I looked up chastity belts just in case they send me

S. HOWARD

back up in there and I don't have proper backup or one of them pop up out that lock. At least if they do knock me out or something they won't be able to get down there. It's just ridiculous.
All type of stuff happen. I -- I -- I -- I fear. That's part of the reason why I left -- I moved up out of Cook County is because you run into these inmates everywhere you go. At least I may not run -- the chances are very low in DuPage County versus Cook County of me running into one of them. And I got my daughters with me. It's this -- this needs to be taken seriously. It -- it -- it's just too of a -- you know, like it's nothing.
And it is something. Because if their family members -- and I'm talking about that administration. If their family members had to work up in there and deal with that, they would not want to. Trust me. They'd be ready to go in there and fight. Nobody want to see their wife masturbated towards or their girlfriends or