Exhibit 15

```
 1            DOMINIQUE KARRION FREEMAN
 2      IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF ILLINOIS
 3              EASTERN DIVISION
 4   SDHARIE HOWARD, et al.,      )
                                  )
 5          Plaintiffs,           )
                                  )
 6      vs.                       )  Case No. 17-cv-8146
                                  )
 7   COOK COUNTY SHERIFF'S        )
     OFFICE, et al.,              )
 8                                )
             Defendants.          )
 9
10
11      DEPOSITION OF DOMINIQUE KARRION FREEMAN
12                Chicago, Illinois
13            Wednesday, January 16, 2019
14
15
16
17
18
19
20
21
22
23   Reported by:
24   JANET L. ROBBINS, CSR, RPR
25   JOB NO. 154299
```

1 DOMINIQUE KARRION FREEMAN
2 different than what you thought it would be?
3    A. Initially -- initially it aligned
4 with the expectations, but it --
5    Q. Did that change at some point?
6    A. It definitely evolved into just a
7 tremendous weight.
8    Q. Weight, W-E-I-G-H-T?
9    A. Yes.
10    Q. What do you mean by that?
11    A. I guess with the workload due to
12 staffing issues.
13    Q. When you applied for the CRW job,
14 you understood that it would involve going into
15 the divisions and meeting with the inmates,
16 correct?
17    A. Correct.
18    Q. And you knew from your time as a
19 classifications specialist some of the crimes
20 with which these individuals had been charged,
21 correct?
22    A. Definitely, uh-huh.
23    Q. Currently as a CRW, is there a
24 mechanism by which you learn of new policies or
25 new procedures? In other words, is there a

1 DOMINIQUE KARRION FREEMAN
2 team meeting, is there a roll call meeting that
3 you attend?
4    A. No. So new policies and procedures,
5 the way we're made aware that those come about,
6 we get an e-mail that says you have -- and this
7 is an example -- you have three Lexipol policy
8 changes to review and need your acknowledgment.
9 So we get e-mails.
10    Q. And when you get those e-mails, is
11 it your practice to review the information
12 that's presented on Lexipol?
13    A. When I have time.
14    Q. What do you do when you don't have
15 time?
16    A. I never have time. So I'm working.
17 Unless you want to rephrase the question.
18    Q. Well, you said, I think, that you'll
19 review the policies on Lexipol when you have
20 time, but you never have time.
21    Does it follow then that you never
22 review the policies on Lexipol?
23    A. I would never say never. When there
24 are times -- say if there's a lockdown, then
25 I'm able to go and catch up on the new policies

1 DOMINIQUE KARRION FREEMAN
2 that have come into play.
3    Q. So your testimony is that it's rare
4 that you have the time to review new policies
5 that you receive through e-mail by Lexipol?
6    A. Currently, due to my current
7 assignment, that would be yes.
8    Q. Okay. Can you take out Exhibit 2,
9 please? That's the complaint.
10    A. Yes, sir.
11    Q. Thank you. In paragraph 36, I think
12 it's the fifth line, there's a sentence that
13 begins, "As a CRW."
14    Do you see that?
15    A. Yes, sir.
16    Q. The sentence states, "As a CRW, she
17 has been assigned to Divisions 2, 11, 08/RTU,
18 5, and Division 6 Annex," right?
19    A. Yes.
20    Q. Are those all of the divisions to
21 which you've been assigned as a CRW?
22    A. Yes, to my knowledge.
23    Q. The next sentence says, "She has
24 also worked in Divisions 3, 4, 9, 17, the law
25 library, and 8/Cermak."

1 DOMINIQUE KARRION FREEMAN
2 When did you work in Divisions 3, 4,
3 9, 17, the law library and Cermak?
4    A. Do you mean as a CRW --
5    Q. Well --
6    A. -- or in general?
7    Q. -- let me rephrase the question.
8    As a CRW, have you worked in
9 Divisions 3, 4, 9, 17, the law library or
10 Cermak?
11    A. Yes.
12    Q. Even though you weren't assigned to
13 those locations?
14    A. Yes.
15    Q. Why would you -- let's start with
16 Division 3. When did you work in Division 3 as
17 a CRW and why?
18    A. So Division 3, it was brief because
19 as my time as a CRW, they were getting ready to
20 do transitional housing and close that
21 division. So I may have passed through there
22 in terms of like picking up grievances. So it
23 was not actual tier visitation for Division 3.
24    Q. Do you recall whether any detainee
25 ever exposed himself to you while you were in

Page 98

1  DOMINIQUE KARRION FREEMAN
2  Division 3 as a CRW?
3  A. No.
4  Q. No, it didn't happen, or no, you
5  don't recall?
6  A. No, it didn't happen. And that was
7  where -- no. Well, there's 3 and 3 Annex, but
8  no.
9  Q. When and why did you work in
10 Division 4 as a CRW?
11 A. Division 4 I worked on overtime.
12 When? It would have had to have been when I
13 first started. So between July of 2016 and I'm
14 going to venture and say March of 2017, that's
15 when we had overtime, during that time frame,
16 so within my first six months of working in
17 Inmate Services.
18 Q. Was Division 4, was that a female
19 division at that time or no?
20 A. It was, yes, sir.
21 Q. Is it accurate that no detainee ever
22 exposed him or herself to you while you were in
23 Division 4?
24 A. To my knowledge, no. Yes, it is
25 accurate.

Page 99

1  DOMINIQUE KARRION FREEMAN
2  Q. You'd make a good lawyer, I think.
3  A. I always wanted to be.
4  Q. I'm not recommending it. I'm just
5  making an observation.
6  When and why did you work in
7  Division 9 as a CRW?
8  A. I -- my first two weeks as a CRW I
9  had to work in Division 9. And I shadowed with
10 the Grade 16s, which are considered CRW-IIs. I
11 don't like Division 9.
12 Q. Division 9 is a maximum security
13 division, correct?
14 A. Super max, yes.
15 Q. Did any detainee expose himself to
16 you when you were working as a CRW in
17 Division 9?
18 A. Every day.
19 Q. And you said you were there for
20 about two weeks?
21 A. Yes, sir.
22 Q. What is Division 17?
23 A. Division 17 was for the women where
24 they go for furlough housing. So it's the
25 women who -- it's no longer there. The

Page 100

1  DOMINIQUE KARRION FREEMAN
2  building is actually torn down as well, but
3  Division 17 was where the women who do day
4  reporting had to come in and check in and do
5  whatever coursework they had to do, as well as
6  the ladies who were pregnant were housed in
7  Division 17. And those who were receiving like
8  drug treatment programs were housed in
9  Division 17.
10 Q. And when did you have occasion to
11 work in Division 17 as a CRW?
12 A. That was another situation where as
13 soon as I got on, those buildings were closing,
14 so I -- mainly that was like a pass-through and
15 it was when I first started working with that
16 department.
17 Q. When did you work in the law library
18 as a CRW?
19 A. I don't know if you know, but each
20 division has its own law library. I worked in
21 the law library in Division 9 within my first
22 month of being a CRW. I would go and assist
23 Ms. Leslie or the law librarian. Ms. Leslie,
24 she's retired at the moment. Well, not at the
25 moment, but she's retired.

Page 101

1  DOMINIQUE KARRION FREEMAN
2  Q. Did any detainees ever expose
3  themselves to you in the law library of
4  Division 9?
5  A. Yes.
6  Q. And when did you work as a CRW in
7  Division 8/Cermak?
8  A. 8/Cermak, during overtime I worked
9  there. And during lobbies currently we have to
10 go to 8/Cermak.
11 Q. And 8 Cermak is the medical board,
12 correct?
13 A. Yes. Correct.
14 Q. Have you ever had a detainee expose
15 himself to you while you were working as a CRW
16 in division 8?
17 A. Are you saying 8/Cermak or 8/RTU?
18 Q. Well, 8/Cermak.
19 A. I believe that an inmate was
20 masturbating. But in terms of actually
21 exposing himself, the door was higher. So I
22 would have to say I don't know if it was that
23 or not, but I know he wasn't having a seizure.
24 Q. Whatever he was doing, you couldn't
25 be certain because your view was obstructed by

Page 114

DOMINIQUE KARRION FREEMAN
A. Yes.
Q. You sent it to Theresa Olson, the Inmate Services & Programs AED?
A. Yes.
Q. And AED means assistant executive director?
A. Correct.
Q. You sent it to John Mueller, Inmate Services deputy director?
A. Yes.
Q. Do you know if you sent it to anyone else?
A. Yes.
Q. Who else would you have sent it to?
A. My current supervisor at that time.
Q. And who was that?
A. Her name was Maria Oseda. She's no longer with the county anymore. O-S-E-D-A, first name Maria.
I also sent it to my supervisor on duty, because this incident took place during overtime. At the time, that particular supervisor was Ms. Fenderson, first name, Lynea, L-Y-N-E-A.

Page 115

DOMINIQUE KARRION FREEMAN
And I believe I sent it to Supervisor Hampton, first name, Lester, L-E-S-T-E-R.
And I also gave this lieutenant on duty a hand copy, but I did not sent it to him. He actually copied my -- my form.
Q. Is there just a supply of these blank forms somewhere for you to use?
A. No. They're actually located in the U drive on our computer -- in our computer database. So there's an Inmate Services forms folder accessible on our computers that we're able to go to for various forms to utilize to do our job. So it's readily available on the computer.
Q. So in the case of Exhibit 4, you printed out the blank form, filled it in by hand and then scanned it?
A. I always do, yes, sir.
Q. Did anyone ever explain to you the purpose of completing and submitting one of these memorandums? In other words, once you submitted it, what did you expect was going to happen with respect to this incident?

Page 116

DOMINIQUE KARRION FREEMAN
A. I don't believe the expectations were explained to me of what was going to happen as a result of it. I always, just for my personal sake, just know that you should always write something up if an incident happens and document as much information as you can to kind of preserve whatever happens or whatever may follow further down the line from it such as this.
But no one's ever actually said if you turn this incident report in, that A, B, and C is going to take place as a result of it. I just kind of always felt like we write the incident report just to report it.
Q. You testified earlier that you have access to CCOMS?
A. Yes.
Q. Have you ever submitted an incident report in CCOMS?
A. CRWs are not allowed to submit incident reports in CCOMS. We don't have that access. That's only a sworn officer access. It's for sworn personnel, I'm sorry, not just officers, but for sworn personnel have the

Page 117

DOMINIQUE KARRION FREEMAN
capabilities of documenting incidents in CCOMS, not civilian staff.
Q. Do you as a CRW have any ability to add or edit any information in CCOMS, or is your access only to view information in CCOMS?
A. In my current position, no. When I was a classifications specialist, yes.
Q. So as a CRW, you can view information in CCOMS but not add or edit information?
A. That is correct.
Q. Taking a look at Exhibit 4, does this describe an incident that took place in Division 11?
A. Yes.
Q. On January 26th of 2017?
A. Yes.
Q. Were you assigned to Division 11 in January of 2017 or were you assigned to Division 2?
A. I was still assigned to Division 2. I was working overtime in Division 11 that day.
Q. According to the "Details of Incident" at the bottom of the first page, you

Page 118

DOMINIQUE KARRION FREEMAN

 1  were working overtime and you entered CH with
 2  Officer Orlando to retrieve a signature from
 3  Inmate [redacted], correct?
 4      A.  Correct.
 5      Q.  Is it correct then that Division 11
 6  is a division where you as a CRW will enter the
 7  tiers on some occasions?
 8      A.  Correct.
 9      Q.  But you testified earlier that
10  there's some where you won't?
11      A.  That is correct.
12      Q.  Which divisions will you not enter
13  the tiers as a CRW?
14      A.  Division 2.
15      Q.  Division 2 is the only one, as far
16  as you know?
17          MS. WILLENSON:  You mean of where
18      she's worked?
19  BY MR. LEISHMAN:
20      Q.  Well, let's start with that.  Of the
21  divisions where you've worked?
22      A.  Division 2.
23      Q.  Are you aware, one way or the other,
24  if there are other divisions where CRWs will

Page 119

DOMINIQUE KARRION FREEMAN

 1  not enter the tiers?
 2          MS. WILLENSON:  Objection on
 3      foundation.
 4          THE WITNESS:  I can't speak for
 5      other CRWs.  I can only speak for myself
 6      for this particular incident.
 7          But customarily, Division 2 dorms,
 8      in our dorm settings, and we stay at the
 9      door.  The furthest that a CRW may go may
10      be in the day room, which is just beyond
11      the door to the tables, but we don't even
12      do that anymore.  And there are four
13      buildings considered dorms where that would
14      take place.  Actually, three dorms.
15  BY MR. LEISHMAN:
16      Q.  Is that a policy, to your
17  understanding, that CRWs will not enter the
18  dorm subdivision 2?
19      A.  No, that's not a policy.  That's not
20  a policy.  In Dorm 2 and Dorm 3, that's their
21  sleeping area, so we would have no business
22  going in their sleeping area.
23          For Dorm 4, it's pretty chaotic
24  because you walk in and it's just a giant room

Page 120

DOMINIQUE KARRION FREEMAN

 1  with hundreds of bunk beds, rows and rows of
 2  bunk beds, so you have no choice but to walk
 3  down a path and be exposed to whatever living
 4  area that they're in.  But Dorm 4 is currently
 5  closed and Dorm 1 is currently closed.
 6          So outside of those areas, yeah,
 7  we -- typically we would not go on the tier in
 8  their living space because it's a dorm setting.
 9  We would stay at the door.
10      Q.  Did somebody instruct you at some
11  point in time not to enter a dorm where it's
12  the detainee's living space?
13      A.  To my knowledge, I don't think
14  anybody instructed me.  I'm just not going
15  nowhere by an inmate's bed.  I'm sure it's
16  listed somewhere, though.
17      Q.  Looking back at Exhibit 4, your
18  "Details of Incident" says, "Upon approaching
19  the cell CRW announced to Inmate [redacted] that I
20  need a signature and had a response to his
21  appeal.  CRW Freeman then placed her back to
22  the wall as I've been trained to never stand in
23  front of the cell."
24          Did you have an understanding of why

Page 121

DOMINIQUE KARRION FREEMAN

 1  you were trained to never stand in front of a
 2  cell as a CRW?
 3      A.  Trained may not have been -- trained
 4  was not used in the sense of training, but I've
 5  been just -- from talking with officers and
 6  supervisory staff and command staff, I've
 7  always been told don't stand in front of the
 8  chuckhole, don't stand in front of their door.
 9          So I used the word "train."  But in
10  the sense that somebody's actually sat me down
11  or held a meeting and said you should never
12  stand in front of a chuckhole, that's never
13  been done.
14      Q.  Did anyone who told you never to
15  stand in front of a chuckhole explain to you
16  why you shouldn't stand in front of a
17  chuckhole?
18      A.  Not that I can recall, other than
19  for obvious reasons, they might throw --
20  "they," being the inmates, might throw
21  something out of the chuckhole at you.  So
22  depending on where you're going, you don't
23  necessarily want to stand in front of the door.
24      Q.  Do you have an understanding of what

DOMINIQUE KARRION FREEMAN

sorts of things detainees could throw through a chuckhole?
 A. I do.
 Q. What's your understanding?
 A. Urine, feces, male fluids, pretty much whatever they want.
 Q. Have you ever had urine or feces thrown at you by a detainee?
 A. No, sir.
 Q. Do you know of any CRW who has had urine or feces thrown at him or her by a detainee?
 A. I've heard stories, yes.
 Q. Do you have any personal knowledge? In other words, did you ever observe such an incident?
 A. Not that I can recall.
 Q. Have you ever heard a story of a male CRW having urine or feces thrown at him?
 A. Not that I can recall.
 Q. Turning back to Exhibit 4, according to your description of the incident, you placed some paperwork in the chuckhole for Inmate [redacted] to review, and Inmate [redacted] placed

DOMINIQUE KARRION FREEMAN

his penis on the paperwork and began stroking it, correct?
 A. That is correct.
 Q. Where was Officer Orlando in relation to you at this time?
 A. Standing about maybe three or four feet to my left.
 Q. Was he facing Detainee [redacted] or facing away from Detainee [redacted]?
 A. Facing away.
 Q. So when you realized what Detainee [redacted] was doing, Officer Orlando couldn't see what he was doing, is that correct?
 A. That is correct.
 Q. You write, "CRW alerted Officer Orlando who had his back turned to cell, as he was watching deck. Officer Orlando told inmate that his actions were disrespectful, escorted CRW Freeman off tier."
  Do you recall with any more specificity what Officer [redacted] told Detainee [redacted] at this time?
 A. Other than that he was disrespectful

DOMINIQUE KARRION FREEMAN

and a piece of shit.
 Q. Officer Orlando called Detainee [redacted] a piece of shit?
 A. Yes.
 Q. Did you have any further interaction with Detainee [redacted] or Officer Orlando before he escorted you off of the tier?
 A. Not that I can recall. I think more conversation took place once I got -- once he got me off the tier, because there was still one or two inmates still out in the day room, one being on the phone and the other, I think, was sitting at the table watching TV.
 Q. According to your description --
well, the next sentence says, "Called Lieutenant Holmes & Sergeant Bojo and informed CRW to go see Lieutenant Holmes."
  Who called Lieutenant Holmes? Did you place that call or was that Officer Orlando?
 A. Officer Orlando radioed him.
 Q. And Officer Orlando then told you to go see Lieutenant Holmes?
 A. He did.

DOMINIQUE KARRION FREEMAN

 Q. And did you go see Lieutenant Holmes at that time?
 A. Lieutenant Holmes actually met me in the hall. So I never made it to the lieutenant's office. He was already en route to the tier.
 Q. At that time, did you tell Lieutenant Holmes what had happened?
 A. I did.
 Q. What did Lieutenant Holmes say to you?
 A. He asked me if I had wrote an incident report. I said I did.
  No. Actually, strike that.
  He asked me if I had written a report. I said not yet. He asked if I wanted to press charges. I said definitely.
  He said, "Well, if you press charges, I'm going to have to put down all of your information and stuff like that."
  I said, "Exactly what information do you have to put down?"
  He said, "Well, I have to get your name and your address and stuff and that

Page 142

DOMINIQUE KARRION FREEMAN
tier visitation.
    Could you describe to me what that means and what you were doing when you were visiting the tier?
    A. So in Division 11, my tier visitation would be either standing at the door or sitting down at the officer's desk and having the inmate come out one by one.
    At this time, I was quite pregnant. And I usually have an officer stand at the door. And then there's a tier worker that may do some running back and forth depending on if the inmate is inside or -- that's inside their cell at that time, because they're on half and half. Top comes out at one time; bottom comes out at a different time. So that I wouldn't have to keeping walking up and down tier stairs, I'd have an inmate worker walk up and down the stairs if they were actually inside their cell.
    But I believe I was sitting at the desk and I had just finished servicing, passing out trust fund balances and other documents.
    Q. Was that process of having detainees

Page 143

DOMINIQUE KARRION FREEMAN
brought to you at the desk part of an accommodation for your pregnancy at the time?
    A. No.
    Q. Was that the practice for all CRWs in Division 11 to not enter the tiers?
    MS. WILLENSON: Object to foundation.
    THE WITNESS: I can't speak to -- to the other CRWs as it relates to what they would do. But in this situation, we would service them at the door.
BY MR. LEISHMAN:
    Q. Was that your decision or did someone tell you to service the detainees at the door rather than entering the tier?
    A. Well, being my size at that particular time and how far along I was in my pregnancy, walking the stairs to go to the individuals that were actually in their cells and not out would pose a hazard risk for myself.
    So not only was it my decision, but the officer would always tell me, "No, Ms. Freeman, you sit right here; we're going to

Page 144

DOMINIQUE KARRION FREEMAN
bring them to you." Because the steps on the tier have holes through them. So you just don't want those kind of problems. I wouldn't want to fall.
    Q. Your narrative says that you "voiced that this was utterly disrespectful and unwarranted."
    This was directed at Detainee ███, I take it?
    A. Yes.
    Q. Are those the words that you used, or did you use other language?
    A. No, I did say "this was utterly disrespectful and unwarranted."
    Q. When you told Detainee ███ that, did he cover himself up, or what did he do?
    A. He put his shirt back down and immediately began saying, "I didn't do that, that's not what I did, that's not what I did."
    Q. Did any of the officers say anything to you or to Detainee ███ at that point in time?
    A. Yeah. A few -- they -- they asked

Page 145

DOMINIQUE KARRION FREEMAN
me if I was okay. I'm like, "Yeah, I'm okay, but I want to write him up. And I want an incident report done because that's totally disrespectful. Like how are you just going to pull your -- or not pull it out, it just fell out. You lift your shirt and then your penis falls out."
    I don't know too many people that lift their shirt and their penis falls out. But this guy on this particular day, he lifted his shirt and his penis fell out.
    So they said some choice words to him as well being that I was in a sensitive state and just that he was totally disrespectful to even do that.
    Q. Do you recall any of the choice words that they said to him?
    A. Not specifically, no, sir.
    Q. Did Officer Villalobos, Officer Popp or Officer Stengl do anything that you felt was an attempt to discourage you from writing up Detainee ███ or pressing charges against Detainee ███
    A. I can't recall. But the mere fact

Page 146

1  DOMINIQUE KARRION FREEMAN
2  that they said that they didn't see anything
3  and they was standing there looking at the door
4  and at the window, just as I was standing there
5  looking at the door and the window, but they
6  didn't see anything.
7      Q.  Who told you that they didn't see
8  anything?
9      A.  I believe the report says that they
10 didn't see anything.  And when they were
11 writing the report, all of a sudden everybody's
12 like, "No, I didn't see anything."
13     Q.  When you say "the report," are you
14 talking about the report that you wrote or the
15 report that was submitted in CCOMS?
16     A.  I believe the report that was
17 submitted in CCOMS.  Because when the shift
18 command came, he was asking questions, "Did any
19 of you guys see anything?"
20     "No, I didn't see anything."
21     "Did anybody see anything?"
22     "No, I didn't see anything."
23     But everybody was standing there
24 with me in the same location, so...
25     ///

Page 147

1  DOMINIQUE KARRION FREEMAN
2      (Exhibit 8 was marked for
3  identification.)
4      THE WITNESS:  Am I able to go to the
5  bathroom.
6      MR. LEISHMAN:  Sure.  Five minutes.
7      (Whereupon, a recess was had
8  from 2:17 p.m. to 2:21 p.m.)
9  BY MR. LEISHMAN:
10     Q.  Ms. Freeman, can you take a look at
11 Exhibit 8 and let me know when you've had a
12 chance to review it.
13     A.  Okay.
14     (Witness viewed said document.)
15     THE WITNESS:  Okay.
16 BY MR. LEISHMAN:
17     Q.  Are there any pages in Exhibit 8
18 that you have seen before today?
19     A.  I've seen CCSO_Howard_0149297.
20     Q.  That's a misdemeanor complaint
21 against Detainee Forrester?
22     A.  That is correct.
23     Q.  Anything else in here that you've
24 seen before?
25     A.  I've seen CCSO_Howard_0149301.

Page 148

1  DOMINIQUE KARRION FREEMAN
2      Q.  And that's Detainee ███
3  booking card?
4      A.  That is correct.
5      Q.  Anything else in Exhibit 8 that
6  you've seen before?
7      A.  No, sir.
8      Q.  Would you look at the first page,
9  please.  And I'm looking in the box titled
10 "Administrative Assessment."
11     In the second line all the way
12 across it says, "Lieutenant Johnson was
13 notified by PCO Villalobos of Inmate ███
14 action.  Lieutenant Johnson notified CRW
15 Freeman that documentation is need on the
16 incident."
17     Is it true that at some point you
18 spoke to Lieutenant Johnson about what Detainee
19 ███ had done?
20     A.  Yes.
21     Q.  And --
22     A.  Just that an incident had occurred.
23     Q.  Do you recall Lieutenant Johnson
24 telling you that more documentation was needed
25 on the incident?

Page 149

1  DOMINIQUE KARRION FREEMAN
2      A.  Yes.
3      Q.  And you provided him the
4  memorandum --
5      A.  She.
6      Q.  You provided her the memorandum that
7  we saw in Exhibit 7?
8      A.  Yes.
9      Q.  What's Lieutenant Johnson's first
10 name?
11     A.  That's a good question.  I don't
12 know.
13     Q.  If you know?
14     A.  I don't know.  Might be Sharon.  I
15 know she's retired.  She's just recently
16 retired.
17     Q.  Were you aware after you spoke with
18 Lieutenant Johnson that an incident report was
19 created in CCOMS for Detainee ███
20 conduct?
21     A.  I don't recall.
22     Q.  Were you aware or were you made
23 aware at any time that Detainee ███ had
24 been issued a disciplinary ticket for his
25 conduct?