Exhibit 16

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

SDAHRIE HOWARD, DENISE HOBBS )
and ELLENOR ALTMAN, )
individually and on behalf of )
all others similarly situated, )
 )
    Plaintiffs, ) Case No. 17-cv-8146
 )
  vs. )
 )
COOK COUNTY SHERIFF'S OFFICE )
and COUNTY OF COOK, )
 )
    Defendants. )
---------------------------------

DEPOSITION OF DENISE WILLA HOBBS

Chicago, Illinois

Wednesday, October 10, 2018

Reported by:

Sandra L. Rocca, CSR, RPR, RMR, CRR

JOB NO. 148924

Page 90

D. HOBBS

couldn't draft an incident report because you didn't have access to CCOMS or to a computer?
A. No.
Q. After you finished at the academy, you were assigned to Division 2?
A. Yes.
Q. What type of inmates are housed in Division 2?
A. They were classified as minimum/medium.
Q. And our records reflect that you were assigned to Division 2 from July 6, 2007 to November 15, 2007. Does that sound right to you?
A. Yes.
Q. Were you subjected to any masturbation or indecent exposure by inmates during that time period?
A. No.
Q. Do you know anyone in Division 2 who has been subjected to masturbation or indecent exposure?
MS. WILLENSON: At any time?
Q. At any time?
A. At any time?
Q. Yes. Any time during your employment?
A. I'm not sure.
Q. You can't identify any individual for me as you sit here today?

Page 91

D. HOBBS

A. No.
Q. And you then moved to Division 8, is that right?
A. No. After I left Division 2, I went to Division 4.
Q. And how long were you in Division 4?
A. I'm sorry. I'm sorry, you're right. It is 3 and 8 or 8 and Cermak. At that time in 2007, yeah, I think in November I went to Division 3.
Q. Okay. Our records reflect that you were at Division 8 November 15, '07 to December 26, '08?
A. Yeah, that was 3/8. We were combined with Cermak which was 8, but I mostly was in Division 3.
Q. And what type of inmates are housed in Division 3?
MS. WILLENSON: Or were at the time?
THE WITNESS: Were at the time. It's torn down. It was a female division.
Q. Were you also in Division 8 for a portion of that time?
A. I was assigned there some. Not too much. That was the hospital part, Cermak.
Q. During the time period that you were at Division 3 and Division 8 from November of 2017 to December 26 of 2008, were you ever subjected to

Page 92

D. HOBBS

masturbation or indecent exposure?
MS. WILLENSON: Hold on. You said 2017 and then 2008.
Q. I'm sorry.
During the time that you were assigned to Division 3 and Division 8 between November of 2007 and December of 2008, were you ever subjected to indecent exposure or masturbation by inmates?
A. No.
Q. Do you know when Division 3 was torn down?
A. Maybe -- I'm guessing maybe '16.
MS. WILLENSON: Don't guess.
THE WITNESS: Yes. I'm not sure, but somewhere around there.
Q. Fair enough. And you recall being assigned to Division 10 after your stint in Division 3 and Division 8?
A. Yes.
Q. And Division 10 houses some of the worst offenders at CCSO, is that correct?
A. Yes, it's max, yes.
Q. Did you bid into that position?
A. Yes.
Q. And why did you want to bid into Division 10?
A. Better days off. And I believe I was able to get

Page 93

D. HOBBS

day shift, 3:00 to 11:00.
Q. And you worked, during this stint in Division 10, from December of '08 to December of '09, does that sound right?
A. Sounds about right, yes.
Q. During that time period, were you subjected to masturbation or indecent exposure?
A. No.
Q. And then our records show you were assigned to boot camp from December of '09 to January of 2010. Does that sound familiar to you?
A. No.
Q. Have you ever been assigned to boot camp?
A. No.
Q. Do you know if officers are specifically assigned to boot camp?
A. You have to apply for -- to go to boot camp, yes.
Q. And what is -- what occurs at boot camp?
MS. WILLENSON: I'll object to foundation.
Q. To the extent you know?
A. To the extent I know, it's young adults assigned there by the court. They go through a boot camp-type atmosphere, environment.
Q. Are they juveniles?

Page 106

D. HOBBS

A. Well, I've had incidents where, you know, they say stuff like, I can help you with that, that's -- you knock-kneed, I can help you with that. And just when they're in a group or they're in the gym and the hallways, you get the comments and things of that nature. But...

Q. Do you recall the names of any of the inmates?

A. No.

Q. Did you write any of those inmates up for making those comments?

A. Couldn't tell who it was. It's just all the time, constant.

Q. This inmate that made that comment to you that you brought to the attention of Lieutenant Munt and Sergeant Nalepa, was he a psych inmate?

A. No.

Q. And then after Division 10, you bid to -- well, you went -- strike that.

After Division 10 you went to Division 8?

A. The new 8, RTU.

Q. And you were in Division 8 from August 25, '13 to October 16, 2016, does that sound right?

A. Yes.

Q. Did you bid into that position?

A. Yes.

Page 107

D. HOBBS

Q. Why did you do that?

A. That's when I started noticing Division 10 -- because I had been there several times before, started to do the turn. When I went to 10 when they were saying they were going to create the psych, I was like, okay, that's something I would probably want to work with. They talked about the programs and things to that nature. And it started really kind of deteriorating and going down on, you know, what was happening and the type of inmates.

And I was like, you got a new building coming. And I was like one of the first ones like I'm going here because you kind of losing control. Like I said, they turned the division over to the mental health standard. They wanted to create this, although RTU was going to be also, 10 was getting kind of bad. So I was like, I'll go to RTU. And a lot of people were like, you want to go there, they going to have all the cameras. I was like, so. Cameras can't hurt you. They can help you. So I know I do my job, so I was like, I'm out. I'm going to go down there.

Q. So you left Division 10 because of the working conditions that you were experiencing that we just went over?

A. Not so much the working conditions, but what we

Page 108

D. HOBBS

were being subjected to.

Q. And so you bid to Division 8?

A. Uh-huh.

Q. And were you on the female tier in Division 8?

A. Initially I was doing male and female.

Q. And was there a point in time when you were doing only female?

A. Yes.

Q. And what period of time was that?

A. I believe the females were moved over there in February 2014.

Q. During the time you were in Division 8 from August of 2013 to October of 2016, were you subjected to any detainee masturbation or indecent exposure?

A. No.

Q. And then you were assigned back to Division 10 on October -- in October of 2016?

A. Yes.

Q. And did you bid into that position?

A. Yes.

Q. And why did you decide to go back to Division 10?

A. I went back for family reasons, being able to get a better detail, was able to get a Sunday and Monday.

Q. And what was your detail in the RTU?

Page 109

D. HOBBS

A. Monday/Tuesday.

Q. And what family reasons are you referring to?

A. It was just to take care of my mom, my sister and I. And having some part of the weekend gave me things to do with my mom, like go to church, take her to church. And it also would give my sister some parts of the weekend off instead because she would stay with her in the daytime and I'd stay with her at night most nights.

Q. Had you heard anything about Division 10 -- about the conduct that was occurring in Division 10 by the inmates at the time that you bid back into Division 10 in October 2016?

A. Yes.

Q. And what did you hear?

A. And you would read the reports in the CCOMS. You just saw everything that was going on, 9 and 10, and some of the other divisions and just throughout the compound.

Q. But you made the decision that you were going to go back to Division 10 because you wanted those -- the details?

A. Yes.

Q. And are you currently in Division 10?

A. Yes.

Q. And you've been there since October of 2016?

28

Page 162

D. HOBBS

 THE WITNESS: No.
 Q. Any other incidents of sexual harassment that we have not already discussed by detainees that occurred to you?
 MS. WILLENSON: Object to form and foundation as to what constitutes sexual harassment.
 THE WITNESS: I have comments made about my body shape and things to that said to you all the time by the inmates.
 Q. Have we -- sorry. Go ahead.
 A. They just say things to you in a sexual nature.
 Q. Have we gone over all the incidents of sexual harassment directed at you by detainees for which you would have filed an incident report?
 MS. WILLENSON: Object to the form.
 THE WITNESS: Yes.
 Q. Are you aware of any CCSO employee who discouraged you from filing any disciplinary reports against inmates for indecent exposure, masturbation, or sexual harassment?
 A. Again I would have to name Dr. Gomez.
 Q. Dr. -- is it Gomez?
 A. Gomez.
 Q. Other than Dr. Gomez?

Page 163

D. HOBBS

 A. When you ask that, are you saying just overall or just for the masturbation?
 Q. Relating to -- I'll ask the question again.
 Other than Dr. Gomez, are you aware of any CCSO employee who has discouraged you from filing any type of incident report or disciplinary report relating to inmate masturbation, indecent exposure, or sexual harassment?
 A. I would also name Lieutenant Munt and Sergeant Nalepa.
 Q. And we've already gone over the allegations against Lieutenant Munt and Sergeant Nalepa?
 A. Yes.
 Q. Nalepa, is that right?
 A. Yes, Nalepa.
 Q. Anyone else other than Dr. Gomez, Lieutenant Munt and Sergeant Nalepa?
 A. No.
 Q. Do you know who employs Dr. Gomez?
 A. Cook County.
 Q. When do you believe incidents of masturbation and indecent exposure became more frequent?
 MS. WILLENSON: If you're -- are you asking what her observations were?
 MR. MILIANTI: Yes.

Page 164

D. HOBBS

 THE WITNESS: Had to be 2012.
 Q. In 2012?
 A. My observations. That's when I started experiencing it.
 Q. Why do you believe they became more frequent?
 MS. WILLENSON: Object to the form.
 Q. Starting in 2012?
 A. Repeat that again.
 Q. Sure. Why do you believe the incidents of masturbation and indecent exposure became more frequent starting in 2012?
 MS. WILLENSON: Object to the form.
 THE WITNESS: I don't know.
 Q. I'm sorry?
 A. I don't know.
 Q. Have you heard of Savage Life?
 A. Yes.
 Q. What is your understanding of Savage Life or what it is?
 A. My understanding it's just inmates that live a Savage Life, don't care, do everything.
 Q. Is it a jail gang, do you know?
 A. I don't know.
 Q. Do you know any members of Savage Life?

Page 165

D. HOBBS

 A. I don't know.
 Q. Have you heard any rumors that members of Savage Life, one of their goals is to try and masturbate in front of female officers?
 A. I don't know.
 (Hobbs Exhibit 121 marked for identification.)
 Q. You've just been handed what's been marked as Hobbs deposition Exhibit 121. This document is Bates Hobbs 0030 through 0037.
 Ms. Hobbs, this is your handwriting?
 A. Yes.
 Q. Is that right?
 A. Yes.
 Q. And these are your handwritten notes, is that correct?
 A. Yes.
 Q. And at the top of this it says, "313s violations, Division 10," is that right?
 A. Yes.
 Q. Where did you keep these notes?
 A. What do you mean?
 Q. Where are they physically maintained? Is this in a notebook, loose leaf paper?