Exhibit 17

```
     IN THE UNITED STATES DISTRICT COURT
        NORTHERN DISTRICT OF ILLINOIS
              EASTERN DIVISION

SDAHRIE HOWARD, DENISE HOBBS,
ELLENOR ALTMAN, TAVI
BURROUGHS, SHADONNA DAVIS,
SHARON WILSON, KIMBERLY
CRAWFORD-ALEXANDER, ESTHER
JONES, BALVINA RANNEY,
TAWANDA WILSON, SUSANA
PLASENCIA, and PATRICIA
JAGIELSKI, on behalf of           Case No. 17-cv-8146
themselves and all others
similarly situated,               Judge Matthew J. Kennelly
        Plaintiffs,               Mag. Judge Sidney I.
                                  Schenkier
     vs.
COOK COUNTY SHERIFF'S
OFFICE, and COUNTY OF COOK,

        Defendants.
-------------------------------


        DEPOSITION OF ELLENOR ALTMAN

               Chicago, Illinois

           Monday, September 17, 2018



Reported by:
JANICE M. KOCEK, CSR, CLR
JOB NO. 147711
```

Page 118

E. ALTMAN

1  responding immediately to problematic and
2  combative inmate behavior through appropriate
3  interaction; verbal orders; effective and, when
4  appropriate, proper use of physical force?
5      MS. WILLENSON: Yeah, he's jumping
6    here.
7      THE WITNESS: Okay. Yes.
8  BY MR. MILIANTI:
9      Q. And that is your understanding of
10 your job responsibilities as a correctional
11 officer throughout your employment; is that
12 correct?
13     A. Yes.
14     Q. And would you agree with me that the
15 "Key Responsibilities and Duties" section
16 contained in this document were your key
17 responsibilities and duties throughout your
18 employment as a correctional officer?
19     MS. WILLENSON: You need to read it.
20     THE WITNESS: Yeah, well, this came
21    out last year. So prior to that, I don't
22    know if anything changed. Because I never
23    really --

Page 119

E. ALTMAN

1  BY MR. MILIANTI:
2      Q. Okay. Well, why don't you take a
3  moment to review the key responsibilities and
4  duties and let me know if any of the ones that
5  are listed here are not -- or have never been
6  your responsibilities as a correctional
7  officer.
8      MS. WILLENSON: I object to the
9    form.
10     (Witness reviewing document.)
11 BY MR. MILIANTI:
12     Q. Are you done reviewing the key
13 responsibilities and duties section?
14     A. Yes.
15     Q. Okay. Are there any key
16 responsibilities and duties listed in Exhibit
17 18 that you believe do not apply to you as a
18 correctional officer?
19     A. Are you talking about now or when I
20 first started? Because when I first started
21 some of this --
22     Q. Okay. When you first started, what
23 did not apply to you?
24     A. Word and Excel. You had to have --

Page 120

E. ALTMAN

1  able to use. We didn't have -- well, the
2  officers that worked the tier didn't have
3  computers.
4      Q. I'm only referring to the "Key
5  Responsibilities and Duties" section, not the
6  "Knowledge, Skills and Abilities."
7      A. Oh, I went down.
8      Q. Is there anything in the "Key
9  Responsibilities and Duties" section that you
10 believe do not apply to you as a correctional
11 officer?
12     A. No. No, they all apply.
13     Q. They apply?
14     A. Yes.
15     Q. They've all applied to you
16 throughout your employment; is that correct?
17     A. Yes.
18     Q. After you finished the academy, I
19 believe you testified, you were assigned to
20 Division 5; is that correct?
21     A. Yes.
22     Q. Did you request to be assigned to
23 Division 5 or was it given to you?
24     A. It was just given to me.

Page 121

E. ALTMAN

1      Q. What type of inmates at that time
2  were housed in Division 5?
3      A. Medium. Might have been minimum.
4      Q. And was it male inmates?
5      A. All male.
6      Q. All male.
7      Where were you stationed in Division
8  5?
9      A. What tier?
10     Q. What tier, yes.
11     A. 1A, 1B, 1C. Let me see. What other
12 floors? Sometimes the second floor. It was
13 random.
14     Q. And how long did you remain at
15 Division 5; do you recall?
16     A. I believe until 2000 --
17     Q. Does November 1, 2007, sound right?
18     A. Possibly. It was a short time and I
19 was bumped over to 3 and 8.
20     Q. Do you recall being assigned to
21 Division 8 on November 1, 2007?
22     A. Division 8?
23     Q. Yes.
24     A. 3 and 8? Because they were

31

|  | Page 122 | | Page 123 |
|---|---|---|---|

```
                Page 122                                    Page 123
 1         E. ALTMAN                       1         E. ALTMAN
 2   together.                             2   was all women?
 3       Q.  Well, where were you assigned after  3       A.  Yes.
 4   Division 8?                           4       Q.  And did you bid to go to Division 8,
 5       A.  3 and 8.                      5   Division 3?
 6       Q.  3 and 8?                      6       A.  No, not in November. I wasn't
 7       A.  They were combined.           7   eligible to bid.
 8       Q.  That's the residential treatment  8       Q.  And how would you be assigned -- how
 9   unit?                                 9   would they determine if you were going to be at
10       A.  Yes.                         10   Division 8 or Division 3?
11       Q.  Is that Division 8?          11       A.  We didn't. They just call your name
12       A.  Plus Division 3. It was Division 3  12   and gave you the assignment. After a while
13   at the time and residential. They were  13   they would do 90-day assignments.
14   together. So you went to either Division 3 if  14       Q.  Do you recall how long you were in
15   you were assigned or Division 8.    15   Division 8 and Division 3?
16       Q.  What type of offenders are housed in  16       A.  Couple years.
17   Division 8 at that time?            17       Q.  Does April 30th of 2010 sound
18       A.  Might have been minimum because it  18   accurate to you?
19   was open door.                      19       A.  That's -- yeah. That's possible,
20       Q.  How about in Division 3?    20   yeah. That could be.
21       A.  They were all women. So...  21       Q.  Do you recall any incidents of
22       Q.  So when you worked Division 8, it  22   indecent exposure or masturbation during the
23   was minimum. Was it all males?      23   time period you were assigned to Division 8 and
24       A.  It was all males.           24   3 between November 1, 2007, and April 30th,
25       Q.  And when you worked Division 3, it  25   2010?
```

```
                Page 124                                    Page 125
 1         E. ALTMAN                       1         E. ALTMAN
 2       A.  Not that I recall. I -- I don't  2       Q.  Cermak and Division 10 were together
 3   remember.                            3   at the time?
 4       Q.  Do you recall being assigned to  4       A.  Right. Cermak and Division 10 was
 5   Division 10 on April 30th of 2010?  5   together. I went down there a couple of times.
 6       A.  The exact date, I don't know.  6       Q.  And what type of offenders were
 7       Q.  Does April of 2010 sound accurate to  7   housed in Division 10 at that time?
 8   you?                                 8       A.  I think they were max. Max.
 9       A.  In division where?           9       Q.  Male?
10       Q.  10.                         10       A.  Men.
11       A.  20 what?                    11       Q.  And do you recall why you would have
12       Q.  2010.                       12   bid to go to Division 10?
13       A.  I -- I don't -- I don't know.  13       A.  It was Cermak and 10. So I had
14       Q.  Well, if CCSO records show that you  14   worked Cermak, which I would be on the women's
15   were assigned to --                 15   floor, 2 West and probably the detail.
16       A.  I might have because --     16       Q.  So were you bidding to get into
17       Q.  -- on April 30th, 2010, do you have  17   Division 10 or into Cermak?
18   any reason to dispute that?         18       A.  They were together.
19       A.  No.                         19       Q.  They were together.
20       Q.  Do you recall whether or not you bid  20       A.  They were together.
21   into Division 10 at that time?      21       Q.  Okay. And when you worked at
22       A.  Yes. I think it was Cermak and  22   Cermak, it was on the women tier?
23   Division 10 probably back then. And that's the  23       A.  2 West, yes.
24   only reason why I would be in 10 because they  24       Q.  Do you recall how long you were in
25   were together.                      25   Division 10 and Cermak?
```

Page 126

1    E. ALTMAN
2    A.  No.
3    Q.  Do you recall -- does April of 2011
4    sound accurate to you, for about a year?
5    A.  April -- April? In 10 -- in
6    Division 10?
7    Q.  Yes.
8    A.  In 2011. I don't recall.
9    Q.  You don't remember one way or the
10   other?
11   A.  I -- no.
12   Q.  Do you recall any incidents of
13   indecent exposure or masturbation when you were
14   assigned to Cermak and Division 10 in April of
15   2010?
16   A.  Not that -- not that I recall, no.
17   Q.  Do you recall being assigned to
18   Division 4 after your stint at Cermak and
19   Division 10?
20   A.  Yes.
21   Q.  Okay. Do you recall being assigned
22   there in April of 2011?
23   A.  Yes, if that was around the bid time
24   because that -- that was around the bid time.
25   Q.  And you bid into Division 4?

Page 127

1    E. ALTMAN
2    A.  Yes.
3    Q.  Why would you -- why would you want
4    to bid into Division 4?
5    A.  Weekends off.
6    Q.  And at that time, Division 4, was
7    that female inmates?
8    A.  Yes.
9    Q.  And were you a tier officer on
10   Division 4?
11   A.  Some of the -- part of the time,
12   yes. Other times I was a sanitation and food
13   officer.
14   Q.  And do you recall being in
15   Division 4 until September of 2012?
16   A.  No, because I got hurt -- let me
17   see. 2011, November. I got hurt in 2011 in
18   November while I was in Division 4.
19   Q.  And were you out for nine months?
20   A.  Nine months.
21   Q.  And you came back in August?
22   A.  August 2012.
23   Q.  August of 2012. When you came back
24   from your workplace injury, where were you
25   assigned?

Page 128

1    E. ALTMAN
2    A.  External operation.
3    Q.  Do you recall during the time period
4    that you worked in Division 4 any incidents of
5    indecent exposure or masturbation?
6    A.  No masturbation, no. Indecent
7    exposure with the women, no.
8    Q.  And how long were you in external
9    ops, do you recall?
10   A.  Few months, until I think like
11   November 2012.
12   Q.  And did you bid to go into external
13   ops?
14   A.  No, that's the assignment I was
15   given for light duty coming off of injury on
16   duty.
17   Q.  And what is external ops?
18   A.  They're the ones -- officers that be
19   at each post to let you in the gate to get in
20   to the County.
21   Q.  Security of the premises?
22   A.  Yes, yes.
23   Q.  And you were only in external ops
24   for a month or two; is that right?
25   A.  Yes.

Page 129

1    E. ALTMAN
2    Q.  And then where were you assigned; do
3    you recall?
4    A.  Division 11.
5    Q.  And did you bid into Division 11?
6    A.  Yes.
7    Q.  And why did you want to bid into
8    Division 11?
9    A.  I had never worked over there before
10   and that was the best detail I could get.
11   Q.  Do you recall being assigned to
12   Division 11 October 28th, 2012?
13   A.  Uh-huh -- uh-uh, uh-uh.
14   Q.  Around that time period?
15   A.  October, no. I don't think -- I
16   don't believe I went into Division 11 until
17   November of 2012.
18   Q.  November of 2012?
19   A.  Yes.
20   Q.  Okay. What type of offenders are
21   housed in -- or were housed in Division 11 at
22   that time?
23   A.  Medium and some max.
24   Q.  Medium and max?
25   A.  Medium and max.

33

Page 130

E. ALTMAN
Q. And were you assigned a tier?
A. Yes.
Q. Do you recall where?
A. All over. It didn't -- all over. I did, you know, pretty much the -- almost the whole building and the law librarian and dispensary as well.
Q. I'm sorry, you did where?
A. The law librarian and dispensary.
Q. And do you recall how long you were in Division 11?
A. I believe to 2014.
Q. Does November 2014 sound accurate to you?
A. Could have been if that was the bid time.
Q. Do you recall any incidents of indecent exposure or masturbation during the time period you worked in Division 11?
A. No.
Q. Do you recall working in Division 8 after you worked at Division 11?
A. No.
Q. Where did you go after Division 11?

Page 131

E. ALTMAN
A. Our -- RTU was considered 808. I went to RTU.
Q. RTU?
A. RTU.
Q. At that time Division 8 was considered RTU?
MS. WILLENSON: 08.
THE WITNESS: The new one -- there was a new one, 8 and 08. So it was the new building.
BY MR. MILIANTI:
Q. Okay. So Division 08 was considered RTU?
A. I don't know if it's 08 or 8. I can't remember.
Q. And that would have been in November 2014; is that correct?
A. Yes.
Q. And what type of inmates were housed in Division 08 at that time?
A. They were psych, medical, minimum, medium. Could have been max as well. I don't know for sure but it could have been.
Q. Why did you bid into Division 08?

Page 132

E. ALTMAN
A. Weekends off. Yeah, weekends off.
Q. And do you recall where you were stationed when you worked in Division 08?
A. 5th floor majority of the time and sometimes the other floors. I don't know if it was 2, 3, or 4 or -- one of them, could have been.
Q. And the 5th floor was the female floor?
A. All females.
Q. And when you say the "majority of the time," how much of the time?
A. I would say pretty much 90 percent of the time 90, 95 percent of the time.
Q. 90, 95 percent of the time were you on the female?
A. Yes, yes.
Q. And were you a tier officer?
A. Yes.
Q. And then the other 5 to 10 percent of the time where would you have been assigned?
A. One of the men floors, either on the tier or dispensary officer.
Q. Where is the dispensary located?

Page 133

E. ALTMAN
A. In the hallway.
Q. In the hallway. In the hallway where?
A. In the division. It's like -- it's a hallway and there's a room and that's where the doctor or the nurse see you at. An officer sits along the tier on the outside to watch, you know, the doctors or nurses see the inmates.
Q. So what were your job responsibilities at the dispensary?
A. To contact the tier officer to let him know who was going to see what doctors.
Q. And then would the tier officer transport the inmate from the tier down to the hallway so they could have their --
A. No.
Q. -- medical review?
A. No.
Q. Would you go get the inmate?
A. Sometimes. Other times the officer just send him around -- because it was like a circle -- send him around to where I was.
Q. During the time period that you --

34

Page 134

E. ALTMAN

1  do you recall being assigned to Division 08
2  until October of 2016?
3      A.  Yeah, I think that might be before
4  the bid, yes -- right after the bid, yes --
5  after the -- before the bid, yes.
6      Q.  And during the time period that you
7  were assigned to Division 08, did you have any
8  incidents of masturbation or indecent exposure
9  while you worked on the female tier?
10     A.  Not that I recall.  If they did, it
11 was under the cover and it wasn't towards me.
12     Q.  So if a female inmate is
13 masturbating under the covers, would you issue
14 her an incident report?
15     A.  No.
16     Q.  Why not?
17     A.  Because it wasn't directed towards
18 me.
19     Q.  How would you determine whether or
20 not it was directed towards you?
21     A.  Because they -- under the cover
22 they're not looking at me.  They're under the
23 cover doing their thing.  And if I notice, you
24 know, because you can see the movement under

Page 135

E. ALTMAN

1  the cover, you know, I would instruct them
2  to -- you know, to stop.  Or the other inmates
3  would see and they will let me know, hey, she's
4  over there, you know, playing with herself.
5      Q.  So if you saw a female inmate
6  masturbating under the covers, but it was not
7  directed at you, you would instruct her to
8  stop?
9      A.  I would.  Even if it wasn't at me,
10 yes.  I would instruct her to stop, yes.
11     Q.  Any incidents of indecent exposure
12 with female inmates when you were assigned to
13 Division 08 that you can recall?
14     A.  No.
15     Q.  Can you recall any incidents of
16 masturbation or indecent exposure with male
17 inmates when you were assigned to Division 08?
18     A.  When they have they hands in their
19 pants, you know, like continuously, I will tell
20 them take your hands out of the front of your
21 pants.
22     Q.  Was it directed at you?
23     A.  Yes.
24     Q.  Would you write up incident reports?

Page 136

E. ALTMAN

1      A.  No.
2      Q.  Why not?
3      A.  Because then they didn't really --
4  the sergeants or lieutenants didn't really
5  consider, you know, that it was important
6  enough to write one.  You know, he'll say, "Was
7  he actually doing it towards you or were his
8  hands just in his pants?"  And if you said,
9  "His hands was in his pants and he was looking
10 at me," he'll say, "Well, you know, you really
11 can't prove that he was playing with his self."
12 So didn't write it.
13     Q.  How many times did that happen to
14 you when you were on Division 08?
15     A.  Several times.
16     Q.  Can you give me a number?
17     A.  Anytime I worked with the male
18 detainees.
19     Q.  And their hands would be in their
20 pants?
21     A.  In the front, yes.
22     Q.  Okay.  And what -- what were they
23 doing with their hands in front?
24     A.  There would be some movement, you

Page 137

E. ALTMAN

1  know.  I don't know if it's actual gesture
2  or -- you know, that --
3      Q.  Do you know whether or not they were
4  masturbating?
5      A.  I don't know.  They could have been.
6      Q.  You don't know one way or the other?
7      A.  Right.  So I was -- you know, they
8  was looking at me, their hands moving.  And I'm
9  like, okay, you know, take your hands out your
10 pants.
11     Q.  And when you told them to take their
12 hands out of their pants, did they do so?
13     A.  Yes.
14     Q.  Was there ever an instance when you
15 told an inmate when you were assigned to
16 Division 08 to take his hands out of his pants
17 and he refused your order?
18     A.  No, but they'll do it again, you
19 know.
20     Q.  Did you ever write up or request to
21 write up an inmate for having his hands in his
22 pants --
23     A.  No.
24     Q.  -- when you were assigned to

35

Page 138

E. ALTMAN

Division 08?
A. No, I will mention it but I wouldn't write it. I would mention it to the sergeant. But, of course, you know, don't know whether or not he was actually masturbating or not.
Q. So you would mention it to the sergeant that you saw the inmate with his hands in his pants?
A. Uh-huh, yeah.
Q. But you didn't know whether or not the inmate was masturbating?
A. His hand was moving but not to the point where it was completely out, you know, the full gesture, but could have been just playing with his self.
Q. You didn't think it was significant enough to write an incident report? Would that be an accurate statement?
A. I won't say whether significant enough. I'm saying that even if I mention it to the sergeant, they would be like, "Okay. Well, he stopped" or "Can you prove he was actually doing, you know?" And if you said, "Well, he got his hands in his pants." They

Page 139

E. ALTMAN

would say, "Okay. Well, we're not doing a report."
Q. How many times did you mention it to a sergeant?
A. I want to say at least three or four times maybe. Several times, let me put it like that. I don't know the exact number. It was several times.
Q. You believe three or four times?
A. I'm going to say several. I don't know the exact number.
Q. More than four?
A. Could have been.
Q. Less than ten?
A. Yes.
Q. Less than seven?
A. Yes.
Q. So somewhere between four and six?
A. Could be, yes.
Q. And four, six times you mentioned it to the sergeant that the inmate had his hands in his pants?
A. Uh-huh, yes.
Q. Which inmate -- I'm sorry.

Page 140

E. ALTMAN

Who was the sergeant?
A. More than likely Sergeant Daly.
Q. What's Sergeant Daly's first name?
A. I have no idea.
Q. Male or female?
A. Male.
Q. Did you report it to anybody other than Sergeant Daly?
A. No.
Q. What would you tell Sergeant Daly?
A. Inmate -- you know, I was like, "Inmate, you know, he had his hands in his pants doing X, Y, Z." He was like, "Oh, okay." I'm like, "So, you" -- "you know, should I write?" "No, you can't prove he was actually doing whatever." So that was pretty much the answer to any time you address that issue.
Q. So you would tell Sergeant Daly that the inmate had his hands in his pants and then what would you say?
A. You know, should I -- should I write him up or, you know. No.
Q. And Sergeant Daly would respond no?
A. Yeah, no.

Page 141

E. ALTMAN

Q. What would he say?
A. "No. Write him up for what? For his hands in his pants?" And so you be like, okay, leave it at that.
Q. How would you respond?
A. I say okay.
Q. Did you need Sergeant Daly's approval to file an incident report?
A. Well, you have to inform the sergeant before you do it because I guess on the system, you know, they have to know that you're writing it so they know to go do whatever they have to do with the report.
Q. That's not my question. Did you need his -- did you need Sergeant Daly's approval before you could fill out an incident report?
A. Yes and no. You -- you could do it. But you would ask for their advice prior to doing it. And they will tell you yes or no, don't waste your time. So I took it at that. And if they say no, I didn't.
Q. So is it your testimony that anytime you wrote an incident report you would seek the

Page 142

E. ALTMAN

approval of your supervisor before you wrote the report?

A. Pretty much at that time, yes.

Q. But you would agree with me that you didn't need your supervisor's approval in order to file an incident report, correct?

A. I thought I kind of did need their approval because they would tell you, you know, "I'm" -- "You know, I'm" -- "I'm not signing off on that type of report." So it was -- "I don't think it's that serious." So you took it as, okay, he said it's not that important and he don't want to do the paperwork. You know, you didn't. You just didn't do it.

Q. Okay. Just so I understand your testimony, it's your testimony that you could not write an incident report --

A. I didn't say I couldn't. I didn't say I couldn't.

Q. Okay. That's my question.

A. No.

Q. Could you write an incident report?

A. No, I could.

Q. Without your supervisor -- without

Page 143

E. ALTMAN

your sergeant's approval?

A. Yes, I could.

Q. Knew you could do that, right?

A. I could.

Q. You chose not to do that, correct?

A. By advice of supervisor.

Q. You chose not to do that, correct?

A. By the advice of the supervisor, yes.

Q. Okay. Your supervisor advised you not to do it?

A. Yes.

Q. And you took your supervisor's advice?

A. Yes.

Q. Even though you knew you could write the report --

A. Yes.

Q. -- without his approval?

A. Yes.

Q. Did any other sergeant tell you you shouldn't write up the inmates who had their hands in their pants while you worked in Division 08 other than Sergeant Daly?

Page 144

E. ALTMAN

A. I know Sergeant Moore was over there. Whether or not I mentioned it to him, I don't recall.

Q. So the only one you remember right now is Sergeant Daly?

A. Is Sergeant Daly.

Q. And what shift did Sergeant Daly work?

A. 7:00 to 3:00.

Q. Was he on the male tier or female tier?

A. What do you mean? Where the sergeant was?

Q. Yes.

A. Oh, I was on -- had to be the male tier.

Q. Did you ever go -- who was the lieutenant on the 7:00 to 3:00 shift when you worked the male tier at 08?

A. Lieutenant Ross and Lieutenant Pullums.

Q. What's the last one? I'm sorry.

A. Pullums, P-u-l-l-u-m-s.

Q. Did you ever talk to Lieutenant Ross

Page 145

E. ALTMAN

and Lieutenant Pullums about inmates in Division 08 who have their hands in their pants?

A. No.

Q. Why didn't you speak with them about it?

A. Because I spoke to my immediate supervisor, which was the sergeant.

Q. Did you agree with Sergeant Daly's recommendation that you not write an incident report for the instances where the inmates had their hands in their pants?

A. Not that I totally agree with. I -- I didn't do it because if you write reports and they say, "Well, no, don't do it," then it creates a hostile environment because then you're considered you write everything, you know. So I let it go.

Q. And then after Division 8 were you assigned to Division 10; is that correct?

A. Yes.

Q. Did you bid into Division 10?

A. Yes.

Q. Why did you bid into Division 10?

Page 146

E. ALTMAN
A. Weekends off.
Q. And do you recall starting in Division 10 in October of 2016?
A. Yes.
Q. And how long did you remain there; do you know?
A. To the present time.
Q. You're still in Division 10?
A. Yes.
Q. And what type of inmates are housed in Division 10?
A. Medium and max and psych and medical.
Q. Where have you been assigned in Division 10?
A. Let me see. On the tiers. Majority all tiers.
Q. Which tiers?
A. All tiers, except for one brief two months in the law library. Oh, and sometimes in the lobby. After I was put out of the law library I was placed in the lobby. Nope -- let me see. Yep.
Q. Let me just go back for a second.

Page 147

E. ALTMAN
With respect to the inmates who had their hands in their pants when you were in Division 08, did you ever see their penises?
A. No.
Q. Did you ever see them ejaculate?
A. No.
Q. Did you ever notice whether or not they had an erection?
A. I wasn't trying to look. All I know, you know -- all I knew, their hands was moving in their pants. So I didn't stare to see if it was going to reach it. So...
Q. So all you saw was the hands in the pants, you didn't see an erection. Would that be an accurate statement?
A. Right. They didn't get to that point.
Q. Are you currently assigned to shift 2?
A. Yes.
Q. In Division 10?
A. Yes.
Q. And did you start that in October of 2017, about a year ago?

Page 148

E. ALTMAN
A. No, started it in 2016, second shift. October 2016.
Q. So you've been the 7:00 to 3:00 shift the entire time you've been in Division 10 starting in October 2016?
A. Yes.
Q. Who's your lieutenant for that 7:00 to 3:00 shift?
A. Now or back then?
Q. Now currently.
A. Lieutenant Grier, Lieutenant A. Johnson, Lieutenant C. Johnson, sometimes Lieutenant Barajas.
Q. Is Lieutenant Grier male or female?
A. Female. A. Johnson is a female. C. Johnson is a male. Barajas is a male.
Q. And have they been -- how long have they been your lieutenants?
A. They switch off from Division 8, Cermak. So off and on probably -- off and on, I'm going to say since I started. But I don't know about Lieutenant Grier and Barajas.
Q. Have you worked in any other areas of the jail that we haven't discussed?

Page 149

E. ALTMAN
A. Let me think. I worked in Division 9.
Q. When did you work in Division 9?
A. Briefly, 2010. I believe it was 2010 for three months.
Q. Where did you work in Division 9?
A. Where?
Q. Where.
A. On tier.
Q. You were --
A. I don't know what tower because they got two towers.
Q. What type of inmates were housed --
A. Super max, super max.
Q. Male?
A. Yes.
Q. During the three-month time period that you worked in Division 9 in 2010, were you subjected to any indecent exposure or masturbation by inmates?
A. Yes.
Q. How frequently?
A. Every time that they decided to take a shower. And -- and go to the first shower

38

|  |  |
|---|---|
| Page 150 | Page 151 |

```
Page 150
                    E. ALTMAN
 1
 2   opposed to going over to the one on the further
 3   end where you couldn't see.  Because I sat up
 4   and you could see out.  So I could see from my
 5   peripheral vision they standing there doing
 6   they thing.
 7        Q.   Was it directed at you?
 8        A.   Yeah, because they knew I could see.
 9   They knew that I could see them because I was
10   up.  And I controlled the actual showers.
11   So -- so they purposely went to the first one
12   where the officer can see as opposed to the
13   ones on the further end where you couldn't see
14   them.
15        Q.   When in 2010 did you work at
16   Division 9?
17        A.   I don't know.  It was a hardship.
18   So I don't know.
19        Q.   You don't recall?
20        A.   Uh-uh.
21        Q.   How many times did you see a male
22   inmate masturbate?
23        A.   Several.
24        Q.   Can you put a number on it for me?
25        A.   At least two to three times a week.
```

```
Page 151
                    E. ALTMAN
 1
 2        Q.   Two to three times a week for three
 3   months?
 4        A.   Uh-huh.
 5        Q.   Is that a yes?
 6        A.   Yes.  Sorry.
 7        Q.   Did you write any of the inmates up?
 8        A.   No.
 9        Q.   Why not?
10        A.   Because they're going to say they
11   were in the shower area and that's, you know --
12   how do I say -- private, supposedly private.
13   So -- but it wasn't private enough because I
14   can clearly see.  But that's if they were in
15   the shower.
16        Q.   Were these inmates looking at you
17   when they were in the shower masturbating?
18        A.   I -- I try not to do direct contact
19   so I wouldn't put a face with a body part.  So
20   I can just see -- see the figure and I can see
21   the motion from my peripheral vision and then I
22   would tell another inmate to tell that inmate
23   to move over to the other end or I was going to
24   shut the showers off.
25        Q.   So you would see inmates
```

```
Page 152
                    E. ALTMAN
 1
 2   masturbating two or three times a week for
 3   three months but you didn't write --
 4        A.   Uh-uh.
 5        Q.   -- any of them up?
 6        A.   Uh-uh.
 7        Q.   Correct?
 8        A.   No.  Because like I said, I never
 9   actually see who it is.  I would see the figure
10   and I would see the motion and I would tell the
11   inmate move.  I didn't want to put a face to
12   the body part.
13        Q.   Did anyone discourage you from
14   filing incident reports relating to inmates'
15   conduct?
16        A.   No, no.
17        Q.   And you understood that you could
18   file an incident report if you wanted to; is
19   that correct?
20        A.   Yeah, but most of the time we
21   didn't.  It was handwritten.  And again, prove
22   it.  You know, that he was doing -- he was
23   taking a shower.  So that would have been a
24   dispute.
25        Q.   Anywhere else that you've worked in
```

```
Page 153
                    E. ALTMAN
 1
 2   the jail other than what we've already
 3   discussed here today?
 4        A.   No.
 5        Q.   Did you ever work at -- in Leighton,
 6   the court services?
 7        A.   No.
 8        Q.   And would it be accurate to say that
 9   your personal knowledge of sexual harassment by
10   detainees is limited to the areas to which you
11   were assigned and to which we've already
12   discussed?
13        A.   What do you mean?
14        Q.   Your personal knowledge meaning
15   things that you saw with your own eyes would be
16   limited to things in the jail?
17        A.   Limited?
18        Q.   Yes.
19        A.   Limited.  I don't know.  I don't
20   know about limited to the areas in the jail.
21   No, I don't think it's limited just inside
22   because you got the tunnel they'd walk through.
23   Let me see.
24        Q.   Did you see any incidences of
25   indecent exposure or masturbation in the
```