Exhibit 18

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SDAHRIE HOWARD, ET AL.,                    Case No. 17 C 8146
                                           Judge Matthew F. Kennelly
                                           Magistrate Judge Sidney I. Schenkier

                Plaintiffs,

        V.

COOK COUNTY SHERIFF'S OFFICE, ET AL.,

                Defendants.


**<u>EXPERT REPORT OF JEANNE S. WOODFORD</u>**

# TABLE OF CONTENTS

I.  Expert Statement.................................................................................................. 1

II.  Introduction ..................................................................................................... 1

    A. Engagement........................................................................................... 1

    B. Professional Experience and Qualifications.................................................... 1

III.  Documents Reviewed .......................................................................................... 3

IV.  Summary of Opinions and Basis for Opinion........................................................... 3

V.  Detailed Bases for Opinions ................................................................................. 5

    A. The Cook County Jail Has an Excessively Large Number of Reported Incidents of Masturbation and Indecent Exposure ......................................................... 5

    B. Incidents of Masturbation and Indecent Exposure Are Severely Underreported, Making the Problem Far Worse than the Number of Reported Incidents Indicate ....... 8

    C. Inmates Frequently Engage in Sexual Offenses Other than Masturbation and Indecent Exposure, Which Are Rarely Reported ...................................................... 12

    D. An Unreasonably Large Number of Incident Reports of Masturbation and Indecent Exposure Do Not Result in Guilty Determinations at Least Partly Because of Practices in Violation of the Jail's Stated Policies, the Standards of the American Correctional Association, and Practices of Other Institutions ......................................... 15

        1. Staff Are Not Adequately Trained in Writing Reports or In Dealing with Sexual Harassment.................................................................................. 17

        2. The Disciplinary Hearing Process Is Seriously Flawed ......................... 19

        3. The CCSO Fails to Involve Staff in Devising Appropriate Sanctions for Inmates...21

        4. The Jail Fails to Impose Effective Sanctions on Inmates Who Commit Multiple Acts of Masturbation or Indecent Exposure............................................... ..22

        5. CCSO Fails to Enforce the Sanctions that Are Imposed......................... 25

      6.  Defendants Have Not Placed Experienced Professionals at the Helm of the Disciplinary System ................................................................................................ 25

   E.  CCSO Does Not Adequately Inform Inmates of Expectations ................................... 26

   F.  Detainees Are Not Properly Dressed ......................................................................... 28

   G.  Facility Design Flaws and the Lack of an Adequate Alarm System Put Women Employees Unnecessarily At Risk. .............................................................................. 30

VI.    CONCLUSION ............................................................................................................ 34

# EXPERT REPORT OF JEANNE S. WOODFORD

## I.  Expert Statement

1.      I am competent to testify to the matters herein and unless otherwise indicated I make this declaration based upon my personal knowledge, skill, experience, training, research and education.

## II.  Introduction

### A.  Engagement

2.      I have been retained as an expert witness for Plaintiffs Sdahrie Howard, et al, in the matter of *Sdahrie Howard, et al. v. Cook County Sheriff's Office, et al.*, in the United States District Court for the Northern District of Illinois Eastern Division.

3.      To support the Plaintiffs' motion to certify the case as a class action, I have been asked to offer opinions regarding measures taken by the Cook County Sheriff's Office related to inmate sexual harassment directed at women working at the Cook County Jail and, specifically, whether such measures were consistent with best correctional practices or adequate to address that harassment. I have also been asked to opine on injunctive relief measures that would be effective in curtailing inmate sexual harassment.

### B.  Professional Experience and Qualifications

4.      I received my B.A. from Sonoma State University in 1978. Since that time, I have experience working at all levels of California correctional facilities. In 1978, I became a correctional officer at San Quentin State Prison. I worked for the California Department of Corrections and Rehabilitation for the next 27 years in various custodial and management positions, including Correctional Counselor, Program Administrator, Captain, Litigation Coordinator, Associate Warden, Chief Deputy Warden and finally Warden of San Quentin in 1999. I served as Warden from 1999 through 2004.

5.      In March 2004, Governor Schwarzenegger appointed me as the Director of what was then the California Department of Corrections ("CDC"). As the Director, I worked with the Secretary of the Agency to add Rehabilitation to the mission of the CDC. On July 1, 2005, the California Department of Corrections was reorganized and renamed the California Department of Corrections and Rehabilitation ("CDCR"). In July 2005, Governor Schwarzenegger appointed

me to the position of Undersecretary for the CDCR. I also served as Acting Secretary of the CDCR for a short time.

6.      In both my positions as Undersecretary and Acting Secretary, I served as the Chair of the Prison Industry Board. I also led efforts to address conditions of confinement for inmates to include overcrowding, health care and mental health care. I advocated for the expansion of the visiting program for the incarcerated and their families. I also started the gender responsive commission to create policies and appropriate programs for women incarcerated in the CDC. I retired from the CDCR in July 2006.

7.      From November 2006 until May 2008, I was the Chief Adult Probation Officer for the City and County of San Francisco. In that position, my responsibilities included the administration of the Adult Probation Department, formulating polices and plans for the rehabilitation of adult probationers, managing the budgetary and fiscal activities and services of the organization, working with other agencies to improve services for individuals on adult probation, directing the preparation, approval, review and maintenance of records and reports, and cooperating with various social service agencies, law enforcement bodies and interested groups regarding crime prevention programs and services.

8.      I served as the Executive Director of Death Penalty Focus, a non-profit organization devoted to the abolition of the death penalty from April 2011 until May 2013. I also served as a Senior Fellow at the Chief Justice Earl Warren Institute on Law and Social Policy, University of California, Berkeley School of Law as a criminal justice expert. I worked on several criminal justice projects for the institute and provided direction and assistance to student interns engaged in criminal justice policy development. I have been involved in the evaluations and needs studies for federal, state and local correctional facilities including jail needs studies for the Placer County Jail and for the cities of Kirkland and Bellevue, Washington. I also participated in investigations for various civil rights complaints filed by ICE detainees confined in a county correctional facility in Pinal County, Arizona in 2011. From 2007 through 2010, I was a member of a task force on the American Bar Association (ABA) Criminal Justice Standards on the Treatment of Prisoners.

9.      In the past 10 years, I have spoken at more than 60 meetings and conferences regarding correctional issues, and I have testified before the California State Legislature and Congress on at least 12 occasions. I have also taught courses regarding correctional policy in

California at Sonoma State University in 2009, 2010, and 2015 and through Stanford University's Continuing Studies program in 2011.

10.     A complete description of my educational and employment background, my prior publications, and the cases in which I have previously served as an expert witness is set forth in my curriculum vitae, which is attached as Appendix A.

11.     All of my positions with the CDCR involved working with prisoners, including oversight of the inmate disciplinary process, inmate appeals process and classification of inmates. I was responsible for the overall safety and security of the prison(s). I also had direct and indirect oversight over custody staff and am experienced in handling staff misconduct, investigations against staff, and disciplinary matters. I also have experience with policies and procedures related to adult custody and security operations, auditing of prisons and investigations of inmate misconduct.  My opinions, as detailed below, are based upon my years of correctional experience, my review of documents and transcripts of deposition testimony provided to me, one on-site visit of Cook County Jail,[1] my review of policies of other correctional agencies, and research of criminal justice related topics.

## III.  Documents Reviewed

12.     Refer to Appendix B for a list of documents and information that I reviewed and considered in writing this expert report.

## IV.  Summary of Opinions and Basis for Opinion

13.     I have been asked to provide expert opinions regarding the policies and practices of the Cook County Sheriff's Office ("CCSO") as they relate to sexual harassment by inmates confined in the Cook County Jail ("the jail") of women working in the jail and the adjacent George N. Leighton Criminal Courthouse ("the courthouse"). The women include those whom CCSO employed as sworn and civilian personnel at the jail and courtroom deputies at the courthouse and whom Cook County employed in positions with Cermak Health Services, the provider of daily healthcare for detainees at the jail, at any time since April 23, 2015. My expert

---

[1]     The tour of the Cook County Jail allowed me to draw several conclusions regarding the culture and climate of the facility.  It was disappointing to not be able to tour the facility with detainee movement and programs in full operation.  We entered many areas that, according to the Plaintiffs, would be full of detainees, and found few if any inmates in the area.  Most law libraries were closed and most classrooms were empty as examples of programs not operating as normal.  Despite the curtailment of programs, I was able to get a good feel for the jail.

opinions are prepared for consideration by the Court in support of the Plaintiffs' motion for class certification. I have three primary opinions:

a.　Inmate sexual harassment of women working in all parts of the Cook County Jail and adjoining Leighton Courthouse has been pervasive and far greater than in other correctional institutions in the United States between 2014 (if not before) through April 2018. I haven't seen enough data concerning the last eight months of 2018 to state with reasonable certainty whether the inmate sexual harassment continued in that year to be greater than other correctional institutions.

b.　CCSO has failed to adopt, or failed timely to adopt, policies and practices related to inmate sexual harassment of women employees that have been shown to be effective in other correctional institutions in deterring or curtailing sexual harassment of women employees. Although certain practices have improved since the court entered a preliminary injunction at the end of November 2017, the policies and practices remain inadequate in many respects; and

c.　The Court could order facility-wide injunctive relief measures that would be effective in deterring and curtailing inmate sexual harassment.

In addition, I have numerous secondary opinions described in detail in Section V below that support the three primary opinions. These opinions concern Defendants' policies and practices in place during part or all the period from 2014 to present that diverged from the best practices in other correctional institutions and that either facilitated inmates' sexual harassment of female employees or made it difficult for employees to address that harassment effectively.

14.　The expert opinions set out in this report are based on my 30 plus years' experience working in the field of Criminal Justice to include the California Department of Corrections and Rehabilitation (CDCR). My diverse correctional experience includes working in a variety of custody positions. As a Correctional Officer, I worked in inmate housing units, inmate recreational areas, inmate dining room, the main kitchen, all inmate program and work areas, the visiting room and wall and gun post of San Quentin State Prison. In other positions I have held, I was inside the prison among the inmates on a routine basis to perform my duties. I met with inmates in inmate/counselor meeting room offices, the health facility and inmate medical and psychiatric patient rooms and medical office areas. It is worth noting that I worked as a Correctional Officer during the early 1980's when San Quentin housed high security level

4

IV inmates to include gang leaders and gang members as well as inmates serving Security Housing Unit Sentences for violent behavior to include violence against staff.

15.     The CDCR is the largest Correctional system in the United States currently housing over 130,000 inmates in 34 prisons. The prisons range from level I to level IV inmates and include death row inmates.   The policies of the CDCR, like all correctional agencies, are developed to provide for the safety and security of inmates, staff and the public.

## V. Detailed Bases for Opinions

### A.     The Cook County Jail Has an Excessively Large Number of Reported Incidents of Masturbation and Indecent Exposure

16.     The CCSO's website describes the Jail as follows:  The Cook County Jail is operated by the Cook County Department of Corrections (CCDOC).  At ninety-six acres and 8 city blocks, it is one of the largest single-site jails in the country.  Approximately 100,000 individuals circulate through the jail annually. The majority of individuals who circulate through the Jail annually are there for short stays. From April 2016 to April 2017, the most recent period reported on the CCSO's website, the average length of stay was 62 days. The daily Jail population reportedly averages 6,100 inmates. (http://www.safetyand justicechallenge.org/challenge-site/cook-county).

17.     The Plaintiffs and the Defendants in this case appear to agree that the incidents of sexual harassment—which include but are in no way limited to incidents of inmates indecently exposing themselves, masturbating at staff, making sexual epithets, leering, gesturing, and groping, and engaging in other sexual assaults—began to increase as early as 2012 and no later than 2014. (Curry Depo. at 84-93, 232; Hobbs Depo. at 163-164; Howard Depo. at 88-89; Plasencia Depo. at 134; Ranney Depo. at 161-162; Declarations of Anntionettea Montgomery, Tanisha Cribbs, and Sybil Keys.) Deposition testimony of the named Plaintiffs and written declarations obtained from women employed at the Jail report a noticeable increase of sexual misconduct by inmates toward women beginning in 2012 or 2013 and continuing through 2017, when the Court entered a preliminary injunction with measures directed at curtailing inmate sexual harassment. The data I reviewed of incidents of indecent exposure and masturbation from July 2015 to January 2018 (Bates No. 0084825) reflect that the conduct was pervasive, both in

terms of frequency and location. Defendants also produced an analysis (Bates No. 0145831)[2] suggesting a noticeable increase of incidents of sexual misconduct, along with an increase in violent and disruptive behavior of all types, beginning in 2015.[3]

18.     The conclusions in this report will be based on the undisputed fact that the incidents of sexual misconduct increased and became pervasive in the three to five years prior to implementation of the Court's preliminary injunction.

19.     CCSO provided an analysis of disciplinary data from 1/1/2016 to 10/31/2017 (Bates No. 0145831) by location and number of incidents for the following offenses: indecent exposure (code violation 210, subsequently raised to 323); masturbation (313); both indecent exposure (210/323) and masturbation (313); and public indecency (UCR 1570).  As described in this subsection V.A, this analysis shows a staggering number of reported incidents of masturbation and indecent exposure far beyond what should exist in a correctional institution employing best practices.  But as also described in subsections V.B and V.C, this represents only part of the sexual harassment at the Jail.  Harassment encompasses far more than masturbation and indecent exposure, and all evidence suggests that many, probably most, incidents of harassment are not reflected in the available incident reports.

20.     CCSO's internal analysis reported that over those 22 months 510 inmates were issued disciplinary tickets for 881 incidents of sexual misconduct in the Jail, documented in 1,016 disciplinary reports. (One incident can result in multiple detainees receiving separate disciplinary reports.)  That is an average of 554 disciplinary reports a year.  In addition, during this same period, there were 205 documented incidents in the courthouse, by 159 detainees, which resulted in 208 public indecency charges (UCR code 1570).  91 detainees were involved in an incident both in the Cook County Department of Corrections and in the courthouse.

21.     A Quality Control Report monitoring sexual misconduct incidents (codes 313 and 323) to ensure compliance with the preliminary injunction order issued by Judge Kennelly on

---

[2]     This document has a "Draft" watermark.  In my opinion it is appropriate to cite the document notwithstanding the watermark for three reasons.  First, I have not seen a final version of the document, in which case I would cite to it.  Second, I have not seen any document with information contradicting the data for which I am citing the document. Third, Amar Patel, the director of CCSO's Bureau of Information and Technology, testified (as CCSO's designee) about this document, identifying it as a "panel review" and describing how the Office of Research created it and which data and documents were utilized. (Patel Depo. at 93-94, 104-111.)

[3]     I understand that Defendants sometimes attribute the increase in reported incidents of masturbation and indecent exposure to detainees who formed a group called Savage Life. However, the data I reviewed of sexual misconduct incidents reported from July 2015 to January 2018 do not support the suggestion that sexual misconduct was limited to a small number of detainees known as Savage Life.

November 28, 2017 and a directive issued by Chief Brad Curry on November 29, 2017 reflects little abatement as of December 2017 with 44 incidents (528 projected over a year).  In the first four months of 2018 the average declined to 33 per month (393 projected over a year). (CCSO Howard 0277874-75.)

22.     As stated earlier, the number of incidents of reported sexual misconduct is extremely high. To put this in perspective I reviewed the COMPSTAT Statistical Reports for several prisons in California. I chose one level II, medium security prison, one level II/III prison, two Level IV prisons and two level IV high security prisons.  One of the Level IV High Security Prisons I reviewed is Corcoran State Prison. One of the missions of this prison is the housing of inmates who have been diagnosed with the mental condition of exhibitionist and in need of treatment.  In addition, Corcoran State Prison was selected to operate a two-year pilot program to house repeat sexual misconduct offenders. These offenders have the choice of completing a Security Housing Unit term or attending treatment at Corcoran State Prison.  The COMPSTAT reports include disciplinary data for 13 months October 2017 through Oct 2018.  The following table summarizes the data:

|  | Avenal | Calipatria | Centinella | Corcoran | High Desert | Pelican Bay |
|---|---|---|---|---|---|---|
| **# Inmates** | 3,880 | 3,788 | 3,532 | 3,143 | 3,498 | 1,670 |
| **Level** | II | IV | III, IV | IV | IV | IV |
| **# Sexual Incidents with Guilty Findings** | 8 | 22 | 17 | 132 | 46 | 26 |
| **Sexual Conduct /Population/Year** | .2% | .5% | .4% | 3.9% | 1.2% | 1.4% |
| **Expired Charge %** | 1.4% | 1.6% | .3% | 5.5% | 3.1% | 3.2% |

23.     The best way of comparing the frequency of serious sexual misconduct (which in California is described as indecent exposure and sexual disorderly conduct) at the Cook County Jail and in the California prisons is in the line of the table for Sexual Conduct/Population/Year. This divides the number of inmates found guilty of serious sexual misconduct by the prison population and multiplies the quotient by 12/13 to reflect that it covers a 13-month period. Putting aside Corcoran State Prison, which as mentioned above houses inmates diagnosed with the mental condition of exhibitionism and inmates in a two-year pilot program to house repeat

sexual misconduct offenders, the highest percentage was 1.4%. The comparable figure for reported incidents at Cook County is 9.7% (1,086 ÷ 6,100 x 12/22), about seven times greater. Even if the 205 incidents in the Courthouse are ignored, the figure for Cook County is 7.9% (881 ÷ 6,100 x 12/22). During the first four months of 2018, the average was still 6.4%, about 4 ½ times the California rate. The prevalence of reported sexual misconduct even far exceeds the percentage at Corcoran, which has the mission of housing inmates likely to commit such violations.[4]

**B.      Incidents of Masturbation and Indecent Exposure Are Severely Underreported, Making the Problem Far Worse than the Number of Reported Incidents Indicate**

24.      While the number of reported incidents of masturbation and indecent exposure at the Jail is egregious compared to other correctional institutions, in my opinion the data provided by the Defendants severely underrepresents the incidents of sexual misconduct and sexual harassment by inmates for four reasons. First, non-uniform staff, which I understand constitute at least 25% of the proposed class, are not allowed as a matter of policy to directly file incident reports for sexual misconduct by inmates in the jail management system (CCOMS) as a result of CCSO policy and technology limitations. For an incident report to be created in CCOMS, non-uniform staff must locate a uniform staff member, report what occurred, and successfully request that an incident report be written by the uniformed staff member. (Burroughs Depo. at 18, 101, 196-98; Declaration of Gabriela Henderson.) In addition, for the incident report to be submitted and an inmate disciplinary ticket created, the reporting officer's shift supervisor must sign off on the report. (CCSO_Howard_0064470-74; CCSO_Howard_0001678.)

25.      Non-uniform staff, which includes both civilian CCSO personnel (e.g. in Inmate Services) and Cermak Health Services medical and mental health personnel, do not have access to the jail management system to submit incident reports that will trigger the disciplinary process. (Patel Depo. at 86-87, 102-104; Freeman Depo. at 116-117.) Instead, they are totally dependent on uniform staff to submit incident and disciplinary reports in CCOMS. (Freeman Depo. at 139-177.) Male officers sometimes discouraged non-uniform staff from having inmates written up or pursuing criminal charges against inmates. (Freeman Depo. at 145-146, 178.) Although civilian personnel can write memoranda to submit to Inmate Services supervisors or

---

[4]      The significance of the last line in the table will be explained in Section V.D below.

report incidents of inmate misconduct in the hospital reporting system (EMERS), their memos and EMERS reports are not recorded in the jail management system, do not initiate the disciplinary process, and are not included in CCSO's incident data. Only reports made by uniform staff are maintained in the databases that CCSO uses to track incidents. (Patel Depo. at 14-37, 110-11, 144-145, 154-155.) As a final indignity, if civilian personnel cannot convince uniform staff to submit an incident report, any indecent exposure or other assault against them will not be investigated by CIID and hence will not be investigated for possible criminal prosecution. (CCSO_HOWARD_0257494-0257506.)

26. In my opinion, this system of forcing non-uniform staff to locate uniform staff to write incident reports is unreasonable and inappropriate. I know of no other jail or prison that allows only uniform staff to write up an incident or document the inappropriate behavior of inmates. It is my experience that all staff in other correctional systems have the ability to document the behavior of inmates, both good and bad, in the same way uniformed staff are able to. This type of civilian complaint system includes writing incidents for processing through the disciplinary system.

27. The process for non-uniform personnel to make reports is time consuming, burdensome and acts as a barrier to non-uniform staff to report and follow up on incidents of sexual harassment (Declarations of Shonnita Lanier, Gabriela Henderson, and Patricia Dianne Green). Non-uniform staff must complete their assigned duties while trying to utilize multiple systems for reporting an incident of sexual misconduct. They often have little if any time to find a uniform staff member who has the time to listen to their report of the incident and then translate that into an incident report. (Burroughs depo. at 101.) Uniform staff members sometimes refuse to write an incident as they did not witness the behavior. (Declarations of Gabriela Henderson and Patricia Dianne Green; Burroughs Depo. at 101, 196-98.) And non-uniform staff are also expected to write their own incident reports, in the form of written memos or complaints or in the hospital event reporting system called EMERS, even though EMERS does not have a box for sexual harassment and even though those reports do not lead to inmate discipline. (Burroughs Depo. at 18-19, 87-93; Freeman Depo. at 116).

28. The result of this unnecessary, burdensome and difficult process is that many incidents of sexual misconduct go unreported by non-uniform staff members. Non-uniform staff report not having confidence in the system partly because they were left in the dark about what

happened to any complaints that they made.  (Declarations of Shonnita Lanier, Danielle Thomas, and Gabriela Henderson; Burroughs Depo. at 130, 184.)  Even now, civilian personnel cannot access CCOMS, the database in which incident reports are tracked.  (Patel Depo. at 86-87, 102-104; Declaration of Patricia Dianne Green; Burroughs Depo. at 109, 157, 252.) Civilian employees had to ask a uniformed staff member to pull a copy of an incident report filed on their behalf.  (Burroughs Depo. at 19-20.)  The Jail does not have a system to notify civilian employees that detainees are being held accountable for their conduct.  And with no access to CCOMS, civilian employees still have no way of knowing, unless they find out from uniformed staff, whether detainees are disciplined for sexual misconduct against them.  (Burroughs Depo. at 109, 118, 122.)

29. Until after this lawsuit was filed, courthouse deputies also could not access CCOMS.  (Declaration of Jessica Correa; Curry Depo. at 53-55; Wilensky Depo. at 74-75; Patel Depo. at 86-87-102-104.)  This made it more difficult for them to prepare and file incident reports and in all likelihood lead to additional underreporting of such incidents at the courthouse (Jones Depo. at 58-59; Wilson Depo. At 119-121.)

30. Second, in some cases, women uniform staff have stopped writing up incidents or stopped reporting all incidents of sexual misconduct as these incidents were not being taken seriously, as discussed in section V.D below.  They report the futility they have experienced of writing incident reports for sexual misconduct as the disciplinary system for inmates in the CCSO fails to hold inmates accountable and CCSO frequently fails to follow through with appropriate referrals for criminal prosecution. (See declarations by Rita McCoy, Latarsha Anderson, Sharon Taylor, Gloria Ellis, Kelly Shields, Alicia Webster, and Lisa Yates; Howard Depo. 78-82).  Feelings of futility likely were exacerbated because CCSO's CIID–the division charged with investigating detainee misconduct–was seriously understaffed between 2014-17 causing huge backlogs and often complete failures to investigate incidents. (Curry Depo. 156-158; CCSO_HOWARD_251124.)

31. Third, women uniform staff members were told not to write reports in certain circumstances and more generally discouraged from writing them. They were sometimes told they could not write reports for certain conduct (Howard Depo. at 80) such as masturbating in the showers or the cells because the cells are inmates' "private domains." (Robinson Depo. At 54; Declarations of Patricia Brown-Conley, Desiree Ray.) Or they were told that they could not

write a report if the behavior was not caught on video. (Declaration of Jessica Correa.) They also could not write up inmates if they could not identify the perpetrators, which could happen during movement or if multiple detainees were engaged in the conduct at the same time. (Declarations of Shonnita Lanier, Gabriela Henderson, Jessica Correa, Jacqueline Brown (signed 1/14/19), Tanisha Henderson, Desiree Ray, and Tanisha Cribbs.)  And supervisors' reactions when they did write reports showed them that the reports were not welcome. (Jones Depo. at 62-64; Declarations of Hester Washington-Farr, Patti Jagielski, Kimberly Bowen, Lori Ponce, Ronica Williams, and Tamara Anderson)

32.     Fourth, supervisors sometimes do not move disciplinary reports of inmate harassment forward, and because a supervisor's signature is required, those reports do not enter the database.  (Declarations of Monshai Addison, Christina Lopez, Darlene McCord, and Kelly Shields; CCSO_Howard_0064470-74; CCSO_Howard_0001678.)

33.     Fifth, officers and other staff report numerous incidents of multiple inmates exposing themselves and masturbating as a group or inmates doing so during movement.  The incidents that occurred during movement of large numbers of inmates prevented the staff member from stopping to identify the inmate or write an incident package. (Howard Depo. 79; Burroughs Depo. at 143-44, 192; Declarations of Shonnita Lanier and Anntionettea Montgomery.).  The incidents involving multiple inmates occur most frequently in bullpens/holding cells in receiving or staging areas for inmates going to court but also in other areas of the Jail where large groups of inmates are gathered. (Declaration of Kelly Shields.) Supervisors are called when this behavior occurs and inmates are told to stop but incident reports are rarely written. (Declarations of Patricia Dianne Green, Sheleda Groves, Sharon Taylor, Donnetta Myart, Shonnita Lanier, Latarsha Anderson, Christina Lopez, Darlene McCord, Sybil Keys, Tanisha Cribbs, Tanisha Henderson, Jacqueline Brown, Diane Winter, and Christina Muhammad.) As a result, these incidents are not included in the disciplinary tracking system.

34.     I cannot estimate on a scientific basis what percentage of the incidents of masturbation and/or indecent exposure are reported, but I feel confident based on the testimony and my knowledge and experience of the behavior of correctional officers that fewer than half the incidents of masturbation and/or indecent exposure have been reported over the past few years.

**C.** **Inmates Frequently Engage in Sexual Offenses Other than Masturbation and Indecent Exposure, Which Are Rarely Reported**

35.    CCSO data (bates 0145831) includes three codes for sex related violations other than masturbation and indecent exposure: Sexual Harassment, Sexual Activity and Sexual Abuse or Assault.  Unfortunately, Table 12 in this document does not provide specific details regarding these offenses, lumping them in with all other types of offenses. Sexual Harassment and Sexual Abuse or Assault, by definition, are sexually disorderly conduct.  The incidents of this behavior must be counted to begin to understand the true magnitude of the problem faced by women employees at CCSO.

36.    Whatever the recorded counts, there is also good reason to believe that the incidents of sexual misconduct other than masturbation and indecent exposure are severely underreported.   Women staff throughout the jail report sexual epithets and sexual threats by detainees each and every day to include comments like, "Look at that big ass", "suck some dick" and being called everything except Officer to include "bitch" and "hoe." (All declarations; Howard Depo. 129; Burroughs Depo. 131-32.)  Detainees seem to believe that they can engage in this type of harassment with impunity, reflecting a culture of toleration of sexual harassment. CCSO does not prepare reports showing the frequency of reports of this type of abuse as it does for other types of violations that it apparently regards as more important. (CCSO_Howard_0301689-702.)  The culture within the CCSO Jail that accepts this type of harassment is a big problem and impacts women staff in every aspect of their jobs.

37.    During the tour of the Jail, Housing Units inmates appeared to feel free to leer at women. For example, an inmate in Division 2 North, who felt comfortable to leer at one of the Plaintiffs, Officer Greer, winking and sticking his tongue out at her.  I personally observed many other inmates leering at women in our tour group, whispering to each other as they did so.

38.    The CCSO inmate disciplinary code includes a provision for Disrespect to Staff, defined as: "Insulting or directing obscene or abusive language towards staff, use of offensive gestures directed toward staff, addressing staff by inappropriate names and/or making inappropriate remarks to staff."  The same inmate disciplinary code includes, as mentioned above, Sexual Harassment, defined as: "subjecting another person to sexually harassing or sexually suggestive conduct, including making sexual proposals."  These inmate disciplinary infractions are consistent with all other jail and prison systems I am familiar with.  They, like the

infraction descriptions at other institutions, encompass the types of sexual words and conduct that I observed and are described in the declarations.

**39.** It is my experience at other facilities that conduct rules, including disrespect and harassment rules, are strictly enforced through a progressive discipline process. It is clear from the declarations of staff and my own observations during the tour that CCSO is not holding inmates accountable for the behavior of sexual harassment to include verbal disrespect, and inappropriate gestures of a sexual nature. (Declarations of Patricia Dianne Green, Jacqueline Brown2, Patti Jagielski, and Shonnita Lanier.)

40. I have toured many facilities and have never observed the level of sexual harassing behavior that I witnessed in the CCSO Jail. In other correctional institutions that I have led, worked in, or visited, with rare exceptions women are able to work without hearing sexual epithets and without being the subject of leering or other disrespectful behavior. Inmates cannot be allowed to leer at staff and talk about them as sexual objects. This behavior must be addressed swiftly, with certain sanctions.

41. CCSO administrators have not attempted to deal with this type of infraction swiftly or certainly. Instead, women staff have been told to wear smocks or keep their coats or sweaters on (Declarations of Kimberly Bowen, Gabriela Henderson, Tanisha Henderson, Shonnita Lanier, and Diane Winter), and during my tour I saw women wearing coats and sweaters. This is hardly an appropriate response to the pervasive and inappropriate behavior of inmates in CCSO Jail. It does not address the underlying issues or stop the behavior.

42. In my opinion, the testimony of incessant harassment is probably accurate. This assessment is based on several factors. First, while in my experience incidents of harassment through words and gestures in other correctional institutions is very rare, it still far outnumbers incidents of masturbation and indecent exposure. Given the large amount of documented and undocumented masturbation and indecent exposure at the Cook County Jail, I would expect verbal harassment and harassing gestures to be extremely common. Second, the testimony that I have seen is quite consistent. Third, I personally observed the inappropriate behavior while on the tour. This type of inmate behavior appears to be routine and go on without staff intervention or consequences. It will take a concerted effort to change this culture.

43. The defendants also ignored an alternative approach to dealing with harassment in the form of sexual epithets or gestures. CCSO's written policy since 2011, which reflects

accepted correctional practices, is to provide on-tier, on-the-spot discipline for these types of violations. (CCSO_HOWARD_0000914-915.) Despite this written policy, on-tier, on-the-spot discipline for lower level code violations was never used. (Wilensky Depo. at 28-29.) In my opinion, incidents of this behavior should be documented. That documentation does not have to be on the same detailed template used to report incidents in CCOMS. As an alternative, the incident could be documented in a disciplinary chrono and, following an immediate review by a supervisor, the supervisor would select an appropriate and immediate sanction from a list of approved sanctions available for this behavior. Those sanctions could include confinement in a cell for the remainder of the day, loss of recreational privileges, or loss of telephone privileges as examples.[5] This is a short-term step until the culture of the jail improves and these incidents are reduced. When incidents of this type are significantly reduced incidents of disrespecting staff by cursing at them or using derogatory language should result in a higher level disciplinary processed through the incident report system, following a first offense documented in a disciplinary chrono. These types of violations have been so pervasive at Cook County jail that processing all of them through the incident report system, at this time, would bring it to a grinding halt and the women employees would be doing nothing but writing reports all day. (Altman Depo. at 97-98; Burroughs Depo. at 131.)

44. The defendants' failure to implement any approach for dealing with sexual words and gestures allows a culture of harassment to flourish. It sends the message that this type of behavior is not even considered significant. Addressing the use of sexual words and gestures and general disrespect of staff will require a very specific policy and short-term strategy to bring the incidents of this behavior under control.

**D. An Unreasonably Large Number of Incident Reports of Masturbation and Indecent Exposure Do Not Result in Guilty Determinations at Least Partly**

---

[5] While I am not offering legal opinions, my understanding as an expert in correctional practices is that this type of policy would not violate due process.

**Because of Practices in Violation of the Jail's Stated Policies, the Standards of the American Correctional Association, and Practices of Other Institutions**

45.     CCSO's inmate disciplinary system did not and does not conform to accepted correctional standards and has failed to curtail or control inmate sexual harassment of staff. The objectives of an inmate disciplinary system are summarized in this statement from the California Department of Corrections' Department Operations Manual:

> The Department provides a graduated system of inmate discipline designed to be administered commensurate with the seriousness of the offense. Discipline shall be so administered as to maintain control, conserve human values and individual dignity and promote socially desirable changes in attitude and behavior.

46.     To achieve this goal a correctional facility must have well written policies and procedures that provide clear direction to staff and inmates regarding the expectations and the procedures to be followed in administering inmate discipline. The CCSO does have written policies and procedures in place that are adequate for the most part (inadequacies are discussed below). But it fails in several ways in the implementation of its policies.

47.     The CCSO analysis discussed above starting at paragraph 19 also reports disciplinary outcomes for the 22-month January 2016-October 2017 period. For the charge of masturbation (313), there were 793 masturbation disciplinary charges with 486 guilty findings, a rate of only 61%, which is markedly low. 119 masturbation charges resulted in a finding of not guilty (15%), which is unusually high. 182 masturbation charges, nearly one quarter (23%) of the masturbation tickets issued, were reported as dropped/expired because CCSO failed to conduct a hearing within 8 days or the employee's supervisor did not move the report forward. (Table 4, Bates 0145832)

48.     For the charge of Indecent Exposure (210 and later 323), the analysis reports the following outcomes: 505 charges resulting in 289 Guilty findings, a rate of 57%, which is markedly low. 73 indecent exposure charges resulted in findings of not guilty, a rate of 14%, which is unusually high. 142 indecent exposure charges were dropped/expired 28% for failing to conduct a timely hearing.

49.     The disciplinary outcomes for the combined charges of indecent exposure and masturbation (313 & 210/323 combined offenses) are reported as follows: 1,298 total disciplinary tickets issued, resulting in 775 guilty findings, a rate of only 60%, which is markedly

low. 192 combined charges resulted in not guilty findings (15%), which is high. And 324 incidents, a full 25%, were dropped/expired. (Table 6, Bates 0145832)

50.     The table in paragraph 22 showing the results of disciplinary incident reports at six California prisons provides further support that the rate of dropped/expired reports at Cook County is remarkably high. Whereas 25% of the indecent exposure and masturbation charges were dropped/expired, in the California prisons the rate of dropping charges ranged from a low of .3% to a high of 5.5%. The average was about 2.5%. That is, the rate of dropped/expired charges at Cook County was about ten times larger than the rate at the California prisons.

51.     Matthew Burke, one of CCSO's 30(b)(6) witnesses who was Chief of Staff during most of the liability period and currently is the interim executive director of human resources, insisted that the overall ticket expiration rate at Cook County Jail (inclusive of but not limited to 313 and related) was somewhere between 3 and 10 % in the summer of 2016. (Burke Depo. 101-02.). If that is true, the rate of ticket expiration at the jail for non-sexual violations was only a little higher than in California, but the rate of ticket expiration for masturbation/indecent exposure was many times higher.

52.     Mr. Steve Wilensky, Director of Inmate Discipline and one of CCSO's 30(b)(6) designees on discipline, agrees that the number of "dropped" tickets was too high. He believes 5% is the maximum acceptable level of dropped charges. He was hired in 2016 with a mandate to fix the dropped ticket problem. (Wilensky Depo. 41-47, 51.) It took CCSO and Wilensky over a year to implement throughout the facility the simple solution of designating a responsible person in each housing division to provide copies of tickets to the hearing officer. (Wilensky Depo. 47-50.)

53.     This solution worked. According to Wilensky and CCSO data, during the period of March-October 2018 the rate of expired tickets (for all types of offenses) was reduced to below 2%. (Wilensky Depo. 195-96.) In my opinion, this problem should have been solved long before the end of 2017.

54.     The 15% rate of not guilty determinations at Cook County is also too high. Although the public California reports do not document the number of Inmate Rule Violation Reports that result in guilty findings, in my experience well over 90% of Inmate Rule Violation Reports result in a finding of guilty. In fact, it is my experience that the number of Rule Violation Reports resulting in a finding of not guilty is extremely low for incidents involving an

inmate or a small number of inmates. In these situations, the staff member is readily able to identify the inmate and document the behavior of the inmate. It is also extremely rare to discount the written report of staff absent proof that the staff was in error in some way, yet that is what has occurred in the adjudicating of the sexual harassment incidents at Cook County DOC.

55.     The combined effect of dropped/expired masturbation and indecent exposure reports at Cook County and not guilty findings by the Disciplinary Hearing Officer for the charges that reach determination in the Cook County DOC – that is, 40% not guilty through the end of 2017 – is alarming. I am unaware of any other jail or prison in which anywhere close to 40% of the reports do not result in a guilty finding.

56.     The high number of dropped and not guilty findings for these offenses would alert a prudent administrator to take notice and determine the causes of the low percentage of guilty findings and then to take appropriate action to address the causes.  In my opinion, there are at least six causes, which are discussed in sections V.E.1-6 below.

### 1.     Staff Are Not Adequately Trained in Writing Reports or In Dealing with Sexual Harassment

57.     Mr. Wilensky testified that he has had concerns regarding the lack of training of staff on how to write better reports. (Wilensky Depo. at 217.)  Mr. Wilensky has asked that training be provided to uniform staff.

58.     In my opinion, he is correct that a correctional facility must provide adequate training of staff in the writing of incident reports.  Processing inmate rule violation reports is costly and staff intensive.  Staff should not be writing unnecessary or unsustainable incident reports.  In a report, a staff member should clearly document the violation and write a factual description regarding the behavior of the inmate.  The process is very simple. For that reason, when staff are appropriately trained on the disciplinary process and report writing, the number of not guilty findings is very low.  But throughout most of the period, staff has not received training on the meaning of the disciplinary codes or how to write reports.  (Howard Depo. 140-48; Jones Depo. at 97-98; Wilensky Depo. at 156-158.)

59.     The failure to train is not limited to the writing of reports. Women staff have not been provided training from the CCSO regarding how to address the incidents of masturbation, indecent exposure or sexual harassment by male detainees. (Declarations of Jacqueline Brown, Jacqueline Brown2, Patricia Dianne Green, Shonnita Lanier, Darlene McCord, and Lori Ponce.)

Training should include scenarios developed from the many incidents of this behavior with clear direction of what the staff should do in response to such behavior. The training should also include direction on when and how to sound an alarm. With few exceptions, the lack of training is mentioned in every declaration I have read.

60. Instead of providing effective training on how to respond to incidents of masturbation, indecent exposure, or sexual harassment by mail detainees, CCSO generally conveys its expectations to staff by sending out policies and directives and having staff read them. (Howard Depo. at 47-48.) For example, after the court entered its preliminary injunction in this case, CCSO did not provide training to officers on the requirements of the injunction. Instead, CCSO issued written policies and directives describing the injunction. (Bates No. 0064451-53; Declaration of Patti Jagielski.) That is not training. Staff are expected to absorb these written policies and directives during their shifts. (Howard Depo. at 47.) According to the plaintiffs this is impractical in most positions.

61. As a best practice, correctional agencies recognize the need for in-person training and testing of staff to ensure core competencies have been achieved. Although in-person training cannot be conducted for all aspects of the operations of a correctional facility, well-run agencies identify key training issues and provide for in-person training. Inmate discipline, including the writing of reports, is a topic in need of specific training given the problems experienced by this facility related to the reporting of inmate infractions. Despite the obvious need for training for staff members in the writing of reports, CCSO just began providing in-person training for officers concerning the preparation of reports in January 2019. (Wilensky Depo. at 154-56.)

62. In most law enforcement agencies I am familiar with, staff members are made aware in the training that they will be severely disciplined for filing a false report up to and including dismissal from their job. Staff reports should be believed absent evidence that their report is in error. But the Plaintiffs' evidence indicates that hearing officers, who as discussed below are outside attorneys, frequently don't give that type of credence to staff reports. (Burke Depo. at 41-42; Wilensky Depo. at 151, 231.)

## 2. The Disciplinary Hearing Process Is Seriously Flawed

18

63.     Mr. Wilensky also testified that hearing officers are expected to hear between 30 and 100 incidents per day.  According to Mr. Wilensky, rarely does a disciplinary hearing exceed five minutes and many last under one minute.  (Wilensky Depo. at 107-08.)  It is difficult to understand how a properly trained hearing officer can adjudicate a serious incident, assess an appropriate sanction in line with progressive discipline, counsel the inmate and appropriately document the findings of the hearing within one to five minutes and facing that volume of hearings.  The unrealistic expectations about the number of hearings an officer can conduct undoubtedly has contributed to the number of incidents of masturbation and indecent exposure that are not adjudicated within time limitations.  Repeatedly exonerating inmates for missing the time deadlines is unacceptable in a well-run correctional institution and can lead to a continued escalation of the inmate misbehavior.   Detainees must be held accountable for their behavior, this is quite frankly, Corrections 101.  A functioning disciplinary system must be timely and serve to deter unlawful behavior of detainees.  Adjudicating detainee infractions within time limitations is one important component of a functioning system.

64.     The importance of a functioning inmate disciplinary system is recognized by the General Assembly's Illinois Administrative Codes Section 701.160, which requires a written report of the infraction, provides time constraints for adjudicating the infraction, and states:

a)     Written Disciplinary Rules and Regulations
The jail shall have and maintain written standards relating to discipline.  The disciplinary rules and regulations must comply with Section 3.1 of the County Jail Good Behavior Allowance Act [730 ILCS 130/3.1]:

1)     *The jail administrators who supervise institutions under* the *Act shall meet and promulgate uniform rules and regulations for behavior and conduct, penalties, and the awarding, denying, and revocation of good behavior allowance, in such institutions.  All disciplinary action shall be consistent with the provisions of applicable law.  Committed persons shall be informed of rules of behavior and conduct, the penalties for violation thereof, and the disciplinary procedure by which such penalties may be imposed.  Any rules, penalties and procedures shall be posted and made available to the committed persons.*

2)     *Whenever a person is alleged to have violated a rule of behavior, a written report of the infraction shall be filed with the jail administrator within 72 hours of the occurrence of the infraction or the discovery of it, and such report shall be placed in the file of the institution or facility. No disciplinary proceeding shall be commenced more than 8*

> *days after the infraction or the discovery of it, unless the committed*
> *person is unable or unavailable for any reason to participate in the*
> *disciplinary proceeding.*

The Illinois Administrative Codes establish standards to which the Cook County Jail is expected to adhere. The Inmate Disciplinary Policies of the CCSO are written to comply with these standards.

65.     The General Assembly's Illinois Administrative Codes Section 701.160 are consistent with the American Correctional Association (ACA) Standards for Local Detention Facilities.  To comply with ACA standards, facilities must meet 100% of mandatory expected practices and 90% of the non-mandatory expected practices. I have personally been involved in non-ACA audits of jail and prison facilities. In all of my auditing experience, to be considered in compliance with policy, procedures and standards facilities must demonstrate a compliance rate of, at a minimum, 90% with many audit requirements expecting 95 to 100% compliance.

66.     The statistics concerning the outcomes of adjudications of disciplinary reports of incidents of masturbation and indecent exposure indicate that the Cook County Jail does not comply with the standards of the Illinois Administrative Codes, the CCSO's stated policies, or the ACA standards. Compliance with the administrative codes, the policies, or the standards requires that the inmate disciplinary process be closely monitored and that action be taken to remedy the problem if time constraints are not being met.  The failure to meet expected correctional standards for hearing disciplinary incidents within the prescribed time limitations was likely one cause of the extraordinarily high incidents of sexual misconduct by inmates against women employees and thereby the creation of a hostile work environment for women employees.

67.     A second major flaw in the process is that the Jail uses outside attorneys who have never worked in a correctional environment and are not adequately trained as hearing officers.  The use of outside attorneys for hearing inmate infractions is not, in my view, a correctional best practice nor does it bridge a connection between the inmate and the staff, who work each day to provide security, medical and program opportunities to the inmate.  I know of no other county jail utilizing this process.

68.     Hearing officers, whether they are outside attorneys or not, must receive training to insure they have a clear understanding of progressive discipline and the jail system.  Hearing

officers must also have a clear understanding of the goals of the jail disciplinary system and the standards for determining guilt or innocence of an inmate. The evidence is that CCSO does not adequately train its outside lawyer hearing officers. Wilensky, the Director of Inmate Discipline, could not explain the goals of the inmate disciplinary system and testified that he had never thought about them. (Wilensky Depo. 113-15.) He could not answer what evidentiary weight a disciplinary report should be given, saying that it was "situational" and that the incident report had to contain enough details for him to be "comfortable" before rendering a guilty finding. (Wilensky Depo. 62-63.) Hearing dispositions that include statements such as, "My interaction with Cole gave me a gut feeling that this wasn't a 313-case" (Wilensky Depo. 226), is a clear indication of the need for training of hearing officers.

69.     A third major flaw is failing to monitor and analyze the effectiveness of various sanctions. Best practices in corrections is to establish a system of effective rewards and effective punishments. Appropriate rewards and punishments associated with sexual misconduct, or refraining from sexual misconduct, may be different than appropriate sanctions and rewards for other types of violations. A correctional system must be constantly monitoring the disciplinary process and making adjustments to establish and maintain an effective disciplinary system. We talk a lot about carrots and sticks in correctional organizations. Today the trend in corrections is to offer more carrots than sticks to keep inmates busy and involved in positive activities but sticks remain an important part of the process. The CCSO does not use effective sticks in dealing with inmates' sexually assaultive behavior and other sexual harassment. This aspect of its disciplinary sanctions process, like many other aspects, is not in keeping with sound correctional practices.

### 3.     The CCSO Fails to Involve Staff in Devising Appropriate Sanctions for Inmates

70.     A variety of sanctions may be imposed on an inmate found guilty of masturbation and/or indecent exposure. Policy 704, Inmate Discipline Procedure (Exhibit 46) describes the sanctions that may be imposed. The sanctions include loss of work assignment, loss of microwave access, loss of patio privileges, loss of commissary access, loss of visiting privileges, restricted telephone use, loss of special event programs (excluding religious services), any other disciplinary actions deemed necessary, loss of good time credit and time out of cell, privileges, removal from specialty programs (e.g., culinary, creative expression, clubs), financial restitution

(which Mr. Wilensky testified CCSO does not use at all (Wilensky Depo. 30)), and disciplinary detention or an assessment of days in the Special Management Unit (SMU). In addition, detainees who receive multiple disciplinary violations can be moved to a higher security level. The sanctions that are available are appropriate.

71.     The CCSO, however, has erred in failing to involve custody staff in selecting the right sanction.  Custody staff know what is important to inmates and can recommend the right sanction and should be tracking the sanctions to determine what works for individual inmates and for inmates overall.

72.     More generally, uniform staff are not included in the adjudication of the incidents of inmate misconduct. The Cook County Sheriff is not utilizing a Disciplinary Committee as allowed in their procedures.   The CCSO has opted instead to use outside lawyers to adjudicate the infractions.  A disciplinary committee is utilized by many jail and prison systems to adjudicate infractions.  Disciplinary committees can include mental health staff and staff from other disciplines but always, in my experience, include a sworn (uniform) staff member of the rank of Lieutenant or higher.  The adjudication of inmate rule violations is an opportunity for custody staff to set expectations, talk to the inmate and counsel the inmate.  During the adjudicating process, well trained custody staff will try to gain an understanding of the inmate and utilize this information to make custody, housing and program decisions. The lack of participation of staff at the Cook County Jail in devising appropriate sanctions generally, and for sexual violations in particular, does not keep uniform staff invested in the process of holding inmates accountable and instead minimizes the interaction between inmates and custody staff.

**4.      The Jail Fails to Impose Effective Sanctions on Inmates Who Commit Multiple Acts of Masturbation or Indecent Exposure**

**73.**    Cook County Jail fails to use effective sanctions for inmates who engage in multiple incidents of indecent exposure and masturbation.  The data from July 2015 to January 2018 (Bates No. 0084825) clearly demonstrates that prior disciplinary behavior for the same or similar sexual offense is not reviewed or taken into consideration during the disciplinary hearing process.  There are significant numbers of repeat offenders. The sanctions for the first offense frequently are the same as or more severe than for the third, fourth or fifth offense without any reason given for applying the same or a lesser sanction.  Management testimony also suggests a lack of consideration of imposition of progressive discipline.  (Burke Depo. 46-48; Wilensky

Depo. 84-85.)  When a prior sanction was ineffective in changing the inmate's behavior, there is no reason to believe that the same or a lesser sanction will be effective.

74.     Instead of repeating the sanction and hoping for a different outcome, a hearing officer should consider applying different sanctions, increased sanctions or other strategies to address the behavior.  In Section 701.160 concerning Disciplinary Findings and Penalty Imposition, the Joint Committee on Administrative Rules states, "In reaching a decision regarding the type of discipline to be imposed, the hearing officer or committee shall evaluate the violation and the violator and choose the disposition that is most likely to promote conformation to normal standards of conduct." It is difficult to understand how this can be accomplished if the hearing officer has no experience working in a jail or with inmates.  It is also difficult to understand how effective sanctions can be determined if the disciplinary process takes less than five minutes on average (Wilensky Depo. at 107).

75.     The best thinking is that a hearing officer should, when confronted with an inmate engaging in repetitive disciplinary violations should both increase and vary the sanction in a manner that takes into account, in the words of the Joint Committee, both the violation and the violator.   This approach applies to repetitive masturbation and/or indecent exposure.  The California Department of Corrections and Rehabilitation, for example, like most correctional facilities I am familiar with today, has clearly established rules for holding inmates accountable and provides alternative programs to assist inmates in learning the skills to control their behavior.  It is important to note it is not either sanctions or corrective program; it is both. Section 52100 of the CDCR's manual, which is dedicated to Inmate Indecent Exposure and Sexual Disorderly Conduct Management, states the purpose is to ensure that every indecent exposure or sexual disorderly conduct incident is reported, tracked, managed, subject to discipline, and referred for prosecution.  It provides that inmates who engage in acts of indecent exposure or sexual disorderly conduct will be subject to security measures that are designed to decrease the opportunity for the inmate to repeat the behavior and/or minimize the impact that the behavior has on prison staff and others.  Security Measure are tools used by staff for a determinate period to identify, prevent, reduce and eliminate the behavior.  There are two types of security measures: immediate security precautions and post-disciplinary restrictions.  The immediate security precautions are listed and include: Solid door with yellow placard, use of an exposure control jumpsuit and temporary restriction from yard or other settings which may

provide a venue for the behavior and substitution of activity setting to reduce the possibility of the behavior impacting staff. The section spells out the potential disciplinary restrictions. These restrictions potentially increase with repetition of the offense. This is consistent with the disciplinary code for other types of repeat offenses. Title 15, Section 3315.

76. For many detainees, disciplinary confinement alone will not suffice to change their behavior. For that reason, CDCR's Section 3334 allows for inmates to be assigned to a Behavioral Management Unit. A Behavioral Management Unit is an alternative general population housing and programming unit which is designed to reduce inmates' continuing involvement in disruptive behavior, violence or noncompliance with CDCR rules and regulations and to allow non-disruptive inmates in the general population the opportunity to program without continual interruption due to the behavior of a smaller, more disruptive segment of the inmate population. CDCR's Behavior Management Unit has identified 4 steps that inmates must complete to return to the general population and their privileges are increased as they progress though the steps. The Cook County Jail does not have a similar program.

77. Erratic mental health assessments further undermine the effectiveness of the disciplinary sanctions. Best practices in corrections is to involve mental health staff before or during the hearing process in appropriate cases to assess behavior and accountability of detainees in view of their mental illness. CCSO does not do this. Instead, a mental health review is conducted only after the hearing process is concluded, and only then for inmates with a "P-3" mental health classification who have been sanctioned with segregation. A decision is then made about whether the inmate should be required to serve the sanction imposed. A review of the disciplinary data reveals inconsistency in the mental health assessments of detainees charged with masturbation and indecent exposure. This may indicate a lack of training of mental health professionals. I also have seen no written guidelines for these assessments. Without clear guidelines for mental health professionals for assessing behavior and assessing accountability of detainees in view of their mental illness, detainees can manipulate the mental health program to excuse their masturbation, indecent exposure, or other harassment of employees.

78. The data also suggest that the staff at the Cook County Jail may overattribute mental illness as the cause of masturbation and indecent exposure. The RTU is where the most severely mentally ill inmates are housed in the CCSO, yet this unit has relatively few incidents of masturbation and indecent exposure. If the most mentally ill inmates are not the primary inmates

involved in this behavior, it is difficult to understand how mental illness can be considered a contributing factor absent specific diagnosis for exhibitionism.

### 5. CCSO Fails to Enforce the Sanctions that Are Imposed

**79.** Of course, for sanctions to be effective, they must be carried out or enforced. According to the Plaintiffs, disciplinary sanctions are not effectively communicated to correctional officers and other employees who would need to ensure that the sanctions were imposed**.** (Howard Depo. at 135-36, 149, 164, 209-10.)

80. During the tour of the Cook County Jail, I witnessed one incident of a detainee not wearing a green jump suit despite a guilty finding for masturbation and/or indecent exposure. Green jumpsuits are to be worn by detainees when they are found guilty of either masturbation or indecent exposure. One of the Plaintiffs, Denise Hobbs, on tour with our group, knew the inmate was supposed to be in a green jump suit. Ms. Hobbs informed the on-duty uniform staff member who instructed the detainee to return to his cell and change into the green jumpsuit. It was explained to me that the only way for uniform staff to know that the detainees are supposed to be in a green jumpsuit is to look up his identification card in the office. In this case the inmate, ███████████ had a pink identification card on file, which identified him as guilty of either masturbation or indecent exposure. This example, as well as many others apparent from documents produced by Defendants, highlights the need to improve the ineffective system for tracking, monitoring, and enforcing disciplinary sanctions including the important policy that inmates involved in sexual misconduct be clearly identified and required to adhere to the sanction to wear a green jumpsuit. (CCSO_Howard_0260261; CCSO_Howard_0270405; CCSO_Howard_0260916; CCSO_Howard_0270922-25.) Uniform staff must have a clear process for knowing what sanctions are in place for any particular inmate. Holding detainees found guilty of sexual misconduct accountable for wearing an appropriate green jump suit is extremely important for the safety of women staff.

### 6. Defendants Have Not Placed Experienced Professionals at the Helm of the Disciplinary System

81. The disciplinary system is of critical importance in a correctional institution to enforce rules of conduct and ensure the safety and security of inmates and staff. A well-functioning disciplinary system is critical to maintaining an environment in which sexual harassment of employees by inmates is limited to a reasonable level. Administrators of a well-

run institution should place only experienced, skilled professionals in positions of responsibility over the disciplinary system.

82. Mr. Wilensky, the director of inmate discipline, had zero correctional experience when he assumed that post in 2016. Since graduating from law school, he had worked for six years as an assistant public defender and then about twenty years as a solo criminal defense attorney before becoming disenchanted with that practice. (Wilensky Depo. at 8-11.) Matthew Burke, who was responsible for the inmate discipline system's compliance with a consent decree with the federal Department of Justice between 2014 and 2018, also had no correctional experience; he graduated from law school in 2009 and served in the Sheriff's general counsel office between then and assuming his role overseeing the disciplinary system. (Burke Depo. at 11-17.) None of the other hearing officers has corrections experience. CCSO hired one in 2012 or 2013 right out of law school, and the other had a job prosecuting police officers. (Wilensky Depo. at 112-14) Compounding the lack of experience, CCSO does not provide any formal training to these hearing officers lacking corrections experience. (Wilensky Depo. at 208)

**E. CCSO Does Not Adequately Inform Inmates of Expectations**

83. Another cause of the pervasive harassment at the Cook County Jail, in my opinion, is that inmates are not made adequately aware of the jail's expectations and the consequences of violating them. In my opinion, well-run institutions inform inmates of those expectations within a short time of their arrival at the institution and have means of reinforcing the message throughout their stay.

84. During my time at San Quentin, custody staff in Receiving and Release initially interviewed inmates. Custody staff obtained classification information from the inmate and spoke to each inmate about behavioral expectations in the prison. Each inmate was given a copy of Title 15 detailing the rules of the CDCR. Newly arriving inmates next received an in-person orientation provided by peer educators (inmates trained to provide orientation). When the Peer Education program was started, its primary mission was to deliver information about HIV and the need for testing. But the program grew to include other health care topics and behavior expectations. The Peer Education Program was overseen by contract staff from the community. I considered the program an important part of the overall orientation program. Within 14 days of an inmate's arrival to the general population the inmate would appear before a classification committee. This committee would again explain the behavioral expectations of the prison.

26

Inmates who were arriving for processing through the reception center at San Quentin would receive the same processing in Receiving and Release as other inmates. In addition, the inmates were provided less formal in-person orientation in their assigned housing unit by custody staff and met with a Correctional Counselor within 30 days of their arrival. The Correctional Counselor again reinforced behavioral expectations and explained how their behavior would impact their future housing and programming in the CDCR. Since I retired from the CDCR, the department has developed specific programs for orienting younger inmates into the CDCR and expanded its use of Peer educator and Peer Counselors. Obviously, correctional institutions can differ in the exact nature of the orientation sessions and who delivers the messages, but I believe that the reinforcement of the messages concerning expectations through multiple orientation sessions conducted in-person by different persons makes it far more likely that detainees will conform to expectations than does the process used at Cook County Jail.

 **85.** The Cook County Jail does not provide an in-person orientation to inmates when they arrive, let alone repeated sessions as in California. Instead, inmates look at a video that includes non-sexual harassment information and are supposed to receive an inmate handbook. But videos do not have the same impact as in-person sessions. In addition, the Plaintiffs state that the facility often runs out of inmate handbooks. (Howard Depo. 95.) Even if that is the exception rather than the rule, in my opinion not having an in-person orientation is a major inadequacy. Some inmates may not have the reading skills to understand the manual, and even if they do, they are unlikely to take the time to review and understand it. Foregoing an in-person orientation misses a powerful opportunity to convey that the facility has a zero-tolerance policy for certain types of behavior, including sexual harassment of employees.

 86. CCSO should immediately implement in-person orientation of inmates that will, among other things, inform them that rules will be enforced, including rules designed to enforce the zero-tolerance policy toward sexual harassment of staff members. CCSO also should implement an effective system of reminders. CCSO contemplated as early as 2016 placing explicit posters warning inmates of the sanctions for masturbation, indecent exposure and other harassment would be effective. The posters were either never put up at all or were quickly taken down. (Curry Depo. at 163-169.) CCSO either should create posters along the lines contemplated several years ago or give the reminders by other effective means such as on the closed circuit televisions in the jail (and not just quote the language of the handbook, as Mr.

Curry states is done). Staff must also be trained at the same time to get the message that respect is expected by both staff and inmates. Addressing the inmate disciplinary process, training staff and developing a specific plan to address the culture of the facility to achieve the clear goal of creating an environment of mutual respect will lead to a work place where sexual harassment and incidents of sexual misconduct by inmates are dramatically reduced and restore the faith of women employees that they are valued members of the CCSO team.

F.    **Detainees Are Not Properly Dressed**

87.    During the jail tour, detainees were not dressed appropriately in many cases. Inmates were seen out of their cells partially clothed. Numerous photos taken by the Plaintiffs' photographer of detainees both inside and outside of their housing unit demonstrate the lack of adherence to detainee dress standards. See photos #4, #74, #75, #84, #96, #106, #118, #148, #153, #212.

88.    I also observed numerous inmates with clothing two or three sizes bigger than the detainee's normal clothing size. It was not atypical to see an inmate, who appeared to need a clothing size of small, wearing a two-piece inmate uniform with a size marking on the front of 2XL or 3XL. Staff had two ideas on the tour to explain this inmate clothing problem, 1. Detainees request clothing sizes two or three times bigger than their normal size and 2. The facility runs out of clothing and issues whatever is available to detainees. In any case the result is that pants are falling down on inmates even when they struggle to wear their clothing appropriately. I personally observed inmates struggling to keep their pants in place. Detainee clothing standards are an important aspect of the culture of a facility. Detainees wearing appropriate clothing in the appropriate size helps establish a culture of respect for self and for others. In the Cook County Jail, it appears that staff members do not attempt to hold detainees accountable to clothing standards (Declaration of Hester Washington-Farr) and inmates with their pants hanging below their butts were not uncommon in most areas of the facility we visited.

89.    The 2018 staffing report for Division 9 corroborates the suggestion that the facility runs out of clothing. The report lists under accomplishments: "Setting up and maintaining compliance of inmates required to be in green '313' uniforms" and under 'Recommendations' is a request to: "Maintain its own laundry services for the 313 jumpsuits. The building requires regular green jumpsuits exchanges but have not been receiving it on a

weekly basis as needed." This statement indicates a need to improve the distribution and access to the green jumpsuits to remain in compliance with the policy of the Cook County DOC.

90. During the tour, we also observed inmates in green jumpsuits that were not fastened as intended. As an example, an inmate in Division 9 was wearing a green jumpsuit all the way down to his crotch without staff intervening to address the situation. In the SMU, an inmate in a green jumpsuit was escorted to the medical room with his green jumpsuit down past his crotch. The current green jumpsuits are clearly inadequate. It is my understanding that the Facility is working to identify a jump suit that does not allow the inmate the freedom to so readily open the front of his jumpsuit. Identifying an appropriate jump suit should be a priority for the CCSO. There is no question that the current green jump suits are inadequate. (Declaration of Anntionettea Montgomery and Diane Winter.) The question is why hasn't something been done before now to address this situation.

91. In the mental health program tier, Tier 2231, we did find inmates appropriately dressed. It may be that the mental health program has established standards for inmate behavior. The CCSO should look at what is working in this unit and determine if the program can be duplicated in other parts of the jail.

92. All correctional agencies I am familiar with have inmate clothing standards and hold inmates/detainees accountable to those standards. Cook County DOC also has a clothing policy for detainees. While there are many ways to ensure that inmates wear clothing in accordance with DOC policy, two steps are obvious and necessary. First, the facility must purchase and maintain appropriate clothes. CCSO has been aware of a serious problem with inmate masturbation since at least 2014. It began exploring purchase of the types of jumpsuits and other clothes used by other correctional systems in 2015. As discussed in the next paragraph, other institutions had years of experience with exposure control jumpsuits. I am confident that California officials would have imparted that these jumpsuits were effective in reducing the rates of masturbation and indecent exposure. But instead of following what other institutions had done, CCSO attempted to design its own retrofitted uniforms and began issuing them in 2016, but not surprisingly, these were ineffective. It did not move forward with acquisitions until 2018 – after this lawsuit was filed – and even then it has acquired only a small number of prototypes. (Curry Depo. 185-210.) Second, inmates should not be issued clothing that is more than one size up from their normal size. Inmates should not be released from their

cell if not dressed appropriately and progressive discipline should be utilized to gain adherence to inmate clothing attire policies.

93.     In my opinion, CCSO has acted unreasonably in its efforts to clothe inmates who masturbate or engage in indecent exposure in jumpsuits that would be effective in restricting those activities.  Indeed, its efforts have amounted to four years of wheel-spinning.  It should have acted far more quickly, and it should have seriously investigated the experiences of other correctional systems and either adopted the most effective solution or made minor adjustments in the jumpsuits rather than to engage in a failed attempt to design its own clothes.  While I do not know exactly when the California system purchased and began issuing exposure control jumpsuits, the regulations including the jumpsuit became effective in 2007 so acquisition and distribution must have been no later than then.  Other correctional institutions have followed.  But CCSO acted as if masturbation and indecent exposure toward female employees was a novel problem.  On November 13, 2017, shortly after this lawsuit was filed, Debbie Boecker, who identified herself as CCSO's Director of Compliance, posted on a blog maintained by the National Institute of Corrections the following:

> We are looking for information on how other agencies are addressing issues with male inmates exposing their genitals and/or masturbating in front of female correctional staff: 1) Is this an ongoing issue in your facility? 2. Are inmates only targeting correctional officers, or are they also exhibiting this behavior in front of attorneys, volunteers, etc? [3.] What has your department implemented in an effort to stop or minimized this behavior? [4)] what has been effective? What has been ineffective? Any information would be greatly appreciated.

(CCSO_Howard_0269682-84 contains California's response to Boecker's email.)  This type of outreach should have been made in 2014 or, at the latest 2015, and CCSO should have purchased and started using state-of-the-art jumpsuits promptly thereafter rather than still being engaged in the acquisition of prototypes years later.

## G.     Facility Design Flaws and the Lack of an Adequate Alarm System Put Women Employees Unnecessarily At Risk.

94.     During the tour, we were shown many offices where attorneys, medical, or other professional staff meet with inmates.  Many of these offices did not have a means for non-uniform staff to call for assistance should they require help or need to alert custody staff that the

inmate is misbehaving. Attorney visitation rooms do not have panic buttons or any other means to alert staff to a problem. A 12/8/16 email to Cara Smith from Brad Curry described an incident of an Assistant Public Defender being trapped in an interview room for 3-5 minutes with a masturbating inmate, (Bates No. 0260994). The configuration of the office areas also made it difficult or impossible for uniform staff to provide constant and direct supervision. This is not unusual in a medical setting or even in offices set aside for attorney visits or counseling or other services provided to inmates, but the lack of a panic button or similar warning system was. The result is that non-uniform staff are dependent on uniform staff to utilize their radios to sound an alarm or intervene in a situation where the inmate is misbehaving to include masturbation or exposing himself. It is true that uniform staff can utilize their radio to sound an alarm if they observe an incident but how effective is a radio if uniform staff do not observe the incident or when an inmate sexually attacks the staff member?

**95.** The dependence of non-uniform staff on uniform staff to react to incidents of sexual behavior puts non-uniform staff at significant risk. Uniform staff are not always available or do not always carry out their duties as they should. (Declaration of Patricia Dianne Green; Declaration of Gabriela Henderson; Burroughs Depo. at 71-72, 101.) A December 2, 2016 email between Nneka Jones Tapia and Printiss Joes describes an incident where a detainee had cut his green jumpsuit and was masturbating in front of a nurse. The officer had allowed the inmate out of his cell with an altered green jump suit, left the nurse in the vestibule by herself with the tier door open. Inmates were entering and exiting the hallway with no one monitoring the situation. The nurse was forced to risk her own safety to go to the tier to get the officer. (Bates No. 0260916).

**96.** The experience of Officer Rita McCoy provides another example of the need for an adequate alarm system. She was blocked in an office by an inmate who pulled out his penis and started masturbating. Officer McCoy tried to push him out of the door. Detainees on the tier could see what was happening and started yelling for her partner who was eventually able to come in and assist her in subduing the detainee. The officer's inability to sound an alarm and summon help placed her in danger of serious harm. (Declaration of Rita McCoy.) Non-uniform staff members are even more vulnerable without the ability to sound an alarm or possess a radio. (Declarations of Shonnita Lanier (Nurse), Gabriela Henderson (Correctional Rehabilitation Worker.)) During the tour, one of the Plaintiffs, Ms. Burroughs, identified a waiting area in

medical where inmates would stand on the benches, face the windows where women medical staff were working and expose themselves and masturbate. According to our plaintiff ,this behavior would go on for quite some time before custody staff were available to address the situation**.** The humiliation to which CCSO exposes non-uniform staff of having to hope that uniform staff will notice when inmates expose themselves and masturbate in their presence is unacceptable and not normal in any correctional facility with which I am familiar. (Burroughs Depo. 106-08.)

97. In a well-run facility that took sexual harassment seriously, the alarm system would be used by officers and civilian staff to call for assistance to deal with inmates who masturbated and refused verbal orders to stop, and to remove inmates who exposed themselves. At a minimum, all officers must have an alarm in addition to a radio and every employee needs an alarm. At a minimum, offices utilized by non-uniform or civilian staff must be equipped with a panic button or an alarm of some type. The jail has an emergency response team, but according to the plaintiffs, does not use it for this purpose. Additionally, I have seen no evidence of an emergency response plan with adequate protocol for dealing with inmates engaged in sexual criminal behavior such as masturbation at female employees and indecent exposure.

98. Until the preliminary injunction was entered, the Jail also had not implemented best practices, such as those long implemented in California, to take immediate security precautions when a report of sexual misconduct is made and before adjudication of whether the conduct constitute a violation. Appropriate precautions include placing a placard outside the inmate's cell or a window covering over the cell, use of the exposure control jumpsuit immediately, and temporary restrictions from common areas. (California Department of Corrections Departmental Operation Manual Chapter 5, Article 25, Inmate Indecent Exposure and Sexual Disorderly Conduct Management Page 423-425).

**99.** On our tour in late 2018, we visited numerous locations where showers and toilets were open, lacking appropriate modesty panels or shields. These areas were in full view or partial view of all staff to include women employees. In other areas inmates had placed sheets up as shower curtains fully blocking the activity of the inmate. This is a safety issue. Modesty panels need to be appropriately designed to facilitate viewing of the inmate from the neck up and from the knees down to allow custody staff to determine there is no unlawful behavior or dangerous activities occurring in the shower or toilet area while still allowing for the privacy of

the inmate and not requiring women employees to view inmates without clothing. See photos #68, # 69, #70, #83, # 84, #87, #121, #125, #146, #177, #178, #187, #208, #214, #215, #216, #217. The open shower and toilet areas facilitate inmates sexually harassing women employees by masturbating or exposing themselves. (Declarations of Christina Muhammad and Darlene McCord.) These areas are out of the view of video surveillance.

100. While CCSO should have installed modesty panels or similar features to reduce the opportunity for inmates to masturbate at or expose themselves to women employees, it also should have done so to comply with the Prison Rape Elimination Act. Since PREA was signed into law in 2003, prisons and jails have been preparing for and completing PREA audits. CCSO has stated on numerous occasions that the jail is PREA-compliant but it has not undergone a PREA audit. PREA requires facilities to implement policies and procedures that enable inmates to shower, perform bodily functions, and change clothing without nonmedical staff of the opposite gender viewing their breasts, buttocks, or genitalia, except in exigent circumstances or when such viewing is incidental to routine cell checks. If CCSO had addressed this issue following the enactment of PREA, the women employees would not have been subjected to the inappropriate sexual behavior of inmates while in the shower or toilet area.

101. CCSO considered glazing or tinting cell windows as early as 2014 to make them effectively one-way (employees could look in, but detainees could not see out) and thereby eliminate or drastically reduce the practice of inmates exposing themselves in front of windows to correctional officers and civilian employees on the other side of such windows. However, the glazier was a county rather than CCSO employee and CCSO did not have control over how quickly the work was performed. (Curry Depo. at 231-36.) CCSO and the County have succeeded in glazing and/or tinting windows in Division 9, and it has significantly reduced masturbation and indecent exposure in that Division. (Curry Depo. at 239-40.) In my opinion, CCSO and the county should have done what was necessary to make one-way the windows in some cells in each division. Not every cell would need to be fixed. Detainees who engaged in masturbation and indecent exposure could be placed into the treated cells. Indeed, this may have served as a deterrent to detainees engaging in this type of behavior in addition to inhibiting future violations by detainees who did.

102. Food ports also known as cuff ports (or chuckholes by CCSO) have often been utilized by inmates since as early as 2015 to stick their penis out for women staff to see, or

utilized to masturbate and ejaculate at women staff on the tier. (Declarations of Christina Muhammad, Sybil Keys, Darlene McCord, and Gabriela Henderson; Burroughs Depo. at 112-13, 164, 243; Crawford-Alexander Depo. at 148-49; Robinson Depo. at 87-88.) During our tour, most food ports were left open. I was told, during the tour, that there was a project underway to repair the food ports so that they can remain locked in Division 9. Mr. Curry indicated in his deposition that the project may have been completed in Division 9, but did not know for sure. (Curry Depo. at 237-39.) Until this project or a similar fix is made, open chuckholes will continue to expose women employees to inmates' masturbation and ejaculation. Even if it has been completed, it took an unreasonable length of time to address that issue in that division and the issue has not been addressed in other divisions.

## VI.    CONCLUSION

103.    The practices of the Cook County Jail have been inconsistent for the past five years or longer with prevailing correctional practices and often with its own written policies. Because of these inadequate practices, women employees are exposed to pervasive sexual harassment throughout the Jail at levels far beyond any other correctional institution with which I am familiar. The Jail does not adequately deter or curtail that harassment. Although certain practices have improved since the court entered a preliminary injunction at the end of November 2017, the policies and practices remain inadequate in many respects and the sexual harassment continues to this date. The Court, however, could order facility-wide injunctive relief measures that would be effective in deterring and curtailing inmate sexual harassment.


Date:  February 1, 2019

**Jeanne S. Woodford**

# Jeanne S. Woodford Report
## February 1, 2019

## <u>Appendix A</u>

**_Jeanne S. Woodford_**
Post Office Box 732
Benicia, CA 94510
Home: (707) 746-1712
Cell: (707) 853-0928
E-mail: jeannewoodford@comcast.net

## CAREER EXPERIENCE:

**5/06 to PRESENT**   **Correctional Consultant and Educator**

Involved in volunteer and contract work to improve the criminal justice system. Guest Speaker at UC Berkeley Law School, Stanford Law School, Stanford School of Public Policy, Santa Clara School of Law and various community groups. Op-Ed pieces published in major newspapers, testified in front of US Congress and the California Legislature. Taught criminal justice classes at Sonoma State University, University of California, Hastings School of Law and Stanford University. Consulted on a federally funded Women's Reentry grant for the City and County of San Francisco. Served as an expert in Death Penalty cases and other Criminal cases. Retained or appointed as an expert in civil cases involving jails and prisons offering expert opinions, reports and testimony on a variety of issues including: Mental Health Treatment, The Americans with Disability Act, Prison Overcrowding, LGBTI Confinement Policy and Practices to include compliance with PREA, Religious Rights, and Classification and Security of Jails and Prisons. Toured prisons, jails and juvenile facilities in California, New York and Arizona to provide an expert opinion regarding correctional practices, compliance with court orders and investigated civil rights complaints for the Department of Homeland Security.

**11/10 to 3/15**   **Senior Fellow, Chief Justice Earl Warren Institute, University of California Berkeley School of Law**

Serve as the criminal justice expert on a variety of criminal justice projects. Provided leadership and assistance to student interns engaged in criminal justice policy development.

**4/11 to 5/13**   **Executive Director, Death Penalty Focus**

Provide leadership and management of Death Penalty Focus, a non-profit dedicated to the mission of ending the death penalty. Co-lead Proposition 34, a California ballot initiative to end the death penalty in California. Duties included major fund raising, (over seven million dollars), public speaking and development of education and campaign material.

**11/06 to 05/08**          **Chief Adult Probation Officer, San Francisco Adult Probation Department**

Management and leadership of the San Francisco Adult Probation Department: Lead staff through a strategic planning process to establish goals, values and a clear mission for the San Francisco Adult Probation Department. Assisted staff with implementation of evidence based practices and began caseload management focused on successfully completing probation. Worked with the Mayor, the Courts, the District Attorney, the Public Defender, the Sheriff and Community Groups to improve communication and the effectiveness of the Probation Department. Budget: $11 million

**07/05 to 07/06**          **Appointed by Governor Arnold Schwarzenegger: Undersecretary of the California Department of Corrections and Rehabilitation (CDCR)**

Responsibilities included leading major policy; program and organization change; representing the Administration before the Legislature, Department of Finance, and other state, federal, and local government, and constituent groups. Provide administrative direction to all CDCR staff. Chaired the Corrections Standard Authority and the Prison Industries Board. Implemented COMP STAT to facilitate data driven decision making to achieve accountability, effective policy, improved utilization of resources and sound fiscal decisions. Worked with Court Monitors in several cases involving mental healthcare (Coleman), health care (Plata), disabilities (Armstrong), and developmental disabilities (Clark). Budget: $8 billion

**02/04 to 07/05**          **Appointed by Governor Arnold Schwarzenegger: Director of Department of Corrections**

Responsible for the administration of 32 State prisons, 38 conservation camps, more than 185 parole units, and contracts with 50 public or private community-based facilities or centers. In this capacity, Served as Chair, Prison Industry Board. Worked with the Administration to successfully add rehabilitation to the mission of the CDC resulting in the name change to California Department of Corrections and Rehabilitation, (CDCR). Worked with Administration, Legislature and Department of Finance to obtain funding and other resources to address conditions of confinement for inmates to include overcrowding, health care and mental health care. Implemented the gender responsive commission to create policies and appropriate programs for women incarcerated in the CDC. Budget: $6 billion

**02/99 to 02/04**        **Warden, San Quentin State Prison**

Responsible for the leadership and management of San Quentin State Prison. San Quentin has three primary missions: Reception Center, condemned housing, and a level II general population. Developed and implemented programs for prisoners including The Success Dorm; the first reentry program in a California prison. Worked with court monitors and headquarters staff toward compliance with court orders in several court cases involving mental health care, health care, disabilities and developmental disabilities. Chaired Institutional Classification Committees, Co-chaired several committees with the Health Care Manager in our efforts to achieve compliance with court mandates. Committees included suicide prevention and review, use of force, emergency medical response, medication compliance, mental health program compliance and medical and mental health hiring as well as other short and long-term committees deemed necessary to achieve our goals. Budget: $110 million

**08/97 to 02/99**        **Chief Deputy Warden, San Quentin State Prison**

Directly responsible for the day-to-day operation of San Quentin State Prison: 1,500 staff and a prisoner population of 5,800. Conducted internal audits and supervised staff in efforts to comply with court orders in several court cases involving mental health care, health care, disabilities and developmental disabilities. Budget: $110 million

**04/96 to 8/97**        **Associate Warden, San Quentin State Prison**

Directly responsible for managing San Quentin's Central Services Division. Primary responsibility for perimeter security, yards, gates, wall posts, dining hall, Receiving and Release, emergency response, custody post orders, watch commanders, visiting and mail programs. Additional responsibilities included the position of San Quentin's Equal Employment Opportunity (EEO) Coordinator. Managed a custody personnel budget of $56 million

**06/78 to 4/96**        Served in a variety of positions within the California Department of Corrections, (CDC) to include: Correctional Officer, Correctional Counselor, Program Administrator and Captain. I was also the Litigation Coordinator for three years at San Quentin State Prison responsible for working with court monitors in several conditions of confinement cases. I worked in the Court Compliance Unit in headquarters for one year, which provided me with extensive experience with court compliance, auditing, monitoring and preparing issue papers and budget request to obtain funding to comply with court mandates.

**EDUCATION:**     Bachelor of Arts Degree
                 Sonoma State University


**APPOINTMENTS:**

- Health Right 360 Board of Directors
- Prison Industries Authority Board Member (appointed by California Senate Rules Committee)
- Northern California Innocence Project Advisory Board

**Past Appointments:**

- Governors Leadership Institute
- John Jay College of Criminal Justice Advisory Committee
- Governors Technology Services Board for the Department of technology Services
- Council on Mentally Ill Offenders (Chair)
- Correctional Standards Authority (Chair)
- Friends Outside Sacramento Chapter (Honorary Chair)


**References provided upon request.**

# CURRICULUM VITAE OF JEANNE S WOODFORD

| DATE | TITLE |
|---|---|
| March 19, 2004 | California Judicial Council in Monterey – Speaker: The State of Criminal Justice in California |
| April 21, 2004 | Senate Budget Sub 2 Committee Hearing – Testify regarding the need for a new death row in California. |
| April 22, 2004 | Briefing Director's Introduction Remarks Little Hoover Commission regarding the State of Corrections in California and the need for reform |
| May 4, 2004 | Opening Statement (Senator Romero) Hearing on the state of corrections |
| May 5, 2004 | Assembly Oversight Hearing- Testimony regarding the need to repair the structural deficiency in the CDC's budget |
| May 21, 2004 | Medal of Valor-California State Capitol-Speaker |
| June 1, 2004 | Joint Hearing Assembly Committee on Health – Testimony regarding health care in the CDC |
| June 8, 2004 | Friends Outside Annual Dinner-Keynote Speaker: The Need for Rehabilitation |
| June 23, 2004 | Confirmation Hearing Opening Remarks Senate Rules Committee |
| June 28, 2004 | Statewide Training of Chief Probation Officers – Keynote Speaker: The Need for Reform |
| August 16, 2004 | Mule Creek State Prison Media Event with the Governor – Speaker: The Need for Rehabilitation |
| August 23, 2004 | NOVA Conference Speaker: Reforming the CDC. |
| September 13, 2004 | 5th Annual Centerforce Inside/Out Summit – Keynote Speaker: The State of Criminal Justice in California |
| September 15, 2004 | League of Women Voters-Speaker: The Need for Sentencing Reform in California |
| September 17, 2004 | Odyssey-Speaker: The need for Sentencing Reform in California |
| September 29, 2004 | Legislative Hearing "The Inmate Health Care Challenge: Fixing a Broken System in Light of the Deukmejian Report" (Senate Select Committee on Government Oversight and Senate Select Committee on the California Correctional System) – Speaker |
| October 9, 2004 | California Judges Association Conference in Monterey-Panel w/Senator Jackie Speier. |
| December 8, 2004 | Sonoma State University: Perspective on the Future - Speaker |
| January 2005 | Article: Managing Death Row – co-author. Published in Managing Special Populations in Jails & Prisons text |
| February 8, 2005 | Senate Select Committee on the California Correctional System (Hearing on Racial Segregation in Prisons) – Speaker |
| February 23, 2005 | Sonoma County Peace Officer of the Year Banquet-Keynote Speaker |
| March 10, 2005 | Harvard University, John F. Kennedy School of Government Forum-Panel on Corrections – Panel Member |
| March 16, 2005 | Forensic Mental Health Conference Speaker: The Need for Improved Mental Health Care in the CDC |
| April 21, 2005 | Citizen's Advisory Committee Conference, Opening Remarks: The Need for Reform |
| April 23, 2005 | California Correctional Supervisor's Organization Keynote Speaker: The Need for Reform |
| April 24, 2005 | Hospitals & Institutions Conference Speech: Health Care in CDCR |
| May 12, 2005 | Alcoholic's Anonymous Volunteers in Parole Keynote Speaker: The Importance of Volunteers in Prisons and in Our Community. |
| May 25, 2005 | Rehabilitation Conference Speaker: The Need for Drug Treatment |
| June 6, 2005 | National Institute of Corrections Faith-Based Conference. Washington D.C. – Speaker: The Importance of Religious Volunteers in our Prisons |

| | |
|---|---|
| June 14, 2005 | Friends Outside Annual Dinner Speaker: The Importance of Programs for Inmates and Their Families |
| June 24, 2005 | Basic Correctional Officer Academy Graduation – Speaker: Professionalism and Ethics |
| July 20, 2005 | California Youth Authority Medal of Valor – Speaker |
| July 27, 2005 | Channel City Club Keynote Speaker: Correcting Corrections |
| October 17, 2005 | Educators Keynote Speaker-Lake Tahoe. The Importance of Education |
| October 20, 2005 | Employers Forum "San Diego County's Undiscovered Labor Resource" (Community Reentry Project) Keynote Speaker |
| October 21, 2005 | Basic Correctional Officer Academy Graduation – Speaker: Professionalism and Ethics |
| January 25, 2006 | Little Hoover Commission (Sacramento) Opening Remarks: The Need for Sentencing Reform and Rehabilitation |
| February 1, 2006 | Fire Chiefs Return to Work Coordinators Conference – Opening Remarks |
| February 2, 2006 | Senate Hearing "Have California's Prisons Been Rehabilitated" – Speaker |
| May 19, 2006 | Medal of Valor Speaker-California State Capitol |
| May 23, 2006 | Coalition of Alcohol and Drug Associations Public Policy Conference – Morning Speaker: The Importance of Drug Treatment |
| May 27, 2006 | Sonoma State Commencement Exercises Speaker |
| June 8, 2006 | American Institute of Architects National Convention and Design Exposition – Speaker: The Need to Build Prisons for Programming and Safety |
| August 2006 | Los Angeles Times OP Ed: "Why I quit the Prison System" |
| November 27, 2006 | Speaker at USC Annenberg Institute for Justice and Journalism Topic: Sentencing Reform |
| February 4, 2007 | Article: The Future of Prison Design featured in the American Institute of Architect's magazine |
| May 18, 2007 | Sonoma Learning – Sonoma State University Speaker: Future of Corrections |
| July 14, 2007 | Judicial Council of California Symposium – Speaker: The Need for Sentencing Reform |
| July 17, 2007 | Sonoma State – Speaker: Criminal Justice Time for Reform |
| September 6, 2007 | Northern California Service League – 12th Annual Reentry Conference – Speaker |
| September 11, 2007 | Hastings Law School, San Francisco – Speaker: The Need for Sentencing Reform |
| October 23, 2007 | Eighth Annual Inside/Out Summit – Critical Juncture – Innovative Solutions for Addressing the Impacts of Youth & Adult Incarceration in our communities – Speaker |
| November 2007 | Association of Women Executives in Corrections – Speaker: My Career in CDCR |
| November 28, 2007 | White House Faith & Community Initiatives National Summit on Prisoner Re-entry – Speaker: The Importance of Re-entry Programs |
| January 23, 2008 | USC Annenberg Institute for Justice and Journalism – Speaker: Sentencing Reform |
| March 4, 2008 | Center for Collaborative Solutions (CCS) Annual Labor Management Conference – Presenter/Speaker: The Importance of Working with Unions |
| March 14, 2008 | UC Berkeley – Violence Conference – Speaker: Prison Overcrowding Must be Addressed |
| March 15, 2008 | USF – Symposium – Solutions for California Prisons – Speaker: Why Criminal Justice Reform is Important for Public Safety |
| March 31, 2008 | John Jay College of Criminal Justice – Speaker: The Importance of Prison Education and Vocational Programs |
| April 22, 2008 | Testified before the US Subcommittee on Crime, Terrorism, and Homeland Security in support of revising the Prison Litigation Reform Act |

| May and June 2008 | Review, audit and report of the San Mateo Youth Services Center following an escape of a youth facing an adult trial as an adult. |
|---|---|
| September 24, 2008 | Testified before the California Legislative Subcommittee in support of Proposition 5 |
| October 2008 | Signed rebuttal to argument in favor of Proposition 9 for the California General Election official voter information guide |
| October 7, 2008 | Centerforce Summit Forum panel participant. The Need for Expanding Rehabilitation |
| October 10, 2008 | Berkeley Law Center Conference panel: The Need for Sentencing Reform |
| November 6, 2008 | American Institute of Architects speaker regarding design influence on corrections |
| November 8, 2008 | Panel participant with American Institute of Art and Design discussing the influence of Architectural design on criminal justice reform |
| January 2009 | Appointing to the Prison Industries Authority (PIA) Board by Senate Rules |
| February 3, 2009 | Testified as an expert for the Plaintiffs before the Federal Three Judge Panel regarding the impact of overcrowding on health care and mental health treatment. Case: Ralph Coleman, et al Plaintiffs, v. Edmund G. Brown JR., et al, Defendants No.2:90-cv-0520 LKK DAD (PC) Three Judge Court No.C01-1351 TEH |
| February 27, 2009 | Speaker Berkeley Criminal Justice Forum: The Need for Criminal Justice Reform |
| March 9, 2009 | Speaker Sonoma State University Criminal Justice Forum |
| March 19, 2009 | Speaker Hastings School of Law, Defining the Problem-The State of Criminal Justice in Ca. |
| April 2009 | Entered into 5-month contract with Drug Policy Alliance to develop criminal justice policy strategy for Ca. |
| May 2009 through August 2009 | Volunteered consulting services at the request of Legislators working on Ca. Correctional budget issues |
| May 2009 | Editorial in San Diego Tribune regarding corrections and accountability |
| June 30, 2009 | Guest speaker The Fellowship Forum, a group of Stanford graduates and Hewitt Packard executives: The State of Criminal Justice in California |
| August 12, 2009 | Interviewed for Time Magazine regarding corrections in Calif. (On-line edition) |
| August 13, 2009 | Interviewed for NPR- All Things Considered, regarding correctional issues in Ca. |
| September and October 2009 | Taught a series of classes at Sonoma State University entitled Overview of Corrections |
| September 2009 | Jail needs study Cities of Kirkland and Bellevue, Washington. |
| October 1, 2009 | Guest Speaker Saint Mary's College: Criminal Justice in California |
| October 2, 2009 | Guest Speaker University of California Berkeley: Criminal Justice in California |
| October 21, 2009 | Education Seminar Los Angeles Public Defenders Office "An Overview of California Prisons" |
| October 27, 2009 | Participated in panel discussion regarding Criminal Justice and the State of California |
| October 2009 | Contracted for Needs Study Placer County Jail |
| February 2010 | Contracted to assist implementing the Second Chance Reentry Grant for the City and County of San Francisco |
| February 2010 | ABA Criminal Justice Standards on Treatment of Prisoners completed. I was a member of the task force for a portion of the five-year project. |
| April 12, 2010 | Appeared on Pod Cast regarding Correctional Reform for the UC Berkeley Criminal Justice Center |
| April 13, 2010 | Taught six-week course at Sonoma State University regarding the State of Corrections in California |
| May 11, 2010 | Testified before the Ca. Legislature regarding Options for Improving Prison Operations and Outcomes |
| June 30, 2010 | Testified before the Ca. Legislature regarding SB 399, The Fair Sentencing for Youth |

|  | Act. |
|---|---|
| September and October 2010 | Taught six-week course at Sonoma State University regarding the State of Corrections in California |
| November 3, 2010 | Attend Cal RAPP training and participate in strategic planning to assist SF Adult Probation to implement evidence based practices and procedures. |
| November 9, 2010 | Appointed Senior Fellow Chief Justice Earl Warren Institute Berkeley School of Law |
| November 15, 2010 | Guest speaker for Dr. Barbara Bloom regarding corrections in California; Sonoma State University |
| November 17, 2010 | Panelist at the American Society of Criminologist. The State of Criminal Justice in California |
| November 18, 2010 | Testified before the Little Hoover Commission Topic: Reorganization of the California Department of Corrections |
| December 2, 2010 | Three Strikes Conference Stanford University |
| January 4, 2010 | Speaker Hastings Law School Topic: Corrections in California |
| January 7, 2011 | Presenter SALT Award to the Prison Law Office for Human Rights work. |
| January 20, 2011 | Speaker UC Irvine Topic: Death Penalty and California Criminal Justice |
| February 8, 2011 | Speaker-Stanford for Professor Nation, Public Policy class Corrections in California |
| February 22, 2011 | Speaker-Stanford School of Law, Joan Petersilia class on Criminal Justice |
| March 31, 2011 thru May 19, 2011 | Attorney General transition team meeting-Smart on Crime Project Strategies for Improving Criminal Justice in California |
| April 5, 2011 | Speaker-1st Congregation Church of Sonoma Criminal Justice in California |
| April 6, 2011 | Speaker-UC Berkeley Criminal Justice Course Criminal Justice in California |
| April 18, 2011 | Speaker UC Berkeley Litigation in California Prisons |
| April 26, 2011 | Speaker-Mills College, Death Penalty Symposium |
| April 2011 to present | Expert for Plaintiffs Armstrong v. Brown, United States District Court Northern District of California C-94-2307 CW<br> Primary Issue: Compliance with the American with Disabilities Act, ADA |
| May 2011 to present | Expert for New York State Office of Children and Family Services regarding violence in NY Juvenile Secure facilities. |
| May 2, 2011 | Speaker-USC 3-Strikes Conference |
| May 3, 2011 | Speaker Oakmont Symposium Topic: The State of Corrections |
| May 10, 2011 | Speaker-SF Public Defender's Conference on Criminal Justice: The Need for Sentencing Reform |
| June 7, 2011 | Guest Speaker-Bob Edwards KQED: The Death Penalty |
| June 26, 2011 | Guest Speaker-CVS Channel 5: The Death Penalty |
| June 28, 2011 | Guest Speaker National Latino Peace Officers Sonoma County Chapter. |
| August 1, 2011 | Guest Ron Owen Radio Show KGO The Death Penalty and Criminal Justice Reform |
| August 4, 2011 | Guest Pacifica Radio: The Death Penalty |
| August 8, 2011 | Guest KCEO Radio, Kent Peters Show: The Death Penalty and Criminal Justice Reform |
| August 10, 2011 | Speaker Chevron Retirees Luncheon Topic: Criminal Justice in California |
| August 11, 2011 | Speaker Junior Statesmen of America, Sacramento, Ca. The State of Criminal Justice |
| August 14, 2011 | Guest KGO Lara Starr Producer: The Death Penalty |
| August 17, 2011 | Testified before Ca. Legislative Appropriations Committee regarding SB 490 bill to place death penalty on the Ca. ballot |
| August 30, 2012 | Debate Participant vs. District Attorney, Wagstaff. Topic: The Death Penalty |
| September 13, 2011 | Speaker Fountain Grove Men's Club topic: Criminal Justice in Calif. |
| September 15, 2011 | Speaker Solano Reentry Council Topic: The Importance of Reentry Councils |

| | |
|---|---|
| September 22, 2011 | Guest KGO Peter Collins Show: Criminal Justice and the Death Penalty |
| September 24, 2011 | Guest Speaker PAX Christi Event in LA regarding the Death Penalty |
| October 13, 2011 | Speaker Hastings Law School Professor Blocks class: The Need for Sentencing Reform |
| October 27, 2011 | Participated in Criminal Justice Realignment Panel Hastings Law School. |
| November 3, 2011 | Speaker Mt. Diablo Peace and Justice Conference: The Death Penalty and Public Safety |
| November 6, 2011 | Speaker Ignatius Church San Francisco: The Death Penalty and Public Safety |
| November 13, 2011 | Speaker Grace Episcopal Church Bakersfield, Ca. Topic: The Death Penalty and Public Safety |
| November 14, 2011 | Speaker California State University Bakersfield: The Death Penalty and Public Safety |
| November 29, 2011 | Speaker Rotary Club of San Francisco: The Death Penalty and Public Safety |
| November 30, 2011 | Speaker Berkeley Women's Club: The Death Penalty and Public Safety |
| December 6, 2011 | Speaker Marin Bar Association Topic: The Death Penalty in California |
| December 14, 2011 | Guest KCBS Jeff Ball Host: Sentencing Reform |
| January 9, 2012 | Guest KQED Cate Cochran CBC Radio Canada: The Death Penalty and Public Safety |
| January 10, 2012 | Speaker Saint Mary's College Speakers Series on Criminal Justice |
| January 17, 2012 | Speaker Trinity United Methodist Church: The Death Penalty and Public Safety |
| January 17, 2012 | Speaker Sisters of Saint Joseph of Orange: The Death Penalty |
| January 18, 2012 | Speaker Law Offices of the Public Defender Riverside: The Death Penalty and Public Safety |
| January 18, 2012 | Speaker Scripps College Balch Hall: The Need for Sentencing Reform |
| January 25, 2012 | Speaker for the showing of the movie Incendiary, The Metreon San Francisco |
| January 26, 2012 | Speaker San Ramon Valley Democratic Club: The Death Penalty |
| January 31, 2012 | Speaker Women of Westminster Tiburon: The Death Penalty |
| February 1, 2012 | Speaker UC Irvine event held in San Francisco: Sentencing Reform |
| Fall Semester 2012 | Professor UC Hastings School of Law Course: Overview of Criminal Justice |
| February 6, 2012 | UCLA Law School Forum on the death penalty |
| February 11, 2012 | Panel Hastings School of Law Topic: Realigning California's Criminal Justice System |
| February 16, 2012 | Speaker Los Altos Country Club: The State of Criminal Justice and the Need for Sentencing Reform |
| February 24, 2012 | LMU Restorative Justice Panel |
| February 26, 2012 | Speaker Berkeley Sunday Gathering Topic: Death Penalty |
| March 1, 2012 | Safe Ca Signature Filing Press Conference |
| March 7, 2012 | Speaker Sacramento Jesuit High School: The Death Penalty |
| March 14, 2012 | Speaker: San Francisco Academy of Architecture for Justice: The Need for Sentencing Reform |
| March 16, 2012 | Speaker Caleb Foote Symposium UC Berkeley Topic: Criminal Justice Realignment |
| April 5, 2012 | Guest Canadian Radio the Matt Holmes Show: The Death Penalty and Sentencing Reform |
| April 12, 2012 | Debate Saint Mary's College Death Penalty LA Deputy DA Stirling |
| April 16, 2012 | Speaker UC Berkeley Professor C Gardner: The Death Penalty and Criminal Justice in California |
| April 19, 2012 | Speaker Santa Clara University School of Law: The Death Penalty |
| April 24, 2012 | Panel Golden Gate University topic: Death Penalty |
| April 27, 2012 | Speaker ACLU Sonoma County Annual Dinner: Criminal Justice in California |
| May 8, 2012 | Speaker: The Arthur Benjamin High School Sacramento: Criminal Justice in California |
| May 10, 2012 | Guest Student Radio Station El Cerrito: The Death Penalty |
| May 14, 2012 | Speaker Heald College Concord: Criminal Justice in California |

| | |
|---|---|
| May 16, 2012 | Guest Bruce Robinson Radio Show Rohnert Park: The Death Penalty |
| May 17, 2012 | Speaker Diocese of San Diego: The Death Penalty |
| May 20, 2012 | Speaker Sunday Gathering Pacific Palisades: The Death Penalty |
| May 21, 2012 | Speaker Young Democrats LA.: The Death Penalty |
| June 5, 2012 | Speaker Ron Owen Show KGO Radio: The Death Penalty |
| June 7, 2012 | Speaker Sheriffs Association Meeting Placer Co.: The Death Penalty and Public Safety |
| June 17, 2012 | Unitarian Universalist Breakfast Forum San Francisco Speaker: The Death Penalty and Public Safety |
| June 27, 2012 | LA Press Victims Press Conference; The Need to End the Death Penalty |
| July 25, 2012 | KTVU Radio Interview: The Death Penalty and Public Safety |
| May 16, 2012 | Guest Bruce Robinson Radio Show Rohnert Park: The Death Penalty |
| May 17, 2012 | Speaker Diocese of San Diego: The Death Penalty |
| May 20, 2012 | Speaker Sunday Gathering Pacific Palisades: The Death Penalty |
| May 21, 2012 | Speaker Young Democrats LA.: The Death Penalty |
| June 5, 2012 | Speaker Ron Owen Show KGO Radio: The Death Penalty |
| June 7, 2012 | Speaker Sheriffs Association Meeting Placer Co.: The Death Penalty and Public Safety |
| June 17, 2012 | Unitarian Universalist Breakfast Forum San Francisco Speaker: The Death Penalty and Public Safety |
| June 27, 2012 | LA Press Victims Press Conference; The Need to End the Death Penalty |
| July 25, 2012 | KTVU Radio Interview: The Death Penalty and Public Safety |
| July 26, 2012 | Speaker Vanguard Court Watch of Yolo County: The Death Penalty |
| August 13, 2012 | Guest KRXA Hal Ginsberg show: The Death Penalty |
| August 16, 2012 | Speaker Democratic Women Club Monterey: The Death Penalty and Criminal Justice Reform |
| August 17th, 2012 | Speaker St. Paul's Episcopal Church Monterey: The Death Penalty |
| August 18, 2012 | Speaker Old Mission Church Monterey: The Death Penalty |
| August 19, 2012 | Speaker United Methodist Church Atascadero: The Death Penalty |
| August 30, 2012 | Debate Participant Topic: Death Penalty DA Wagstaff |
| September 7, 2012 | Speaker Marin Library Mill Valley: The Death Penalty |
| September 12, 2012 | KQED Forum Radio Guest: The Death Penalty |
| September 13, 2012 | Speaker UC Berkeley, Professor David Onek: Criminal Justice and Sentencing Reform |
| September 18, 2012 | Testified before California Legislature Prop 34 |
| September 20, 2012 | Speaker Safe Ca. Event LA: The Death Penalty |
| September 25, 2012 | Speaker USF ST Thomas More Society; The Death Penalty |
| September 25, 2012 | Speaker Christ the King Church Pleasant Hill: The Death Penalty |
| September 27, 2012 | Speaker Stanford University Law School: Sentencing Reform |
| September 27, 2012 | Speaker Stanford Chapter of the NAACP: Sentencing Reform |
| September 30, 2012 | Debate Asian Pacific Islander Political Forum Sacramento Deputy Sacramento DA: The Death Penalty |
| October 2, 2012 | NPR Richard Gonzales: The Death Penalty |
| October 5, 2012 | Speaker California Agriculture Leadership. The Death Penalty |
| October 7, 2012 | Speaker Holy Families Catholic Church LA: The Death Penalty |
| October 9, 2012 | Catholic Press Conference Church of Saint Raphael and Mission San Rafael: the Death Penalty |
| October 23, 2012 | Debate Participant Prop 34 Congregation Sha'ar |
| October 24, 2012 | Speaker Alamo Woman's Club Walnut Creek: The Death Penalty |
| October 25, 2012 | Guest Democracy Now topic: The Death Penalty |
| October 25, 2012 | San Jose Mercury News on line Debate Death Penalty McGregor Scott |

| October 26, 2012 | Guest Fox Radio: The Death Penalty |
|---|---|
| October 29, 2012 | Guest KALW Radio: The Death Penalty |
| November 1, 2012 | Guest KCBS Radio: The Death Penalty |
| November 8, 2012 | Capitol Weekly Panel Post-Mortem Conference 2012 Election |
| November 13, 2012 | Guest KQED radio: The Need for Criminal Justice Reform |
| November 21, 2012 | Guest KQED radio host Dick Gordon: The Need for Criminal Justice Reform |
| November 28, 2012 | Faculty: Miller Implementation Training Conference Atlanta, Georgia |
| December 9, 2012 | Recipient of the Chief Justice Earl Warren Civil Liberties Award ACLU of Northern California |
| January 31, 2013 | Speaker UC Berkeley Wine and Crime event. The State of Criminal Justice |
| February 6, 2013 | Panelist in Sonoma State University career day: A Career in Criminal Justice |
| February 8, 2013 | Awarded the June Morrison-Tom Gitchoff Founders Award Western Society of Criminologist |
| February 21, 2013 | Panelist Marquette University School of Law Topic: The Death Penalty |
| April 22, 2013 | Speaker Sonoma State University Topic: Ethical Dilemmas in Criminal Justice |
| May 16, 2013 | Speaker: Death Penalty Focus Awards Dinner Los Angeles, Ca. |
| July 2013 | Expert: Riverside Public Defenders Office Prop 36 case |
| August 15, 2013 | Speaker: League of Women Voters Berkeley, California Topic: Criminal Justice in California The Politics of Improving Public Safety |
| September 2013 | Advisory Board Northern California Innocence Project member |
| September 14, 2013 | Entered into five-year contract with US Department of Homeland Security to investigate civil rights complaints filed by immigration detainees |
| October 25, 2013 | Testified as an expert for Plaintiffs in *Coleman, et al., v. Brown, et al.*, U.S. District Court, Eastern District of California, Case No. CIV S 90-0520 LKK-JFM |
| October 29, 2013 | Retained as an expert for Plaintiffs in *Davis, et al. vs. Abercrombie*, et al, U.S. District Court for the District of Hawaii, Case No. 11-00144 LEK/BMK, a religious rights case involving Hawaiian inmates housed in Arizona |
| March 2016 | Retained as an expert for Plaintiffs in *McKibben, et al. vs. McMahon, et al.,* U.S. District Court, Central District of California, Case No. EDCV 14-02171 JGB-SP, a case involving conditions of confinement for LGBTI inmates |
| May 2016 | Speaker Santa Cruz County Employers Forum on re-entry and employment for former inmates |
| October 5, 2016 | Testified as a defense expert in *People v. Darrel Gurule,* Los Angeles Superior Court, Case No. BA369369-01 |
| November 9th, 2016 | Speaker Santa Clara Law School Topic: The Death Penalty. |
| November 2016 | Retained by Plaintiffs as an expert in *Frank O Connell vs. JD Smith, et al.,* U.S. District Court, Central District of California, Case No. 13-CV-01905 (MWF-PJW), a wrongful conviction case |
| May 2017 | Retained as an expert by Plaintiff in *Ramos, et al. vs. Swatzell, et al.,* U.S. District Court, Central District of California, Case No. 12-cv-01089 (BRO)(SP), a prison sex misconduct case |
| May 2017 | Retained confidentially as a defense expert by the Tulare County Public Defender's Office in a death penalty case |
| May 2017 | Appointed confidentially as a defense expert by the Los Angeles Public Defender's Office in a criminal case |
| June 2017 | Retained confidentially as a defense expert by the Tulare County Public Defender's Office in a death penalty case |
| June 2017 | Retained as an expert by the United States Department of Justice regarding the housing |

| | of LGBTI inmates. |
|---|---|
| July 2017 | Speaker Commonwealth Club of San Francisco Topic: Private Prisons |
| November 2017 | Retained as an expert in Sparks v. United States of America. In the United States District Court for The Western District of Texas Waco Division, W-11-CV-123, W-16-CV-435, (W-99-CR-070-3) |
| December 2017 | Appointed as an expert People v Luis Bracamontes, Superior Court of California, Sacramento County, Case No. 14F07390 |
| January 2018 | Retained as an expert by the ACLUF, Roger Baldwin Foundation of ACLUF and Kirkland And Ellis, LLP to advise on transgender incarceration policies |
| February 1, 2018 | Retained as an expert by the Hawaiian Legal Corporation, in the matter of Vinhaca v. Department of Public Safety, In the Circuit Court of the First Circuit State of Hawaii, Civil No. 16-1-1063-6 |
| February 7, 2018 | Provided expert testimony in Sparks v. United States of America. In the United States District Court for the Western District of Texas Waco Division, W-11-CV-123, W-16-CV-435, (kW-99-CR-070-3) |
| March 2018 | Chapter Titled: Rethinking Classification, Programming, and Housing for Death Row Inmates published in Living on Death Row, The Psychology of Waiting to Die, American Psychological Association, Washington DC, 2018 |
| March 2018 | Retained as an expert People v. Monteros, Superior Court of California, Alameda County, Miller resentencing case. Docket #H34043 |
| March 20, 2018 | Testified as an expert People v Luis Bracamontes, Superior Court of California, Sacramento County, Case No. 14F07390. |
| April 30, 2018 | Retained as an expert Richards v. County of San Bernardino, et al. USDC Case No: 17-cv-0497-SJO |
| May 10, 2018 | Retained as an expert People v Nguyen, Superior Court of California, Solano County, Miller resentencing case. Case No. FCR194738 |
| June 13, 2018 | Retained as an expert Howard et al. v. Cook County Sheriff's Office and County of Cook, No. 17-cv008146 (N.C. Ill.) |
| January 30, 2019 | Testified as an expert In the District Court of the Fourth Judicial District Of The State Of Idaho, In And For The County Of ADA, Aliza Cover v. Idaho Board of Corrections, Idaho Department of Corrections, and Jeffrey R. Ray, Public Information Officer, Case No. CV01-18-03877 |

# Jeanne S. Woodford Report
## February 1, 2019

## <u>Appendix B</u>

# APPENDIX B

Documents Reviewed in connection with
*Howard et al. v. Cook County Sheriff's Office et al.*

## Plaintiff Deposition Testimony

- Testimony of Plaintiff Ellenor Altman
- Testimony of Plaintiff Tavi Burroughs
- Testimony of Plaintiff Kimberly Crawford-Alexander
- Testimony of Plaintiff Dominique Freeman
- Testimony of Plaintiff Denise Hobbs
- Testimony of Plaintiff Sdahrie Howard
- Testimony of Plaintiff Esther Jones
- Testimony of Plaintiff Susana Plasencia
- Testimony of Plaintiff Balvina Ranney
- Testimony of Plaintiff Sharon Robinson
- Testimony of Plaintiff Tawanda Wilson

## Plaintiff Declarations

- Declaration of Monshai Addison
- Declaration of Latarsha Anderson
- Declaration of Kimberly Bowen
- Declaration of Jacqueline Brown
- Declaration of Jacqueline Brown2
- Declaration of Patricia Brown-Conley
- Declaration of Jessica Correa
- Declaration of Tanisha Cribbs
- Declaration of Gloria Ellis
- Declaration of Patricia Dianne Green
- Declaration of Sheleda Groves
- Declaration of Gabriela Henderson
- Declaration of Tanisha Henderson
- Declaration of Patti Jagielski
- Declaration of Sybil Keys
- Declaration of Shonnita Lanier
- Declaration of Christina Lopez
- Declaration of Darlene McCord
- Declaration of Rita McCoy
- Declaration of Anntionettea Montgomery
- Declaration of Christina Muhammad
- Declaration of Donnetta Myart
- Declaration of Lori Ponce

- Declaration of Kelly Shields
- Declaration of Sharon Taylor
- Declaration of Danielle Thomas
- Declaration of Alicia Webster
- Declaration of Ronica Williams
- Declaration of Diane Winter
- Declaration of Lisa Yates

## Defendant Deposition Testimony

- Testimony of Matthew Burke, Interim Director of Human Resources (former Chief of Staff) as CCSO's designee under Rule 30(b)(6) on the inmate discipline process.
- Testimony of Brad Curry, Chief Operating Officer of CCSO, as CCSO's designee under Rule 30(b)(6) on policies, procedures, and directives of the Cook County Jail and courthouses.
- Testimony of Amar Patel, Director of CCSO Bureau of Information and Technology, as CCSO's designee under Rule 30(b)(6) on information technology topics.
- Testimony of Steven Wilensky, Director of Inmate Discipline, Cook County Jail, as CCSO's designee under Rule 30(b)(6) on the inmate discipline process.

## Cook County Sheriff's Office Documents and Data

- Bates No. 0000914-15: CCSO Sheriff's Order: Inmate Discipline: Disciplinary Reports and Hearing Procedures (SOGO 11.14.8.0)
- Bates No. 0001678: Inmate Disciplinary Report form
- Bates No. 0064451-53: CCDOC Policy 166: Sexual Misconduct by Detainees Directive – November 28, 2017
- Bates No. 0064470-74: CCDOC Policy 311: Report Preparation
- Bates No. 0084825: Incident reports data from 7/2015 to 1/2018
- Bates No. 0145831-32: Analysis of disciplinary data from 1/1/2016 to 10/31/2017
- Bates No. 0145839-46: Incident data January 1, 2016 through October 31, 2017
- Bates No. 0146002-07: Cook County Sheriff's Office of Research: Incident trends by month in Division 6: October 1, 2015 through December 31, 2016
- Bates No. 0146548-52: Cook County Sheriff's Office of Research: Incident trends by month in Division 10: October 1, 2015 through December 31, 2016
- Bates No. 0251124: Emails between Daniel Moreci and Richard Velasquez dated 5/31/2015-6/1/2015
- Bates No. 0257494-506: Emails between Chief Anthony Del Santo, Gregory Ernst, and John Vega dated 7/1/2016-7/6/2016 attaching CCHHS Staff Safety Incident Reports

- Bates No. 0260261: Cook County Sheriff's Bureau of Intelligence and Investigations Case Review Unit memo from Frank Arce to Michael Holmes dated 10/19/2016
- Bates No. 0260873-77: Cook County Sheriff's Office of Research: UOF Increase Ideas Memo, dated 11/28/2016
- Bates No. 0260916: Emails between Executive Director Nneka Jones Tapia, Daniel Moreci, and Superintendent Printiss Jones dated 12/2/2016
- Bates No. 0260994: Emails between Cara Smith, Brad Curry, and Crystal Grey dated 12/8/2016
- Bates No. 0266994-267005: Cook County Sheriff's Office of Research: Incident trends by month in Division 9: June 1, 2016 through August 31, 2017
- Bates No. 0269682: Emails between Anne Fitzgerald and Debbie Boecker dated 11/27/2017
- Bates No. 0270405: CBB Report dated 12/4/2017
- Bates No. 0270922-25: Emails between Executive Director Nneka Jones Tapia, Superintendent Martha Yoksoulian, Larry Gavin, and other CCSO employees dated 12/13/2017
- Bates No. 0272298-309: Division 9 CCDOC Staffing Report, January 2018
- Bates No. 0275191-200: Cook County Sheriff's Office of Research: Incident trends by month in Division 9: December 1, 2016 through February 28, 2018
- Bates No. 0277874-75: Quality Control Report monitoring sexual misconduct incidents
- Bates No. 0301689-702: Emails between Jeff Johnsen and Aracelis Gotay dated 9/17/2017-9/20/2017 re: August incidents for Division 9
- CCDOC Policy 704: Inmate Discipline Procedure (Exhibit 46)
- CCSO inmate disciplinary code (Disrespect to Staff, Sexual Harassment)

**Other materials**
- American Correctional Association (ACA) Standards of Local Detention Facilities
- California Department of Corrections and Rehabilitation Department Operations Manual, Section 52100: Inmate Indecent Exposure and Sexual Disorderly Conduct Management
- California Department of Corrections Departmental Operations Manual, Chapter 5, Article 25: Inmate Indecent Exposure and Sexual Disorderly Conduct Management, Page 423-425
- CDCR Title 15, Section 3315
- CDCR Section 3334
- COMPSTAT Statistical Report of Avenal State Prison
- COMPSTAT Statistical Report of Calipatria State Prison
- COMPSTAT Statistical Report of Centinela State Prison
- COMPSTAT Statistical Report of Corcoran State Prison
- COMPSTAT Statistical Report of High Desert State Prison
- COMPSTAT Statistical Report of Pelican Bay State Prison

- Illinois Administrative Code Sections 701.160 (730 ILCS 130/3.1): Disciplinary Findings and Penalty Imposition
- Photos taken at Cook County Jail on 11/29/2018: Photos # 4, 68, 69, 70, 74, 75, 83, 84, 87, 96, 106, 118, 121, 125, 146, 148, 152, 177, 178, 187, 208, 212, 214, 215, 216, 217

**<u>Online Resources</u>**
- http://www.safetyandjusticechallenge.org/challenge-site/cook-county 12/27/2018