

Exhibit 19

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


SDAHRIE HOWARD, ET AL.,

               Plaintiffs,

      V.

COOK COUNTY SHERIFF'S OFFICE, ET AL.,

               Defendants.

Case No. 17 C 8146
Judge Matthew F. Kennelly
Magistrate Judge Sidney I. Schenkier


**<u>REBUTTAL EXPERT REPORT OF JEANNE S. WOODFORD (CORRECTED)</u>**

## TABLE OF CONTENTS

Introduction ........................................................................................................................... 1

A.  The Cook County Jail Has an Excessively Large Number of Reported Incidents of
    Masturbation and Indecent Exposure……………………………………………………...1

    1.  The Six California Prisons that I Selected to Study Provide Appropriate Comparators
        for the Cook County Jail, As Confirmed by Dr. Wilner's Own Data ......................... 2

    2.  The Rates of Sexual Incidents with Guilty Findings at Cook County Jail Dwarf the
        Rates at the California Prisons .................................................................................. ..5

    3.  Dr. Wilner Inappropriately Discounts Comparisons of Cook County Jail to California
        Prisons Through PREA Data...................................................................................... ..6

    4.  Ms. Frasier's Attempt To Excuse Rampant Indecent Exposure And Masturbation At
        Cook County Jail Is Based On Faulty Assumptions About How Prisons Operate .... .7

    5.  Ms. Frasier's Opinions About Ignoring Inmate Sexual Harassment And Sexual
        Misconduct As An Adequate Or Preferred Means Of Responding To Such
        Misconduct Demonstrates A Lack Of Understanding Of The Causes And Impact Of
        Inmate Sexual Harassment And Sexual Misconduct In A Correctional Facility. ...... ..9

    6.  The Existence Of A Group Called Savage Life Does Not Explain The Rampant
        Sexual Harassment Problem At CCDOC And Did Not Prevent Jail Administrators
        From Taking Reasonable And Adequate Steps To Curtail The Problem. ................ 12

    7.  Well-Run Jails And Prisons Can Control The Behavior Of Inmates Charged With
        Serious Crimes ........................................................................................................ 14

    8.  The Fact That CCSO Also Had Other Issues To Address Does Not Excuse
        Management For Failing To Take Reasonable, Adequate, And Prompt Action To
        Respond To A Rampant Inmate Sexual Harassment Problem...................... ……….15

B.  Incidents of Masturbation and Indecent Exposure are Severely Underreported, Making
    the Problem Far Worse than the Number of Reported Incidents Indicate……………....16

C.  Inmates Frequently Engage in Sexual Offenses Other than Masturbation and Indecent
    Exposure, Which Are Rarely Reported……………………………………………………17

D.  An Unreasonably Large Number of Incident Reports of Masturbation and Indecent
    Exposure Do Not Result in Guilty Determinations at Least Partly Because of Practices in
    Violation of the Jail's Stated Policies, the Standards of the American Correctional
    Association, and Practices of Other
    Institutions……………………………………………………………………………17

    1.  Staff Are Not Adequately Trained in Writing Reports or In Dealing with Sexual
        Harassment........................................................................................................... 17

    2.  The Disciplinary Hearing Process is Seriously Flawed ........................................... 18

    3.  The CCSO Fails to Involve Staff in Devising Appropriate Sanctions for Inmates ..... 21

    4.  The Jail Fails to Impose Effective Sanctions on Inmates Who Commit Multiple Acts
        of Masturbation or Indecent Exposure.................................................................... 21

     5.   CCSO Fails to Enforce the Sanctions that Are Imposed ........................................... 23

     6.   Defendants Have Not Placed Experienced Professionals at the Helm of the Disciplinary System ................................................................................................. 23

  E.  CCSO Does Not Adequately Inform Inmates of Expectations…………………………23

  F.  Detainees Are Not Properly Dressed………………………………………………………25

  G.  Facility Design Flaws and the Lack of an Adequate Alarm System Put Women Employees Unnecessarily At Risk……………………………………………………26

     1.   Cook County Jail's Facility Design Flaws Violate PREA And Contribute To The Sexual Harassment Problem ........................................................................... 26

     2.   Ms. Frasier Does Not Explain How It Is Acceptable For A Jail Not To Have An Adequate Alarm System For Staff ..................................................................... 27

CONCLUSION…………………………………………………………………………29

**Introduction**

I have reviewed the expert reports of Margo L. Frasier and Benjamin S. Wilner, Ph.D. I am providing this supplemental report to refute comments made by both experts in response to my own expert report.

To summarize my conclusions, neither expert acknowledges or appears to understand the impact that sexual harassment has on women working at the Cook County Jail (the "jail")[1] and the detrimental impact of allowing this behavior to go largely unchecked. Well-run jails and prisons do not create or permit an institutional culture that blames women staff for inmate sexual misconduct and expects them to ignore criminal misconduct directed at them at work.

CCSO's expert Margo L. Frasier has not offered evidence in support of her opinions. It is my expert opinion that while the Cook County Sheriff's Office ("CCSO") has taken some small steps as a result of the injunction in the lawsuit, and these small steps have reduced the incidents of sexual misconduct, there is much more work to be done. CCSO did not act in a timely manner to address the incidents of sexual misconduct and did very little to address the incidents of sexual harassment of staff by inmates until the court issued an injunction. As outlined in my original report, more jail-wide measures can be adopted to protect women staff from aggressive sexual misconduct and harassment and greatly reduce the incidents of sexual misconduct and sexual harassment that they experience. Ms. Frasier has offered no persuasive reasons to the contrary.

In his report, CCSO's expert Dr. Benjamin Wilner tries to compare the frequency of acts of sexual misconduct directed at women staff to the frequency of other inmate misconduct at the jail. Most of the events that he includes are not comparable. He counts only reported incidents of sexual misconduct and fails to account for the serious underreporting of sexual misconduct incidents. Finally, he accuses me of having "cherry picked" data when discussing the California prison COMPSTAT reports I use in my opening report. I am not a statistician, but his own data combined with information about the population of the six California prisons on which I focused show that those prisons were representative of the entire system. They were not "cherry picked." Moreover, his data shows that inmates at CCSO were found guilty of sexual misconduct at rates per inmate population four or more times greater than the rates at comparable prisons in California.

**A.      The Cook County Jail Has an Excessively Large Number of Reported Incidents of Masturbation and Indecent Exposure**

Dr. Wilner and Ms. Frasier attempt to minimize the sexual harassment problem at Cook County Jail by suggesting that other misconduct was more common or deserved greater attention. However, their reports do not refute the evidence or my opinions that indecent exposure and masturbation were far worse at Cook County Jail than at well-run correctional institutions.

---

[1] When I refer to the jail, I am generally including the George N. Leighton Criminal Courthouse. When I am referring specifically to the courthouse, I say "the courthouse."

1.     **The Six California Prisons that I Selected to Study Provide Appropriate Comparators for the Cook County Jail, As Confirmed by Dr. Wilner's Own Data**

Dr. Wilner accuses me of having "cherry picked" data when discussing the California prison COMPSTAT reports I use in my opening report. I am not a statistician, but his own data combined with information about the population of the six California prisons on which I focused show that those prisons were representative of the entire system. They were not "cherry picked."

Dr. Wilner divides California prisons into two types: General Population and High Security. This is an oversimplification. As discussed below, the California Department of Corrections and Rehabilitation (CDCR) groups inmates into four security levels with Level I being the lowest level and Level IV the highest, and there are gradations among those classifications. Nonetheless, Dr. Wilner's groupings are useful in showing the representativeness of the six prisons I selected.

Start with the ten prisons that he classifies as General Population. I list them below along with his calculations of the rate of sexual incidents with guilty findings per population. The three I selected are in bold italics:

|  |  |
|---|---|
| Solano | 1.07% |
| Mule Creek | 0.79% |
| ***Centinella*** | ***0.59%*** |
| ***Calipatria*** | ***0.51%*** |
| Valley | 0.50% |
| Ironwood | 0.28% |
| California Training Facility | 0.25% |
| Chuckwalla | 0.22% |
| Pleasant Valley | 0.21% |
| ***Avenal*** | ***0.15%*** |

The three prisons that I selected that he groups with the General Population prisons had the third and fourth highest and the lowest rates. Their average place in the order was 5.67 ((3+4+10)/3). The average place of all ten prisons was 5.5 ((1+2+3+4+5+6+7+8+9+10)/10). There is barely a difference. The simple average rate of sexual incidents for Centinella, Calipatria, and Avenal was 0.42%, while the simple average for all ten prisons was 0.46%.

By both these measures, the three prisons I selected are almost exactly statistically representative of the General Population prisons in California. This is remarkable because I did not review the COMPSTAT reports for every California prison prior to making my selection of prisons to utilize. My approach instead was to choose a prison at every level of security. The CDCR does not operate a prison specifically for Level I inmates, who are housed at every prison in California in minimum support facilities or who live and work in fire camps throughout the State of California. For this reason, I selected one Level II medium custody prison (Avenal), a Level III/IV general population programming prison with a history of inmate discipline problems (Centinella), and one Level IV prison that houses few inmates with mental health issues

(Calipatria). My sense that these three prisons overall would approximate the rate of sexual incidents for General Population prisons as a whole is borne out by the statistics.

Dr. Wilner's calculations of the rate of sexual incidents with guilty findings per population for the ten prisons he classifies as High Security are listed below, with the three I selected again in bold italics:

| | |
|---|---|
| Sacramento | 10.97% |
| Salinas Valley | 5.85% |
| *Corcoran* | *3.62%* |
| Los Angeles County | 3.37% |
| Kern Valley | 1.28% |
| *High Desert* | *1.24%* |
| *Pelican Bay* | *1.02%* |
| Substance Abuse Treatment | 0.84% |
| California Correctional | 0.71% |
| California City Correctional | 0.04% |

The three High Security prisons I selected had the third, sixth, and seventh highest rates. Their average place in the order was 5.33 ((3+6+7)/3). The average place of all ten prisons again was 5.5 ((1+2+3+4+5+6+7+8+9+10)/10). Again, the difference was minimal, but Corcoran, High Desert, and Pelican Bay had a slightly lower position (representing a lower incidence rate), on average, than did the entire group of ten prisons.

Thus, Dr. Wilner's argument on cherry-picking comes down solely to average rates for the High Security prisons. Corcoran, High Desert, and Pelican Bay on average had a rate of 1.96%. The ten High Security prisons collectively had a rate of sexual incidents with guilty findings of 2.89%. But the difference is primarily a product of a single prison, Sacramento, which has a rate nearly double the rate of any other prison and triple the rate of the third highest prison. Without Sacramento, the average would be 2.00%, almost exactly the same as the three prisons I selected. Even if to balance the elimination of Sacramento the prison with the lowest rate, California City Correctional, also was eliminated, the average rate would be 2.24%. Again, I am not a statistician, but I would have thought that having a single prison have such an impact on his average numbers would have caused Dr. Wilner to perform additional investigations.

Sacramento prison is a primary treatment center for inmates who have serious mental health conditions, some of which contribute to them engaging in sexual misconduct in a prison. These prisoners are shipped to Sacramento from other prisons throughout the State. The prison has approximately 500 inmates designated at the Enhanced Outpatient Level of care (EOP) in its general population. These inmates are severely mentally ill and require 10 hours of mental health treatment per week. The prison further houses approximately 200 inmates in its Psychiatric Services Unit. These are inmates with severe mental illness who are serving a SHU term for committing a misdemeanor or a felony within the prison. These inmates must also be provided a minimum of 10 hours of psychiatric treatment per week. Finally, Sacramento is also designated to house Level IV inmates requiring a Mental Health Crisis Bed. These beds are for inmates who are gravely disabled or a danger to themselves or others. By contrast, Cook County Jail is not sent inmates with mental health issues, including issues that have contributed to prior sexual misconduct, from all over the State of Illinois. In my opinion, it would be inappropriate

to include California State Prison, Sacramento, among the prisons to be compared to the Cook County Jail.

Indeed, a similar argument could be made about the facility with the second highest rate of sexual misconduct, Salinas Valley State Prison. Salinas Valley operates a licensed Psychiatric Inpatient program previously operated by the Department of State Hospitals. This program is designated to provide more intensive treatment for patients who cannot function adequately or stabilize in an outpatient program. In addition, Salinas Valley houses approximately 350 inmates in the mental health program at the EOP level of care and approximately 1,100 inmates in the mental health program at the Correctional Clinical Case Management System, (CCCMS) level of care. Inmates in the CCCMS level of care are inmates in the mental health program who exhibit symptom control or are in partial remission as a result of treatment. These inmates are monitored on a routine basis by mental health staff. Salinas Valley State Prison also operates a Crisis Bed Unit for inmates in psychiatric crisis.

The mission of these two prisons includes housing some of the most severely mentally ill inmates in the CDCR. The mentally ill inmates sent to these two facilities include inmates serving SHU terms for committing violent offenses against staff including sexual misconduct against staff. For these reasons, the two prisons are poor comparators for the Cook County Jail.

If Sacramento, Salinas, and California City Correctional are eliminated, the average rate of sexual misconduct with guilty findings for the seven remaining High Security prisons is 1.73%, below the 1.96% rate of the three prisons that I studied.

Again, however, I did not select the three High Security prisons after reviewing the COMPSTAT reports for every California prison. I selected Pelican Bay State Prison because it is California's most secure Level IV Maximum Security Prison and it is the facility that was sued because of incidents of sexual harassment and sexual misconduct of staff by inmates (*Freitag v. Ayers*). I also selected Pelican Bay because 50% of the inmates at this facility are housed in the SHU for committing a misdemeanor or a felony within a prison in California. The remaining 50% are Maximum Security inmates housed in the general population. It is fair to say that Pelican Bay houses the most violent inmates in the CDCR to include approximately 200 inmates in the mental health program at the CCCMS level of care.

I selected High Desert State Prison as it is a Level IV prison that has had problems in the past and houses inmates with lengthy disciplinary histories for incidents involving violence. Many of the inmates housed at High Desert have completed multiple SHU terms for committing misdemeanors or felonies within California Prisons. High Desert houses approximately 1,400 inmates in the mental health program at the CCCMS level of care.

Finally, I selected Corcoran State Prison as stated in my original report because it is one of two prisons that house inmates who have been found guilty of indecent exposure or sexual misconduct and have a mental illness that was found to have contributed to sexual misconduct. I also selected Corcoran because in 2017 this prison was selected to conduct a pilot program providing treatment to inmates that had been found guilty of indecent exposure or sexual misconduct with or without mental illness as a contributing factor. Corcoran houses inmates in

the mental health program to include approximately 400 EOP inmates and 1,300 CCCMS inmates. I did not look at the data for the remaining prisons in California.

As can be seen, I selected what I thought was a good cross section of prisons and was careful to include several prisons that have a mission of treating inmates who engage in sexual misconduct toward staff or a history of high rates of sexual misconduct toward staff as in the case of Pelican Bay. I did not, as alleged by Dr. Wilner without any basis, pick prisons with low sexual violation rates in order to make Cook County Jail look worse by comparison.

2. **The Rates of Sexual Incidents with Guilty Findings at Cook County Jail Dwarf the Rates at the California Prisons**

Dr. Wilner's argument that the Cook County indecent exposure rate is "within the reasonable range for indecent exposure-related incidents" is flawed (Wilner Report 9). He measures the reasonable range by the rates of guilty verdicts in the 20 California prisons and compares them to the rates of guilty verdicts in each Cook County Jail division.

His methodology is flawed for several reasons. First, as discussed above, he includes Sacramento in his calculations, which definitely should be excluded, and Salinas Valley, which possibly should be.

Second, he uses a single rate for all the California prisons even though a majority of the Cook County inmates are not High Security inmates. Having calculated separate rates for High Security and General Population inmates, he should have applied those rates to the divisions in Cook County Jail containing comparable inmates. I'm not a statistician, but that is a simple method to control for differences in the mix of inmates.

Third, Dr. Wilner made the comparisons based on guilty rates for sexual incidents. But as discussed in my original report, and as confirmed by his Findings 7 and 8 (Wilner Report 14-17), guilty rates at Cook County Jail were lower than in California prisons because of low adjudication rates and low guilty determination rates. That does not mean that sexual incidents did not occur, just that the Cook County Jail disciplinary system was not functioning properly. Cook County's low adjudication and guilty finding rates make it look better in comparison than would a comparison of incident reports.

Fourth, as discussed in my original report, it is almost certain that the number of sexual incidents in the Cook County Jail is substantially underreported for multiple reasons, including the inability of non-uniformed staff to write incident reports. In California, medical staff and social workers can write incident reports when they witness incidents or the incidents are directed at them. As a result of that underreporting at Cook County Jail as well as the point above, the ratio of sexual incidents to guilty findings is far lower in Cook County Jail than in California prisons.

Finally, Dr. Wilner does not include any incidents that occurred in Division 1 in his analysis. His methodology also excludes incidents that occurred outside housing divisions, including in the courthouse (Wilner Report 11), or in what he calls "indeterminate" (Wilner Report 13-14). There is no reason to think that the California prison numbers exclude any incidents with guilty findings.

But despite these five methodological flaws, Dr. Wilner's numbers reflect that there are much higher rates of guilty findings for sexual incidents per inmate at Cook County Jail than in the California prisons. He masks this difference by comparing the rates of sexual incidents at Cook County Jail, which contains a mix of maximum, medium, and minimum security inmates, with the rates at High Security California prisons.

I understand that Dr. Kathleen Lundquist is responding to Dr. Wilner's analyses of the Cook County data and that some of the numbers may change, but his numbers reflect that the annual rate of sexual incidents in Cook County Divisions 8, 9, and 10 is 12.11% while the annual rate in the remainder of the Jail is 1.92%. He apparently considers Division 8, 9, and 10 to be roughly equivalent to California's High Security institutions and the remainder of the Jail roughly equivalent to California's General Population institutions, stating:

> Division 8 includes the Cermak Health Services and the Residential Treatment Unit, which provides treatment for substance abuse, mental illness and general health screenings and evaluations for inmates at the jail. Divisions 9 and 10 house maximum security inmates. In addition, Division 9 houses inmates that committed disciplinary infractions while in custody. The jail Divisions other than 8, 9 and 10 house 1) female inmates or 2) male inmates with a minimum or medium security classification.

(Wilner Report 13) (footnotes omitted). Thus, the sexual incident rates at Divisions 8, 9, and 10 should be compared to the rates in California's High Security prisons while the rates in the other divisions should be compared to California's General Population prisons.

As discussed above, the average rate at the California High Security Prisons, using the rates at each prison that he calculates, is 2.89%, but eliminating Sacramento and California City Correctional lowers the rate to 2.24%. Also eliminating Salinas Valley would cut the rate further to 1.72%. Thus, using his own numbers, the rate of sexual incidents at Cook County Jail Divisions 8, 9, and 10 is 4.14, 5.41, or 7.04 times greater than the rate of similar incidents in California High Security prisons.

The average rate of sexual incidents in the ten California General Population prisons is .46%. This means that the rate of sexual incidents at Cook County Jail outside Divisions 8, 9, and 10 – again, using Dr. Wilner's own numbers – is 4.17 times greater than in California's General Population prisons.

### 3. Dr. Wilner Inappropriately Discounts Comparisons of Cook County Jail to California Prisons Through PREA Data

Dr. Wilner also attempts to utilize data from Prison Rape Elimination Act (PREA) reports (8, 17, 18) to prove that California has a low rate of PREA incidents compared to other states with large prison populations, including Illinois, and therefore that it, and especially the six prisons that I selected, are not fair comparators for the Cook County Jail. I have three responses. First, PREA does not track the rate of inappropriate sexual behavior by inmates toward staff. The focus of PREA is sexual misconduct against inmates by other inmates, staff, contractors, volunteers or

other individuals who come in contact with inmates. Second, it is unclear why he believes that only states with large prison populations could be proper comparators, but if he thinks that it is more difficult for states with large prison populations to have low rates of PREA-specific sexual misconduct, California's and Texas' PREA numbers refute that assumption. They both have larger prison populations than Illinois. Third, the fact that California's PREA-specific numbers are low compared to Cook County's or Illinois' violation rates suggest that some or all of California's policies to address sexual harassment of female staff are successful, and throughout my initial report I recommend that some of those very policies be adopted at Cook County.

4. **Ms. Frasier's Attempt To Excuse Rampant Indecent Exposure And Masturbation At Cook County Jail Is Based On Faulty Assumptions About How Prisons Operate**

Ms. Frasier begins her report (Frasier 4) with general and inaccurate assumptions about prison systems, with a tendency to excuse Cook County Jail's rampant sexual harassment problem due to what she suggests are unusual difficulties. In the first paragraph under "Background of CCDOC," Ms. Frasier asserts, "Unlike prison systems that know when inmates will arrive, how many inmates will be received, and the background of the inmates, CCDOC receives inmates unannounced, does not know how many will be received at a given time or on a given day, and usually knows nothing about the inmates that are being received." This assertion is based on faulty assumptions about prison systems.

In fact, in various assignments at San Quentin, I was responsible for managing the San Quentin Reception Center. Reception Center processing was one of three missions of the prison. The Reception Center housed approximately 3,200 inmates and during my tenure received inmates from 12 counties. Eventually the number of counties delivering newly sentenced inmates and parole violators was reduced to eight. Like Cook County Jail, we did not have the luxury of having an exact count of the number of inmates that would arrive on any given day. Instead, like all jails and prisons I am familiar with, we tracked intake and utilized averages to project the number of inmates that we thought would arrive on a given day. Monday and Fridays were always our big intake day. We adjusted staffing schedules and planned for overtime if necessary to accomplish the task of receiving inmates and completing the security task associated with assessing inmates and housing them appropriately. Our average intake was approximately 200 inmates a day during the years when we received inmates from 12 counties. Similarly, Ms. Frasier indicated that CCDOC receives approximately 100,000 inmates a year which equates to approximately 274 inmates a day.

At one point in my career I had managerial responsibility of a large parole violator unit that the California Department of Corrections and Rehabilitation (CDCR) contracted for with the Alameda County Jail. I spent one day a week at the Alameda County Jail over a period of months. The Alameda County Jail like most jail systems I am familiar with, utilized a computer system that maintained historical information on inmates. This is done as many inmates arriving in the County Jail are repeat offenders. Reception Centers in the CDCR operate like a county jail. In addition, CDCR Reception Centers receive new commitments that often arrive with very little information other than their Abstract of Judgment as proof that they were sentenced to State Prison and county jail behavior records.

Like county jails, prisons are complicated.  San Quentin is an example of how complicated prisons can be.  In addition to operating a large Reception Center I was responsible for two other missions, the housing of approximately 600 death row inmates and the housing of over 2,000 Level I and Level II inmates. Over 40% of the level II general population inmates were life crime inmates serving sentences of 25 to life and 15 to life.  Among this population many inmates were sentenced under California's Three Strikes Law.  The prison operated a large Administrative Segregation ("Ad. Seg.") unit with a budget capacity of 250 beds.   Administrative Segregation would often overflow due to the behavior of inmates in the reception center and grow to 350 beds.   I know firsthand the need to manage beds and budgets.

San Quentin, like all prisons I am familiar with, have massive inmate movement from early in the morning until late in the evening to include feeding two hot meals a day in the dining hall, work/education and program movement, sending work crews into the community, operating a large health care facility, escorting death row inmates, reception center inmates and administrative segregation inmates to dental, medical and mental health appointments as well as classification and disciplinary  hearings. Many of the inmates housed at San Quentin were taken to outside medical appointments to see specialists, to accommodate surgery and for dialysis. San Quentin, like other jails and prisons, manages the movement of general population inmates to all the above listed services and activities.  Prisons must also respond to assaults on staff, assaults on inmates, weapons possession, drug possession, gang activity, use of force, and other inmate misconduct.

San Quentin, like all California Prisons, was subject to court consent decrees or settlement agreements covering just about every aspect of operating a prison to include medical care, mental health care, dental care, use of force, developmental disabilities, American Disability Act and the Thompson Consent Decree.  The Coleman lawsuit resulted in a settlement agreement detailing the mental health treatment for all inmates with a mental illness and included very specific remedies for inmates in Administrative Segregation and Security Housing Units.

While there are certainly differences between county jails and prisons, the housing and confinement of inmates on a day-to-day basis is very similar.  It is true that prisons have a greater ability to transfer inmates, but given the overcrowding issues faced by the CDCR during my time with the Department it was not uncommon for transfers to take months to occur particularly for higher level problem inmates.  Even today, transfer of inmates between institutions is a lengthy process. I must also point out that during most of my tenure at San Quentin, Death Row inmates could only be transferred for medical/psychiatric treatment or for out to court appearances.  Policies and procedures are designed to maintain the safety of staff, inmates and the public with an expectation that inmates will be managed where they are housed.  This is the responsibility of every Correctional Administrator.

In summary, the distinctions that Ms. Frasier tries to paint between challenges at Cook County Jail and prisons are not real. While her report seems to imply that the CCSO is doing all it can and there is nothing left to be done, the facts do not support this. There is no reason to believe that Cook County Jail has unusual challenges not faced by many other jails and prisons. There is also no reason to believe that the practices and solutions implemented in California prisons and

in other corrections systems to address inmate sexual misconduct would not solve the problem of rampant sexual misconduct and sexual harassment at Cook County Jail.

> **5.** **Ms. Frasier's Opinions About Ignoring Inmate Sexual Harassment And Sexual Misconduct As An Adequate Or Preferred Means Of Responding To Such Misconduct Demonstrates A Lack Of Understanding Of The Causes And Impact Of Inmate Sexual Harassment And Sexual Misconduct In A Correctional Facility.**

Ms. Frasier report asserts (Frasier 5): "inmates often take their cues from staff reaction to misconduct and behave in the complete opposite way that employees in other workplaces would respond. When the goal of misconduct is to disrupt operations, and offend and upset staff, staff reaction that indicates the behavior is disturbing will often encourage the behavior as opposed to curtail it." This statement and many other similar assertions in her report seem to imply that staff would be better off ignoring the behavior of inmates. However, that is no different than suggesting that women in any other work environment would be better of feigning indifference to sexually offensive conduct directed at them because reacting in a way that lets the offending men know that the behavior is "disturbing" will only encourage it. Her statements suggest that she believes a culture of sexually harassing behavior by inmates directed at staff is inevitable and should be permitted. Her repeated opinions on this issue are not supported by evidence, are not commonly shared by correctional professionals, and are not consistent with sound correctional practices. Well-run correctional institutions do not permit a culture where inmate sexual harassment of women staff is tolerated and women are expected to feign indifference to it or accept it as part of their jobs. The response prepared by Louise F. Fitzgerald, Ph.D. to Ms. Frasier's expert report, (Frasier 2) speaks directly to Ms. Frasier's implied philosophy of, ignore them and they will stop. Ms. Fitzgerald's report states, "Unfortunately, the opposite reaction (as reflected in the advice "Just ignore him and he'll go away" is also ineffective; such advice reflects assumption that individual victims can control harasser behavior by their response. In actuality, this is almost never the case when it comes to sexual hospitality; it is institutional, not individual, reactions that are able to encourage or curtain sexual harassment."

It is also unreasonable to expect any person who has been assaulted to ignore it. Ms. Frasier does not explain why women working in the jail must tolerate indecent exposure, masturbation, and other sexually harassing conduct and act like it does not disturb them when she does not similarly suggest that other misconduct, such as inmates throwing feces or urine, does not have to be ignored. Throwing feces or urine at a correctional officer or masturbating and exposing themselves to officers equally undermines officers' command presence, and must be dealt with. The answer is to hold inmates accountable for their behavior.

Correctional departments must establish and enforce policies for inmate behavior. Inmates must be made aware of the behavioral expectations and held accountable for following the rules.

Ms. Frasier also provides a litany of reasons she believes inmates involve themselves in this behavior to include staff's overreaction to the behavior, inmates with nothing to lose, inmates with mental illness, and inmates' overall noncompliance with rules particularly when they know there is a rule. (Frasier 9,11,20). Missing from her list is the primary reason male inmates

sexually harass women staff: to degrade women and exert control.  In my opinion, Louise F. Fitzgerald, Ph.D. is correct when she explains in her expert report the behavior of inmates at Cook County Jail:

> Examination of incident reports, plaintiff's statements and depositions reveal that sexual harassment at [Cook County Jail] overwhelmingly takes the form of an exceptionally vicious form of sexual hostility.  Acts of aggressive masturbation predominate, along with (and often accompanied by) threats of sexual violence.  Consistent with the research cited above, such behavior has little to do with sexual desire[FN] or an attempt to coerce women into sexual acts: the nature of the relationship between [Cook County Jail] detainees and female employees does not lend itself to these forms of harassment.  Rather, the plaintiffs allege, and incident reports document, a workplace permeated by highly degrading acts that essentially constitute a "once-removed" form of sexual assault, often accompanied by graphic and violent threats of the "real thing."
>
> > [FN] This is not to say that perpetrators are uninterested in sexual gratification but rather that these specific actions reflect not sexual desire but contempt, and the need for power and control.

Ms. Frasier's explanation boils down to this is the way inmates behave and there isn't much more that can be done to address this behavior. Ms. Frasier's explanation reminds me of the CDCR's response when the women staff's sexual harassment case, as mentioned in Ms. Frasier' report, was first filed in Pelican Bay.  The courts did not accept the response from the CDCR and it was forced to develop comprehensive policies and procedures to address the sexual misconduct by inmates towards staff.  The policies that it was forced to develop reduced the level of inmate sexual harassment.  The policies did not limit employment opportunities for women. The policies were developed to ensure women could work in an environment where the incidents of sexual misconduct by inmates toward staff would be addressed and female employees would be supported.  There is no expectation in the CDCR that female staff should consider the possibility that inmates might expose themselves or engage in sexual harassment toward staff when bidding for a work assignment.  Female staff in the CDCR like their male counterparts bid for assignments for a variety of personal reasons.

Along the same lines, Ms. Frasier states (Frasier 6) "that many of the inmates do not care that sexual misconduct is against the rules. In fact, some do it precisely because it is against the rules. Consequently, in my experience, educating inmates that sexual misconduct is prohibited is likely to be effective among only a small portion of the inmate population and likely to be counter-productive with other inmates.  For some of the inmates, the more the prohibition against sexual misconduct is emphasized, the more they are motivated to participate in the conduct and in a bold a manner as possible." I find these comments baffling. Inmates cannot conform their behavior to expectations if the expectations are not clearly explained and reiterated.  Does she believe that a correctional institution should not inform inmates at all about the rules of the institution?

I will utilize the Prison Rape Elimination Act, PREA as an example.  PREA has 43 standards that prisons and jails must comply with.  Implementing just one of the 43 standards would likely

not eliminate prison rape. Implementing all 43 standards is necessary to achieve a reduction in prison rape.

Inmates need to understand what sexual misconduct is, how to report it and that it will not be tolerated. This is the reason for specific and detailed PREA standards for inmate education. PREA Standards 115.33 Inmate Training requires prisons to provide information about the agency's zero tolerance policy regarding sexual abuse and sexual harassment during the intake process, to provide additional comprehensive education to inmates either in person or through video regarding their rights to be free from sexual abuse and sexual harassment and regarding agency policies and procedures for responding to such incidents within 30 days of intake, to provide this inmate education in formats accessible to all inmates, including those who are limited English proficient, deaf, visually impaired, or otherwise disabled, as well as to inmates who have limited reading skills, and to ensure that key information is continuously and readily available or visible to inmates through posters, inmate handbooks, or other written formats. Clearly, the administrators of PREA do not regard inmate education about sexual misconduct to be unhelpful or even counterproductive.

Following Ms. Frasier's philosophy, we would not provide training to inmates on PREA as it might increase prison rape. However, correctional practitioners know that the majority of inmates will comply with expectations when expectations are clear and inmates are held accountable for their behavior. To be clear, simply providing training to inmates will not stop sexual misconduct by inmates towards staff. However, training of inmates is one component of a comprehensive plan to reduce inmate sexual harassment directed against staff.

Another example is found in the Performance-Based Standards for Adult Local Detention Facilities Fourth Edition, which recognizes the importance of providing training to inmates. Standard 4-ALDF-2a-29 (Ref. New) states:

> Information is provided to inmates about sexual abuse/assault including.
> . prevention/intervention
> . self-protection
> . reporting sexual abuse/assault
> . treatment and counseling
>
> The information is communicated orally and in writing, in a language clearly understood by the inmate, upon arrival at the facility.

No one could reasonably suggest that this information should not be provided to inmates because it might encourage them to engage in sexual abuse/assault.

Finally, Ms. Frasier also intimates that the prevalence of mental illness among inmates is an excuse for the rampant sexual harassment at Cook County Jail. A substantial portion of the inmates in every correctional institution of which I am aware has a mental illness. Cook County Jail is not unique. Having a mental illness, in most cases, does not excuse an inmate from following the rules. California Prisons, like most prisons, have a very specific process for evaluating inmates in the mental health program to determine, based on written guidelines, if

their mental illness contributed to their misbehavior accompanied by very specific treatment plans to address the mental illness. In contrast, Ms. Frasier has not identified polices of either CCSO or the Cook Health and Hospital System (CCHHS) that detail the process or the criteria utilized to determine if an inmate's mental illness contributed to the misbehavior of inmates who engage in sexual harassment, indecent exposure or masturbation at Cook County Jail. I understand that CCHHS mental health staff are supposed to fill out a form when sanctions are imposed on inmates classified as "P-3" and that there may be other documents showing how often sanctions were reduced because of mental illness. However, Ms. Frasier does not appear to have done any review of this information to support her opinions, or speculations, about the prevalence of mental illness among inmates who engaged in sexual misconduct. Once again, she appears to excuse CCSO for normalizing and tolerating inmate sexual harassment of female staff with no basis to distinguish Cook County Jail from other jails and prisons, which also have inmates with mental illness yet still take effective action to address inmate sexual harassment.

6. **The Existence Of A Group Called Savage Life Does Not Explain The Rampant Sexual Harassment Problem At CCDOC And Did Not Prevent Jail Administrators From Taking Reasonable And Adequate Steps To Curtail The Problem**.

Throughout her report, Ms. Frasier refers to the gang Savage Life as being responsible for the increase of sexual misconduct by inmates toward staff. The CCDOC did not provide evidence in support of this claim other than general descriptions of Savage Life and its objectives. In fact, the evidence I have seen suggests that members of this group were not responsible for the majority of incidents of sexual misconduct directed at staff and that only half of the inmates identified by CCSO as Savage Life members had any reported incidents of sexual misconduct.

After I submitted my original report, CCSO produced more information about Savage Life, including a document showing its members, which, as of May 15, 2016, included 47 inmates. (CCSO_Howard_329273-329286.) Using this document and the summary of sexual misconduct incidents that Dr. Wilner relied on, a legal assistant at Mehri & Skalet generated a summary of incidents of sexual misconduct by Savage Life members. His analysis identified one Savage Life member with 31 reported incidents of sexual misconduct; 2 with 7 incidents apiece; 5 with 6 incidents apiece; 4 with 4 incidents apiece; 2 with 2 incidents apiece; 6 with 1 incident; and 24 with no incidents. Further, Savage Life members were responsible for a total of 105 incidents of sexual misconduct from January 2015 to October 2018, less than 5% of the 2,200 incidents counted by Dr. Wilner. It should also be noted that, per CCSO, Savage Life did not even exist prior to August 2015 (CCSO Howard 330095) and thus cannot possibly explain the significant number of incidents that occurred at the jail in 2014 and in the first seven months of 2015. Ms. Frasier also fails to explain how a group with members in a small number of tiers in two housing divisions (plus two members on separate tiers in another building) could be responsible for more than two thousand documented incidents of sexual misconduct all over the jail. To the extent that Savage Life is relevant at all, it is as an example of CCSO's failure to manage one or a small number of individuals. This mis-management is reflected, for example, in CCSO housing eight members of the group together on a single tier in Division 10, including four inmates with public indecency charges. (CCSO_Howard_0329284.)

What is disturbing about the incidents involving inmates considered to be members of Savage Life is the lack of appropriate response by CCSO to the over 30 incidents of sexual misconduct by one identified member. The report on this inmate's 8th incident states that he was known as a masturbator. The documents provided to me suggest he did not have a P-3 mental health status; when he was found guilty and sanctions were imposed, the sanctions were upheld with no mitigating factors noted. This inmate frequently committed his offenses through the 'chuck hole' in his cell. He received no sanctions for 11 of the incidents: seven incidents did not have disposition sheets, one incident was documented as an expired ticket, one was identified as an invalid ticket, and two incidents resulted in a not guilty finding. On the remaining incidents, the sanctions were not progressive or effective. The sanctions ranged from 10 days in the 'Special Management Unit (SMU) to 25 days. As an example, on 3/25/17 he received a sanction of 14 days in SMU followed by sanctions of 25 days in SMU on 5/2/17 and 5/28/17 and 10 days in SMU on 7/19/17 and 14 days on 7/25/17 and 15 days on 8/17/17. He was found not guilty of an incident on 2/19/17 and there is no disposition sheet for an incident dated 8/28/17.

The frequency of the incidents of sexual misconduct should have driven a special review of this inmate to develop a plan of action to manage this case. The purpose of a special review is to bring all the experts in the room to determine if the inmate has been classified appropriately. The review should include mental health staff to ascertain if the inmate has been appropriately evaluated by mental health staff. If there are no medical/mental health issues to be addressed custody staff must develop a security plan to identify the appropriate housing and restrictions that should be placed on this inmate. At a minimum, the inmate should have been confined in a cell with a locking 'chuck hole' and placed in an appropriate exposure control jump suit. Other security measures that should have been considered include: limiting showers to a time and place where he could not expose himself to medical staff and other civilian staff entering or approaching the unit, and special escorting (including wrists handcuffed behind his back) and monitoring of the inmate during medical and psychiatric appointments. Other sanctions could have included loss of visiting privileges and structuring law library access to provide for more custody supervision.

As Warden of San Quentin I was responsible for housing all male inmates sentenced to death row. During most of my tenure, there were only two reasons I could transfer a death row inmate; for medical treatment and to go out to court. San Quentin housed some very difficult death row inmates. Managing many of these cases required frequent discussions with staff and special security precautions including placing special restraints on particularly violent inmates and requiring additional staff for escort when removing the inmate from his cell or taking the inmate to medical and psychiatric appointments. The point is difficult inmates must be case managed and often require more specific safety and security protocols than the average inmate.

The identified incidents that involved identified Savage Life inmates contain no documentation to support the assertion by CCSO that these inmates were acting out of loyalty to a gang rather than as individuals engaging in unlawful behavior. What is clear is that CCSO did not have a plan of action to address the behavior of the inmates who engaged in repeated acts of sexual misconduct.

In my opinion, there is no reason to believe that the rampant sexual misconduct and harassment problem at Cook County Jail was primarily associated with Savage Life. Once again, this appears to be an excuse offered for CCSO's failure to adequately address its rampant sexual harassment and sexual misconduct problem.

Similar to other opinions blaming female staff for inmate sexual harassment, Ms. Frasier also opines in her report (Frasier 9) about the goals of Savage Life and seems to imply that the female staff fell into their trap by overreacting and allowing the inmates to create mistrust and friction among staff. No documentation provided to me supports the statements made by Ms. Frasier. Indeed, Ms. Frasier's speculation seems to be based on what Dr. Louise Fitzgerald explains is a "false assumption," i.e. that victims of sexual harassment "can control harasser behavior by their response." (Fitzgerald Rebuttal 2.) I agree with Dr. Fitzgerald that this is not the case and that it is the correctional institution, not staff reactions, that either encourage or control sexual harassment by inmates. As to Savage Life, if a jail gang forms to foment chaos and engage in criminal activity, including aggressive sexual misconduct directed at women, it is the responsibility of jail administrators to control it. CCSO jail administrators did not. Well-run correctional institutions do not blame women for "overreacting" to sexually aggressive, criminal behavior by a jail gang.

### 7. **Well-Run Jails And Prisons Can Control The Behavior Of Inmates Charged With Serious Crimes**

Ms. Frasier lays out an argument on page 20 of her report that inmates charged with Class X felonies (6-30 years in prison) and for intentional murder (life imprisonment or 100 years) housed in Divisions 9 and 10 are primarily responsible for the majority of misconduct. She argues that because they are facing long prison sentences they are not deterred by otherwise effective disciplinary measures such as criminal public indecency charges. She should not rely on unproven assumptions. If careful studies identify similarities among offenders, then programs should be designed with appropriate staffing to manage the population.

During my career, I managed the San Quentin Reception Center Records Office. I reviewed hundreds of records of newly sentenced inmates along with their county jail records. In addition, as a consultant I have worked on numerous resentencing cases and reviewed the county jail records and prison records of inmates receiving life sentences, life without the possibility of parole sentences, and the death sentence. Only a small percent of the inmates with lengthy prison sentences presented a problem in the county jail and an even smaller percent involved behavior directed toward a staff member. The assertion regarding the behavior of inmates facing long prison terms is inconsistent with the data. There are differences in inmates. The crime committed by the inmate does not determine how the inmate will behave in prison. The CDCR classification system that has been in place for over three decades has proven that it isn't the crime that is committed that will determine the behavior of the inmate in custody, it is other risk factors that will determine in-custody behavior. The primary risk factors are age, gang affiliation and past behavior while incarcerated. As a result, the CDCR has created the youthful offender program and housing for young offenders from the age of 18 to 22. It is also why probation departments around the country have youthful offender caseloads for the individuals on probation in the same age group.

8. **The Fact That CCSO Also Had Other Issues To Address Does Not Excuse Management For Failing To Take Reasonable, Adequate, And Prompt Action To Respond To A Rampant Inmate Sexual Harassment Problem**

Ms. Frasier's report, (Frasier 7) under the heading "Sexual Misconduct at CCDOC and Leighton," states, "it is important to keep in mind that sexual misconduct is only one of many undesirable behaviors which the CCSO must address." She goes on to list other types of undesirable behavior and quotes from the report of Benjamin S. Wilner that these other incidents are "2-12 times more prevalent than reported indecent exposure–related incidents." She then asserts, "the problem of inmate sexual misconduct cannot be treated in a vacuum."

The logic of this thinking is hard to understand. All correctional institutions must deal with a variety of "undesirable behaviors" by inmates, yet all serious incidents of inmate misconduct, including sexual misconduct and other sexual harassment, must be adequately addressed.

Ms. Frasier's "2-12" times figure is based upon Dr. Wilner's report, which compares reported incidents of sexual misconduct with other code violations, such as having contraband and fighting with other inmates. That is a poor comparison. Sexual misconduct directed at women working at Cook County Jail cannot be equated to most other forms of inmate misconduct. Sexual misconduct directed at staff degrades women and disrupts their job duties. When directed at female officers, sexually aggressive behavior undermines command presence and jeopardizes the safety of inmates, visitors, and other staff in ways that most other rule violations do not. Inmates throwing of feces or urine at Jail employees may be comparable to sexual misconduct, but neither Ms. Frasier nor Dr. Wilner has made any effort to identify how often this occurred. This is not to say that correctional facilities can simply ignore other behavior. Issues such as contraband and fighting must be dealt with. But Dr. Wilner's analysis, which Ms. Frasier relies upon, is comparing apples to oranges and does not show that CCSO had more important problems to address. Ms. Frasier and Dr. Wilner also fail to recognize that sexual misconduct and sexual harassment are more than masturbation and indecent exposure, and they brush off the pervasive verbal and other sexually aggressive behavior directed at women throughout the jail. It is also very clear from staff declarations and depositions that the incidents of inmate sexual misconduct were underreported by staff for a variety of reasons, including that filing reports appeared to be a waste of time when CCSO management did not take adequate steps in response and instead permitted a culture of sexually aggressive conduct by inmates toward women to permeate the jail.

Ms. Frasier states, "It is not reasonable to suggest that all of the attention and other resources of the CCSO should have been devoted to addressing sexual misconduct to the exclusion of other inmate behavior, including those which may result in bodily harm to other inmates, staff or even the general public." To my knowledge, no one suggested this. But if CCSO must devote additional resources to curtailing sexual misconduct while also continuing to address other issues, then that is what reasonable correctional practices require. Well-run correctional institutions do not tolerate pervasive sexual harassment of female staff. In addition, the remedy sought by plaintiffs is not simply a female staff remedy—it is a remedy that improves the work environment for all staff, as training improves and inmates are made aware of a strong zero-

tolerance policy related to sexual harassment and held accountable in a meaningful way for their inappropriate and unlawful behavior.

**B. Incidents of Masturbation and Indecent Exposure are Severely Underreported, Making the Problem Far Worse than the Number of Reported Incidents Indicate**

Ms. Frasier brushes off the credible evidence of a severe underreporting problem by citing deposition testimony that was limited to questions about active discouragement, e.g. by supervisors telling women they could not file reports. Her opinion ignores all of the testimony by women staff, officers and civilians that they could not and did not document every incident of inmate sexual harassment. The reasons include: (1) the conduct was so pervasive that they would be writing reports all shift and could not do that and also carry out their job duties; (2) supervisors made a variety of statements to them that certain categories of sexually aggressive conduct could not be reported, for example, indecent exposure and masturbation in shower areas or cells, even when the conduct was intentional; (3) supervisors would not sign off on reports if the behavior was not captured on video; (4) filing reports did not result in any meaningful consequences to inmates; and (5) civilian staff including social workers, law librarians, and medical personnel had no access to CCOMS to file incident reports and were instead completely dependent on officers to draft and file incident reports on their behalf, leading to severe underreporting of incidents directed at non-officers.

It is not customary or reasonable for a correctional facility to have no system for civilian staff to directly report inmate misconduct. Ms. Frasier believes it is appropriate for non-sworn staff to rely on sworn staff to enter reports of misconduct in the system, (Frasier 8). She states the non-sworn staff should have limited access to information contained in the CCSO computer system. However, all jails and prisons I am familiar with have different levels of access for staff depending on their job title and need to know information. Computer programs can and do accommodate this type of access. In fact, CCSO already does this with social workers, who can access the jail management system (CCOMS) to view certain information about inmates but cannot view other information or write incident reports. (Patel Depo. at 103). All staff should be able to write their own reports to include incidents of inmate misbehavior. Relying on sworn staff to interview the non-sworn staff and write a report creates a complicated process that is time-consuming, inefficient, and leads to underreporting. I discuss this in greater detail in my expert report, (pgs.8-9). There are many examples of systems that provide access to databases to report information without disclosing other confidential information in the database. I can file a police report from my home computer and have. These reports are utilized by my local police to follow up on minor incidents of crime such as packages stolen from my front porch. When I file a report, I am not able to review all information in the police database including records that might exist on the alleged offender. I am at a loss to understand why the CCSO has failed to allow all employees the ability to write inmates up for misconduct.

All staff including civilian staff should also be trained on appropriate report writing. Social workers, medical staff, and other non-sworn staff are trained professionals. There is no reason to believe they cannot write adequate incident reports if trained on the system. If non-sworn staff do not write a complete report the reviewers can request additional information from the reporting employee. The reporting employee can file supplemental reports to answer the question(s) or

address the concern. Many police and correctional agencies utilize this process to flesh out the details to determine if a violation of law or policy has been committed.

In my opinion, CCSO's failure to create a system for medical and other civilian staff to use to report inmate sexual misconduct contributed to the sexual harassment problem at CCDOC.

**C. Inmates Frequently Engage in Sexual Offenses Other than Masturbation and Indecent Exposure, Which Are Rarely Reported**

Dr. Wilner includes incidents coded as sexual harassment in his counts, which would include some but not all reported incidents of verbal harassment, but he ignores anything other than indecent exposure and masturbation in his written report. Dr. Wilner assumes that the plaintiffs' sexual harassment complaint is limited to indecent exposure and masturbation by inmates (Wilner 8, 10), and he ignores allegations concerning verbal and other forms of harassment entirely. Dozens of women have signed declarations describing this behavior, which is also to be expected in a climate where indecent exposure and masturbation by inmates are tolerated.

Ms. Frasier hardly mentions sexual harassment other than indecent exposure and masturbation. When she does mention it, it is to suggest that female staff should ignore this behavior, which includes explicit threats of sexual violence, obscene and degrading comments, sexual gestures and other threatening and unacceptable conduct. This behavior cannot be ignored. Jails and prisons should not tolerate threats of sexual violence and other degrading sexual comments directed at officers, medical personnel, and other staff. In my expert opinion, CCSO has created a climate where this serious misconduct is tolerated.

**D. An Unreasonably Large Number of Incident Reports of Masturbation and Indecent Exposure Do Not Result in Guilty Determinations at Least Partly Because of Practices in Violation of the Jail's Stated Policies, the Standards of the American Correctional Association, and Practices of Other Institutions**

    **1.    Staff Are Not Adequately Trained in Writing Reports or In Dealing with Sexual Harassment**

Ms. Frasier asserts that CCSO staff are adequately trained in report writing, but the evidence does not support this. First, she discusses an online training that CCSO implemented only after the lawsuit was filed and the court entered a preliminary injunction, as shown by the fact that the disciplinary code used in the training is the new code dated November 2017. Mr. Wilensky also testified that staff only started to receive this training in 2018. (Wilensky Depo. at 156-157.)

CCSO should have implemented training for staff on report writing in 2014 or 2015. By 2016, Mr. Wilensky, the director of inmate discipline, had concerns regarding the lack of training of staff on how to write better report. (Wilensky Depo. at 217-218). He testified that he noticed "from the moment he started" that "disciplinary tickets [were] being poorly written so that they were not resulting in appropriate discipline." (Wilensky Depo. at 218). Mr. Wilensky asked that training be provided to uniform staff. CCSO took too long to address this problem, even when it

was clear that the lack of training was resulting in a failure to impose consequences on inmates who engaged in sexual misconduct.

As I discussed in my expert report (pg. 17), the training at least until 2018 was inadequate as it did not include training on the meaning of the disciplinary codes or how to write reports, even though the director of discipline had identified a need for training on those topics. (Howard Depo. at 140-48; Jones Depo. at 156-158). The 2018 training module endorsed by Ms. Frasier is only online. There are pros and cons to both online and in-person training. Online training is cheaper and can provide more consistent training. However, online training does not allow for interaction with other staff and a subject matter expert. My review of the literature suggests that blended training is the best approach meaning that organizations should utilize a combination of online training and in-person training. All of the literature I reviewed stated that one advantage of online learning is students can complete the course or the training at a time convenient for them and under circumstances that allowed for their full concentration. However, this is not the approach of the CCSO to online training. The CCSO expects employees to complete their online training during their work shift. (Howard Depo. at 45-46). There is no dedicated time for completing the training free from the distractions and responsibilities of their job assignment. There is no mechanism to hold a discussion with an instructor or obtain answers to questions. I am familiar with correctional agencies utilizing a blended training approach. These correctional agencies allow staff to complete online training in training rooms away from their work assignment, often with an expert in the room to answer questions. The online training at CCDOC is inadequate.

## 2. The Disciplinary Hearing Process is Seriously Flawed

The numbers that Dr. Wilner has tabulated reflect that throughout most of the period an excessive number of sexual misconduct incidents were not adjudicated. His Figure 8 reflects that only 72% of sexual misconduct reports were adjudicated between January 2015 and August 2016. He does not present a figure for September 2016 through August 2017, but he does state that the average adjudication rate for September 2016 through September 2018 was 83% and for September 2017 through September 2018 was 91%. For the adjudication rate to be 8% higher during the second half of the period than it was for the entire period, the adjudication rate during the first half of the period, September 2016 through August 2017, must have been about 8% lower than the average, or roughly 75%. It appears, therefore, that for the 32-month period from January 2015 through August 2017, the adjudication rate was 75% or less. These are consistent with the adjudication rates that I reported in my original report (paras. 47, 50). Neither Dr. Wilner nor Ms. Frasier attempts to justify such a low adjudication percentage. It is not an excuse to say that the rate was similar to that for other 300 level incidents.

Dr. Wilner reports that there has been a finding of guilty in 89% of the adjudicated sexual misconduct cases. His data indicate that, eliminating erratic movements associated with the display of monthly figures, the rate has remained relatively constant during the 2015-18 period. The 89% average, however, may be misleading. In incident reports involving multiple violations, some sexual and some not, it does not reflect the finding on specifically the sexual incident. I report in my original report a guilty rate of about 85% (para. 49). If, however, we assume that the 89% figure is not misleading, this means that there was a guilty finding in only

between 60-65% of the sexual misconduct incidents between 2015 and August 2017.  This is totally unacceptable.

Such high dismissal rates jeopardize the ability of the jail to control inmate behavior and places staff and inmates at greater risk of harm.  My expert report (pg. 17, paragraph 55) documents a much higher number of expired incidents of indecent exposure and masturbation infractions than the figures utilized by Ms. Frasier.  It again appears she might be looking only at a recent time period rather than evaluating CCSO's practices from 2014, when the sexual harassment problem became pervasive, until the lawsuit was filed and the injunction entered.

I recognize that inmates do not abandon their rights at the door of a jail or prison and both inmates and staff must believe the disciplinary process is fair and unbiased.  I am also familiar with *Wolff v. McDonnell*, 418 U.S 539 (1974). That decision addresses the liberty interest of inmates. The due process standards of *Wolff v. McDonnell* apply only to discipline that may result in a finding of guilty and the loss of credit that would extend an inmate's time in custody.

Ms. Frasier concludes that because of the requirement in *Wolff*, which applies in limited circumstances, the inmate must be tried by an unbiased tribunal or hearing officer and that "it is problematic to use a hearing officer who has been subjected to misconduct similar to what the inmate is alleged to have committed or a hearing officer who may feel pressure to convict the inmate because their co-worker have been subjected to misconduct similar to the alleged misconduct at issue." (Frasier 14). I do not understand the logic of this thinking.  If this standard were applied to our judicial system, a female judge could not try a case regarding sexual misconduct if she had been a victim of sexual misconduct or a gay judge could not sit on a case involving gay marriage, or a Hispanic judge could not sit on a case involving the multiple border issues working their way through the courts today. I am not a lawyer and am not offering legal opinions, but I know of no such standard in our judicial system.  What is required is that judges follow the law.  The same is true in administrative hearings.  The hearing officer cannot have had direct involvement in the incident.  The hearing officer must be well trained in due process and follow the law. None of these principles counsel against having trained correctional lieutenants involved in the hearing process. Correctional staff understand why and how inmates engage in misconduct, how that misconduct impacts the command presence of officers and the ability of civilian staff to carry out their jobs, and how inmates respond to various sanctions. Outside lawyers with no corrections experience do not.

The use of disciplinary hearing committees offers a mechanism for conducting disciplinary hearings with a team of professionals who serve to ensure a fair and productive disciplinary hearing process.  The goal of a fair and productive process has led many correctional agencies to include a mental health professional on the committee. Non-lawyers can be trained to understand preponderance of the evidence, and in my experience it is not necessary to have outside lawyers on a hearing team to ensure a fair process. However, the disciplinary hearing committee could include a lawyer if the CCSO finds this safeguard to be necessary. One of the court monitors in previous litigation against CCSO spoke approvingly of the use of civilian hearing officers when she observed them "sitting with the facility's discipline coordinator and CCDOC uniformed discipline coordinator," opining that it "brings professionalism, consistency, and objectivity to this process." (McCampbell Report No. 9 at 43). I have three reactions to this: First, the process

the monitor observed in "several hearings" in 2014 is no longer in use. Subsequent to her observations, CCSO entirely eliminated uniformed staff from the hearing process. The monitor does not appear to endorse or approve of a process with no uniformed staff member participation. Second, in my experience, uniformed staff do bring "professionalism, consistency, and objectivity" to the disciplinary hearing process, as well as knowledge and experience that outside lawyers lack. Third, CCSO disciplinary documents and data reflect that the results of the hearing process using only outside attorneys with no uniformed staff involvement are neither consistent nor objective. Sanctions are inconsistent and discipline is not progressive. Inmates have been found not guilty of sexual misconduct based on the "gut feeling" of hearing officers (Wilensky Depo. at 226), findings that a victim's statements recorded in a disciplinary report signed by a sworn officer was "hearsay" (CCSO_Howard_0084714-15, 0279994-95, 0148942-43, 0083588-89), and doubts about whether it was realistic that two inmates could be masturbating at the same time (CCSO_Howard_0151938-0151945). Leaving sworn staff out of the disciplinary process demonstrates a lack of respect for the professionalism, insight, and experience of staff as well as a lack of understanding that the primary goal of an inmate disciplinary system is to promote a change in the behavior of the inmate. It is a poor corrections practice to operate a disciplinary system without the participation of sworn staff in hearings.

The use of only attorneys in hearings at the jail fails to address the goals of an inmate disciplinary system and appears to only address the concern that sworn staff are incapable of providing due process to inmates. It is my experience that well trained hearing officers are very capable of conducting fair and impartial disciplinary hearings. It is also my experience that hearing officers utilize what they learn in the inmate disciplinary hearing process to train staff and correct staff when they find staff have behaved in less than a professional manner. A robust inmate appeals system also serves to monitor the inmate disciplinary process.

A finding of guilty on an inmate infraction should be based upon a determination by the person conducting the hearing that a preponderance of evidence submitted at the hearing substantiates the charge. This language is taken directly from the CDCR Department Operation Manual. This same or similar language can be found in every correctional agency I am familiar with. A hearing officer starts with the premise that the report of the correctional employee, that has been reviewed by a supervisor, is true and accurate. This is not dissimilar to a traffic ticket. The report of the police officer is presumed to be true and accurate. If you can prove the speed gun utilized by the traffic officer had not been calibrated as the manufacturer requires, you might beat the ticket. Absent evidence of a faulty speed gun you will pay your traffic ticket because the preponderance of the evidence would suggest you are guilty. There is a reason the standard of guilt for inmate discipline is lower than in a criminal trial. The sworn staff member or correctional employee is documenting the behavior of the inmate in a signed statement. The inmate is given an opportunity to present information that could impact the disposition of the hearing. An example of that is an employee walks into a room to find two inmates fighting and charges them both with mutual combat. If one of the inmates is able to prove through video or witness statements that he was attacked by the other inmate and was simply trying to hold the inmate to prevent injury to himself, this is information that should change the outcome of the hearing. But in the absence of proof, through video, credible witnesses or other evidence that the officer was wrong about what he or she thought happened, however, the sworn staff member's report should be believed.

The number of disciplinary hearings that are being conducted each day and the amount of time spent on average with each inmate is also a problem. There is too little time spent with the inmate to achieve the goals of a functioning inmate disciplinary system.

### 3. The CCSO Fails to Involve Staff in Devising Appropriate Sanctions for Inmates

Ms. Frasier (Frasier 20) discusses the use of on-the-spot discipline and suggests that it is inappropriate to have such discipline. Again, the expert attempts to sensationalize the issue by mentioning a comment by one of the plaintiffs when describing how she felt. I made a recommendation that inmates who engage in sexual harassment in the form of sexual epithets or gestures should be disciplined following the sworn staff writing a disciplinary chrono and a review by a supervisor. This is similar to the procedures in CCSO's own written disciplinary policies until 2017, and also the procedures the court monitor spoke approvingly of, which Ms. Frasier fails to acknowledge. The sanctions I recommended included confinement in the inmate's cell for the remainder of the day, loss of telephone privileges, or loss of recreational privileges for the day. None of the sanctions creates a liberty interest nor do any of the sanctions rise to the level of being harsh or unreasonable. Ms. Frasier found fault with this in spite of the fact that she commended the CCSO for establishing a policy to take immediate and on-the-spot group punishment of inmates in the court should one inmate masturbate or expose themselves during court transport, (Frasier 10,12). She also explains why group punishment is violative of due process (Frasier 20) despite thinking it was a great idea on pages 10 and 12 of her report. In fact, group punishment is a part of everyday life in a prison. All inmates may be required to return to their cells to address the behavior of an inmate(s) in housing units with day rooms as an example. Staff must often take actions that impact all inmates to maintain control of the unit or facility. Correctional staff know that actions like this must be carefully monitored with a return to normal programming for uninvolved inmates as soon as possible to prevent greater problems.

I am disappointed by Ms. Frasier's efforts to discredit a well-recognized correctional practice as evidenced by Title 15 Minimum Standards for Local Detention Facilities Crime Prevention and Corrections Division I, Chapter I, Subchapter 4, Section 1081, which states: Plan for Inmate Discipline. Each facility administrator shall develop written policies and procedures for inmate discipline. The plan shall include, but not be limited to, the following elements: (a) Temporary Loss of Privileges: For minor acts of non-conformance or minor violations of facility rules, staff may impose a temporary loss of privileges, such as access to television, telephones, commissary, or lockdown for less than 24 hours, provided there is written documentation and supervisory approval." These standards cover all county jails in California and are consistent with standards of county jails around the country. Having no procedure for on-the-spot discipline imposed by correctional supervisors is not acceptable and in my opinion has contributed to the sexual harassment problem at Cook County Jail.

### 4. The Jail Fails to Impose Effective Sanctions on Inmates Who Commit Multiple Acts of Masturbation or Indecent Exposure

Ms. Frasier asserts that the CCSO imposes appropriate sanctions on inmates who engage in masturbation and indecent exposure (Frasier 18-20). She provides no basis for this opinion and

appears to be attempting to utilize the words of one of the plaintiffs, who was describing what she was feeling, to falsely suggest the plaintiffs are seeking discipline of inmates in violation of the law. Sanctions must be graduated and effective. I discussed the use of the Behavior Management Unit in my report, (pg. 24, paragraph 76), as an example of increasing sanctions for inmates who continue to involve themselves in inappropriate disruptive behavior. The use of appropriate graduated sanctions is an acceptable response to inmates who continue to disrupt the orderly operations of the jail. Losing privileges for lengthy periods of time for repeat behavior is an acceptable correctional practice absent a mental condition that contributed to the behavior of the inmate.

Long-term stays in segregation are no longer an acceptable practice in corrections, but placing inmates in programs with limited privileges and allowing the inmate to earn greater privileges through program participation and infraction-free behavior is. To do nothing or to continue to utilize sanctions that have failed to change the behavior of the inmate is not acceptable.

Ms. Frasier asserts that the SMU housing unit provides enhanced security measures while providing counseling and programming aimed at changing the inmate's disruptive behavior. I have not seen information about any CCSO program for repeat sexual misconduct offenders. On the jail tour, we did not observe programming, and the jail administrators conducting the tour appeared to be calling ahead to the housing divisions before we arrived to cancel movement. If such a program does exist, CCSO should provide details of the program for the plaintiffs review to include documentation of the effectiveness of the program.

Ms. Frasier in the last paragraph of page 12 paints a hopeless picture of the ability to manage maximum security inmates in a county jail setting. I agree with Ms. Frasier that idleness is a problem. It is not only a problem in county jails but in prison systems as well. Both jails and prisons must address this issue with work, education or structured programs to prevent idleness. Specific programs for long term inmates in county jail and prisons is important to the goals of rehabilitation and security. County jails, like prisons, have the ability to offer inmates greater privileges when they behave. Offering tablets, video games, longer TV privileges or even earned visiting days not available to inmates who receive incident reports are just a few of the programs I am aware of being offered by prisons and jails around the country. Carrots and sticks only work when there is a menu of carrots to work with.

Sheriff Dart in a recent Op-Ed printed in the Washington Post, (April 4, 2019) stated, "At my jail in Cook County, Ill.- one of the nation's largest, with about 5,500 detainees-we have seen an increasing length of stay for individuals in our custody, for many reasons including a painfully slow-moving criminal- justice system. Several of our current detainees have been here nearly 10 years without adjudication." He then discusses the need to engage inmates in programs, services and treatment. Given his stated concern for providing inmates with programs and services to improve public safety, the CCSO should have a well-developed program designed for long term detainees given the housing of increased numbers of long term inmates, including a menu of carrots. To the best of my knowledge, this is not happening at Cook County Jail.

5. **CCSO Fails to Enforce the Sanctions that Are Imposed**

I addressed the issue of CCSO's failure to enforce the sanctions that are imposed in my original expert report, (p 25). Ms. Frasier does not address this issue. It is worth repeating that, according to the plaintiffs, disciplinary sanctions are not tracked and there is no reliable system to ensure sanctions are carried out. Uniform staff must have a clear process for knowing what sanctions are in place for any particular inmate. The system must identify the inmates and the sanctions imposed in a format easily accessible by on-duty staff. Without a reliable tracking system, inmates are not held accountable for their behavior and are more likely to repeat it.

6. **Defendants Have Not Placed Experienced Professionals at the Helm of the Disciplinary System**

Ms. Frasier tries to defend Mr. Wilensky, the director of inmate discipline, despite his lack of qualifications and experience to be overseeing the disciplinary system. Ms. Wilensky does not have a clear understanding of the goals of a functioning inmate disciplinary process, as Ms. Frasier asserts, (Frasier 15-16). I would not expect that he would. He has not been trained nor does he have the correctional experience to understand the day-to-day operations of a jail.

It is not difficult to articulate the goals of an inmate disciplinary system. The California Department of Corrections offers a good example. Article 24 states "Inmate Discipline 1. Policy. The Department provides a graduated system of inmate discipline designed to be administered commensurate with the seriousness of the offense. Discipline shall be so administered as to maintain control, conserve human values and individual dignity and promote socially desirable changes in attitude and behavior." The Policy of the CDCR is consistent with other correctional agencies I am familiar with. However, it seems to have been lost at Cook County Jail that a goal of the disciplinary system is to maintain control by imposing meaningful consequences on inmates who violate the code of conduct including by sexually harassing staff.

E. **CCSO Does Not Adequately Inform Inmates of Expectations**

Ms. Frasier contends that the jail inmate orientation program consisting of a handbook, an orientation video and posters throughout the facility adequately addresses the need to inform inmates of the rules, (pages 10 and 11). Ms. Frasier appears to ignore the deposition testimony of plaintiff Howard, (Howard Depo 95) which indicates that the facility often runs out of inmate handbooks. Further the video does not include information about sexual harassment of staff. Also, some inmates may not have the reading skills to understand the inmate handbook, and may not take the time to read and understand the rules. An in-person orientation process for inmates is one method of changing the culture of the jail. An in-person inmate orientation program designed to explain the rules and behavioral expectation does not have to be lengthy. It is also important to understand that county jails house many offenders for years not days as they await trial. Ms. Frasier attempts to paint a picture of county jails that is not realistic. It is true county jails house a large percent of inmates for days and weeks but they also have long-term jail inmates, as Sheriff Dart described in his own Op-Ed piece. This mission requires a long-term offender approach. From personal experience, I can attest to the success of direct communication between sworn staff and inmates regarding expectations and the consequences of

not following the rules vs. the benefits of following the rules.  The more opportunity for staff and inmates to interact in a positive and constructive way such as in-person orientation with staff providing information to inmates the better the outcome.   I often told my staff, "It is our job to tell the inmates how to do their time not the inmate next to him."

The U.S. Department of Justice National Institute of Corrections published a *Sheriff's Guide to Effective Jail Operations (2007)* This Guide emphasizes the need to communicate the rules to inmates as follows in the section "Defining and Conveying Expectations for Inmate Behavior":

> The staff's expectations for inmate behavior and the way these expectations are conveyed have a powerful influence on how inmates act. Historically, jail staff have expected inmates to be uncooperative, destructive, aggressive, violent, and manipulative. Staff have communicated these expectations by avoiding interaction with inmates, adopting a negative demeanor when they do interact with inmates, and accepting negative inmate behavior as normal. It is important to set high, but attainable, expectations for inmates and then ensure that the inmates have the means to comply. Once acceptable inmate behavior is defined, the jail must convey its expectations to the inmates.

> Jails convey their expectations for inmate behavior both directly and indirectly. Most jails develop a handbook for inmates that not only gives information about jail schedules, procedures, and services, but also includes rules for the inmates. These rules include a description of sanctions if rules are broken and a description of the jail's disciplinary process. Staff can indirectly demonstrate that they expect inmates to behave well by interacting extensively with them, treating them with respect and consideration, and ensuring that inmate living areas are maintained in good order.

This Jail guide issued by the Department of Justice reinforces my expert opinion that communication with inmates can and should take many forms, (written expectations, videos, posters throughout the facility) and that direct, extensive interaction with inmates is a key component to effectively communicating expectations. One way to ensure this is accomplished is to develop an in-person inmate orientation program for inmates.  The in-person orientation program could be designed for inmates who will be housed at the jail for longer than several days to eliminate the need to orientate inmates who will bail out or be released after a few days. In my opinion, in-person orientation that includes a strong and detailed zero tolerance policy and the consequences of violating that policy should be implemented at Cook County Jail to begin to change the climate of tolerating inmate sexual harassment of female staff.   After the problem abates, CCSO could revisit whether handbooks and videos are adequate to convey the zero tolerance policies and behavioral expectations.

CCSO must also develop a method for ensuring that inmates receive the orientation handbook and are capable of understanding the contents of the book.  They must also modify the orientation film and require inmates to sign a statement that they viewed and understood the information provided in the orientation video.  The film must include specific training on behavior expectations and a strong and detailed zero-tolerance policy for sexual harassment and sexually inappropriate behavior.  The orientation video must address the expectation that staff and inmates will speak to each other in a respectful and appropriate manner.  Further, staff must

monitor the viewing of the film to ensure inmates are complying with the expectation to view the film.

## F. Detainees Are Not Properly Dressed

Ms. Frasier states that the CCDOC enforces the inmate dress code (Frasier 21). This just isn't true as documented by photographs taken during our tour. It was routine to see inmates dressed in clothing that is two, three or even four sizes too big for them. Inmates walk around with pants sagging. This problem contributes to the sexual misconduct problem at the jail. CCSO must gain control of this problem by first determining the cause of the problem and then providing a solution. Is the problem that inmates are allowed to obtain clothing that is too large for them or is the problem that the CCDOC does not keep the appropriate clothing sizes on hand to allow inmates to dress appropriately?

CCSO is not following jail standards related to inmate dress. For example, Performance Based Standards for Adult Local Detention Facilities Fourth Edition includes a clothing standard for jails. Standard 4-ALDF-4B-03 (Ref. 3-ALDF-4D-08 and 4D-09) states: "Facility clothing is properly fitted climatically suitable, durable and presentable." CCSO is clearly not in compliance with this American Correctional Association (ACA) Standard.

One specific area that must improve is the type of jumpsuits that are utilized for inmates when they are found guilty of masturbation or indecent exposure. The green jumpsuits are entirely inadequate and as noted in my report, CCSO has taken too long to address this problem (pgs. 25,29,30). The green jumpsuits being issued to inmates found guilty of sexual misconduct were obviously not designed to prevent indecent exposure. The Velcro does not remain closed and the design of the suit allows inmates to easily expose themselves very quickly. In addition, during our tour the only way a staff member knew an inmate was to be in a green jumpsuit was to look up each inmate in CCOMS. I understand that since our tour a new procedure has been implemented resulting in a list of inmates who should be in a green jumpsuit being published each day for use by unit sworn staff. That is an improvement, but it remains to be seen whether it will be sufficient to solve the problem.

Ms. Frasier concludes her report by discussing the jail tour and her observations, (Frasier 25-26). She makes several observations that are questionable. During the tour, Ms. Frasier was far behind me and the photographer, Lloyd Degrane, for most of the day. Mr. Degrane is a freelance photographer who has extensively documented the Illinois prison system as well as the Cook County Jail. His documentary work in prisons has been exhibited and published.[2] He was working at my direction for most of the tour, occasionally stepping away to photograph an office, an attorney visiting area or a wall posting at the request of an attorney representing assistant public defenders in their sexual harassment lawsuit. When I asked him to photograph an area where inmates were present, he would inform the inmates that he was taking a photo and if they did not want to be in the photo they could turn their backs to him. At no time did this

---

[2] An example of his prison documentary work is also published on his website: http://lloyddegrane.com/documentary/prison.htm.

mild-mannered professional attempt to incite the inmates to do something inappropriate, as suggested in Ms. Frasier's report (25-26). If Ms. Frasier observed such behavior she had a duty to say something: she did not. I also do not agree with Ms. Frasier's comments about the tour causing the inmates to react as she describes on pages 25 and 26 of her report. I have been on many tours of jails and prisons and this is not my experience. As Warden of San Quentin, large tour groups were a routine weekly occurrence. Court monitors and their staff along with CDCR staff and attorneys would also tour the prison routinely. Inmates did not behave as I and others observed inmates behaving on the tour of the Cook County Jail. It is my expert opinion that Cook County Jail has a culture that allows inmates to behave in a way that is disrespectful towards staff and staff are expected to ignore this behavior. It is simply unacceptable.

In regards to the observation of Ms. Frasier that male staff were wearing coats and jackets and her implication that female staff are complaining about this needlessly: she is correct that it was a cold day and many staff may have decided to wear an extra layer of clothing such as a coat or jacket. However, this is different from being told you should wear a coat, jacket or smock to stop inmates from sexually harassing you, which is what female staff report. They also report wearing jackets and sweaters in the summer in an effort to reduce the incidents of sexual harassment. Female staff should not be told to cover up to keep inmates from harassing them as they carry out their duties as professionals working in the Cook County Jail.

## G. Facility Design Flaws and the Lack of an Adequate Alarm System Put Women Employees Unnecessarily At Risk

### 1. Cook County Jail's Facility Design Flaws Violate PREA And Contribute To The Sexual Harassment Problem

Ms. Frasier discusses the need to balance privacy and security in correctional settings, (Frasier 7). As we observed on the jail tour, CCSO houses inmates from the Illinois prison system, so it must comply with PREA. CCSO has also stated more than once that the jail is PREA compliant. PREA standard 115.15 (d) states: "The facility shall implement policies and procedures that enable inmates to shower, perform bodily functions, and change clothing without nonmedical staff of the opposite gender viewing their breasts, buttocks, or genitalia, except in exigent circumstances or when such viewing is incidental to routine cell checks. Such policies and procedures shall require staff of the opposite gender to announce their presence when entering an inmate housing unit." Cook County Jail does not meet this standard, and Ms. Frasier does not attempt to show otherwise.

Although PREA does not tell a correctional agency how to achieve the standard, most jails and prisons do so by providing modesty panels or barriers that allow inmates to be seen from chest up, knees down. This practice allows the inmate privacy and provides for security and meets PREA standards.

Ms. Frasier did not describe a means for CCSO to meet the standard without the installation of modesty panels that provide for observation of the inmate from the knees down and neck up. I am at a loss to understand how compliance could be achieved without the installation of appropriate modesty panels of some type.

Ms. Frasier further states that there is no evidence that CCSO's non-compliance with PREA has led to increased incidents of indecent exposure or masturbation. Not so. There are numerous documented incidents of inmates purposely exposing themselves and masturbating while in the shower and while looking at the female staff on duty.

### 2.     Ms. Frasier Does Not Explain How It Is Acceptable For A Jail Not To Have An Adequate Alarm System For Staff

Ms. Frasier states that the jail facility design complies with industry standards, (Frasier 21). She makes specific reference to the fact that a panic button or alarm system is not necessary for non-uniform or uniform staff (Frasier 2, 22). She finds the fact that uniform staff have a radio to be sufficient. I disagree and find the lack of an alarm system to be atypical and dangerous. I have toured many jails and prisons and, apart from Cook County Jail, have never been in a facility where all staff have not had access to an alarm system of some sort. To make the point of how important personal alarm systems are in jails and prisons I reviewed and highlight below the National Institute of Corrections Review Team Report of the Washington Department of Corrections Monroe Correctional Complex, Incident Review of the Death of Correctional Officer Jayme Biendi. Correctional Officer Biendi lost his life on January 29, 2011. This report was published in March of 2011.

The finding of the Review Team Report under the heading of Communication and Alarm (pages 9-11) states:

> There is no personal body alarm (PBA) system at the MCC.WSR. Uniformed staff must depend on direct verbal notification when possible, telephone and/or their assigned portable radio to alert control and other staff to an immediate need for assistance should they be assaulted or should the threat of assault be imminent. The radio system does feature an alert capability in addition to the normal radio transmission capability associated with depressing the microphone key and communicating verbally the need for assistance, location and identity of the transmitting officer. The alert capability audibly signals the control room area where the radio control station is located and simultaneously keys the microphone on the portable radio ('hot mic") possessed by the officer to transmit for a prescribed time period and override all other radio traffic to allow control and other radios tuned to the same talk group to hear any verbal/audible activity that may be occurring in the immediate vicinity of the radio. This function is initiated by depressing a small red button just proximal to the antennae connection point to the body of the radio. These options in many cases are sufficient to allow an officer to acquire assistance when it is needed. There are, however, concerns with depending on these options alone that are addressed with the installation of a PBA, (Personal Body Alarm) system and discussed below. **These concerns are magnified in the case of non-uniform /custody staff who are not issued a portable two-way radio and must depend on the telephone and/or shouting or screaming for assistance.**

The report continues as follows:

Recommendation 2: We recommend the installation of a personal body alarm system that when activated automatically alerts the institution main control room and provides the name of the officer and the officer's location within the institution -the current capability associated with the radio system described in the finding above only alerts to the specific radio from which the alert was received and not the name of the staff member or the location from the which the alert emanated. If desired the system can be integrated with the radio system to immediately announce from the radio console the alert and associated information to all staff on the talk group being utilized. There are several vendors that can provide such a system thus fostering a competitive procurement process to hold down costs. It is recommended that the system selected include only those features required to make it functional to accomplish only what is necessary to provide for enhanced staff safety. This would include that the system be self-monitoring in terms of alerting control room staff when transmitter battery strength is low and if, for any other reason, a transmitter or receiver becomes dysfunctional. The system with which we are most familiar alerts when either a button is depressed on the transmitter worn by the staff member or when a lanyard attached to both the transmitter and to the belt or clothing of the wearer is dislodged by an inmate pulling the transmitter away from the staff member in an effort to keep them from depressing the alert button. There are systems that feature transmitters worn by the staff that alert when the orientation angle of the transmitter to perpendicular changes significantly indicating that the staff wearing it has fallen or been forced or knocked to the ground. The issue of false alarms has served to dissuade many users from this feature.

For cost containment purposes the agency may also consider location specificity of the PBA system be limited to general zones or areas such as designated living areas and/or zones/sectors within large buildings such as industries at MCCWSR. For example, as opposed to the expensive requirement that the PBA alert system provide the location of an officer needing assistance in a cell block to within a 15-foot area and/or distinguish which tier level he/she is located, it is sufficient that the system simply advise that the officer needs assistance in a block to allow response staff to locate him/her in that area. Similarly, instead of requiring that the system provide the specific office from which an alert is transmitted from the programs area building (PAB) at MCC/WSR, two area/zone locations encompassing the main hallways would be sufficient. We are available to assist your department further in developing the specifications for a system that is effective while simultaneously cost efficient in recognition of the difficult fiscal times impacting all of us in state government.

CCSO does not provide for constant and direct supervision of all inmates in all areas of the prison. Non-sworn staff are the most vulnerable as their offices are not under video surveillance or do not have an officer standing outside the door for immediate response as needed to prevent a serious assault or worse against a staff member.  I cannot overstate the serious risk to staff safety in this scenario.

It is my hope that the CCSO will not wait for a tragedy to understand how dangerous their current alarm response practice is.

## CONCLUSION

Having read the reports of Margo Frasier and Benjamin Wilner, I stand by all of the opinions in my original report.

Dr. Wilner's report does not show that other institutions have as pervasive a sexual misconduct problem as Cook County Jail or that I "cherry-picked" in comparing rates of sexual misconduct at Cook County Jail with California prisons. Dr. Wilner's comparison of incidents of indecent exposure and masturbation directed at staff with other misconduct is comparing apples and oranges. He has also not shown that CCSO has adequately addressed the sexual harassment problem. Finally, Dr. Wilner does not appear to understand that the lawsuit is about more than indecent exposure and masturbation or address other sexually aggressive behavior by inmates directed at female staff.

Ms. Frasier has not offered evidence in support of her opinions. Her comments about why inmates sexually harass female staff miss the point. Inmates sexually harass female staff to degrade them and exert control, and the appropriate response is not to ignore the behavior but rather to impose consequences so inmates understand that the behavior will not be tolerated. It is my expert opinion that while CCSO has taken some small steps as a result of the preliminary injunction in the lawsuit, which have reduced the incidents of sexual misconduct, there is much more work to be done. Additional measures like the ones identified in my expert report would improve the safety of all staff at the jail and greatly reduce the incidents of sexual misconduct and sexual harassment experienced by female staff.

**Date: April 30, 2019**

*Jeanne S Woodford*

**Jeanne S. Woodford**

Documents Reviewed in connection with Rebuttal Report in
*Howard et al. v. Cook County Sheriff's Office et al.*

Plaintiff Deposition Testimony
- Testimony of Plaintiff Sdahrie Howard
- Testimony of Plaintiff Esther Jones

Defendant Deposition Testimony
- Testimony of Amar Patel, Director of CCSO Bureau of Information and Technology, as CCSO's designee under Rule 30(b)(6) on information technology topics.
- Testimony of Steven Wilensky, Director of Inmate Discipline, Cook County Jail, as CCSO's designee under Rule 30(b)(6) on the inmate discipline process.

Expert Reports
- Benjamin S. Wilner, Ph.D.
- Margo L. Frasier, Ph.D.
- Louise F. Fitgerald, Ph.D.
- Fitzgerald Rebuttal Report

Cook County Sheriff's Office Documents and Data
- CCSO_Howard_329273-329286
- CCSO_Howard_330095
- CCSO_Howard_0329284
- CCSO_Howard_0151938-0151945

Other Materials
- Prison Rape Elimination Act (PREA) reports
- California Department of Corrections and Rehabilitation Policy
- Performance-Based Standards for Adult Local Detention Facilities Fourth Edition
- McCampbell Report
- California Department of Corrections and Rehabilitation Department Operations Manual
- Title 15 Minimum Standards for Local Detention Facilities Crime Prevention and Corrections Division I, Chapter I, Subchapter 4, Section 1081
- U.S. Department of Justice National Institute of Corrections, *Sheriff's Guide to Effective Jail Operations* (2007)
- Performance Based Standards for Adult Local Detention Facilities Fourth Edition
- National Institute of Corrections Review Team Report of the Washington Department of Corrections Monroe Correctional Complex, Incident Review of the Death of Correctional Officer Jayme Biendi
- Declaration of Dominic Charles

Online Resources
- http://lloyddegrane.com/documentary/prison.htm