Exhibit 21

1    IN THE UNITED STATES DISTRICT COURT
2        NORTHERN DISTRICT OF ILLINOIS
3              EASTERN DIVISION
4
5  SDAHRIE HOWARD, DENISE HOBBS    )
6  and ELLENOR ALTMAN, ET AL.      )
7                                  )
8         Plaintiffs,              )
9                                  )
10                                 ) Case No. 17-cv-8146
11                                 )
12        vs.                      )
13                                 )
14 COOK COUNTY SHERIFF'S OFFICE    )
15 and COUNTY OF COOK,             )
16                                 )
17        Defendants.              )
18 ----------------------------------
19            DEPOSITION OF SHARON ROBINSON
20                 Chicago, Illinois
21            Wednesday, September 12, 2018
22 Reported by:
23 Sandra L. Rocca, CSR, RPR, RMR, CRR
24
25 JOB NO. 147709

Page 82

S. ROBINSON
A. Like when you do a report, the written is in the report. When you pull it, everything that you typed is there. But when I pulled this particular one, it wasn't there.
Q. The narrative wasn't there?
A. The narrative.
Q. Because this incident report under "statement of facts" narrative says "see infraction report."
A. And I did pull -- when it says "see infraction report," you usually press -- it's on the computer where you could press run the incident report. And I even went into the infraction, I couldn't pull the report.
Q. So in other words, you couldn't find the narrative that went with this report?
A. Not at all.
Q. Did you originally prepare this incident report?
A. I did.
Q. And it looks like you prepared it on or about January 15th, 2014, right?
A. Yes.
Q. Did you also prepare a disciplinary report or was this the disciplinary report?
A. I did a disciplinary report and an incident report.
Q. Do you see the disciplinary report in this exhibit?

Page 83

S. ROBINSON
A. It says "type of incident" and it says "discipline." If I'm not mistaken, CCOMS has changed a lot.
Q. Yeah.
A. So it would be for both back then. It would be for incident report and disciplinary. So now you're able to do incident and then attach the discipline with it.
Q. But at this time, the way you did a disciplinary report was to use the incident-type disciplinary?
A. Yes.
Q. And this was when you were in Division 9, correct?
A. Yes.
Q. The two inmates involved or the two inmates listed on here _____ and _____, is that right?
A. Yes.
Q. Then you go to the next page. This also looks like some kind of printout from CCOMS, right?
A. Yes.
Q. What is this?
A. It was just me trying to pull the report and it wasn't showing that it was a report. The narrative wasn't there.
Q. Right. There's a description on the screen it looks like that says "masturbating in front of staff," right?
A. Yes.

Page 84

S. ROBINSON
Q. And it looks like the third page -- is that the same as the second page?
A. Yes.
Q. And what's the last page?
A. That's all the different incidents that shows -- when you pull his name up, all the different incidents he had been involved in.
Q. Is this the first time that you wrote an incident report concerning detainees masturbating?
A. No. No.
Q. When was the first report that you remember preparing?
A. I can't remember, but when I came to Division 9, it was -- every day it was something. Every day. I had only been there for a month and every day I was writing something or involved in something with detainees masturbating or being disrespectful towards me.
Q. And you said you can look those up on CCOMS now today?
A. Yes.
Q. So let me ask you about that. It sounds like you came over to Division 9 from Division 4?
A. 5.
Q. 5, okay. And Division 5 at that time, was that

Page 85

S. ROBINSON
males or females?
A. It was males and then it closed down.
Q. Then it closed down. That's why you ended up in 9?
A. Yes.
Q. You told me that they gave you a choice of 9 or 10?
A. Yes.
Q. And you chose 9?
A. Yes.
Q. When you were on 9, in Division 9, was your main job to guard the tier?
A. Yes.
Q. So when you were in Division 9, were you assigned to a specific tier or did your tier assignment depend upon the day?
A. It rotated.
Q. So you might be on different tiers on different days?
A. Yes.
Q. And was there some kind of list that you checked to determine where you were supposed to be that day?
A. Roll call, the lieutenant tells you where to go.
Q. So at roll call the lieutenant calls out all the tier assignments?
A. Yes.

Page 94

S. ROBINSON

have a view of the tier?
A. Yes.
Q. Do you guard two tiers at once there or just one?
A. Sometimes.
Q. Sometimes two?
A. Yes.
Q. Depends on staffing?
A. Yes.
Q. Does the tier have a dayroom?
A. Yes.
Q. And then the tier has cells, is that correct?
A. Yes.
Q. And then a shower area?
A. Yes.
Q. Is the shower area off the dayroom?
A. Yes.
Q. And are the cells on the other side of the dayroom from the shower room or same side?
A. Depending on -- depending on the tier, it depends on the cells of the shower. So the showers are typically close to the dayroom and typically close to the door, the door where you come in at.
Q. So you mentioned that sometimes you have to come onto the tier, is that correct?

Page 95

S. ROBINSON

A. Yes.
Q. How many correctional officers worked on the same shift -- let me strike that.
    How many correctional officers were on the tier with you when you were in 9?
A. One.
Q. One other?
A. One other.
Q. So there would be two of you?
A. Yes.
Q. And the two of you would be responsible for either one or two tiers?
A. We back each other up.
Q. When you had to leave the bubble and go onto the tier, was there a procedure for that?
A. You're supposed to let your partner know that you're going over to the tier.
Q. And what reasons would you have to go over to the tier?
A. To let the nurse in, to let the detainees out. Some detainees were half-and-half. It depends a variety of different reasons, medical reasons. Some people might have to go to Cermak so you have to go on the tier for a lot of different reasons.

Page 96

S. ROBINSON

Q. So what your report says is that you were called over from 2B to change the channel on 2A, right?
A. Yes.
Q. And I'm trying to understand what that means.
A. I was working 2A and the detainees was hitting on the window to change the channel on 2B. And if I'm not mistaken, my partner wasn't paying -- didn't want to do it. And I'm like, you make the day worse or you have us have a bad day if you just don't do the stuff that they ask you to do. And another detainee got -- another detainee got my attention to change the channel, so I came to change the channel. I went to change the channel.
Q. So you went into the tier?
A. Yes.
Q. When you enter the tier, where do you enter?
A. Through the door.
Q. Is there some kind of interlock there?
A. Yes.
Q. So there's really two doors?
A. Between me and the detainee?
Q. Yes, correct. If you're in the bubble, are there two doors between you and the tier?
A. Yeah.
Q. And when you entered the tier -- I'm sorry, strike

Page 97

S. ROBINSON

that.
    Which tier did you enter, 2A or 2B?
A. 2B.
Q. Were there detainees in the dayroom on 2B?
A. Not to my knowledge. If I can remember, it was a school wing and the detainees had just came back from school. They said they had to come back for something, I'm not sure. And a couple of the detainees came back so everyone wasn't out.
Q. There were some detainees in the dayroom?
A. Yes.
Q. But not the whole tier?
A. Yes.
Q. As you entered the tier on 2B, which way is the shower area, to your right or left?
A. My left.
Q. And so your testimony earlier was that as you entered the tier, the two detainees came running at you naked, holding their penises in their hands masturbating?
A. Yes.
Q. And what happened then? In other words, they came running at you. What did you do?
A. They came running at me side-by-side, two grown men playing with their penises running up to me. And I was so

Page 98

S. ROBINSON

shocked, I didn't know what to do. I just ran out of the tier, closed the interlock door and called for a supervisor right away.

Q. Did they say anything to you?

A. Yeah, they was like, come in here, bitch. Come here. Come suck this dick and I'm going to fuck you. And I just ran out, called the supervisor. He came and they still was in the shower when he came.

Q. The supervisor meaning Nalepa?

A. Yes.

Q. And then after the incident is obviously when you wrote this report, correct?

A. Yes.

Q. Anything else you remember about that incident?

A. Not that I can recall.

Q. If you look at the disciplinary report, the violation number is 600. I was looking at the first page of the report, of 33. Do you see where it says violation number 600?

A. Uh-huh.

Q. Okay. Is that one of the disciplinary codes in the code that we looked at before or is that something different?

A. I'm not sure.

Q. Okay. When you write up a disciplinary report like

Page 99

S. ROBINSON

this, do you determine what the violation number is, what code number to charge under?

A. Yes.

MS. BRENNAN: Can we give -- I think she hasn't read the whole thing and that's distracting. Do you want to finish reading it?

Q. Yes, please go ahead.

A. Okay.

Q. Have you had a chance to read the report now?

A. Yes.

Q. Do you want to change any of your answers based on having read the report?

A. Yes.

Q. What answer would you like to change?

A. Code 600, that's the code you put in for engaging in inappropriate sexual activity.

Q. And that's why you coded it as 600?

A. Yes.

Q. If you go to the second page, there's a disciplinary report and findings, right?

A. Yes.

Q. And the date on it looks like January 24, 2014, correct?

A. Yes.

Page 100

S. ROBINSON

Q. If I'm correct, you don't usually see this report, this inmate disciplinary report, is that correct, or do you?

A. No, I don't.

Q. This report states that the disposition was guilty as charged, right?

A. Yes.

Q. And this is for inmate ▮, correct?

A. Yes.

Q. And then it states -- I can't frankly read that first word, but it says "guilty, 25 days." Right?

A. Yeah, it was saying the code 600, guilty.

Q. 600. That makes sense. 600 guilty, 25 days. Do you understand what that means, 25 days?

A. Yes.

Q. What does that mean?

A. He received 25 days discipline for masturbating.

Q. And 25 days discipline, does that mean in segregation?

A. Yes.

Q. So if he's in segregation, he would be moved off the tier, correct?

A. Yes.

Q. And moved to a segregation unit or I think the SMU they call it, right?

Page 101

S. ROBINSON

A. Yes.

Q. Let's go to the fourth page of this report -- of this document rather. This is inmate ▮, a disciplinary report on inmate ▮ correct?

A. Yes.

Q. And it looks like the date of hearing on this is January 16, 2014, correct?

A. Yes.

Q. And if you look at the disposition, it's also guilty, right?

A. Yes.

Q. And it looks like underneath that is written 600 -- "code 600, 40 days plus 7 days" -- and I can't read what that is. Do you know what that is?

A. No.

Q. Does it appear to you from this report that inmate ▮ was given 40 days in segregation?

MS. BRENNAN: Object to the form. You can answer.

THE WITNESS: Yes, 40 days and then it says 7 days something else.

Q. Is that Nutraloaf?

A. Oh, that's what that is. Nutraloaf, that means they gave them Nutraloaf to not -- from what I was told, I'm not sure, to not have their private part --

Page 166

S. ROBINSON
and was like, oh, they changed the charges.
Q. Do you know anything about this incident other than what you've read in the article?
A. No.
Q. You don't know who the CO was that was involved in this?
A. No.
Q. Do you know what happened to the legislation that was proposed?
A. No.
Q. Are you familiar at all with the practice of blue boxing detainees?
A. Yes.
Q. Have you been trained in how to do that?
A. Nobody's been trained know how to do it. They just give you the cuffs and tell them to blue box them.
Q. Have you actually done it?
A. I have.
Q. What is that process?
A. You put the handcuffs on a detainee and then you take the box and close the box and lock the box. It's a special key for the box.
Q. And it was described to us on Friday as being a long chain that goes around the detainees. Is that a process

Page 167

S. ROBINSON
you're familiar with?
A. So that's only for certain detainees they do that. But like I guess the aggressive detainees, they put the chain around them. But all the other inmates -- those are the only inmates are blue boxed. Nobody else is blue boxed. Only the aggressive -- the aggressive inmates, those are the ones that's shackled and handcuffed, but those are the only ones that I've seen.
Q. Were you aware of a Sheriff's Department policy of blue boxing detainees with a history of masturbation and exposure when they were being transported?
MS. BRENNAN: Object to the form.
Q. Were you aware of that policy?
A. No.
Q. I know in your current job it doesn't sound like you're involved in transporting detainees, are you?
A. Yes.
Q. You are involved in that?
A. Yes.
Q. How does your current job involve that?
A. I take the workers back. I pick the workers up and take them back to the different divisions, to Division 6 and Division 2.
Q. When you transport your workers from the laundry,

Page 168

S. ROBINSON
are they handcuffed?
A. No.
Q. Are they restrained in any way?
A. No.
Q. Are you aware of the green jumpsuits?
A. Yes.
Q. What do you know about the green jumpsuits?
A. They don't work.
Q. You've seen inmates wearing them?
A. Yes.
Q. And do you know that the green jumpsuits are issued specifically to inmates with a history of masturbation, sexual harassment, exposure?
A. Yes.
Q. And you told me they don't work. What have you observed that leads you to the conclusion they don't work?
A. Well, first of all, the Velcro goes from the crotch area or right before the crotch area to the top and they pop out of them. A lot of inmates are not handcuffed to the back. They're handcuffed to the front so they pop out of them. And a lot of detainees have the top part of the jumpsuit down to their waist and a lot of detainees put holes in the crotch area where their penises hang out. So they still have their penises out and their drawers exposed

Page 169

S. ROBINSON
because they put a hole where the crotch is.
Q. So to your observation, the green jumpsuits were not effective in preventing masturbation and exposure?
A. No. They could be.
Q. How could they be?
A. If you put the Velcro right here at the top and not down here at the bottom.
Q. Are you aware of the pink ID cards?
A. A couple of the inmates have them.
Q. Do you know what they signify?
A. Masturbators.
Q. Have those helped at all?
A. Some inmates that's masturbators don't even have them. When I was in Division 4, I walked a court over and when I took him over, the sergeant told me I can't take him. And I said, well, why can't you take him. He said because he's a 313. And I said, well, his ID and his pass doesn't say he's a 313. I said I'm walking him and he has on a regular DOC. He said, I can't him. You have to go take him to laundry and change him out. I'm like, well, nobody even told me he was a 313 or he's supposed to be in a jumpsuit.
So I took him because the sergeant wouldn't take him. So I took him back and had him change out to a 313, to the jumpsuit, and took him back over to court because