Exhibit 22

DocuSign Envelope ID: 096E207D-BD06-4637-A51F-0A662DA16E2C

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SDAHRIE HOWARD, *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | Judge Matthew F. Kennelly |
| | ) | |
| v. | ) | Mag. Judge Sidney I. Schenkier |
| | ) | |
| COOK COUNTY SHERIFF'S OFFICE, | ) | Case No. 17-CV-8146 |
| *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

## EXPERT REPORT OF LOUISE F. FITZGERALD, Ph.D.

DocuSign Envelope ID: 096E207D-BD06-4637-A51F-0A662DA16E2C

# Table of Contents

Introduction and Overview ................................................................. 2

Summary of Facts and Allegations ....................................................... 4

    PART I:  NATURE AND PREVALENCE OF SEXUAL HARASSMENT .......................... 5

Nature and prevalence of inmate sexual harassment at CCSO.............................. 6

    A. Nature of harassment at CCSO ................................................. 6

    B. Prevalence of harassment at CCSO ............................................ 7

    PART II:  RISK FACTORS FOR SEXUAL HARASSMENT .......................... 9

    A. Organizational Risk Factors ................................................. 9

    B. Analysis of Organizational Risk Factors for Harassment at Cook County Jail and Courthouse ................................................. 10

    PART III:  Harm Caused by Sexual Harassment ................................. 18

    A. Stimulus factors related to sexual harassment ......................... 18

    B. Environmental factors related to sexual harassment. ................. 23

    PART IV:  CONCLUSIONS AND OPINIONS ....................................... 27

Opinions and Conclusions ............................................................... 27

DocuSign Envelope ID: 096E207D-BD06-4637-A51F-0A662DA16E2C

**Louise F. Fitzgerald, Ph.D.**
**Fitzgerald, Collinsworth & Associates**
**85 Fiesta Way**
**Fort Lauderdale, FL 33301**

## Introduction and Overview

February 4, 2019

I, Louise F. Fitzgerald, am Emeritus Professor of Psychology and Gender and Women's Studies at the University of Illinois at Urbana-Champaign, where I held appointments in the Divisions of Clinical/Community Psychology as well as Industrial/Organizational Psychology, and for a number of years directed the Psychology and Law Clinic at the Psychological Services Center.

For the last 20+ years, I have specialized in the study of sexual harassment and other forms of workplace mistreatment: the risk factors and organizational causes, the psychological and other consequences, the ways in which victims respond to such situations, and how organizations can prevent, discourage, and remedy this problem. I have published widely on these topics in peer-reviewed scientific journals in my field. In addition, I have received numerous grants and contracts from government agencies (e.g., U.S. National Institutes of Health, U.S. Department of Defense) to support these and other studies. I have consulted with numerous organizations and institutions concerning their policies and procedures, both in general and in the aftermath of organizational investigations. In recognition of my contributions in this area, I have been named a Fellow of the Society of Industrial and Organizational Psychology; the American Psychological Association named me the 2003 recipient of its career award for Distinguished Contributions to Research in Public Policy. In 2013, the Conference on Occupational Safety and Health presented me with its Lifetime Career Award, and in 2016, the US EEOC named me consultant to its Select Taskforce on Sexual Harassment; I currently serve on the NIH Working Group on Sexual Harassment.

I have been qualified as an expert witness in both state and federal court and provided consultation to the U.S. Equal Employment Opportunity Commission, the U.S. Department of Justice, the U.S. Department of Defense, the U.S. Merit Systems Protection Board, various Legal Aid societies, and numerous private attorneys. I have conducted psychological evaluations of over 100 plaintiffs involved in litigation at the request of both plaintiff and defense attorneys, as well as training workshops on forensic evaluation and CLE sessions for national and state bar and psychological associations. In addition, for over 30 years, I have taught the scientific basis of our knowledge of sexual harassment and workplace mistreatment at both the graduate and undergraduate levels and trained graduate students to become skilled in forensic evaluations. I have testified numerous times in both federal and state court, as well as in administrative hearings. Finally, I have assisted in the preparation of *amicus* briefs for the American Psychological Association (In the matter of *Harris v. Forklift*

2

*Systems, Inc.*) and the National Employment Lawyers Association (In the matter of *Ellerth v. Burlington Industries*).

I was asked by counsel for plaintiffs to consult in the matter of *Howard et al. vs. Cook County Sheriff's Office, and Cook County*, a class action complaint currently pending in the United States District Court, Northern District, Eastern Division, (Case No. 17-cv-8146). Specifically, I was asked to provide a description of the factors that are known to stimulate and facilitate high levels of sexual harassment in work organizations, as well as the characteristics that cause harm to victims, and how they do so; I was also asked to illustrate these characteristics with examples taken from the present case[1]. My opinions are evidence-based and rely on the extensive body of social science research on sexual harassment in organizations and institutions, as well as my over 30 years of experience as a researcher, consultant, and expert in this area.

The report itself begins with a brief statement of my qualifications, followed by a brief description of the facts and allegations to provide context for the analysis that follows. I then describe what is known from social science research concerning the risk factors and conditions that are associated with high levels of harassment in organizations and institutions; I then analyze the degree to which these risk factors are present in the defendant organization, specifically, the Cook County Sheriff's Office. Following this, I review the factors that contribute to harm and distress in instances of sexual harassment and the psychological process by which they do so. Finally, I provide an analysis of the materials, allegations and deposition testimony in the present case with an eye to illuminating the degree to which they do or do not fit these models of prevalence and harm.

---

[1] I offer no opinion on the legal merits of this case, a determination reserved solely to the finder of fact; rather I examine the facts as they have been made known to me and opine from an organizational perspective as to the presence of known factors that give rise to higher levels of harassment, as well as known risk factors for harm.

DocuSign Envelope ID: 096E207D-BD06-4637-A51F-0A662DA16E2C

**Summary of Facts and Allegations**

The Cook County Jail is one of the largest correctional facilities in the United States, housing over 6000 inmates, of whom approximately 95% are male, and employing approximately 10,000 personnel, including both law enforcement and civilian employees. The present complaint is brought by five correctional officers, four deputy sheriffs, and two civilians (one who works as a correctional rehabilitation worker and one paramedic) on behalf of all similarly situated female personnel; they allege that female employees at the Jail and Courthouse[2] are both subjected to widespread and persistent sexual harassment by Jail detainees.  According to available documents, there have been hundreds of instances of male detainees engaging in aggressive, exhibitionistic masturbation and indecent exposure directed at the proposed class members, incidents that have been increasing over the last several years (at least until this lawsuit was filed).  The plaintiffs allege that this behavior is intentionally directed at female employees on the basis of their sex; among other things, the allegations include instances of detainees aiming ejaculations at women and claims that detainees also grope and grab at female employees, and verbally threaten them with rape and sexual assault.

In addition, the plaintiffs allege being targeted with exceptionally vulgar and disgusting sexual comments as well as hostile threats of sexual violence. They allege that detainees' comments include sexual epithets, such as "bitch" and "cunt," as well as explicit descriptions of sexual acts inmates threaten to commit against class members. For example, they allege that detainees threaten to "fuck" them in a variety of different iterations, including, as examples: "Bend over so I can fuck you"; "I'll fuck the shit out of you"; "I'm going to fuck you in your ass." Their allegations also include other sexually explicit statements regarding the women's bodies and detainees' penises and ejaculations. Finally, the complainants allege that they are repeatedly threatened with rape and murder.

According to the plaintiffs, this harassment has been escalating since at least 2014 and occurs routinely and repeatedly throughout the Jail and Courthouse. I have been informed that, between January 2016 and October 2017, more than 1000 reports of masturbation and indecent exposure have been reported to the Cook County Sheriff's Office. The plaintiffs allege that, despite explicit knowledge of the extent and frequency of these occurrences, the Cook County Sheriff's Office and County of Cook have not taken adequate steps to address this situation or impose meaningful consequences on detainees. They further allege that this failure to act exacerbates what is an extremely hostile work environment, allows the behavior to escalate, and fosters a culture amongst detainees that they can behave with impunity and suffer no meaningful punishment.

---

[2] All references to the "Jail" include the jail, courthouse and entire jail complex.

DocuSign Envelope ID: 096E207D-BD06-4637-A51F-0A662DA16E2C

## PART I:  NATURE AND PREVALENCE OF SEXUAL HARASSMENT

The sexual abuse of female correctional officers by inmates and detainees has probably existed since women were first allowed to serve in male facilities, a process that accelerated in the mid-1970's following the passage of the Equal Opportunity Employment Act of 1972.  Although virtually no formal research on this topic exists,[3] news accounts, many curated by the Marshall Project (Santo, 2017) leave little doubt as to the existence and nature of this problem.

A great deal is by now known about sexual harassment of women in the workplace more generally (see, e.g., Fitzgerald & Cortina, 2018, for a recent review) including its nature and prevalence, its causes and consequences, and how organizations can prevent and respond.  In the following pages, I review what is known from social science research about these topics and apply that knowledge to the facts of this case, as they have been made known to me.

Sexual harassment is a form of workplace mistreatment that can be experienced either <u>directly</u> or <u>indirectly</u>, the latter referred to as <u>ambient harassment</u> (National Academy of Sciences ("NAS"), 2018).   Direct harassment consists of three types of behavior: (1) <u>gender harassment/hostility</u> which includes both <u>sexist</u> and <u>sexual hostility</u>, that is, verbal and nonverbal behavior that conveys sexualized hostility, sexual objectification, exclusion, or second class status about women; (2) <u>unwanted sexual attention,</u> which refers to unwelcome verbal or physical advances of a sexual nature (up to and including sexual assault); and (3) <u>sexual coercion</u>, which refers to a situation in which some sort of favorable treatment is conditioned on sexual activity.  Contrary to popular stereotypes, the great majority of sexual harassment involves hostility and degradation rather than romantic interest; gender harassment/hostility is by far the most common form of workplace harassment; straightforward (though unwanted and sometimes offensive) sexual attention is much less widespread, and only a small minority of women experience the manipulative sexual coercion that has recently received such media attention (NAS, 2018).

Such behavior damages not only those to whom it is addressed but reaches beyond the focal individual to affect the entire workgroup, a phenomenon known as <u>ambient harassment</u> (Glomb et al., 1997).  The National Academy of Sciences  (2018) recently defined ambient harassment as the overall level of sexual harassment in a particular workplace, as defined by the frequency of harassing behaviors of all types and level of severity; in this type of harassment, the people negatively affected are not only those directly targeted but rather include bystanders and coworkers who observe or hear about other women being directly targeted.  Thus, ambient harassment refers to the experience of working in an environment permeated with sexually offensive and degrading behavior, that is, a highly sexualized atmosphere in which crude and

---

[3] See Chapman, 2005, for one of the few exceptions.

offensive sexual behavior is common and employees see that it is normative, whether specifically directed at them or not. It refers most obviously to "target-less" actions such as pornographic materials (e.g., posters, magazines) as well as to crudely sexualized and hostile graffiti displayed in the workplace. It also includes such experiences as observing other women being harassed, learning about female coworkers who have been harassed, and witnessing retaliation toward others who complain. Akin to "second-hand smoke," to which it is often compared, ambient harassment refers to the experience of working in an environment in which women, sex, and sexuality are widely and publicly degraded.

Ambient harassment gives rise to "bystander stress" (Schneider,1995), that is, negative job-related, psychological, and health-related consequences that result from witnessing or hearing about sexually offensive experiences of others (or women in general) in one's work environment. Research demonstrates that these effects can be equivalent to those of being a direct target; women who work in environments in which their coworkers are harassed display heightened anxiety, lower job satisfaction and other psychological and job-related consequences; exposure to ambient harassment increases psychological distress and turnover intentions even among those who indicate that they "didn't mind" (Berdahl and Aquino, 2009; Miner-Rubino & Cortina, 2007). Bradley-Geist and her colleagues (2015) provided experimental evidence that ambient exposure affects both women's self-esteem and their career aspirations. The pervasiveness of ambient harassment is directly related to the degree to which the organization tolerates sexually offensive behavior by its employees; that is, the extent to which harassment occurs across a workgroup, whether targeted towards specific individual members or not, reflects standards of acceptable behavior in that particular organization.

Research has shown that ambient harassment reaches beyond individual employees to affect the morale and performance of entire teams, that is, work groups (Raver & Gelfand, 2005); in Raver and Gelfand's (2005) study, ambient harassment affected team cohesion and interpersonal team relationships; ambient sexual hostility was particularly potent, significantly degrading not only team relationships and cohesion but also team performance.

**Nature and prevalence of inmate sexual harassment at CCSO**

### A. Nature of harassment at CCSO

Examination of incident reports, plaintiff statements and depositions reveal that sexual harassment at CCSO overwhelmingly takes the form of an exceptionally vicious form of sexual hostility. Acts of aggressive masturbation predominate, along with (and often accompanied by) threats of sexual violence. Consistent with the research cited

DocuSign Envelope ID: 096E207D-BD06-4637-A51F-0A662DA16E2C

above, such behavior has little to do with sexual desire[4] or an attempt to coerce women into sexual acts; the nature of the relationship between CCSO detainees and female employees does not lend itself to these forms of harassment. Rather, the plaintiffs allege, and incident reports document, a workplace permeated by highly degrading acts that essentially constitute a "once-removed" form of sexual assault, often accompanied by graphic and violent threats of the "real thing."

### B. Prevalence of harassment at CCSO

How widespread is this problem at CCSO? The true prevalence rate of harassment is unknown; however, case materials document over 1000 instances of sexual aggression by inmates across the 22-month period from January 1, 2016 to October 31, 2017 (Exhibit 19); as with all prevalence estimates based on officially reported behavior, this is assuredly a profound under-estimate. Research repeatedly demonstrates that only a small number[5] of workplace victims make any kind of formal report.[6] That figure seems plausible at the Jail where many factors combined to deter female employees from reporting instances of harassment. Further, such behavior is not restricted to a particular division or location, but occurs throughout the Jail and Courthouse, including such areas as dayrooms, medical dispensaries, transport tunnels, "bullpens" and even the law library. Inmates masturbate on the transport buses and in the Emergency Room, in the courtyard, and on the recreation cage patio, singly and in groups; they masturbate in the Central Kitchen, on the bridge, and in Receiving.

Illustrative examples of such complaints appear below:

Gloria Ellis: "I recall a detainee told me, '*Bitch, I want to fuck you right now with this big dick.*'" (Ellis decl.).

Monshai Addison: "*I'm going to fuck you in the ass.*" (Addison decl.).

Patti Jagieleski: "Detainees have said, '*Let me fuck you in the ass*,' '*Show me your titties*,' '*Show me that G spot*,' and '*Suck it.*'" (Jagielski decl.).

Tanisha Cribbs: "On February 24, 2017, detainee ███████████ masturbated with his penis exposed in male holding and stated to me, '*I want to fuck the shit out of you*,' and '*I will suck yo pussy.*'" (Cribbs decl.).

---

[4] This is not to say that perpetrators are uninterested in sexual gratification, but rather that these specific actions reflect not sexual desire but contempt, and the need for power and control.

[5] Figures vary from study to study but rarely rise above 15%; the most recent USMSPB study (2016) reported a complaint rate of 11% and the National Academies report (NAS, 2018) warns against using organizational reporting rates as an estimate of prevalence as so few victims ever report.

[6] Many class members testified that they do not (or no longer) file incident reports because it is useless to do so.

<u>Jessica Correa</u>: "Detainees regularly call me "*bitch*," "*cunt*," and "*whore*." (Correa decl.).

<u>Donnetta Myart</u>: "Detainees have also made threatening statements, such as, '*I'm going to find you and give you what you need*,' while holding their penises in their hands." (Myart decl.).

<u>Sharon Taylor</u>: "[O]ne detainee told me that he was waiting for me, that he would think about me when he was masturbating, and that *he would come and find me after he was released from custody*." (Taylor decl.).

Without exception, all 11 plaintiffs and 40 class members who have so far provided testimony have described multiple inmates masturbating at them, generally while providing running commentary of the crudest and most degrading sort. Inmates routinely and graphically threaten to rape, harm, or even kill the complainants, either now or when they are released and free to seek them out. The sheer number of perpetrators (510 individual perpetrators during the 22-month period summarized in Exhibit 19), as well as the sexually threatening and degrading nature of their actions, combine to produce the most sexually toxic work environment I have encountered in over 30 years of research and practice.

Because the harassment is so widespread, ambient harassment is (almost by definition) even more widespread, affecting even those who have not been exposed directly[7] and compounding the distress of those who have. Although virtually all complainants testified to the almost omnipresent ambient harassment, the declaration of Nurse Shonnita Lanier provides perhaps the most comprehensive description:

"I saw other women working in different jobs being subjected to the same or similar harassment. For example, a female social worker was constantly being catcalled by an inmate and he ultimately grabbed her. Rumors travel through the Jail about a teacher who was raped. My coworkers have warned me: '*Be careful. That happened*.' All of the women staff at the jail experience similar harassment." (Lanier decl.).

***Summary***. Based on the case materials and testimony I have reviewed, the Jail is permeated by a crude and aggressive form of sexual hostility seldom seen (and never tolerated) in other workplaces, whether organizational or institutional. Hard data reveal over 1000 written complaints over a recent 22-month period, a number that likely reflects far fewer than the true number of incidents. It appears that virtually every female CO, deputy, and non-sworn employee has been directly exposed, and it is certain that all have been exposed to the ambient environment, a situation that virtually guarantees high levels of distress, harm, and impact on the entire female workforce.

---

[7] To the degree that any such women exist.

DocuSign Envelope ID: 096E207D-BD06-4637-A51F-0A662DA16E2C

## PART II:  RISK FACTORS FOR SEXUAL HARASSMENT

Why do some organizations have more problems with sexual harassment than others? What are the common factors, that, taken together, produce high levels of harassment and what can be done to counter them? After studying this problem for almost 35 years, scientists have identified a number of specific risk factors that have been reliably shown to give rise to sexual harassment.

Although some men may have a higher likelihood of sexually harassing women than do other men <u>research also demonstrates that an organization with strong management norms and an organizational climate that does not tolerate sexual harassment can inhibit harassment, even on the part of those who would otherwise do so.</u>  This is known as the Person X Situation theory of sexual harassment, first introduced by Pryor, Giedd, and Williams (1995) and consistently borne out by much subsequent research.  Given this situation, it is not surprising that considerable attention has been devoted to determining the organizational conditions and actions that facilitate or inhibit sexual harassment.

### A.  Organizational Risk Factors

It is by now largely accepted in the scientific community that organizational conditions, rather than individual deviance, are the most powerful predictors of sexual harassment in any workplace.  Organizations that are characterized by a masculinized work environment, as well as organizational tolerance of offensive behavior, typically have far greater problems with sexual harassment.  Because balancing organizational gender ratios is a long-term proposition, most research has focused on identifying the nature of a tolerant organizational climate and ways to change it.

***Organizational tolerance for sexual harassment***[8]. Organizational tolerance (sometimes known as organizational climate) is the single most powerful factor in determining whether sexual harassment will occur. Studies have shown that strict management norms and a climate that does not tolerate offensive behavior can inhibit harassment even by those with a propensity to do so (Fitzgerald, Hulin et al., 1997; Pryor et al., 1993; Willness et al., 2007). This is not to say that individual deviance plays no role, nor that some individuals may not be largely immune to either education or consequences; on the whole, however, the data consistently show that organizations can inhibit and reduce harassment if they make the effort to do so.

Organizational climate for sexual harassment has two components:  <u>practical</u> and <u>perceptual</u>.  The <u>practical component</u> consists of such things as policies, complaint procedures, education and training, and the like; the degree to which these are clearly formulated, widely known, and well-executed largely determines the <u>perceptual</u>

---

[8] Organizational tolerance for sexual harassment is also associated with greater harm for targets; this issue is discussed at greater length below.

DocuSign Envelope ID: 096E207D-BD06-4637-A51F-0A662DA16E2C

<u>components</u>, that is, beliefs concerning (1) the degree to which the organization does not take this issue (or one's complaints) seriously, (2) the risk to targets for complaining, and (3) a perceived lack of sanctions against offenders (Hulin, Fitzgerald, & Drasgow, 1996).

Research has shown that perceptions of an organization's tolerance for sexually harassing behavior are significantly related to both direct and ambient sexual harassment. In environments that are seen as more tolerant or permissive, women are likely to be directly harassed (Fitzgerald et al., 1997; Williams, Fitzgerald, and Drasgow, 1999) and to witness harassment of others (Glomb, et al., 1997). A recent meta-analysis that combined data from 41 studies, with a combined sample of nearly 70,000 participants, found perception of organizational tolerance to be the most potent predictor of sexual harassment in work organizations (Willness, Steel, & Lee, 2007). An even more recent national study of over 600 working men (Patel, Griggs, & Miller, 2017) found that harassing behavior was more commonly reported "among men who say their company does not have guidelines against harassment, hotlines to report it, punishment for perpetrators, or who say their managers don't care."

*Summary.* The NAS recently concluded that "The two characteristics of (work) environments most associated with higher rates of sexual harassment are (a) male-dominated gender-ratios and leadership; (b) and organizational climate that communicates tolerance of sexual harassment (e.g., leadership that fails to take complaints seriously, fails to sanction perpetrators, or fails to protect complainants from retaliation)" (National Academy of Sciences, 2018, 49-50). It further states: "Organizational climate is by far the greatest predictor of the occurrence of sexual harassment, and ameliorating it can prevent people from harassing others. A person (with a high likelihood of) harassing others is significantly less likely to do so in an environment that does not support harassing behavior and/or has clear, strong, and transparent consequences for these behaviors" (p. 50-51).

## B. Analysis of Organizational Risk Factors for Harassment at Cook County Jail and Courthouse[9]

Like most correctional institutions, both historically and today, the Cook County Jail is a thoroughly masculinized workplace; not only are the relevant job duties and tasks those that have traditionally been performed by men,[10] but current EEO statistics reveal that slightly over 70% of CCSO corrections officers are men, thus producing a setting and culture that tends to be associated with a more tolerant organizational environment (Fitzgerald et al., 1997).

---

[9] It is important to note that this analysis is based solely on the allegations, documents and testimony that I have reviewed, not formal findings of fact.

[10] Historically, women have been largely barred from working in correctional institutions, and It was only in the 1970's and '80's that they were able to serve in all 50 states.

As noted above, however, organizational climate for sexual harassment is by far the most powerful predictor of whether sexual harassment will occur and will be damaging when it does. Research consistently demonstrates that the essence of an organizational climate that does not tolerate harassment is one in which members perceive that the organization takes this problem seriously, it is safe to complain, and there are meaningful sanctions for perpetrators. Such a climate sends a strong message to both potential perpetrators and potential targets that the organization does not tolerate harassment. This section of the report addresses the degree to which CCSO manifests elements of organizational tolerance for sexual harassment.

***1. Degree to which the issue is taken seriously***. The record contains numerous indicators that CCSO has a history of not taking inmate sexual harassment (or employee complaints about it) particularly seriously. Until the inception of this lawsuit and the Court's preliminary injunction entered on November 28, 2017, the department had no written policy concerning sexual harassment by inmates; although policies in and of themselves are insufficient to address this problem, the lack of any policy suggests that the issue is simply nowhere on the organizational radar. In addition, employees received (and continue to receive) no formal training on the topic, despite the fact that incident reports have soared across the last 5 years.

According to plaintiffs, the sexual harassment of female employees by inmates was largely considered by CCSO supervisors, managers and male coworkers as simply a fact of life, a stance reflected publicly in 2017 by CCSO's Policy Director in a statement to the press: *"(This is) something that happens in a custodial environment, period"* (10/28/17). Other examples include:

- Esther Jones testified that neither the sergeants nor lieutenants wanted to take time to write up masturbation incidents and that they were tired of hearing the women complain. (Jones dep., 62-63; 134-135).

- Darlene McCord testified that in response to complaints about masturbation, her male supervisor told her "*It's nothing. That happens all the time.*" (McCord decl.).

- Christina Muhammed testified that "I have been told by supervisors that this behavior *'is just part of the job'*" and *"this is what you're paid for.*" (Muhammed decl.).

- Oneka Conley testified that women have regularly been told that detainee sexual misconduct is "*part of the job.*" (Conley decl.).

- Susana Plasencia was told by her supervisors that *"(T)here's not anything we can really do about it."* (Plasencia dep., 129).

- When Denise Hobbs complained that a detainee told her, "You make my dick hard," the sergeant responded, "*Hobbs, that's a compliment.*" (Hobbs Dep., 101-102).

- After a detainee stood on his bunk in his underwear, masturbating at Dominique Freeman, the officer on duty said, "*I'm sorry that happened to you, but this is what they do.*" (Freeman dep., p. 163).

- A male coworker told Evette Trejo that she was only upset because she "*hadn't seen a dick before.*" (Trejo decl.).

In addition to this apparently widespread belief that harassment by inmates was expected and inevitable, courthouse deputies and non-sworn employees had no reliable channels for complaining. For example:

- Deputies in the courthouse were not able to write up the standard jail incident reports for inmates in order to trigger discipline. (Placensia dep., 86, describing process that courts followed prior to November of 2017).

- The healthcare workers who provide treatment to inmates had no ability to file an incident report. If they wanted to make a complaint, they had to get an officer to do so, but officers would often ignore them or refuse. For example, Tavi Burroughs testified that when she asks officers to help her deal with masturbating or sexual harassment from inmates, they ignore her. (Burroughs dep., 52, 184).

- Tavi Burroughs also testified that when she was groped by a detainee, the male officer she reported it to refused to write it up, because he claimed he did not see it. (Burroughs dep., 130).

- Gabriela Henderson, a Correctional Rehabilitation worker, testified that a male sergeant told her he would not pursue discipline against a masturbating inmate because "*I wasn't there, I didn't see it.*" (G. Henderson decl.).

Other women filed complaints but got no response. For example:

- Denise Hobbs testified that when she and two other plaintiffs filed an OPR (Office of Professional Responsibility) complaint against the Sheriff's Office regarding detainee sexual harassment (among other issues) no one ever followed up with her. (Hobbs Dep., 7-9).

- Susana Plasencia testified that, despite more than a dozen complaints of masturbation/indecent exposure, no one ever followed up to tell her whether any discipline was issued (Plasencia dep., 108); Tawanda Wilson was also never told the results of any of the harassment complaints she made. (T. Wilson dep., 158).

- Rita McCoy testified to being assaulted by an inmate; after she wrote the incident up and tried to pursue criminal charges, she was not contacted for a year. When she was contacted, she was discouraged from pursuing charges, being told *"[h]e didn't touch you.*" (McCoy decl.).

- Another time she tried to pursue criminal charges against a masturbating inmate, she was told there was a "backlog." (*Id.*).

And some were actively discouraged from complaining:

- According to <u>Tawanda Wilson</u>, she and others were told to stop filing criminal charges against masturbating inmates.  (T. Wilson dep., 108).

- <u>Jacqueline Brown</u>[11] testified that she was told a number of times by Sgt. Spearman not to complete an incident report because *"he doesn't have the time to complete his part."* (Brown2 decl.).

- <u>Tamara Anderson</u> testified that when she complained about masturbation her superiors told her "*stop being so sensitive*," "*this is part of your job*," and the Jail is "*their house, they can do what they want to do in their house*." (Anderson decl.).

- <u>Dominique Freeman</u> has felt discouraged from complaining many times, including when three officers who were present when a detainee exposed his penis to her told their commanding officer that they didn't see anything.  (Freeman dep., 145-46).

- <u>Evette Trejo</u> was discouraged from complaining because her supervisors did not take her complaints seriously and did not want to file the paperwork.  (Trejo decl.).

**2. Risk for complaining**.  Considerable evidence suggests that plaintiffs perceived that complaining about harassment was not only largely futile but could also be risky; unlike women in more traditional work settings, these corrections officers fear not only job-related consequences but also physical retaliation from detainees.  A number of women testified about these fears and their concern that the CCSO would neither respond to nor protect them.

For example, some women fear <u>inmate attack</u>:

- <u>Sharon Robinson</u> testified she stopped writing disciplinary reports for masturbation after a detainee threatened her for writing him up.  After identifying Ms. Robinson as the "*bitch who press charges on me*," he said, "*I see what kind of car you drive. . . . When I find you, I am going to kill you, bitch.  I am going to rape you*."  (Robinson dep., 50, 107, 115-117).

---

[11] There are two class members named Jacqueline Brown; this comment refers to Jacqueline Brown who began work at CCSO in 1998.

- <u>Tawanda Wilson</u> testified that she was confronted by an inmate after she tried to press criminal charges. (T. Wilson dep., 145-146). Another detainee was able to swing the door open and chase after her while holding his penis masturbating, yelling *"fuck you, bitch"* when she told him to stop. (*Id.*, 201).

- <u>Bridget Insley</u> testified to being threatened and harassed repeatedly by an inmate after she filed charges against him. (Insley decl.).

- <u>Lori Ponce</u> testified that she and others are reluctant to file complaints about inmate sexual misconduct because the inmates threaten the women with retaliation. (Ponce decl.).

Others fear <u>retaliation from coworkers</u>, and/or <u>losing their job</u>:

- <u>Sdahrie Howard</u> testified that Sergeant Vega (from CIID) told her that the female officers' lawsuit was frivolous, and threatened retaliation: *"once it's unfounded, I'm sending it right to OP – OPI and they'll be up there fighting for their jobs*." (Howard dep., 245-46).

- <u>Shonnita Lanier</u> testified that she was told by her own supervisor, *"snitches get stiches*" after he refused to follow up on her report of masturbation by inmates. (Lanier decl.).

- <u>Donnetta Myart</u> testified that after she wrote up several inmates for masturbating, she was transferred to a less desirable position; she believed her supervisor did not want to deal with disciplining inmates. (Myart decl.).

- <u>Sheleda Groves</u> testified that when she writes up a masturbating inmate, her supervisor focuses on her (Groves') behavior for possible discipline. (Groves decl.).

- <u>Kimberly Bowen</u> testified that she was temporarily reassigned to an undesirable location in response to her filing a complaint of detainee sexual misconduct. (Bowen decl.).

- <u>Balvina "Bo" Ranney</u> testified that female deputies expressed concern to her about the risk of complaining about inmate sexual misconduct *("[Management is] going to fuck with me.")*. (Ranney dep., 165).

Still others testified that women officers are often <u>investigated for their attempts to </u>stop masturbation or imminent ejaculation.

- <u>Kimberly Crawford-Alexander</u> testified that she was investigated and assigned remedial training after she used force to protect herself against a detainee. (Crawford-Alexander dep., 192-193).

- <u>Tanisha Henderson</u> testified she is afraid to stop the masturbation, "*they know that if we intervene, the cameras will show the officer yelling at the inmate. The inmate will complain that the officer was aggressive, and the County will settle with the inmate but not protect us. I am afraid to be involved in any confrontational situations*."  (T. Henderson decl.).

- <u>Denise Hobbs</u> testified that both detainees and correctional officers know that the correctional officers will be the ones looked at, regarding how they "*react or handle the situation as opposed to what the inmate had done to cause you to intervene or do something.*" (Hobbs dep., 127).  She testified that detainees take advantage of the presence of cameras, threatening that they would "*take your job.*"  (*Id.*).

   ***3.  Meaningful sanctions***.  Reliable discipline for bad behavior is an integral component of an organizational climate that does not tolerate sexual harassment, and some research suggests that it may be the most powerful (Hunter-Williams, Drasgow, & Fitzgerald, 1999); however, many class members testified that there were few consequences to inmates for their misconduct and abuse and thus little point in reporting.

- <u>Tawanda Wilson</u> testified the polices are not enforced. "*[I]nmates are still pulling out their penis like it's nothing.*" (T. Wilson dep., 84).  *"[T]hey do it so many times, I'm getting tired reporting it and nothing happening.*" (T. Wilson dep., 249).

- <u>Oneka Conley</u> testified she was discouraged from continuing to write up incident reports for sexual misconduct because there were no consequences to the detainees.  (Conley decl.).

- <u>Angelique Herrera</u> testified that she was discouraged from continuing to file reports because of supervisor responses, such as "*[w]hat do you expect, they are locked up all day. You can't blame them for acting like that when they see a pretty girl."* (Herrera decl.).[12]

- Many women testified that their male supervisors made no real effort to discipline detainees that harass them (Perez decl.; Shelton decl.).

- Some women have been told multiple times that "*there is nothing to be done*" about the harassment.  (Bowen decl.).

---

[12] This set of responses illustrates the close connection among various aspects of organizational climate; if employees have reason to believe that their complaints are not taken seriously, they also tend to believe that nothing will happen in response; they are then less likely to complain.  Thus, do perceptions drive behavior.

DocuSign Envelope ID: 096E207D-BD06-4637-A51F-0A662DA16E2C

- <u>Kimberly Crawford-Alexander</u> testified that despite the frequency of the masturbation, the number of complaints, and requests to bring criminal charges, no one was responding. (Crawford-Alexander dep., 145-146). She testified, "*nobody was doing anything.*" (Crawford-Alexander dep., 231).

- <u>Denise Hobbs</u> testified that the Sheriff's Office as a whole has failed to discipline detainees for sexual harassment. (Hobbs dep., 81). For example, she felt she "got no support" in one particular complaint she made about masturbation, other than her boss spoke to the detainee – "*But as far as issuing any discipline or anything like that, they did nothing*." (Hobbs dep., 100).

- <u>Christina Muhammed</u> testified that even after she was struck in the face by an inmate (while he was threatening to "*fuck her in the ass,*") no criminal charges were pursued. (Muhammed decl.).

- <u>Shonnita Lanier</u> testified that she was providing medical care when an inmate started vigorously stroking his penis and instructing her to "*look at it.*" Although she called for an officer to assist, she is not aware that any discipline was issued[13] (Lanier decl.).

- <u>Kelly Shields</u> testified that discipline that they tried to issue was allowed to expire, meaning no discipline was given.[14] (Shields decl.).

Discipline that is issued is meaningless to detainees:

- <u>Sharon Robinson</u> testified that (at least prior to this lawsuit) detainees who are written up for masturbation still get commissary, still get to have visits, watch TV, and use the phone, even when they are in segregation. (S. Robinson dep., 156).

- According to <u>Cassandra Shelton</u>, detainees will make statements that they do not care about being written up, such as "*I don't care lady—it's not going to do nothing.*" (Shelton decl.). Sometimes detainees mock the women if they are ordered to stop masturbating (*Id.*).

- Detainees have told women that instruct them to stop masturbating: *"Nothing going to happen,"* or "*I'll be back tomorrow.*" (Bowen decl.).

---

[13] Recall that nonsworn personnel cannot file incident reports on their own.

[14] The rate of expiration of masturbation/indecent exposure disciplinary tickets between 1/2016 and 10/17 was 22% (masturbation) and 28% (indecent exposure) and 24% combined. (Exh. 19, 145839-846). This is considerably lower than the overall rate of expiration for all disciplinary tickets.

- Others have been told, "*write it up, nothing will happen*" (McCoy decl.); or "*yeah, we'll take care of it.*" (Webster decl.).

- <u>Donetta Myart</u> recounted that, when she instructed an inmate to stop masturbating and threatened to write him up, he replied *"so what"* and continued masturbating. (Myart decl.).

- Some officers believe that the lack of consequences tends[15] to egg on the sexual misconduct by other detainees (L. Anderson decl.).

Criminal charges are frequently not pursued:

- <u>Sharon Robinson</u> testified that Sheriff's investigators do not always follow up when an officer writes in a disciplinary report that they want to press charges. (S. Robinson dec., 67, 134). *See also* D. Thomas decl.

- <u>Kelly Shields</u> testified that she has sought to press criminal charges on 5 or 6 occasions and was never contacted in response (Shields decl.).

- <u>Lori Ponce</u> was told by a Sheriff's investigator not to bother filing charges because, "*[n]ine times out of ten, it's going to be dropped because they are facing bigger charges.*" (Ponce decl.).

Other women testified inmates were actually rewarded for sexual misconduct. For example:

- <u>Latarsha Anderson</u> testified that inmates who had masturbated and then stopped for a period of time, were treated to pizza parties. (L. Anderson decl.).

- <u>Angelique Herrera</u> testified that detainees have joked about the masturbation, stating that, *"if they are good they will get a pizza party.*" (Herrera decl.).

- <u>Sheleda Groves</u> also testified that "*detainees even get rewarded sometimes for their bad behavior.*" (Groves decl.).

Complainants are not told whether their reports result in discipline, adding to their perception that there are no meaningful consequences:

- <u>Tavi Burroughs</u> testified that when she does report an incident of masturbation, she does not know if the detainee is disciplined. She stated, *"I would like to see immediate discipline."* (Burroughs dep., 109).

---

[15] CCSO's own documents suggest that even when women were able to pursue discipline, no discipline was issued in about 40% of the cases.

DocuSign Envelope ID: 096E207D-BD06-4637-A51F-0A662DA16E2C

- <u>Sdahrie Howard</u> testified that when officers write up detainees for masturbating, the inmates often stay right on the tier where she is working, but the officer is not told whether the detainee received any discipline or not.  (Howard dep., 134-36).

- <u>Darlene McCord</u> testified that after filing 20 incident reports, she was never told the outcome of her complaints.  (McCord decl.).

***Summary.***  The evidence presented here suggests that the organizational climate within CCSO tolerates the sexual abuse of female employees by inmates; there is a widespread perception – and considerable "hard data" - that CCSO staff simply does not take this issue seriously or discipline offenders effectively; many women believe that they risk not only hostile and violent retaliation from inmates for complaining, but also damage to their jobs or job conditions from supervisors and managers, who don't want to be bothered with what is seen as a relatively trivial issue.  Such perceptions are the essence of what is meant by a workplace climate that tolerates sexual harassment.

## PART III:  Harm Caused by Sexual Harassment

Three sets of pathogenic factors underlie the harms of sexual harassment: <u>stimulus factors</u> (i.e., the severity of the harassment itself), the <u>vulnerability of the victim</u>[16] and the <u>organizational or institutional environment</u> in which the harassment takes place.  As explained below, the stimulus factors and organizational environment documented to be present in the Jail are likely to lead to increased harm to the victims of harassment.

### A. Stimulus factors related to sexual harassment

Sexual harassment can be thought of as an occupational stressor like any other, and the familiar determinants of stressor severity apply:  that is, <u>frequency</u>, <u>intensity</u>, and <u>duration</u>.  Frequency and duration are self-explanatory, and both have been empirically linked to harm; that is, the more frequently the subject is harassed, and the longer she is exposed to the situation, the more damage she is likely to experience. Numerous studies have found that frequency is, in general, the most potent of the three stimulus factors; although the type of harassment (intensity) also contribute significantly to outcome.  This is particularly true when the situation is hostile, threatening, physical and explicit.

Intensity is a complex issue which can be simply and informally stated as:  what makes a bad situation bad?  A number of factors have been identified to date; for example, behavior that is <u>hostile and threatening</u>, <u>physical </u>(as opposed to merely verbal), and <u>explicitly sexual,</u> that is <u>directed at a specific target</u> (as opposed to women

---

[16] Given the nature of the present class action proceedings, it is not possible to address the vulnerability of individual victims.

in general) by a <u>powerful offender</u> and/or <u>multiple offenders,</u> engaging in <u>multiple forms of behavior,</u> from which it is <u>difficult to escape</u> is the paradigmatic case of severe sexual harassment.

<u>An additional factor that adds to the stress of this experience is uncertainty</u>. Uncertainty has long been identified as a major stress inducer; multiple studies demonstrate that uncertainty concerning the meaning or inevitability of various events contributes to anxiety; these effects have been studied both experimentally (DeBerker et al., 2016) and in the context of naturally occurring events (Mishel, 2014). The virtually unanimous finding is that uncertainty concerning whether a negative event will happen or not is more stressful than the certainty that it will (or will not) happen. There are various explanations for this phenomenon, most of which emphasize that uncertainty requires the individual to be on constant alert (i.e., in a constant state of physiological arousal); the resulting anxiety produces a sustained stress response to an unpredictable threat.

Finally, as noted above, the duration of the stressful situation is highly correlated with various types of harm; the longer an individual is exposed to a stressor, the more damaged they are likely to be.

With specific reference to CCSO, the Plaintiffs and Class Members describe virtually all the severity factors related to harm. The following examples are illustrative and far from exhaustive:

1. ***Frequency:***

<u>Latarsha Anderson</u>: A CO who works mainly in transportation, Sgt. Anderson testified, "*I experience harassment from the male trainees daily."* (L. Anderson decl.).

<u>Kelly Shields</u>: A Sheriff's Deputy, who works in the court system, testified that crude sexual comments were directed at her *"almost every day"* (Shields decl.).

<u>Tamara Anderson</u>: Sgt. Anderson testified that when she worked in Division 9, *"the masturbation occurred every day.*" (T. Anderson decl.).

<u>Patricia Green</u>: A registered nurse who takes care of inmate medical needs, and administers medication on the tiers, testified: *"On almost every tier, there are inmates masturbating every day."* (Green decl.).

<u>Jacqueline Brown</u>, a Correctional Officer who worked at CCSO for 15 years, testified, *"I experienced crude and sexual comments so frequently that I lost track of how many times. . . ."* (Brown1 decl.).

2. ***Intensity***:

***Multiple offenders***.  Virtually all of the complainants allege being harassed not only multiple times, but by multiple inmates.  Perhaps the most striking examples of this risk factor are the numerous descriptions of group harassment.  For example:

> Sharon Taylor: "*At times, there would be as many as ten to fifteen detainees masturbating in the same bullpen at the same time. I cannot recall the exact number of detainees involved in a specific group masturbation incident; I have lost count.*" (Taylor decl.).

> Sheleda Groves: *"When detainees from Division 9 were in the holding cell, they would come as close as they could to where me and other female correctional officers were sitting, pull out their penises, and masturbate as a group, in front of everyone."* (Groves decl.).

> Latarsha Anderson*: "I walked to the bullpen and saw approximately 5-6 detainees standing side-by-side, all with their penises out of their pants and stroking them.  One of them actually "bust" [ejaculated] on the window."* (L. Anderson decl.).

> Tamara Anderson: *"Once I went on tier in division 9 and the entire deck was masturbating with their penises exposed through the chuckholes*." (T. Anderson decl.).

***Sexual***.  Not all harassment directed at women is specifically sexual in nature; some is more broadly sexist, mainly conveying contempt for women as women[17]; although such harassment can certainly be damaging, it is particularly so when the behavior is specifically sexual.  Virtually all class members described this type of harassment in the CCSO.

> Christina Lopez: "Other comments I have heard include: '*Sit on my face and suck my dick,'* '*look at the ass on her*,' and "*I am going to swallow your pussy.*'" (Lopez decl.).

> Sharon Taylor: "I have had other inappropriate comments directed at me including... '*I want to suck your pussy*,' and, '*Let me lick your ass*.' I have heard these types of comments from detainees more times than I could count." (Taylor decl.).

---

[17] An example in the present case is a situation faced by Class member Christina Lopez: "On April 26, 2016, I was supervising the Kitchen when an inmate called me a bitch. I sent him back to his dormitory and he said, '*This is why they should never give pussy the power. Ain't no one even listening to this Bitch; I should slap her.'"* (Lopez decl.).

Angelique Herrera: "They have said, *'I want to bend her over,'* or *'just give me one shot with her.'* They also tell me that they can smell my vagina and would love to taste it, that they will '*treat me good*,' and that they will look for me when they get out." (Herrera decl.).

Patricia Green: "Division 10 detainees also make sexual advances at me. For example, one inmate wrote me a letter describing wanting to have sex with me when he is released from the Jail, talking about how he dreams about different ways of having sex with me and wants a relationship with me." (Green decl.).

**Hostile.** Sexualized behavior that is hostile or threatening is particularly traumatizing. Research has shown that rape is women's greatest fear (Gordon & Riger, 1989), even greater than murder, and also that sexual harassment elevates women's fear of rape. Much of the harassment directed at plaintiffs and class members was hostile, threatening and filled with violent threats. For example:

Sybil Keys: "One detainee told me he would *'fuck me in the ass so hard, cum would come out of my ears and nose*.'" (Keys decl.).

Gloria Ellis: "I recall a detainee told me, '*Bitch, I want to fuck you right now with this big dick.'*" (Ellis decl.).

Tanisha Henderson: "I hear crude or sexual comments from male detainees directed at me all the time. The comments are so severe, I often am afraid I will be raped. I hear comments from detainees such as, '*I'm going to fuck your big ass*,' 'I'll *fuck you*,' '*look at that ass*,' and '*bitch, where do you live*?'." (Henderson decl.).

Christina Lopez: "That first week, I was standing by the elevator and a detainee said, '*I'll bend you over and fuck the shit out of you with your fat ass*.'" (Lopez decl.).

Donnetta Myart: "Detainees have also made threatening statements, such as, '*I'm going to find you and give you what you need*,' while holding their penises in their hands." (Myart decl.).

Jessica Correa: "Detainees have also made sexually threatening comments such as, '*I'm going to stick this dick in you*.'" (Correa decl.).

Tanisha Cribbs: "[D]etainees have told me, '*I will rape you*," ... and '*I'll fuck the shit out of you.'*" (Cribbs decl.).

Given this very high level of aggressive sexual hostility, it is not surprising that many class members describe an elevated fear of rape: *see, e.g.*, Rey decl. ("*one day, a female officer is going to be* _raped_"); Washington-Farr decl. ("*I am constantly looking over my back, paranoid that I will be* _raped_"); Groves decl. ("*I am afraid of being* _raped_");

Shelton decl. ("*I am fearful that I will be trapped with one or more inmates during an inmate transfer and _raped_*"); Bowen decl. ("*I am afraid that one day a detainee will grab me and _rape_ me*"); Montgomery decl. ("*I'm worried that one of us will get _raped_").*

### 3. *Duration:*

Documents produced in the litigation suggest that sexual harassment has been occurring since at least 2014. Although the number of reported incidents does not capture all or even much of the harassment, documents reflect that there were approximately 200 public indecency incidents reported in 2014; 250 incidents reported in 2015; and more than 1000 reports of sexual violations in 2016 through October of 2017. Other documents show there were 607 reported incidents in 2017 alone. Whatever the actual number of incidents that occurred, it appears that the sexual harassment has been occurring since at least 2014 (Curry Exh. 3; 5; 6; 8; 30). Testimony from numerous women indicate the harassment has been occurring for several years. *See* Brown2 decl. (describing harassment over period of years); Montgomery decl. (harassment increasing over years); Ray decl. (describing harassment over many years); Washington-Farr decl.; Webster decl.; Williams decl.

### 4. *Inability to escape and Uncertainty*:

An inability to escape harassment and uncertainty as to when it may occur have been shown to increase the severity of harassment experienced. Several women testified to feelings of heightened stress due to their inability to escape the harassment and the uncertainty of when they could be harassed again. These factors are also related to the ambient harassment that occurs in the Jail described above.

Patricia Brown-Conley testified that after being diagnosed with PTSD due to sexual harassment, her request to have less contact with inmates due to her health was denied. (Brown-Conley decl.).

Anntionettea Montgomery testified to her inability to escape harassment and feeling of helplessness: "*I feel so helpless at work. I get so stressed out about going to work. I have to go in and my stomach is in knots.*" (Montgomery decl.).

Kimberly Crawford–Alexander described feelings of uncertainty "*and just that uneasy expectation of what's going to happen. You know, it's a little unnerving….*" (Crawford-Alexand dep., p. 295).

Denise Hobbs described anticipatory anxiety *("You had to come in there to work every day knowing that again I could be subject to and was.*") (Hobbs dep., 198).

Christina Lopez described this as follows: "*I am uncomfortable all the time. I am nervous and anxious about seeing masturbation and humiliated by the way the detainees talk to me. It makes me embarrassed and ashamed*". (Lopez decl.).

22

DocuSign Envelope ID: 096E207D-BD06-4637-A51F-0A662DA16E2C

**B. Environmental factors related to sexual harassment.**

The context in which harassment occurs can exacerbate or ameliorate its impact. For example, being harassed in a non-responsive and non-supportive environment is considerably more damaging than being harassed in one that provides intervention and support.  Psychologists have long known that individuals harassed in what is labeled a <u>tolerant organizational climate</u> have worse outcomes than others; indeed, numerous studies show that organizational tolerance of sexual harassment contributes significantly to harm over and above that done by harassment itself.  Organizational tolerance was originally defined as not taking the issue of harassment seriously, risk to the target for complaining, and a lack of meaningful sanctions for offenders; organizations and institutions who display this set of conditions have considerably higher rates of harassment and, as noted above, such an environment is itself a significant risk factor for harm[18] (see Fitzgerald et al., 1997; and more generally, Sojo et al., 2012 and Yang et al., 2014).

 <u>Ambient sexual harassment</u> is a second environmental factor that has been found to lead to harm.  Ambient harassment is defined as the overall level of sexual harassment in a work group as measured by the frequency of sexually harassing behaviors experienced by other women in the group. The frequency and intensity of the harassment described above would lead to a high level of ambient harassment. As discussed earlier, ambient harassment gives rise to "bystander stress" (Schneider,1995), that is, negative job-related, psychological, and health-related consequences that result from witnessing or hearing about sexually offensive experiences of other women in one's work environment. Many women testified to negative consequences (psychological, job-related and health-related) as a result of anticipating harassment or ambient harassment.  *See, e.g.*, Anderson decl.; Brown-Conley decl.; Brown1 decl.; Green decl. (witnessed coworker being ejaculated on); T. Henderson decl.; Keys decl. (coworker was ejaculated at); L. Macklin decl. (hearing about harassment of other women).

Finally, Smith and her colleague (Smith & Freyd, 2014) have recently demonstrated the serious impact of a phenomenon labeled <u>institutional betrayal</u>.  The term refers to wrongdoings perpetrated by an institution upon individuals dependent on that institution, including failure to prevent or respond supportively to wrongdoings by individuals (e.g. sexual harassment, sexual assault) committed within the context of the institution.  Institutional betrayal encompasses acts of commission as well as omission; commission includes such things as blaming a victim when she reports abuse or retaliating against her; acts of omission include not responding to complaints, failing to sanction perpetrators, and the like.  Institutional betrayal is related to the concept of a tolerant organizational environment, but can be distinguished by, among other things, the fact that it is an institutional response to reports of wrongdoing (i.e., after the fact)

---

[18] The three aspects of organizational tolerance were previously discussed, along with extensive examples; I will not repeat that discussion here, but it is important to note the dual role played by organizational conditions as both a precipitant of harassment and an additional influence on harm.

rather than a climate that can precipitate wrongdoing by tolerating it. Like a tolerant organizational climate, institutional betrayal has been shown to contribute to psychological harm over and above that caused by the original wrongdoing itself.

Several women testified that the organizational response from the Jail increased their distress from the sexual harassment.

Tavi Burroughs described her feelings of organizational betrayal: "*it's just one instance of indifference and the degradation that we get from both the inmates and the Sheriff's Office and my employer.*"  (Burroughs dep., 159).

Sharon Robinson described symptoms associated with organizational betrayal; She testified to feeling upset and endangered by the Sheriff's office when she was attacked by detainee ███████ because she had pressed charges against him for masturbating. (S. Robinson dep., 114).  She also testified that her supervisor, Lieutenant Pierce, didn't care that the inmate might attack her.  (*Id*; *See also* 108, "*You jeopardized my life putting me back on this tier where this man where I pressed charges on him.*").

Kimberly Crawford–Alexander described feeling betrayed by her coworkers: "*But like constantly, constantly, and then you have partners there, they're not helping you. They're not saying nothing, you know. And it's a daily basis. It's kind of over – overwhelming, you know.*" (Crawford-Alexander dep., 197).


Christina Lopez described experiencing organizational betrayal ("*I feel like I am worthless.  I am not valued as an employee.  I am embarrassed to work for the Cook County Sheriff's Office; the sheriff does not care about us or our safety. My workplace is unsafe.  If something happens to one of us, the sheriff doesn't care. He'll just find another body to take the abuse.*" (Lopez decl.).

Lisa Yates described feeling powerless and betrayed by management: "*I feel like my employers do not care about our well-being or what happens to female Correctional Officers.  I feel that they are more concerned about detainees' well-being.*"  (Yates decl.).

Sheleda Groves testified to experiencing organizational betrayal: "*I feel betrayed. I feel lied to. I feel unprotected.  I am helpless to change by situation.*" (Groves decl.).

Rita McCoy described experiencing organizational betrayal: "*After the attack, no one from the county came to check on me, no one asked if I needed to talk to a therapist.*"  (McCoy decl.).

DocuSign Envelope ID: 096E207D-BD06-4637-A51F-0A662DA16E2C

### C. Impact of Sexual Harassment

Sexual harassment has been linked to three broad categories of harm: psychological, job-related, and health-related. A review of the materials here demonstrates that the women working in the Jail describe experiencing typical and expected reactions to the sexual harassment, in the form of psychological consequences, job related difficulties and detrimental health consequences.

**1. *Psychological consequences*.** Numerous studies document that harassing sexual behavior has serious emotional consequences; a number of rigorous investigations have confirmed that such experiences can cause substantial emotional damage, even when they are less serious and intense than those typically required to trigger statutory relief. By 2018, researchers had produced nearly 200 studies documenting the nature and severity of the harm harassment does to victims, including decrements in general mental health (Fitzgerald, Drasgow, Hulin, Gelfand, and Magley, 1997), increases in depression and anxiety disorders (Ho, Dinh, Bellefontaine, & Irving, 2012; Reed, Collinsworth, & Fitzgerald, 2016); increased incidence of alcohol abuse (Rospenda, Fujishiro, Shannon, & Richman, 2008); elevated risk of eating disorders (Harned & Fitzgerald, 2002); and symptoms of post-traumatic stress disorder (Ho, et al., 2012; Willness, et al., 2007). Dionisi, Barling, and Dupres (2012) reported that all forms of sexual harassment were more strongly associated with decrements in psychological well-being than other forms of workplace aggression.

Research has linked sexual harassment not only to psychological distress (i.e., symptoms) but also to actual diagnosable psychological disorder (e.g., major depressive disorder, post-traumatic stress disorder). Women who have experienced sexual harassment are significantly more likely to suffer from Post-Traumatic Stress Disorder and Major Depressive Disorder than other women. In a similar vein (Dansky & Kilpatrick, 1997), Fitzgerald and her colleagues (Fitzgerald, Buchanan et al., 1999) found that the most common diagnoses found among harassment plaintiffs are Major Depressive Disorder and Post-Traumatic Stress Disorder. Other work reveals that harassment significantly increases women's fear of rape, lowers their self-esteem, and damages their sense of safety and trust of others.

Many of the Plaintiffs and Class Members described typical psychological distress associated with harassment. *See, e.g.*, Altman dep., 295, 331-36; Burroughs dep., 281; Crawford-Alexander dep., 281, 293-98; Hobbs dep., 197-205; Howard dep., 290-92; S. Robinson dep., 193-95; T. Wilson dep., 271-76; McCord decl. ("*It was getting crazy and it made me feel heavily stressed at work and in my everyday life*"); McCoy decl. ("*The sexual harassment is degrading and it takes a toll on you mentally. It makes me feel less as a woman*"); Montgomery decl. ("*I feel so helpless at work. I get so stressed out about going to work. I have to go in and my stomach is in knots. Sometimes I am scared. I feel like I lost control*"); and Williams decl. ("*As a result of the constant sexual harassment, my marriage has suffered. . . . I started seeking therapy because of the harassment*").

***2. Job-related consequences.*** Dozens of studies have made clear that sexual harassment also takes a toll on women's work lives. Across a wide range of industries, researchers find that encounters with sexual harassment on the job predict reductions in <u>job satisfaction</u> (e.g., Lim & Cortina 2005; Lonsway et al., 2013). This is a strong finding that applies not only to white American civilian women, but also U.S. military personnel, women of color in the U.S., and women in other nations (e.g., Canada, Mainland China, Hong Kong, Turkey). Recent meta-analytic reviews (a sophisticated statistical method of combining multiple studies to produce a more reliable result) confirm these findings (Willness, Steel and Lee, 2007).

<u>Organizational withdrawal</u> is another common consequence of sexual harassment, a consequence that has major implications for employers. Many harassed women engage in some form of *work withdrawal*, remaining in their job but disengaging from it (via absenteeism, tardiness, neglect of assignments, etc.). Others contemplate more complete forms of *job withdrawal*—quitting their jobs altogether (e.g., O'Connell & Korabik 2000; Schneider et al., 1997; Shupe et al., 2002). Sims, Drasgow and Fitzgerald (2005) tracked military servicewomen over a 4-year time-span, and correlated their experiences with administrative records, finding that harassed women leave their employment at higher rates than other women. Organizational withdrawal is often interpreted as a method of escaping an abusive situation; it is an obviously effective method, but one that comes with considerable costs—social, economic, and professional. This does not count the cost to employers, such as turnover, replacement costs for hiring and training, reputational damage, litigation costs and so forth.

Sexual harassment also detracts from <u>productivity and performance</u>, as shown through both surveys (Barling et al., 2001; Magley et al. 1999; Raver & Gelfand, 2005) and experimental studies (Woodzicka & LaFrance 2005). In addition, as sexual harassment increases, organizational commitment decreases (e.g., Magley et al., 2005; Schneider et al., 1997) and job stress increases (e.g., Cortina et al. 2002; Lim & Cortina 2005; Magley et al., 2005). Other job-related correlates of sexual harassment include <u>impaired work relationships, increased work conflicts, and lowered team performance.</u>

With specific reference to CCSO, the named Plaintiffs and class members describe a variety of <u>job related consequences</u>, consistent with the research. *See, e.g.*, Hobbs dep., 66-68, 127-28 (officers are increasingly disciplined for their reactions to detainees' misbehavior); Burroughs dep., 291-93 (career has been devalued); S. Robinson dep., 186-88 (re-assignment to tier with detainee who threatened her as retaliation; no ability to work overtime without exposure to harassment); T. Wilson dep., 272 (risks being written up by refusing to work in the lockup where detainees can expose themselves and masturbate); Crawford-Alexander dep., 262 ("You have to feel confident to do your job, not to feel like I don't want to get suspended").

***3. Health-related consequences.*** Compared to the body of work on psychological and professional outcomes, less research has addressed relationships between sexual harassment and women's physical health. Such effects are often indirect, mediated through mental health. A number of studies have documented links to

26

overall *health perceptions and satisfaction* (e.g., Bergman & Drasgow, 2003; Fitzgerald et al. 1997; Lim & Cortina 2005). Others have identified specific somatic complaints associated with harassing experiences, including headaches, exhaustion, sleep problems, gastric problems, nausea, respiratory complaints, musculoskeletal pain, and weight loss/gain (e.g., Barling et al., 1996; de Haas et al., 2009; Piotrkowski, 1998). Schneider et al. (2001) conducted an experiment showing that experiences of even mild harassment cause increased cardiovascular reactivity; more recently, Thurston and her colleagues (Thurston et al., 2018) demonstrated that sexual harassment is associated with significant decrements in cardiovascular health.

Many women testified to experiencing health-related consequences consistent with the research described above and typical of victims of sexual harassment. *See, e.g.*, Burroughs dep., 294 (headaches); Winter decl. (seizures); Addison decl. (panic attacks and high blood pressure); Lopez decl. (chest pains, stomach pains, shortness of breath); Brown-Conley decl. (PTSD, panic attacks); Jagielski decl. (weight gain); T. Henderson decl. (migraines); Brown2 decl. (weight gain, hair loss).

**Summary**.  Among the most reliable findings in the organizational research is that (1) the frequency of sexual harassment, along with its severity and the duration of exposure damages its victims in multiple aspects of their lives, and (2) organizations that  tolerate such behavior have much higher levels of harassment and their victims are considerably more damaged, over and above the harm done by the harassment itself. The extent and nature of the harassment experienced by the class members, as well as the Jail's indifference to their situation, can be expected to damage them profoundly in multiple ways.

## PART IV:  CONCLUSIONS AND OPINIONS

## Opinions and Conclusions

1. CCSO displays a high level of organizational tolerance for sexual harassment of women employees by inmates.  Numerous objective indicators confirm that CCSO does not take this issue seriously, that it can be (and is certainly perceived to be) risky to complain, and there is a distinct likelihood that meaningful remedial action will not be taken.  These conditions can be expected to encourage and maintain high levels of sexual harassment as well as a strong probability of harm to those women who are exposed to it both directly and indirectly.

2.     The degree to which CCSO tolerates the sexual harassment of its female employees is, from an organizational perspective, nothing short of amazing.  In no other type of organization could such a working environment be imagined.  The data reviewed here suggest that CCSO accepts this sexual abuse and misconduct as inevitable, a fact of life in the correctional environment.  Although jails present significant challenges, the present situation is far from inevitable, as can be seen from correctional facilities, but more broadly from the successes of other high-risk organizations such as the military and law enforcement more broadly.

DocuSign Envelope ID: 096E207D-BD06-4637-A51F-0A662DA16E2C

3.     Given its extent and egregious nature, the harassment can be expected to impact virtually every female employee who works in the Jail or the Leighton Courts, either directly or indirectly.

4.     Because of the prevalence and egregious nature of inmate sexual harassment, as well as CCSO's indifference to the issue, female employees can be expected to experience emotional distress (including depression, decreased self-esteem, damage to intimated relationships); increased anxiety (including fear of rape and assault, as well as fear for their safety and that of their families); stress-related health problems, and significant impact on job-related factors such as satisfaction, work withdrawal, and organizational commitment.

5.      In my professional opinion, the harassment remains largely unabated because management fails to view the jail as a workplace, as well as a correctional institution.

6.     I hold these opinions to a reasonable degree of professional certainty.


Dated: February 4, 2019

DocuSigned by:

*Louise Fitzgerald*

237A9E1F869E49E...

Louise F. Fitzgerald, Ph.D.

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| SDAHRIE HOWARD, *et al.* | ) |
| | ) |
| Plaintiffs, | )    Case No. 17-cv-8146 |
| | ) |
| v. | )    Judge Matthew F. Kennelly |
| | ) |
| COOK COUNTY SHERIFF'S OFFICE, | )    Mag. Judge Sidney I. Schenkier |
| *et al.* | ) |
| | ) |
| Defendants. | ) |

## APPENDIX

| | |
|---|---|
| Appendix A | List of citations used in preparing the Expert Report. |
| Appendix B | List of documents and information reviewed and considered in writing the Expert Report. |
| Appendix C | Expert's qualifications, including a list of all publications authored in the previous 10 years. |
| Appendix D | A list of all other cases in which, during the previous 4 years, the expert testified as an expert at trial or by deposition. |

**Expert Report of Louise F. Fitzgerald, Ph.D.**
**February 4, 2019**
**Appendix A**

References Cited

Barling, J., Dekker, I., Loughlin, C. A., Kelloway, E. K., Fullagar, C., Johnson, D. (1996).

Prediction and replication of the organizational and personal consequences of

workplace sexual harassment. *Journal of Managerial Psychology, 11(5),* 4-25.

Barling, J., Rogers, A. G., & Kelloway, E. K. (2001). Behind closed doors:  In-home

workers' experience of sexual harassment and workplace violence. *Journal of*

*Occupational Health Psychology, 6(3)*, 255-269.

Berdahl, J. L. (2007). The sexual harassment of uppity women. *Journal of Applied*

*Psychology, Vol 92(2)*, 425-437.

Berdahl, J. L., & Aquino, K. (2009).  Sexual behavior at work:  Fun or folly.  *Journal of*

*Applied Psychology, 94(1)*, 34-47.

Bergman, M. E., & Drasgow, F. (2003). Race as a moderator in a model of sexual

harassment:  An empirical test. *Journal of Occupational Health Psychology, 8(2)*,

131-145.

Bradley-Geist, J.C., Rivera, I., & Geringer, S.D. (2015).  The collateral damage of

ambient sexism:  Observing sexism impacts bystander self-esteem and career

aspirations.  *Sex Roles, 73, (1-2),* 29-42.

Chapman, S.B. (2009). Inmate-perpetrated harassment:  Exploring the gender-specific

experience of female correction officers (Doctoral dissertation). Retrieved from

Dissertation Abstracts International Section A:  Humanities and Social Sciences.

Cortina**,** L. M., Fitzgerald, L. F., & Drasgow, F. (2002).  Contextualizing Latina

  experiences of sexual harassment:  Preliminary tests of a structural model. *Basic*

  *and Applied Social Psychology, 24(4)*, 295-311.

Dansky, B. S., & Kilpatrick, D. G. (1997). Effects of sexual harassment. In W.

  O'Donohue (Ed.). *Sexual harassment: Theory, research, and treatment* (pp.

  152-174). Needham Heights, MA: Allyn & Bacon.

deBerker, A.O., Rutledge, R.B., Mathys, C., Marshall, L., Cross, G.F., Dolan, R.J., &

  Bestmann, S. (2016). Computations of uncertainty mediate acute stress

  responses in humans. *Nature Communications, 7.*

  https://www.nature.com/articles/ncomms10996

de Haas, S., Timmerman, G., & Höing, M. (2009). Sexual harassment and health

  among male and female police officers. *Journal of Occupational Health*

  *Psychology, 14(4),* 390-401.

Dionisi, A. M., Barling, J., & Dupré, K. E. (2012). Revisiting the comparative outcomes

  of workplace aggression and sexual harassment. *Journal of Occupational Health*

  *Psychology, 17(4)*, 398-408.

Fitzgerald, L. F., Buchanan, N., Collinsworth, L. L., Magley, V. M., & Ramos, A. (1999).

  Junk logic:  The abuse defense in sexual harassment litigation.  *Psychology,*

  *Public Policy, and Law, 5,* 730-759.

Fitzgerald, L.F., & Cortina, L. M. (2018). Sexual harassment in work organizations:  A

  view from the 21st century.  In C.B. Travis, J.W. White, A. Rutherford, W.S.

  Williams, S.L. Cook, K.F. Wyche (Eds.),  *APA Handbook of the Psychology of*

*Women: Perspectives on Women's Private and Public Lives, Vol. 2* (pp. 215-234). Washington, DC: American Psychological Association.

Fitzgerald, L. F., Hulin, C. L., Drasgow, F., Gelfand, M., & Magley, V. (1997). The antecedents and consequences of sexual harassment in organizations: A test of an integrated model. *Journal of Applied Psychology, 82*, 578-589.

Glomb, T. M., Richman, W. L., Hulin, C L., Drasgow, F., Schneider, K. T., & Fitzgerald, L. F. (1997). Ambient sexual harassment: An integrated model of antecedents and consequences. *Organizational Behavior and Human Decision Processes, 71(3),* 309-328.

Harned, M. S., & Fitzgerald, L. F. (2002). Understanding the link between sexual harassment and eating disorder symptoms: A mediational analysis. *Journal of Consulting and Clinical Psychology, 70,* 1170-1181.

Ho, I. K., Dinh, K. T., Bellefontaine, S. A., & Irving, A. L. (2012). Sexual harassment and posttraumatic stress symptoms among Asian and White women. *Journal of Aggression, Maltreatment & Trauma, 21(1)*, 95-113.

Hulin, C., Fitzgerald, L. F., & Drasgow, F. (1996). Organizational influences on sexual harassment. In B. Gutek and M. Stockdale (Eds.), *Women and work*, Vol. 6. Newberry Park, CA: Sage.

Kabat-Farr, D., & Cortina, L. M. (2014). Sex-based harassment in employment: New insights into gender and context. *Law and Human Behavior, 38(1),* 58-72.

Lim, S., & Cortina, L. M. (2005). Interpersonal mistreatment in the workplace:  The interface and impact of general incivility and sexual harassment.  *Journal of Applied Psychology, 90(3)*, 483-496.

Lonsway, K. A., Paynich, R., & Hall, J. N. (2013). Sexual harassment in law enforcement:  Incidence, impact, and perception. *Police Quarterly, 16(2),* pp. 177-210.

Magley**,** V. J., & Shupe, E. I. (2005). Self-labeling sexual harassment. *Sex Roles: A Journal of Research, (3-4)*, 173-189.

Magley, V. J., Waldo, C. R., Drasgow, F., & Fitzgerald, L. F. (1999).  The impact of sexual harassment on military personnel: Is it the same for men and women? *Military Psychology, 11*, 283-302.

Miner-Rubino, K., & Cortina, L. M. (2007). Beyond targets:  Consequences of vicarious exposure to misogyny at work.  *Journal of Applied Psychology, 92(5),* 1254-1269.

Mishel, M. H. (2014). Theories of uncertainty in illness. In M.J. Smith,  & P. R. Liehr, (Eds.). *Middle range theory for nursing., 3rd ed.* (pp. 53-86). New York: Springer Publishing Co.

National Academy of Sciences (2018). Sexual harassment in academic sciences, engineering, and medicine. http://sites.nationalacademies.org/shstudy/index.htm

O'Connell, C. E., & Korabik, K. (2000). Sexual harassment:  The relationship of personal vulnerability, work context, perpetrator status, and type of harassment to outcomes. *Journal of Vocational Behavior, 56(3*), 299-329.

Patel, J.K., Griggs, T., & Miller, C.C. (2017, December 28). We asked 615 men about how they conduct themselves at work. *New York Times* https://www.nytimes.com/interactive/2017/12/28/upshot/sexual-harassment-survey-600-men.html

Piotrkowski, C. S. (1998). Gender harassment, job satisfaction, and distress among employed White and minority women. *Journal of Occupational Health Psychology, 3(1)*, 33-43.

Pryor, J. B., LaVite, C. M., & Stoller, L. M. (1993). A social psychological analysis of sexual harassment: The person/situation interaction. *Journal of Vocational Behavior, 42(1),* 68-83.

Raver, J. L., & Gelfand, M. J. (2005). Beyond the individual victim: Linking sexual harassment, team processes, and team performance. *Academy of Management Journal, 48(3),* 387-400.

Reed, M.E., Collinsworth, L.L., & Fitzgerald, L.F. (2005). There's no place like home: Sexual harassment of low income women in housing. *Psychology, Public Policy, and Law, 11(3),* 439-462.

Rospenda, K. M., Fujishiro, K., Shannon, C. A., & Richman, J. A. (2008). Workplace harassment, stress, and drinking behavior over time: Gender differences in a national sample. *Addictive Behaviors, Vol 33(7)*, 964-967.

Santo, A. (Nov. 2017). https://www.themarshallproject.org/2017/11/09/the-unique-sexual-harassment-problem-female-prison-workers-face

Schneider, K. (1996). *Bystander stress: The effect of organizational tolerance of sexual harassment on victims' coworkers*. University of Illinois at Urbana-Champaign.

Schneider, K., Swan, S., & Fitzgerald, L. F. (1997). The job-related, psychological, and health-related outcomes of sexual harassment. *Journal of Applied Psychology, 82*, 401-415.

Schneider, K.T., Pryor, J.B., & Fitzgerald, L.F. (2010). Sexual harassment research in the United States. In S. Einarsen, H. Hoel, D. Zapf, & C. Cooper (Eds.). *Bullying and Harassment in the Workplace* (pp. 245-266). Baton Rouge, FL: CRC Press.

Shupe E., Cortina, L. M., & Ramos, A., Salisbury, J., & Fitzgerald, L.F. (2002). The incidence and outcomes of sexual harassment among Hispanic and Non-Hispanic White Women: A comparison across levels of cultural affiliation. *Psychology of Women Quarterly, 26,* 298-308.

Sims, C. S., Drasgow, F., & Fitzgerald, L. F. (2005). The effects of sexual harassment on turnover in the military: Time dependent modeling. *Journal of Applied Psychology*, *90(6)*. pp. 1141-1152.

Smith, C.P., and Freyd, J.J. (2014). Institutional betrayal. *American Psychologist, 69(5)*, 575-587.

Sojo, V.E., Wood, R.E., & Genat, A.E. (2015). Harmful workplace experiences and women's occupational well-being: A meta-analysis. *Psychology of Women Quarterly, 40(1),* 10-40.

Thurston, R. C., Chang, Y., Matthews, K. A., von Känel, R., & Koenen, K. (2019). Association of sexual harassment and sexual assault with midlife women's mental and physical health. *JAMA: Internal medicine, 179(1)*, 48-53.

U.S. Merit Systems Protection Board (1995). *Sexual harassment of federal workers: An Update*. Washington, DC: U.S. Government Printing Office.

U.S. Merit Systems Protection Board (2016). *Sexual harassment of federal workers.* Washington, DC: U.S. Government Printing Office.

Williams, J. H., Fitzgerald L. F. , & Drasgow, F. (1999). The effects of organizational practices on sexual harassment and individual outcomes in the military. *Military Psychology, 11,* 303-328.

Willness, C. R., Steel, P.,& Lee, K. (2007). A meta-analysis of the antecedents and consequences of workplace sexual harassment. *Personnel Psychology, 60(1),* 127-162.

Woodzicka, J, A., & LaFrance, M. (2005). The effects of subtle sexual harassment on women's performance in a job interview. *Sex Roles: A Journal of Research, Vol 53(1-2),* 67-77.

Yang, L.-Q.,  Spector, P.E., Chang, C.-H., Gallant-Roman, M., Powell, J. &  (2012). Psychosocial precursors and physical consequences of workplace violence towards nurses:  A longitudinal examination with naturally occurring groups in hospital settings. *International Journal of Nursing Studies 49,* 1091–1102.

**Expert Report of Louise F. Fitzgerald, Ph.D.**
**February 4, 2019**
**Appendix B**

# APPENDIX B

Documents Reviewed in connection with
*Howard et al. v. Cook County Sheriff's Office et al.*

## Court Filings

- Document No. 107 – Second Consolidated Compliant
- Document No. 143 – Third Consolidated Complaint

## Plaintiff Deposition Testimony

- Testimony of Plaintiff Ellenor Altman
- Testimony of Plaintiff Tavi Burroughs
- Testimony of Plaintiff Kimberly Crawford-Alexander
- Testimony of Plaintiff Dominique Freeman
- Testimony of Plaintiff Denise Hobbs
- Testimony of Plaintiff Sdahrie Howard
- Testimony of Plaintiff Esther Jones
- Testimony of Plaintiff Susana Plasencia
- Testimony of Plaintiff Balvina Ranney
- Testimony of Plaintiff Sharon Robinson
- Testimony of Plaintiff Tawanda Wilson

## Plaintiff Declarations

- Declaration of Monshai Addison
- Declaration of Latarsha Anderson
- Declaration of Tamara Anderson
- Declaration of Kimberly Bowen
- Declaration of Jacqueline Brown
- Declaration of Jacqueline Brown2
- Declaration of Patricia Brown-Conley
- Declaration of Oneka Conley
- Declaration of Jessica Correa
- Declaration of Tanisha Cribbs
- Declaration of Gloria Ellis
- Declaration of Patricia Dianne Green
- Declaration of Sheleda Groves
- Declaration of Gabriela Henderson
- Declaration of Tanisha Henderson
- Declaration of Angelique Herrera
- Declaration of Bridget Insley
- Declaration of Patti Jagielski
- Declaration of Sybil Keys

- Declaration of Shonnita Lanier
- Declaration of Christina Lopez
- Declaration of Darlene McCord
- Declaration of Rita McCoy
- Declaration of Lakisha Macklin
- Declaration of Anntionettea Montgomery
- Declaration of Christina Muhammad
- Declaration of Donnetta Myart
- Declaration of Ramonita Perez
- Declaration of Lori Ponce
- Declaration of Desiree Ray
- Declaration of Cassandra Shelton
- Declaration of Kelly Shields
- Declaration of Sharon Taylor
- Declaration of Danielle Thomas
- Declaration of Evette Trejo
- Declaration of Hester Washington-Farr
- Declaration of Alicia Webster
- Declaration of Ronica Williams
- Declaration of Diane Winter
- Declaration of Lisa Yates

## Defendant Deposition Testimony

- Testimony of Matthew Burke, Interim Director of Human Resources (former Chief of Staff) as CCSO's designee under Rule 30(b)(6) on the inmate discipline process.
- Testimony of Brad Curry, Chief Operating Officer of CCSO, as CCSO's designee under Rule 30(b)(6) on policies, procedures, and directives of the Cook County Jail and courthouses.
- Testimony of Steven Wilensky, Director of Inmate Discipline, Cook County Jail, as CCSO's designee under Rule 30(b)(6) on the inmate discipline process. Wilensky Exhibit 19 – Bates No. 0145839-46.

## Cook County Sheriff's Office Documents and Data

- Bates No. 0271056: Email Re: CCB-2017-19872 Masturbation - December 15, 2017
- Bates No. 0270983: Email FW: RCDC-2017-19792 Indecent Exposure – December 14, 2017
- Bates No. 0270987: Email FW: RCDC-2017-19792 Indecent Exposure – December 14, 2017

- Bates No. 0064451-53: CCDOC Policy 166: Sexual Misconduct by Detainees Directive – November 28, 2017
- Bates No. 0065776-81: CCDOC Policy 104: Discrimination and Harassment
- Bates No. 0083442-43: Incident Report - April 12, 2017
- Bates No. 0162052-55: Teamsters Local 700 Letter Re: Notice of Alleged Safety or Health Concerns Cook County Department of Corrections – June 23, 2016
- Bates No. 016448-50: Inmate Disciplinary Report – September 26, 2017
- Bates No. 0271052 - Email from T. Williams to J. Johnson and others re: CCB-2017-19872 Masturbation – December 15, 2017- Corresponds with video Bates labeled CCSO_Howard_0271053
- Bates No. 0271053 - Video related to CCSO_Howard_0271052 (email listed above)
- Bates No.0164797 – Incident Report – May 9, 2015
- Bates No.0164804 – Incident Report – June 4, 2015
- Bates No.0164811 – Incident Report – June 13, 2015
- Bates No.0164819 – Incident Report – July 4, 2015
- Bates No.0164824 – Incident Report – July 17, 2015
- Bates No.0158003 – Incident Report – September 18, 2015
- Bates No.0164792 – Incident Report – October 23, 2015
- Bates No.0164838 – Incident Report – February 10,2016
- Bates No.0164831 – Incident Report – July 3, 2016
- Bates No.0164909 – Incident Report – February 21, 2017
- Bates No.0164841 – Incident Report – June 30, 2017
- Bates No.0164878 – Incident Report – July 17, 2017
- Bates No.0149202 – Incident Report – January 19, 2018
- Bates No.0164914 – Incident Report – March 20, 2018
- Bates No.0148452 – Incident Report – May 8, 2016
- Bates No.0148907 – Incident Report – January 24, 2018
- Bates No.0083442-43 – Incident Report – April 12, 2017
- Bates No.0088862-63 – Incident Report – April 12, 2017
- Bates No.0164059-60 – Incident Report – September 26, 2017
- Bates No.0148896 – Incident Report – June 13, 2017
- Bates No.0148674 – Incident Report – October 14, 2017
- Bates No.0148703 – Incident Report – October 17, 2017
- Bates No.0082827 – Incident Report – February 7, 2017
- Bates No.0082912 – Incident Report – March 11, 2017
- Bates No.0161271 – Incident Report – August 31, 2017
- Bates No.0161308 – Incident Report – September 7, 2016
- Bates No.0159188 – Incident Report – April 13, 2017
- Bates No.0166444-45 – Incident Report – March 13, 2017
- Bates No.0165814-15 – Incident Report – December 8, 2015
- Bates No.0165675 – Incident Report – September 27, 2016
- Bates No.0165687-88 – Incident Report – October 17, 2016
- Bates No.0165697 – Incident Report – November 10, 2016
- Bates No.0165729 – Incident Report – March 20, 2017
- Bates No.0165727-28 – Incident Report – March 20, 2017
- Bates No.0165744-45 – Incident Report – April 17, 2017

- Bates No.0165769 – Incident Report – May 23, 2017
- Bates No.0165782-83 – Incident Report – June 23, 2017
- Bates No.0165639-40 – Incident Report – May 24, 2016
- Bates No.0165641 – Incident Report – July 7, 2016
- Bates No.0165658-59 – Incident Report – August 19, 2016
- Bates No.0165686 – Incident Report – October 11, 2016
- Bates No.0165683 – Incident Report – October 20, 2016
- Bates No.0165698 – Incident Report – November 3, 2016
- Bates No.0165708-09 – Incident Report – December 20, 2016
- Bates No.0165712 – Incident Report – February 8, 2017
- Bates No.0165721 – Incident Report – March 8, 2017
- Bates No.0165722-23 – Incident Report – March 9, 2017
- Bates No.0165805-06 – Incident Report – September 28, 2017
- Bates No.0150943 – Incident Report – December 10, 2015
- Bates No.0080786 – Incident Report – November 30, 2017

**Plaintiffs' Documents and Data**
- Bates No. Atlman0018 – Incident Report – December 14, 2016
- Bates No. Altman0038-39 – Incident Report – August 15, 2018
- Bates No. Burroughs0001 – Incident Report – January 24, 2018
- Bates No. CRAWFORD-ALEXANDER_0001 – Incident Report – April 10, 2013
- Bates No. CRAWFORD-ALEXANDER_0030 – Incident Report – April 10, 2013
- Bates No. CRAWFORD-ALEXANDER_0050 – Incident Report – July 17, 2016
- Bates No. Howard0054 – Incident Report – February 9, 2013
- Bates No. Howard0055 – Incident Report – December 24, 2014
- Bates No. Jones0001 – Incident Report – March 13, 2017
- Bates No. Jones0002 – Incident Report – August 9, 2017
- Bates No. S.WILSON_0001 – Incident Report – February 16, 2017
- Bates No. S.WILSON_0003 – Incident Report – January 17, 2014

**Expert Report of Louise F. Fitzgerald, Ph.D.**
**February 4, 2019**
**Appendix C**

*Louise F. Fitzgerald, Ph.D.*
*85 Fiesta Way*
*Fort Lauderdale, FL 33301*
*217-766-2064*
*lff1353@gmail.com*

May, 2018

**EDUCATION**

B.A.            (magna cum laude) - Psychology - 1974
                The University of Maryland

M.A.            Psychology - 1975
                The Ohio State University

Ph.D.           Psychology - 1979
                The Ohio State University

**POSITIONS HELD**

2008-present    Emeritus Professor
                Psychology and Gender & Women's Studies
                University of Illinois at Urbana-Champaign

2009-2011       Distinguished Senior Scholar
                Department of Psychology
                DePaul University

1995-2008       Professor
                Psychology & Gender and Women's Studies
                University of Illinois at Urbana-Champaign

1987-1995       Associate Professor
                Psychology, Women's Studies, Educational Psychology
                University of Illinois at Urbana-Champaign

Spring, 1994    Visiting Scholar
                Departments of Data Theory and Women's Studies
                University of Leiden

Fall, 1990      Faculty Research Fellow
                Institute for the Study of Cultural Values and Ethics
                University of Illinois at Urbana-Champaign

1985-1987       Assistant Professor
                Graduate School of Education
                University of California, Santa Barbara

1981-1985       Assistant Professor
                Graduate School of Education
                Kent State University, Kent, Ohio

1980-1981    Senior Research Associate
             International Personnel Management Association
             Washington, D.C.

**EDITORIAL BOARDS**

> Journal of Counseling Psychology               (1981-1987)
> Journal of Vocational Behavior                 (1984 - 1992)
> Psychology of Women Quarterly                  (1989 – 1995;
> Journal of Occupational Health Psychology      (1999 – 2004)
> Psychological Injury and the Law               (2013 – present)

**DISTINGUISHED REVIEWER**

> Psychology of Women Quarterly                  (2008-present)

**CONSULTING REVIEWER**

> Journal of Applied Psychology
> Law and Human Behavior
> Journal of Interpersonal Violence
> Violence and Victims
> Journal of Personality and Social Psychology
> American Journal of Community Psychology
> Journal of Applied Social Psychology
> Sex Roles
> British Journal of Social Psychology
> American Educational Research Journal

**HONORS**

> Magna Cum Laude (B.A.)
> Distinction in Psychology (B.A.)
> Departmental Honors (Ph.D.)
> Fellow, American Psychological Association –Counseling Psychology
> Fellow, American Psychological Association – Psychology of Women
> Fellow, American Psychological Association – Industrial/Organizational
> Fellow, American Psychological Society
> Holland Prize for Research in Personality and Career Development-1992
> Distinguished Contribution to the Psychology of Women –
>     Div. 17 Committee on the Status of Women - 1992
> Distinguished Contribution Award of the Washington Educational Press
>     for Outstanding Treatment of a Public Concern 1994
> Distinguished Contributions to Research in Public Policy – American
>     Psychological Association – 2003
> Heritage Award, Distinguished Contributions to Research in the
>     Psychology of Women – American Psychological Association –
>     Division 35, Psychology of Women – 2010
> Lifetime Career Award – Conference on Occupational Safety and Health,
>     2013

**GRANTS**

"Outcomes of sexual harassment:  A model of harm and recovery"
National Institutes of Mental Health
2001-2006 - $1,600,000

"Outcomes of sexual harassment: An integrative process model"
National Institutes of Mental Health
1996-2001 - $750,000

Outcomes of sexual harassment:  An integrative process model"
National Institutes of Mental Health
Shannon Award - $100,000 - 1994-1996

"Sexual harassment on campus"
UIUC Campus Research Board
Spring, 1993 - $7350

"Sexual victimization in Brazil"
Edwin & Flora Hewlett Foundation
Summer, 1991 - $3,500

 "A cognitive-behavioral intervention for reducing sexually aggressive behavior in college men"
University of Illinois Campus Research Board
1991 - $9,084

Tarnishing the ivory tower - sexual harassment on campus"
Women's Educational Equity Act
U.S. Department of Education
1984-1985 -   $67,564.00

**PROFESSIONAL ASSOCIATIONS**

American Psychological Society, Inaugural Fellow
American Psychological Association (Fellow, Divisions 17, 35, 14)
Florida Psychological Association
Association for Women in Psychology
International Society for Traumatic Stress Studies
Law and Society
National Council for Research on Women
Society for Industrial/Organizational Psychology
Society for Human Resource Management

**PUBLICATIONS**

**BOOKS AUTHORED OR CO-AUTHORED**

Fitzgerald, L. F., Collinsworth, L. L., & Oliveri, R. (in preparation). There's no place like home: Sexual harassment of low-income women in housing. Book in preparation.

Koss, M. P., Goodman, L., Browne, A., Fitzgerald, L. F., Keita, G., & Russo, N. (1994). No safe haven: Violence against women at home, at work, and in the community. Washington, DC: American Psychological Association.

Betz, N. E., & Fitzgerald, L. F. (1987). The career psychology of women. New York: Academic Press.

Osipow, S. H., & Fitzgerald, L. F. (1996). Theories of career development (4th edition). Allyn & Bacon.

**CHAPTERS IN BOOKS**

Fitzgerald, L. F., & Cortina, L. (2017). Sexual harassment: A view from the 21st century. In J. White (Ed.) *Handbook of the Psychology of Women*. Washington, DC: American Psychological Association.

Magley, V.J., Fitzgerald, L.F., Salisbury, J., Drasgow, F., & Zickar, M.J. (2013). Changing sexual harassment within organizations via training interventions: Suggestions and empirical data. In R. Burke & C. Cooper (Eds.), *The Fulfilling Workplace: The Organization's Role in Achieving Individual and Organizational Health*. Surrey, United Kingdom: Gower

Fitzgerald, L.F., & Collinsworth, L.L. (2007). (Un)common knowledge: The legal viability of sexual harassment research. In E. Borgida & S. Fiske, Eds. *Beyond Common Sense: Psychological Science in the Courtroom*. (pp. 103-125). Boston: Blackwell Publishing.

Fitzgerald, L. F. (2004). Who says? Legal vs. psychological constructions of welcomeness in sexual harassment litigation. (pp. 94-110). In C. MacKinnon & R. Siegal (Eds.). Directions in sexual harassment law.New Haven, CT: Yale University Press.

Pryor, J. B., & Fitzgerald, L. F. (2003). Sexual harassment research in the United States. *Bullying and emotional abuse in the workplace: International perspectives in research and practice*, 79-100.

Fitzgerald, L. F. & Collinsworth, L. L. (2002). The forensic psychological evaluation in sexual harassment litigation. In Isabela Schultz (Ed.). Handbook of psychological injuries: Evaluation, treatment, and compensable damages. Chicago, IL: American Bar Association.

Fitzgerald, L.F., Collinsworth, L.L., & Harned, M. S. (2002). Sexual harassment. In J. Worrell (Ed.) Encyclopedia of women and gender: Sex similarities and differences

and the impact of society on gender.  Boston:  Academic Press.

Fitzgerald, L. F., & Harmon, L. W. (2001).  Women's career development:  A postmodern update.  In F. T. L. Leong and A. Barak (Ed.).  Contemporary models in vocational psychology:  A volume in honor of Samuel H. Osipow, pp. 207-230.

Fitzgerald, L. F. (2000).  Sexual harassment.  In Kazdin, Alan E. (Ed). Encyclopedia of psychology, Washington, DC, US; London, England: American Psychological Association; Oxford University Press.

Fitzgerald, L. F., Magley, V., & Swan, S. (1997).  But was it really sexual harassment?  Legal,behavioral, and psychological definitions. In W. O'Donohue (Ed.), Sexual harassment: Theory. research, and treatment.  New York: Allyn & Bacon.

Hulin, C., Fitzgerald, L. F., & Drasgow, F. (1996).  Organizational influences on sexual harassment.  In B. Gutek and  M. Stockdale (Eds.), Women and work, Vol. 6. Newberry Park, CA: Sage.

Fitzgerald, L. F., Fassinger, R., & Betz, N. E. (1995). Theoretical advances in the study of women's career development.  In W. B. Walsh & S. H. Osipow (Eds.), Handbook of vocational psychology (2nd ed.). Hillsdale,  NJ: Lawrence Erlbaum and Associates.

Fitzgerald, L. F., Hulin, C., & Drasgow, F. (1995).  The antecedents and consequences of sexual harassment in organizations:  An integrated process model.  In S. Sauter & G. Keita (Eds.). Job stress 2000: Emergent issues.  Washington, DC: American Psychological Association.

Fitzgerald, L. F. (1994).  No safe haven: Violence against women in the workplace.  In Koss, et al., (Eds.), No safe haven: Violence against women at home, at work, and in the community.  Washington, DC: American  Psychological Association.

Fitzgerald, L. F., & Betz, N. E. (1994).  Career development in cultural context: The role of gender, race, class and sexual orientation.  In M. Savickas & R. Lent (Eds.), Convergence in theories of career choice and development.  Palo Alto, CA: Consulting Psychologists Press.

Fitzgerald, L. F., & Rounds, J. B. (1994).  Women and work: Theory encounters reality.  In Walsh, B. W., & Osipow, S. H. (Eds.), Career counseling for women. Hillsdale, NJ: Erlbaum.

Fitzgerald, L. F., & Ormerod, A. J. (1993).  Breaking silence: The sexual harassment of women in academia and the workplace.  In F. L. Denmark & M. A. Paludi (Eds.), Handbook of  the  psychology of  women. Westport, CT: Greenwood Press.

Betz, N. E., & Fitzgerald, L. F. (1993).  Individuality and diversity: Theory and research in counseling psychology.  Annual Review of Psychology, 44, 343-381.

Weitzman, L. M., & Fitzgerald, L. F. (1993).  Employed mothers:  Labor force profiles and diverse lifestyles. In J. Frankel (Ed.), Employed mothers and the family context.  New York: Springer.

Fitzgerald, L. F., & Weitzman, L. M. (1992). The career development of women: Concepts and issues for theory and practice. In Z. Leibowitz & D. Lee (Eds.), <u>Adult career development, (2nd ed.)</u>. Arlington, VA: American Association of Counseling and Development.

Fitzgerald, L. F. (1990). Sexual harassment: The definition and measurement of a construct. In M. Paludi (Ed.), <u>Ivory Power: Gender and sexual harassment in the academy</u>. New York: SUNY Press.

Fitzgerald, L. F., & Weitzman, L. M. (1990). Men who harass: Portrait of the artist. In M. Paludi (Ed.), <u>Ivory power: Gender and sexual harassment in the academy</u>. New York: SUNY Press (Series in the Psychology of Women).

Betz, N. E., Fitzgerald, L. F., & Hill, R. (1989). Individual differences: The foundations of vocational psychology. In D. T. Hall, et al. (Eds.), <u>The handbook of career theory</u>. Cambridge: Oxford University Press.

Fitzgerald, L. F. (1986). Career counseling for women: Principles, problems, and procedures. In Z. Leibowitz & D. Lee (Eds.), <u>Adult career development: Concepts, issues and practices</u> (pp. 116-131). Arlington, VA: American Association for Counseling and Development.

Fitzgerald, L. F., & Betz, N. E. (1983). Issues in the vocational psychology of women. In W. B. Walsh & S.H. Osipow (Eds.), <u>The handbook of vocational psychology</u> (pp. 83-159). Hillsdale, NJ: Lawrence Erlbaum & Associates.

## <u>MONOGRAPHS</u>

Fitzgerald, L. F. (1993). <u>The last great open secret: Sexual harassment of women in the workplace and academia</u>. Washington, DC: Federation of Cognitive, Psychological and Behavioral Sciences.

Fitzgerald, L. F. (1992). <u>Sexual harassment in higher education: Concepts and issues</u>. Washington, DC: National Education Association.

Fitzgerald, L. F., & Rounds, J. B. (1989). Vocational behavior, 1988: A critical analysis. <u>Journal of Vocational Behavior</u>, <u>35</u>, 105-163.

Fitzgerald, L. F. (1986). On the essential relations between education and work. <u>Journal of Vocational Behavior</u>, <u>28</u>, 254-286.

Fitzgerald, L. F., & Nutt, R. L. (1986). Principles concerning the counseling/psychotherapy of women: Rationale and implementation. <u>The Counseling Psychologist</u>, <u>14</u>, 180-216.

Fitzgerald, L. F. (1985). <u>Education and work: The essential tension</u>. Columbus, OH: The National Center for Research in Vocational Education.

## ARTICLES IN JOURNALS

Fitzgerald, L. F. (forthcoming).  Invisible:  Recovering those we left behind.  In J. Berdahl, F. Crosby and P. Stockdale (Eds.). *Equality, Diversity & Inclusion: An International Journal.*

Fitzgerald, L. F. (2017).  Still the last great open secret:  Sexual harassment as systemic trauma.  *Journal of Trauma and Dissociation, 18*, 483-489.

Fitzgerald, L. F., & Foote, W. (Eds.).  (2016).  Legal and psychological issues in harassment and discrimination.  *Special issue:  Psychological Injury and the Law.*

Lawson, A. K. & Fitzgerald, L. F. (2016).  Sexual harassment litigation:  Road to Re-victimization or recovery.  *Psychological Injury & Law*; *9*, 216-229

Reed, M. E., Collinsworth, L. L., Lawson, A. K., & Fitzgerald, L. F. (2016). The psychological impact of previous victimization: examining the "abuse defense" in a sample of harassment litigants. *Psychological Injury and Law, 9*(3), 230-240.

Fitzgerald, L. F., Collinsworth, L. L., & Lawson, A. K. (2013).  Sexual harassment, Criterion A and PTSD:  If it walks like a duck....  *Psychological Injury and the Law, 1-11.*

Lawson, A. K., Wright, C. V., & Fitzgerald, L. F. (2013). The evaluation of sexual harassment litigants:  Reducing discrepancies in the diagnosis of PTSD.  *Law and Human Behavior, 37,* 337-347.

Larsen, S. E., & Fitzgerald, L. F. (2011).  PTSD symptoms and sexual harassment:  The role of attributions and perceived control.  *Journal of Interpersonal Violence*, 26, 2555-2567.

Wright, C. V., Collinsworth, L. L., & Fitzgerald, L. F. (2010) Why did this happen to me?: Cognitive schema disruption and post-traumatic stress disorder in victims of sexual trauma.  *Journal of Interpersonal Violence*, 25, 1801-1814,

Collinsworth, L.L., Fitzgerald, L.F., & Drasgow, F. (2009).  In harm's way: Factors related to psychological distress following sexual harassment.  *Psychology of Women Quarterly.*

Wright, C. V., & Fitzgerald, L. F. (2009).  What should I do?  Predicting the decision to join a sexual harassment class action.  *Law and Human Behavior, 33, 265-282.*

Buchanan, N, T. & Fitzgerald, L. F. (2008).  The effects of racial and sexual harassment on work and psychological well-being of African American women.  *Journal of Occupational Health Psychology, 13,* 137-151.

Wright, C. V., & Fitzgerald, L. F. (2007).  Angry and afraid:  Women's appraisals

of sexual harassment during litigation.  *Psychology of Women Quarterly, 31*, 73-84.

Palmieri, P. A. & Fitzgerald, L. F. (2005).  Confirmatory factor analysis of PTSD symptoms in sexually harassed women.  *Journal of Traumatic Stress, 18*, 657-666.

Reed, M.E., Collinsworth, L.L., & Fitzgerald, L.F. (2005).  There's no place like home:  Sexual harassment of low income women in housing.  *Psychology, Public Policy, and Law, 11(3),* 439-462.

Sims, C. S., Drasgow, F., & Fitzgerald, L. F. (2005).  The effects of sexual harassment on turnover in the military: Time dependent modeling.  *Journal of Applied Psychology*, *90(6).* pp. 1141-1152.

Langhout, R.D., Bergman, M.E., Cortina, L.M., Fitzgerald, L.F., Drasgow, F., Williams, J. (2005).  Sexual harassment severity: Assessing situational and personal determinants and outcomes.  *Basic and Applied Social Psychology, 35(5),* pp. 975-1007.

Fitzgerald, L. F. (2003).  Sexual harassment and social justice:  Reflections on the distance yet to go.  *American Psychologist, 58*, 915-924.

Fitzgerald, L. F. (2003). A new framework for sexual harassment cases.  *Trial, 39* (3), 36-44.

Klaw, E. L., Rhodes, J., & Fitzgerald, L. F. (2003).  Natural mentors in the lives of adolescent African American mothers:  Tracking relationships over time.  *Journal of Youth and Adolescence.  32,* 223-232.

Harned, M. S., & Fitzgerald, L. F. (2002).  Understanding the link between sexual harassment and eating disorder symptoms: A mediational analysis. *Journal of Consulting and Clinical Psychology, 70,* 1170-1181.

Cortina, L.M., Fitzgerald, L.F. & Drasgow, F. (2002).  Contextualizing Latina experiences of sexual harassment: Preliminary tests of a structural model. *Basic and Applied Social Psychology, 24,* 295-311.

Shupe E., Cortina, L. M., & Ramos, A., Salisbury, J., & Fitzgerald, L.F. (2002). The incidence and outcomes of sexual harassment among  Hispanic and Non-Hispanic White Women:  A comparison across levels of cultural affiliation.  *Psychology of Women Quarterly, 26,* 298-308.

Cortina, L.M., Lonsway, K.L., Magley, V.J., Freeman, L.V., Collinsworth, L.L., , M., & Fitzgerald, L.F. (2002).  What's gender got to do with it?  Incivility in the federal courts. *Law and Social Inquiry, 27.*

Lonsway, K.A., Freeman, L.V., Cortina, L.M., Magley, V.J., & Fitzgerald, L.F. (2002).  Understanding the judicial role in addressing gender bias: A view from the Eighth Circuit federal court system*.  Law and Social Inquiry, 27.*

Stark, S., Chernyshenko, O., Lancaster, A., Drasgow, F., & Fitzgerald, L. F. (2002).  Toward standardized measurement of sexual harassment:  Shortening the

SEQ-DoD using Item Response Theory.  *Military Psychology, 14,* 49-72.

Bergman, M. E., Langhout, R. D., Palmieri, P. A., Cortina, L. M., & Fitzgerald, L. F. (2002).  The (un)reasonableness of reporting:  Antecedents and consequences of reporting sexual harassment.  *Journal of Applied Psychology, 87*, 230-242.

Mazzeo, S., Bergman, M. E., Buchanan, N., Drasgow, F., & Fitzgerald, L. F. (2001).  Situation specific assessment of sexual harassment:  A different approach. *Journal of Vocational Behavior. 59,* 120-131.

Lonsway, K. A., Welch, S., & Fitzgerald, L. F. (2001).  Police training in sexual assault response:  Process, outcomes, and elements of change.  *Criminal Justice and Behavior, 28*, 695-730.

Levina, M., Waldo, C. , & Fitzgerald, L. F. (2000).  We're here, we're queer, we're on TV:  The effects of visual media on heterosexuals' attitudes toward gay men and lesbians.  *Journal of Applied Social Psychology, 30,* 738-758.

Fitzgerald, L. F., Buchanan, N., Collinsworth, L. L., Magley, V. M., & Ramos, A. (1999).  Junk logic:  The abuse defense in sexual harassment litigation.  *Psychology, Public Policy, and Law, 5,* 730-759.

Magley, V., Hulin, C. L., Fitzgerald, L. F., & DeNardo, M. (1999).  Outcomes of self-labeling sexual harassment.  *Journal of Applied Psychology, 84,* 390-402.

Fitzgerald, L. F., Drasgow, F., & Magley, V. J. (1999).  Sexual harassment in the Armed Forces: A test of an integrated model.  *Military Psychology, 11,* 329-343.

Fitzgerald, L. F., Magley, V. J., Drasgow, F., & Waldo, C. R. (1999).  Measuring sexual harassment in the military:  The SEQ-DOD.  *Military Psychology, 11*, 243-263.

Magley, V. J., Waldo, C. R., Drasgow, F., & Fitzgerald, L. F. (1999).  The impact of sexual harassment on military personnel: Is it the same for men and women?  *Military Psychology, 11*, 283-302.

Williams, J. H., Fitzgerald L. F. , & Drasgow, F. (1999).  The effects of organizational practices on sexual harassment and individual outcomes in the military. *Military Psychology, 11,* 303-328.

Payne, D. L., Lonsway, K. A., & Fitzgerald, L. F. (1999).  Rape myth acceptance: Exploration of its structure and measurement using the Illinois Rape Myth Acceptance Scale.  *Journal of Research in Personality, 33,* 27-68.

Berg, D. R., Lonsway, K. A., & Fitzgerald, L. F. (1999).  Rape prevention education for men:  The effectiveness of empathy-induction techniques.  *Journal of College Student Development,  40*, 219-234.

Cortina, L., Swan, S., Fitzgerald, L. F., & Waldo, C. R. (1998).  Sexual harassment and assault:  Chilling the climate for women in academia.  *Psychology of Women Quarterly, 22*, 419-441.

Waldo, C. R., Berdahl, J. L., & Fitzgerald, L. F. (1998). Are men sexually harassed? If so, by whom? *Law and Human Behavior, 22,* 59-79.

Fitzgerald, L. F., Hulin, C. L., Drasgow, F., Gelfand, M., & Magley, V. (1997). The antecedents and consequences of sexual harassment in organizations: A test of an integrated model. *Journal of Applied Psychology, 82,* 578-589.

Schneider, K., Swan, S., & Fitzgerald, L. F. (1997). The job-related, psychological, and health-related outcomes of sexual harassment. *Journal of Applied Psychology, 82,* 401-415.

Glomb, T. M., Richman, W. L., Hulin, C. L., Drasgow, F., Schneider, K. T., & Fitzgerald, L. F. (1997). Ambient sexual harassment: An integrated model of antecedents and consequents. *Organizational Behavior and Human Decision Processes, 71,* 309-328.

Hesson-McInnis, M., & Fitzgerald, L. F. (1997). Sexual harassment: A preliminary test of an integrated model. *Journal of Applied Social Psychology, 27,* 877-901.

Fitzgerald, L. F., Gelfand, M., & Drasgow, F. (1996). Measuring sexual harassment: Theoretical and psychometric advances. *Basic and Applied Social Psychology, 17,* 425-445.

Gelfand, M., Fitzgerald, L. F., & Drasgow, F. (1995). The latent structure of sexual harassment: A cross-cultural confirmatory analysis. *Journal of Vocational Behavior 47(2),* 164-177.

Good, G. E., Robertson, J. M., Fitzgerald, L. F., Stevens, M., & Bartels, K. (1995). The relation between masculine role conflict and psychological distress in male university counseling center clients. *Journal of Counseling and Development.*

Lonsway, K., & Fitzgerald, L. F. (1995). The attitudinal antecedents of rape myth acceptance: A theoretical and empirical reexamination. *Journal of Personality and Social Psychology, 68,* 704-711.

Fitzgerald, L. F., Swan, S., & Fisher, K. (1995). Why didn't she just report him? The psychological and legal context of women's responses to sexual harassment. *Journal of Social Issues, 51,* 117-183.

Good, G. E., Robertson, J. M., ONeil, J. M., Fitzgerald, L. F., Stevens, M., Kristineord, K. A., Bartels, K. M., & Braverman, D. G. (1995). Male gender role conflict: Psychometric issues and relations to psychological distress. *Journal of Counseling Psychology, 42,* 3-10.

Lonsway, K., & Fitzgerald, L. F. (1994). Rape myths: In review. *Psychology of Women Quarterly, 18,* 133-164.

Fitzgerald, L. F. (1993). Sexual harassment: Violence against woman at work. *American Psychologist, 48,* 1070-1076.

Goodman, L. A., Koss, M. P., Fitzgerald, L. F., Russo, N. F., & Keita, G. P. (1993). Male violence against women: Current research and future directions. *American Psychologist, 48,* 1054-1058.

Fitzgerald, L. F., & Shullman, S. L. (1993). Sexual harassment: A research analysis and agenda for the '90's. *Journal of Vocational Behavior, 42,* 5-27.

Fitzgerald, L. F. (1992). Science v. Myth: The failure of reason in the Clarence Thomas hearings. *University of Southern California Law Review, 65*, 1399-1410.

Robertson, J., & Fitzgerald, L. F. (1992). Overcoming the masculine mystique: Preferences for alternative norms of assistance among men who avoid counseling. *Journal of Counseling Psychology.*

Fitzgerald, L. F., & Ormerod, A. J. (1991). Perceptions of sexual harassment: The influence of gender and context. *Psychology of Women Quarterly, 15(2)*, 281-294.

Robertson, J., & Fitzgerald, L. F. (1990). (Mis)treatment of the nontraditional man: The effects of client gender role and life-style on diagnosis and attribution of pathology. *Journal of Counseling Psychology, 37*, 3-9.

Fitzgerald, L. F., & Hesson-Mclnnis, M. S. (1989). The dimensions of sexual harassment: A structural analysis. *Journal of Vocational Behavior, 35*, 309-326.

Shapiro, S., & Fitzgerald, L. F. (1989). The development and validation of The Orientation Toward Learning Scale. *Educational Psychological Measurement, 49*, 375-384.

Fitzgerald, L. F., et al. (1988). The dimensions and extent of sexual harassment in higher education and the workplace. *Journal of Vocational Behavior, 32*, 152-175.

Fitzgerald, L. F., & Osipow, S. H. (1988). We have seen the future but is it us: Vocational aspirations of counseling psychology graduate students. *Professional Psychology, 19,* 575-583.

Fitzgerald, L. F., et al. (1988). Academic harassment: Sex and denial in scholarly garb. *Psychology of Women Quarterly, 12,* 329-340.

Fitzgerald, L. F. (1988). On the importance of operational definitions: A comment on Hayden. *Journal of Counseling Psychology, 35*, 351-352.

Fitzgerald, L. F., & Hubert, L. J. (1987). Multidimensional scaling: Some possibilities for counseling psychology. *Journal of Counseling Psychology.* Special issue on quantitative methods), 34,469-480.

Fitzgerald, L. F., & Osipow, S. H. (1986). An occupational analysis of counseling psychology: How special is the specialty? *American Psychologist, 41*, 535-544.

Fitzgerald, L.F., & Nutt, R. (1986). The division 17 principles concerning the counseling/psychotherapy of women: Rationale and implementation. <u>Counseling Psychologist, 14,</u> 180-216.

Fitzgerald, L. F., & Cherpas, C. (1985). On the reciprocal relationship between gender and occupation: Rethinking the assumptions concerning masculine career development. *Journal of Vocational Behavior, 27,* 109-122.

Fitzgerald, L. F., a Betz, N. E. (1985). Astin's model in theory and practice: A technical and philosophical critique. *The Counseling Psychologist, 12,* 135-138.

Hughes, C., Martinek, S., & Fitzgerald, L. F. (1985). Sex role attitudes and career choices: The role of children's self-esteem. *Elementary School Guidance and Counseling, 20,* 57-66.

Fitzgerald, L. F., & Shullman, S. L. (1984). The myths and realities of women in organizations. *Training and Development Journal, 38,* 65-70.

Fitzgerald, L. F., & Quaintance, M. K. (1982). Survey of assessment center use in state and local government. *Journal of Assessment Center Technology, 5,* 9-2 1.

Fitzgerald, L. F. (1980). Non-traditional occupations: Not for women only. *Journal of Counseling Psychology, 27*, 252-259.

Fitzgerald, L. F., & Crites, J. 0. (1980). Toward a career psychology of women: What do we know? What do we need to know? *Journal of Counseling Psychology, 27,* 44-62.

Fitzgerald, L. F., & Crites, J.0. (1979). Career counseling for women: StNavarards for practitioners. *The Counseling Psychologist, 8,* 33 -34.

Crites, J.0., & Fitzgerald, L.F. (1978). The competent male. *The Counseling Psychologist, 7,* 11-14.

**SELECTED TECHNICAL REPORTS**

Fitzgerald, L. F., et al. (1997). <u>Final Report - Attorney Survey</u>. St. Louis, MO: U.S. Eighth Circuit Gender Fairness Task Force.

Fitzgerald, L. F., et al. (1997). <u>Final Report - Judges Survey</u>. St. Louis, MO: U.S. Eighth Circuit Gender Fairness Task Force.

Fitzgerald, L. F., et al. (1997). <u>Final Report - Court Employee Survey</u>, St. Louis, MO: U.S. Eighth Circuit Gender Fairness Task Force.

Fitzgerald, L. F., et al. (1996). <u>Final Report: Vice-Chancellor's Survey on Campus Climate for Gender, Race and Sexual Orientation</u>. University of Illinois at Urbana-Champaign, Urbana, IL.

**OTHER**

       Fitzgerald, L. F. (1992).  <u>Sexual harassment in organizations</u>.  Washington, DC: American Society of Association Executives.

       Fitzgerald, L. F. (1989).  Vocational Assessment.  In T. Husen & T. N. Postlethwaite (Eds.). <u>International Encyclopedia of Education</u>.  Supplementary Vol. 1. Oxford: Pergamon Press. (Encyclopedia article)

       Fitzgerald, L. F. (1980).  <u>Incidence and use of assessment centers in the public sector</u>.  IPMA Special Report:  Washington, D.C.


**SELECTED COLLOQUIA AND INVITED ADDRESSES**

       U.S. Equal Employment Opportunity Commission
       Stanford University
       University of Michigan
       Duke University
       Yale University
       Northwestern University
       National Employment Lawyers' Association
       American Psychological Society
       American Association for the Advancement of Science
       American Bar Association
       American Psychological Association
       Federation of Cognitive, Behavioral and Social Sciences
       National Education Association
       Leiden University (The Netherlands)
       Carnegie Mellon University
       Virginia Commonwealth University
       The Ohio State University
       Temple University
       Harvard University, Kennedy School of Government
       The First International Conference on Women's Mental Health (Amsterdam)

**SERVICE**

***GOVERNMENT***

       State of Washington, Office of the Attorney General (Consultant, 2018)
       U.S. National Institutes of Health (Consultant) (2016 - present)
       U.S. Equal Employment Opportunity Commission (Consultant) (1994-present)
       U.S. Department of Defense
           - Defense Manpower Data Center (Consultant, 1993-2006)
           - Manpower Advisory Committee (1991-1996)
       U.S. Department of Justice (Consultant) (1992-present)
       U.S. Eighth Circuit Taskforce on Gender Fairness in the Courts (Consultant)
           (1995-1997)
       U.S. Internal Revenue Service (Consultant) (1994)

State of Illinois Taskforce on Sexual Harassment (1992)
State of Illinois Legal Assistance Foundation (Consultant) (1992)

## UNIVERSITY

### *Campus Level*

Research Director, Campus Climate Survey (1993 -1995)
Chair, Campus Ombudsperson Search Committee (Fall, 1993)
Chancellor's Committee on the Status of Woman (1989-1992; Chair, 1991-1992)
Miller Committee (1992-1993)
Institutional Review Board (1992-1995)
Chair, UIUC Taskforce on Women in Science and Engineering (CIC) (1992-1993)
Faculty Senate (Spring, 1989)

### *College Level*

Graduate College Behavioral and Social Sciences Committee (1990-1993)

### *Department Level*

Psychology
- Undergraduate Education Committee (2001-present)
- Faculty Advisory Committee (1993; 1996-1999)
- Graduate Education Committee (1995-96)
- Affirmative Action Officer (1990-1995)
- Admissions Rep (I/O) 2001

Women's Studies
- Faculty Advisory Committee (1989-1992)
- Zero-time Appointment Committee (1992-1995)

Educational Psychology
- Division Chair, Counseling Psychology (1989-1993)

## PROFESSIONAL

Administrator-Researcher Consortium 3; ARC3 (2015-present)
APA Taskforce on Male Violence Against Women (1992-1995)
APA Division 35
-    Chair, Taskforce on Victim Privacy Concerns (1998)
-    Awards Committee (2002-2005)
APA Division 17
  - Scientific Affairs Committee (1990-1993)
        Chair, 1991-1992
  - Committee on Women (1984-1987)
        Chair, 1985-1986
AREA Research Awards Committee

**Expert Report of Louise F. Fitzgerald, Ph.D.**
**February 4, 2019**
**Appendix D**

# Federal and state cases in last four years
## May, 2018

1) *Tara Wendt v. Charter Communications, LLC*). (Deposition, May 2014; Trial, June 2015). U.S. District Court for the District ofMinnesota, Case No.: 13-cv-01308 RHK/TNL.

2) *Janie Doe, et al., vs. Walton-Verona Board of Education, et al.,* (Deposition, May 2014). UNITED STATES DISTRICT COURT EASTERN DISTRICT OF KENTUCKY NORTHERN DIVISION AT COVINGTON Case No. 2:11-cv-00171-WOB

3) *Tina Haskenhoff vs. Homeland Energy Solutions, LLC, and Walter Wendland*, Iowa District Court, Chickasaw County, Case No. L4CV003218 (Trial, October, 2014)

4) *Fuery, et al., vs City of Chicago, et al*. United States District Court**,** Northern District of Illinois, Case 1:07-cv-05428 (Trial, December, 2015)

5) *Sydney Harris v. Robert Chaney and Chaney Group Management and Development Corporation.* Minnesota District Court, County of Hennepin, Fourth Judicial District, (File No. 27-CV-15-2728). (Trial, February, 2016).

6) *Lewis – Bzystrzycki vs. City of Country Club Hills, et al*., Circuit Court of Cook County Illinois, Case No. 12-L-00916. (Deposition, April 2016).

7) *Nicole Patsalides vs. Fort Pierce Police Department, et al*., United States District Court, Southern District of Florida, Fort Pierce Division. (Case No. 15-14431-civ-Graham/Lynch). (Deposition, September, 2016).

8) *Robin Eubanks, et al., vs. Klickitat County, et al.* Superior Court of the State of Washington in and for the County of Clark, Case No: 11-2-00802-2. (Deposition, June 2017; Trial, October, 2017).

9) *Christie Van, et al., vs. Ford Motor Company,* United States District Court**,** Northern District of Illinois, Eastern Division, Case No. 1:14-CV-08708. (Deposition, October, 2017).