Exhibit 23

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SDAHRIE HOWARD, DENISE HOBBS            )
and ELLENOR ALTMAN,                     )
individually and on behalf of           )
all others similarly situated,          )
                                        )
        Plaintiffs,                     ) Case No. 17-cv-8146
                                        )
    vs.                                 )
                                        )
COOK COUNTY SHERIFF'S OFFICE            )
and COUNTY OF COOK,                     )
                                        )
        Defendants.                     )
---------------------------------

DEPOSITION OF ESTHER LUCINDA JONES
Chicago, Illinois
Friday, October 12, 2018

Reported by:

Sandra L. Rocca, CSR, RPR, RMR, CRR
Job No: 148925

Page 30

E. JONES

of crimes and in some cases serious crimes?
A. Yes.
Q. And you attended the -- when did you attend the training academy?
A. I want to say in March of '94 because it was a waiting period for a new class to open up.
Q. And how long were you at the training academy?
A. Ten weeks.
Q. Do you recall what type of training you received at the training academy?
A. We did physical training, self-defense, law, CPR, HAZMAT classes. We took classes where we would rely on our partner for support in the job, trust -- to trust your partner, things like that.
Q. When you were at the academy, were you receiving training along with individuals who had received offers in the jail or was this training specific to the courthouse?
A. Specific courts.
Q. It sounds like you received a bit of classroom training during your academy training?
A. We were always in the classroom except when we went out into the forest preserve for the trust classes. And when we would train to shoot, naturally we were on the gun range.

Page 31

E. JONES

Q. Did you -- when you were at the academy, did you receive any training on CCSO policies and procedures?
A. Yes.
Q. Do you remember any policies or procedures that you would have received training on when you were at the academy?
A. They were called -- our policies were called General Orders and it was basically the things that you do in a courtroom, courtroom security, how to secure the courthouse. If it's a fire, fire drills or bomb scares. Basically how to do things in the courthouse.
Q. Do you recall whether or not you received any training on sexual harassment?
A. For our co-workers.
Q. And when did you complete your training at the academy? You said it was ten weeks after March 1994?
A. Yes, about that. It was in the summertime.
Q. So summer of 1994?
A. No, summer. Yes, summer of '94.
Q. Do you recall where you were first assigned after you graduated and completed the training at the academy?
A. Yes.
Q. Where was that?
A. I've only been assigned at 26th Street my whole

Page 32

E. JONES

career. You filled out a list where they called it a dream position or -- your wish list. We did a wish list of three places and 26th Street was my Number 1. And I asked for 26th Street, permanent courtroom, and days so my son could reach me.
Q. And did you receive that?
A. Yes.
Q. So you were able to get a job at 26th Street in a permanent courtroom and work days?
A. Yes.
Q. Since you started at the CCSO?
A. Yes.
Q. And why was that your -- why was 26th Street your first choice?
A. Because it had overtime.
Q. And what courtroom were you assigned to when you first started?
A. My first courtroom and the first judge I worked for was Mary Maxwell Thomas in courtroom 206.
Q. And how long did you work in courtroom 206?
A. About seven years.
Q. So until about 2001?
A. I don't know the exact dates.
Q. Do you recall what courtroom you would have went

Page 33

E. JONES

to after courtroom 206?
A. After Judge Thomas retired, I went to courtroom 203 and I worked for Judge Michael Brown. And we left 203 and eventually moved up to 504 until he retired.
Q. And how long do you believe you worked with Judge Michael Brown in courtroom 203 or 504?
A. I worked for him about seven years. But it was a break between Judge Thomas and Judge Brown because they assigned me to the front door.
Q. How long did you work at the front door?
A. About five -- about five years.
Q. Five years?
A. Yes.
Q. So you worked in Judge Thomas' courtroom in 206 for seven years, right?
A. Uh-huh.
Q. And then you were assigned to the front door for five years?
A. Yes.
Q. And then you were assigned to Judge Michael Brown's courtroom 203 and 504 for seven years?
A. Yeah.
Q. And when you were assigned to the front door, that would have been -- these are approximate dates, let me

## Page 38

E. JONES

or her responsibilities?

A. The dock is where merchandise is brought into the courthouse or administration building. It's like a delivery-type section and you just supposed to watch to make sure they're doing exactly what they're supposed to be doing and not moving furniture out that belongs to the County.

Q. Any other positions of which you are aware at the courthouse that do not have any inmate contact other than what you've told me?

A. I don't think there's any other positions.

Q. I believe you testified you worked for Judge Michael Brown for seven years?

A. Uh-huh.

Q. Is that right?

A. Yes.

Q. Where were you assigned after Judge Michael Brown retired?

A. I stayed with the same courtroom, but another judge came in and took over that court call. Deputies follow the court call unless they punishing you.

Q. So you were still assigned to courtroom 504?

A. Yes. He came up to that room.

Q. And who was the judge?

## Page 39

E. JONES

A. Michael McHale.

Q. And how long did you work in Judge McHale's courtroom?

A. I'm still assigned. I've been with him, I want to say probably four or five years.

Q. And that's your current assignment is before --

A. Yes.

Q. -- judge McHale?

A. Yes, but we're in courtroom 308.

Q. So when you first started with judge -- in Judge McHale's courtroom, you were in 504?

A. Uh-huh.

Q. Is that a yes?

A. Yes.

Q. And then at some point you moved to courtroom 308?

A. Yes, because they assign the judges on the second and third floor. And as one judge either pass, retire, they move up to the higher floors because they're bigger courtrooms, so it's like a benefit and so they move up to the bigger courtrooms.

Q. Do you recall when you moved down to courtroom 308?

A. No.

## Page 40

E. JONES

Q. Would it have been sometime in 2015?

A. I don't recall.

Q. Would it be accurate to say that since at least 2015, you've been assigned to either courtroom 504 or courtroom 308?

A. Yes.

Q. You just can't remember when you started working in courtroom 308?

A. Right, I don't remember when we moved there.

Q. Has your partner been the same when you were in courtroom 504 and courtroom 308?

A. Yes.

Q. And are you currently out of work on medical leave?

A. No. Can I explain that?

Q. Yes.

A. When I had my incident, I was on vacation so I just finished out my vacation. My judge is not there this week and I had -- Monday was a holiday and I had scheduled two vacation days. And so I took two sick days, but I'm going back to work next week. I have no restrictions.

Q. And I notice today you are using a cane?

A. Yes.

Q. Is that as a result of your stroke or have you

## Page 41

E. JONES

been using a cane for a longer period of time?

A. As a result of my stroke my left leg is a little weak and it might give out. And since I'm so far away from home, rather than try to hold onto something to stabilize myself, I got the cane. The doctor didn't recommend it. It's something that I feel secure in doing because I know what my leg was doing. And they knew that when I left the hospital.

Q. Ms. Jones, are you okay to proceed do you want to take a break at this point before I start showing you an exhibit?

A. No.

(Jones Exhibit 149 marked for
identification.)

Q. You've just been handed what's been marked as deposition Exhibit 149. Have you seen this document before?

A. I don't recall.

MR. KULWIN: So just for the record, this is a transcript report and it's -- does not have any Bates stamps on it.

MR. MILIANTI: It's the last -- do you have the last page of it?

MR. KULWIN: File provided in native format.

Page 62

E. JONES

years. And before he left, he was on disability for three
years.
 Q. Was he completely off of work when he was on
disability?
 A. Yes.
 Q. So it's been at least five years since he was on
the CR team?
 A. Yes.
 Q. Did any -- has any member of the CR team
discouraged you from initiating or filing a disciplinary
report?
 A. For this guy ▇ Kevin Joy, but he was not
part of the CR unit.
 Q. Right. I'm just asking about the CR team or CR
unit. Any member of the CR team that has ever discouraged
you from filing an incident report?
 A. Sometimes the sergeant would say that they don't
have time to do a report or they might try to get back to
you because they were always short. They would try to fit
you in or, you know, they didn't have time to be bothered
with something like that. Just leave it alone, let it go,
you know. That's just what that they do, you know.
 Q. Do you recall the names of any sergeant who said
that to you with respect to an incident in the courthouse?

Page 63

E. JONES

 A. Sergeant Chacone was good for something like
that, you know, sweeping things under the rug. We don't
have time for that. They got other things to do.
 Q. And Sergeant Chacone was a sergeant on the CR
team?
 A. On the -- he was in charge occasionally. I don't
think it was a permanent spot for him because it was like
he didn't want to do anything anyway. He was good for
that. Hunter, every now and then he was like, oh, well,
we'll get back to you or when we get through with this,
they'll come -- somebody will come down and see you and
we'll get the report. And sometimes it would happen.
Sometimes it wouldn't.
 Q. So with respect to Sergeant Chacone, can you
recall a specific instance where he was trying to sweep
things under the rug and not pursue an incident report on
your behalf?
 A. Not a specific. Well, I would say it wasn't a
masturbating case that time. It was ▇ trying to
pass notes to one of the guys. He just said it was not
important. How would he put it? It was like everything --
every time you would call Chacone, if Chacone was there,
nothing was more important than whatever he was doing. So
sometimes things would get, you know, passed on or not done

Page 64

E. JONES

at all.
 Q. Can you recall a specific instance where you
brought or you raised a masturbation or indecent exposure
or sexual harassment incident to the attention of Sergeant
Chacone and he did not pursue it on your behalf?
  MR. KULWIN: Specifically by means of a name or
just an incident?
  MR. MILIANTI: Just an incident.
  THE WITNESS: Not an incident, I don't recall.
 Q. And with respect to Sergeant Hunter, you gave an
explanation that sometimes he will come down and tell you
it's not important enough to pursue, is that?
 A. Yeah.
 Q. Did I summarize your testimony accurately?
 A. Yes.
 Q. Do you recall a specific instance when he would
have said that to you?
 A. No, I don't. And not with masturbators.
 Q. Other than Sergeant Chacone and Sergeant Hunter,
any other members of the CR team who you believe
discouraged you from filing or initiating a disciplinary
report relating to inmate misconduct?
 A. Hopkins would do it sometimes. He would just
shrug it off. That's not nothing.

Page 65

E. JONES

 Q. Do you recall a specific instance where Sergeant
Hopkins said that to you?
 A. No, but when they would get like that, you know,
you didn't want to bother them, you know, because it was a
problem or something like that, you know. So you kind of
didn't want to bother them until it just -- things just
really got out of hand.
 Q. But as you sit here today, you can't recall a
specific incident with respect to Sergeant Hopkins where he
discouraged you from initiating a disciplinary report, is
that right?
 A. No, I can't recall.
 Q. Anyone else other than Sergeant Hopkins, Sergeant
Chacone, and Sergeant Hunter whom you believe discouraged
you from initiating or pursuing an incident report?
 A. Kevin Joy.
 Q. But Mr. Joy is not part of --
 A. Right, he's not part.
 Q. But just with respect to the CR team, anyone
else?
 A. No.
  (Document marked previously as
  Exhibit 115 was presented.)
 Q. I've just handed you what's previously been

Page 106

E. JONES

1  
2   I believe she was back there trying to talk to her client
3   and he was standing off to the side but in her vision, kind
4   of like on the same angle that we are, about that close.
5      Q.  You're looking at the court reporter who's in
6   your peripheral vision?
7      A.  Yes.
8      Q.  All right.  So after you saw this, you said you
9   called your sergeant, the floor sergeant?
10     A.  I'm not sure.  I think I asked him what are you
11  doing?  Why are you doing that?  Stop it.  And he became
12  embarrassed or something and that's when he started calling
13  me all kinds of bitches.
14     Q.  What do you recall him saying to you?
15     A.  You a bitch.  You a bitch.  You know, they always
16  tell you mind your own business.
17     Q.  And did you say anything back?
18     A.  No, I just was waiting for somebody to come and
19  write him up.
20     Q.  And at the time that you went back there and said
21  what are you doing, was he still masturbating or was he
22  finished?
23     A.  He had stopped and ran from where he was kind of
24  toward the back to where the toilet was.
25     Q.  And did the CR team arrive or a member of the CR

Page 107

E. JONES

1  
2   team arrive?
3      A.  I don't know.  I don't even remember.
4      Q.  Do you remember if the CR team took a statement
5   from the law clerk?
6      A.  No, because everybody was so afraid to say
7   anything or do anything.  Everybody had got to the point
8   nobody wanted to tell or say anything.
9      Q.  You don't believe the law clerk reported
10  anything?
11     A.  I don't think she did.
12     Q.  Did you -- do you have a specific recollection of
13  calling your sergeant and reporting this incident?
14     A.  I don't remember.
15     Q.  Do you have a recollection of speaking with
16  anybody from the CR team about this incident?
17     A.  I don't remember.
18     Q.  Do you know if you brought criminal charges
19  against inmate ▮▮▮▮▮?
20     A.  I know he had started coming over in green.  He
21  started wearing that jumpsuit, so I might have filed
22  charges.
23     Q.  You don't recall as you sit here today whether or
24  not you filed criminal charges against Mr. ▮▮▮▮▮?
25     A.  I don't remember.  I don't remember.

Page 108

E. JONES

1  
2      Q.  Did anyone, as best you can recall, discourage
3   you from initiating any kind of disciplinary report against
4   Mr. ▮▮▮▮▮?
5      A.  Somebody must have told me something because on
6   here it says he couldn't be written up because his penis
7   was not on the outside of his pants.  So I must have called
8   a CR unit to file it, but I guess they didn't let me file
9   it.
10     Q.  You have here, "Defendant could not be written up
11  because his penis was not on the outside of his pants.  He
12  was stroking it from the inside."
13     You don't recall who told you the defendant could
14  not be written up?
15     MR. KULWIN:  Objection, asked and answered.
16     THE WITNESS:  No.
17     Q.  And is that an accurate statement that his hand
18  was inside his pants, he was stroking his penis from inside
19  his pants?
20     A.  Yes.
21     (Jones Exhibit 154 marked for
22     identification.)
23     Q.  You've just been handed what's been marked as
24  Exhibit 154.  It's Bates CCSO_Howard_155649 through 155651.
25     Have you seen this document before, Ms. Jones?

Page 109

E. JONES

1  
2      A.  No.
3      Q.  This appears to relate to a disciplinary report
4   against ▮▮▮▮▮, inmate ▮▮▮▮▮.  The date of
5   the infraction is December 14, 2017 and the location of the
6   infraction is the criminal courts building.
7      Why don't you take a moment and look at the
8   infraction narrative and let me know when you're done?  On
9   the first page of that.
10     A.  I'm done.  I remember this.
11     Q.  Do you know why Mr. ▮▮▮ was incarcerated?
12     A.  No.
13     Q.  If you turn to the second page of this document,
14  it shows that the reporting personnel's name is O. Sanchez.
15  Do you see that?
16     A.  Oscar, yes.
17     Q.  Oscar.  Is Oscar a man?
18     A.  He's the deputy sheriff in courtroom 306.
19     Q.  And you did not fill out this disciplinary
20  report, correct?
21     A.  No.
22     Q.  And you did not provide the narrative that's
23  contained in this exhibit, is that right?
24     A.  No.
25     Q.  Did you review this at the time that it was

Page 110

E. JONES

1 prepared or after it was prepared?
2 A. No.
3 Q. Is the infraction narrative an accurate summary
4 of what happened on that day?
5 A. Well, actually his penis wasn't exposed. He went
6 in through the open part of his jumpsuit and was
7 masturbating. And because he didn't have his penis out,
8 they told me I couldn't press charges against him. They
9 told me they had to have their penis out.
10 Q. So in this narrative where it says that ▇▇▇
11 had exposed his penis and began to masturbate in front of
12 Deputy Sheriff Jones and Deputy Sheriff Sanchez, that's not
13 accurate?
14 A. No. It was on the inside.
15 Q. Is it accurate that he was an HRM escort in a
16 green jumpsuit?
17 A. Yes.
18 Q. And he was handcuffed behind his back?
19 A. Yes, but he -- he had his hands -- what they call
20 like when you shooting pool, like this, you know how people
21 shoot pool behind their back. I don't know how he did it,
22 but his hands was all the way around in the front and he
23 was masturbating.
24 Q. Okay.

Page 111

E. JONES

1 A. They called it a pool shot or something like
2 that.
3 Q. And it says in this infraction narrative that he
4 was in the maximum security bullpen?
5 A. Yes.
6 Q. Do you know who placed him in that bullpen?
7 A. Those two guys that were supposed to be watching
8 him.
9 Q. So he was escorted by two officers?
10 A. HRM guys.
11 Q. And he was placed in the maximum security bullpen
12 and that's when he reached his arms around?
13 A. Right.
14 Q. And was masturbating inside of his jumpsuit?
15 A. Yes. And they said that he was one of the ones
16 -- him and another guy, they were competing against each
17 other to see who could masturbate the most.
18 Q. Did you personally see the inmate put his hands
19 inside of his pants?
20 A. Yes.
21 Q. And where were you in relation to the inmate when
22 you saw that?
23 A. He was in the max cell sitting down. And I was
24 -- it's the max cell. It's courtroom 307's cell and next

Page 112

E. JONES

1 to that was 306 cell. I was putting female prisoners in
2 306 cell and when I turned around, that's when I saw him
3 masturbating, Oscar and I.
4 Q. And was the inmate looking at you and Mr. San --
5 and Officer Sanchez?
6 A. Yes.
7 Q. And did either you or Officer Sanchez say
8 anything to the inmate?
9 A. We told him to stop.
10 Q. And did he stop?
11 A. No. He kept on. So Oscar went to the phone,
12 which is like two feet away, and he called the office for a
13 CR unit to come and write him up.
14 Q. And did the CR unit arrive?
15 A. Yes.
16 Q. Did you provide a statement to the CR unit or was
17 -- was it just Officer Sanchez?
18 A. I believe I said something -- added something.
19 Yes, because Kevin Joy is some kind of investigator for the
20 masturbator program or something. And that's when he came
21 up and told me that because I didn't actually see his
22 penis, I couldn't press charges on him. And jokingly said,
23 so you won't be able to get in the lawsuit.
24 Q. Do you know what he was referring to?

Page 113

E. JONES

1 A. I guess this -- this lawsuit or something.
2 Q. And he said -- do you know -- it's Investigator
3 Joy?
4 A. That's his title.
5 Q. That's his title. Do you know what rank he is?
6 A. From what I knew, he was just a deputy sheriff
7 because he used to work with us. So I don't know what kind
8 of investigator he is, but that's what I guess they call
9 him.
10 Q. And you said he said in a joking manner, you
11 won't be able to get in the lawsuit?
12 A. Right. And I had to sign some kind of form. He
13 had some kind of form that he told me I had to sign.
14 Q. Do you know what type of form it was?
15 A. I guess not to press charges against him.
16 Q. And --
17 A. That guy.
18 Q. Did you sign the form?
19 A. Yes.
20 Q. What did he tell you about the form? What did
21 Investigator Joy tell you about the form?
22 A. I understood the form to be because he started
23 filling out a form to press charges, that form was to
24 counter, the beginnings. Just like if a police officer

**Page 114**

E. JONES

writes you a ticket, he has to account for the number on the ticket. So I thought that form that I was signing was to explain why he started writing this guy up. And that form was going to explain why the guy was not going to be written up, because his penis wasn't exposed.

Q. Did Investigator Joy explain to you that you were signing a form indicating that you were not going to be pressing charges against the inmate?

A. Right, to counter what we had started.

Q. And you voluntarily signed that form?

A. I signed it.

Q. You don't believe he was trying to trick you to sign the form, do you?

A. All -- well, I thought if you fill out one paper, and another paper has to cover it, another paper has to cover it, so I figured that form was covering the paper where we started writing. And it was going to say why we stopped writing. So I thought it was a form that had to be filled out.

Q. When you signed the form, did you understand what you were signing?

A. No, other than closing the case out or whatever.

Q. So you understood by signing the form it would close out the case?

**Page 115**

E. JONES

A. Explaining that his penis wasn't shown.

Q. And do you recall when you had this conversation with Investigator Joy?

A. Maybe an hour after the guy had -- was masturbating. It was all in the same day. It was all in the same morning.

Q. Do you know if any criminal charges were brought against ▇▇▇ as a result of this incident?

A. I don't know, but some people from the jail, they came up. Like they had on plain clothes. I don't know who they were.

Q. But you don't know whether or not criminal charges were filed against ▇▇▇?

A. No.

Q. Do you know Officer Zambrano and Officer Rowe?

A. No.

Q. Do you know whether those two are the HRM escorts that day for ▇▇▇?

A. I don't know.

Q. Do you know whether those two officers brought any type of Inmate Disciplinary Report against inmate ▇▇▇?

A. No, I don't know.

Q. I take it you don't know whether or not they

**Page 116**

E. JONES

brought any criminal charges against ▇▇▇?

A. No. I don't know.

Q. If you turn to the last page of this exhibit, this is the findings of fact and decision with respect to this incident that was filed against ▇▇▇.

Have you seen this document before?

A. No.

Q. Do you have any knowledge as to whether or not ▇▇▇ received 60 days in disciplinary housing as a result of this incident?

A. No.

Q. Do you have any knowledge as to whether or not ▇▇▇ received 60 days of phone restrictions as a result of this incident?

A. No.

Q. Do you have any knowledge as to whether ▇▇▇ received 90 days of visit restrictions as a result of this incident?

A. No.

Q. Do you think that punishment, to the extent he received that, do you believe that would be sufficient for this particular incident?

MR. KULWIN: Objection, calls for an expert opinion. Irrelevant and immaterial. She's not a

**Page 117**

E. JONES

correctional expert. You can answer the question if you have any -- to the extent it's relevant to anything, you can answer the question.

THE WITNESS: You say do I believe it was -- repeat the question.

Q. Do you believe the punishment that ▇▇▇ received is appropriate?

A. I don't know. I don't know how to determine what's appropriate.

Q. Do you have any personal knowledge as to whether or not an inmate can be charged with a crime -- a criminal violation if he is masturbating underneath his clothing?

A. Repeat that.

Q. Do you have any personal knowledge as to whether or not an inmate can be criminally charged for masturbating underneath their clothing?

A. I don't know. No, I don't have any knowledge. Like I say, all this stuff is related to what they do in the jail and we weren't trained on all that.

Q. If you look on the second page of this document, it has Sergeant -- it looks like Quimque. Do you see that?

A. Oh, Sergeant Q, yes.

Q. Who is that?

A. He was a sergeant at 26th Street, Quimque.