Exhibit 24

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

SDAHRIE HOWARD, DENISE HOBBS, ELLENOR ALTMAN, TAVI BURROUGHS, SHADONNA DAVIS, SHARON WILSON, KIMBERLY CRAWFORD-ALEXANDER, ESTHER JONES, BALVINA RANNEY, TAWANDA WILSON, and SUSANA PLASENCIA, on behalf of themselves and all others similarly situated,

        Plaintiffs,

v.

COOK COUNTY SHERIFF'S OFFICE, and COUNTY OF COOK,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case no. 17-cv-8146

Judge Matthew Kennelly
Mag. Judge Sidney I. Schenkier

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

CRYSTAL BROWN, SARAN CRAYTON, SAMANTHA SLONIM, CELESTE ADDYMAN, ERIKA KNIERIM, JULIE HULL, ROCIO ARMENDARIZ, BRETT GALLAGHER, RACHELLE HATCHER, KYAN KEENAN, TAKENYA NIXON, CARLY PATZKE, STEPHANIE SCHLEGEL, ASHLEY SHAMBLEY, CORYN STEINFELD, NIYATI THAKUR, JULIE WILLIS, on Behalf of Themselves and a Class of Similarly Situated Persons,

        Plaintiffs,

v.

COOK COUNTY; AMY CAMPANELLI, in her official capacity as Public Defender of Cook County; and THOMAS DART, in his official Capacity as Sheriff of Cook County,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case no. 17-cv-8085

Judge Matthew Kennelly
Mag. Judge Daniel Martin

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

## EXPERT REPORT OF BENJAMIN S. WILNER, Ph.D.

Alvarez & Marsal Disputes and Investigations, LLC ("A&M") has been retained by counsel representing named Defendants, Cook County Sheriff's Office and Thomas Dart, in his official capacity as Sheriff of Cook County (collectively, "CCSO"), to comment on statistical issues in the aforementioned matters. It is my understanding that there are other related matters that cover the same general subject matter to which my comments might relate.

It is my understanding that the Plaintiffs allege that the CCSO created a hostile work environment at the George N. Leighton Criminal Court Building ("Courthouse") and within Cook County Jail ("CCJ") whereby male detainees have exposed themselves and masturbated in front of female Assistant Public Defenders, law clerks and sworn & civilian personnel at the jail.

I, Benjamin S. Wilner Ph.D., am quantifying trends I observed in CCJ data and commenting on the data to which Ms. Jeanne S. Woodford cited in her Expert Report dated February 1, 2019. Through my analysis of the Cook County Offender Management System ("CCOMS") and associated data, I found that the number of reported indecent exposure-related incidents has been declining at CCJ both before and after the Preliminary Injunction and Temporary Restraining Order of November 28, 2017 in this matter. I also found that the reported indecent exposure-related incidents are less prevalent and have experienced a greater reduction than benchmarks. Any underreporting of incidents that might have existed likely would not affect these conclusions. While Ms. Woodford provided certain benchmarks in her Expert Report, these were "cherry picked" and not representative of jails like CCJ. If Ms. Woodford did not "cherry pick" her claimed benchmarks, then the frequency of indecent exposure-related incidents at CCJ would fall within the range of other correctional facilities.

I generated the aforementioned conclusions by reviewing the documents listed in *Exhibit 1*. I reserve the right to modify and/or expand my opinions as I obtain and analyze additional information.

A&M is compensated for its services on an hourly basis and is being reimbursed for out-of-pocket expenses. A&M is compensated at a rate of $715 per hour for my time. Other individuals from A&M also provided assistance in this matter; their hourly rates range from $250 to $715. No one who has contributed to this engagement has any known financial interest in any party to the matter, other than as taxpayers and residents of Cook County. A&M's compensation is neither based nor contingent on the results of this analysis.

This Report is provided solely for use in the matters described in the captions at the top of this Report. This Report is not to be used with, circulated, quoted or otherwise referred to in whole or in part for any other purpose, or in any other document without the express written consent of A&M.

# I.   Qualifications

My qualifications are stated in my curriculum vitae, which is attached as *Exhibit 2*. That Exhibit details my education, credentials, testimony, publications and relevant presentations.

I am a Managing Director at A&M. I have performed economic and statistical analyses in a great variety of engagements, including financial analysis, contract losses, a wide range of class action, intellectual property and lost income matters. For example, I previously analyzed Cook County Jail data regarding prisoner flows through its Receiving, Classification, Diagnostic Center ("RCDC"). In addition to testifying in a wide variety of matters, I also serve as a business consultant. For example, I have been retained by the U.S. Department of Homeland Security to economically analyze various proposed policies. Additionally, I received a special commendation from the Commissioner of U.S. Customs and Border Protection for revising a $2.5 billion annual tariff.

I have a Bachelor of Arts degree, Magna cum Laude with Distinction in Major in Mathematics and Economics from the University of Pennsylvania as well as a General Course Degree in Mathematics and Statistics from the London School of Economics. I was awarded a Ph.D. in Managerial Economics and Decision Science from the Kellogg Graduate School of Management at Northwestern University.

I have served as a professor of economics, finance and statistics in the business schools at the University of Michigan, the University of Iowa, Northwestern University and the Helsinki School of Economics.

My research has been published in the peer reviewed academic journals including the *Journal of Finance*, the leading academic journal in finance. I have been awarded research grants from multiple universities as well as from the United States Government's National Science Foundation. My research has been extensively cited. For example, the former President of the University of Chicago relied on my undergraduate thesis as the theoretical basis for one of his published research papers. I also served as a referee for multiple academic journals and textbooks.

As an undergraduate, I spent three years as a research assistant to the 1980 Nobel Prize winner Lawrence R. Klein. Dr. Klein was awarded the Nobel Prize in Economics for economic and statistical forecasting. As a graduate student, I studied under Roger Myerson, who won the 2007 Nobel Prize in Economics for game theoretic modeling, and Dale Mortensen, who won the 2010 Nobel Prize in Economics for his study of labor markets.

# II.   Ms. Woodford's Data Opinions

In her Expert Report, Ms. Woodford claimed that "[i]nmate sexual harassment of women working in all parts of the Cook County Jail and adjoining Leighton Courthouse has been

pervasive and far greater than in other correctional institutions in the United States between 2014 (if not before) through April 2018."[1]

To support her claim that CCJ "has an excessively large number of reported incidents of masturbation and indecent exposure,"[2] Ms. Woodford compared incident rates at CCJ and **_select_** prisons in California for October 2017 through October 2018.[3] She qualitatively noted the existence of some underreporting of such incidents,[4] but could not "estimate on a scientific basis what percentage of the incidents of masturbation and/or indecent exposure are reported."[5] Despite this inability to estimate, she "fe[lt] confident based on the testimony and my knowledge and experience" to speculate about the quantitative frequency of underreporting of alleged indecent exposure-related incidents.[6]

Because she assumed that there were high underreporting rates for alleged indecent exposure-related incidents, Ms. Woodford further speculated that there were high underreporting rates for sexual offences other than alleged masturbation and alleged indecent exposure.[7] She also hypothesized an extrapolation that because there were examples of these other offences, their prevalence must be "incessant," "extremely common," and "routine."[8] She also speculated that the CCSO did not implement any approach to dealing with these issues.[9]

Ms. Woodford also claimed that the frequency of inmates being found guilty of indecent exposure-related offences was "markedly low" without providing verifiable guilty rates from other prisons.[10] Ms. Woodford also claimed that CCSO's policies caused the rate of indecent exposure-related offences to be less than those of her **_select_** prisons in California.[11]

# III.  Relevant Data

Before I note my analysis of relevant data, I first describe that relevant data. Section A below discusses Cook County data. Section B discusses data from other sources.

---

[1] Expert Report of Jeanne S. Woodford, February 1, 2019, ("Woodford Expert Report") paragraph 13a.
[2] Ibid., Section V.A.
[3] Ibid., paragraph 22.
[4] Ibid., paragraph 24 – 33.
[5] Ibid., paragraph 34.
[6] Id.
[7] Ibid., paragraph 36.
[8] Ibid., paragraph 42.
[9] Ibid., paragraph 44.
[10] Ibid. paragraphs 49 & 54.
[11] Ibid., paragraphs 50 & 53.

## A. Cook County Data

The Cook County Offender Management System ("CCOMS") reports information related to inmate incidents of all types along with violation codes that characterize the reported misconduct associated with the incidents.

### 1. Incident Codes

The CCSO categorizes inmate incidents by the level of their severity. For example, 200-level offences (offences with codes in the 200s) are considered to be less severe than 300-level offences (offences with codes in the 300s).

CCOMS has five relevant indecent exposure-related offence codes,[12] which are

- 210 Indecent Exposure: Intentional exposure of genitals, buttocks, pubic region or female breasts (areola or nipples) and/or unauthorized nudity.
- 216 Sexual Harassment: Subjecting another person to sexually harassing or sexually suggestive conduct, including making sexual proposals.
- 313 Indecent Exposure/Mast[u]rbation: Masturbation in public or in front of staff or visitors (if an inmate is found in violation if this offense a 3rd time or more within a 90-day period, he/she will be subjected to 400 level penalties.)
- 323 Indecent Exposure: Same as code 210 above, but CCSO elevated the violation code to 300-level on or around May 2, 2017
- 325 Sexual Harassment: Same as code 216, but CCSO elevated the violation code to 300-level on or around May 2, 2017

CCSO also produced other 300-level offences that are non-sexual in nature.

- 307 Battery: Intentionally or knowingly causing bodily harm or making provoking contact with someone.
- 320 Verbal Threat to Staff: A threat made against or to an employee that causes the employee to believe the inmate intends to cause harm to him/her, another staff member, a family member, or a friend.
- 321 Inappropriate Urinating or Defecating: Urinating or defecating in an area other than a toilet or urinal and/or possession of defecate, urine or other bodily fluids in an unauthorized container or area.
- 322 Disrespect to Staff: Insulting or directing obscene or abusive language towards staff, use of offensive gestures directed toward staff, addressing staff by inappropriate names and/or making inappropriate remarks to staff.

Furthermore, the Plaintiffs allege that CCSO's discriminatory intent could be observed by claiming that contrary to indecent exposure-related incidents, "discipline is often swift" when

---

[12] CCSO_Howard_0078544 - 50 & CCSO_Brown_0078497 – 502.

similar harassment is directed at men.[13] For example, CCOMS has an incident code 403, which describes "Assault on Staff with Bodily Fluids: Throwing or projecting bodily fluid, including saliva, feces, urine, blood, or any other body fluid at or on staff."[14] The Plaintiffs believe this code is relevant because corrections officers subjected to the thrown urine or feces are both men and women, while the subjects of the indecent exposure-related incidents are primarily women.

### 2. Data on Incidents

With regards to the reported indecent exposure-related incidents, several relevant datasets were produced in this litigation. As each cover different time periods, different incident codes and/or contain different data fields, I merged these files to derive a comprehensive list of reported indecent exposure-related incidents.

CCSO_Howard_0170379.xlsx is the most inclusive database produced by the CCSO in this litigation. It contains information on incidents corresponding to the five aforementioned indecent exposure-related incident codes between January 1, 2015 and October 7, 2018.[15] Four different reports are included in this database:

1. The Disciplinary Report lists all the recorded incidents that had an reported indecent exposure-related incident.
2. The Incident Report lists the incidents from the Disciplinary Report that were further investigated by CCSO.
3. The Disciplinary Hearing Report lists the incidents that were adjudicated.
4. The Witness Report lists witness information from the incidents.

CCSO_Howard_0147525.xlsx was produced and only contained data through July 13, 2018. It did not contain information on Sexual Harassment incidents (216 and 325 codes). However, it did contain information from the Business Intelligence database, which contains information on incidents that were further investigated by the Department of Corrections ("DOC"). Sixty-nine percent of the incidents on the Disciplinary Report were further investigated by the DOC.

I cleaned the combined data to eliminate incidents occurring at courts other than the Leighton Courthouse.

These cleaned, aggregated incidents conservatively include reported indecent exposure-related incidents where the victim was a male employee as CCOMS does not specifically report the victim's gender. On the other hand, the putative class involves only female employees. The number of reported indecent exposure-related incidents would be lower if male victims were excluded.

---

[13] Howard Second Consolidated Complaint dated July 31, 2018 ("Howard Second Complaint"), p. 5.
[14] CCSO_Brown_0078500.
[15] CCSO_Howard_00084825.xlsx was also produced and contained the same information as CCSO_Howard_0147525.xlsx, except that it only contained data through January 23, 2018.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

CCSO_Howard_0170377.xlsx contains information on incidents corresponding to the four aforementioned other "similar" benchmark incident codes between January 1, 2015 and October 9, 2018. This database includes the Disciplinary Report, Incident Report, Disciplinary Hearing Report and Witness Report like CCSO_Howard_0170379.xlsx.

CCSO_Howard_0320474.xlsx contains information on 403 code incidents between January 1, 2015 and January 11, 2019. This database includes the Disciplinary Report, Incident Report, Disciplinary Hearing Report and Witness Report like CCSO_Howard_0170379.xlsx and CCSO_Howard_0170377.xlsx.

### 3. Inmate Population Data

As well as the incident-related data above from CCOMS, I also reviewed the relevant inmate population data from CCJ.[16] The inmate population data is a list of average daily inmate populations for each month by jail Division from January 2015 to November 2018.

## B. Other Data

In addition to the Cook County data, I also reviewed spreadsheets prepared by McGuireWoods attorneys, the COMPSTAT data from California prisons relied upon by Ms. Woodford in her expert report and Prison Rape Elimination Act (PREA) reports from various jurisdictions.

### 1. McGuireWoods Attorney-Reviewed Spreadsheets

As the CCOMS electronic database does not contain all information contained in the paper files regarding each incident, attorneys at McGuireWoods reviewed the paper files and/or electronically maintained pdf documents to augment the CCOMS data. For example, as CCOMS does not contain data on incidents that occurred in the Courthouse prior to October 2017, McGuireWoods attorneys recorded data on such incidents that were reported in the Courthouse. Additionally, McGuireWoods attorneys entered information on the victim type (e.g., Assistant Public Defender, Corrections Officer) when available. These data are presented in *Exhibits 3 - 5*.

### 2. COMPSTAT Data

As discussed above, Ms. Woodford utilized data from **_select_** prisons in California for October 2017 through October 2018.[17] Even though she did not provide the data underlying her Expert Report, I was able to locate her presumed data source from the California Department of Corrections and Rehabilitation ("CDCR"). The CDCR publishes information from its COMPSTAT database.[18] In particular, the CDCR publishes 13-Month Statistical Reports, which contains information on indecent exposure-related incidents along with other similar metrics from **_all_** California prisons.

---

[16] CCSO_Howard_0321569.
[17] Woodford Expert Report, paragraph 22.
[18] https://www.cdcr.ca.gov/COMPSTAT/About-COMPSTAT html viewed on February 13, 2019.

### 3. PREA Reports

Instead of just assuming that the **_select_** California prisons Ms. Woodford utilized in her Expert Report were a proper benchmark for incident rates at CCJ, I obtained information from other prisons that allowed me to assess Ms. Woodford's benchmark assumption. In particular, I was able to locate PREA Reports from many jurisdictions. The Prison Rape Elimination Act ("PREA") of 2003 required prisons to provide information regarding rapes that occurred in their facilities.[19] While these Reports did not isolate information on alleged indecent exposure-related incidents, the PREA Reports quantified inmate-on-inmate and staff-on-inmate incidents. While specific terminology varied, these Reports provided information on the occurrences of sexual harassment, sexual abuse and nonconsensual sexual contact.

# IV.  Findings

I generated several findings based upon my analysis of the data described in the prior Section.

It is important to analyze data and trends and not just put forth anecdotes about reported events.

### Finding 1:  _Contrary to the Plaintiffs' Claim, Reported Indecent Exposure-Related Incidents Are Not the Most Pervasive Inmate Discipline Issue at CCJ_

Plaintiffs claim that the reported indecent exposure-related incidents and "sexual harassment occurs on a daily or nearly daily basis through the Jail and in the Courthouse and has been an ongoing and escalating issue since 2013."[20] Furthermore, Plaintiffs allege that

> The harassment of female employees by male detainees is so frequent, pervasive, unwelcome, and consistently traumatizing that it makes the Jail and the Courthouse an objectively abusive, hostile, oppressive, and dangerous workplace for class members, adversely changing the terms and conditions of their employment compared to men who work in the same job titles.[21]

Based on these comments, one could conclude that Plaintiffs are claiming that the reported indecent exposure-related incidents are the most pervasive issue at CCJ. However, contrary to the Plaintiffs' claim, Figure 1 below shows that occurrences of other "similar" incident codes were 2 – 12 times more prevalent than reported indecent exposure-related incidents at CCJ.

---

[19] https://www.prearesourcecenter.org/about/prison-rape-elimination-act-prea viewed on February 13, 2019.
[20] Howard Second Complaint, p. 2.
[21] Ibid., p. 3.



**Figure 1**
Indecent Exposure-Related vs. 300 Level Benchmark vs. 403 Benchmark Reported Incidents

***Finding 2:    The Prevalence of Reported Indecent Exposure-Related Incidents Have Been Declining Since Late 2016 (i.e., Before the TRO)***

***Finding 3:    Reported Indecent Exposure-Related Incidents Have Been Reduced at a Greater Rate Than Other Reported Benchmark Incidents***

To demonstrate these Findings, I recast the data in Figure 1 above. To properly analyze changes in reported incident rates, I create an index for each general reported incident category shown in Figure 1. In particular, this index sets each general reported incident category to be 100% in December 2016. The value in each subsequent month implies the percentage that month's reported incident rate is of December 2016 for each general reported incident category. For example, as shown in Figure 2 below, the frequency of reported indecent exposure-related incidents in September 2018 is only 27% of December 2016 levels. This implies that the CCSO has reduced the frequency of reported indecent exposure-related incidents by roughly three-quarters during this 22-month period.



Figure 2
Indecent Exposure-Related vs. 300 Level Benchmark vs. 403 Benchmark Reported Incidents
as a % of Dec-16

TRO:
11/28/17

Figure 2 also demonstrates that the decline in the frequency of reported indecent exposure-related incidents began declining before the November 2017 TRO.  Therefore, the data are inconsistent with the Plaintiffs' claim that "sexual harassment … has been an … escalating issue since 2013."[22]

Additionally, Figure 2 shows that the frequency of reported indecent exposure-related incidents has declined at a faster rate than other 300-level and 403 benchmark incidents as the blue line is below the red line and the green line (for almost all months).  This contradicts the Plaintiffs' claim that the CCSO puts more effort into limiting reported incidents that affect men and women (the 300-level and 403 level benchmark incidents) than reported incidents that primarily affect women (the reported indecent exposure-related incidents).  Consequently, data displaying the frequency of reported incident rates are inconsistent with the Plaintiffs' claims.

Even though the reported indecent exposure-related incidents are declining at a faster rate than the other 300-level and 403 benchmark incidents, Figure 2 also shows that the frequency of all three of the incident types have declined after the TRO.

As discussed above, the Plaintiffs claim that there is underreporting of alleged indecent exposure-related incidents.[23]  In particular, they claim that the courthouse deputies' lack of access to the CCOMS database contributed to this alleged underreporting.[24]  However, they also

---

[22] Ibid., p. 2.
[23] Howard Second Complaint, p. 4, 18 and 21.
[24] Woodford Expert Report, paragraph 29.

note that the courthouse deputies were granted access to the CCOMS database after this lawsuit was filed in November 2017.[25]

Figure 2 above is inconsistent with the Plaintiffs' underreporting claim. If, as the Plaintiffs allege, CCSO's lack of access to CCOMS for courthouse deputies contributed to the alleged underreporting, the number of reported incidents should increase when courthouse deputies were granted access. Figure 2 shows that the number of reported indecent exposure-related incidents **declined** after the CCSO granted courthouse deputies with CCOMS access. As a result, the data are consistent with this change in CCOMS access not affecting any alleged underreporting.

### Finding 4: *The Data Show That Few Reported Indecent Exposure-Related Incidents Occurred in the Courthouse*

Attorneys at McGuireWoods reviewed the case files and identified reported indecent exposure-related incidents that were not electronically entered into CCOMS, including Courthouse incidents prior to October 2017. Figure 3 below shows that there were few reported incidents in the Courthouse. From January 2015 to November 2017, there were only an average of 5.7 reported indecent exposure-related incidents per month in the Courthouse. However, this frequency of incidents at the Courthouse further decreased to an average of 1.5 reported incidents per month after the CCSO granted courthouse deputies access to the CCOMS database. These data are inconsistent with the Plaintiffs' assertion that "sexual harassment occurs on a daily or nearly daily basis … in the Courthouse"[26] and the aforementioned lack of CCOMS access allegedly causing underreporting.



---

[25] Id.
[26] Howard Second Complaint, p. 2.

***Finding 5:*** ***The Data Show That Few Assistant Public Defenders Were Subjected to Reported Indecent Exposure-Related Incidents***

Attorneys at McGuireWoods reviewed the case files of all reported indecent exposure-related incidents and extracted the employment type of each reported victim(s). Figure 4 below shows that there were few reported incidents of Assistant Public Defenders being subjected to reported indecent exposure-related incidents. From January 2015 to November 2017, there were only an average of 3.2 reported indecent exposure-related incidents per month with Assistant Public Defenders as victims. However, this frequency of incidents at the Courthouse further decreased to an average of 0.4 reported incidents per month after the CCSO granted courthouse deputies access to the CCOMS database. These data are inconsistent with the Plaintiffs' assertion that the aforementioned lack of CCOMS access allegedly caused underreporting.

In addition, Figure 4 shows that reported indecent exposure-related incidents with Assistant Public Defenders as victims declined after October 2017. It is my understanding that the timing of this decline coincided with a change in policy regarding the transportation of detainees in the Courthouse. This policy change in October 2017 was also prior to the TRO.[27]



***Finding 6:*** ***The Data Show That Reported Indecent Exposure-Related Incidents Are Not Pervasive Throughout CCJ***

The data reported the location of the reported indecent exposure-related incidents. Figure 5 below shows that almost all of the reported indecent exposure-related incidents that occurred

---

[27] Declaration of Brad Curry, CCSO's Chief Operating Officer, paragraph 18.

within CCJ occurred in Divisions 8, 9 and 10. Division 8 includes the Cermak Health Services and the Residential Treatment Unit, which provides treatment for substance abuse, mental illness and general health screenings and evaluations for inmates at the jail.[28] Divisions 9 and 10 house maximum security inmates.[29] In addition, Division 9 houses inmates that committed disciplinary infractions while in custody.[30] The jail Divisions other than 8, 9 and 10 house 1) female inmates or 2) male inmates with a minimum or medium security classification.[31]



These reported indecent exposure-related incidents are not pervasive throughout CCJ and are primarily isolated with a certain portion of the inmate population as approximately three-quarters of these reported incidents that allegedly occurred within CCJ occurred in Divisions 8, 9 and 10.

Whereas reported indecent exposure-related incidents are "non-pervasive," other benchmark incidents are more likely to occur throughout the prison. For example, Figure 5 also shows that just over half of the 300-level benchmark incidents occurred within Divisions 8, 9 and 10.

Figure 6 demonstrates that there were few reported indecent exposure-related incidents in Divisions 1, 2, 3, 4, 5, 6, 11 and 15.[32] The bar graph below lists the CCJ Division and its

---

[28] http://hconews.com/2013/08/14/cook-county-jail-expands-medical-facilities/ viewed on February 13, 2019.
[29] https://www.cookcountysheriff.org/cook-county-department-of-corrections/divisions-of-jail/ viewed on February 13, 2019.
[30] Id.
[31] Id.
[32] Divisions 1, 3 and 4 are no longer in use at CCJ. Division 1, 3 and 4 did not have incidents after January 2016, March 2017 and April 2018, respectively. In addition, Division 5 did not begin housing inmates until July 2017.

respective monthly average number of reported incidents over the 45-month period of January 2015 to September 2018.



Figure 6
Indecent Exposure-Related Incidents Reported By Jail Division
January 2015 - September 2018, Monthly Averages

Therefore, the data are inconsistent with the Plaintiffs' claim that "sexual harassment occurs on a daily or nearly daily basis through the Jail."[33]

***Finding 7:   Adjudication Rates Do Not Suggest Any Discriminatory Intent by CCSO***

The Plaintiffs allege that CCSO does not adjudicate reported indecent exposure-related incidents because its policies discriminate against women.   However, Figure 7 below shows that adjudication rates for reported indecent exposure-related incidents are similar to those of benchmark reported incidents.[34,35]   In particular, from January 2015 through September 2018, the

---

Lastly, Division 15 represents reported incidents in the data occurring off-site from CCJ or the Courthouse (e.g., in transport, in an external hospital, or other facility); thus, there is no actual Division 15 housing inmates at CCJ.   I have conservatively included the Division 15 reported incidents from my analysis even though these incidents are considered to not have occurred within CCJ or the Courthouse.

[33] Howard Second Complaint, p. 2.

[34] The CCOMS database had the following adjudication decisions reported on its Disciplinary Hearing Report: Guilty, Not Guilty, Invalid, Expired, Discharged, Shipped and Not Listed.   I further summarized the adjudication decisions as Adjudicated, Not Adjudicated and Not Available.   I categorized Guilty, Not Guilty, and Invalid as Adjudicated. Expired was categorized as Not Adjudicated.   In addition, if an incident appeared on the Disciplinary Report, but was not reported on the Disciplinary Hearing Report, I conservatively assumed the incidents associated with these inmates were Not Adjudicated.   Furthermore, I categorized Discharged, Shipped and Not Listed as Not Available.   I excluded the Not Available incidents from my calculated Adjudication Rate.

adjudication rates for reported indecent exposure-related incidents, 300-level benchmark incidents, and 403 code benchmark incidents were 79%, 82% and 77%, respectively.



Figure 7 also shows that adjudication rates for reported indecent exposure-related incidents have been generally increasing over time, consistent with the CCSO's efforts to combat this issue. As further evidence of the fact that the CCSO takes indecent exposure-related incidents seriously, they elevated these incidents from a 200-level issue to a 300-level issue in early May 2017. The adjudication rate for the reported indecent exposure-related incidents was 73% through May 2017. After May 2017, the adjudication rate increased to 90%.

Even prior to the elevation of these indecent exposure-related incidents from a 200-level issue to a 300-level issue in early May 2017, there was a higher adjudication rate when incidents were a 300-level offence compared to a 200-level offence. For example, the adjudication rate for 300-level indecent exposure-related incidents was 76% for January 2015 to May 2017; whereas, the 200-level adjudication rate was 67%.

I also analyzed the adjudication rate for the reported indecent exposure-related incidents before and after September 2016. It is my understanding that Steve Wilensky started as the Director of Inmate Discipline around this time. Figure 8 below shows that the average adjudication rate

---

Furthermore, the adjudication decisions on the Disciplinary Hearing Report are indicated by inmate and are not specific to the violation code charged. Therefore, I conservatively assumed that the adjudication decision applied to all violation code charges for a given inmate.

[35] Adjudication rates fall sharply for 403 incidents in the summer of 2018 because only 5 and 6 such incidents occurred in August and September 2018. A small number of non-adjudications during this period greatly sway the data.

increased by 11% after September 2016. This adjudication rate increase was similar to the increase experienced in the 300-level benchmark incidents; however, it exceeded the 403 code benchmark incidents. The average adjudication rate increased even more after Mr. Wilensky had been in his position for more than a year.

| Figure 8 Adjudication Rate Increase | | | |
|---|---|---|---|
| Period | Indecent Exposure-Related Reported Incidents | 300 Level Benchmark Reported Incidents | 403 Benchmark Reported Incidents |
| Jan-15 – Aug-16 | 72% | 74% | 74% |
| Sep-16 – Sep-18 | 83% | 86% | 80% |
| **Increase** | **11%** | **12%** | **6%** |
| | | | |
| Jan-15 – Aug-16 | 72% | 74% | 74% |
| Sep-17 – Sep-18 | 91% | 91% | 78% |
| **Increase** | **19%** | **17%** | **4%** |

***Finding 8:*** ***Contrary to Ms. Woodford's Claim, Guilty Rates Are Not "Markedly Low" Compared to Other Benchmarks at CCJ***

Similar to the Plaintiffs alleging that CCSO does not adjudicate reported indecent exposure-related incidents because its policies discriminate against women, Ms. Woodford also claimed that the guilty determinations were unreasonably low.[36] However, Ms. Woodford did not compare guilty rates for reported indecent exposure-related incidents and rates for other incidents whose victims she claimed to be more male within CCJ.[37]

Figure 9 below shows such a comparison. In particular, contrary to the Plaintiffs' and Ms. Woodford's claims, that guilty rates for reported indecent exposure-related incidents within CCJ are similar to those of benchmark reported incidents within CCJ whose victims Ms. Woodford claimed to be more male. In particular, from January 2015 through September 2018, the guilty rates for reported indecent exposure-related incidents, 300-level benchmark incidents, and 403 code benchmark incidents were 89%, 84% and 93%, respectively.[38]

---

[36] Woodford Expert Report, paragraphs 45 – 56.

[37] Ibid., paragraphs 47 – 49.

[38] CCOMS rarely reported more than one adjudication decision for each inmate incident, even though inmates regularly were charged with multiple violation codes for a given incident. When CCOMS reported an inmate as Guilty & Not Guilty or Not Guilty & Invalid, I conservatively classified the inmate as Not Guilty for all relevant violation codes. For inmates reported as Guilty & Invalid, I classified the inmate as Guilty for all relevant violation codes.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



**Figure 9**
Indecent Exposure-Related vs. 300 Level Benchmark vs. 403 Benchmark - Guilty as a % of Adjudicated

*Finding 9:* *Ms. Woodford Incorrectly Utilized California Prisons as a Benchmark for What Indecent Exposure-Related Incident Rates Should Have Occurred in CCJ*

As discussed above, Ms. Woodford assumed without any analysis that the reported indecent exposure-related incident rates at CCJ should be similar to those rates experienced by *__select__* California prisons. However, an analysis of PREA Reports demonstrates that 1) Illinois prisons have generally higher rates of inmate sexual incidents than California prisons, 2) the rates of sexual incidents for inmates in Illinois prisons are more typical of prisons in states with large inmate populations than California, and 3) California prisons have generally lower rates of inmate sexual misconduct than prisons in other states with large inmate populations.

While the PREA Reports do not isolate information on reported indecent exposure-related incident rates, they do demonstrate that other facilities have a larger number of inmate-on-inmate sexual incidents. In particular, Figure 10 below shows that California had the second lowest number of PREA allegations per inmate of the ten states with the most number of inmates.[39] On the other hand, Illinois' rates were over three times greater than California's rates. Additionally, prisons in comparable states like Georgia and Pennsylvania had more PREA allegations per inmate than Illinois.

---

[39] The PREA Report for California included the *select* state prisons that Ms. Woodford utilized in her expert report. The PREA Report for Illinois was for state prisons, and it did not include CCJ.

| Year | Texas | California | Florida | Michigan | Illinois | Penn. | Georgia |
|---|---|---|---|---|---|---|---|
| **Figure 10** [40] | | | | | | | |
| **PREA Rates for 2015 - 2017** | | | | | | | |
| 2015 | 0.23% | 0.29% | 1.29% | 0.84% | 0.61% | 1.03% | 1.78% |
| 2016 | 0.20% | 0.39% | 0.74% | 0.94% | 1.27% | 1.60% | 1.91% |
| 2017 | 0.24% | 0.44% | 0.65% | n/a | 1.76% | 1.49% | 1.86% |
| **Average** | **0.22%** | **0.37%** | **0.89%** | **0.89%** | **1.21%** | **1.38%** | **1.85%** |

Therefore, Ms. Woodford did not eliminate the possibility that her assumed comparison is biased because she utilized an invalid benchmark about what reported indecent exposure-related incident rates in CCJ should have been.

**Finding 10:    *Not Only Did Ms. Woodford Improperly Utilize Data from California in her Expert Report, She "Cherry-Picked" Her Selection of the Select California Prisons She Analyzed***

Ms. Woodford only depicted the rates of guilty findings of sexual misconduct for three California facilities in the General Population Males report and three California facilities in the High Security report from COMPSTAT in her Expert Report. However, she excluded data COMPSTAT had on 14 other California facilities. The specific California prisons she excluded from her Expert Report appear to be purposeful, potentially to advance her desired result.

Figure 11 below shows that Ms. Woodford excluded prisons that had greater rates of guilty findings of sexual misconduct than the prisons she cited in her Expert Report. For example, Ms. Woodford excluded the two California High Security prisons with the highest rates of guilty findings of sexual misconduct in COMPSTAT: Sacramento and Salinas Valley. In particular, Sacramento's incident rate was three times larger than the largest incident rate Ms. Woodford selected. Additionally, this incident rate from Sacramento that ***Ms. Woodford ignored*** exceeds her overstated belief of what the incident rate was at CCJ.

Additionally, Ms. Woodford also excluded the two California General Population prisons with the highest rates of guilty findings of sexual misconduct in COMPSTAT: Solano and Mule Creek. She also elected to present data from the California General Population prison that had the lowest rate of guilty findings of sexual misconduct in COMPSTAT: Avenal.

---

[40] Per https://www.bjs.gov/content/pub/pdf/cpus16.pdf, the top ten most populous inmate states were: (1) Texas, (2) California, (3) Florida, (4) Georgia, (5) Pennsylvania, (6) New York, (7) Ohio, (8) Illinois, (9) Virginia, and (10) Michigan. The annual PREA reports were not available on a statewide basis from 2015 to 2017 for New York and Virginia; Ohio did not report total PREA allegations like the other states; and Michigan was not available for 2017.

| Figure 11 [41] | | | |
|---|---|---|---|
| **Sexual Incident Rates for November 2017 – November 2018** | | | |
| **High Security** | | **General Population** | |
| **Included by Woodford** | **Annual Sexual Incidents with Guilty Findings per Population** | **Included by Woodford** | **Annual Sexual Incidents with Guilty Findings per Population** |
| Corcoran | 3.62% | Centinella | 0.59% |
| High Desert | 1.24% | Calipatria | 0.51% |
| Pelican Bay | 1.02% | Avenal | 0.15% |
| **Excluded by Woodford** | | **Excluded by Woodford** | |
| Sacramento | 10.97% | Solano | 1.07% |
| Salinas Valley | 5.85% | Mule Creek | 0.71% |
| Los Angeles County | 3.37% | Valley | 0.50% |
| Kern Valley | 1.28% | Ironwood | 0.28% |
| Substance Abuse Treatment Facility | 0.84% | Correctional Training Facility | 0.25% |
| California Correctional | 0.71% | Chuckwalla | 0.22% |
| California City Correctional Facility | 0.04% | Pleasant Valley | 0.21% |

Ms. Woodford only analyzed October 2017 – October 2018 data yet attempts to draw conclusions about 2014, 2015, 2016 and most of 2017 incident rates. One cannot draw conclusions about pre-October 2017 incident rates based upon the data she provided in her Expert Report. Therefore, she did not demonstrate what she claimed to have demonstrated.

*Finding 11: If Ms. Woodford Did Not Cherry-Pick and Utilized Reasonable Benchmarks, Then the CCJ Would Be Within the Reasonable Range for Indecent Exposure-Related Incidents*

In order to compare CCJ to the California prisons above in Figure 11, I independently calculated the annual indecent exposure-related incidents with guilty findings per inmate over the entire period of January 2015 to September 2018. The annual indecent exposure-related incidents with guilty findings at CCJ per inmate was 5.65%. Therefore, this annual incident rate per inmate at CCJ is less than Sacramento and Salinas.

This overall incident rate at CCJ over the entire period is also less than the incident rate that Ms. Woodford claimed the incident rate to be in her Expert Report because she 1) only investigated a small portion of the time period for which she attempted to draw conclusions (January 2016 – October 2017), 2) incorrectly calculated the number of CCJ inmates with guilty findings for indecent exposure related incidents,[42] and 3) understated the average population at CCJ.[43] These

---

[41] Compstat-13 Month Statistical Reports, November 2017 – November 2018.
[42] In paragraph 20 of her Expert Report, she stated that there were 1,016 incidents at CCJ; however, when she calculated the incident rate in paragraph 23, she incorrectly used 1,086 incidents.

errors caused Ms. Woodford to overstate the overall rate of indecent exposure-related incidents at CCJ.

Figure 12 below shows the different annual incident rates per inmate by jail Division over January 2015 to September 2018. Figure 12 demonstrates again that the indecent exposure-related incidents were concentrated to Divisions 8, 9 and 10. Furthermore, it shows that the annual incident rate for the rest of the jail Divisions at CCJ was 1.92%. Therefore, the rest of CCJ excluding Divisions 8, 9 and 10 is markedly lower than Divisions 8, 9 and 10. Specifically, Jail Divisions 2 and 3 were 0.73% and 0.98%, respectively, which would even put their incident rates within the range of Ms. Woodford's cherry-picked General Security California prisons.

| Figure 12 Annual Number of Inmates with Guilty Findings for Indecent Exposure-Related Incidents per Population by Division January 2015 – September 2018[44] | |
|---|---|
| **Division** | **Annual Incident Rate** |
| Division 2 | 0.73% |
| Division 3 | 0.98% |
| Division 4 | 4.58% |
| Division 5[45] | 11.30% |
| Division 6 | 3.15% |
| Division 8 | 5.32% |
| Division 9 | 19.03% |
| Division 10 | 12.65% |
| Division 11 | 1.51% |
| **Total CCJ** | **5.65%** |
| **Division 8, 9 & 10** | **12.11%** |
| **Total CCJ excluding Division 8, 9 &10** | **1.92%** |

---

[43] CCSO_Howard_0321569. Ms. Woodford incorrectly assumed there were 6,100 inmates at CCJ when the average population over her time period of January 2016 to October 2017 was 7,665.

[44] The annual number of inmates with guilty findings for reported indecent exposure-related incidents per population was calculated by taking the total number of monthly guilty inmates by Division and dividing the total monthly jail population by Division from January 2015 to September 2018. (CCSO_Howard_0321569) This resulted in an average monthly incident rate by Division, which was then multiplied by 12 to calculate an annual incident rate.

The number of guilty inmates was comprised of the reported amount from CCOMS as well as an estimated amount for the incidents only recorded in the McGuireWoods data. There were only 59 reported jail incidents that were only in the McGuireWoods data, which represents 2.8% of the total reported incidents over January 2015 to September 2018. I estimated the number of guilty inmates from these 59 incidents by multiplying the total number of incidents from the McGuireWoods data by the average inmates per incident and average guilty percentage from the CCOMS data over the same period.

[45] Jail Division 5 had a relatively low average daily population compared to other Divisions, which causes the incident rate as compared to the inmate population in that Division shown in Figure 12 appears elevated. However, relatively few indecent exposure-related incidents occurred in that Division. For example, Figure 6 shows that the monthly average of indecent exposure-related incidents in Division 5 was only 0.82 between January 2015 to September 2018. Division 11, which Figure 6 shows to have a roughly similar number of indecent exposure-related incidents to Division 5, has one of the lowest incident rates per inmate population as shown in Figure 12.

# V. Conclusion

A proper data analysis demonstrates that contrary to Ms. Woodford and the Plaintiffs' claims the number of reported indecent exposure-related incidents have been declining at CCJ both before and after the TRO. The indecent exposure-related incidents that were reported appear to be concentrated in certain jail Divisions and are not pervasive throughout CCJ and the Courthouse as the Plaintiffs' allege. Additionally, the frequency of Assistant Public Defenders being subjected to reported indecent exposure-related incidents is relatively small.

Several conclusions contrary to Ms. Woodford's claims arise once one properly compares indecent exposure-related incidents at CCJ to relevant benchmarks. For example, CCJ data show that adjudication rates are inconsistent with Ms. Woodford's discrimination claims. Data also show that guilty rates for indecent exposure-related incidents are not "markedly low." Sexual misconduct rates for Illinois prisons are not out of line with other large states. Indecent exposure-related incident rates at CCJ are comparable to rates at California prisons if one does not "cherry-pick" benchmarks like Ms. Woodford did.

March 7, 2019

Benjamin S. Wilner, Ph.D.