Exhibit 30

```
 1          IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                    EASTERN DIVISION
 3
 4   SDAHRIE HOWARD, DENISE HOBBS,  )
     & ELLENOR ALTMAN, individually )
 5   and on behalf of all others    )
     similarly situated,            )
 6                  Plaintiffs;     )
                                    )
 7                                  )
        -v-                         )Case No. 17-CV-8146
 8                                  )
                                    )
 9                                  )
                                    )
10   COOK COUNTY SHERIFF'S OFFICE,  )
     THOMAS J. DART, individually   )
11   and in his official capacity   )
     as Sheriff of Cook County, and )
12   COOK COUNTY,                   )
                     Defendants.    )
13
14
15       The Discovery Deposition of STEVEN WILENSKY,
16   taken before Beth Radtke, RPR, CRR, within and for
17   the State of Illinois, pursuant to the provisions of
18   the Federal Rules of Civil Procedure of the United
19   States District Court, at 20 South Clark Street,
20   Chicago, Illinois, commencing at the hour of
21   approximately 9:30 a.m. on the 9th day of January,
22   2019.
23
24
```

# Page 6

1  Q. Okay. If you answer the question, I will
2  assume that you understood it. Is that fair?
3  A. That's fair.
4  Q. Is there any reason that your ability to
5  give complete and truthful testimony today would be
6  impaired?
7  A. No, there isn't.
8  Q. No illness or medication?
9  A. No.
10 Q. Okay. What did you do to prepare for the
11 deposition today?
12 A. I looked at the notice, went over the
13 notice, looked over procedures that would be relevant
14 from the notice, met with and spoke with Pete a
15 number of times, met with and spoke to Matt Burke one
16 time. I think that would pretty much cover it.
17    MS. BRENNAN: And I think since you
18 mentioned Matt, I think we should just have everybody
19 identify who they are and who they represent so we
20 know who's in the deposition.
21    MR. MILIANTI: Sure. Pete Milianti on
22 behalf of CCSO counsel.
23    MR. BURKE: Matthew Burke from the Cook
24 County Sheriff's Office.

# Page 7

1     MR. SCOUFFAS: Nick Scouffas, general
2  counsel, Cook County Sheriff's Office.
3     MS. MICHALIK: Paul Michalik for Cook
4  County.
5     MS. FRISCH: Naomi Frisch, attorney for
6  plaintiffs.
7  BY MS. BRENNAN:
8   Q. Did you review documents in preparation for
9  the deposition?
10  A. I did.
11  Q. What documents?
12  A. Procedure 704, which became 131, the
13 administrative code, the notice itself, and various
14 disciplinary codes in the jail.
15  Q. And when you say the "administrative code,"
16 you mean the statute?
17  A. Correct. Administrative code on jail
18 standards.
19    MS. BRENNAN: I'm going to show you what
20 we'll mark as Deposition Exhibit 1.
21    (Exhibit No. 1 was marked for
22    identification.)
23 BY MS. BRENNAN:
24  Q. Is Deposition Exhibit 1 the notice that you

# Page 8

1  reviewed prior to the deposition?
2  A. It is.
3  Q. And you reviewed the topics that are
4  contained in the notice?
5  A. I did.
6  Q. And you're prepared to testify on behalf of
7  the Sheriff's Office on those topics?
8  A. I am.
9  Q. And for what time period?
10  A. Generally I started in September of 2016, so
11 that's probably what I would be most prepared to
12 speak about.
13    MR. MILIANTI: Just for the record, as we
14 had previously discussed, there are a few topics
15 where Steve is not identified as the 30(b)(6)
16 representative, but I'm sure as we go along, we --
17    MS. BRENNAN: We'll talk about those.
18 BY MS. BRENNAN:
19  Q. You said you started with the County in
20 September of 2016?
21  A. That's correct.
22  Q. Can you give me, prior to your County
23 employment, your employment history?
24  A. Sure. I was sworn in as a lawyer

# Page 9

1  November 1989. At that point, I went to work for the
2  Cook County Public Defender's Office as an assistant
3  public defender. I worked in various locations and
4  assignments from November '89 until October of 1995.
5     In October of '95, I left the public
6  defender's office and opened up my own practice
7  almost exclusively in criminal defense as a sole
8  practitioner, did that from technically October of
9  '95 until I left the office in -- I left my practice,
10 closed up my practice late summer of 2016.
11  Q. And how did you come to be employed at the
12 Cook County Sheriff's Office?
13  A. I was looking for a next in my professional
14 life, became a little bit disenchanted with the
15 practice, started networking, reached out to people
16 who had -- I looked upon as people I trusted while I
17 was in private practice. I ended up speaking to a
18 few judges.
19    One of the judges I spoke to suggested that
20 it might be a good fit to try to get into the
21 sheriff's office. She forwarded a resumé to the
22 sheriff's office. I spoke to Helen Burke, had an
23 interview with her. At that time, she was trying to
24 create a position related to...

1  (Interruption.)
2  MS. BRENNAN: This is Marni Willenson on
3  behalf of the plaintiffs as well.
4  BY THE WITNESS:
5  A. At that point, she was trying a create a
6  position related to officers who may testify in court
7  related to their capacity in the department, among
8  other things, and wanted a lawyer's perspective to
9  help those people out.
10  That didn't pan out; they were not able to
11  get budgetary approval to get that position. I spoke
12  to her later in spring of 2016. She advised me that
13  that position wasn't going to happen. I had gone in
14  to interview with her.
15  BY MS. BRENNAN:
16  Q. Can I interrupt you for one second?
17  A. Sure.
18  Q. Can you just elaborate on the position that
19  she was trying to create for officers who would
20  testify in court? For what purpose?
21  A. In any capacity, whether it be a sheriff's
22  officer related to incidents, in preparation of
23  testifying in court.
24  Q. For criminal incidents that occurred outside

1  of the jail or internal to the jail?
2  A. Both. Both.
3  Q. Okay.
4  A. That was my understanding.
5  Q. And do you have any other details about what
6  the position was to entail?
7  A. That's the extent of it.
8  Q. Okay. So then you spoke to her again in the
9  spring of 2016?
10  A. 2016. She said that position wasn't going
11  to happen, they weren't going to fill a position of
12  that nature. I touched base with her in the summer,
13  and she talked about the need for a director and
14  inmate discipline, if I would be potentially
15  interested in that position.
16  Q. And what did she tell about the director of
17  inmate discipline position?
18  A. She told me what it would entail. It would
19  be overseeing a small staff in addition to conducting
20  disciplinary hearings in the jail.
21  Q. And so you interviewed with Ms. Burke for
22  the position?
23  A. Yes.
24  Q. Did you interview with anyone else?

1  A. No.
2  Q. Do you know if the position was ever posted?
3  A. I don't know.
4  Q. Was there ever a job description created for
5  the director of inmate discipline that you are aware
6  of?
7  A. I think there is now.
8  Q. I have seen a deputy director of discipline
9  job description; I have not seen a director of inmate
10  discipline position. Do you know if one exists?
11  A. It does exist. They changed the name, the
12  title, from director to manager.
13  MS. BRENNAN: Pete, is it possible for you
14  to get that to us on a break?
15  MR. MILIANTI: We can look to see if we have
16  that.
17  MS. BRENNAN: Okay. Well, I'll just point
18  out for the record that we talked about whether or
19  not this position description exists earlier with
20  counsel and were told that it would be produced if it
21  existed. So I would request again that it gets
22  produced today.
23  BY MS. BRENNAN:
24  Q. At the time -- well, do you recall when it

1  was that you interviewed with Ms. Burke?
2  A. It would have been the -- at that point, the
3  interview -- the interview would have been summer
4  of -- early summer, late spring of '16.
5  Q. How much time elapsed between the interview
6  and you being offered the position?
7  A. A short time. I don't recall.
8  Q. Was it more than a week?
9  MR. MILIANTI: I'll object to the form.
10  If you know.
11  BY THE WITNESS:
12  A. I don't know.
13  BY MS. BRENNAN:
14  Q. Did you understand you were going to be
15  replacing somebody that currently held the director
16  of inmate discipline position?
17  A. I was told that there was an acting director
18  at that time.
19  Q. And who was that acting director at the
20  time?
21  A. Mike Grady.
22  Q. I'm sorry. Who?
23  A. Mike Grady.
24  Q. And do you know how long Mike Grady had been

Page 14

1 the acting director of inmate discipline?
2  A. I don't.
3  Q. Had there been a permanent director of
4 inmate discipline prior to Mr. Grady?
5  A. Yes.
6  Q. And who was that?
7  A. Bill Rohde.
8  Q. And how long was he the permanent director
9 of inmate discipline?
10  A. I don't know.
11  Q. Do you know what time period he was -- held
12 that position?
13  A. I don't.
14    MR. MILIANTI: Just for the record, Noelle,
15 we do have another witness here who is prepared to
16 testify pre-September 2016 specifically on that topic
17 as we discussed yesterday.
18    MS. BRENNAN: Okay.
19 BY MS. BRENNAN:
20  Q. At the time that you interviewed with
21 Ms. Burke, what involvement had you personally had
22 with the inmate discipline process at Cook County
23 Jail?
24  A. At the time that I spoke to her about it?

Page 15

1  Q. Yes.
2  A. Other than what she told me about it, none.
3  Q. Did you have any experience in inmate
4 discipline processes for any other prisons or jails?
5  A. No.
6  Q. At the time that you were hired, what sort
7 of training were you given?
8  A. I was supplied with present code, the code
9 at that time, policies related to the code, I had a
10 walk-through in advance of starting with the unit,
11 and then once I started, I continued to shadow, not
12 doing any hearings on my own, for a period of time.
13  Q. And you continued to shadow Mr. Grady or
14 somebody else?
15  A. No. He wasn't there at the time. Hiram
16 Fenjac was the hearing officer that I was shadowing
17 at that time.
18  Q. When you referred earlier to there being a
19 small staff -- excuse me -- underneath the director
20 of inmate discipline, how many staff members?
21  A. At the time I started?
22  Q. Mm-hmm.
23  A. Five.
24  Q. And were all five of those staff members

Page 16

1 hearing officers?
2  A. Only Hiram was at that time. Mike Grady
3 was, but he wasn't working at the exact time that I
4 started.
5  Q. So at the time that you started, there was
6 one hearing officer, which was Hiram?
7  A. On-site. There were other people doing
8 hearings, but not on-site.
9  Q. Okay. Who were the other four staff that
10 you referred to?
11  A. There were two sworn officers. You want
12 their names?
13  Q. Yes.
14  A. Tennille Deberry, T-e-n-n-i-l-l-e,
15 D-e-b-e-r-r-y; another sworn officer, Daniel
16 Sylvester, S-y-l-v-e-s-t-e-r; Hiram Fenjac,
17 F-e-n-j-a-c is the correct spelling of his last name,
18 H-i-r-a-m. There were two administrative assistants,
19 Judy Troglia, T-r-o-g-l-i-a, and a woman who retired
20 shortly after I started. Her first name was Karen.
21 And forgive me, I don't remember her last name.
22  Q. Who were the -- how many off-site hearing
23 officers were there at the time that you first took
24 the position of director of inmate discipline?

Page 17

1  A. There were a -- they were scheduled, so
2 there were a number of them. They would do it
3 remotely on video from downtown. Their involvement
4 stopped shortly after I started. How many, I can't
5 give you an exact number. I don't know.
6  Q. Who were they employed by?
7  A. The sheriff. They were lawyers in the
8 sheriff's office.
9  Q. They were sheriff -- they were direct
10 employees of the sheriff?
11  A. Correct.
12  Q. And approximately how many hearing officers?
13  A. Ten or more. They would rotate.
14  Q. And you said that they were all attorneys?
15  A. To my knowledge, they were all attorneys.
16  Q. What was the role of the two sworn officers
17 that you mentioned earlier?
18  A. They provided security for us as we went
19 around the jail to do hearings, and then they served
20 an administrative function; they would fill out
21 certain paperwork related to hearings.
22  Q. Did they have any role in the actual
23 adjudication of tickets?
24  A. Never.

Page 42

1 that shows us by division each pending hearing.
2  Q. And how frequently is the CCOMS viewed to
3 see all the pending hearings reviewed and then
4 scheduled for?
5  A. Multiple times per day.
6  Q. And was that the case at the time that you
7 became the director of inmate discipline?
8  A. I don't know -- I can't tell you what they
9 did before. I think they were tending to them in
10 that fashion. I can tell you once I started, had
11 been made aware of the expiring ticket issue, I sat
12 on that to make sure we didn't expire tickets.
13  Q. And what was the expiring ticket issue that
14 you referred to?
15  A. It was brought to my attention, when I
16 interviewed with Helen, that there was an issue
17 related to expired tickets.
18  Q. And what was the issue related to expired
19 tickets?
20  A. That a larger than acceptable number of
21 tickets were being expired.
22  Q. Did they say what percentage of tickets were
23 being expired?
24  A. At that time, no.

Page 43

1  Q. Did she say how it came to her attention
2 that a large number of tickets were being expired?
3  A. No.
4  Q. Do you know how she learned that a large --
5 larger than acceptable number of tickets were being
6 expired?
7  A. Do I know before I started how she became
8 aware of that? No.
9  Q. Do you know after you started how she became
10 aware of that?
11  A. No. It was just -- I was hired with a
12 mandate to fix it.
13  Q. And what processes did you put into place in
14 order fix the problem with the larger than acceptable
15 number of tickets expiring?
16  A. I initially identified the reason why I
17 thought they were expiring, and then we put a team
18 together to bring a process to fix it.
19  Q. And what were the identified reasons for the
20 large number of tickets expiring?
21  A. The ticket --
22     MR. MILIANTI: Object to the form.
23 BY THE WITNESS:
24  A. The tickets were not being made available to

Page 44

1 the unit, our unit, to be able to conduct the
2 hearing.
3 BY MS. BRENNAN:
4  Q. What do you mean the tickets were not being
5 made available to your unit?
6  A. So each -- each day someone from our unit
7 goes to the divisions to pick up the tickets in a
8 central location to prepare them for hearing.
9 Multiple times a day, actually, but at least once a
10 day. And not all tickets that were pending were
11 being made available to us for pickup.
12  Q. Did you determine why they were not being
13 made available?
14  A. Couldn't pinpoint specifically. There was
15 some breakdown in the process from the time the
16 ticket was generated until the time it was supposed
17 to be made available to our unit for hearing.
18  Q. So at that time when you first started,
19 there was no way to view in CCOMS by division all the
20 pending tickets?
21  A. There was.
22  Q. I'm sorry?
23  A. There was.
24  Q. But that wasn't being done?

Page 45

1  A. I think it was being done, but tracking them
2 down without a process of who to track them down was,
3 I think, a difficult task at that time until we could
4 put together a concise project or process on how to
5 address that.
6  Q. So when you first started, the inmate
7 discipline unit could see the tickets in CCOMS but
8 was not always able to access the physical ticket
9 from the units?
10  A. Correct. Because you can't pull the tickets
11 off of CCOMS to do them.
12  Q. And when you could see that the tickets were
13 in CCOMS, could you see what the charges were for
14 those tickets?
15  A. Yes.
16  Q. And you could see the date on which the
17 tickets were issued?
18  A. Yes.
19  Q. And so would you know the date upon which
20 the tickets would expire?
21  A. Correct.
22  Q. And that would be eight days if they were
23 not heard by a hearing officer, is that correct?
24  A. Eight days from the incident or the

12 (Pages 42 - 45)

Veritext Legal Solutions
www.veritext.com                                                888-391-3376

1 discovery of it, yes.
2  Q. So the disciplinary unit didn't have
3 independent access to the actual disciplinary report,
4 is that correct?
5  A. Not in the form needed to do the hearing,
6 no.
7  Q. What does that mean?
8  A. So if you looked today at a pending
9 disciplinary report in CCOMS, it's not a complete
10 report because it's not signed and approved and
11 served. It has to be -- once the guts of the report
12 are prepared, it has to be printed out to get access
13 to signatures from the necessary people and then
14 served on the detainee.
15  Q. Does the discipline unit serve the detainee
16 with the --
17  A. No.
18  Q. Okay.
19  A. The division where the incident occurred, in
20 most cases, serves the detainee. We at times will,
21 but the general practice is that it's served by the
22 division either where the detainee ends up or where
23 the incident originated.
24  Q. So the inmate discipline unit could see that

1 the ticket existed, what the allegations were, but
2 didn't have the physical document that was signed by
3 the victim or whoever else had to sign it?
4  A. Yes.
5  Q. And without the physical document signed by
6 the appropriate people, the inmate discipline unit
7 could not conduct a hearing?
8  A. Pursuant to rule, correct.
9  Q. At the time that you became the director of
10 inmate discipline, do you have an estimate of the
11 percentage of tickets that were expiring?
12  A. It was about 20 percent.
13  Q. Was there any other reason that you
14 identified for the larger than acceptable number of
15 tickets expiring, aside from you not getting the
16 physical hard discipline report?
17  A. That was the main issue.
18  Q. So you said you put a team together to
19 brainstorm for a process to fix the breakdown?
20  A. Yes.
21  Q. And what solutions did your team propose?
22  A. So we put together a process whereby there
23 would be a point person in my unit and we called upon
24 the divisions in different units throughout the

1 system to have a point person in their divisions and
2 units that our unit point person could coordinate
3 with to identify, practically speaking, hey, we don't
4 have this one, can you hunt it down for us, it's
5 going to expire on such and such a date, get it to us
6 so we can do the hearing. And we methodically put
7 that into play into the entire system.
8  Q. So there was a point -- an individual point
9 person in each division that was responsible for
10 making sure that you got the actual hard copy
11 discipline incident reports?
12  A. Based on communication from the point person
13 in my unit, yes.
14  Q. Who was the point person in your unit?
15  A. It's been a couple of people.
16  Q. Who was it initially when you implemented
17 this change?
18  A. Barbara Figeuroa.
19  Q. And obviously the division point person
20 would be an individual in that particular division,
21 is that correct?
22  A. Yes.
23  Q. And what did Barbara Figueroa do to ensure
24 that she was getting -- that your unit was getting

1 the documentation you needed to conduct a hearing?
2  A. Communication. She would e-mail and/or call
3 the point person in the given division where the
4 ticket was missing from.
5  Q. So she would go into CCOMS and see what
6 tickets were outstanding?
7  A. Yes.
8  Q. Figure out which ones that your unit did not
9 have?
10  A. Did not have, yeah, based on -- we would
11 print out the pending in each division each day, we
12 would check off that which we had. The remaining
13 ones were the ones we didn't have. She would
14 contact, send an Excel spreadsheet to the different
15 divisions or units letting them know that we need to
16 ticket, and they would make it available.
17  Q. Any other changes you put into the system to
18 try and eliminate the problem with expiration of
19 tickets?
20  A. No. That one worked pretty well.
21  Q. How long after you became the director of
22 discipline did this system go into place?
23  A. It finally went live -- we didn't do it --
24 we didn't think it was going to be -- well, let me

1 take a step back.
2 We did it by division. We didn't do the
3 entire system at once. We wanted to introduce it
4 slowly so that we could work out whatever kinks there
5 were as we went forward. So it first went live in
6 June of '17, and throughout '17 until late fall/early
7 winter, it was systemwide by that time.
8  Q. So you first implemented beginning with one
9 division this new system in June of 2017?
10  A. Two divisions. It was -- the initial -- the
11 initial pilot was two divisions.
12  Q. Which two divisions did you start the pilot
13 in?
14  A. RTU and 10.
15  Q. Prior to the new system going live in June
16 of 2017, did you continue to have a large number of
17 tickets expire due to lack of information you needed?
18  A. Quite honestly, I think the first part of
19 '17, there still were expiring tickets, yes.
20  Q. How long did it take to roll out the new
21 system that you started in June of 2017?
22  A. It went live then and it was systemwide by
23 late fall/early winter of 2017. I think the last
24 division got it in maybe early December.

Page 51

1  Q. And when you referred to an unacceptable
2 large number of expired tickets, what does that mean
3 to you?
4  MR. MILIANTI: Object to form.
5 BY THE WITNESS:
6  A. My personal opinion?
7 BY MS. BRENNAN:
8  Q. Your opinion in the role of director of
9 inmate discipline. What would be an unacceptable
10 percentage of expired tickets?
11  A. I could tell you my goal was to have
12 100 percent of all tickets generated actually heard.
13 That was the goal that was articulated to everyone
14 who participated in the program.
15  Q. What, in your professional opinion, is an
16 acceptable number of expired tickets by percentage?
17  MR. MILIANTI: Object to the form.
18 BY THE WITNESS:
19  A. I don't have a number for you. It's hard
20 for me to answer that question.
21 BY MS. BRENNAN:
22  Q. Would it be acceptable to have 10 percent of
23 the tickets expired?
24  A. No.

Page 52

1  Q. Would it be acceptable to have 5 percent of
2 the tickets expired?
3  A. I would say that would be the absolute max.
4  Q. If you go to C4, it refers to "all inmate
5 disciplinary hearings shall be conducted in a
6 reasonably private and secure setting."
7  A. Yes.
8  Q. Does that continue to be the policy today?
9  A. To the best we can, yes.
10  Q. And typically where are the hearings
11 conducted?
12  A. It depends on the division. In Division 9,
13 there is an office either outside the tier or in what
14 we call the core that inmates are -- detainees are
15 brought to us for a hearing. It's an enclosed type
16 of office with a door. There are some, just by
17 virtue of how the setup is, that we do right at the
18 tier door. Privately, out of anyone's earshot, but
19 not in an office. Most of them are done in some --
20 something that you could describe as an office.
21  Q. Okay. And we'll get into this more a little
22 bit later, but who would be present at a hearing?
23  MR. MILIANTI: Object to the form. The time
24 period that he was director.

Page 53

1 BY MS. BRENNAN:
2  Q. Yeah, you can assume that that's the time
3 period that I'm referring to unless I ask you
4 something else.
5  A. Again, that would be dependent on where we
6 are, but generally it would be the hearing officer,
7 the sworn officer as security who is escorting us
8 around, and if a detainee is being brought to us, it
9 would be the officer who brings the detainee, but
10 they wouldn't necessarily be there the entire time.
11 They would be nearby, but they wouldn't be, like --
12 necessarily all the time right in the hearing. But
13 usually in Division 9 they would be. Not usually,
14 they always are.
15  Q. In addition to the sworn officer that's
16 there for your security?
17  A. Yeah. They're there for us; the other
18 officer would be there to maintain security as it
19 relates to the detainee.
20  Q. And during the time that you've been
21 director of inmate discipline, there's no Cermak
22 individual present for a hearing?
23  A. No. They're referred findings after the
24 fact, but they are not physically present for a

Page 62

1  Q. How infrequently?
2  A. I would say less than -- around the same
3  amount of time that -- once a month. Sorry.
4  Q. And you referred to security issues.
5  A. Yeah, sometimes it's not logistically
6  feasible to do that.
7  Q. Does the hearing officer ever request other
8  witnesses to attend a hearing?
9  A. Attend them or speak to them?
10 Q. Well, let's start with attend.
11 A. During the hearing you're asking, correct?
12 Q. Yes.
13 A. No.
14 Q. So the hearing officer -- are you suggesting
15 that the hearing officer may speak to a witness?
16 A. After the hearing, after getting the
17 inmate's version, before a finding, the hearing
18 officer may reach out to the complainant. Someone
19 references a witness prior to make the hearing to be
20 more comfortable making the finding.
21 Q. Is there a protocol regarding when the
22 hearing officer would reach out to a complainant
23 prior to making a decision on a ticket?
24 A. A protocol?

Page 63

1  Q. Yes.
2  A. Can you clarify that?
3  Q. Is there any instruction about when the
4  hearing officer should reach out to the complainant?
5  A. No. It's situational. We usually as a unit
6  talk about it. You know, I'll either talk about it
7  with my colleagues that I'm struggling with one, and
8  I let them know I'm reaching out. And similarly, if
9  they are struggling with making a finding, what they
10 feel is a comfortable finding, I will instruct them
11 in all cases in that situation to reach out to a
12 complainant.
13 Q. How often does a hearing officer reach out
14 to a complainant?
15     MR. MILIANTI: Object to the form.
16 BY THE WITNESS:
17 A. On average, maybe a couple times a month.
18 BY MS. BRENNAN:
19 Q. And how is that discussion documented?
20 A. Which discussion?
21 Q. When the hearing officer reaches out to a
22 complainant.
23 A. I instruct our hearing officers when that
24 happens to include that conversation in their

Page 64

1  finding.
2  Q. So it would be written in the finding?
3  A. Yes.
4  Q. There's no separate document that would
5  summarize the discussion with the complainant?
6  A. Correct.
7  Q. If the hearing officer did speak to a
8  complainant, it would be reflected in the finding?
9  A. It should be.
10 Q. And with respect to the hearing officer
11 reaching out to a witness, would any discussion with
12 a witness that the hearing officer had be reflected
13 in the finding?
14 A. It should be.
15 Q. And again, there would be no separate
16 document reflecting any discussion with a witness a
17 hearing officer had?
18 A. Correct.
19 Q. All right. I think we're going to have to
20 defer the rest of Exhibit 2 to our later witness, but
21 you might want to keep it in front of you just in
22 case.
23 A. I'm just closing it up to the page we were
24 at.

Page 65

1      MS. BRENNAN: If anybody wants to take a
2  break, let me know.
3      MR. MILIANTI: Yeah.
4      MS. BRENNAN: Okay.
5      (A short break was taken.)
6  BY MS. BRENNAN:
7  Q. Okay. You had testified earlier that a
8  hearing officer could reach out to either a witness
9  or a complainant if they were struggling with making
10 a decision on guilt, is that correct?
11 A. Correct.
12 Q. And what do you mean when you say
13 "struggling to make a decision on guilt"?
14 A. If they were not comfortable that the
15 evidence that has been presented, via the report
16 and/or the video, was sufficient that they were
17 comfortable making a finding.
18 Q. So how did you instruct the other hearing
19 officers about when to decide to reach out to a
20 complaining witness or the complainant or a witness?
21 A. There is a lot of dialogue back and forth in
22 the unit about particular hearings. If they come to
23 me and say, "Well, what do you think," I would tell
24 them what I thought and it would almost universally

Page 106

1  Q. And you told us earlier somebody physically
2  goes over and picks up the hard copies?
3  A. Yes. Brings them back the office. We go on
4  CCOMS to see where that detainee is located at the
5  particular time, copy the report, and attach it to a
6  facts and findings form and prepare the top line of
7  the facts and findings form, which would include
8  name, detainee number, date of birth, and incident
9  number.
10  Q. Okay. And then what is the next step?
11  A. We take the --
12  Q. I'm sorry. You don't have any role in
13  serving the inmate with the disciplinary report, is
14  that correct?
15  A. Unless it's unserved. If we get the report
16  and for whatever reason it hasn't been served, we
17  will either contact the officer to let them know this
18  is an unserved report, go serve them so we can do the
19  hearing, or we will serve it in the hearing itself
20  and give them the opportunity to have the hearing
21  right then or we can come back within the 24-hour
22  requirement.
23  Q. How often does your unit receive a
24  disciplinary report that hasn't been served?

Page 107

1  MR. MILIANTI: Object to the form.
2  BY THE WITNESS:
3  A. Infrequently. It would be very hard for me
4  to give you a number.
5  BY MS. BRENNAN:
6  Q. Okay. So you copy the report and attach it
7  to the facts and finding form. Then what happens?
8  A. By division, we print the list of pending
9  hearings, identify those that are on list that we
10  have as opposed to those that we don't have. Joi
11  reaches out to identify the missing reports, where
12  they come from, identifies the liaison or point
13  person within the unit or division to try and get
14  those, and we -- we go out and do hearings.
15  Q. And that would be you, Hiram, and Joi?
16  A. Hiram and Joi, yes.
17  Q. How many hearings do you conduct a day,
18  typically?
19  A. As a group?
20  Q. Yeah, the unit.
21  A. I would say it's a pretty wide range. It
22  could be anywhere between 30 and 100.
23  Q. Each day?
24  A. I make that same face every day.

Page 108

1  Q. Right.
2  A. Yes. There are times it's far more. If
3  there's been a mass search, we do more. There are
4  few times when it's any less than that.
5  Q. How long does a typical hearing take?
6  A. What's typical?
7  Q. I don't know.
8  A. They could take as little as a minute, they
9  could take as little as 30 seconds, they could be
10  longer than that. But they would rarely be more than
11  5 minutes.
12  Q. And is the inmate given a copy of the facts
13  and findings at the conclusion of the hearing?
14  A. No. Well, when you say "the conclusion,"
15  contemporaneously with the conclusion of the hearing?
16  Q. Yes.
17  A. No. For security reasons, we have them
18  served with the facts and findings subsequent to us
19  leaving the premises.
20  Q. So do you handwrite in --
21  A. Yes.
22  Q. -- the conclusion?
23  A. Yes, the facts and findings form is
24  handwritten.

Page 109

1  Q. And then you give it to somebody in the
2  division?
3  A. No. Eventually, yes. But if you want me to
4  take you through the process, no.
5  Once we make the findings, some of them are
6  done contemporaneously with the hearings; we can make
7  a finding right on the spot. We don't give them the
8  finding, but we make it.
9  There are other situations where we have to
10  go back to the office, look at video, look at
11  background of the detainee, interview witnesses.
12  Once we have completed all the facts and
13  findings for the day, we input them into COMS.
14  Q. And is that done by the actual hearing
15  officer?
16  A. The inputting of -- it's done by our entire
17  unit, other than Judy is responsible for getting
18  facts and findings into COMS.
19  Q. So you would put in your own facts and
20  findings for hearings you conducted?
21  A. We just do it for each other. We do it
22  until the task is done. It used to be done by an
23  administrative assistant that we don't have anymore,
24  so we do the task.

1  Q. So it happens every day that the findings
2  are inputted by the end of the day?
3  A. Almost every hearing is a -- a finding is
4  made before the end of the day for that hearing, and
5  it would be put into COMS that same day. No one
6  leaves until everything is in COMS, assuming there's
7  been a finding.
8  Q. And you said almost every hearing a
9  conclusion is reached the same day and the finding is
10 entered, correct?
11 A. Correct. Not all, but almost every one.
12 Q. And then how does the inmate get notice of
13 the finding?
14 A. So it's inputted into CCOMS. The officers
15 keep a log of our hearings.
16 Q. A handwritten log?
17 A. Yes.
18 Q. Okay.
19 A. We keep a copy of the disciplinary report
20 that -- that copy we make at the beginning of the
21 process is attached to the facts, a copy of the facts
22 and findings. It's delivered to the division where
23 the detainee is located, and then that point person
24 in the division who has helped us find the tickets in

1  some ways has a role in delivering that hard copy to
2  the detainee of facts and findings.
3  Q. So you take the file that includes the
4  disciplinary report, handwritten facts and findings,
5  computerized facts and findings, anything else
6  related to the hearing, send that physical document
7  back to the division, and the division serves it on
8  the inmate?
9  A. Correct.
10 Q. And how long does the division person have
11 to serve the findings on the inmate?
12 A. I think technically it's 14 days they have
13 to be made aware. I'm not a hundred percent certain
14 of that. But the directive now is almost
15 immediately. They get it and the detainees have the
16 facts and findings in most situations within a day of
17 it being delivered to the division.
18     In addition to that, detainees, as a common
19 practice, ask the officer on the tier, "What happened
20 in my hearing?" And the officer could go into COMS
21 and tell them the results of the hearing as well.
22 Q. How long does your unit have to get the
23 facts and findings and the packet back to the
24 division?

1  A. There's no time dictated. We just do it
2  same day or the next day.
3     MS. BRENNAN: Can we go off the record for a
4  second?
5     (A lunch break was taken.)
6  BY MS. BRENNAN:
7  Q. So we were talking about the disciplinary
8  hearing process in general. And before we continue
9  that, I just wanted to ask you a couple follow-up
10 questions from earlier.
11    You mentioned that Joi is currently a
12 hearing officer?
13 A. Yes.
14 Q. And did you hire her?
15 A. Yes.
16 Q. And where did she come to you from?
17 A. She applied to a posting. She had
18 previously worked for the health and hospital system
19 in Cook County. She had administrative hearing
20 experience with Mercer County in New Jersey. She was
21 a prosecutor for, I think, sworn officers.
22 Q. She was a prosecutor for police sworn
23 officers who engaged in misconduct during their
24 employment?

1  A. That's my memory, yes.
2  Q. And when was she hired?
3  A. March of '17.
4  Q. So she had been a prosecutor and then went
5  to Health and Human Services?
6  A. I don't have her resumé in front of me.
7  There may have been some jobs in between, but she
8  came to us from health and hospital services.
9  Q. Do you know what her job at health and
10 hospital services was?
11 A. My memory tells me she was doing some
12 Shakman stuff, but I don't remember specifically what
13 it was.
14 Q. And what about Hiram? You said he was
15 already employed --
16 A. He was already employed with the department.
17 Q. Do you know what his background was or is?
18 A. I think most of his work as a -- since he
19 was sworn in has been with the sheriff's office, but
20 I'm not a hundred percent sure.
21 Q. Since he became a sworn officer you mean?
22 A. Sworn in as a lawyer.
23 Q. Oh, okay.
24    Do you know when he graduated from law

Page 114
1  school?
2     A.  I don't.  Something tells me 2012 or '13,
3  but I'm not a hundred percent sure.
4     Q.  And it's your understanding his work in the
5  inmate disciplinary department was his first job out
6  of law school?
7     A.  No.  The sheriff's department, I think, may
8  have been his first job out of law school, but he
9  worked in a different department before doing inmate
10 discipline.
11    Q.  Which department?
12    A.  I think he was in FOIA.
13    Q.  What is the overall goal of the
14 disciplinary -- inmate disciplinary system?
15    A.  To -- I'm not sure I've ever thought about
16 it, to be honest with you, what the goal is.
17       To help to make the jail as safe as possible
18 and making sure, while doing that, the rules that we
19 are duty-bound to follow are followed.
20    Q.  And when you say the rules that you are
21 duty-bound to follow, what do you mean?
22    A.  The general procedural -- general procedural
23 requirements upholding the due process requirements.
24    Q.  What are the due process rights of an inmate

Page 115
1  who has been accused of a violation of a...
2     A.  They are entitled to a hearing.
3     Q.  Okay.  Can I -- I'll be a little more
4  specific.  I was thinking and you thought I was done
5  with the question.
6        What are the due process rights to an inmate
7  who has been accused of -- let's start with a Level 1
8  violation?
9     A.  We treat them the same as a 200 or 300 or
10 400 level in terms of timing elements, burden of
11 proof, things like that.  They're treated one and the
12 same.
13    Q.  And are the due process rights treated the
14 same for a Level 2, Level 3, and Level 4 violation?
15    A.  Yes, they are.
16    Q.  And so what are those due process
17 requirements that you are duty-bound to follow?
18    A.  They are entitled to a hearing in a timely
19 fashion, so the hearing has to be conducted within
20 eight days of the incident or eight days from its
21 discovery; they're entitled to not have a hearing
22 within 24 hours of being served with the report if
23 they so choose not to do the hearing in that
24 timeframe, so we would have to come back if they

Page 116
1  asserted that right.
2     Q.  Anything else?
3     A.  And to be judged by a standard of proof of
4  preponderance of the evidence.  I would say those are
5  the main ones.
6     Q.  So we were talking about the actual going
7  out into the divisions to hold the hearings.
8     A.  Yes.
9     Q.  And you said -- and I know this is an
10 estimate, 30 to 100, maybe more hearings per day?
11    A.  Rarely more, but can be.
12    Q.  And are those Monday through Friday?
13    A.  Yes.
14    Q.  Are there any hearings on the weekends?
15    A.  I tried it at the beginning, and then I
16 asked myself, What the heck am I doing?  So no.
17    Q.  Okay.  And do hearing officers get split up
18 by division when they go?
19    A.  No.
20    Q.  So how do you decide who to send where?
21    A.  I generally ask the other two where they
22 want to go on a given day and then we decide from
23 there where we're going.
24    Q.  Do you know at the time that you ask them

Page 117
1  "Where do you want to go," what the various
2  infractions are that you're going to be judging
3  during that day?
4     A.  Generally.  Not always all of them, but
5  generally if certain ones stick out, we are aware of
6  them usually.
7     Q.  And why do you ask them where they would
8  like to go?
9     A.  Sometimes if the day before they were at the
10 same place, there was -- or a previous time there was
11 an incident where a detainee was particularly
12 disrespectful to them and they may be seeing that
13 detainee again, I would defer to their comfort.  I
14 typically don't care where I go, but I try to honor
15 their comfort.
16    Q.  And you said that the hearing can be
17 anywhere from 30 seconds, a minute, to 5 minutes,
18 probably not ever longer than that, is that correct?
19    A.  I would say that's rare if it was longer.
20    Q.  And generally, the only individuals present
21 would be the inmate, the hearing officer, and any
22 sworn personnel providing security, is that correct?
23    A.  Correct.
24    Q.  When you're at a particular division for

Page 126

1    If you know, you can answer.
2 BY THE WITNESS:
3    A.  I don't know this for sure, but I think -- I
4 want to say it's 44 per tier, and there's four tiers,
5 but I'm not a hundred percent sure on that.
6 BY MS. BRENNAN:
7    Q.  And do you know how many inmates can be
8 housed in Division RTU 4A?
9       MR. MILIANTI:  Same objection.
10 BY THE WITNESS:
11   A.  I think there's 10 cells in 4A.
12 BY MS. BRENNAN:
13   Q.  Where are the single cells located?
14   A.  The single cells, or people who are
15 singularly celled?
16   Q.  Never mind.  Well, let me ask you this:  Is
17 there a sanction that would result in somebody being
18 required to be placed in a single cell?
19   A.  I think presently 1F, there are some --
20 there are detainees who are celled individually.  So
21 that's one of the tiers in 1 South.
22   Q.  What are the other four tiers -- I mean, the
23 other three tiers?  There's 1F?
24   A.  E, F, G, H.  1E, 1F, 1G, 1H.  I apologize.

Page 127

1    Q.  I thought you were just testing my alphabet
2 skills.
3    A.  The one part I figured you knew -- if it was
4 1 South, you knew it was 1 before the letter.
5 Forgive me for assuming.
6    Q.  No, no.
7       Does your office have any role in dealing
8 with situations where there's insufficient housing
9 for inmates who are supposed to be sent to
10 segregation?
11   A.  Do we have a role in...
12   Q.  Finding a different spot?
13   A.  No.
14   Q.  Do you have any role in determining whether
15 a slot is available?
16   A.  No.
17      (Exhibit No. 12 was marked for
18       identification.)
19 BY MS. BRENNAN:
20   Q.  So the court reporter has handed you what
21 has been marked as Exhibit 12 and is Bates-labeled
22 88842 through 49.
23   A.  Okay.
24   Q.  We've talked about some forms --

Page 128

1    A.  Yes.
2    Q.  -- and processes, and I want to use this to
3 walk through and get some additional detail.
4    A.  Sure.
5    Q.  Do you recognize this document or any
6 portions of the document?
7    A.  The collection of the documents?  Yes, sure.
8    Q.  What is it?
9    A.  Page 1 is an incident report.  Page 2 is the
10 facts and findings that is spit out of CCOMS once we
11 have entered the findings.  So if you want to get the
12 facts and findings after we inputted the data, this
13 is what would print out.  The third page is a
14 disciplinary report.  The fourth page is a witness
15 statement form.  The fifth page is an additional
16 disciplinary report.  The last page is facts and
17 findings that we use to make our written ruling.
18   Q.  Do you recognize the handwriting on that
19 second-to-last page?
20   A.  I do.
21   Q.  Whose handwriting is that?
22   A.  Joi's.
23   Q.  And what's the last page?
24   A.  It's a chain of custody log for the video --

Page 129

1 telephone and video monitoring unit.
2    Q.  And is this something that is generated by
3 your office?
4    A.  That last page?
5    Q.  Yes.
6    A.  No.
7    Q.  What does this document mean -- well, does
8 this document suggest that your hearing officer had
9 the video at the time of the hearing?
10   A.  Had it, meaning in their possession?
11   Q.  Mm-hmm.
12   A.  It doesn't indicate to me that they did or
13 didn't.
14   Q.  Okay.  Is this something that ordinarily
15 goes to CIID when they do an investigation, this
16 particular document, the last page?
17   A.  I'm not familiar with this document.
18   Q.  So the first page you said is an incident
19 report.  Does the discipline unit get a copy of the
20 incident report?
21   A.  Sometimes, sometimes not.  But we have
22 access to it if we need it.
23   Q.  And this is a complaint by Sergeant Anderson
24 about an inmate masturbating, making vulgar sexual

Page 174

1  269290 through 191.
2     Can you just take a look at these?
3     A. Okay.
4     Q. Have you seen these documents before?
5     A. I don't think I have.
6     Q. Were you aware that in November of 2017, it
7  was discovered the court was maintaining their own
8  list of masturbating detainees that were not being
9  conveyed to DOC?
10    A. Their own list, no.
11    Q. The e-mail reads: "It seems they have a
12 running list of masturbating detainees that they have
13 never made us aware of who do not have an active 313
14 alert and who are not in jumpsuits."
15    Do you see that?
16    A. I do.
17    Q. And were you ever made aware of the fact
18 that masturbators -- individuals accused of
19 masturbating in the court were not provided active
20 313 alerts and not in jumpsuits?
21    MR. MILIANTI: Objection to form.
22 BY MS. BRENNAN:
23    Q. In November of 2017?
24    A. No.

Page 175

1     MR. MILIANTI: Object to the form.
2  BY MS. BRENNAN:
3     Q. Did you ever know that the individuals
4  accused of masturbating in the court by the courtroom
5  deputies were not being subject to discipline?
6     A. I was made aware that we were not getting
7  all the reports from courts, if those allegations
8  occurred.
9     Q. Prior to November of 2017, was it your
10 understanding that courts did not create disciplinary
11 tickets that were then being adjudicated in your
12 department?
13    A. They were, but we just weren't getting all
14 of them. So they didn't have a CCOMS reporting
15 requirement at that time. They had an independent
16 reporting system at that time. So you wouldn't see a
17 disciplinary report of the type that we talked about
18 for a court allegation of discipline until after
19 that.
20    Q. Until after November 2017?
21    A. Yes.
22    Q. So prior to November of 2017, no discipline
23 was being adjudicated for individuals accused of
24 masturbating if they were accused by court personnel?

Page 176

1     MR. MILIANTI: Objection, misstates his
2  testimony.
3  BY THE WITNESS:
4     A. That's not what I said. I said we weren't
5  getting all of them. We were getting tickets from
6  courts for all kinds of discipline. They would come
7  to us either through the hearing board e-mail or
8  they -- the reports would be in the divisions with
9  the rest of the tickets we would be picking up. It
10 just became -- we became aware that we were not
11 getting all of them.
12 BY MS. BRENNAN:
13    Q. How did you become aware that you were not
14 getting all of them?
15    A. I don't remember who advised me of the fact,
16 but it was the impetus to require courts to start
17 reporting in COMS so we would have vision -- all of
18 the -- all of the pending tickets would be visible.
19    Q. So the tickets completed by courts prior to
20 November of 2017 were not in COMS?
21    A. Correct.
22    Q. Pardon?
23    A. Correct.
24    Q. And how did you become aware of those that

Page 177

1  you did become aware of?
2     A. Either through -- we have a general hearing
3  board e-mail that Hiram manages so that the copies
4  would be sent to us from courts, or at times they
5  would be dropped off in the divisions with the
6  detainee's paperwork that brought them back in the
7  jail.
8     Q. So sometimes an e-mail would be sent to the
9  general hearing board e-mail list that included a
10 ticket issued to a detainee?
11    A. The courts would e-mail the ticket to the
12 hearing board e-mail thereby advising us that someone
13 had been written up for a violation, whatever it was,
14 and then we would go do the hearing.
15    Q. And how many of the tickets that were being
16 sent to the hearing board from courts -- let me
17 strike that.
18    What percentage of tickets that were issued
19 by hearings -- I mean, by the court personnel made it
20 to the hearing board?
21    A. I have no idea.
22    Q. Could have been 10 percent, could have been
23 75 percent, you don't know?
24    A. I honestly don't know.

Page 206

1  A. There very well might have been.
2  Q. So what steps did you implement in order to
3  try to alleviate the backlog?
4  A. The department?
5  Q. Yes.
6  A. Created sanction tiers.
7  Q. And those are different than the ones we
8  talked about earlier?
9  A. They're different than SMU. They're
10 different than disciplinary housing. The policy, the
11 main heading is Special Management Unit. The
12 subheadings are disciplinary housing and sanction
13 housing. Disciplinary housing is what we've been
14 referring to as SMU this whole day.
15 Q. And what is sanction housing?
16 A. That was reserved for 200 level offenses
17 where they would go and have commissary restrictions
18 and live in a unit, a designated unit where
19 commissary would be restricted just like it was in
20 disciplinary housing. Phone privileges were
21 restricted. I don't recall what else was restricted.
22 Q. So it was a --
23 A. Hours -- I'm sorry.
24 Q. No, you go ahead.

Page 207

1  A. Hours out were not restricted like they
2  were -- hours out of their cell were not restricted
3  like they were in disciplinary housing.
4  Q. And in disciplinary housing, what was the
5  restriction on hours out?
6     MR. MILIANTI: Object to the time period.
7  BY MS. BRENNAN:
8  Q. Since --
9  A. At one point it was 23 and 1, but I can't
10 recall if that was during my time in the jail or not.
11 It may have preceded my time in the jail.
12 Q. And now it's 3 hours at least out?
13 A. I think so.
14 Q. And do you know why the disciplinary housing
15 rules went from 23 and 1 to 3 hours out?
16 A. I don't.
17 Q. Do you know whether or not there was any
18 research or best practices that prompted the jail to
19 make that change?
20 A. I personally don't.
21    MS. BRENNAN: Is this going to be a topic
22 that --
23    MR. MILIANTI: I believe that's covered
24 under Shelly's notice.

Page 208

1     MS. BRENNAN: Well, this is really about SMU
2  housing in particular, and the use of minimum and
3  maximum sanctions under O, 4(O), then also 5(A) is
4  research best practices, analyses of detainee
5  behavior relied upon in reviewing or revising --
6     MR. MILIANTI: Mr. Burke can testify about
7  SMU and number of hours in and number of hours out
8  and changes thereto.
9     MS. BRENNAN: So he can testify to 4(O) and
10 5(A)?
11    MR. MILIANTI: We have an objection to 5(A).
12 If you can -- maybe we can discuss this now or later
13 specifically what you're looking for in 5(A), because
14 right now we have an overall objection given the
15 vagueness of the request.
16    MS. BRENNAN: Why don't we talk about it on
17 a break.
18    MR. MILIANTI: With respect to 4(O),
19 Mr. Burke can testify from 2014 to the present.
20    MS. BRENNAN: And what about 5(B), which is
21 the role of any government agency --
22    MR. MILIANTI: Mr. Burke is prepared to
23 testify, as we previously discussed, and any
24 objections raised to the extent he can reasonably

Page 209

1  remember items that occurred and discussions that
2  were had dating back to 2011 -- 2010.
3  BY MS. BRENNAN:
4  Q. Can you take a look at paragraph 8?
5  Actually, can we talk about, sorry, paragraph 7
6  quickly?
7  A. Yes.
8  Q. So you talked about the shadowing and things
9  that you did when you started your job?
10 A. Yes.
11 Q. Have you gone to any other training related
12 to inmate discipline systems?
13 A. No.
14 Q. And have the other hearing officers that you
15 work with gone to any training related to inmate
16 discipline systems outside of the sheriff's training?
17 A. No.
18 Q. Paragraph 8 references the identity of
19 individuals able to complete a disciplinary ticket
20 and all approvals required for submitting and
21 processing a disciplinary ticket. I'm just going to
22 ask you a limited question about it --
23 A. Okay.
24 Q. -- during your time period, if you can

Page 210

1  answer it.
2  Q. Do you know today who is able to create a
3  disciplinary ticket as in the type of employee? Like
4  a correctional officer?
5  A. I think that's what the policy said. We
6  went through that. I think that's correct.
7  Q. So correctional officer. Do you know if a
8  deputy can, today, create a disciplinary ticket?
9  A. What's a deputy?
10  Q. Sheriff's deputy in the court.
11  A. Oh, yes.
12  Q. And Cermak employees cannot create
13  disciplinary tickets, is that correct?
14  A. I don't know that.
15  Q. Have you ever adjudicated a disciplinary
16  ticket created by a Cermak employee?
17  A. No.
18  Q. And with respect to the deputies in the
19  court, did they start creating the disciplinary
20  tickets in CCOMS in the end of 2017, approximately?
21  A. In CCOMS?
22  Q. Yes.
23  A. Yes. May have been the beginning of '18
24  before they actually started, but it was in that time

Page 211

1  period.
2  Q. Paragraph 10, I think, we have exhausted.
3  More recently a policy was implemented where you
4  looked back at previous violations when it comes to
5  313?
6  A. 313, 323, 325, and violence to staff, yes.
7  Q. And that was implemented sometime in 2018?
8  MR. MILIANTI: Objection. I believe that
9  misstates his testimony.
10  BY THE WITNESS:
11  A. So for the visiting restrictions, that
12  occurred in '17. That was implemented in '17.
13  Pretty sure.
14  BY MS. BRENNAN:
15  Q. Can you explain that?
16  A. The -- if they had previous 313 and 323
17  infractions, visiting restrictions kick in. The
18  amount would be dictated by their background.
19  Q. And that began sometime in 2017?
20  A. I'm pretty sure it did. May have been late
21  '17. I'm not positive, but I'm pretty sure.
22  Q. So paragraph 13 references any and all
23  systems in place by CCSO to ensure that discipline
24  issued is ultimately imposed including any tracking

Page 212

1  systems used from the time you started to the
2  present.
3  You talked about an alert that goes into
4  CCOMS for 313 and related?
5  A. Yes.
6  Q. And how does the alert get entered?
7  A. I don't know.
8  Q. Your office does not do that?
9  A. Correct.
10  Q. Somebody in Classifications is supposed to
11  do that?
12  A. I think so.
13  MR. MILIANTI: Object to form.
14  BY MS. BRENNAN:
15  Q. And then the alert should be noticed when,
16  let's say, a visitor arrives to visit an inmate who
17  is on a visiting restriction?
18  A. It could be noticed at any time.
19  Q. Does your office have any responsibility for
20  ensuring that the alerts are adhered to?
21  A. No.
22  Q. Pardon?
23  A. No.
24  Q. Are you aware of any audit or tracking

Page 213

1  system that identify whether or not sanctions issued
2  have been implemented?
3  A. No.
4  MR. MILIANTI: Just going to object to the
5  form of the question.
6  But answer if you can.
7  THE WITNESS: Are we done with the notice?
8  MS. BRENNAN: Yeah.
9  (Exhibit No. 22 was marked for
10  identification.)
11  BY MS. BRENNAN:
12  Q. So the reporter has handed you what's been
13  marked as Deposition Exhibit 22, Bates-labeled 269431
14  through 434. Just take a minute to read that.
15  A. Okay.
16  Q. And the second two pages are the draft of a
17  policy that relates to treatment of 313 related
18  inmate violations, correct?
19  A. Yes.
20  Q. And you were involved in drafting this
21  policy?
22  A. Well, my initials are there. I'm trying to
23  remember, to be honest with you.
24  Q. Well, if you go to the first page, in the

Page 226

1  has been marked Deposition Exhibit No. 28, which is
2  an e-mail from you to Director Jones regarding a not
3  guilty finding dated December 27, 2017.
4      Do you recall this particular incident?
5      A.  [redacted] is a frequent person we confront,
6  so I'm not sure I particularly remember this as much
7  as I remember him.
8      Q.  The e-mail states: "This was a bit tougher
9  than most of the others on not guilty findings.
10 Video was not helpful.  The alleged incident occurred
11 in the cell.  The nurse was there to see [redacted]
12 cellmate.  In the report the officer wrote that the
13 nurse initially said [redacted] had his penis in his hand,
14 not that he was masturbating.  [redacted] said he was using
15 the toilet when the nurse arrived later in the
16 report.  The nurse said he was masturbating.  We have
17 a fair amount of contact with [redacted] and he is a big
18 pain in the butt, but he is a fighter and agitator.
19 We spoke to the social worker who knows him well.  I
20 am honestly not sure if we are correct on this one,
21 but my interaction with [redacted] during the hearing gave
22 me a gut feeling that this wasn't a 313 case."
23     The e-mail notes that the report says in the
24 beginning that [redacted] had his penis in his hand and

Page 227

1  that she -- the report later says the nurse said that
2  he was masturbating.  Do you see that as a
3  discrepancy?
4      A.  Potentially.
5      Q.  Why?
6      A.  The officer -- in that particular situation,
7  the officer said he was using the bathroom, I think.
8      Q.  The inmate said he was using the bathroom?
9      A.  Right.  I'm sorry.  The inmate said he was
10 using the bathroom.  Isn't there something about
11 where the officer turned around or not?
12     Q.  Not that I see.
13     A.  It may be another incident I'm thinking of.
14     In any event, the initial outcry wasn't that
15 he was masturbating.  That can have an impact.
16     Q.  But the nurse wasn't the one who drafted the
17 report, correct?
18     A.  I understand.
19     Q.  That's correct, yes?
20     A.  Yes.
21     Q.  And can you explain what you mean when you
22 say "My interaction with [redacted] gave me a gut feeling
23 that this wasn't a 313 case"?
24     A.  Sometimes you just feel it's there or isn't,

Page 228

1  coupled with whatever evidentiary deficiencies there
2  might be.
3      Q.  I'm sorry.  You said, "Sometimes you feel
4  it's there or it isn't."  Can you explain --
5      A.  The case -- it's enough or it isn't.  Enough
6  evidence or it's not enough evidence.
7      Q.  So you understood this one to be a pretty
8  close call, I assume, based on what you wrote?
9      A.  Yeah.  My description would indicate that it
10 was a close call.
11     Q.  And do you recall reaching out to the nurse
12 to ask her what happened?
13     A.  I don't recall whether I did or didn't.
14     Q.  Do you think if you had reached out to her,
15 it would be included in the e-mail?
16     A.  Probably.
17     Q.  Do you recall there being an incident a week
18 later where [redacted] was accused and found guilty of
19 masturbating?
20     A.  I don't have independent knowledge that he
21 was.
22     MS. BRENNAN:  Why don't we take a few
23 minutes, and I'll try and see what I can skip and get
24 through so we can have a chance to talk.

Page 229

1      (A short break was taken.)
2      (Exhibit No. 29 was marked for
3       identification.)
4  BY MS. BRENNAN:
5      Q.  So the court reporter handed you what has
6  been marked Deposition Exhibit No. 29 and is
7  Bates-labeled 281586 through 588.
8      Have you seen this document before?
9      A.  I have.
10     Q.  And what is it?
11     A.  It's the description of my job.
12     Q.  Was this document in existence at the time
13 you were hired?
14     A.  I don't know.  I just know that originally
15 the title was director and this shows it to be
16 manager.
17     Q.  Are the key responsibilities and duties that
18 are listed accurate, to the best of your knowledge?
19     A.  May I review them?
20     Q.  Of course.
21     A.  The second-to-last one, provides weekly
22 reports.
23     Q.  Yes.
24     A.  We don't -- we don't provide weekly reports.

|  |  |
|---|---|
| Page 234<br>1  they could go into COMS and determine the outcome or<br>2  have someone go into COMS for them.<br>3  BY MS. BRENNAN:<br>4  Q.  I guess there is a lot of reference in the<br>5  documents that deal with the disciplinary process<br>6  that refer to protecting the rights of the inmates,<br>7  right?<br>8      MR. MILIANTI:  Object to the form,<br>9  characterization of the documents.<br>10 BY THE WITNESS:<br>11  A.  Yes.<br>12 BY MS. BRENNAN:<br>13  Q.  And that seems to be one of the primary<br>14 goals of the disciplinary process, is that correct?<br>15     MR. MILIANTI:  Same objection.<br>16 BY THE WITNESS:<br>17  A.  Complying with due process is one of the<br>18 goals of the process.<br>19 BY MS. BRENNAN:<br>20  Q.  And there are various procedures and<br>21 protocols that you need to follow in order to comply<br>22 with what you understand to be due process rights of<br>23 the inmates, correct?<br>24  A.  Yes. | Page 236<br>1  you're not sure, then your way to protect the<br>2  interests of the victims is to reach out to talk to<br>3  her, and I'm saying the two examples that we have<br>4  don't reflect that.<br>5  A.  I think it's a bad sample set.<br>6  Q.  How many not guiltys do you think you<br>7  reported to Director Jones during that -- I mean, it<br>8  was a couple-month period, correct?<br>9  A.  Yes.<br>10  Q.  How many not guiltys did you report to her?<br>11  A.  I don't know.<br>12  Q.  What's an estimate?<br>13  A.  I couldn't even do that.<br>14  Q.  Well, you said that there aren't very many,<br>15 correct?<br>16  A.  There aren't.<br>17  Q.  So is there ten?<br>18     MR. MILIANTI:  Object to the form of the<br>19 question, asked and answered, calls for speculation.<br>20 BY THE WITNESS:<br>21  A.  I don't know.<br>22 BY MS. BRENNAN:<br>23  Q.  Do you have any explanation for why in the<br>24 two that we are able to find, you did not reach out |
| Page 235<br>1  Q.  And what I'm trying to get at is what<br>2  procedures or protocols have you implemented to seek<br>3  to protect the rights of the victims?<br>4  A.  Me personally?<br>5  Q.  Yes.<br>6  A.  In most cases, when there's some doubt, you<br>7  reach out to the complainant to -- for clarification<br>8  or elaboration before we make a finding.<br>9  Q.  So the only two not guilty findings that we<br>10 just looked at that we were able to find, there was<br>11 no effort to reach out to the victims?<br>12  A.  I don't know that for sure, but there was no<br>13 indication.<br>14  Q.  Well, the director is asking you to notify<br>15 her of not guilty findings.  Don't you think you<br>16 would have let her know if you had spoken to the<br>17 victim?<br>18  A.  If -- if you stacked up the high percentages<br>19 of guiltys, I could probably show you where we've<br>20 reached out.<br>21  Q.  But my point is these are the two not<br>22 guiltys and you didn't reach out.<br>23  A.  Pretty small number.<br>24  Q.  That we have, yes.  But you told me that if | Page 237<br>1  to the victim to protect her interest in this<br>2  process?<br>3  A.  I don't.<br>4  Q.  Can you go to page 2, the top of the job<br>5  description?  I just want some clarification.  The<br>6  top of the paragraph reads:  "Reviews all reports<br>7  associated with an inmate's discipline prior to and<br>8  after the disciplinary hearing for accuracy,<br>9  completeness, and compliance with the general orders<br>10 and administrative codes."<br>11  A.  Okay.<br>12  Q.  What does that mean?<br>13  A.  That's a great question.  I'm not sure -- I<br>14 didn't draft this document.  I'm not sure myself.  I<br>15 would hesitate to speculate on what that means.<br>16 There are times when reports have procedural<br>17 deficiencies on them.  When we catch them, we reach<br>18 out to officers to fix them.<br>19  Q.  In the middle of the page, it says:  "Works<br>20 with DOC to track all disciplinary and other findings<br>21 resulting from the hearings."<br>22     Do you see that?<br>23  A.  Yes.<br>24  Q.  And you've mentioned that you send your |