Exhibit 32

**MARGO L. FRASIER, J.D.**
**3300 PLOVER RAIN WAY**
**PFLUGERVILLE, TEXAS 78660**

March 7, 2019

Mr. Peter Milianti
McGuire Woods LLP
77 West Wacker Drive, Suite 1400
Chicago, Illinois 60601-1818

Re: *Sdahrie Howard, et al. v. Cook County Sheriff's Office and Cook County*, United States District Court, Northern District of Illinois, Eastern Division, Civil Action No. 17-CV-8146;
*Crystal Brown, et al. v. Cook County and Cook County Sheriff's Office*, United States District Court, Northern District of Illinois, Eastern Division, Civil Action No. 17-CV-8085.

## REPORT OF MARGO L. FRASIER, J.D.

**INTRODUCTION:**

My name is Margo Frasier. I am presently self-employed as a criminal justice consultant and expert. I have been retained as an expert witness in the above referenced matters.

I have been asked to render opinions relating to the actions of the Cook County Sheriff's Office (CCSO) regarding the decisions made by the CCSO to respond to acts of sexual misconduct by inmates housed in the various divisions of the Cook County Department of Corrections (CCDOC) and adjacent Leighton Criminal Courthouse (Leighton). Specifically, Plaintiffs claim that they have been subjected to sexual harassment by inmates and that CCSO has allegedly acted with deliberate indifference to their complaints. Plaintiffs contend that CCSO has violated their rights under Title VII and equal protection under the law.

Specifically, I have been asked to review documentary material related to the actions of CCSO to respond to the acts of sexual misconduct by inmates housed in the CCDOC and Leighton, the pleadings of the parties, relevant policies, relevant training, and case law for the purpose of determining whether CCSO took reasonable, prompt and appropriate steps to prevent and correct the inmate behavior at issue and treated sexual misconduct similarly to other forms of inmate misconduct. I also took part in the tour of the CCDOC and the court transport basement lockup attended by Plaintiffs' experts. Additionally, I previously served as an expert in a matter involving the CCSO and spent five days touring and interviewing inmates in the CCDOC, particularly Divisions 9 and 10 and Cermak, in May 2014.

**QUALIFICATIONS OF EXPERT:**

I have significant experience in all facets of law enforcement and corrections. Presently, I am self-

employed as a criminal justice consultant and expert. I am also the court appointed monitor for the consent judgments involving the Orleans Parish Sheriff's Office (New Orleans, Louisiana) and the Metropolitan Detention Center (Albuquerque, New Mexico) where, among other provisions, I monitor the provisions related to inmate misconduct, including sexual misconduct. From 2011-2017, I was employed as the Police Monitor for the City of Austin. My duties as Police Monitor included overseeing all the internal affairs investigations of the Austin Police Department, including investigations involving allegations of sexual harassment, and providing recommendations on how to improve the Austin Police Department. Prior to joining the City of Austin, I was a Senior Associate with MGT of America, Inc., where I provided litigation support, expert witness services, and consulting in criminal justice issues. Prior to joining MGT, I was an Assistant Professor of Criminal Justice in the College of Criminal Justice at Sam Houston State University in Huntsville, Texas. Prior to joining the faculty at Sam Houston State University, I was the duly elected Sheriff of Travis County (Austin), Texas.

I assumed office as Sheriff of Travis County, Texas, on January 1, 1997, and served as the Chief Law Enforcement Officer and Chief Corrections Officer of Travis County, Texas, until December 31, 2004. I graduated from Sam Houston State University with a Bachelor of Science degree with honors in Criminology and Corrections in 1974. I received thirty hours of credit towards a Master of Arts degree in Criminal Justice Management from Sam Houston State University. I received my Juris Doctor with high honors from Florida State University College of Law in 1984. I am certified both as a peace officer and jail officer by the Texas Commission on Law Enforcement Officer Standards and Education.

During my 45 years of experience, I have worked at a state prison in Texas; worked in a number of different capacities within the Travis County Sheriff's Office; worked at and managed a county jail system; worked for the legislative committee which provided oversight of the jail and prison systems of the State of Florida; represented, as an attorney, numerous cities, counties, city officials and county officials in litigation related to law enforcement, corrections, and employment law; served as Sheriff, and, therefore, Chief Law Enforcement Officer and Chief Corrections Officer, of Travis County, Texas; provided criminal justice consultation; served as Police Monitor of the City of Austin; and served as a court appointed monitor by federal courts.

In addition, from 1997 to 2004, I was on the faculty at Saint Edward's University in Austin, Texas. At Saint Edward's University, I taught criminal justice courses including courses on American Policing, Corrections, and Juvenile Justice. While on the faculty at Sam Houston State University from 2005 to 2008, I taught criminal justice courses including Criminal Law, Criminal Investigation, Professionalism and Ethics in Criminal Justice, Legal Aspects of Corrections, Seminar on Administration and Organization, and Legal Aspects of Criminal Justice Management. Specifically, as part of the courses on Legal Aspects of Criminal Justice Management and Legal Aspects of Corrections, I taught the legal principles related to the liability of criminal justice agencies for the actions of their employees and liability of employees; specifically, those related to issues of training, supervision, search and seizure, inmate misconduct, and use of force. In addition, as part of the course on Legal Aspects of Criminal Justice Management, I taught the management and legal principles related to law enforcement employees' rights and criminal justice agencies' responsibilities under Title VII and the United States Constitution.

I have extensive experience and have provided consulting, instructional, and legal services in such areas as training, classification, security, use of force, search and seizure, supervision of staff, inmate rights, mental health laws, sexual harassment, inmate misconduct, employment matters, and employee discipline. My experience includes instructing at the National Sheriffs' Institute. I also instruct at the New Sheriffs' School sponsored by the Sheriff's Association of Texas where I specifically instruct new sheriffs on the rights of employees and proper law enforcement management. I have developed and implemented policies and procedures which relate to almost every aspect of the operation of a law enforcement agency and a correctional agency including those related to inmate misconduct and sexual harassment. I am extremely familiar with the statutes and case law of the United States which relate to the First, Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and Title VII. I am particularly familiar with the duties imposed on a Sheriff, jail administrators, and jail officers to respond to acts of sexual misconduct by inmates. I have extensive experience in analyzing particular incident(s) that have allegedly occurred in an employment setting, law enforcement setting, or jail setting to determine whether public officials acted in accordance with accepted procedures consistent with competent corrections training and within the laws and Constitutions of the United States, whether a corrections administrator failed to enact any policy or procedure that he/she is required to adopt, and whether corrections officials have acted outside the range of acceptable corrections discretionary acts.

As the Sheriff of Travis County, Texas, I was the head of an agency which employed over 1,300 employees and had a budget for 2004-2005 of over $90 million dollars. The capacity of the Travis County Jail system at the time was 2,450 inmates. As the Chief Law Enforcement Officer and Chief Corrections Officer, I was directly responsible for the supervision of the jail and supervision of law enforcement officers patrolling, investigating, and enforcing criminal laws within Travis County. As such, I was the ultimate policymaker for dealing with issues of inmate misconduct, including sexual misconduct.

Additionally, I was directly responsible for the oversight of the employment and training practices of the Travis County Sheriff's Office to ensure compliance with state and federal statutes and the United States Constitution. As a former Police Monitor of the City of Austin, Sheriff, and Assistant Professor of Criminal Justice, I am extremely familiar with the laws which relate to employees of police departments and sheriff's offices and the liability of criminal justice agencies for taking reasonable measures to protect its employees from inmate misconduct, including sexual misconduct. I am also aware of the legal limits placed on the disciplining of inmates and the use of force towards inmates for misconduct.

During my time as Sheriff, I was a member of the Sheriffs' Association of Texas, National Sheriffs' Association, the Major County Sheriffs' Association, and the National Executive Institute Associates. I was elected to the Board of Directors of the National Sheriffs' Association by a vote of the membership in 2002 and served through 2004. I was elected to be the Treasurer of the Major County Sheriffs' Association by a vote of the membership in 1999 and served as treasurer through 2001. I was elected to be the Vice-President of the Major County Sheriffs' Association by a vote of the membership in 2002 and served as Vice-President through 2003. I was elected to be the President of the Major County Sheriffs' Association by a vote of the membership and served as President during 2004. I was twice selected by the Combined Law Enforcement Associations

of Texas as the Administrator of the Year for the State of Texas.

Details of my experience and education may be found in my resume attached hereto as Exhibit A. Details of other matters in which I have consulted may be found in the listing attached hereto as Exhibit B.

**COMPENSATION:**

I am being compensated for my time at a rate of $300.00 per hour.

**METHODOLOGY:**

In arriving at my opinions, I have examined the following and the documents which accompanied them:

1. See appendix of documents attached as Exhibit C;
2. Tour of CCDOC system and basement lockup on November 29, 2018;
3. Tour of CCDOC system during May 2014; and
4. Relevant case law.

Additionally, I have examined the conduct of the CCSO considering my experience as a law enforcement officer, attorney, corrections official, administrator, court monitor, and educator. The opinions set forth herein are based upon analysis of these facts by applying my law enforcement, corrections, administrative and teaching experience; legal education; training; personal knowledge of the applicable amendments to the United States Constitution and the applicable provisions of the law of the United States. My opinions are also based on my understanding of the facts and circumstances concerning the actions of the officials of the CCSO evidenced by the materials I have examined and my personal training and experience, particularly in corrections administration.

**BASIS OF OPINIONS:**

**<u>Background of CCDOC</u>**

The CCDOC is one of the largest jail systems in the United States.   As with any large jail system, average daily population is not indicative of the workload and challenges facing the jail administrators.   Currently, the average daily population of the CCDOC system is 6,500 inmates. In addition, approximately 100,000 individuals circulate annually through the jail, which spans ninety-six acres and 8 city blocks.   Unlike prison systems that know when inmates will arrive, how many inmates will be received, and the background of the inmates, CCDOC receives inmates unannounced, does not know how many will be received at a given time or on a given day, and usually knows nothing about the inmates that are being received.   The CCSO is also faced with the challenge of transporting 700 to 900 inmates per day to court; either through use of a tunnel system or vans and buses.[1]   This movement is on top of the movement required daily for medical, dental and mental health appointments, attorney visits, visitation with family and friends, religious services, law library and other requirements, such as barbershop and recreation.   The

---

[1]  Declaration of Brad Curry ("Curry Decl.") ¶¶ 3-4.

main courthouse in which criminal cases are heard is the Leighton Criminal Courthouse. Connected to each courtroom are lockups in which inmates are held before being brought into the courtroom.   A prison system rarely has court transportation responsibility.

CCDOC consists of seven actively used divisions.   As the divisions were constructed over many decades, the designs differ greatly among the divisions.   Some of the facilities were constructed at a time when female corrections officers did not work in the male facilities and there was not cross-gender supervision by female corrections officers over male inmates.

The Cook County Jail has been the subject of several federal consent decrees, including a consent decree arising from a U.S. Department of Justice lawsuit filed in 2010.[2]   Some of the main issues addressed in the consent decree entered in *United States of America v. Cook County, Illinois, et al.*, concerned inmate on inmate violence, use of force, inmate misconduct and the discipline system, use of segregation, and medical and mental health care.[3] Actions taken by the CCSO to address inmate sexual misconduct were taken in light of the provisions of the court order which guided the use of force, the inmate disciplinary system, use of segregation, and treatment of inmates with mental health issues.[4]

## Difference Between Jails and Other Workplaces

Jails and other correctional institutions are different than other workplaces in many ways and, in my opinion, it is erroneous to treat a jail as simply another workplace.   In the typical work environment, a company only has to be concerned about the conduct of its employees when it comes to dealing with sexual harassment.   If an employee sexually harasses another employee, management can take appropriate discipline action, including firing the harassing employee.   In most work environments, if a fellow employee complains that behavior is objectionable, the employee who is saying and doing objectionable things will realize that the behavior is unwanted and stop the behavior whether because they do not want to offend their fellow employee and/or lose their job.

Amongst many differences, in a jail environment, management has to deal with the reality that inmates often take their cues from staff reaction to misconduct and behave in the complete opposite way that employees in other workplaces would respond.   When the goal of misconduct is to disrupt operations and offend and upset staff, staff reaction that indicates the behavior is disturbing will often encourage the behavior as opposed to curtailing it.   Additionally, jails cannot fire or ban inmates who are engaging in sexual harassment as an employer might a harassing employee or customer.   Indeed, the majority of the inmates in CCSO's custody are pretrial detainees who are innocent until proven guilty and have civil rights beyond average citizens because the state has chosen to hold them in custody.

## Inmate Sexual Misconduct in Correctional Environments

Inmates engage in sexual misconduct for a variety of reasons.   There are some that want to get

---

[2]  *See United States of America v. Cook County, Illinois, et al.*, 1:10-cv-02946 (N.D. Ill.)
[3]  *See Id.* at Dkt. # 13.
[4]  *Id.*

attention from the staff even if it is negative attention. Some may feel that staff will be flattered that they see them as sexually attractive. Some do it to disrupt the jail environment; the more it stops operations, the better. Some do it in hopes of intimidating staff; the more extreme the reaction by staff, the better. Some, such as the Savage Life gang discussed later, do it to gain acceptance in a group. Some participate because it results in them being moved to another housing location or being taken to the medical clinic or hospital. There are some who participate in masturbation and are hoping they will not be detected. And others' behavior is a result of mental illness. Many of the inmates do not care that sexual misconduct is against the rules. In fact, some do it precisely because it is against the rules. Consequently, in my experience, educating inmates that sexual misconduct is prohibited is likely to be effective among only a small portion of the inmate population and likely to be counter-productive with other inmates. For some of the inmates, the more the prohibition against sexual misconduct is emphasized, the more they are motivated to participate in the conduct and in as bold a manner as possible.

Sexual misconduct by inmates is directed towards both genders of staff. In my experience, it is not unusual for inmates to expose their genitals and masturbate in front of male staff members and call male staff members derogatory names and make threats which have a sexual overtone; including some of the same names and threats directed towards female staff. In fact, many inmates consider the verbal sexual misconduct towards male corrections officers to be even more insulting than that directed at females. Regardless of towards which gender verbal sexual misconduct is directed, it should not be ignored. I have found in my experience that many inmates respond to verbal reprimands informing them that it is not appropriate and that it will result in me not talking with them if they use such language. Whether or not the verbal reprimand is successful in changing the behavior, it is incumbent on the corrections officer to report the behavior through the disciplinary system. To this end, the CCSO requires its sworn staff members to report incidents of inmate misconduct, including sexual harassment.[5]

I have not performed a comparative study of the rates of exhibitionist masturbation and other forms of sexual misconduct at the CCDOC. As noted above, such behavior occurs in all correctional institutions with which I am familiar, regardless of the efforts undertaken to deter it. Although I am not personally familiar with the California state correctional system, I am aware that exhibitionist masturbation occurs within that system as well. In fact, one of the first cases of inmate sexual harassment came out of the Pelican Bay Prison in California over ten years ago. In my opinion, it is an error to conclude from a high incidence or increased incidence of inmate sexual misconduct over a limited period of time within a correctional institution that the institution has failed to take proper steps to prevent and correct inmate behavior or is indifferent to such behavior. Rather, to draw conclusions about these issues, one must consider the policies and procedures in place to address inmate sexual misconduct, the institution's response to any increase in inmate sexual misconduct and the effectiveness of those efforts. In this report, I will do so with respect to the CCSO.

## Balancing Opportunities for Female Staff with Challenges of Cross-Gender Supervision

In a facility where the behavior is disproportionately directed towards females, one of the ways some correctional administrators have chosen to lessen the behavior is to limit contact between

---

[5] CCSO Policies 311 and 704.

female staff and male inmates. The inmate population in most jails is 90% male and 10% female inmates. Many jails, especially, large urban jails, have a substantial number of female staff; some as much as 60%.

Limiting contact between female staff and male inmates results in fewer job opportunities for female corrections officers and reduces the number of female corrections officers hired and where they are assigned. If such an approach was used by CCSO, it would likely result in female staff being limited to the single female division and lower security level male divisions. This would result in female corrections officers having a difficult time getting preferred assignments and requested time off. While some correctional facilities utilize gender as a bona fide occupational qualification, the CCSO places few limits on where female corrections officers can be assigned. Female corrections officers are allowed the freedom to bid for positions in all of the divisions, including courthouse security and Divisions 9 and 10. In fact, many of the Plaintiffs testified that they bid to work in the male divisions and the Leighton courthouse, including the assignments where the risk of being subjected to sexual misconduct by male inmates units is higher, as it results in them getting better days off and preferred assignments.[6] While on site, observation was made of female corrections officers working in a variety of assignments including the Special Management Unit (SMU). In my experience, while some female corrections officers may not enjoy working with male inmates, others welcome the opportunity and prefer to supervise male inmates, including male inmates who present challenges.

## Balancing Privacy and Security

In correctional facilities, it is a challenge to balance the interests of privacy and security. Every time something is added to a facility to further privacy interests, it has the potential of creating a security hazard. Inmates seek out places which are hidden from the view of corrections officers and cameras to engage in misconduct and self-harm. For instance, toilet areas and shower areas are some of the more common areas where privacy shields, conducted of concrete blocks or metal screens, are added. They are also the most common areas, other than individual cells, where misconduct, including sexual misconduct, and self-harm occur. Retrofitting existing facilities is often very costly.

## Sexual Misconduct at CCDOC and Leighton

When examining inmate sexual misconduct at CCDOC and Leighton, it is important to keep in mind that this behavior is only one of many undesirable inmate behaviors which the CCSO must address. Other incidents the CCSO must address and officers must report include assaults by inmates on inmates, assaults by inmates on staff, uses of force, destruction of jail property by inmates, sexual misconduct by inmates, arson, and escape. There are significantly less reported incidents of sexual misconduct in comparison to other similar incidents.[7] In fact, other similar incidents were 2-12 times more prevalent than reported indecent exposure-related incidents. Thus, the problem of inmate sexual misconduct cannot be treated in a vacuum. It is not reasonable to suggest that all of the attention and other resources of the CCSO should have been devoted to addressing sexual misconduct to the exclusion of other inmate behaviors, including those which

---

[6] Hobbs Dep. 92, 96, 108; Ranney Dep. 26; Altman Dep. 145-46.
[7] Benjamin S. Wilner Report, Figure 1.

may result in bodily harm to other inmates, staff or even the general public.   This is not to diminish the seriousness of inmate sexual misconduct or the effect that it may have on victims, but to address the realities that a correctional institution has responsibilities to protect all inmates and staff and that its resources are limited.

There has been a suggestion by Plaintiffs' expert that female corrections officers underreport incidents of sexual misconduct by as much as fifty percent.   As discussed above, such a failure to report would constitute a violation of CCSO policies 311 and 704.   If female corrections officers are failing to follow policy and report sexual misconduct, they are complicit in allowing the behavior to go unpunished.   It is not unusual for some misconduct to go unreported in correctional institutions; including sexual misconduct.   In my experience, the level of underreporting for sexual misconduct is equal to or lower than other forms of misconduct.   While it is the correctional institution's responsibility to enable reporting and to encourage reporting, it is the responsibility of the corrections officers to report misconduct.   When reviewing CCSO's records, it is clear that corrections officers knew how to report and reported misconduct.   In my opinion, and based upon my review of deposition testimony and declarations, the CCSO does not, as alleged by Plaintiffs, discourage employees from filing incident reports regarding sexual misconduct.[8]   There were few, if any, concrete examples of supervisors acting outside the scope of their employment by disobeying CCSO policy and discouraging employees from reporting incidents of detainee sexual harassment.   The CCSO encourages the filing of incident reports regarding sexual misconduct.[9] CCSO has an adequate system for reporting misconduct and encouraging reporting of misconduct.

There are often places within a court and jail system where officers will not have ready access to the reporting system.   It is common that officers working in the courthouse do not have the same access as corrections officers working in the jail who either have a dedicated physical post which has a computer terminal or ready access to a computer terminal.   This was originally the situation at CCSO, but the courthouse officers were able to report and did report by relaying the information to their supervisors and writing handwritten reports.[10]   Changes were made to enable courthouse officers to enter their own reports directly.

Plaintiffs' expert is critical of Cermak employees and CCSO non-sworn staff not being able to enter their own reports.   It is not uncommon to limit access of non-sworn staff to the computer system which includes the ability to access the report program.   There are limits at both the state and national level to access to criminal histories which are normally part of the computer system. These are commonly referred to as the NCIC and ICIC which are limited to law enforcement officials.   What agencies commonly do is provide an alternative such as having non-sworn staff write a statement or memo and have uniformed staff enter it into the report program.   This is the alternative that the CCSO has reasonably chosen.

As part of the file review, I have also reviewed statements written by Cermak employees which often lacked the completeness required to establish an inmate has committed a disciplinary

[8] Altman Dep. 151-52, 196, 212, 218, 256-58; Wilson Dep. 143, 155-56, 159, 170-71, 183-84, 194, 203, 213, 221, 227, 231, 235, 239, 240, 243, 251; Hobbs Dep. 134, 137, 150, 157, 220-21; Plasencia Dep. 120-21; Robinson Dep. 146; Burroughs Dep. 182-84.
[9] Ranney Dep. 164-65; Hobbs Dep. 157; Robinson Dep. 147-48.
[10] Plasencia Dep. 89-90, 114; Jones Dep. 58-60; Wilson Dep. 107, 109-10, 119-20; Ranney Dep. 132-35.

violation. By having a corrections officer review their statements and flush out the details, the quality of the reports is improved.

While jail systems prohibit and seek to deter misconduct by inmates, including sexual misconduct by inmates, inmate misconduct occurs in every jail. Sexual misconduct by inmates usually consists of exhibitionism, masturbation, and sexually charged remarks and threats. While almost every jail has to deal with inmates engaging in sexual misconduct, the CCSO found itself in the unusual position of having a group of inmates decide to use sexual misconduct, along with other forms of misconduct, as a way to gain admission, favor and status within the group. This group, Savage Life, rewarded inmates for participating in sexual misconduct and other disruptive behavior such as throwing urine and feces on staff and assaulting staff. One goal of Savage Life and other inmates was to use misconduct to disrupt CCSO operations.[11] In my opinion, sexual misconduct proved to be an effective tool by these inmates as it not only caused disruption of the jail operations, but also created mistrust and friction among the staff. The disruption would be even more so if, as suggested by the Plaintiffs, a supervisor had no option but to immediately respond to every incident of sexual misconduct. Such a view is not mindful of the other incidents that supervisors need to respond to such as assaults and uses of force, and other tasks being performed.

### CCSO Staff Are Adequately Trained in Report Writing.

CCSO corrections officers and deputies receive training on Inmate Discipline, including report writing. The training is delivered through an interactive electronic training module.[12] Staff are trained that an Incident Report must accurately describe the charge and the facts supporting each element of the alleged violation.[13] Staff are trained on eleven "Key Report Writing Requirements"[14] and on the "Four Cs" of a well-written report (Clear, Concise, Complete, Correct grammar).[15] Staff are further trained that they must proofread their Incident Reports, because the outcome of the disciplinary hearing will in most cases depend on the specific details in the report.[16] The training also emphasizes that each staff member is responsible for knowing the charges in the Inmate Disciplinary Code.[17]

The interactive training includes scenarios in which the staff member must review the facts of an incident and identify the corresponding charge codes.[18] The interactive training further asks the staff member to identify both well-written and inadequate reports and provides breakdowns and explanation of examples of both.[19] To successfully complete this training, the staff member must take a Final Assessment and achieve a score of 80% or better.[20]

---

[11] CCSO_Howard_0295067, 0295076, and 0260507.
[12] CCSO_Howard_0162056-162095.
[13] *Id.*
[14] Clear, relevant, brief, complete, current, accurate, fair, informative, objective, proper form, and on time.
[15] CCSO_Howard_0162056-162095.
[16] *Id.*
[17] *Id.*
[18] *Id.*
[19] *Id.*
[20] *Id.*

This training is comprehensive and adequate in my opinion. A staff member who successfully completes the CCSO's training is equipped to prepare and submit complete and accurate Incident Reports. This training is also similar in delivery and scope to report-writing training that I have observed in other correctional institutions. To the extent that certain CCSO staff members struggle to prepare adequate written reports, this is common to every correctional institution that I have observed. In my opinion, where a staff member struggles with his/her reports, prompt review and correction of inadequate reports with a supervisor is the most effective way to help the staff member. In addition, the CCSO has more recently introduced additional web-based and year-long in-service training in order to remind officers, sergeants, and lieutenants how to effectively complete reports and disciplinary tickets and assist those struggling with this aspect of their job.[21]

My understanding is that Plaintiffs claim the CCSO's training on report writing is inadequate because, among other reasons, the training should be offered live. I am not aware of any evidence that "live" training on report preparation is any more effective than quality interactive online training such as that used by the CCSO. While some institutions offer live training, it is by no means the only effective way to offer the training or an industry standard in my experience. Use of interactive electronic training modules is an excellent way to provide training to large numbers of employees simultaneously. Providing the same training in the classroom in a jail system as large as CCSO could take more than a year or two.

### The CCSO Adequately Informs Inmates of Behavioral Expectations.

There are many ways that jails try to limit inmate misconduct. One of the ways is to inform inmates of the rules and expectations through an orientation process. The way orientation takes place in jails differs from prisons. While most large prisons have a facility dedicated to the intake and classification of inmates where inmates may be housed for weeks as they go through a battery of tests and orientations, jails, including the Cook County Jail, due to the number of inmates being received on a daily basis, must process the inmates quickly through booking and orientation. Upon entry, each inmate is given a copy of the Inmate Information Handbook.[22] The Handbook informs inmates that sexual abuse, sexual assault, sexual harassment, sexual intimidation and harassment are prohibited and must be reported immediately.[23] This is the first information presented to the inmates after a description of the intake process.[24] The Handbook further informs inmates that they may not expose themselves to any staff, volunteers, or other inmates, and that masturbation is not tolerated.[25] In addition to rule books, the CCSO uses an orientation video and posters. Specifically, the orientation video plays on tiers on a daily basis and posters warn inmates in the jail that a third public indecency offense would result in a felony conviction and sex offender registration.[26] As noted later, the CCSO also used a series of inmate group meetings, referred to as town halls, to specifically address the issue of sexual misconduct. The CCSO also verbally warns inmates that if any inmate in the courthouse lockups engages in an act of public indecency all the inmates in that particular lockup will be handcuffed behind the back for the remainder of

---

[21] Wilensky Dep. 156.
[22] Curry Decl. ¶ 7
[23] CCSO_Howard_00281238
[24] *Id.*
[25] CCSO_Howard_00281249-281250
[26] Curry Dep. 163–16, 292–293.

their time in the courthouse that day.[27]   It is accepted correctional practice and reasonable to use rule books, orientation videos, posters and verbal warnings to inform inmates of the rules.

I understand that Plaintiffs contend that the CCSO should have offered live trainings or orientations to inmates, and that doing so would have somehow reduced incidents of indecent exposure and masturbation.  This allegation is premised on the assumption that inmates do not know that exposing themselves or masturbating at staff is offensive and not permitted.  That assumption is largely, if not entirely, incorrect.  In my opinion and based on my experience and correctional knowledge, inmates usually engage in this behavior precisely <u>because</u> they know it is offensive.

One way to address the problems created when inmates as a group are participating in misconduct, is to separate the inmates, if possible.   One option available to prison systems is to separate them to different facilities which are often separated by miles and where they do not have the opportunity to communicate and coordinate their behavior.   The CCSO does not have that option. Indeed, the CCSO has very limited options to separate the majority of the inmates committing sexual misconduct because they are maximum security inmates, and as such their classification requires them to be housed in Divisions 9 and 10.

Nevertheless, as noted later, the CCSO attempted to dissuade inmates from participating in sexual misconduct by sending inmates to county jails outside of Cook County.   Due to the sheer numbers of inmates in the CCSO's system, the limited capacity in other nearby county jails, and the necessity of transporting the inmates back to court, these efforts were unsustainable.   In addition, this effort had unintended consequences.   The inmates viewed being sent to other county jails as a reward for their misbehavior and some participated in sexual misconduct in hopes of being sent to other county jails.   Similarly, when inmates viewed being transported to outlying courthouses as a reward for having criminal charges filed, the CCSO worked with the Cook County judiciary, Cook County Public Defender's Office ("CCPD"), and the Cook County State's Attorney's Office ("CCSAO") to move any public indecency court hearings to the Leighton Criminal Courthouse so as to not incentivize acts of public indecency.[28]

The CCSO has also introduced other measures to attempt to curb inmates from exposing themselves, even if these inmates expose themselves while in groups or during movement and cannot be identified.

- Beginning in October 2015 the CCSO began conducting roll call presentations and issuing roll call memos to remind staff of proper handcuffing and transportation procedures;[29]
- beginning in January 2016 the CCSO began handcuffing all inmates in courthouse lockups;[30]
- in October 2016 the CCSO began requiring inmates found administratively guilty of engaging in acts of public indecency to wear modified jumpsuits that restrict access to the

---

[27] Curry Decl. ¶ 18.
[28] Curry Decl. ¶ 34.
[29] Curry Dep. 128.
[30] The CCSO later discontinued this measure due to objection from the Cook County Public Defender's Office and certain judges. Curry Decl. ¶ 19.

inmates' genitals;[31]
- around this time the CCSO also issued a memo reminding staff to properly handcuff inmates behind the back and in blue box devices;[32]
- the CCSO's specialized Emergency Response Team has conducted additional in-division training on how to properly utilize blue box restraints;[33]
- the CCSO tried creating a special disciplinary tier as an increased sanction and means of managing inmates prone to exhibitionist masturbation;[34]
- the CCSO added additional deputies and exempt staff to monitor courthouse lockups;
- beginning in March 2017, the CCSO began keeping inmates found administratively guilty of engaging in acts of public indecency in the Leighton Courthouse in the bridge between the jail and courthouse (rather than in the lockups which are accessed by assistant public defenders and law clerks) until their cases are called;
- in October of 2017 the CCSO expanded this measure to keep inmates found administratively guilty of engaging in acts of public indecency in the bridge until their cases are called regardless of where they engaged in the conduct;
- around this time, the CCSO also began handcuffing all inmates behind the back during transport, reminding inmates that they are being cuffed in this manner due to the occurrence of public indecency incidents and warning them that if any inmate in the courthouse lockups engages in this behavior all the inmates in that particular lockup will be handcuffed behind the back for the remainder of their time in the courthouse that day;
- the CCSO also implemented sentences in its SMU for inmates found administratively guilty of public indecency offenses, during which inmates are subject to special restrictions including to have to wear a waist restraint system which restricts the use of their hands when moving about the tier and being cuffed to an eyebolt so they cannot move around during their hours out of their cell;
- the CCSO also added alerts for public indecency offenders to its Offender Management System ("CCOMS").[35]

In my opinion and based on my education, experience and correctional knowledge, these measures are robust, some of them are quite creative, and others are similar to measures that I know other correctional institutions have used to successfully combat inmates from engaging in acts of public indecency during transport and while in groups.

Another method of attempting to change inappropriate behavior by inmates is to restrict them from participating in programming and/or upgrade their security level. Many correctional experts contend that such an approach is self-defeating as inmates with additional idle time tend to become involved in misconduct. In a prison system, an inmate's level of security often equates to privileges and programming. An inmate in a lower security prison may be allowed the opportunity to work outside or be allowed access to more desirable programming. Such

[31] Curry Decl. ¶¶ 11-15
[32] Curry Dep. 255–256.
[33] Id.
[34] The CCSO later discontinued using this tier when detainees came to view it as a "status symbol." Curry Decl. ¶ 32.
[35] Curry Decl. ¶¶ 11-15, 17, 18, 21, 26, 32, 33; Curry Dep. 138, 140 –142, 255-256. These practical measures are in addition to the other more analytical, policy, and political oriented remedial measures that the CCSO has undertaken to curb detainee sexual harassment incidents, which are noted throughout the rest of my report.

opportunities are very limited even in a jail as large as the CCDOC. As mentioned, the majority of the inmates involved in the incidents of sexual misconduct were and are maximum security inmates. As maximum-security inmates, they are housed in more secure facilities such as Divisions 9 and 10 and are not eligible for most of the work assignments, most of the programming, and less restrictive visitation.

**CCSO Policies Regarding Inmate Sexual Misconduct**

CCSO has in place an extensive set of policies which have been reviewed and approved by the federal court monitor. The CCSO's policies are reasonable and sufficient to address the issues of inmate sexual misconduct.[36] While there may be isolated incidents where correctional staff fail to follow policy, the CCSO's policies themselves are clear and consistent with best correctional practices.

Some examples are Policy 704 Inmate Discipline Procedure, Procedure 131 Inmate Discipline Procedure, and the Inmate Disciplinary Code Charts. The inmate disciplinary code originally had seven levels of offenses. That is an usually high number of levels of offenses for an inmate disciplinary code. Most inmate disciplinary codes contain two levels, major and minor offenses and then provide a range of punishment for each. The CCSO made the decision to compact the seven levels into four in December 2013. Disrespect to staff, fighting, gang activity, indecent exposure, theft from staff, and sexual harassment were Level 2 offenses which carried a punishment of 5 to 15 days in SMU in addition to loss of privileges. Verbal threat to staff, battery, arson, unauthorized possession of drugs, and indecent exposure/masturbation were Level 3 offenses which carried a punishment of 5 to 25 days in SMU in addition to loss of privileges. Level 4, the highest level, was reserved for offenses such as assault on staff with bodily fluids, battery to staff, sexual abuse/assault, and homicide. Level 4 carries a punishment of 26 to 60 days in SMU along with the loss of privileges. In May 2017, adjustments were made to the inmate disciplinary code. While battery, fighting, and gang activity remained Level 2 offenses, disrespect to staff, indecent exposure, sexual harassment, and theft from staff were upgraded to Level 3 offenses. Attempted battery to staff was upgraded to a Level 4 offense. Upon conviction of three Level 3 offenses, an inmate's punishment is enhanced to a Level 4 offense.[37] Notably, under the terms of the federal court order, there are limits as to the discipline that can be taken against inmates who have mental health issues. For instance, the inmate's mental health must be considered in assessing sanctions. Moreover, the option of filing criminal charges has consistently existed.

**The CCSO has an Effective Inmate Disciplinary System**

Persons are incarcerated in jail because they have been accused of violating criminal laws. The majority of them are awaiting trial and have not been convicted of a crime. Inmates do not abandon their rights at the jailhouse door except to the extent that restrictions placed on them serve legitimate penological needs. There is a need for a discipline system in jail because inmates participate in a variety of misconduct. The CCDOC is no exception. In my opinion, the most

---

[36] Even Plaintiffs' Expert acknowledged that the CCSO has "written policies and procedures in place that are adequate for the most part[.]" Woodford, ¶ 46.
[37] Wilensky Dep. 92-93.

common method used to discourage misconduct by inmates is the inmate disciplinary process. In order for the disciplinary process to be effective, hearing officers must be viewed by inmates and staff as fair, unbiased, and independent adjudicators; this is particularly true for the inmates.

While the CCSO may discipline inmates, there are restrictions on the disciplinary process that the CCSO may employ under Illinois law and case law. The United States Supreme Court provided guidance in the matter of *Wolff v. McDonnell*, 418 U.S. 539 (1974). This decision remains the leading Supreme Court case on discipline of inmates. In *Wolff*, the Supreme Court held that an inmate must be: (1) provided with reasonable notice of the charge brought against him, (2) given sufficient time to prepare for the hearing, (3) allowed to present a defense, and (4) tried by an unbiased tribunal or hearing officer. Once a decision has been made, the inmate must be given notice of the decision.

The basic tenet of an effective disciplinary system is that the hearing officer(s) cannot have an actual or perceived conflict of interest. For this reason, acceptable correctional practice is that the hearing officer should not be someone who is biased or whose ability to decide the case in an unbiased matter would be subject to question. It is therefore problematic to use a hearing officer who has been subjected to misconduct similar to what the inmate is alleged to have committed, or a hearing officer who may feel pressure to convict the inmate because their co-workers have been subjected to misconduct similar to the alleged misconduct at issue . Some correctional agencies, including the CCSO, have made the decision to use a hearing officer who is not part of the corrections officer ranks since the vast majority of the incident reports are written by corrections officers. In my opinion, licensed attorneys are an excellent choice as hearing officers; particularly attorneys who have practiced criminal law or been administrative hearing officers in other contexts.

In approximately 2012, the CCSO made the decision to use individual, independent, attorneys as hearing officers (as opposed to a disciplinary hearing team composed largely of correctional staff).[38] The CCSO made this change because of concerns it had regarding the efficiency and fairness in the disciplinary process.[39] As Matt Burke, Interim Executive Director of Human Resources, explained during his deposition, when the CCSO used a disciplinary hearing team approach, there were issues with the team not being able to conduct hearings because a member of the team was not there and there was no available replacement.[40] Additionally, because the lieutenants on the disciplinary hearing team were in the chain of command at the jail, the CCSO had concerns that the lieutenants did not always provide the proper level of due process for some of the hearings and "would just rubber stamp guilty findings without really adequately weighing the evidence."[41]

As a result of these concerns, the CCSO switched to using independent attorneys as hearing officers. The CCSO implemented its current disciplinary process with input from the United States Department of Justice (DOJ), the plaintiff in the *United States of America v. Cook County, Illinois, et al.*, and the monitor, Susan McCampbell, appointed by the federal district to oversee

---

[38] Burke Dep. 26.
[39] *Id.* at 25.
[40] *Id.* at 26
[41] *Id.*

the implementation of the court order.[42] It is my understanding that the CCSO's use of independent attorneys as hearing officers has been held up as a model system and recommended by the DOJ to other correctional facilities.[43]

In my opinion, based on the CCSO's concerns about efficiency and fairness in its disciplinary process, and the approval it received from the DOJ and Ms. McCampbell, a reasonable corrections administrator would have thought that the use of attorneys as hearing officers was a decision that resulted in enhanced fairness and proper application of the concepts of burden of proof and due process. In addition to corrections officers being subject to having their ability to be unbiased questioned, corrections officers have far less experience with the concepts of burden of proof and due process than a law school graduate; much less someone like Steve Wilensky, the current Director of Inmate Discipline, who has over 25 years of criminal law experience.

Additionally, conducting disciplinary hearings is a time-consuming process. Corrections officers have other demands on their time and are seldom assigned full time as a hearing officer or member of a tribunal. Mr. Burke testified that when the jail compound was short on staffing for lieutenants, the lieutenants on the disciplinary hearing team would be called to fill-in and then would not be able to conduct hearings on that day.[44] In my experience, when a correctional agency tries to fit duty as a disciplinary hearing officer in with all the other demands on the time of corrections officers and corrections supervisors, it often results in hearings not being held in a timely manner. In my opinion and based on my experience and correctional knowledge, the decision by the CCSO to use independent hearing officers who are licensed attorneys is not only a reasonable decision, but a forward-thinking decision. In fact, it allows for the hearing officer to not have other duties and to maintain consistency among the way cases are decided and punishment is administered. By using dedicated hearing officers, the hearing officer is then able to review the report and any video evidence and do any necessary follow-up to allow the hearing officer to make an informed decision on adjudication and sanctions.

I understand that Plaintiffs' expert is criticizing the CCSO's decision to use independent attorneys as hearing officers because they do not have correctional experience and, therefore, cannot bridge some type of connection between the inmate and staff.[45] This assumption, in my opinion, is flawed and akin to arguing that all judges trying criminal cases must be former law enforcement officers.

Plaintiffs also contend that the CCSO's hearing officers have not been adequately trained. In support of this contention, Plaintiffs' expert falsely states that Mr. Wilensky could not explain the goals of the inmate disciplinary system during his deposition. I have reviewed Mr. Wilensky's deposition testimony and it is clear that Plaintiffs' expert has intentionally misstated Mr. Wilensky's testimony regarding the inmate disciplinary system. In response to the question of what is the overall goal of the inmate disciplinary system, Mr. Wilensky testified as follows:

> To – I'm not sure I've ever thought about it, to be honest with you, what the

---

[42] *Id.* at 30.
[43] *See also id.* at 29-30.
[44] *Id.* at 27.
[45] Woodford ¶ 67.

goal is.

> **To help to make the jail as safe as possible and making sure, while doing that, the rules that we are duty-bound to follow are followed.**[46]

Mr. Wilensky's explanation of the goal of the CCSO's inmate disciplinary system is, and in my opinion should be, the stated goal of every correctional institution's disciplinary system.

Plaintiffs' expert also criticizes Mr. Wilensky's qualifications claiming that he "could not answer what evidentiary weight a disciplinary report should be given, saying that it was 'situational' and that the incident report had to contain enough details for him to be 'comfortable' before rendering a guilty finding" and references pages 62 and 63 of Mr. Wilensky's deposition.[47]  I have reviewed those pages of Mr. Wilensky's deposition transcript and they do not support Plaintiffs' expert's criticism and appear to take Mr. Wilensky's testimony out of context.  In response to the question of whether there is any instruction about when a hearing officer should reach out to a complainant, Mr. Wilensky responded as follows:

> No.  It's situational.  We usually as a unit talk about it.  You know, I'll either talk about it with my colleagues that I'm struggling with one, and I let them know I'm reaching out.  And similarly, if they are struggling with making a finding, what they feel is a comfortable finding, I will instruct them in all cases in that situation to reach out to a complainant.[48]

In my opinion, it is reasonable for a hearing officer to contact a complainant on a case-by-case basis, and nothing in the question or Mr. Wilensky's response have anything to do with the evidentiary weight a disciplinary report should be given.

In my opinion, to not scrutinize a corrections officer's report and simply presume the report to be true, is akin to a presumption that the inmate is guilty and that the inmate has the burden of rebutting the presumption.  In other words, the inmate would be considered guilty unless the inmate was able to prove his/her innocence.  In my opinion, such an approach would be violative of due process.  CCSO hearing officers are trained that a corrections officer's report should be given a great deal of weight as there are consequences to the corrections officer if he/she wrote a false report.[49]  However, there have been incidents where corrections officers falsify reports. The Texas Department of Criminal Justice, the state prison system, is currently investigating several incidents where corrections officer wrote bogus reports to retaliate against certain inmates and harass them.  In my experience of overseeing investigations of in jail systems, I have encountered incidents where corrections officers and deputies were not truthful or completely truthful in incident reports and falsely charged inmates with misconduct.

Plaintiffs' expert also suggests that the CCSO's inmate disciplinary system is flawed because the

---

[46] Wilensky Dep. 114 (emphasis added).
[47] Woodford ¶ 68.
[48] Wilensky Dep. 63.
[49] Burke Dep. 40-41.

hearings are short, rarely exceeding five minutes and many last under one minute.[50] Plaintiffs'
expert questions "how a properly trained hearing officer can adjudicate a serious incident, assess
an appropriate sanction in line with progressive discipline, counsel the inmate and appropriately
document the findings of the hearing within one to five minutes."[51] Plaintiffs' expert, however,
has taken Mr. Wilensky's testimony out of context. At his deposition, Mr. Wilensky was asked
"how long does a typical hearing take?"[52] In response to that question, Mr. Wilensky testified
that the hearing itself (as opposed to the entire disciplinary hearing process) could take only a few
minutes.[53] Mr. Wilensky further testified, however, that *after* the hearing, the hearing officer will
prepare the facts and findings form and that there are situations where the hearing officer has to
"go back to the office, look at video, look at background of the inmate, interview witnesses" and
input the facts and findings into CCOMS.[54] Mr. Wilensky was never asked how long the entire
disciplinary hearing process takes, and it is misleading and disingenuous for Plaintiffs' expert to
suggest that the entire disciplinary process, including pre-hearing preparation time and post-
hearing analysis time, only takes a few minutes. Based on my experience, it is not uncommon for
the actual disciplinary hearing to only last a few minutes. In the vast majority of cases, the facts
and evidence are clear and/or the inmate admits to the allegations. Additionally, in my
experience, it is not unreasonable for a hearing officer to hold the hearing portion of the
disciplinary process at a rate of 30-35 hearings in a day. In any event, I am not aware of any
evidence suggesting that a longer disciplinary hearing would result in an increase in guilty findings
or a decrease in incidents of misconduct.

Plaintiffs' expert also contends that the number of hearings an officer is expected to perform has
"undoubtedly contributed to the number of incidents of masturbation and indecent exposure that
are not adjudicated within time limitations."[55] Plaintiffs' expert did not cite to any evidence in
support of her opinion, and I am not aware of any evidence suggesting that disciplinary tickets
expired because hearing officers did not have sufficient time to conduct the hearings. In fact, Mr.
Wilensky testified that disciplinary tickets expired because the tickets were not being made
available to his unit, rather than the hearing officers not having sufficient time to conduct the
hearings.[56] Additionally, it is my understanding that since Mr. Wilensky became the Director of
Inmate Discipline, that the adjudication rate of inmate disciplinary tickets has increased, and
correspondingly, the number of expired tickets has drastically reduced.[57]

In sum, Plaintiffs' expert's criticism of Mr. Wilensky and the CCSO's current inmate disciplinary
system is simply not supported by the statistical evidence I have reviewed. The Illinois
Administrative Code is very restrictive in that it requires dismissal of an inmate disciplinary charge
if it is not heard in eight days. At the CCSO, this is referred to as an expired ticket. There was
a period of time the CCSO was not timely hearing disciplinary charges and the adjudication rate
for indecent exposure-related reported incidents was around 72%.[58] While some charges for

---

[50] Woodford ¶ 63.
[51] *Id*.
[52] Wilensky Dep. 108.
[53] *Id*.
[54] *Id*. at 109.
[55] Woodford ¶ 63.
[56] Wilensky Dep. 43-44.
[57] Benjamin S. Wilner Report, Figure 8.
[58] *Id.*.

sexual misconduct were dismissed and not adjudicated as part of the larger group, they were not dismissed at a rate that was statistically significant than other charges.[59]   Due to the efforts of Mr. Wilensky and the other hearing officers, the adjudication rate of disciplinary charges has steadily increased.   Prior to September 2016, the adjudication rate for indecent-exposure related reported incidents was 72%.   After September 2016, the adjudication rate increased to 83%, with the adjudication at 91% between September 2017 and September 2018.%.[60]   In my opinion, the hiring of Mr. Wilensky, in combination with several other remedial measures addressed throughout this report, led to this decrease in expiration of tickets and increase in adjudication rate.

It is my understanding that Plaintiffs are also contending that the guilty rate for incidents of indecent exposure and masturbation is too low.   In my opinion, it would be improper to set a goal of a certain percentage rate for convictions in disciplinary hearings.   To do so would indicate that convictions were more important than due process and fairness.   While it is not uncommon to see a conviction rate in excess of 80% in inmate disciplinary hearings, in my opinion, once the conviction rate exceeds 95%, the process may become suspect.   From January 2015 through September 2018, the guilty rate for incidents of indecent exposure and masturbation that were adjudicated was approximately 89%.   It is also my understanding that during this same time period, the guilty rate for other 300-level offenses that were adjudicated was 84%.[61]   In my opinion and based on my experience and correctional knowledge, these guilty rates are consistent with the overall guilty rates I have observed in other correctional institutions that have an effective and unbiased disciplinary process.

**The CCSO Imposes Appropriate Sanctions on Inmates who Engage in Masturbation and Indecent Exposure**

Plaintiffs' expert Jeanne Woodford (Plaintiffs' Expert) acknowledges that the sanctions that are available are appropriate.[62]   However, she is critical of what she perceives as the failure to involve correctional staff in selecting the "right sanction."[63]   The sanctions were promulgated by CCSO administrators as required under Illinois law.[64]

In my opinion and based on my experience, the decisions as to the sanctions available and the appropriate sanction for an individual case are best left to the jail administration and the hearing officer.   If correctional staff are involved in selecting sanctions, I would have concerns that they would be too punitive; particularly in regard to misconduct to which they have been subjected. Some of the sanctions for sexual misconduct suggested by the Plaintiffs, such as "haul off and slap them" in the face or a stay in segregated housing for anywhere between three months to one year without visits and commissary and phone restrictions, certainly fall into this category.[65]   In my opinion, these suggested sanctions would be found by a court to be so punitive as not to serve a legitimate penological purpose.

---

[59] *Id.*
[60] *Id.*
[61] Benjamin S. Wilner Report, Figure 9.
[62] Woodford ¶ 70.
[63] *Id.* at ¶ 71.
[64] 20 Ill. Adm. Code 701.160.
[65] Howard Dep. 269; Altman Dep. 227-228.

While hearing officers attempt to impose appropriate sanctions that will deter an inmate from participating in future misconduct, it is naïve to believe that sanctions can be individualized in all cases. For instance, it is not accurate to say that the loss of visitation for an inmate who receives visitors infrequently is deterred less than the inmate who receives visitors frequently. Loss of visitation is a deterrent for both groups of inmates. In my opinion and based on my experience, what is more important is consistency in punishment.

As discussed above, one form of punishment administered by the disciplinary process for inmates who engage in sexual misconduct is placement of the inmate in disciplinary segregation or, as it is called at the CCDOC, SMU, for a period of time. Sexual misconduct, however, is not the only type of misconduct which occurs at the CCDOC and for which disciplinary segregation is an appropriate sanction. Similar to other county jails, the CCDOC has limited space in which to house inmates under disciplinary segregation conditions. It is considered to be good correctional practice to allow inmates the opportunity to reduce their time in disciplinary segregation based on good behavior while in disciplinary segregation. By allowing time off for good behavior, it allows inmates who continue to participate in misconduct to be kept longer in disciplinary segregation assuming space allows. While I am aware of testimony suggesting that inmates adjudicated guilty of sexual misconduct were released from disciplinary segregation early, I am not aware of any evidence suggesting that inmates found guilty of sexual misconduct were given preferential treatment over inmates found guilty of other offenses which resulted in disciplinary segregation time.

Administration segregation is the practice of placing inmates in very restrictive housing once they have completed their time in disciplinary segregation. Inmates are allowed out of their cells for a short period of time each day (usually one to two hours) and are typically restrained with handcuffs and shackles when out of their cells. Due to the nature of the restrictions, inmates in administrative segregation are seldom provided with programming. There has been a movement away from housing inmates in administrative segregation for lengthy periods of time as it has not been found to correct behavior and has been found to be detrimental to inmates' mental health. Instead of using administrative segregation, the CCSO utilizes the SMU. In my opinion, the SMU meets the goal of keeping particularly violent and dangerous inmates separate from the general population and providing enhanced security measures, while providing counseling and programming aimed at changing the inmates' disruptive behavior and reintegrating them into general population. In my experience, under the SMU concept, out of cell time is increased, but the increased out of cell time is structured and inmates participate in programming aimed at correcting their behavior, deterring future misconduct, and successfully reintegrating inmates into the general population. This approach, in my opinion and based on my experience, has been shown to be much more effective in deterring all types of inmate misconduct than using time during a disciplinary hearing to talk to and counsel inmates, as suggested by Plaintiffs' Expert. The use of special management units is considered to be one of the best correctional practices for dealing with problematic inmates. As a result, in January 2016, CCSO proposed legislation that would have increased penalties for a second conviction of public indecency in a custodial environment to a felony and included loss of custody credit (good time) and having to register as a sex offender.[66]

---

[66] Curry Decl. ¶ 29.

There has been a suggestion that discipline should be administered on the spot. CCSO Sheriff's order 11.2.1.0 allows for a corrections officer to take immediate action to protect themselves from an inmate's misconduct. This includes the use of chemical spray if necessary, to stop the behavior.[67] At least some of the Plaintiffs have chosen not to become certified in the use of chemical spray.[68] However, neither policy nor the United States Constitution allows for corporal punishment, such as "hauling off" and slapping an inmate in the face, as suggested by one of the Plaintiffs.[69] As mentioned above, due process is required for inmate discipline. Another danger of on-the-spot discipline is that it may be arbitrary as to which inmates are punished, which offenses are punished, and what type of discipline is meted out. Undoubtedly, on-the-spot discipline would result in inconsistent disciplinary sanctions and, which Plaintiffs' expert acknowledges is undesirable.[70] Disciplining all inmates in the housing unit for the behavior of a few or one is violative of due process. While some may argue it would promote positive peer pressure, in my experience, it is more likely to result in physical retaliation against the offending inmate. Such a result would expose the CCSO to failure to protect and excessive force claims as the CCSO cannot allow an inmate to act as its proxy in inflicting corporal punishment.

With respect to repeat offenders of sexual misconduct, it is my opinion that the CCSO has imposed reasonable and appropriate sanctions consistent with accepted penological purposes. As an initial matter, the range of available sanctions is limited in a jail setting. The sanctions available to the CCSO are consistent with the sanctions used by other correctional institutions. Additionally, in my opinion and based on my experience and correctional knowledge, it is not uncommon in jail settings to see misconduct, regardless of the type, carried out repeatedly by the same offenders, regardless of the type of sanctions imposed. It is my understanding that the majority of the inmates who engage in sexual misconduct are housed in maximum security Divisions 9 and 10 of the jail, and have been charged with Class X felonies (6-30 years in prison) and for intentional murder (life imprisonment or 100 years). In my experience, because these inmates are potentially facing long prison sentences, they are not deterred by otherwise effective disciplinary measures such as criminal public indecency charges (which, on the third conviction, can be charged as a Class 4 felony and punishable by one to three years in prison), and loss of good time credit. The CCSO has taken reasonable steps to enhance the sanctions available for repeated offenders. For instance, in May 2017, the CCSO revised its inmate disciplinary code and enhanced the sanction for indecent exposure and sexual harassment from Level 2 offenses (which carries a punishment of 5 to 15 days in SMU) to Level 3 offenses (which carries a punishment of 5 to 25 days in SMU). Additionally, upon conviction of three Level 3 misconduct offenses, an inmate may be sanction at a Level 4 offense. Mr. Wilensky also testified that since he began as Director of Inmate Discipline, the practice is for hearing officers to issue the "higher or the highest" SMU sanction available for inmates found guilty of indecent exposure or masturbation.[71] Unfortunately, in my experience, increasing and altering the sanctions does not necessarily result in decreasing the offensive conduct. Nonetheless, the CCSO has taken reasonable measures to try to do so.

**Additional Prompt and Adequate Steps Taken by the CCSO to Deter Sexual Misconduct and**

---

[67] Sheriff's Order 11.2.4.0.
[68] Hobbs Dep. 61-62.
[69] Howard Dep. 269.
[70] Woodford ¶¶ 73-74.
[71] Wilensky Dep., 166-167.

### A. The CCSO Enforces the Inmate Dress Code.

In August 2016, the CCSO designed a specialized restrictive inmate uniform by modifying a regular inmate jumpsuit by removing the buttons and sewing the uniform up further so that the inmate does not have as easy access to his genitals.[72] The uniforms are green in color which makes them easy to spot. At the time of the designing of the uniform, the only exposure prevention uniforms on the market were uniforms which closed in the back and had closures (including padlocks) which required staff assistance to put on and take off the uniform. While a uniform with the closure may serve a purpose, it also places staff at risk in that they have to be involved in the putting on and removal of the uniform. The modification route by the CCSO was a reasonable decision.

The inmates do not like wearing the exposure prevention uniforms. Some of the inmates have torn them and have gone so far as to burn them in the microwave. Inmates who tear or destroy the uniforms are subject to inmate disciplinary action. Staff are required to ensure that inmates who have been convicted of exposure or masturbation are wearing their green uniforms when they come out of their cells.

I understand that Plaintiffs allege that the CCSO does not adequately enforce the inmate dress code, and that inmates wear exposure-control jumpsuits or standard jail uniforms loosely or improperly, leading to incidents of exposure and masturbation. The documents I have reviewed demonstrate that the CCSO, in fact, does enforce the dress code and disciplines officers who fail to ensure that inmates are properly clothed.[73] During the tour of the Jail, it was noted that an inmate who should have been wearing a green uniform was not. I observed the supervisor order the correctional officer to immediately correct the improper uniform, and the staff member was subsequently disciplined for his failure to enforce the inmate dress code.[74]

I did observe on the Jail tour some inmates in loosely fitting clothing in certain tiers. As enforcement of the dress code rests in the hands of the deputies and sergeants on each tier, medical area of the jail or, in the case of Leighton, each area of the courthouse, it is not entirely surprising that enforcement may vary from area to area.

### B. The CCSO's Facility Design Complies with Industry Standards.

Alterations have been made to the facility itself in an effort to curb inmate sexual harassment. For instance, plastic covers have been placed over the open slots in the doors to eliminate the ability for inmate to throw bodily fluids or expose their genitals through the slots and window tints have been installed in Division 9 and 10.

I understand that Plaintiffs complain that certain office and medical areas in the CCDOC lack a "panic button" or alarm system that non-uniform staff may use to summon assistance if an inmate

---

[72] Curry Decl. ¶¶ 11-15.
[73] CCSO_Howard_0320552-320567
[74] CCSO_Howard_0320567.

engages in misconduct.[75]   While some jails or prisons have such systems in office areas, not all do, and I do not consider such a system to be an industry standard.   It is not unusual or inappropriate for a correctional institution to rely on uniform staff with radios to alert other personnel to an emergency.   Of particular relevance here, Plaintiffs' Expert does not allege that any particular incident of inmate exposure or masturbation would have been prevented by such a system, and I am not aware of any such incident.   Plaintiffs' Expert does describe two specific situations where an alarm would allegedly have been desirable, but in one situation a corrections officer departed from protocol by leaving non-sworn staff unattended (and was disciplined as a result),[76] and the other involved a uniformed corrections officer who would have been equipped with a radio.[77]

I also understand that Plaintiffs' expert takes issue with the CCSO's lack of modesty panels or shields in certain locations.[78]   It is correct that optimal corrections practice in shower and toilet areas is to provide panels that provide privacy while allowing corrections officers to view inmates from the neck up and knees down, and that certain areas of the CCDOC lack such panels (while other areas do have them).   My understanding is that the CCSO is open to installing such panels where appropriate.   More importantly, I am not aware of any evidence that the lack of such panels in certain areas necessarily leads to increased incidents of indecent exposure or masturbation. While Plaintiffs' Expert attacks the CCSO for non-compliance with the Prison Rape Elimination Act (PREA), it is important to understand that, while PREA requires policies and procedures that allow inmates to shower, perform bodily functions, and change clothing without corrections officers of the opposite gender viewing their buttocks, breasts, and genitalia, it does not require any particular modesty measures. Moreover, again, there is no evidence that the CCSO's non-compliance with PREA has led to increased incidents of indecent exposure or masturbation.

Plaintiffs' expert also criticizes the CCSO for failing to install glazing on windows in certain areas of the CCDOC that would restrict inmates' view.   As Plaintiffs acknowledge, however, window tints have been installed in Division 9 and 10 – where indecent exposure and masturbation occur more frequently than elsewhere – and the installation has succeeded in reducing such incidents.[79] Additionally, on certain tiers, the CCSO has covered the portions of visitation / interview windows which cover inmates' torso area with paper to reduce visibility.[80]   This demonstrates to me that the CCSO is exploring reasonable measure to combat the behavior at issue.   As Plaintiffs' expert recognizes, the CCSO is dependent on the County's glazier's schedule to implement this solution.[81]   In my experience, it is not industry standard to have one-way glass installed in all areas of a correctional facility. Furthermore, as the CCSO's experience evidences, there are challenges associated with these efforts as the inmates peel off the coating and there is a security risk by limiting visibility into the official visitors' room, dayrooms, or cells. Additionally, inmates are often double celled and one of the inmates is likely to not be a person who has been convicted of sexual misconduct who is then subjected to restriction of his freedom to see outside of the small confine of his cell. However, the CCSO is still exploring options on window coverings.

---

[75] Woodford ¶ 94.
[76] CCSO_Howard_0260916.
[77] Declaration of Rita McCoy.
[78] Woodford ¶ 99.
[79] Woodford ¶ 101; Curry Dep. 231 – 232.
[80] Curry Dep. 232.
[81] *Id.*

Plaintiffs' expert also opines that the CCSO should have installed locking food ports, or "chuckholes," throughout the Jail to prevent inmates from exposing themselves through the ports.[82] As Plaintiffs acknowledge, the CCSO requested that County Facilities management install locking mechanisms on cell chuckholes, and Facilities Management, over which the CCSO has no control, has begun and perhaps finished installing such mechanisms in Division 9.[83] I observed on our tour of CCDOC that chuckholes in the SMU were locked. In addition, the CCSO built and implemented a special food cart device that protects officers from masturbation, exposure and projectiles while delivering food.[84] Again, these efforts demonstrate to me that the CCSO is taking reasonable steps to prevent the conduct. It is not industry standard, in my experience, for a correctional facility to have locking food ports installed throughout the facility. Installation in particularly problematic areas as necessary is a reasonable measure to prevent exposure and masturbation.

## C.    Various Other CCSO Measures to Combat Inmate Sexual Harassment.

As discussed above, the CCSO has long had in place a disciplinary and a classification process intended to deter inmate misconduct and control inmate behavior. Part of this were rules prohibiting inmates from sexually harassing staff, disrespecting staff, exhibitionism, masturbation, throwing bodily fluids on staff, and assaulting staff. The increase in sexual misconduct by inmates began in 2014 when a loose-knit group of inmates began using assaults on staff in various forms and self-mutilation as ways to disrupt the CCDOC system. In 2015, the loose-knit group formalized giving itself the nomenclature of Savage Life. To gain membership in the Savage Life gang, an inmate was required to assault a staff member. This assault could be by physical violence against the staff member, throwing urine and feces on the staff member, or masturbating in the presence of a staff member. In my experience with dealing with inmate groups or gangs who use misconduct to disrupt the correctional institution, the bolder and more harmful the conduct, the more the inmate is rewarded with recognition. While the CCSO had always had rules in place prohibiting these types of inmate misconduct, once Savage Life formed, the CCSO immediately began to address the unique challenges Savage Life posed.

In October 2015, in addition to inmates being informed that sexual misconduct violated the inmate disciplinary code by way of the inmate handbook and orientation video, the CCSO held town hall meetings with inmates who engaged in exhibitionism and masturbation. Public defenders were also involved, and it was explained to inmates that there were increased penalties for multiple convictions for public indecency and that inmates would be required to register as a sex offender.[85]

The CCSO also altered its handcuffing procedures for inmates being transported to Leighton in March 2017. Inmates who had been found administratively guilty of engaging in sexual misconduct in the courthouse were required to remain handcuffed in the basement lockup until their case was called instead of being unhandcuffed in the lockup adjacent to the courtrooms. The inmates subject to remaining handcuffed in the basement lockup was expanded in October 2017

---

[82] Woodford ¶ 102.
[83] *Id.*
[84] Curry Dep. 311 – 312.
[85] Curry Decl. ¶ 36.

to all inmates who had committed sexual misconduct regardless of where the incident took place.[86]

Also, in October 2017, the CCSO altered the handcuffing procedures for all inmates who had not engaged in sexual misconduct. Those inmates are handcuffed behind their backs for transport to and from the courthouse. As part of the procedure, inmates are also warned that if any inmate engages in sexual misconduct that all of them will be handcuffed behind their backs for the remainder of the day at the courthouse. The CCSO had previously, in January 2016, handcuffed all inmates while in the courthouse lockups, but discontinued the practice due to opposition from some of the judges and the CCPD.[87]

As in other divisions, inmates in Division 9 and 10 are not normally handcuffed when they are in the dayroom of their living areas. Such an across the board protocol would violate Illinois jail standards and the constitutional provision that the use of restraints needs to serve a legitimate penological purpose. A different approach is taken for the four tiers in Division 9 designated as SMU. SMU inmates are required to wear a waist belt connected to their handcuffs which restricts the use of their hands when moving about the dayroom.[88]

In February 2017, to increase the amount of monitoring by deputies in the courthouse, the CCSO placed an additional 5 deputies on floors 4 through 7. This allowed an additional deputy to be added to each of the floors. When budget cuts in August 2017 required the discontinuation of the practice of assigning additional deputies, the CCSO assigned management staff who are not subject to overtime pay requirements to provide additional monitoring.[89]

Efforts are also made to track inmates who have committed sexual misconduct. An alert is placed in CCOMS to track the inmates and ensure, in part, that they are clothed in the green exposure prevention uniforms and held in the basement lockup when taken to court. This also provides notice to any CCSO employee who views the inmate's CCOMS profile that they are dealing with a inmate who has committed a public indecency offense. There is also an alert on the inmate's identification card and it is a noticeable pink color. [90]

In 2016, the CCSO increased internal assessments of problematic issues and inmates, including inmate sexual misconduct.[91] As part of the assessments, the CCSO implemented many of the processed outlined above. [92] Such measures were the steps that a reasonable correctional administrator would take to deter inmate misconduct, including inmate sexual misconduct. When trying different processes to deter inmate misconduct, it is not unusual for some of them to be unsuccessful or less successful than hoped. Additionally, it takes a while to influence the inmate population as a whole. That is especially true when inmates are motivated to participate in misconduct, such as sexual misconduct, due to the status it gains them in an inmate group or gang such as Savage Life.

---

[86] *Id.* at ¶¶ 17-18; Curry Dep. 137-138.
[87] *Id.* at ¶¶ 17-19; Curry Dep. 137-138.
[88] Curry Decl. ¶ 21.
[89] Curry Decl. ¶ 26; Curry Dep. 140– 141.
[90] Curry Decl. ¶¶ 31, 33.
[91] Curry Decl. ¶ 35.
[92] *See generally* Curry Decl.

In addition to the wide variety of reasonable remedial measures discussed throughout this report, in an effort to combat incidents of inmate sexual harassment, the CCSO has also undertaken the measures summarized in the chart attached as Exhibit D.

Based on my knowledge and experience, the CCSO's efforts to combat inmate sexual harassment which are noted in the attached chart and throughout my report exceed corrections industry standards and display that the CCSO has acted as any reasonable corrections administrator would.

Plaintiffs' Expert suggests that the CCSO has not monitored the effectiveness of the sanctions it has implemented to thwart incidents of inmate sexual harassment. Yet the aforementioned list of measures, which the CCSO implemented at various times throughout the last several years, as well as the other remedial measures that the CCSO has undertaken to address incidents of inmate sexual harassment mentioned throughout the rest of my report, undisputedly display that the CCSO is not only monitoring the measures that it undertakes to combat inmate misconduct, including sexual harassment, but also discontinued measures it found to be ineffective and actively advanced (and continues to advance) new measures to combat this evolving problem. In particular, the CCSO's Business Intelligence Unit and monthly panel reviews, amongst other mentioned measures, are specifically designed to monitor incident trends, and correspondingly, the effectiveness of measures that the CCSO is using to combat specific types of misconduct, including incidents of inmate sexual harassment.[93]

Moreover, analysis of the sexual misconduct incidents indicates that sexual misconduct peaked in December 2016 and has been declining from January 2017 to present.[94] The reduction appears to be the result of the culmination of the steps taken by the CCSO to deter sexual misconduct. Indeed, the efforts by the CCSO were recognized by the federal court monitor in her May 2016 report, and even one of the Plaintiffs has testified that she has not witnessed any sexual misconduct incidents in the past year.[95]

**Touring the CCSO Facilitates Confirmed that the CCSO has Acted as Reasonable Corrections Administrators.**

I participated in a tour of CCDOC facilities along with numerous attorneys, Plaintiffs, three Plaintiffs' experts, a photographer employed by the Plaintiffs, and CCSO officials. Over the years, I have participated in over 50 inspection tours of jails and prisons, and walked through jails and prisons as a corrections officer, court monitor, and expert literally thousands of times. It is highly unusual to have a large group of females touring a correctional facility; much less touring male facilities. It is also unusual to have Plaintiffs known to the inmates accompany the tour. Naturally, the inmates were curious about what was going on and the presence of female corrections officers known to the inmates as part of the group even made it more unusual. The atmosphere created was almost circus like. There were numerous times when Plaintiffs and/or the Plaintiffs' attorneys or experts would point towards inmates or groups of inmates and then whisper to each other. It resulted in the inmates becoming agitated at times. While inmates are used to others coming in to their living areas on occasion, they do not like it when they feel like they are

---

[93] Curry Decl. ¶ 35.
[94] Benjamin S. Wilner Report, Figure 1.
[95] Ranney Dep. 209.

being observed like caged animals who the visitors are waiting to see behave badly. At one of the units, the photographer seemed to be egging an inmate on to do something inappropriate. When I mentioned that I felt he should stop, the response led me to believe that he hoped the inmate would do something inappropriate that he could document on film.

During the tour, I heard very few inappropriate comments by the inmates. I also did not witness inmates "leering" at the tour. The behavior I witnessed and the comments I heard were what I commonly see and hear when touring jails and prisons across the country; especially when unknown females are introduced unannounced in the jail. Most of the questions were along the line of asking what all of the commotion was about. When I heard a comment down by the basement lockup that I felt was inappropriate along the line of "fine looking ladies", I spoke to the inmate and told him his remarks were inappropriate. The inmate backed up and did not make further comments. This was indicative of him knowing the remark was inappropriate and that there would be consequences for future behavior. Any assertion by Plaintiffs' experts that this is the worst atmosphere of sexual harassment they have ever experienced makes me question how much experience they have in large urban jails. I have personally experienced and am aware of situations where male corrections officers incite the inmates and even provide opportunities for inmates to masturbate towards female staff. What I saw at CCDOC was an atmosphere where male corrections officers and supervisors were supportive and even protective of their female counterparts.

During the tour, while I saw female staff wearing sweaters and coats, I also saw male staff members with sweaters and coats. It was a very cold day and the temperature varied throughout the building. There were inmates who I saw during the tour that were not conforming with the inmate dress code. The level of conformance with the dress code varied from tier to tier and division to division. The area in which I noticed the highest level of compliance was the SMU which would be expected as adherence to the rules of the institution received additional attention in the SMU as it is part of transforming the inmate's behavior. In my experience, it is not unusual for some inmates to not comply with the dress code. In fact, if all of the inmates on all tiers and in all divisions had been in compliance with the dress code, I would have been suspicious that the CCSO had staged the atmosphere for the benefit of the tour.

**OPINIONS:**

1. The CCSO's actions in responding to incidents of inmate sexual harassment were prompt, reasonable and appropriate.
2. Plaintiffs were not discouraged from filing inmate disciplinary reports and criminal complaints against inmates who engaged in sexual misconduct. In fact, they were encouraged to do so. If any of the Plaintiffs did not file inmate disciplinary reports, they violated the policies of the Cook County Sheriff's Office and potentially led inmates to believe that they could participate in sexual misconduct with impunity.
3. A reasonable corrections administrator, when deciding what measures to take to respond to sexual misconduct by inmates, could have made the same decisions as the corrections administrators of the Cook County Sheriff's Office.
4. Cook County Sheriff's Office and Cook County did not show deliberate indifference to the rights of the Plaintiffs. In fact, quite the opposite is true. The officials of the Cook

County Sheriff's Office and Cook County expended, and continue to expend, resources in the form of time, money, and effort to deter inmates from committing sexual misconduct.

In conclusion, it is my professional opinion that the actions taken by Cook County Sheriff's Office and Cook County were those that a reasonable corrections administrator could and would have taken under the same or similar circumstances.

Additionally, I reserve the right to modify my opinions should additional facts be forthcoming that justify such modifications.

Sincerely,

Margo L. Frasier, J.D.

# MARGO FRASIER
## 3300 PLOVER RAIN WAY
## PFLUGERVILLE, TEXAS
### 512-565-0464

---

### RANGE OF EXPERIENCE

---

Margo Frasier has over 40 years of experience in the criminal justice field. Ms. Frasier is a criminal justice consultant and provides litigation support.  Ms. Frasier serves as a subject matter expert in law enforcement and corrections for the Special Litigation Section of the United States Department of Justice. In addition, she serves as the Lead Monitor overseeing implementation of the provisions of the Consent Judgment for the jail system in Orleans Parish, Louisiana.  She also oversees the provisions related to corrections operations and administration of the Consent Judgment for the jail system in Bernalillo County, New Mexico.

Ms. Frasier served as the elected sheriff of Travis County, Texas from 1997 through 2004; the first woman to hold the office where she started as deputy more than two decades earlier. As sheriff, she oversaw 1,350 deputies and other employees with a budget of more than $90 million.  She earned praise for her leadership in improving the jail system and the implementation of community policing. Since leaving office, Ms. Frasier worked as an assistant professor in the College of Criminal Justice at Sam Houston State University in Huntsville, Texas, a Senior Associate for MGT of America, Inc., and as the Police Monitor for the City of Austin. Over the years, as a consultant and an attorney, she has provided expert testimony in matters involving criminal justice including civil rights, employment law, law enforcement practices, and corrections practices.

Ms. Frasier is on the board of the National Association of Civilian Oversight of Law Enforcement (NACOLE) where she serves as Vice-President.  Ms. Frasier served as treasurer, vice-president, and president of the Major County Sheriffs' Association. She also served on the boards of the National Sheriff's Association, National Center for Women and Policing, Texas Institute for Public Problem Solving, and the Children's Advocacy Center of Central Texas. In addition, she was recognized twice by the Combined Law Enforcement Association of Texas as Administrator of the Year. She also received a Lifetime Achievement Award from the National Center on Women in Policing.

## PROFESSIONAL AND BUSINESS HISTORY

Margo L. Frasier, J.D., Consultant, January 1997 – Present.

City of Austin, Police Monitor, January 2011—January 2017.

MGT of America, Inc., Senior Associate, July 2008 – January 2011.

Sam Houston State University, Assistant Professor, January 2005 – July 2008.

Travis County Sheriff's Office, Sheriff, January 1997 – December 2004.

St. Edward's University, Assistant Professor (Part-time), January 1997 – December 2004.

Bickerstaff, Heath, LLP, Partner, January 1991 – December 1996.

Brown Maroney (Now Brown McCarroll), Associate, January 1985 – December 1991.

| |
|---|
| **YEARS OF EXPERIENCE:** 40+ in criminal justice |
| **EDUCATION:** |
| Bachelor of Science in Criminology & Corrections, Graduated with Honors, Sam Houston State University, 1974 |
| Juris Doctor, Graduated with High Honors, Florida State University College of Law Tallahassee, Florida, 1984 |

U.S. District Court , Tallahassee, Florida, Law Clerk (Intern), September 1984 – December 1984.

Florida Senate Committee on Criminal Justice,  Legislative Analyst, August 1983 – July 1984.

Travis County Sheriff's Office , Austin, Texas, Captain, October 1975 – August 1982.

Austin Community College , Austin, Texas, Instructor, September 1980 – May 1982.

Texas Department of Corrections, Huntsville, Texas, Corrections Officer, May 1974 – May 1975.

## PROFESSIONAL AND BUSINESS EXPERIENCE

Consultant in litigation matters involving law enforcement and corrections related to civil rights, employment law, law enforcement practices, and corrections practices.

Subject matter expert for the Special Litigation Section of the United States Department of Justice.

Court appointed lead monitor of the Consent Judgment pertaining to the jail system in Orleans Parish, Louisiana.

Court appointed monitor of the corrections practice and administration provisions for the Consent Judgment pertaining to the jail system in Bernalillo County, New Mexico.

Police Monitor for the City of Austin which assesses citizen complaints, monitors internal affairs investigations, and monitors and makes recommendations on policies, procedures, and discipline.

Consultant at MGT of America, Inc., in criminal justice regarding law enforcement agencies and correctional facilities.

Assistant Professor in the College of Criminal Justice at Sam Houston State University. Undergraduate courses taught include Fundamentals of Criminal Law, Legal Aspects of Corrections,

Professionalism and Ethics, and Criminal Investigation. Graduate courses taught include Seminar in Organization and Administration and Legal Aspects of Criminal Justice Management.

Sheriff of Travis County, Texas. Assumed office as the first female sheriff in Travis County history in January 1997. Served as the Chief Law Enforcement Officer and Chief Corrections Officer of Travis County. The Travis County Sheriff's Office is an agency of over 1,350 employees with a 2004 budget of over $90 million. It is a full-service sheriff's office which patrols over 700 square miles and operates a jail system which houses over 2,400 inmates.

Assistant Professor in the College of Behavioral Sciences at St. Edward's University on a part-time basis. Courses taught included American Policing and Corrections.

Partner at the law firm of Bickerstaff, Heath LLP. Primary practice involved the representation of local government clients, including school districts, police departments, and sheriff's offices in civil rights and employment law matters.

Associate at the law firm of Brown Maroney (Now Husch Blackwell). Primary practice was general litigation with an emphasis in litigation involving representation of local government clients, including school districts, police departments, and sheriff's offices in civil rights and employment law matters.

Interned as a law clerk for U.S. District Judge Maurice Paul.

Interned as a legislative analyst for the Florida Senate Committee on Criminal Justice. Drafted and analyzed legislation in the area of criminal justice.

Served as Captain for the Travis County Sheriff's Office, Texas. Progressed through the ranks from deputy sheriff/corrections officer to captain with five years of service as captain. Main duties included management of jail system and coordination with Commissioners' Court.

Adjunct Instructor at Austin Community College. Adjunct Instructor in criminal justice on a part-time basis. Classes taught included Introduction to Criminal Justice and Corrections.

Corrections officer for the Texas Department of Corrections. Duties included maintenance of security and supervision of inmates in a maximum-security prison.

## AWARDS

Lifetime Achievement Award, National Center on Women in Policing, 2003

Community Service Award, NAACP, Austin Chapter, 1999 and 2000

Recognition for Being Outstanding Role Model, Austin Area Urban League, 2000

Breaking the Glass Ceiling Award, National Center on Women in Policing, 1999

Administrator of the Year, Combined Law Enforcement Association of Texas, 1998

Bridge Builder of the 21st Century, National Women of Achievement, Inc., 1997

Administrator of the Year, Combined Law Enforcement Association of Texas, 1997

Correctional Officer of the Year, National Jail Association, 1981

**PROFESSIONAL ACCOMPLISHMENTS**

National Association of Civilian Oversight of Law Enforcement (NACOLE) (Board member 2016-Present; Vice-President 2017-Present; Treasurer 2016-2017)

Major County Sheriffs' Association (President, 2004; Vice-President, 2002-2003; Treasurer, 1998-2001)

National Sheriff's Association (Board of Directors, 2002-2004)

SafePlace Foundation, Board of Trustees (1997-2004)

Big Brothers/Big Sisters of Central Texas, Board Member (2000-2004)

Children's Advocacy Center of Central Texas, Advisory Board Member (1997-2004)

National Center for Women and Policing, Board Member (1998-2008)

Texas Institute for Public Problem Solving, Executive Board Member (1998-2004)

**PUBLICATIONS**

Frasier, Margo L., The Use of Conducted Energy Devices (Tasers), *Telemasp Bulletin,* Texas Law Enforcement Management and Administrative Statistics Program, (2005) Vol. 12, No. 6, pp. 1-11.

Frasier, Margo L., Search and Seizure, *Suing and Defending Governmental Entities Seminar 2005,* Texas Bar CLE, Vol. 17, Chapter 12, pp. 1-8.

Frasier, Margo L., Use of Force Training, *Suing and Defending Governmental Entities Seminar 2010,* Texas Bar CLE, Vol. 22, Chapter 9, pp. 1-22.

Frasier, Margo L., Law Enforcement Update: What the Courts and the Legislature Have Been Up to in 2010-2011, *Suing and Defending Governmental Entities Seminar 2011,* Texas Bar CLE, Vol. 23, Chapter 17, pp. 1-4.

Frasier, Margo L., Hot Topics in Jail Administration, *Advanced Government Law 2015,* Texas Bar CLE, Vol. 27

**CONFERENCE PRESENTATIONS**

New County Judges and Commissioners School, LBJ School of Public Affairs, University of Texas at Austin, Austin, Texas, January 2005. Presentation on Jail and Law Enforcement Liability

American Jail Association, Annual Conference, Kansas City, Kansas, May 2005. Presentation of paper entitled: Legal Consequences of Prison Rape

17th Annual Suing and Defending Government Entities Seminar, San Antonio, Texas, July 2005 Presentation of paper entitled: Search and Seizure

Oregon Jail Managers' Association, Ontario, Oregon, August 2005. Two day presentation on the

Prison Rape Elimination Act; sponsored by the National Institute of Corrections

South Dakota Jail Administrators' Association, October 2005. Two-day presentation on the Prison Rape Elimination Act; sponsored by the National Institute of Corrections

Oregon Sheriffs' Association, December 2005. Presentation on the Prison Rape Elimination Act; sponsored by the National Institute of Corrections

Women in Criminal Justice Seminar, Corrections Management Institute of Texas, Dallas, Texas, April 2006. Presentation on "Managing and Being Managed"

American Jail Association, Annual Conference, Salt Lake City, Utah, May 2006. Presentation of paper entitled: Prison Rape Elimination Act, Investigating Sexual Assault Allegations in Jail Settings

Utah Sheriff's Association, Annual Conference, Salt Lake City, Utah, September 2006. Presentation on the Prison Rape Elimination Act; sponsored by the National Institute of Corrections

Virginia Sheriff's Association, Annual Conference, Virginia Beach, Virginia, April 2007. Presentation on the Prison Rape Elimination Act; sponsored by the National Institute of Corrections

Michigan Sheriff's Association, Annual Conference, Thompsonville, Michigan, June 2007. Presentation on the Prison Rape Elimination Act; sponsored by the National Institute of Corrections

National Sheriffs' Association, Annual Conference, Salt Lake City, Utah, June 2007. Participation on panel of experts on the Prison Rape Elimination Act

Women in Criminal Justice Seminar, Corrections Management Institute of Texas, San Antonio, Texas, May 2008. Presentation on "Women as Leaders"

Texas Association of Counties' Leadership Reunion, Bandera, Texas, May 2008. Presentation on "Leading with Ethics"

22nd Annual Suing and Defending Government Entities Seminar, San Antonio, Texas, July 2010, Presentation of paper entitled: "Use of Force Training"

Texas Municipal League Attorneys' Workshop, Austin, Texas, September 2010, Presentation of paper entitled: "Use of Force Training"

Texas Association of Counties, 2010 Annual Seminar, September 2010, Presentation on jail overcrowding and possible solutions

23nd Annual Suing and Defending Government Entities Seminar, Austin, Texas, July 2011, Presentation of paper entitled: "Law Enforcement Update"

Legal Training for Travis County Constables, March 2012, Presentation entitled "Law Enforcement Perspective: Working with a Diverse Population"

25th Annual Corrections Accreditation Managers' Association, Austin, Texas, April 2012, Presentation entitled "Accountability"

National Sheriffs' Association, Annual Conference, Nashville, Tennessee, June 2012, Presentation entitled "Implementing the Prison Rape Elimination Standards"

National Association of Women Law Enforcement Executive, Annual Conference, Austin, Texas, August 2012, Presentation entitled "Executive Response to Critical Incidents"

Sheriffs' Association of Texas, New Sheriffs' Management School, Austin, Texas, December 2012, Presentation entitled "Ten Things to Know as a New Sheriff"

27th Annual Advanced Government Law Seminar, Austin, Texas, July 2015, Presentation of paper entitled: "Hot Topics in Jail Administration"

Pathways to Strengthening Civilian Oversight of Baltimore Police, Baltimore, Maryland, October 2016.   Presentation on panel regarding different oversight models.

International Hispanic Network, Annual Conference, Austin, Texas, November 2016. Presentation on "Local Law Enforcement, Race and Community"

Investigating Physical and Sexual Abuse in Institutional Settings, November 2016, New York Department of Corrections and Community Supervision

29th Annual Advanced Government Law Seminar, Austin, Texas, July 2017, Presentation on "Jail Liability"

24th Annual NACOLE Conference, St. Petersburg, Florida, October 2018, Presentation on "Assessing Institutional Culture"

(revised 10/8/2018)

**EXHIBIT B**

## <u>CASES IN WHICH MARGO L. FRASIER HAS TESTIFIED</u>
(revised March 7, 2019)

<u>Annette Aguilera, Individually, and as Next Friend of Susie Aguilera, A Minor v. Maverick County, et al.</u>, Cause No. 06-09-21974-MCV, 293rd District Court of Maverick County, Texas (retained by defense counsel, Rodney Handel) (gave testimony at trial)

<u>Solomon Oludamisi Ajibade, et al. v. John Wilcher, et al.</u>, Civil Action No. 4:16-CV-82-WTM-GRS, United States District Court, Southern District of Georgia, Savannah Division (retained by plaintiff counsel, Cameron Kuhlman) (gave testimony by deposition)

<u>Charles Henry Alvarez, et al. v. Community Education Centers, Inc. et al.</u>, Civil Action 3:16-CV-01471, United States District Court, Northern District, Dallas Division (retained by defense counsel, Michael Dean) (gave testimony by deposition)

<u>Justin Borum, et al. v. Swisher County</u>, Civil Action No. 2:14-CV-00127, United States District Court, Northern District of Texas, Amarillo Division (retained by defense counsel Malerie Anderson) (gave testimony by deposition and at trial)

<u>Jennifer Kaye Byers v. Navarro County, et al.</u>, Civil Action No. 3:09-CV-01792-D, United States District Court, Northern District of Texas, Dallas Division (retained by defense counsel, Eric Magee) (gave testimony by deposition)

<u>Cesar Cuellar, Sr., et al. v. Priscilla Hernandez, et al.</u>, Civil Action No. 5:17-CV-000760, United States District Court, Southern District of Texas, Laredo Division (retained by defense counsel, Albert Lopez) (gave testimony by deposition)

<u>Jose Manuel De Leo, Jr. v. Michael Rosales, et al.</u>, Cause No. C-0396-15-H, 389th Judicial District of Hidalgo County, Texas (retained by defense counsel, Eileen Leeds) (gave testimony by deposition)

<u>Chet Driver v. Stephen Godfrey</u>, Civil Action No. 9:16-CV-00010, United States District Court for the Eastern District of Texas, Lufkin Division (retained by defense counsel, Robert Davis) (gave testimony by deposition)

<u>Donna Davis, Individually and on behalf of the Estate of Richard Davis and minors Cody Davis, Katherine Davis and Megan Davis v. Montgomery County, et al.</u>, Civil Action No. 4:07-CV-00505, United States District Court, Southern District of Texas, Houston Division (retained by plaintiffs' counsel, Lanny Ray) (gave testimony by deposition)

<u>Charles Deckard, et al. v. Nacodoghes County, Texas, et al.</u>, Civil Action No. 9:13-CV-00294-RC, United States District Court, Eastern District of Texas, Lufkin Division (retained by defense counsel, Robert Davis) (gave testimony by deposition)

<u>Nichole DeShazo, Special Administrator of the Estate of Charles DeShazo, deceased v.</u>

**EXHIBIT B**

Elvis Baneski, et al., Civil Action No. 14-CV-1575. United States District Court, Northern District of Illinois, Western Division (retained by defense counsel, Dominic Lanzito) (gave testimony by deposition)

Robert de la Garza v. Kirby Brumby, Individually and in His Official Capacity as Sheriff of Goliad County, Texas, , Civil Action No. 6:11-CV-00037, United States District Court, Southern District of Texas, Victoria Division (retained by defense counsel, Casey Cullen) (gave testimony by deposition)

Sarah Dill, Individually and as Next Friend and Legal Guardian of Joshawa A. Curlee v. Bell County, Texas, Civil Action No. A-03-CA-070-SS, United States District Court, Western District of Texas, Austin Division (retained by defense counsel, Charles S. Figerio) (gave testimony at trial)

Dumas Towing, LLC v. Sheriff J.E. (Bo) DeArmond and Scott Higginbotham, Civil Action No. 2:11-CV-121-J, in the United States District Court, Northern District of Texas, Amarillo Division (retained by defense counsel, Matt Matzner) (gave testimony by deposition)

Mario Del Refugio Escamilla, et al. v. Webb County, et al., Civil Action No. 5:11-CV-13, in the United States District Court, Southern District of Texas, Laredo Division (retained by defense counsel, Charles Frigerio) (gave testimony by deposition)

Lawrence Faulkenberry v. Caldwell County, Texas, et al., Civil Action No. 1:15-CV-01089, in the United States District Court, Western District of Texas, Austin Division (retained by defense counsel, Eric Magee) (gave testimony by deposition and at trial)

Chad Forbes v. Caldwell County, et al., Civil Action No. A-08-CA-532-LY, United States District Court, Western District of Texas, Austin Division (retained by defense counsel, Bob Bass) (gave testimony by deposition)

Jose Luis Garza, et al. v. City of Donna, Texas, et al., Civil Action No. 7:16-CV-00558, United States District Court, Southern District of Texas, McAllen Division (retained by defense counsel, J. Arnold Aguilar) (gave testimony by deposition)

Maria Garcia, Individually and as Next Friend of Minor, J.G. v. Navasota Independent School District, et al., Civil Action No. 4:09-cv-03892, United States District Court, Southern District of Texas, Houston Division (retained by defense counsel, Todd Clark) (gave testimony by deposition)

Monica Garcia, Individually, et al. v. LCS Correction Services, Inc., et al., Civil Action No. 2:11-CV-00004, United States District Court, Southern District of Texas, Corpus Christi Division (retained by defense counsel, Myra Morris) (gave testimony by deposition and at trial)

Estate of Andres L. Gutierrez, Deceased, et al. v. Frio County Sheriff's Deputy Roger Salinas, Individually and Officially, et al., Civil Action No. 5:10-CV-00735-OLG, United

States District Court, Western District of Texas, San Antonio Division (retained by defense counsel, Eileen Leeds) (gave testimony at trial)

Bradley R. Ham v. Weldon Tucker, Civil Action No. 01-CA-0837-RF, United States District Court, Western District of Texas, San Antonio Division (retained by defense counsel, Robert Bass) (gave testimony by deposition and at trial)

Florida Harris v. Polk County, et al., Civil Action No. 6:13-CV-00412, United States District Court, Eastern District of Texas, Tyler Division (retained by defense counsel, Eric Magee) (gave testimony at trial)

Marie Hicks-Fields, et al. v. Christopher Pool, et al.: Civil Action No. 4:12-CV-3650, United States District Court, Southern District of Texas, Houston Division (retained by defense counsel, Lisa Hulsey) (gave testimony by deposition)

James Adison Holmes, Jr. v. John Doe Scouts, et al., Civil Action No. C-09-273, United States District Court, Southern District of Texas, Corpus Christi Division, (retained by defense counsel, Kevin Cullen) (gave testimony at trial)

Russell Hubble, as Personal Representative of the Estate of Jennifer Lynne Meyers, Deceased v. County of Macomb, et al., Civil Action No. 2:16-CV-13504-PDB-DRG, United States District Court, Eastern District of Michigan, Southern Division (retained by plaintiff counsel, Harold Perakis) (gave testimony by deposition)

Tylon Hudson, et al. v. Toni Preckwinkle, et al., Civil Action No. 13-CV-8752, United States District Court, Northern District of Illinois, Eastern Division (retained by defense counsel, Paul McGrady) (gave testimony by deposition and at trial)

Mosevelt Jackson, Jr. and Linda Jackson v. Washington County, et al.; Civil Action No. A-09-CA-878, United States District Court, Western District of Texas, Austin Division (retained by defense counsel, Eric Magee) (gave testimony at trial)

Peggy Johnson, et al. v. Johnson County, Civil Action No. 3:04-CV-2066-D, United States District Court, Northern District of Texas, Dallas Division (retained by defense counsel, Stephen Henninger) (gave testimony by deposition)

Vicky Johnson v. Victor Hall, et al., Civil Action No. W-98-CA-151, United States District Court, Western District of Texas, Waco Division (retained by plaintiff's counsel, Sara Leon) (gave testimony by deposition and at trial)

Serena Kincanon, as the Permanent Guardian of Ralph Karl Ingrim, an Incapacitated Person v. Randall County, et al., Civil Action No. 2:17-00055-J, United States District County, Northern District of Texas, Amarillo Division (retained by defense counsel, Blair Oscarsson) (gave testimony by deposition)

Kent Krueger v. Raymond Chapa, Civil Action No. SA-01-CA-0101-FB, United States District Court, Western District of Texas, San Antonio Division (retained by defense

counsel, Michael Shaunessy) (gave testimony at trial)

<u>Elizabeth Lawson v. City of Jefferson, et al.</u>, Civil Action No. 2:13-CV-00105, United States District Court, Eastern District of Texas, Marshall Division (retained by defense counsel, Darren Coleman) (gave testimony by deposition and at trial)

<u>Michelle Martinez, et al. v. Maverick County, et al.</u>, Civil Action No. DR-08-CA-077, United States District Court, Western District of Texas, Del Rio Division (retained by defense counsel, Norman Giles) (gave testimony by deposition)

<u>John Mascheck, et al. v. Jim Wells County, et al.</u>, Civil Action No. 2:05-CV-00291, United States District Court, Southern District of Texas, Corpus Christi Division (retained by defense counsel, Myra K. Morris) (gave testimony by deposition and at trial)

<u>Joanna Mays, et al. v. Johnson County, Texas</u>, Civil Action No. 3-08-CV-1207-P, United States District Court, Northern District of Texas, Dallas Division (retained by defense counsel, Greg Blaies) (gave testimony by deposition)

<u>Cindy Moreno, et al. v. The City of Brownsville, et al.</u>, Civil Action No. 1:08-CV-504, United States District Court, Southern District of Texas, Brownsville Division (retained by defense counsel, Eileen Leeds) (gave testimony by deposition)

<u>Rosemary Monzon, et al. v. Randy Geries, Parmer County Sheriff, et al.</u>, Civil Action No. 2:06-CV-039, United States District Court, Northern District of Texas, Amarillo Division (retained by defense counsel, Charlotte Bingham) (gave testimony by deposition)

<u>Jay Anthony Nottingham v. Joel Finsterwald, Sheriff of Wheeler County, et al.</u>, Civil Action No. 2:10-CV-0023-J, United States District Court, Northern District of Texas, Amarillo Division (retained by defense counsel, Matt Matzner) (gave testimony at trial)

<u>Pascual Q. Olibas and Cheryl Olibas, Individually and d/b/a Freedom Bail Bonds v. Ronny Dodson, Individually and in his Official Capacity as Sheriff of Brewster County and Brewster County</u>, Civil Action No. 4:11-CV-00094-RAJ, United States District Court, Western District of Texas, Pecos Division (retained by defense counsel, Greg Hudson) (gave testimony by deposition)

<u>Yotarsha Oliver v. Allen Clark, et al.</u>, Civil Action No. 2:11-CV-227-TJW-CE, United States District Court, Eastern District of Texas, Marshall Division (retained by defense counsel, David Iglesias)

<u>Michelle Sheffield v. John Doe I, Individually and in his Official Capacity, Williamson County and the Williamson County Sheriff's Department</u>, Civil Action No. A-11-CA-300-LY, United States District Court, Western District of Texas, Austin Division (retained by defense counsel, Charles Frigerio) (gave testimony at trial)

<u>Shawna Fleweger Shelton, et al. v. Fayette County, et al.</u>, Civil Action No. 4:16-CV-01500,

United States District Court, Southern District of Texas, Houston Division (retained by defense counsel, Joanna Salinas) (gave testimony at trial)

Harold Shields v. Carol L. Twiss, et al., Civil Action No. SA-01-CA-0289-HG, United States District Court, Western District of Texas, San Antonio Division (retained by defense counsel, Dawn Carmody) (gave testimony by deposition)

Robert Shreve, et al. v. Franklin County, Ohio, et al., Cause No. 2:10-CV-244, United States District Court, Southern District of Ohio, Eastern Division (retained by intervenor's counsel, Aaron Fleisher, U. S. Department of Justice) (gave testimony by deposition)

Jorge Sifuentes, et al.v. The City of Corsicana, Navarro County, et al., Civil Action No. 3-04-CV-2307-K, United States District Court, Northern District of Texas, Dallas Division (retained by defense counsel, Portia Bosse) (gave testimony by deposition)

Jacqueline Smith v. Harris County, Texas, Civil Action No. 4:15-CV-02226, United States District Court, Southern District of Texas, Houston Division (retained by defense counsel, Laura Hedge) (gave testimony by deposition)

Vladmir Stojcevski, Individually and as Personal Representative of the Estate of David Stojcevski, Deceased v. County of Macomb, et al., Civil Action No 15-CV-11019, United States District Court, Eastern District of Michigan, Southern Division (retained by plaintiff counsel, Harold Perakis) (gave testimony by deposition)

Sylvia Torres, et al. v. Hidalgo County, et al., Civil Action No. M-06-332-D, United States District Court, Southern District of Texas, McAllen Division (retained by defense counsel, Myra Morris) (gave testimony by deposition)

Lynda Denise Tucker v. Corey Ridings and Jimmy Russell, Sheriff of Taney County, Missouri, Cause No. 15-3175, United States District Court, Western District of Missouri, Southern Division (retained by plaintiff's counsel, Mark Kempton) (gave testimony by deposition)

T.W. v. Llano County, et al., Civil Action No. A-97-CA-887-SS, United States District Court, Western District of Texas, Austin Division (retained by defense counsel, Michael Shaunessy) (gave testimony by deposition and at trial)

United States of America v. Terry S. Johnson, in his official capacity as Alamance County Sheriff, Civil Action No. 1:12-CV-1349, United States District Court, Middle District of North Carolina (retained by plaintiff counsel Michael Songer, United States Department of Justice) (gave testimony by deposition and at trial)

United States of America v. Maricopa County, Arizona, et al., Civil Action No. 2:12-CV-00981-LOA, United States District Court for the District of Arizona (retained by plaintiff counsel Jennifer Mondino, United States Department of Justice) (gave testimony by deposition)

**EXHIBIT B**

Celinda Villareal, et al. v. Brooks County, et al., Civil Action No. 2:17-CV-00091, United States District Court, Southern District of Texas, Corpus Christi Division (retained by defense counsel Eileen Leeds) (gave testimony by deposition)

Rodney J. Watt v. City of Highland Park, Illinois, et al., Civil Action No. 01-C-6230, United States District Court, Northern District of Illinois, Eastern Division (retained by plaintiff counsel, Tom Marzewski) (gave testimony by deposition)

The Estate of Patrick Wise, et al. v. City of Gladewater, et al., Civil Action No. 2:17-CV-788, United States District Court, Eastern District of Texas, Marshall Division (retained by plaintiff counsel Brian Gaddy) (gave testimony by deposition)

**EXHIBIT C**

## Appendix of Documents

### Plaintiff Deposition Testimony & Declarations

- Ellenor Altman deposition testimony & exhibits
- Tavi Burroughs deposition testimony & exhibits
- Kimberly Crawford-Alexander deposition testimony & exhibits
- Dominique Freeman deposition testimony & exhibits
- Denise Hobbs deposition testimony & exhibits
- Sdharie Howard deposition testimony & exhibits
- Esther Jones deposition testimony & exhibits
- Susana Placencia deposition testimony & exhibits
- Balvina Ranney deposition testimony & exhibits
- Sharon Robinson deposition testimony & exhibits
- Twanda Wilson deposition testimony & exhibits
- Plaintiffs 000978-1277

### Defendant Deposition Testimony

- Matthew Burke deposition testimony & exhibits
- Brad Curry deposition testimony & exhibits
- Amar Patel deposition testimony & exhibits
- Larry Schurig deposition testimony & exhibits
- Steven Wilensky deposition testimony & exhibits

### Cook County Sheriff's Office Documents and Data

- CCSO_Howard_0000008-0000010: Deputy Sheriff (D2) job description
- CCSO_Howard_0000018-20: Correctional Officer (CO1) job description
- CCSO_Howard_0000126-69: Inmate Information Handbook
- CCSO_Howard_0000909-10: Sheriff's Order 11.14.8.0 dated December 24, 2013
- CCSO_Howard_0000911-26: Sheriff's Order 11.14.8.0 dated December 11, 2011
- CCSO_Howard_0000927-29: CCSO Form Inmate Disciplinary Report, Inmate Disciplinary Report – Findings of Fact and Decision, Inmate Disciplinary Appeal Form
- CCSO_Howard_0001676-77: Sheriff's Order 11.14.8.0 dated November 25, 2014
- CCSO_Howard_0001678-82: CCSO Form Inmate Disciplinary Report, Inmate Disciplinary Hearing – Findings of Fact and Decision
- CCSO_Howard_0022083-94: Sheriff's Order 11.2.1.0 – Response to Resistance/Use of Force Policy
- CCSO_Howard_0022128-35: Sheriff's Order 11.2.4.0 – Use of Oleoresin Capsicum (OC) Sprays
- CCSO_Howard_0055792-93: CCCSD Policy 904
- CCSO_Howard_0059135-36: CCCSD Policy 1004
- Howard_CCSO_0061376-82: CCDOC Policy 704
- CCSO_Howard_0064451-53: CCDOC Policy 166

- Howard_CCSO_0064470-74: CCDOC Policy 311
- CCSO_Howard_0065776-81: CCDOC Policy 104
- CCSO_Howard_0078544-50: Inmate Disciplinary Code December 2013
- CCSO_Howard_0078551-56: Inmate Disciplinary Code November 2017
- CCSO_Howard_0080022-0080061: Discrimination and Harassment Annual Training
- CCSO_Howard_0097096-100: Policy 411
- CCSO_Howard_0145446: Roll Call Memorandum dated February 1, 2017
- CCSO_Howard_0145447: Roll Call Memorandum dated October 31, 2017
- CCSO_Howard_0145744-55: Analysis of Incidents in Division 11: July 1, 2016-September 30, 2017
- CCSO_Howard_0145831-38: Analysis of Disciplinary Data January 1, 2016 through October 31, 2017
- CCSO_Howard_0147356-404: Collective Bargaining Agreement – Illinois FOP Labor Council and County of Cook - Sheriff of Cook County December 1, 2012-November 20, 2017.pdf
- CCSO_Howard_0147461-523: Collective Bargaining Agreement – Illinois FOP Labor Council and County of Cook - Sheriff of Cook County December 1, 2017-November 30, 2020.pdf
- CCSO_Howard_0145894-902: Analysis of Incidents in Division 2: July 1, 2016-September 30, 2017
- CCSO_Howard_0146091-101: Analysis of Incidents in Division 6: July 1, 2016-September 30, 2017
- CCSO_Howard_0146174-84: Analysis of Incidents in Division 8 RTU: July 1, 2016-September 30, 2017
- CCSO_Howard_0146259-68: Analysis of Incidents in Division 8: July 1, 2016-September 30, 2017
- CCSO_Howard_0146462-74: Analysis of Incidents in Division 9: July 1, 2016-September 30, 2017
- CCSO_Howard_0146508-18: Analysis of Incidents in Division 10: July 1, 2016-September 30, 2017
- CCSO_Howard_0162052-55: Teamsters Local 700 Letter to OSHA dated June 23, 2016
- CCSO_Howard_0162056-95: Cook County Sheriff's Office Inmate Discipline Training.pdf
- CCSO_Howard_0164686-778: Use of Force Training
- CCSO_Howard_0260507: Email between Paul Villanueva and Michael Bernardini dated October 31, 2016
- CCSO_Howard_0260916: Email between Printiss Jones and Nneka Jones Tapia dated December 2, 2016
- CCSO_Howard_0281024-29: Inmate Disciplinary Code January 2018
- CCSO_Howard_0281113-19: Inmate Disciplinary Code December 2018
- CCSO_Howard_0281120-35: CCDOC Procedure 131
- CCSO_Howard_0281407: Adjudication Decision Data April 2018
- CCSO_Howard_0281408: Adjudication Decision Data August 2018
- CCSO_Howard_0281409: Adjudication Decision Data July 2018
- CCSO_Howard_0281410: Adjudication Decision Data June 2018

- CCSO_Howard_0281411: Adjudication Decision Data March 2018
- CCSO_Howard_0281412: Adjudication Decision Data May 2018
- CCSO_Howard_0281413: Adjudication Decision Data November 2017
- CCSO_Howard_0281414: Adjudication Decision Data: October 2018
- CCSO_Howard_0281415: Adjudication Decision Data September 2018
- CCSO_Howard_0296067: Savage Life
- CCSO_Howard_0295076: Savage Life
- CCSO_Howard_0320552-67: Employee Discipline Reports

**Other Produced Documents**
- CCHHS-Howard 000003-4: Correctional Medical Technician II job description
- Crawford-Alexander_0025-26: Exposure procedure directive dated November 29, 2017
- Crawford-Alexander_0143-156: Cook County Sheriff's Office PREA Recommendations for the Cook County Dept. of Corrections Working Document
- CCHH-Howard 000175-000235: Collective Bargaining Agreement - Service Employees International Union Local 73 December 1, 2012-November 30, 2017.pdf
- Plaintiffs00283-00390: Collective Bargaining Agreement – International Brotherhood of Teamsters, Local Union 700 and The County of Cook-Cook County Sheriff December 2012-November 30, 2017.pdf
- Plaintiffs 000775-997: Photographs from Cook County Jail tour on November 29, 2018

**Other Documents**
- 20 Ill. Adm. Code 701.160
- 28 C.F.R. 115.78
- Benjamin Wilner Expert Report dated March 7, 2019
- *Brown* Plaintiffs settlement letter dated July 20, 2018
- *Brown et al. v. Cook County et al.*, 1:17-cv-08085 (N.D. Ill.), Agreed Preliminary Injunction Order between Plaintiffs and the Cook County Public Defendant dated November 11, 2017, Dkt. # 46
- *Brown et al. v. Cook County et al.*, 1:17-cv-08085 (N.D. Ill.), Declaration of Brad Curry dated November 15, 2017, Dkt. #24-1
- *Brown et al. v. Cook County et al.*, 1:17-cv-08085 (N.D. Ill.), First Amended Complaint dated January 31, 2018, Dkt. #81
- Deposition transcript excerpts cited by Jeanne Woodford
- *Howard* Plaintiffs' Injunctive Relief Settlement Letter dated July 20, 2018
- *Howard* Plaintiffs' Monetary Relief Settlement Letter dated July 20, 2018
- *Howard* Plaintiffs' Response to Cook County Sheriff's Office's Settlement Response Letter dated September 27, 2018
- *Howard et al. v. Cook County Sheriff's Office et al.*, 1:17-cv-08146 (N.D. Ill.), Joint Preliminary Injunction Order dated November 28, 2017, Dkt. #16
- *Howard et al. v. Cook County Sheriff's Office et al.*, 1:17-cv-08146 (N.D. Ill.), Second Consolidated Complaint dated July 31, 2018, Dkt. #107
- Jeanne Woodford Expert Report dated February 1, 2019
- Letter from McGuireWoods to Counsel dated September 21, 2018

- *U.S. v. Cook County v. Cook County, Illinois, et al.*, 1:10-cv-02946 (N.D. Ill), Agreed Order dated May 26, 2010, Dkt. #13
- *U.S. v. Cook County v. Cook County, Illinois, et al.*, 1:10-cv-02946 (N.D. Ill), McCampbell Report #1 filed September 24, 2010, Dkt. #29
- *U.S. v. Cook County v. Cook County, Illinois, et al.*, 1:10-cv-02946 (N.D. Ill), McCampbell Report #3 filed May 14, 2012, Dkt. #103
- *U.S. v. Cook County v. Cook County, Illinois, et al.*, 1:10-cv-02946 (N.D. Ill), McCampbell Report #4 filed May 14, 2012, Dkt. #105
- *U.S. v. Cook County v. Cook County, Illinois, et al.*, 1:10-cv-02946 (N.D. Ill), McCampbell Report #6 filed April 25, 2013, Dkt. #161
- *U.S. v. Cook County v. Cook County, Illinois, et al.*, 1:10-cv-02946 (N.D. Ill), McCampbell Report #7 filed December 4, 2013, Dkt. #210
- *U.S. v. Cook County v. Cook County, Illinois, et al.*, 1:10-cv-02946 (N.D. Ill), McCampbell Report #8 filed April 21, 2014, Dkt. #231
- *U.S. v. Cook County v. Cook County, Illinois, et al.*, 1:10-cv-02946 (N.D. Ill), McCampbell Report #9 filed November 4, 2014, Dkt. #262
- *U.S. v. Cook County v. Cook County, Illinois, et al.*, 1:10-cv-02946 (N.D. Ill), McCampbell Report #10 filed June 2, 2015, Dkt. #290
- *U.S. v. Cook County v. Cook County, Illinois, et al.*, 1:10-cv-02946 (N.D. Ill), McCampbell Report #11 filed May 18, 2016, Dkt. #319
- *U.S. v. Cook County v. Cook County, Illinois, et al.*, 1:10-cv-02946 (N.D. Ill), McCampbell Report #12 filed November 23, 2016, Dkt. #335

| | **Additional Action Taken By the CCSO to Address Inmate Sexual Harassment** |
|---|---|
| 1 | The CCSO has its Video Monitoring Unit conduct spot checks to ensure that inmates who have engaged in indecent exposure behavior are being properly handcuffed and clothed in restrictive jumpsuits. |
| 2 | The CCSO conducts monthly shakedowns of each tier to, amongst other things, ensure that inmates are in proper uniform. |
| 3 | The CCSO maintains a zero-tolerance policy for inmate sexual harassment. |
| 4 | The CCSO maintains and has expanded CCOMS, which now allows employees in both the jail and courts to, amongst other things, track the life cycle of an incident report, investigation and any resulting sanctions. |
| 5 | The CCSO has its Bureau of Information Technology track indecent exposure and masturbation incidents. |
| 6 | The CCSO requested its police department to prioritize the investigation and prosecution of indecent exposure and masturbation incidents and hired additional investigators to allow cases to be processed faster. |
| 7 | The CCSO implemented Tableau dashboards, which provide visuals summary of data in the CCSO's system that divisions can use to analyze trends in CCOMS data, including data involving inmate sexual harassment incidents, and determine if follow-up measures or actions are needed. |
| 8 | The CCSO met with CCPD, CCSAO, and members of the Cook County judiciary to discuss efforts that all stakeholders were taking and could take to combat incidents of inmate public indecency. |
| 9 | The CCSO implemented monthly review panels to review and address inmate masturbation incidents and other inmate misconduct. |
| 10 | The CCSO maintains a quality improvement committee to ensure that its functions and operations are continually improved, and expands the purview of this committee to include its courts. |
| 11 | The CCSO introduced, in late 2017, a Sexual Misconduct by Inmates Directive / Policy 166 to establish clear and uniform guidelines regarding the joint preliminary injunction orders in the instant case and related cases. |
| 12 | The CCSO created the Storm/Rogue notification system to provide instant alerts and conference calls with command staff for incidents of exhibitionist masturbation, who would in turn instantly communicate such violations to the Sheriff's police. |
| 13 | The CCSO has begun working with an outside vendor on designing another modified jumpsuits to further reduce access to inmate's genital area. |
| 14 | The CCSO asked the CCSAO to notify victims of the disposition of indecent exposure cases; (15) implemented an Officer Safety Alert Board with pictures of the inmates who have engaged in acts of public indecency. |
| 15 | The CCSO started placing inmates accused of indecent exposure and masturbation in pre-hearing restrictive jumpsuits and detention. |
| 16 | The CCSO requested that CCPD staff communicate with inmates through specialized talk boxes which offer them protection from public indecency incidents while speaking with their clients. |
| 17 | The CCSO assigned a dedicated staff member to conduct audits of tiers to ensure that inmates were in proper uniform and that staff members on that tier are disciplined if the |

| | |
|---|---|
| | inmates were not in proper uniform. |
| 18 | The CCSO formed a Business Intelligence Unit, in part, to track incident reports in CCOMS, ensure that they are processed to completion in a timely fashion, analyze incidents and incident data, including incidents of sexual harassment, and present findings to a standing committee for recommendations and action. |
| 19 | The CCSO offered to allow CCPD employees to have meetings with their clients via video teleconferencing. |

1

---

[1] Curry Dep. 39–40, 128-129, 183, 199–200, 211–212, 219, 242–243, 255 –256, 261–262, 293-294, 302-303-307; Curry Decl. ¶¶ 7, 29, 30, 31, 34-36; Wilensky Dep. 42-43, 84-85, 92-93; Patel Dep. 131–133, 157.