Exhibit 33

```
 1
 2          IN THE UNITED STATES DISTRICT COURT
 3             NORTHERN DISTRICT OF ILLINOIS
 4                   EASTERN DIVISION
 5   SDAHRIE HOWARD, DENISE HOBBS,
     ELLENOR ALTMAN, TAVI
 6   BURROUGHS, SHADONNA DAVIS,
     SHARON WILSON, KIMBERLY
 7   CRAWFORD-ALEXANDER, ESTHER
     JONES, BALVINA RANNEY,
 8   TAWANDA WILSON, SUSANA
     PLASENCIA, and PATRICIA
 9   JAGIELSKI, on behalf of           Case No. 17-cv-8146
     themselves and all others
10   similarly situated,               Judge Matthew J. Kennelly
11              Plaintiffs,            Mag. Judge Sidney I.
                                       Schenkier
12        vs.
13   COOK COUNTY SHERIFF'S
     OFFICE, and COUNTY OF COOK,
14
                Defendants.
15   ------------------------------
16
            ** CONTAINS CONFIDENTIAL PORTIONS **
17
                 ** BOUND SEPARATELY **
                    PAGES 251-256
18
       DEPOSITION OF KIMBERLY CRAWFORD-ALEXANDER MORECI
19
                     Chicago, Illinois
20
                Tuesday, September 18, 2018
21
22
23   Reported by:
24   JANICE M. KOCEK, CSR, CLR
25   JOB NO. 147712
```

Page 6

K. CRAWFORD-ALEXANDER MORECI
County of Cook. We're going to be asking you some questions today about the lawsuit that you and others have filed. What I'd like you to do is answer my questions to the best of your knowledge and ability. Okay?
   A.   Okay.
   Q.   All right. If you don't understand one of my questions, please tell me you don't understand it. I'm happy to rephrase it or state it a different way. Okay?
   A.   Okay.
   Q.   Once you've answered my question, I'm going to assume from the fact that you've answered it that you understood it. All right?
   A.   All right.
   Q.   Couple things I'd like you to do. Try to speak up and try audibilize (verbatim) your answers. In other words, respond verbally instead of nodding your head or shrugging your shoulders, that kind of thing.
   A.   Yes, sir.
   Q.   You probably understand the court reporter is trying to get down everything we say here today. Okay?

Page 7

K. CRAWFORD-ALEXANDER MORECI
   A.   Yes.
   Q.   Another thing I'd like you to try to do today is wait until I'm done with my question before you start your answer even if you think you know what my question is going to be. Okay?
   A.   Okay.
   Q.   I'll by the same token try to wait until you're done with your answer before I move on to my next question. That's also so the court reporter can get a clear record. All right?
   A.   Okay.
   Q.   You work for the Cook County sheriff's department, correct?
   A.   Yes, sir.
   Q.   How long have you worked there?
   A.   Twelve years and a couple months.
   Q.   All at the jail?
   A.   Yes.
   Q.   What's your current assignment?
   A.   I work receiving. That's intake for new inmates. 2:00 to 10:00 shift.
   Q.   Do they call it RCDC?

Page 8

K. CRAWFORD-ALEXANDER MORECI
   A.   Yes.
   Q.   And do all new inmates go through the RCDC?
   A.   As far as I know, yes.
   Q.   Male and female?
   A.   Yes.
   Q.   How long have you been in receiving?
   A.   Year and a half now.
   Q.   What are your job duties in receiving?
   A.   Well, right now I'm going on a year in X-ray movement. So my job duties are to take the inmates, the new. Once they're done getting medical triage from the medical staff, I take them to get an X-ray in another room. And usually I'll take them downstairs or put them in another bullpen depending on how the day dictates with the court -- with the inmates that are already at the jail, if they can take them down to the holding. If not, I put them in the holding cell upstairs where I'm at.
   Q.   And that's your day-to-day responsibilities right now?
   A.   Uh-huh.

Page 9

K. CRAWFORD-ALEXANDER MORECI
   Q.   Is that right?
   A.   Yeah.
   Q.   Since you've been in the RCDC, have you written any incident reports concerning masturbation by inmates?
   A.   Yeah. Yes, I have.
   Q.   How many reports have you written?
   A.   One.
   Q.   Do you remember the detainee involved?
   A.   I'm sorry. I -- I wrote two.
   Q.   Two?
   A.   Yeah, I remember the detainee.
   Q.   Who -- who were the detainees involved?
   A.   One was a ▮▮▮▮▮▮▮▮▮. And ▮▮▮▮▮▮▮.
   Q.   Where were you before receiving?
   A.   The kitchen, I think.
   Q.   Do you call it central kitchen?
   A.   Central kitchen.
   Q.   How long were you in central kitchen?
   A.   Maybe a year.

Page 10

K. CRAWFORD-ALEXANDER MORECI
1
2  Q. Could be less?
3  A. Yeah, I think it was a year because
4  I left with a bid. So it was a year.
5  Q. And you bid into receiving from
6  central kitchen?
7  A. Yes, sir.
8  Q. What was your shift in central
9  kitchen?
10  A. 3:00 to 11:00.
11  Q. And what were your job duties in
12  central kitchen?
13  A. Oh, God. Well, basically is an open
14  floor plan so there really isn't no holding for
15  the inmates. So you're kind of on the floor
16  with a bunch of civilians and literally like 80
17  inmates. So you're watching for the stealing
18  or the usual suspect things that you think
19  would not be good to do. You know, they have
20  knives and equipment and things like that. So
21  just making sure that the area is secure. And
22  then we move the inmates back to the divisions,
23  you know, to bring more inmates over from
24  Division 2 and Division 6.
25  Q. So in central kitchen you have both

Page 11

K. CRAWFORD-ALEXANDER MORECI
1
2  detainees and civilian workers?
3  A. Yes.
4  Q. And I assume that they're preparing
5  food?
6  A. Yes.
7  Q. And it sounds like you're keeping an
8  eye on the detainees who are working in the
9  kitchen?
10  A. And the civilians.
11  Q. Good point. And the civilians.
12    When you were in central kitchen did
13  you write any reports concerning detainee
14  masturbation?
15  A. No. No, sir.
16  Q. How come you bid from central
17  kitchen into receiving?
18  A. I didn't really like the favoritism
19  that I seen in central kitchen. And I just
20  moved on just to learn something new.
21  Q. Tell me what you mean by
22  "favoritism."
23  A. Well, the assignment rarely changed.
24  Every 30 days -- every 90 days they do -- they
25  call -- they called it a 90. They do a 90-day

Page 12

K. CRAWFORD-ALEXANDER MORECI
1
2  roster and assignment supposed to change. Most
3  people's assignment changed except mine and I
4  didn't like that. So didn't want to complain,
5  just moved on to the next place to do something
6  different.
7  Q. And did you bid to get into central
8  kitchen?
9  A. Yes.
10  Q. Where were you before central
11  kitchen?
12  A. Division 9.
13  Q. How long were you in Division 9?
14  A. Maybe -- maybe eight and a half
15  years. In one part -- one -- maybe like the
16  sixth year I left. Went to 10 for a couple
17  months, then came back to 9. It was like a
18  mini bid but they don't do mini bids anymore.
19  Q. So eight and a half years with the
20  interruption when you went to Division 10?
21  A. Yeah.
22  Q. Was Division 8 maximum security when
23  you went there?
24  A. You mean Division 9?
25  Q. Division 9. Thank you.

Page 13

K. CRAWFORD-ALEXANDER MORECI
1
2  A. Yeah.
3  Q. And did you write any reports when
4  you were in Division 9, any incident reports,
5  concerning detainee masturbation?
6  A. Yes.
7  Q. How many?
8  A. I couldn't recall. They would be in
9  the computer and INVIZE. I wrote several.
10  Q. More than two?
11  A. Yeah, yes.
12  Q. More than five?
13  A. Yes.
14  Q. More than ten?
15  A. Yeah.
16  Q. When you were in Division 9, would
17  you enter incident reports directly into a
18  computer system?
19  A. Yes.
20  Q. Was that INVIZE?
21  A. No, we -- we -- as far as I know, we
22  don't do the INVIZE. INVIZE came after the
23  fact. When I first started Division 9 we were
24  all paper. It was all paper. And once they
25  transferred over to these new systems, I assume

| Page 146 | Page 147 |
|---|---|
| K. CRAWFORD-ALEXANDER MORECI | K. CRAWFORD-ALEXANDER MORECI |

**Page 146**

1  K. CRAWFORD-ALEXANDER MORECI
2  Whether they asked them or not, I don't know.
3  But that's what they told us.
4      So I had a conversation at the time
5  with my boyfriend, he wasn't my husband yet,
6  and he says, "You women, y'all don't press
7  charges." He goes, "That's the problem.
8  Nobody's pressing charges." And we got to like
9  a back and forth conversation. I go, "That's
10  not true. The women are pressing charges and
11  they're dropping the ball, sheriff's police."
12  I go, "We're pressing charges." He goes, "My
13  conversation with sheriff police, they saying
14  nobody is going to press charges." So I told
15  him the next time that that shit happens, I
16  said, "I'm going to" -- "I'm going to make it
17  my business. I'm going to go find a sheriff's
18  police guy. Every time I see him I'm asking
19  him when we going to court." So that's why
20  this came to this. Otherwise, I never would
21  have seen this piece of paper and most officers
22  never seen that paper.
23      Q. But my -- the answer to my question
24  is, yes, something was done to ▇
25  correct?

**Page 147**

1  K. CRAWFORD-ALEXANDER MORECI
2  A. Yes.
3      MS. BRENNAN: Object to the form of
4  the question.
5  BY MR. PHILLIPS:
6  Q. You can answer.
7  A. Yes.
8  Q. Your testimony is that you saw an
9  inmate in a visiting cage with his girlfriend
10  masturbating while his girlfriend was taking
11  her clothes off; is that correct?
12  A. Uh-huh, yes.
13  Q. And did you believe that was a
14  violation of the disciplinary code?
15  A. It was absolutely a violation of the
16  disciplinary code.
17  Q. And you did not write it up,
18  correct?
19  A. No. That's correct, sir.
20  Q. Is there anyone else who saw that to
21  your knowledge?
22  A. No.
23  Q. Any other specific incidents
24  occurring on Division 9 concerning masturbation
25  and exposure that you observed and did not

**Page 148**

1  K. CRAWFORD-ALEXANDER MORECI
2  write up?
3  A. Yes, on the different tiers I worked
4  on.
5  Q. Anything that you can recall
6  specifically?
7  A. During inmate count, inmate putting
8  his penis in the chuck hole while you're doing
9  the count.
10  Q. What did you -- what did you do in
11  response to that?
12  A. Nothing. We were told that inmate's
13  cell room is his private area and that was
14  okay.
15  Q. Who told you that?
16  A. The supervisors.
17  Q. Did they tell you it was okay for
18  the inmates to put their penises through the
19  chuck holes?
20  A. No, they didn't do that. They said
21  the inmate can technically masturbate in their
22  cell because it is their private domain.
23  Q. If an inmate is masturbating in a
24  cell in tier 2H, can you see that from the
25  bubble?

**Page 149**

1  K. CRAWFORD-ALEXANDER MORECI
2  A. If he sticks his penis in the chuck
3  hole, absolutely.
4  Q. What if he doesn't stick his penis
5  in the chuck hole?
6  A. I wouldn't be able to see it.
7  Q. Let me show you what we'll call
8  Group Exhibit 71.
9      (Howard Deposition Exhibit 71
10      was marked for identification.)
11  BY MR. PHILLIPS:
12  Q. Is the first page of Exhibit 71 an
13  incident report that you wrote concerning the
14  incident with detainee ▇ that we've
15  discussed a little earlier today?
16      (Witness reviewing document.)
17  BY MR. PHILLIPS:
18  Q. Have you had a chance to look
19  through Exhibit 71?
20  A. Yes, sir.
21  Q. Is the first page of Exhibit 71 an
22  incident report that you wrote?
23  A. Yes, sir.
24  Q. And this concerns an incident that
25  occurred on April 12th, 2017, correct?

Page 150

K. CRAWFORD-ALEXANDER MORECI
1
2  A. Yes.
3  Q. And detainee ▓ was the offender,
4  correct?
5  A. Yes.
6  Q. And under incident type you put down
7  sexual assault, correct?
8  A. Yes, sir.
9  Q. Is that like a drop-down box where
10  you can choose from different options or is
11  sexual assault something you typed in?
12  A. You can -- you can write that in.
13  Q. And that's what you wrote in?
14  A. Well, actually I had rape right
15  there but they told me I couldn't put that.
16  Q. So you put sexual assault; is that
17  right?
18  A. Yes, sir.
19  Q. But you wanted to put rape?
20  A. I did.
21  Q. The location where this occurred you
22  have as the tunnel, correct?
23  A. Yes, sir.
24  Q. Is that the same location that we've
25  been calling the bridge or is that someplace

Page 151

K. CRAWFORD-ALEXANDER MORECI
1
2  different?
3  A. We were coming from the bridge --
4  from the bridge through -- I don't know if
5  you've been to the tunnel area of like Division
6  5. That --
7  Q. Uh-huh.
8  A. -- there. That's where we kind of
9  broke away from the other group. Because we
10  walking maybe a group of 25 something inmates
11  initially.
12  Q. Initially and then what happened?
13  A. It was a -- it was me, Officer
14  Moore, Officer Martello, Sergeant Ludwig, and I
15  think Officer Lopez. And they were at the --
16  Sergeant Ludwig and Officer Lopez were at the
17  back of the line. And something happened where
18  a fight broke out and they were fighting. And
19  we stopped the line right there at that
20  Division 5 tunnel. And the -- a couple of
21  inmates we had left, it was about ten, she said
22  just go -- go ahead and walk to the division.
23  Q. So you and Martello and Moore took
24  the approximately ten inmates towards Division
25  9?

Page 152

K. CRAWFORD-ALEXANDER MORECI
1
2  A. Yes.
3  Q. Were these inmates returning from
4  court?
5  A. Yes, sir.
6  Q. So as you told me before, part of
7  your responsibility is to take the court
8  returns and bring them back to the divisions?
9  A. Yes, sir.
10  Q. According to your report, you were
11  at the head of the line walking backwards
12  escorting the detainees, correct?
13  A. Yes, sir.
14  Q. Meaning you were facing the
15  detainees?
16  A. Yes.
17  Q. Where were Martello and Moore?
18  A. They were at the back of the line.
19  Q. Is that standard procedure when
20  you're walking a group of inmates that one
21  officer stands at the front of the line and the
22  other officers were at the back?
23  A. No.
24  Q. You don't know why that was the case
25  this day?

Page 153

K. CRAWFORD-ALEXANDER MORECI
1
2  A. I would say fear but that's just my
3  assumption.
4  Q. Fear of what?
5  A. The inmates. Or doing the job. I
6  don't know. You'd have to ask those two
7  officers.
8  Q. Well, we might. What is standard
9  procedure in this kind of situation where
10  you're transporting inmates back from receiving
11  -- or from receiving back to their division in
12  terms of where the officer stands?
13  A. Well, you need one at the head of
14  the line because you need someone to lead the
15  line and obviously one at the back. So
16  somebody should be -- besides having a third
17  person, somebody should have been kind of like
18  in the middle. If you have four you can have
19  two in the middle, one at the end, one at the
20  front.
21  Q. In this particular incident you had
22  three officers for about ten inmates, correct?
23  A. Yes.
24  Q. ▓ was wearing a green jumpsuit
25  according to this narrative?

Page 154

K. CRAWFORD-ALEXANDER MORECI
Q. Yes.
Q. Did you know detainee ▮?
A. No.
Q. First time you had encountered him?
A. Yes, sir.
Q. What did it signify to you that he was wearing a green jumpsuit?
A. I'm sorry?
Q. What did it mean that he was wearing a green jumpsuit?
A. Oh, that was the jumpsuits for the inmates that would masturbate. They started putting them in the jumpsuits.
Q. So that told you that he had some history of masturbation?
A. Yes.
Q. And according to this he maneuvered around the other detainees so he could be in your sight?
A. Yes.
Q. Can you explain to me what that means?
A. I was at the beginning of the line and then you have just the one line of the

Page 155

K. CRAWFORD-ALEXANDER MORECI
inmates, side by side, walking -- they walk usually like -- you try to walk them in twos if you can. He was maybe like in the third row of the line on the opposite side. He kept cutting through, like weaving through the line of inmates to get on the side I was at, which is on the left-hand side.
Q. And you state in your report he did that so he could be within your sight so he could continue to pull out his penis and continue to masturbate?
A. Yes.
Q. Stroking his penis in a back-and-forth motion. Do you see that?
A. Yes.
Q. So you witnessed him take his penis out of his jumpsuit?
A. Yes.
Q. And how many times did you witness him do that?
A. Lots. Maybe five to six times. I don't know.
Q. The green jumpsuits to my understanding were designed so that inmates

Page 156

K. CRAWFORD-ALEXANDER MORECI
cannot remove their penises from their jumpsuits in this kind of situation.
A. You must have not seen one.
Q. I actually have seen one, to be honest with you.
A. Couldn't have.
Q. Well, I did. But let's not argue about that.
   How was inmate ▮ able to remove his penis when he was wearing a green jumpsuit?
A. Because he didn't have the -- the jumpsuit fully on, which a lot of them don't.
Q. Explain to me "not fully on."
A. The green jumpsuit is made of Velcro. So they can just pull it apart. When we got him, it was open, and you seen his white t-shirt and this -- the jumpsuit open.
Q. Kind of pulled back off his shoulders?
A. Yes, I think -- he was blue boxed. He was blue boxed down by his genitals.
Q. Who blue boxed him?
A. I don't know. They came to us -- it's changed now. But what they used to do on

Page 157

K. CRAWFORD-ALEXANDER MORECI
the bridge when they would come to court, they would leave them in court blue boxed unless the judge decided he didn't want him that way. So day shift or whoever walked him over initially from court, I assume they -- they did. And we didn't unblue box him or anything.
Q. In other words, you got him that way?
A. Yeah.
Q. And neither you nor any of the other officers changed the blue boxing so that his hands were up at his chest, correct?
A. No, blue box requires a special key.
Q. Which you don't have?
A. No.
Q. Who's got that key?
A. Security.
Q. And security is a unit within the jail?
A. It's -- every jail has their own security. But our security is a unit, then RCDC.
Q. So while this detainee was blue boxed and wearing a green jumpsuit he

Page 158

K. CRAWFORD-ALEXANDER MORECI
1
2  repeatedly pulled out his penis in front of
3  you; is that correct?
4     A.  Yes, sir.
5     Q.  According to you he was stroking his
6  penis when he did that?
7     A.  Yes, sir.
8     Q.  Okay.  Did he say anything to you
9  that you can recall?
10    A.  What's written on the paper, sir.
11    Q.  So according to what is written on
12  the paper, you repeatedly told him to stop,
13  right?
14    A.  Yes, sir.
15    Q.  He said, "Okay," and continued to
16  masturbate, right?
17    A.  Yes.
18    Q.  So is that when he said to you,
19  "Okay"?
20    A.  Yes.
21        MS. BRENNAN:  And also the things
22    things that she wrote that he said to her
23    on the report.
24  BY MR. PHILLIPS:
25    Q.  Well, but that's not what she wrote.

Page 159

K. CRAWFORD-ALEXANDER MORECI
1
2  What she wrote was (as read):  Other detainees
3  began to say sexually explicative things to
4  reporting officer, right?
5     A.  If that's what's there, sir.
6     Q.  Well, I can read it.  I know what's
7  there.
8     A.  Okay.
9     Q.  What I'm asking is what you
10  remember.  Okay?
11    A.  Yes.
12    Q.  All right.  Is it correct that your
13  report does not allege that Mr. ▆▆▆ said
14  explicit things to you, sexually explicit
15  things?
16        MS. BRENNAN:  I'm going to object.
17    It specifically talks about "come on, I'm
18    just about to bust."  Read it again.  I
19    know.  But if he's going to force you to
20    actually say the words, which I think is
21    ridiculous --
22        MR. PHILLIPS:  Well, it's not
23    ridiculous.
24        MS. BRENNAN:  -- and harassing.
25        MR. PHILLIPS:  I'm asking her --

Page 160

K. CRAWFORD-ALEXANDER MORECI
1
2  I'm asking her what she remembers.  Come
3  on, Noelle.  I mean --
4         MS. BRENNAN:  Let her read the
5    document.  It says it in the document.
6         MR. PHILLIPS:  Well, what did you
7    say, though?  Why did you say that?  I
8    mean, it's not ridiculous for me to ask her
9    what she remembers.  It's a deposition.  I
10    mean, give me a break.  If she wants to
11    read it, she can read it.
12        MS. BRENNAN:  Let her read it.
13        MR. PHILLIPS:  But don't -- don't
14    disparage why I'm asking questions.  I'm
15    asking what happened.
16        MS. BRENNAN:  Well, I think it's
17    offensive to make her go through --
18        MR. PHILLIPS:  Well, then the whole
19    process must be offensive.
20        THE WITNESS:  It is.  It is.
21        MR. PHILLIPS:  Okay.  Then maybe you
22    should leave if you find it offensive,
23    ma'am.  If you don't want to file a
24    lawsuit, don't file a lawsuit.  But we're
25    here at a deposition.  I'm asking you what

Page 161

K. CRAWFORD-ALEXANDER MORECI
1
2  happened.
3         MS. BRENNAN:  I would ask that you
4    treat my client with respect.
5         MR. PHILLIPS:  I've treated her with
6    respect all day.  I've been treating her
7    with respect all day.  I'm not treating her
8    with disrespect.  I'm asking her what
9    happened.  And I'm not upset with her but
10    I'd like for her to answer the question.
11        MS. BRENNAN:  I want you to read
12    this and I want you to tell him everything
13    that you can think of that ▆▆▆ said to
14    you to you during this incident.
15        THE WITNESS:  He wanted to -- at
16    this time ▆▆▆ stated, "Come on, I'm" --
17    "I was just about to bust."  He wanted to
18    finish and then he wanted to eat my ass.
19  BY MR. PHILLIPS:
20    Q.  Okay.  So the way you wrote up this
21  report, if I'm reading it right, is you told
22  him to stop.  He said, "Okay" and continued to
23  masturbate, correct?
24    A.  Yes, sir.
25    Q.  Okay.  Did he get back into the line

| Page 162 | Page 163 |
|---|---|
| 1  K. CRAWFORD-ALEXANDER MORECI | 1  K. CRAWFORD-ALEXANDER MORECI |
| 2 at that point? | 2 line -- |
| 3  A.  No, he kept like moving out of the | 3  A.  Yes, sir. |
| 4 line. I was putting him back in the line. He | 4  Q.  -- and essentially do the same |
| 5 just kept walking out. | 5 thing? |
| 6  Q.  When you say you "put him back in | 6  A.  Yes, sir. |
| 7 the line," does that mean you gave him a verbal | 7  Q.  Okay. And according to your report |
| 8 direction -- | 8 -- well, let me strike that. Maybe it doesn't |
| 9  A.  No. | 9 say. |
| 10  Q.  -- to go back? | 10      How many times did that happen? |
| 11  A.  No, I stopped the line and I walked | 11  A.  About three times, sir. |
| 12 him back to the end of the line. | 12  Q.  So three times you told him to stop. |
| 13  Q.  Okay. Did you -- did you touch him, | 13 You stopped the line. You put him back in the |
| 14 when you say you walked him back? | 14 line. You started the line. He did the same |
| 15  A.  No. | 15 thing. Is that correct? |
| 16  Q.  That means you walked with him | 16  A.  Yes, sir. |
| 17 back -- | 17  Q.  Your report states, first of all, |
| 18  A.  Yeah. | 18 that other detainees began to say sexually |
| 19  Q.  -- to the line? | 19 explicit things to you, right? |
| 20  A.  Yes, sir. | 20  A.  Yes, sir. |
| 21  Q.  And then you would start the line | 21  Q.  Did you write up any of those other |
| 22 again? | 22 detainees? |
| 23  A.  Yes, sir. | 23  A.  No. |
| 24  Q.  Correct? | 24  Q.  You were able to identify them; |
| 25      And then he would get out of the | 25 weren't you? |

| Page 164 | Page 165 |
|---|---|
| 1  K. CRAWFORD-ALEXANDER MORECI | 1  K. CRAWFORD-ALEXANDER MORECI |
| 2  A.  No, but I could have got their | 2      Do you see that? |
| 3 information when I went to 9. | 3  A.  Yes. Yes, sir. |
| 4  Q.  The things that they said to you, | 4  Q.  Are you saying that you were in fear |
| 5 were those things -- by saying those things, | 5 of them surrounding you or are you saying they |
| 6 were they violating the detainee rules? | 6 were actually surrounding you and you were in |
| 7  A.  They were violating me as a person. | 7 fear? |
| 8 But yes, they were violating the detainee rules | 8  A.  I was in fear of them surrounding |
| 9 brought on by ▇▇▇. | 9 me. I had two partners. They didn't say |
| 10  Q.  In other words, you think he | 10 anything and they just stayed in the back of |
| 11 provoked it? | 11 the line. And all these inmates are walking up |
| 12  A.  Yeah. | 12 on me. I'm the only one talking. I'm the only |
| 13  Q.  But even if he's the one that | 13 one using that wonderful verbal judo the County |
| 14 provoked it they still violated the rules? | 14 gave me that wasn't working. |
| 15  A.  Absolutely. | 15  Q.  So I guess I'm still unclear, |
| 16  Q.  That's certainly not an excuse, | 16 though. Are you saying they are actually |
| 17 right? | 17 surrounding you? |
| 18  A.  Nope. | 18  A.  It was basically me with a line of |
| 19  Q.  Then you state in your report (as | 19 inmates and my partners was in back, far back. |
| 20 read): At this point the reporting officer | 20  Q.  I understand that. The question I |
| 21 stopped the line in fear of detainee ▇▇▇ and | 21 had for you is, are the inmates in line or are |
| 22 other detainees surrounding reporting officer, | 22 they surrounding you at this point? |
| 23 which has occurred in the tunnels with other | 23  A.  They're around me. |
| 24 officers -- or I'm sorry -- which has occurred | 24  Q.  And your fellow officers are where? |
| 25 in the tunnels with officers. | 25  A.  In back. |

| | |
|---|---|
| Page 166 | Page 167 |

### Page 166

1  K. CRAWFORD-ALEXANDER MORECI
2  Q. How far away?
3  A. Behind the inmates. They were just
4  in back.
5  Q. Well, the line, you said it was a
6  two-by-two line, right?
7  A. Yes. It doesn't always stay that
8  way, unfortunately. It's the jail.
9  Q. You try?
10 A. Yes.
11 Q. All right. So they were about -- if
12 they were at the back of the line, they were
13 roughly five people back, correct?
14 A. Yeah. Yes, sir.
15 Q. According to your report, you used
16 two pushes to the chest to create distance and
17 put detainee ▇ again to the rear of the
18 line?
19 A. Yes.
20 Q. All right. So you pushed detainee
21 ▇ in his chest; is that correct?
22 A. Yes, sir.
23 Q. Did you push any other inmates?
24 A. No.
25 Q. Just him?

### Page 167

1  K. CRAWFORD-ALEXANDER MORECI
2  A. Yes, sir.
3  Q. And you pushed him back to the rear
4  of the line?
5  A. Yes, sir.
6  Q. At this time, according to your
7  report, detainee stated (as read): Come on, I
8  was just about to bust.
9       Which you took as ejaculation,
10 right?
11 A. Yes, sir.
12 Q. And that comment upset you, correct?
13 A. No, not upset me. It just made me
14 feel degraded.
15 Q. And that's when you struck him in
16 the face with an open hand, correct?
17 A. Yes, sir.
18 Q. Was that action consistent with the
19 department's use of force policy?
20 A. Not sure how to answer that.
21 Q. Because you don't know?
22 A. No, it's not because I don't know.
23 I'm just not sure how to answer that.
24 Q. Why are you not sure?
25 A. Well, I can tell you it's consistent

### Page 168

1  K. CRAWFORD-ALEXANDER MORECI
2  with it because the inmate was walking up on me
3  and he was threatening to put semen on me or
4  whatever, whatever that term means. That's
5  what I thought it meant. I have a right to
6  defend myself and do whatever it is, you know,
7  I have to do. But at the end of the day, the
8  -- the policy can turn around and say, well,
9  the inmate was handcuffed, even though he
10 wasn't properly handcuffed. So I -- kind of
11 like a catch-22.
12 Q. You think it was justified for you
13 to slap him in the face in that situation?
14 A. Yes.
15 Q. And do you think you should have
16 been disciplined for slapping him in the face
17 in that situation?
18 A. No.
19 Q. Was pushing detainee ▇ in the
20 chest consistent with the department's use of
21 force policy?
22 A. Yes.
23 Q. And what have you been taught about
24 using pushes to the chest as a way of
25 controlling inmates?

### Page 169

1  K. CRAWFORD-ALEXANDER MORECI
2  A. It's a distance. Keep the inmate at
3  a distance.
4  Q. So it's permissible to push them in
5  the chest for that purpose?
6  A. Yes.
7  Q. And that's what you wrote in that
8  report as to why you were doing it, correct?
9  A. Yes.
10 Q. According to your report, detainee
11 ▇ stated to you that he's suing for
12 $100 million.
13 A. Yes.
14 Q. Correct?
15 A. Yes, sir.
16 Q. Anything else you remember him
17 saying in connection with this incident other
18 than what's in your report?
19 A. He kept just saying just let him
20 bust.
21 Q. I'm sorry. That's quoted in there,
22 too, right?
23 A. Yeah.
24 Q. You didn't actually see him
25 ejaculate, correct?