Exhibit 34

```
IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
           EASTERN DIVISION


SDAHRIE HOWARD, DENISE HOBBS,   )
& ELLENOR ALTMAN, individually  )
and on behalf of all others     )
similarly situated,             )
                  Plaintiffs;   )
                                )
                                )
    -v-                         )Case No. 17-CV-8146
                                )
                                )
                                )
                                )
COOK COUNTY SHERIFF'S OFFICE,   )
THOMAS J. DART, individually    )
and in his official capacity    )
as Sheriff of Cook County, and  )
COOK COUNTY,                    )
                  Defendants.   )
```

   The Discovery Deposition of MATTHEW BURKE, taken before Beth Radtke, RPR, CRR, within and for the State of Illinois, pursuant to the provisions of the Federal Rules of Civil Procedure of the United States District Court, at 20 South Clark Street, Chicago, Illinois, commencing at the hour of approximately 9:06 a.m. on the 10th day of January, 2019.

## Page 6

1  documents.
2  Q. Do you recall what documents you reviewed?
3  A. Many of the same documents that were
4  produced yesterday in the deposition of Mr. Wilensky,
5  as well as sections of the monitors reports in the
6  agreed order case with the Cook County Sheriff's
7  Office.
8  Q. Do you recall what sections of the reports
9  that you reviewed?
10  A. Generally the ones that dealt with inmate
11  discipline.
12  Q. Did any of those sections of the reports
13  from the monitor in that litigation deal in
14  particular with masturbation issues?
15  A. I can't recall right now if they
16  specifically mentioned masturbation. I do know that
17  a report or two did reference masturbation somewhere
18  in the report but not necessarily in the disciplinary
19  sections.
20  Q. So there were sections that dealt with
21  potential reforms to the sheriff's disciplinary
22  system?
23  A. Correct.
24  Q. Aside from your attorney, have you talked to

## Page 7

1  anybody about the deposition?
2  A. In preparing, I also spoke to a few members
3  of the Cook County Sheriff's Office.
4  Q. Who did you speak to?
5  A. Larry Gavin, who is an assistant executive
6  director of the CCDOC, Amar Patel, Daniel Korso,
7  Steve Wilensky, John Murphy. I believe that's it.
8  Q. Without going through each of them, were the
9  conversations you had with these five individuals
10  related to preparing to be able to provide testimony
11  on behalf of the corporation for the topics
12  designated in Exhibit 1?
13  A. Yes.
14  Q. Did you speak to Steve Wilensky yesterday
15  about preparing for the deposition today?
16  A. I'm sorry, what do you mean?
17  Q. Did you talk to him yesterday about his
18  testimony?
19  A. When we had met with our attorney prior to
20  his deposition.
21  Q. Okay, I don't -- if your attorney was
22  present, I don't want to know.
23  Did you have any other discussions with
24  Mr. Wilensky outside the presence of your attorney

## Page 8

1  yesterday?
2  A. No.
3  Q. What is your current position at the
4  sheriff's office?
5  A. I am the interim executive director of human
6  resources.
7  Q. And who is currently the executive director
8  of the jail?
9  A. That position is unfilled currently.
10  Q. So who was the last person to hold that
11  position?
12  A. Nneka Jones Tapia.
13  Q. And when did she leave?
14  A. March or April of 2018.
15  Q. And is somebody acting into her position
16  currently, to that position currently?
17  A. No. The responsibilities fall primarily on
18  Jeff Johnson and Dr. Jane Gubser, G-u-b-s-e-r.
19  Q. Is Dr. Gubser a sheriff's office employee?
20  A. Yes.
21  Q. And what is his role when he's not
22  performing the duties of the executive director?
23  A. Well, her title is the chief of programs,
24  and Jeff Johnson's title is the chief of operations.

## Page 9

1  Q. And chief of programs is -- does that mean
2  chief of programs for the inmates?
3  MR. MILIANTI: Object to the form.
4  BY THE WITNESS:
5  A. Yes, primarily.
6  BY MS. BRENNAN:
7  Q. And I'm sorry, Jeff Johnson's title is?
8  A. Chief of operations.
9  Q. Who is the current chief of staff to the
10  sheriff?
11  A. There is none.
12  Q. How long have you been working at the
13  sheriff's office?
14  A. Over 11 years.
15  Q. So you were hired in --
16  A. 2007.
17  Q. And what was the first position that you
18  were hired into?
19  A. Legal assistant.
20  Q. Prior to working at the sheriff's
21  department, what positions had you held?
22  A. I was in law school.
23  Q. What year did you graduate from law school?
24  A. 2009.

Page 10

1  Q. 2009?
2  A. Yeah.
3  Q. So you were hired as a legal assistant on a
4  part-time basis in 2007?
5  A. It was a full-time basis. I was going to
6  night school.
7  Q. What were your duties as a legal assistant?
8  A. Tracking litigation, attending hearings,
9  primarily in Federal Court.
10 Q. On behalf of the sheriff?
11 A. On behalf of the sheriff.
12    I worked on labor issues, particularly
13 hearing employee grievances.
14 Q. How did you come to be hired as a legal
15 assistant in 2007?
16 A. I was just hired. I don't know what you
17 mean. Sorry.
18 Q. Did you -- was there a posting for a job?
19 A. No.
20 Q. Did you -- did somebody contact you and
21 suggest that you come in for an interview?
22 A. Yes, I believe so.
23 Q. Who contacted you?
24 A. I believe it would have been Brian Towne.

Page 11

1  Q. What was Brian Towne's position, if you
2  know?
3  A. I believe he was director of administration
4  for the sheriff's office or something like that.
5  Q. Did you interview with Mr. Towne?
6  A. I believe so, and I believe I interviewed
7  with Peter Kramer who, at the time, was the acting
8  general counsel.
9  Q. How did you know Mr. Towne for him to
10 suggest that you come in for an interview?
11 A. I had worked with him on Sheriff Dart's
12 campaign.
13 Q. How long did you hold the legal assistant
14 position?
15 A. Approximately a year and a half. Until I
16 passed the bar exam.
17 Q. And then what was your next position?
18 A. Assistant general counsel.
19 Q. And that was in 2009?
20 A. Correct.
21 Q. And how did you come to attain the assistant
22 general counsel position?
23 A. Well, once I passed the bar, there was a
24 need for attorneys and I was a natural fit because of

Page 12

1  my prior experience in the office.
2  Q. Was there a posting for the position?
3  A. I do not believe so at that time.
4  Q. Did somebody invite you to interview for the
5  job?
6  A. No, it was more of a promotion.
7  Q. Did you fill out an application?
8  A. I don't believe so.
9  Q. Who was your boss when you were the
10 assistant general counsel?
11 A. Peter Kramer.
12 Q. And did you know Peter Kramer prior to
13 becoming a legal assistant in 2007?
14 A. Vaguely.
15 Q. How?
16 A. I believe we had mutual friends.
17 Q. What do you mean?
18 A. He's a couple years older than me and I
19 think we had mutual friends, so I met him.
20 Q. How did you meet him?
21 A. Socially.
22 Q. And did he also work on Sheriff Dart's
23 campaign?
24 A. He may have. I'm not positive.

Page 13

1  Q. How long did you hold the assistant general
2  counsel position?
3  A. I believe for a year or two.
4  Q. And what was the next position you held
5  after that?
6  A. First assistant general counsel.
7  Q. So that would have been in 2011 -- or 2012
8  -- 2010 or 2011?
9  A. Probably closer to 2011 or even '12.
10 Q. How did you come to attain the first
11 assistant general counsel position?
12 A. It was a promotion.
13 Q. Did you apply for it?
14 A. No.
15 Q. Did somebody ask you if you were interested
16 in the promotion?
17 A. I honestly don't recall exactly how it
18 happened.
19 Q. Did somebody leave and that vacancy was
20 created as a first assistant general counsel?
21 A. There may have been a restructuring of the
22 entire legal department at the time and that's how we
23 did it.
24 Q. Who did you report to when you were the

1 first assistant general counsel?
2　A. I believe for a time I reported to Nancy
3 Donahoe, and then to an individual named Sean
4 Heffernan.
5　Q. What was Sean Heffernan's position?
6　A. I believe he was general counsel.
7　Q. Going back to the assistant general counsel
8 position, what were your general duties?
9　A. I'm sorry, as assistant general counsel?
10　Q. Mm-hmm.
11　A. Working with the state's attorneys on
12 pending litigation against the sheriff's office, I
13 played a larger role in labor relations and contract
14 negotiations. At the onset of the agreed order with
15 the Department of Justice, I played a large role in
16 compliance coordination efforts.
17　Q. And as the first assistant general counsel
18 what were your duties?
19　A. The same responsibilities I just referenced
20 as assistant general counsel, but in addition,
21 managing a team of about five to ten attorneys.
22　Q. And were those attorneys handling litigation
23 where the sheriff was either a defendant or a party
24 to a particular case?

1　A. Yes.
2　Q. How long did you hold the first assistant
3 general counsel position?
4　A. I believe about two years.
5　Q. And then what was your next position?
6　A. The chief of staff of the Cook County
7 Department of Corrections.
8　Q. What year did you attain that position?
9　A. June of 2014.
10　Q. Who did you report to?
11　A. Cara Smith.
12　Q. How did you come to attain the chief of
13 staff position?
14　A. It was also a promotion.
15　Q. What were your duties as chief of staff to
16 CCDOC?
17　A. Primarily to work with the executive
18 director of the CCDOC, who again, was Cara Smith at
19 the time.
20　Q. And what particular duties did you perform
21 in working with her?
22　A. I was essentially her right-hand man in
23 making sure that our compliance efforts with the
24 agreed order were continuing, making sure that we

1 were within our budget, being an in-house liaison to
2 the labor unions who had members within CCDOC. I
3 would also work with the legal department on issues
4 or litigation.
5　Q. What were your responsibilities as chief of
6 staff for the inmate discipline system?
7　A. I believe at the time the inmate discipline
8 unit fell under my chain of command.
9　Q. Was there a director of inmate discipline in
10 June of 2014?
11　A. The head of the unit was William Rohde,
12 R-o-h-d-e.
13　Q. And he reported directly to you?
14　A. I had a deputy chief of staff named Daniel
15 Korso who he reported to.
16　Q. Is Korso with a C?
17　A. I'm sorry, a K.
18　Q. Did you have ultimate responsibility over
19 the inmate discipline system and it working
20 effectively?
21　　MR. MILIANTI: Object to the form.
22 BY THE WITNESS:
23　A. Yes.
24

1 BY MS. BRENNAN:
2　Q. Maybe I should ask a better question.
3　　Were you essentially responsible for the
4 effective functioning of the inmate discipline
5 system?
6　A. I was ultimately responsible for making sure
7 that we were in compliance with the agreed order's
8 provisions pertaining to inmate discipline.
9　Q. How long did you hold the chief of staff
10 position?
11　A. Until July of 2018.
12　Q. And what's your current position?
13　A. Interim executive director of human
14 resources.
15　Q. Do you have a designated position that is
16 below that while you're acting as the interim
17 director?
18　A. No.
19　Q. So can you take a look at Exhibit 2 and
20 Exhibit 3?
21　　So Exhibit 2, can you just tell me briefly
22 what you understand this to be?
23　A. This is the inmate discipline sheriff's
24 order from 2011.

Page 18

1  Q. And there were some changes from the 2011
2  version to the December '13 version, which is Exhibit
3  No. 3, is that correct?
4  A. Yes, Exhibit No. 3 is a change order.
5  Q. So taking a look at Exhibit 1 -- Exhibit 2,
6  sorry. The last three pages, I believe, are the
7  then-existing disciplinary charge codes, Bates
8  labeled 930 to 933?
9  A. Yes.
10  Q. Have you seen that before?
11  A. Yes.
12  Q. And can you go to the Bates-labeled document
13  that is 932? At the top you'll see the
14  predatory/violence code. It's a Category 6.
15     Can you just read what the 600 category is?
16  A. "Engaging in sexual acts including indecent
17  exposure, masturbation, subjecting another person to
18  sexually harassing or suggestive conduct through
19  physical action and/or verbal or written statements."
20  Q. So is this what -- is this a description of
21  what would be the current 313 violation?
22     MR. MILIANTI: Object to the form.
23  BY MS. BRENNAN:
24  Q. Let me -- I'll ask you a different

Page 19

1  question.
2     Would masturbating at officers fall under
3  this Category 600 code?
4  A. If someone were masturbating, then that
5  would be a 313 and it would have been a 600.
6  Q. Okay. So under the old code, the
7  masturbation violation was a Category 600, correct?
8  A. Correct.
9  Q. And under the old code, the sexually
10  harassing or suggestive conduct was a Category 600
11  violation, correct?
12  A. Correct.
13  Q. And under the old code, the indecent
14  exposure was a 600 violation category, correct?
15  A. Correct.
16  Q. And if you look at the next page, the last
17  page, it includes the penalties for code violations.
18     Do you see that.
19  A. Yes.
20  Q. And Category 6 violations resulted in 25 to
21  60 days in disciplinary segregation and/or sanctions,
22  correct?
23  A. Correct.
24  Q. And some of the additional sanctions that

Page 20

1  could have been included were listed above in
2  Category 1 and 2, correct?
3  A. Correct.
4  Q. So can you take a look at Exhibit 3? And
5  the last 3 pages are the code that existed in
6  December 2013, correct?
7  A. Correct.
8  Q. And you -- if you look at the second page,
9  indecent exposure, which had been a Category 6 is now
10  a Category 2 violation, correct? Under 210?
11  A. Yes.
12  Q. And sexual harassment, which had been a
13  Category 6 violation is now a 200 violation under
14  216, correct?
15  A. Correct.
16  Q. Do you know why those violations changed?
17  The level of violations changed?
18  A. I do not recall specifically.
19  Q. And the indecent exposure/masturbation went
20  from a 600 category to a 313, correct?
21  A. Correct.
22  Q. And just so it's clear, the overall system
23  went from 600 level, 1 through 3 violations, and now
24  they're 1 through 4 violations, correct?

Page 21

1     MR. MILIANTI: Just object to the form.
2  BY THE WITNESS:
3  A. 1 through 7.
4  BY MS. BRENNAN:
5  Q. 1 through 7, okay.
6     If you look at the last page that refers to
7  the sanctions, the 200 sanctions, which now include
8  indecent exposure and sexual harassment, propose 5 to
9  15 days in segregation, correct?
10  A. Correct.
11  Q. And the 300 level sanctions are now 5 to
12  25 days, and that includes the masturbation, correct?
13  A. Correct.
14  Q. And do you know why there was a decision to
15  reduce the sanctions when inmates engaged in indecent
16  exposure?
17  A. I do not remember specifically, but the
18  change in the disciplinary codes was all related to
19  the overhaul we were doing of our classification
20  system.
21  Q. And what does that mean?
22  A. The classification system is used to
23  determine the appropriate housing or security level
24  for detainees, and we had worked with a

1 classification expert as part of our efforts in the
2 agreed order, and one of the initiatives was to make
3 clearer the disciplinary codes and to get them down
4 to four levels. So most of the changes were prompted
5 by re-looking at the entire classification and
6 discipline system.
7    Q. Okay. Classifications deals with what?
8 Minimum, maximum security and mental health
9 classifications?
10    A. Minimum, medium, maximum, and then within
11 that, you might have subcategories of mental health
12 housing, medical housing, protective custody, and
13 disciplinary housing.
14    Q. So that deals with how you categorize a
15 particular inmate, correct?
16    A. Correct.
17    Q. And that does not dictate how you -- what
18 the sanctions available for a particular violation
19 are, correct?
20    A. I believe --
21      MR. MILIANTI: Object to the form.
22 BY THE WITNESS:
23    A. I believe that's correct.
24

1 BY MS. BRENNAN:
2    Q. Okay. Unless the individual has a P3
3 designation, in which case there would be certain
4 sanctions that are not available, correct?
5    A. P3 or P4, or potentially M3 or M4.
6    Q. So in the process of moving from a
7 seven-level code system to a four-level code system,
8 the violations of indecent exposure sanctions were
9 downgraded, correct?
10    A. I don't know if it's fair to say that it was
11 necessarily downgraded.
12    Q. Well, the sanction available for indecent
13 exposure under the code that was in place in November
14 of 2011 was 25 to 60 days in disciplinary
15 segregation, and in the new code, it's 5 to 15. So
16 the available sanctions for indecent exposure were
17 reduced; is that correct?
18    A. Yes.
19    Q. And were the available sanctions for sexual
20 harassment, which under November '11 were 25 to
21 60 days in disciplinary segregation, and in December
22 of 2013 were 5 to 15 days in segregation, reduced?
23    A. Yes.
24    Q. And under November 2011, violation for

1 masturbation was 25 to 60 days in disciplinary,
2 correct?
3    A. Correct.
4    Q. And under the December 2013, a violation for
5 masturbation is 5 to 25 days in disciplinary,
6 correct?
7    A. Correct.
8    Q. One of the amendments that is identified in
9 Exhibit 3 is F1, disciplinary hearings on major
10 infractions. Actually, let me ask you a different
11 question first.
12      If you go to page 3 of Exhibit 2, under
13 Definitions, paragraph F is a disciplinary hearing
14 team, and then Exhibit 3 amends that section?
15    A. Yes.
16    Q. Why did -- and the amendment creates --
17 states that any inmate discipline will be heard by a
18 disciplinary hearing officer authorized to conduct
19 such hearings who is independent of the divisional
20 chain of command.
21      Do you see that?
22    A. Yes.
23    Q. Why did the disciplinary system change from
24 using a disciplinary hearing team to an individual

1 officer independent of the divisional chain of
2 command?
3    A. Around 2012, I believe, or maybe even a
4 little bit earlier, we had determined that the
5 disciplinary hearing team didn't provide the
6 efficiency that we needed or the level of
7 independence from the jail chain of command and the
8 ability to always ensure an adequate level of due
9 process in these hearings. So we had switched to
10 have attorneys conduct the disciplinary hearings.
11    Q. When you said that the -- what was the
12 disciplinary team? How was it made up?
13    A. When we first began looking at discipline as
14 part of our agreed order compliance efforts, it was
15 comprised of two correctional lieutenants and a
16 couple civilian staff that they would use as well.
17    Q. Were the civilian staff from Cermak or
18 external civilian staff?
19    A. I can't recall specifically. I think there
20 may have been a time and I don't know if it was
21 before or after 2010 where Cermak staff may have been
22 involved, but I don't recall ever seeing Cermak staff
23 involved. I believe it was sheriff's office staff.
24    Q. And you said that one of the deficiencies of

Veritext Legal Solutions
www.veritext.com     888-391-3376

## Page 26

1 the team was that it was not efficient. How was it
2 not efficient?
3    A. Because you had to get the whole committee
4 together to conduct hearings, I recall there being
5 issues with them not being able to get to certain
6 divisions because a member of the team wasn't there
7 and there was no available replacement.
8      In addition, the lieutenants who were on the
9 committees worked, I think, 6:00 to 2:00 or 7:00 to
10 3:00 p.m. and had a lunch break and, you know,
11 sometimes didn't have the flexibility needed in order
12 to sometimes complete hearings or have long days or
13 things like that.
14    Q. Then you said that the use of the
15 disciplinary team was not independent. What did you
16 mean by that?
17    A. Because the lieutenants were in the chain of
18 command at the jail, there was some concern that they
19 would not maybe always provide the proper level of
20 due process for some of these hearings, meaning that
21 maybe they would just rubber stamp guilty findings
22 without really adequately weighing the evidence.
23    Q. Did the lieutenants participating in the
24 hearing committees -- discipline hearing committees

## Page 27

1 preside over discipline that was within their actual
2 division or tier that they were supervising?
3    A. No, they were, I believe, standalone
4 lieutenants. So they were not necessarily within a
5 particular division, they were just reporting to, I
6 believe, an assistant executive director, or maybe a
7 superintendent, but not a superintendent in the
8 division.
9    Q. Was the role as the hearing board team
10 member their primary function?
11    A. I believe so, and if I recall correctly, I
12 think that also presented a problem because sometimes
13 when there would be short staffing on the compound
14 for lieutenants, they would be called to go fill in,
15 and so they wouldn't be able to conduct hearings that
16 day because they would have to be a lieutenant
17 somewhere in the division.
18    Q. So they were not actually in the immediate
19 chain of command of the individual who had made the
20 disciplinary ticket, correct?
21      MR. MILIANTI: Object to the form of the
22 question.
23 BY THE WITNESS:
24    A. I believe so.

## Page 28

1 BY MS. BRENNAN:
2    Q. You believe that is correct?
3    A. Yes.
4    Q. Okay. So the -- so it's clear, the
5 lieutenants who were conducting the hearings were not
6 in the specific chain of command of the officers who
7 were writing the disciplinary tickets, is that
8 correct?
9    A. That is correct, except, like I said,
10 sometimes I believe that they could be deployed to be
11 a shift commander or a lieutenant of a certain shift,
12 at which point they may have an officer who is under
13 their command that wrote a ticket that they would
14 then maybe hear a few days later.
15    Q. Okay.
16    A. I don't recall too specifically, but...
17    Q. How many lieutenants held the position of
18 hearing team -- discipline hearing members?
19    A. I believe it was just two.
20    Q. Do you know how long that system had been in
21 place?
22    A. No.
23    Q. Do you know whether or not it is more common
24 than not to have a lieutenant or sworn member in a

## Page 29

1 prison or jail to participate in hearing
2 adjudications for inmate discipline?
3    A. I'm not certain what the breakdown would be.
4    Q. Have you looked at -- what's it called,
5 American Association of Correctional Officers?
6    A. There is the ACA, so the American
7 Correctional Association. There's also the AJA, the
8 American Jail Association.
9    Q. Have you looked at the standards of the ACA
10 about what is recommended for whether or not a sworn
11 officer should participate in the adjudication of
12 hearings on inmate discipline?
13    A. I have not.
14    Q. And the AJA is the American Jail
15 Association?
16    A. Yes.
17    Q. Have you looked at their recommendations
18 about whether or not sworn officers should
19 participate in the hearing adjudication process for
20 inmate discipline?
21    A. I have not. I don't know if they have
22 standards like that.
23    Q. Okay.
24    A. I do know that the decision was made in