Exhibit 37

```
1        IN THE UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF ILLINOIS
2                 EASTERN DIVISION
3
    SDAHRIE HOWARD, DENISE HOBBS,     )
4   and ELLENOR ALTMAN, et al.,       )
                                      )
5                  Plaintiffs,        )
                                      )
6        vs.                          )  Case No.
                                      )  17-cv-8146
7   COOK COUNTY SHERIFF'S OFFICE      )
    and COUNTY OF COOK,               )
8                                     )
                   Defendants.        )
9
10
11
12          DEPOSITION OF BALVINA RANNEY
13                Chicago, Illinois
14            Tuesday, October 16, 2018
15
16
17
18
19
20
21
22
23  Reported by:
24  RACHEL F. GARD, CSR, RPR, CLR, CRR
25  JOB NO. 148926
```

Page 26

B. RANNEY
until roughly November of 1997?
A. Yes.
Q. Where did you go after that?
A. 26th and California.
Q. Did you bid into that job?
A. Yes.
Q. Have you been at 26th and California ever since?
A. Yes.
Q. And if I understand this correctly, you periodically have the opportunity to bid into other jobs, correct?
A. Correct.
Q. So if you wanted to go to another courthouse, you would have an opportunity to bid into that?
A. Yes.
Q. Have you ever tried to bid out of 26th and California?
A. No.
Q. What's your current assignment?
A. I'm assigned to courtroom 700, Judge Linn.
Q. Is that L I N N or L Y N N?

Page 27

B. RANNEY
A. Yes, L I N N.
Q. How long have you been in that courtroom?
A. Since 2009. Like May.
Q. Did you bid into that assignment, or was that assignment given to you?
A. No, that was assignment that was given to me. I guess the deputy that was in there was leaving or something.
Q. Have you regularly worked any jobs in the courthouse since May of 2009 other than courtroom 700?
A. When there's -- if there's -- if they're shorthanded, I'll go to another courtroom. If my courtroom is down, I'll go help at the front door. Wherever they need -- if they need me, I go to different assignments.
Q. Have you been regularly assigned any place other than courtroom 700, though, since 2009?
A. No.
Q. So occasionally, you'll go to other assignments if you're needed?
A. Yes.

Page 28

B. RANNEY
Q. And who's your current supervisor in courtroom 700?
A. Right now?
Q. Yeah.
A. Sergeant Kowalski. He's been basically there almost every day.
Q. How long has he been your supervisor?
A. Just this -- since he got transferred. I don't know exactly when he got transferred, but recently.
Q. Where did he come from?
A. A street unit.
Q. So recently being he became your supervisor sometime in 2018?
A. Yes.
Q. Who was your supervisor before Kowalski?
A. Well, the supervisors would take turns. So there's a list.
Q. You might have several?
A. Yes.
Q. Who were the sergeants that supervised you before Kowalski?

Page 29

B. RANNEY
A. Sergeant Stawczyk. Sergeant King, male. Sergeant King, female. Sergeant Hunter. Sergeant Gercone. Sergeant Mateck. I think that's all the sergeants.
Q. And so those six sergeants you named would be supervising you on different days; is that right?
A. Yeah, yes.
Q. Was it sort of a situation where you would show up to work and you didn't know who the sergeant was going to be when you got there?
A. Yes.
Q. You mentioned there's two sergeant Kings?
A. Yes.
Q. One is male, and one is female?
A. Yes.
Q. Do you know the male Sergeant King's first name?
A. I think it's Darryl, D A R R Y L.
Q. Is he still at 26th and Cal?
A. I think he's a deputy now.
Q. He was demoted, you mean?

Page 38

B. RANNEY
Q. Just recently?
A. Yes.
Q. This year?
A. Yes, yes.
Q. Does the transport team currently bring the 313s to the courtroom and back down to the bridge?
A. Yes.
Q. How long has that been going on?
A. That's also recently -- well, because they don't stay up by us anymore.
Q. The 313s?
A. Right. Before they used to. So ...
Q. For how long have they not been staying up by you?
A. How long have they not been staying up?
Q. Yeah. You said they used to stay up by you but now they don't.
A. Since last year, the end of last year.
Q. Is the current procedure for 313s that they get brought up from the bridge by the transport team?

Page 39

B. RANNEY
A. Uh-huh.
Q. Is that a yes?
A. Yes, I'm sorry.
Q. When their court appearance is over, they get brought back to the bridge; is that correct?
A. Yes.
Q. By the transport team?
A. Yes.
Q. Currently do you have any responsibility for transporting 313s?
A. No.
Q. Do you have responsibility currently for transporting any other inmates to and from the lockup?
A. The remand, the people that are not in Cook County Jail custody and they're just taken off the floor, we have to bring them down.
Q. So if somebody came over from IDOC, you would be responsible for taking that person up and back?
A. Yes.
Q. Is there an IDOC officer who's

Page 40

B. RANNEY
responsible for that inmate or that group of inmates?
A. When they're in their care, they are, but once they're remanded, they're in our care.
Q. And when you say remanded, what do you mean by remanded?
A. Well, they are not in IDOC custody. They are now in the Cook County sheriff's custody.
Q. And does that mean they're in Cook County Jail, the CCDOC's custody?
A. Correct.
Q. So you have inmates who have been remanded from IDOC to CCDOC?
A. Yes. Right now we have two that are currently remanded, and they are now with the regular guys.
Q. What about inmates from other jails, such as Kane County or Lake County, are you responsible for bringing them from the bridge to the courtroom?
A. No. They actually come with the correctional officers with them.

Page 41

B. RANNEY
Q. So if you get an inmate from -- who's in the custody of Kane County DOC in your courtroom, a Kane County DOC officer will be responsible for bringing that inmate up to the courtroom and back?
A. Yes.
Q. Other than remands, are you responsible currently for bringing any inmates to the courtroom from the bridge or back to the bridge from the courtroom?
A. No.
Q. In the past 5 years, have you been responsible for bringing any inmates other than remands from the bridge to the courtroom or back?
A. Oh, yes.
Q. When did that change?
MR. KULWIN: Objection. Asked and answered.
You can answer the question.
Q. Let me ask -- let me rephrase the question.
Did that also change towards the end of last year?

Page 42

B. RANNEY

Q. Okay. So up until the end of last year, what -- which inmates were you responsible for bringing from the bridge to the courtroom and back to the bridge?
A. All of them.
Q. Including females?
A. Yes.
Q. And juveniles?
A. Yes.
Q. Could you describe for me what the process was for doing that?
A. Okay. So the trans team will bring them up on the elevator. Then we get their mitts, uncuff them. Before they weren't cuffed. They would just come uncuffed.
Q. When you say before, before what?
A. Before all this, they would come up uncuffed. They would come just like free, no handcuffs.
Q. So the transport team would bring them up from the bridge, though, in the elevator?
A. Right. And then we would put them

Page 43

B. RANNEY

in the cell. Check their IDs or their mitts, make sure they're there. Put them on the list. When they're done with court when we have a few or we take a break, then we will drop them down to the bridge.
Q. So it sounds like what you're telling me is the transport team would bring them up from the bridge, but you or your partner would sometimes take them back down to the bridge?
A. Right. It only deals with the north end of the courthouse because the north end, I don't know why it was that way, but the south end, they would pick the prisoners and take them back down.
Q. South end had different procedures?
A. Yes.
Q. But you're on the north end?
A. Yes.
Q. And how would you and your partner bring the inmates from the courtroom lockup down to the bridge? What were the procedures around that?
A. We would put them on a list, who was

Page 44

B. RANNEY

done. And we'd handcuff them. When we were able -- when we got handcuffs. We didn't have handcuffs before.
Q. When did you get handcuffs?
A. Sometime last year.
Then we bring them down. We wait because everybody is bringing their inmates down, and then there would usually be a line. And then we wait our turn. They'll sign off, give them the mitts, and then we go back up.
Q. Both of you -- would both you and your partner bring the inmates downstairs or just one of you?
A. Just one.
Q. And you said you would handcuff them after the point in time when you got handcuffs. How would you cuff them?
A. I would cuff them in the back. I was told to cuff them in the front.
Q. Told by whom?
A. Lieutenant Dillon, Lieutenant Wodarczyk, sergeants.
Q. Why would you cuff them in the back?
A. That's the way you're supposed to.

Page 45

B. RANNEY

Q. When you say that's the way you're supposed to, what do you mean? What tells you you're supposed to do it that way?
A. That's the way we were trained.
Q. Where?
A. In the academy and in-service.
Q. Were you ever reprimanded for cuffing inmates behind the back rather than the front?
A. No. I was told to put them in the front.
Q. By the people you mentioned before?
A. (Nodding).
Q. Yes?
A. Yes.
Q. And I assume you transported them up and down through the elevator?
A. Yes.
Q. You mentioned waiting in line. Would that be upstairs or downstairs?
A. Downstairs in the tunnel.
Q. And was there a process where you had to check the inmates back in, for lack of a better word?

Page 74

B. RANNEY

Q. attorney?
A. Yes.
Q. What caused you to look for an attorney?
A. I felt that nothing was being done.
Q. About what specifically?
A. About the masturbating.
Q. About inmates masturbating at the courthouse?
A. Yes. Masturbating at the courthouse, exposing themselves, just the way they were talking. It was just, you know -- it was bad.
Q. When did it start getting bad?
A. When did it start getting bad?
Q. Uh-huh.
A. I want to say it started up in 2015, but it started getting really bad, like, 2017.
Q. When did you start looking for an attorney?
A. 2017. I just couldn't take it anymore.
Q. And when you say it started getting really bad, what do you mean by that?

Page 75

B. RANNEY

A. I was literally transporting a prisoner and -- I was transporting a prisoner, and he was actually masturbating next to me. And he just, like, kind of laughed at it, and I think that was my breaking point because I went to look for a supervisor --
MR. KULWIN: You need some Kleenex?
THE WITNESS: Yeah, please.
Q. Couple of napkins?
MR. KULWIN: Take a second. It's okay.
A. I went to look for a supervisor, and Sergeant Mateck was on the bottom of the bridge, and I couldn't go any further because they were backed up in the tunnel, which it was happening every single day now. And I said I need to make a complaint. He needs to be charged -- I was very upset.
Q. I'm sorry, you said that to Sergeant Mateck?
A. Uh-huh. And they said, well, you have to talk to the DOC sergeants. So I went to the bridge on the top and I went to -- I go can I speak to a sergeant, and as I was

Page 76

B. RANNEY

speaking, they go well, what do you need? There were other correctional officers. And I says this guy just, like, masturbating. I want to make a complaint. He was masturbating in front of me, like, right next to me.
And they're like, oh, well, you've got to talk to your sergeant, and I felt like I was a ping pong, you know, going back and forth, and I was standing there, and I turn around to look, and there's another guy in front of me masturbating in the max cell.
Q. On the bridge?
A. On the bridge. As soon as you walk in, you saw, you know, they were masturbating right there. I was just -- I was really upset because that was not the only time. And I just -- it was really busy. And I remember the sergeant says, okay, I'll get to you. And he didn't. And --
Q. This is the DOC sergeant?
A. No, Sergeant Mateck.
Q. Oh, Sergeant Mateck.
A. And then finally, I says there was another guy that's also in the cell. He was

Page 77

B. RANNEY

like, okay, well, we'll get that too, whatever. Then he goes, you know what? I didn't know who he was because he wasn't my prisoner.
Q. This is another inmate, though?
A. Right.
Q. Okay.
A. He's like, well, okay, we'll have to go check the video to find out what time and stuff.
Q. I'm sorry, who said that?
A. Mateck.
Q. Mateck, okay.
A. Yeah. So it was either a holiday or a day off or something, or he wasn't there. And when I saw him the next day or the following day to follow up on it, he said, we'll write the report. I said okay. But I said what about the other one? He goes, oh, I don't know, that's the jail part. You have to handle it. I go, but I don't even know his name, like, what prisoner that was also.
He was just like I don't know, I can't tell you. This is all I remember you telling me.

Page 94

B. RANNEY

Q. Is it accurate to say that you were not satisfied with the answers you were getting from the sergeants at roll call on this issue?
A. Yes.
Q. Did you speak with the lieutenants after you had already raised this at roll call?
A. Yes.
Q. And I'm sorry if I asked this already. How many times did you speak to the lieutenants about this issue?
MR. KULWIN: Objection. Asked and answered.
Q. Okay. I don't remember what you said. I'm sorry.
MR. KULWIN: I think she said many. But go ahead.
Q. Now I'm recalling. I think you said it was more than three times, right?
A. Yes.
Q. Okay. What was the response of the lieutenants when you spoke to them about this issue?
A. I remember one conversation. The -- Lieutenant Wodarczyk says, I'm looking at this

Page 95

B. RANNEY

every single day, at the cameras masturbating. I go, there has to be something that can be done. He goes, well, we're doing what we can. I says it seems like it's getting worse instead of getting better. So basically he was just, what they were doing. Like we're doing what we can, you know.
Q. What did he say they were doing?
MR. KULWIN: If anything.
A. They were just telling us to make sure to get them down. That is like the answer, hurry up and get them down. But sometimes we couldn't. And that was a problem. And I felt that that's why they were even doing it even more because they were upset that they were stuck in the courtrooms.
So they didn't understand that we couldn't bring them down. So they would like, I guess, take it out on us, masturbating. There were times where they were very obnoxious and loud. They were trying to, I guess, throw a tantrum, or whatever to grab our attention, but we couldn't take them down. They said, well, just hurry up and try to take them down.

Page 96

B. RANNEY

How can we? Every time something happens, we call. Everybody is tied up, the bridge is backed up, so just going to have to wait.
Q. Any other specific conversation you recall with any of the lieutenants about this issue?
A. Say that again.
Q. Any other specific conversation you recall with any of the lieutenants about this issue?
A. I remember one incident where a guy actually brought Vaseline and snuck it in his pants to masturbate in my lockup. And we were reviewing the tape, and I told the lieutenant, I go this is disgusting because he wasn't even searched. He wouldn't have been able to bring it to masturbate. He actually brought Vaseline.
Q. Who was supposed to search him?
A. They're saying they don't have enough people to search the prisoners.
Q. Was it part of your responsibility to search the prisoners when you would bring them up from the bridge?

Page 97

B. RANNEY

A. At the end, it was. And then it was not -- then they said you don't have to search them. And that was Lieutenant Wodarczyk and Dillon that said that.
Q. When you said at the end it was your responsibility, the end of what?
A. Well, we had so many prisoners coming up, and I had asked them can we search them down on the bridge before coming up. And they said no. I said then where are we supposed to search them? And they said, well, search them in the lockup. But you have 22 -- 18 to 20 prisoners in there, and you're searching them inside the lockup? I'm not going to go inside the lockup with that many men.
So my partner would help search them on the wall, and I would stand there to make sure everything is okay, but not everybody was searched.
Q. This is when you would bring the inmates up from the bridge to the courtrooms?
A. Right. And my partner started feeling it was a safety risk. He says, this

TSG Reporting - Worldwide - 877-702-9580

25

1  B. RANNEY
2  A. I don't understand what you're
3  saying, I'll be honest.
4  Q. Okay. That's fine if you don't
5  understand the question.
6  MS. HARVEY: Okay. No further
7  questions.
8  MR. KULWIN: I just have a few
9  cleanup questions, if I may.
10  EXAMINATION
11  BY MR. KULWIN:
12  Q. On a number of occasions, and just
13  recently this afternoon, you were asked
14  questions about various detainees and whether
15  they, quote, just made comments. Do you
16  remember those questions just now, whether
17  these were detainees that just made comments to
18  you? Do you remember those questions?
19  A. Yes.
20  Q. Is it difficult for you to
21  articulate and discuss those comments?
22  MR. PHILLIPS: Objection. Leading.
23  A. Yes. It's very difficult.
24  Q. Okay. Let me ask you a question.
25  I'm going to say some things to you, and I'm

1  B. RANNEY
2  sorry for doing this to you, but can you tell
3  me if you've heard comments such as the
4  following from inmates -- and these are the
5  comments you were referring to when answering
6  the questions about comments detainees made to
7  you. Here we go. You can just say yes or no.
8  I'm going to fuck you up, bitch.
9  Have you heard things like that?
10  A. Yes.
11  Q. I'll fuck the shit out of you. I'm
12  going to fuck you in your ass. Have you heard
13  things like that?
14  A. Yes.
15  Q. I'm going to put my dick on you if
16  you come in here. Have you heard things like
17  that?
18  A. Yes.
19  Q. Bitch, you press charges on me, I
20  should fuck you up. Have you heard things like
21  that?
22  A. Yes.
23  Q. I'll rape you and your kids. Have
24  you heard that?
25  A. Yes.

1  B. RANNEY
2  Q. I'll make you suck my dick. Have
3  you heard that?
4  A. Yes.
5  Q. I will eat your pussy. Have you
6  heard that?
7  A. Yes.
8  Q. Suck my dick. Have you heard that?
9  A. Yes.
10  Q. And other comments of that same
11  nature over the years?
12  A. Yes.
13  Q. Have you been hearing those comments
14  more frequently between 2015, 2016, 2017 as the
15  years have gone on?
16  A. Yes.
17  Q. Have these been open and notorious
18  so that your supervisors and other people in
19  the lockup have heard these things?
20  A. Yes.
21  Q. Has any sergeant or lieutenant
22  intervened in any way to stop the inmates from
23  doing these things?
24  A. No.
25  Q. Have you also had sexual epithets

1  B. RANNEY
2  thrown at you such as cunt, bitch, and whore?
3  A. Yes.
4  Q. And have those kind of comments been
5  loud enough so that your supervisors, from time
6  to time, heard those things, to the best of
7  your knowledge?
8  A. Yes.
9  Q. Have they done anything about it?
10  A. No.
11  Q. You were asked some questions about
12  all -- if you could name all the deputies who
13  came to you between 2015 and the present to
14  discuss with you what was going on in the
15  lockups.
16  Do you remember those questions?
17  A. Yes.
18  Q. And do you remember stating as many
19  names as you could remember at the time, today?
20  Do you remember that?
21  A. Yes.
22  Q. Did you also remember adding some
23  names as the day went on when they came up in
24  further questioning?
25  A. Yes.