Exhibit 38

1             SUSAN PLASENCIA
2     IN THE UNITED STATES DISTRICT COURT
3         NORTHERN DISTRICT OF ILLINOIS
4             EASTERN DIVISION
5  SDAHRIE HOWARD, DENISE HOBBS    )
                                   )
6  and ELLENOR ALTMAN, et. al.,    )
                                   )
7                                  )
             Plaintiffs,           )
8                                  )
                                   )
9       vs.                        ) Case No.
                                   )
10                                 ) 17-cv-8146
   COOK COUNTY SHERIFF'S OFFICE,   )
11                                 )
   and COUNTY OF COOK,             )
12                                 )
             Defendants.           )
13
14
15
16         DEPOSITION OF SUSANA PLASENCIA
17          Thursday, September 27, 2018
18                Chicago, Illinois
19
20
21
22 Reported By:
23 TRICIA J. FLASKA, CSR, RPR
24 JOB NO. 147718
25

Page 30

SUSAN PLASENCIA

1
2  assigned to the courthouses?
3    A  Yes.
4    Q  And was that training classroom training or
5  practical training or a little bit of both?
6    A  Both.
7    Q  What did you do in terms of practical
8  training?
9    A  We did like some kind of scenarios, just
10 mostly, you know, if we had to -- you know, if you
11 were in the hallway or entry screening and someone
12 didn't want to comply with coming into the building.
13 It was kind of mostly that kind of stuff.
14       We had firearms training.  We had what they
15 call red man training --
16   Q  What's red man training?
17   A  The instructors would dress up in these big
18 red padded suits, so that was more of like defensive
19 tactic type training, and then just like PT
20 training, just physical training, running, jumping
21 jacks, sit-ups.  That was kind of it.
22   Q  Did you have any -- as part of your
23 training, did you shadow another deputy in a
24 courthouse?  Was there any of that kind of training?
25   A  When I first got to 26th Street, they would

Page 31

SUSAN PLASENCIA

1
2  sometimes put me in a courtroom with like two other
3  deputies just to kind of see like what the paperwork
4  was, what they did.  That was probably just a few
5  times, though.
6    Q  So that was after you left the academy?
7    A  Correct.
8    Q  And you said there was some classroom
9  training at academy?
10   A  Yes.
11   Q  Can you give an estimate of what percentage
12 was classroom as opposed to practical training?
13   A  I would say that was probably maybe 70
14 percent.  We were mostly in the classroom.
15   Q  So then once you're done with the academy,
16 did you get a choice of which courthouse to be
17 assigned to?
18   A  I did not.
19   Q  They just told you where to go?
20   A  Correct.  They just told us where to
21 report.
22   Q  And where were you assigned after the
23 academy?
24   A  26th and California.
25   Q  Have you been at 26th and California since

Page 32

SUSAN PLASENCIA

1
2  that time?
3    A  I have.
4    Q  Do you have a process, either under your
5  union contract or under the department's policies,
6  where you can bid for open positions at other
7  courthouses?
8    A  We do.  When they become available.
9    Q  Have you ever bid to work in another
10 courthouse?
11   A  I have not.
12   Q  I'm assuming that at this point in your
13 career you've got a fair amount of seniority?
14   A  Yes.
15   Q  So when you were first assigned to 26th and
16 California, did you get assigned to a specific
17 courtroom or a specific department?  What was your
18 first assignment there?
19   A  My first assignment was the front door.
20   Q  And I don't want to go through every
21 assignment you've had, but have you at times been
22 assigned to a courtroom.
23   A  Yes.
24   Q  Are you currently on the CR team?
25   A  Yes.

Page 33

SUSAN PLASENCIA

1
2    Q  How long have you been on the CR team?
3    A  Since December of '17.
4    Q  How did you get assigned to the CR team?
5    A  They needed another deputy, preferably
6  female, on the CR team, because there was only one.
7  When I worked afternoons, I did that work.  So they
8  asked if I would come out of the courtroom and onto
9  the CR team and I agreed.
10   Q  Who asked you that?
11   A  Lieutenant Dillon.  It's now Sergeant
12 Dillon.
13   Q  And how did you know they needed another
14 female on the team?
15   A  From Lieutenant Dillon.
16   Q  He told you that?
17   A  Yeah.  He said, "We need another female.
18 Would you do it so we don't have to train somebody?"
19   Q  And you said you did that kind of work when
20 you were assigned to the courtroom.  Could you
21 explain that?
22   A  I did that when I was working afternoons.
23   Q  When you say that work, what are you
24 referring to?  What work?
25   A  We processed the warrants, any kind of

Page 34

1  SUSAN PLASENCIA
2  arrests, ran the LEADS system.
3  Q  So you were assigned to a courtroom but you
4  were doing that kind of work?
5  A  I was doing that when I worked afternoons,
6  and when I worked afternoons I was not assigned to a
7  courtroom. I was the female security officer on
8  afternoons.
9  Q  A better question probably would have been
10 what were you doing before you joined the CR team?
11 A  I was in a courtroom.
12 Q  What courtroom was that?
13 A  Courtroom 602.
14 Q  So just so I understand, is that where you
15 were assigned when Lieutenant Dillon asked you to
16 join the CR team, or was there an assignment between
17 there?
18 A  That was the courtroom I was assigned to
19 when Lieutenant Dillon asked.
20 Q  And you said you were working afternoons.
21 What's the afternoon shift at the courthouse?
22 A  Right now it's 2:00 to 10:00. When I was
23 working on it, it was 3:00 to 11:00 or 4:00 to
24 12:00.
25 Q  And can you bid for shifts within the

Page 35

1  SUSAN PLASENCIA
2  courthouse?
3  A  When it's available.
4  Q  So, in other words, if you decide you
5  wanted to work mornings instead of afternoons, you
6  could bid for open morning shifts at the courthouse?
7  A  Correct. When we -- when we re-bid the
8  building.
9  Q  Right, from time to time?
10 A  Correct.
11 Q  Not at any time?
12 A  Correct.
13 Q  You had to wait until bids were being
14 posted --
15 A  Yes.
16 Q  -- and you could bid for a morning
17 position?
18 A  Yes.
19 Q  Did you bid in the afternoons?
20 A  I bid to go to afternoons when I went to
21 afternoons, and then I bid to come back to days when
22 I came back to days.
23 Q  And when did you come back to days?
24 A  2012.
25 Q  And at the time that you were asked to join

Page 36

1  SUSAN PLASENCIA
2  the CR team, were you working mornings -- or, I'm
3  sorry -- days or afternoons?
4  A  Days.
5  Q  So the CR team was not something you bid
6  into?
7  A  No.
8  Q  It was a team that you were asked to join?
9  A  Correct.
10 Q  Who's your current supervisor on that team?
11 A  Sergeant Hunter.
12 Q  Have you worked with Sergeant Hunter since
13 you joined the CR team?
14 A  Yes.
15 Q  And is Lieutenant Lang his current
16 supervisor?
17 A  Yes.
18 Q  Do you also work with Sergeant Gercone on
19 the CR team?
20 A  At times, yes.
21 Q  Does he fill in for Sergeant Hunter on
22 certain days?
23 A  He does.
24 Q  How many people on that team? Per shift, I
25 guess.

Page 37

1  SUSAN PLASENCIA
2  A  On our shift there's -- when we're all
3  there, there's seven.
4  Q  And I've heard that team described as being
5  courthouse security.
6    Is that an accurate way to describe it?
7  A  Yes.
8  Q  Could you tell us, generally, what you do
9  on the CR team?
10 A  Sure. Every morning we go down to the
11 front door and assist the front door personnel,
12 mostly by directing anybody coming in where to go,
13 check their phones in, and then just direct them
14 where they go.
15   If there is a call, mostly from the
16 probation department, that somebody came in and has
17 an outstanding warrant, we go get them. We process
18 the warn. If we're lucky enough that the warrant is
19 from the courthouse, we try to contact the courtroom
20 to see if we can bring them before their judge.
21   If there's a fight in a hallway or a
22 lockup, we get a call. We respond to that. We
23 assist Chicago police, if they're there, to pick
24 somebody up. We'll wait with them when they pick
25 them up outside the courtroom after they've gone to

Page 38

SUSAN PLASENCIA

court. We take them and just escort them out of the building through the dock.

You know, if somebody is getting arrested for something, we will get them and bring them upstairs. We don't tend to do the arrest charges anymore. CIID will come and handle the actual arrest, but we'll tend to do the supplemental report for it, or, you know, if somebody brings in like marijuana or something like that, we'll inventory it and hand that off to CIID.

Q You talked about if somebody comes in with an outstanding warrant, does that mean that somebody shows up at the courthouse and they have an outstanding warrant unrelated to the reason why they're there?

A Correct.

Q So times people show up and they have a warrant outstanding. And do you go and take them into custody?

A We do.

Q Okay. And I think you mentioned accompanying the CPD, if they're there to pick someone up.

A Correct.

Page 39

SUSAN PLASENCIA

Q Does that mean to make an arrest?

A Sometimes it's to make an arrest. Sometimes it's an investigative alert. Somebody they just want to talk to. But we have our procedures on you have to wait until they go to court, and then once they come out of court and they're done, then you can take them, and then we have to take them through the basement of the building so they're not walking through the building with them.

Q Makes sense. And then are there sometimes crimes committed within the courthouse?

A Yes.

Q You mentioned fights would be an example?

A Yes.

Q And would masturbation or indecent exposure be an example of a crime committed within the courthouse?

A Yes.

Q What's the role of the CR team when there's a crime committed within the courthouse?

A We will -- in the example of a fight, we will find out who the aggressor was, who the victim was. Separate them. Get statements. We'll start

Page 40

SUSAN PLASENCIA

-- you know, we'll run a background on the people involved just to make sure that nobody does have an outstanding warrant.

We do call our CIID department. Usually the Sergeant will do that. He'll call the sergeant there -- they'll send somebody out, and we at that point, like I said, we'll do like a supplemental report as to what happened and we'll give that over to CIID when they come and take whoever -- if somebody's pressing charges -- on a fight they don't always press charges -- but if they're pressing charges, then they will take the individual -- they'll take the arrest over, they'll take the individual over, and like our supplemental reports with it.

Q So it sounds like you do some initial investigation and then at some point you hand it over to CIID?

A Right. And this is just recent. CIID just started taking them within like the last -- maybe this calendar year. Prior to that the CR team would handle actually printing out the charges and having them sign the charges and clerking them.

Q So, in other words, you would file criminal

Page 41

SUSAN PLASENCIA

charges --

A Correct.

Q -- if there was a crime committed within the courthouse?

A Correct.

Q That process you just described, is that the same if there's an incident of masturbation or exposure in the courthouse?

A Now it is. There's also entering it into CCOMS, which is the computer system that we now have, so it's all entered into CCOMS. Disciplinary is generated. CIID does come now to do the charging, but everything else goes into CCOMS. With the indecent exposures there is also an Offense Incident Report generated with that.

That all gets printed out. A copy of it will go with CIID and a copy will go to the supervisor.

Q So the process, in terms of CIID -- I'm sorry, strike that.

In the process of the CR team coming to the scene, talking to the people involved, taking statements, that all applies if there's a masturbation --

Page 42

SUSAN PLASENCIA

A Correct. Camera numbers are taken down, taken to the lieutenant or the superintendent, depending on who's available, and video footage has to be viewed and then they have to preserve that.

Q You don't, yourself, review video?

A I do not.

Q And you said it's the lieutenant or the superintendent?

A Correct.

Q Who's the superintendent there at that building now?

A Sajdak, S-A-J-D-A-K.

Q And in an example of a masturbation incident in the courthouse, will you fill out an incident report?

A Yes.

Q If the offending -- if the offender is an inmate at Cook County Jail, is there any additional paperwork that needs to be filled out?

A Disciplinary.

Q So like a disciplinary report?

A Correct.

Q Other than that, is there any differences in the process in what you do if the offender is an

Page 43

SUSAN PLASENCIA

inmate of the jail?

A Well, when it's an offender, the immediate is to call your immediate supervisor, who then, in turn, calls the CR supervisor who sends out his -- the CR team. Other than that, it's not much different because then you're just getting -- now we're going into CCOMS. It's an additional step, basically, the CCOMS.

Q When did CCOMS get rolled out in the courthouse?

A I want to say, again, within the last calendar year because the computers just kind of came out to everybody's courtroom with it, so I want to say since I had just left the courtroom. So probably December, January.

Q Do you recall, when you first joined the CR Team, if CCOMS had been implemented?

A I think it was implemented shortly thereafter.

Q You mentioned a moment ago if you're a deputy in a courtroom and there's a criminal offense committed in the courtroom or the courtroom lockup, is the procedure to call your supervisor?

A Yes.

Page 44

SUSAN PLASENCIA

Q And I think you then mentioned that the supervisor then calls the sergeant of the CR team?

A Yes.

Q And in your current job, you're one of the people that responds to those kind of calls; is that correct?

A I do not.

Q All right. Who responds to those kind of calls?

A Anybody else on the CR team.

Q Is there a reason why you don't respond to those kind of calls?

A I have responded recent -- not real recent, but recently to them. I just have not -- I just have not really been called to one.

There was one yesterday that my Sergeant felt I just should not have gone.

Q The one yesterday, was that a 313/323 incident? Or something else?

A He was not in green. There was no actual exposure, but there was masturbation under his pants.

Q That was the incident yesterday?

A That was the incident yesterday and my

Page 45

SUSAN PLASENCIA

supervisor felt that somebody else should go.

Q Do you respond to other kind of incidents in the courthouse other than masturbation or exposure incidents?

A Yes.

Q I believe what you're saying is that generally now you don't respond to masturbation and exposure instances in the courthouse?

A I have. I just really haven't lately, I guess.

Q When is the last time that you responded to that kind of incident in the courthouse?

A There was one that happened in a courtroom. I know it was courtroom 606 and it was while I was on the CR team, so it's been since December, or maybe just earlier this year.

Q Is that the only one you can recall responding to since you've been on the CR team?

A I don't remember.

Q Okay. If an incident occurs in the courthouse, be it masturbation or a fight or some other crime, do you hear about it? In other words, does a call go over the radio that you can hear?

A Yes.

Page 94

SUSAN PLASENCIA

bringing her back down?
 A Correct. Because there was nowhere to house the females that day. Both bullpens were really, really full.
 Q Okay.
 A And because none of the detainees could ever say my last name, I was generally referred to as Ms. P or Deputy P. That was how they referred to me as. So I kept hearing "Ms. P., Ms. P.," from 600's bullpen, "Can I talk to you? Can I ask you something? I want to ask you something about my case."
 I'm like, "I'm not your deputy. I can't."
 "Well, can I talk to you? Can I talk to you?"
 I was never really one to not see what one of the inmates wanted. Sometimes it was, "Can you see if my mom is in the gallery?" Or "Can you ask my public defender to come back and talk to me?"
 So I said, "I'll deal with you when I come back upstairs." I took the female downstairs to the bridge. I came up for -- and I actually momentarily forgot that somebody was even asking for -- so I heard, "Ms. P., Ms. P., can I ask you

Page 95

SUSAN PLASENCIA

something?"
 So as I started to walk over toward 600's bullpen -- so when I got up the elevator, instead of going to the left, I went towards the right. And the next thing I knew, he had stuck his penis out between the bars of the lockup and had started masturbating. And I believe I said, "What the fuck" and walked away.
 I called my supervisor -- I called the courtroom next door and I told them, "Listen" -- because I could see their bullpen on my camera -- I said, "This guy" -- kind of told them where he was standing, "I need to know his name."
 I just called the sergeant, told them what had happened and then my sergeant's like, "What?" And he's like, "All right. I'm going to come up."
 He came up. Told him what happened and he called the sergeant.
 Q It sounds like, from your sergeant's reaction, he was surprised as well.
 A Correct.
 Q Who was your sergeant at that time?
 A I think it was -- we called him Sergeant Q, but Quimque.

Page 96

SUSAN PLASENCIA

 Q This report is signed by Sergeant Hunter, it looks like. At least the disciplinary report.
 Does that look like his signature?
 A Yes.
 Q Did Sergeant Hunter come down and speak with you about this incident?
 A I don't remember. I remember speaking to Sergeant Quimque.
 Q Do you remember speaking to anybody on the CR team?
 A I believe Deputy Woods either came and spoke to me or called on the phone, but I remember speaking to him.
 Q Is Deputy Woods CIID or is he --
 A No. He's on the CR team.
 Q You remember speaking to Deputy Woods, but you don't remember on the phone or --
 A Correct.
 Q And what do you remember saying to Deputy Woods and what do you remember him saying to you?
 A I told him what happened. He kind of questioned it too. He's like, what? He actually asked me -- I remember Woods asking me, "Are you okay?"

Page 97

SUSAN PLASENCIA

 I just said, "Yeah, I'm fine. I'm just pissed."
 Q And do you know who filled out this report?
 A It does look like Deputy Woods filled it out, although it's not signed.
 Q Where should he have signed it?
 A He should have signed it under his typed name at the bottom left.
 MS. BRENNAN: She's on a different page.
 THE WITNESS: Oh. I'm sorry. I'm on the Offense Incident Report.
BY MR. PHILLIPS:
 Q You're looking at the --
 A The Offense Incident Report, which we refer to them as OIs.
 Q So this is the OI on page 3 of Exhibit 116.
 A The discipline report was only signed by Sergeant Hunter. And that may have been because he was the one who forwarded it.
 Q Okay. Let's start with the OI.
 A Okay.
 Q So you testified that Deputy Woods filled out this OI -- or you believe he did --
 A Yes.

Page 234

SUSAN PLASENCIA
case to be called.
Q  Who did he expose himself to?
A  It was the public defenders's law clerk, a female by the name of Rachel Shirley.
Q  In your experience -- well, let me ask you this.
Is this the first time you recall somebody exposing and masturbating in the actual courtroom?
A  Yes.
Q  And do you know whether or not these public defenders filed any charges?
A  In this case, Ms. Shirley did sign complaints.
Q  And was it the -- in your experience, did the public defenders usually bring disciplinary or criminal charges against the inmates after they masturbated at them?
A  Most often, they did not.
Q  Why not?
A  From what the public defenders told me, for the most part, they felt it was a conflict of interest.
Q  Can you explain what you mean by that?
A  They felt that if it was their client, then

Page 235

SUSAN PLASENCIA
they felt that they would have to somehow bring in a multiple defendant unit public defender or public defender from another courtroom, perhaps, or maybe have their partner to take over the case. At times, they didn't want to ask the judge to do that.
They felt that when these cases were going to the misdemeanors' courtrooms, that it would have to be a public defender defending them and, again, they felt that may be a conflict of interest. A public defender defending somebody charged with a crime against another public defender.
Q  Okay. We talked a little bit about sexual comments during -- in lockup.
A  Yes.
Q  Can you estimate how often you hear sexual comments in the lockup from inmates?
A  More often now than before, you know, kind of all of this happened, I would say, maybe every time now that I walk in a lockup, I hear something. I'm not in the lockups as much as I was before, when I was in 602. But when I was in 602, it was just about every day; more than once a day.
Q  And you said before all this happened. You mean prior to the first incident report we talked

Page 236

SUSAN PLASENCIA
about in the beginning of the day that you had filed?
A  Correct.
Q  Okay.
A  Every now and then, you would get a comment here or there, but really nothing to the extent that we're hearing now, as gross as we're hearing now. Just kind of like catcalls or whistling maybe before, but nothing has graphic.
Q  Can you give us an example of some of the thing that have been said to you by detainees?
A  I've heard like, damn, CO, I could rip that ass open. Or, oh, love to tear that ass up. Or, oh, I could take you home and bend you over and treat you better than any other man could.
If I'm walking through and if my partner is standing behind me on purpose, they're like, oh, get out of the way, I want to see that juicy ass. Just primarily, it's about my rear end and just stuff that I really never heard before or wanted to hear before and -- well, who would want to hear that.
I just, you know -- and before, you would just hear stuff like, oh, you're so pretty. Or, oh, I wish you were my girlfriend. And that's kind of

Page 237

SUSAN PLASENCIA
what my mean by catcall. Or they would whistle as you walk by. And now, it's just jumped from that to very sexual comments.
MS. BRENNAN: Okay. I don't have any further questions.
MR. PHILLIPS: I do have a few more questions for you now.
THE WITNESS: Okay.
RE-EXAMINATION
BY MR. PHILLIPS:
Q  Would you go to 143. I want to make sure I'm clear that 143 describes an incident that you did not, yourself, witness, correct?
A  Correct.
Q  And you're not the victim in this incident report, correct?
A  Correct.
Q  Do you know why, in this incident report, the victim is not identified by name, only identified as an officer of the court?
A  I do. It was a public defender who wanted nothing to do with this situation.
Q  So the victim did not want to be named in the report?