Exhibit 39

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SDAHRIE HOWARD, DENISE HOBBS, ELLENOR ALTMAN, TAVI BURROUGHS, SHADONNA DAVIS, SHARON WILSON, KIMBERLY CRAWFORD-ALEXANDER, ESTHER JONES, BALVINA RANNEY, TAWANDA WILSON, SUSANA PLASENCIA, and PATRICIA JAGIELSKI, on behalf of themselves and all others similarly situated, Plaintiffs, vs. COOK COUNTY SHERIFF'S OFFICE, and COUNTY OF COOK, Defendants. | Case No. 17-cv-8146 Judge Matthew J. Kennelly Mag. Judge Sidney I. Schenkier |

-------------------------------

VIDEOTAPED DEPOSITION OF TAWANDA WILSON

Chicago, Illinois

Tuesday, September 25, 2018

Reported by:
JANICE M. KOCEK, CSR, CLR
JOB NO. 147716

Page 18

1  T. WILSON
2  A. No, the County put me at full duty.
3  Q. And when you say "the County," do
4  you know who from the County forced you to
5  return to full duty?
6      MR. KULWIN: I don't think she said
7  "forced."
8      But you can answer.
9  BY MR. MILIANTI:
10 Q. Let me rephrase that. Strike that
11 question.
12     When you returned to work in
13 February or March of 2015, do you know who from
14 the County indicated you had to return to full
15 duty work?
16 A. I don't know who said it. All I
17 know is they wouldn't let me see the County
18 doctor. They just -- it came from somewhere
19 else. But I went full duty.
20 Q. And when you returned to work in
21 February or March of 2015, where were you
22 assigned?
23 A. I was assigned to bond court.
24 Q. And where is that located?
25 A. That's on the main floor in room 100

Page 19

1  T. WILSON
2  in female transportation.
3  Q. And this is at the Leighton
4  courthouse?
5  A. Yes.
6  Q. So you were assigned both to bond
7  court and female transportation when you
8  returned to work?
9  A. Yes.
10 Q. How much time did you spend in bond
11 court?
12 A. It was from -- bond court was then
13 -- started -- the morning we would transport
14 females from -- I left -- because I was doing
15 paperwork. So I left the jail around 9:00 and
16 then we started the female transportation.
17 Then I went to bond court around 10:30.
18     MR. KULWIN: I think he means what
19 period of time did you work in bond court.
20 Do you recall? Not the actual start of the
21 day.
22     THE WITNESS: Oh, from '15 -- '15 to
23 -- I've been the 10th floor for maybe three
24 years. So '15, '16, '17. So I went into
25 -- on the 10th floor. I didn't work there

Page 20

1  T. WILSON
2  long. Maybe two or three months. It
3  wasn't long at all.
4  BY MR. MILIANTI:
5  Q. So you were assigned to bond court
6  for two to three months in 2015?
7  A. Yes.
8  Q. And that would have been until
9  roughly the time period that you then sustained
10 another injury in June of 2015?
11 A. Yes.
12 Q. Would that be right?
13     How much contact did you have with
14 inmates during the time period of February,
15 March 2015 until you sustained that injury in
16 June of 2015?
17 A. The whole entire day.
18 Q. And was it mainly female inmates
19 that you were transporting?
20 A. Yes, female inmates.
21 Q. And was that who you mainly had
22 contact with, were the female inmates?
23 A. No, and male.
24 Q. And where were you transporting the
25 female inmates?

Page 21

1  T. WILSON
2  A. To courtrooms.
3  Q. Where would you pick up the female
4  inmates?
5  A. The bridge.
6  Q. And where is the bridge located?
7  A. The basement of the Leighton
8  building.
9  Q. Basement at the courthouse?
10 A. Yes.
11 Q. And the inmates would be in lockup?
12 A. No, they'd be roaming around freely.
13 Q. What do you mean they'd be roaming
14 around?
15 A. They're just walking around. Just
16 walking. Go up here to where you going to
17 chief judge. Or go this way. Send 'em up
18 here. Send them up here. They just walking.
19 Q. Were the inmates handcuffed?
20 A. No.
21 Q. Were they just female inmates or --
22 A. No, these are males.
23 Q. I thought you were transporting the
24 female inmates.
25 A. This is -- we would have to wait

1  T. WILSON
2  until the males get finished and then the
3  females would come afterwards. And so I had to
4  stand there and wait until all of the guys were
5  done and then the females would come and then
6  we would transport them. Females don't come
7  until the males are done.
8  Q. So what time would you report to the
9  bridge?
10  A. My shift then was 6:00 to 2:00. So
11  I report to the bridge at 6:00 o'clock.
12  Q. And what would you do when you
13  report to the bridge at 6:00 a.m.?
14  A. I would go over to the jail. Then
15  we used to do the paperwork for bond court. So
16  we used to transport the bond paperwork to
17  LEADS.
18  Q. And what type of paperwork would you
19  do?
20  A. Transmittals, transporting for
21  coming in from CPD so they could process them
22  for court.
23  Q. And what is LEADS?
24  A. I guess when they run -- state's
25  attorneys -- I guess running backgrounds, see

1  T. WILSON
2  if they have any warrants.
3  Q. So you would start your day by
4  preparing these transport bond paperwork; is
5  that right?
6  A. Yes.
7  Q. And how long would you do that?
8  A. We did that until bond -- CPD
9  stopped bringing the prisoners. I want to say
10  9:30.
11  Q. They would start bringing the female
12  inmates?
13  A. No, the females came over after the
14  guys. So they came over around -- whenever
15  they finished. So the time varied.
16  Q. Okay. So from 6:00 a.m. to 9:30 you
17  were essentially doing paperwork?
18  A. Yes, I was at the jail.
19  Q. And then starting at 9:30 is when
20  the male inmates would arrive at the jail?
21  A. Yes.
22  Q. You have any contact with inmates
23  between 6:00 and 9:30 in the morning?
24  A. Yes, I did.
25  Q. When would you have contact?

1  T. WILSON
2  A. Walking through my paperwork.
3  Q. Okay. And then at 9:30 a.m. the
4  male inmates arrive and what -- what were your
5  job responsibilities at that time?
6  A. They were already there. I was just
7  walking through with my paperwork.
8  Q. You weren't responsible for
9  transporting the male inmates?
10  A. No.
11  Q. And then the female inmates would
12  arrive after the male inmates left; is that
13  right?
14  A. Yes.
15  Q. And then you would transport the
16  female inmates up to the courtrooms?
17  A. Yes.
18  Q. And how long did you do this type of
19  work in bond court and transporting the female
20  inmates?
21  A. I did that for about maybe a year.
22  Q. And that would have been until
23  February or March of 2016?
24  A. Yes.
25  Q. Who did you report to during that

1  T. WILSON
2  time period?
3  A. Then it was Sergeant Gercome. It
4  was Sergeant Gercome. I was between bond court
5  and the 10th floor. So there was Gercome when
6  I was in bond court and then when they needed
7  help on the 10th floor it was Sergeant King.
8  Q. So during this time period,
9  February, March of 2015 to February, March of
10  2016 you also assisted on the 10th floor?
11  A. Yes.
12  Q. Of Leighton, right?
13  A. Yes.
14  Q. And what would you do on the 10th
15  floor?
16  A. Just security.
17  MR. KULWIN: Okay. There is no 10th
18  floor of Leighton.
19  THE WITNESS: The psych --
20  psychiatric, forensic clinical. It's on
21  the 10th floor.
22  MR. KULWIN: Of Leighton?
23  THE WITNESS: Yes, it's in the admin
24  side.
25  MR. KULWIN: Okay.

Page 34

1  T. WILSON
2  Lange took over?
3    A.  Yes, he was.
4    Q.  Did you report to any other
5  lieutenants other than Lieutenant Lange and
6  Lieutenant Wodarczyk since the fall of 2015?
7    A.  Maybe Lieutenant Dillon.
8  D-i-l-l-i-o-n.  Dillon.  Or maybe o-n.
9    Q.  Other than Lieutenant Dillon,
10 Lieutenant Lange, and Lieutenant Wodarczyk,
11 have you reported to any other lieutenants
12 since February -- since -- I'm sorry -- since
13 the fall of 2015?
14   A.  Those are the only lieutenants that
15 were there.
16   Q.  Have you reported to any other
17 sergeants other than Sergeant King?
18   A.  Sergeant Hunter.
19   Q.  Is Sergeant Hunter male or female?
20   A.  Male.
21   Q.  And how long have you been reporting
22 to Sergeant Hunter?
23   A.  Since I've been back.  So 2015.
24   Q.  And you mentioned when you got back
25 from IOD; is that right?

Page 35

1  T. WILSON
2    A.  Yes.
3    Q.  What does IOD stand for?
4    A.  Injured on duty.
5    Q.  And why would you report to Sergeant
6  Hunter or Sergeant King?  How was that
7  determined which sergeant you would report to?
8    A.  They make the schedule who's the --
9  what sergeants have certain floors.  If we need
10 someone, Sergeant King, she does the schedule
11 in the morning and she's on the admin side.  So
12 she's always in charge of that side.  Sergeant
13 Hunter is in charge of the security team.  And
14 then they have different sergeants in charge of
15 different floors.
16   Q.  And with respect to the injury that
17 you sustained in 2010, did you provide any
18 deposition testimony?
19   A.  No.
20   Q.  And has that lawsuit been resolved?
21   A.  Yes.
22      MR. KULWIN:  Objection.  Asked and
23 answered.
24      MR. MILIANTI:  I apologize.  I ask
25 if you can indulge me.

Page 36

1  T. WILSON
2      MR. KULWIN:  It's in the morning.
3    It's a rainy day.  Feel free.  Just making
4    my record.
5  BY MR. MILIANTI:
6    Q.  You can go ahead and answer.
7    A.  Yes.
8    Q.  It has been resolved?
9    A.  Yes.
10   Q.  Do you know when it was resolved?
11      MR. KULWIN:  Same objection.
12      Go ahead.
13      THE WITNESS:  Last year.
14 BY MR. MILIANTI:
15   Q.  So when you returned from your
16 injury in 2015, have you worked in any other
17 locations other than what we've already talked
18 about today, which would have been bond court
19 transporting female inmates and then the 10th
20 floor?
21   A.  Sometimes the courtroom but not
22 often.
23   Q.  And which courtroom?
24   A.  It would be different courtrooms.
25 Whatever deputy called off that day and they

Page 37

1  T. WILSON
2  needed a female, they would put me in that
3  spot.
4    Q.  And how frequently would you say you
5  work in different courtrooms since your return
6  from your injury in the spring of 2015?
7    A.  Maybe five times.  That's it.
8    Q.  Five times total?
9    A.  That was in 2015.  Haven't been in
10 one since.
11   Q.  So you have -- you've only worked in
12 a courtroom on five occasions since the spring
13 of 2015; is that correct?
14   A.  Before -- before my IOD I worked in
15 the courtroom.  So I don't know if you're
16 saying have I ever worked in the courtroom.
17   Q.  Just since the spring of 2015 you
18 have only worked -- excuse me -- you've only
19 worked in the courtroom on five occasions?
20   A.  Yes.
21   Q.  And the last time you would have
22 worked in a courtroom would have been sometime
23 in 2015?
24   A.  Yes.
25   Q.  Did you encounter any indecent

1 T. WILSON
2 contained on the second page of this exhibit
3 truthful and accurate?
4 A. It is.
5 Q. All right. And it states that the
6 inmate exposed his sex organ to you while he
7 was in the lockup of the 10th floor psychiatric
8 unit, right?
9 A. Yes.
10 Q. And he said -- he told you, quote,
11 "Put a cracker on it and eat it"?
12 A. Yes.
13 Q. While his sex organ was exposed to
14 you?
15 A. Yes.
16 Q. So the inmate was in the lockup at
17 the time that this occurred?
18 A. Yes.
19 Q. And where were you in relation to
20 the lockup?
21 A. Sitting at the desk.
22 Q. How far away was the inmate?
23 A. At the -- leaning against the gate
24 up on the desk. I mean, leaning on the gate
25 because the desk is up against the -- the

1 T. WILSON
2 lockup, the gate.
3 Q. It's flush with the --
4 A. It's flush, yes.
5 Q. -- with the lockup area?
6 A. Yes.
7 Q. How many feet away do you believe
8 the inmate was from you?
9 A. Like maybe -- maybe three.
10 Q. Three feet away?
11 A. Yes.
12 Q. And what happened at that time he
13 was about three feet away from you?
14 A. I was eating some crackers. I have
15 real bad allergies. So I was eating some
16 crackers because I had a real bad allergies.
17 And he stood up and he walked over to the desk
18 and he had his part, he said, "Hey, why don't
19 you put a cracker on this and eat it."
20 MR. KULWIN: Are you okay? Can we
21 take a second.
22 MR. MILIANTI: Sure. We can take a
23 break.
24 MR. KULWIN: Let's just take a
25 minute and take a break. One minute.

1 T. WILSON
2 MR. MILIANTI: Sure. Take as long
3 as you need.
4 (Whereupon, a recess was taken
5 from 1:52 p.m. to 1:55 p.m.)
6 BY MR. MILIANTI:
7 Q. All right. So you were eating a
8 cracker and at that time the detainee walked up
9 to you and said, "Hey, why don't you put a
10 cracker on it and eat it"?
11 MR. KULWIN: You know, at this point
12 I'm going to object. We just went through
13 this. You saw how that affected her. It's
14 in the record. Can you ask another
15 question where you don't actually quote the
16 report?
17 MR. MILIANTI: I'm sorry. But I
18 need to get a complete record.
19 MR. KULWIN: You don't need to do
20 that.
21 MR. MILIANTI: I get no pleasure out
22 of asking these questions but I need to do
23 my job.
24 MR. KULWIN: You are doing your job.
25 You're doing a fine job. But you don't

1 T. WILSON
2 have to repeat something that she just read
3 out loud twice to you that's in the written
4 record and it's clearly having an extreme
5 emotional affect on her. It's unfair, it's
6 untoward, and quite frankly it's just
7 unnecessary. So if you can avoid repeating
8 and re-reading the same allegation that
9 you've read into the record three times
10 now, I would appreciate it.
11 MR. MILIANTI: I'll do my best but
12 to the extent to create an accurate
13 record I will have to read it.
14 MR. KULWIN: I appreciate you doing
15 your best.
16 MR. MILIANTI: Again, I get no
17 pleasure out of asking these --
18 MR. KULWIN: Well, it seems, quite
19 frankly, since you keep repeating it --
20 MR. MILIANTI: You know what, that's
21 offensive. That is offense.
22 MR. KULWIN: I'll tell you what's
23 offensive. What's offensive is you read
24 into the record, then you have her read it
25 out loud. And now you're reading it again

Page 166

1  T. WILSON
2  for the third time and she's crying.
3      MR. MILIANTI: This is the crux of
4  your case.
5      MR. KULWIN: I know what the crux of
6  the case is. How does the crux of my case
7  require you to read the same language to
8  her again? If you can't form a question
9  without reading the exact same language
10 again for the third time, then, you know
11 what, no offense, you need a little help
12 here. Okay. So go ahead.
13     MR. MILIANTI: Shelly, coming from
14 you, that is -- I will take that under
15 advisement because of your long
16 distinguished career.
17     MR. KULWIN: Thank you. I
18 appreciate that.
19     MR. MILIANTI: So that counts.
20     MR. KULWIN: I do have a long,
21 distinguished career as a matter of fact.
22 Maybe you looked me. It's been 40 years.
23 I'm damn proud of it.
24 BY MR. MILIANTI:
25     Q. After you -- after the inmate said

Page 167

1  T. WILSON
2  what he said to you --
3      MR. KULWIN: There you go.
4  BY MR. MILIANTI:
5      Q. What did you do?
6      A. I jumped up immediately and ran out
7  of the an area.
8      Q. And where did you go?
9      A. To the phone. To the sheriff's
10 office and called.
11     Q. Did you say anything in response to
12 the inmate?
13     A. I called him nasty.
14     Q. Did you say anything else other than
15 nasty?
16     A. No.
17     Q. Did he say anything in response to
18 you?
19     A. "Bitch, just put a cracker on it and
20 eat it."
21     Q. So he repeated the same statement
22 but he said "bitch" in front of it?
23     A. Yes.
24     Q. Did you say anything to him?
25     A. No, I just left out.

Page 168

1  T. WILSON
2      Q. Were there any deputy sheriffs in
3  the area at this time?
4      A. I don't know who was working with me
5  because my regular partner was off. That was
6  the only time that I would go back there is
7  when they were off. Because the guy who was
8  assigned up there with us, he's a -- he's 80.
9  So he doesn't really do anything but just open
10 up the door.
11     Q. As you sit here today, can you
12 recall whether or not any other deputy sheriffs
13 were on the floor at the time of this incident?
14     A. It might have been one more.
15     Q. One more. Do you recall who that
16 may have been?
17     A. I don't.
18     Q. And when this inmate made the
19 statement, could you see him masturbating?
20     A. Yes, he was right in front of me
21 right at the desk.
22     Q. And how long did you have to witness
23 him masturbating?
24     A. Just long as -- enough for me to bug
25 my eyes open and run out.

Page 169

1  T. WILSON
2      Q. It would have been a split second
3  like the other incidents?
4      A. Yeah. And him laughing.
5      Q. And you left the room or left the
6  10th floor lockup area and you went into an
7  office and called your sergeant?
8      A. Yes.
9      Q. And that would have been Sergeant
10 King?
11     A. Yes.
12     Q. What did you say to Sergeant King?
13     A. I told her what happened, this guy
14 just pulled his penis out in front of me at the
15 gate.
16     Q. And what did Sergeant King do?
17     A. A team came up and charged him.
18     Q. The CR team?
19     A. Yes.
20     Q. Do you recall who from the CR team
21 came up from the 10th floor?
22     A. It was a female, Hernandez -- might
23 have been Woods.
24     Q. Do you see on this second page of
25 this exhibit near the bottom, it says reporting