Exhibit 41

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE NORTHERN DISTRICT OF ILLINOIS

 3                        EASTERN DIVISION

 4    SDAHRIE HOWARD, DENISE HOBBS,)
      ELLENOR ALTMAN, TAVI         )
 5    BURROUGHS, SHADONNA DAVIS,   )
      SHARON WILSON, KIMBERLY      )
 6    CRAWFORD-ALEXANDER, ESTHER   )
      JONES, BALVINA RANNEY,       )
 7    TAWANDA WILSON, SUSANA       )
      PLASENCIA, and PATRICIA      )
 8    JAGIELSKI, on behalf of      )  No. 17-cv-8146
      themselves and all others    )
 9    similarly situated,          )  Judge Matthew J.
                                   )
10                   Plaintiffs,   )  Kennelly
                                   )
11       vs.                       )  Mag. Judge Sidney I.
                                   )
12    COOK COUNTY SHERIFF'S OFFICE )  Schenkier
      and COUNTY OF COOK,          )
13                                 )
                    Defendants.    )
14

15            (CONTAINS CONFIDENTIAL INFORMATION)

16       Deposition of BENJAMIN STUART WILNER, Ph.D.

17                      Chicago, Illinois

18                   Friday, April 26, 2019

19                         9:36 a.m.

20


21    Job No. 40761

22    Pages: 1 - 248

23    Reported by:  Jean S. Busse, CSR, RPR

24                  Notary Public, DuPage County, Illinois
```



Page 135

1 Woods and then the Sheriff's Office and how we got
2 to the numbers shown here.
3   Q.  And if, for instance, the incidents that
4 were reflected in Exhibit 2 that I gave you do not
5 appear in CCOMS or in McGuire Woods' reports, then
6 it wouldn't be reflected in your numbers that are in
7 Wilner Exhibit 7?
8   A.  So the process that I went through -- I'm
9 sorry.  Do you mean Exhibit 4?
10   Q.  No.
11   A.  I'm sorry.  Too many exhibits.
12   Q.  Too many exhibits.  There will be even
13 more of them.
14   A.  All right.  Repeat the question, please.
15   Q.  Sure.  If, for instance, the incidents
16 that are described in Exhibit 2 --
17   A.  Yes.
18   Q.  -- did not appear in CCOMS and did not
19 appear in the McGuire Woods review, would they be
20 reflected in your totals that appear in Wilner
21 Exhibit 7?
22   A.  I think I said that the files shown in
23 my Exhibit 4 are greater than CCOMS' and McGuire
24 Woods'.

Page 136

1   Q.  But they are derived from those sources,
2 aren't they?
3   A.  No.
4   Q.  In what way are they not deprived from
5 those sources?
6   A.  I think we talked about that some of the
7 files within -- shown in Exhibit 4 come from CCOMS.
8 Some come from other databases.
9   Q.  Comes from, for instance, this Business
10 Intelligence database?
11   A.  For example.
12   Q.  But that reflects smaller numbers than the
13 CCOMS numbers; correct?
14   A.  It appears within the 825, the 525.  The
15 "DOC Incidents" tabs have smaller numbers than the
16 "Disciplinary" tab.
17   Q.  Incidentally, while you were at lunch, did
18 you happen to look to see whether you could identify
19 any of the incidents in Exhibit 2 and locate them in
20 your list of incidents that you were counting?
21   A.  I don't have the relevant files to do it.
22   Q.  Did you think at all about how you would
23 do it, how you would search?
24   A.  A little bit but not much.

Page 137

1   Q.  Not enough to reach a conclusion?
2   A.  That is correct.
3   Q.  By my count -- and when you have a
4 calculator, you can run it yourself -- between
5 January of 2015 and April of 2017, there are
6 actually over 1,250 incidents that are reported.
7       Assuming that that is correct, do you have
8 any understanding why CCSO took 28 months to elevate
9 these two forms of what you call indecent
10 exposure-related incidents from the 200 level to the
11 300 level?
12   A.  It is my understanding that the CCSO did
13 multiple actions regarding this, and why the
14 elevation that you described in April of 2017 and
15 other things occurred before and after I don't know.
16       MR. LIEDER:  Could we have this document
17 marked as Exhibit 8.
18       (Wilner Exhibit 8 marked for
19 identification.)
20   Q.  Dr. Wilner, you've seen the document
21 that's been marked as Exhibit 8 before?
22   A.  Not in this form, but I believe so, yes.
23   Q.  You say "not in this form" because it was
24 in color?

Page 138

1   A.  No.  In general I don't print the
2 double-sided.
3   Q.  Okay.  Could you turn to page -- let me
4 ask you differently.
5       This is Dr. Lundquist's report, isn't it,
6 or at least as best you can tell?  And I know you
7 haven't had time to review every page, but this
8 looks like Dr. Lundquist's report?
9   A.  It appears to be.
10   Q.  And you have reviewed Dr. Lundquist's
11 report?
12   A.  I have.
13   Q.  Could you turn to her Figure 3 on Page 13?
14   A.  Yes.
15   Q.  She counted up the number of what she
16 calls sex-related incidents, what you call indecent
17 exposure-related incidents, by quarter for the
18 period January 2015 to September 2018; is that
19 right?
20   A.  I know she attempted to do that.
21   Q.  And she attempted to then divide or show
22 how many of them were masturbation, how many were
23 indecent exposure, how many were sexual harassment,
24 how many were sexual assault; is that right?



1  You show here that the rate through August
2  of 2016 was 72 percent, and then it becomes -- for
3  indecent exposure-related incidents, and then it
4  becomes 83 percent; is that right?
5  **A. For indecent exposure-related reported**
6  **incidents, yes.**
7  Q. But that's for a two-year period,
8  September '16 through September 2018; is that right?
9  **A. So a little over two years, yes.**
10 Q. If you look below the dark bar for
11 September 2017 to September 2018, it's 91 percent;
12 is that right?
13 **A. For indecent exposure-related reported**
14 **incidents, yes.**
15 Q. Yes. If it's 83 percent for indecent
16 exposure-related incidents for the
17 two-year-and-one-month period, September '16 to
18 September '18, and 91 percent for the 13-month
19 period, September '17 to September '18, does that
20 suggest to you that it was probably about 75
21 percent during the period September '16 through
22 August 2017?
23 **A. I don't know.**
24 Q. Well, if it's 83 percent for the two-year

1  period and 91 for the second half, it would be
2  somewhat below 83 percent, wouldn't it,
3  mathematically?
4  **A. It's not a two-year period.**
5  Q. It's a two-year-and-one-month period.
6  **A. Again, you're wanting me to be accurate,**
7  **and you're trying -- so you're trying to get me to**
8  **numbers that are not accurate.**
9  Q. If for the 25-month period it is 83
10 percent but for the last 13 months of that period it
11 is 91 percent, for the first twelve months of the
12 period it necessarily was below 83 percent, wasn't
13 it?
14 **A. Most likely, yes.**
15 Q. Not just most likely. That's mathematics.
16 **A. Yes.**
17 Q. You're better at it than I am.
18 Do you know how much below 83 percent it
19 was during the period from September 2016 to August
20 2017?
21 **A. No, not off the top of my head. It's in**
22 **my data. If you want to show me my data, I'm happy**
23 **to look at it.**
24 Q. Have you done any type of comparison of

1  the adjudication rates at the Cook County Jail to
2  the rates in jails or prisons in other states?
3  **A. I could not find -- other than the**
4  **California data that Ms. Woodford presented, I could**
5  **not find any other data on specifically indecent**
6  **exposure-related incidents.**
7  Q. So you did look for data in other states
8  and couldn't find it?
9  **A. I looked for data, yes.**
10 Q. And you did find some in California, is
11 that right, adjudication rates for indecent
12 exposure-related incidents?
13 **A. I'm trying -- I'm trying to remember if**
14 **the CompStat data had adjudication rates or could be**
15 **calculated. I just don't remember.**
16 Q. Could you go to the first sentence below
17 the Figure 7 --
18 **A. Back to Figure 17?**
19 Q. -- on Page 15.
20 **A. The first sentence below.**
21 Q. Below it.
22 That reads, "Figure 7 also shows that
23 adjudication rates for reported indecent
24 exposure-related incidents have been generally

1  increasing over time, consistent with the CCSO's
2  efforts to combat this issue."
3  Do you see that?
4  **A. I do.**
5  Q. What do you mean by "this issue"?
6  **A. Indecent exposure.**
7  Q. So to combat the frequency of indecent
8  exposure? Is that what you mean by "this issue"?
9  **A. I guess, yes.**
10 Q. How did you become aware that the CCSO was
11 making efforts to combat the frequency of indecent
12 exposure-related incidents?
13 **A. I believe Mr. Curry talked about that, as**
14 **well as other conversations and documents.**
15 Q. Is it your understanding that the CCSO
16 believed that low adjudication rates interfered with
17 their efforts to try to combat the frequency of
18 indecent exposure-related incidents?
19 **A. I don't recall whether or not they did say**
20 **that. If you want to show me some documents to**
21 **refresh my recollection, I'm happy to consider it.**
22 Q. Whether or not they thought that, you
23 believe that increasing adjudication rates would be
24 consistent with the efforts to combat that?

