# Exhibit 43

1

1

2    ORAL DEPOSITION OF

3     MARGO FRASIER

4     APRIL 23, 2019

5

6       W A R N I N G !

7 This unedited rough draft of the proceedings is not

8 certified. The rough draft transcript may not be cited

9 or used in any way or at any time to rebut or contradict

10 the certified transcription of the proceedings. There

11 will be discrepancies in this form and the final form,

12 because this form has not been edited, proofread,

13 corrected, finalized, indexed, bound or certified. There

14 will also be a discrepancy in page numbers appearing on

15 the unedited rough draft and the edited, proofread,

16 corrected and certified final.

17       * * * * *

18       MARGO FRASIER,

19 having been first duly sworn, testified as follows:

20       E X A M I N A T I O N

21 BY MR. KULWIN:

22    Q   Ma'am, can you state your name and spell your

23 last name for the record?

24    A   Margo Lee Frasier, F-R-A-S-I-E-R.

25       MR. KULWIN: Okay. This is the deposition of

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT

11        MR MILIANTI:  Are you done.

12        THE WITNESS:  Yeah.

13    Q   (By Mr. Kulwin) If I understand it, you're

14 telling me that in those places, you saw inmates engaged

15 in disruptive behavior, and because the staff responded

16 to it, told them to stop, or to curtail it, or brought in

17 backup or whatever it was, that actually encouraged them

18 to do it more?  That's your testimony?

19    A   That they continued the behavior.  And at least

20 in appearance to me is the fact that one of the reasons

21 they continued the behavior is they were getting a

22 reaction.

23    Q   And where did you see that in this case?  You

24 said it was in the reports, but where?

25    A   Well, there's several of the reports where the

             UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT
                                187

1 fact that the staff tells the inmate to response and the

2 inmate's response is to kind of laugh and continue the

3 behavior.

4    Q   Okay.  And you interpret that to mean that

5 because the staff told them to stop they continued the

6 behavior.

7    A   That's not the point I'm trying to make here.

8 Perhaps it's not very artfully.  But there are some

9 inmates that what they -- they like getting the reaction.

10 That doesn't, that in no way means that the staff

11 shouldn't tell them to stop.  It's just that, you know,

1

2        ORAL DEPOSITION OF

3         MARGO FRASIER

4         APRIL 23, 2019

5

6         W A R N I N G !

7 This unedited rough draft of the proceedings is not

8 certified.  The rough draft transcript may not be cited

9 or used in any way or at any time to rebut or contradict

10 the certified transcription of the proceedings.  There

11 will be discrepancies in this form and the final form,

12 because this form has not been edited, proofread,

13 corrected, finalized, indexed, bound or certified.  There

14 will also be a discrepancy in page numbers appearing on

15 the unedited rough draft and the edited, proofread,

16 corrected and certified final.

17          * * * * *

18         MARGO FRASIER,

19 having been first duly sworn, testified as follows:

20         E X A M I N A T I O N

21 BY MR. KULWIN:

22    Q   Ma'am, can you state your name and spell your

23 last name for the record?

24    A   Margo Lee Frasier, F-R-A-S-I-E-R.

25        MR. KULWIN:  Okay.  This is the deposition of

        UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT

19  tolerance policy is actually talking about staff towards

20  staff.

21     Q   (By Mr. Kulwin) Right, right.

22     A   As opposed to inmates towards staff.

23     Q   Right.  But my --

24     A   But it would -- it's behavior, if the inmates

25  were fellow staff members, that would certainly have

1  violated the policy.

2     Q   Right.  So to be clear, the conduct that was

3  occurring from 2015 through 2018, that inmates were

4  visiting upon female staff, the masturbation, the

5  sexually assaultive language, the public indecency, all

6  added up to, as Mr. Curry admitted, a sexually hostile

7  work environment, based on your knowledge of what that

8  means, correct?

9     A   I'm not basing it on what Mr. Curry's opinion

10  is.  I think that the prevalence of the behavior,

11  particularly like mid '15 into '16, on into it started to

12  kind of be curtailed, that that created a hostile work

13  environment.

14     Q   Was there anything within any of the laws or

15  statutes that you have extensive familiarity with, is

16  there anything that precluded the CCSO, assuming it was

17  after appropriate disciplinary procedures were

18  undertaken, precluded them from requiring inmates to use

19  exposure jumpsuits that prevented access to their

20 genitals without assistance from a guard?

21   A   I think that the -- that requiring the wearing

22 of those suits essentially 24 hours a day, which is what

23 you'd have to do, since some of the incidents occur

24 within their own cells, that it has a very high risk of

25 there being some sort of constitutional problem because

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT
150

1 of the fact that it also prevents them from being able to

2 use the restroom facilities without assistance from

3 staff.

4   Q   How about when they're anywhere but their cell?

5 Would that create a constitutional problem, in your mind?

6      MR MILIANTI:  Just object to the form of the

7 question.

8      THE WITNESS:  Probably create some PREA

9 problems.  If -- if part of that is that they're

10 constantly being supervised so that someone is readily

11 available always to undo the suit so that they can use

12 restroom facilities, then yeah.

13   Q   (By Mr. Kulwin) Are you aware that such suits

14 are marketed to correctional institutions to combat

15 masturbation problems?

16   A   I'm aware that there are very, there are some

17 institutions that use those facilities.  It's not a

18 common practice, because of some of the difficulties

19 involved with them.

18   A   I have not.

19   Q   Are you aware of anybody else who has, besides

20 in this case?

21   A   I'm not -- I'm aware that there have been

22 certainly other institutions in which there was an

23 extremely severe problem, as severe as this, but I'm not,

24 I'm not aware of the Public Defender being involved.

25   Q   What institution are you aware of that the

201

1 sexual harassment of male inmates towards female

2 employees, such as what occurred in this institution

3 between 2014 and 2018, was at the same levels?  What

4 institution?

5   A   I think there's -- I'm trying to remember the

6 name of the institution itself.  There was an institution

7 in Florida that was actually a federal institution.  It

8 was in Florida.  And not only was there this kind of

9 behavior, but there was also evidence that the behavior

10 was encouraged by the male staff towards the female

11 officers, where there were similar sort of allegations in

12 Virginia.

13   Q   Do you remember the institution?

14   A   Where the -- I don't.  I'd have to --

15   Q   Do you remember the time?

16   A   All of them are fairly in the last, you know,

17 ten years.  There were some issues out in pelican bay in

18 California, I know, where the behavior was described as

file:///BBSERVER-PC/...riff's%20Department/Discovery/Deposition%20Transcripts/30b6%20Transcripts/Margo%20Frasier/190423Frasier.txt[5/2/2019 9:14:28 PM]

19  being very pervasive.  And in some of these institutions,

20  you had kind of the added fact that the male staff

21  members encouraged the behavior.

22      Q    So if I understand it, in all of your work,

23  you're familiar with the one in Florida, the called

24  encase, an institution in Virginia, but you can't recall

25  which one, and pelican bay.  Other than that, anything

1  else?

2      A    You know, those are the ones that as I'm

3  sitting here right now.

4      Q    Okay.  You say, on Page 6 in the last full

5  paragraph, that it is an error, in your opinion, it's an

6  error to conclude from high incidents or increased

7  incidents of inmate sexual misconduct over a limited

8  period of time within a correctional institution that the

9  institution has failed to take proper steps to prevent

10  inmate behavior or is indifferent to such behavior.

11      What do you consider a limited period of time?

12      A    A, you know, basically about a -- if you, what

13  you see is that you have increased behavior say over a 9

14  to 18-month period where you see the behavior is not

15  abating, it doesn't mean that they're not making efforts.

16      Q    Okay.  How about if you see the behavior not

17  abating for three years, and increasing?  Then can you

18  draw that inference?