Exhibit 47

# <u>MICHAEL HOLMES DECLARATION</u>

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the following is true and correct:

1. My name is Michael Holmes. I am retired from a career with the Cook County Sheriff's Office. I started as a cadet at the Cook County Jail ("Jail") on May 5, 1985, worked my way up through the ranks to First Assistant Executive Director ("FAED"), and retired in lieu of being laid off on December 31, 2017.

2. On or around October of 2013, I was promoted to Assistant Executive Director ("AED"), and I reported to Daniel Moreci, who was First Assistant Executive Director at the time. My job duties as AED in 2013-14 included overseeing several departments at the Jail, including Records, Receiving, Division 2, Division 6, Division 9, and Classifications.

3. In late 2014, I was promoted to FAED. There was continues restructuring of upper management at that time, while Cara Smith was the Executive Director, but all the Divisions reported up to the Sheriff through the Superintendents, Assistant Executive Directors, First Assistant Executive Directors, the Executive Director, and other Chiefs. When I was promoted, the Sheriff designated four people as "First" Assistant Executive Directors. Daniel Moreci and I were assigned to oversee the regular divisions, Nneka Jones was assigned to the mental health divisions, and George Turner was a liaison with Office of Professional Review ("OPR") for staff discipline. When I

DocuSign Envelope ID: 0EDF6CCB-FD2F-48CA-8527-E2629E544D18

became FAED, I oversaw most of the same departments as before (Records, Receiving, Division 2, Division 6, and Classifications), but was also put in charge of Division 5, 10, and 11. All of the Superintendents from those divisions reported to me. Oversight of Division 9 was assigned to Moreci, who was a gang specialist, and was better equipped to design programs for the violent criminals housed in Division 9. Around March of 2015, Nneka Jones was promoted to Executive Director, and Brad Curry and Tarry Williams were brought over in management roles. Eventually, Brad Curry was made a Bureau Chief and Tarry Williams was made Chief of Operations. I reported to Tarry Williams and Nneka Jones. I continued doing the same duties, but after about a year, George Turner retired, Daniel Moreci went exclusively to Gang Intel, and I became the FAED over all the divisions.

4.     In my role overseeing Classifications as an AED and FAED, I would meet with Mike Miller, Assistant Executive Director, each week to review the status of disciplinary segregated housing. We would have a list of everyone in segregated housing and everyone waiting to go to segregated housing, and would review whether we could adjust time served in segregated housing to make space for the waiting detainees.

5.     From July of 2016 until my retirement, in my role as FAED, I was in charge of the Case Review Unit ("CRU") at the Jail. I reported to Brad Curry, Bureau Chief/Chief Operating Officer of the Jail. As head of the CRU, I was responsible for reviewing all incidents that occurred at the Jail and in all

2

Cook County Courthouses and satellite locations.  Each day, my team and I would review approximately thirty (30) to fifty (50) incidents that occurred throughout the Cook County system on the previous day.  We reviewed video footage along with incident reports and other information we received regarding misconduct.

6.    As head of the CRU, I was involved in weekly meetings with Brad Curry where we reviewed incidents and discussed issues of both staff and detainee misconduct, including detainee masturbation and indecent exposure.  I also had weekly telephone meetings with Susan McCampbell, DOJ monitor; Brad Curry; Matthew Burke, Chief of Staff; Nneka Jones; Helen Burke, Bureau Chief; and Jennifer Black, Deputy Chief of Quality Improvement & Accountability.

7.    Beginning around 2014, I observed a steady increase in sexual harassment of female staff by male detainees.  I saw male detainees exposing their penises and purposefully masturbating at female officers, supervisors, and civilian staff.   Whenever I was in the Jail, I heard detainees make crude or sexual comments which were directed at any female within sight.

8.    In the CRU, I would review at least one incident, and sometimes many more, every day involving a detainee exposing his penis or masturbating at female staff.  Many incidents involved multiple detainees masturbating at the same time.

DocuSign Envelope ID: 0EDF6CCB-FD2F-48CA-8527-E2629E544D18

9.      Supervisors, managers, and directors at the Jail knew about the detainees'
exhibitionist behavior and their sexual comments towards women. Besides
the number of incidents of indecent exposure, exhibitionist masturbation, and
verbal sexual threats that supervisors had to sign off on in incident reports
and managers and directors reviewed, all of us witnessed this behavior first
hand.

10.      In my role as FAED, I discussed the problem of detainees increasingly
masturbating and exposing themselves to female staff with other managers
often. Mike Miller and I shared an office for some time in 2014, and we talked
about it regularly.  We also got complaints from Cermak employees.  Connie
Manella, one of the Cermak supervisors, complained at meetings and
elsewhere about the detainees' sexual harassment of her employees.

11.      At almost every one of my weekly meetings with Brad Curry, Nneka Jones,
Tarry Williams, and Matt Burke, which I attended in my role as AED and
FAED, the subject of masturbation, indecent exposure, and sexual
harassment of female staff was discussed.  The problem was not taken
seriously.  As a result, no effective measures were implemented to stop it.

12.      In my 32 years in corrections, I have seen that inmates in a jail setting need
structure and routine.  Immediately disrupting that routine is an effective
way to stop inmates from engaging in inappropriate behavior.  While I was
FAED, the CCSO's policies allowed such immediate disruption only in special
circumstances but not as a regular course of action.  As a result, detainees

4

who sexually harassed female staff continued to do so, and the problem got worse.

13.   For example, I once reviewed an incident with a detainee who was remanded after bond court.  When he was standing in line to go into court, a female Public Defender walked by and this detainee grabbed her buttocks.  Nothing happened.  He had his hearing and was taken into custody.  When he got to receiving on the Jail side, he grabbed a female officer's buttocks.  He should have been immediately reprimanded and identified by the supervisor in charge of the court receiving area upon sexually assaulting the female Public Defender, then sent directly to segregated housing upon entering the Jail.

14.   As another example, in November of 2016, Brad Curry copied me on an email describing a detainee who had exposed his penis to a visitor but had still not been moved off of his tier, four days later.

15.   When detainees did get written up for indecent exposure or masturbation, they most often received a disciplinary sentence of a period of time in segregated housing, or the SMU.  While this was intended to be a deterrent to the detainees' behavior, it was ineffective because often the SMU housing was not much different from detainees' previous housing assignment.

16.   Additionally, detainees' assignments to the SMU were sometimes delayed pending the hearing process.  Jail policy permitted detainees who had masturbated to female staff to remain in the area where that staff member worked before their hearing or before serving their sanctions. For example, in

June of 2016, Nneka Jones copied me on an email inquiring why detainee M.T. had masturbated in front of female staff and was just moving to the SMU 16 days later. Detainees also often returned to the same area where they had committed the sexual harassment after completing their assignment to SMU.

17. This problem continued throughout my time as head of the CRU. In November of 2017, I was copied on an email describing an incident in Division 9 where two detainees were written up for masturbation, sexual activity, and indecent exposure, but remained housed on their tier.

18. There were so many detainees sentenced to time in the SMU for indecent exposure and masturbation that there was often no available housing in SMU. It could take several months for a space to become available to move that detainee into segregated housing.

19. At one point we had a waiting list for SMU housing of over 200 detainees. This could have been solved by designating more tiers as SMU housing.

20. Steve Wilensky, Director of Inmate Discipline, and I used to discuss the lack of available SMU housing often while I was head of CRU. He was aware that when his staff assigned time to SMU as a sanction, the sentences often were delayed for long time periods.

21. I consistently recommended to the administration that they add more SMU housing. There was plenty of unused housing at the Jail that could have been designated as SMU. I remember once, in our weekly DOJ meeting, I

DocuSign Envelope ID: 0EDF6CCB-FD2F-48CA-8527-E2629E544D18

mentioned that we had 176 detainees who had been sentenced to SMU but were waiting for a space.

22.     In 2015, management at the Jail began discussing the possibility of putting known masturbators in exposure control jumpsuits to prevent them from masturbating.  On July 17, 2015, Debbie Boecker, Director of Compliance, sent me and other managers, including Brad Curry and Nneka Jones, information about exposure control jumpsuits being used effectively in the California Department of Corrections.

23.     In June of 2016, I was copied on an email exchange between Nneka Jones and Edward Byrne regarding dark green jumpsuits the Jail had on hand and whether he could retro-fit them as exposure control suits.

24.     Soon thereafter, the CCSO decided that detainees found guilty of indecent exposure or masturbation would be placed in these modified green jumpsuits, instead of ordering the jumpsuits being effectively used in the California Department of Corrections.

25.     The green jumpsuits that the masturbating detainees wore were completely ineffective in preventing masturbation and indecent exposure.  The jumpsuits opened all the way down to the detainee's waist in the front, and could be worn pulled down around the waist like regular pants.  Detainees often tore their jumpsuits so that they could have easy access to their penis area.

26.     In December of 2016, Brad Curry forwarded me an email from Nneka Jones to Printiss Jones, Daniel Moreci, Tarry Williams, and himself describing a

video she saw of a nurse who was masturbated at.  The video also showed

another detainee who was supposed to be in a green jumpsuit.  He had cut

the pants off and was wearing it as a top with regular uniform pants.

27.     The officers, sergeants, lieutenants, and superintendents were never given

effective training or tools to curb the masturbation.  To my knowledge, the

directors never even discussed training the officers on proper responses to

masturbation, and never discussed providing resources for women who were

sexually harassed by detainees.

DocuSign Envelope ID: 0EDF6CCB-FD2F-48CA-8527-E2629E544D18

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct and is based on my personal knowledge and beliefs.

5/2/2019

_____
Date

DocuSigned by:

Michael Holm

4C171D77A81C487...

_____
Signature

9