IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SDAHRIE HOWARD, et al. | ) | |
| | ) | |
| | ) | Case No. 17-cv-8146 |
| | ) | |
| Plaintiffs, | ) | Judge Matthew F. Kennelly |
| v. | ) | |
| | ) | |
| COOK COUNTY SHERIFF'S OFFICE, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' JOINT MEMORANDUM OF LAW
IN SUPPORT OF THEIR MOTION TO EXCLUDE THE TESTIMONY,
REPORTS, AND OPINIONS OF DR. LOUISE FITZGERALD**

**I.    INTRODUCTION**

Dr. Louise Fitzgerald is a social science researcher. She offers her expert opinion—which she claims to be "evidence-based" and "rel[ies] on the extensive body of social science research"—despite acknowledging that she did not conduct any independent research for this case and that "virtually no formal research on this topic exists." Ex. A (Fitzgerald Expert Report) at 3, 5. Dr. Fitzgerald opines that the Cook County Jail (the "Jail") and the Leighton Criminal Courthouse (the "Courthouse") are "permeated" by "widespread" sexual harassment which "impact virtually every female employee who works in [the Jail and Courthouse], either directly or indirectly." *Id.* at 8, 28. She reaches this sweeping conclusion despite the fact that she has not utilized any social science survey or other scientific instrument to evaluate the experiences of named Plaintiffs or putative class members, nor has she conducted any psychological evaluations.

Dr. Fitzgerald's opinions should be excluded as unreliable and irrelevant under Federal Rule of Evidence 702 for three reasons. First, her opinions are not based on any "recognized scientific method." Multiple federal courts have rejected expert opinions employing similar

1

methodologies which attempt to apply "social framework" analysis to the specific facts of a case. Such methodologies are inherently unreliable because they are not grounded in any scientific process nor based on a sample of representative data. Rather, the purported "expert" merely cherry-picks "data" from the record to support her opinion while ignoring any contrary evidence, which is what Dr. Fitzgerald did here. In fact, this Court has previously rejected Dr. Fitzgerald's opinion and similar methodology as unreliable and unscientific in a Title VII sexual harassment case. *See EEOC v. Dial Corp.*, 2002 WL 31061088 (N.D. Ill. Sep. 17, 2002) (Urbom, J.).

Second, Dr. Fitzgerald improperly seeks to invade the province of the fact-finder by offering opinions on legal conclusions and ultimate questions of fact, all under the guise of jargon such as "ambient harassment" and "organizational tolerance." This Court should not allow her opinion to usurp the fact-finder's role in forming legal conclusions based on the facts of the case.

Third, Dr. Fitzgerald admits she has no education, training, or experience in studying inmate sexual harassment against employees in a correctional setting, and her opinion fails to acknowledge the fundamental differences between employee-employee harassment in a typical workplace and inmate-employee harassment in a correctional facility. For all these reasons, Dr. Fitzgerald's testimony, reports, and opinions should be excluded in their entirety.

II.     FACTUAL BACKGROUND

Dr. Fitzgerald is an Emeritus Professor of Psychology and Gender and Women's Studies at the University of Illinois. She specializes in the study of sexual harassment and often serves as an expert—almost exclusively for plaintiffs—in sexual harassment cases. Ex. A. at 2; Ex. B (Deposition of Louise Fitzgerald) at 54:18–59:8, Ex. 2.

Dr. Fitzgerald developed the "Sexual Experiences Questionnaire" (SEQ), a social science survey she believes to be "the only theory-based, reliable and valid measure of the prevalence of

sexual harassment in the workplace." Ex. B at 81:16–83:19. Yet, Dr. Fitzgerald did not administer the SEQ or any other survey to CCSO employees. *Id.* at 74:6–22, 88:13–15. Instead, Dr. Fitzgerald utilized a methodology with no "specific name" and mainly relied on her review of the pleadings, deposition transcripts of 11 named Plaintiffs and three CCSO managers, witness declarations from 40 putative class members, and select documents Plaintiffs' counsel compiled for her review. *Id.* at 76:15–18, 78:9–11, 80:16–81:1. She did not independently gather data for her analysis. *Id.* at 74:6–22. These documents, and a one-day tour of portions of the Jail, encompass the entire universe of "data" that Dr. Fitzgerald relied upon in forming her opinions. *See id.* at Ex. 2.

Dr. Fitzgerald's expert report is divided into four parts, the heart of which are Parts I and II. Ex. A at 5-17. Part I assesses the "nature and prevalence of inmate sexual harassment at CCSO" during the period for which Plaintiffs are seeking class certification. *Id.* at 6. This section consists largely of select excerpts of the named Plaintiffs' deposition testimony and declarations submitted by putative class members in support of class certification. *Id.* at 6–8. Although Dr. Fitzgerald attempts to extrapolate from this testimony to all female CCSO employees, she agreed during deposition that data gathered from individuals involved in litigation is "likely not representative of all sexual harassment victims" in an organization, a conclusion that is consistent with her own research.[1] *See* Ex. B at 102:23–105:10, 106:8–109:7, 109:18–114:20.

Dr. Fitzgerald also contends that "ambient harassment" was "widespread" in the Jail and Courthouse, "affecting even those who have not been exposed directly." Ex A at 8. She defines "ambient harassment" as "the experience of working in an environment permeated with sexually offensive and degrading behavior" and analogizes it to second-hand smoke. *Id.* at 5–6. Yet, she acknowledges that her use of the term "harassment" is based on the social science definition of the

---

[1] Ex. B at Ex. 4 at 82 ("It is likely that, because these women have . . . filed legal complaints, their experiences were far more severe than nonreporting victims.").

3

term, and not the legal definition as contemplated under Title VII. Ex. B at 139:13–140:7.

Part II of Dr. Fitzgerald's expert report is entitled "Risk Factors for Sexual Harassment." Like Part I, this section primarily consists of select excerpts of the named Plaintiffs' deposition testimony and putative class members' declarations, which Dr. Fitzgerald references to conclude that "the organizational climate within CCSO tolerates the sexual abuse of female employees by inmates." Ex. A at 9–18. The opinions in Part II are purportedly based on the existing body of social science research on sexual harassment in organizations and institutions, but Dr. Fitzgerald admits that no social scientist has ever conducted any scientific study or research specifically on inmate sexual harassment of employees in a correctional setting. Ex. B at 69:15–20, 89:9–17.

### III. LEGAL STANDARD

The Court's "gatekeeping" role in evaluating the admissibility of expert testimony under Federal Rule of Evidence 702 is intended "to make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *In re Testosterone Replacement Therapy Prod. Liab. Litig.*, 2018 WL 3586182, at *1 (N.D. Ill. July 26, 2018) (Kennelly, J.) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). To further this goal, Rule 702 permits expert testimony so long as:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

*Brand v. Comcast Corp., Inc.*, 302 F.R.D. 201, 208 (N.D. Ill. 2014) (Kennelly, J.).

Admissible expert testimony "must be 'connected to the existing data' by more than 'the *ipse dixit* of the expert.'" *In re Testosterone*, 2018 WL 3586182, at *1 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). Rather, expert testimony "must be grounded in the scientific

process and may not be merely a subjective belief or unsupported conjecture." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

In the context of a motion for class certification, "[i]f a district court has doubts about whether an expert's opinions may be critical for a class certification decision, the court should make an explicit *Daubert* ruling." *Messner v. Northshore Univ. HealthSystems*, 669 F.3d 802, 812 (7th Cir. 2012) (quotation marks omitted). Because Plaintiffs rely on Dr. Fitzgerald's opinions to support their commonality and superiority arguments in support of their request to certify a class, (*see* Dkt. 171 at 10–11, 19, 22, 33), the Court must "rule conclusively on [the CCSO's] challenge to her opinions before it turn[s] to the merits of plaintiffs' motion." *Messner*, 669 F.3d at 813.

IV. **ARGUMENT**

    A. **Dr. Fitzgerald's Opinions Are Not Based on a Valid or Reliable Methodology.**

        1. <u>The methodology used by Dr. Fitzgerald in this case has been rejected by courts and scholars as an invalid form of "social framework" analysis.</u>

Courts must carefully "examine the methodology the expert has used in reaching [her] conclusions," because even "[a] supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some **recognized scientific method**." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) (emphasis added). The "social framework" methodology employed by Dr. Fitzgerald has been rejected by multiple federal courts and even criticized by the Supreme Court as unscientific and unreliable. Thus, she tries to avoid the "social framework" label by claiming her methodology has no "specific name," but her testimony reveals she is, in fact, employing a variant of "social framework" analysis. *See* Ex. B at 75:5–78:14.

Dr. Fitzgerald describes her methodology as consisting of two components. First, she "provide[s] a description of the factors that are known to stimulate and facilitate high levels of sexual harassment in work organizations, as well as characteristics that cause harm to victims." *Id.*

5

at 76:20–24. According to Dr. Fitzgerald, this is known as traditional "social framework" analysis and is based on the current body of social science research on sexual harassment in organizations. *Id.* at 75:8–13, 76:20–77:3, 78:15–79:6. Dr. Fitzgerald, however, goes beyond traditional social framework analysis by attempting to "illustrate these characteristics with examples taken in the present case" and opining on "whether risk factors for sexual harassment were present" at the Jail and Courthouse. *Id.* at 77:4–78:8, 79:14–81:1. This second component of her methodology has failed to withstand scrutiny from courts and scholars alike.

The originators of social framework analysis have denounced the very types of opinions offered by Dr. Fitzgerald—in which an expert purports to use social science research to analyze the facts of a particular case—as unscientific misapplications of social framework evidence. *See* Monahan, Walker & Mitchell, Contextual Evidence of Gender Discrimination: The Ascendance of "Social Frameworks," 94 Va. L. Rev. 1715, 1719 (2008). A valid social framework analysis summarizes the general research in a specific subject-area with the goal of providing context for the fact-finder to interpret case-specific evidence. *See id.* at 1717. But an expert offering valid social framework evidence may "not tell the jury what to decide in any given case," only "what to consider." *Tuli v. Brigham & Women's Hosp., Inc.*, 592 F. Supp. 2d 208, 211 (D. Mass. 2009). As the originators of social framework analysis explained, "If linkages from general research findings to a specific case are to be made, those linkages must be recognized as arguments to be made by the attorneys, rather than evidentiary proof that can be offered by expert witnesses." Monahan et al., *supra*, at 1718. In *Wal-Mart Stores, Inc. v. Dukes*, the Supreme Court cited the Monahan article with approval on this very point, noting that the plaintiffs' expert, while "claim[ing] to present a social framework," had actually "testified about social facts specific to [the defendant]," thereby "elicit[ing] criticism from the very scholars on whose conclusions he relies." 564 U.S. 338, 354

6

n.8 (2011) (citing Monahan et al., *supra*, at 1745, 1747, 1748).

Federal district courts have adopted the principles articulated in the Monahan article, explicitly rejecting expert opinions like Dr. Fitzgerald's opinion here—in which an expert purports to apply her general knowledge to the specific facts of a case—as invalid and unreliable. In *EEOC v. Bloomberg L.P.*, the court excluded purported social framework expert testimony, finding that the expert based his opinions on "insufficient facts and data" without "any reliable method," as he "merely engaged in 'dog-earing' passages from depositions that he believed supported his conclusion." 2010 WL 3466370, at *14-16 (S.D.N.Y. Aug. 31, 2010) (explaining that the expert "made no effort to ensure that the materials that he reviewed were representative," did not undertake a "systematic approach" to reviewing the case documents, and effectively "intuited [his] conclusions"). Similarly, in *Childers v. Trustees of the University of Pennsylvania*, the court excluded social framework expert testimony where the expert "sift[ed] through evidence to find passages that support[ed] the Plaintiff's theory of the case," instead of summarizing relevant social science literature to "give jurors a context within which to evaluate the evidence" for themselves. 2016 WL 1086669, at *5-6 (E.D. Pa. Mar. 21, 2016).

Here, Dr. Fitzgerald's opinions are based on the same flawed methodology rejected in *Bloomberg* and *Childers*. In reviewing the deposition transcripts and witness declarations which formed the factual basis for her opinions, Dr. Fitzgerald employed a method she calls "content coding" which, based on her description, appears to be no different than what attorneys do when citing to record evidence to support their legal arguments. Ex. B at 182:12–186:12. While Dr. Fitzgerald claims she would have "coded" counter-examples "if [she] had found any" in the deposition transcripts or witness declarations, she admittedly did not cite any counter-examples in her report. *Id.* at 187:17–189:12, 191:10–193:7. In fact, Dr. Fitzgerald concedes that she was only

7

looking for examples to support the opinions in her report:

> Q   Sure. And if you came across instances where any of the named plaintiffs were encouraged to file incident reports, would you have included that in your report?
> A   Not as an example of the point I was making.
> Q   **So you were only looking for examples of the points that you were making in your report; is that right?**
> A   **Well, of course.**

*Id.* at 197:9–17. This explains why Dr. Fitzgerald apparently ignored or failed to address evidence favorable to CCSO in her expert report, such as the numerous remedial measures CCSO has undertaken over the years to combat inmate sexual harassment.[2] *See id.* at 153:2–166:16. Moreover, Dr. Fitzgerald claims she did not find a single example of a named Plaintiff testifying that she was not discouraged from reporting inmate sexual harassment (*id.* at 188:19–193:7), apparently ignoring the numerous instances in which several named Plaintiffs testified that they were not discouraged, and were even encouraged, to report such harassment.[3]

Rather than being guided by an objective coding system, Dr. Fitzgerald simply focused on the data she wanted to support her opinions while ignoring data to the contrary. This does not satisfy the scientific standard required under *Daubert*. *See Barber v. United Airlines, Inc.*, 17 F. App'x 433, 437 (7th Cir. 2001) ("Because in formulating his opinion Dr. Hynes cherry-picked the facts he considered to render an expert opinion, the district court correctly barred his testimony because such a selective use of facts fails to satisfy the scientific method and *Daubert*."). Consistent with the reasoning in *Dukes*, *Bloomberg*, and *Childers*, this Court should exclude her opinions because her methodology is not a "recognized scientific method" and does not involve

---

[2] Dr. Fitzgerald cannot even recall if she received or reviewed the exhibits attached to the declarations of CSSO's witnesses Brad Curry, Matthew Burke, and Steve Wilensky. Ex. B at 48:22–50:14.

[3] *See* S. Plasencia Dep. at 120:11-21, 188:18-189:5; Altman Dep. 152:13-16, 196:16-21, 217:24-218:11; T. Wilson Dep. at 143:16-24, 155:25-156:5, 159:5-11, 170:24-171:2, 184:5-7, 194:17-22, 203:11-18, 213:20-22, 221:20-22, 227:15-21, 231:18-24, 235:19-23, 239:2-9, 240:14-19, 243:14-21, 251:10-13; Hobbs Dep. at 134:14-18, 137:18-20, 150:9-14, 157:12-22; Robinson Dep. at 146:5-48:2; Ranney Dep. at 164:3-165:7 (collectively attached as Ex. C).

application of any scientific methods, tools, or principles. *Smith*, 215 F.3d at 718.

> 2. Dr. Fitzgerald's opinion is based on unreliable methodology because she used unrepresentative "data" created for the purpose of litigation.

Dr. Fitzgerald believes the SEQ is "the **only** theory-based, reliable and valid measure of the prevalence of sexual harassment in the workplace," but she did not administer the SEQ in this case, nor did she conduct any independent research or empirical studies or even interview any named Plaintiffs or putative class members. Ex. B at 46:2–17, 74:6–22, 81:12–83:19. As a researcher, Dr. Fitzgerald admits she "wish[ed]" she had used the SEQ in this case because the correctional setting "is an area that no one has ever done" and she "would rather sort of play with it as a researcher before [she] got under the spotlight of a court proceeding." *Id.* at 88:13–89:17.

The primary "data" that Dr. Fitzgerald relied upon to formulate her opinions are the deposition and declaration testimonies from 11 named Plaintiffs and 40 putative class members. *Id.* at 80:16–81:1. Dr. Fitzgerald's heavy reliance on testimony from litigants and interested parties renders her opinions inadmissible because her "data" is derived from an unrepresentative litigation sample and thus not scientifically valid. Despite her acknowledging the need for statistically-valid samples to draw generally-applicable conclusions about a particular population (*id.* at 98:11–99:2)—and her admission that data gathered from individuals involved in litigation is "likely not representative of all sexual harassment victims" in an organization (*id.* at 106:8–109:7, Ex. 4 at 82; *see also id.* at 102:23–105:10, 109:18–114:20)—Dr. Fitzgerald offers sweeping conclusions about over 2,000 putative class members employed across the Jail and Courthouse based primarily on select deposition excerpts and attorney-drafted declarations from interested litigants. This is entirely speculative and fails to satisfy *Daubert* standards.

Dr. Fitzgerald has unsuccessfully tried this strategy before in this very District. In *Dial Corp.*, she opined on the "pervasive effect" of sexual harassment on all women who worked at the

9

defendant's facility based on "detailed examples taken from the testimony of certain claimants" and survey results obtained through administering the SEQ to a group of employees that largely consisted of class members in the litigation. 2002 WL 31061088, at *8, n.7. In finding Dr. Fitzgerald's opinions inadmissible, Judge Urbom explained that it was not scientifically sound to use "depositions primarily to illustrate [] opinions with detailed examples taken from the testimony of certain claimants" and assume that such testimony can be used to "draw formal conclusions about the experiences of the entire relevant population of employees." *Id.* at *8 n.7.[4]

As in *Dial Corp.*, Dr. Fitzgerald cannot make such "inappropriate generalization[s]" about the entire population of female CCSO employees based predominantly on unrepresentative "data" from 11 named Plaintiffs and 40 putative class members. *Id.* at *8. This is especially true here because, unlike in *Dial*, Dr. Fitzgerald did not even administer the SEQ or conduct any independent research. This Court should follow Judge Urbom's reasoning and reject Dr. Fitzgerald's sweeping conclusions about the entire population of female CCSO employees.[5]

    3. <u>Dr. Fitzgerald did not rely on representative data of a sufficient sample size, thus she has no scientific basis to opine about the entire putative class.</u>

Dr. Fitzgerald also fails to offer any statistically valid basis that would permit extrapolation from the 11 named Plaintiffs' or the 40 declarants' alleged experiences to those of over 2,000 women the Plaintiffs seek to represent. Indeed, Dr. Fitzgerald does not know the total number of female employees in the putative class; the total number or ratio of female employees or medical personnel who interact with inmates; or the total number or ratio of female employees who filed

---

[4] Judge Urbom also concluded that "the inclusion of a large number of class members in the [SEQ] survey appears to have strongly influenced the overall results," thus the "survey data do not reliably reflect the views of experiences of the overall population of relevant employees." *Id.* at *9.

[5] In a recent case, *Van v. Ford Motor Company*, 2018 WL 4635649, at *12 (N.D. Ill. Sept. 27, 2018) (Dow, Jr., J.), Judge Dow similarly expressed "doubts about the admissibility of the opinions propounded by Dr. Fitzgerald," under the guise of the "social framework" method, in support of class certification in a Title VII sexual harassment case. Ultimately, Judge Dow denied class certification on other grounds and has not yet ruled on the defendant's renewed *Daubert* motion to exclude Dr. Fitzgerald's opinions.

incident reports pertaining to inmate sexual harassment during the relevant time period. Ex. B at 31:6–35:14. Dr. Fitzgerald did not think such information was "important" or "relevant" for her to draw conclusions about the "prevalence of harassment at CCSO" or to opine that "harassment can be expected to impact virtually every female employee who works in the [Jail]." *Id.*; Ex. A at 7, 28. Instead, Dr. Fitzgerald focused on "the number of complaints and number of incidents" without considering the total "number of women," and she merely assumed that "the enormous majority" of female CCSO employees had contact with inmates and thus experienced the same type of sexual harassment as the named Plaintiffs and declarants. Ex. B at 32:8–12, 39:19–40:21. Such unscientific speculation flies in the face of basic statistical principles requiring a statistically sufficient sample size in order to draw generally applicable conclusions about a particular population. *Id.* at 98:11–99:22.[6] Without knowing the total size of the population about which she is opining, Dr. Fitzgerald cannot conclude, with any degree of scientific validity, that the data she analyzed was of a sufficient sample size to draw conclusions about the entire population.

Moreover, Dr. Fitzgerald admits the incident reports she analyzed were limited to a 22-month time period from January 1, 2016 through October 31, 2017, and that she did not receive or review any incident reports or other non-testimonial evidence outside of this time period. Ex. B at 35:15–37:18. Nevertheless, Dr. Fitzgerald opines that "virtually every female CO, deputy, and non-sworn employee has been directly exposed" to sexual harassment since at least 2015 through the present. *Id.* at 130:1–13. Her methodology is unreliable because the data she relied upon only captures 22 of the 50-month time period for which Plaintiffs are seeking class certification, and she provides no scientific basis to warrant extrapolating such limited analysis across the relevant

---

[6] *See also Ingram v. NWS, Inc.*, 1997 WL 688882, at *12 (N.D. Ill. Oct. 23, 1997) ("The usefulness of a statistical analysis is dependent upon the size of the sample used."); *U.S. v. Mikos*, 2003 WL 22922197, at *4 (N.D. Ill. Dec. 9, 2003) (sample size was too small for reliable statistical inference because "the relevant population is huge").

period. *See Dial Corp.*, 2002 WL 31061088, at *10 ("[T]he failure of the survey to confine its focus to a relevant time frame renders it unreliable . . . within the meaning of Rule 702.").

These methodological shortcomings also render Dr. Fitzgerald's opinions on ambient harassment invalid. Despite her characterization of ambient harassment at the Jail and Courthouse as "widespread," Dr. Fitzgerald admits that she would need to design a study or administer a questionnaire to scientifically measure the level of ambient harassment within an organization. Ex. B at 135:6–136:18. But here, Dr. Fitzgerald did not conduct any study or questionnaire to measure ambient harassment, and instead, based her opinion that ambient harassment at the Jail and Courthouse was "widespread" merely on anecdotal evidence that she selected from the depositions and declarations in this case. *Id.* at 123:9–125:13. Moreover, in her report, Dr. Fitzgerald opined that "it is certain that all [employees] have been exposed to the ambient environment," but at her deposition, she admitted it was possible that some employees "are far removed from the . . . inmates" and thus were not exposed to ambient harassment. Ex. A at 8; Ex. B at 130:22–132:9. This directly contradicts Plaintiffs' argument that "all Class Members experience ambient harassment" (Dkt. 171 at 19) and correctly suggests that whether each employee experienced ambient harassment depends on her individualized experiences.[7]

Dr. Fitzgerald seemed to acknowledge the limitations of her methodology during her deposition and attempted to backpedal by asserting that she was not asked to offer expert testimony on the "prevalence" of sexual harassment at the Jail.[8] Ex. B at 90:8–91:9. According to Dr. Fitzgerald, "[W]hen you've got 1,000 incident reports, whatever the true number may be, . . . it's irrelevant. You've got a big problem." *Id.* at 91:3–9, 93:10–15. But this is precisely the sort of

---

[7] *See* CCSO's Response in Opposition to Plaintiff's Motion for Class Certification at 19–28. Dr. Fitzgerald also concedes that, from the perspectives of victims, "harassment is not a homogenous experience." Ex. B at 212:16–23.

[8] This is contrary to Dr. Fitzgerald's expert report. Part I of her report contains a subsection entitled, "Nature and **prevalence** of inmate sexual harassment at CCSO." Ex. A at 6 (emphasis added).

unscientific testimony that Rule 702 is intended to exclude, regardless of the expert's qualifications. That opinion rests only on Dr. Fitzgerald's say-so; no scientific principles are offered to support it. Accordingly, Dr. Fitzgerald's generalizations about the putative class must be excluded as unreliable under *Daubert* and cannot be used to support Plaintiffs' arguments in support of class certification. *See Joiner*, 522 U.S. at 146 ("[N[othing . . . requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert").

### B. Dr. Fitzgerald's Opinions Will Not Assist the Court in Understanding the Evidence and Invades the Province of the Fact-Finder.

To be admissible, expert testimony must not only be "reliable," but also "relevant." *Daubert*, 509 U.S. at 589. "When analyzing the relevance of proposed [expert] testimony, the district court must consider whether the testimony will assist the trier of fact with its analysis of any of the issues involved in the case." *Smith*, 215 F.3d at 718. Experts generally may not offer "legal definitions, legal conclusions, or [opinions on] ultimate questions of fact" reserved for the province of the fact-finder. *Morris v. Ford Motor Co.*, 2012 WL 5947753, at *6 (N.D. Ind. Nov. 28, 2012). Here, Dr. Fitzgerald's opinions should be barred because they will not assist the Court in understanding evidence and improperly seek to invade the province of the trier-of-fact.

By opining on the supposedly high level of "ambient harassment" at the Jail and Courthouse, Dr. Fitzgerald attempts to rebrand the legal conclusion of "hostile work environment." Indeed, Dr. Fitzgerald admits that the term "harassment" as used in her report is based on the social science definition of "harassment," not on the legal definition under Title VII which "turn[s] on factors that science cannot address." Ex. B at 139:13–140:24. To trigger liability under Title VII, the fact-finder, not Dr. Fitzgerald, must decide whether putative class members experienced harassing conduct. Dr. Fitzgerald also admits she would need to individually evaluate each employee in order to assess the presence of psychological symptoms. Ex. B at 216:14–22. By

opining that "virtually every female employee" was impacted by inmate harassment and "can be expected to experience emotional distress" (Ex. A at 28), Dr. Fitzgerald "invades the province of the jury" by "improperly commenting on and interpreting testimony." *Sullivan v. Alcatel-Lucent USA Inc.*, 2014 WL 3558690, at \*6-7 (N.D. Ill. July 17, 2014).

Similarly, Dr. Fitzgerald opines that "CCSO tolerates the sexual harassment of its female employees" and that "the harassment remains largely unabated because management fails to view the jail as a workplace, as well as a correctional institution."[9] Ex. A at 27–28. But Dr. Fitzgerald does not explain how she determined that CCSO failed to "view the jail as a workplace" or measured the degree to which CCSO "tolerated" inmate sexual harassment. This opinion reflects nothing more than Dr. Fitzgerald's conjecture—she is no more qualified than the fact-finder to make these determinations, especially since she has no knowledge of "how [CCSO is] running the Jail." Ex. B at 219:16–220:11. Because Dr. Fitzgerald has no "special knowledge or skill that would be particularly helpful" in assessing CCSO's state of mind, her opinions on this subject merit exclusion under *Daubert*. *Id.*; *Johnson v. Wyeth LLC*, 2012 WL 1204081, at \*3 (D. Ariz. Apr. 11, 2012) (precluding plaintiff's experts from offering "opinions concerning defendants' motive, intent, knowledge, or other state of mind"); *see also* Section IV.C, *infra*.

      **C.    Dr. Fitzgerald Is Not Qualified to Provide Expert Testimony on Sexual Harassment by Inmates Against Female Employees in a Correctional Facility.**

"In ascertaining whether an expert is qualified, the question [the Court] must ask is not whether an expert witness is qualified in general, but whether [her] qualifications provide a foundation for [her] to answer a specific question." *Brand*, 302 F.R.D. at 208 (quoting *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010) (internal brackets and quotation marks omitted). Thus

---

[9] Plaintiffs rely upon this opinion to argue that CCSO lacked "strong management norms and an organizational climate that does not tolerate sexual harassment." Dkt. 171 at 22.

the Court "must look at each of the conclusions [she] draws individually to see if [she] has the adequate education, skill, and training to reach them." *Gayton*, 593 F.3d at 617.

Dr. Fitzgerald acknowledges that she is not a "jail expert" and has never analyzed, received training, or researched inmate sexual harassment against employees in a correctional facility. Ex. B at 62:22–64:10, 231:6. Nor is she aware of any other social scientist or expert having ever conducted a psychological or scientific study on this topic. *Id.* at 69:15–20, 89:9–17. In fact, Dr. Fitzgerald is only aware of one academic research article on this subject,[10] which concluded that the current body of social science research "[is] unable to account for the unique correctional environment and experience of female correctional employees." Chapman, *supra*, at 1–2.[11]

Failing to recognize the unique correctional environment and experience of female correctional employees, Dr. Fitzgerald believes the Jail is no different from any other workplace. *Id.* at 223:7–225:4. However, Dr. Fitzgerald admits she is **not** qualified to provide a "**professional**" opinion on the differences between a correctional setting and a private workplace because she is "not a correctional person." *Id.* at 225:9–16. As a result, this Court should exclude her report and opinions because she lacks the "education, skill, and training" to opine about inmate sexual harassment against employees in the unique correctional environment. *Gayton*, 593 F.3d at 617.

## V. CONCLUSION

For all the foregoing reasons, Defendants' Joint Motion to Exclude the Testimony, Reports, and Opinions of Dr. Louise Fitzgerald should be granted.

---

[10] *See* Sarah Billingsley Chapman, Ph.D. (CUNY), Inmate-Perpetrated Harassment: Exploring the Gender-Specific Experience of Female Correction Officers, https://pqdtopen.proquest.com/doc/304856728.html?FMT=ABS, 2009.

[11] Dr. Chapman explains that inmate sexual harassment "differs substantially in nature" from the traditional conception of workplace harassment because "[t]he dynamic between male inmates and female officers differs from the traditional supervisor-employee or employee-employee relationships in the workplace." *Id.* at 4–5. Even "the legal definition of sexual harassment lacks any definitive relevance" to inmate sexual harassment "because female correction officers may have little means of formal or legal retaliation against" inmates who commit such harassment. *Id.* at 4.

Dated: June 3, 2019

Respectfully submitted,

| COOK COUNTY SHERIFF'S OFFICE | COOK COUNTY |
|---|---|
| By: _/s/ Peter A. Milianti_____<br>One of its Attorneys | By: _/s/ Elizabeth A. Ekl_____<br>One of its Attorneys |
| Christina M. Egan<br>Michael R. Phillips<br>Peter A. Milianti<br>David D. Leishman<br>Katharine P. Lennox<br>Melissa M. Weiss<br>McGuireWoods LLP<br>77 West Wacker Drive<br>Suite 4100<br>Chicago, Illinois 60601-1815<br>cegan@mcguirewoods.com<br>Telephone: 312.849.8100<br>Fax: 312.849.3690 | Elizabeth A. Ekl<br>Terrence M. Burns<br>Dan M. Noland<br>Paul A. Michalik<br>Katherine C. Morrison<br>Reiter Burns, LLP<br>311 S. Wacker Dr. # 5200<br>Chicago, Illinois 60606<br>eekl@reiterburns.com<br>Telephone: 312.982.0090 |

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 3, 2019, I caused the foregoing document to be served upon all counsel of record through the Court's electronic filing system.

By:     */s/ Peter A. Milianti*
Christina Egan
Michael R. Phillips
Peter A. Milianti
David D. Leishman
Katharine P. Lennox
Melissa M. Weiss
McGuireWoods, LLP
77 West Wacker Drive
Suite 4100
Chicago, Illinois 60601-1815
cegan@mcguirewoods.com
mphillips@mcguirewoods.com
pmilianti@mcguirewoods.com
dleishman@mcguirewoods.com
klennox@mcguirewoods.com
mweiss@mcguirewoods.com
Telephone: 312.849.8100
Fax: 312.849.3690
