LOUISE F. FITZGERALD, PH.D                         April 30, 2019

Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION
------------------------------------------------------

SDAHRIE HOWARD, DENISE HOBBS,
ELLENOR ALTMAN, TAVI BURROUGHS,
DOMINIQUE FREEMAN, KIMBERLY
CRAWFORD-ALEXANDER,
ESTHER JONES, BALVINA RANNEY,
TAWANDA WILSON, and SUSANA
PLASENCIA, on behalf of themselves
and all others similarly situated,

                    Plaintiffs,

          vs.                Case No. 17-cv-8146

COOK COUNTY SHERIFF'S OFFICE
and COUNTY OF COOK,

                    Defendants.

------------------------------------------------------



          Deposition of LOUISE F. FITZGERALD, Ph.D

               Tuesday, April 30th, 2019

                    9:39 a.m.

                      at


               U.S. Legal Support
     411 East Wisconsin Avenue, Suite 1625
               Milwaukee, Wisconsin



     Reported by Sarah Gilkay, RPR, RMR, CRR

Exhibit B

LOUISE F. FITZGERALD, PH.D                         April 30, 2019

Page 31

1        women employed by Cook County Sheriff's Office

2        that are excluded from the plaintiffs class

3        definition?

4    A   I have not heard of any, but that's not

5        something that I've really been involved in.

6    Q   What is your understanding of the size of the

7        potential putative class?

8            MR. KULWIN:  Same objection.

9            You can answer.

10           THE WITNESS:  I forget how many women work

11       there.  It's definitely over 1,000.

12   BY MR. MILIANTI:

13   Q   Did you request that information?

14   A   I have that information.  It's sort of plastered

15       all over the documents.  I just don't remember.

16       It's not something that's a particular focus.

17   Q   The size of the putative -- potential putative

18       class is not a focus for your expert report?

19   A   I don't know why it would be.

20   Q   Do you have an understanding of the number of

21       women employed as correctional officers in the

22       jail during the relevant time period?

23   A   Maybe we should look at my report.

24   Q   Sure.  Would that help you?

LOUISE F. FITZGERALD, PH.D                              April 30, 2019

```
                                                          Page 32
 1    A    Oh, yes.  It may not help me with that
 2         particular question, but we'll see.
 3              (Exhibit 1 marked for identification.)
 4    BY MR. MILIANTI:
 5    Q    I've just handed you what's been marked as --
 6    A    Exhibit 1.
 7    Q    -- Fitzgerald deposition Exhibit No. 1.
 8    A    I do not believe I actually have that number.  I
 9         have seen that number.  I think I focused more
10         on the number of complaints and number of
11         incidents than number of women.  I didn't know
12         that would be important.
13    Q    So you don't believe the number of women
14         employed as correctional officers in the jail
15         during the relevant time period is relevant for
16         your opinions in this case, is that an accurate
17         statement?
18    A    I'm not sure that it's an accurate statement.  I
19         would have to know what you mean by "relevant"
20         and to which opinion.  I mean, certainly the
21         proportions of men and women and the nature of
22         their positions and the power structure, the
23         gender nature of the power structure, is
24         important.
```

LOUISE F. FITZGERALD, PH.D                          April 30, 2019

```
                                                        Page 33
1                    Specific numbers, whether it was 10
2         or 100 or 1,000 or -- there are approximately
3         10,000 personnel, so it's a large number.  I
4         mean, I don't know why a particular number would
5         be important, so I did not memorize that number.
6    Q    Do you know the number of women employed as
7         deputy sheriffs at the courthouse during the
8         relevant time period?
9    A    No.
10            MR. KULWIN:  Same objection.
11        Argumentative.  Irrelevant.
12            Go ahead.  You can answer the question.
13   BY MR. MILIANTI:
14   Q    You answered "no"; is that right?
15   A    I think I answered no.
16   Q    Do you know the number of female medical
17        personnel who have interaction with inmates --
18            MR. KULWIN:  Same objection.
19   BY MR. MILIANTI:
20   Q    -- during the relevant time period.
21            MR. KULWIN:  I'm sorry.  Same objection.
22            THE WITNESS:  Not off the top of my head.
23        No.
24
```

LOUISE F. FITZGERALD, PH.D                          April 30, 2019

Page 34

```
 1   BY MR. MILIANTI:

 2   Q    Would you believe that information is relevant

 3        for your opinions?

 4             MR. KULWIN:  Same objection.

 5             THE WITNESS:  No.

 6             MR. KULWIN:  Sorry.  You have to wait until

 7        I finish.  Asked and answered.  Argumentative.

 8                  Go ahead.  The answer is "no."

 9   BY MR. MILIANTI:

10   Q    Do you know how many individual female CCSO

11        employees who work in the jail and the

12        courthouse have actually filed incident reports

13        pertaining to detainee sexual harassment from

14        April 2015 to the present?

15   A    I have had that -- I do.  Between January 16 and

16        October 2017, more than 1,000 reports of

17        masturbation and indecent exposure have been

18        reported to the Cook County Sheriff's Office.

19        That is not the same as the number of women,

20        because -- wait a minute.  Strike that, as you

21        guys say.

22                  The reports would reflect the

23        number of people who complained.  That, I

24        believe, is approximately an 18-month period.
```

LOUISE F. FITZGERALD, PH.D                          April 30, 2019

Page 35

1  Q    Okay.  But I believe you said from January 2016
2       through October 2017, and as your report
3       reflects, there were more than 1,000 reports --
4       incident reports that have been reported to the
5       CCSO; is that right?
6  A    Correct.
7  Q    Do you know how many individual female CCSO
8       employees work in the jail and the Leighton
9       courthouse filed incident reports related to
10      inmate sexual harassment prior to January 2016?
11 A    Not as I sit here.
12 Q    Did you request that information?
13 A    I asked for information on reports, and I got
14      what I got.
15 Q    And the information you received relates to --
16      with respect to incident reports relates to the
17      time period January 2016 through October 2017;
18      is that correct?
19 A    I believe so.
20 Q    And you haven't received, as far as you know,
21      any other reports related to the number of
22      incidents reports related to detainee sexual
23      harassment, other than during that time period;
24      is that right?

LOUISE F. FITZGERALD, PH.D                     April 30, 2019

Page 36

```
 1    A    You know, we could easily look.

 2    Q    Sure.

 3    A    I don't know if it's attached, but --

 4    Q    Here.  Why don't I mark this as Exhibit 2.

 5               (Exhibit 2 marked for identification.)

 6   BY MR. MILIANTI:

 7    Q    I think you're referring to your appendix?

 8    A    Uh-huh.  I mean yes.

 9    Q    You've just been handed what's been marked as

10         Fitzgerald Deposition Exhibit No. 2?

11    A    And this would be B.

12               (Reporter clarification.)

13          THE WITNESS:  "B," as in "boy."

14   BY MR. MILIANTI:

15    Q    And you're referring to Appendix B; is that

16         correct?

17    A    I am referring to Appendix B.

18    Q    And that's a list of the documents and

19         information that you reviewed and considered in

20         writing your expert report; is that correct?

21    A    Yes.

22    Q    Okay.

23    A    And I -- well, I'll just stop.

24    Q    Okay.  Based upon your review of Exhibit B, are
```

U.S. Legal Support, Inc.
(312) 236-8352

LOUISE F. FITZGERALD, PH.D                          April 30, 2019

```
 1          you aware of any reports that you received
 2          relating to inmate sexual harassment, other than
 3          for the time period January 2016 through
 4          October 2017?
 5   A      I have no idea.
 6   Q      And nothing in Exhibit 2 refreshes your memory?
 7   A      Well, what I recall mainly about the breakdown
 8          was annotated in Exhibit 19, I think.  And I
 9          don't know -- I don't see that in here, but it
10          may be the way that the -- but I did -- I do
11          have that.
12   Q      Exhibit 19?
13   A      Exhibit 19.
14   Q      Okay.  And Exhibit 19 you believe is a breakdown
15          of the number of incidents of inmate sexual
16          misconduct from the time period January 1, 2016,
17          through October 31, 2017?
18   A      I could not tell you the dates.
19   Q      And we'll go over that exhibit later today.
20          What I'm asking is, other than that document,
21          are you aware of any other documents, either
22          prior to or after that time period, that
23          detail --
24   A      Actually, I have not necessarily seen a
```

LOUISE F. FITZGERALD, PH.D                          April 30, 2019

Page 39

1          injunction, so that would be January 18th.  That
2          would cover that time period.
3     Q    And how do you know that?
4     A    I have been told that, and I have read that.  I
5          read it in Ms. Woodard's -- if that's the
6          correct name, the woman who -- the jail expert
7          for the plaintiffs in this case.
8     Q    And who told you that, that the incident rates
9          dropped by 30 percent since the implementation
10         of a TRO?
11    A    I just said I read it in the expert report.
12    Q    Okay.  Other than reading it in the expert
13         report or Ms. Woodford's report, have you
14         received any data, spreadsheets, anything else
15         to suggest that the number of incident -- the
16         incident rate topped by 30 percent after the
17         implementation?
18    A    I don't recall.
19    Q    Do you know whether all female CCSO employees
20         who work in the jail and the Leighton courthouse
21         have contact with inmates?
22    A    I believe that it is my understanding that, with
23         the possible exception of some administrative
24         staff, a small number of administrative staff,

LOUISE F. FITZGERALD, PH.D                          April 30, 2019

Page 40

1        that the enormous majority -- I mean, that's
2        their job.  They're correctional officers.  And
3        they are deputy sheriffs, and they are
4        librarians in the prison, and they are medical
5        people who take care of the inmates, so ...
6    Q   And how do you know that?
7    A   How do I know what?
8    Q   How do you know that the -- the number, that
9        there is an exceptional number, enormous
10       majority of female CCSO employees have contact
11       with detainees?  Is that based on what somebody
12       told you or documents that you reviewed?
13   A   That's the job.
14   Q   Okay.  And I'm just asking what's the -- did you
15       review any documents in support or to
16       substantiate your opinion?
17   A   I have not seen a document that says what
18       percentage of female employees do not have
19       contact with inmates.
20   Q   Did you ask for such information?
21   A   No.
22   Q   At the time that you submitted your report, did
23       you know how many inmates were housed in the
24       Cook County Jail?

LOUISE F. FITZGERALD, PH.D                    April 30, 2019

Page 46

```
 1    Q    And I believe there are 40 total.
 2               Did you speak with any of the
 3         declarants?
 4    A    I did.
 5    Q    Which ones did you speak with?
 6    A    I spoke with one of them extensively, and I
 7         don't remember which one it was.  It may have
 8         Tavi Burroughs.  And the reason I spoke with her
 9         extensively is because she drove me home from
10         the jail.
11    Q    And Ms. Burroughs is one of the named
12         plaintiffs; is that right?
13    A    Yes.  Yes.  And I spoke to others who were on
14         our jail tour.
15    Q    Other than --
16    A    If you mean did I interview them in a formal
17         sense, no.
18    Q    All right.  So you said you spoke extensively
19         with Ms. Burroughs.
20               Other than Ms. Burroughs, do you
21         recall the names of any other individuals with
22         whom you spoke relating to this case who are
23         identified in Exhibit B?
24    A    All I can say is that the women that I spoke to
```

LOUISE F. FITZGERALD, PH.D                     April 30, 2019

Page 48

```
1            themselves.

2    Q       So you didn't seek any clarification?

3    A       No.

4    Q       Did you request any documents relating to any of

5            the information that was detailed in any of the

6            declarations?

7    A       Not that I recall.

8    Q       You took the declarations at face value, would

9            that be an accurate statement?

10   A       In what way?

11   Q       Well, for instance, if a declarant indicated

12           that they filed an incident report related to

13           inmate sexual misconduct, did you ask for the

14           underlying incident report?

15   A       No.

16   Q       So you would just take at face value that they,

17           in fact, filed an incident report?

18   A       For my purposes, yes.

19   Q       If I turn the page, you have defendant

20           deposition testimony?

21   A       Yes.

22   Q       And there is three deponents listed there.

23                       Did you -- for the first one, the

24           testimony of Matthew Burke, do you recall
```

LOUISE F. FITZGERALD, PH.D                          April 30, 2019

Page 49

1          whether or not you received the exhibits to his

2          deposition?

3   A      I don't recall.

4   Q      With respect to the testimony of Brad Curry, do

5          you recall whether or not you received the

6          exhibits to his deposition testimony?

7   A      I don't recall.

8   Q      And with respect to the testimony of

9          Steven Wilensky, other than what's listed here

10         as Exhibit 19, do you recall whether you

11         received any exhibits to his deposition

12         testimony?

13  A      I don't recall.

14  Q      Would there be anything that could refresh your

15         recollection?

16  A      I suppose I would have to look on my computer,

17         but if there was some -- when I'm reading the

18         depositions, if I do not have the exhibits, and

19         if from reading them it appears that it would be

20         important to read the exhibit, I'll make certain

21         that I get it.

22  Q      Okay.  And since you identify Wilensky

23         Exhibit 19 in Appendix B, but you don't identify

24         any other exhibits for the testimony of

LOUISE F. FITZGERALD, PH.D                          April 30, 2019

Page 50

1       Brad Curry or testimony of Matt Burke, does that
2       suggest to you that you didn't deem it necessary
3       to review exhibits attached to their
4       depositions?
5   A   I don't think we can assume anything about my
6       feelings.  I asked Noelle's office to prepare
7       this list because I do not do lawyer speak as
8       well as you folks do.  And so the way I identify
9       things tends to be annoying to attorneys, and so
10      I said, "Can your office prepare a list in the
11      proper terminology of everything that you sent
12      me," and that is what this is.  So I don't know
13      whether that means they didn't send me the other
14      exhibits.  I just don't know.
15  Q   Okay.  And if you turn to the next page, you
16      have listed -- the first bullet is Bates number
17      64451 through 53, CCDOC Policy 166.
18                  Do you see that?
19  A   I do.
20  Q   And the one underneath it is CCDOC Policy 104?
21  A   Yes.
22  Q   Other than these two policies, do you recall
23      reviewing any other CCDOC policies?
24  A   I reviewed the sexual harassment policy, sexual

LOUISE F. FITZGERALD, PH.D                                April 30, 2019

Page 54

| | | |
|---|---|---|
| 1 | | did not specifically break out the jail or |
| 2 | | something to that effect, and so it took a |
| 3 | | while. |
| 4 | Q | Are there any documents that you reviewed, other |
| 5 | | than this -- the EEO-1 report, that are not |
| 6 | | reflected in Exhibit B? |
| 7 | A | Not that I recall. |
| 8 | Q | Okay.  Why don't we take a look at Appendix B. |
| 9 | A | B? |
| 10 | Q | B. |
| 11 | A | We just looked at Appendix B. |
| 12 | Q | I'm sorry.  You're right. |
| 13 | A | Sorry. |
| 14 | Q | D. |
| 15 | A | "D" as in "dog." |
| 16 | Q | "D" as in "dog." |
| 17 | A | Okay. |
| 18 | Q | Appendix D you provide the cases in which you |
| 19 | | have testified as an expert at trial or by |
| 20 | | deposition since -- |
| 21 | A | In the last four years. |
| 22 | Q | In the last four years? |
| 23 | A | And that was since May -- preceding May 2018. |
| 24 | Q | Okay.  Have you testified as an expert at trial |

LOUISE F. FITZGERALD, PH.D                    April 30, 2019

Page 55

1          or by deposition in any other cases since

2          May 2018?

3     A    I have.

4     Q    Do you recall the name of the case?

5     A    There was Fuller versus the Idaho Department of

6          Correction.

7     Q    Any other case?

8     A    I don't know if this counts.  It was an

9          arbitration.  Does that count?

10    Q    Well, why don't you just tell me the name of the

11         arbitration matter.

12    A    Believe me.  This is clothed in deepest secrecy.

13         Spotted -- I'm going to have to look up.  I can

14         do this when we take a break.  And, in fact,

15         when we take a break, I may have an updated

16         version of this that I can --

17    Q    Okay.

18    A    -- produce for you.

19    Q    But there is an arbitration matter?

20    A    There is an arbitration matter.  There is the

21         Advocate matter that we discussed earlier.  If I

22         was deposed, which, as I said here, I don't

23         remember.  There -- let's see what else.  I want

24         to say there is another trial, but I don't --

LOUISE F. FITZGERALD, PH.D                          April 30, 2019

```
                                                        Page 56
 1            can't pull it up.
 2    Q       Okay.  In the Fuller case, did you testify on
 3            behalf -- I'm sorry.  Were you retained on
 4            behalf of the plaintiff or the defendant?
 5    A       The plaintiff.
 6    Q       And was the plaintiff alleging sexual
 7            harassment?
 8    A       And sexual assault and wrongful termination.
 9    Q       And did you opine that -- first of all, is
10            Fuller a woman?
11    A       Fuller is a woman.
12    Q       Did you opine that she had been, in fact,
13            sexually harassed, sexually assaulted?
14    A       That would be inappropriate.  That's a legal
15            determination.
16    Q       Did you offer opinions as to whether or not she
17            had been subjected to any type of sexual
18            harassment?
19    A       May I make a suggestion?
20    Q       Sure.
21    A       I think it would work better if you asked me
22            "What were you requested to do?"
23    Q       Sure.  What were you requested to do in Fuller?
24    A       Okay.  I was requested to do two things.  One
```

LOUISE F. FITZGERALD, PH.D                    April 30, 2019

Page 57

1        was to evaluate Ms. Fuller psychologically and
2        provide a report, and, secondly, I was asked to
3        evaluate the conditions in her place of work in
4        the Idaho Department of Corrections and the way
5        that that -- that the department had responded
6        both to her and over time to other women who had
7        made complaints about the person who turned out
8        to be the rapist.
9    Q   And did you reach your opinions in that case to
10       a reasonable degree of psychological certainty?
11   A   I did.
12   Q   Okay.  And I take it the arbitration matter you
13       mentioned, sworn to secrecy, there is a
14       confidentiality agreement?
15   A   The decision comes tomorrow.  Yes.
16   Q   Are you able to discuss what you were requested
17       to do in that case?
18   A   I did an evaluation.
19   Q   And on behalf of the plaintiff?
20   A   Yes.
21   Q   Were you retained by the plaintiff or
22       plaintiff's counsel?
23   A   Yes.
24   Q   And did you reach your opinions in that case to

LOUISE F. FITZGERALD, PH.D                    April 30, 2019

Page 58

1       a reasonable degree of psychological certainty?

2   A   I did.

3   Q   In the nine cases that are listed in Appendix D,

4       do you know how many times you testified on

5       behalf of the plaintiff?

6   A   For these, I believe it was all of them.

7   Q   Did any of these nine cases involve allegations

8       of sexual harassment in any kind of a

9       correctional setting?

10  A   The Fuller case.  And the reason it's not on

11      there is because they never deposed me in that

12      case.  I never testified at trial.

13  Q   And in the Fuller case was --

14  A   Idaho Department of Corrections.

15  Q   Was the plaintiff harassed and assaulted by a

16      co-worker?

17  A   She was.  She was a corrections officer.

18  Q   Have you ever been retained by an employer to

19      opine as to whether or not women have been

20      subjected to any type of sexual harassment?

21  A   Again, I can't do that.

22  Q   Have you ever been retained by an employer?

23  A   Yes.

24  Q   Okay.  In those cases where you've been

LOUISE F. FITZGERALD, PH.D                    April 30, 2019

Page 59

```
 1         retained, how many cases have you been retained
 2         by an employer in the last five years?
 3    A    In the last five years, I don't know.  I was
 4         retained in one, and I had to withdraw because I
 5         had a conflict.  I was retained -- if I can go
 6         beyond five years, I was retained in a large
 7         class action case in the sixth district --
 8         circuit, sorry, to -- on behalf of the company.
 9                   I was -- I have been retained maybe
10         four or five times by individual employment
11         attorneys, but I have never actually written a
12         report.  I did for the class action.
13    Q    And in this class action where you testified on
14         behalf of the company, what were you requested
15         to do?
16    A    I was requested to do a survey -- an audit of
17         the work environment there to assist them in
18         making the point that basically although the
19         named plaintiffs who I interviewed may well have
20         had a point, which they did, their experiences
21         were not representative of what was going on in
22         the company.
23                   So that time I used the SEQ to
24         great effect.  We actually administered it in
```

LOUISE F. FITZGERALD, PH.D                    April 30, 2019

                                                      Page 62
1              of victimization and violence that they had

2              experienced, their trauma levels.  We were not

3              allowed to ask about harassment while in prison.

4     Q        And when did you do this research?

5     A        The data collection was about two years ago.

6              Maybe last year.  We presented the results

7              actually just a couple weeks ago at the

8              Midwestern Psychological Association convention

9              in Chicago.

10    Q        And you're looking at the extent of various

11             kinds of victimization and trauma levels

12             experienced by the female inmates?

13    A        That was at a women's prison.

14    Q        And various levels of victimization and trauma

15             of the female inmates by correctional staff?

16    A        No.  That's why I said we weren't allowed to ask

17             that.

18    Q        Okay.  And did that research or study at all

19             inform your opinions or conclusions in this

20             case?

21    A        No.

22    Q        And other than that one research or study you

23             just described, you have not conducted any

24             research or studies concerning sexual harassment

LOUISE F. FITZGERALD, PH.D                        April 30, 2019

Page 63

| | | |
|---|---|---|
| 1 | | in a correctional setting, would that be |
| 2 | | accurate? |
| 3 | A | No.  It's very difficult to get to do studies in |
| 4 | | correctional settings. |
| 5 | Q | And you have not done so? |
| 6 | A | No. |
| 7 | Q | You have not authored any articles concerning |
| 8 | | inmate sexual harassment of female correctional |
| 9 | | workers; is that right? |
| 10 | A | No.  I have not seen any articles about |
| 11 | | harassment of male prisoners by female |
| 12 | | correctional officers. |
| 13 | Q | Okay.  But you haven't -- and maybe -- |
| 14 | A | I mean, I've looked. |
| 15 | Q | No.  Maybe I wasn't clear.  You haven't authored |
| 16 | | or -- authored any articles concerning sexual |
| 17 | | harassment in a correctional setting, period, |
| 18 | | male or female? |
| 19 | A | No. |
| 20 | Q | Is that right? |
| 21 | A | Correct. |
| 22 | Q | Do you have any training in corrections? |
| 23 | A | No. |
| 24 | Q | Have you taken any courses or classes in |

LOUISE F. FITZGERALD, PH.D                    April 30, 2019

Page 64

```
 1          corrections?
 2    A     No.
 3    Q     Have you ever worked in a correctional setting?
 4    A     No.
 5    Q     Have you conducted any training for correctional
 6          facilities?
 7    A     No.
 8    Q     Have you conducted any research specific as to
 9          why inmates engage in sexual harassing behavior?
10    A     No.
11    Q     Have you researched or studied any correctional
12          facilities that --
13    A     May I go back --
14    Q     Sure.
15    A     -- a bit to that previous question.  No, I have
16          not done that.  And the point here for me is
17          that the reason -- we know the reasons people
18          sexually harass, and it is true of all
19          organizations across the board.  I'm actually
20          speaking next week to the US Civil Rights
21          Commission, and the last slide that I put
22          together said -- is talking about exactly that,
23          "This is what causes sexual harassment."  This
24          is true in all organizations.  So there is no
```

U.S. Legal Support, Inc.
(312) 236-8352

LOUISE F. FITZGERALD, PH.D                          April 30, 2019

Page 69

1      and make a recommendation to the editor whether

2      to publish or not.  In good journals, the

3      rejection rate is like 95 percent.

4                    So -- and peer review can also help

5      authors make their papers better.  So sometimes

6      instead of getting a rejection, you get a

7      "revise and resubmit."  And -- because -- and

8      you take into account what they have to say.

9                    So the important part of -- I think

10     is it's anonymous.  I send in a paper.  They

11     don't know who I am.  Well, they probably do at

12     this point, but I don't know who they are, and

13     that's for sure.  And so it's fair, and it's

14     quality control.

15  Q  In -- you're not aware of any peer reviewed or

16     psychological or otherwise scientific studies

17     relating to inmate sexual harassment of female

18     correctional employees; is that right?

19  A  I know that there is one beginning, but not --

20     no.  I don't think it's ever been done.

21  Q  In forming your opinions in this case, did you

22     compare the frequency of inmate sexual

23     misconduct-related behavior that has occurred at

24     the CCSO to the frequency of inmate sexual

LOUISE F. FITZGERALD, PH.D                    April 30, 2019

Page 74

```
 1          even get a good bit of exhibitionism in
 2          factories.  Things like that.  The masturbation
 3          part is probably pretty unique.
 4    Q     Thankfully.
 5    A     I certainly hope it is.
 6    Q     Did you do any of your own research for this
 7          case?
 8    A     What do you mean by "research"?
 9    Q     Did you conduct any empirical studies?
10    A     No.
11    Q     Did you conduct any studies of any kind?
12    A     I did the kind of research one always does.  I
13          did not produce new data.  I reviewed everything
14          that was available.
15    Q     Well, you reviewed everything that was sent to
16          you?
17    A     No.  I reviewed the literature.  I reviewed the
18          PREA and all the literature about PREA.  I -- so
19          I read about correctional officers, but I did
20          not -- now, that's background research.  Did I
21          go out and conduct a study and generate new
22          data?  No.
23    Q     And you mentioned you did background research,
24          and you're relying upon social science research
```

LOUISE F. FITZGERALD, PH.D                    April 30, 2019

                                                    Page 75

1            in arriving at your opinions and conclusions.

2                          Would that be an accurate

3            statement.

4    A       I'm informed by social science research.

5    Q       Are you grounding your opinions in this case in

6            the social framework methodology?

7    A       No.

8    Q       What is the social framework methodology?

9    A       Well, they're different versions of it.  Strict

10           social framework would be if I just reviewed the

11           research on -- except there isn't any, this

12           topic -- and summarized it.  That was the

13           original definition of "social framework."

14                          Then people started -- in social

15           framework research, it's off the shelf, I guess,

16           if you will.  But some people started using

17           social framework research off the shelf to make

18           inferences -- which, of course, is the whole

19           point of having research -- about related

20           situations.

21                          And this became somewhat of a

22           politicized tempest in a teapot during the

23           Walmart case, or maybe it was Sears.  And so all

24           opinions by a social scientist are informed by

LOUISE F. FITZGERALD, PH.D                          April 30, 2019

Page 76

```
 1          the research, at least they better be informed
 2          by the research that has gone before.
 3                    What you're doing is you're
 4          applying these to a new or related set of facts
 5          and saying "This is what we know.  This is how
 6          this works.  Now let's look at this particular
 7          organization and see if it has the
 8          characteristics that we know typify an
 9          organization at high risk for sexual
10          harassment."
11     Q    What methodology did you use in arriving at
12          your --
13                    (Reporter clarification.)
14     BY MR. MILIANTI:
15     Q    What methodology did you use in arriving at your
16          opinions and conclusions in this case?
17     A    I don't believe there is a specific name for
18          what I did.  You can look at the introduction
19          and overview, see what I was asked to do.
20                    I was asked to provide a
21          description of the factors that are known to
22          stimulate and facilitate high levels of sexual
23          harassment in work organizations, as well as
24          characteristics that cause harm to victims.
```

LOUISE F. FITZGERALD, PH.D                    April 30, 2019

Page 77

```
 1         That's social framework, okay, I mean, if you
 2         want to call it that.  It's what social
 3         scientists have been doing forever.
 4                     Then as well -- oh, I said that.  I
 5         was also asked to illustrate these
 6         characteristics with examples taken in the
 7         present case, and that's what I did.
 8    Q    And you illustrate particular characteristics by
 9         looking at specific facts of this case; is that
10         right?
11    A    I'm sorry?
12    Q    You illustrate those characteristics by looking
13         at specific facts in this case; is that right?
14    A    I did.  I said -- I mean, I didn't say it this
15         way, but, okay, this is what we know causes
16         harm.  Are any of those things present in this
17         case?
18                     Because some of this is -- it's
19         not -- what am I trying to say?  Some of it is
20         counterintuitive, particularly the -- the
21         reporting piece of it.  It's very hard for
22         people to understand why women don't report.  In
23         fact, I spend a lot of my time in court on that
24         particular topic.
```

LOUISE F. FITZGERALD, PH.D                    April 30, 2019

Page 78

```
 1    Q    Would it be accurate to say that in this case
 2         you reviewed portions of the record that you
 3         received in order to determine, for instance,
 4         whether risk factors for sexual harassment were
 5         present?
 6    A    Yeah.  That's exactly what Ms. Woodford did.
 7    Q    I'm asking whether it's what you did.
 8    A    It is what I did.
 9    Q    And you don't believe there is a specific name
10         for that type of methodology?
11    A    I don't believe so.
12    Q    And --
13    A    I have given over using the term "social
14         framework" because it's so widely misunderstood.
15    Q    Okay.  On page 3 of your report you claim that
16         your opinions are evidence based?
17    A    They are.
18    Q    And rely on the extensive body of social science
19         research on sexual harassment in organizations
20         and institutions?
21    A    Correct.
22    Q    Right.  What -- what do you mean when you say
23         that your opinions are evidence based?
24    A    Let me look at this.  Where is this?
```

LOUISE F. FITZGERALD, PH.D                          April 30, 2019

Page 79

1   Q    I'm sorry.  It's --

2   A    They are evidence based because they rely on the

3        extensive body of social science research on

4        sexual harassment.  I should have said "because

5        in organizations and institutions."  And they

6        are also experience based.

7   Q    So the -- when you say -- the evidence to which

8        you're referring is the social science research?

9   A    I am not excluding the evidence, the specific --

10       the evidence specific to this case, but the

11       scientific foundation of my opinions -- I mean,

12       I'm not just making this up out of whole cloth.

13       There is more than 1,000 articles on this topic.

14  Q    Right.  And I'm just asking is the evidence to

15       which you're referring in your report, when you

16       say "evidence based," is that just exclusively

17       the social science research?  Is there any other

18       evidence?

19  A    As opposed to?

20  Q    Any other evidence that you're relying upon.

21  A    No, I'm not making any exclusions here.

22  Q    What do you mean by that?

23  A    It is based not only on the extensive body of

24       research on the causes, process, and

LOUISE F. FITZGERALD, PH.D                    April 30, 2019

Page 80

```
 1        consequences of sexual harassment in
 2        organizations, it is also based on the evidence
 3        specific to this organization that was provided
 4        to me.
 5               Ordinarily the term "evidence
 6        based" would mean -- it's come to mean you do a
 7        treatment, it's evidence based, and you don't
 8        just go out and institute something out of thin
 9        air.  But I used it in this context to say this
10        is based on science, as well as on the evidence
11        in this case.
12   Q    Okay.
13   A    I think there is a kind of a clang association
14        between the way we use the words, the term
15        "evidence."
16   Q    Well, you said you also relied upon evidence
17        specific to this organization?
18   A    Yes.
19   Q    What evidence?
20   A    The statements by the complainants.  The
21        depositions of the complainants.  The
22        depositions of three witnesses from the jail.
23        The jail tour.  Basically everything that I read
24        about how this process works, the reporting
```

LOUISE F. FITZGERALD, PH.D                          April 30, 2019

Page 81

1      process and so forth and so on.

2                    The fact that the plaintiffs --

3      that the jail provides no training to -- or did

4      provide no training to the correctional officers

5      about how to handle these incidents.  The fact

6      that the non-uniformed officers have great --

7      have to jump a lot of hurdles to be able to file

8      a complaint.

9                    So that's what I mean by

10     "evidence."  And that is not all inclusive.

11     It's what I remember right this minute.

12  Q  Okay.  And in this case you didn't administer

13     any questionnaires or surveys to the female

14     employees; right?

15  A  No.

16  Q  And you did develop the Sexual Experiences

17     Questionnaire?

18  A  I did.

19  Q  And that is a social science survey; is that

20     right?

21  A  I don't know what you mean by a "social science

22     survey."

23  Q  How would you describe the survey or

24     questionnaire?

LOUISE F. FITZGERALD, PH.D                                    April 30, 2019

Page 82

 1    A     It is a psychometrically sound method for
 2          assessing people, usually a woman -- it's
 3          designed for women.  People use it with men, and
 4          I'm not sure that's a good idea.  Her experience
 5          of sexual harassment.
 6                       You can do that as a survey in the
 7          workplace.  You can do it as a structured
 8          interview, either in the workplace or not.  And
 9          I just found out yesterday that the National
10          Academy of Sciences and the Government
11          Accounting Office are going to use it to do the
12          first national study of sexual harassment, which
13          means, not to precipitate anything, I can die
14          happy.
15    Q     And you have --
16                 (Exhibit 3 marked for identification.)
17    BY MR. MILIANTI:
18    Q     You've just been handed what's been marked as
19          Fitzgerald Exhibit 3.
20                 (Discussion held off the record.)
21    BY MR. MILIANTI:
22    Q     Okay.  You've just been handed what's been
23          marked as Fitzgerald Exhibit No. 3.
24                       Do you recognize this document?

LOUISE F. FITZGERALD, PH.D                    April 30, 2019

Page 83

```
 1    A    If it's what I think it is, I do.
 2    Q    Okay.  And what is this?
 3    A    This is testimony that I gave to the US Equal
 4         Employment Opportunity Commission.
 5    Q    And do you know when you gave this testimony?
 6    A    2017, I believe.  May have been '16.
 7    Q    2016 or 2017?
 8    A    2016 or 2017.  Yes.
 9    Q    And if you look at the second paragraph, you say
10         "To the degree I have any claim to fame in the
11         social harassment world, it is that I developed
12         the Sexual Experiences Questionnaire"?
13    A    This is true.
14    Q    And you go on to say "It's the only theory
15         based, reliable, and valid measure of the
16         prevalence of sexual harassment in the
17         workplace."
18                     Is that right?
19    A    Correct.
20    Q    Is this questionnaire -- this questionnaire can
21         be administered in any workplace; is that
22         correct?
23    A    It is a questionnaire that can be administered
24         in any workplace.  You sometimes have to make
```

LOUISE F. FITZGERALD, PH.D                    April 30, 2019

1        data on peer harassment among college students.

2        It was used in the major ARC 3 studies involving

3        all the major universities across the country

4        about two years ago and is getting ready to be

5        used again.

6                  See, it's not just me.  It's, like,

7        the SEQ is -- I won't say that nobody uses

8        something else.  For example, the Merit Systems

9        Protection Board has never adopted it.  They

10       have their own way they like to do it.  But

11       it's -- I mean, there are over 1,500 references

12       to the SEQ.  It's not just me.

13   Q   Did you -- you didn't administer the SEQ in this

14       case; right?

15   A   No.  But it's tempting.  I wish.

16   Q   Why is it tempting?

17   A   Oh, it's just -- that question you asked about

18       whether I identify as a researcher.  This would

19       be -- see, that's my advice to you, it's like

20       for free.  When this is over, let's -- let's do

21       a study.

22   Q   Well, why didn't you administer the SEQ in this

23       case?

24   A   I was not asked to, and I suspect it would not

LOUISE F. FITZGERALD, PH.D                          April 30, 2019

Page 89

```
 1        have been allowed.
 2   Q    Did you discuss with counsel --
 3   A    No.
 4   Q    -- the SEQ?
 5   A    No.
 6   Q    Did you offer the -- did you indicate to counsel
 7        that you could do the SEQ?
 8   A    No.
 9   Q    Would you have liked to have done the SEQ in
10        this case?
11   A    I think I would rather do it as a researcher.
12   Q    What do you mean by that?
13   A    I don't know how else to say it.  I'd rather --
14        because this is an area that no one has ever
15        done, it's brand new, I would rather sort of
16        play with it as a researcher before I got under
17        the spotlight of a court proceeding.
18   Q    Well, you have used the SEQ in other class
19        action cases to opine on the prevalence of
20        sexual harassment in an organization; right?
21   A    I did in the one and -- well, I've done it
22        twice.  Once it was disallowed; once it was not.
23        But I think one of the things I learned from
24        those experiences was that you would do want to
```

LOUISE F. FITZGERALD, PH.D                    April 30, 2019

Page 90

1      do a pilot and make sure that it worked the way
2      it's supposed to work, that it was reliable in
3      this population, that it was valid, which means
4      we would have to collect validity data.  It's a
5      big project.
6   Q  All of that could have been done here; correct?
7   A  In theory, yes.
8   Q  Would you have preferred to administer the SEQ
9      to measure the prevalence of sexual harassment
10     at the CCSO?
11  A  I'm not concerned about the prevalence of sexual
12     harassment at CCSO.  I mean, I may not be saying
13     that right.  Of course I'm concerned about it,
14     but that's not my point.  I take it as a given
15     that there is a lot of it.  The exact numbers of
16     it are not of interest.
17  Q  Why not?
18  A  Why would they be?
19  Q  Well, you've --
20  A  That was not part of my charge.
21  Q  -- indicated that the SEQ is the only reliable
22     and valid measure of the prevalence of sexual
23     harassment in the workplace, so my question to
24     you, if it's the only valid and reliable

U.S. Legal Support, Inc.
(312) 236-8352

LOUISE F. FITZGERALD, PH.D                         April 30, 2019

                                                            Page 91
 1            measure, wouldn't you have preferred to use it
 2            in this case?
 3    A       I wasn't trying to measure the prevalence of
 4            sexual harassment.  I was -- that was not the
 5            point.  I mean, when you've got 1,000 incident
 6            reports, whatever the true number may be,
 7            whether there is underreporting or
 8            overreporting -- well, underreporting, it's
 9            irrelevant.  You've got a big problem.
10    Q       Okay.  And you mentioned that the reporting that
11            you looked at, that is in reference to the
12            October -- I'm sorry, the January 1, 2016,
13            through October 31, 2017, report?
14    A       Correct.
15    Q       And you didn't review any other data measuring
16            the prevalence of sexual harassment in the jail
17            and the courthouse?
18    A       That does not measure the prevalence.  The data
19            doesn't measure the prevalence.  It measures
20            reporting statistics, and I cite here to the
21            National Academy of Sciences 2018, cannot be
22            taken as a reliable indicator of the level of
23            sexual harassment that is present.
24    Q       Why not?

LOUISE F. FITZGERALD, PH.D                    April 30, 2019

Page 92

```
 1    A    Because every study ever done has -- it is --
 2         let me restart.
 3                   It is by now accepted, like I said,
 4         at basically the highest levels of science that
 5         reporting is woefully inadequate -- inadequate
 6         as a measure for a number of reasons.  The great
 7         majority of people don't report.  The last
 8         United States Merit Systems Protection Board
 9         study, which was in 2018, demonstrated that
10         11 percent of the women in their study who had
11         been sexually harassed made reports.  That's --
12         the highest number I've ever seen was
13         30 percent.
14                   And these are people who are not
15         under stress, who are not, you know, in
16         necessarily highly dangerous workplaces.  They
17         don't have the same kinds of risks and dangers
18         to them.  So it's just, like, there is a
19         difference, I think, between whether you've got
20         a big problem and exactly how big is your
21         problem.
22    Q    Okay.
23    A    Once you get to a certain point, you don't need
24         to know any more.
```

LOUISE F. FITZGERALD, PH.D                    April 30, 2019

Page 93

| 1 | Q | Well, if you didn't rely upon -- if you didn't |
| 2 | | rely upon the data of the number of reported |
| 3 | | incidents from January 1 -- you didn't -- |
| 4 | A | I didn't. |
| 5 | Q | You didn't say that? |
| 6 | A | I didn't say that. |
| 7 | Q | I thought you just said that. |
| 8 | A | No, I didn't say that. |
| 9 | Q | Let me ask you a different question. |
| 10 | | What data did you rely upon in |
| 11 | | measuring the prevalence of sexual harassment at |
| 12 | | CCSO? |
| 13 | A | I did not measure the prevalence. I said when |
| 14 | | you have 1,000 incident reports in 18 months, |
| 15 | | you have a problem. And those incident reports |
| 16 | | don't even count certain kinds of sexual |
| 17 | | misconduct. We already talked about that |
| 18 | | earlier on. |
| 19 | Q | Do you know how many individuals plaintiffs' |
| 20 | | counsel represent in this case? |
| 21 | | MR. KULWIN: Objection. Relevancy. |
| 22 | | You can answer. |
| 23 | | THE WITNESS: I do not -- that's a |
| 24 | | complicated question, but my short answer is no. |

LOUISE F. FITZGERALD, PH.D                    April 30, 2019

Page 98

1       generally what is done.

2                      Other things that could be done,

3       and I think are listed in the document that sort

4       of says "This is what can happen," are the loss

5       of telephone privileges, the loss of

6       recreational privileges, the loss of activities

7       and programming.  I forget what else.  They have

8       to wear a jumpsuit, a color-coded jumpsuit

9       which, by all accounts I have read, is

10      ineffective in preventing the problem.

11  Q   Would you agree that in order to draw a

12      generally -- to draw generally-applicable

13      conclusions about a particular population that

14      you need to examine a statistically valid or

15      sufficient sample size in that population?

16          MR. KULWIN:  Objection.  Outside the scope

17      of her expertise.  She's not a statistician.

18          Can I have the question back again, please.

19              (Question read aloud by the reporter.)

20          MR. KULWIN:  I'll also say it's vague and

21      doesn't apply to any issues in this case, so I

22      object.  It's argumentative.  It's immaterial.

23                  To the extent you understand the

24      question and can actually answer the question,

LOUISE F. FITZGERALD, PH.D                         April 30, 2019

Page 99

1        go ahead.

2            THE WITNESS:  Well, I do understand the

3        question.  And if you're doing a research study,

4        yes.

5   BY MR. MILIANTI:

6   Q    What do you think is a sufficient sample size of

7        a female workplace population to generalize

8        findings to the entire female workplace

9        population?

10           MR. KULWIN:  Same objection.

11           THE WITNESS:  There are tables to determine

12       that, depending on the size of the female

13       workforce.  You would also want to look at

14       assignments, like where -- like I said, when we

15       went into that organization, we went into every

16       different department and sampled every shift.

17       That's what would make it representative.  It

18       doesn't necessarily have to be enormous.  It has

19       to be representative, and it has to have enough

20       statistical power to make a reliable -- to

21       produce a reliable result.  And that depends on

22       the size of the workforce.

23   BY MR. MILIANTI:

24   Q    If there, for example, are 100 women who work at

LOUISE F. FITZGERALD, PH.D                    April 30, 2019

```
                                              Page 102
 1   A    I didn't say that we had a litigation sample,
 2        because we're not doing research.
 3   Q    Would you agree that the litigation sample would
 4        include the named plaintiffs and declarants in
 5        this case?
 6            MR. KULWIN:  Objection.  Asked and answered
 7        twice.
 8            THE WITNESS:  A random sample is, by
 9        definition, random.
10   BY MR. MILIANTI:
11   Q    Do you know what an "organizational sample" is?
12   A    It's a sample from an organization.
13   Q    Do you know what the organizational sample is --
14        or what would be the organizational sample in
15        this case?
16   A    It would be the same, essentially.  Because
17        you're doing it for purposes of litigation, it
18        would be -- essentially it would be the same.
19   Q    It would be the same as the litigation sample?
20   A    Yes.
21   Q    And why is that?
22   A    Unless you -- well, maybe we have gone down the
23        wrong path.  Possibly, if you mean litigation
24        sample to include only people who are involved
```

LOUISE F. FITZGERALD, PH.D                         April 30, 2019

Page 103

1          in the lawsuit, that's a different issue.

2                      The principles of randomness and

3          representativeness and sufficient power still

4          apply, but in that case you could draw a

5          distinction between a litigation sample and the

6          organizational sample.  It would make more sense

7          to sample the organization, because you want to

8          be able to draw conclusions about the

9          organization, and it is not, by definition, the

10         case that the -- and I'm not speaking of this

11         case.  I'm speaking in general.

12                     It is not necessarily the case that

13         the women who are involved in litigation are

14         part of the same population as the rest of the

15         organization.  That's what we found at American

16         Showa, was that the litigation group, their

17         experiences were totally different than the rest

18         of the organization.

19    Q    So here the litigation -- let's assume the

20         litigation sample would be the people involved

21         in this particular lawsuit.

22    A    Tell me what you mean by "involved."

23    Q    The named plaintiffs.  Those who have actually

24         filed --

LOUISE F. FITZGERALD, PH.D                          April 30, 2019

Page 104

1   A   Only those 11 women?

2   Q   Yes.

3   A   Yes.

4   Q   Okay.  Would you -- would that be a litigation

5       sample, only individuals who have filed who are

6       named plaintiffs in this case?

7           MR. KULWIN:  Objection.  Asked and

8       answered.

9           THE WITNESS:  I don't think "litigation

10      sample" is a term of art.  It just sort of means

11      people -- sampling people who are involved in

12      litigation.  It's, like, what is it that you

13      want to do?  You cannot generalize to the entire

14      organization by counting 11 people out of

15      probably several thousand.

16  BY MR. MILIANTI:

17  Q   Would you agree that there is an inherent

18      problem of bias when information is obtained

19      from individuals --

20  A   Excuse me.

21  Q   Would you agree that there is an inherent

22      problem of bias when information is obtained

23      from individuals in the context of litigation?

24  A   I will agree that litigation provides its own

LOUISE F. FITZGERALD, PH.D                    April 30, 2019

                                                      Page 105

1            challenges.  I do not believe that, by

2            definition, people who are involved in

3            litigation lie.

4     Q      What challenges are there when information is

5            obtained from individuals that are involved in

6            litigation?

7     A      You want to -- there really is not any more --

8            they are of a similar nature to any other

9            organizational research.  You need to have some

10           sort of validity information.

11    Q      And what do you mean by that?

12    A      Which you can -- which you can get.  We did this

13           in Smith Barney.

14    Q      Well, in this case did you do -- what do you

15           mean by "validity information"?

16    A      "Validity" means that you're measuring what you

17           think you're measuring.

18    Q      Did you do any validity analysis here?

19    A      I didn't collect any data here.  You're asking

20           me questions about an elephant, when I'm talking

21           about a horse.

22    Q      Would you agree that it's likely that where

23           women have made formal complaints and filed

24           legal complaints, their experiences are far more

LOUISE F. FITZGERALD, PH.D                    April 30, 2019

```
                                                    Page 106
 1          severe than non-reporting victims?
 2     A    Severity is related to reporting, but so are
 3          other things, such -- well, there are a number
 4          of other things, and you cannot make such a
 5          blanket statement.
 6               (Exhibit 4 marked for identification.)
 7     BY MR. MILIANTI:
 8     Q    I've just handed you what's been marked as
 9          Deposition Exhibit No. 4, and this is a study
10          that you authored; is that correct?
11     A    I co-authored it.
12     Q    And it's entitled "Angry and Afraid:  Women's
13          Appraisal of Sexual Harassment During
14          Litigation."
15                         Is that correct?
16     A    Correct.
17     Q    If you could please turn to page 82.
18               MR. KULWIN:  Just for the record, this is
19          in 2007, so that was 12 years ago.  So if she
20          needs time to read the whole article, she can
21          read the whole article.
22               THE WITNESS:  You can read the abstract.
23          Page 82.
24
```

LOUISE F. FITZGERALD, PH.D                          April 30, 2019

```
 1    BY MR. MILIANTI:

 2    Q    Can you read that first full paragraph starting

 3         with "Although the present study" and let me

 4         know when you're finished.

 5    A    (Reviewing document.)

 6                    These were, yeah, women that I

 7         had -- this was based on 72 women who were being

 8         evaluated for -- it was a damages evaluation.

 9    Q    In the context of litigation?

10    A    Yeah.  They were individual litigants.  They

11         were not class members.

12    Q    Okay.

13    A    And I said -- no.  I don't disagree with myself.

14    Q    You still hold these opinions that are reflected

15         in this first full paragraph on page 82?

16    A    Yeah, I do.

17    Q    And when you say "The present sample is

18         distinctive and likely not representative of all

19         sexual harassment victims," what do you mean by

20         that?

21    A    I say -- I go on to say most people who are

22         sexually harassed never -- they don't ever even

23         tell anybody, much less file a formal legal

24         complaint.  About 1 percent of victims get
```

LOUISE F. FITZGERALD, PH.D                    April 30, 2019

Page 108

```
 1          involved in litigation.  And so the question
 2          arises are these people different than all the
 3          other sexual harassment victims we'll just say
 4          in the United States.  It may be that their
 5          experiences were more severe.
 6     Q    And you --
 7     A    We were talking about -- in this study, we were
 8          looking at how women react in that primary
 9          appraisal phase where you -- where it first
10          happens, and you kind of look at it and you sort
11          of say, "Okay, is this relevant to me?  Is it
12          bad for me?  Is it okay?"
13                    And we assessed their reactions
14          during their evaluations and found that they
15          were angry.  Their reactions were they were
16          demoralized, they were anxious, they were
17          afraid, and they did not blame themselves.
18     Q    And you go on to say that it is likely that
19          because these women have made formal reports and
20          filed legal complaints, their experiences were
21          more severe than non-reporting victims?
22     A    I -- I think that that's a truism.  It
23          doesn't -- you can't extrapolate from that that
24          all non-reporting victims have experiences that
```

LOUISE F. FITZGERALD, PH.D                    April 30, 2019

```
                                                    Page 109
 1          are trivial.
 2     Q    Right.  But you also can't extrapolate that all
 3          non-reporting victims have the same experiences
 4          those who report it; right?
 5     A    For scientific purposes, you can't.  But --
 6     Q    You can't?
 7     A    But all of these -- I said you can't.
 8     Q    Okay.
 9     A    You've got to remember that all of these women
10          were victims of very severe harassment.  And --
11     Q    Similar to --
12               MR. KULWIN:  Let her finish, please.
13                    Go ahead.
14               THE WITNESS:  I guess I'm not sure where
15          you're going or what you're trying to learn from
16          me.
17    BY MR. MILIANTI:
18     Q    You go on to say that the "present analysis must
19          be replicated in non-litigation samples before
20          statements can be made concerning the" --
21     A    Right.
22     Q    -- "generalizability" --
23     A    "Generalizability."
24     Q    -- "the generalizability of the results"?
```

LOUISE F. FITZGERALD, PH.D                          April 30, 2019

1   A   Um-hum.

2   Q   And what do you mean by that?

3   A   Well, I am trying to think of a good example.  I

4       mean, generalizability, which is the goal of

5       research -- you don't necessarily care about

6       these 72 victims.  I mean, I'm not going to

7       write an article about them, if it doesn't

8       matter.

9                    We want to -- the question here was

10      that -- that I am referring to is do women not

11      in litigation react -- have the same reactions.

12      I can't say that, because I haven't studied

13      women not in litigation in this particular way.

14      So I can't -- I don't know if women not in

15      litigation who have been sexually harassed have

16      the same reactions.  I mean, maybe they're more

17      embarrassed and humiliated than angry and

18      afraid.  I mean, that's what generalization --

19      generalizability is all about.

20  Q   In this case, you've only studied or reviewed

21      the testimony or declarations from women who

22      would be considered involved in litigation.

23                    Would that be an accurate

24      statement?

LOUISE F. FITZGERALD, PH.D                          April 30, 2019

Page 111

1   A    They're the only people who have given

2        depositions.

3   Q    And you have not studied women who are not

4        involved in this litigation?

5   A    Well, I read the statements of 40 of them.

6   Q    Right.  Would you consider those women to be

7        involved in the litigation, if they're

8        declarants?

9   A    I don't know.  If they what?

10  Q    If they're declarants.

11  A    I don't know.  I don't know how that works.

12  Q    Do you believe it's appropriate -- strike that.

13            Do you believe that an opinion

14       that's based on information largely provided by

15       female employees who are involved in litigation

16       can be generalized to all female employees in an

17       organization?

18  A    Say that one again.

19  Q    Sure.  Do you believe --

20            I'm sorry.  Can you just read back

21       the question.

22            (Question read aloud by the reporter.)

23            THE WITNESS:  In that organization?

24

LOUISE F. FITZGERALD, PH.D                    April 30, 2019

Page 112

```
 1    BY MR. MILIANTI:

 2    Q    Yes.

 3    A    For what purpose.

 4    Q    For any purpose?

 5    A    No.  It has to be for what purpose, because that

 6         question matters.

 7    Q    Well, where would it be appropriate for you to

 8         make that type of generalization?

 9    A    Well, number one, I'm not trying to do that, so

10         what we're talking about is completely

11         hypothetical.  What we are doing is not science,

12         and the rules for science -- for doing science

13         are different than the rules for applying

14         science.

15              The rules for generating knowledge

16         are different from the rules for knowledge

17         application.  So I'm not sure I really

18         understand how to answer that question.  I would

19         say what all social scientists say.  It depends.

20    Q    Okay.  Well, let's use the example of -- you

21         asked for a specific example, so why don't we

22         talk about emotional distress or harm to women

23         as a result of sexually harassing behavior.

24              Can you base an opinion on
```

LOUISE F. FITZGERALD, PH.D                    April 30, 2019

```
 1           information that's largely provided by those
 2           female employees involved in litigation with
 3           respect to harm that they have suffered and
 4           generalize it to all female employees in the
 5           same organization?
 6     A     It depends on if they have same or similar
 7           circumstances.
 8     Q     And you wouldn't know that unless you did some
 9           type of analysis --
10                 MR. KULWIN:  Can you let her finish.
11                 MR. MILIANTI:  I'm sorry.
12                 MR. KULWIN:  Were you finished?
13     BY MR. MILIANTI:
14     Q     I'm sorry.  Were you not finished?
15     A     I think I was finished.
16     Q     And you wouldn't know that unless you did some
17           type of analysis of the other women in the
18           organization; is that right?
19     A     So we're talking about -- see, I actually --
20           what I did was an analysis of risk factors for
21           harm.  I think we could say to some degree that
22           all the women who worked in the jail were
23           exposed to those risk factors, some possibly to
24           a greater degree than others.  And I guess
```

LOUISE F. FITZGERALD, PH.D                    April 30, 2019

Page 114

1      that's what damages determinations are all

2      about, but that's not what this report is about.

3      And when that -- when and if that time comes,

4      there will need to be more data.

5    Q    What type of data?

6    A    At this point I could not say.  Certainly a

7         description -- I mean, I don't know legally,

8         but, from my perspective, we would need to know

9         what happened to them.  Some of them might even

10        choose not to join the class, so we don't have

11        to worry about them.  The ones that did decide

12        to join the class, from my perspective, we would

13        need to know what happened to them.

14   Q    And why would you need to know what happened to

15        them?  What's the significance?

16   A    To make some -- well, there has to be a lot of

17        different kinds of information.  I mean, this is

18        a legal thing.  I don't think I can give you a

19        good answer.  As a researcher, I would need to

20        know what happened to them.

21              I could make some -- I could

22        construct some algorithm prediction by how long

23        have they been there, what tiers did they work

24        in, had they been physically -- you know, the

U.S. Legal Support, Inc.
(312) 236-8352

LOUISE F. FITZGERALD, PH.D                    April 30, 2019

Page 123

1    A    There may have been other places where it was
2         identified.
3    Q    But you don't know, as you sit here today?
4    A    I don't know.
5    Q    Okay.  And are you aware of the number of
6         incident reports of inmate sexual misconduct
7         that occurred between January 2015 and present?
8    A    I already answered that question.  No.
9    Q    Okay.  On page 8 of your report, right in the
10        middle, you say "Because the harassment is so
11        widespread, ambient harassment is (almost by
12        definition) even more widespread"?
13   A    Yes.
14   Q    Okay.  How did you reach the conclusion that the
15        harassment is widespread?
16   A    I would consider a thousand incidents in 22
17        months to be widespread.
18   Q    And that's what you base your opinion on?
19   A    No.  I base it on more than that, but that is
20        the most explicit -- it is reported in all parts
21        of the jail by all types of female employees.  I
22        don't know what else you would call it aside
23        from "widespread."
24                        It was not limited to small pockets

LOUISE F. FITZGERALD, PH.D                          April 30, 2019

```
 1           or one tier.  It happens in -- in the tiers.  It
 2           happens in the tunnels.  It happens in the
 3           medical examination rooms.  It happens in the
 4           law libraries.  That's pretty much the entire
 5           jail.
 6     Q     And you're relying upon Exhibit 19 to
 7           Mr. Wilensky's deposition?
 8     A     Not for that statement.
 9     Q     Not for that statement?  Because you have here
10           "The sheer number of perpetrators (510) during
11           the 22 month" --
12     A     Well, you're jumping back and forth.
13     Q     So the thousand incidents that you just
14           referenced, that, again, relates to Exhibit 19,
15           right, the data from January 1 --
16     A     Yes.
17     Q     -- 2016?
18                     So what I'm asking is other than
19           that data, did you review anything else to
20           conclude that the problem is so widespread, that
21           the harassment is so widespread?
22     A     I just enumerated that based on depositions and
23           based on declarations, and possibly based on
24           other ancillary documents, I have been made
```

LOUISE F. FITZGERALD, PH.D                    April 30, 2019

```
 1          aware that it happens in the tiers, when the

 2          nurses go up to put the medications through the

 3          chuckholes.  It happens in the tunnels, when the

 4          inmates are being taken from one place to

 5          another.  It happens in the holding cells.  It

 6          happens in the medical examination rooms, and it

 7          happens in the law library.  And I have read

 8          descriptions of all -- all of those and that it

 9          happens in every division.

10     Q    When you say that the harassment is so

11          widespread, is that based on any type of

12          scientific analysis that you have done?

13     A    It's based on the data I saw.

14     Q    And that -- reviewing data isn't scientific?

15     A    Excuse me?

16     Q    Is reviewing the data here, would you consider

17          that to be scientific?

18     A    I have no idea how to answer your question.

19     Q    Well, do you think there is anything scientific

20          about reviewing an exhibit that lists incidents

21          of sexual misconduct and where they occur?

22          That's all I'm asking.

23          MR. KULWIN:  Objection.  Argumentative.

24          Incomplete hypothetical.  Doesn't take into
```

LOUISE F. FITZGERALD, PH.D                        April 30, 2019

Page 130

```
1    Q    And when you say that virtually every female CO,

2         deputy, and non-sworn employee has been directly

3         exposed, does that cover any particular time

4         period?

5    A    The time period that is covered by the materials

6         in this case.

7    Q    So is it your testimony that from 2015 to the

8         date of your report virtually every female CO,

9         deputy, and non-sworn employee has been --

10   A    I believe --

11   Q    -- directly exposed?

12   A    I believe that the materials actually describe

13        behavior that occurred before 2015.

14   Q    Okay.  So from 2014?

15   A    I don't know.

16   Q    Sometime in 2014?

17   A    I cannot put any back end on it precisely.  I

18        would have to analyze every document for that

19        purpose.

20   Q    And have you done that analysis?

21   A    No.

22   Q    And you go on to say that it is certain that all

23        have been exposed to the ambient environment;

24        right?
```

LOUISE F. FITZGERALD, PH.D                    April 30, 2019

```
                                              Page 131
 1    A    I do say that.  And I would -- I would make one

 2         adjustment to that statement.

 3    Q    Okay.

 4    A    It may be -- and I don't know, I just haven't --

 5         I don't have information on this.  But it is

 6         theoretically possible that some of the women in

 7         administration -- just knowing how organizations

 8         work, I think it's doubtful, but it is possible

 9         that they know nothing about this.

10    Q    So when you say, "certain" in your report, you

11         don't actually mean "certain"; is that correct?

12              MR. KULWIN:  Objection.  Argumentative.

13         Asked and answered.

14                     But you can answer the question.

15              THE WITNESS:  I answered it the way I

16         answered it.

17    BY MR. MILIANTI:

18    Q    And when you say, "women in administration,"

19         what do you mean by that?

20    A    I think I'm making some assumptions that there

21         are people who work in offices that are far

22         from -- and it may not be the case, but that

23         there are woman who work in offices that are far

24         removed from the -- both the inmates and the
```

LOUISE F. FITZGERALD, PH.D                    April 30, 2019

Page 132

1      female COs or the medical personnel or the
2      female deputies.  I don't have a sort of
3      architectural layout where I can see, like, oh,
4      here is the, I don't know, the finance
5      department, and it's -- and they just go in
6      there, and they do their thing, and they never
7      come out, and it's like they have never been
8      exposed.  I am just saying that is theoretically
9      possible.
10  Q  Have you reviewed any statements or testimony by
11     any female employees who claim that they have
12     only been exposed to ambient harassment?
13  A  I don't remember.  I don't think so.  I'm pretty
14     sure not.  I am virtually sure not.
15  Q  And studies have examined that ambient
16     harassment --
17  A  I'm sorry.
18  Q  I'm sorry.  Studies have examined that ambient
19     sexual harassment is -- affects both male and
20     female employees; is that right?
21         MR. KULWIN:  Do you have specific studies
22     you want to identify?  I'll object.  Vague.
23     Which studies?  When?  Who?  Where?  Be more
24     specific.

LOUISE F. FITZGERALD, PH.D                April 30, 2019

Page 135

1          had never been in that environment.  I don't

2          know.  Maybe there are administrative people who

3          work in satellite offices.  I don't know.

4     Q    I understand what you're saying, and I think my

5          question is just a little bit different.

6                    What would you need to do in order

7          to be able to opine to a reasonable degree of

8          psychological, scientific, or professional

9          certainty that all female employees at the CCSO

10         have been exposed to ambient harassment?

11    A    Nothing more than I've already done.  If I

12         wanted to be more specific about it, like the

13         degree to which ambient harassment was -- was

14         prevalent in a particular work group or

15         department or division or other subset of the

16         jail versus other divisions and departments and

17         subsets of the jail, then I would have to study

18         it.

19                    But to make the general

20         statement -- I mean study it formally.  To make

21         the general statement based on the nature of

22         ambient harassment, I'm comfortable with my

23         statement.

24    Q    When you say that you would need to study it

LOUISE F. FITZGERALD, PH.D                        April 30, 2019

Page 136

1        formally, what do you mean by that?

2    A   I would design a study.  I would -- there are

3        scales to measure this.  There is the bystander

4        stress scale.  There are other methodologies for

5        doing it.  For example, this is going to get

6        complex.  You can take a known work group and

7        compute their sexual harassment scores and then

8        impute the level or predict the level of another

9        woman's psychological distress, not counting her

10       own sexual harassment score.  I mean, there is

11       some tricky methodologies you can use.

12               What I would do, quite simply, is I

13       would administer questionnaires, and probably

14       buried in some other form of questionnaire, in

15       order to make sure it's not particularly biased

16       or has no demand effects, and I would just look

17       and see which work groups had higher scores.  I

18       mean, it's not a complicated problem.

19   Q   And that's not something that you studied or

20       tested here?

21   A   No.

22   Q   And when you say, "questionnaire," are you

23       referring to the SEQ?

24   A   No.  That's not a measure of ambient harassment.

LOUISE F. FITZGERALD, PH.D                      April 30, 2019

Page 139

```
 1    A    I -- are you looking at something?

 2    Q    I'm just -- just based on my review of your

 3         report --

 4    A    Okay.

 5    Q    -- it's all these different --

 6    A    Yeah.

 7    Q    -- social science concepts --

 8    A    Yes.

 9    Q    -- that you have detailed --

10    A    Yes.

11    Q    -- and written about in your report; right?

12    A    Yes.  Yes.

13    Q    When you're discussing sexual harassment in the

14         context of these theories and concepts, are

15         you -- you're referring to the social science

16         definition of sexual harassment?

17    A    As in not legal?

18    Q    Yes.

19    A    Always.  Having said that, we study what happens

20         to people.  Behavior.  Reactions.  The

21         particular stressors we study, sexual hostility,

22         unwanted sexual attention, sexual coercion, are

23         behaviors that are consistent with legal

24         guidelines, but there is no implication that any
```

LOUISE F. FITZGERALD, PH.D                        April 30, 2019

Page 140

1          particular situation we study does or does

2          not -- I mean, that's not something research can

3          assess.  You can make a stab at it, if for some

4          reason you wanted to -- such things as severity,

5          welcomeness, you know, frequency -- but that's

6          not -- we're interested in, if you don't mind me

7          saying so, bigger game than that.

8    Q     What is your definition, your social -- I'm

9          sorry -- your social science definition of

10         sexual harassment?

11   A     The generally accepted definition is unwanted

12         and/or offensive sex-related behavior in the

13         workplace.  And then we go on to talk about the

14         three types and subtypes, and then we kind of

15         show the relationship to legal concepts, like

16         sexual hostility and gender hostility and

17         unwanted sexual attention are part of a hostile

18         work environment, and sexual coercion is the

19         behavioral way of saying "quid pro quo."

20                    But we -- we can't determine

21         whether any situation meets those criteria, not

22         only for formal reasons -- you know, we can't,

23         but also because those decisions turn on factors

24         that science cannot assess.  Statutes of

LOUISE F. FITZGERALD, PH.D                    April 30, 2019

Page 153

1   BY MR. MILIANTI:
2   Q    Did you ask plaintiffs' counsel for documents
3        showing the remedial measures the CCSO has
4        undertaken to address this issue?
5   A    Well, I have some documents.  That's how I know
6        about them.
7             (Exhibit 5 marked for identification.)
8   BY MR. MILIANTI:
9   Q    I've handed you what's been marked as Deposition
10       Exhibit No. 5.
11  A    Uh-huh.
12  Q    Do you recognize this document?
13  A    I don't recognize it, but I am sure I have seen
14       it.
15  Q    Okay.  This is one of the documents you believe
16       you have reviewed?
17  A    I believe it is.
18  Q    Okay.  And this is the declaration of
19       Brad Curry --
20  A    Right.
21  Q    -- is that right?
22  A    Yes.
23  Q    Do you know who Mr. Curry is?
24  A    I do.  He was hired as the chief of staff.

LOUISE F. FITZGERALD, PH.D                      April 30, 2019

Page 154

1   Q    Okay.

2   A    Whatever that may mean.

3   Q    And if you look to the second page of this

4        exhibit under "Modified Uniforms."

5   A    Yes.

6   Q    In paragraph 11 Mr. Curry states that one way

7        the CCSO tried to prevent the behavior is

8        through the use of modified uniforms that

9        restricts immediate access to the detainee's

10       genitalia, and that's one of the remedial

11       measures that you mentioned a few minutes ago;

12       is that right?

13  A    Well, yes.  But what this does not mention is

14       that, number one, they don't always wear them,

15       and, number two -- and this is detailed pretty

16       thoroughly in Ms. Woodford's report -- there is

17       a whole body of literature and technology out

18       there on exposure control clothing -- something

19       I was not aware of -- and for whatever reason

20       CCSO kind of tried to reinvent the wheel, and

21       whatever they did, it didn't really work.  I

22       mean, we saw during the tour, you know, some --

23       it's Velcro, for God's sake, and I still like

24       the zipper idea.

LOUISE F. FITZGERALD, PH.D                    April 30, 2019

```
                                                    Page 155
 1   Q    Do you -- and this shows in paragraph 12 that in

 2        August of 2016 the uniforms were first designed,

 3        and then in October of 2016, once the uniforms

 4        were ready, they apprised the detainees --

 5   A    Yes.

 6   Q    -- of the uniforms?

 7   A    Um-hum.

 8   Q    Do you believe this measure demonstrates that

 9        the CCSO takes the issue of inmate sexual

10        misconduct seriously?

11            MR. KULWIN:  Objection.  Lack of foundation

12        as to when.

13            THE WITNESS:  I actually think it speaks

14        for itself.  It's -- taking something seriously

15        is -- and conveying to your employees that you

16        take it seriously involves -- I mean, this is

17        part of what I would look for, but certainly in

18        and of itself it's not sufficient.  But, yeah,

19        it's a good idea.  They need to implement it

20        better.

21   BY MR. MILIANTI:

22   Q    And do you believe this demonstrates that as of

23        August 2016 that the issue of inmate sexual

24        misconduct was on the CCSO's radar?
```

LOUISE F. FITZGERALD, PH.D                    April 30, 2019

```
 1              MR. KULWIN:  Objection.  Vague.
 2              You can answer it, if you understand.
 3              THE WITNESS:  I think once the complaint
 4         was filed, it was on the radar.
 5    BY MR. MILIANTI:
 6    Q    Okay.  But I'm --
 7    A    And I don't know -- I don't recall when that
 8         was.
 9    Q    I'm asking to the extent that these uniforms
10         were implemented in the fall of 2016, does that
11         demonstrate to you that the issue of inmate
12         sexual misconduct was on the CCSO's radar?
13    A    It could be a small piece of evidence in that
14         direction.  Yes.
15    Q    If you turn the page, "Handcuffing Procedures"?
16    A    Yes.
17    Q    Which you mentioned earlier is a remedial
18         measure as well?  Paragraph 17.
19    A    Uh-huh.
20    Q    Why don't you go ahead and read paragraph 17 and
21         let me know when you're finished.
22    A    Okay.  This is in the courthouse.
23    Q    Yes.
24    A    (Reviewing document.)
```

LOUISE F. FITZGERALD, PH.D                        April 30, 2019 .

```
                                                    Page 157
 1                    It's certainly a good idea.
 2    Q    Do you believe --
 3    A    My understanding from what I have learned since
 4         is that it is not reliably employed.
 5    Q    And who did you hear that from?
 6    A    Well, I had read some of it from some of the
 7         complainants and witness statements, but I -- in
 8         fact, there was one horrendous story, and I
 9         can't tack it to a particular person.  It was a
10         medical personnel.  That the guy is supposed to
11         remain handcuffed until the medical personnel
12         take -- asks that the handcuffs be taken off,
13         but this person was not.  And I don't remember
14         the details.  He started masturbating at her and
15         then somehow -- I'm probably mixing apples and
16         pears -- he -- he actually chased her down the
17         hall while masturbating at her, so ...
18    Q    Do you believe --
19              MR. KULWIN:  I think she's still in the
20         middle of her answer.
21              THE WITNESS:  Yeah.  But the majority of
22         the critique of the handcuffing that I got was
23         from Dr. Woodford's report.
24
```

LOUISE F. FITZGERALD, PH.D                    April 30, 2019

Page 158

1   BY MR. MILIANTI:

2   Q    Okay.  And do you believe the remedial measures

3        that are outlined in paragraph 17 in Mr. Curry's

4        declaration demonstrate that the CCSO is taking

5        the issue of sexual misconduct -- inmate sexual

6        misconduct seriously?

7             MR. KULWIN:  Objection.  Lack of foundation

8        as to when.

9             You may answer the question, if you can.

10            THE WITNESS:  I can't say that they were

11       taking it seriously.  What I can say is that

12       they were, for whatever reason, attempting to

13       make some improvements.

14  BY MR. MILIANTI:

15  Q    Okay.

16  A    And I guess they kind of had to because of the

17       injunction, so I don't know if it was true

18       organizational policy or whether it was a -- you

19       know.

20  Q    Well, as reflected in paragraph 17, it shows

21       that the measures were implemented in March, at

22       least some of the measures were implemented in

23       March of 2017; is that right?

24  A    Yes.

LOUISE F. FITZGERALD, PH.D                           April 30, 2019

                                                          Page 159

1    Q    Does paragraph 17 in Mr. Curry's declaration

2         suggest to you that the issue of inmate sexual

3         misconduct was on the CCSO's organizational

4         radar, at least as of March 2017?

5    A    I think they were aware they had a problem.

6    Q    And if you turn to page 5.

7    A    Five?

8    Q    Of Mr. Curry's declaration under "Deputy

9         Monitoring," were you --

10   A    Yes.

11   Q    Were you aware that the CCSO tried to prevent

12        this behavior by deputy monitoring?

13   A    I'm not sure I recall this.  Let me take a look

14        at it.

15   Q    Sure.

16             MR. KULWIN:  While she's looking at that,

17        what was Exhibit 2?

18             MR. MILIANTI:  I think it was her appendix.

19             MR. KULWIN:  Appendix.  That's what I

20        thought.  Got it.

21   BY MR. MILIANTI:

22   Q    Let me know when you're finished, and I'll ask

23        you a question.

24   A    Now, that's a good idea.

LOUISE F. FITZGERALD, PH.D                    April 30, 2019

```
                                                    Page 160
 1    Q    Were you aware --

 2    A    This particular part, this one particular part

 3         is a good idea, to explain to detainees that if

 4         any detainee engages in prohibited sexual

 5         activity, all the detainees in the lockup will

 6         be handcuffed.  And that's eliciting the peer

 7         pressure.  That's a good idea.

 8                    No. 25 I'm not too sure about.  I

 9         know that there are -- that they try to change

10         the way that public defenders sort of do their

11         thing and not to enter the lockup for visits

12         without a deputy.  It -- the one thing I would

13         say about this is that my understanding is they

14         don't have a call button.

15    Q    Okay.

16    A    And that -- that makes it -- that's an

17         important -- but, yes, this is a good idea.

18    Q    Do you believe the measures that are reflected

19         in paragraphs 24 through 26 of Mr. Curry's

20         declaration demonstrate that the CCSO was taking

21         the issue of inmate sexual misconduct seriously?

22              MR. KULWIN:  Object to lack of foundation

23         as to when.

24              You can answer.
```

LOUISE F. FITZGERALD, PH.D                        April 30, 2019

Page 161

1          THE WITNESS:  I'm not going to sign on to
2      that.  I'm saying they are trying to respond to
3      a problem.  I do not know whether they are
4      taking it seriously or -- as in what is
5      happening is wrong and their employees are being
6      damaged, or whether it's "We've got to do
7      something about this because we've got a lawsuit
8      and we've got" -- I mean, I don't want to take
9      away from the fact that they're responding, but
10     I simply don't know enough to be able to say the
11     quality of how they think about this issue.
12  BY MR. MILIANTI:
13  Q   Do you believe that paragraphs 24 through 26 of
14      Mr. Curry's declaration demonstrate that the
15      issue of inmate sexual misconduct was on the
16      CCSO's radar?
17  A   I do think it's on the radar.
18  Q   If you look at paragraph 29 of Mr. Curry's
19      declaration, in this paragraph Mr. Curry
20      explains how the CCSO proposed Senate Bill 2220
21      in January of 2016, which would have increased
22      criminal penalties for exposure in a custodial
23      environment, including a loss of custody credit
24      and strengthening the threat of having to

LOUISE F. FITZGERALD, PH.D                          April 30, 2019

                                                           Page 162

 1          register as a sex offender.

 2                    Do you see that?

 3    A     But that did not happen, did it?

 4    Q     Well, my question to you is do you believe this

 5          measure demonstrates that the CCSO takes the

 6          issue of inmate sexual misconduct seriously?

 7    A     Well, I don't know --

 8                    MR. KULWIN:  Objection as to lack of

 9          foundation.

10                    THE WITNESS:  I'm sorry.

11                    MR. KULWIN:  You can answer.

12                    THE WITNESS:  I think the sex offender

13          thing might have been -- might have had some

14          effectiveness.  This other stuff, fines, I --

15          and the other thing that is sort of bothersome

16          about this is that nothing addresses the

17          atmosphere of sexual violence that permeates

18          many areas of the jail.

19    BY MR. MILIANTI:

20    Q     Okay.  I just --

21    A     Please let me finish.

22    Q     I just don't think it's responsive to my

23          question.

24                    MR. KULWIN:  She still gets to answer.

LOUISE F. FITZGERALD, PH.D                    April 30, 2019

1          MR. MILIANTI:  Not if it's non-responsive.

2          MR. KULWIN:  She really actually does,

3     Pete, because that happened to me during my

4     deposition with your expert.  She would go off

5     on these tangents, and you kept saying "Let her

6     finish."  So turnabout is fair play.  Let her

7     finish.  She thinks she's answering.

8               Go ahead.

9          THE WITNESS:  I guess I'm wishing you had

10    asked me a question about -- the broad question

11    about are they trying to -- are they trying to

12    address these issues, and I would say partially,

13    yes.  Don't ask me why and whether they have

14    really got the message, but on some level I

15    don't care.  Yes, partly.  But partly not,

16    because they're only addressing a very small

17    part of it, and quite -- well -- so, anyway.

18    All right.  I'm done.

19 BY MR. MILIANTI:

20   Q    Do you believe the measure that's reflected in

21        paragraph 29 in Mr. Curry's declaration

22        demonstrates that the issue of inmate sexual

23        misconduct was on the CCSO's radar?

24   A    I do.

LOUISE F. FITZGERALD, PH.D                           April 30, 2019

                                                          Page 164
1    Q    If you look at paragraph 36 of Mr. Curry's
2         declaration, he discusses how the CCSO in
3         October of 2015 met with the Public Defenders'
4         Office to discuss efforts to address public
5         indecency incidents, including beginning to
6         receive information about such incidents
7         directly from the CCSD's office.
8                      Do you see that?
9    A    Can I read this paragraph?
10   Q    Sure.
11   A    (Reviewing document.)
12                     Yes, I see this.
13   Q    Okay.  Do you believe this measure demonstrates
14        that the CCSO -- I'm sorry.
15                     Do you believe the measure
16        reflected in paragraph 36 of Mr. Curry's
17        declaration demonstrates to you that the CCSO
18        was taking the issue of inmate sexual misconduct
19        seriously?
20             MR. KULWIN:  Objection as to lack of
21        foundation.
22             THE WITNESS:  And my response is the same.
23        I think it was on their radar.  I know from
24        visiting the jail that there was one poster that

LOUISE F. FITZGERALD, PH.D                      April 30, 2019

Page 165

```
 1         I saw, a cartoon, in the entire jail about -- I
 2         don't know whether they went away or whether
 3         they were never put up or whatever, but it's
 4         trying to communicate expectations to detainees.
 5                       For example, these town halls.  I
 6         don't know how they did that, but being very
 7         clear with these folks what is expected of them
 8         is important.  And consistently reinforcing that
 9         message, that's why the posters are a good idea,
10         and so ...
11   BY MR. MILIANTI:
12   Q     And you reviewed Mr. Wilensky's deposition;
13         right?
14   A     Mister who?
15   Q     Wilensky.
16   A     I did.
17   Q     And are you aware that in May of 2017 the CCSO
18         increased indecent exposure offenses in severity
19         from a 200-level offense to a 300-level offense?
20   A     Yes.
21   Q     And do you believe that measure demonstrates to
22         you that the CCSO was taking the issue of inmate
23         sexual misconduct seriously?
24   A     I have the same answer to that that I had to all
```

LOUISE F. FITZGERALD, PH.D                    April 30, 2019

Page 166

1    of these others.  It is a step.  I cannot state
2    the degree to which it indicates a change in the
3    climate or the culture, and it certainly does
4    not address the entire issue.  I don't want to
5    take away from the fact that they have done
6    something and that the something that they have
7    done has made a difference, but that's why I say
8    it's on their radar.
9  Q  Yes.  Does this -- that was my next question.
10    Does the change that was made in May of 2017 to
11    the penalty for indecent exposure-related
12    offenses demonstrate to you that the issue was
13    on the organization's radar, the issue of inmate
14    sexual misconduct?
15 A  I don't see how it could not be, with everything
16    that's going on.
17              (Discussion held off the record.)
18              (A recess was taken from 3:20 p.m.
19    until 3:27 p.m.)
20 BY MR. MILIANTI:
21 Q  So in your report, in discussing the degree to
22    which the issue is taking -- taken seriously by
23    the CCSO, still on page 11, you mention that
24    there is no policy concerning inmate sexual

LOUISE F. FITZGERALD, PH.D                                    April 30, 2019

Page 182

1           taking inmate sexual harassment seriously?

2    A      I do.

3    Q      And under the first bullet point in the section

4           you state "Deputies in the courthouse were not

5           able to write up the standard jail incident

6           reports for inmates in order to trigger

7           discipline."

8                        Is that right?

9    A      That's what it says.

10   Q      And you cite to Placensia deposition at page 86?

11   A      Correct.

12   Q      When you were looking -- how did you go about

13          finding support for this proposition?

14   A      What essentially I did -- and it was -- that's

15          not -- I wouldn't describe it that way.  But I

16          took all of the documents, the declarations, and

17          all of the depositions, and I coded them in

18          terms of examples, in terms of either taking it

19          seriously or them believing or -- I'm sorry --

20          the plaintiffs believing that it was not taken

21          seriously.  And they came in -- it came in

22          different, sort of, flavors.

23                        This had to do with the deputies

24          and the non-uniformed personnel, their procedure

LOUISE F. FITZGERALD, PH.D                           April 30, 2019

Page 183

| | | |
|---|---|---|
| 1 | | was very difficult, and that the first part was |
| 2 | | that it was just considered a fact of life.  So. |
| 3 | | I coded every single declaration |
| 4 | | and document or testimony, and I -- I'm trying |
| 5 | | to -- I don't believe I included all of them.  I |
| 6 | | think these are -- maybe I included all of them. |
| 7 | | I don't remember. |
| 8 | Q | When you say you -- |
| 9 | A | I don't think so. |
| 10 | Q | When you say you "coded" them -- |
| 11 | A | Yes. |
| 12 | Q | -- what do you mean?  How did you code the |
| 13 | | declarations and the deposition testimony? |
| 14 | A | It's content coding. |
| 15 | Q | What methodology did you use? |
| 16 | A | Content coding. |
| 17 | Q | Okay.  What does that mean? |
| 18 | A | It means I coded the content with respect to a |
| 19 | | set of criteria that involved -- like, I am |
| 20 | | intimately familiar with the concept with people |
| 21 | | believing their organization does not take |
| 22 | | harassment seriously.  I am also intimately |
| 23 | | familiar with the ways that organizations |
| 24 | | indicate to their employees that they do not |

LOUISE F. FITZGERALD, PH.D                          April 30, 2019

Page 184

1        take it seriously.

2                    So when I would see -- I went

3        through each -- I don't think I went through it

4        each time for each of the three.  I probably

5        just coded it as I went along.  If there was a

6        statement that said -- "And they never -- I made

7        27 incident reports, and I never heard back

8        about any of them," I would write "Not taken

9        seriously."  Okay?

10                   If it said "I didn't have any way

11       to -- I had to ask other people to file a

12       complaint for me, and they wouldn't always do

13       that," "Not taken seriously.  No reliable system

14       for reporting."

15                   So it's -- content coding is a

16       method that's used in qualitative research, and

17       it's fairly standard.

18   Q   How many different codes did you have?

19   A   I simply code -- I coded for not taking it

20       seriously, perceptions that it was risky to

21       complain, and perceptions that nothing would be

22       or was done.  And then, as it turned out, there

23       were sort of different types of examples of

24       that, and then sort of multiple attestation to

LOUISE F. FITZGERALD, PH.D                    April 30, 2019

Page 185

```
 1              those different types of examples.
 2    Q    So correct me if I'm wrong, you had three
 3         different content codes?
 4    A    With subcodes.  Yeah.
 5    Q    How many subcodes, do you believe?
 6    A    Well, those were not preexisting.  Those arose
 7         out of the data.
 8    Q    Do you recall how many subcodes you would have
 9         had?
10    A    I could tell you, because they're right here.
11         Just a sec.  Okay.  So "Fact of life," so that
12         would be one.  "No reliable channels for a
13         subset of employees to complain."  "No response
14         to complaints."  "Discouraged from complaining."
15                   So I guess there were four sort of
16         subcategories that emerged under the "not taken
17         seriously" rubric.
18    Q    Did you do key term searches for specific
19         language?
20    A    No.  I read them.
21    Q    Did you read the transcripts front to back?
22    A    Yes, I did.
23    Q    What is the -- I believe you said you loaded
24         these deposition transcripts onto some type of a
```

LOUISE F. FITZGERALD, PH.D                           April 30, 2019

Page 186

1          platform; is that right?  Did you do that?

2     A    I didn't say that.

3     Q    No.  You just reviewed --

4     A    They were on my computer.

5     Q    You reviewed the deposition transcripts on your

6          computer, and then you coded --

7     A    Well, I might -- yeah.  You know, I would -- the

8          first thing I would do is I would highlight,

9          okay, the statements that were -- and I would

10         use different colors.  And then when I went to

11         write the report, I just sort of cut and pasted

12         the examples into the report.

13    Q    Okay.  And you didn't use a searchable database

14         to load the transcripts?

15    A    I wouldn't know what to search for because I

16         can't very well search for "not taken

17         seriously."  That's sort of a hypothetical

18         construct.  And so, no, you actually have to

19         read them.

20    Q    Did you employ any type of scientific

21         methodology in your review of these deposition

22         transcripts and the declarations?

23    A    It kind of depends on what you mean by that.

24         It's pretty low-level stuff.  It's -- I, what we

LOUISE F. FITZGERALD, PH.D                    April 30, 2019

                                                   Page 187
1        call, atomized them, which means there is this
2        whole declaration, and I take it sentence by
3        sentence.  And some of them were irrelevant to
4        anything I was looking at, some of the
5        sentences.  Those that were relevant, I
6        highlighted.  But it's basically applying the
7        concept -- applying -- wait a minute.  Let me
8        think.  Am I applying the concept to the data?
9        Yes.  So I don't know if you want to call that
10       scientific or not.  It's certainly informed by
11       science.
12    Q  Do you believe it's scientific?
13    A  I believe what I do is scientific.
14    Q  Even this review of deposition transcripts?
15    A  Even this.  Yes.  I've published papers doing
16       this, like doing this with depositions.
17    Q  So one of your -- when you're doing the content
18       coding, you said one of the codes you used was
19       "not taking it seriously"?
20    A  Correct.
21    Q  Right.  Would you also point out during your
22       review of the deposition transcripts instances
23       where it appeared to you that the CCSO was
24       taking the issue seriously?

LOUISE F. FITZGERALD, PH.D                         April 30, 2019

Page 188

| 1 | A | If I had found any. |
|---|---|---|

1   A   If I had found any.

2   Q   Okay.  And do you know if you found any?

3   A   I didn't find any.

4   Q   How about the coding that you used, perceptions

5       that it was risky to complain, did you find any

6       instances where the deponents or the named

7       plaintiffs testified that they did not believe

8       it was risky to complain?

9   A   No.

10  Q   Or any contrary evidence to that effect?

11  A   No.  Not everybody said that.

12  Q   Right.  Right.  How about instances where named

13      plaintiffs indicated that they were discouraged

14      from reporting?

15  A   That is in "not taken seriously."  It's the last

16      subcategory.

17  Q   Not taken seriously?

18  A   Yes.

19  Q   Okay.  And did you find any instances where the

20      named plaintiffs testified that they were not

21      discouraged from complaining?

22  A   Not that I recall.  But I'm not sure that's

23      something that would have -- would have

24      naturally occurred.  I mean, these -- these

LOUISE F. FITZGERALD, PH.D                    April 30, 2019

                                                   Page 189
1           statements were not taken for that purpose, so
2           I'm not sure that that would have come up.  I
3           think where some of these sort of said "Oh, no,
4           they encouraged me, and they said, 'You've
5           really got to do this, and let me help you, and
6           we're going to make sure this doesn't happen
7           again,'" I didn't see anything like that.
8      Q    How about in the deposition testimony, did you
9           see any evidence that CCSO staff did not
10          discourage individuals from complaining?
11     A    I coded the depositions in the same way I coded
12          the declarations, so ...
13     Q    So if you would have found instances where named
14          plaintiffs testify that they were not
15          discouraged from reporting --
16     A    I always -- I always include counter examples,
17          if there are counter examples.
18     Q    And when you say you "always include them," you
19          always include them in your report?
20     A    Yes.
21     Q    Okay.  And so the fact that you didn't include
22          any in your report here, does that suggest to
23          you that there were -- you didn't find any
24          instances where named plaintiffs testified that

LOUISE F. FITZGERALD, PH.D                          April 30, 2019

                                                         Page 190
1          they were not discouraged from reporting

2          incidents of inmate sexual misconduct?

3     A    No.  That's not the right question.  I found, I

4          believe -- I mean, I'd have to look at each one.

5          I cannot say to you, as I sit here, that each

6          and every -- in fact, I am pretty sure that each

7          and every named plaintiff made some statement

8          about it not being taken seriously.  They may

9          have.  But if they didn't say that, that -- it

10         wouldn't be noted in here, because what would be

11         noted is if they had said "Well, this time I

12         made this complaint, and they responded very

13         quickly and they -- you know, they got the guy

14         served, and it went through the hearing, and

15         this was the outcome, and I was informed, and I

16         was satisfied with the process."

17                    I would have said that not all the

18         plaintiffs had this experience, or at least one

19         plaintiff had a different experience.

20    Q    Okay.  And just so I'm clear -- and I want to

21         use the example of you point out instances where

22         CCSO -- female CCSO employees were actively

23         discouraged from complaining, okay, if we can

24         use that as an example.

LOUISE F. FITZGERALD, PH.D                          April 30, 2019

Page 191

```
 1    A    We need to talk about specifics here.  This is
 2         page 13.
 3    Q    Page 13.  Yes.
 4    A    Yes.  Sorry.
 5    Q    So you have --
 6    A    And there are five examples.
 7    Q    Right.  Five examples.  You say some were
 8         actively discouraged from complaining; right?
 9    A    Yes.
10    Q    So my question to you is did you find any
11         instances in your review of the named
12         plaintiffs' deposition testimony where they
13         testified that they were not discouraged from
14         complaining?
15              MR. KULWIN:  Objection.  Asked and
16         answered.
17              You can answer it again.
18              THE WITNESS:  Where they testified that
19         they said -- not just that they didn't say they
20         were, but that they said "I was not," no.
21    BY MR. MILIANTI:
22    Q    So, for instance, if they were asked the
23         question:  "Did your sergeant discourage you
24         from reporting this incident of inmate
```

LOUISE F. FITZGERALD, PH.D                        April 30, 2019

```
                                                 Page 192
 1          masturbation?" and they answered "No" --
 2                 MR. KULWIN:  Objection.  Argumentative.
 3                 MR. MILIANTI:  I'm not done.
 4                 MR. KULWIN:  I'm sorry.
 5                 THE WITNESS:  I didn't see anything.
 6                 MR. KULWIN:  He's not to done.
 7                       Go ahead.
 8                 THE WITNESS:  I'm sorry.
 9   BY MR. MILIANTI:
10   Q    Would you have -- did you come across any of
11        that testimony in your review?
12   A    Well, there weren't questions and answers in the
13        declarations.
14   Q    Right.  I'm only talking about --
15   A    Oh, talking about the depositions?
16   Q    Yes.
17   A    I don't recall that.
18   Q    Okay.  And if you did see testimony along those
19        lines, is it your testimony that you would have
20        coded it in your review for purposes of your
21        report?
22   A    As an example, yes.
23   Q    And would you also, then, have included it in
24        your report as a counter example?
```

LOUISE F. FITZGERALD, PH.D                         April 30, 2019

                                                        Page 193
 1    A    Unless I screwed up.

 2    Q    Okay.  And if you didn't include it in your

 3         report, would that suggest to you that your

 4         coding was deficient?

 5    A    No.  It would -- it would indicate to me that I

 6         made a mistake.  But not in the coding.  Just in

 7         the inclusion.

 8    Q    So under -- we'll go back to page 12 under the

 9         courthouse --

10    A    I'm sorry.  Page 12?

11    Q    Yeah.  "The courthouse deputies and non-sworn

12         employees had no reliable channels for

13         reporting."

14    A    Yes.

15    Q    Do you see that?  And then you cite to

16         Ms. Placensia's transcript?

17    A    Yes.

18                    (Discussion held off the record.)

19    BY MR. MILIANTI:

20    Q    All right.  In -- you indicate that non-sworn

21         employees had no reliable channels for

22         complaining?

23    A    Correct.

24    Q    And in that second bullet in that section you

                    U.S. Legal Support, Inc.
                       (312) 236-8352

LOUISE F. FITZGERALD, PH.D                     April 30, 2019

Page 197

1        always exceptions to everything.  I don't know.

2        I would have to see what the evidence was.

3   Q    Okay.  Would you --

4   A    I mean, sometimes I could imagine the situation

5        where somebody -- it's kind of like "Go file a

6        report."  Is that encouraging?  I mean, I don't

7        know is what I'm saying.  I can't answer that in

8        the abstract.

9   Q    Sure.  And if you came across instances where

10       any of the named plaintiffs were encouraged to

11       file incident reports, would you have included

12       that in your report?

13  A    Not as an example of the point I was making.

14  Q    So you were only looking for examples of the

15       points that you were making in your report; is

16       that right?

17  A    Well, of course.

18  Q    I'm going to --

19  A    I mean, I could give examples of 100,000 things.

20  Q    Let me show you --

21  A    Oh, dear.  Here it comes.

22            (Exhibit 7 marked for identification.)

23            THE WITNESS:  Okay.  Susan Plasencia.  It's

24       not page -- oh, yeah.  It's page 86.

LOUISE F. FITZGERALD, PH.D                    April 30, 2019

Page 212

1          with that statement?

2     A    I have no reason to disagree with it.

3     Q    Did you do any type of research or analysis here

4          relating to turnover rates at the CCSO or

5          healthcare costs or sick leave or absenteeism

6          attributable to the pressures placed upon

7          correctional officers?

8     A    No.

9     Q    Ms. Chapman also states studies have found women

10         experience higher levels of stress than do their

11         mail peers in male-dominated professions, even

12         if they don't experience sexual harassment.

13                   Would you agree with that

14         statement?

15    A    Yes.

16    Q    You have previously stated, I believe, that

17         harassment is not a homogeneous experience --

18         it's not a homogeneous experience, and harm to

19         the victim will vary depending on what was done

20         to her, by whom, and for how long?

21    A    Correct.

22    Q    Do you still hold that opinion?

23    A    I do.

24    Q    And you've also previously stated, I believe,

LOUISE F. FITZGERALD, PH.D                    April 30, 2019

```
 1        individual data, even if it were only, as it was
 2        in this other class action, a bunch of survey
 3        data that we could look at the frequency and
 4        severity and look at their severity of their
 5        different outcome scores.
 6                        But I have no reason to believe
 7        that it operates -- I mean, 20,000 people is a
 8        pretty reliable sample.  20,000 women.
 9    Q   In what work environment?
10    A   They were in the military.  So frequency --
11        frequency matters.  That's not surprising.  Like
12        I said, I was surprised that it kicked in as
13        early as it did.
14    Q   Okay.  You said that you would not make any
15        statement about any individual person with
16        respect to the amount of harm that they have
17        suffered; is that correct?
18    A   Without having individual data.
19    Q   Without doing an individual forensic evaluation?
20    A   Probably.  Or -- or other -- having other types
21        of information.  I certainly would never assign
22        a diagnosis without an evaluation.  I might be
23        able to make other statements.
24    Q   Did you consider any alternative sources of
```

LOUISE F. FITZGERALD, PH.D                         April 30, 2019

Page 219

1   Q    How would you define "largely unabated"?

2   A    Still going on.  I guess I could say, based

3        solely on my hearsay about the 30 percent

4        decline in incident reports, although we know

5        that incident reports are not the same thing as

6        prevalence rates, I can say it's at this point

7        70 percent of what it -- that probably shouldn't

8        be taken as a serious statement.

9                     I think what I'm saying is it

10       continues to happen because the people that make

11       the decisions are thinking about their

12       organization simply as a correctional

13       institution, as a jail, as in "This is a jail,

14       what do you expect," as opposed to thinking

15       about it as a workplace.

16  Q    And I guess I'm trying to understand how did you

17       determine that the inmate sexual misconduct at

18       the CCSO remains largely unabated because

19       management fails to view the jail as a

20       workplace?

21  A    The intent of that sentence is to say this

22       continues to be a problem because management is

23       not paying attention to the welfare of its

24       female employees in the same way that they're

LOUISE F. FITZGERALD, PH.D                                April 30, 2019

```
                                                          Page 220
 1          paying attention to running their jail.
 2    Q     And how do you know -- how do you know how
 3          they're running their jail?
 4    A     I don't know how they're running the jail.
 5    Q     So when you say that it continues to be a
 6          problem because they're not paying attention to
 7          sexual -- inmate sexual misconduct compared to
 8          other areas of the jail, you don't know how
 9          they're treating other areas of the jail, would
10          that be an accurate statement?
11    A     I'll be happy to give you that.  I don't think
12          I've heard anybody make an argument that CCSO is
13          wildly committed to the welfare of its female
14          employees and has taken all of these proactive
15          steps and instituted wellness programs and -- I
16          could go on, but I won't.  I'm tired.
17             MR. MILIANTI:  Why don't we take a short
18          break.  I think I'm about done.  You tell me if
19          I'm about done.
20             MR. KULWIN:  You have one hour, one minute,
21          and 27 seconds.
22             MR. MILIANTI:  Okay.
23             MR. KULWIN:  But you don't have to use all
24          of it.  I will use some of it.
```

LOUISE F. FITZGERALD, PH.D                          April 30, 2019

Page 223

1          returning?

2    A     Yes.

3    Q     Okay.  And you would agree with me that in this

4          case the CCSO cannot ban an inmate from the

5          jail?

6    A     I agree with that.

7    Q     Are there any other differences in your

8          professional experience between the way in which

9          a private workplace can respond to a third party

10         engaging in sexual misconduct versus the way a

11         correctional facility can engage -- or can

12         respond to sexual misconduct by an inmate?

13   A     There will be -- as far as discipline is

14         concerned -- discipline is not the whole

15         picture.  But as far as discipline is concerned,

16         obviously the content will be different, but the

17         process of effective discipline and the effect

18         of reliable discipline is the same.

19                    Similarly, the things that lead to

20         a high level of harassment, although it's

21         tempting to say, "Well, it's a jail, what do you

22         expect, they're not good people," but, in fact,

23         you can do exact -- well, you can greatly

24         increase your chances of good behavior in the

LOUISE F. FITZGERALD, PH.D                    April 30, 2019

Page 224

1    same way that you do in any organization.

2    You -- you -- I won't say start, but, okay, you

3    start with the low-level stuff.  You create an

4    environment of civilized behavior and respect.

5    You have -- you do things to convey that people

6    need to respect not only other people, but

7    themselves.

8              And one of the examples I'll give

9    here is you don't let your inmates run around

10   half dressed or in clothes that are three times

11   too big for them, or you try to create an

12   environment where you respect yourself and each

13   other.

14             Secondly, you create expectations

15   for behavior, and then you reinforce those

16   expectations.  And you remind people.  And --

17   because when you -- when you have a lot of

18   low-level stuff, like they have -- relatively

19   speaking, low-level stuff -- here, just the

20   disrespect, the crude -- particularly sexually

21   crude language, it's a breeding ground for the

22   higher-level stuff.

23             And that process is exactly the

24   same in Smith Barney as it is in Cook County

LOUISE F. FITZGERALD, PH.D                    April 30, 2019

Page 225

```
 1        Jail.  So, of course, there are content
 2        differences, but the process, both of prevention
 3        and of remediation, is exactly the same, and
 4        causation is exactly the same.
 5    Q   So you said that you want to create an
 6        environment of civilized behavior and with
 7        respect; right?
 8    A   Yes.
 9    Q   Do you believe that's more challenging to do in
10        a correctional setting than in a private
11        workplace?
12    A   I'm not a correctional person, so my opinion on
13        that is certainly not a professional one.  I
14        mean, I look at it and say it would be hard.
15        Jail people that I have talked to say it can be
16        done.  So I don't -- I don't know.
17                    But the thing is, you need to make
18        the effort, because these are the -- it may be
19        hard.  That's no reason not to do it.  I mean,
20        it's like the jumpsuit with the zipper.  Yeah,
21        maybe you're going to have to get somebody to go
22        with them to supervise them, but if that's what
23        you have to do, that's what you have to do.  I
24        mean, these are criminal assaults.
```

LOUISE F. FITZGERALD, PH.D                          April 30, 2019

```
                                                      Page 231
 1           lock people up in solitary forever.  I mean, I
 2           think that's awful.  But actually take the
 3           telephone privileges away, actually keep them in
 4           the cell for the day, actually limit their
 5           visitation privileges for, say, a week.
 6                       And I'm not a jail expert, so I
 7           don't know.  I'm sure there are other things,
 8           depending on how your system works.  Don't
 9           reward them for refraining from bad behavior,
10           because it just encourages people to engage in
11           bad behavior so that they can stop engaging in
12           bad behavior and get rewarded.  There is a lot
13           of meaningful things that can be done.
14      Q    In your Appendix B, the list of documents that
15           you reviewed, you identified multiple incident
16           reports.  We went over that earlier today;
17           right?
18      A    Yes.
19      Q    Did you review any of the disciplinary facts and
20           findings associated with those incident reports?
21      A    I don't recall.
22      Q    And if they're not listed --
23      A    If it's not in there, I may or may not have
24           received them subsequently.  I just -- I don't
```

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| SDAHRIE HOWARD, *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 17-cv-8146 |
| | ) | |
| v. | ) | Judge Matthew F. Kennelly |
| | ) | |
| COOK COUNTY SHERIFF'S OFFICE, | ) | Mag. Judge Sidney I. Schenkier |
| *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

## **APPENDIX**

| | |
|---|---|
| Appendix A | List of citations used in preparing the Expert Report. |
| Appendix B | List of documents and information reviewed and considered in writing the Expert Report. |
| Appendix C | Expert's qualifications, including a list of all publications authored in the previous 10 years. |
| Appendix D | A list of all other cases in which, during the previous 4 years, the expert testified as an expert at trial or by deposition. |



Expert Report of Louise F. Fitzgerald, Ph.D.
February 4, 2019
Appendix A

References Cited

Barling, J., Dekker, I., Loughlin, C. A., Kelloway, E. K., Fullagar, C., Johnson, D. (1996). Prediction and replication of the organizational and personal consequences of workplace sexual harassment. *Journal of Managerial Psychology, 11(5),* 4-25.

Barling, J., Rogers, A. G., & Kelloway, E. K. (2001). Behind closed doors: In-home workers' experience of sexual harassment and workplace violence. *Journal of Occupational Health Psychology, 6(3)*, 255-269.

Berdahl, J. L. (2007). The sexual harassment of uppity women. *Journal of Applied Psychology, Vol 92(2)*, 425-437.

Berdahl, J. L., & Aquino, K. (2009). Sexual behavior at work: Fun or folly. *Journal of Applied Psychology, 94(1)*, 34-47.

Bergman, M. E., & Drasgow, F. (2003). Race as a moderator in a model of sexual harassment: An empirical test. *Journal of Occupational Health Psychology, 8(2)*, 131-145.

Bradley-Geist, J.C., Rivera, I., & Geringer, S.D. (2015). The collateral damage of ambient sexism: Observing sexism impacts bystander self-esteem and career aspirations. *Sex Roles, 73, (1-2),* 29-42.

Chapman, S.B. (2009). Inmate-perpetrated harassment: Exploring the gender-specific experience of female correction officers (Doctoral dissertation). Retrieved from Dissertation Abstracts International Section A: Humanities and Social Sciences.

Cortina, L. M., Fitzgerald, L. F., & Drasgow, F. (2002). Contextualizing Latina experiences of sexual harassment: Preliminary tests of a structural model. *Basic and Applied Social Psychology, 24(4)*, 295-311.

Dansky, B. S., & Kilpatrick, D. G. (1997). Effects of sexual harassment. In W. O'Donohue (Ed.). *Sexual harassment: Theory, research, and treatment* (pp. 152-174). Needham Heights, MA: Allyn & Bacon.

deBerker, A.O., Rutledge, R.B., Mathys, C., Marshall, L., Cross, G.F., Dolan, R.J., & Bestmann, S. (2016). Computations of uncertainty mediate acute stress responses in humans. *Nature Communications, 7.* https://www.nature.com/articles/ncomms10996

de Haas, S., Timmerman, G., & Höing, M. (2009). Sexual harassment and health among male and female police officers. *Journal of Occupational Health Psychology, 14(4),* 390-401.

Dionisi, A. M., Barling, J., & Dupré, K. E. (2012). Revisiting the comparative outcomes of workplace aggression and sexual harassment. *Journal of Occupational Health Psychology, 17(4)*, 398-408.

Fitzgerald, L. F., Buchanan, N., Collinsworth, L. L., Magley, V. M., & Ramos, A. (1999). Junk logic: The abuse defense in sexual harassment litigation. *Psychology, Public Policy, and Law, 5,* 730-759.

Fitzgerald, L.F., & Cortina, L. M. (2018). Sexual harassment in work organizations: A view from the 21st century. In C.B. Travis, J.W. White, A. Rutherford, W.S. Williams, S.L. Cook, K.F. Wyche (Eds.), *APA Handbook of the Psychology of*

*Women: Perspectives on Women's Private and Public Lives, Vol. 2* (pp. 215-234). Washington, DC: American Psychological Association.

Fitzgerald, L. F., Hulin, C. L., Drasgow, F., Gelfand, M., & Magley, V. (1997). The antecedents and consequences of sexual harassment in organizations: A test of an integrated model. *Journal of Applied Psychology, 82*, 578-589.

Glomb, T. M., Richman, W. L., Hulin, C L., Drasgow, F., Schneider, K. T., & Fitzgerald, L. F. (1997). Ambient sexual harassment: An integrated model of antecedents and consequences. *Organizational Behavior and Human Decision Processes, 71(3),* 309-328.

Harned, M. S., & Fitzgerald, L. F. (2002). Understanding the link between sexual harassment and eating disorder symptoms: A mediational analysis. *Journal of Consulting and Clinical Psychology, 70,* 1170-1181.

Ho, I. K., Dinh, K. T., Bellefontaine, S. A., & Irving, A. L. (2012). Sexual harassment and posttraumatic stress symptoms among Asian and White women. *Journal of Aggression, Maltreatment & Trauma, 21(1)*, 95-113.

Hulin, C., Fitzgerald, L. F., & Drasgow, F. (1996). Organizational influences on sexual harassment. In B. Gutek and M. Stockdale (Eds.), *Women and work*, Vol. 6. Newberry Park, CA: Sage.

Kabat-Farr, D., & Cortina, L. M. (2014). Sex-based harassment in employment: New insights into gender and context. *Law and Human Behavior, 38(1),* 58-72.

Lim, S., & Cortina, L. M. (2005). Interpersonal mistreatment in the workplace: The interface and impact of general incivility and sexual harassment. *Journal of Applied Psychology, 90(3)*, 483-496.

Lonsway, K. A., Paynich, R., & Hall, J. N. (2013). Sexual harassment in law enforcement: Incidence, impact, and perception. *Police Quarterly, 16(2),* pp. 177-210.

Magley, V. J., & Shupe, E. I. (2005). Self-labeling sexual harassment. *Sex Roles: A Journal of Research, (3-4),* 173-189.

Magley, V. J., Waldo, C. R., Drasgow, F., & Fitzgerald, L. F. (1999). The impact of sexual harassment on military personnel: Is it the same for men and women? *Military Psychology, 11*, 283-302.

Miner-Rubino, K., & Cortina, L. M. (2007). Beyond targets: Consequences of vicarious exposure to misogyny at work. *Journal of Applied Psychology, 92(5),* 1254-1269.

Mishel, M. H. (2014). Theories of uncertainty in illness. In M.J. Smith, & P. R. Liehr, (Eds.). *Middle range theory for nursing., 3rd ed.* (pp. 53-86). New York: Springer Publishing Co.

National Academy of Sciences (2018). Sexual harassment in academic sciences, engineering, and medicine. http://sites.nationalacademies.org/shstudy/index.htm

O'Connell, C. E., & Korabik, K. (2000). Sexual harassment: The relationship of personal vulnerability, work context, perpetrator status, and type of harassment to outcomes. *Journal of Vocational Behavior, 56(3)*, 299-329.

Patel, J.K., Griggs, T., & Miller, C.C. (2017, December 28). We asked 615 men about how they conduct themselves at work. *New York Times* https://www.nytimes.com/interactive/2017/12/28/upshot/sexual-harassment-survey-600-men.html

Piotrkowski, C. S. (1998). Gender harassment, job satisfaction, and distress among employed White and minority women. *Journal of Occupational Health Psychology, 3(1)*, 33-43.

Pryor, J. B., LaVite, C. M., & Stoller, L. M. (1993). A social psychological analysis of sexual harassment: The person/situation interaction. *Journal of Vocational Behavior, 42(1)*, 68-83.

Raver, J. L., & Gelfand, M. J. (2005). Beyond the individual victim: Linking sexual harassment, team processes, and team performance. *Academy of Management Journal, 48(3)*, 387-400.

Reed, M.E., Collinsworth, L.L., & Fitzgerald, L.F. (2005). There's no place like home: Sexual harassment of low income women in housing. *Psychology, Public Policy, and Law, 11(3)*, 439-462.

Rospenda, K. M., Fujishiro, K., Shannon, C. A., & Richman, J. A. (2008). Workplace harassment, stress, and drinking behavior over time: Gender differences in a national sample. *Addictive Behaviors, Vol 33(7)*, 964-967.

Santo, A. (Nov. 2017). https://www.themarshallproject.org/2017/11/09/the-unique-sexual-harassment-problem-female-prison-workers-face

Schneider, K. (1996). *Bystander stress: The effect of organizational tolerance of sexual harassment on victims' coworkers.* University of Illinois at Urbana-Champaign.

Schneider, K., Swan, S., & Fitzgerald, L. F. (1997). The job-related, psychological, and health-related outcomes of sexual harassment. *Journal of Applied Psychology, 82,* 401-415.

Schneider, K.T., Pryor, J.B., & Fitzgerald, L.F. (2010). Sexual harassment research in the United States. In S. Einarsen, H. Hoel, D. Zapf, & C. Cooper (Eds.). *Bullying and Harassment in the Workplace* (pp. 245-266). Baton Rouge, FL: CRC Press.

Shupe E., Cortina, L. M., & Ramos, A., Salisbury, J., & Fitzgerald, L.F. (2002). The incidence and outcomes of sexual harassment among Hispanic and Non-Hispanic White Women: A comparison across levels of cultural affiliation. *Psychology of Women Quarterly, 26,* 298-308.

Sims, C. S., Drasgow, F., & Fitzgerald, L. F. (2005). The effects of sexual harassment on turnover in the military: Time dependent modeling. *Journal of Applied Psychology, 90(6).* pp. 1141-1152.

Smith, C.P., and Freyd, J.J. (2014). Institutional betrayal. *American Psychologist, 69(5),* 575-587.

Sojo, V.E., Wood, R.E., & Genat, A.E. (2015). Harmful workplace experiences and women's occupational well-being: A meta-analysis. *Psychology of Women Quarterly, 40(1),* 10-40.

Thurston, R. C., Chang, Y., Matthews, K. A., von Känel, R., & Koenen, K. (2019).

    Association of sexual harassment and sexual assault with midlife women's

    mental and physical health. *JAMA: Internal medicine, 179(1),* 48-53.

U.S. Merit Systems Protection Board (1995). *Sexual harassment of federal*

    *workers: An Update*. Washington, DC: U.S. Government Printing Office.

U.S. Merit Systems Protection Board (2016). *Sexual harassment of federal*

    *workers.* Washington, DC: U.S. Government Printing Office.

Williams, J. H., Fitzgerald L. F. , & Drasgow, F. (1999). The effects of

    organizational practices on sexual harassment and individual outcomes in

    the military. *Military Psychology, 11,* 303-328.

Willness, C. R., Steel, P.,& Lee, K. (2007). A meta-analysis of the antecedents and

    consequences of workplace sexual harassment. *Personnel Psychology, 60(1),*

    127-162.

Woodzicka, J, A., & LaFrance, M. (2005). The effects of subtle sexual harassment on

    women's performance in a job interview. *Sex Roles: A Journal of Research, Vol*

    *53(1-2),* 67-77.

Yang, L.-Q., Spector, P.E., Chang, C.-H., Gallant-Roman, M., Powell, J. & (2012).

    Psychosocial precursors and physical consequences of workplace violence

    towards nurses: A longitudinal examination with naturally occurring groups in

    hospital settings. *International Journal of Nursing Studies 49,* 1091–1102.

# Expert Report of Louise F. Fitzgerald, Ph.D.
## February 4, 2019
## Appendix B

## APPENDIX B

Documents Reviewed in connection with
*Howard et al. v. Cook County Sheriff's Office et al.*

### Court Filings

- Document No. 107 – Second Consolidated Compliant
- Document No. 143 – Third Consolidated Complaint

### Plaintiff Deposition Testimony

- Testimony of Plaintiff Ellenor Altman
- Testimony of Plaintiff Tavi Burroughs
- Testimony of Plaintiff Kimberly Crawford-Alexander
- Testimony of Plaintiff Dominique Freeman
- Testimony of Plaintiff Denise Hobbs
- Testimony of Plaintiff Sdahrie Howard
- Testimony of Plaintiff Esther Jones
- Testimony of Plaintiff Susana Plasencia
- Testimony of Plaintiff Balvina Ranney
- Testimony of Plaintiff Sharon Robinson
- Testimony of Plaintiff Tawanda Wilson

### Plaintiff Declarations

- Declaration of Monshai Addison
- Declaration of Latarsha Anderson
- Declaration of Tamara Anderson
- Declaration of Kimberly Bowen
- Declaration of Jacqueline Brown
- Declaration of Jacqueline Brown2
- Declaration of Patricia Brown-Conley
- Declaration of Oneka Conley
- Declaration of Jessica Correa
- Declaration of Tanisha Cribbs
- Declaration of Gloria Ellis
- Declaration of Patricia Dianne Green
- Declaration of Sheleda Groves
- Declaration of Gabriela Henderson
- Declaration of Tanisha Henderson
- Declaration of Angelique Herrera
- Declaration of Bridget Insley
- Declaration of Patti Jagielski
- Declaration of Sybil Keys

- Declaration of Shonnita Lanier
- Declaration of Christina Lopez
- Declaration of Darlene McCord
- Declaration of Rita McCoy
- Declaration of Lakisha Macklin
- Declaration of Anntionettea Montgomery
- Declaration of Christina Muhammad
- Declaration of Donnetta Myart
- Declaration of Ramonita Perez
- Declaration of Lori Ponce
- Declaration of Desiree Ray
- Declaration of Cassandra Shelton
- Declaration of Kelly Shields
- Declaration of Sharon Taylor
- Declaration of Danielle Thomas
- Declaration of Evette Trejo
- Declaration of Hester Washington-Farr
- Declaration of Alicia Webster
- Declaration of Ronica Williams
- Declaration of Diane Winter
- Declaration of Lisa Yates

**Defendant Deposition Testimony**

- Testimony of Matthew Burke, Interim Director of Human Resources (former Chief of Staff) as CCSO's designee under Rule 30(b)(6) on the inmate discipline process.
- Testimony of Brad Curry, Chief Operating Officer of CCSO, as CCSO's designee under Rule 30(b)(6) on policies, procedures, and directives of the Cook County Jail and courthouses.
- Testimony of Steven Wilensky, Director of Inmate Discipline, Cook County Jail, as CCSO's designee under Rule 30(b)(6) on the inmate discipline process. Wilensky Exhibit 19 – Bates No. 0145839-46.

**Cook County Sheriff's Office Documents and Data**

- Bates No. 0271056: Email Re: CCB-2017-19872 Masturbation - December 15, 2017
- Bates No. 0270983: Email FW: RCDC-2017-19792 Indecent Exposure – December 14, 2017
- Bates No. 0270987: Email FW: RCDC-2017-19792 Indecent Exposure – December 14, 2017

- Bates No. 0064451-53: CCDOC Policy 166: Sexual Misconduct by Detainees Directive – November 28, 2017
- Bates No. 0065776-81: CCDOC Policy 104: Discrimination and Harassment
- Bates No. 0083442-43: Incident Report - April 12, 2017
- Bates No. 0162052-55: Teamsters Local 700 Letter Re: Notice of Alleged Safety or Health Concerns Cook County Department of Corrections – June 23, 2016
- Bates No. 016448-50: Inmate Disciplinary Report – September 26, 2017
- Bates No. 0271052 - Email from T. Williams to J. Johnson and others re: CCB-2017-19872 Masturbation – December 15, 2017- Corresponds with video Bates labeled CCSO_Howard_0271053
- Bates No. 0271053 - Video related to CCSO_Howard_0271052 (email listed above)
- Bates No.0164797 – Incident Report – May 9, 2015
- Bates No.0164804 – Incident Report – June 4, 2015
- Bates No.0164811 – Incident Report – June 13, 2015
- Bates No.0164819 – Incident Report – July 4, 2015
- Bates No.0164824 – Incident Report – July 17, 2015
- Bates No.0158003 – Incident Report – September 18, 2015
- Bates No.0164792 – Incident Report – October 23, 2015
- Bates No.0164838 – Incident Report – February 10,2016
- Bates No.0164831 – Incident Report – July 3, 2016
- Bates No.0164909 – Incident Report – February 21, 2017
- Bates No.0164841 – Incident Report – June 30, 2017
- Bates No.0164878 – Incident Report – July 17, 2017
- Bates No.0149202 – Incident Report – January 19, 2018
- Bates No.0164914 – Incident Report – March 20, 2018
- Bates No.0148452 – Incident Report – May 8, 2016
- Bates No.0148907 – Incident Report – January 24, 2018
- Bates No.0083442-43 – Incident Report – April 12, 2017
- Bates No.0088862-63 – Incident Report – April 12, 2017
- Bates No.0164059-60 – Incident Report – September 26, 2017
- Bates No.0148896 – Incident Report – June 13, 2017
- Bates No.0148674 – Incident Report – October 14, 2017
- Bates No.0148703 – Incident Report – October 17, 2017
- Bates No.0082827 – Incident Report – February 7, 2017
- Bates No.0082912 – Incident Report – March 11, 2017
- Bates No.0161271 – Incident Report – August 31, 2017
- Bates No.0161308 – Incident Report – September 7, 2016
- Bates No.0159188 – Incident Report – April 13, 2017
- Bates No.0166444-45 – Incident Report – March 13, 2017
- Bates No.0165814-15 – Incident Report – December 8, 2015
- Bates No.0165675 – Incident Report – September 27, 2016
- Bates No.0165687-88 – Incident Report – October 17, 2016
- Bates No.0165697 – Incident Report – November 10, 2016
- Bates No.0165729 – Incident Report – March 20, 2017
- Bates No.0165727-28 – Incident Report – March 20, 2017
- Bates No.0165744-45 – Incident Report – April 17, 2017

- Bates No.0165769 – Incident Report – May 23, 2017
- Bates No.0165782-83 – Incident Report – June 23, 2017
- Bates No.0165639-40 – Incident Report – May 24, 2016
- Bates No.0165641 – Incident Report – July 7, 2016
- Bates No.0165658-59 – Incident Report – August 19, 2016
- Bates No.0165686 – Incident Report – October 11, 2016
- Bates No.0165683 – Incident Report – October 20, 2016
- Bates No.0165698 – Incident Report – November 3, 2016
- Bates No.0165708-09 – Incident Report – December 20, 2016
- Bates No.0165712 – Incident Report – February 8, 2017
- Bates No.0165721 – Incident Report – March 8, 2017
- Bates No.0165722-23 – Incident Report – March 9, 2017
- Bates No.0165805-06 – Incident Report – September 28, 2017
- Bates No.0150943 – Incident Report – December 10, 2015
- Bates No.0080786 – Incident Report – November 30, 2017

**Plaintiffs' Documents and Data**
- Bates No. Atlman0018 – Incident Report – December 14, 2016
- Bates No. Altman0038-39 – Incident Report – August 15, 2018
- Bates No. Burroughs0001 – Incident Report – January 24, 2018
- Bates No. CRAWFORD-ALEXANDER_0001 – Incident Report – April 10, 2013
- Bates No. CRAWFORD-ALEXANDER_0030 – Incident Report – April 10, 2013
- Bates No. CRAWFORD-ALEXANDER_0050 – Incident Report – July 17, 2016
- Bates No. Howard0054 – Incident Report – February 9, 2013
- Bates No. Howard0055 – Incident Report – December 24, 2014
- Bates No. Jones0001 – Incident Report – March 13, 2017
- Bates No. Jones0002 – Incident Report – August 9, 2017
- Bates No. S.WILSON_0001 – Incident Report – February 16, 2017
- Bates No. S.WILSON_0003 – Incident Report – January 17, 2014

Expert Report of Louise F. Fitzgerald, Ph.D.
February 4, 2019
Appendix C

*Louise F. Fitzgerald, Ph.D.*
*85 Fiesta Way*
*Fort Lauderdale, FL 33301*
*217-766-2064*
*lff1353@gmail.com*

May, 2018

## EDUCATION

B.A.     (magna cum laude) - Psychology - 1974
         The University of Maryland

M.A.     Psychology - 1975
         The Ohio State University

Ph.D.    Psychology - 1979
         The Ohio State University

## POSITIONS HELD

2008-present  Emeritus Professor
              Psychology and Gender & Women's Studies
              University of Illinois at Urbana-Champaign

2009-2011     Distinguished Senior Scholar
              Department of Psychology
              DePaul University

1995-2008     Professor
              Psychology & Gender and Women's Studies
              University of Illinois at Urbana-Champaign

1987-1995     Associate Professor
              Psychology, Women's Studies, Educational Psychology
              University of Illinois at Urbana-Champaign

Spring, 1994  Visiting Scholar
              Departments of Data Theory and Women's Studies
              University of Leiden

Fall, 1990    Faculty Research Fellow
              Institute for the Study of Cultural Values and Ethics
              University of Illinois at Urbana-Champaign

1985-1987     Assistant Professor
              Graduate School of Education
              University of California, Santa Barbara

1981-1985     Assistant Professor
              Graduate School of Education
              Kent State University, Kent, Ohio

1

1980-1981    Senior Research Associate
             International Personnel Management Association
             Washington, D.C.

## EDITORIAL BOARDS

Journal of Counseling Psychology          (1981-1987)
Journal of Vocational Behavior            (1984 - 1992)
Psychology of Women Quarterly             (1989 – 1995;
Journal of Occupational Health Psychology (1999 – 2004)
Psychological Injury and the Law          (2013 – present)

## DISTINGUISHED REVIEWER

Psychology of Women Quarterly             (2008-present)

## CONSULTING REVIEWER

Journal of Applied Psychology
Law and Human Behavior
Journal of Interpersonal Violence
Violence and Victims
Journal of Personality and Social Psychology
American Journal of Community Psychology
Journal of Applied Social Psychology
Sex Roles
British Journal of Social Psychology
American Educational Research Journal

## HONORS

Magna Cum Laude (B.A.)
Distinction in Psychology (B.A.)
Departmental Honors (Ph.D.)
Fellow, American Psychological Association –Counseling Psychology
Fellow, American Psychological Association – Psychology of Women
Fellow, American Psychological Association – Industrial/Organizational
Fellow, American Psychological Society
Holland Prize for Research in Personality and Career Development-1992
Distinguished Contribution to the Psychology of Women –
       Div. 17 Committee on the Status of Women - 1992
Distinguished Contribution Award of the Washington Educational Press
       for Outstanding Treatment of a Public Concern 1994
Distinguished Contributions to Research in Public Policy – American
       Psychological Association – 2003
Heritage Award, Distinguished Contributions to Research in the
       Psychology of Women – American Psychological Association –
       Division 35, Psychology of Women – 2010
Lifetime Career Award – Conference on Occupational Safety and Health,
       2013

**GRANTS**

"Outcomes of sexual harassment:  A model of harm and recovery"
National Institutes of Mental Health
2001-2006 - $1,600,000

"Outcomes of sexual harassment: An integrative process model"
National Institutes of Mental Health
1996-2001 - $750,000

Outcomes of sexual harassment:  An integrative process model"
National Institutes of Mental Health
Shannon Award - $100,000 - 1994-1996

"Sexual harassment on campus"
UIUC Campus Research Board
Spring, 1993 - $7350

"Sexual victimization in Brazil"
Edwin & Flora Hewlett Foundation
Summer, 1991 - $3,500

"A cognitive-behavioral intervention for reducing sexually aggressive behavior in college men"
University of Illinois Campus Research Board
1991 - $9,084

Tarnishing the ivory tower - sexual harassment on campus"
Women's Educational Equity Act
U.S. Department of Education
1984-1985 -   $67,564.00

**PROFESSIONAL ASSOCIATIONS**

American Psychological Society, Inaugural Fellow
American Psychological Association (Fellow, Divisions 17, 35, 14)
Florida Psychological Association
Association for Women in Psychology
International Society for Traumatic Stress Studies
Law and Society
National Council for Research on Women
Society for Industrial/Organizational Psychology
Society for Human Resource Management

3

**PUBLICATIONS**

**BOOKS AUTHORED OR CO-AUTHORED**

Fitzgerald, L. F., Collinsworth, L. L., & Oliveri, R. (in preparation). There's no place like home: Sexual harassment of low-income women in housing. Book in preparation.

Koss, M. P., Goodman, L., Browne, A., Fitzgerald, L. F., Keita, G., & Russo, N. (1994). No safe haven: Violence against women at home, at work, and in the community. Washington, DC: American Psychological Association.

Betz, N. E., & Fitzgerald, L. F. (1987). The career psychology of women. New York: Academic Press.

Osipow, S. H., & Fitzgerald, L. F. (1996). Theories of career development (4th edition). Allyn & Bacon.

**CHAPTERS IN BOOKS**

Fitzgerald, L. F., & Cortina, L. (2017). Sexual harassment: A view from the 21st century. In J. White (Ed.) *Handbook of the Psychology of Women*. Washington, DC: American Psychological Association.

Magley, V.J., Fitzgerald, L.F., Salisbury, J., Drasgow, F., & Zickar, M.J. (2013). Changing sexual harassment within organizations via training interventions: Suggestions and empirical data. In R. Burke & C. Cooper (Eds.), *The Fulfilling Workplace: The Organization's Role in Achieving Individual and Organizational Health*. Surrey, United Kingdom: Gower

Fitzgerald, L.F., & Collinsworth, L.L. (2007). (Un)common knowledge: The legal viability of sexual harassment research. In E. Borgida & S. Fiske, Eds. *Beyond Common Sense: Psychological Science in the Courtroom*. (pp. 103-125). Boston: Blackwell Publishing.

Fitzgerald, L. F. (2004). Who says? Legal vs. psychological constructions of welcomeness in sexual harassment litigation. (pp. 94-110). In C. MacKinnon & R. Siegal (Eds.). Directions in sexual harassment law.New Haven, CT: Yale University Press.

Pryor, J. B., & Fitzgerald, L. F. (2003). Sexual harassment research in the United States. *Bullying and emotional abuse in the workplace: International perspectives in research and practice*, 79-100.

Fitzgerald, L. F. & Collinsworth, L. L. (2002). The forensic psychological evaluation in sexual harassment litigation. In Isabela Schultz (Ed.). Handbook of psychological injuries: Evaluation, treatment, and compensable damages. Chicago, IL: American Bar Association.

Fitzgerald, L.F., Collinsworth, L.L., & Harned, M. S. (2002). Sexual harassment. In J. Worrell (Ed.) Encyclopedia of women and gender: Sex similarities and differences

4

and the impact of society on gender. Boston: Academic Press.

Fitzgerald, L. F., & Harmon, L. W. (2001). Women's career development: A postmodern update. In F. T. L. Leong and A. Barak (Ed.). Contemporary models in vocational psychology: A volume in honor of Samuel H. Osipow, pp. 207-230.

Fitzgerald, L. F. (2000). Sexual harassment. In Kazdin, Alan E. (Ed), Encyclopedia of psychology, Washington, DC, US; London, England: American Psychological Association; Oxford University Press.

Fitzgerald, L. F., Magley, V., & Swan, S. (1997). But was it really sexual harassment? Legal,behavioral, and psychological definitions. In W. O'Donohue (Ed.), Sexual harassment: Theory, research, and treatment. New York: Allyn & Bacon.

Hulin, C., Fitzgerald, L. F., & Drasgow, F. (1996). Organizational influences on sexual harassment. In B. Gutek and M. Stockdale (Eds.), Women and work, Vol. 6. Newberry Park, CA: Sage.

Fitzgerald, L. F., Fassinger, R., & Betz, N. E. (1995). Theoretical advances in the study of women's career development. In W. B. Walsh & S. H. Osipow (Eds.), Handbook of vocational psychology (2nd ed.). Hillsdale, NJ: Lawrence Erlbaum and Associates.

Fitzgerald, L. F., Hulin, C., & Drasgow, F. (1995). The antecedents and consequences of sexual harassment in organizations: An integrated process model. In S. Sauter & G. Keita (Eds.). Job stress 2000: Emergent issues. Washington, DC: American Psychological Association.

Fitzgerald, L. F. (1994). No safe haven: Violence against women in the workplace. In Koss, et al., (Eds.), No safe haven: Violence against women at home, at work, and in the community. Washington, DC: American Psychological Association.

Fitzgerald, L. F., & Betz, N. E. (1994). Career development in cultural context: The role of gender, race, class and sexual orientation. In M. Savickas & R. Lent (Eds.), Convergence in theories of career choice and development. Palo Alto, CA: Consulting Psychologists Press.

Fitzgerald, L. F., & Rounds, J. B. (1994). Women and work: Theory encounters reality. In Walsh, B. W., & Osipow, S. H. (Eds.), Career counseling for women. Hillsdale, NJ: Erlbaum.

Fitzgerald, L. F., & Ormerod, A. J. (1993). Breaking silence: The sexual harassment of women in academia and the workplace. In F. L. Denmark & M. A. Paludi (Eds.), Handbook of the psychology of women. Westport, CT: Greenwood Press.

Betz, N. E., & Fitzgerald, L. F. (1993). Individuality and diversity: Theory and research in counseling psychology. Annual Review of Psychology, 44, 343-381.

Weitzman, L. M., & Fitzgerald, L. F. (1993). Employed mothers: Labor force profiles and diverse lifestyles. In J. Frankel (Ed.), Employed mothers and the family context. New York: Springer.

5

Fitzgerald, L. F., & Weitzman, L. M. (1992). The career development of women: Concepts and issues for theory and practice. In Z. Leibowitz & D. Lee (Eds.), <u>Adult career development, (2nd ed.)</u>. Arlington, VA: American Association of Counseling and Development.

Fitzgerald, L. F. (1990). Sexual harassment: The definition and measurement of a construct. In M. Paludi (Ed.), <u>Ivory Power: Gender and sexual harassment in the academy</u>. New York: SUNY Press.

Fitzgerald, L. F., & Weitzman, L. M. (1990). Men who harass: Portrait of the artist. In M. Paludi (Ed.), <u>Ivory power: Gender and sexual harassment in the academy</u>. New York: SUNY Press (Series in the Psychology of Women).

Betz, N. E., Fitzgerald, L. F., & Hill, R. (1989). Individual differences: The foundations of vocational psychology. In D. T. Hall, et al. (Eds.), <u>The handbook of career theory</u>. Cambridge: Oxford University Press.

Fitzgerald, L. F. (1986). Career counseling for women: Principles, problems, and procedures. In Z. Leibowitz & D. Lee (Eds.), <u>Adult career development: Concepts, issues and practices</u> (pp. 116-131). Arlington, VA: American Association for Counseling and Development.

Fitzgerald, L. F., & Betz, N. E. (1983). Issues in the vocational psychology of women. In W. B. Walsh & S.H. Osipow (Eds.), <u>The handbook of vocational psychology</u> (pp. 83-159). Hillsdale, NJ: Lawrence Erlbaum & Associates.

## MONOGRAPHS

Fitzgerald, L. F. (1993). <u>The last great open secret: Sexual harassment of women in the workplace and academia</u>. Washington, DC: Federation of Cognitive, Psychological and Behavioral Sciences.

Fitzgerald, L. F. (1992). <u>Sexual harassment in higher education: Concepts and issues</u>. Washington, DC: National Education Association.

Fitzgerald, L. F., & Rounds, J. B. (1989). Vocational behavior, 1988: A critical analysis. <u>Journal of Vocational Behavior, 35</u>, 105-163.

Fitzgerald, L. F. (1986). On the essential relations between education and work. <u>Journal of Vocational Behavior, 28</u>, 254-286.

Fitzgerald, L. F., & Nutt, R. L. (1986). Principles concerning the counseling/psychotherapy of women: Rationale and implementation. <u>The Counseling Psychologist, 14</u>, 180-216.

Fitzgerald, L. F. (1985). <u>Education and work: The essential tension</u>. Columbus, OH: The National Center for Research in Vocational Education.

6

## ARTICLES IN JOURNALS

Fitzgerald, L. F. (forthcoming). Invisible: Recovering those we left behind. In J. Berdahl, F. Crosby and P. Stockdale (Eds.). *Equality, Diversity & Inclusion: An International Journal*.

Fitzgerald, L. F. (2017). Still the last great open secret: Sexual harassment as systemic trauma. *Journal of Trauma and Dissociation, 18,* 483-489.

Fitzgerald, L. F., & Foote, W. (Eds.). (2016). Legal and psychological issues in harassment and discrimination. *Special issue: Psychological Injury and the Law.*

Lawson, A. K. & Fitzgerald, L. F. (2016). Sexual harassment litigation: Road to Re-victimization or recovery. *Psychological Injury & Law; 9,* 216-229

Reed, M. E., Collinsworth, L. L., Lawson, A. K., & Fitzgerald, L. F. (2016). The psychological impact of previous victimization: examining the "abuse defense" in a sample of harassment litigants. *Psychological Injury and Law, 9*(3), 230-240.

Fitzgerald, L. F., Collinsworth, L. L., & Lawson, A. K. (2013). Sexual harassment, Criterion A and PTSD: If it walks like a duck.... *Psychological Injury and the Law, 1-11.*

Lawson, A. K., Wright, C. V., & Fitzgerald, L. F. (2013). The evaluation of sexual harassment litigants: Reducing discrepancies in the diagnosis of PTSD. *Law and Human Behavior, 37,* 337-347.

Larsen, S. E., & Fitzgerald, L. F. (2011). PTSD symptoms and sexual harassment: The role of attributions and perceived control. *Journal of Interpersonal Violence,* 26, 2555-2567.

Wright, C. V., Collinsworth, L. L., & Fitzgerald, L. F. (2010) Why did this happen to me?: Cognitive schema disruption and post-traumatic stress disorder in victims of sexual trauma. *Journal of Interpersonal Violence,* 25, 1801-1814,

Collinsworth, L.L., Fitzgerald, L.F., & Drasgow, F. (2009). In harm's way: Factors related to psychological distress following sexual harassment. *Psychology of Women Quarterly.*

Wright, C. V., & Fitzgerald, L. F. (2009). What should I do? Predicting the decision to join a sexual harassment class action. *Law and Human Behavior, 33,* 265-282.

Buchanan, N, T. & Fitzgerald, L. F. (2008). The effects of racial and sexual harassment on work and psychological well-being of African American women. *Journal of Occupational Health Psychology, 13,* 137-151.

Wright, C. V., & Fitzgerald, L. F. (2007). Angry and afraid: Women's appraisals

of sexual harassment during litigation. *Psychology of Women Quarterly, 31*, 73-84.

Palmieri, P. A. & Fitzgerald, L. F. (2005). Confirmatory factor analysis of PTSD symptoms in sexually harassed women. *Journal of Traumatic Stress, 18*, 657-666.

Reed, M.E., Collinsworth, L.L., & Fitzgerald, L.F. (2005). There's no place like home: Sexual harassment of low income women in housing. *Psychology, Public Policy, and Law, 11(3),* 439-462.

Sims, C. S., Drasgow, F., & Fitzgerald, L. F. (2005). The effects of sexual harassment on turnover in the military: Time dependent modeling. *Journal of Applied Psychology, 90(6)*. pp. 1141-1152.

Langhout, R.D., Bergman, M.E., Cortina, L.M., Fitzgerald, L.F., Drasgow, F., Williams, J. (2005). Sexual harassment severity: Assessing situational and personal determinants and outcomes. *Basic and Applied Social Psychology, 35(5),* pp. 975-1007.

Fitzgerald, L. F. (2003). Sexual harassment and social justice: Reflections on the distance yet to go. *American Psychologist, 58,* 915-924.

Fitzgerald, L. F. (2003). A new framework for sexual harassment cases. *Trial, 39* (3), 36-44.

Klaw, E. L., Rhodes, J., & Fitzgerald, L. F. (2003). Natural mentors in the lives of adolescent African American mothers: Tracking relationships over time. *Journal of Youth and Adolescence. 32,* 223-232.

Harned, M. S., & Fitzgerald, L. F. (2002). Understanding the link between sexual harassment and eating disorder symptoms: A mediational analysis. *Journal of Consulting and Clinical Psychology, 70,* 1170-1181.

Cortina, L.M., Fitzgerald, L.F. & Drasgow, F. (2002). Contextualizing Latina experiences of sexual harassment: Preliminary tests of a structural model. *Basic and Applied Social Psychology, 24,* 295-311.

Shupe E., Cortina, L. M., & Ramos, A., Salisbury, J., & Fitzgerald, L.F. (2002). The incidence and outcomes of sexual harassment among Hispanic and Non-Hispanic White Women: A comparison across levels of cultural affiliation. *Psychology of Women Quarterly, 26,* 298-308.

Cortina, L.M., Lonsway, K.L., Magley, V.J., Freeman, L.V., Collinsworth, L.L., , M., & Fitzgerald, L.F. (2002). What's gender got to do with it? Incivility in the federal courts. *Law and Social Inquiry, 27.*

Lonsway, K.A., Freeman, L.V., Cortina, L.M., Magley, V.J., & Fitzgerald, L.F. (2002). Understanding the judicial role in addressing gender bias: A view from the Eighth Circuit federal court system. *Law and Social Inquiry, 27.*

Stark, S., Chernyshenko, O., Lancaster, A., Drasgow, F., & Fitzgerald, L. F. (2002). Toward standardized measurement of sexual harassment: Shortening the

SEQ-DoD using Item Response Theory. *Military Psychology, 14,* 49-72.

Bergman, M. E., Langhout, R. D., Palmieri, P. A., Cortina, L. M., & Fitzgerald, L. F. (2002). The (un)reasonableness of reporting: Antecedents and consequences of reporting sexual harassment. *Journal of Applied Psychology, 87,* 230-242.

Mazzeo, S., Bergman, M. E., Buchanan, N., Drasgow, F., & Fitzgerald, L. F. (2001). Situation specific assessment of sexual harassment: A different approach. *Journal of Vocational Behavior. 59,* 120-131.

Lonsway, K. A., Welch, S., & Fitzgerald, L. F. (2001). Police training in sexual assault response: Process, outcomes, and elements of change. *Criminal Justice and Behavior, 28,* 695-730.

Levina, M., Waldo, C. , & Fitzgerald, L. F. (2000). We're here, we're queer, we're on TV: The effects of visual media on heterosexuals' attitudes toward gay men and lesbians. *Journal of Applied Social Psychology, 30,* 738-758.

Fitzgerald, L. F., Buchanan, N., Collinsworth, L. L., Magley, V. M., & Ramos, A. (1999). Junk logic: The abuse defense in sexual harassment litigation. *Psychology, Public Policy, and Law, 5,* 730-759.

Magley, V., Hulin, C. L., Fitzgerald, L. F., & DeNardo, M. (1999). Outcomes of self-labeling sexual harassment. *Journal of Applied Psychology, 84,* 390-402.

Fitzgerald, L. F., Drasgow, F., & Magley, V. J. (1999). Sexual harassment in the Armed Forces: A test of an integrated model. *Military Psychology, 11,* 329-343.

Fitzgerald, L. F., Magley, V. J., Drasgow, F., & Waldo, C. R. (1999). Measuring sexual harassment in the military: The SEQ-DOD. *Military Psychology, 11,* 243-263.

Magley, V. J., Waldo, C. R., Drasgow, F., & Fitzgerald, L. F. (1999). The impact of sexual harassment on military personnel: Is it the same for men and women? *Military Psychology, 11,* 283-302.

Williams, J. H., Fitzgerald L. F. , & Drasgow, F. (1999). The effects of organizational practices on sexual harassment and individual outcomes in the military. *Military Psychology, 11,* 303-328.

Payne, D. L., Lonsway, K. A., & Fitzgerald, L. F. (1999). Rape myth acceptance: Exploration of its structure and measurement using the Illinois Rape Myth Acceptance Scale. *Journal of Research in Personality, 33,* 27-68.

Berg, D. R., Lonsway, K. A., & Fitzgerald, L. F. (1999). Rape prevention education for men: The effectiveness of empathy-induction techniques. *Journal of College Student Development, 40,* 219-234.

Cortina, L., Swan, S., Fitzgerald, L. F., & Waldo, C. R. (1998). Sexual harassment and assault: Chilling the climate for women in academia. *Psychology of Women Quarterly, 22,* 419-441.

Waldo, C. R., Berdahl, J. L., & Fitzgerald, L. F. (1998). Are men sexually harassed? If so, by whom? *Law and Human Behavior, 22,* 59-79.

Fitzgerald, L. F., Hulin, C. L., Drasgow, F., Gelfand, M., & Magley, V. (1997). The antecedents and consequences of sexual harassment in organizations: A test of an integrated model. *Journal of Applied Psychology, 82,* 578-589.

Schneider, K., Swan, S., & Fitzgerald, L. F. (1997). The job-related, psychological, and health-related outcomes of sexual harassment. *Journal of Applied Psychology, 82,* 401-415.

Glomb, T. M., Richman, W. L., Hulin, C. L., Drasgow, F., Schneider, K. T., & Fitzgerald, L. F. (1997). Ambient sexual harassment: An integrated model of antecedents and consequents. *Organizational Behavior and Human Decision Processes, 71,* 309-328.

Hesson-McInnis, M., & Fitzgerald, L. F. (1997). Sexual harassment: A preliminary test of an integrated model. *Journal of Applied Social Psychology, 27,* 877-901.

Fitzgerald, L. F., Gelfand, M., & Drasgow, F. (1996). Measuring sexual harassment: Theoretical and psychometric advances. *Basic and Applied Social Psychology, 17,* 425-445.

Gelfand, M., Fitzgerald, L. F., & Drasgow, F. (1995). The latent structure of sexual harassment: A cross-cultural confirmatory analysis. *Journal of Vocational Behavior 47(2),* 164-177.

Good, G. E., Robertson, J. M., Fitzgerald, L. F., Stevens, M., & Bartels, K. (1995). The relation between masculine role conflict and psychological distress in male university counseling center clients. *Journal of Counseling and Development.*

Lonsway, K., & Fitzgerald, L. F. (1995). The attitudinal antecedents of rape myth acceptance: A theoretical and empirical reexamination. *Journal of Personality and Social Psychology, 68,* 704-711.

Fitzgerald, L. F., Swan, S., & Fisher, K. (1995). Why didn't she just report him? The psychological and legal context of women's responses to sexual harassment. *Journal of Social Issues, 51,* 117-183.

Good, G. E., Robertson, J. M., ONeil, J. M., Fitzgerald, L. F., Stevens, M., Kristineord, K. A., Bartels, K. M., & Braverman, D. G. (1995). Male gender role conflict: Psychometric issues and relations to psychological distress. *Journal of Counseling Psychology, 42,* 3-10.

Lonsway, K., & Fitzgerald, L. F. (1994). Rape myths: In review. *Psychology of Women Quarterly, 18,* 133-164.

Fitzgerald, L. F. (1993). Sexual harassment: Violence against woman at work. *American Psychologist, 48,* 1070-1076.

Goodman, L. A., Koss, M. P., Fitzgerald, L. F., Russo, N. F., & Keita, G. P. (1993). Male violence against women: Current research and future directions. *American Psychologist, 48,* 1054-1058.

Fitzgerald, L. F., & Shullman, S. L. (1993). Sexual harassment: A research analysis and agenda for the '90's. *Journal of Vocational Behavior, 42,* 5-27.

Fitzgerald, L. F. (1992). Science v. Myth: The failure of reason in the Clarence Thomas hearings. *University of Southern California Law Review, 65,* 1399-1410.

Robertson, J., & Fitzgerald, L. F. (1992). Overcoming the masculine mystique: Preferences for alternative norms of assistance among men who avoid counseling. *Journal of Counseling Psychology.*

Fitzgerald, L. F., & Ormerod, A. J. (1991). Perceptions of sexual harassment: The influence of gender and context. *Psychology of Women Quarterly, 15(2),* 281-294.

Robertson, J., & Fitzgerald, L. F. (1990). (Mis)treatment of the nontraditional man: The effects of client gender role and life-style on diagnosis and attribution of pathology. *Journal of Counseling Psychology, 37,* 3-9.

Fitzgerald, L. F., & Hesson-McInnis, M. S. (1989). The dimensions of sexual harassment: A structural analysis. *Journal of Vocational Behavior, 35,* 309-326.

Shapiro, S., & Fitzgerald, L. F. (1989). The development and validation of The Orientation Toward Learning Scale. *Educational Psychological Measurement, 49,* 375-384.

Fitzgerald, L. F., et al. (1988). The dimensions and extent of sexual harassment in higher education and the workplace. *Journal of Vocational Behavior, 32,* 152-175.

Fitzgerald, L. F., & Osipow, S. H. (1988). We have seen the future but is it us: Vocational aspirations of counseling psychology graduate students. *Professional Psychology, 19,* 575-583.

Fitzgerald, L. F., et al. (1988). Academic harassment: Sex and denial in scholarly garb. *Psychology of Women Quarterly, 12,* 329-340.

Fitzgerald, L. F. (1988). On the importance of operational definitions: A comment on Hayden. *Journal of Counseling Psychology, 35,* 351-352.

Fitzgerald, L. F., & Hubert, L. J. (1987). Multidimensional scaling: Some possibilities for counseling psychology. *Journal of Counseling Psychology,* Special issue on quantitative methods), *34,* 469-480.

Fitzgerald, L. F., & Osipow, S. H. (1986). An occupational analysis of counseling psychology: How special is the specialty? *American Psychologist, 41,* 535-544.

Fitzgerald, L.F., & Nutt, R. (1986). The division 17 principles concerning the counseling/psychotherapy of women: Rationale and implementation. Counseling Psychologist, 14, 180-216.

Fitzgerald, L. F., & Cherpas, C. (1985). On the reciprocal relationship between gender and occupation: Rethinking the assumptions concerning masculine career development. *Journal of Vocational Behavior, 27,* 109-122.

Fitzgerald, L. F., a Betz, N. E. (1985). Astin's model in theory and practice: A technical and philosophical critique. *The Counseling Psychologist, 12,* 135-138.

Hughes, C., Martinek, S., & Fitzgerald, L. F. (1985). Sex role attitudes and career choices: The role of children's self-esteem. *Elementary School Guidance and Counseling, 20,* 57-66.

Fitzgerald, L. F., & Shullman, S. L. (1984). The myths and realities of women in organizations. *Training and Development Journal, 38,* 65-70.

Fitzgerald, L. F., & Quaintance, M. K. (1982). Survey of assessment center use in state and local government. *Journal of Assessment Center Technology, 5,* 9-2 1.

Fitzgerald, L. F. (1980). Non-traditional occupations: Not for women only. *Journal of Counseling Psychology, 27,* 252-259.

Fitzgerald, L. F., & Crites, J. 0. (1980). Toward a career psychology of women: What do we know? What do we need to know? *Journal of Counseling Psychology, 27,* 44-62.

Fitzgerald, L. F., & Crites, J.0. (1979). Career counseling for women: StNavarards for practitioners. *The Counseling Psychologist, 8,* 33 -34.

Crites, J.0., & Fitzgerald, L.F. (1978). The competent male. *The Counseling Psychologist, 7,* 11-14.

**SELECTED TECHNICAL REPORTS**

Fitzgerald, L. F., et al. (1997). Final Report - Attorney Survey. St. Louis, MO: U.S. Eighth Circuit Gender Fairness Task Force.

Fitzgerald, L. F., et al. (1997). Final Report - Judges Survey. St. Louis, MO: U.S. Eighth Circuit Gender Fairness Task Force.

Fitzgerald, L. F., et al. (1997). Final Report - Court Employee Survey, St. Louis, MO: U.S. Eighth Circuit Gender Fairness Task Force.

Fitzgerald, L. F., et al. (1996). Final Report: Vice-Chancellor's Survey on Campus Climate for Gender, Race and Sexual Orientation. University of Illinois at Urbana-Champaign, Urbana, IL.

12

**OTHER**

Fitzgerald, L. F. (1992). <u>Sexual harassment in organizations</u>. Washington, DC: American Society of Association Executives.

Fitzgerald, L. F. (1989). Vocational Assessment. In T. Husen & T. N. Postlethwaite (Eds.). <u>International Encyclopedia of Education</u>. Supplementary Vol. 1. Oxford: Pergamon Press. (Encyclopedia article)

Fitzgerald, L. F. (1980). <u>Incidence and use of assessment centers in the public sector</u>. IPMA Special Report: Washington, D.C.


**SELECTED COLLOQUIA AND INVITED ADDRESSES**

U.S. Equal Employment Opportunity Commission
Stanford University
University of Michigan
Duke University
Yale University
Northwestern University
National Employment Lawyers' Association
American Psychological Society
American Association for the Advancement of Science
American Bar Association
American Psychological Association
Federation of Cognitive, Behavioral and Social Sciences
National Education Association
Leiden University (The Netherlands)
Carnegie Mellon University
Virginia Commonwealth University
The Ohio State University
Temple University
Harvard University, Kennedy School of Government
The First International Conference on Women's Mental Health (Amsterdam)

**SERVICE**

***GOVERNMENT***

State of Washington, Office of the Attorney General (Consultant, 2018)
U.S. National Institutes of Health (Consultant) (2016 - present)
U.S. Equal Employment Opportunity Commission (Consultant) (1994-present)
U.S. Department of Defense
   - Defense Manpower Data Center (Consultant, 1993-2006)
   - Manpower Advisory Committee (1991-1996)
U.S. Department of Justice (Consultant) (1992-present)
U.S. Eighth Circuit Taskforce on Gender Fairness in the Courts (Consultant) (1995-1997)
U.S. Internal Revenue Service (Consultant) (1994)

State of Illinois Taskforce on Sexual Harassment (1992)
State of Illinois Legal Assistance Foundation (Consultant) (1992)

## UNIVERSITY

### *Campus Level*

Research Director, Campus Climate Survey (1993 -1995)
Chair, Campus Ombudsperson Search Committee (Fall, 1993)
Chancellor's Committee on the Status of Woman (1989-1992; Chair, 1991-1992)
Miller Committee (1992-1993)
Institutional Review Board (1992-1995)
Chair, UIUC Taskforce on Women in Science and Engineering (CIC) (1992-1993)
Faculty Senate (Spring, 1989)

### *College Level*
Graduate College Behavioral and Social Sciences Committee (1990-1993)

### *Department Level*
Psychology
- Undergraduate Education Committee (2001-present)
- Faculty Advisory Committee (1993; 1996-1999)
- Graduate Education Committee (1995-96)
- Affirmative Action Officer (1990-1995)
- Admissions Rep (I/O) 2001

Women's Studies
- Faculty Advisory Committee (1989-1992)
- Zero-time Appointment Committee (1992-1995)

Educational Psychology
- Division Chair, Counseling Psychology (1989-1993)

## PROFESSIONAL

Administrator-Researcher Consortium 3; ARC3 (2015-present)
APA Taskforce on Male Violence Against Women (1992-1995)
APA Division 35
- Chair, Taskforce on Victim Privacy Concerns (1998)
- Awards Committee (2002-2005)
APA Division 17
- Scientific Affairs Committee (1990-1993)
        Chair, 1991-1992
- Committee on Women (1984-1987)
        Chair, 1985-1986
AREA Research Awards Committee

14

Expert Report of Louise F. Fitzgerald, Ph.D.
February 4, 2019
Appendix D

**Federal and state cases in last four years**
**May, 2018**

1) *Tara Wendt v. Charter Communications, LLC).* (Deposition, May 2014; Trial, June 2015). U.S. District Court for the District ofMinnesota, Case No.: 13-cv-01308 RHK/TNL.

2) *Janie Doe, et al., vs. Walton-Verona Board of Education, et al.,* (Deposition, May 2014). UNITED STATES DISTRICT COURT EASTERN DISTRICT OF KENTUCKY NORTHERN DIVISION AT COVINGTON Case No. 2:11-cv-00171-WOB

3) *Tina Haskenhoff vs. Homeland Energy Solutions, LLC, and Walter Wendland*, Iowa District Court, Chickasaw County, Case No. L4CV003218 (Trial, October, 2014)

4) *Fuery, et al., vs City of Chicago, et al.* United States District Court, Northern District of Illinois, Case 1:07-cv-05428 (Trial, December, 2015)

5) *Sydney Harris v. Robert Chaney and Chaney Group Management and Development Corporation.* Minnesota District Court, County of Hennepin, Fourth Judicial District, (File No. 27-CV-15-2728). (Trial, February, 2016).

6) *Lewis – Bzystrzycki vs. City of Country Club Hills, et al.*, Circuit Court of Cook County Illinois, Case No. 12-L-00916. (Deposition, April 2016).

7) *Nicole Patsalides vs. Fort Pierce Police Department, et al.*, United States District Court, Southern District of Florida, Fort Pierce Division. (Case No. 15-14431-civ-Graham/Lynch). (Deposition, September, 2016).

8) *Robin Eubanks, et al., vs. Klickitat County, et al.* Superior Court of the State of Washington in and for the County of Clark, Case No: 11-2-00802-2. (Deposition, June 2017; Trial, October, 2017).

9) *Christie Van, et al., vs. Ford Motor Company,* United States District Court, Northern District of Illinois, Eastern Division, Case No. 1:14-CV-08708. (Deposition, October, 2017).

*Psychology of Women Quarterly*, 31 (2007), 73–84. Blackwell Publishing, Inc. Printed in the USA.
Copyright © 2007 Division 35, American Psychological Association. 0361-6843/07



# ANGRY AND AFRAID: WOMEN'S APPRAISAL
# OF SEXUAL HARASSMENT DURING LITIGATION

Caroline Vaile Wright and Louise F. Fitzgerald
*University of Illinois at Urbana–Champaign*

The purpose of this study was to examine primary appraisal of sexual harassment, that is, a victim's cognitive evaluation of the harassment and the factors that influence this appraisal. The perspectives of 72 female plaintiffs were investigated by measuring their primary appraisal of the event, examining the structure of this appraisal, and assessing the influence of stimulus and individual factors on appraisal. Cluster analysis revealed four distinct emotion clusters: demoralization, anxious arousal, fear, and self-blame. Significant correlations suggest that these four appraisal clusters are differentially related to certain stimulus (e.g., intensity) and individual (e.g., self-esteem, previous victimization, feminist attitudes, and attributions) factors. Theoretical and practical implications for the role of primary appraisal are discussed.

Most of the time during the harassment I felt extremely alone. I felt like no one could, or would ever understand what this man was doing to me inside of my mind.

—Litigant in sexual harassment lawsuit

I felt like running away—disappearing—becoming as unnoticeable as possible. I stopped wearing colors in my clothing—wore mostly black and gray to be less noticeable—I felt disbelief and extremely isolated from everyone.

—Litigant in sexual harassment lawsuit

For the many female targets of sexual harassment, the experience can be psychologically, physically, and economically debilitating.[1] Although the prevalence and negative consequences (e.g., psychological and physical health, job-related outcomes) of sexual harassment in organizations has been well documented (e.g., Fitzgerald, Swan, & Magley,

Caroline Vaile Wright, Department of Educational Psychology, and Louise F. Fitzgerald, Department of Psychology, University of Illinois at Urbana–Champaign.

This project was funded by the National Institute of Mental Health Grant MH50791-08 and by the Defense Manpower Data Center.

We would like to acknowledge the contributions of Fritz Drasgow, Dorothy Espelage, Lisa Spanierman, Linda Collinsworth, and Angela Lawson to earlier versions of the article.

Address correspondence and reprint requests to: Caroline Vaile Wright, University of Illinois, Department of Educational Psychology, 1310 S. Sixth St., Champaign, IL 61820. E-mail: cvwright@uiuc.edu

1997; O'Connell & Korabik, 2000), the psychological process of harassment has often been overlooked and underresearched. This gap in the literature is unfortunate because a more thorough understanding of this psychological process might explain why harassment victims experience different types and degrees of psychological and physical health and job-related outcomes. Investigating the process is complicated, however, because targets often differ in their cognitive appraisal of even roughly similar events; more specifically, they differ in regard to their emotional reactions and their subsequent behavioral responses (Fitzgerald et al., 1997).

Much of what is known about the appraisal of stressors, such as sexual harassment, arises out of the stress and coping literature, which defines cognitive appraisal as the process through which an individual evaluates whether a particular event is relevant to his or her well-being (Lazarus & Folkman, 1984). Cognitive appraisal is generally divided into two categories: primary appraisal and secondary appraisal. Primary appraisal refers to an instantaneous, largely unconscious process through which individuals evaluate stimuli as irrelevant, benign, or threatening; such appraisal is considered one of the main determinants of subsequent action. Secondary appraisal involves evaluation of the various response options available; in other words, what to do (Folkman, Lazarus, Dunkel-Schetter, DeLongis, & Gruen, 2000). This model implies that how a person appraises an event shapes his or her emotional (i.e., primary) and behavioral (i.e., secondary) responses to the stressor (Lazarus & Folkman, 1984).

In the last decade, sexual harassment research has focused almost solely on how targets react behaviorally (e.g., ignoring the harassment, reporting it to a supervisor), rather

than emotionally (e.g., Baker, Terpstra, & Larntz, 1990; Schneider, Swan, & Fitzgerald, 1997; Terpstra & Baker, 1989). This focus on behavioral reactions, although certainly important, ignores a crucial first step. From a cognitive theoretical framework, to fully understand the behavioral response, one must first understand the emotional reaction leading up to that response (Fitzgerald, Swan, & Fischer, 1995; Lazarus & Folkman, 1984). Although a number of analogue studies have explored perceptions of harassment (e.g., whether a particular behavior should be considered harassment and under what conditions), and some studies have asked targets the degree to which the situation was upsetting or inappropriate, to date, no studies have systematically examined the broad range of emotional responses possible in such situations, despite much discussion suggesting that sexual harassment is in the eye of the beholder. Thus, empirical research is needed to generate a greater understanding of the primary appraisal process (i.e., emotional reactions) and the contributory factors that influence these appraisals.

Although research on primary appraisal and emotional reactions to sexual harassment has been scant, several influential studies have provided groundwork from which to begin. One of the earliest studies to ask about emotional reactions to sexual harassment was conducted by Schneider (1987). Schneider (1987) surveyed female graduate students and found that 36% of participants felt embarrassed and 14% were physically afraid after being sexually coerced by a faculty member. More recently, Schneider et al. (1997) surveyed working women in the private sector and found that 66% of their sample rated a sexual harassment incident that they personally experienced as offensive or extremely offensive; an additional 26% rated the event as slightly offensive. In the same sample, 56% of women rated the incident as upsetting or extremely upsetting, and 29% rated it as slightly upsetting. Finally, Wilson (2000) examined three case studies of female sexual harassment victims who provided verbal narratives of their experiences. Wilson reported that the affective reactions of these women followed a common theme of feeling "uncomfortable, vulnerable, and frightened" (p. 1090).

Studies such as these provide a preliminary understanding of the primary appraisal of sexual harassment, but have examined only a limited number of potential emotional reactions, mostly anger and fear, and have failed to include other possible emotions such as guilt, shame, disappointment, sadness, and worry. In addition, these preliminary studies lack a theoretical framework from which to understand the various types of emotional reactions experienced and instead appear to combine all emotional reactions together as a unidimensional construct.

## Theoretical Framework

One potential theoretical framework for conceptualizing primary appraisal is the stage model developed by Salisbury, Ginorio, Remick, and Stringer (1986). This model is based upon the authors' experiences with a group of 17 female sexual harassment victims who sought group and individual psychotherapy. Salisbury et al. (1986) conceptualized the stages of emotional response as representing a progressive, ordered sequence of changes in how the victim perceives herself, her coworkers, and the work world, described as follows:

1. *Confusion/self-blame.* Victims describe feelings of humiliation, embarrassment, and often guilt resulting from the belief that they may have somehow caused or encouraged the harasser's behavior. Feelings of self-blame and embarrassment continue until the victim no longer feels responsible for the behavior and labels it as harassment.
2. *Fear/anxiety.* Victims describe feelings of helplessness, being trapped, paranoid, paralyzed, and fearful of both negative job-related reprisals and for their own physical safety. In addition, they report their self-esteem is threatened, both inside and outside of work.
3. *Depression/anger.* Feelings of anxiety shift to depression and helplessness, while self-esteem continues to plummet. Victims also report a turning point at which they begin to feel furious, expressing anger about being treated unfairly and concern for others in the workplace.
4. *Disillusionment.* Often feelings of disappointment and distrust arise after the victims begin questioning their expectations about fairness and justice and come face to face with the organizational and legal systems' inadequacies. Victims express doubts about work-related decisions, as well as their personal safety.

These stages may provide a better understanding of not only the wide spectrum of possible emotional responses but also how and why victims' affective reactions can change over time. However, Salisbury et al.'s (1986) stages could be rendered more comprehensive by empirically testing the nature of primary appraisal and by establishing the salient antecedents that influence harassment victims' appraisal.

## Antecedents to Primary Appraisal

Investigating the antecedents of primary appraisal might explain why individuals express a diverse array of emotional reactions to stressful events. Fitzgerald et al. (1997) proposed three elements that influence victims' primary appraisal of sexual harassment: stimulus factors, individual factors, and contextual factors. Their *model of harm* proposed that primary appraisal is a function of these three factors; primary appraisal, in turn, affects secondary appraisal, as well as psychological and physical health and job-related outcomes. This model was used as the framework for investigating the potential antecedents to primary appraisal.

*Stimulus factors.* Stimulus factors involve aspects of the harassing behavior itself that may affect appraisal. Fitzgerald et al. (1997) classified these factors into three general categories: *frequency*, *duration*, and *intensity*. Frequency refers to the actual number of harassing behaviors, whereas duration refers to the span of time over which they occurred (e.g., weeks, months, or years). Intensity refers to the magnitude or severity of the harassing behaviors. Salisbury and Sebek (1994, as cited in Fitzgerald et al., 1997) theorized that higher intensity is associated with the following sexual harassment characteristics: (a) multiple perpetrators, (b) powerful perpetrator(s), (c) experiencing physical as opposed to only verbal behavior, (d) frightening as opposed to simply annoying behavior, (e) being the specific target of the behavior, and (f) having restricted possibilities for escape.

Empirical research on the impact of these stimulus factors on primary appraisal is both promising and incomplete. Several aspects of harassment intensity (e.g., powerful perpetrators, physical vs. verbal behavior, and frightening vs. annoying behavior) have been found to influence women's primary appraisal of harassing events (e.g., Frazier, Cochran, & Olson, 1995; Kinney, 2003). In addition, several studies have also discovered a relation between harassment frequency and levels of distress (e.g., Brooks & Perot, 1991; Fitzgerald, Buchanan, Collinsworth, Magley, & Ramos, 1999; Piotrkowski, 1998; Samoluk & Pretty, 1994). The duration of harassment, believed to be theoretically linked to primary appraisal, has thus far not been empirically examined. The association between primary appraisal and harassment frequency, intensity, and duration was examined in the current study.

*Individual factors.* Aspects of the target that may influence her primary appraisal are referred to as individual factors. Although little research on the impact of individual factors has been conducted with actual victims (Koss et al., 1994), five factors have been hypothesized: previous victimization, feminist attitudes, personal resources, attributions, and control (Fitzgerald et al., 1997).

Overall, individual factors implicated as primary appraisal antecedents, such as personal resources and control, are rarely investigated; however, a few studies have examined the role of previous victimization, feminist attitudes, and attributions on primary appraisal. Recently, Collinsworth (2004) and Reed (2004) each investigated the role of previous victimization in determining harm in harassment victims. Although both investigations showed that previous victimization contributed to psychological and physical health and job-related outcomes, the effect was trumped by other factors, such as harassment intensity. Earlier studies examined the association between feminist attitudes and primary appraisal, finding that participants' feminist ideology directly influenced the degree to which they perceived the incident as offensive (e.g., Brooks & Perot, 1991; Jensen & Gutek, 1982). Victim attributions regarding

harassment (i.e., beliefs about causality) have typically focused on self-blame. Jensen and Gutek (1982) found that victims who blamed themselves in some way were less likely than other victims to report the problem to someone in their workplace, suggesting that attributions can influence victim responses. However, the relationship between attributions and primary appraisal has yet to be studied directly.

Finally, although self-esteem was not included in Fitzgerald et al.'s (1997) model, some researchers have hypothesized that a victim's degree of self-esteem might affect whether she appraises sexual harassment behaviors as emotionally stressful. Malovich and Stake (1990) argued that a woman with a higher degree of self-esteem, measured specifically in their study as performance self-esteem, may also be more confident in her abilities and consequently be less intimidated by sexually harassing behaviors. Self-esteem may provide some important insight into how women differentially experience sexual harassment; therefore, it was included in this study as an individual factor along with previous victimization, feminist attitudes, and attributions to assess the impact of these antecedents on primary appraisal.[2]

*Contextual factors.* Finally, contextual factors refer to aspects of the organizational context in which the harassing behaviors take place. Examples of contextual factors that may influence women's primary appraisals include the organizational climate, management norms, organizational polices and procedures, the gender ratio of the organization, the occurrence of other types of harassment (e.g., racial harassment), and bystander stress (Fitzgerald et al., 1997). Numerous studies have established a link between contextual factors, sexual harassment, and outcomes (Fitzgerald, Drasgow, Hulin, Gelfand, & Magley, 1997; Fitzgerald, Drasgow, & Magley, 1999; Glomb et al., 1997), but have failed to include the role of cognitive appraisal in their models. Unfortunately, the current study was also unable to incorporate contextual factors into the analyses;[3] therefore, the focus of this study was on the influence of stimulus and individual factors on primary appraisal.

Expanding our understanding of how stimulus and individual factors influence a victim's primary appraisal of sexual harassment will enrich our comprehension of why women express varying degrees of fear, anger, disappointment, and blame to often similar experiences. This understanding in turn could have critical psychological (e.g., understanding why women differentially experience negative outcomes and how to effectively treat them) and legal implications (e.g., provide the legal system with a more informed understanding of the victim's perspective of the harassment she experienced). Therefore, the purpose of the present study was to extend the research on the cognitive and emotional reactions of women who have been harassed by identifying how characteristics of the situation or the women themselves influence this appraisal. The following specific research questions were examined: (a) What is the nature

of primary appraisal in a population of female sexual ha-
rassment litigants? and (b) Which stimulus and individual
factors influence the primary appraisal of victims?

## METHOD

### Participants

Data for this study were collected from a sample of
72 women involved in sexual harassment litigation located
throughout the United States.[4] Each had filed a formal legal
complaint of work-related sexual harassment that ultimately
resulted in litigation. The nature of these claims varied
across cases and reflected the various behavioral patterns
documented in the social science and legal literature (e.g.,
Fitzgerald, Swan et al., 1995; Lindemann & Kadue, 1992).
Although no formal analysis was attempted, the claims ap-
peared to be a reasonable cross-section of cases that ap-
pear in court. Gender hostility and unwanted sexual atten-
tion were more common than sexual coercion; most claims
named coworkers as perpetrators; and the behaviors were
typically described as frequent, repetitive, and of consider-
able duration. As a part of the litigation discovery process,
each plaintiff underwent an extensive psychological evalu-
ation for purposes of damages assessment.

On average, the plaintiffs were 39 years old (range =
17 to 59; $SD$ = 9.6) and predominantly Caucasian (93.1%,
$n$ = 66; there were 4 African-Americans, 1 Hispanic/Latina,
and 1 Asian American plaintiff). Approximately half were
married (48.6%, $n$ = 35), 26.4% were single ("never mar-
ried;" $n$ = 19), and 25% were separated, divorced, or wid-
owed ($n$ = 18). Nine percent had completed less than a high
school education ($n$ = 7), 16.7% held a GED or high school
diploma ($n$ = 12), nearly half (48.6%, $n$ = 35) had attended
some college or vocational school, 12.5% received a degree
from a 4-year college ($n$ = 9), and 12.5% had postcollege
training ($n$ = 9).

### Procedures

Participants underwent extensive individual psychological
evaluations, typically conducted over a 2-day period by the
second author, an experienced clinical psychologist serv-
ing as an independent expert consultant. The women were
referred for evaluation to determine whether they were
suffering from significant psychological distress or a di-
agnosable psychological disorder. During these 2 days, a
three-part evaluation was conducted involving the admin-
istration of standardized tests and interviews, including the
In-Depth Interview Schedule (IDIS; Fitzgerald, Magley,
& Swan, 1996) and the Structured Clinical Interview for
DSM-IV (Spitzer, Williams, Gibbon, & First, 1990). The
IDIS is designed to tap specifics regarding the harassment
situation, including information concerning various stimu-
lus and individual factors of interest in the overall study.
Participants also provided a psychosocial history and de-

mographic information and completed a work-related sur-
vey that included scales assessing feminist attitudes and
self-esteem. They also gave their own narrative account of
the sexual harassment they experienced. At the conclusion
of the evaluation, the participants received an additional
paper-and-pencil survey either sent in the mail or given
in person, with a cover letter and a self-addressed stamped
envelope to return the questionnaire. The questionnaire in-
cluded the primary appraisal, attributions, and harassment
intensity measures and was administered after the evalua-
tion to reduce potential demand characteristics.

Forensic evaluation presents a classic example of power
disparity between the evaluator and the assessee, and com-
bining this process with research creates a huge challenge
of the possibility of informed consent. We addressed these
issues through a consent form emphasizing anonymity and
the lack of any consequences for refusal (i.e., their choice
would in no way influence the outcome of their evalua-
tion). The consent form also emphasized that the consul-
tant would remain blind to their decision until after the
completion of the report. Each participant in the current
study gave informed consent to allow her responses to be
used anonymously for research purposes.

### Measures

#### Primary Appraisal

Primary appraisal was assessed by a paper-and-pencil mea-
sure that contained a 23-item scale, in which respondents
indicated on a 5-point Likert-type scale from 0 (never)
through 4 (most of the time) how frequently they expe-
rienced a given feeling in response to the harassment.[5]
The Primary Appraisal scale, designed by Swan (1995) for
her dissertation and modeled after Folkman and Lazarus's
(1985) emotions scale, listed a variety of negative emotions
(e.g., angry, threatened, ashamed, distressed, etc.) poten-
tially experienced by the respondents. Means and alphas
for all scales are listed in Table 1.

#### Stimulus Factors

*Frequency and type.* The Sexual Experiences Ques-
tionnaire (SEQ; Fitzgerald, Gelfand, & Drasgow, 1995;
Fitzgerald et al., 1988) assesses offensive, sex-related behav-
iors that may have been experienced by women in the work-
force. In the present case, the 20 behavioral items were pre-
sented orally during administration of the IDIS. Responses
were provided orally on a 5-point Likert-type scale, ranging
from 0 (never) through 4 (many times), thereby reflecting
the frequency with which each respondent had experienced
specific sexually harassing behaviors.

This version of the SEQ comprises three subscales: Gen-
der Harassment (5 items), Unwanted Sexual Attention (10
items), and Sexual Coercion (5 items). These subscales re-
flect the different types of harassment experienced by re-
spondents. Gender harassment refers to sexist remarks and

### Table 1
Means, Standard Deviations, and Coefficient Alphas for All Scales

| Scale name | No. of items | n | M | SD | α |
|---|---|---|---|---|---|
| Primary appraisal | 23 | 72 | 85.22 | 21.61 | .95 |
| Demoralization | 7 | 72 | 27.40 | 8.02 | .93 |
| Anxious arousal | 8 | 72 | 32.18 | 7.58 | .91 |
| Fear | 6 | 72 | 20.33 | 6.82 | .87 |
| Self-blame | 2 | 72 | 5.31 | 2.65 | .76 |
| Objective factors: | | | | | |
| Frequency (SEQ) | 20 | 55 | 24.60 | 13.40 | .84 |
| Type | | | | | |
| GH | 5 | 55 | 11.09 | 5.72 | .81 |
| USA | 10 | 55 | 10.73 | 7.93 | .80 |
| SC | 5 | 55 | 2.78 | 4.46 | .85 |
| Intensity | 9 | 71 | 33.34 | 5.44 | .59 |
| Duration | 1 | 57 | 51.86 | 55.50 | — |
| Individual factors: | | | | | |
| Previous victimization | 1 | 55 | 2.11 | 1.57 | — |
| Attitudes | 13 | 69 | 54.01 | 5.15 | .63 |
| Attributions | | | | | |
| Behavioral self-blame | 5 | 69 | 10.96 | 5.06 | .79 |
| Characterological self-blame | 5 | 70 | 9.50 | 4.05 | .72 |
| Chance | 5 | 67 | 9.90 | 4.36 | .70 |
| Harasser | 5 | 69 | 19.99 | 4.18 | .64 |
| Society | 5 | 70 | 14.89 | 4.34 | .75 |
| Self-esteem | 10 | 70 | 27.50 | 5.73 | .87 |

*Note.* SEQ = Sexual Experiences Questionnaire; GH = gender harassment; USA = unwanted sexual attention; SC = sexual coercion.

behaviors that convey insulting, hostile, and degrading attitudes about women but are not necessarily aimed at sexual cooperation. Unwanted sexual attention is offensive and unwelcome verbal and nonverbal sexual behavior, including forceful attempts to stroke, fondle, or touch, as well as attempted or completed forced sex. The extortion of sexual cooperation in return for job-related considerations is referred to as sexual coercion. Gender harassment and unwanted sexual attention parallel the legal construct of hostile work environment, whereas sexual coercion maps onto the legal standard of quid pro quo (Fitzgerald, Gelfand et al., 1995).

Fitzgerald et al. (1988) reported internal consistency estimates for the SEQ between .86 and .92 and a test-retest coefficient of .86. In addition, Gelfand, Fitzgerald, and Drasgow (1995) confirmed the three-factor structure in both a workplace and university setting, as well as across two cultures (the United States and Brazil). Coefficient alphas in the present sample were just below those reported by the scale's authors (i.e., .80 to .85).

*Intensity.* The Severity Scale (Swan, 1995) is a 9-item paper-and-pencil measure that examines various objective characteristics of the harassing situation that have been theoretically linked with severity or intensity. These characteristics included hostility, sexuality, ambiguity, degree of threat, difficulty of escape from the situation, and whether

the respondent was the sole target. Respondents indicated whether these items were characteristic of their harassment experiences on a 5-point Likert-type scale ranging from 1 (*never*) to 5 (*most of the time*).

*Duration.* Respondents were asked to provide the dates the harassment began and ended. Responses were recoded into number of months to reflect the length of time the harassment had occurred.

### Individual Factors

*Previous victimization.* Questions related to experiences of childhood sexual and physical abuse, adolescent sexual abuse, and adult sexual abuse and battering were assessed orally during the IDIS. In each of these five areas, participants' responses were coded dichotomously as either previously abused or not. Scores were subsequently summed to reflect a 6-point index ranging from 0 (*no experiences*) to 5 (*all five types of experiences*) of previous victimization.

*Attitudes.* The Attitudes Toward Women Scale (Swim, Aikin, Hall, & Hunter, 1995) is a 13-item paper-and-pencil measure that combines items tapping both old-fashioned and modern sexism. Items measuring old-fashioned sexism include "Women are generally not as smart as men." Modern sexism consists of three categories: denial of continuing

discrimination, antagonism toward women's demands, and resentment about special favors for women (Swim et al., 1995). Example items include, respectively, "Discrimination against women is not a problem in the U.S.," "It is easy to understand the anger of women's groups in America," and "Over the past few years, the government and news media have been showing more concern about the treatment of women than is warranted by women's actual experiences." Responses were recorded on a 5-point Likert-type scale ranging from 1 (*strongly disagree*) to 5 (*strongly agree*). Items were recoded and reverse scored such that higher scores reflected more pro-feminist attitudes.

Swim et al. (1995) used confirmatory factor analysis to establish a two-factor solution: Old-Fashioned Sexism and Modern Sexism. The authors reported internal consistency estimates of .65 for Old-Fashioned Sexism and .75 for Modern Sexism. Given that the two-factor structure demonstrated only a slightly better fit than the one-factor structure for women in their sample, the Attitudes Toward Women Scale was treated as a one-factor scale in this study, yielding a coefficient alpha moderately lower than reported by the scale's authors (i.e., .63).

*Attributions.* The Attributions Scale (Frazier, 1990; Frazier & Schauben, 1994) is a 25-item paper-and-pencil measure that assesses the degree to which respondents attributed the harassment to various causes. Responses were given on a 5-point Likert-type scale ranging from 1 (*not at all descriptive*) to 5 (*very descriptive*).

The Attributions Scale is divided into five subscales: Behavioral Self-Blame, Characterological Self-Blame, Chance, Harasser, and Society. Each subscale comprised 5 items. The Behavioral Self-Blame subscale included items that attribute the harassment to a lack of behavioral response on the part of the victim, such as "I should have resisted more" and "I didn't do enough to protect myself." The Characterological Self-Blame subscale refered to the degree that one attributes the experience to a part of their personal character (e.g., "I'm a careless person" or "I am too trusting"). The Chance subscale included items that attribute the experience to some aspect of chance or luck, such as "This was just bad luck" and "Things like this happen at random." The Harasser subscale refered to reasons attributed to the harasser himself to explain the behavior (e.g., "The harasser was sick" or "The harasser thought he could get away with it"). Finally, the Society subscale involved attributions related to aspects of society as a whole, such as "Men are socialized to be violent" and "Media encourages violence against women." Coefficient alphas for the five subscales ranged from .64 to .79. High scores reflect a greater degree to which respondents attributed their experience to each subscale.

*Self-esteem.* The Rosenberg Self-Esteem Scale (RSE; Rosenberg, 1965) is a 10-item paper-and-pencil measure assessing respondents' degree of self-esteem. The RSE is the most widely used measure of self-esteem and responses were provided on a 4-point Likert-type scale ranging from 1 (*strongly agree*) to 4 (*strongly disagree*). Negatively worded items were reverse scored, and items were recoded so that higher scores reflected higher levels of self-esteem.

### Missing Data Imputation

To maximize usable data, missing items were imputed according to a specific criterion. For scales containing 4 to 9 items, cases missing one item were imputed. In scales consisting of 10 to 19 items, up to two missing items were imputed. Finally, in scales containing 20 or more items, imputation was allowed for up to three items. Two-Way Imputation (TW) utilizes the formula item mean + (person's mean − mean of item means) by calculating across available scores the mean for the item, and the mean for the person, and the overall mean respectively; TW imputation has been identified as the most effective method available for imputing missing data (Bernaards & Sijtsma, 2000).

## RESULTS

### Nature of Primary Appraisal

To examine the structure of primary appraisal, Swan's (1995) 23-item Primary Appraisal Scale was subjected to a complete-link cluster analysis and multidimensional scaling procedure. Cluster analysis is a multivariate classification technique useful for grouping objects in complex data sets. The clustering method analyzes a proximity matrix to form groups of similar variables over a group of people (Borgen & Barnett, 1987). Cluster analysis, a nonparametric technique, as opposed to factor analysis, was employed due to sample size.

Four clusters were identified using Ward's method in hierarchical cluster analysis. Cluster 1 includes items reflecting *demoralization*, that is, litigants' expressions of being let down and betrayed as a result of their harassment. The six clustered items were feeling humiliated, degraded, insulted, offended, embarrassed, and annoyed. The items in Cluster 2 appear to represent *anxious arousal* on the part of participants. These items assessed feelings of anxiety and depression (e.g., anxious, sad, depressed, and worried) and items tapping their level of anger (e.g., angry, stressed, upset, and disgusted). Cluster 3 included items asking about the degree to which women felt *fear* as a result of their harassment experiences. The six items in this cluster include feeling afraid, threatened, intimidated, helpless, trapped, and confused. Finally, the fourth cluster, *self-blame*, was composed of two items, guilt and ashamed, apparently tapping the degree to which participants endorsed feelings of blame in regard to the harassment. Coefficient alphas for each of the four clusters were adequate (range = .76 to .93). Moreover, these four clusters closely resemble the stages of affective responses proposed by Salisbury et al. (1986).

Case: 1:17-cv-08146 Document #: 186-2 Filed: 06/03/19 Page 138 of 143 PageID #:4916



**Fig. 1.** Multidimensional scaling of primary appraisal clusters.

To examine the structure further, the proximity matrix was then subjected to multidimensional scaling, a procedure used to spatially represent the observed similarity among a set of objects to discover the underlying meaning of dimensions (Fitzgerald & Hubert, 1987; Weinberg, 1991). The two-dimensional solution, which appears in Figure 1, converged in six iterations, with a stress value of .14 and accounted for 94% of the variance. Stress is a measure of goodness of fit, for which scores closer to zero represent a better fit (Fitzgerald & Hubert, 1987). The first dimension of the solution reveals a clear internally focused versus externally focused emotion distinction; the second dimension lacks a clear interpretation.

### The Influence of Stimulus and Individual Factors on Primary Appraisal

In addition to assessing the structure of the primary appraisal scale and its stimulus and individual antecedents, this study investigated the relation between appraisal and its antecedents. Typically, hierarchical linear regression and dominance analysis would be conducted to assess the influence of stimulus and individual factors on the primary appraisal clusters. However, due to the limited sample size, these procedures are statistically inappropriate; therefore, a full correlation matrix (see Table 2) was examined as a preliminary step for future research.

There were a number of correlations of interest between primary appraisal and its stimulus and individual antecedents. Harassment intensity was correlated ($r = .31$) with primary appraisal as a total scale score, implying that the more severe the harassment, the more emotionally traumatizing the experience was perceived. Attributions toward

society ($r = .24$) and self-esteem ($r = -.30$) were also correlated with primary appraisal as a total scale. Moreover, certain stimulus and individual factors were differentially correlated with the four clusters of appraisal (see Table 3).

Items corresponding to each of the four clusters were summed to create scale scores. The first cluster, *Demoralization*, was significantly negatively correlated with self-esteem ($r = -.26$). Significant correlations were found between *Anxious Arousal* and harassment intensity ($r = .35$) and self-esteem ($r = -.29$). *Fear*, the third cluster, was significantly correlated with harassment intensity ($r = .32$), previous victimization ($r = .32$), and attributions toward society ($r = .27$). Finally, the *Self-Blame* cluster was related to feminist attitudes ($r = -.30$) and three of the attribution subscales (behavioral self-blame, $r = .51$; characterological self-blame, $r = .43$; and chance, $r = .32$).

There were no significant correlations between the stimulus factors of frequency and duration with primary appraisal or the four clusters of primary appraisal. However, harassment intensity was significantly correlated ($p = .01$) with primary appraisal, *Anxious Arousal*, and *Fear*. All four individual factors were correlated with at least one of the appraisal clusters. Of particular interest was that self-esteem, which originally was not a part of Fitzgerald, Swam, and Magley's (1997) model of harm, was significantly correlated with primary appraisal, *Demoralization*, and *Anxious Arousal*. In addition, previous victimization was solely correlated with *Fear*.

### DISCUSSION

Although victim response has been much discussed in the psychological literature, one of the prime determinants of such responses, in this case primary appraisal, has

Table 2

Correlation Coefficients

| Scale | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 Primary appraisal | — | | | | | | | | | | | | | | | | | | |
| 2 Demoralization | .75** | — | | | | | | | | | | | | | | | | | |
| 3 Anxious arousal | .88** | .79** | — | | | | | | | | | | | | | | | | |
| 4 Fear | .78** | .65** | .82** | — | | | | | | | | | | | | | | | |
| 5 Self-blame | .38** | -.32** | .39** | .33** | — | | | | | | | | | | | | | | |
| 6 SEQ | -.03 | -.21 | -.02 | .08 | .24 | — | | | | | | | | | | | | | |
| 7 GH | -.20 | -.29* | -.24 | -.07 | .07 | .28* | — | | | | | | | | | | | | |
| 8 USA | -.06 | -.25 | .03 | .04 | .18 | .51** | .35** | — | | | | | | | | | | | |
| 9 SC | .29* | .16 | .31* | .26 | .30* | .32* | .07 | .40** | — | | | | | | | | | | |
| 10 Intensity | .31** | .20 | .35** | .32** | .05 | .32* | .04 | .39** | .20 | — | | | | | | | | | |
| 11 Duration | -.18 | -.15 | -.17 | -.10 | -.10 | .20 | .37** | .12 | -.08 | .04 | — | | | | | | | | |
| 12 PV | .23 | .13 | .19 | .32* | .08 | .16 | .20 | .15 | .15 | .04 | .18 | — | | | | | | | |
| 13 Attitudes | -.09 | -.08 | -.07 | -.01 | -.30* | .19 | .22 | .03 | .03 | .15 | -.10 | .06 | — | | | | | | |
| 14 Behavioral SB | .11 | .02 | .03 | .10 | .51** | .17 | .34* | .00 | .08 | -.23 | -.14 | .10 | -.23 | — | | | | | |
| 15 Character SB | .14 | .05 | .12 | .07 | .43** | .18 | .16 | .14 | .11 | -.04 | -.10 | -.04 | -.25* | .66** | — | | | | |
| 16 Chance | .11 | .01 | .13 | .07 | .32** | .15 | .11 | .04 | .04 | -.17 | -.17 | .00 | -.13 | .42** | .50** | — | | | |
| 17 Harasser | .19 | .10 | .20 | .17 | .23 | -.08 | -.21 | -.06 | .15 | .22 | .04 | .01 | -.01 | -.03 | .01 | .11 | — | | |
| 18 Society | .24* | .12 | .24 | .27* | .23 | .24 | .25 | .18 | .10 | .03 | .03 | .23* | .17 | .17 | .27* | .27* | .15 | — | |
| 19 Self-Esteem | -.30* | -.26* | -.29* | -.22 | -.23 | -.12 | -.08 | -.03 | -.20 | -.27* | .02 | -.15 | .06 | -.30* | -.30* | -.23 | -.15 | -.17 | — |

Note. SEQ = Sexual Experiences Questionnaire; GH = gender harassment; USA = unwanted sexual attention; SC = sexual coercion; PV = Previous Victimization; SB = Self-Blame.
*p < .05 level, two-tailed. **p < .01, two-tailed.

### Table 3
Associations Between Antecedents and the Four Appraisal Clusters

| Appraisal cluster | Antecedents | |
|---|---|---|
| | Stimulus | Individual |
| Demoralization | None | Low self-esteem |
| Anxious arousal | High intensity | Low self-esteem |
| Fear | High intensity | High previous victimization |
| | | High societal attributions |
| Self-blame | None | Low feminist attitudes |
| | | High behavioral self-blame attributions |
| | | High characterological self-blame attributions |
| | | High chance attributions |

historically been overlooked and underresearched. Previous research on this topic typically investigated a limited number of emotional reactions and conceptualized primary appraisal as a unidimensional construct. To address these issues, we included a greater variety of potential cognitive and emotional reactions and examined the structure of primary appraisal using the theoretical framework of Salisbury et al. (1986) to ascertain whether a multidimensional conceptualization of primary appraisal is appropriate.

Cluster analysis and multidimensional scaling identified four distinct but related aspects of primary appraisal of sexual harassment. These four groups, which closely resemble Salisbury et al.'s (1986) stages of emotional response, represent victims' feelings of demoralization, anxious arousal, fear, and self-blame. The demoralization cluster includes feeling let down and insulted as a result of the harassment. The anxious arousal cluster refers to both feelings of anger regarding the harassment as well as more psychologically-related responses such as feelings of depression and anxiety. The fear cluster represents a victim's feelings of threat and intimidation as a result of the harassment; self-blame refers to the degree to which the victim expressed feelings of responsibility for the harassment. Multidimensional scaling revealed a two-dimensional solution. The first dimension appears to distinguish between internally focused emotions (e.g., guilt toward self) and externally focused emotions (e.g., anger toward others); the second dimension is somewhat less clear and was not readily interpretable. These results suggest that primary appraisal might be better conceptualized as a multidimensional construct, reflecting a victim's emotional reaction toward herself and others.

Correlations were also examined to assess the relation between proposed antecedents in Fitzgerald, Swan, and Magley's (1997) model and primary appraisal. Stimulus and individual factors were differentially related to the four appraisal clusters. For the demoralization cluster, a significant negative correlation was found with self-esteem, suggesting

that individuals with higher self-esteem were less likely to express demoralized feelings. The directionality of this relation is unclear, and researchers differ as to whether self-esteem is best conceptualized as an antecedent (Malovich & Stake, 1990) or as a consequence (Gruber & Bjorn, 1986) of sexual harassment. It may be that self-esteem operates as both and deserves further exploration.

Victims who were subjected to more intense harassment situations were more likely to endorse feelings of anxious arousal. In addition, the anxious arousal cluster was negatively correlated with self-esteem, suggesting that litigants with higher self-esteem are less likely to endorse strong anxious-arousal appraisals toward harassment; however, once again the directionality of this relation is unclear. Further, women who expressed feeling fear as a result of the harassment were more likely to have experienced intense harassment, to be previously abused, or to make societal attributions for the harassment. Finally, litigants who endorsed self-blaming feelings as a result of the harassment were more likely to express less feminist attitudes and attribute the harassment to behavioral and characterological aspects of themselves as well as to chance. This result suggests that endorsing pro-feminist attitudes may offer some psychological protection to sexual harassment victims by giving them a greater sense of control (i.e., fewer chance attributions) over the experience and, as such, are also less likely to blame themselves for the harassment.[6]

The results of this study suggest that a litigant's primary appraisal of sexual harassment is complex and involves a myriad of emotional responses. Moreover, stimulus and individual factors are differentially associated with these four distinct primary appraisal clusters. A better understanding of how and why victims differentially express aspects of demoralization, anxious arousal, fear, and self-blame can have direct theoretical and practical implications. Theoretically, primary appraisal is a critical component of Fitzgerald, Swan, and Magley's (1997) model of harm. This study empirically demonstrates that how a victim emotionally responds to harassment is influenced not only by various aspects of the harassment itself but also by her own characteristics. Primary appraisal, in turn, affects subsequent behavioral reactions (e.g., coping responses), as well as psychological and physical health and job-related outcomes. Therefore, primary appraisal serves as a crucial first step in understanding why victims cope with harassment in a variety of ways and why they experience varying degrees and types of disruption. For example, a victim who endorses feeling fear as a result of the harassment experience may be less likely to report the harassment and subsequently suffer more severe psychological or health-related outcomes, as opposed to outcomes that are more job-related.

Victims' primary appraisal of harassment also has practical legal and counseling implications. When judges and juries have a thorough understanding of a victim's experience of harassment, they are better able to empathize with her and take her perspective into account. This is particularly

pertinent for male jurors and judges, as research has empirically shown that men are less able to empathize with the victimization experiences of women (Weiner, Watts, Goldkamp, & Gasper, 1995). It is also crucial for counselors and mental health practitioners to have a thorough understanding of the emotional responses of sexual harassment victims, in that primary appraisal directly informs the course of treatment as well as the subsequent goals set by both practitioner and client (Hamilton, Alagna, King, & Lloyd, 1987; Salisbury et al., 1986).

Although the present study extends our understanding of the role of primary appraisal, we acknowledge a number of limitations on the conclusions that can be drawn. First, researchers have found that legal action for victims of sexual harassment is rare; in fact only 1% of victims participate in litigation (Fitzgerald, Swan et al., 1995). As a result, the present sample is distinctive and likely not representative of all sexual harassment victims. It is likely that, because these women have made formal reports and filed legal complaints, their experiences were more severe than nonreporting victims. The present analyses must be replicated in nonlitigant samples before statements can be made concerning the generalizability of the results. Such comparative analyses of litigants and nonlitigants could also increase our understanding of why some individuals make formal complaints and others do not.

A second limitation has to do with the nature of the data itself. At least one factor, male–female ratios in the organization, hypothesized by Fitzgerald, Swan, and Magley's (1997) model to be a determinant of primary appraisal could not be included in this study because the necessary data were not available; this is an unfortunate, though not uncommon, problem with clinical samples. Further, this is regrettable given the numerous studies that have established a link between organizational antecedents, sexual harassment, and outcomes, but failed to include the role of cognitive appraisal (e.g., Fitzgerald, Drasgow et al., 1997). The influence of such contextual factors on primary appraisal is another area for future study, as it may inform researchers and the legal system regarding job-related consequences of harassment.

It is of course reasonable to ask whether the distinctive nature of our sample may have influenced the substantive results obtained from the cluster analysis. We do not believe this is likely the case. First, the administration of additional instruments with validity checks, which are not described in the current study, suggests that the participants were not attempting to misrepresent themselves or appear more psychologically distressed than was actually the case. Second, even if this were not the case, the nature of cluster analysis is such that the results would not be affected because this analysis determines proximity by examining correlations among items, not mean scores; correlations are not affected by the magnitude of scores. Given these considerations, we believe that our results reliably represent the structure of primary appraisals of sexual harassment.

Finally, any research conducted with a vulnerable group by a more powerful (in this case, even more so than usual) investigator raises substantial ethical concerns regarding issues of voluntary consent. As feminist researchers, we take these issues particularly seriously and attempted to neutralize the situation to the degree possible. As described above, the evaluator remained blind to each litigant's decision regarding research participation, and participants were assured that there was no way their decision to participate could affect their litigation. We believe that participants had an adequate understanding of the issues of consent and power, as approximately 10% of them refused to participate in the study.

Lastly, the limited sample size restricted our ability to analyze the data to the fullest extent. It is our hope that our ongoing data collection will eventually yield a sample of sexual harassment litigants that enables us to employ more advanced analytic procedures, thus allowing a more in-depth understanding of this important process.

*Initial submission: November 21, 2005*
*Initial acceptance: June 29, 2006*
*Final acceptance: August 30, 2006*

## NOTES

1. Although studies have shown that men are also targets of sexual harassment (U.S. Merit Systems Protection Board, 1988), the prevalence rates are generally much lower for men; in this study only the sexual harassment of women will be discussed.
2. Information regarding personal resources and control were not available for this sample; therefore, these were not included in the study.
3. Contextual factor information was not available for this sample; therefore, these factors were not included in the study.
4. The original target sample consisted of 95 individuals; for various reasons, 12 were not administered or did not complete the primary appraisal questionnaire (e.g., their cases unexpectedly settled; they were atypical in some way [e.g., a few plaintiffs were male, a few were students rather than employees]). After taking into account missing data, the final sample consisted of 72 female plaintiffs involved in workplace sexual harassment litigation.
5. One item was dropped from the scale to improve reliability and because it failed to provide any additional information.
6. We would like to thank one of our anonymous reviewers for suggesting this insight.

## REFERENCES

Baker, D. D., Terpstra, D. E., & Larntz, K. (1990). The influence of individual characteristics and severity of harassing behavior on reactions to sexual harassment. *Sex Roles, 22,* 305–325.

Bernaards, C. A., & Sijtsma, K. (2000). Influence of imputation and EM methods on factor analysis when item nonresponse in questionnaire data is nonignorable. *Multivariate Behavioral Research, 35,* 321–364.

*Appraisal of Sexual Harassment*                                                                83

Borgen, F. H., & Barnett, D. C. (1987). Applying cluster analysis in counseling psychology research. *Journal of Counseling Psychology, 34,* 456–468.

Brooks, L., & Perot, A. R. (1991). Reporting sexual harassment: Exploring a predictive model. *Psychology of Women Quarterly, 15,* 31–47.

Collinsworth, L. L. (2004). *Individual and objective influences on psychological outcomes of sexual harassment: A preliminary examination.* Unpublished doctoral dissertation, University of Illinois, Urbana–Champaign.

Fitzgerald, L. F., Buchanan, N. T., Collinsworth, L. L., Magley, V. J., & Ramos, A. M. (1999). Junk logic: The abuse defense in sexual harassment litigation. *Psychology, Public Policy, and Law, 5,* 730–759.

Fitzgerald, L. F., Drasgow, F., Hulin, C. L., Gelfand, M. J., & Magley, V. J. (1997). Antecedents and consequences of sexual harassment in organizations: A test of an integrated model. *Journal of Applied Psychology, 82,* 578–589.

Fitzgerald, L. F., Drasgow, F., & Magley, V. J. (1999). Sexual harassment in the armed forces: A test of an integrated model. *Military Psychology, 11,* 329–343.

Fitzgerald, L. F., Gelfand, M. J., & Drasgow, F. (1995). Measuring sexual harassment: Theoretical and psychometric advances. *Basic and Applied Social Psychology, 17,* 425–445.

Fitzgerald, L. F., & Hubert, L. J. (1987). Multidimensional scaling: Some possibilities for counseling psychology. *Journal of Counseling Psychology, 34,* 469–480.

Fitzgerald, L. F., Magley, V. J., & Swan, S. (1996, March). *The in-depth interview schedule: Assessing psychological, organizational, and health-related outcomes for sexual harassment victims.* Paper presented at the annual meeting of the Association for Women in Psychology, Portland, OR.

Fitzgerald, L. F., Shullman, S. L., Bailey, N., Richards, M., Swecker, J., Gold, Y., et al. (1988). The incidence and dimensions of sexual harassment in academia and the workplace. *Journal of Vocational Behavior, 32,* 152–175.

Fitzgerald, L. F., Swan, S., & Fischer, K. (1995). Why didn't she just report him?: The psychological and legal implications of women's responses to sexual harassment. *Journal of Social Issues, 51,* 117–138.

Fitzgerald, L. F., Swan, S., & Magley, V. J. (1997). But was it really sexual harassment?: Legal, behavioral, and psychological definitions of the workplace victimization of women. In W. O'Donohue (Ed.), *Sexual harassment: Theory, research, and treatment* (pp. 5–28). Boston: Allyn & Bacon.

Folkman, S., & Lazarus, R. S. (1985). If it changes it must be a process: Study of emotion and coping during three stages of a college examination. *Journal of Personality and Social Psychology, 48,* 150–170.

Folkman, S., Lazarus, R. S., Dunkel-Schetter, C., DeLongis, A., & Gruen, R. J. (2000). The dynamics of a stressful encounter. In E. T. Higgins & A. Kruglanski (Eds.), *Motivational science: Social and personality perspectives* (pp.111–127). Ann Arbor, MI: Sheridan Books.

Frazier, P. A. (1990). Victim attributions and post-rape trauma. *Journal of Personality and Social Psychology, 59,* 298–304.

Frazier, P. A., Cochran, C. C., & Olson, A. M. (1995). Social science research on lay definitions of sexual harassment. *Journal of Social Issues, 51,* 21–37.

Frazier, P. A., & Schauben, L. (1994). Causal attributions and recovery from rape and other stressful life events. *Journal of Social and Clinical Psychology, 13,* 1–14.

Gelfand, M. J., Fitzgerald, L. F., & Drasgow, F. (1995). The structure of sexual harassment: A confirmatory analysis across cultures and settings. *Journal of Vocational Behavior, 47,* 164–177.

Glomb, T. M., Richman, W. L., Hulin, C. L., Drasgow, F., Schneider, K. T., & Fitzgerald, L. F. (1997). Ambient sexual harassment: An integrated model of antecedents and consequences. *Organizational Behavior and Human Decision Processes, 71,* 309–328.

Gruber, J. E., & Bjorn, L. (1986). Women's responses to sexual harassment: An analysis of sociocultural, organizational, and personal resource models. *Social Science Quarterly, 67,* 814–826.

Hamilton, J. A., Alagna, S. W., King, L. S., & Lloyd, C. (1987). The emotional consequences of gender-based abuse in the workplace: New counseling programs for sex discrimination. *Women and Therapy, 6,* 155–182.

Jensen, I., & Gutek, B. A. (1982). Attributions and assignment of responsibility for sexual harassment. *Journal of Social Issues, 38,* 121–136.

Kinney, T. A. (2003). Themes and perceptions of written sexually harassing messages and their link to distress. *Journal of Language and Social Psychology, 22,* 8–28.

Koss, M. P., Goodman, L. A., Browne, A., Fitzgerald, L. F., Keita, G. P., & Russo, N. F. (Eds.). (1994). *No safe haven: Male violence against women at home, at work, and in the community.* Washington, DC: American Psychological Association.

Lazarus, R. S., & Folkman, S. (1984). *Stress, appraisal, and coping.* New York: Springer.

Lindemann, B., & Kadue, D. D. (1992). *Sexual harassment in employment law.* Washington, DC: Bureau of National Affairs.

Malovich, N. J., & Stake, J. E. (1990). Sexual harassment on campus: Individual differences in attitudes and beliefs. *Psychology of Women Quarterly, 14,* 63–81.

O'Connell, C. E., & Korabik, K. (2000). Sexual harassment: The relationship of personal vulnerability, work context, perpetrator status, and type of harassment to outcomes. *Journal of Vocational Behavior, 56,* 299–329.

Piotrkowski, C. S. (1998). Gender harassment, job satisfaction, and distress among employed white and minority women. *Journal of Occupational Health Psychology, 3,* 33–43.

Reed, M. E. (2004). *The psychological impact of sexual harassment and previous victimization in a sample of class action litigants.* Unpublished doctoral dissertation, University of Illinois, Urbana–Champaign.

Rosenberg, M. (1965). *Society and the adolescent self image.* Princeton, NJ: Princeton University Press.

Salisbury, J., Ginorio, A. B., Remick, H., & Stringer, D. M. (1986). Counseling victims of sexual harassment. *Psychotherapy, 23,* 316–324.

Samoluk, S. B., & Pretty, G. M. H. (1994). The impact of sexual harassment simulations on women's thoughts and feelings. *Sex Roles, 30,* 679–697.

Schneider, B. (1987). Graduate women, sexual harassment, and university policy. *Journal of Higher Education, 58,* 46–65.

Schneider, K. T., Swan, S., & Fitzgerald, L. F. (1997). Job-related and psychological effects of sexual harassment in the

workplace: Empirical evidence from two organizations. *Journal of Applied Psychology, 82,* 401–415.

Spitzer, R. L., Williams, J. B. W., Gibbon, M., & First, M. B. (1990). *Structured clinical interview for DSM-III-R, Nonpatient Edition.* Washington, DC: American Psychiatric Press.

Swan, S. (1995). *So what? Why did it bother her? Factors affecting women's subjective appraisal of the severity of sexual harassment experiences.* Unpublished doctoral dissertation, University of Illinois, Urbana–Champaign.

Swim, J. K., Aikin, K. J., Hall, W. S., & Hunter, B. A. (1995). Sexism and racism: Old-fashioned and modern prejudices. *Journal of Personality and Social Psychology, 68,* 199–214.

Terpstra, D. E., & Baker, D. D. (1989). The identification and classification of reactions to sexual harassment. *Journal of Organizational Behavior, 10,* 1–14.

U.S. Merit Systems Protection Board. (1988). *Sexual harassment of federal workers: An update.* Washington, DC: U.S. Government Printing Office.

Weinberg, S. L. (1991). Methods, plainly speaking: An introduction to multidimensional scaling. *Measurement and Evaluation in Counseling and Development, 24,* 12–34.

Weiner, R. L., Watts, B. A., Goldkamp, K. H., & Gasper, C. (1995). Social analytic investigation of hostile work environments. *Law and Human Behavior, 19,* 263–280.

Wilson, F. (2000). The subjective experiences of sexual harassment: Cases of students. *Human Relations, 53,* 1081–1097.