1                    SUSAN PLASENCIA
2          IN THE UNITED STATES DISTRICT COURT
3             NORTHERN DISTRICT OF ILLINOIS
4                   EASTERN DIVISION
5    SDAHRIE HOWARD, DENISE HOBBS    )
                                     )
6    and ELLENOR ALTMAN, et. al.,    )
                                     )
7                                    )
                                     )
         Plaintiffs,                 )
8                                    )
                                     )
9         vs.                        ) Case No.
                                     )
10                                   ) 17-cv-8146
     COOK COUNTY SHERIFF'S OFFICE,   )
11                                   )
     and COUNTY OF COOK,             )
12                                   )
                 Defendants.         )
13
14
15
16            DEPOSITION OF SUSANA PLASENCIA
17            Thursday, September 27, 2018
18                 Chicago, Illinois
19
20
21
22   Reported By:
23   TRICIA J. FLASKA, CSR, RPR
24   JOB NO. 147718
25

Exhibit C

1      SUSAN PLASENCIA

2      S U S A N A   P L A S E N C I A,

3  called as a witness, having been first duly sworn by

4  a Notary Public, was examined and testified as

5  follows:

6                    EXAMINATION

7  BY MR. PHILLIPS:

8      Q   Would you please state your full name for

9  the record.

10      A   Susana, S-U-S-A-N-A, Plasencia,

11  P-L-A-S-E-N-C-I-A.

12      Q   You have any middle name or middle initial?

13      A   I do not.

14      Q   What's your current address?

15      A   3118 South Lowe, L-O-W-E, Avenue, apartment

16  number 3, Chicago, Illinois 60616.

17      Q   And your date of birth?

18      A   2/1/1973.

19      MR. PHILLIPS:  Okay.  Let's let the record

20  reflect this is the deposition of Susana Plasencia

21  being taken pursuant to the Federal Rules of Civil

22  Procedure, the Local Rules of the US District Court

23  for the Northern District of Illinois, and pursuant

24  to Notice.

25  BY MR. PHILLIPS:

1                      SUSAN PLASENCIA

2      A   I was told later by the lieutenant --

3      Q   By Dillon?

4      A   Yeah.  When he was watching the video, he

5   said, "You said this was only one."

6         And I said, "Yeah."

7         And he said, "There were four in total."

8      Q   Do you remember who the DOC sergeant was

9   that you asked to press charges?

10     A   I do not remember.

11     Q   It's accurate to say that nobody from the

12  courthouse ever discouraged you from filing criminal

13  charges?

14     A   No.

15    MS. BRENNAN:  Object to the form of the

16  question.

17  BY MR. PHILLIPS:

18     Q   Is that accurate?

19     A   Not me.

20     Q   No; meaning, no one's discouraged you?

21     A   Correct.

22     Q   Have you heard of others being discouraged

23  from filing criminal charges?

24     A   I have heard that it's part of our job,

25  which I take it as being discouraging.  Take it as a

1                    SUSAN PLASENCIA

2          First of all, has anyone actually told you,

3    stay out of lockup?

4       A    Yes.

5       Q    Who told you that?

6       A    I remember Lieutenant Dillon once, as he

7    laughed, kind of said, well, then, maybe you should

8    just stay out of lockup.

9       Q    And how did you take that comment?

10      A    I didn't take offense to it because that

11   was after like a two-week time of literally calling

12   them every single day.  And I said, you know what, I

13   think you're right, because maybe then something

14   will get done if nobody goes back there.  Like I

15   kind of responded kind of like a jerk to my

16   lieutenant, to be honest with you, but I was kind of

17   fed up, too.

18      Q    It sounds like, from what you've told me

19   today, Lieutenant Dillon treated your complaints

20   seriously.

21      A    He did.

22      Q    And would you say that's true of the other

23   leadership at the courthouse, they treated your

24   complaints seriously?

25      MS. BRENNAN:   Object to the form of the

1                    SUSAN PLASENCIA

2    question.

3    BY MR. PHILLIPS:

4         Q    You can answer the question.

5         A    Yes.

6         Q    I'm sorry, I need you to look at one more

7    paragraph.

8         A    Okay.

9         Q    Paragraph 164.

10        A    Okay.

11        Q    Page 38.

12        A    Okay.

13        Q    States that, "Harassment makes it difficult

14   to perform her duties."

15             Do you see that?

16        A    Yes.

17        Q    You've told me a little bit about that.

18   And the fact that when you were in the courtroom,

19   there were times when you didn't feel comfortable

20   going back to the lockup, right?

21        A    Correct.

22        Q    Okay.  Is there any other way that this

23   behavior has made it difficult for you to perform

24   your duties?

25        A    Well, aside from going -- not going into

Page 1

```
 1
 2        IN THE UNITED STATES DISTRICT COURT
 3           NORTHERN DISTRICT OF ILLINOIS
 4                EASTERN DIVISION
 5   SDAHRIE HOWARD, DENISE HOBBS,
     ELLENOR ALTMAN, TAVI
 6   BURROUGHS, SHADONNA DAVIS,
     SHARON WILSON, KIMBERLY
 7   CRAWFORD-ALEXANDER, ESTHER
     JONES, BALVINA RANNEY,
 8   TAWANDA WILSON, SUSANA
     PLASENCIA, and PATRICIA
 9   JAGIELSKI, on behalf of          Case No. 17-cv-8146
     themselves and all others
10   similarly situated,             Judge Matthew J. Kennelly
11              Plaintiffs,          Mag. Judge Sidney I.
                                     Schenkier
12        vs.
13   COOK COUNTY SHERIFF'S
     OFFICE, and COUNTY OF COOK,
14
                   Defendants.
15   ------------------------------
16
17
            DEPOSITION OF ELLENOR ALTMAN
18
                 Chicago, Illinois
19
            Monday, September 17, 2018
20
21
22
23   Reported by:
24   JANICE M. KOCEK, CSR, CLR
25   JOB NO. 147711
```

```
 1                    E. ALTMAN

 2          (Witness sworn.)

 3   E L L E N O R   A L T M A N ,

 4        called as a witness, having been duly

 5        sworn by a Notary Public, was examined

 6        and testified as follows:

 7   EXAMINATION BY

 8   MR. MILIANTI:

 9        Q.    Let the record reflect that this is

10   the deposition of Ellenor Altman taken pursuant

11   to the Federal Rules of Civil Procedure.

12             Ms. Altman, my name is Peter

13   Milianti.  I'm one of the attorneys

14   representing the Cook County Sheriff's Office

15   in the lawsuit that you and several other

16   plaintiffs have filed against it.

17             I'm going to be asking you a series

18   of questions here today.  And I ask that you

19   answer each of my questions fully and carefully

20   as you can.  If -- just for some ground rules,

21   if at any point in time you don't understand

22   one of my questions or you need me to clarify

23   it, just let me know and I will do my best to

24   rephrase if so that you understand the

25   question.
```

Page 152

                    E. ALTMAN

1

2   masturbating two or three times a week for

3   three months but you didn't write --

4        A.    Uh-uh.

5        Q.    -- any of them up?

6        A.    Uh-uh.

7        Q.    Correct?

8        A.    No.  Because like I said, I never

9   actually see who it is.  I would see the figure

10  and I would see the motion and I would tell the

11  inmate move.  I didn't want to put a face to

12  the body part.

13       Q.    Did anyone discourage you from

14  filing incident reports relating to inmates'

15  conduct?

16       A.    No, no.

17       Q.    And you understood that you could

18  file an incident report if you wanted to; is

19  that correct?

20       A.    Yeah, but most of the time we

21  didn't.  It was handwritten.  And again, prove

22  it.  You know, that he was doing -- he was

23  taking a shower.  So that would have been a

24  dispute.

25       Q.    Anywhere else that you've worked in

```
1                    E. ALTMAN
2             What's Lieutenant's Johnson first
3    name?
4        A.    C., Craig.
5        Q.    Craig.  So how soon after the
6    incident did you see Lieutenant Johnson?
7        A.    I don't know because I don't -- he
8    just walked the floors.  He just walked by
9    sometime and stop in and see how everything
10   going.  And I seen him in passing and stopped
11   him.
12       Q.    And when you saw him, you told him
13   about the incident and he said that he was
14   sorry?
15       A.    Yes.
16       Q.    And did you -- you wrote up an
17   incident report that day?
18       A.    Yes.
19       Q.    Nobody discouraged you from writing
20   up an incident report; is that correct?
21       A.    No.
22       Q.    Did you ask Lieutenant Johnson to do
23   anything to assist you in preparing the
24   incident report?
25       A.    No.
```

1                      E. ALTMAN

2    doing -- I didn't see this.

3         Q.    Did you --

4         A.    I didn't want to try to look long

5    enough to see if he was going to do it.

6         Q.    Did you actually see him

7    masturbating or did you see his arm going back

8    and forth?

9         A.    No, I saw his penis in his hand,

10   masturbating.

11        Q.    Okay.  And then after you told him

12   to stop, he stops.  What happens next?

13        A.    The shower area was right next to

14   it.  Walks up to the shower behind the wall and

15   -- and stands there and -- because I'm still

16   standing there waiting for the officer to bring

17   the inmates out.  And he said, "I'm sorry.  I

18   didn't know."  I don't know what he didn't

19   know.  But he said "I'm sorry.  I didn't know."

20        Q.    And what did you say in response?

21        A.    I told him get out of my sight.

22        Q.    And where was he supposed to go?

23        A.    Back in the day room.

24        Q.    And what happened next?  Did you

25   write an incident report?

```
 1                        E. ALTMAN
 2        A.    Yes.
 3        Q.    Immediately?
 4        A.    After I completed my law library
 5   assignment.
 6        Q.    Did anyone assist you with
 7   completing the incident report?
 8        A.    No.
 9        Q.    Did anybody discourage you from
10   writing the incident report?
11        A.    No.
12        Q.    And if you look on the first page
13   under "Administrative Test Assessment."
14        A.    First page?
15        Q.    Yes.
16        A.    Oh, yeah.  Okay.
17        Q.    At the bottom there, in the second
18   sentence it says (as read):  Inmate ▮▮▮▮▮was
19   written a disciplinary report and due to
20   incident ▮▮▮▮▮▮▮▮▮, inmate ▮▮▮▮▮ was
21   escorted to Cermak for medical evaluation.
22   Inmate ▮▮▮▮▮ will receive a psych evaluation
23   upon medical clearance and will be transferred
24   to SMU housing per CCDOC policies.
25                Do you see that?
```

Page 1

```
 1
 2           IN THE UNITED STATES DISTRICT COURT
 3              NORTHERN DISTRICT OF ILLINOIS
 4                   EASTERN DIVISION
 5   SDAHRIE HOWARD, DENISE HOBBS,
     ELLENOR ALTMAN, TAVI
 6   BURROUGHS, SHADONNA DAVIS,
     SHARON WILSON, KIMBERLY
 7   CRAWFORD-ALEXANDER, ESTHER
     JONES, BALVINA RANNEY,
 8   TAWANDA WILSON, SUSANA
     PLASENCIA, and PATRICIA
 9   JAGIELSKI, on behalf of        Case No. 17-cv-8146
     themselves and all others
10   similarly situated,            Judge Matthew J. Kennelly
11              Plaintiffs,         Mag. Judge Sidney I.
                                    Schenkier
12        vs.
13   COOK COUNTY SHERIFF'S
     OFFICE, and COUNTY OF COOK,
14
                Defendants.
15   ------------------------------
16
17
         VIDEOTAPED DEPOSITION OF TAWANDA WILSON
18
                    Chicago, Illinois
19
            Tuesday,  September 25, 2018
20
21
22
23   Reported by:
24   JANICE M. KOCEK, CSR, CLR
25   JOB NO. 147716
```

 1                     T. WILSON

 2            (Witness sworn.)

 3    T A W A N D A   W I L S O N,

 4         called as a witness, having been duly

 5         sworn by a Notary Public, was examined

 6         and testified as follows:

 7    EXAMINATION BY

 8    MR. MILIANTI:

 9         Q.    Let the record reflect this is the

10    deposition of Tawanda Wilson taken pursuant to

11    the Federal Rules of Civil Procedure.

12            Ms. Wilson, my name is Pete

13    Milianti.  We met just a few minutes ago.  I'm

14    one of the attorneys representing the Cook

15    County Sheriff's Office in a lawsuit that you

16    have filed against it along with other class

17    representatives.

18            Please answer each of my questions

19    as fully and carefully as you can today.  If

20    for any reason you don't understand one of my

21    questions, please let me know and I will try to

22    rephrase it so that you do understand the

23    question.

24            If you answer the question, I will

25    assume that you understood it.  Is that fair?

1                    T. WILSON

2          THE WITNESS:  I didn't file charges

3      because of what the sergeant said.

4  BY MR. MILIANTI:

5      Q.    I'm not talking about criminal

6  charges.  I'm just talking about this inmate

7  disciplinary report.

8      A.    I didn't know how to do that.  We

9  didn't -- we didn't know anything about

10  disciplinary reports.

11      Q.    Right.  But did anybody discourage

12  you from filing this inmate disciplinary

13  report?

14      A.    Well, couldn't no one -- because I

15  didn't know about it.

16      Q.    Okay.  Let me rephrase it.

17          For instance, at any point in time

18  did Sergeant Maytag say, "Deputy Wilson, you

19  shouldn't be filing this incident report"?

20      A.    Oh, no.

21      Q.    At any point in time did Lieutenant

22  Dillon or anybody else say, "Deputy Wilson, you

23  shouldn't be filing this incident report"?

24      A.    No.

25      Q.    Do you know if the inmate was

1                    T. WILSON

2   command to put it away, he complied?

3        A.    Yes.

4        Q.    What did you do after that?

5        A.    I called the sergeant and informed

6   the sergeant.

7        Q.    And who did you call, do you

8   remember?  Would it have been Sergeant King?

9        A.    Yes.

10       Q.    What did you tell Sergeant King?

11       A.    This guy just pulled his penis out.

12       Q.    And what did Sergeant King say?

13       A.    I don't know.  I know one time she

14  said, "I'm tired of this sh-" -- you know,

15  "pulling out the penis."  And she sent the team

16  up.  She said, "Okay, I'll call them to go up."

17       Q.    So she was frustrated with the

18  inmates?

19       A.    Yes.

20       Q.    She said something like, "I'm tired

21  of the inmates doing this"?

22       A.    Yes.

23       Q.    And then she called the CR team.

24       A.    Yes.

25       Q.    She didn't discourage you from

1                    T. WILSON

2  speaking with the CR team, right?

3        A.    No.

4        Q.    And then did the CR team arrive?

5        A.    Yes.

6        Q.    Where did you speak with the CR

7  team?  Would it have been on the 10th floor?

8        A.    Yes.

9        Q.    Was the inmate still there?

10       A.    He was in the lockup area and then I

11 went into the office.

12       Q.    Who from the CR team spoke with you?

13       A.    Shavers.

14       Q.    Do you like Deputy Sheriff Shavers?

15       A.    No, I guess that he like to do

16 reports.  I don't know.  He's a little --

17       Q.    What did Deputy Sheriff Shavers do

18 at that time?

19       A.    He just had his paper, his pad and

20 pen.  He wrote down and said, "Okay, what

21 happened?"  And I told him.

22       Q.    Did Deputy Sheriff Shavers

23 discourage you from filing the disciplinary

24 report?

25       A.    No.

1                    T. WILSON

2    exposure or masturbation to which you were

3    exposed.

4         A.    No.

5         Q.    And would it be accurate to say that

6    with respect to the incident that we've just

7    gone over that occurred soon after you returned

8    to work in early 2015 that nobody discouraged

9    you from filing the inmate disciplinary report

10   against the inmate?

11        A.    Yes.

12             (Howard Deposition Exhibit 89

13             was marked for identification.)

14   BY MR. MILIANTI:

15        Q.    You've just been handed what's been

16   marked as Deposition Exhibit 89.  This is

17   Bates-stamped Howard 150942 through Howard

18   150944.  Why don't you take a moment and take a

19   look at this disciplinary report and let me

20   know when you're finished.

21        A.    I reviewed this.

22        Q.    You remember this one?

23        A.    Yes.

24        Q.    Okay.  And this is an inmate

25   disciplinary report relating to an incident

1                          T. WILSON

2     member's name and it has Deputy Sergeant L.

3     Hernandez?

4          A.    That's deputy sheriff.

5          Q.    I'm sorry.  Deputy sheriff?

6          A.    Hernandez.

7          Q.    Do you know --

8          A.    Sergeant Hunter.

9          Q.    And Sergeant Hunter.  So both of

10    them came up from the CR team?

11         A.    Yes.

12         Q.    And one of them took your statement?

13         A.    Yes.

14         Q.    Do you know which one?

15         A.    Hernandez.

16         Q.    And Hernandez is the one who wrote

17    this narrative?

18         A.    Yes.

19         Q.    And did you review it?

20         A.    I did.

21         Q.    And you believed it was truthful and

22    accurate?

23         A.    Yes.

24         Q.    Did anyone discourage you from

25    filing this disciplinary report?

1                          T. WILSON

2       A.    No.  I filed charges.

3       Q.    In addition to filing the -- the

4  disciplinary report, you also filed criminal

5  charges against the inmate?

6       A.    I did.

7       Q.    And that's what this document --

8  this second document reflects is the criminal

9  charge that you filed against the inmate for

10 public indecency?

11           The one you were on.

12      A.    Oh, I'm sorry.  Yes.

13      Q.    And no one discouraged you from

14 bringing criminal charges against this inmate;

15 is that correct?

16      A.    Correct.

17      Q.    And if you look at the narrative, it

18 says near the bottom, the last sentence (as

19 read):  Deputy Sheriff Wilson signed complaints

20 against ███ and ███ was transported to the

21 arrest room for processing.  ███ is scheduled

22 to appear in bond court on ███████

23           Do you see that?

24      A.    Yes.

25      Q.    It goes on to say (as read):  ███

1                         T. WILSON

2    filed this inmate disciplinary report based on

3    what you told them?

4         A.    Yes.

5         Q.    Did anybody discourage you from

6    filing this inmate disciplinary report?

7         A.    No.

8         Q.    If you turn to the next page.  This

9    is the inmate disciplinary report findings of

10   fact and decision.  Do you see that?

11        A.    Yes.

12        Q.    It appears this inmate was guilty as

13   charged for a 313.  Do you see that at the

14   bottom?

15        A.    Yes.

16        Q.    And a 313 is masturbation; is that

17   correct?

18        A.    Yes.

19        Q.    And he received 20 days -- says

20   "seg."  Do you see that?

21        A.    Yes.

22        Q.    Is it your understanding he received

23   20 days segregation?

24        A.    Yes.

25        Q.    Did you file criminal charges

1                      T. WILSON

2        A.     They took him away so he could be

3   charged.

4        Q.     Did she call the CR team unit?

5        A.     Yeah, they -- they did.  They came

6   up.  But he didn't care.

7        Q.     When you say "he," you mean the

8   inmate?

9        A.     The inmate.  He didn't care.

10       Q.     All right.  So the CR unit comes up

11  and gets a statement from you?

12       A.     They do.

13       Q.     And that statement then is reduced

14  to what's contained in this infraction

15  narrative; is that right?

16       A.     Yes.

17       Q.     Did anyone discourage you from

18  filing this inmate disciplinary report?

19       A.     No.

20       Q.     Did you file criminal charges

21  against this inmate?

22       A.     Yes.

23       Q.     What do you recall about filing the

24  criminal charges?

25       A.     I don't know what happened.

1                    T. WILSON

2        A.    I don't know who came up.  I know as

3    far as DeMarco because when I got with DeMarco

4    I said, "He was chasing me."

5        Q.    And Deputy Sheriff DeMarco took your

6    statement?

7        A.    Yes.

8        Q.    Okay.  And he filed an incident

9    inmate disciplinary report on your behalf?

10       A.    I guess so.

11       Q.    Did anyone discourage you from

12   filing an inmate disciplinary report?

13       A.    No.

14       Q.    Did you ask to file criminal

15   charges?

16       A.    Yes, I did.

17       Q.    Did you file criminal charges?

18       A.    I did.

19       Q.    Do you know the status of the

20   criminal charges?

21       A.    No.

22       Q.    Do you know if Deputy Sheriff Garcia

23   filed criminal charges?

24       A.    I don't think so.

25       Q.    Did Deputy Sheriff Garcia also see

1                          T. WILSON

2        Q.     Did the inmate stop?

3        A.     I don't -- I think he did because I

4   told him to have a seat.

5        Q.     Do you recall that he -- when you

6   told him to have a seat he stopped?

7        A.     I think he did.

8        Q.     And then your partner put him into

9   lockup?

10       A.     Yes.

11       Q.     And then what did you do when your

12  partner put him in lockup?

13       A.     Notified my supervisor.

14       Q.     Okay.  Did the CR unit come up?

15       A.     Yes.

16       Q.     And did someone take a statement?

17       A.     Yes.

18       Q.     Do you recall who?

19       A.     Not sure.

20       Q.     Did anyone discourage you from

21  filing an incident report?

22       A.     No.

23       Q.     Do you know if the inmate was

24  disciplined?

25       A.     No, not that I know of.

1                        T. WILSON

2        A.    Yes.

3        Q.    Do you see where it shows that the

4   inmate was guilty as charged for a 313, which

5   is masturbation; is that right?

6        A.    Yes.

7        Q.    And he received 21 days of

8   segregation?

9        A.    Yes, of phone restriction.

10       Q.    21 days of phone restriction, right?

11       A.    Yes.

12       Q.    And if you turn to the fourth -- I'm

13  sorry -- the fourth page of this exhibit,

14  80789.  It says "Witness Statement Form."

15             Do you see that?

16       A.    Yes.

17       Q.    And this contains the same

18  information as on the first page, right?

19       A.    Yes.

20       Q.    And no one discouraged you from

21  filing this incident report; is that correct?

22       A.    Correct.

23       Q.    And if you turn to page 80792.

24       A.    Okay.

25       Q.    And that's an incident report; is

1                          T. WILSON

2    you take a look at these notes and tell me if

3    they are accurate.

4                (Witness reviewing document.)

5                THE WITNESS:  Yes.

6    BY MR. MILIANTI:

7        Q.    If you could turn to the last page

8    of this document, have you ever seen a

9    complaint refusal on victim's request form?

10       A.    Have I ever seen this?

11       Q.    Yes.  Not this particular document,

12   but have you ever seen a complaint refusal on

13   victim's request form?

14       A.    No.

15       Q.    You ever have been asked to sign a

16   complaint refusal on victim's request form?

17       A.    No.

18       Q.    Did anyone discourage you from

19   filing a criminal complaint against inmate

20   ███████

21       A.    No.

22       Q.    Did you have any run-ins with inmate

23   ██████ before November 30th, 2017?

24       A.    No.

25       Q.    Did you have any run-ins with inmate

                              T. WILSON

1

2    needed to go walk past him in order to use the

3    restroom, what should you do?

4         A.    Yes.

5         Q.    And she told you you should find

6    another bathroom to avoid the inmate?

7         A.    Yes.

8         Q.    And did you disagree with her

9    instruction, recommendation?

10        A.    I did.  I said, "Take him back

11   downstairs until the doctor's ready to see

12   him."

13        Q.    Did you tell -- strike that.

14              Did she tell you why she did not

15   want to take him back downstairs until the

16   doctor was ready to see him?

17        A.    No, she didn't tell me anything.

18        Q.    She didn't -- you didn't file an

19   incident report with respect to this incident,

20   right?

21        A.    No, no, no.

22        Q.    And she didn't discourage from you

23   filing any type of incident report?

24        A.    No.

25        Q.    Do you think she was providing you

1                   T. WILSON

2     A.    Yes.

3     Q.    And what happened?

4     A.    Inmate pulled his penis out.

5     Q.    Was the inmate in the lockup?

6     A.    Yes, he was.

7     Q.    Was the inmate masturbating?

8     A.    He was.

9     Q.    Could you see him masturbating?

10    A.    I could.

11    Q.    Did you report the conduct?

12    A.    I did.

13    Q.    To whom?

14    A.    Sergeant King.

15    Q.    And what did Sergeant King do?

16    A.    Called for a CR team to come up.

17    Q.    And did the CR team come up?

18    A.    They did.

19    Q.    And did you file an incident report?

20    A.    I did.

21    Q.    Did anybody discourage you from

22 filing that incident report?

23    A.    No.

24    Q.    Do you know if you filed criminal

25 charges against that inmate?

1                          T. WILSON

2          Q.     Anybody discourage you from filing

3     that incident report?

4          A.     No.

5          Q.     Did you file a criminal complaint?

6          A.     I did.

7          Q.     Anybody discourage from you filing

8     the criminal complaint?

9          A.     No.

10         Q.     Do you know if the inmate was

11    disciplined as a result of this incident?

12         A.     I know he came back to the 10th

13    floor with a green jumpsuit on.

14         Q.     Other than being assigned a green

15    jumpsuit, do you know if the inmate was

16    disciplined in any other manner?

17         A.     No.

18         Q.     Do you know the status of any

19    criminal complaint against this inmate?

20         A.     No, no.

21         Q.     Did you have any run-ins with this

22    inmate ▇ either before or after this

23    particular incident?

24         A.     Yes, he came back to the 10th floor.

25         Q.     And what happened when he came back?

                         T. WILSON

1

2       A.      He came with his green jumpsuit on

3  and he stared down -- or down to -- with me.  I

4  was at the front at the post.  And they set the

5  green at the back of the interview rooms.  And

6  so they put him in the room and he looked down

7  there at me and was like "bitch."

8       Q.      Did he say --

9       A.      Because he had on a green jumpsuit.

10      Q.      He called you a bitch?

11      A.      Yeah, he mean-mugged me.

12      Q.      Did you say anything in response?

13      A.      No.

14      Q.      Did you file an incident report

15  relating to that?

16      A.      No.

17      Q.      Anybody discourage from you filing

18  an incident report?

19      A.      No.

20      Q.      Any other run-ins with inmate ████

21  other than what you just described?

22      A.      I haven't seen him since.

23      Q.      Any other incidents of indecent

24  exposure or masturbation that you can recall?

25      A.      I don't know.  It might have been

                              T. WILSON

1

2        A.     Yes.

3        Q.     And did the CR unit respond?

4        A.     Yes.

5        Q.     Did the CR unit investigate the

6   situation?

7        A.     Yes.

8        Q.     Do you know if the inmate was --

9   received a disciplinary report?

10       A.     That I don't know.

11       Q.     Do you know if he was charged with

12  indecent exposure, masturbation?

13       A.     I don't know.

14       Q.     Did you file a disciplinary report

15  as a result of this incident?

16       A.     I just gave my statement and then

17  that was it.

18       Q.     Did anyone discourage you --

19       A.     No.

20       Q.     -- from bringing an incident report?

21       A.     No.

22       Q.     Did you ask to criminally charged

23  this inmate?

24       A.     Yes, I did.

25       Q.     Do you know the status of any

1                    T. WILSON

2        Q.    What did Sheriff Dart say to you?

3        A.    He's not doing anything.

4        Q.    Did Sheriff Dart say anything to

5    you?

6        A.    Just it's a waste of time.

7        Q.    You believe you've been discouraged

8    because it's a waste of time?

9        A.    Yes.

10       Q.    Did anybody specifically tell you

11   not to file an incident report with respect to

12   this incident last Thursday?

13       A.    No.

14       Q.    Any other incidents of indecent

15   exposure or masturbation that you can recall

16   other than what you've already testified to

17   here today?

18       A.    Not that I know of.

19       Q.    Have you ever heard of Savage Life?

20       A.    Savage Life?

21       Q.    Yeah.

22       A.    I heard of it before through

23   in-service.

24       Q.    What is your understanding of Savage

25   Life?

1          IN THE UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF ILLINOIS

3                EASTERN DIVISION

4

5   SDAHRIE HOWARD, DENISE HOBBS     )

6   and ELLENOR ALTMAN,           )

7   individually and on behalf of   )

8   all others similarly situated,   )

9                             )

10        Plaintiffs,        )  Case No. 17-cv-8146

11                             )

12       vs.                    )

13                             )

14   COOK COUNTY SHERIFF'S OFFICE     )

15   and COUNTY OF COOK,          )

16                             )

17        Defendants.        )

18   --------------------------------

19           DEPOSITION OF DENISE WILLA HOBBS

20               Chicago, Illinois

21          Wednesday, October 10, 2018

22

23

    Reported by:

24

    Sandra L. Rocca, CSR, RPR, RMR, CRR

25   JOB NO. 148924

Page 4

                    DENISE WILLA HOBBS,

1  having been first duly sworn, was examined and testified as

3  follows:

4                    CROSS EXAMINATION

5  BY MR. MILIANTI:

6      Q.   All right.  Good morning, Ms. Hobbs.  We met a

7  few minutes ago.  My name is Pete Milianti.  I'm one of the

8  attorneys representing the CCSO and Sheriff Dart in the

9  lawsuit that you have filed against both of those

10 individuals or entities.

11         Have you ever had your deposition taken before?

12     A.   No.

13     Q.   Okay.  I'm sure your attorney has already given

14 you the ground rules, but I will go over them very, very

15 quickly just to refresh your memory.

16         I'm going to be asking you a series of questions

17 here today.  If at any point in time you don't understand

18 one of my questions, please let me know and I will rephrase

19 it in the hope that you do then understand my question.

20         Is that fair?

21     A.   Yes.

22     Q.   If you answer a question, I will assume that you

23 understood it.  Is that fair?

24     A.   Yes.

25     Q.   We have a court reporter here today.  She's

Page 134

1                          D. HOBBS

2          Q.   Do you know what that means, SMU?

3          A.   No.  I just know it's in Division 9 and it's

4     something -- SMU is an acronym for seg.

5          Q.   Is it Special Management Unit?  Is that what it

6     is?

7          A.   Yes.

8          Q.   You don't have any reason to dispute that this

9     inmate received 21 days in SMU for this conduct?

10         A.   I don't know if he actually was ever taken over

11    to serve it.  That I don't know.

12         Q.   You don't know one way or another?

13         A.   No.

14         Q.   No one discouraged you from filing this incident

15    report, is that right?

16         A.   This one here?

17         Q.   Yes.

18         A.   No.

19              (Hobbs Exhibit 117 marked for

20              identification.)

21         Q.   You've just been handed what's been marked as

22    Exhibit -- Hobbs Exhibit 117.  Have you seen this document

23    before?

24         A.   Yes.

25         Q.   And this is an incident report that's dated

Page 137

1                          D. HOBBS

2    his hands in his pants?

3         A.   Yes, he pulled it out.

4         Q.   And was he masturbating or just holding it?

5         A.   No, he just pulled it out.

6         Q.   And what did you do in response?

7         A.   Closed his door and I locked it.

8         Q.   Did you do anything else?

9         A.   Finished locking up my tier and went to my

10   interlock inside and made the call and started the report.

11        Q.   And who did you call?

12        A.   I called the sergeant.

13        Q.   Is that Sergeant White?

14        A.   Yes.

15        Q.   And then you went ahead and filed the incident

16   report, is that correct?

17        A.   Yes.

18        Q.   Anybody discourage you from filing the incident

19   report?

20        A.   No.

21        Q.   If you turn to the first page of this exhibit

22   under the administrative assessment?

23        A.   Yes.

24        Q.   It shows -- or it states that the responding

25   lieutenant reviewed the stationary camera and could not see

Page 150

1                              D. HOBBS

2        A.   He was facing me.

3        Q.   But was he looking at you?

4        A.   I don't know.  Again I was watching the officer.

5        Q.   So you don't know whether or not the conduct was

6   directed at you?

7        A.   When I did face him the second time, he pulled it

8   out, he was looking directly at me.

9        Q.   At any point in time did Lieutenant McArdle

10  discourage you from filing an incident report?

11       A.   No.

12       Q.   Did anybody from the CCSO discourage you from

13  filing an incident report with respect to this incident?

14       A.   No.

15       Q.   And if you turn to Howard 148678, it's the inmate

16  disciplinary report, findings of fact?

17       A.   678?

18            MS. WILLENSON:  They're out of order.

19            MR. MILIANTI:  Thank you, Marni.

20       Q.   And this findings of fact and decision reflects

21  that a hearing was held with the inmate on October 18,

22  2017.  Do you see that at the top?

23       A.   Yes.

24       Q.   And it shows that the inmate was guilty as

25  charged for a 105 and a 313?

Page 157

D. HOBBS

1

2   A.   Yes.

3   Q.   And when you told him "really, you're going to

4   pull your dick out," did he then put his penis away?

5   A.   That's when he ran over to the shower area.

6   Q.   He put his penis away and ran to the shower area?

7   A.   Yes.

8   Q.   And then he saw you were picking up the phone?

9   A.   Yes.

10  Q.   And then he --

11  A.   Same thing, screaming "no, I'm sorry."

12  Q.   Did anyone discourage you from filing this

13  disciplinary report?

14  A.   No.

15  Q.   And who did you report this incident to?

16  A.   Sergeant Smith.

17  Q.   Did Sergeant Smith say anything to you when you

18  reported it to him?

19  A.   Other than just "write him up."

20  Q.   He encouraged you to write him up, to write up

21  the inmate?

22  A.   Yes.

23  Q.   And if you'd turn to 148705, that's the findings

24  of fact and the decision, is that correct?

25  A.   Yes.

1        IN THE UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF ILLINOIS

3              EASTERN DIVISION

4

5   SDAHRIE HOWARD, DENISE HOBBS      )

6   and ELLENOR ALTMAN, ET AL.        )

7                                     )

8          Plaintiffs,               )

9                                     )

10                                    )   Case No. 17-cv-8146

11                                    )

12       vs.                         )

13                                    )

14  COOK COUNTY SHERIFF'S OFFICE      )

15  and COUNTY OF COOK,               )

16                                    )

17          Defendants.              )

18  --------------------------------

19              DEPOSITION OF SHARON ROBINSON

20                  Chicago, Illinois

21              Wednesday, September 12, 2018

22  Reported by:

23  Sandra L. Rocca, CSR, RPR, RMR, CRR

24

25  JOB NO. 147709

1           SHARON ROBINSON,

2  called as a witness, having been duly sworn, was examined and

3  testified as follows:

4                 CROSS EXAMINATION

5  BY MR. PHILLIPS:

6      Q.   Could you state your name for the record, please?

7      A.   Sharon Robinson.

8      Q.   Any middle name or middle initial?

9      A.   R.

10     Q.   Could you give me your current address?

11     A.   724 Bradley Avenue, Matteson, Illinois, 60443.

12     Q.   And your date of birth?

13     A.   8/16/68.

14     Q.   Let's let the record reflect this is the deposition

15 of Sharon R. Robinson being taken pursuant to the Federal

16 Rules of Civil Procedure, the local rules for the U.S.

17 District Court for the Northern District of Illinois and

18 pursuant to Notice.

19          Ms. Robinson, have you ever given a deposition or

20 given testimony in court?

21     A.   No.

22     Q.   Okay.  Let me tell you what's going to happen

23 today.  You probably figured out that I am an attorney

24 representing the Cook County Sheriff's Office regarding the

25 lawsuit that you and several others have filed.

1                            S. ROBINSON

2        A.    That's what the paperwork says.

3        Q.    Did you know that when this Complaint was filed?

4        A.    No.

5        Q.    Did any supervisor ever discourage you from

6   reporting detainee masturbation or exposure?

7        A.    No.  No.  They've never discouraged me, but I've

8   had a supervisor -- and I can't recall the name -- that says

9   as long as they're in their cells that they're able to

10  masturbate.  They're in their personal space.

11       Q.    That occurred in Division 4?

12       A.    Yes.

13             (Exhibit 40 marked for identification.)

14       Q.    Let's mark this as Exhibit 40.  Do you recognize

15  Exhibit 40 as being your answers to Interrogatories?

16       A.    Yes.

17       Q.    And if you look on page 14, is that your signature

18  on page 14?

19       A.    Yes.

20       Q.    Do you understand that by signing these

21  Interrogatories, you're verifying under penalty of perjury

22  that the answers are true and correct to the best of your

23  knowledge and belief?

24       A.    Yes.

25             MS. BRENNAN:  Subject to legal objections.

1                           S. ROBINSON

2           MR. PHILLIPS:  Of course.

3       Q.   Would you go to page 11?  Page 11, Number 14 asks

4   you to identify every occasion on which you reported or

5   complained to the Defendants or their employees regarding the

6   issues in (A), (B) and (C), right?

7       A.   Yes.

8       Q.   Your answer begins on the bottom of page 11 and

9   goes on to page 12.  But you state on page 12 that you

10  expressly complained almost daily while assigned in

11  Division 9 to Lieutenant Pierce, Sergeant Jones and Sergeant

12  McGrath about the sexual harassment and Defendants' failure

13  to adequate measures, if any, to remedy and/or address her

14  complaints.  See that?

15      A.   Yes.

16      Q.   Have you described for me all the complaints that

17  you made to those officers or is there anything else that you

18  can recall in that regard?

19      A.   No, I just complained every day of -- every time I

20  come to work that I'm doing reports of detainees masturbating

21  in front of me or making some type of sexual gesture toward

22  me.  So Lieutenant Pierce knew, the commander knew, the

23  superintendent knew and I did reports and I complained every

24  day.

25      Q.   Is there anything you remember them telling you

S. ROBINSON

2 about the complaints or in response?

3     A.    Write them up.

4     Q.    Any other officers who you complained to about

5 sexual harassment aside from those three?

6           MS. BRENNAN:  Other than what she's already

7 testified to?

8           MR. PHILLIPS:  Absolutely.  Yes, absolutely.

9           THE WITNESS:  Just my family.

10    Q.    No other officers though from CCSO?

11    A.    No.

12    Q.    You state further that you also complained to

13 Commander Hickey and Director Cara Smith?

14    A.    Yes.

15    Q.    When was that?

16    A.    When the stuff happened with ████████, when she

17 called me on my cell phone and I did the paperwork, I just --

18 that's when I just -- I just couldn't take it no more.  I was

19 just -- I just felt like every day I came to work, I had to

20 do reports or somebody was doing something, pulling their

21 penises out on me.  And then you put me on the assignment

22 where I pressed charges on him, we went to court and he got

23 found guilty and you put me back on the same tier.

24           So I complained to Commander, and Cara -- director

25 Cara Smith and I just told them I didn't feel safe in there.

Page 1

1          IN THE UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF ILLINOIS
2                 EASTERN DIVISION
3

     SDAHRIE HOWARD, DENISE HOBBS,    )
4    and ELLENOR ALTMAN, et al.,      )
                                      )
5                    Plaintiffs,      )
                                      )
6          vs.                        )  Case No.
                                      )  17-cv-8146
7    COOK COUNTY SHERIFF'S OFFICE     )
     and COUNTY OF COOK,              )
8                                     )
                     Defendants.      )
9
10
11
12        DEPOSITION OF BALVINA RANNEY
13            Chicago, Illinois
14        Tuesday, October 16, 2018
15
16
17
18
19
20
21
22
23   Reported by:
24   RACHEL F. GARD, CSR, RPR, CLR, CRR
25   JOB NO. 148926

1                    B. RANNEY

2                    (Witness sworn.)

3    WHEREUPON:

4                    BALVINA RANNEY,

5    called as a witness herein, having been first

6    duly sworn, was examined and testified as

7    follows:

8                    EXAMINATION

9    BY MR. PHILLIPS:

10       Q.    Would you please state your full

11   name for the record.

12       A.    Balvina Ranney.

13       Q.    Could you spell Ranney?

14       A.    Yes, R A N N E Y.

15       Q.    Any middle name or middle initial?

16       A.    No.

17       Q.    What's your current address,

18   Ms. Ranney?

19       A.    4914 West 31st Place, Cicero,

20   Illinois 60804.

21       Q.    And your date of birth?

22       A.    10/4/71.

23            MR. PHILLIPS:  All right.  Let's let

24        the record reflect this is the deposition

25        of Balvina Ranney, taken pursuant to the

1                          B. RANNEY

2          A.      No.

3          Q.      Were you present at any roll calls

4   where the sergeants encouraged female deputies

5   to report these kind of incidents?

6          A.      Yeah, they would say to the

7   deputies, but this was later.  This was not,

8   like, in the beginning.

9          Q.      The roll calls were later?

10         A.      No, about reporting stuff.

11         Q.      Right.

12         A.      This was, like, in 2017.

13         Q.      So there were roll calls that you

14  remember in 2017 where the sergeants encouraged

15  deputies to report these kind of incidents?

16         A.      Well, they say to encourage after

17  the deputies will tell them what was going on.

18  So at roll call, the deputies were able to ask

19  a question, and they would say, you know, this

20  happened in so-and-so courtroom, you know.

21  What we need -- what are we going to do about

22  it and stuff like that.  I remember a couple

23  times the sergeant said, well, put a to-from in

24  it.

25         Q.      Say that again, I'm sorry.

```
 1                    B. RANNEY
 2        A.     Put a to-from in it.
 3        Q.     Like a memo?
 4        A.     Yes.
 5        Q.     In other words, report what
 6  happened?
 7        A.     Right.
 8        Q.     When you spoke to female deputies
 9  about these incidents, did you encourage them
10  to report them to their sergeants?
11        A.     Yes.  But a lot of times, they told
12  me, but what is that going to do, you know?
13  And if I say anything or they're going to cause
14  an abutter, they're going to -- in their words,
15  they're going to fuck with me.
16        Q.     Who's they?
17        A.     Management.
18        Q.     Did you ever feel like management
19  messed with you for reporting any of these
20  incidents?
21        A.     No, I don't.  I felt that being a
22  union steward, I was able to -- not only
23  just -- I've always had a good rapport with
24  everybody I work with.  You know, I try to help
25  out whenever I can.  I try to help out whenever
```