**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| SDAHRIE HOWARD, et al. | ) | |
| | ) | |
| | ) | Case No. 17- cv-8146 |
| | ) | |
| Plaintiffs, | ) | Judge Matthew F. Kennelly |
| v. | ) | |
| | ) | |
| COOK COUNTY SHERIFF'S OFFICE, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' JOINT MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

1

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................... 1

BACKGROUND ................................................................................................. 2

I.  Organization of the CCSO ................................................................ 2

II.  CCSO Policies Related to Sexual Harassment ................................. 6

III.  CCSO's Efforts to Combat Detainee Sexual Misconduct. ............... 9

    A.  The CCSO has informed detainees that sexual misconduct is prohibited. ............................................................................. 9

    B.  The CCSO has educated staff regarding measures to combat sexual misconduct. ...................................................... 9

    C.  The CCSO has disciplined and increased consequences for sexual misconduct. ............................................................... 10

    D.  The CCSO has implemented measures to physically prevent detainees from engaging in sexual misconduct directed towards CCSO and County staff. ........................................ 11

IV.  Detainee Sexual Misconduct Is Predominantly Perpetrated by Maximum Security Offenders Housed in Divisions 8, 9 and 10. .......................................... 11

V.  Despite Policy, Some Putative Class Members Failed to Report Detainee Sexual Misconduct, Including Incidents Perpetrated Against Their Fellow Putative Class Members. ..................................................................... 15

ARGUMENT ................................................................................................... 17

I.  Legal Standard. ............................................................................... 18

II.  Plaintiffs Fail to Satisfy Rule 23(a). .............................................. 19

    A.  Plaintiffs Lack Commonality as to their Hostile Work Environment Claim. ........................................................... 19

        i.  Plaintiffs Present No Common Evidence to Support Their Hostile Work Environment Claim. ........................ 20

        ii.  Alleged Verbal Harassment Does Not Supply Commonality. ................................................ 26

        iii.  Alleged Ambient Harassment Does Not Supply Commonality. ................................................ 28

    B.  Plaintiffs Present No Common Evidence to Support their Equal Protection and Illinois Civil Rights Act Claims. ................... 29

    C.  Plaintiffs Lack Typicality. ................................................... 30

    D.  Plaintiffs are Inadequate Representatives. ........................... 32

**TABLE OF CONTENTS**
(continued)

**Page**

III.    Plaintiffs Fail to Satisfy Rule 23(b). ........................................................ 35

    A.    Common Questions Do Not Predominate. ............................................... 35

        i.    Plaintiffs' Hostile Work Environment Claim Necessitates Individualized Inquiries. .................................... 36

            a.    Variation in Plaintiffs' Work Environments Will Not Allow Plaintiffs to Establish Class-Wide Hostile Work Environment Claims with Common Evidence. ................................................ 36

            b.    Variation in Plaintiffs' Subjective Experiences Will Not Allow Plaintiffs to Establish Class-Wide Hostile Work Environment Claims with Common Evidence. ................................................ 38

            c.    Variation in Plaintiffs' Potential Damages Contributes to Individual Issues Predominating. ............. 41

            d.    Variation in Available Defenses Contributes to Individual Issues Predominating. .................................... 41

    B.    Class Litigation Is Not the Superior Method of Proceeding with the Case. ........................................................................ 44

IV.    A Rule 23(c)(4) Issues Class is Inappropriate. ................................................... 44

V.    Alternatively, Any Certified Class Should Limited and Divided into Subclasses. ........................................................................ 45

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Adusumilli v. City of Chicago,*
164 F.3d 353 (7th Cir. 1998) ...................................................26

*Alexander v. Casino Queen, Inc.,*
739 F.3d 972 (7th Cir. 2014) ...............................................20, 21

*Allen v. Chicago Transit Auth.,*
No. 99 C 7614, 2000 WL 1207408 (N.D. Ill. July 31, 2000) ..................30

*Amchem Products, Inc. v. Windsor,*
521 U.S. 591 (1997)........................................................32, 35

*Becker v. Verizon N., Inc.,*
No. 06-2956, 2007 WL 1224039 (7th Cir. Apr. 25, 2007) (unpublished)...........43

*Bell v. Wolfish,*
441 U.S. 520 (1979)..............................................................23

*Berndt, et al. v. Cal. Dept. of Corrections, et al.,*
Case No. 1:03-cv-03174-PJH, Dkt. # 452 (N.D. Cal. Mar. 20, 2012)............39, 40

*Blair v. Supportkids, Inc.,*
2003 WL 1908031 (N.D. Ill. April 18, 2003).....................................35

*Bolden v. Walsh Const. Co.,*
688 F.3d 893 (7th Cir. 2012) ............................20, 21, 22, 23, 25, 26, 38

*Brand v. Comcast Corp., Inc.,*
302 F.R.D. 201 (N.D. Ill.) (Kennelly, J.)................21, 26, 27, 28, 30, 33, 34, 36, 38

*Brand v. Comcast Corp. Inc.,*
Case. No. 1:11-cv-08471, Dkt. # 102 .........................................33

*Camilotes v. Resurrection Health Care Corp.,*
286 F.R.D. 339 (N.D. Ill. 2012)..............................................23, 42

*Carlson v. C.H. Robinson Worldwide, Inc.,*
2005 WL 758602 (D. Minn. Mar. 31, 2005) .....................................25

*Chicago Teachers Union, Local No. 1 v. Bd. of Educ. of City of Chicago,*
797 F.3d 426 (7th Cir. 2015) .................................................25

*Comcast Corp. v. Behrend*,
  133 S.Ct. 1426 (2013) ................................................................................................19

*Elder v. Comcast Corp.*,
  2015 WL 3475968 (N.D. Ill. June 1, 2015) ...............................................................22

*Elkins v. Am. Showa, Inc.*,
  219 F.R.D. 414 (S.D. Ohio 2002) ............................................21, 31, 32, 34, 38, 41

*Ellerd v. Cnty. of Los Angeles*,
  No. CV 08–4289 CAS, 2009 WL 982077 (C.D.Cal. Apr.9, 2009) ........................33

*Espenscheid v. DirectSat USA, LLC*,
  705 F.3d 770 (7th Cir. 2013) ...................................................................................44

*Faulk v. Home Oil Co.*,
  184 F.R.D. 645 (M.D. Ala. 1999) ............................................................................37

*Freitag v. Ayers*,
  468 F.3d 528 (9th Cir. 2006) ...................................................................................40

*In re Gen. Motors Corp. Dex-Cool Prods. Liab. Litig.*,
  241 F.R.D. 305 (S.D. Ill. 2007) ...............................................................................45

*Goodwin v. Conagra Poultry Co.*,
  No. 03–cv–1187, 2007 WL 1434905 (W.D.Ark. May 15, 2007) ...........................30

*Halperin v. Int'l Web Servs.*,
  LLC, 70 F.Supp.3d 893 (N.D. Ill. 2014) ................................................................21

*J.H. Cohn & Co. v. Am. Appraisal Assocs., Inc.*,
  628 F.2d 994 (7th Cir.1980) ....................................................................................33

*Kress v. CCA of Tennessee*,
  694 F.3d 890 (7th Cir. 2012) ...................................................................................31

*Latonya Lee v. The Children's Place Retail Stores, Inc.*,
  2014 WL 5100608 (N.D. Ill. Oct. 8, 2014) ...........................................................33

*Mateo v. V.F. Corp.*,
  No. C 08–05313 CW, 2009 WL 3561539 (N.D.Cal. Oct. 27, 2009) .....................33

*McCaster v. Darden Restaurants*,
  845 F.3d 794 (7th Cir. 2017) ........................................................................20, 25, 29

*McKenzie v. Milwaukee County*,
  381 F.3d 619 (7th Cir. 2004) ...................................................................................28

*Messner v. Northshore Univ. HealthSystem.*,
    669 F.3d 802 (7th Cir. 2012) ........................................................................18, 19

*Moser v. Indiana Dep't of Corr.*,
    406 F.3d 895 (7th Cir. 2005) ...........................................................26, 28, 31

*Nabozny v. Podlesny*,
    92 F.3d 446 (7th Cir. 1996) ...........................................................................29

*Oncale v. Sundowner Offshore Services, Inc.*,
    523 US 75 (1998)........................................................................................27, 28

*Parko v. Shell Oil Co.*,
    739 F.3d 1083 (7th Cir. 2014) ..................................................................35, 36

*Patt v. Family Health Sys., Inc.*,
    280 F.3d 749 (7th Cir. 2002) ........................................................................26

*Payne v. Pauley*,
    337 F.3d 767 (7th Cir.2003) .........................................................................37

*Puffer v. Allstate*,
    255 F.R.D. 450 (N.D. Ill. 2009).......................................................35, 37, 44

*Puffer v. Allstate Ins. Co.*,
    675 F.3d 709 (7th Cir. 2012) ........................................................................45

*Radmanovich v. Combined Ins. Co. of Am.*,
    216 F.R.D. 424 (N.D. Ill. 2003)..............................................................35, 38

*Ramirez v. Palisades Collection LLC*,
    250 F.R.D. 366 (N.D. Ill. 2008)....................................................................35

*Ramos v. Cook County Sheriff's Office*,
    Case No. 1:18-cv-00274 (N.D. Ill) ...............................................................44

*Randall v. Rolls-Royce Corp.*,
    637 F.3d 818 (7th Cir. 2011) ..................................................................32, 34

*Reid v. Lockheed Martin Aeronautics Co.*,
    205 F.R.D. 655 (N.D. Ga. 2001)...................................................................37

*Retired Chi. Police Ass'n v. City of Chi.*,
    7 F.3d 584 (7th Cir. 1993) ............................................................................30

*Riffey v. Rauner*,
    910 F.3d 314 (7th Cir. 2018) ...........................................................32, 41, 42

*Rudolph, et. al v. Dept. of Corrections, et al.*,
  Case No. 5:06-cv-56-RS, Dkt. #211 (N.D. Fl. Nov. 9, 2006) ....................................26, 39, 40

*Sample v. Aldi*,
  No. 93 C 3094, 1994 WL 48780 (N.D. Ill. Feb. 15, 1994)......................................................33

*Sandoval v. City of Chicago*,
  No. CIV.A.07 C 2835, 2007 WL 3087136 (N.D. Ill. Oct. 18, 2007) ....................................30

*Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.*,
  559 U.S. 393 (2010)................................................................................................................21

*Siegel v. Shell Oil Co.*,
  612 F.3d 932 (7th Cir. 2010) ................................................................................................19

*Slayton v. Ohio Dep't of Youth Servs.*,
  206 F.3d 669 (6th Cir. 2000) ................................................................................................26

*Sprague v. Gen. Motors Corp.*,
  133 F.3d 388 (6th Cir. 1998) ................................................................................................30

*Starr v. Chicago Cut Steakhouse, LLC*,
  75 F.Supp.3d 859 (N.D. Ill. 2014) ........................................................................................18

*Szabo v. Bridgeport Machs.*,
  249 F.3d 672 (7th Cir. 2001) ..........................................................................................35, 36

*Turner v. Honeywell, Micro Switch Div.*,
  54 F.App'x 236 (7th Cir. 2002) ......................................................................................28, 31

*Van v. Ford Motors*,
  2018 WL 4635649 (N.D. Ill. Sept. 27, 2018) .................................................................32, 44

*Visser v. Packer Engineering Associates, Inc.*,
  924 F.2d 655 (7th Cir.1991) ..................................................................................................37

*Vulcan Golf, LLC v. Google Inc.*,
  254 F.R.D. 521 (N.D. Ill. 2008)............................................................................................42

*Wal-Mart Stores, Inc. v. Dukes*,
  131 S.Ct. 2541 (2011)...........................................................................18, 19, 20, 22, 25

*White v. Osmose, Inc.*,
  204 F.Supp.2d 1309 (M.D.Ala. 2002) ..................................................................................33

*Wigod v. PNC Bank, N.A.*,
  338 F. Supp. 3d 758 (N.D. Ill. 2018) ....................................................................................41

*Wright v. Family Dollar, Inc.*,
  No. 10 C 4410, 2010 WL 4962838 (N.D. Ill. Nov. 30, 2010)...........................................33, 34

*Wrightsell v. Sheriff of Cook Cty.*,
  8 C 5451, 2009 WL 482370 (N.D. Ill 2009).........................................................................32

*Yuknis v. First Student, Inc.*,
  481 F.3d 552 (7th Cir. 2007) ...................................................................................1, 26, 28

**Statutes**

740 ILCS 23/5 .............................................................................................................................29

Code December 2013..............................................................................................................6, 10, 23

Code November 2017 .............................................................................................................6, 10, 23

FLSA............................................................................................................................................33

*Illinois Civil Rights Act* ...........................................................................................................29

**Rules**

Fed. R. Civ. P. 12(b)(1).............................................................................................................43

Fed. R. Civ. P. 56(e) .................................................................................................................37

Fed. R. Evid. 602 ......................................................................................................................37

Illinois Rule of Professional Conduct 1.7 ...............................................................................32

Rule 23 ...........................................................................................................................17, 19, 21

Rule 23 .......................................................................................................................................20

Rule 23(a)..............................................................................................................................18, 19, 25

Rule 23(a)...................................................................................................................................36

Rule 23(a)(2)..............................................................................................................................22

Rule 23(a)(3)..............................................................................................................................30

Rule 23(b)..............................................................................................................................18, 35

Rule 23(b)...................................................................................................................................36

Rule 23(b)(3)......................................................................................................................19, 35, 42, 44

Rule 23(b)(3) ................................................................................................35, 45

Rule 23(c)(4) ................................................................................................44, 45

Rule 23(c)(4)(A), Rule 23(b)(3)'s ......................................................................45

**Other Authorities**

20 Ill. Adm. Code 701.160(d) Ex. 26 ..................................................................6

20 Ill. Adm. Code 701.160(l) ...............................................................................7

B-03.01 9/13/15 ....................................................................................................8

Ex. 41, Expert Report of Benjamin Wilner, Ph.D. ..............10, 14, 24, 25, 29, 38, 45

report at 5; Miller Decl. ¶ 16 ................................................................................3

report at 11; Curry Decl. ¶ 18 ..............................................................................9

report at 12, 21; Curry Decl. ¶ 11-15, 18 ..........................................................11

report at 12; Curry Decl. ¶ 32 ............................................................................10

report at 12; Curry Dep. 255–256; Curry Decl. ¶ 29 .........................................10

report at 23; Curry Decl. ¶ 36 ..............................................................................9

Roll Call ..............................................................................................................10

Senate Bill 2220 ..................................................................................................10

## INTRODUCTION

Plaintiffs seek certification of a class comprised of more than 2,000 women who work in every building and work assignment of the Cook County Jail and Leighton Courthouse, a compound that services more than 100,000 detainees of all security levels and genders each year. The proposed class encompasses some employees who are at odds with one another. It includes sworn female correctional officers, who are first responders to any incident in the Jail, and their female supervisors, some of whom are accused by their fellow putative class members of failing to report or otherwise respond to and prevent the misconduct. Similarly, it encompasses sworn personnel accused by civilian class members of failing to take reports of sexual misconduct. The proposed class also includes female correctional officers and their female supervisors who have spent substantial time in the maximum security areas of the Jail where sexual harassment is primarily reported, as well as female officers who have little or no detainee contact, or contact only with lower security or female detainees. It also encompasses civilian administrative personnel (secretaries, librarians, information technology personnel, etc.) and healthcare workers. It encompasses Sheriff's Deputies who work in the Court Services division at the Leighton Courthouse, including those who transport and guard detainees and those who guard the judges' parking lot. And, it encompasses women who have reported multiple incidents of exposure and masturbation, as well as women who have never reported it, despite their obligations to do so as sworn correctional officers. Plaintiffs' motion argues that putative class members who claim severe emotional distress from detainee sexual misconduct and those who have never or rarely experienced such behavior should be handled as a class.

Thus, it is perhaps needless to say that this proposed class has numerous defects and is far too broad to be certifiable. First, the Class Representatives lack commonality with, and are atypical of, many other members of the proposed class in light of these variations. Second, Plaintiffs'

contention that supervisors who are themselves class members contributed to the discrimination they faced by ignoring complaints and generally failing to take detainee sexual harassment seriously, creates a conflict of interest amongst the class which renders the class representatives inadequate. <u>Third</u>, individualized issues— including not only the extent to which any class member was subjected to detainee misconduct (if at all), but also the extent to which the class member can demonstrate damages, whether and why the class member failed to report detainee misconduct, and other unique affirmative defenses —predominate and render the class unsuitable for certification.

<u>Lastly</u>, in the face of all of these issues, Plaintiffs assert that Defendant Cook County Sheriff's Office ("CCSO") failed to implement reasonable policies to stop the misconduct, and that this failure is the "glue" that binds their individual claims together. The record belies the assertion that the CCSO has tolerated the misconduct. More importantly, the only policies common throughout the Jail and Courthouse are those that prevent sexual harassment. And, it is well established that inconsistent or imperfect enforcement of a policy is not a basis for class certification. Furthermore, to the extent the misconduct persists, it persists in a subset of the Jail population, with whom many members of the proposed class have had limited to no contact. Plaintiffs' claim that detainees sexually harass women with impunity in every corner of the Jail and Courthouse is not supported by the evidence. The proposed class cannot be certified.

## **BACKGROUND**

### I. **Organization of the CCSO**

The CCSO is organized into several divisions. The Court Services Division provides security at the fourteen courthouses in Cook County, including the Leighton Criminal Courthouse ("Leighton" or the "Courthouse"). The Department of Corrections ("DOC") is responsible for overseeing detainees housed in the Cook County Jail, including their transport to Leighton and

other courthouses. The DOC's responsibility includes 36 buildings collectively referred to as the Cook County Jail (the "Jail"), spread over ninety-six acres and 8 city blocks roughly bordered by Sacramento Avenue, California Avenue, 26th Street and 31st Street in Chicago.[1]  Approximately 100,000 detainees circulate annually through the Jail.[2]  Seven active buildings, called "Divisions," house detainees.  Other buildings in the Jail are active but do not house detainees; employees who work in these buildings primarily perform administrative functions and have little to no detainee contact.[3]  The Jail also contains Cermak Health Services ("Cermak"), which provides healthcare to detainees and the Residential Treatment Unit (the "RTU"), which provides treatment for mentally ill inmates.[4]  Civilian employees of Cook County provide healthcare services at these facilities while DOC employees provide security and transport functions.

Various Divisions of the Jail house detainees of different genders and security classifications.[5]  For example, Division 2 houses general population male inmates of a minimum or medium security classification. The active portion of Division 5 currently houses female general population detainees of all security classifications. Division 9 houses maximum security male detainees and also contains the special management unit.[6]  Each Division has its own dedicated staff, sergeants, lieutenants and superintendents.[7]  As the Divisions were constructed over decades, their designs differ greatly.[8]  Specifically, certain Divisions were designed and constructed when there was no cross-gender supervision of male detainees by female corrections officers.[9]  Thus, for

---

[1] Ex. 1, Michael Miller Declaration ("Miller Decl.") ¶ 13.
[2] Ex. 2, Expert Report of Margo Frasier ("Frasier Report") at 4.
[3] Miller Decl. ¶ 13.
[4] Cermak is designated as Division 8 while the RTU is designated as Division 08; *see also* Miller Decl. ¶ 14.
[5] Frasier report at 5; Miller Decl. ¶ 16.
[6] Ex. 3, CCSO_Howard_0323260-65 (CCSO Website Printout); Miller Decl. ¶ 16.
[7] Ex. 4, CCSO_Howard_0078538-39 (Department of Corrections Organizational Chart); Miller Decl. ¶ 17.
[8] Frasier Report at 5.
[9] *Id.*

example, certain areas of the Jail have modesty panels in shower and toilet areas, while others do not.[10]

The CCSO employs both sworn and civilian staff in the DOC. Frontline sworn staff are known as Correctional Officers or "COs." COs report to Sergeants who in turn report to Lieutenants. Lieutenants then report to Superintendents, who are responsible for a division or department of the DOC. Due to the differences in Divisions, units, and positions, some female employees who work at the Jail do not have regular contact with detainees as part of their job duties, including but not limited to women employed in the mailroom, information technology, classification, records, payroll, and electronic monitoring.[11] Even among staff with regular detainee contact, as discussed below, staff in different Divisions experience wildly different frequencies of detainee misconduct, including sexual misconduct.[12]

In the CSD, frontline sworn staff are known as Deputy Sheriffs or "deputies." As in the DOC, the chain of command in the CSD is deputies, Sergeants, Lieutenants and Superintendent but the supervisory employees work only for the CSD.[13] Some deputies and other sworn personnel are assigned to the Courthouse. Although the Courthouse is connected by an underground tunnel to the Jail, it is a separate building.[14] Deputy sheriffs are assigned to a variety of positions at the Courthouse including: Front Door security, Jury Room, Grand Jury Room, Sheriff's Office, Male Bridge, Female Bridge, DOC Count, 10th Floor, Dock, Courtrooms (including the felony

---

[10] Frasier Report at 22.

[11] CCSO_Howard_0078538-39 (Department of Corrections Organizational Chart); Miller Declaration ¶¶ 15, 17-19.

[12] This brief will use "sexual misconduct" to refer to indecent exposure, exhibitionist masturbation, and verbal sexual harassment by detainees; *see also* Miller Decl. ¶¶ 19-27; Ex. 5, Don Beachem, Jr. Declaration ("Beachem Decl.") ¶¶ 10-13; Ex. 6, Martha Yoksoulian Declaration ("Yoksoulian Decl.") ¶¶ 8-12; Ex. 7, Joseph Giunta Declaration ("Giunta Decl.") ¶¶ 8-13; Ex. 8, Erica Queen Declaration ("Queen Decl.") ¶¶ 8-10; Ex. 9, Salomon Martinez Declaration ("Martinez Decl.") ¶¶ 8-11.

[13] Ex. 10, CCSO_Howard_0039011-15 (CSD Policy 200 1/22/2016); Ex. 11, Declaration of Joseph Bellettiere ("Bellettiere Decl.") ¶¶ 8-9.

[14] Bellettiere Decl. ¶ 8.

courtrooms and central bond court), Security/CR, Shuttle, Transport, Radio Room, and Judge Lot.[15] Each position has different responsibilities and different levels of detainee contact, with some positions having no detainee contact at all.[16] CSD employees have their own policies and procedures and are subject to a different collective bargaining agreement than DOC employees.[17] The CSD has a hierarchical structure separate from the DOC reporting structure.[18]

County employees who are assigned to "Cermak" include medical personnel in positions such as correctional medical technicians, nurses, physicians' assistants, certified medication technicians, emergency medical technicians, medical social workers, correctional psychologists, psychiatrists, and dental hygienists. Medical personnel may be assigned to provide medical services to detainees in any of the following areas: dispensaries in the Jail, on Division tiers, in the Cermak medical area of the Jail, also known as Division 8, or emergency medical services anywhere at the DOC.[19] Other women in positions with Cermak Health Services include: accountants, storeroom supervisors, medical record unit management, programmers, and process analysts. The job duties and responsibilities of women holding these positions include little to no contact with detainees.[20] Cermak employees have their own policies and procedures and are governed by their own collective bargaining agreements.[21] Cermak has a reporting structure separate from the DOC or CSD reporting structures.[22]

---

[15] Ex. 12, CCSO_Howard_0271060-61 (CCSO CSD Daily Assignment Log); Ex. 13, E. Jones Dep. 32:17-33:22.
[16] E. Jones Dep. 34:21-35:5, 36:12-22; Bellettiere Decl. ¶ 12.
[17] Ex. 14, CCSO_Howard_0038992-9660 (CSD Policy Manual 1/22/2016); Ex. 15, CCSO_Howard_0147356-404 (2012-2017 CBA FOP); Bellettiere Decl. ¶ 9.
[18] CCSO_Howard_0039011-15 (CSD Policy 200 1/22/2016); Bellettiere Decl. ¶ 10.
[19] Ex. 16, T. Burroughs Dep. 28:2-29:8, 47:11-48:10; see also Group Ex. 17, CCHHS-Howard 000441-535, 002037-2105 (Cermak Job Descriptions).
[20] See CCHHS-Howard 000441-535, 002037-2105 (Cermak Job Descriptions).
[21] Ex. 18, CCHHS-Howard 000175-00235 (CBA Service Employees International Union Local 73 – Representing Hospital Technicians, December 2012-November 2017); Ex. 19, CCHHS-Howard 000103-104 (Burroughs Acknowledgement of Receipt of Policies); Group Ex. 20, CCHHS-Howard 000157-161, 169-174, 236-238, Burroughs0010-14 (Cermak Policies).
[22] Ex. 21, CCHHS-Howard 00241-45 (Correctional Health Services Hierarchy Cermak Health Services/JTDC)

## II.    CCSO Policies Related to Sexual Harassment

The CCSO prohibits sexual harassment, including by detainees, throughout the DOC and CSD.[23]  Further, the inmate disciplinary code specifically prohibits sexual harassment, indecent exposure, and masturbation.  The disciplinary code specifically prohibits, and throughout the class period has prohibited, sexual harassment by detainees, through assorted charge codes including: 313 (indecent exposure/masturbation); 320 (verbal threat to staff); 322 (disrespect to staff); 323 (indecent exposure); and 325 (sexual harassment).[24]

Enforcement of the sexual harassment policies and detainee disciplinary code is, by law, vested in the sworn staff, sergeants, and lieutenants in each Division and in the CSD.  Illinois law requires sworn staff who observe disciplinary violations, including sexual harassment, indecent exposure, or masturbation, to submit a written report of the occurrence.[25] This requirement is incorporated into CCSO's policies for both the DOC and the CSD.  For the DOC, sworn staff who observe or detect a rule violation are responsible for addressing the misconduct by, in part, completing an Incident Report and disciplinary ticket and submitting it to their supervisor prior to being relieved from their tour of duty.[26]  Civilian employees who witness an inmate violate the disciplinary code are required to notify a sworn member or supervisor so that a report can be completed.[27]  Sworn staff are required to complete reports when a crime has occurred regardless

---

[23] Ex. 22, CCSO_Howard_0009677-83 (DOC Policy 315 4/14/17); Ex. 23, CCSO_Howard_0054606-11 (CSD Policy 315 6/1/17).
[24]  Ex.  24,  CCSO_Howard_0078544-47  (Inmate  Disciplinary  Code  December  2013);  Ex.  25, CCSO_Howard_0078551-56 (Inmate Disciplinary Code November 2017).
[25] Ex. 26, 20 Ill. Adm. Code 701.160(d).
[26] Miller Decl. ¶¶ 5-11, Ex. A-D.
[27] Ex. 27, CCSO_Howard_0000911-26 (SOGO 11.14.8.0(IX)(B)(1)(b) 3/17/15).

of whether a victim wants to pursue prosecution, as the CCSO's internal administrative inmate disciplinary process is distinct from the criminal complaint system.[28]

When an Incident Report is generated in the DOC, DOC sergeants are then responsible for ensuring that proper documentation of detainee misconduct is completed, reviewed and forwarded to the required management personnel.[29] DOC lieutenants are responsible for ensuring that personnel under their authority provide written documentation on any incidents prior to the end of their tour of duty and forwarding the documentation. They are also responsible for ensuring all reports submitted contain sufficient facts of the incident for investigation and inquiry.[30] Class Representatives acknowledge these requirements.[31]

In the CSD, a sworn member is required to initiate a disciplinary report and other related reports for all rule violations of the CCDOC Inmate Handbook and Disciplinary Code. In practice, prior to all CSD sworn staff members obtaining access to the Cook County Offender Management System ("CCOMS") in October 2017, a sworn staff member would inform his or her sergeant of an incident. The sergeant, in turn, would contact the Control and Response Team ("CR Team") to investigate and write the report.[32] Since October 2017, all incidents of misconduct (as well as other incidents within the DOC and CSD) can be recorded and tracked in CCOMS. However, at the Courthouse, the CR Team remains responsible for documenting inmate misconduct.

Per CSD Policy 904, civilian employees are required to report a rule violation to a sworn member for proper action.[33] CSD sergeants are responsible for collecting, reviewing, and

---

[28] Ex. 28, CCSO_Howard_0064470-74 (Policy 311.3.1 12/1/17); 20 Ill. Adm. Code 701.160(l); Ex. 29, Burke Dep. 69:10-23 (employees can initiate criminal charges by contacting the Criminal Intelligence Division ("CIID"), the Sheriff's Police, or the Chicago Police).
[29] Miller Decl. ¶ 10, Ex. C.
[30] Miller Decl. ¶ 10, Ex. C.
[31] Ex. 30, E. Altman Dep. 108:16-110:9; Ex. 31, D. Hobbs Dep. 84:24-85:9.
[32] E. Jones Dep. 58:9-60:2; Ex. 32, T. Wilson Dep. 119:18-120:25; Ex. 33, S. Plasencia Dep. 43:21-44:4, 47:5-48:9.
[33] Ex. 34, CCSO_Howard_0055792-93 (Policy 904 12/31/15); Bellettiere Decl. ¶¶ 5-6.

examining all reports submitted by members under their supervision to ensure proper preparation.[34] Lieutenants, in turn, are tasked with being aware of criminal activity and specific problem areas and coordinating activities toward resolving these problems.[35] Class Representatives acknowledge these requirements.[36]

Cermak Health Services works collaboratively and vigorously with DOC to protect its employees, contractors, volunteers, trainees, and students against harm.[37] Per Cermak Policies B-03.01 and B-08, if an inmate intimidates, harasses, harms or threatens a Cermak staff member, the staff member is required to immediately notify the DOC officer on scene and promptly notify a Cermak supervisor and a DOC superintendent or chief if available.[38] The staff member is also required to document the incident. Department supervisors are required to assist the employee in documenting the event, report the incident to the Department Head and Site Administrator, facilitate entry of the report into the Jail Notification Log, and consult with the employee and Department Head regarding reassignment. Beginning June 10, 2016, Cermak and DOC initiated a new process, requiring Cermak staff to document incidents on a Staff Safety Incident Report form.[39] Pursuant to the new process, the Incident Reports are sent to a Staff Safety leadership group at both DOC and Cermak the same day they are received. These incidents are then numbered, tracked, and entered into CCOMS. A weekly meeting among key Cermak and DOC staff is held to review the status of these incidents and conduct any necessary follow-up. The Class

---

[34] Ex. 35, CCSO_Howard_0054470-75 (Policy 201.7.2 6/1/17).
[35] CCSO_Howard_0054470-75 (Policy 201.6 6/1/17).
[36] S. Plasencia Dep. 47:5-9.
[37] CCHHS-Howard 000169-174 (Cermak Policy B-03.01 9/13/15); CCHH-Howard 000236-238 (CHS Policy 02.02.01 9/25/13).
[38] Burroughs0010 (Cermak Policy B-08).
[39] CCHHS-Howard 000174.

Representative for Cermak acknowledges receipt of Cermak policies, including the requirement to report an inmate who sexually exposes himself or herself.[40]

### III.    **CCSO's Efforts to Combat Detainee Sexual Misconduct.**

The CCSO has vigorously worked to curb detainee sexual misconduct.

#### A.    *The CCSO has informed detainees that sexual misconduct is prohibited.*

Upon arrival at the Jail, detainees are advised that sexual misconduct targeted at any individual will not be tolerated through the Inmate Information Handbook.[41] The CCSO also verbally reminds detainees that sexual misconduct of any form is unacceptable and warns them that if any inmate in the Courthouse engages in public indecency, the detainees in the lockup will be handcuffed.[42] The CCSO also posts signs throughout the Jail that warn detainees of the criminal penalty for engaging in public indecency.[43] Additionally, the CCSO held a series of town hall meetings where Assistant Public Defenders explained to detainees the potential criminal consequences of engaging in sexual misconduct.[44]

#### B.    *The CCSO has educated staff regarding measures to combat sexual misconduct.*

In an effort to further educate staff regarding steps to address detainee sexual misconduct, beginning in October 2015, the CCSO began conducting roll call presentations and issuing roll call memos to remind staff of proper handcuffing and transportation procedures.[45] In October 2016 and October 2017, the CCSO issued additional reminders to its staff about various tactics to

---

[40] T. Burroughs Dep. 63:22-64:21; 73:14-19; CCHHS-Howard 000103 (Hosp. Orientation Acknowledgement – Burroughs).
[41] Frasier report at 10; Ex. 36, Declaration of Brad Curry ("Curry Decl.") ¶ 7; Ex. 37, CCSO_Howard_0281248-51 (Inmate Handbook July 2017).
[42] Frasier report at 11; Curry Decl. ¶ 18.
[43] Frasier report at 10; Ex. 38, Curry Dep. 163-164, 292-293.
[44] Frasier report at 23; Curry Decl. ¶ 36.
[45] Frasier report at 11; Curry Dep. 128.

combat detainee sexual misconduct directed towards themselves and others.[46] The CCSO also conducted additional training on a variety of detainee sexual misconduct-related issues.[47]

### C. *The CCSO has disciplined and increased consequences for sexual misconduct.*

At various points between 2015 through the present, the CCSO has imposed the following additional sanctions upon detainees found administratively guilty of engaging in indecent exposure or masturbation: visitation restrictions, informing families the restriction was due to masturbation, reducing good time credits, loss of commissary, loss of working privileges, and loss of phone privileges.[48] The CCSO also created a special disciplinary tier as an increased sanction and means of managing inmates prone to exhibitionist masturbation.[49] In May 2017, the CCSO revised the disciplinary code and increased disrespect to staff, indecent exposure, and sexual harassment from level 2 offenses to level 3 offenses, which increased the potential penalties for these offenses, and created the Special Management Unit ("SMU").[50] The CCSO has also improved adjudication rates for administrative disciplinary tickets, including sexual misconduct related offenses.[51] Further, the CCSO has made multiple attempts to introduce legislation which it believes would help to combat detainee sexual misconduct directed towards CCSO and County employees.[52]

---

[46] Frasier report at 12; Curry Dep. 255–256; Curry Decl. ¶ 29; Ex. 39, CCSO_Howard_145447 (10/31/2017 Roll Call Memo).

[47] Frasier report at 12; Curry Dep. 255–256 (both discussing in-division training conducted by the CCSO's Emergency Response Team on how to properly utilize blue box restraints); Frasier report at 10; Ex. 40, Wilensky Dep. 156 (both discussing training on report writing in order to improve reports written by officers so that the incident can be properly adjudicated)

[48] Curry Decl. ¶ 30.

[49] This measure was discontinued due to unintended consequences. Frasier report at 12; Curry Decl. ¶ 32.

[50] Frasier report at 13; Wilensky Dep. 92-93; CCSO_Howard_0078544-47 (Inmate Disciplinary Code December 2013); CCSO_Howard_0078551-56 (Inmate Disciplinary Code November 2017); Curry Decl. ¶ 21.

[51] Ex. 41, Expert Report of Benjamin Wilner, Ph.D. ("Wilner Rept.") at 14-16 (discussing his review of adjudication rates for sexual misconduct and other disciplinary codes and concluding that the adjudication rate increased since the CCSO installed a new Director of Inmate Discipline in late 2016, and that the adjudication rates for sexual misconduct was comparable to those of other offenses of similar severity). The attachments to Ex. 41 have not been filed due to confidentiality concerns. Should the Court like to review the attachments, the CCSO will happily provide them for in camera review.

[52] Curry Decl. ¶ 29 (discussing that in January 2016, the CCSO proposed Senate Bill 2220, which would have increased the penalties for engaging in indecent exposure in a custodial environment, and that the CCSO also attempted to change the Cook County Code of Ordinances to allow it to fine detainees who engage in public indecency acts).

D.     ***The CCSO has implemented measures to physically prevent detainees from engaging in sexual misconduct directed towards CCSO and County staff.***

Beginning in January 2016, the CCSO began handcuffing all inmates in courthouse lockups.[53] In March 2017, the CCSO began keeping detainees found administratively guilty of indecent exposure in the Courthouse in the bridge between the Jail and the Courthouse until their cases are called. The CCSO later expanded this measure to all detainees found administratively guilty of indecent exposure regardless of where the conduct occurred.[54]   The CCSO also began handcuffing all detainees behind the back during transport regardless of whether they had engaged in indecent exposure or masturbation and implemented restrictive jumpsuits for known offenders.[55]  In certain areas of the Jail, the CCSO also modified chuckholes in cell doors, installed window tints, and covered portions of the visitation/interview room windows with paper to reduce detainee's visibility into the rooms.[56]

## IV.     Detainee Sexual Misconduct Is Predominantly Perpetrated by Maximum Security Offenders Housed in Divisions 8, 9 and 10.

Although Plaintiffs attempt to justify their extremely broad class definition by contending that inmate sexual harassment occurs everywhere in the Jail, their own evidence, as well as the CCSO's data, confirms that the overwhelming majority of incidents were perpetrated by maximum security detainees housed in Divisions 8, 9, and 10 of the Jail.

The CCSO retained a statistical expert, Dr. Benjamin Wilner, to analyze reported incidents of indecent exposure, masturbation, and sexual harassment from January, 2015 through September, 2018 at both the Jail and the Courthouse.  With respect to the former, Dr. Wilner concluded that "reported indecent exposure-related incidents are not pervasive throughout [the

---

[53] The CCSO discontinued this measure due to objection from the Cook County Public Defender's Office and certain judges. Curry Decl. ¶ 19.
[54] Curry Decl. ¶ 17; Curry Dep. 138.
[55] Frasier report at 12, 21; Curry Decl. ¶ 11-15, 18.
[56] Frasier Report at 21-22.

Jail] and are primarily isolated with a certain portion of the inmate population as approximately three-quarters of these reported incidents that allegedly occurred in the [Jail] occurred in Divisions 8, 9, and 10." Wilner Report p. 13. Figure 6 of Dr. Wilner's report shows the average monthly number of reported incidents by the detainees' housing Division:



Dr. Wilner concluded that the data were, therefore, "inconsistent with Plaintiffs' claim that 'sexual harassment' occurs on a daily or near daily basis through the Jail." Wilner Report p. 14. Plaintiffs' own statistical expert, Dr. Kathleen Lundquist, purports to rebut Dr. Wilner's analysis by categorizing incidents by where they occurred rather than by where the offender is housed. Yet, her own representation of the location of incidents confirms that they are highly localized to Divisions 8, 9 and 10:





Figure 6 (Corrected)
Sex-Related Incidents by Male Inmates by Jail Location of Incident
January 2015 - September 2018, Monthly Averages

Lundquist report p. 10. And Dr. Lundquist takes the position that Divisions 3, 4, and 5 are completely irrelevant to this matter,[57] and excluded them from her chart, because they house female detainees – notwithstanding that Plaintiffs' proposed class includes all women who have worked in Divisions 3, 4, and 5 during the class period.

Plaintiffs' declarations likewise confirm that the conduct is localized. Notwithstanding vague boilerplate language that indecent exposure occurs "everywhere,"[58] to the extent declarations identify specific incidents by location, nearly all of them are alleged to have occurred in Divisions 9 or 10 or in bullpens where detainees are held during transport. By the CCSO's count, of the 143 declarants, only eight specifically state that incidents occurred in Division 1,

---

[57] See e.g., Ex. 42, Lundquist Report at p. 8 ¶ 18, p. 11 ¶ 20, Table 2, and Figure 2.
[58] See, e.g., Kimtrina McClelland Decl. ¶ 15 ("[I]t happens everywhere"); Yawfis Wilson Decl. ¶ 4 ("It's everywhere."); Belinda Sanders Decl. ¶ 8 ("[I]nmates are constantly masturbating everywhere you look."); Tamara Anderson Decl. ¶ 12 ("It is everywhere"). All references to Plaintiffs' declarations are to declarations filed under seal contained in Dkt. # 171-2.

eleven specifically identify Division 2, five identify Division 4, five identify Division 5, one identifies Division 3 (Annex), and none identify Division 3. Additionally, each of the COs whom Plaintiffs have designated as Class Representatives worked at some point in Divisions 8, 9 or 10. Many of these Plaintiffs report experiencing few, if any, incidents of inmate sexual harassment in other areas of the Jail where they have worked.[59]

Dr. Wilner's analysis shows that reported incidents of sexual misconduct in the Courthouse are relatively rare, with an average of only 5.7 reported indecent exposure related incidents per month in the Courthouse between January 2015 and November 2017.[60] More recently, the Courthouse typically experiences between 1 and 3 such incidents per month, inclusive of incidents where public defenders and other non-class members are victims.[61] The sexual misconduct incidents in the Courthouse generally do not occur on the Administrative Wing of Leighton, where there is only one courtroom.[62] Indeed, almost all of the sexual misconduct incidents that the Sheriff Deputy Plaintiffs experienced occurred in the Courtroom Wing of Leighton.[63] Additionally, the Deputies identify in their declarations a limited number of courtroom lockups where they recall specific incidents of indecent exposure and masturbation.[64] In short, the pattern

---

[59] *See, e.g.*, E. Altman Dep. 128:3-7 (no incidents in Div. 4); T. Burroughs Dep. 223:9-12 (unable to recall any incidents in Division 2); Ex. 43, K. Crawford-Alexander Dep. 7:22-8:2, 227:18-23, 267:22-268:8 (Plaintiff has not experienced incidents in the area she currently works (Receiving) or in the Kitchen); Ex. 44, D. Freeman Dep. 97:24-98:25, 102:14-21, 106:19-22 (Plaintiff never experienced indecent exposure in Divisions 2, 3, 4, or 5); D. Hobbs Dep. 108:13-16 (Plaintiff did not experience incidents in Division 8).

[60] Wilner Rept. Fig. 7.

[61] Wilner Rept. Fig. 7.

[62] Bellettiere Decl. ¶¶ 8, 14.

[63] S. Plasencia Dep. 68:18-23, 93:14-95:9, 103:20-104:4, 117:10-22, 121:24-122:13, 143:2-25, 147:8-14, 155:7-16, 158:5-13, 162:13-24, Dep. Ex. 120, 123, 127 (identifying incidents in the bridge area and lockups of courtroom 302, 402, 502, 600, and 602); E. Jones Dep. 88:18-24, 103:23-104:7, 111:22-112:4 (identifying incidents in the lockup of courtroom 307 and 308); Ex. 45, B. Ranney Dep. 75:2-76:20, 153:7-17, 177:8-14, 224:17-225:4, Dep. Ex. 159, 160, 162 (identifying incidents in the lockup of courtroom 700, on the bridge hallway while transporting a Division 9 detainee, in bullpen 4 of the CCDOC bridge (by a Division 10 detainee), and in courtroom 402's maximum security lockup).

[64] *See* Alicia Webster Decl. ¶ 4 (recalling incident in Courtroom 303 lockup); Jessica Correa Decl. ¶ 5 (recalling incident in Courtroom 302 lockup); Evette Trejo Decl. ¶ 5 (recalling incident in Courtroom 306 holding cell); Angelique Herrera Decl. ¶ 6 (recalling incident in Courtroom 202 lockup); Bridget Insley Decl. ¶ 4 (recalling incident in Courtroom 201); Kelly Shields Decl. ¶ 5 (recalling incident in Courtroom 402 lockup); Lynette Flowers Decl. ¶ 5

reflected in Plaintiffs' declarations, deposition testimony[65] and expert report is consistent with the

CCSO's data, which reflects that the majority of incidents were perpetrated by maximum security

detainees housed in Divisions 8, 9, and 10 and occurred either in those divisions of the Jail or in

the Courtroom Wing of Leighton where those detainees had pending criminal cases.

## V. Despite Policy, Some Putative Class Members Failed to Report Detainee Sexual Misconduct, Including Incidents Perpetrated Against Their Fellow Putative Class Members.

Plaintiffs' evidence also shows that many putative class members, including at least one

proposed Class Representative, failed to report alleged detainee sexual misconduct incidents which

now form the basis of their claims.[66] Indeed, Plaintiffs claim that those who have experienced

verbal harassment should be included in the class, but admit that most such incidents went

---

(recalling incident in courtroom 702 lockup); Laura Mlinarcik Decl. ¶ 1 (stating she observed male detainees exposing themselves and masturbating in courtroom 205, 302, 303, and 404); Jennifer Marszweski Decl. ¶ 5 (recalling incident in courtroom 101 lockup); Patrice Scott Decl. ¶¶ 1, 4, 5 (stating incidents happen in her courtroom lockup (courtroom 304) and when her bullpen is combined with courtroom 303's bullpen).

[65] *See, e.g.*, Ex. 46, S. Howard Dep. 78-80, 139:12-23, 156:10-23, 159-60, 166-67, 169-70, 190-91, 203-04, 231:4-20 (testifying that she experienced detainee sexual misconduct incidents in Divisions 8, 9 and 10 and on the bridge to Leighton); E. Altman Dep. 135:16-24, 147:2-18, 149:18-25, 154:2-9, 189-91, 213-14, 247-48 (testifying that she experienced detainees with their hands in their pants in Division 08 (RTU), "cat calling" in the tunnel to Leighton and sexual misconduct in Divisions 9 and 10); T. Burroughs Dep. 112:19-113:11, 143:18-144:8, 156:5-15, 184:10-18; 193:3-10, 223:9-12, 233:19-234:16, 248:4-17, 261:6-262:2, 262:24-4, Dep. Ex. 112 (testifying that she experienced detainee sexual misconduct in the hallway and Division 10, including in the dispensary hallway, dispensary, nursing clinic area and tiers and recalling no incidents of indecent exposure or masturbation in Division 2); K. Crawford-Alexander Dep. 65:10-20, 114:2-10, 142:23-144:25, 209:8-210:7, 228:9-25, 316:10-317:7, 331:9-332:3 (testifying that she experienced detainee sexual misconduct incidents in Division 9, on the bridge and in the tunnel and tunnel bullpens); D. Freeman Dep. 46:8-24; 48:7-16, 117:13-16, 139:7-19, 155:13-24, 174:2-13, 184:23-185:9 (testifying about incidents in Division 08/RTU, an incident in Receiving involving detainees housed in Division 9, incidents in Division 9, and incidents in Division 11); D. Hobbs Dep. 90:10-16, 95:22-96:2, 96:21-97:5, 131:9-14, 134:21-135:8, 144:2-12, 154:2-9, 160:23-161:6 and Dep. Ex. 116 (no incidents while assigned to Divisions 2 or 4, testifying about incidents in Div. 10); Ex. 47, S. Robinson Dep. 50-54, 83-84, 87-88, 90-91, 97:2-25, 105-07, 118:3-23, 120-21, 125-27, 135, 137-39, 141 (testifying that she experienced detainee sexual misconduct incidents in Divisions 3 (by female detainees), 4, 5 (verbal only) and 9 and on the bridge to Leighton).

[66] Alicia Webster Decl. ¶ 10 (filed "at least one"); Lynette Flowers Decl. ¶ 20 (wrote a "few write-ups"); Angelique Westmoreland Decl. ¶ 7 (identifying one Incident Report); Sandra Parker Decl. ¶ 9 ("only written a few"); Ayesha Brown Burge Decl. ¶ 9 (identifying one Incident Report); Kimtrina McClelland Decl. ¶ 13 (wrote three Incident Reports); Monique Brown Decl. ¶ 7 ("never written an incident report"); Asian Sanford Decl. ¶ 12 (never written a report); S. Howard Dep. 78:12-19 (Plaintiff unable to recall the number of times she did write up a detainee she observed masturbating); K. Crawford-Alexander 147:23-148:9 (Plaintiff did not write up an inmate for exposing himself through the chuckhole); T. Wilson Dep. 338:22-339:23 (Plaintiff has observed detainees not properly wearing green jumpsuits but has failed to write them up); B. Ranney 163:8-164:2.

15

unreported and undertake no analysis of where these utterances occurred or with what relative frequency.[67]

This conduct not only evidences that many putative class members did not avail themselves of all available remedial measures, but it also establishes that these individuals violated CCSO policies which require such incidents to be reported.[68]  In fact, at least one putative class member has not written up any detainees for exposure or masturbation, even though she describes it as a "regular occurrence," because "[i]t would just make my job harder."[69]  Similarly, other putative class members claim to not have time.[70]  Many Class Representatives and putative class members claim that their supervisors, including female supervisors within the putative class, failed to act to stop sexual harassment, discouraged reporting, and/or were indifferent to class member concerns.[71] For example, Plaintiff Crawford-Alexander testified that a female Sergeant (who, under Plaintiffs' definition would be part of the same putative class) failed to write up male detainees who exposed

---

[67] *See* Dkt. # 171 at 7 (Plaintiff's Memorandum in Support of Their Motion for Class Certification); *see also* Danielle Harms Decl. ¶ 6 (never reported comments); Kirsten Bain-Norris Decl. ¶ 13 (never reported comments); Cynthia Wilson Decl. ¶ 7 (never reported comments); B. Ranney Dep. 162:24-163:3.

[68] Miller Decl. ¶¶ 5-11, Ex. A-D; Bellettiere Decl. ¶¶ 5-6, Ex. A; Giunta Decl. ¶¶ 4-7, Ex. A-D; Martinez Decl. ¶¶ 4-7, Ex. A-D; Queen Decl. ¶¶ 4-7, Ex. A-D; Yoksoulian Decl. ¶¶ 4-7, Ex. A-D; Beachem Decl. ¶¶ 4-7, Ex. A-D.

[69] Tanisha Henderson Decl. ¶ 12.

[70] Sharon McHugh Decl. ¶ 8; Belinda Sanders Decl. ¶ 8; April Rowell-Robinson Decl. ¶ 7; Monique Brown Decl. ¶ 7.

[71] B. Ranney Dep. 28:24-29:5, 240:21-24 (Class representative with at least one female Sergeant has never had a Lieutenant or Sergeant intervene to stop detainee sexual harassment); T. Wilson Dep. 27:22-28:5, 95:17-96:6, 251, 294:18-295:8 (testifying that a female Sergeant instructed her, among others, not to use reasonable force to stop detainees from masturbating, as well as that she has informed a female Sergeant on "multiple, multiple occasions" about detainee masturbation and Sergeant has not taken action to protect her or stop the conduct); D. Hobbs Dep. 189:16-190:6 (Class representative does not believe Lieutenants or Sergeants are doing enough to prevent detainees from exposing themselves); E. Jones Dep. 72:3-73:6, 134:23-135:3 (testifying that she reported indecent and exposure to supervisors so often "they didn't want to be bothered with it," and due to lack of manpower "they really don't give a damn" and that she believes that Lieutenants in the courthouse "don't … really even care. They just doing time like a prisoner too"); S. Robinson Dep. 138; S. Howard Dep. 129-130; *see also* Lisa Yates Decl. ¶ 9; Jessica Correa Decl. ¶ 11; Sheleda Groves Decl. ¶ 12; Gloria Ellis Decl. ¶ 14; Patricia Dianne Green Decl. ¶ 10; Shonnita Lanier Decl. ¶ 10; Anntoinettea Montgomery Decl. ¶ 10; Ronica Williams Decl. ¶ 15; Lakisha Macklin Decl. ¶ 9; Cassandra Shelton Decl. ¶ 15; Terri Merriweather Decl. ¶ 11; Monique Brown Decl. ¶ 7; Ricquia Thomas-Carter Decl. ¶ 12; Erin Delegan Decl. ¶ 15; Angela Maniak Decl. ¶ 21; Cara Alger Decl. ¶ 7; Beth Connors Decl. ¶ 4; Ida Lewis Decl. ¶ 16; Alexis Taylor Decl. ¶ 11; Cynthia Wilson Decl. ¶ 6; Yawfis Wilson Decl. ¶ 13; Asian Sanford Decl. ¶ 12; Gracie Garner Decl. ¶ 6; Kimtrina McClelland Decl. ¶ 13; Latisha Statham Decl. ¶ 6.

themselves to her because the Sergeant "said she's used to it."[72] Similarly, Plaintiff Altman testified that a female Lieutenant (who would also be a putative class member) classified her report of a detainee masturbating as "frivolous."[73] However, others admit that their supervisors encourage report filing and/or accept reports.[74] In addition, civilians in the Jail state that sworn members (including those in the putative class) fail to take reports or take steps to stop misconduct as policy requires.[75] In sum, Plaintiffs' own evidence displays that putative class members and supervisory staff (some of whom are also putative class members) responded differently from division to division, supervisor to supervisor and incident to incident.

## <u>ARGUMENT</u>

Plaintiffs' proposed class consists of "[a]ll women who have been employed by the CCSO at the Jail, or as Court Services deputies at the Leighton Courthouse, or by the County in positions with Cermak Health Services, at any time since April 23, 2015, except women who, during that period, have held the positions identified in Exhibit A to [the] Complaint." Dkt. # 171 at 2.

Plaintiffs' proposed class cannot survive the rigorous analysis required by Rule 23. The variances among the putative class members and their assignments and work areas described above render the proposed class uncertifiable. Individualized issues that permeate the proposed class include: (1) whether each individual had regular detainee contact during the relevant time period

---

[72] K. Crawford-Alexander Dep. 319:20-320:2.

[73] E. Altman Dep. 333:8-334:6.

[74] S. Plasencia Dep. 120:11-21, 188:18-189:5; E. Altman Dep. 152:13-16, 196:16-21, 217:24-218:11; T. Wilson Dep. 143:16-24, 155:25-156:5, 159:5-11, 170:24-171:2, 184:5-7, 194:17-22, 203:11-18, 213:20-22, 221:20-22, 227:15-21, 231:18-24, 235:19-23, 239:2-9, 240:14-19, 243:14-21, 251:10-13; Hobbs Dep. 134:14-18, 137:18-20, 150:9-14, 157:12-22; S. Robinson Dep. 146:5-148:3; B. Ranney Dep. 164:3-165:7.

[75] *See, e.g.*, T. Burroughs Dep. 101:9-12 (class representative Correctional Medical Technician testified that "officers don't always take my report or respond to me when I ask them to"); Daarina Muhammad Decl. ¶ 12 (nurse asked officers on duty to report misconduct, but never received follow up); Catherine Esquival Decl. ¶ 7 (Correctional Rehabilitation Worker believes officers are reluctant to address misconduct); Beverly Taylor Decl. ¶ 9 (Patient Care Attendant felt "completely unsupported by the officers"); Vickie Neylon Decl. ¶ 5 (officers would not write up detainees who exposed themselves out of sight of the officers); Rosette Hunter Decl. ¶ 8 (officers tell her "there's nothing we can do," or "you know how these guys are").

such that they could have experienced severe and pervasive sexual harassment; (2) if they did have regular detainee contact, whether this contact was with female or male inmates; (3) if male inmates, whether the inmates were minimum, medium or maximum security inmates, as the record reflects that maximum security inmates in Divisions 8, 9 and 10 are more likely to engage in sexually harassing behavior; (4) whether each individual who had regular detainee contact during the relevant time period experienced a subjectively and objectively hostile work environment, including whether they experienced verbal harassment alone, viewed a detainee's penis when they were walking by a cell, or experienced indecent exposure and masturbation that was directed at them; (5) whether each individual who was subjected to a hostile work environment was so subjected due to, rather than in spite of, the CCSO's efforts to prevent the conduct; (6) whether any of the employees who fulfill the prior factors are accused of hostile work environment wrongdoing such that they have conflicts with other class members; (7) whether any such employee is subject to individualized defenses, including failure to report detainee misconduct; and, (8) whether any such employee can demonstrate cognizable damages. These questions are not subject to common proof, and individual issues predominate Plaintiffs' claims.

## I.    <u>Legal Standard.</u>

"To be entitled to class certification, a plaintiff must satisfy each requirement of Rule 23(a)—numerosity, commonality, typicality, and adequacy of representation—as well as one of the subsections of Rule 23(b)." *Starr v. Chicago Cut Steakhouse, LLC*, 75 F.Supp.3d 859, 870 (N.D. Ill. 2014) citing *Messner v. Northshore Univ. HealthSystem.*, 669 F.3d 802, 811 (7th Cir. 2012). These requirements "effectively limit the class claims to those fairly encompassed by the named plaintiff[s'] claims." *Wal-Mart Stores, Inc. v. Dukes,* 131 S.Ct. 2541, 2550 (2011) (internal citations omitted).

Because they seek certification under Rule 23(b)(3), Plaintiffs must also establish that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Fed.R.Civ.P. 23(b)(3).

In deciding whether Plaintiffs have met their burden, the court must engage in a "rigorous analysis" of the proposed class that goes beyond the pleadings to understand the claims, defenses, relevant facts and substantive law. *Comcast Corp. v. Behrend*, 133 S.Ct. 1426, 1428 (2013) (quotation omitted). "Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate… that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Dukes*, 131 S.Ct. at 2551. Factual determinations necessary for Rule 23 findings must be made by a preponderance of the evidence. *Messner v. NorthShore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012).

## II.    Plaintiffs Fail to Satisfy Rule 23(a).

To meet their burden under Rule 23(a), Plaintiffs must demonstrate (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. *Siegel v. Shell Oil Co.*, 612 F.3d 932, 935 (7th Cir. 2010).

### A.    *Plaintiffs Lack Commonality as to their Hostile Work Environment Claim.*

The evidence does not allow any common finding of whether over 2,000 women employed in various areas of the Courthouse, Jail, and Cermak, each with their own supervision, structure, design, detainee population and amount of detainee contact, all experienced severe and pervasive sexual harassment of an objectively and subjectively hostile nature. As Plaintiffs rely on allegedly common policies, or lack thereof, as the common issue necessary to litigate their individualized claims, they must provide "significant proof" that Defendants operated under a general policy of discrimination, which manifested in the same general fashion for all putative class members.

19

*Dukes*, 131 S.Ct. at 2553.  In addition, commonality will only exist where Plaintiffs show "that the class members have suffered the same injury." *Bolden v. Walsh Const. Co.*, 688 F.3d 893, 896 (7th Cir. 2012) (internal quotation marks omitted).  Put another way, Plaintiffs "must show that 'the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members.'" *McCaster v. Darden Restaurants*, 845 F.3d 794, 800 (7th Cir. 2017) (citation omitted).

Plaintiffs fail to do so.  Plaintiffs claim that commonality exists because the CCSO is purportedly governed by central policies, and all putative class members have allegedly experienced at least ambient or verbal harassment by detained.  However, the only common policies in the record are the CCSO's policies forbidding, and requiring reporting of, sexual harassment.  Moreover, working conditions, including exposure to detainee sexual misconduct, differ materially across the Jail and Courthouse as do putative class members' responses to such misconduct.  As such, putative class members' experiences with detainee sexual harassment and resulting injuries, if any, differ greatly and preclude satisfaction of Rule 23's commonality elements.

      i.    <u>Plaintiffs Present No Common Evidence to Support Their Hostile Work Environment Claim.</u>

With regards to Plaintiffs' Title VII hostile work environment claim, they have not presented "significant proof" of the common question of whether a hostile work environment existed for women in the Jail, Courthouse and Cermak.  To establish a hostile work environment, a plaintiff must show: "(1) that the work environment was both subjectively and objectively offensive; (2) that the harassment was based on membership in a protected class; (3) that the conduct was severe or pervasive; and (4) that there is a basis for employer liability." *Alexander v. Casino Queen, Inc.,* 739 F.3d 972, 982 (7th Cir. 2014) (internal quotation marks omitted).  The factors that may be considered "in deciding whether the environment is objectively hostile include

20

"the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Alexander*, 739 F.3d at 982. In other words, the analysis is fact specific and individualized.

Although "significant proof" of "hostile working conditions at a *single* place of employment" may be sufficient to establish commonality for purposes of a hostile work environment claim,[76] when there is variation in the working conditions across different sites, common questions are not presented. *Bolden*, 688 F.3d at 896. Commonality does not exist where the evidence fails to show "a common pattern or practice, or an equally egregious level, of sexual harassment among the various areas of the [facilities where putative class members work], among the employees supervised by different supervisors and working with different co-workers, and among the employees on different shifts." *Elkins v. Am. Showa, Inc.*, 219 F.R.D. 414, 424 (S.D.

---

[76] *Brand v. Comcast Corp., Inc.*, 302 F.R.D. 201, 217-20 (N.D. Ill.) (Kennelly, J.) (citations omitted, emphasis added). Plaintiffs rely in large part on this Court's opinion in *Brand* to support their commonality arguments. *Brand*, however, is distinguishable. There, this Court found that commonality was met for the hostile work environment class because there was significant proof that an objectively and subjectively racially hostile work environment existed throughout the single Comcast facility. *Id.* at 217-21. As Plaintiffs note, the "significant proof" came, in part, from testimony from 12% (44/350) of the class that they had experienced racially hostile conduct and conditions in the single facility. *Id.* at 217, 219. Here, Plaintiffs have submitted testimony from approximately 7% (153/2,000) of the class that they experienced varying degrees of detainee "sexual harassment" predominantly in Divisions 8, 9 and 10 of the Jail. *See* Facts § V; Dkt # 171 at 25 (discussing that "[t]he Class contains almost 2,000 members). Notwithstanding that the majority of the evidence offered comes from a low percentage of putative class members who predominantly experienced specific instances of detainee "sexual harassment" in select areas of the Jail, Defendants read *Brand*'s commonality determination to also turn on the fact that the use of *racial epithets by supervisors* was the hostile conduct at issue. *Id.* at 218-19. As the Court discussed, racial epithets, and certainly those spoken by supervisors, are on the "more severe" end of hostile conduct, such that objective and subjective hostility are met. *Id.* at 218-19. In contrast, here, many of the declarations submitted by Plaintiffs speak of conduct *by detainees* which may not be actionable in its own right. However, "[a] class action, no less than traditional joinder (of which it is a species), merely enables a federal court to adjudicate claims of multiple parties at once, instead of in separate suits"; it does not "change plaintiffs' separate entitlements to relief." *Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 408 (2010). Therefore, it is impermissible to allow a class action to proceed where, as here, not all of the putative class members could bring a freestanding suit. *Halperin v. Int'l Web Servs.*, LLC, 70 F.Supp.3d 893, 900 (N.D. Ill. 2014) (discussing that where putative class members' claims may only be actionable in aggregation, to allow such claims to proceed "would effectively allow a civil procedural device, Federal Rule of Civil Procedure 23, to "abridge, modify, or enlarge a[ ] substantive right").

Ohio 2002); *see also Bolden*, 688 F.3d at 896 ("[W]hen multiple managers exercise independent discretion, conditions at different [ ] sites [] do not present a common question."). Additionally, varying or ineffective enforcement of policies or rules cannot be the basis for class certification. *Bolden*, 688 F.3d at 896; *see also Elder v. Comcast Corp.*, 2015 WL 3475968 at *10 (N.D. Ill. June 1, 2015) ("In light of the variation in instructions from more than 250 supervisors, and the variation in the frequency, nature, and duration of the lunch break interruptions, Plaintiffs have not established by a preponderance of the evidence that any common questions central to their meal break claim could be resolved on a classwide basis.").

In *Bolden*, the Seventh Circuit found that because employment policies allowed managers to exercise discretion in coping with offensive language or bigoted conduct, conditions at different worksites did not present a common question. *Bolden* 688 F.3d at 998. This was so, the court found, because "some managers will take advantage of the opportunity to discriminate while others won't." *Id.* at 897 citing *Dukes*, 131 S.Ct. at 2554. Therefore, the class failed to meet Rule 23(a)(2) and was also not manageable because "[i]t would require at least one trial per site (to ascertain site–specific conditions) and perhaps one trial per week or month per site (because construction crews are constantly changing, and workers on site while concrete was being poured may have encountered working conditions different from those that prevailed when cabinet work was being installed)." *Id.* at 898-99.

Plaintiffs ignore that, like in *Bolden*, CCSO policies allow staff (including nonsupervisory, supervisory and administrative hearing personnel) discretion in how to handle detainees' sexually harassing conduct. Though CCSO policy requires staff to report inmate misconduct, including sexual harassment, staff are likewise required to use their professional judgment in how to immediately address the detainee's actions. For example, staff may order a detainee to return to

his cell if he is masturbating in the day room, may immediately move a detainee to another tier if he masturbated at a staff member on the tier on which he was housed or may elect to use OC (pepper) spray on a detainee if he refuses repeated instructions to stop masturbating.[77]

Plaintiffs also ignore that, like themselves, supervisory staff also frequently moved throughout the facility, changed divisions and changed from shift to shift.[78] Instead, Plaintiffs attempt to distinguish *Bolden* because (they claim) the CCSO is centrally organized, because all Divisions and departments experienced sexual harassment, because women work and move through the Jail encountering detainees in various assignments, and because class members all experienced "ambient harassment." Dkt. # 171 at 28.[79] Plaintiffs also allege that the CCSO's "fail[ure] to adopt reasonable policies to address the harassment by male detainees" is a common policy or practice that would support class-wide liability. *Id.* at 35. But, as in *Bolden*, the only "common" policies are those that forbid the conduct of which Plaintiffs complain.[80] Moreover, the absence of a policy would only suggest that the practices for addressing detainee harassment fall within supervisors' discretion and vary from department to department. *See e.g. Camilotes v. Resurrection Health Care Corp.*, 286 F.R.D. 339, 348, n.5 (N.D. Ill. 2012) (finding that plaintiffs'

---

[77] Deference to jail officials in managing entire complexes down to individual detainees is the benchmark of judicial review of jail management. The Supreme Court acknowledged such in *Bell v. Wolfish*, 441 U.S. 520 (1979), and it holds true here. "[T]he problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions. Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.* at 547 (citations omitted). The varied responses by CCSO staff to detainee misconduct throughout the Jail, Courthouse and Cermak would require individualized review to determine if Defendants' conduct during the situation was actionable in light of the deference required to run a jail.

[78] Alta Johnson Decl. ¶ 1; Toni Calvin Decl. ¶ 1; Lashon Crump Decl. ¶ 1; Tunesia Mitchell Decl. ¶ 1; Hazel Derden Decl. ¶ 1; Kendra Black Decl. ¶1; Elaine Scott Decl. ¶ 9 (has had various supervisors because their assignments fluctuate).

[79] Plaintiffs' contention that all women experienced "ambient harassment" is contradicted by their own expert's deposition testimony. *See* Ex. 48, Fitzgerald Dep. 130:22-132:14 (admitting that some employees may not have experienced "ambient harassment").

[80] CCSO_Howard_0009677-83 (DOC Policy 315 4/14/17); CCSO_Howard_0054606-11 (CSD Policy 315 6/1/17); CCSO_Howard_0078544-47 (Inmate Disciplinary Code December 2013); CCSO_Howard_0078551-56 (Inmate Disciplinary Code November 2017); CCSO_Howard_0281248-51 (Inmate Handbook July 2017).

contention that they were not given guidance by their employer on how to deal with cancelation of automatic meal breaks suggested only that practices would vary from department to department and fell within the supervisors' discretion).

The record supports that such discretion exists. At the Jail, each Division has its own Superintendent, who oversees a unique detainee population of a particular security classification and has authority to determine how to respond to detainee misconduct in his or her division given the unique detainee population. Likewise, each tier and shift has its own supervisors charged with carrying out the disciplinary code.[81] The Courthouse, in turn, has a different Superintendent from DOC.[82] Each floor and assignment at the Courthouse is overseen by different supervisors.[83] Authority to stop and prevent the misconduct is, of necessity, vested in each Division's nonsupervisory and supervisory personnel.[84] Moreover, the record also reflects that the vast majority of inmate sexual misconduct incidents are perpetrated by detainees from Divisions 8, 9 and 10 of the Jail, and, as such, the majority of women who are reporting or testifying that they experienced such conduct also worked in these Divisions or in the courtrooms that hear the cases of detainees from Divisions 8, 9 and 10.[85]

In sum, the evidence, including class members' own declarations, simply does not support Plaintiffs' attempt to turn the various separate Divisions, and indeed buildings that comprise the "Jail" campus, and the adjacent Courthouse, into a <u>uniform work experience</u>. Rather, the evidence

---

[81] Miller Decl. ¶ 17.
[82] Bellettiere ¶ 10; CCSO_Howard_0271060.
[83] Bellettiere ¶ 10; E. Jones Dep. 55:5-11
[84] See FNs 25-35, supra.
[85] Wilner Rept. Fig. 5 and 6; D. Hobbs Dep. 96:13-23, 106:17-23, 108:17-21 (assigned to Division 10 and RTU); K. Crawford-Alexander Dep. 12:10-21 (assigned to Division 9 for eight and a half years with a short assignment to Division 10); T. Burroughs 48:13-20 (assigned work area in Division 10); Ranney Dep. 50:22-51:20, 187:19-188:6 (assigned to courtroom 700, which is also a felony courtroom and testifying that she interacts with many detainees from Division 9); S. Plasencia Dep. 50:22-51:20, 132:24-133:13 (assigned to courtroom 602, which is a felony courtroom, and testifying that Division 9 detainees were engaging in sexual misconduct); E. Jones Dep. 40:4-7 (has been assigned to courtroom 504, which hears felony cases).

shows that putative class members' experiences with detainee sexual misconduct vary widely, with the offensive conduct localized to certain parts of the detainee population.[86] This is particularly true with respect to the Courthouse, where the overall frequency of reported inmate sexual misconduct is relatively low and is confined to the Courtroom Wing of the Building.[87]

As a result, to evaluate Plaintiffs' claims, the Court would need building-specific, perhaps division-specific, courtroom-specific, tier-specific, shift-specific, assignment-specific or plaintiff-specific, details. *Cf. Bolden*, 688 F.3d at 896; *see also McCaster v. Darden Restaurants, Inc.*, 845 F.3d 794 (7th Cir. 2017) (employees failed to satisfy commonality where they did not identify any unlawful conduct by employer that spanned the entire class and caused all class members to suffer the same injury, and thus, resolving proposed class members' claims turned entirely on facts specific to each member's claim); *Carlson v. C.H. Robinson Worldwide, Inc.*, 2005 WL 758602 at * 13 (D. Minn. Mar. 31, 2005) (holding that anecdotal evidence, including the plaintiffs' testimony that they only experienced sexual harassment in certain branches failed to demonstrate the existence of a centralized policy and practice of tolerating or promoting sexual harassment and whether a hostile work environment existed across all areas included in the class).

In short, Plaintiffs' failure to provide significant proof of a common policy or practice giving rise to a hostile work environment precludes the Rule 23(a) requirements from being met. *See Dukes*, 131 S.Ct. at 2548, 2551-53 (commonality absent where Wal-Mart had an official policy against discrimination, but plaintiffs alleged that a "strong and uniform corporate culture" permitting discrimination against women existed); *cf with Chicago Teachers Union, Local No. 1 v. Bd. of Educ. of City of Chicago*, 797 F.3d 426, 437 (7th Cir. 2015) (finding class certification

---

[86] *See* Facts § IV, *supra.*
[87] Wilner Rept. Fig. 7; *see also* FNs 60-64, *supra.*

appropriate "where there is a uniform policy or process applied to all," and distinguishing *Bolden* where the class encompassed varying working conditions and amount, if any, of discriminatory practices across various sites and superintendents who had discretion to address offensive incidents that occurred on their site).

### ii.    Alleged Verbal Harassment Does Not Supply Commonality.

Plaintiffs also assert that all putative class members have been exposed to verbal harassment and that this is a basis for certification. Yet, context is critical to determining hostility. *Yuknis v. First Student, Inc.*, 481 F.3d 552, 555 (7th Cir. 2007); *see also Brand,* 302 F.R.D. at 218 ("A court examining such a claim must "look to all the circumstances" in a particular workplace") (citation omitted). "Prisoners, by definition, have breached prevailing societal norms in fundamentally corrosive ways. By choosing to work in a prison, corrections personnel have acknowledged and accepted the probability that they will face inappropriate and socially deviant behavior." *Rudolph, et. al v. Dept. of Corrections, et al.*, Case No. 5:06-cv-56-RS, Dkt. #211 at 10 (N.D. Fl. Nov. 9, 2006) citing *Slayton v. Ohio Dep't of Youth Servs.*, 206 F.3d 669, 677 (6th Cir. 2000) (citations omitted). Even in non-custodial environments, offhand comments frequently do not rise to the level of actionable harassment. *Adusumilli v. City of Chicago*, 164 F.3d 353, 361 (7th Cir. 1998).[88]

To that end, Plaintiffs fail to provide "significant proof" that detainee gender-specific verbal harassment altered the conditions of employment throughout the putative class. According

---

[88] *See also Moser v. Indiana Dep't of Corr.*, 406 F.3d 895, 902 (7th Cir. 2005) (commenting on plaintiff's "tits," legs, "boy's anatomy" and his penis size, saying that a female co-worker "just needed a good f* * *," speaking down to plaintiff, telling other male employees to watch out because she liked good-looking men; commenting on female job applicants' physical appearance; using profanity; and commenting that a female co-worker was running a whorehouse); *Patt v. Family Health Sys., Inc.*, 280 F.3d 749, 754 (7th Cir. 2002) (eight gender-based comments did not constitute harassment).

to Plaintiffs' motion and declarations, such verbal harassment is seldom even reported.[89] While Plaintiffs supply a variety of disgusting detainee language, they generally do not provide specific evidence of where, when and how frequently the language was heard.

Additionally, while Plaintiffs appear to assume that the vulgar language they report is evidence of gender hostility, an individual inquiry would be necessary to determine whether this was so. *See Oncale v. Sundowner Offshore Services, Inc.*, 523 US 75, 80 (1998) ("We have never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotation."); *Brand*, 302 F.R.D. at 218 (recognizing that "all the circumstances" in a particular workplace" and "context" are critical in assessing hostile work environment claims). Given the context of working in a correctional facility, it cannot be presumed to be sexual harassment every time a detainee uses the word "bitch" or "ass" in front of or to a female employee, or even tells her "suck my dick" in response to her ordering him back into his cell. Notably, Plaintiffs do not assert that male correctional officers are not subjected to similar language from detainees. The CCSO's expert, Margo Frasier, opines that it is not unusual in correctional environments for male inmates to "call male staff members derogatory names and make threats which have a sexual overtone; including some of the same names and threats directed towards female staff."[90] And, in fact, Plaintiffs' testimony confirms that detainees direct vulgar language and threats towards *both* male and female staff.[91]

---

[89] *See* Dkt. # 171 at 7; *see also* Danielle Harms Decl. ¶ 6 (never reported comments); Kirsten Bain-Norris Decl. ¶ 13 (never reported comments); Cynthia Wilson Decl. ¶ 7 (never reported comments); B. Ranney Dep. 162:24-163:3.
[90] Frasier Report at 6.
[91] *See e.g.*, S. Howard Dep. 237:21-23 (has seen detainees threaten male officers); E. Altman Dep. 281:15-20, 283:16-23 (aware of male officers threatened with physical violence, "sworn at," and "cussed out"); T. Wilson 254:8-14, 256:12-16 (aware of male officers physically threatened by detainees; detainees swearing at male officers happens "all the time"); D. Hobbs Dep. 182:12-16 (aware of male CCSO employees being physically threatened).

iii.     Alleged Ambient Harassment Does Not Supply Commonality.

"Second-hand" harassment alone is unlikely to be actionable. *Moser*, 406 F.3d at 902 citing *McKenzie v. Milwaukee County,* 381 F.3d 619, 624 (7th Cir. 2004); *see also Turner v. Honeywell, Micro Switch Div.*, 54 F.App'x 236, 239 (7th Cir. 2002) (second hand reports of racial harassment were insufficient to support harassment claim).   "The American workplace would be a seething cauldron if workers could with impunity pepper their employer and eventually the EEOC and the courts with complaints of being offended by remarks and behaviors unrelated to the complainant except for h[er] having overheard, or heard of, them." *Yuknis*, 481 F.3d at 555.  Second-hand harassment is even less likely to be actionable in a correctional environment, as context is essential to evaluate gender hostility. *Oncale*, 523 US at 80; *Brand*, 302 F.R.D. at 218.

Plaintiffs contend, premised on the expert report of Dr. Louise Fitzgerald, that all class members have experienced "ambient harassment" and gender-specific abusive language. Dkt. # 171 at 13-15, 28, 30.  However, Dr. Fitzgerald admitted in her deposition that not all putative class members have necessarily experienced "ambient harassment."[92]  Moreover, the CCSO has moved to exclude Dr. Fitzgerald's report, but even if her speculation that all female employees experience "ambient" harassment were admissible,[93] and even if all class members experienced "ambient" harassment by detainees, this would not provide significant proof of a hostile work environment for all putative class members given the correctional environment and perpetrator population at issue.

---

[92] Fitzgerald Dep. 130:22-132:14.
[93] *See* contemporaneously filed *Daubert* motion regarding Dr. Fitzgerald.

### B. *Plaintiffs Present No Common Evidence to Support their Equal Protection and Illinois Civil Rights Act Claims.*

Plaintiffs' commonality argument focuses solely on the purported common evidence that they contend supports their hostile work environment claim. Dkt. #171 at 26-32. Plaintiffs offer no common evidence, much less significant proof, which would support their Equal Protection and ICRA claims. Plaintiffs have set forth no evidence that *Defendants* operated under a general policy that intended to discriminate towards women, as is necessary for these claims to be viable. Plaintiffs focus instead on the detainees, contending that their sexually harassing conduct was motivated by putative class members' gender. Dkt. #171 at 28-29. However, whether the detainees' conduct was motivated by Plaintiffs' gender is irrelevant; it is the Defendants' common conduct or practice that is at issue. *McCaster*, 845 F.3d at 800; *Nabozny v. Podlesny*, 92 F.3d 446, 453-54 (7th Cir. 1996) (discussing that equal protection claims require the intention to treat a group differently for the purpose of causing its adverse effects on an identifiable group); 740 ILCS 23/5 (prohibiting governmental entities from discriminating on account of gender).

Further, Plaintiffs' contention that the CCSO's sexual harassment policies, procedures, training and remedial measures aimed at combatting detainee indecent exposure and masturbation were inadequate simply does not amount to significant proof of gender discrimination. Indeed, the record reflects quite the opposite. The CCSO's efforts to combat detainee indecent exposure-related incidents included numerous policy and practice changes during the class period and resulted in reported incidents of sexual misconduct being reduced at a greater rate than many other forms of detainee misconduct which did not specifically target female victims.[94] In sum, because Plaintiffs have proffered no common significant proof related to their Equal Protection and ICRA claims, class certification on these claims should be denied.

---

[94] Wilner Rept. at 9-11.

### C. *Plaintiffs Lack Typicality.*

To satisfy Rule 23(a)(3), Plaintiffs must show that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Typicality is not shown when plaintiffs and putative class members work in different areas or departments of a facility, have different supervisors and "[t]heir claims arise out of differing events and conduct within the particular departments in which they work." *Goodwin v. Conagra Poultry Co.,* No. 03–cv–1187, 2007 WL 1434905, at *14 (W.D.Ark. May 15, 2007); *see also Sandoval v. City of Chicago*, No. CIV.A.07 C 2835, 2007 WL 3087136, at *6 (N.D. Ill. Oct. 18, 2007) (typicality for class discrimination claims not met given "the great potential variations for class members' claims" where putative class included individuals who worked in different City departments); *Allen v. Chicago Transit Auth.*, No. 99 C 7614, 2000 WL 1207408, at *10 (N.D. Ill. July 31, 2000) (similar holding). Indeed, in *Brand*, this Court noted that, the fact that the plaintiffs (and all putative class members) worked in *the same facility*, thus exposing them to the same hostile conditions, was important to its determination that typicality was met. *Brand,* 302 F.R.D. at 222.

This is so because Plaintiffs' claims must "have the same essential characteristics as the claims of the class at large." *Retired Chi. Police Ass'n v. City of Chi.*, 7 F.3d 584, 597 (7th Cir. 1993) (citation omitted). Typicality, therefore, is not satisfied where "a named plaintiff who proved h[er] own claim would not necessarily have proved anybody else's claim." *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 399 (6th Cir. 1998) citing *Retired Chi. Police Ass'n*, 7 F.3d at 597; *see also Allen*, No. 99 C 7614, 2000 WL 1207408, at *10 (N.D. Ill. July 31, 2000) ("If the named plaintiffs' claims are too individualized, such that they do not arise from the same event, practice or course of conduct that gives rise to the claims of the other class member, typicality will not be found.") (citation omitted).

While Plaintiffs and their fellow declarants have worked in various locations in the Jail and Courthouse, and for various supervisors, during the class period, the vast majority of their specific experiences with detainee sexual harassment involved maximum security detainees from Divisions 8, 9, and 10.[95] Each of the Plaintiffs have worked either in these divisions or in the Courtroom Wing of Leighton where these detainees have their criminal cases heard and experienced the majority of detainee sexual misconduct there. It follows that Plaintiffs' claims will not be typical of those female employees who have no detainee contact or who work elsewhere in the Jail, Courthouse or Cermak, but who have never worked in Divisions 8, 9 and 10 or had no contact with detainees assigned to Divisions 8, 9, and 10.

Furthermore, Plaintiffs' experiences are not typical or representative of the women who they allege have suffered "ambient" harassment. Plaintiffs each claim to have personally experienced direct incidents of detainee sexual harassment. As such, if the Plaintiffs proved their own hostile work environment claims, it cannot be assumed that females who had entirely different, indirect harassment experiences would succeed in establishing their own. *See Turner*, 54 F.App'x at 239; *Moser*, 406 F.3d at 902 (citation omitted).

More generally, given Plaintiffs' claims and evidence, a class representative who proved her own claim would not necessarily prove anyone else's. Other class members may have experienced isolated, non-actionable harassing remarks from detainees, or they may have had no detainee contact at all. In sum, "the conduct complained of is too divergent and of such widely variant severity and duration to allow the Court to attribute a collective nature to it" and find the typicality requirement satisfied. *Elkins*, 219 F.R.D. at 425; *see also Kress v. CCA of Tennessee*, 694 F.3d 890, 893 (7th Cir. 2012) (district court did not abuse its discretion in determining named

---

[95] *See* Facts § IV, *supra*.

31

plaintiffs were not typical of a class of "any and all persons" confined in a prison where individual inquiry was necessary to determine whether prison's policy may have negatively impacted every class member); *Wrightsell v. Sheriff of Cook Cty.,* 8 C 5451, 2009 WL 482370 at *3 (N.D. Ill 2009) (typicality lacking because resolution of the claims would require a case-by-case analysis of each class members' unique situation).

### D. *Plaintiffs are Inadequate Representatives.*

The conflicts of interest amongst putative class members who are supervisory and non-supervisory staff, and between sworn and civilian class members, render the class representatives inadequate. Adequacy of representation will be undermined by conflicts of interest amongst the class as well as named plaintiffs being subject to a defense that would not defeat unnamed class members claims.[96] *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 625 (1997). In fact, conflicts of interest between class representatives and putative class members is an independent ground for denial of class certification. *Randall v. Rolls-Royce Corp.*, 637 F.3d 818, 824 (7th Cir. 2011) (citations omitted); *see also Riffey v. Rauner*, 910 F.3d 314, 319 (7th Cir. 2018) (suggesting that "disharmony within the class" is a basis for denying class certification).

Illinois Rule of Professional Conduct 1.7 expressly prohibits undertaking a representation of one client that is "directly adverse to another client," and therefore, representation will be found inadequate where the putative class includes those who allegedly participated in the wrongful conduct. *Van v. Ford Motors*, 2018 WL 4635649, *6 (N.D. Ill. Sept. 27, 2018) (citations omitted); *see also Elkins v. Am. Showa, Inc.*, 219 F.R.D. 414, 423 (S.D. Ohio 2002) (discussing the

---

[96] In addition to the conflicts arguments discussed herein, Denise Hobbs is also an inadequate class representative because her testimony revealed that she did not experience any actionable detainee sexual harassment during the relevant time period. D. Hobbs Dep. 114:5-8 (filed EEOC Charge on January 27, 2016); 125:24-126:3 (does not recall any incidents in 2015 calendar year). Thus, Hobbs claims would be subject to a defense that other class members' claims may not be, thereby rendering her inadequate.

conflicting interest between supervisory and non-supervisory personnel in a putative class). Accordingly, "it is generally true that supervisory and nonsupervisory employees should not be placed in the same class." [97] *Latonya Lee v. The Children's Place Retail Stores, Inc.*, 2014 WL 5100608 at *3 (N.D. Ill. Oct. 8, 2014) quoting *Sample v. Aldi,* No. 93 C 3094, 1994 WL 48780, at *4 (N.D. Ill. Feb. 15, 1994); *see also Ellerd v. Cnty. of Los Angeles,* No. CV 08–4289 CAS (FFMx), 2009 WL 982077, at *5 (C.D.Cal. Apr.9, 2009) (refusing to certify proposed class of social workers and their supervisors because an inherent conflict existed between the parties where the social workers would have to prove that their supervisors violated federal law by telling the social workers not to record their overtime); *White v. Osmose, Inc. .,* 204 F.Supp.2d 1309, 1314– 1315 (M.D.Ala. 2002) (refusing to certify proposed class because foremen and crewmen had dissimilar job duties and there was an inherent conflict between them because foremen were responsible for reporting the correct number of hours worked by crewmen); *Mateo v. V.F. Corp.,* No. C 08–05313 CW, 2009 WL 3561539, at *5 (N.D.Cal. Oct. 27, 2009) (denying certification under the FLSA because the putative class included the plaintiff and those she supervised, and the defendant's defense that the plaintiff worked employees off-the-clock during their breaks in violation of the defendant's policy brought into question the adequacy of the named plaintiff's representation) quoting *J.H. Cohn & Co. v. Am. Appraisal Assocs., Inc.,* 628 F.2d 994, 999 (7th Cir.1980); *Wright v. Family Dollar, Inc.*, No. 10 C 4410, 2010 WL 4962838, at *3 (N.D. Ill. Nov. 30, 2010) (similar holding).

---

[97] Indeed, this Court and Plaintiffs' counsel have both previously recognized that it is improper to include potential wrongdoers in a class with other employees. *Brand*, 302 F.R.D. at 225-26, 231 (agreeing that "including as class members managers and supervisors who are claimed to have contributed to causing the hostile work environment or who are accused of ignoring complaints about it likely would create significant conflicts among the class[,]" and declining to include supervisors and managers in the class); Ex. 49, *Brand v. Comcast Corp. Inc.*, Case. No. 1:11-cv-08471, Dkt. # 102 ("Joint Stipulation Regarding Exclusion of Supervisors and Managers from the Class" filed by Noelle Brennan after this Court issued its class certification ruling).

The proposed class includes supervisors who are accused by other class members of failing to follow CCSO reporting policies and of turning a blind eye to detainee misconduct.[98]  The class also includes CCSO sworn officers accused by other class members of refusing to take reports of misconduct.[99]  Indeed, multiple Class Representatives testified that female supervisors discouraged them from filing complaints related to detainee sexual harassment and failed to stop the conduct.[100]  Such an inherently conflicted class cannot be certified.[101]

Additionally, in *Randall*, the Seventh Circuit found that the adequacy of the plaintiffs' representation was undermined given the possibility that they could strategically engage in conduct that could create evidence of discrimination upon which other class members' claims could be based. *Id.* at 637 F.3d at 824.  Similarly here, the named Plaintiffs who are sworn class members[102] (supervisory or not) may strategically fail to create incident reports or disciplinary tickets related to incidents of detainee sexual harassment perpetrated against other class members, and particularly those civilian class members who do not have access to CCOMS.  As Plaintiffs contend that such failures to generate incident reports and disciplinary tickets create evidence of discrimination, there is a conflict of interest between the plaintiffs and unnamed members of the putative class, which renders their representation inadequate. *Randall*, 637 F.3d at 824.

---

[98] *See* FN 71 *supra.*

[99] *See e.g.* Ex. 50, Dkt. #143 at ¶¶ 39, 41-43, 50.g.,l., 52.a., 55 (Third Consolidated Amended Complaint); FN. 75, *supra.*

[100] *See* FNs. 71-73, *supra.*

[101] Defendants note that there are no supervisory class representatives.  Thus, if the Court were inclined to create subclasses, any supervisory subclasses should fail. *Brand*, 302 F.R.D. at 225 ("[T]he Court agrees that including as class members managers and supervisors who are claimed to have contributed to causing the hostile work environment or who are accused of ignoring complaints about it likely would create significant conflicts among the class."); *Elkins v. Am. Showa Inc.*, 219 F.R.D. 414, 423 (S.D. Ohio 2002) (questioning, in the context of a putative hostile work environment class, whether the named plaintiffs, all of whom who did not occupy supervisory positions, adequately represented female supervisory personnel).

[102] Howard, Hobbs, Altman, Crawford-Alexander, Jones, Ranney, T. Wilson and Plasencia.

34

**III.**     <u>**Plaintiffs Fail to Satisfy Rule 23(b).**</u>

Rule 23(b)(3) requires plaintiffs to establish that questions of law or fact common to the members of the class predominate over any questions affecting only individual members and that class litigation is <u>superior</u> to other available methods for the fair and efficient adjudication of the controversy. "In considering Rule 23(b)(3)'s requirements, the court must review the substantive elements of plaintiffs' cause of action, the proof necessary for the various elements and the manageability of the trial on these issues." *Ramirez v. Palisades Collection LLC*, 250 F.R.D. 366 (N.D. Ill. 2008). Plaintiffs fail to meet Rule 23(b)(3)'s predominance and superiority requirements because, given the nature of the Jail and conduct at issue, Plaintiffs' claims must be evaluated in light of an array of individualized factors.

      **A.**     ***Common Questions Do Not Predominate.***

"If liability questions are not subject to class-wide proof and would instead require 'individual and fact intensive' determinations, it cannot be said that common issues predominate." *Radmanovich v. Combined Ins. Co. of Am.,* 216 F.R.D. 424, 435-36 (N.D. Ill. 2003). Rule 23(b)(3)'s predominance standard is "far more demanding" than the (a)(2) commonality requirement. *Puffer v. Allstate,* 255 F.R.D. 450, 470 (N.D. Ill. 2009) citing *Amchem Prods. v. Windsor*, 521 U.S. 591, 624 (1997). Accordingly, the "[m]ere *assertion* by class counsel that common issues predominate is not enough." *Parko v. Shell Oil Co.*, 739 F.3d 1083, 1085 (7th Cir. 2014). Indeed, "similarity of claims and situations must be demonstrated rather than assumed." *Szabo v. Bridgeport Machs.*, 249 F.3d 672, 677 (7th Cir. 2001). Thus, in conducting its predominance inquiry, "[t]he court must "probe behind the pleadings" to understand the parties' claims and defenses and determine whether they are subject to proof by common evidence." *Blair v. Supportkids, Inc.*, 2003 WL 1908031, *4 (N.D. Ill. April 18, 2003) (citation omitted); *see also*

35

*Parko v. Shell Oil Co.*, 739 F.3d 1083, 1086 (7th Cir. 2014) (reversing class certification where district court treated predominance as a pleading requirement).

Here, Plaintiffs merely assert in a single paragraph that common questions predominate. Dkt. # 171 at 38. Plaintiffs disregard the unique predominance standard and suggest in conclusory fashion that by satisfying Rule 23(a)'s commonality requirement, they have also met Rule 23(b)'s predominance requirement. *Id.* They also suggest, without citation to authority, that the subjective element of their hostile work environment claim, which by its very nature requires an individualized inquiry, "should be rebuttably presumed." *Id.* Likewise, Plaintiffs fail to address the substantive elements of their Equal Protection and ICRA claims at all. However, these blanket assertions are insufficient even at the class certification stage. *Parko*, 739 F.3d at 1085; *Szabo*, 249 F.3d at 677. Plaintiffs, therefore, have failed to meet their burden of establishing that questions of law or fact common to the members of the class predominate.

  i. <u>Plaintiffs' Hostile Work Environment Claim Necessitates Individualized Inquiries.</u>

    a. *Variation in Plaintiffs' Work Environments Will Not Allow Plaintiffs to Establish Class-Wide Hostile Work Environment Claims with Common Evidence.*

Predominance is lacking because Plaintiffs' and other putative class members' work environments, and correspondingly their experiences with detainee sexual hostility in those environments, if any, vary widely. *Brand*, 302 F.R.D. at 223 (suggesting that predominance may not be met if "plaintiffs might have experienced the hostile work environment differently."). The variations in experience with detainee sexual misconduct is necessarily impacted by putative class members' positions, duty assignments, amount of time spent in maximum security divisions (where the majority of indecent exposure related incidents occur), frequency of visits to maximum security divisions, alleged discouragement from reporting, or lack thereof, remedial measures

implemented in specific areas of the Jail or Courthouse, and physical setup of each class members'

work environment.[103]  Plaintiffs' anecdotal evidence, including their vague class member

declarations, does not constitute evidence that harassment was severe or pervasive for "[a]ll

women… employed… at the Jail, or as Court Services deputies at… Leighton… or… in positions

with Cermak[.]"[104]  Determining whether each putative class member experienced objectively and

subjectively severe or pervasive sexual harassment will, therefore, require an individualized

inquiry that will predominate over common questions.

This is exacerbated by the fact that the class definition spans multiple worksites— the

various areas of the Jail, Leighton and Cermak —each with distinct working conditions. *See e.g.*

*Reid v. Lockheed Martin Aeronautics Co.*, 205 F.R.D. 655, 675-76 (N.D. Ga. 2001) (denying

certification of a hostile work environment class claim over multiple facilities because "the actions

constituting the alleged hostile environment occurred with varying frequency and possessed

varying degrees of severity" for some class members, while others did not experience harassment

at all); *Faulk v. Home Oil Co.*, 184 F.R.D. 645, 659 (M.D. Ala. 1999) (denying certification for a

---

[103] *See* Facts § IV, *supra.*; *See* Miller Decl. ¶¶ 13-27; Bellettiere Decl. ¶ 8, 12-15; Beachem Decl. ¶¶ 10-13; Yoksoulian Decl. ¶¶ 8-12; Giunta Decl. ¶¶ 8-13; Queen Decl. ¶¶ 8-10; Martinez Decl. ¶¶ 8-11.

[104] To that end, the portions of the putative class members' declarations that (1) are not based on the declarants' personal knowledge; (2) constitute or rely on hearsay; or (3) contain conclusory allegations, speculation and unsupported personal beliefs should be stricken. Under Fed.R.Civ.P. 56(e), a declarant must be made on personal knowledge, set forth facts that would be admissible in evidence and show that the declarant is competent to testify on the matters stated in the affidavit. Though the Federal Rules of Civil Procedure do not create a standard for reviewing declarations submitted in support of motions other than a motion for summary judgment, there is no reason that declarations should be held to a lesser evidentiary standard at this stage. Indeed, it is well established that a declarant must testify about what he observed himself and not speculate about what he thinks happened. *Payne v. Pauley,* 337 F.3d 767, 772 (7th Cir.2003); Fed.R.Evid. 602 (witness must have personal knowledge of matter in order to testify to it). "[A]lthough personal knowledge may include reasonable inferences, those inferences must be 'grounded in observation or other first-hand personal experience.'" *Payne,* 337 F.3d at 772 quoting *Visser v. Packer Engineering Associates, Inc.,* 924 F.2d 655, 659 (7th Cir.1991). Accordingly, the portions of the declarations submitted by Plaintiffs that (1) are not based on the declarants' personal knowledge; (2) constitute or rely on hearsay; or (3) contain conclusory allegations, speculation and unsupported personal beliefs should be stricken or disregarded by the court. *See also Puffer v. Allstate,* 255 F.R.D. 450, 467 (N.D. Ill. 2009) ("Other declarations are of little probative value on the issue of commonality because the declarants offers either no approximate date as to alleged discriminatory occurrences or no allegations at all of specific instances or observations of discrimination…While some of these declarants allege generally that Allstate has a 'male-dominated' or 'boys' club' culture, these allegations, unaccompanied by a time frame or specific discriminatory act, are too vague to be helpful.").

hostile work environment class because the twenty-one facilities at issue were not subject to common proof). There is simply no "significant proof" to support, for example, that women employed in an all-female Division of the Jail or the Records Department (which has no detainee contact) have experienced severe or pervasive detainee sexual harassment. In fact, the record reflects the contrary.[105] Predominance for this multi-site class is thus lacking. *Cf. Bolden*, 688 F.3d at 899 (finding that multi-site class failed, and suggesting that "site– or superintendent–specific classes" may be more appropriate) *with Brand*, 302 F.R.D. at 223-24 (finding that whether a hostile work environment existed in a single facility could be established by common proof).

        b.    *Variation in Plaintiffs' Subjective Experiences Will Not Allow Plaintiffs to Establish Class-Wide Hostile Work Environment Claims with Common Evidence.*

Determination of whether detainee sexual misconduct conduct experienced by putative class members, if any, was subjectively offensive requires an individualized analysis. A "pattern or practice finding would not [ ] satisfy the need for each plaintiff to show that she found [Defendants'] work environment to be subjectively hostile, which is one individual issue that would have to be resolved with regard to each class member in establishing liability." *Radmanovich,* 216 F.R.D. at 437; *see also Elkins,* 219 F.R.D.at 425-26 (finding that the need to inquire into individual perceptions of the varying sexual harassment, hostile work environment behaviors alleged by the plaintiffs made a class action inappropriate). Courts considering proposed classes of correctional employees bringing similar claims of inmate sexual harassment have in fact reached the conclusions that the classes were uncertifiable because individual issues predominated over common issues.

---

[105] *See* Wilner Rept. Fig. 6; Miller Decl. ¶¶ 13-27 ; Bellettiere Decl. ¶ 8, 12-15; Beachem Decl. ¶¶ 10-13; Yoksoulian Decl. ¶¶ 8-12; Giunta Decl. ¶¶ 8-13; Queen Decl. ¶¶ 8-10; Martinez Decl. ¶¶ 8-11; *see also* Lundquist Rept. ¶¶18, 20, Table 2, Figure 2 (excluding Division 3, 4 and 5 from her analysis and deeming them "not relevant").

In *Rudolph, et. al v. Dept. of Corrections, et al.*, Case No. 5:06-cv-56-RS, Dkt. # 211 at 2 (N.D. Fl. Nov. 9, 2006), a group of female non-security employees of the Florida Department of Corrections ("FDOC") brought a putative class action alleging that they were sexually harassed by male inmates and that the FDOC maintained and fostered this sexually hostile work environment in violation of Title VII and derivative state laws. In ruling on the plaintiffs' class certification motion, the court found that the plaintiffs failed to establish that common questions predominated. In so finding, the court noted that "[e]ven when the subjective component is disregarded at the outset and a pattern or practice of sexual harassment is established, the subjective requirement does not simply vanish; rather, it re-emerges and becomes relevant when assessing whether the pattern and practice actually resulted in the sexual harassment of a *particular* plaintiff…Stated differently, just because a pattern and practice of sexual harassment is found to exist does not conclusively establish that any particular plaintiff was a victim of sexual harassment; rather, liability to each plaintiff must *still* be established." *Id.* at 9 (emphasis added). The court found that the analysis of the subjective elements was particularly necessary in that case as, just as is the case here, class members were employed in various capacities, in various facilities with different detainee populations and different supervisors, and had differing amounts of contact with detainees. *Id.* at 10. "These differences impact both the subjective *and* objective components of the case. The capacity in which a Plaintiff [is] employed and the amount of contact that a Plaintiff ha[s] with the alleged perpetrators are certainly relevant in determining the frequency and severity of the harassment." *Id.*

Similarly, in *Berndt, et al. v. Cal. Dept. of Corrections, et al.,* Case No. 1:03-cv-03174-PJH, Dkt. # 452, at 1-2 (N.D. Cal. Mar. 20, 2012), the court denied certification to a class of female correctional employees who also alleged that they were subject to a hostile work environment as

39

a result of inmate indecent exposure, targeted masturbation and ejaculation ("IEX incidents") being unaddressed and supervisors discouraging reporting of such incidents.[106]  The court found that predominance was unsatisfied because an individualized inquiry was needed to establish "that the defendant institution failed to take "proper preventative and remedial steps with regard to inmate behavior[ ]"" given that the only commonality among the plaintiffs and class member declarants was that they each witnessed an IEX incident. *Id.* quoting *Freitag v. Ayers*, 468 F.3d at 539.  Otherwise, the class consisted of

> female employees with different job duties and responsibilities (ranging from correctional officer to treatment group facilitators); female employees who worked at various CDCR facilities; female employees who witnessed IEX incidents under differing circumstances and at different points in time; female employees who complained to CDCR about the manner in which IEX incidents were handled; female employees who did not complain to CDCR about the manner in which IEX incidents were handled; and female employees who admitted they obtained the relief they sought when they requested CDCR intervention.

*Id.* at 20.  Thus, "only an individualized inquiry would answer the question whether defendant CDCR has taken "proper preventative and remedial steps" with regard to IEX incidents at a given institution and in response to a given complaint by a female CDCR employee." *Id.*

As in *Rudolph* and *Berndt*, Plaintiffs have cast too wide a net.  The putative class is employed in various capacities, in various facilities with different detainee populations, has different supervisors, and differing amounts of contact with detainees.  As such, an individualized analysis is necessary to determine whether each class members' subjective experiences rise to the level of a hostile work environment.

---

[106] The predecessor litigation to *Berndt* was *Freitag v. Ayers*, 468 F.3d 528 (9th Cir. 2006), a single plaintiff litigation cited by Plaintiffs.  The *Berndt* court addressed and distinguished *Freitag*, finding that while "the Ninth Circuit in Freitag made clear that, in order for sexual harassment liability to attach to defendant CDCR under Title VII in the circumstances alleged here, plaintiffs must demonstrate that the defendant institution failed to take "proper preventative and remedial steps with regard to inmate behavior." See Freitag, 468 F.3d at 539. Plaintiffs cannot do so here, however, without an individualized inquiry." *Berndt,* Case No. 4:03-cv-03174-PJH, Dkt. # 452, at 8-9, 13, 20.

c.    *Variation in Plaintiffs' Potential Damages Contributes to Individual Issues Predominating.*

Class certification is also inappropriate where, as here, it is clear that "the question [of] whether damages are owed for many, if not most, of the proposed class members can be resolved only after a highly individualized inquiry." *Riffey*, 910 F.3d at 319. "This suggests not only that individual questions predominate at this stage of the litigation, but also that it would be difficult to manage the litigation as a class." *Riffey*, 910 F.3d at 319; *see also Elkins*, 219 F.R.D. 414, 427 (S.D. Ohio 2002) ("Subjective standards will have to be employed to determine the individual class members' damages since the individuals were exposed to different forms of harassment for varying periods of times. The need for repeated individualized inquiries demonstrates that the predominance requirement is not met.").

Each Plaintiffs' alleged damages, if any, will be unique– of those who have experienced actionable harassment incidents, some have experienced exclusively incidents of verbal harassment, some have allegedly experienced incidents of ejaculation directed at them, while others have observed detainees masturbating in their bunks as they passed by during a cell check, some of experienced several incident exposure incidents, others only a few, some have alleged they have seen a therapist, while others have not claimed any emotional distress.[107]

d.    *Variation in Available Defenses Contributes to Individual Issues Predominating.*

Predominance is also not shown where "affirmative defenses will require a person-by-person evaluation of conduct to determine whether [a defense] precludes individual recovery." *Wigod v. PNC Bank, N.A.*, 338 F. Supp. 3d 758, 773 (N.D. Ill. 2018) (citations omitted); *see also*

---

[107] *Compare* A.W. Decl. (Decl. Ex. 866-871) ¶ 18 (severe emotional distress and therapy); P.B. Decl. (Decl. Ex. 117-126) ¶ 26 (PTSD); *with* D.G. Decl. (Decl. Ex. 278-284) (no mention of emotional distress); C.R. Decl. (Decl. Ex. 655-657) (same); Q.D. Decl. (Decl. Ex. 223-228) (same); B.C. Decl. (Decl. Ex. 175-178) (same)

*Riffey*, 910 F.3d at 319 ("The [defendant] would be entitled to litigate individual defenses against each member. This suggests not only that individual questions predominate at this stage of the litigation, but also that it would be difficult to manage the litigation as a class."); *Camilotes*, 286 F.R.D. at 352–53 (decertifying class in part because "each Plaintiff's claim will require individualized inquires, as will Defendant's defense to each particular Plaintiff's claim."); *Vulcan Golf, LLC v. Google Inc.*, 254 F.R.D. 521, 531 (N.D. Ill. 2008) (reasoning that "[t]he existence of affirmative defenses which require individual resolution can be considered as part of the court's analysis to determine whether individual issues predominate under Rule 23(b)(3)" in denying motion for class certification).

Defendants' defenses require yet more individualized inquiry, again precluding a finding of predominance of generalized, class-wide concerns. The CCSO has asserted affirmative defenses including (1) statute of limitations; (2) failure to take advantage of preventative or corrective measures; and (3) failure to mitigate. Furthermore, some Class Representatives and putative class members chose to bid into maximum security areas and remain there despite the alleged prevalence of sexual misconduct, giving rise to potentially other defenses.[108] The CCSO is also entitled to present evidence that detainees who engaged in misconduct towards particular class members were, in fact, disciplined per policy, to rebut Plaintiffs' assertions that nothing was done. Moreover, the CCSO is aware that at least one of the Class Representatives has filed a workers' compensation claim relating to the conduct alleged in the Complaint. As such, the election of remedies doctrine and workers' compensation exclusivity rule may be relevant to her, and other putative class members' claims.

---

[108] D. Hobbs Dep. 92:16-25 (bid into Division 10, knowing it "houses some of the worst offenders at CCSO," in order to get better days off); S. Howard Dep. 99:13-110:13 (bid into Division 10 to get day shifts); E. Altman Dep. 145:23-146:5 (bid into Division 10 for better days off).

It is only through an individualized inquiry that the viability of each of these defenses will be determined. For example, discovery has revealed that Plaintiff Denise Hobbs did not experience any actionable harassment in the 300 days preceding her EEOC charge and is subject to a unique statute of limitations defense on that basis.[109] Similarly, the CCSO would be entitled to explore whether any putative class members failed to disclose their purported claims in bankruptcy petitions, which render them without standing, and this Court, without subject-matter jurisdiction. *See Becker v. Verizon N., Inc.*, No. 06-2956, 2007 WL 1224039, at *1 (7th Cir. Apr. 25, 2007) (unpublished) (finding that a Chapter 13 debtor did not have standing to assert her discrimination claims against her former employer because these claims belonged to her bankruptcy trustee); Fed. R. Civ. P. 12(b)(1). This defense is especially critical given that two out of the thirteen named plaintiffs, Sharon Wilson and Shadonna Davis, were withdrawn as class representatives because their claims were potentially barred by their failure to disclose them in bankruptcy filings.[110] Several other putative class members have also revealed bankruptcy filings.[111] It is thus fair to assume that other class members will be subject to this defense. Given the subject matter jurisdiction implications, both Defendants and the Court are certainly entitled to conduct the individualized inquiries necessary to determine the viability of this, as well as other defenses to each putative class member's claims.

---

[109] D. Hobbs Dep. 114:5-8 (filed EEOC Charge on January 27, 2016); 125:24-126:3 (does not recall any incidents in the 2015 calendar year).

[110] Dkt. # 143 (Third consolidated complaint terminating Shadonna Davis and Sharon Wilson); S. Robinson Dep. 7:17-9:25, Dep. Ex. 24.

[111] Ex. 51, Plaintiff Tawanda Wilson's Supplemental Answer to Defendant Cook County Sheriff's Office's Interrogatory No. 11; Ex. 52, Plaintiff Susana Plasencia Supplemental Answer to Defendant Cook County Sheriff's Office's Interrogatory No. 11; Ex. 53, Plaintiff Esther Jones' Supplemental Answer to Defendant Cook County Sheriff's Office's Interrogatory No. 11; Burroughs Dep. 12:12-19.

### B.    *Class Litigation Is Not the Superior Method of Proceeding with the Case.*

Where there are a large number ""of class members each harmed to a different extent (and many not harmed at all)[,]' a Rule 23(b)(3) class would be unmanageable." *Van v. Ford Motors*, 2018 WL 4635649, *8 (N.D. Ill. Sept. 27, 2018) citing *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 776 (7th Cir. 2013).

The proposed class is not manageable.  As currently defined, the class would require mini trials to ascertain at least: (1) the different working conditions in each of the divisions, given that different areas of the Jail, Courthouse and Cermak have different levels of interaction with detainees and deal with detainee populations that exemplify entirely unique levels of (mis)behavior; (2) the different working conditions for each position, given that different positions are assigned to different parts of the complex and have different interactions with detainees; (3) each class members' response to an incident of detainee sexual misconduct, and the CCSO's response thereto; and (4) the extent of each class members' damages, if any.

Moreover, class certification is not needed to afford putative class members an opportunity to litigate claims. "When a class member has a sufficiently large stake in litigation to be able to afford to litigate on his own, this consideration weighs against allowing a suit to proceed as a class action." *Puffer v. Allstate,* 255 F.R.D. 450, 472 (N.D. Ill. 2009).  Here, one putative class member has already filed her own independent action.[112]  Class certification is thus inappropriate and unnecessary.

### IV.    <u>A Rule 23(c)(4) Issues Class is Inappropriate.</u>

Plaintiffs' suggestion that it is appropriate to certify their class under Rule 23(c)(4) if the class does not satisfy the requirements of Rule 23(b)(3) is flawed.  Rule 23(c)(4) provides that,

---

[112] *Ramos v. Cook County Sheriff's Office*, Case No. 1:18-cv-00274 (N.D. Ill)

"[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues." Fed. R. Civ. P. 23(c)(4). However, "[w]here class certification is sought as to issues under Rule 23(c)(4)(A), Rule 23(b)(3)'s requirements of predominance and manageability must be satisfied, and class certification must be denied where those requirements cannot be met." *In re Gen. Motors Corp. Dex-Cool Prods. Liab. Litig.*, 241 F.R.D. 305, 314 (S.D. Ill. 2007); *see also Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 720 n.7 (7th Cir. 2012) (discussing that bifurcation of the liability and damages phases under Rule 23(c)(4) would be inappropriate where, as here, plaintiffs have not established that a uniform policy caused harm to the putative class). As discussed *supra*, Plaintiffs have not met Rule 23(b)(3)'s predominance requirements. Moreover, Plaintiff's admit that manageability concerns would not decline if their proposed class were certified under Rule 23(c)(4). Dkt. # 171 at 35. Certification under Rule 23(c)(4) is thus inappropriate.

## V.     Alternatively, Any Certified Class Should Limited and Divided into Subclasses.

In the event that the Court is inclined to certify a class, any such class should be limited to those non-supervisory female CCSO employees or County employees in positions with Cermak Health Services who had a regular assignment in Divisions 8, 9 and 10 of the Jail at any time since April 23, 2015. As discussed *supra*, the record establishes that the vast majority of reported incidents of indecent exposure-related incidents occurred that occurred in the Jail and the Courthouse took place in Divisions 8, 9 and 10 of the Jail. Wilner Rept. at 12-14. Assuming *arguendo* that the number of reported incidents of detainee sexual misconduct in Divisions 8, 9 and 10 provides "significant proof" of a hostile work environment, only those females who were regularly assigned to these Divisions during the relevant time period would be exposed to the sexually harassing conduct such that it would be come severe or pervasive.

45

Finally, any class ought to be limited to women who reported sexual misconduct. Otherwise, mini trials will be required to determine why the class member chose not to report, or whether she experienced it at all, found it offensive and the context and circumstances surrounding each woman's experience(s).

## **<u>CONCLUSION</u>**

For the foregoing reasons, Plaintiffs' Motion for Class Certification should be denied.


Dated:  June 3, 2019

Respectfully submitted,

COOK COUNTY SHERIFF'S OFFICE

By: _  /s/ Christina M. Egan____  _
One of its Attorneys

Christina M. Egan
Michael R. Phillips
Peter A. Milianti
David D. Leishman
Katharine P. Lennox
Melissa M. Weiss
McGuireWoods LLP
77 West Wacker Drive
Suite 4100
Chicago, Illinois 60601-1815
cegan@mcguirewoods.com
Telephone: 312.849.8100
Fax:  312.849.3690

COOK COUNTY

By: _/s/ Elizabeth A. Ekl____
One of its Attorneys

Elizabeth A. Ekl
Terrence M. Burns
Dan M. Noland
Paul A. Michalik
Katharine C. Morrison
Reiter Burns, LLP
311 S. Wacker Dr. # 5200
Chicago, Illinois 60606
eekl@reiterburns.com
Telephone: 312.982.0090


116816310_17

## CERTIFICATE OF SERVICE

I hereby certify that on June 3, 2019, I caused the foregoing document to be served upon all counsel of record through the Court's electronic filing system.

By:     */s/ Christina M. Egan*
Christina M. Egan
Michael R. Phillips
Peter A. Milianti
David D. Leishman
Katharine P. Lennox
Melissa M. Weiss
McGuireWoods, LLP
77 West Wacker Drive
Suite 4100
Chicago, Illinois 60601-1815
cegan@mcguirewoods.com
mphillips@mcguirewoods.com
pmilianti@mcguirewoods.com
dleishman@mcguirewoods.com
klennox@mcguirewoods.com
mweiss@mcguirewoods.com
Telephone: 312.849.8100
Fax: 312.849.3690