**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| SDAHRIE HOWARD, et al., | ) | |
| | ) | Case No. 17-cv-8146 |
| Plaintiffs, | ) | |
| | ) | Judge Matthew F. Kennelly |
| v. | ) | |
| | ) | |
| COOK COUNTY SHERIFF'S OFFICE et al., | ) | |
| | ) | |
| Defendants. | ) | |

**<u>PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR CLASS
CERTIFICATION</u>**

**Table of Contents**

Table of Contents ............................................................................................................. i

INTRODUCTION .......................................................................................................... 1

ARGUMENT .................................................................................................................. 1

   I.   The Court Should Certify the Proposed Class. ...................................................... 1

     A.   Plaintiffs Have Established Ascertainability and Numerosity. ....................... 1

     B.   Plaintiffs Have Established Commonality. ..................................................... 1

     C.   Plaintiffs Have Established Typicality. ......................................................... 13

     D.   Plaintiffs and Their Counsel Are Adequate Representatives. ....................... 14

     E.   The Proposed Class Satisfies Rule 23(b)(3). ................................................ 17

     F.   Alternatively, Common Issues May Be Certified Under Rule 23(c)(4). ....... 21

     G.   There Is No Reason to Redefine the Class. .................................................... 21

   II.   The Court Should Not Exclude Expert Testimony of Woodford and Fitzgerald ............. 22

     A.   Jeanne Woodford. ........................................................................................ 22

     B.   Dr. Louise Fitzgerald. .................................................................................. 26

   III.   Dr. Wilner's Report Should Be Excluded. ...................................................... 29

     A.   Wilner's Report Should Be Excluded Because It Relies on the Judgments of Defense Counsel in Collecting and Coding Data. ............................................................ 30

     B.   Wilner's Report Misleadingly Identifies Irrelevant "Benchmark" Incidents................. 33

CONCLUSION ................................................................................................................ 35

## Table of Authorities

**Cases**

*Allen v. Chicago Transit Auth.*, No. 99 C 7614, 2000 WL 1207408 (N.D. Ill. July 31, 2000) .... 14

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455 (2013)................................................ 8

*Beckford v. Dep't of Corr.*, 605 F.3d 951 (11th Cir. 2010) ........................................................... 7

*Bolden v. Walsh Const. Co.,* 688 F.3d 893 (7th Cir. 2012) ........................................... 2, 3, 12, 17

*Brand v. Comcast Corp., Inc.,* 302 F.R.D. 201 (N.D. Ill. 2014).................................. 6, 13, 19, 21

*Brendt v. Cal. Dep't of Corr.*, No. C 03-3174 PJH, 2012 WL 950625 (N.D. Cal. Mar. 20, 2012)

........................................................................................................................................... 18

*Brown v. Nucor Corp.*, 785 F.3d 895 (4th Cir. 2015)................................................................ 9, 10

*Brown v. Yellow Transp. Inc.*, No. 08 C 5908, 2011 WL 1838741, at *4 (N.D. Ill. May 11, 2011)

........................................................................................................................................... 15

*Butler v. Sears, Roebuck & Co.,* 727 F.3d 796 (7th Cir. 2013) .................................................... 21

*Camilotes v. Resurrections Health Care Corp.*, 286 F.R.D. 339 (N.D. Ill. 2012) ........................ 3

*Carlson v. C.H. Robinson Worldwide, Inc.,* 2005 WL 758602 (D. Minn. Mar. 31, 2005) ........... 3

*Cason-Merenda v. Detroit Med. Ctr.*, No. 06-15601, 2013 WL 1721651 (E.D. Mich. Apr. 22,

2013)................................................................................................................................... 34

*Chicago Teachers Union v. Bd. Of Educ.*, 797 F.3d 426 (7th Cir. 2015)...................................... 8

*Childers v. Trustees of the Univ. of Pennsylvania*, No. 14-2439, 2016 WL 1086669 (E.D. Pa.

Mar. 21, 2016)................................................................................................................... 27

*Cook Cty. Sheriff's Office v. Cook Cty. Comm'n on Human Rights,* 53 N.E.3d 1144 (Ill. App. Ct.

2016)..................................................................................................................................... 9

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)............................ 22, 28, 33

*De La Fuente v. Stokely-Van Camp, Inc.,* 713 F.2d 225 (7th Cir. 1983)...................................... 13

*Durant v. Greenfield & Fortenberry, LLC,* No. 1:16-CV-965-RP, 2018 WL 3155822 (W.D. Tex. June 28, 2018) ......................................................................................................... 34

*EEOC v. Bloomberg, L.P.*, No. 07 Civ. 8383, 2010 WL 3466370  (S.D.N.Y Aug. 31, 2010) .... 27

*EEOC v. Dial Corp.,* 99-C-3356, 2002 WL 31061088 (N.D. Ill. Sept. 17, 2002) ...................... 26

*EEOC v. Morgan Stanley & Co.,* 324 F. Supp. 2d. 451 (S.D.N.Y. 2004)............................. 27, 29

*EEOC v. Sears, Roebuck & Co.*, 628 F. Supp. 1264 (N.D. Ill. 1986) ......................................... 32

*EEOC v. Sears, Roebuck & Co.*, 839 F.2d 302 (7th Cir. 1988)................................................... 32

*Elder v. Comcast Corp.*, No. 12 C 1157, 2015 WL 347596 (N.D. Ill. June 1, 2015)................... 3

*Ellis v. Costco Wholesale Corp.,* 285 F.R.D. 492 (N.D. Cal 2012)............................................ 27

*Erickson v. Wis. Dep't of Corr.,* 469 F.3d 600 (7th Cir. 2006) ...................................................... 7

*Faulk v. Home Oil Co.*, 184 F.R.D. 645 (M.D. Ala. 1999) ......................................................... 18

*Freitag v. Ayers*, 463 F.3d 838 (9th Cir. 2006)............................................................................. 7

*Frobose v. Am. Sav. & Loan Ass'n of Danville*, 152 F.3d 602 (7th Cir. 1998).............................. 8

*Goodwin v. Conagra Poultry Co.*, No. 03-CV-1187, 2007 WL 1434905 (W.D. Ark. May 15, 2007)........................................................................................................................................ 14

*Halperin v. Int'l Web Servs., LLC*, 70 F. Supp. 3d 893 (N.D. Ill. 2014) ..................................... 10

*Holmes v. Godinez,* 311 F.R.D. 177 (N.D. Ill. 2015) .................................................................. 18

*Hosick v. Chicago State Univ. Bd. of Trustees*, 924 F. Supp. 2d 956 (N.D. Ill. 2013).................. 8

*In re Gen. Motors Corp. Dex-Cool Prods. Liab. Litig.*, 241 F.R.D. 305 (S.D. Ill. 2007) ........... 21

*In re Testosterone Replacement Therapy Prod. Liab. Litig.,* 14 C 1748, 2018 WL 3586182 (N.D. Ill. July 26, 2018) ............................................................................................................. 30

*Janus v. State, County & Muni. Employees,* 138 S. Ct. 2448 (2018) ............................................ 19

*Jefferson v. Windy City Maintenance, Inc.,* No. 96 C 7686, 1998 WL 474115 (N.D. Ill. Aug. 4, 1998)........................................................................................................................................ 15

*Kress v. CCA of Tenn., LLC*, 694 F.3d 890 (7th Cir. 2012) ....................................................... 14

*Lee v. Children's Place Retail Stores, Inc.,* No. 14 C 3258, 2014 WL 5100608 (N.D. Ill. Oct. 8, 2014)........................................................................................................................................ 16

*Lucas v. Vee Pak, Inc.,* No. 12-CV-09672, 2017 WL 6733688 (N.D. Ill. Dec. 20, 2017) . 6, 10, 13

*McCaster v. Darden Restaurants, Inc.*, 845 F. 3d 794 (7th Cir. 2017) ........................................ 10

*McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 491 (7th Cir. 2012) 21

*Messner v. Northshore Univ. Health Sys.*, 669 F.3d 802 (7th Cir. 2012).................................... 14

*Minemyer v. B-Roc Representatives, Inc.*, No. 07 C 1763, 2009 WL 3757378 (N.D. Ill. Oct. 29, 2009)........................................................................................................................................ 30

*Moore v. Ulta Salon, Cosmetics & Fragrance, Inc.,* 311 F.R.D. 590 (C.D. Cal. 2015).............. 16

*Obrycka v. City of Chicago,* 792 F. Supp. 2d 1013 (N.D. Ill. 2011) ..................................... 30, 32

*Parish v. Sheriff of Cook Cty.*, No. 07 C 4369, 2016 WL 1270400 (N.D. Ill. Mar. 31, 2016)..... 14

*Passananti v. Cook Cty.,* 689 F.3d 655 (7th Cir. 2012) ................................................................ 9

*Porter v. Pipefitters Ass'n Local Union 597*, 208 F. Supp. 3d 894 (N.D. Ill. 2016).............. 10, 13

*Portz v. St. Cloud Univ.*, 297 F.Supp.3d 929 (D. Minn. 2018).................................................... 24

*Radmanovich v. Combined Ins. Co. of Am.*, 216 F.R.D. 424 (N.D. Ill. 2003)............................. 17

*Reid v. Lockheed Martin Aeronautics Co.*, 205 F.R.D. 655 (N.D. Ga. 2001) ............................. 18

*Riffey v. Rauner*, 910 F.3d 314 (7th Cir. 2018)......................................................................... 19

*Rivera v. Guevara,* 319 F. Supp. 3d 1004 (N.D. Ill. 2018).................................................... 31, 33

*Rosario v. Livaditis*, 963 F.2d 1013 (7th Cir. 1992) ................................................................... 13

*Rudolph, et al. v. Dep't of Corr., et al.*, No. 5:06-cv-56-RS-MD, Dkt. # 211 (N.D. Fl. Nov. 9, 2006) ................................................................................................................................. 18

*Rush v. Wyeth*, 514 F.3d 825 (8th Cir. 2008) .............................................................................. 24

*Sandoval v. City of Chicago*, No. CIV A 07 C 2835, 2007 WL 3087136 (N.D. Ill. Oct. 18, 2007) ........................................................................................................................................ 14

*Santiago v. RadioShack Corp.*, No. 11 C 3508, 2012 WL 934524 (N.D. Ill. Feb. 10, 2012) ...... 21

*Smith v. Nike Retail Servs., Inc.,* 234 F.R.D. 648 (N.D. Ill. 2006) ............................................... 15

*Sommerfield v. City of Chicago,* 254 F.R.D. 317 (N.D. Ill. 2008) ............................................... 30

*Sprague v. Gen. Motors Corp.*, 133 F.3d 388 (6th Cir. 1998) ..................................................... 14

*Ty Inc. v. Softbelly's Inc.*, No. 00 C 5230, 2006 WL 5111124 (N.D. Ill. Apr. 7, 2006) .............. 30

*Van v. Ford Motors,* No. 14-cv-8708, 2018 WL 4635649 (N.D. Ill. Sept. 27, 2018) ................. 16

*Wagner v. NutraSweet Co.*, 170 F.R.D. 448 (N.D. Ill. 1997) ...................................................... 16

*Wagner v. Nutrasweet Co.,* 95 F.3d 527 (7th Cir. 1996) ............................................................. 13

*Whitney v. Khan*, 330 F.R.D. 172, 180 (N.D. Ill. 2019) .......................................................... 6, 19

*Wirtz v. Turner,* 330 F.2d 11 (7th Cir. 1964) .............................................................................. 24

*Wrightsell v. Sheriff of Cook Cty.*, No. 08 CV 5451, 2009 WL 482370 (N.D. Ill. Feb. 19, 2009) 14

**Other Authorities**

Fed. R. Civ. P. 23 ........................................................................................................... 10, 19, 23

Fed. R. Evid. 702 ...................................................................................................................... 32

Fed. R. Evid. 702 Adv. Comm. Note (2000) ............................................................................ 28

Fed. R. Evid. 703 ...................................................................................................................... 32

M. Hart & P. Secunda, *A Matter of Context: Social Framework Evidence in Employment Discrimination Class Actions,* 78 Fordham L. Rev. 37 (2009) .................................................... 29

## INTRODUCTION

Defendants' arguments opposing class certification are unpersuasive. They contend that each part of the Complex is a separately managed facility and not an integrated part of one centrally managed operation. They suggest that sexual misconduct is largely confined to three divisions of the Jail despite significant evidence to the contrary. They treat sexual harassment as limited to official reports of masturbation or indecent exposure, ignoring the vile and omnipresent verbal sexual harassment and CCSO policies that denied hundreds of Class Members the ability to report incidents and deterred others from reporting them. They assert intra-class conflicts but cannot point to evidence suggesting any meaningful conflict. They move to bar testimony of Plaintiffs' experts when it is their statistical expert who should be excluded. None of these arguments, however, warrants denial of class certification.

Part I of this brief is Plaintiffs' reply in support of class certification. Part II opposes Defendants' *Daubert* motion against two of Plaintiffs' experts. And Part III supports Plaintiffs' motion to exclude the testimony of Defendants' statistical expert, Benjamin Wilner.

## ARGUMENT

**I.    The Court Should Certify the Proposed Class.**

**A.    Plaintiffs Have Established Ascertainability and Numerosity.**

Plaintiffs have shown that the proposed class satisfies the ascertainability and numerosity requirements for certification. Plaintiffs' Memorandum In Support of their Motion for Class Certification (Dkt. No. 171) ("Pl. Br.") at 25-26. Defendants do not discuss or contest this.

**B.    Plaintiffs Have Established Commonality.**

The parties agree on the four elements of a hostile work environment claim. Pl. Br. at 26; Defendants' Joint Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification (Dkt. No. 198) ("Def. Br.") at 20. Defendants' silence further indicates their

agreement that, to establish commonality, Plaintiffs need only show that one of those four elements can be proven (or disproven) through common evidence. Pl. Br. at 26. Nothing presented by Defendants undercuts Plaintiffs' showing that three of the elements and the objective component of the fourth can be established through common evidence.

### 1. Common Evidence Can Establish that the Sexual Harassment Was Severe or Pervasive and Was Objectively Offensive.

Defendants do not dispute that inmates' masturbation at and exposure of their genitals to female employees constituted severe harassment and was objectively offensive; indeed, they characterize some of the behavior as "offensive conduct." Def. Br. at 25. Defendants equivocate on verbal harassment, acknowledging that "Plaintiffs supply a variety of disgusting detainee language," but inaccurately claim that Plaintiffs "generally do not provide specific evidence of where, when and how frequently the language was heard." *Id.* at 27.[1] None of Defendants arguments warrant denying certification.

### a. Class Members interact with detainees, move throughout the Complex and are exposed to sexual harassment regardless of job duties or assignment.

Defendants argue that harassment cannot be established through common evidence because it was not pervasive or did not rise to the level of objective offensiveness except in three male housing divisions (Divisions 8, 9, and 10). According to Defendants, the Complex has separate physical sites with different "supervisors, structure, design, detainee population and amount of detainee contact" and that "working conditions, including exposure to detainee sexual misconduct, differ materially across the Jail and Courthouse." Def. Br. at 19, 20. They analogize the situation to *Bolden v. Walsh Const. Co.,* 688 F.3d 893 (7th Cir. 2012). *Bolden,* however,

---

[1] Defendants are wrong. Plaintiffs have provided ample evidence that verbal harassment occurs daily throughout the Complex. Pl. Br. at 6-7; *see, e.g.* Pl. Br. Ex. 1, Healy Decl. ¶ 5 (comments like "you have big tits" and "I really want to fuck you" happen daily in Divisions 9, 10, and 11 and happen frequently in other areas of the Jail); Ellis Decl. ¶ 9, Brown-Conley Decl. ¶ 9, T. Harris Decl. ¶ 9, Sanford Decl. ¶ 10.

involved 262 distinct and separate worksites covering a ten-plus year period. *Id.* at 895. Each worksite was *temporary*; the workers were *transient*. *Id.* at 894-96. Here, the facility comprises eight contiguous City blocks, Def. Br. at 3, connected through a series of tunnels and administered, as discussed below, as a single Complex. Pl. Br. at 2.[2]

It simply is not true that women assigned positions outside Divisions 8, 9, and 10 escaped sexual harassment. First, Class Members do not work in only one location.[3] Correctional Officers move throughout the Jail regardless of specific assignment and change assignments. Pl. Br. at 3-4. Courtroom deputies move from courtroom to courtroom and transport detainees, including between courtrooms and the bridge, where frequent harassment occurs. *Id.*[4] Civilians employed by CCSO, including correctional rehabilitation workers and law librarians, work with detainees throughout the Jail.[5] Cook County health care employees, including nurses, doctors, mental health specialists, and emergency response technicians, provide medical care to detainees throughout the Complex. Pl. Br. at 5. In addition, women assigned to one division or location encounter and are harassed by inmates from other divisions in the connecting tunnels. Pl. Br. at 4-5; 9.

---

[2] Other cases cited by Defendants are similarly distinguishable. *Elder v. Comcast Corp.*, No. 12 C 1157, 2015 WL 347596, at *7 (N.D. Ill. June 1, 2015) (class not certified where class members worked statewide in 52 different garages); *Camilotes v. Resurrections Health Care Corp.*, 286 F.R.D. 339, 342 (N.D. Ill. 2012) (class not certified where class members worked in eight different hospitals, employed by eight different defendants); *Carlson v. C.H. Robinson Worldwide, Inc.,* No. Civ. 02-3780 JNE/JGL, 2005 WL 758602, at *13 (D. Minn. Mar. 31, 2005) (class not certified where class members worked in 134 individual branches in over 42 states).

[3] The proposed class includes about 1080 correctional officers, 520 Cermak medical providers, 150 courtroom deputies, 75 program services civilian employees, 35 police officers, and 200 administrative employees or clerks, approximately 2,060 female employees. Defendants provided class lists to Plaintiffs on October 2, 2018 including the names and titles of all potential Class Members. Such lists will be provided to the Court upon request. Ex. 53, Declaration of Sdharie Howard ("Howard Decl.") ¶¶ 15, 17.

[4] *See also* Ex. 54, Declaration of Susana Plasencia ("Plasencia Decl.") ¶¶ 4, 5; Pl. Br. Ex. 1, Mlinarcik Decl. ¶¶ 1–4 (has been assigned to five different courthouses in the last six years and has been masturbated at in many areas of the Courthouse).

[5] *See, e.g.* Pl. Br. Ex. 1, Esquivel Decl. ¶ 1 (CRW worked in all divisions except one), Delegan Decl. ¶ 1 (has worked in every law library in the Jail).

Second, Plaintiffs presented evidence that severe or pervasive sexual harassment occurred both within and without Divisions 8, 9, and 10. *See* Pl. Br. at 13 – 14. For example, Plaintiffs have presented evidence that more than 500 of the proposed 2000 Class Members filed a formal complaint of sexual misconduct (indecent exposure or masturbation). Pl. Br. at 1. Moreover, **283 of the 540** individual victims identified in Plaintiffs' summary Exhibit 2 (Dkt. No. 171-3), were subjected to sexual misconduct and harassment outside of or in addition to in Divisions 8, 9, and 10. *See* Pl. Br. Ex. 2. For example, at least 58 different women experienced sexual harassment in Division 11; at least 81 different women experienced sexual harassment in Receiving/RCDC; at least 54 different women experienced sexual misconduct in the tunnels. *Id.* Multiple complaints of sexual harassment were made in medium and low security divisions, including at least 22 in Division 1; another 25 in Division 2; and 49 in Division 6. *Id.* Similarly, sexual misconduct incidents were documented in Divisions 3, 4, and 5, in External Operations (including at exterior posts), Transportation, and the Kitchen. *Id.* There are hundreds of documented incidents of sexual misconduct in the Courthouse, including incidents that occurred on every floor of the Courthouse, on the bridge, in tunnels, and the medical clinic. Pl. Br. 9-10.

> b. *Defendants' claims that Class Members in some assignments escape sexual harassment is wrong.*

Defendants submitted declarations from Jail and Courthouse supervisors who identify divisions, units, and assignments within the Complex where they assert women would have little detainee contact in their daily duties.[6] According to Defendants, any detainee sexual misconduct occurring in those areas would not be sufficiently severe or pervasive, defeating commonality. Def. Br. 36-37. For example, Michael Miller claims that women who worked in Central Kitchen and in exterior post assignments in External Operations "do not have regular detainee contact"

---

[6] Def. Br. Ex. 1, Ex. 5, Ex. 6, Ex. 7, Ex. 8. Ex. 11.

and "there have been few, if any, formal or informal reports made of detainees engaging in indecent exposure, masturbation, or sexual misconduct . . . in those areas."[7] However, Plaintiffs put forth evidence of detainee sexual misconduct in both of those areas.[8] In fact, Declarant Diane Winter was sexually assaulted in the Central Kitchen, when an inmate touched her breasts.[9]

Mr. Miller and the other declarants list over forty (40) assignments in the Jail and Courthouse where they claim women do not have regular contact with male detainees.[10] However, many of these assignments are temporary or rotational.[11] Even Superintendent Giunta admits that one of these assignments is only done on an overtime basis only. (Def. Br. Ex. 7, ¶ 8). Further, women working in a division, unit, or assignment without regular detainee contact are often exposed to male detainees while walking to work, on overtime assignments, and in previous or subsequent roles.[12] Defendants' attempt to carve out women from the class based on faulty evidence and assumptions about a lack of contact with detainees should be rejected.

### c. Every Class Member is exposed to ambient harassment.

Plaintiffs have put forth evidence that sexually threatening and degrading harassment occurs throughout the Complex across job types, creating an environment so toxic that all Class Members experience ambient harassment. Pl. Br. at 15. This type of "secondhand" harassment is

---

[7] Def. Br. Ex. 1, ¶¶ 19-20.

[8] *See* Pl. Br. Ex. 2 (6 individual complaints of sexual harassment in Central Kitchen; 13 complaints in External operations); Ex. 53, Howard Decl. ¶¶5, 6, 16 (women who work at or walk by post 7, an exterior post assignment, are in clear view of Division 9 detainees in their recreation area, who expose their penises and make vulgar comments at them); Pl. Br. Ex. 1, Catrina Brown Decl. ¶¶1, 5, 6 (masturbation incidents happen in the kitchen about once a month, detainees walking through the tunnel stop at the gate to the kitchen and expose themselves to kitchen staff; staff who are assigned to the kitchen have to transport detainees through the tunnels where they are exposed to detainee sexual harassment).

[9] Pl. Br. Ex. 1, Winter Decl. ¶ 10.

[10] *See* Def. Br. Ex. 1, 7, 11.

[11] *See generally*, Ex. 54, Plasencia Decl. (describing that due to short-staffing and other "departmental needs," deputies could work anywhere in the courthouse regardless of their permanent assignment); Ex. 53, Howard Decl. (describing rotational nature of some assignments and the necessity for staff to travel throughout the compound where sexual harassment is likely to occur as part of their daily duties).

[12] Ex. 53, Howard Decl. ¶ 15; Ex. 54, Plasencia Decl. ¶¶ 5, 14, 16.

part of the overall hostile work environment. *Id.* As this Court has previously explained, "offensive phrases need not have been spoken directly to plaintiffs to create an objectively hostile work environment; if use of the terms is "'[r]epeated,' then they may be actionable 'even if they are heard secondhand.'" *Brand v. Comcast Corp., Inc.,* 302 F.R.D. 201, 218 (N.D. Ill. 2014) (internal citation omitted). Here, where the omnipresent and extreme harassment (including *thousands* of reported indecent exposure or masturbation incidents) is particularly egregious, ambient harassment goes *far* beyond repeated offensive phrases.

> ### d. Class Members need not experience exactly the same level of exposure.

Common evidence can establish that harassment was severe or pervasive and objectively offensive notwithstanding variations in exposure to or damage from the hostile environment. As this court previously explained, "[a] hostile work environment may be experienced differently from one person to the next, but it is nonetheless 'a single unlawful practice under Title VII.'" *Brand*, 302 F.R.D. at 218 (internal citation omitted). Further, even if some Class Members were not subjected to a hostile work environment, the class should still be certified. "The Seventh Circuit has instructed that when a company-wide discriminatory practice is alleged, a class can still be certified despite the need for subsequent individualized inquiries to determine which class members were actually adversely affected by the discriminatory practice." *Lucas v. Vee Pak, Inc.,* No. 12-CV-09672, 2017 WL 6733688, at *5 (N.D. Ill. Dec. 20, 2017) (internal citation omitted); *Whitney v. Khan*, 330 F.R.D. 172, 180 (N.D. Ill. 2019) ("Although this case presents questions that require individualized resolution … the common allegations concerning the RTU's staffing and scheduling policies can be resolved with respect to the class as a whole.")

> ### e. Defendants are is not exempt from Title VII.

Defendants' suggestion that the vile and sexually threatening verbal sexual harassment is not severe or pervasive or objectively offensive because the Class Members chose to work in a

jail is not supported by caselaw. When faced with the same argument, the Eleventh Circuit Court of Appeals explained "[w]e refuse the invitation of the Department to treat inmates differently from other third-party harassers and prisons differently from other employers under Title VII. Several of our sister circuits have refused this invitation too and permitted liability for sexual harassment by inmates." *Beckford v. Dep't of Corr.*, 605 F.3d 951, 958 (11th Cir. 2010); *see also Freitag v. Ayers*, 463 F.3d 838, 848 (9th Cir. 2006) (While "'[i]t is absurd to expect that a prison can actually stop all obscene comments and conduct from its inmates … 'we can expect and require prisons … to implement and enforce policies reasonably calculated to minimize such harassment and protect the safety of its employees.'") (internal citations omitted); *Erickson v. Wis. Dep't of Corr.,* 469 F.3d 600, 605 (7th Cir. 2006) (rejecting argument that facility was not liable for sex harassment by detainee).

Even Defendants' *own* corrections expert agreed that sexual harassment does not "come with the territory" of working in a jail and is not something that either sworn staff or civilian jail employees should simply accept they will experience.[13] She even conceded that at least for some time period, the prevalence of the sexual harassment "created a hostile work environment."[14]

### 2. Common Evidence Can Establish Harassment Was "Because of Sex."

Defendants' suggestion that the verbal sexual harassment here is *not* based on sex is nonsensical. Def. Br. at 27. As the *Beckford* court explained, when addressing the same defense argument, where the plaintiffs showed "the inmates called them cunts, whores, bitches, and sluts, … we have ruled that these gender-specific and highly offensive epithets evidence sex-based harassment under Title VII." 605 F.3d at 960. It is simply not plausible that gender specific epithets and comments like "I'm gonna fuck the shit out of you," "put my dick in your mouth"

---

[13] Ex. 55, April 23, 2019 Deposition of Margo Frasier (Frasier Dep.) 227:9-229:1.
[14] *Id.* 162:10-21.

and "I'd like to rape you in your mouth" are anything but sex-based. Pl. Br. at 6-7.

### 3. The Same Common Evidence for Equal Protection and ICRA Claims.

Defendants point out that Plaintiffs did not separately address commonality with respect to the Equal Protection and Illinois Civil Rights Act ("ICRA") claims, but that is because it was unnecessary: ICRA claims are subject to the same analysis as Title VII claims; *see Hosick v. Chicago State Univ. Bd. of Trustees*, 924 F. Supp. 2d 956, 966 (N.D. Ill. 2013); *Frobose v. Am. Sav. & Loan Ass'n of Danville*, 152 F.3d 602, 616 (7th Cir. 1998); and the same common evidence supporting certification of Title VII claims is sufficient to support certification of Equal Protection claims; *see Chicago Teachers Union v. Bd. Of Educ.*, 797 F.3d 426, 445 (7th Cir. 2015). Further, certifying a class under Rule 23(b)(3) does not require Plaintiffs to prove that *each* element of their claims is subject to classwide proof. *Id.* at 444 (citing *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 469 (2013)). And, contrary to Defendants' contention, Plaintiffs have set forth evidence that Defendants operated under a general policy that intended to discriminate towards women because of their gender: Defendants' failure to adequately address detainee sexual harassment towards female employees. *See* Pl. Br. at Sec. II.F.

### 4. Common Evidence Can Establish Defendants' Liability.

*a. Liability will hinge on common evidence concerning the adequacy of Defendants' policies applicable throughout the Complex.*

Defendants do not dispute they were aware as early as 2014, and certainly by 2015, that criminal sexual misconduct incidents occurred frequently enough to require an institutional response. Pl. Br. at Section II.E.[15] Instead, Defendants argue there is little centralization, and that "the only 'common' policies are those that forbid the conduct of which Plaintiffs complain." Def.

---

[15] *See also* Pl. Br. Ex. 47, Holmes Decl. ¶ 7 (former First Assistant Executive Director, around 2014, discussed the increase in masturbation and verbal harassment, with CCSO administrators including Assistant Executive Director Mike Miller); Ex. 56, January 11, 2019 Deposition of Brad Curry ("Curry Dep.") 87:4-93:24.

8

Br. at 23. Defendants' position regarding its policies assume that any policy—no matter how ineffective—would protect them from liability. That is not the law. *See Passananti v. Cook Cty.*, 689 F.3d 655, 673 (7th Cir. 2012) ("[M]ere creation of a sexual harassment policy will not shield a company from its responsibility to actively prevent sexual harassment in the workplace.") (internal citation omitted.) *Cf. Cook Cty. Sheriff's Office v. Cook Cty. Comm'n on Human Rights*, 53 N.E.3d 1144, 1152 (Ill. App. Ct. 2016) ("'[E]vidence in this case reveals that any enforcement mechanism' that the [CCSO] allegedly had in place to protect employees from sexual or age-related harassment 'is broken and needs to be repaired.'").

Defendants' "decentralization" argument is factually baseless. CCSO admits that it has responsibility and authority for running both the Jail (the Department of Corrections) and the Court Services Department" and is "responsible for securing detainees and providing security for courthouse personnel. Pl. Br. at 2. CCSO describes itself as operating "one of the largest single-site jails in the country."[16] CCSO's uniform policies regarding detainee misconduct, detainee discipline, use of force, and various employee conduct policies "apply equally to all of its employees regardless of what division they work in, courthouse or jail"[17] and under CCSO's hierarchical reporting structure, all departments report up to Sheriff Dart. Pl. Br. at 3.

The facts here are similar to *Brown v. Nucor Corp.*, 785 F.3d 895 (4th Cir. 2015) where the defendant argued no common questions exist because the large plant at issue was actually several separate facilities and most of the discrimination occurred in a single department. *Id.* at 910. In rejecting that argument, the court explained "class members shared common spaces, were in regular physical contact with other departments, … and were subject to hostile plant-wide policies and practices." *Id.* The court explained that nothing in the [Wal-Mart] opinion suggests

---

[16] Cook County Sheriff's Office, Corrections, https://www.cookcountysheriff.org/cook-county-department-of-corrections (visited 6/26/19).
[17] Ex. 56, Curry Dep. at 294:16 - 18.

that single, localized operations must be analytically dissected into component parts." *Id.* at 911. The same is true here.

As in *Nucor*, Defendants' liability will be resolved with common evidence of uniform policies and practices that failed to adequately address detainee sexual harassment. *See Porter v. Pipefitters Ass'n Local Union 597*, 208 F. Supp. 3d 894, 906 (N.D. Ill. 2016) ("The fact that individual contractors made the final hiring decisions does not matter because Plaintiffs challenge Local 597's overarching policies, which influenced the entire job assignment and hiring process."). The adequacy of these "polic[ies] can provide the 'glue' necessary to litigate" this final element as a class. *Lucas*, 2017 WL 6733688, at *5 (internal citations omitted).[18]

Defendants claim to have taken a variety of Complex-wide measures to address sexual harassment, but Plaintiffs' evidence indicates that they were inadequate, ineffective, and untimely. Pl. Br. at 18-24. Moreover, Defendants neglected to institute a host of policies that have been effective at other correctional institutions or are obvious responses to inmate sexual harassment. *Id.* Defendants' policies and procedures applied to the entire Complex, and evidence about whether they were inadequate is common to all Class Members:

- CCSO's general anti-discrimination and harassment policy (Policy 315) (*see* Def. Br. at 6 n. 23), does not even *reference* detainee harassment of staff. CCSO had no formal policy on detainee sexual harassment until the November 2017 Jail-wide directive implementing the Preliminary Injunction (*see* Pl. Br. at 19).[19]

- CCSO has failed to provide effective notice to detainees that sexual harassment is prohibited. The inmate handbook (*see* Def. Br. at 9) is lengthy, frequently in low supply and not distributed, and includes only vague prohibitions on sexual

---

[18] Cases cited by Defendants' are distinguishable. *See, e.g., McCaster v. Darden Restaurants, Inc.*, 845 F. 3d 794, 801 (7th Cir. 2017) (affirming denial of class certification and grant of summary judgment because the common question proposed was "no question at all")*; Halperin v. Int'l Web Servs., LLC*, 70 F. Supp. 3d 893, 900 (N.D. Ill. 2014) (ruling on a motion to dismiss, the court held that there could be no aggregation of claims where individuals could not state a claim under applicable law).

[19] *See* Def. Br. Exhibits 22-23 (Policy 315); Ex. 56, Curry Dep. 262:12-263:3; Pl. Br. Ex. 29, Policy 166, CCSO_Howard_0097010-012.

harassment of staff.[20] CCSO *considered* putting signs up as early as 2015, but they were either never posted or quickly taken down.[21] The "verbal reminders" began in 2017 and refer only to detainees engaged in courthouse movement.[22] The touted town hall meetings were limited in scope and never repeated.[23] And CCSO has declined to implement an effective orientation program or ensure comprehension of any of the measures it does take.[24]

- While CCSO claims it "educated staff" (Def. Br. at 9), it never trained employees on how to respond to inmate sexual misconduct; the measures it claims to have taken deal with peripheral issues (*e.g.* handcuffing and transportation). And the "reminder" about sexual misconduct against staff was not issued until 2017 in conjunction with the Preliminary Injunction.[25]

- The referenced efforts to physically prevent sexual misconduct (handcuffing, delayed courthouse transport, modified chuckholes, window tints and covers) universally occurred after Plaintiffs' EEOC charges and, in most cases, this lawsuit were filed, and they have not been uniformly implemented or enforced.[26]

- CCSO delayed using *any* type of modified jumpsuit until mid-to-late 2016 and still has <u>not</u> implemented exposure control jumpsuits, such as those used in the California correctional system since 2007.[27]

- Although CCSO's inmate disciplinary code prohibits sexual harassment (*see* Def. Br. at 6, 10), it *reduced* the code levels and sanctions for indecent exposure and sexual harassment in 2013 and failed to raise them until 2017.[28]

---

[20] *See* Def. Br. Ex. 37 at CCSO_Howard_0281248-51 (including a 49-point list of inmate responsibilities and a five-line section titled "Treat Everyone with Respect" that notes "being sexually inappropriate" (among other things such as battering or intimidating others) may result in discipline, lost or restricted privileges, or criminal charges); Pl. Br. Ex. 19, Expert Rebuttal Report of Jeanne Woodford (Corrected) April 30, 2019, ("Woodford Rebuttal Rep.") at 23-24.

[21] Ex. 56, Curry Dep. at 163-69.

[22] Pl. Br. Ex. 3, Declaration of Brad Curry in Brown, et al. v. Cook Co., et al, 17-cv-08085, Dkt. 24-1 (Nov. 15, 2017) ("Curry Decl.") ¶ 18.

[23] Ex. 57, CCSO_Howard_0088888-89 (describing townhall meetings with presentation from the Public Defender's Office to detainees who engage in sexually offensive behavior); Ex. 56, Curry Dep. 122:16 – 124:12.

[24] Pl. Br. Ex. 18, Expert Report of Jeanne Woodford, ¶¶ 85-86; Woodford Reb. Rep. at 23-24.

[25] Pl. Br. Ex. 3, Curry Decl. ¶¶ 17-18.

[26] Pl. Br. at 19-20; *See also* Pl. Br. Ex. 47, Holmes Decl. ¶ 12 ("CCSO's policies allowed [immediate disruption of sexual misconduct] only in special circumstances but not as a regular course of action. As a result, detainees who sexually harassed female staff continued to do so").

[27] Ex. 56, Curry Dep. 186:10-211:1; Pl. Br. Ex. 18, Woodford Rep. ¶ 92; Pl. Br. Ex. 47, Holmes Decl. ¶¶ 22-25.

[28] *See* Pl. Br. at 23; Ex. 58, January 9, 2019 Deposition of Steven Wilensky ("Wilensky Dep.") 87:2 – 89:21.

- CCSO's other defenses of its ineffective disciplinary system fail to address the staggering rate of expired tickets during much of the class period, the untrained and inexperienced Director of Discipline and hearing officers who operate without guidance, and the failure to impose progressive discipline and arrest detainees for indecent exposure across the Complex.[29]

- CCSO permitted detainees who engaged in criminal sexual misconduct to remain in their housing area with the victimized staff member(s) until their hearing (if one ever took place). Worse, it failed to maintain sufficient SMU space for detainees sanctioned for sexual misconduct; it could take months before detainees were moved to SMU. Even with a wait list of more than 200 detainees and ample space to designate more tiers as SMU, CCSO elected not to do so.[30]

Defendants' liability will turn on their Complex-wide failures, established through common proof, and superseding any discretion an individual employee could exercise. Defendants again attempt to analogize this case to *Bolden*. But there, the 262 work sites had different superintendents, with different foreperson crews. Unlike here, the defendant had few centralized relevant policies. Rather, each site instituted its own employment policies and made its own hiring and pay decisions. *Bolden*, 688 F.3d at 896. *Bolden* simply does not apply here.

  *b. Any discretion delegated to employees to respond to detainee sexual misconduct is due to the failure to implement effective policies*

Defendants assert a lack of commonality because they supposedly allow staff to exercise discretion on how to handle detainee sexual misconduct, such as whether to impose immediate consequences (return to cell, move off of tier). Def. Br. at 22. They assert that "[a]uthority to stop and prevent the misconduct is, of necessity, vested in each Division's nonsupervisory and supervisory personnel." *Id.* at 24.

That statement does not constitute a defense to class certification, but rather an admission of liability. Defendants' *failure to implement effective, uniform policies* to respond to detainee sexual harassment will ultimately establish liability. Here, one of Plaintiffs' primary complaints

---

[29] Pl. Br. at 21-24.
[30] Pl. Br. Ex. 47, Holmes Decl. ¶ 16-21.

is that, until after this suit was filed, CCSO had *no formal policy* addressing detainee sexual misconduct; there was *no institutional response*. CCSO failed to provide direction or training regarding real time responses to the harassment; how to decrease opportunities for repeated harassment; how to respond to attempted assaults; or even what women could do when harassed. Pl. Br. at 19-20. This is *not* the type of discretion that doomed the class in *Wal-Mart*, rather it is an institutional failure to respond to widespread sexual harassment of its female employees.

### C. Plaintiffs Have Established Typicality.

Defendants challenge typicality, arguing that because named Plaintiffs had various supervisors and worked in different divisions, some of which had the highest number of formally reported sexual misconduct incidents, their claims cannot be typical of women who worked in other areas of the Complex or experienced only verbal or ambient harassment. Def. Br. at 31. Neither the facts nor the law supports this argument.

Plaintiffs' claims are typical if they arise from the same practice or course of conduct as the claims of other class members and are based on the same legal theory. *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992); *Lucas,* 2017 WL 6733688, at *6. Typicality is determined by looking to a defendant's actions, not the individual class member's experience or defendant's defenses to certain class members' allegations. *See Wagner v. Nutrasweet Co.,* 95 F.3d 527, 534 (7th Cir. 1996); *De La Fuente v. Stokely-Van Camp, Inc.,* 713 F.2d 225, 232 (7th Cir. 1983).

Here, Plaintiffs and other Class Members universally experienced sexual harassment caused by Defendants' institutional failures. That some Plaintiffs experienced more frequent or extreme harassment than other Class Members does not erode "the essential characteristics" of the claims they share. *See Brand*, 302 F.R.D. at 221. Arguments that certain Class Members have suffered differing degrees of injury or even no injury do not defeat typicality. *See Porter*, 208 F. Supp. 3d at 907-08 (argument that claims depended on each class members' "unique

circumstances" and some may not have suffered an injury were "best left for summary judgment") (citing *Messner v. Northshore Univ. Health Sys.*, 669 F.3d 802, 823 (7th Cir. 2012)); *Parish v. Sheriff of Cook Cty.*, No. 07 C 4369, 2016 WL 1270400, at *6-7 (N.D. Ill. Mar. 31, 2016) (arguments about differences in class members' harm were premature at class certification stage, so typicality met).[31] Because Plaintiffs' and Class Members' claims are all based on the hostile work environment created by Defendants' failure to take action reasonably calculated to curb detainee sexual harassment, typicality is met.

### D. Plaintiffs and Their Counsel Are Adequate Representatives.

Defendants do not dispute that Plaintiffs experienced the same sexual harassment as other Class Members, seek remedies beneficial to all Class Members, and have participated fully in discovery. Nor do they challenge Plaintiffs' counsel's qualifications. Pl. Br. at 33; Def. Br. at 32-34. Rather, they assert conflicts among Class Members preclude finding adequacy. *Id.* at 32-33.

Defendants mainly rely on an alleged conflict between Plaintiffs, who are non-supervisory employees, and an unspecified number of supervisors in the class. *Id.* at 32-33. And while Defendants argue "it is generally true that supervisory and nonsupervisory employees should not be placed in the same class," Def. Br. at 32, there is no *per se* rule applicable here.

---

[31] Cases cited by Defendants are distinguishable. *See Kress v. CCA of Tenn., LLC*, 694 F.3d 890, 893 (7th Cir. 2012) (inmates alleging inadequate medical care at jail did not establish typicality because claims "require individual determinations" and outcomes vary based on preexisting medical conditions); *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 398-99 (6th Cir. 1998) (early retirees with contract and estoppel claims lacked typicality because claims turned on individualized representations made to each class member); *Goodwin v. Conagra Poultry Co.*, No. 03-CV-1187, 2007 WL 1434905, at * 14 (W.D. Ark. May 15, 2007) (typicality lacking when plaintiffs' hostile work environment claims turned on mistreatment from their supervisors, not from overarching policies of the plant); *Wrightsell v. Sheriff of Cook Cty.*, No. 08 CV 5451, 2009 WL 482370, at *3 (N.D. Ill. Feb. 19, 2009) (inmates alleging inadequate dental care lacked typicality because level of need for care and jail's response requires individual determinations); *Sandoval v. City of Chicago*, No. CIV A 07 C 2835, 2007 WL 3087136, at *6 (N.D. Ill. Oct. 18, 2007) (typicality not found because plaintiffs provided "no evidence, only speculation" concerning policies in all City departments); *Allen v. Chicago Transit Auth.*, No. 99 C 7614, 2000 WL 1207408, at *10 (N.D. Ill. July 31, 2000) (plaintiffs alleging discriminatory denials of promotions, equal pay, and other benefits lacked typicality when different departments used different methods to make such decisions).

As an initial matter, Defendants have identified only one Class Member and two Plaintiffs who have stated a female supervisor responded inappropriately to a report of sexual misconduct—that is no basis to conclude there is a conflict.[32] Moreover, courts in this Circuit have carved out an exception for hostile environment cases. As explained by the *Brown v. Yellow Transp., Inc.,* court, in a hostile work environment case, where supervisory and non-supervisory victims have the same interests—stopping the discriminatory behavior—"the inclusion of both supervisor and non-supervisor employees in the class does not destroy commonality, typicality, or adequacy." No. 08 C 5908, 2011 WL 1838741, at *4 (N.D. Ill. May 11, 2011).[33] *See also Smith v. Nike Retail Servs., Inc.,* 234 F.R.D. 648, 661 (N.D. Ill. 2006) ("Here the strength of the common injury and interest shared by the named plaintiffs and class members—the harm caused by an allegedly hostile work environment and the interest in eliminating that environment—plainly overrides any potential conflicts."); *Jefferson v. Windy City Maintenance, Inc.,* No. 96 C 7686, 1998 WL 474115, at *8–9 (N.D. Ill. Aug. 4, 1998) (to the extent there is tension between a supervisor and non-supervisor class member "any such tension is overcome by the supervisor's personal interest in eliminating the alleged discrimination as to herself"). The same is true here.

---

[32] In footnotes 71-73 Defendants cites testimony that allegedly supports this proposition, but almost all of that testimony fails to support Defendants' proposition. *See* Ex. 59, B. Ranney Dep. 28:24-29:5 (merely noting she had one female supervisor during her tenure; no testimony a female supervisor failed to intervene); Ex. 60, T. Wilson Dep. 27:22-28:5; 251; 294:18-295:8 (testifying that female supervisor told her not to touch detainees; no testimony regarding a "female Sergeant" failing to protect her; but complaining that female sergeant has an "attitude" problem); Ex. 61, D. Hobbs Dep. 189:16-190:6 (no testimony regarding female sergeants or lieutenants); Ex. 62, E. Jones Dep. 72:3-73:6 (no testimony regarding female supervisors); Ex. 63, S. Robinson Dep. 138 (no testimony regarding female supervisors); Ex. 64, S. Howard Dep. 129-139 (same). With respect to the 25 declarations cited by Defendants, only one marginally supports Defendants' argument, stating "I expect my managers and supervisors to do something to try to help with the sexual harassment, but since they are all women, they are victims as well." The other declarations do not support Defendants' argument. Ex. 65, July 1, 2019 Declaration of Dominic Charles ("Charles Decl.") ¶ 8.

[33] Defendants cite *Brand*, (Def. Br. at 32-33 n. 97), but the inclusion of supervisors in that class did not cause this Court to conclude that non-supervisory employees were inadequate representatives. Rather, it directed that supervisors who "have been accused of hostile work environment-related wrongdoing or are claimed to have ignored complaints" should be identified so that it could consider how to deal with them. 302 F.R.D. at 225-26, 231.

Second, Defendants have not, and cannot, assert that lieutenants and sergeants in the class held policy-making positions. These women could not, for example, change Defendants' policies precluding civilian employees from filing disciplinary reports, allowing 25% of sexual misconduct charges to lapse unadjudicated, or failing to use exposure control jumpsuits. *See* Pl. Br. at 31. As former First Assistant Executive Director Michael Holmes testified: "officers, sergeants, lieutenants and superintendents were never given effective training or *tools* to curb the masturbation." (emphasis added).[34] No disabling conflict exists when supervisors are subject to the same policies as non-supervisory class members and lack the power to change them. *See, e.g., Moore v. Ulta Salon, Cosmetics & Fragrance, Inc.,* 311 F.R.D. 590, 606 (C.D. Cal. 2015); *Wagner v. NutraSweet Co.*, 170 F.R.D. 448, 451-52 (N.D. Ill. 1997).

The cases Defendants cite involve supervisors included in the proposed class who made relevant decisions or engaged in the conduct being challenged. *See, e.g., Van v. Ford Motors,* No. 14-cv-8708, 2018 WL 4635649, at *6 (N.D. Ill. Sept. 27, 2018) (adequacy questioned where "some putative class members have 'fought to preserve the sexually harassing culture at Ford'"); *Lee v. Children's Place Retail Stores, Inc.,* No. 14 C 3258, 2014 WL 5100608, at *3 (N.D. Ill. Oct. 8, 2014) (assistant manager could not represent non-supervisory employees claiming they were required to work off-the-clock when she was "responsible for overseeing associate hours and ensuring compliance with defendant's timekeeping policy"). That is not the case here.

Defendants also raise alleged conflicts between "CCSO sworn officers accused by other [C]lass [M]embers of refusing to take reports of misconduct." Def. Br. at 33. Defendants suggest that sworn officers might "strategically fail to create incident reports or disciplinary tickets related to incidents of detainee sexual harassment perpetrated against other Class Members" to create evidence of discrimination. *Id.* at 34. Not only is this argument offensive to Class

---

[34] Pl. Br. Ex. 47, Holmes Decl. ¶ 27.

Members sworn to keep the peace, Defendants have also failed to identify a single female sworn officer who refused to take a report from civilian Class Members. Def. Br. at 17 n.75.[35]

### E.  The Proposed Class Satisfies Rule 23(b)(3).

#### 1.  Common Issues Predominate Over Individual Issues.

Plaintiffs do not contend that they satisfy predominance merely because they satisfy commonality. Def. Br. at 35-36. Rather, as explained in Plaintiffs' opening brief and again above, they prove each of the four elements of their hostile work environment claims (all except subjective offensiveness) with common evidence. Pl. Br. at 34. Defendants cannot refute the common nature of these four issues. *See supra* Section I. B. Common issues predominate because all four elements can be established through common evidence.

Defendants primarily respond by citing decisions rejecting certification of hostile environment claims against employers operating multiple separate facilities, asserting that the Complex constitutes multiple facilities. But the facilities in the cases in this Circuit were geographically and managerially separate. *See Bolden*, 688 F.3d at 894-96, 898 (defendant construction company had few company-wide policies but at least 262 projects with separate superintendents, each with hiring duties and control over working conditions); *Radmanovich v. Combined Ins. Co. of Am.*, 216 F.R.D. 424, 428-29 (N.D. Ill. 2003) (defendant insurance company had over 400 districts throughout the country with separate managers supervising sales

---

[35] Not a single one of the declarations cited by Defendants specifically identifies a *female* officer who did not take a report. Moreover, Defendants also erroneously assert that Denise Hobbs is not an adequate representative because "she did not experience any actionable detainee sexual harassment during the relevant time period." Def. Br. at 32 n.96. But Hobbs testified to two documented indecent exposure incidents in 2017. Ex. 61, D. Hobbs Dep. 125:8-126:2. In addition, Defendants misrepresent her deposition testimony. The question addressed only *indecent exposure or masturbation* incidents in 2015. Hobbs did *not* testify that she suffered no *sexual harassment*. *Id.* 125:24-126:3; *see also, id.* 162:8-12 (verbal harassment happens "all the time").

agents).[36] Similarly, the two prison cases cited by Defendants involve multiple facilities scattered throughout a State. In *Rudolph, et al. v. Dep't of Corr., et al.,* the proposed class included female employees who worked in various prison facilities, each managed by different wardens, throughout the state of Florida. No. 5:06-cv-56-RS-MD, Dkt. # 211 at 10 (N.D. Fl. Nov. 9, 2006) ("The stratification of Plaintiffs across institutions and geography unequivocally weighs against class certification."). Similarly, in *Berndt v. Cal. Dep't of Corr.,* the proposed class included women employed at any facility throughout the entire state of California housing inmates who had engaged in sexual harassment. No. C 03-3174 PJH, 2012 WL 950625, at *7 (N.D. Cal. Mar. 20, 2012).[37] These cases are easily distinguishable on the facts and are also outside this Circuit. *Cf. Holmes v. Godinez,* 311 F.R.D. 177, 216 (N.D. Ill. 2015) (certifying a class of inmates housed in IDOC facilities throughout the state of Illinois).

Plaintiffs' motion to certify a class of women employed at the Complex is simply not comparable to failed attempts to certify classes against employers operating multiple facilities scattered over wide geographic areas with different teams of managers and separate policies at each facility. The Complex is one centrally administered facility. Indeed, the Complex is more centralized in administration than the federal correctional complex in Coleman, Florida, which includes four prisons (two high security, one medium security, and one low security), each with

---

[36] Most cited decisions outside this Circuit also involve proposed classes spanning geographically and managerially scattered facilities. *See Reid v. Lockheed Martin Aeronautics Co.*, 205 F.R.D. 655, 659, 668, 675-76 (N.D. Ga. 2001) (proposed class had members working in eight states under four different "presidents"); *Faulk v. Home Oil Co.*, 184 F.R.D. 645, 649, 659 (M.D. Ala. 1999) (proposed class had members working at 21 gas station/convenience stores in two states).

[37] Defendants also rely on the report of their expert Benjamin Wilner to argue that, because officially reported inmate sexual *misconduct* (i.e. masturbation and indecent exposure, but not all sexual harassment) was less pervasive in certain parts of the Complex, women working in the less affected areas do not have common claims with women working in others. Def. Br. at 37 & n. 105. Wilner's Report should be excluded, as explained below. *See supra* Section I.B.1.b. Even if the testimony is admissible, Defendants' arguments still fail. *See* Pl. Br. at 4 (discussing that women experienced harassment in areas outside their primary assignments, during movement, and that assignments frequently changed).

its own warden and reporting structure. Yet an Administrative Judge certified a hostile environment class of female employees who had worked at any of the prisons.[38] This case is much more similar to *Brand*, involving a single facility with a single set of managers and policies, and *White*, involving a correctional complex, than to cases involving companies with multiple, separate facilities.

Of course, Class Members did not all have identical experiences and are not entitled to identical damages. As this court in *Brand* explained, that will not defeat class certification:

> Comcast may be correct that damages may differ among plaintiffs … but this do[es] not undermine the fact that the fundamental question that predominates is a common question, namely whether there was a hostile work environment in plaintiffs' workplace. The Seventh Circuit has consistently held that "common proof of damages for class members … is not required." (internal citation omitted).[39]

302 F.R.D. at 223-24.

*Riffey v. Rauner*, 910 F.3d 314 (7th Cir. 2018), does not change the analysis. In *Riffey*, the primary liability issue had been resolved by *Janus v. State, County & Muni. Employees,* 138 S. Ct. 2448 (2018), leaving damages as the primary issue. 910 F.3d at 316-17. Under that scenario, it was easy to conclude that the district court did not abuse its discretion in denying certification based on the need for individualized damages determinations. But this case, with several critical common liability issues, is dramatically different. Here, the normal rule stated in *Messner* and *Brand*, that "common proof of damages" is unnecessary to satisfy predominance, should control.

---

[38] Pl. Br. Ex. 44, *White v. Holder*, EEOC Case No. 510-2012-00077X, slip op. at 2 (Miami Dist. Off. Apr. 9, 2013) (certifying class); *see* Ex. 66, *White v. Holder*, slip op. at 13 (Miami Dist. Off. July 6, 2016) (decision on cross-motions for summary judgment with information about organizational structure).

[39] *See also, Whitney*, 330 F.R.D. at 180 (Kennelly, J.) ("[Plaintiff's] proposed class … satisfies the predominance requirement notwithstanding the need for individualized proof of objective seriousness.")

Finally, Defendants have not shown that any defenses they may have against the claims of individual Class Members alters the balance between common and individual issues. The exaggerated emphasis on some Class Members not filing formal incident reports (Def. Br. at 15-17), is a true red herring that does not defeat predominance (or any other prerequisite of class certification).[40] Defendants do not dispute knowing that sexual harassment and underreporting were widespread.[41] Plaintiffs have alleged that Defendants lacked effective institutional systems to address complaints (including the more than 2000 it formally received) (Pl. Br. at 21-24), thus even "unjustified" failures to report would not constitute an unreasonable failure of Class Members to follow CCSO policies or avail themselves of remedial measures. *See* Def. Br. at 16. Also, if Defendants intend to pursue the issue, it goes to the merits, not to class certification, and a class action will still allow them to present their defenses. As described previously, if Plaintiffs prevail at the first stage of trial of common issues, the second stage will consist of a series of "mini-trials" where individualized issues, including damages and individualized defenses, will be adjudicated.

## 2. A Class Action Is Superior to Other Means of Adjudication.

In contesting manageability, Defendants reiterate their predominance arguments. Def. Br. at 44-45. Plaintiffs will not copy and paste their responses. But two other points that make a class action superior bear mentioning. First, a class action is the only means to secure necessary, broad programmatic relief. This Court's preliminary injunction already has substantially reduced the level of reported sexual misconduct incidents. Pl. Br. at 18. Absent certification of the class, Plaintiffs may not be able to secure final injunctive relief. *See Santiago v. RadioShack Corp.*, No.

---

[40] As Plaintiffs set out in their opening brief, Class Members faced a variety of obstacles in filing reports, including direct deterrence, misinformation, the reasonable belief that reports would not result in meaningful consequences, and lack of access to CCOMS. Pl. Br. at 11-13.
[41] *See supra* page 7-8; Pl. Br. at 16; Pl. Br. Ex. 47, Holmes Decl. ¶ 9-11.

11 C 3508, 2012 WL 934524, at *4 (N.D. Ill. Feb. 10, 2012). Second, female employees have voted overwhelmingly for the class action. While one member of the proposed class filed an individual action,[42] Def. Br. at 44, almost 400 women have retained Plaintiffs' counsel to represent them and 142 have submitted declarations in support of certification.

### F. Alternatively, Common Issues May Be Certified Under Rule 23(c)(4).

If the Court concludes that either predominance or manageability concerns preclude certification under Rule 23(b)(3), it should still certify the class under Rule 23(c)(4) to litigate common issues. Defendants assert that Rule 23(c)(4)(A) certification is appropriate only if "Rule 23(b)(3)'s requirements of predominance and manageability [are] satisfied," (Def. Br. at 44), in reliance on *In re Gen. Motors Corp. Dex-Cool Prods. Liab. Litig.*, 241 F.R.D. 305, 314 (S.D. Ill. 2007). However, the Seventh Circuit, overruled that view in *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc*., 672 F.3d 482, 491 (7th Cir. 2012), as this Court recognized in *Brand*. 302 F.R.D. at 224; *see also Butler v. Sears, Roebuck & Co.,* 727 F.3d 796, 800 (7th Cir. 2013) ("a class action limited to determining liability on a class-wide basis, with separate hearings to determine … the damages of individual class members … is permitted by Rule 23(c)(4) and will often be the sensible way to proceed"). Thus, Rule 23(c)(4) certification is proper if (b)(3) certification is not.

### G. There Is No Reason to Redefine the Class.

The Court should reject Defendants' proposal to restrict the class to non-supervisory[43] women who had a regular assignment in Divisions 8, 9, or 10 since April 23, 2015 and who reported sexual misconduct. Def. Br. at 44-45. First, Defendants continue to conflate officially reported sexual misconduct (masturbation or indecent exposure) with *sexual harassment*, which

---

[42] This filing was necessary because the Class Member had filed her own EEOC charge with sexual harassment and individual retaliation claims and, under the law in this Circuit, could not "piggyback."

[43] Female supervisors need not be excluded because there is no material conflict, as discussed above.

includes all offensive sexual behavior, whether documented or not. Defendants' approach cannot be reconciled with Title VII or the Equal Protection Clause, which prohibit *sexual harassment,* not just criminal sexual behavior. Second, Defendants' approach is also irreconcilable with the record, which includes evidence that hundreds of Class Members, filed reports of *sexual misconduct* outside Divisions 8, 9, and 10 and that *sexual harassment* permeated the Complex.[44] Defendants' proposal would exclude, for example, women who worked in the Courthouse and Receiving based on the report of Dr. Wilner, who undercounted reported incidents in those locations (see Section IV below). Detainees frequently sexually harass women who do not work in the divisions where they are housed, for example, when they encounter women in the tunnels or even walking to their cars.[45] To exclude women for whom there are no recorded reports of criminal sexual behavior would also disproportionately and unfairly exclude hundreds of civilian employees who cannot enter reports in CCOMS, and courtroom deputies who could not do so until late 2017. Pl. Br. at 12. It would also punish women deterred from reporting sexual harassment for the many credible reasons set out elsewhere.[46] For these reasons, the Court should adopt Plaintiffs' class definition.

## II.    The Court Should Not Exclude Expert Testimony of Woodford and Fitzgerald

### A.    Jeanne Woodford.

Defendants seek to bar "portions" of the opinion of Plaintiffs' corrections expert, Jeanne Woodford, under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Def. Br. at 54-60. They do not identify which "portions" they seek to exclude, but Plaintiffs assume it is

---

[44] *See* Pl. Br. at 5-11, 13-15, Ex. 2.
[45] *See, e.g.* Pl. Br. Ex. 1, Miller Decl. ¶¶ 4-5, Bain-Norris Decl. ¶ 4, Spencer Decl. ¶ 9, C. Brown Decl. ¶ 4, Bryant Decl. ¶ 12, Conley Decl. ¶ 2, 6-7, Cribbs Decl. ¶¶ 5-6;  Pl. Br. 14 n. 66 (citing declarations documenting harassment of Class Members assigned to women's divisions), 14 (inmates in Jail courtyard harassed Class Member entering the building).
[46] Pl. Br. Ex. 18, Woodford Rep. ¶¶ 24-31; Pl. Br. at 12-13.

her opinion that "sexual harassment at the Jail and Courthouse has been pervasive and far greater than other correctional institutions in the United States between 2014 (if not before) through April 2018."[47] The Court should reject Defendants' arguments, which misrepresent the opinion and erroneously apply *Daubert* standards to non-statistical calculations performed using elementary math.

> **1.     Defendants misrepresent the basis for Woodford's opinion on the extent of inmate sexual harassment at the Complex.**

The premise of Defendants' *Daubert* argument is that Woodford's opinion on the extent of sexual harassment at the Complex is "base[d] upon" a "statistical analysis" of reported sexual misconduct incidents. Def. Br. at 54-55. That premise is false.

First, Woodford's opinion is not limited to reported sexual misconduct incidents; it encompasses all *sexual harassment*.[48] She supports her opinion with many secondary opinions on the "excessively large number of reported incidents of masturbation and indecent exposure," (*id.* ¶¶ 16-23); the severe underreporting problem and reasons for it, including lack of a civilian reporting system *(id.* ¶¶ 24-34); and the frequency of "sexual offenses other than masturbation and indecent exposure, which are rarely reported," (*id.* ¶¶ 35-44). Thus, even if some portion of her opinion warrants exclusion under *Daubert* (which it does not), there is no basis to exclude her entire opinion on the extent of sexual harassment at the Complex.

Second, Defendants' claim that the "basis" of Woodford's opinion is a "statistical analysis" is false. Def. Br. at 54-55. Her opinion is based upon "[her] years of correctional

---

[47] Pl. Br. Ex. 18, Woodford Rep. ¶ 13(a). Woodford offers three "primary" opinions, under "Summary of Opinions and Basis for Opinions," supported by "numerous secondary opinions" described in "Detailed Bases for Opinions." *See* Pl. Br. Ex. 18 ¶¶ 13-23. It appears Defendants seek to exclude a "primary" opinion, even though their arguments apply only to portions of the "secondary opinions" discussing COMPSTAT data. See Def. Br. at 54-60.

[48] Pl. Br. Ex 18, Woodford Rep. ¶ 19 ("[h]arassment encompasses far more than masturbation and indecent exposure").

experience,[49] [her] review of documents and transcripts of deposition testimony provided to [her], one on-site visit of Cook County Jail, [her] review of policies of other correctional agencies, and research of criminal justice topics."[50] At her deposition, she testified that her opinion on the prevalence of sexual harassment at the Complex is based upon all of her experience and her knowledge of "what's happening within jails and prisons around the country."[51] Since the premise of Defendants' argument is false, the entire argument fails.

### 2. Woodford Did Not Perform "Statistical Analysis."

Defendants' *Daubert* challenge presumes Woodford performed "statistical analysis," but she did not. In her reports, she used CDCR COMPSTAT data[52] to "put in perspective" the "extremely high" number of reported indecent exposure incidents at the Complex.[53] In using COMPSTAT data, Woodford did not conduct "statistical analysis." She did division, calculated averages, and placed numbers in rank order using data she understands from her experience at CDCR. *Id.* Her calculations were "an exercise in basic math using simple deductive reasoning." *Rush v. Wyeth*, 514 F.3d 825, 831 (8th Cir. 2008); *see also Wirtz v. Turner*, 330 F.2d 11, 14 (7th Cir. 1964) (wage and hour investigator could testify to computation of unpaid wages); *Portz v. St. Cloud Univ.*, 297 F.Supp.3d 929, 955 (D. Minn. 2018) (Title IX gender equity expert need not be a "mathematician or statistician" to do "simple mathematic analysis in light of her previous experience"). Woodford is not proffered as an expert in statistics, so Defendants' arguments do

---

[49] Woodford served for 30 years at all levels of the California Department of Corrections and Rehabilitation (CDCR), from correctional officer to Undersecretary and Acting Secretary and has served on numerous criminal justice commissions and task forces, taught courses on correctional policy, and has served as a criminal justice expert for governmental entities and litigants. *Id.* ¶¶ 4-11 and Appendix A.
[50] *Id.* ¶14.
[51] Ex. 67, May 1, 2019 Deposition of Jeanne Woodford ("Woodford Dep.") 73:17-24; *see generally id.* at 71-79.
[52] COMPSTAT (not "COMSTAT") is "short for computerized statistics" and "refers to a system-wide collaborative approach to collecting, validating, and reporting strategic and operational performance data for business management purposes." https://www.cdcr.ca.gov/compstat/about-compstat/ (visited 6/21/19).
[53] Pl. Br. Ex. 18, Woodford Rep. ¶ 22.

not warrant excluding any portion of her report.

### 3. The Criticisms of Woodford's Calculations Are Weak or Mistaken.

Since Woodford is not offered as a statistics expert, Defendants' criticisms at most go to the weight the jury should afford her opinion. And those criticisms are weak. First, Defendants misrepresent the COMPSTAT data on sexual misconduct incidents, citing the data dictionary ("Counting Rules") to purport to show the relevant data category includes only "guilty findings." Def. Br. at 56-57 n. 157. In fact, the counting rule includes all "adjudicated" incidents; and the definition of "adjudicated" is "[a] formal judgment or decision of the guilt *or innocence* of an inmate" (emphasis added).[54] Therefore, Woodford compared adjudicated incidents to reported incidents,[55] not guilty findings to reported incidents.

Second, in her rebuttal report, Woodford thoroughly disposes of the claim that she "cherry picked" among California prisons.[56] She did not. Third, the criticism about "comparable data sets" is weak. Def. Br. 55-58. Although the time frames covered by the COMPSTAT report and CCSO internal analysis are not identical, they are proximate, and Defendants fail to show how the difference matters. Similarly, Woodford does not agree that CCSO inmates "differ[]" in material respects from California prison inmates assigned, comparably, to either "high security" or "general population" housing.[57] Finally, Woodford does not "extrapolate" CDCR data "across all correctional institutions in the United States." Def. Br. at 59. Instead, she uses the data to "put in perspective" the "staggering number" of reported sexual misconduct incidents at the Complex,

---

[54] Ex. 68, (COMPSTAT Division of Adult Institutions Counting Rules) at 19 (code 171) and Glossary. Plaintiffs acknowledge Ms. Woodford described the data as "guilty finding" rates, which is imprecise.
[55] California prisons have extremely low rates of expired charges, so adjudicated incidents will nearly equal reported incidents. *See* Pl. Br. Ex. 18, Woodford Rep. ¶¶ 22-23.
[56] Pl. Br. Ex. 19, Woodford Reb. Rep. at 2-5.
[57] There is no evidence that the two-year "pilot program" at Corcoran, for sexual misconduct offenders who are not diagnosed exhibitionists but voluntarily submit to treatment, "effectively removed" such offenders "from the inmate population" at other California prisons." Def. Br. at 57.

"far beyond what should exist in a correctional institution employing best practices."[58] Her opinion is based upon her knowledge, experience, and qualifications in the field of corrections, not on data extrapolation.[59]

### B.    Dr. Louise Fitzgerald.

Defendants assert that Dr. Louise Fitzgerald's opinions are not based upon a valid or reliable methodology and that her opinions should be excluded because she has not previously analyzed sex harassment at a correctional facility. Def. Br. at 46-54. These arguments have no merit. Accordingly, Defendants' motion against her should be denied.[60]

### 1.    Dr. Fitzgerald Employed A Valid Reliable Methodology.

Using a social framework methodology, Fitzgerald concluded that the Complex had the organizational risk factors associated with the existence of a sexually hostile work environment.[61] As a result, the Complex could "be expected to encourage and maintain high levels of sexual harassment as well as a strong probability of harm to those women who are exposed to it both directly and indirectly."[62] Such social framework methodology has been admitted into evidence in federal and state courts both pre and post-*Daubert* for the last 40

---

[58] Pl. Br. Ex. 18, Woodford Rep. ¶¶19, 22-23.

[59] Defendants also seek to exclude Ms. Woodford's opinion for use of the word "pervasive." Def. Br. at 60. But she is not offering an opinion on whether a hostile environment existed at the Complex. Ex. 67, Woodford Dep. 65:13-23. She uses the word as an adjective, not a "legal conclusion." *Id.* 105:14-19.

[60]At a minimum, the Court should admit Fitzgerald's unchallenged opinions regarding the scientific research about organizational risk factors that allow sexually harassing hostile work environments to exist, the experience of sexual harassment "directly or indirectly" and through "ambient harassment," and the psychological and physical impact of sexual harassment. Pl. Br. Ex. 22, Expert Report of Louise Fitzgerald ("Fitzgerald Rep.") at 5-6, 9-18, 25-28; *see EEOC v. Dial Corp.*, 99-C-3356, 2002 WL 31061088, at *11-12 (N.D. Ill. Sept. 17, 2002) (admitting Fitzgerald's report regarding the "general description of the nature, causes and consequences of harassment, together with factors and conditions that lead to psychological harm and various response strategies" as helpful to the trier of fact and insufficiently challenged by defendants); Fed. R. Evid. 702 Adv. Comm. Note (2000) (expert testimony about "general principles" of a particular field, *e.g.*, "thermodynamics," "blood clotting," admissible to educate factfinder).

[61] Pl. Br. Ex. 22, Fitzgerald Rep. at 3; Ex. 69, Apr. 30, 2019 Deposition of Louise Fitzgerald ("Fitzgerald Dep.") 74:23-77:7, 112:20-114:4, 249:6-250:5.

[62] Pl. Br. Ex. 22, Fitzgerald Rep. at 27; *see also* Ex. 69, Fitzgerald Dep. 112:20-114:4.

years.[63] As Hart/Secunda note:

> [A]n expert offering social framework testimony will explain the general social
> science research on the operation of stereotyping and bias in decision making and
> will examine the policies and practices operating in the workplace at issue to
> identify those that research has shown will tend to increase or limit the likely
> impact of these factors
>
>            ***
>
> When an expert applies her knowledge of studies in her field to an examination of
> the policies in place at a challenged workplace, the resulting testimony is well
> within what is permitted by the Federal Rules of Evidence.

*Id.* at 39-40;[64] *see Ellis v. Costco Wholesale Corp.,* 285 F.R.D. 492, 520 (N.D. Cal 2012)

(certifying Title VII class based partly on social framework testimony that Costco's policies led

to gender bias "from the top down"); *EEOC v. Bloomberg, L.P.*, No. 07 Civ. 8383, 2010 WL

3466370, at *13-14 (S.D.N.Y Aug. 31, 2010) (noting social framework analysis is regularly

admitted in sex discrimination cases and "valuable in giving jury context within which to

evaluate the particular evidence relating to the workplaces at issue") (citing four NY federal

court decisions denying *Daubert* motions to bar opinions based on social framework analysis in

sex discrimination cases); *EEOC v. Morgan Stanley & Co.,* 324 F. Supp. 2d. 451, 460-62

(S.D.N.Y. 2004) (denying *Daubert* motion to bar social framework testimony in Title VII class

action).

     Neither *Bloomberg* nor *Childers v. Trustees of the Univ. of Pennsylvania*, No. 14-2439,

2016 WL 1086669 (E.D. Pa. Mar. 21, 2016), upon which Defendants heavily rely, rejects social

framework methodology as invalid. Indeed, as noted above, *Bloomberg* stands for the opposite

proposition, while *Childers* recognizes that such testimony has been repeatedly admitted by other

courts and may have been in that case under different facts. *Childers,* at * 5-6. Unlike the experts

---

[63] M. Hart & P. Secunda, *A Matter of Context: Social Framework Evidence in Employment
Discrimination Class Actions,* 78 Fordham L. Rev. 37 (2009) ("Hart/Secunda").

[64] Defendants' claim that Fitzgerald tried to avoid calling her methodology "social framework analysis" is
belied by her testimony explaining what she did, and stating, "that's social framework." Ex. 69, Fitzgerald
Dep. 76:15-77:7.

in those cases, Fitzgerald did *not* rely solely upon information "fed" to her by Plaintiffs' counsel in rendering her opinions. She formed them after touring the Jail and reviewing the three CCSO 30(b)(6) representatives' depositions describing CCSO's alleged remedial/prophylactic efforts to address sexual misconduct, the testimony of 51 Class Members, and a representative sample of sexual misconduct incident reports.[65]

Defendants also assert that Fitzgerald ignored the "remedial measures CCSO undertook to combat inmate sexual harassment" in reaching her conclusions (Def. Br. at 49), but even a cursory review of her deposition and report reveals otherwise.[66]

Defendants' argument to bar Fitzgerald's opinion on ambient harassment because she did not do "a study or questionnaire" and admitted "it was possible" that "some employees" were not exposed to it, (Def. Br. 52-53), is equally meritless. The latter complaint is a topic for cross-examination, not a *Daubert* motion. *See Daubert*, 509 U.S. at 595-96 (rejecting stricter exclusion test because "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence"). The former relies on the dubious proposition that because Fitzgerald cannot quantify the *exact* level of ambient sexual harassment, she cannot opine as to the existence of *any* of it. Defendants not only cite to no legal authority supporting their point, they

---

[65] Pl. Br. Ex. 22, Fitzgerald Rep. 3-4; Ex. 69, Fitzgerald Dep. 127:8-128:21. As Defendants note, Fitzgerald reviewed only a sample of sexual misconduct incident reports selected by Plaintiffs' counsel. But they point to nothing that shows reviewing all 2,000 such reports – which document the same behavior over and over again – would change her opinions. CCSO's further complaint that Fitzgerald's opinions are unreliable because she only reviewed incident data from between January 2016 to October 31, 2017, Defs. Br. at 52, is hypocritical; Fitzgerald began her report before CCSO agreed to provide its 2014 and 2015 information and before the County had produced *any* documents about the incidents that its employees experienced. *See* Ex. 69, Fitzgerald Dep. 237:20-239:1; Pl. Br. Ex. 22, Fitzgerald Rep. at 7.
[66] *See* Ex. 69, Fitzgerald Dep. 145-180, 230-232; Pl. Br. Ex. 22, Fitzgerald Rep. at App. B (evaluated 30(b)(6) depositions and Brad Curry declaration about CCSO's alleged remedial measures, inmate disciplinary policies, sexual harassment and correctional officer training policies, and exposure control uniform procurement efforts).

also fail to take into account Fitzgerald's opinion, supported by ample literature in the field, that women who work in an organization plagued by the high level of sexual harassment present here suffer from such conduct even if it is not specifically directed at them.[67]

### 2.    Fitzgerald Is Not Offering Opinions on Jail Administration.

Finally, Defendants argue Fitzgerald's opinions should be barred because she "is not a 'jail expert'" or qualified to opine on the "differences between a correctional setting and a private workplace." Def. Br. 53-54. But that same argument was rejected against another social framework analyst. *Morgan Stanley,* 324 F. Supp. 2d at 460-462 (denying *Daubert* motion to bar social framework expert in sex discrimination case because he had no familiarity with the division where sex discrimination occurred). Fitzgerald is not being asked to, and does not need to, opine on the differences between sex harassment at a jail versus a private employment setting. As Defendants' own "jail expert" opined, inmate sexual harassment "is *not* part of the job" that women must endure simply because they work in a prison.[68] For these reasons, Defendants' *Daubert* motion should be denied.

### III.    Dr. Wilner's Report Should Be Excluded.

It is the statistical analyses contained in the report of Dr. Benjamin Wilner ("Wilner Rep.") which should be excluded under *Daubert*. Wilner's report fails *Daubert* standards and Federal Rules of Evidence 702 and 703 in two ways. First, his analyses are based largely on data collection and coding done by CCSO counsel (attorneys or other personnel) at McGuire Woods

---

[67] Ex. 69, Fitzgerald Dep. 244:24-246:3; Pl. Br. Ex. 22, Fitzgerald Rep. at 5-6 (citing articles on "ambient harassment"). Defendants note, but never argue, that Fitzgerald's "failure" to do a SEQ survey undercuts the reliability of her opinions. Def. Br. at 45-46. Putting aside, again, that Defendants cite to nothing that supports that assertion, Fitzgerald explained in her deposition why it is meritless. Ex. 69, Fitzgerald Dep. 83:2-93:18; 241:16-244:23 (explaining the SEQ was designed to determine if sexual harassment exists in a workplace and such a study is unnecessary where the sexual harassment problem is so obviously prevalent and known to exist).

[68] Ex. 55, Frasier Dep. 227:9-28:17. Frasier also conceded that she thought the conduct at the Jail in 2015-2016 created a sexually hostile work environment. *Id.* 162:10-21.

("MW"). MW personnel had to make numerous judgments and made many errors in the collection and summarization process. Second, Wilner's analyses misleadingly downplay the severity of sexual misconduct by positing irrelevant "benchmarks" that do not qualify as comparators to that harassment.[69]

### A. Wilner's Report Should Be Excluded Because It Relies on the Judgments of Defense Counsel in Collecting and Coding Data.

Numerous courts have rejected expert testimony based on data prepared by counsel for the litigation. *See, e.g., Obrycka v. City of Chicago,* 792 F. Supp. 2d 1013, 1024-28 (N.D. Ill. 2011); *Sommerfield v. City of Chicago,* 254 F.R.D. 317, 325-26 (N.D. Ill. 2008); *Ty Inc. v. Softbelly's Inc.*, No. 00 C 5230, 2006 WL 5111124, at *2-3 (N.D. Ill. Apr. 7, 2006); *see also In re Testosterone Replacement Therapy Prod. Liab. Litig.,* 14 C 1748, 2018 WL 3586182, at *12 (N.D. Ill. July 26, 2018) (Kennelly, J.) (excluding opinion because expert relied on compilation of materials prepared by counsel). Conversely, courts have allowed expert testimony based on facts or data provided by counsel under three circumstances suggesting that the data is untainted. Wilner's report does not satisfy any of the exceptions.

### 1. Counsel, Not Wilner, Selected and Coded Data for this Litigation.

Expert analyses based on counsel-prepared data may be admissible when the information "was not prepared exclusively for litigation." *See Minemyer v. B-Roc Representatives, Inc*., No. 07 C 1763, 2009 WL 3757378, at *7 (N.D. Ill. Oct. 29, 2009). Here, however, MW selected and coded data specifically for this lawsuit.[70]

To reach his expert opinions, Wilner used three datasets of disciplinary incidents.[71] A primary source for Wilner's opinions, is data compiled by MW, who "reviewed the paper files

---

[69] Pl. Br. Ex. 24, March 7, 2019 Expert Report of Benjamin Wilner ("Wilner Rep.") 5, 9-10.
[70] Pl. Br. Ex. 24, Wilner Rep. 7, 11.
[71] *Id.* at 5-7.

… [and] recorded data on such incidents that were reported in the Courthouse. They also entered information on the victim type (e.g. Assistant Public Defender, Corrections Officer)" for the great majority of incidents.[72] MW began this work before retaining Wilner and continued it afterward.[73] Because MW prepared this data for purposes of this lawsuit, Wilner's opinions are not admissible under the first exception.

### 2. McGuire Woods's Selection and Coding of Data for Purposes of this Litigation Was Not Mechanical and Was Not Guided by Wilner.

A court also may allow expert testimony based on data prepared by counsel when the selection and coding "borders on the mechanical" and "requires less subjective characterization than summarizing a deposition," especially when the opposing party "offers no analysis or citation suggesting that counsel" erred. *See Rivera v. Guevara*, 319 F. Supp. 3d 1004, 1067 (N.D. Ill. 2018).

Here, MW's selection of relevant incidents that occurred at the Courthouse was not "mechanical" because it required MW to make judgment calls regarding which incidents at the Courthouse should be included in the dataset. Pl. Br. Ex. 24, Wilner Rep. 7, 11. The disciplinary codes that Wilner used to identify sexual misconduct and benchmark incidents were not used at the Courthouse.[74] MW was not guided by Wilner in making these judgment calls. He assumes "there likely was some process" to skip any files that were not related to issues in this case.[75] Wilner doesn't "recall conversations regarding the filtering process. They [MW] just said,

---

[72] Pl. Br. Ex. 24, Wilner Rep. 7; Ex. 70, April 26, 2019 Deposition of Benjamin Wilner ("Wilner Dep.") 11:24-12:19. The MW review ultimately yielded 236 incidents that Wilner treated as involving sexual misconduct, or in his terms, relevant "indecent exposure-related reported incidents," that did not appear in CCSO's databases. Ex. 71, June 27, 2019 Declaration of Kathleen Lundquist ("Lundquist Decl.") ¶ 3. That was over 10% of his universe of such incidents. Similarly, MW was the sole source of 366 "300 level benchmark reported incidents" and nine (9) "403 benchmark reported incidents." *Id.*
[73] Ex. 70, Wilner Dep. 71:16-21.
[74] Ex. 70, Wilner Dep. 80:22-82:10.
[75] *Id.* at 118:19-120:10.

'Here's the things that were relevant,' and the line items were shown in my Exhibits 3, 4, and 5 to my report."[76] Wilner cannot use the qualifications of the MW personnel to excuse reliance on counsel to select relevant data. He does not know who performed the work under MW's direction or their qualifications.[77] He did not provide any instructions to MW "about how to go about extracting that information."[78]

MW's coding of incidents it selected—including if they were an "indecent exposure-related reported incident" or a comparator incident, assigning a disciplinary code, and coding other information for Wilner's analyses—also contained numerous mistakes.[79] The numerous errors highlight that coding was not purely mechanical. Plaintiffs have identified errors in the coding of month, location, or victim type for 106 of the 602 sexual misconduct incidents and "300 level benchmark reported incidents" for which MW was Wilner's sole source, *i.e.*, a whopping 17.6 %.[80]

### 3. Wilner's Alleged Audit of McGuire Woods's Work Was Ineffective.

A final exception warranting admission of data prepared by counsel is if the expert conducted an adequate review to assess its accuracy. *See Obrycka*, 2011 WL 2600554, at *8. Wilner's firm purportedly verified from documents underlying a sample of the incidents recorded by MW that those incidents were accurately reflected.[81] This "audit" did not detect any

---

[76] *Id.* at 120:11-20.

[77] *Id*. at 70:12-71:15.

[78] *Id.* at 72:21-73:6.

[79] Plaintiffs' expert Dr. Kathleen Lundquist testified about coding incidents as sexual or non-sexual, "there is some level of judgment. That there is some level of potentially sexual content in the . . . narrative and that a judgment needs to be made." Ex. 72, May 14, 2019 Deposition of Kathleen Lundquist ("Lundquist Dep.") at 139:19-140:5.

[80] Ex. 65, Charles Decl. ¶¶ 4, 7; *see EEOC v. Sears, Roebuck & Co.*, 628 F. Supp. 1264, 1304-05 (N.D. Ill. 1986) (rejecting analysis partly because EEOC "has made so many general coding errors"), *aff'd*, 839 F.2d 302 (7th Cir. 1988).

[81] Ex. 70, Wilner Dep. at 73:7-74:2.

"changes [that] needed to be made to the data that I utilized in my report"[82] meaning it did not reveal the many errors Plaintiffs have identified. Expert review of data produced by counsel should be admissable only if it identifies no errors. *See Rivera,* 319 F. Supp. 3d at 1067 (allowing expert testimony when movant "offers no analysis or citation suggesting that counsel mischaracterized" the data it prepared for expert).

Also, even if MW had accurately coded all 236 incidents, Wilner did not review the underlying files to determine if MW had selected all the relevant ones.[83] And because CCSO has not produced the universe of documents that MW reviewed, Plaintiffs cannot effectively cross-examine MW on its selection process, even if the Court allowed counsel to be placed on the witness stand.[84]

Wilner's analyses based upon counsel-prepared data are not admissible under any exception. His report and testimony should be excluded.

### B.    Wilner's Report Misleadingly Identifies Irrelevant "Benchmark" Incidents.

Wilner's report contains 11 "findings." Pl. Br. Ex. 24. Six involve comparisons of "indecent exposure-related reported incidents" to "300 level benchmark reported incidents" and "403 benchmark reported incidents." *Id.* For example, he states that sexual misconduct incidents were: less prevalent than "benchmark" incidents, more concentrated in three divisions than were "benchmark" incidents and adjudicated at about the same rates as "benchmark" incidents. *Id.* at 8-9, 13, 14-15. But these comparisons are prejudicially misleading because many of the "benchmark" incidents are not similar to the sexual misconduct incidents and because other

---

[82] *Id.* 188:13-17.

[83] Ex. 70, Wilner Dep. 118:19-120:10; *infra* sect. III.A.2.

[84] For example, Wilner identified David Leishman, one of the lead lawyers for MW in this case, as someone who "reviewed the records and was involved in extracting information on which [Wilner] relied." Ex. 70, Wilner Dep. 70:12-16; *See Daubert*, 509 U.S. at 596 (listing "[v]igorous cross-examination" as one of "the traditional and appropriate means of attacking shaky but admissible evidence").

"benchmark" incidents themselves are sexual in nature.

To be helpful to the factfinder, benchmarks must be similar to the event being evaluated. *See, e.g., Durant v. Greenfield & Fortenberry, LLC,* 1:16-CV-965-RP, 2018 WL 3155822, at *5 (W.D. Tex. June 28, 2018) (explaining to establish lost damages through the price of other licenses, "the image at issue in the license used as a benchmark must be sufficiently similar to the image in the fictitious license between infringer and owner"); *Cason-Merenda v. Detroit Med. Ctr.*, No. 06-15601, 2013 WL 1721651, at *6 (E.D. Mich. Apr. 22, 2013) (benchmark "must be sufficiently comparable to the market under consideration to permit the conclusion that price differences are the product of antitrust violations, and not other factors").

Wilner selected the four 300-level codes and code 403 because Plaintiffs sought data on such incidents during discovery, not because they are similar to the sexual misconduct codes.[85] He has "***no idea***" whether he would have treated these incidents as "benchmarks" if Plaintiffs had not requested the data in discovery.[86] Moreover, he did not "do a full statistical analysis regarding whether benchmarks are proper," and hence could not opine "whether or not they are true statistical benchmarks."[87] Instead, he testified, the comparisons provide context. *Id.* But events offered as "context" also are misleading if they are not similar.

Whereas Plaintiffs complain of sexual harassment against female employees, the "300 level benchmark reported incidents" are not so limited by victim type. MW personnel coded whether the victims of "indecent exposure-related reported incidents" and the "benchmark" incidents were "CCSO," "Medical Personnel," Assistant Public Defender, or "Other." *Id.* at 186:3-189:12. But insofar as the MW data can be trusted, it shows that the "300 level benchmark incidents" are not at all like the "indecent exposure-related reported incidents." The MW data

---

[85] Ex. 70, Wilner Dep. 153:21-154:12, 164:20-165:19.
[86] *Id.*
[87] *Id.* 160:8-163:7.

shows that only 10% of the "indecent exposure-related incidents" were directed against "Others" (primarily other inmates), while 82% of the Batteries (code 307), 47% of the Urination incidents (code 321), 35% of the Disrespect to Staff (code 322), and 30% of the Verbal Threats to Staff (code 320) were directed against Others.[88] None of these violations – and especially not the Battery and Urination incidents – are like Sexual Misconduct violations. None are proper comparators or benchmarks.

In addition to being unlike the sexual misconduct incidents in their targets, the 320 and 322 violations also are not proper comparators because, as Defendants admit, they are among the codes by which CCSO "has prohibited sexual harassment by detainees." Def. Br. at 6. Dr. Lundquist also has shown that some incidents coded as 320 and 322 are sexual and Wilner has "no idea" how many more such incidents there are.[89] In other words, to an unknown extent, Wilner is comparing sexual misconduct incidents to other sexual misconduct incidents.

For all of these reasons, his report should be excluded from the case.

## CONCLUSION

For the reasons stated in Plaintiffs' initial brief and above, the Court should grant Plaintiffs' motion for class certification, grant Plaintiffs' motion to exclude Dr. Wilner's report and testimony, and deny Defendants' motion to exclude testimony of two of Plaintiffs' experts.

---

[88] *See generally,* Ex. 71, Lundquist Decl. ¶¶ 5-6.
[89] Pl. Ex. 20, Lundquist Rep. at 14-16; Ex. 72, Lundquist Dep. at 128:18-142:13; Ex. 70, Wilner Dep. at 173:9-176:20.

Dated: July 1, 2019

Respectfully Submitted,

/s/ *Noelle Brennan*_____
One of the Attorneys for Plaintiffs

Marni Willenson
marni@willensonlaw.com
WILLENSON LAW, LLC
542 S. Dearborn St., Suite 610
Chicago, IL 60605
312.508.5380

Caryn C. Lederer
clederer@hsplegal.com
Kate E. Schwartz
kschwartz@hsplegal.com
Emily R. Brown
ebrown@hsplegal.com
HUGHES SOCOL PIERS
RESNICK & DYM, LTD.
70 W. Madison St., Suite 4000
Chicago, Il 60602
312.604.2630

Shelly B. Kulwin
skulwin@kmklawllp.com
Jeffrey Kulwin
jkulwin@kmklawllp.com
Rachel A. Katz
rkatz@kmklawllp.com
KULWIN, MASCIOPINTO & KULWIN,
LLP
161 N. Clark Street, Suite 2500
Chicago, IL 60601
312.641.0300

Attorneys for Plaintiffs

Noelle Brennan
nbrennan@nbrennan-associates.com
Kristin Carter
kcarter@nbrennan-associates.com
Naomi Frisch
nfrisch@nbrennan-associates.com
NOELLE BRENNAN & ASSOCIATES,
LTD.
20 S. Clark St., Suite 1530
Chicago, IL 60603
312.422.0001

Cyrus Mehri
cmehri@findjustice.com
Ellen Eardley
eeardley@findjustice.com
Michael Lieder
mlieder@findjustice.com
MEHRI & SKALET, PLLC
1250 Connecticut Ave., NW, Suite 300
Washington, D.C. 20036
202.822.5100

**CERTIFICATE OF SERVICE**

I hereby certify that on July 1, 2019, I electronically filed **PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION** by the following means: the CM/ECF system which will provide notification of such filing to the e-mail addresses of all counsel of record.

Dated: July 1, 2019

/s/ *Noelle Brennan*
One of the Attorneys for Plaintiffs

Noelle Brennan
nbrennan@nbrennan-associates.com
Kristin Carter
kcarter@nbrennan-associates.com
Naomi Frisch
nfrisch@nbrennan-associates.com
NOELLE BRENNAN & ASSOCIATES, LTD.
20 S. Clark St., Suite 1530
Chicago, IL 60603
312.422.0001