**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **SDAHRIE HOWARD, ELLENOR ALTMAN,** | ) | |
| **DENISE HOBBS, TAVI BURROUGHS,** | ) | |
| **BALVINA RANNEY, TAWANDA WILSON,** | ) | |
| **SUSANA PLASENCIA, ESTHER JONES,** | ) | |
| **KIMBERLY CRAWFORD-ALEXANDER,** | ) | |
| **and DOMINIQUE FREEMAN, on behalf of** | ) | |
| **themselves and all others similarly** | ) | |
| **situated,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 17 C 8146** |
| | ) | |
| **COOK COUNTY SHERIFF'S OFFICE and** | ) | |
| **COUNTY OF COOK,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

The plaintiffs are women employed as correctional officers, rehabilitation

workers, medical professionals, and deputy sheriffs at the Cook County Jail and the

adjoining criminal courthouse. They have sued Cook County and the Sheriff's Office,

which operates the jail, alleging that the defendants failed to curtail sexual harassment

by male detainees—including sexual epithets, threats of sexual violence, and

masturbation—in violation of Title VII, the Illinois Civil Rights Act, and the Equal

Protection Clause of the U.S. Constitution's Fourteenth Amendment. The plaintiffs have

moved to certify a class of similarly situated individuals. For the reasons set forth

below, the Court grants the motion but modifies the definition of the proposed class.

**Background**

**A.     Organization of the complex**

The Cook County Sheriff's Office operates a complex that includes the Cook County Jail and the George N. Leighton Criminal Courthouse.  The complex comprises dozens of buildings spanning eight city blocks.  Each year, the jail houses more than 100,000 detainees in seven residential divisions of varying security levels.  The staff of the jail includes sworn correctional officers who often work at multiple locations within the jail during their tenure and travel throughout the complex when transporting inmates.  The jail also employs civilian workers who have less direct contact with detainees, such as employees responsible for mail, payroll, and information technology.

In addition to the residential divisions, the jail encompasses Cermak Health Services, the jail's health care provider, and the Residential Treatment Unit (RTU), which provides mental health services.  Medical providers have contact with detainees throughout the jail, although non-medical staff of Cermak and the RTU (such as accountants and records managers) have comparatively little detainee contact.

The jail is connected to the adjacent courthouse via underground tunnels through which detainees are transported to court hearings held at the Leighton Courthouse.  The Court Services Department, a division of the sheriff's office, provides security in the courthouse.  As with the employees of the jail, the extent to which court services deputies interact with detainees depends on their particular assignment, though their assignments often change.

**B.     The plaintiffs' allegations**

The named plaintiffs in the suit are women employees of the jail and the sheriff's

office, including four correctional officers (plaintiffs Sdahrie Howard, Ellenor Altman, Denise Hobbs, and Kimberly Crawford-Alexander); a correctional rehabilitation worker (Dominique Freeman); a paramedic (Tavi Burroughs); and four court services deputies (Esther Jones, Balvina Ranney, Tawanda Wilson, and Susana Plasencia). They have sued the Cook County Sheriff's Office under Title VII of the Civil Rights Act of 1964, alleging that the sheriff's office subjected them to a hostile work environment.[1] They contend that this conduct also constitutes unlawful discrimination in violation of the Equal Protection Clause of the U.S. Constitution and the Illinois Civil Rights Act.[2]

The plaintiffs allege that detainees in the jail engage in frequent sexual harassment, including exhibitionist masturbation, sexual epithets and threats, and sexual violence. They further allege that the defendants' policies—including their failure to enact appropriate measures to curb harassment—proximately caused this severe and pervasive harassment. In November 2017, the Court granted the parties' agreed motion for a preliminary injunction, which mandated additional procedures intended to reduce harassment in the jail and the courthouse. *See* dkt. nos. 16, 27.

## Discussion

The plaintiffs have moved to certify a class of similarly situated individuals. Both sides have also moved to exclude certain expert opinions. Because those opinions are

---

[1] Cook County is also named as a defendant as a potential indemnitor of the sheriff's office.

[2] Because the plaintiffs are using section 1983 as a parallel remedy to their Title VII hostile work environment claims, "the elements needed to establish liability are the same under both statutes." *Alamo v. Bliss*, 864 F.3d 541, 548 n.16 (7th Cir. 2017). Their claim under the Illinois Civil Rights Act similarly parallels federal civil-rights law. *See Cent. Austin Neighborhood Ass'n v. City of Chicago*, 2013 IL App (1st) 123041, ¶ 10, 1 N.E.3d 976, 980 ("We look to cases concerning alleged violations of federal civil rights statutes to guide our interpretation of the Act.").

potentially relevant to the motion for class certification, the Court will address the motions to exclude before turning to the certification motion.

## A.    Expert testimony

The defendants have moved to exclude the reports and testimony of two of the plaintiffs' expert witnesses:  Dr. Louise Fitzgerald and Jeanne Woodford.  The plaintiffs have also moved to exclude the opinions of the defendant's expert Dr. Benjamin Wilner.

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  *See Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 778 (7th Cir. 2017).  The party "seeking to introduce the expert witness testimony bears the burden of demonstrating that the expert witness testimony satisfies the [*Daubert*] standard by a preponderance of the evidence."  *Id.* at 782 (alteration in original).  This analysis has three steps:  the Court "must determine whether the witness is qualified; whether the expert's methodology is scientifically reliable; and whether the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue."  *Id.* at 779.  In considering the question of methodological reliability—particularly relevant here—the Court must take a "flexible" approach that depends on "the precise sort of testimony at issue and not on any fixed evaluative factors."  *Id.* at 780.  And because the Court serves a gatekeeping role rather than acting as the finder of fact, this inquiry is limited to the experts' "principles and methodology, not the conclusions that they generate."  *Id.* at 781.

### 1.    Dr. Fitzgerald

The defendants have moved to exclude Dr. Fitzgerald's report, arguing that she

did not use a reliable methodology.  Dr. Fitzgerald holds a Ph.D. in psychology.  She testified that she performed a version of a "social framework analysis"—though at times she eschewed that term during her deposition—which involves the use of social science research to provide context for general issues of causation.  Fitzgerald Dep., Defs.' Ex. 48, dkt. no. 198–56, at 75:8–77:7.  Dr. Fitzgerald also reviewed certain pleadings, deposition testimony, and declarations, as well as data concerning incidents of sexual misconduct by detainees.  Based on this evidence, she concluded that the sheriff's office does not take sexual harassment seriously and that the "extent and egregious nature" of the harassment would "impact virtually every female employee who works in the Jail or the Leighton Courts."  Fitzgerald Rpt., Defs.' Ex. 54, dkt. no. 198–62, at 27–28.

The defendants contend that an expert using social framework analysis may testify only generally about the social-scientific background relevant to the case and may not reliably offer case-specific opinions.  It points to a footnote in the Supreme Court's decision in *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011), where the Court noted that the scholars who originally developed social-framework analysis have argued that it cannot reliably be used to opine about a particular case.  *Id.* at 354 n.8.  And another judge in this district has expressed doubts about the admissibility of Dr. Fitzgerald's testimony for similar reasons.  *See Van v. Ford Motor Co.*, No. 14-cv-8708, 2018 WL 4635649, at *13 (N.D. Ill. Sept. 27, 2018); *see also Tuli v. Brigham & Women's Hosp., Inc.*, 592 F. Supp. 2d 208, 215–16 (D. Mass. 2009) (concluding that an expert's social-framework testimony had "scientific validity" because the expert "allow[ed] the jury to make the final decision and expressly disclaim[ed] the capacity to draw any

conclusion in this particular case").

The Court need not decide whether experts testifying about social frameworks should be categorically precluded from offering case-specific opinions. Even if they are not, the plaintiffs have failed to establish that Dr. Fitzgerald used a reliable methodology to reach her opinions about the Cook County Jail. Significantly, Dr. Fitzgerald testified that she did not administer a survey she had developed for assessing workplace harassment. She described this survey as "the only theory-based, reliable, and valid measure of the prevalence of sexual harassment in the workplace." Fitzgerald Dep., Defs.' Ex. 48, dkt. no. 198–56, at 83:14–19. Dr. Fitzgerald's explanation for failing to gather this data is simply that she is "not concerned about the prevalence of sexual harassment at [the Cook County Sheriff's Office]" in the sense that she "take[s] it as a given that there is a lot of it." *Id.* at 90:8–16.

Rather than gathering evidence independently through a survey, Dr. Fitzgerald relied on declarations and deposition testimony from the named plaintiffs, as well as declarations by other putative class members and a tour of the jail. Dr. Fitzgerald acknowledged that this evidence did not allow her to scientifically generalize about the experiences of all the women within the jail. *Id.* at 111:12–112:19 ("What we are doing is not science . . . ."); *see also id.* at 109:2–7 (stating that, for "scientific purposes," she could not "extrapolate that all non-reporting victims have the same experiences [as] those who report" harassment). Thus by her own admission, Dr. Fitzgerald's method of reviewing the testimony and statements of women involved in this litigation does not permit a scientific assessment of the conditions at the jail.

The plaintiffs have not pointed to evidence that would permit the Court to find that

Dr. Fitzgerald's approach is widely used or considered reliable. *See Lapsley v. Xtek, Inc.*, 689 F.3d 802, 810 (7th Cir. 2012) (noting that the reliability of scientific evidence depends in part on whether a technique has been tested, analyzed for error, and generally accepted within the scientific field). The Court therefore excludes, for purposes of the motion for class certification, her opinions regarding the extent of sexual harassment at Cook County Jail.

**2.    Woodford**

The defendants have also moved to exclude portions of the report of Jeanne Woodford. Woodford worked in the California prison system for over thirty years, including stints as the warden of San Quentin State Prison and director of the California Department of Corrections. Among other conclusions in her report, she opines that incidents of masturbation, indecent exposure, and other sexual offenses at Cook County Jail are excessively frequent relative to several California prisons during the same period.

The defendants argue that these opinions should be excluded because they depend on statistical analyses that Woodford is not qualified to conduct and that are methodologically flawed. Woodford is undoubtedly qualified to opine on many aspects of jail and prison administration given her extensive experience. *See Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010) ("An expert's testimony is not unreliable simply because it is founded on [her] experience rather than on data; indeed, Rule 702 allows a witness to be 'qualified as an expert by knowledge, skill, experience, training or education.'" (quoting Fed. R. Evid. 702)). Whether she has the necessary qualifications to draw statistical comparisons between the Cook County Jail and

California prisons is a separate question.

The plaintiffs argue that Woodford's opinions did not require statistical expertise but instead are "an exercise in basic math using simple deductive reasoning." Pls.' Reply Br., dkt. no. 204, at 24 (quoting *In re Prempro Prods. Liab. Litig.*, 514 F.3d 825, 831 (8th Cir. 2008)). But the mathematical opinion discussed in *In re Prempro* was truly basic: it required the expert to the observe only that ten is less than twelve. *In re Prempro*, 514 F.3d at 831. In this case, by comparison, Woodford had to select a set prisons from which to compare data, interpret and appropriately characterize that data, adjust the numbers to account for differences of time and inmate population, and draw the appropriate conclusions. *See* Woodford Expert Rpt., dkt. no. 173–19, ¶ 22. Far from being an exercise in basic math, Woodford's opinions rest on "judgment and art as well as the reasoned manipulation of numbers." *Falise v. Am. Tobacco Co.*, 258 F. Supp. 2d 63, 67 (E.D.N.Y. 2000).

Woodford's lack of statistical expertise is all the more notable in light of her questionable methodology. Rather than comparing Cook County Jail to a nationwide sample of jails or prisons, she selected only six prisons in California to serve as comparators. On the present record, the Court has no means of determining whether this sample of six is either quantitatively or qualitatively adequate to support Woodford's opinions. *See Gopalratnam*, 877 F.3d at 781 (noting that an expert may not "rely on data that has no quantitative or qualitative connection to the methodology employed"). Moreover, Woodford does not explain her decision to base her opinion solely on a comparison with California institutions. And even if a comparison only to California were statistically appropriate, Woodford's attempts to defend her decision to limit the

analysis to six such comparators only further highlight her lack of qualifications to conduct this sort of analysis. Woodford's rebuttal report contains lengthy statistical arguments and analysis in an effort to refute criticism from the defendants' expert. For example, in an effort to explain her failure to consider the California prison with the highest rate of sexual incidents, Woodford argues that if both that prison and the prison with the lowest rate are not considered, the statewide rates are more comparable to Cook County Jail. *See* Woodford Rebuttal Rpt., dkt. no. 173–20, at 3. But it is far from obvious that this is an appropriate statistical method, and Woodford readily admits to having no statistical expertise of her own. Because the Court must ensure "that an expert's testimony rests on a reliable foundation and is relevant to the task at hand," *Gopalratnam*, 877 F.3d at 778, Woodford's opinions are excluded for purposes of the motion for class certification to the extent that they depend on her statistical comparisons rather than her professional expertise.

### 3. Dr. Wilner

Finally, the plaintiffs have moved to exclude portions of the expert report of Dr. Benjamin Wilner, who holds a Ph.D. in Managerial Economics and Decision Science. The plaintiffs take issue with two aspects of Dr. Wilner's report: his reliance on data coded by attorneys for the sheriff's office and his conclusions regarding the rates of sexual misconduct in comparison to other issues of inmate discipline at Cook County Jail.

The Court concludes that the fact that Dr. Wilner partially relied on attorney-coded data does not undermine the admissibility of his opinions. Although courts have held that relying on evidence provided by attorneys may in some cases undermine the

reliability of an expert's methods, *see, e.g.*, *Obrycka v. City of Chicago*, 792 F. Supp. 2d 1013, 1025–26 (N.D. Ill. 2011), this is not such a case. The data coded by the attorneys formed only a small part of the evidence on which Dr. Wilner based his opinions, and the relatively formulaic way in which that data was compiled—by reading incident reports from the courthouse to classify the nature of the disciplinary violation and the identity of victim—is a far cry from the attorney-prepared outlines of the litigant's arguments that warranted exclusion in *Obrycka*. *See id.* at 1026 (explaining that it was "not 'good science' or sound methodology" for the expert to base his conclusions on "Plaintiff's roadmap of the case and the evidence her counsel has identified as supporting her claims").

The plaintiffs' second argument—that Dr. Wilner used faulty evidence to compare various types of detainee misconduct at the jail—is more persuasive. Dr. Wilner's statistical comparison refers to four "non-sexual" disciplinary incident codes that he uses as benchmarks. *See* Wilner Rpt., Defs.' Ex. 41, dkt. no. 198–49, at 5. By the defendants' own characterization, two of those codes (battery and urination) do in fact encapsulate non-sexual misconduct, but two others (verbal threats and disrespect to staff) are among the disciplinary codes by which the defendants sanction inmates engaged in sexual harassment. *See* Defs.' Resp. Br., dkt. no. 198, at 6. In comparing the rates of misconduct, Dr. Wilner does not differentiate between these codes but instead groups them together. *See, e.g.*, Wilner Rpt., Defs.' Ex. 41, dkt. no. 198–49, at 9–10.

During his deposition, Dr. Wilner explained that the reason he chose those particular codes as benchmarks was solely because the plaintiffs had requested

information about those disciplinary codes during discovery.  Wilner Dep., Pls.' Ex. 70, dkt. no. 204–19, at 164:20–165:19.  This explanation is unsatisfactory; the fact that certain data was produced in discovery does not automatically make it appropriate for an expert to rely on that data for a particular purpose.  In this case, Dr. Wilner contends that the purpose of his benchmark comparisons is to contrast the rates of sexual misconduct by detainees with the rates of other types of non-sexual misconduct.  But without knowing whether and to what extent these other misconduct categories themselves include incidents of sexual harassment, the Court cannot find that there is a "rational connection between the data and the opinion[s]" offered by Dr. Wilner. *Gopalratnam*, 877 F.3d at 781.

For these reasons, the Court concludes that Dr. Wilner's opinions based on his use of benchmark data are inadmissible for the purposes of the motion for class certification.

**B.     Class certification**

The plaintiffs have moved to certify the following class:

> All women who have been employed by the CCSO at the Jail, or as Court Services deputies at the Leighton Courthouse, or by the County in positions with Cermak Health Services, at any time since April 23, 2015, except women who, during that period, have held the positions identified in Exhibit A to Complaint.

Mot. for Class Cert., dkt. no. 172, at 2.  The positions identified in Exhibit A that are excluded from the class include high-level management employees such as the executive director, chief financial officer, and superintendent.  *See* Ex. A to Compl., dkt. no. 143, at 35.

A party moving for class certification must show that the proposed class meets the requirements of Federal Rule Civil Procedure 23(a):  "numerosity, typicality,

commonality, and adequacy of representation." *Beaton v. SpeedyPC Software*, 907 F.3d 1018, 1025 (7th Cir. 2018). Because the plaintiffs seek certification under Rule 23(b)(3), they must also show that questions of law or fact common to the class members predominate over individualized issues and that a class action is the superior method of adjudicating the case. Fed. R. Civ. P. 23(b)(3); *Beaton*, 907 F.3d at 1025.

At the class certification stage, the Court does not "adjudicate the case," but rather "select[s] the method best suited to adjudication of the controversy fairly and efficiently." *Amgen, Inc. v. Conn. Retirement Plans & Tr. Funds*, 568 U.S. 455, 460 (2013) (internal quotation marks and alterations omitted). The Court does not assume the truth of the plaintiffs' allegations, however, and makes findings regarding factual disputes as necessary to rule on class certification. *Priddy v. Health Care Serv. Corp.*, 870 F.3d 657, 660 (7th Cir. 2017).

### 1.    Ascertainability

At the threshold, the members of a proposed class must be ascertainable, meaning that the class must be "defined clearly and based on objective criteria." *Mullins v. Direct Dig., LLC*, 795 F.3d 654, 659 (7th Cir. 2015). The proposed class in this case is clearly defined and does not incorporate impermissible criteria, such as subjective mental states or entitlement to relief on the merits. *See id.* at 659–60. It therefore satisfies the ascertainability requirement.

### 2.    Numerosity

The plaintiffs contend that the class contains nearly 2,000 members, which is more than enough to satisfy the numerosity requirement. *See Hale v. AFNI, Inc.*, 264 F.R.D. 402, 404 (N.D. Ill. 2009) ("Although there is no 'magic number' of class members

for numerosity purposes, when a class numbers at least 40, joinder will be considered impracticable."). The defendants do not dispute that the proposed class is sufficiently numerous, and the Court finds that this requirement is satisfied.

### 3. Commonality

In order to satisfy the commonality requirement of Rule 23(a), the plaintiffs must identify at least one question common to all the class members whose answer is "apt to drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at 350. The plaintiffs point to four questions they contend meet this requirement, though for the purposes of commonality the Court needs to consider only the first one: whether the work environment at the jail and the courthouse is objectively offensive.[3]

The defendants argue that the question of objective offensiveness cannot be resolved for the class as a whole. A plaintiff alleging that the defendant has created a hostile work environment in violation of Title VII must show that "the harassment was severe or pervasive to a degree that altered the conditions of employment and created a hostile or abusive work environment." *Gates v. Bd. of Educ. of City of Chi.*, 916 F.3d 631, 636 (7th Cir. 2019). The defendants contend that differences among the class members' work environments make it impossible to resolve the question of whether the harassment was objectively hostile on a classwide basis. They point to evidence that

---

[3] Although the parties treat the requirements that the harassment must be "objectively offensive" and that it must be "severe and pervasive" as though they are unrelated elements of the plaintiffs' claim, they are closely intertwined, and the Court will consider them together. *See Swyear v. Fare Foods Corp.*, 911 F.3d 874, 880–81 (7th Cir. 2018) (noting that a plaintiff proves the "severe or pervasive" element by showing that the harassment was objectively offensive with reference to "severity of the conduct, its frequency, whether it is merely offensive as opposed to physically threatening or humiliating, and whether it unreasonably interfered with an employee's work performance").

an outsize proportion of the incidents of sexual misconduct by detainees occurred in three maximum security residential divisions and that some of the putative class members (for example, those that work in the records department or in all-female divisions of the jail) had considerably less contact with detainees.

The defendants rely on *Bolden v. Walsh Construction Co.*, 688 F.3d 893 (7th Cir. 2012), in which the Seventh Circuit held that employees of a construction company alleging a racially hostile work environment could not satisfy the commonality requirement because different worksites within the company "had materially different working conditions." *Id.* at 896. The court relied on the Supreme Court's decision in *Wal-Mart*, in which the Court held that a policy of leaving hiring decisions up to the discretion of store managers did not constitute "convincing proof of a companywide discriminatory pay and promotion policy." *Wal-Mart*, 564 U.S. at 359.

Three features of this case distinguish it from *Bolden*. First, unlike in *Bolden* and *Wal-Mart*, the plaintiffs allege that common policies beyond the mere delegation of discretionary decision-making caused their injuries. The plaintiffs contend, for example, that the defendants rarely discipline inmates for harassment, ignore complaints from their employees, and fail to train supervisors to respond appropriately to incidents of harassment. These policies are the glue that binds the putative class members' claims together, in contrast to the disparate decision-making processes at issue in *Bolden* and *Wal-Mart*. And to the extent that the severity of the harassment turns on particular discretionary decisions by supervisors, the plaintiffs have "identified a common mode of exercising discretion that pervades the entire company," which allegedly derives from the defendants' common policies, that is sufficient to satisfy commonality. *Wal-Mart*,

564 U.S. at 356; *see also Chi. Teachers Union, Local No. 1 v. Bd. of Educ. of City of Chi.*, 797 F.3d 426, 437 (7th Cir. 2015) ("[A] company-wide practice is appropriate for class challenge even where some decisions in the chain of acts challenged as discriminatory can be exercised by local managers with discretion—at least where the class at issue is affected in a common manner . . . .").

The second distinction from *Bolden* is that the putative class members all work within a single complex and class members generally must travel through multiple different parts of that complex in the course of their employment. The defendants acknowledge this feature of the jail/courthouse complex. *See* Defs.' Resp. Br., dkt. no. 198, at 23. The fact that the putative class members frequently occupy the same work environments, even if only briefly, provides a much stronger basis for class certification than *Bolden*, where the court emphasized that "[t]he 12 plaintiffs did not experience the working conditions at all 262 sites either individually or collectively." *Bolden*, 688 F.3d at 898. Moreover, although the defendants argue that the incidents of sexual harassment are concentrated in particular divisions of the jail, the plaintiffs have presented evidence that at least some detainee harassment occurs in every building in the complex. *See* Lundquist Rebuttal Rpt., Pls.' Ex. 20, dkt. no. 173–21, at 10.

The final aspect of this case that distinguishes *Bolden* is the plaintiffs' evidence concerning "ambient harassment," which Dr. Fitzgerald defines as harassment that "reaches beyond the focal individual to affect the entire workgroup."[4] Fitzgerald Rpt., Defs.' Ex. 54, dkt. no. 198–62, at 5. She further explains that "ambient harassment

---

[4] Although the Court previously excluded certain of Dr. Fitzgerald's opinions for the purposes of this motion, her opinions regarding the social-scientific background of workplace harassment are admissible. *See Van*, 2018 WL 4635649, at *12–13.

refers to the experience of working in an environment highly permeated with sexually offensive and degrading behavior, that is, a highly sexualized atmosphere in which crude and offensive sexual behavior is common and employees see that it is normative, whether specifically directed at them or not." *Id.* at 5–6. The evidence of widespread sexual harassment by detainees shows that there is at least one common question—whether the ambient harassment experienced by female employees at the jail and the courthouse is sufficiently severe and pervasive to support a Title VII hostile work environment claim—whose answer will drive the resolution of the litigation.

The defendants argue that ambient harassment cannot support a finding of commonality because the plaintiffs are unlikely to prevail on that theory. Even if that assessment were correct—which is far from clear—the defendants' arguments concerning the viability a Title VII claim based on ambient harassment implicate only the putative class's entitlement to relief, not the appropriateness of class certification based on common questions. "At this early stage in the litigation, the merits are not on the table." *Beaton*, 907 F.3d at 1025; *see also Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 823 (7th Cir. 2012) ("Any consideration of the merits at the class certification stage . . . runs the risk of supplanting the jury as the finder of fact.").

### 4.    Typicality

Rule 23(a)(3) requires the claims of the named plaintiffs to be "typical of the claims . . . of the class." The Seventh Circuit has explained that a named plaintiff's claims are typical if they "arise[] from the same event or practice or course of conduct that gives rise to the claims of other class members and [are] based on the same legal theory." *Lacy v. Cook County*, 897 F.3d 847, 866 (7th Cir. 2018). The defendants

argue that the plaintiffs cannot satisfy typicality in light of the variation between putative class members' job duties and work environments.

The Court concludes that the named plaintiffs' claims share the same essential characteristics as those of the class as a whole. Although the Seventh Circuit has recognized that direct harassment differs from ambient or secondhand harassment, that difference is a matter of degree rather than of kind. *See Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 902 (7th Cir. 2018) (explaining that comments made to co-workers of the plaintiff are relevant (if relatively less probative) evidence that the defendants' conduct was severe or pervasive); *Dandy v. UPS, Inc.*, 388 F.3d 263, 272 (7th Cir. 2004) ("Repeated use of such highly offensive terms in the work environment . . . may create an objectively hostile work environment, even if they are heard secondhand."); *Russell v. Bd. of Trs. of Univ. of Ill. at Chi.*, 243 F.3d 336, 343 (7th Cir. 2001) (noting that the impact of "'second hand harassment' is obviously not as great as the impact of harassment directed at the plaintiff"). The putative class members who did not experience direct harassment thus do not rely on a different legal theory than the named plaintiffs; the underlying claim of harassment and the role of the defendants' policies in allegedly permitting that harassment are the same. The plaintiffs have therefore met their burden to show that their claims are typical of the class as a whole.

### 5.     Adequacy of representation

Rule 23(a)(4) requires the named plaintiffs to be fair and adequate representatives of the class. "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). The

defendants argue that the named plaintiffs are not adequate representatives because the proposed class includes women who were employed in a supervisory capacity. They point out that the plaintiffs have alleged that supervisors failed to respond appropriately to complaints of sexual misconduct by detainees, including by ignoring other putative class members' complaints and deterring them from filing incident reports. *See* Third Am. Compl., dkt. no. 143, ¶¶ 41, 42, 52, 55. The defendants cite evidence that at least some of the supervisors who allegedly failed to respond appropriately were women. Notably, however, none of the named plaintiffs is a supervisor.

In general, "supervisory and nonsupervisory employees should not be placed in the same class." *Lee v. Children's Place Retail Stores, Inc.*, No. 14 C 3258, 2014 WL 5100608, at *3 (N.D. Ill. Oct. 8, 2014). In *Lee*, the court found that the named plaintiff was an inadequate representative because members of the putative class who reported to the plaintiff "would be claiming that plaintiff acted in violation of the law." *Id.* Similarly, in *Van v. Ford Motor Co.*, No. 14-cv-8708, 2018 WL 4635649 (N.D. Ill. Sept. 27, 2018), the court found that the named plaintiffs in a hostile work environment case were not adequate representatives of a putative class that included supervisors, explaining that named plaintiffs may be inadequate "where the putative class includes those who allegedly participated in the wrongful conduct." *Id.* at *6. This Court has expressed the same view. *See Brand v. Comcast Corp.*, 302 F.R.D. 201, 225 (N.D. Ill. 2014) ("[T]he Court agrees that including as class members managers and supervisors who are claimed to have contributed to causing the hostile work environment or who are accused of ignoring complaints about it likely would create significant conflicts among the class.").

The plaintiffs first contend that there is no conflict between the interests of the named plaintiffs and those of the putative class members who worked as supervisors because all the members of the proposed class were subject to the same policies. The plaintiffs also note that despite whatever discretion they exercised, the supervisors in the putative class were not responsible for crafting those policies. But although the defendants' policies affected supervisory and non-supervisory employees alike, the plaintiffs also point to alleged misconduct by supervisors as a factor that contributed to the hostile work environment. Under these circumstances, there is a significant risk that successfully prosecuting their claims will require the plaintiffs to introduce evidence of wrongdoing by some of the class members. This evidence may undermine the ability of those class members, or perhaps even the class as a whole, to obtain relief.

The plaintiffs also cite *Brown v. Yellow Transportation, Inc.*, No. 08 C 5908, 2011 WL 1838741 (N.D. Ill. May 11, 2011), in which the court held that "the inclusion of both supervisor and non-supervisor employees in the class does not destroy commonality, typicality, or adequacy." *Id.* at *4. The court in that case cited *Smith v. Nike Retail Services, Inc.*, 234 F.R.D. 648 (N.D. Ill. 2006), for the proposition that "the strength of the common injury and interest shared by the named plaintiffs and class members—the harm caused by an allegedly hostile work environment and the interest in eliminating that environment—plainly overrides any potential conflicts." *Id.* at 661. In this case, by contrast, although some supervisors may share with the named plaintiffs a common interest in eliminating the jail's allegedly hostile work environment, there is evidence that several female supervisors propagated that environment. The Court is therefore not confident that any common interest is sufficient to override the potential conflict.

In light of these concerns, the Court concludes that it is appropriate to modify the proposed class definition to exclude women who worked in supervisory roles.[5] *See Messner*, 669 F.3d at 825 (7th Cir. 2012) (noting that the district court has authority to refine the class definition to resolve problems of over-inclusiveness).

### 6. Predominance

A plaintiff seeking certification under Rule 23(b)(3) must show that common issues predominate in the litigation. "Rule 23(b)(3)'s predominance requirement is satisfied when common questions represent a significant aspect of [a] case and . . . can be resolved for all members of [a] class in a single adjudication." *Messner*, 669 F.3d at 815 (alterations in original). The Seventh Circuit has explained that "[t]he guiding principle behind predominance is whether the proposed class's claims arise from a common nucleus of operative facts and issues." *Beaton*, 907 F.3d at 1029.

The plaintiffs have identified several questions common to the class as a whole. The first, as the Court previously discussed, is whether all of the putative class members experienced an objectively hostile work environment based on the ambient harassment at the jail and courthouse. Other common questions include whether the detainees' harassment occurred because of sex and whether there is a basis for employer liability based on the defendants' failure to adopt reasonable policies to combat the harassment. Although the question of whether the harassment was because of the plaintiffs' sex is unlikely to be a significant point of dispute in the

---

[5] Because the plaintiffs have pointed to evidence that their proposed class would number nearly 2,000, and because supervisors presumably constitute a minority of the employees of the jail and the courthouse, the Court believes that limiting the class definition in this way is unlikely to implicate Rule 23(a)'s numerosity requirement.

litigation, the other questions constitute substantial areas of legal and factual disagreement.

The defendants argue that individual issues overwhelm any common questions in the litigation. The first such issue has already been discussed with respect to commonality under Rule 23(a): the defendants contend that the putative class members are too differently situated to permit classwide resolution of the objective element of the hostile work environment claim. As the Court noted, however, the plaintiff's evidence of ambient harassment makes such classwide resolution possible. The defendants cite this Court's decision in *Brand* for the proposition that certification of a hostile work environment class may be inappropriate under Rule 23(b)(3) if the plaintiffs "experienced the hostile work environment differently." *Brand*, 302 F.R.D. at 223. But in *Brand*, the Court held that the predominance requirement was satisfied. *Id.* at 223–24 ("Put simply, this common question is whether conditions at [the worksite] presented a hostile work environment for the African-American employees there."). It relied on the Seventh Circuit's observation in *Messner* that Rule 23(b)(3) requires "only common evidence and methodology," not "common results for members of the class." *Messner*, 669 F.3d at 819. Just as in *Brand* and *Messner*, the fact that some of the putative class members may have experienced more direct or severe harassment does not defeat predominance under Rule 23(b)(3).

The defendants also rely on two district court opinions denying class certification under Rule 23(b)(3) in cases concerning sexual harassment by prisoners, but neither case suggests that the plaintiffs in this case have failed to satisfy predominance. In both *Rudolph v. Department of Corrections*, No. 5:06cv56-RS (N.D. Fla. Nov. 9, 2006),

and *Berndt v. California Department of Corrections*, No. C 03–3175 PJH, 2012 WL

950625 (N.D. Cal. Mar. 20, 2012), the proposed classes spanned prisons across the

states of Florida and California over a much longer class period.  The proposed class in

this case is sufficiently geographically and temporally confined to make *Rudolph* and

*Berndt* inapposite.

The remaining individual issues do not represent a significant aspect of the

litigation and may be appropriately resolved through individual proceedings after the

class phase.  First, the question of whether the harassment was subjectively offensive—

that is, whether the putative class members subjectively experienced the detainees'

harassment as hostile—will require individual proof, but it does not appear to constitute

a substantial dispute in this case.  The defendants do not point to evidence suggesting,

for example, that jail employees welcomed or consented to the detainees' behavior.

*See Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 476 (7th Cir. 2004) (noting that

evidence that the harassment was unwelcome—in the form of objections to

supervisors—satisfied the subjective element).

The defendants next argue that certain affirmative defenses will require individual

proof.  Some of these defenses are simple to resolve on a piecemeal basis (e.g., the

statute of limitations defense or the allegation that particular class members' claims are

barred because they were not disclosed during bankruptcy proceedings).  The others

are too underexplained and devoid of supporting evidence to permit the Court to

conclude that they will ultimately prove significant to the disposition of the case (e.g., the

allegation that the putative class members failed to mitigate their damages).

Finally, the defendants argue that determining the amount of damages to which

each putative class member is entitled will require individual proceedings. It is well-established, however, that the need for individualized damages calculations is not a basis for denying class certification. *See Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013) ("It would drive a stake through the heart of the class action device, in cases in which damages were sought rather than an injunction or a declaratory judgment, to require that every member of the class have identical damages."); *see also Messner*, 669 F.3d at 815; *Arreola v. Godinez*, 546 F.3d 788, 801 (7th Cir. 2008). The Court concludes that the need to individually adjudicate damages, even in conjunction with the other individual issues the defendants raise, does not defeat predominance.[6] *See Beaton*, 907 F.3d at 1029 ("[N]ot every issue must be amenable to common resolution; individual inquiries may be required after the class phase.").

Considering both the individual and common issues in the case and their relative importance, the Court that the proposed class satisfies the predominance requirement of Rule 23(b)(3).

### 7. Superiority

Rule 23(b)(3) next requires the plaintiffs to show that a class action is superior to other methods for fairly and efficiently adjudicating this dispute. The number and significance of the common issues that will predominate in the litigation suggests that

---

[6] The Court also concludes that dividing the class issues from individual issues in this manner would be unlikely to cause "the same issue" to be "reexamined by different juries." *See In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1302–03 (7th Cir. 1995). In this case, unlike in *Rhone-Poulenc Rorer*, the divided legal issues do not substantially conceptually overlap. *See id.* at 1303 (holding that the district court's bifurcation was unlawful where a jury considering the issues of comparative negligence or proximate causation would necessarily have to reevaluate a prior jury's determination that the defendant acted negligently).

the proposed class meets this requirement.  *See Messner*, 669 F.3d at 814 n.5 ("[T]he more common issues predominate over individual issues, the more desirable a class action lawsuit will be as a vehicle for adjudicating the plaintiffs' claims." (quoting *Klay v. Humana, Inc.*, 382 F.3d 1241, 1269 (11th Cir. 2004)).  The defendants argue that the superiority requirement is not satisfied because the proposed class is not manageable and a class action is not required to afford the putative class members the opportunity to vindicate their rights.  Neither argument is persuasive.  First, the Court does not view the individual issues at play in this case as sufficiently complex to make a class action unmanageable, and in any case "courts should not refuse to certify a class merely on the basis of manageability concerns."  *Mullins*, 795 F.3d at 663.  Second, a class action represents the best method for vindicating the rights of putative class members whose "potential damages may be too insignificant to provide [them] with an incentive to pursue" their claims.  *Quinn v. Specialized Loan Servicing, LLC*, 331 F.R.D. 126, 133 (N.D. Ill. 2019).  The defendants point out that one putative class member has filed an individual suit.  But given that that proposed class comprises many hundreds of members, a single lawsuit is slim evidence that individual litigation is a viable alternative for the class in general.  For these reasons, the Court concludes that a class action is superior to individual litigation under Rule 23(b)(3).

**8.    Class counsel**

Finally, applying the factors set forth in Rule 23(g), the Court concludes that the plaintiffs' attorneys have the experience, knowledge, and resources to fairly and adequately represent the interests of the class.

**Conclusion**

For the foregoing reasons, the Court grants the plaintiffs' motion for class certification [dkt. no. 172] but modifies the proposed class definition. The Court certifies the following class under Rule 23(b)(3): All women who have been employed by the Cook County Sheriff's Office at the Jail, or as Court Services deputies at the Leighton Courthouse, or by the County in positions with Cermak Health Services, at any time since April 23, 2015, except women who, during that period, have held the positions identified in Exhibit A to the complaint or who were employed in supervisory roles. The Court also appoints the following attorneys as class counsel: Noelle C. Brennan; Shelly B. Kulwin; Heather K. Afra; Emily R. Brown; Kristin H. Carter; Caitlin K. Cervenka; Ellen Eardley; Naomi B. Frisch; Rachel A. Katz; Jeffrey R. Kulwin; Caryn C. Lederer; Michael D. Lieder; Cyrus Mehri; Kate E. Schwartz; and Marni J. Willenson. The case is set for a status hearing on August 20, 2019 at 9:30 a.m. to set any necessary schedules for further proceedings as well as a date for the next settlement conference.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: August 12, 2019