In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 20-1723

SDAHRIE HOWARD, et al.,

*Plaintiffs-Appellees,*

*v.*

COOK COUNTY SHERIFF'S OFFICE and COUNTY OF COOK,

*Defendants-Appellants.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 17 C 8146 — **Matthew F. Kennelly**, *Judge.*

———————————

ARGUED DECEMBER 3, 2020 — DECIDED MARCH 4, 2021

———————————

Before SYKES, *Chief Judge*, and FLAUM and ST. EVE, *Circuit Judges*.

ST. EVE, *Circuit Judge*. In this case we review the certification of a class-action lawsuit alleging a horrible "epidemic" of sexual harassment at the Cook County Jail. The named plaintiffs are ten women who work at the jail or an adjoining courthouse. They sue their employers—the Cook County Sheriff's Office and Cook County—for failing to prevent male inmates from sexually harassing them. They propose to sue not just

for themselves but for thousands of other women who work at the jail or courthouse. The district court certified a class comprising all non-supervisory female employees who work with male inmates at the jail or courthouse, of whom there are about 2,000.

We granted the defendants' request for an interlocutory appeal, *see* Fed. R. Civ. P. 23(f), and we now hold that the district court abused its discretion in certifying the class. The court's primary error was using the peripheral and overbroad concept of "ambient harassment" (i.e., indirect or secondhand harassment) to certify a class of employees who have endured a wide range of direct and indirect harassment. Even without this error, the class cannot stand because it comprises class members with materially different working environments whose claims require separate, individualized analyses. We thus reverse the order certifying the class.

## I. Background

### A. The Jail Complex

The Cook County Jail is one of the largest single-site jails in the country. It fills 36 buildings that span eight city blocks. About 100,000 inmates pass through the jail each year. At any given time approximately 6,500 inmates reside at the jail while awaiting trial. On an average day, between 700 and 900 inmates attend court hearings. (These numbers have decreased somewhat during the COVID-19 pandemic.)

The inmates reside in different housing divisions at the jail. Divisions 3, 4, and 5 house female inmates. Divisions 2 and 6 house male inmates with minimum- or medium-security classifications. Division 8 encompasses medical facilities operated by Cermak Health Services and a Residential

Treatment Unit where inmates receive mental health services. Divisions 9 and 10 house maximum- and super-maximum-security male inmates. The inmates in Divisions 9 and 10 often overlap with the Division 8 population. Other, non-residential parts of the jail, such as the "south campus" and a Division 5 annex, host administrative operations.

The George N. Leighton Criminal Courthouse is a separate structure that connects to the jail through a series of tunnels by which officers take inmates to court hearings. The courthouse has dozens of courtrooms spread across eight floors. It also has an administrative wing containing administrative offices, jury rooms, judicial chambers, a cafeteria, a law library, and a mental health courtroom. The only place in the administrative wing where inmates go is the mental health courtroom.

The Sheriff's Office controls operations at the jail complex. (We use the term "jail complex" as a shorthand for the entire complex, including the jail, Cermak, and the courthouse.) It employs both sworn staff (i.e., correctional officers and deputy sheriffs) and civilian staff. Cermak workers are civilian employees of the County.

Non-supervisory employees at the jail have a variety of roles. Many work in the housing divisions. Others provide healthcare to inmates at Cermak or the Residential Treatment Unit. Others work behind the scenes at Cermak as, for example, accountants, programmers, and administrative assistants. Still others work in non-residential parts of the jail in administrative roles (e.g., mailroom, visitation, IT, records, HR, drug testing). Employees who work at the courthouse (called court services deputies) also have a variety of roles. Some work as courtroom deputies, for example, while others

perform door security or work with juries in the administrative wing.

## B. This Lawsuit

The named plaintiffs are ten women who work at the jail complex. They include four sworn correctional officers, a civilian correctional rehabilitation worker, a civilian paramedic, and four sworn deputy sheriffs who work at the courthouse. One of the correctional officers works in the Strategic Operations and Information Unit reviewing reports and videos of inmate misconduct. The other three work in Divisions 2 or 10, as does the civilian rehabilitation worker. Collectively, the correctional officers and the rehabilitation worker have worked in every housing division (including Cermak and the Residential Treatment Unit) and non-residential parts of the jail. Three of the deputy sheriffs work in the Court Services Department at the courthouse. Their duties include transporting inmates to hearings. The other deputy sheriff works in "the bridge," a staging area in the courthouse basement where inmates wait for the court to call their cases. The four deputy sheriffs have worked at various other locations in the courthouse in the past. The paramedic works at Cermak. She also has worked in Divisions 2, 9, and 10.

In their suit against the Sheriff's Office and Cook County, the plaintiffs allege that they have endured frequent and extreme sexual harassment by male inmates, which the defendants have failed to take reasonable measures to prevent. The harassment occurs "on a daily or nearly daily basis throughout the Jail." The plaintiffs allege that male inmates expose their genitals to them, masturbate at them, direct sexual remarks and gestures at them, grope and grab them, and threaten and commit sexual violence against them. The

plaintiffs say they have complained of this horrible harassment to no avail.

On behalf of themselves and other similarly situated women who work at the jail complex, the plaintiffs sue the defendants for permitting a hostile work environment in violation of Title VII of the Civil Rights Act of 1964. They also bring claims under 42 U.S.C. § 1983 for gender discrimination in violation of the Fourteenth Amendment's Equal Protection Clause; gender-discrimination claims under the Illinois Civil Rights Act, 740 ILCS 23/5; and claims for indemnification against Cook County. A few weeks after the plaintiffs filed suit, the district court entered a preliminary injunction mandating certain preventative measures agreed to by the parties.

This appeal arises from the second of two class certification orders entered by the district court. The second order modified the first, so our review touches on both orders.

## 1. Original Class Certification Order

The plaintiffs moved to certify a class under Federal Rule of Civil Procedure 23(b)(3) comprising all female employees of the Sheriff's Office or the County who work at the jail complex, other than certain high-level management employees like the executive director, chief financial officer, and superintendent.

The plaintiffs submitted a range of evidence in support of their motion for class certification, including the defendants' policies, procedures, and records; expert reports from statistical, psychological, and correctional professionals; 144 class member declarations; and deposition testimony from class members and defense witnesses. The defendants submitted

their own evidence, similar in kind, to oppose class certification. At a general level, the evidence shows:

- *Prevalence of sexual harassment.* There were at least 1,745 filed reports of male inmates sexually harassing female employees at the jail complex between January 2015 and September 2018. The vast majority involved indecent exposure or exhibitionist masturbation. Because of underreporting problems, the number of incident reports may significantly understate the actual number of incidents. According to the plaintiffs' statistical expert, more than two-thirds (1,186) of the reported incidents occurred in Divisions 8, 9, or 10, which house the highest-security male inmates. (The defendants' expert put that number at three-quarters.) Only seven percent (121) of the incidents occurred in Divisions 2 or 6, which house lower-security male inmates. Nine percent (151) occurred in non-residential parts of the jail. And six percent (110) occurred at the courthouse. Beyond incident reports, the 144 class member declarations recounted extreme episodes and patterns of sexual harassment by male inmates.

- *Exposure to harassment.* A female employee's exposure to harassment can vary significantly with job assignment, though job assignments can change. Some class members, for example, described seeing little misconduct while working in Divisions 2 through 5 (which house female inmates and lower-security male inmates), while encountering much more upon transferring to Division 9 (a maximum-security male division). Other employees (e.g., administrative courthouse personnel and non-medical staff at Cermak) do not work in the housing divisions and have less direct contact with male inmates. At the same time, job

assignment is not the only factor that determines an em-
ployee's exposure to harassment. Both employees and in-
mates traverse the jail, so female employees can encounter
male inmates outside of their workspaces. For example,
many class members described sexual harassment occur-
ring in the tunnels that connect the courthouse to the jail.

- ***Policies and Preventative Measures.*** The Sheriff's Office
  controls jail operations through a hierarchical structure. It
  issues policies on inmate security, conduct, and discipline
  that apply to all inmates and employees at the jail com-
  plex. These policies prohibit, and impose sanctions for,
  sexual harassment by inmates. They also establish report-
  ing procedures. They require civilian staff to notify sworn
  staff or supervisors of inmate misconduct. The sworn staff
  or supervisor must then speak with the inmate or file a
  disciplinary report. The Sheriff's Office has taken other
  measures to curb the sexual harassment including inmate
  education, staff training, and physical restrictions on
  known offenders.

Based on this evidence and the parties' extensive briefing,
the district court certified the following class:

> All women who have been employed by the Cook
> County Sheriff's Office at the Jail, or as Court Services
> deputies at the Leighton Courthouse, or by the County
> in positions with Cermak Health Services, at any time
> since April 23, 2015, except women who, during that
> period, have held the positions identified in Exhibit A
> to the complaint or who were employed in supervisory
> roles.

Exhibit A listed the high-level management employees whom the plaintiffs had carved out of the class. The court also excluded supervisory employees because it agreed with the defendants that supervisors' own wrongdoing might become an issue in the lawsuit. *See* Fed. R. Civ. P. 23(a)(4) (requiring that "the representative parties will fairly and adequately protect the interests of the class"). In all other respects, the court found that the plaintiffs' proposed class met the requirements for class certification under Rule 23(b)(3). Relevant here, the court found that the proposed class met the requirements of commonality, typicality, and predominance. *See* Fed. R. Civ. P. 23(a)(2)–(3), (b)(3).

The court's Rule 23 analysis relied heavily on the concept of "ambient harassment," which it defined as "the experience of working in an environment highly permeated with sexually offensive and degrading behavior, that is, a highly sexualized atmosphere in which crude and offensive sexual behavior is common and employees see that it is normative, whether specifically directed at them or not." The court borrowed this definition from the plaintiffs' expert, Dr. Louise Fitzgerald, who performed a "social-framework analysis" to opine on the impact and causes of sexual harassment at the jail complex. Although the court excluded Dr. Fitzgerald's opinions about the extent of sexual harassment at the jail complex and the adequacy of the defendants' curative measures, the court deemed her more general "opinions regarding the social-scientific background of workplace harassment" admissible.

Relying on an ambient-harassment theory, the court found that the putative class met the commonality requirement because the class members shared at least one common

question: "whether the ambient harassment experienced by female employees at the jail and the courthouse is sufficiently severe and pervasive to support a Title VII hostile work environment claim."

Ambient harassment also factored into the court's finding of typicality. The court concluded that the named plaintiffs' claims were typical of the class claims because they relied on the same legal theory as the class members (hostile work environment), even if some had experienced direct harassment and others only ambient harassment. The court reasoned that direct harassment differs from ambient harassment only in degree and not in kind.

Finally, the court found that three common questions predominated over individual questions: (1) "whether all of the putative class members experienced an objectively hostile work environment based on the ambient harassment at the jail and courthouse;" (2) "whether the detainees' harassment occurred because of sex;" and (3) "whether there is a basis for employer liability based on the defendants' failure to adopt reasonable policies to combat the harassment." The court acknowledged that the second question was "unlikely to be a significant point of dispute," but it considered the other two questions to be substantial issues in the case. The court did not see the individual issues—i.e., the subjective offensiveness of the harassment, damages, and affirmative defenses—as significant aspects of the case.

## 2. Class Modification and Interlocutory Appeals

We granted the defendants' motion for an interlocutory appeal of the original class certification order. *See* Fed. R. Civ. P. 23(f). Soon after, however, the plaintiffs moved in the

district court to refine the class based on a newly produced staffing spreadsheet that, in their words, "comprehensively describes and summarizes by division and department, the job duties of all correctional officers and all other job categories in the Jail." According to the plaintiffs, the spreadsheet proved that almost every class member had direct contact with male inmates. The plaintiffs identified a few categories of employees (mostly administrative) whose jobs did not bring them into direct contact with male inmates and asked the district court to trim those employees from the class. Given the pending appeal, the plaintiffs requested an indicative ruling from the district court that it would refine the class based on the spreadsheet. *See* Fed. R. Civ. P. 62.1. They stressed that modifying the class would "have the advantage of allowing Plaintiffs to establish the common issue of whether sexual harassment was severe or pervasive and objectively offensive without reference to ambient or 'secondhand' harassment."

As requested, the district court issued an indicative ruling explaining that if we remanded the case it would grant the plaintiffs' motion to modify the class. The court recognized that the plaintiffs' motion implicated Rule 23's commonality and predominance requirements. Given that the spreadsheet showed that some of the class members lacked contact with male inmates, those class members were now "situated differently from the others in a material way." As such, "a narrower class that excludes positions that lack contact with male detainees is more appropriate than the presently certified class." Yet the court did not reanalyze the Rule 23 requirements or explain why the modified class met them. It also did not resolve the parties' dispute about whether ambient harassment would remain an issue for the modified class. It merely

commented that "narrowing the class is likely to significantly narrow any differences in this regard across the class."

We remanded the case over the defendants' objections, and the district court modified the class definition as follows:

> All women who have been employed by the Cook County Sheriff's Office at the Jail, or as Court Services deputies at the Leighton Courthouse, or by the County in positions with Cermak Health Services, at any time since April 23, 2015, except women who, during that period, have held the positions identified in Exhibit B to the plaintiffs' Rule 62.1 motion or who were employed in supervisory roles.

Exhibit B expanded on Exhibit A to the original certification order by excluding those employee categories that (according to the staffing spreadsheet) had no contact with male inmates. The district court found that the modified class met the requirements of Rule 23 for the reasons stated in its indicative ruling and its initial certification order.

The parties do not provide precise numbers, but they agree that, while the original class had more than 2,000 members, the modified class has just under 2,000 members. According to the defendants, the new class has about 180 fewer members than the original class. The plaintiffs represent that the modified class comprises roughly 1,100 correctional officers, 525 medical and mental health personnel, 150 courtroom deputies, 75 social workers or law librarians, and 100 other employees such as assistants or clerks.

We granted the defendants' Rule 23(f) petition for an interlocutory appeal of the court's order modifying the class.

## II. Discussion

To achieve certification, a proposed class under Rule 23(b) must meet the requirements of Rule 23(a)—numerosity, typicality, commonality, and adequacy of representation—and one of the alternatives listed in Rule 23(b). *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012). Where, as here, plaintiffs seek certification under Rule 23(b)(3), a court must find that common questions of law or fact "predominate" over individual ones and that a class action is "superior" to other methods of adjudicating the case. *Id.*; *McFields v. Dart*, 982 F.3d 511, 515 (7th Cir. 2020). The plaintiffs bear the burden of proving by a preponderance of the evidence that their proposed class satisfies the requirements of Rule 23. *Messner*, 669 F.3d at 811.

Rule 23 is more than "a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Thus, in evaluating the Rule 23 factors, a court does not take the plaintiffs' allegations at face value. Instead, the court "must go beyond the pleadings and, to the extent necessary, take evidence on disputed issues that are material to certification." *Beaton v. SpeedyPC Software*, 907 F.3d 1018, 1025 (7th Cir. 2018); *see also Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 675 (7th Cir. 2001). This will often "entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped." *Wal-Mart*, 564 U.S. at 351. Still, a court's preview of the merits must remain tethered to its Rule 23 analysis. The merits themselves are "not on the table" at this early stage. *Beaton*, 907 F.3d at 1025. Rule 23 does not permit courts "to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).

We review an order on class certification for abuse of discretion, "leaving considerable room for the exercise of judgment unless the factual determinations are clearly erroneous or there are errors of law." *Beaton*, 907 F.3d at 1025. Review "is deferential, but deferential doesn't mean abject." *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 723 (7th Cir. 2011) (internal quotations and citation omitted). A district court must "rigorously analyze" the requirements of Rule 23. *Beaton*, 907 F.3d at 1025. "The decision to certify a class or not can cause a considerable tilt in the playing fields of litigation and therefore is not one to take lightly." *Chi. Teachers Union, Local No. 1 v. Bd. of Educ. of City of Chi.*, 797 F.3d 426, 433 (7th Cir. 2015); *accord Szabo*, 249 F.3d at 675 (noting that class certification "may induce a substantial settlement even if the [plaintiffs'] position is weak").

The defendants' appeal centers on three of Rule 23's requirements: commonality, typicality, and predominance. These requirements overlap, so they often rise or fall together. *See, e.g.*, *McFields*, 982 F.3d at 516–19. This case is no exception. The "same basic defects" doom the class on each front. *Id.* at 518. First, ambient harassment does not unite the modified class because it is no longer a central issue in the case and the plaintiffs have not shown that it manifests in the same way across different parts of the jail complex. Second, and relatedly, the significant variation in harassment levels across different parts of the jail complex renders certain class members' work environments materially different from those of others. Some variation among class claims is inevitable, but the variation in this case is more than Rule 23 tolerates. We reverse on those grounds. We reject the defendants' contention that adequacy of representation is an additional barrier to class certification.

## A. Commonality

We begin with commonality. Rule 23(a)(2) requires "questions of law or fact common to the class." One common question is enough, but not just any question will do. *Wal-Mart Stores*, 564 U.S. at 359; *Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 497 (7th Cir. 2012). As *Wal-Mart* explains, the commonality inquiry is easy to misinterpret, as "[a]ny competently crafted class complaint literally raises common 'questions.'" 564 U.S. at 349 (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)). Superficial common questions like whether each class member "suffered a violation of the same provision of law" do not suffice. *Id.* at 350; *Jamie S.*, 668 F.3d at 497. Rather, the class claims "must depend on a common contention" that is "capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350; *accord* 1 William B. Rubenstein, *Newberg on Class Actions* § 3:18 (5th ed. 2012) (the common question must "not be peripheral but important to most of the individual class member's claims"). "Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Wal-Mart*, 564 U.S. at 350 (quoting Nagareda, *supra*, at 132).

The district court's initial class certification order found a common question to be "whether the ambient harassment experienced by female employees at the jail and the courthouse is sufficiently severe and pervasive to support a Title VII hostile work environment claim." In reaching this conclusion, the court relied on Dr. Fitzgerald's explanation of the ambient-harassment theory. In her expert report, Dr. Fitzgerald

explained that the ambient-harassment theory focuses on the general environment of harassment in a workplace, which affects both direct victims of harassment as well as "bystanders and coworkers who observe or hear about other women being directly targeted." Because ambient harassment "reaches beyond the focal individual to affect the entire workgroup," the ambient-harassment theory allowed the district court to reject the defendants' argument that there was too much variation among the individual experiences of the class members, some of whom lacked direct contact with male inmates.

After the plaintiffs submitted the staffing spreadsheet, however, the court modified the class to exclude nearly 200 employees who, according to the spreadsheet, lacked direct contact with male inmates. As the court saw it, the class members who lacked contact with male inmates were "situated differently from the others in a material way," and thus did not belong in the same class. Although the court recognized that its modification of the class implicated the commonality requirement, it did not reassess commonality or identify a new common question for the modified class. It also did not resolve the parties' dispute as to the continuing significance of ambient harassment in the case, noting only that "narrowing the class is likely to significantly narrow any differences in this regard across the class."

The court's failure to reassess commonality when modifying the class was error, given that the ambient-harassment theory was the focal point of the commonality ruling in the original order. A district court must assure itself at all stages of the litigation that a certified class meets the requirements of Rule 23. Newberg on Class Actions § 7:37; *see Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985). The court properly

exercised its discretion to modify the class in light of new evidence, *see* Fed. R. Civ. P. 23(c)(1)(C); *Fonder v. Sheriff of Kankakee Cnty.*, 823 F.3d 1144, 1147 (7th Cir. 2016), but it was wrong to "presume[]" that the modified class complied with Rule 23, *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982).

To be sure, not every adjustment to a class requires a fresh Rule 23 evaluation. In many cases, a modified class may satisfy Rule 23 for the reasons the original class did, and a court may simply say so. Not so here. Ambient harassment was central to the court's original commonality finding. Yet, in modifying the class, the court excluded nearly 200 class members, apparently *because* their claims depended solely on ambient harassment. The remaining class members—all of whom had direct exposure to male inmates—could (at least in theory) rely on direct harassment to prove their claims. Although the district court recognized that the new class materially differed from the previous class, it failed to identify a new common question for the class. This complicates our review: on one hand, the court seemed to acknowledge that ambient harassment was no longer central to the case. At the same time, the court did not identify a new common question for the modified class, choosing instead to incorporate the reasoning of its earlier order—which had hinged entirely on ambient harassment.

The court's failure to reassess commonality leaves us in the dark as to the legal justification for the modified class. Is ambient harassment still the common question? Or is ambient harassment now on the sidelines? We do not know. Neither do the parties, for that matter. They posit completely different readings of the court's orders. According to the plaintiffs, the court's indicative ruling disavowed ambient harassment.

No. 20-1723                                                              17

What unites the class now, they say, is *direct* harassment by male inmates. They maintain that ambient harassment is a "severable and independent" basis for class certification that we need not address. The defendants see things much differently. They point out that the court's order modifying the class incorporated the reasoning from its initial certification order, so, they say, ambient harassment is still the "glue" holding this class together. *Wal-Mart*, 564 U.S. at 352.

Ordinarily, we would vacate and remand for the court to supplement its reasoning. *See, e.g., Red Barn Motors, Inc. v. NextGear Capital, Inc.*, 915 F.3d 1098, 1101 (7th Cir. 2019). But we have already remanded the case once, and we worry that remanding the case again will prompt a third appeal presenting the same issues. More importantly, we believe that remanding for the court to clarify the common question would ultimately be pointless because, under either party's interpretation of the court's rulings, commonality is lacking. We address the parties' interpretations in turn.

### 1. Ambient Harassment

We start by assuming, as the defendants do, that commonality still depends on ambient harassment—which is to say, the common question remains "whether the ambient harassment experienced by female employees at the jail and the courthouse is sufficiently severe and pervasive to support a Title VII hostile work environment claim." We hold that this is not a common question for the class.

Although the plaintiffs bring a few claims, their bid for class certification focuses almost entirely on their hostile work environment claim. We accept their invitation to focus on that claim, with one caveat that we address later in the opinion.

To succeed on a hostile work environment claim, "a plaintiff must show that she was (1) subjected to unwelcome sexual conduct, advances, or requests; (2) because of her sex; (3) that were severe or pervasive enough to create a hostile work environment; and (4) that there is a basis for employer liability." *EEOC v. Costco Wholesale Corp.*, 903 F.3d 618, 625 (7th Cir. 2018) (internal quotations and citation omitted). The third factor "requires the unwelcome conduct to be severe or pervasive from both a subjective and an objective point of view." *Id.* (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998)). "To be severe or pervasive enough to create a hostile work environment, conduct must be 'extreme.'" *Id.* (quoting *Faragher*, 524 U.S. at 788). "This is not, and by its nature cannot be, a mathematically precise test." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993). Whether a work environment is hostile depends on "all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23.

The district court's commonality analysis focused on the third element of a hostile work environment claim, which asks whether the harassment was severe or pervasive enough to create a hostile work environment. *Costco Wholesale Corp.*, 903 F.3d at 625. The court recognized that not every class member had experienced the same level of harassment, but it thought they shared at least one thing in common: they all worked in an environment plagued by "ambient harassment." Relying on Dr. Fitzgerald's expert report, the court defined ambient harassment as "the experience of working in an environment highly permeated with sexually offensive and degrading behavior, that is, a highly sexualized atmosphere

in which crude and offensive sexual behavior is common and employees see that it is normative, whether specifically directed at them or not."

As an aside, the district court's reliance on Dr. Fitzgerald's expert opinions was improper. The court had previously excluded her case-specific opinions as unreliable. Yet, when analyzing commonality, the court concluded without explanation that Dr. Fitzgerald's "opinions regarding the social-scientific background of workplace harassment" were admissible. We do not follow that reasoning. We have held that "[w]hen an expert's report or testimony is 'critical to class certification,'" the district court "must make a conclusive ruling on any challenge to that expert's qualifications or submissions before it may rule on a motion for class certification." *Messner*, 669 F.3d at 812 (quoting *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 815 (7th Cir. 2010) (per curiam)); *see also Wal-Mart*, 564 U.S. at 354 ("doubt[ing]" that *Daubert* did not apply to expert testimony at the certification stage of class-action proceedings"). We have also held that *Daubert* and Rule 702 apply "to social science experts," just as they apply "to experts in the hard sciences." *Tyus v. Urban Search Mgmt.*, 102 F.3d 256, 263 (7th Cir. 1996); *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993); Fed. R. Evid. 702. The district court's Rule 23 analysis relied heavily on Dr. Fitzgerald's general opinions about the ambient-harassment theory. Before relying on those opinions—which the defendants had moved to exclude, along with the rest of Dr. Fitzgerald's report—the court should have ensured that they lived up to the standards of *Daubert* and Rule 702. *Messner*, 669 F.3d at 812.

The only authority that the district court cited for its decision to admit Dr. Fitzgerald's background opinions was *Van*

*v. Ford Motor Co.*, No. 14-CV-8708, 2018 WL 4635649 (N.D. Ill. Sept. 27, 2018), which denied Ford's motion to exclude Dr. Fitzgerald's expert opinions as premature. *Id.* at *13. But the cited portion of *Van* expressed doubts about the admissibility of Dr. Fitzgerald's opinions and disclaimed any reliance on them. *Id.* at *12–13. Moreover, a court does not fulfill its obligation "to act as a vigorous gatekeeper to ensure the reliability of expert testimony" simply by citing another case that considered similar testimony. *Robinson v. Davol Inc.*, 913 F.3d 690, 696 (7th Cir. 2019). The "rigorous analysis" requirement "applies to expert testimony critical to proving class certification requirements." *In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 187 (3d Cir. 2015); *see Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013).

Expert issues aside, we readily acknowledge that "ambient harassment," to the extent it refers to indirect or secondhand harassment, is a familiar concept in employment-discrimination law. *See generally* Kristin H. Berger Parker, Comment, *Ambient Harassment Under Title VII: Reconsidering the Workplace Environment*, 102 Nw. U. L. Rev. 945 (2008). We have held that harassing comments directed at others, while they "carry less weight" than remarks directed at the plaintiff, may still be relevant to a hostile work environment claim. *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 902 (7th Cir. 2018). We have also made clear that not all indirect harassment is created equal. For example, a discriminatory comment made in the plaintiff's presence might be actionable if it applies equally to the plaintiff, while a mere "rumor" might not be. *Yuknis v. First Student, Inc.*, 481 F.3d 552, 554–55 (7th Cir. 2007); *accord Johnson*, 892 F.3d at 902–03. We have even suggested that, on extreme facts, indirect harassment standing alone could create a hostile work environment. *Dandy v.*

*United Parcel Serv., Inc.*, 388 F.3d 263, 272 (7th Cir. 2004) (opining that the "[r]epeated use of [racial epithets] in the work environment … may create an objectively hostile work environment, even if they are heard secondhand.").

We have never held, however, that ambient harassment can serve as a standalone basis for a hostile work environment claim in the jail or prison context, and the defendants urge us to hold that it cannot. They acknowledge, as they must, that Title VII covers employees who suffer harassment from inmates. *See, e.g.*, *Erickson v. Wis. Dep't of Corr.*, 469 F.3d 600 (7th Cir. 2006); *Beckford v. Dep't of Corr.*, 605 F.3d 951, 958 (11th Cir. 2010) (collecting cases). But, they maintain, hostile work environment claims depend on context, and jails are not "typical work environments." *Vajdl v. Mesabi Acad. of KidsPeace, Inc.*, 484 F.3d 546, 550 (8th Cir. 2007). Jails "by definition" house people who have been detained for "breach[ing] prevailing societal norms." *Slayton v. Ohio Dep't of Youth Servs.*, 206 F.3d 669, 677 (6th Cir. 2000). Not only that, but jail administrators have limited tools at their disposal to control inmate behavior. *Beckford*, 605 F.3d at 959. Many of the incentive structures that allow employers to control employee behavior in the typical workplace are not available to jail administrators. *See id.* There are both "practical and constitutional limits on what [jails] can do to protect staff." *Id.* Unlike employees, inmates cannot be fired. And while other sanctions are available, including discipline and criminal charges, these sanctions (the defendants tell us) do not necessarily deter individuals who are already confined and often facing prolonged imprisonment on existing charges. What is more, some of the most effective sanctions—e.g., separate housing—could raise Eighth Amendment concerns. *Id.*; *see Hutto v. Finney*, 437 U.S. 678, 685 (1978).

In short, "some harassment by inmates cannot be reason-
ably avoided." *Beckford*, 605 F.3d at 959. For that reason, the
defendants contend that ambient harassment cannot support
a hostile work environment claim in the penal context. Like
the district court, we do not entertain that argument because
it goes straight to the merits. *See Schleicher v. Wendt*, 618 F.3d
679, 687 (7th Cir. 2010) ("The chance, even the certainty, that
a class will lose on the merits does not prevent its certifica-
tion."). We do hold, however, that the district court erred in-
sofar as it found that ambient harassment supplied a common
question for the modified class.

The plaintiffs' theory for refining the class was that every
member of the new class had likely experienced—or, at the
very least, had been positioned to experience—direct harass-
ment, given that their job descriptions involved direct contact
with male inmates. If that is so, then the class members, by
and large, have limited use for ambient harassment. Recall
that ambient harassment, while relevant to a hostile work en-
vironment claim, "carr[ies] less weight" than direct harass-
ment. *Johnson*, 892 F.3d at 902; *accord Ellis v. CCA of Tenn. LLC*,
650 F.3d 640, 647 n.2 (7th Cir. 2011) ("In the context of a hostile
work environment claim, secondhand harassment is less se-
vere than firsthand harassment."). Indeed, we have repeat-
edly rejected hostile work environment claims that rest pri-
marily on secondhand harassment. *See, e.g.*, *Yuknis*, 481 F.3d
at 556; *Ezell v. Potter*, 400 F.3d 1041, 1048 (7th Cir. 2005); *Dandy*,
388 F.3d at 272; *Patt v. Family Health Sys., Inc.*, 280 F.3d 749, 754
(7th Cir. 2002); *Johnson v. City of Fort Wayne, Ind.*, 91 F.3d 922,
938 (7th Cir. 1996).

Our precedent makes clear, then, that generally a hostile
work environment claim predicated on ambient harassment

alone would be very difficult to mount. For that reason, the named plaintiffs and the members of the modified class have a clear incentive to prioritize evidence of direct harassment over evidence of ambient harassment. Evidence of ambient harassment may still be relevant to the third element of the class claims, but it is not central. In other words, the answer to the district court's common question—was the ambient harassment sufficiently severe or pervasive to create an objectively hostile work environment?—will not "drive the resolution of the litigation" because it will not resolve the issue that the third element of the class claims now depends on: whether the *direct* harassment that the class members experienced was sufficiently severe or pervasive to create an objectively hostile work environment. *Wal-Mart*, 564 U.S. at 350 (quoting Nagareda, *supra*, at 132).

The district court's continued focus on ambient harassment when modifying the class might be understandable if the plaintiffs had told the district court that ambient harassment was still the centerpiece of the case. But they said essentially the opposite. When asking the court to refine the class, the plaintiffs argued that the court could certify the modified class "without reference to ambient, or 'secondhand' harassment," signaling that it had faded into the background and was no longer the "glue" holding the class together. *Wal-Mart*, 564 U.S. at 352.

All of this is to say that ambient harassment is now, at most, a "peripheral" issue for most class members. Newberg on Class Actions § 3:18. Resolving it one way or another will thus do little to advance the class claims. As such, it cannot be the common question for the modified class. *See Wal-Mart*, 564 U.S. at 350; *McFields*, 982 F.3d at 517 (holding that a question

was not common because it was "relevant to just one small part of the analysis" and "leaves us far from resolving the litigation on a classwide basis").

Even apart from its diminished importance to the modified class, the ambient-harassment theory is a problematic basis for commonality because it overlooks meaningful distinctions among the class members' individual experiences. As discussed in more detail below, class members' experiences can vary dramatically depending on where they work. The district court, however, treated ambient harassment at the jail complex as if it were one homogenous phenomenon that affects every class member in the same way. This conception of ambient harassment—which derives from Dr. Fitzgerald's untested opinions about the general nature of ambient harassment—cannot be reconciled with our case law. We have made clear that ambient harassment, like direct harassment, comes in materially different forms and affects different workers differently. *Yuknis*, 481 F.3d at 554–55; *see Johnson*, 892 F.3d at 902–03. Even if ambient harassment pervades the jail complex, the plaintiffs have not demonstrated that it manifests in the same way across all parts of the jail, such that it could be a common question for the class. *Cf. Wal-Mart*, 564 U.S. at 353–54 (holding expert's "social framework" analysis of Wal-Mart's "corporate culture" could not "bridg[e] the gap" for commonality because expert could not say with any specificity how often stereotypes impacted employment decisions). On this basis too, ambient harassment fails as a common question.

### 2. Direct Harassment

As mentioned, the plaintiffs dispute the premise that the district court relied on ambient harassment when modifying

the class. According to the plaintiffs, the district court's indicative ruling disavowed ambient harassment and replaced it with direct harassment. The plaintiffs articulate the new common question as: "Whether the severity or pervasiveness of detainee sexual harassment has rendered the working environment objectively hostile."

In its indicative ruling, the district court did not hold that it was no longer relying on ambient harassment. But it did modify the class to exclude class members who lacked direct contact with male inmates. And we acknowledge that the court's reasoning for modifying the class is arguably susceptible to the plaintiffs' interpretation. We therefore address the plaintiffs' argument.

Although the plaintiffs distance themselves from ambient harassment, their proposed common question has problems of its own. Namely, it begs the question—what "sexual harassment" are they referring to? It would be one thing if all class members had experienced the same harassment. But that is not what the evidence shows. Rather, the evidence reveals that class members' experiences can vary significantly depending on where they work. Some class members work (or have worked) in Divisions 8, 9, and 10, where the vast majority of sexual harassment has been reported. Others work in Divisions 2 or 6, where reports of sexual harassment have been far less common. Still others work in non-residential parts of the jail or at the courthouse where, again, reports have been far less common. Even if every class member has endured sexual harassment, that does not mean that they have endured the same harassment, such that they could rely on the same evidence to prove their claims. *See Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016).

Hostile work environment claims are fact intensive. They turn on the frequency, severity, character, and effect of the harassment. *Harris*, 510 U.S. at 23. Here, these are "worker-specific" inquiries because they depend on a class member's unique experience—which correlates to where she works. *Bolden v. Walsh Const. Co.*, 688 F.3d 893, 896 (7th Cir. 2012). To be sure, some—maybe many—class members will have had comparable experiences. But the plaintiffs have not proven that for the entire class.

The jail complex is massive. It fills dozens of buildings that sprawl across eight city blocks. There are many different work assignments, both within the jail and at the connected courthouse. Unfortunately, sexual harassment occurs throughout the jail, but the evidence shows that it is heavily concentrated within a few residential divisions where a fraction of class members and named plaintiffs work. The plaintiffs' own evidence suggests that employees who have worked in Divisions 8, 9, or 10 likely have endured far more frequent harassment than employees working elsewhere in the jail or at the courthouse. This does not mean that one class member (e.g., a Division 10 employee) has experienced a hostile work environment while another (e.g., a law librarian) has not. Rather, the questions of whether these two employees have endured objectively severe or pervasive harassment "must be answered separately" because they depend on "individualized questions of fact and law," whose "answers are unique to each [class member's] particular situation." *Jamie S.*, 668 F.3d at 498.

The plaintiffs acknowledge that the frequency of sexual harassment varies by location. In response, they point to evidence showing that employees often change jobs, and both

No. 20-1723                                                    27

employees and inmates traverse the jail. The evidence sup-
ports those assertions, and indeed the district court found
based on this evidence that "class members frequently occupy
the same work environments, even if only briefly." Still, it is a
leap too far to conclude from this evidence that all class mem-
bers share essentially the same work environment. The plain-
tiffs have shown that inmates and class members often pass
through the tunnels connecting the jail to the courthouse. The
plaintiffs have not shown, however, that employees who
work in the courthouse or other parts of the jail frequently
pass through—much less work in—Divisions 8, 9, and 10,
where most incidents occur. Nor have they shown that most
class members worked in Divisions 8, 9, or 10 during the rel-
evant period. Indeed, if the named plaintiffs are representa-
tive of the class, it appears that employees who work in the
courthouse generally do not transfer to positions at the jail.
Without a stronger evidentiary showing, the plaintiffs cannot
demonstrate that class members working in disparate parts of
the massive jail complex have experienced the same work en-
vironment.

For these reasons, the class does not share a common ques-
tion as to whether the severity or pervasiveness of sexual har-
assment by male inmates has created an objectively hostile
work environment.

Importantly, we do not suggest that none of the class
members here could band together to form a smaller class or
classes. Conceivably, a smaller class comprising a subset of
class members who have had comparable experiences could
form a coherent class. Along those lines, the defendants'
counsel conceded at oral argument that a class of employees
who work in Divisions 8, 9, and 10 might satisfy the

requirements of Rule 23. We will leave that issue to the district court's discretion. But the current class is overbroad, and the plaintiffs have failed to establish commonality.

## B. Typicality

Beyond commonality, Rule 23 requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). As a general matter, "[a] plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *Keele v. Wexler*, 149 F.3d 589, 595 (7th Cir. 1998) (internal quotations and citation omitted). Typicality "is meant to ensure that the named representative's claims have the same essential characteristics as the claims of the class at large." *Lacy v. Cook Cnty.*, 897 F.3d 847, 866 (7th Cir. 2018) (internal quotations and citation omitted). The logic behind the typicality requirement "is that a class representative will adequately pursue her own claims, and if those claims are 'typical' of those of the rest of the class, then her pursuit of her own interest will necessarily benefit the class as well." Newberg on Class Actions § 3:28.

Typicality differs from commonality, but the two requirements are "closely related." *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992). "Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Wal-Mart*, 564 U.S. at 349 n.5 (quoting *Falcon*, 457 U.S. at 157 n.13). The distinction between commonality and typicality is that "the commonality inquiry focuses

on what characteristics are shared among the whole class
while the typicality inquiry focuses on the desired attributes
of the class representative." Newberg on Class Actions § 3:31;
*accord Wal-Mart*, 564 U.S. at 349 n.5.

As with commonality, the district court failed to reassess
typicality when modifying the class. Indeed, the court's indic-
ative ruling did not mention typicality. We thus look to the
reasoning of the court's original class certification order,
which the court adopted in modifying the class. The court
found that the named plaintiffs' claims were typical of the
original class claims because the named plaintiffs and the
class members relied on the same legal theory—even if some
of the class members would have to resort to ambient harass-
ment to prove their claims.

We cannot accept this reasoning because, again, it elides
material differences between direct harassment and ambient
harassment. According to the complaint, the named plaintiffs
are each victims of frequent direct harassment. If that is so,
then, for reasons we have explained, the named plaintiffs
have limited use for ambient harassment. Typicality ensures
that class representatives have an "incentive to litigate vigor-
ously" the claims of the absent class members. *Muro v. Target
Corp.*, 580 F.3d 485, 493 (7th Cir. 2009). Even if the named
plaintiffs were to rely on ambient harassment to buttress their
evidence of direct harassment, they would have no reason to
place it front and center. As such, the named plaintiffs are
poor proxies for any class members whose claims rise or fall
on ambient harassment. *See id.* The same would be true if the
situation were reversed and the named plaintiffs had materi-
ally weaker evidence than some of the class members. *See*

*Fonder*, 823 F.3d at 1146; *see also Van v. Ford Motor Co.*, 332 F.R.D. 249, 282–83 (N.D. Ill. 2019).

The district court apparently thought that the named plaintiffs' claims were typical of the class because ambient harassment differs from direct harassment only in degree, and not in kind. *Cf. Yuknis*, 481 F.3d at 554 (opining that the term "second-hand harassment" performs "no analytic function and is better avoided" because it "tends to obscure" immaterial differences between certain types of harassing conduct). Even if that is true, we fail to see how it compels the conclusion that the named plaintiffs' claims are typical of the class claims. It is not enough for typicality that the named plaintiffs and the class members rely on the same legal theory. *See Keele*, 149 F.3d at 595. The named plaintiffs' claims must also share the same essential characteristics as the class claims. *Lacy*, 897 F.3d at 866. Whether ambient harassment differs from direct harassment in degree or in kind, the difference is essential.

The reasoning of the district court's indicative ruling called into question whether typicality still hinged on ambient harassment. But the district court did not reanalyze typicality for the modified class, or otherwise suggest that its earlier analysis did not fully apply. We will not speculate as to how the court might have analyzed typicality with ambient harassment out of the picture. *Spano v. The Boeing Co.*, 633 F.3d 574, 577–78 (7th Cir. 2011) ("[O]ur task is to review only the class certification orders issued by the district court in these two cases. We are not here to review any or all hypothetical orders that the court might have crafted."). We note, however, that much of what we have said about commonality would

apply to typicality, even without regard to ambient harassment.

## C. Predominance

We turn next to predominance. Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members." This requirement builds on commonality; whereas Rule 23(a)(2) requires the existence of a common question, Rule 23(b)(3) requires the common question(s) to "predominate" over the individual ones. As a result, predominance "is far more demanding" than commonality. *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 624 (1997). "There is no mathematical or mechanical test for evaluating predominance." *Messner*, 669 F.3d at 814. Efficiency is the animating principle. *Chi. Teachers Union*, 797 F.3d at 444. To gauge whether a class action would be more efficient than individual suits, "[t]he predominance inquiry 'asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.'" *Tyson Foods*, 136 S. Ct. at 1045 (quoting Newberg on Class Actions § 4:49).

The district court's original class certification order identified three common questions that supposedly predominated: (1) "whether all of the putative class members experienced an objectively hostile work environment based on the ambient harassment at the jail and courthouse;" (2) "whether the detainees' harassment occurred because of sex;" and (3) "whether there is a basis for employer liability based on the defendants' failure to adopt reasonable policies to combat the harassment." As discussed above, the first is not a common question. And the district court acknowledged that the second

question was minor. So we focus on employer liability, asking first whether it qualifies as a common question, and if so, whether it predominates. As with typicality, the court's indicative ruling did not revisit its earlier determination on predominance.

As always, an evaluation of predominance begins with the elements of the underlying claim. *Messner*, 669 F.3d at 815. An employer is liable in a hostile work environment case if (1) a supervisor participated in the harassment (giving rise to strict liability) or (2) the employer was negligent in discovering or remedying the harassment by a coworker or a third party. *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 390 (7th Cir. 2010). The harassers in this case are inmates, not supervisors, so the plaintiffs proceed on a theory of negligence. *See Erickson*, 469 F.3d at 609; *see also Dunn v. Washington Cnty. Hosp.*, 429 F.3d 689, 691 (7th Cir. 2005).

To prove negligence, the plaintiffs must show that (1) the defendants knew or should have known about the harassment and (2) failed to take reasonable steps to prevent it. *Berry v. Delta Airlines, Inc.*, 260 F.3d 803, 811 (7th Cir. 2001). Preventative measures "can involve proactive steps such as constructing a reporting system for instances of sexual harassment, training employees about sexual harassment risks and what can be done to ameliorate them …, and taking reasonable steps to prevent harassment once informed of a reasonable probability that it will occur." *Erickson*, 469 F.3d at 606.

The reasonableness of an employer's response to harassment is a fact-bound inquiry. The response "must be reasonably calculated to prevent further harassment under the particular facts and circumstances of the case at the time the allegations are made." *Berry*, 260 F.3d at 811 (quoting *McKenzie v.*

No. 20-1723                                                          33

*Ill. Dep't of Transp.*, 92 F.3d 473, 480 (7th Cir. 1996)). "We are not to focus solely upon whether the remedial activity ultimately succeeded, but instead should determine whether the employer's total response was reasonable under the circumstances as then existed." *Id.* (quoting *McKenzie*, 92 F.3d at 480). The relevant circumstances include "the gravity of the harassment." *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 432 (7th Cir. 1995); *accord Erickson*, 469 F.3d at 604 ("The greater the potential injury to the employee, the greater care the employer must take.").

In opposing class certification, the defendants submitted evidence of various preventative measures that they have taken to curb sexual harassment by inmates. These measures include: policies prohibiting sexual harassment and establishing reporting procedures; a disciplinary system with a range of sanctions; educating inmates and staff about policies and the consequences of violations; physical restrictions such as handcuffing, waist restraints, and unique jumpsuits for known offenders; a special housing unit for known offenders; and modifications to reduce visibility in certain parts of the jail. In addition, the Sheriff's Office sometimes refers sexual harassment complaints to the State's Attorney Office for potential criminal prosecution. The adequacy of these preventative measures is not at issue in this appeal, but they illustrate some of the tools available to curb harassment.

The plaintiffs tell us that the reasonableness of these preventative measures is a common question because the Sheriff's Officer has one set of policies to control sexual misconduct at the jail complex and it enforces those policies through a centralized, hierarchical management structure. As the plaintiffs see it, the defendants' policies are either reasonable

or they are not, and their reasonableness is a common question. The district court apparently agreed with that reasoning. It found that the defendants' common policies distinguished this case from cases in which the delegation of discretionary authority to local managers precluded commonality. *See Bolden*, 688 F.3d at 896; *Wal-Mart*, 564 U.S. at 352–54.

For their part, the defendants submit that their liability for failing to prevent inmate harassment is not a common question because the same preventative measures might qualify as reasonable for some class members but not others, given the class members' differing job assignments and exposure to harassment. (The plaintiffs say the defendants have forfeited this argument. We disagree; the defendants point out that they disputed employer liability as a common question in their opposition to class certification.)

We grant that, insofar as control over the jail complex is centralized and its policies are uniformly applied, this case differs from *Bolden* and *Wal-Mart*, where the discretion of local managers derailed commonality. Even so, we do not see how this difference translates to a finding that employer liability is a common question that predominates. The defendants' policies may be uniform throughout the jail, but the reasonableness of those policies (and any other preventative measures) still depends on the specific circumstances of the plaintiff(s) or class member(s) challenging the policies. *See McFields*, 982 F.3d at 517. The policies could be reasonable for one class member (e.g., a law librarian), but unreasonable for another (e.g., a Division 10 employee). Or, they could be unreasonable for both; but if they are, they are unreasonable for different legal and factual reasons. *Jamie S.*, 668 F.3d at 498. To reiterate, the jail complex is not a homogenous workplace. In some

parts, the harassment is worse—much worse—than in others. The adequacy of a particular response is evaluated by reference to the underlying problem. Whether preventative measures are reasonable for a given employee depends on the "gravity" of harassment that she endures, *see Baskerville*, 50 F.3d at 432, and the gravity of harassment, in turn, depends on where she works.

For these reasons, employer liability is not a common question for the current class. As before, we do not foreclose the possibility that smaller subsets of the class could share a common question as to employer liability. Because employer liability is not a common question, we have no occasion to ask whether it predominates over individual questions.

Perhaps sensing that the certified class stands on shaky ground, the plaintiffs propose a new common question on appeal: whether the defendants' tolerance of the inmates' sexual harassment amounts to a pattern or practice of discrimination. *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 334–36 (1977). The plaintiffs did not raise this common question below, so they have waived appellate review of it. *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012).

We close out our discussion of employer liability by flagging an issue that the plaintiffs have largely bypassed: the difference between their hostile work environment claims, which we have thus far focused on, and their state-law and equal protection claims, which we have not yet addressed. The district court accepted the plaintiffs' invitation to treat all three claims as parallel, so it did not separately analyze the state and constitutional claims. *See Alamo v. Bliss*, 864 F.3d 541, 550 n.16 (7th Cir. 2017). That is perfectly acceptable for the state-law claims, given that Illinois courts "look to cases

concerning alleged violations of federal civil rights statutes"
when interpreting the Illinois Civil Rights Act. *Cent. Austin
Neighborhood Ass'n v. City of Chi.*, 1 N.E.3d 976, 980 (Ill. App.
Ct. 2013). But the plaintiffs' equal protection claim is not par-
allel to their hostile work environment claim: the equal pro-
tection claim requires proof that the defendants "were moti-
vated by a discriminatory purpose," *Chavez v. Ill. State Police*,
251 F.3d 612, 635–36 (7th Cir. 2001), whereas negligence is
enough for the hostile work environment claim, *Montgomery*,
626 F.3d at 390; *see also Nabozny v. Podlesny*, 92 F.3d 446, 453–
54 (7th Cir. 1996); *Washington v. Davis*, 426 U.S. 229, 239–42
(1976). The plaintiffs may choose to rely on the same evidence
to prove both claims, but the claims' legal elements do not
perfectly overlap.

## D. Adequacy of Representation

The final Rule 23 requirement that the defendants chal-
lenge is adequacy of representation. Rule 23(a)(4) requires
that "the representative parties will fairly and adequately pro-
tect the interests of the class." This inquiry "serves to uncover
conflicts of interest between named parties and the class they
seek to represent." *Amchem Prod.*, 521 U.S. at 625. It also
screens for conflicts of interest among class members because
the same representative parties cannot adequately represent
class members with divergent interests. *Johnson v. Meriter
Health Servs. Employee Ret. Plan*, 702 F.3d 364, 372 (7th Cir.
2012). We have made clear, however, that "the mere possibil-
ity that a trivial level of intra-class conflict may materialize as
the litigation progresses" does not prevent class certification.
*Abbott v. Lockheed Martin Corp.*, 725 F.3d 803, 813 (7th Cir.
2013). "If and when [potential conflicts] become real, the dis-
trict court can certify subclasses with separate representation

No. 20-1723                                                    37

of each." *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 680
(7th Cir. 2009) (citing Fed. R. Civ. P. 23(c)(5)).

The defendants maintain that the modified class fails the
adequacy-of-representation requirement because it includes
both civilian employees, who have a duty to report miscon-
duct, and sworn officers, who have a duty to act on reported
misconduct. They posit that sworn officers should be ex-
cluded from the class for the same reason the district court
excluded supervisors: because their own misconduct might
become an issue in the case (if, for example, the evidence
showed that one of them failed to follow through on a report
of misconduct).

We reject the plaintiffs' preliminary accusation that the de-
fendants have forfeited this argument. In opposing class cer-
tification, the defendants argued that "conflicts of interest
amongst putative class members who are supervisory and
nonsupervisory staff, *and between sworn and civilian class mem-
bers*, render the class representatives inadequate." (Emphasis
added.) The plaintiffs also responded to the argument in their
reply brief below. The district court did not address the argu-
ment, but the defendants made it.

Regardless, the defendants' argument is unconvincing. As
the plaintiffs point out, the defendants offer almost no evi-
dence that the class includes sworn female officers who failed
to report misconduct. They supplied no such evidence in the
district court. (Perhaps that is why the district court passed
over the argument.) On appeal, they muster only two exam-
ples. On remand, if the defendants present evidence of a gen-
uine conflict, the district court can explore the need for sub-
classes. *Kohen*, 571 F.3d at 680. For now, the defendants' argu-
ment is premature.

### III. Conclusion

For these reasons, we REVERSE the district court's order certifying the modified class and REMAND for further proceedings.

CERTIFIED COPY

A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit