**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **SDHARIE HOWARD, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **vs.** ) | **Case No. 17 C 8146** |
| ) | |
| **COOK COUNTY SHERIFF'S OFFICE** ) | |
| **and COUNTY OF COOK,** ) | |
| ) | |
| **Defendants.** ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

MATTHEW F. KENNELLY, District Judge:

The plaintiffs are women who work in the Cook County Jail.  They sued the County and the Sheriff's Office (CCSO), alleging that the defendants have failed to take adequate measures to curtail extensive and disturbing sexual harassment by detainees. They assert claims under Title VII of the Civil Rights Act of 1964, the Equal Protection Clause of the U.S. Constitution, and the Illinois Civil Rights Act (ICRA).

In August 2019, the Court granted the plaintiffs' motion to certify a class, but the Seventh Circuit reversed this decision on interlocutory appeal.  Following the Seventh Circuit's decision, more than five hundred women moved to intervene in the case as individual plaintiffs and were granted leave to do so without objection by the defendants.

The defendants have now filed two motions, seeking summary judgment on all claims by four plaintiffs whose cases were selected for "bellwether" treatment:  Sdharie Howard, Dionne Griggs, Donnetta Myart, and Beverly Taylor.  They also ask the Court to exclude the testimony of the plaintiffs' expert witness Dr. Susan Jones for purposes of

summary judgment.

For the reasons below, the Court grants summary judgment in favor of the defendants on Myart's claims but otherwise denies the defendants' motions. The Court further concludes that the defendants' motion to exclude need not be decided in order to rule on the summary judgment motions and defers the issue until prior to the bellwether trials.

## Background

The plaintiffs allege that, during the relevant time, there was and has been an "epidemic" of sexual harassment at the Jail. Pls.' Resp. at 1. More specifically, they contend, male detainees have exposed themselves to, masturbated at, and verbally harassed women who work in the Jail. The plaintiffs all allege that they have been subjected to this sexual harassment, and many allege numerous incidents, sometimes by repeat offenders. In November 2017, they sued the CCSO and the County under Title VII, the Constitution, and the ICRA, alleging that the defendants failed to take sufficient action to curtail this sexual harassment.

The plaintiffs moved to certify a class of similarly situated individuals. The Court granted the plaintiffs' motion and certified a class under Federal Rule of Civil Procedure 23(b)(3). As later amended, the class was defined as follows:

> All women who have been employed by the Cook County Sheriff's Office at the Jail, or as Court Services deputies at the Leighton Courthouse, or by the County in positions with Cermak Health Services, at any time since April 23, 2015, except women who, during that period, have held the positions identified in Exhibit B to the plaintiffs' Rule 62.1 motion [dkt. no. 242-2 at 2] or who were employed in supervisory roles.

Dkt. no. 273.

The defendants sought an interlocutory appeal of the Court's class certification

2

decision.  On March 26, 2021, the Seventh Circuit reversed the Court's decision and remanded the case.  *Howard v. Cook Cnty. Sheriff's Off.*, 989 F.3d 587, 592 (7th Cir. 2021).  It concluded that "the class cannot stand because it comprises class members with materially different working environments whose claims require separate, individualized analyses."  *Id.*

To put the Seventh Circuit's decision into context, the Court starts with information regarding the structure and organization of the Jail.  The Jail is a very large complex comprising thirty-six buildings on eight city blocks.  As far as detention is concerned, there are seven residential divisions of varying security levels:  Divisions 3, 4, and 5 house female inmates; Divisions 2 and 6 house minimum- to medium-security male inmates; and Divisions 9 and 10 house maximum- to super-maximum-security male inmates.  In addition to these residential divisions, Division 8 encompasses medical facilities where inmates receive mental health services.

The Seventh Circuit emphasized that the certified class included women who worked in different roles in different locations within the Jail.  The court noted that "[a] female employee's exposure to harassment can vary significantly with job assignment, though job assignments can change."  *Id.* at 594.  For example, those working in Divisions 2 through 5 reported relatively little exposure to sexual misconduct, whereas those working in Division 9 reported much more exposure to such misconduct.  For these and other related reasons, the Seventh Circuit determined that the certified class did not meet the requirements of commonality, typicality, and predominance.

Following the Seventh Circuit's decision, 529 women employed by the CCSO or County moved to intervene in the case as individual plaintiffs.  The defendants did not

oppose the motion.  The Court granted intervention.  Given the number of plaintiffs, the Court determined to conduct the litigation going forward by selecting "bellwether" plaintiffs and proceeding in a manner commonly used in mass-tort litigation that is subject to a multi-district litigation centralization order.  On July 9, 2021, the Court directed the parties to file proposals for selecting bellwether cases, dividing the plaintiffs into four groups:  (1) correctional officers; (2) sheriff's deputies; (3) Sheriff's Office civilians; and (4) Cook County health professionals.  On November 5, 2021, the Court approved bellwether plaintiffs in each category, including Griggs, Myart, Howard, and Taylor.  Griggs, Howard, and Myart are correctional officers; Taylor is a patient care attendant.  The Court scheduled the first bellwether trial for June 2022 and the second for July 2022.

Now that the parties have completed discovery on the first-wave bellwether plaintiffs, the defendants have moved for summary judgment, seeking dismissal of all the claims asserted by Griggs, Howard, Myart, and Taylor.

## Discussion

### A.    Preliminary matters

#### 1.    Motion to exclude expert testimony

The defendants move to exclude the testimony of Dr. Susan Jones.  They contend that her opinions are not based on valid or reliable methodology and thus cannot be used to defeat summary judgment.

The Court concludes that it is unnecessary to address the defendant's motion to exclude Dr. Susan Jones's testimony in order to decide the pending summary judgment motions.  Dr. Jones's testimony includes, among other things, comparisons between the

detainee sexual misconduct problem at the Jail as compared to other corrections facilities and opinions regarding whether the defendants took timely and effective action to address the problem. Although this evidence is relevant with respect to the plaintiffs' claims, even without this evidence, summary judgment on the claims of Griggs, Howard, and Taylor would be inappropriate. And the testimony of Dr. Jones has no bearing on the points on which the Court grants summary judgment on Myart's claims. For these reasons, it is unnecessary for the Court to consider the defendants' motion to exclude at this point. Though the motion to exclude will have to be addressed before any bellwether trial in which the plaintiffs seek to offer Dr. Jones's testimony, there is no need to address it at the moment.

### 2.    Local Rule 56.1

The defendants argue that the Court should disregard portions of the plaintiffs' Local Rule 56.1 filings as improper. Regarding the plaintiffs' responses to their statement of facts, the defendants contend that the plaintiffs fail to properly dispute certain facts or cite the record for support. The defendants also contend that the plaintiffs improperly assert additional facts in certain of their responses to the defendants' undisputed facts. Regarding the plaintiffs' statement of additional facts, the defendants argue that the filing does not comport with Local Rule 56.1(b)(3)(C), which requires a "concise response" in the form of "short numbered paragraphs." N.D. Ill. L.R. 56.1(b)(3)(C). The defendants further argue that the plaintiffs inappropriately include legal conclusions and generalized allegations in their statement of additional facts.

The Court does not agree with the defendants' contention that the plaintiffs' statement of additional facts fails to comply with Local Rule 56.1(b)(3)(C). Although the

plaintiffs' statement contains paragraphs with multiple sentences and multiple facts, nothing in the Local Rules categorically prohibits this. The plaintiffs' paragraphs are concise and logically grouped, and there is no basis to find (as the defendants suggest) that they have strategically drafted their statement of facts to circumvent the limitations of the Local Rules. The statement of facts does not obstruct the Court's ability to adjudicate the defendants' motions, nor did it hamper the defendants in responding.

On the defendants' other arguments, the Court agrees that some of the plaintiffs' facts and responses are inappropriately conclusory, lack adequate citation to the record, or are unresponsive to the defendants' facts. It is not necessary, however, for the Court to determine exactly which statements should not be relied upon on summary judgment. The Court notes, where appropriate, what evidence it has relied upon in making its decision and has disregarded evidence that does not comport with the requirements of the Local Rules.

**B.    Standing**

The defendants argue that Myart lacks standing to bring this suit. Specifically, they contend that, because Myart brought these claims during the pendency of her Chapter 13 bankruptcy case, her claims belong to her bankruptcy estate, and she lacks standing to assert them. In response, the plaintiffs argue that Myart has standing because she fully repaid her creditors and because the bankruptcy court confirmed her plan. Additionally, they argue that the defendants waived or forfeited their arguments concerning standing because they did not assert the defense in their answer or when the Court was selecting bellwether plaintiffs.

Under section 541 of the Bankruptcy Code, all of a debtor's property, including

her legal claims, become part of the bankruptcy estate when the petition is filed.  *See* 11 U.S.C. § 541(a)(1).  During the pendency of the case, the debtor has a continuing obligation to disclose newly acquired assets, and any legal claims procured during this time become the property of the estate.  *Rainey v. United Parcel Serv., Inc.*, 466 F. App'x 542, 544 (7th Cir. 2012) ("A Chapter 13 estate encompasses all property, including legal claims, acquired after the petition is filed and before the case is closed."). In a Chapter 13 bankruptcy, the debtor retains possession of her property and has concurrent standing with the bankruptcy trustee to pursue claims on behalf of the estate while the case is still open.  *Id.*  But a legal claim that is not scheduled by the time the bankruptcy is closed remains the property of the estate, and the debtor can no longer pursue the claim.  *Id.*

In this case, Myart filed for Chapter 13 bankruptcy on July 15, 2015.  She represented that she did not have any "[o]ther contingent and unliquidated claims."  *In re Myart*, No. 15-24100 (Bankr. N.D. Ill.), dkt. no. 1 at 10.  On November 14, 2017, Myart filed this action against the defendants.  She never amended her bankruptcy filings to disclose her claims.  She did not disclose the claims to the bankruptcy court in any way before her bankruptcy case was closed on February 6, 2020.

Because Myart filed the present case, and her claims appear to have arisen, during the pendency of her bankruptcy case, her claims belong to the bankruptcy estate.  She did not disclose her claims before the case was closed, so she cannot now pursue the claims for her own benefit.  *See Rainey*, 466 F. App'x at 544 ("Once the bankruptcy case is closed, however, a debtor no longer can pursue claims on behalf of the estate, and typically will be estopped from pursuing claims for his *own* benefit if

those claims were concealed from creditors during the bankruptcy proceedings."). Accordingly, the Court finds that Myart lacks standing to assert these claims.

The plaintiffs make several arguments in response, but none are persuasive. First, they contend that this issue concerns prudential standing rather than constitutional standing and that Myart has constitutional standing because she has a "'distinct and palpable' injury, 'fairly traceable' to the CCSO's conduct, which is 'redressed by a favorable decision.'"  Resp. at 16 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).  This argument does not engage with the points made by the defendants.  In particular, the plaintiffs do not explain how they contend Myart meets each element of standing if her claim belongs to her bankruptcy estate.

The plaintiffs further contend that Myart has standing because she repaid her creditors in full in accordance with her Chapter 13 plan.  But they cite no support for the proposition that full repayment of creditors means that a previously undisclosed claim belonging to the bankruptcy estate reverts back to the debtor.  In fact, the case law suggests the opposite.  *See Rainey*, 466 F. App'x at 544.

The plaintiffs next argue that Myart has standing because her bankruptcy was a Chapter 13 bankruptcy, so she can sue as a debtor-in-possession.  Although technically correct, the plaintiffs ignore the fact that a debtor-in-possession has standing to sue only *on behalf of the estate*.  *Id*.  And more to the point, once a bankruptcy case is closed— as Myart's has—a debtor-in-possession can no longer sue on behalf of the estate.  *Id.*

The plaintiffs' last argument is that the defendants waived or forfeited this defense because they did not assert it in their answer or when selecting bellwether plaintiffs for this case.  An argument about a federal court's subject matter jurisdiction

cannot be waived, however. *Moore v. Olson*, 368 F.3d 757, 759 (7th Cir. 2004) ("Defects in subject-matter jurisdiction, however, may not be waived or forfeited."). The Court is quite disappointed, as it expressed at a recent status conference, that neither party brought Myart's situation to the Court's attention before the bellwether cases were selected and litigated intensely. But that has no effect on Myart's standing. Because the Court concludes that it lacks subject matter jurisdiction to hear the case, it grants summary judgment in favor of the defendants with respect to all of Myart's claims and dismisses those claims for lack of standing.

**C.    Judicial estoppel**

The defendants argue that Myart and Howard are judicially estopped from bringing their claims because they failed to disclose them during their bankruptcy proceedings. The Court has concluded that Myart lacks standing to bring her claims, but even if the Court did not reach that conclusion, it would find that Myart is judicially estopped from bringing her claims. *See Rainey*, 466 F. App'x at 544.

Judicial estoppel "prevents litigants from manipulating the judicial system by prevailing in different cases or phases of a case by adopting inconsistent positions." *Spaine v. Cmty. Contacts, Inc.*, 756 F.3d 542, 547 (7th Cir. 2014). "In the bankruptcy setting, a debtor who receives a discharge by concealing the existence of a chose in action cannot wait until the bankruptcy ends and then pursue the claim." *Williams v. Hainje*, 375 F. App'x 625, 627 (7th Cir. 2010). The Supreme Court has enumerated three factors for courts to consider when deciding whether to apply judicial estoppel in a particular case: (1) whether the party's later position is "clearly inconsistent" with its earlier one; (2) whether the party succeeded in persuading the court to accept its earlier

position such that judicial acceptance of the later position would create "the perception that either the first or the second court was misled"; and (3) whether the party would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. *New Hampshire v. Maine*, 532 U.S. 742, 743 (2001).

Contrary to standing, judicial estoppel can be waived (or forfeited) if not timely asserted. *See McCurry v. Kenco Logistics Servs., LLC*, 942 F.3d 783, 791 (7th Cir. 2019) ("The brief invokes res judicata, collateral estoppel, and judicial estoppel, none of which apply, none of which were asserted below, and all of which are therefore waived."). Under Federal Rule of Civil Procedure 8(c), affirmative defenses must be asserted in the defendant's answer. Fed. R. Civ. P. 8(c) ("In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense . . . ."). An affirmative defense that is not plead in the answer is forfeited if "the plaintiff is harmed by the defendant's delay in asserting it." *Carter v. United States*, 333 F.3d 791, 796 (7th Cir. 2003); *see also Matthews v. Wis. Energy Corp.*, 642 F.3d 565, 570 (7th Cir. 2011). In this case, the defendants did not assert the affirmative defense in their answers [dkt. nos. 344, 347, 374, 381]. The first time they brought up the issue of judicial estoppel was in their motions for summary judgment.

Additionally, the defendants' delay in asserting their judicial estoppel defense caused the plaintiffs prejudice. This is especially true given the fact that the defendants did not raise the issue during the bellwether selection process. Given the number of plaintiffs in the case, the bellwether trials serve a crucial role in facilitating resolution by providing parties with a better understanding of their claims and the possible outcomes of the case. The more representative the claims of the bellwether plaintiffs, the more

useful the information obtained from their trials.  For this reason, the parties and the Court put significant thought into selecting bellwether plaintiffs with representative claims and issues.  Had the Court known of this individualized issue regarding Howard, it would not have allowed her selection as a bellwether plaintiff and would not have ordered the parties to conduct months of discovery and spend significant resources preparing for her trial.  But because the defendants delayed asserting this defense, significant work, time, and resources were put into Howard's case.  The Court thus finds that the defendants waived or forfeited their judicial estoppel argument by failing to timely assert it.

Additionally, the Court finds that the defendants waived or forfeited the argument by failing to sufficiently develop the argument in their briefs.  With respect to Howard, the defendants address only the third factor of judicial estoppel—whether she would derive an unfair advantage if not estopped.  Notably, they do not make any attempt to explain whether the bankruptcy court actually accepted and relied upon Howard's earlier position, and given the unique procedural history of Howard's bankruptcy case, the Court cannot determine the answer from the defendants' submissions.  Howard filed her claim in this case after she obtained a discharge but before her bankruptcy case was reopened.  The defendants do not explain the purpose for which the bankruptcy court reopened the case and do not describe whether or how her failure to disclose her claim affected the case (let alone any judicial ruling or any benefit to Howard) after it was reopened.  Because the defendants' argument is insufficiently developed, the Court finds that they have waived or forfeited it.  *See United States v. Hook*, 195 F.3d 299, 310 (7th Cir. 1999) ("A party's failure to address or develop a claim in its opening brief

constitutes a waiver of that claim, for '[i]t is not the obligation of this court to research and construct the legal arguments open to parties, especially when they are represented by counsel . . . .'").

## D.    Statute of limitations

Next, the defendants argue that certain of Howard's allegations are time-barred. Under Title VII, a plaintiff "must file a complaint with the EEOC within 300 days of experiencing the complained-of discrimination." *Swanson v. Village of Flossmoor*, 794 F.3d 820, 825 (7th Cir. 2015). For section 1983 and ICRA claims, the statute of limitations is two years. *Ray v. Maher*, 662 F.3d 770, 772 (7th Cir. 2011) (stating that federal courts apply state law personal injury limitations periods to section 1983 actions); 735 ILCS § 5/13-202 (setting a two-year statute of limitations for personal injury claims); 740 ILCS § 23/5(b) (setting a two-year statute of limitations for ICRA claims). The defendants contend that some of the incidents that Howard alleges— namely her February 9, 2013 and December 24, 2014 allegations—fall outside of the applicable limitations periods and thus cannot be considered by the Court on summary judgment.

The defendants are correct as a simple matter of counting intervals. Howard filed her EEOC charge on February 16, 2016, so any incident prior to April 22, 2015 occurred more than 300 days before that. Similarly, Howard filed her original complaint on November 10, 2017, so any incident prior to November 10, 2015 took place more than two years before she filed suit.

This does not mean, however, that these incidents are time-barred. Howard is bringing a single claim, not a series of discrete claims arising from separate events.

*See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 118 (2002) (holding that "incidents constituting a hostile work environment are part of one unlawful employment practice"); *Lucas v. Chi. Transit Auth.*, 367 F.3d 714, 724 (7th Cir. 2004). The continuing violation doctrine, which applies to claims under Title VII, the ICRA, and section 1983, allows an employee to recover for employer conduct outside the limitations period when the conduct is related to acts occurring inside the limitations period. *Swanson*, 794 F.3d at 825 (Title VII); *Graves v. Chief Legal Couns. of Ill. Dep't of Hum. Rts.*, 327 Ill. App. 3d 293, 297, 762 N.E.2d 722, 725 (2002) (stating that state courts look to Title VII cases to interpret the ICRA); *Garrison v. Burke*, 165 F.3d 565, 569–70 (7th Cir. 1999) (section 1983). As the Supreme Court stated in *Morgan*, "[h]ostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct." *Morgan*, 536 U.S. at 115. For this reason, the Seventh Circuit has held that hostile work environment claims are timely "as long as 'any act falls within the statutory time period.'" *Adams v. City of Indianapolis*, 742 F.3d 720, 730 (7th Cir. 2014) (quoting *Morgan*, 536 U.S. at 120).

The defendants contend that the continuing violation doctrine does not apply here because Howard was on notice of her potential claims long before she filed the requisite suits. They contend that, for hostile work environment claims, the doctrine applies "only when the plaintiff was reasonable not to perceive her working conditions as intolerable until the acts of harassment had, through repetition or cumulation, reached the requisite level of severity." Dkt. no. 424 at 12 (quoting *DeClue v. Cent. Ill. Light Co.*, 223 F.3d 434, 435 (7th Cir. 2000)). But *DeClue* was decided before *Morgan*, and the other cases that the defendants cite are district court cases that are not binding

on this Court. None of the relevant, post-*Morgan* precedent that the Court is aware of supports the defendants' contention that a plaintiff's notice of her hostile work environment claim precludes application of the continuing violation doctrine. Accordingly, the Court finds that Howard's claim is not time-barred.

## E.    Title VII

The Court deals next with the defendants' arguments regarding the merits of the claims of Howard, Griggs, and Taylor.

Under Title VII, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). The plaintiffs contend that the defendants violated Title VII by failing to take appropriate action to address the hostile work environment created by detainee sexual misconduct. The defendants seek summary judgment on these claims, contending that the alleged misconduct was not severe or pervasive enough to constitute a hostile work environment. With respect to Taylor, the defendants also contend that there is no genuine dispute that the CCSO was not Taylor's employer. The Court begins with this last point.

### 1.    Joint employer

To sustain a claim against a defendant under Title VII, a plaintiff must show that the defendant is her employer. *Love v. JP Cullen & Sons, Inc.*, 779 F.3d 697, 700–01 (7th Cir. 2015). The defendants contend that the CCSO is entitled to summary judgment on Taylor's claims because the County—and the County alone—is her

14

employer. Taylor concedes that the County is her direct employer, but she contends that the CCSO is also her employer for purposes of her Title VII claim.

Title VII allows a plaintiff to bring a claim against a defendant who is not her direct employer under certain circumstances. *Id.* To determine whether a defendant who is not the plaintiff's direct employer can be held liable under Title VII, courts in this Circuit look to the five-factor test articulated in *Knight v. United Farm Bureau Mutual Insurance Co.*, 950 F.2d 377, 378–79 (7th Cir. 1991). *See Frey v. Coleman*, 903 F.3d 671, 676 (7th Cir. 2018) (collecting cases). The five factors are:

> (1) the extent of the [alleged] employer's control and supervision over the employee; (2) the kind of occupation and nature of skill required, including whether skills were acquired on the job; (3) the employer's responsibility for the costs of operation; (4) the method and form of payment and benefits; and (5) the length of the job commitment.

*Love*, 799 F.3d at 702. The first factor, the employer's right to control and supervise, is the most important consideration in this inquiry. *Nischan v. Stratosphere Quality, LLC*, 865 F.3d 922, 929 (7th Cir. 2017).

The defendants contend that the first factor weighs against a finding that the CCSO is Taylor's employer. For support, the defendants point to the undisputed facts that the CCSO did not hire, fire, or discipline Taylor; it does not set her schedule, pay her, or provide her with benefits; and it does not train her or provide her with feedback. The plaintiffs, on the other hand, argue that the first factor weighs in their favor because the CCSO exclusively controls Taylor's working conditions and her ability to work in a discrimination-free work environment. They point to the fact that Taylor works in the Jail, which is solely operated by the CCSO and not the County.

The Court agrees with the plaintiffs. The first *Knight* factor—the employer's right

to control and supervise—suggests that the CCSO may be considered to be Taylor's employer for purposes of her hostile work environment claim. The CCSO has exclusive control over Taylor's working environment at the Jail, and it has exclusive control over the detained persons who are alleged to be immediately responsible for the hostile work environment and the CCSO employees alleged to be responsible for the failure to control it. This amounts to a significant amount of control over Taylor's day-to-day working conditions. Contrary to the defendants' contentions, the right to control and supervise an employee does not just extend to the ability to hire, fire, pay, or direct the employee. Because Taylor works in the Jail, which is operated exclusively by the CCSO, the CCSO has control over her employment in a very significant way that the County does not.

The second and fourth *Knight* factors weigh in favor of the defendants. The second factor concerns the nature and skill of the plaintiff's occupation; the fourth asks whether the defendant provided pay or benefits to the plaintiff. The plaintiffs concede that Taylor is a skilled health care worker who did not receive any training, equipment, or work materials from the CCSO. They likewise do not dispute that the CCSO did not pay Taylor's wages or provide her with employee benefits. These factors thus weigh in favor of the defendants' position.

The defendants also contend that the third factor—responsibility for the costs of operation—supports their argument. They contend that responsibility for the physical maintenance of the Jail belongs to County Facilities Management, an entity that they contend is "within the County's control and outside of the CCSO's control." Dkt. no. 427 at 7. The plaintiffs do not dispute that County Facilities Management is responsible for

16

the physical management and maintenance of the Jail. But they do dispute that the CCSO has no control over the entity. For support, the plaintiffs cite to the deposition of Brad Curry, the Rule 30(b)(6) corporate representative of the CCSO. During the deposition, Curry stated that the CCSO "can ask for things to be a priority" and can rank requests to the County Facilities Management as "high or low." Dkt. no. 426, ex. 15 at 127:24, 128:17–20.

Neither party discusses the fifth *Knight* factor—the length of Taylor's job commitment—so the Court does not either. The Court does note, however, that it appears that Taylor was hired as a long-term employee, rather than as a temporary worker whose employment would end upon completion of a discrete task. *See Frey*, 903 F.3d at 680 ("This was not a temporary assignment or a contract job that would end at the completion of some task.").

After assessing all of the *Knight* factors, the Court concludes that a reasonable jury could find that the CCSO is the plaintiffs' employer for purposes of Title VII. Although two of the five factors weigh in favor of the defendants, the first factor, which is the most significant, supports the plaintiffs' position. *See id.* at 681 ("A plaintiff need not establish that every *Knight* factor falls in her favor in order to prevail."). Additionally, there is some evidence that the CCSO has some degree of control over County Facilities Management, the entity responsible for the physical maintenance of the Jail. For these reasons, the CCSO is not entitled to summary judgment on the ground that was not Taylor's employer for purposes of her Title VII claim.

The Court further notes that a finding that the CCSO may be considered to be Taylor's joint employer would be consistent with analogous authority. Although this

17

exact circumstance has not previously been addressed, this case is similar to cases in which temporary employees sue their placement "employers" under Title VII. In those cases, like here, the employee is formally employed by one entity but works in an environment controlled by a separate entity. Courts in the Seventh Circuit have held that, in temporary employee cases, the placement employer can be held liable under Title VII, despite the fact that the plaintiff is officially employed by a temporary employment agency. *See, e.g.*, *Piano v. Ameritech/SBC*, No. 02 C 3237, 2003 WL 260337, at *5 (N.D. Ill. Feb. 5, 2003) (failure to hire and termination claims); K*err v. WGN Cont'l Broad. Co.*, 229 F. Supp. 2d 880, 885–86 (N.D. Ill. 2002) (hostile work environment and retaliation claims). In such cases, because of the placement employer's control over the day-to-day environment in which the employee works, it may be held liable for sex discrimination under Title VII. Similarly, the CCSO's control over the conditions in the Jail may make it Taylor's employer for purposes of Title VII.

Furthermore, the plaintiffs' position is consistent with Title VII's purpose of preventing sexual harassment in the workplace. Finding that the CCSO cannot be held liable under Title VII for the hostile work environment that Taylor contends she was subjected to could result in a gap in protection against sexual harassment in the Jail. As the plaintiffs put it:

> The County could disclaim Title VII liability for harassment suffered by health care workers at the Jail, citing its inability to control the harassers (male detainees), while the CCSO, for its part, would admit its ability to control the harassers but disclaim Title VII liability by denying any 'employment' relationship with County health care workers.

Pls.' Resp. at 36. This would be antithetical to the purpose of Title VII. *See Piano*, 2003 WL 260337, at *5 ("Failure to apply the joint employer theory in this context would

18

permit an employer that would otherwise be subject to Title VII's constraints to avoid liability for discrimination while maintaining total control over the work of its employees, merely by hiring them through agencies in a temporary capacity.").  For these reasons, the Court finds that the CCSO is Taylor's joint employer for purposes of Title VII.

### 2.    Hostile work environment

Maintenance of a hostile work environment is a form of sex discrimination under Title VII.  *Paschall v. Tube Processing Corp.*, 28 F.4th 805, 812 (7th Cir. 2022).  To sustain a hostile work environment claim, the plaintiff must establish the following elements:

> (1) she was subjected to unwelcome sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature; (2) the conduct was severe or pervasive enough to create a hostile work environment; (3) the conduct was directed at her because of her sex; and (4) there is a basis for employer liability.

*Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 645 (7th Cir. 2005).  When evaluating whether sexual harassment is sufficiently severe or pervasive to meet the second element, a court must assess the conduct both objectively and subjectively.  *Id.*  The former means that "a reasonable person would find [the environment] hostile or abusive."  *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 463 (7th Cir. 2002).  The latter asks if "the victim in fact did perceive [it] to be so."  *Id.*  In evaluating whether the environment was objectively hostile or abusive, the court must consider all of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *EEOC v. Costco Wholesale Corp.*, 903 F.3d 618, 625 (7th Cir. 2018).

The defendants contend that, for each plaintiff's claim, no reasonable jury could find that the conduct was severe or pervasive enough to create a hostile work environment. They argue that, for purposes of summary judgment, the Court should ignore "generalized allegations of sexual misconduct that are not tied to time and/or fail to specify what detainees allegedly engaged in the conduct, the names of any witnesses to the conduct, or to whom (if anyone) they reported the conduct." Dkt. no. 424 at 29 (citing *Gabrielle M. v. Park Forest-Chicago Heights, Ill. Sch. Dist. 163*, 315 F.3d 817, 822 (7th Cir. 2003)). The Court agrees that generalized allegations are insufficient, without more, to defeat summary judgment. *See Lucas*, 367 F.3d at 726 (noting that the plaintiff did not "set forth any of the times, dates, or places which led to" his conclusions). As such, for purposes of summary judgment, the Court considers only the testimony that provides the "times, dates, or places" of the alleged incidents.

The defendants also challenge the plaintiffs' reliance on evidence of sexual harassment directed at other employees. They contend that the Court cannot consider "other employee" evidence on summary judgment because harassment directed at others is immaterial to whether the conduct directed at these specific employees was severe or pervasive. For purposes of this opinion, the Court finds it unnecessary to decide this point. Even without evidence regarding incidents directed at others or about which they may have heard, the plaintiffs have adduced sufficient evidence to permit a reasonable jury to find that the conduct they were subjected to was severe or pervasive enough to create a hostile work environment. The Court discusses this separately with respect to each of the three plaintiffs at issue.

### a.  Howard

The defendants contend that they are entitled to summary judgment on Howard's hostile work environment claim because her "claim rests merely on five reported incidents over more than nine-years."  Dkt. no. 424 at 18.  There are two problems with the defendants' argument.  First, the defendants contend that only reported incidents can be considered by the Court on summary judgment.  This argument holds no water.  There is no requirement that, to defeat summary judgment (or to prevail at trial), a party must provide evidence that is corroborated, whether by incident report forms or anything else.  A plaintiff's own testimony can be sufficient to create a genuine factual dispute.  Whether that testimony is also corroborated by independent evidence involves only the weight and credibility of that evidence.  But on summary judgment, "a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).  For now, it is enough that the plaintiffs provide evidence that, if believed, would allow a reasonable jury to find in their favor on this issue.

The second problem with the defendants' argument is that, to establish a hostile work environment, the plaintiffs are required to show that the alleged conduct was "severe" *or* "pervasive," not both.  As explained above, the frequency of the conduct is one factor to consider in determining whether this element of a hostile work environment claim has been met; it is not dispositive.

A reasonable jury could find that Howard experienced a number of objectively severe incidents of gender-based harassment while working at the Jail.  She reported several of these incidents:  on four separate occasions, detainees masturbated at her

while she was working, and on another occasion, an inmate grabbed her by her waist and pressed his penis against her backside. In addition to these reported incidents, Howard has testified that she experienced others that she did not report. For example, she testified that, while working at Stroger Hospital between September 7, 2018 and May 16, 2019, a detainee with one arm chained to the bed masturbated at her with his unchained arm. Around the same time period, she states, an inmate masturbated at her from the shower while she was in the officers' "bubble." She further testified that, while working in Division 9, she witnessed several detainees simultaneously masturbating at her. A reasonable jury could believe Howard's testimony regarding these incidents irrespective of the fact that she did not contemporaneously report them.

The Court finds that this evidence is sufficient to permit a reasonable jury to find that Howard experienced conduct sufficiently severe or pervasive to create a hostile work environment. Each of these incidents alone would be extremely disturbing to a reasonable person in Howard's position, and a reasonable jury could find that she experienced numerous such incidents during the course of her employment. In arguing that Howard's testimony is insufficient to create a genuine dispute of fact, the defendants contend that some level of sexual misconduct is to be expected in a jail and that Howard's experiences are not severe or pervasive in this context. A reasonable jury could find otherwise. Even if some level of sexual misconduct is to be expected in a jail, a jury could find, based on Howard's testimony, that the level of harassment that she experienced exceeded what any reasonable person would expect in such a workplace. The Court rejects the defendants' suggestion that a workplace—even a jail—where female employees are subjected to multiple men simultaneously

masturbating at them or where detainees touch employees with their genitalia is, as a matter of law, not a hostile work environment. For these reasons, the defendants are not entitled to summary judgment on Howard's claim.

### b. Griggs

With Griggs as with Howard, there are genuine factual disputes regarding whether the sexual misconduct Griggs contends she experienced at the Jail was sufficiently severe or pervasive to create a hostile work environment.

While working at the Jail, Griggs reported three incidents of sexual misconduct by detainees. First, she reported an incident where an inmate screamed at her, "Fuck you, you stupid ass bitch, I'll fuck you [sic] dumbass up, bitch. Fuck you, bitch. Bitch, stupid ass, hoe. Bitch," while attempting to kick down his cell door. Dkt. no. 423 ¶ 136. Second, Griggs reported an incident where a detainee masturbated in front of her. When the correctional officer with Griggs ordered the detainee to stop, he stated, "Fuck you. I'm relieving myself bitches. I wear a green jumpsuit. This is what I do. The sheriff ain't going to do nothing to me." *Id.* ¶ 140. Third, Griggs reported another incident where a detainee masturbated in front of her. In addition to these reported incidents, Griggs testifies that she experienced several other similar masturbation incidents in 2020 and 2021.

This testimony is sufficient to create a genuine dispute regarding whether the conduct Griggs experienced was sufficiently severe or pervasive to create a hostile work environment. As with Howard, Griggs was subjected to numerous instances of exhibitionist masturbation. Additionally, Griggs testified to instances of sex-based verbal abuse and threatening language and conduct by detainees. This is sufficient for

her claim to survive summary judgment.

### c. Taylor

Taylor likewise testified that she was the victim of numerous masturbation incidents by detainees. For instance, she testified that, any time she went to a certain area of the Jail, the same detainee would masturbate at her. She also testified that she experienced an incident where an inmate in solitary confinement masturbated at her while she was working in the nurses' station.

Taylor also testified regarding unwanted physical contact by detainees. Once, an inmate bumped against her body and pushed her forward against the counter. In another instance, a detainee spat in her face and later stated that he did so because she was a "bitch." Dkt. no. 426 ¶ 88.

Additionally, Taylor testified regarding multiple instances of verbal harassment. In one instance in 2021, an inmate told her, "Oh damn, you sure look good. What's your name? You're finer than a motherfucker. I'll eat your ass because I eat ass good." *Id.* ¶ 93. In April 2021, a detainee in a holding cage asked Taylor to suck his penis and threatened to "kick her ass" when he got out of the cage. *Id.* ¶ 99. In February 2022, several detainees masturbated at her while making vulgar comments like "I'm gonna squirt" or "I'm gonna spray." *Id.* ¶ 95.

Taylor's testimony is sufficient to defeat summary judgment. In her deposition, she testifies regarding several other incidents in addition to those just described. Overall, Taylor describes quite a few more instances of sexual harassment than the other plaintiffs. This is clearly enough to create a genuine dispute regarding material facts.

**F.     Section 1983 claim**

"To state a claim for relief under 42 U.S.C. § 1983, a plaintiff must allege that he or she was deprived of a right secured by the Constitution or the laws of the United States, and that this deprivation occurred at the hands of a person or persons acting under the color of state law." *D.S. v. E. Porter Cnty. Sch. Corp.*, 799 F.3d 793, 798 (7th Cir. 2015).  Section 1983 claims against municipalities—*Monell* claims—require a plaintiff to show that she was "deprived of a federal right, as a result of an express municipal policy, [a] widespread custom, or deliberate act of a decision-maker for Cook County, which proximately caused his injury." *Davis v. Carter*, 452 F.3d 686, 691 (7th Cir. 2006); *see Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658 (1978).

Here the plaintiffs allege they were deprived of their rights under the Equal Protection Clause of the Fourteenth Amendment based on the defendants' deliberate indifference to the gender-based hostile work environment to which they were subjected.  *See Boehn v. City of East Chicago*, 799 F.2d 1180, 1185 (7th Cir. 1986) (holding that sexual harassment constitutes sex discrimination in violation of the Equal Protection Clause and is actionable under section 1983).  In general, section 1983 claims alleging equal protection violations due to sexual harassment "follow[] the contours of Title VII claims." *King v. Bd. of Regents of Univ. of Wis. Sys.*, 898 F.2d 533, 537 (7th Cir. 1990).  One difference between the two claims, however, is that "the defendant must intend to harass under equal protection," whereas it need not under Title VII.  *Id.*  Intent can be demonstrated by evidence of deliberate indifference, or evidence that "the defendants were aware of a substantial risk of serious injury to the [plaintiff] but nevertheless failed to take appropriate steps to protect him from a known

25

danger." *Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 926 (7th Cir. 2004).

The defendants contend that they are entitled to summary judgment on the plaintiffs' section 1983 equal protection claims for several reasons. First, they argue that the plaintiffs fail to show that they were treated differently from similarly situated members of an unprotected class. Second, the defendants argue that no reasonable jury could find that they possessed the requisite mental state for a section 1983 equal protection claim. Third, they argue that the plaintiffs cannot show a policy, widespread custom, or policymaker responsible for their injuries. Lastly, they argue that the plaintiffs' section 1983 claims fail for the same reasons that their Title VII claims fail. Because the Court has overruled the defendants' motion for summary judgment on the plaintiffs' Title VII claims, the Court overrules this last contention. The Court addresses the defendants' other arguments in turn.

### 1.    Discriminatory treatment

The defendants' first argument is that the plaintiffs "present no evidence that the CCSO treated any misconduct of a similar gravity that was directed at similarly-situated male COs more seriously than the detainee sexual misconduct that Plaintiffs experienced." Dkt. no. 424 at 21. They contend that all plaintiffs bringing equal protection claims "must present evidence of a similarly situated individual who was intentionally treated differently than the plaintiff." *Id.* But the cases the defendants cite do not address sexual harassment claims like those asserted by the plaintiffs. As explained above, section 1983 claims alleging equal protection violations due to sexual harassment have the same requirements of a Title VII claim, and Title VII claims do not require comparator evidence. Thus the fact that the plaintiffs do not provide such

26

evidence does not doom their claim.  The Court overrules the defendants' argument.

## 2.    Intent

The thrust of the defendants' argument regarding intent is that no reasonable jury could find that they were deliberately indifferent towards detainee sexual misconduct against female correctional officers given "the sheer volume of mitigation efforts that [they] have undertaken."  Dkt. no. 424 at 25.  These efforts include informing detainees that sexual misconduct is prohibited; educating staff on ways to address detainee misconduct; tracking sexual misconduct incidents; introducing the Administrative Officer line[1] to update senior staff on sexual misconduct incidents in real time; implementing measures to physically prevent detainee sexual misconduct; modifying facilities to prevent and discourage detainee sexual misconduct; establishing a special disciplinary tier as an increased deterrent for sexual misconduct; and lobbying for increased penalties for sexual misconduct.  The defendants further contend that they internally disciplined or criminally charged nearly 82 percent of the offenders the plaintiffs reported.

The defendants further argue that, even if their mitigation efforts were not completely effective in addressing detainee sexual misconduct, their efforts demonstrate that they were not intentionally discriminating against the plaintiffs or deliberately indifferent to harm inflicted upon them by detainees due to their gender. Rather, the defendants argue, the severity and persistence of the problem is evidence of the complexity of the issue, and, they contend, there is no evidence that the plaintiffs'

---

[1] The Administrator Officer line is an incident reporting system that allowed shift commanders to inform senior CCSO staff in real time of detainee sexual misconduct.

27

suggested alternatives would have done better.

In response, the plaintiffs point to "substantial evidence" that they contend would permit a reasonable jury to find that the defendants were deliberately indifferent to detainee sexual harassment. Pls.' Resp. at 39. As explained above, a defendant is deliberately indifferent when it is "aware of a substantial risk of serious injury to the [plaintiff] but nevertheless failed to take appropriate steps to protect him from a known danger." *Woodward*, 368 F.3d at 926. The plaintiffs contend that both the CCSO and the County were aware of sexual harassment of the plaintiffs by detainees but consciously failed to take appropriate steps to protect them.

Based on the plaintiffs' evidence, the Court concludes that a reasonable jury could find that the defendants knew of the widespread detainee sexual harassment problem occurring in the Jail. By the defendants' own records, between 2014 and 2018, there were more than 2,000 incidents of detainee sexual misconduct directed at staff at the Jail. And there is a basis to believe that this figure underestimates the true number of incidents in light of evidence that the defendant's employees suppressed or discouraged the reporting of incidents. Teamsters Local 700—the labor union representing correctional officers—complained to the Illinois OSHA and the CCSO about this suppression and later filed a grievance on a class basis alleging that supervisory staff were threatening to write up officers who disciplined detainees for masturbating. Additionally, the plaintiffs cite testimony from Chris Wurth, Cook County Health's Chief Operating Officer, who stated that detainee sexual harassment was the most serious problem he confronted in his position.

The plaintiffs further contend that, despite awareness of the severity of the

28

problem, the defendants' response fell woefully short of appropriately addressing it. The plaintiffs provide evidence specific to both the CCSO and the County. With respect to the former, they contend that the CCSO delayed implementing mitigation measures: the CCSO did not have a written policy addressing detainee sexual harassment until November 2017 and, even then, it did so only because it was required by court order; the CCSO did not adopt adequate jumpsuits that were designed to curb sexual misconduct until 2019; and for years, it did not allocate sufficient resources to investigate detainee sexual misconduct. The plaintiffs further contend that supervisors at the Jail repeatedly discouraged employees from reporting detainee sexual misconduct, minimized victims' experiences, and blamed victims for the harassment, and that the CCSO has disciplined only six officers in six years for failing to properly address detainee sexual misconduct. Lastly, the plaintiffs contend that the CCSO has still not implemented sufficient training for staff on responding to detainee sexual misconduct.

With respect to the County, the plaintiffs argue that the County deprioritizes its responsibility to address detainee sexual misconduct as opposed to other forms of detainee misconduct. The plaintiffs point to the fact that the County did not include a sexual misconduct option on its Staff Safety Incident Report[2]; did not provide any training specific to detainee sexual harassment; and did not complete a root cause analysis for sexual harassment—despite doing these very things for other forms of detainee misconduct. Moreover, the plaintiffs argue, the County's deliberate

---

[2] The Staff Safety Incident Report is a form adopted by the County that allows County employees to report incidents related to detainee safety to the office of the County Chief Operating Officer.

29

indifference is evidenced by the fact that County supervisors blamed and dismissed employees alleging sexual harassment, and its human resources department played no role in responding to detainee sexual harassment of County employees. Additionally, the plaintiffs contend that the County does not keep itself updated on incidents of sexual harassment against its employees. Specifically, they contend that the County does not notify its human resources department about detainee sexual harassment of its own employees. They also contend that the County's deliberate indifference is shown by its failure to inform high-ranking County staff—for example, Director of Mental Health Dr. David Kelner and Director of Psychology Kenya Key—about this Court's preliminary injunction.

The Court concludes that the plaintiffs' evidence is sufficient to permit a reasonable jury to find in favor of the plaintiffs on the question of intent. To show deliberate indifference, the plaintiffs must establish that the defendants knowingly failed to take the appropriate action to minimize known risks. As discussed earlier, the plaintiffs cite evidence supporting their contention that the defendants were aware of widespread detainee sexual misconduct directed at their employees. But despite this awareness and the obvious need for effective mitigation measures, the plaintiffs contend, the defendants knowingly failed to act appropriately to address the issue. The plaintiffs cite evidence tending to show that the defendants delayed in implementing some of these measures and failed to implement others. For instance, there is evidence that the defendants delayed in adopting specialized repeat offender jumpsuits that would effectively prevent detainees from engaging in exhibitionist masturbation. By the time that the defendants adopted the recommended jumpsuit, more than 1,800

detainee sexual misconduct incidents had occurred. Additionally, the plaintiffs' evidence that the defendants did not—and still do not—provide sufficient or adequate training specific to the problem of detainee sexual misconduct is evidence from which deliberate indifference reasonably may be inferred. *See City of Canton v. Harris*, 489 U.S. 378, 390 (1989) (stating that deliberate indifference can be found when "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights").

The plaintiffs also provide evidence that the defendants' employees frequently dismissed or blamed victims of sexual harassment and that the defendants did not often reprimand employees for doing so. Given the plaintiffs' evidence that the defendants controlled their employees' training and was responsible for supervising and disciplining them, a reasonable jury could conclude that the employees' inadequate responses to detainee sexual harassment were a result of insufficient training, supervision, and discipline on the part of the defendants. Such failures to respond to detainee sexual harassment, coupled with knowledge of the widespread nature of such harassment, are sufficient to support a finding of deliberate indifference.

The defendants dispute that their mitigation measures were inadequate, but evidence that the defendants adopted *some* mitigation measures is not enough to warrant summary judgment. Whether the defendants' responses were sufficient—in light of the measures they could have but did not adopt, when they adopted the measures, the severity and nature of the problem, the context of the workplace— involves a genuine factual dispute that must be resolved by a jury. At trial, the jury will evaluate all of the evidence and determine whether the defendants were deliberately

31

indifferent. At this stage, however, the plaintiffs need not prove their case. Rather, they must show is that, with the evidence viewed and reasonable inferences drawn in their favor, there is sufficient evidence for a jury reasonably to conclude that the defendants' actions were so lacking as to amount to deliberate indifference. This the plaintiffs have done.

### 3. Policy, practice, or policymaker

The plaintiffs do not contend that the defendants have an express policy of condoning detainee sexual harassment or that a policymaker of the CCSO or the County deliberately took or failed to take steps and thereby caused their injuries. Instead, the plaintiffs state that the defendants have a widespread practice of deliberate indifference to discrimination as evidenced by their knowingly inadequate responses to what the plaintiffs contend was rampant sexual harassment of female personnel at the Jail. The defendants contend that no reasonable jury could find the existence of such a widespread policy "in light of the vast number and type of continual efforts the CCSO has made to attempt to eradicate detainee sexual misconduct." Dkt. no. 424 at 29. This dispute essentially parallels that concerning the intent question. The parties cite the same evidence and make the same arguments for why summary judgment is or is not warranted.

For the same reasons that the Court has concluded that a reasonable jury could find the requisite intent for the plaintiffs' section 1983 claim against both the CCSO and the County, the Court concludes that a reasonable jury could find that the defendants have a custom or practice resulting in their constitutional violations. In sum, a reasonable jury could find "systemic and gross deficiencies in [the Jail's] staffing,

32

facilities, equipment, or procedures" resulting in harm to the plaintiffs from widespread detainee sexual misconduct. *See Dixon v. County of Cook*, 819 F.3d 343, 348 (7th Cir. 2016). And, as discussed in the previous section, the plaintiffs' evidence is sufficient to support a finding that the defendants knew about these problems and knowingly failed to correct them. *Id.* This is sufficient to show a widespread custom or policy for purposes of a *Monell* claim. *Id.*

The plaintiffs have testified regarding the deficiencies in the defendants' "staffing, facilities, equipment, or procedures" concerning detainee sexual misconduct. They offer evidence suggesting widespread apathy to detainee sexual misconduct by supervisory personnel and upper management Jail employees and that CCSO supervisors were at times openly hostile towards officers who disciplined detainees for masturbating. They also point to evidence that the policies and practices designed to address detainee sexual misconduct were woefully inadequate—for example, insufficient funds were allocated to investigate or pursue criminal charges for detainee perpetrators; the specialized jumpsuits designed by the CCSO for repeat offenders were not effective in stopping those offenders from masturbating; and there was insufficient training for staff regarding detainee sexual misconduct.

Without more, these deficiencies might not establish that the defendants had a practice or custom of deliberate indifference. But the plaintiffs also cite evidence that the defendants knew about the problem and that their responses were ineffective and knowingly failed to correct the problem. The plaintiffs point out that Teamsters Local 700 reported to the CCSO and the Illinois OSHA that incidents were being suppressed and filed a grievance on a class basis to that effect. Despite this awareness, there is

evidence that the defendants only rarely reprimanded employees for failing to properly address such misconduct:  between 2014 and 2019, the CCSO disciplined only six officers for failing to address detainee sexual misconduct.  Additionally, in the period between when the defendants introduced their own, ineffective jumpsuits for repeat offenders and when they finally adopted the recommended, specialized jumpsuits, more than 1,800 masturbation and indecent exposure incidents had occurred.  The plaintiffs provide further examples of how the defendants failed to appropriately correct the deficiencies in their staffing, facilities, equipment, or procedures, which are summarized in the previous section.  Overall, the defendants' allegedly minimal enforcement efforts, their delay in adopting certain mitigation measures, and their refusal to adopt other mitigation measures is evidence from which a reasonable jury could infer an unconstitutional municipal policy that caused the plaintiffs' injuries.  *See id.* ("An unconstitutional municipal policy can 'take the form of an implicit policy or a gap in expressed policies.'") (quoting *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2009).

**G.    ICRA claim**

The defendants make three arguments for granting summary judgment in their favor on the plaintiffs' ICRA claims.  The first is that the Illinois Tort Immunity Act (TIA) bars the claims.  The second is that the plaintiffs' ICRA claims fail because their Title VII claims fail.  And lastly, the defendants argue, if the Title VII claims survive, then the plaintiffs' ICRA claims are duplicative of these claims and should be dismissed.

The defendants' first argument is that the TIA bars the plaintiffs' ICRA claims. Specifically, they contend that three sections of the TIA—sections 2-201, 2-204, and 4-

102—apply to the claims. Section 2-201 immunizes the discretionary policy decisions of public officials. The defendants contend that this section applies because the plaintiffs challenge the defendants' discretionary policy decisions. Section 2-204 applies to claims where the injury is caused by the act or omission of another person. The defendants contend that section 2-204 applies here because the plaintiffs' injuries are caused by the detainees engaging in sexual misconduct, not the defendants. Lastly, section 4-102 applies to claims alleging inadequate police protection services by a local public entity. The defendants contend that, because the plaintiffs challenge the adequacy of their protection from detainees, this provision immunizes them as well.

The defendants made the same argument in their motion to dismiss. The Court declined to rule on the issue at that time but noted that it found it "doubtful the Tort Immunity Act bars [the plaintiffs'] claim for damages under ICRA." *Brown v. Cook County*, No. 17 C 8085, 2018 WL 3122174, at *11 (N.D. Ill. Jun. 26, 2018). The Court now concludes that the TIA does not bar the plaintiffs' claims under the ICRA. As explained in the Court's earlier decision, the ICRA "specifically provides a cause of action and damages remedy against local governments; in fact . . . units of government are the only cognizable defendants under ICRA." *Id.* Reading the TIA to immunize the defendants from liability under the ICRA thus would effectively write it out of existence. *Id.*

The defendants argue, as they did before, that the TIA includes a list of statutes to which it does not apply and that the ICRA is not one of the enumerated exceptions. The plaintiffs, on the other hand, point out that the ICRA was enacted after the TIA. Thus, they contend, the fact that it is not on the list of exceptions does not necessarily

35

mean that the state legislature intended to provide immunity in such situations. Although the Court agrees with the plaintiffs' overall conclusion, it disagrees with their point here. The mere fact that a statute was enacted after the TIA does not automatically except it from the TIA's immunity provisions. For example, section 2-101 was amended after the TIA was enacted to exempt the subsequently enacted Illinois Uniform Conviction Information Act. This suggests that, had the state legislature intended to except the ICRA, it would have amended the TIA to do so.

Supporting the plaintiffs' position, however, are numerous Illinois state court opinions suggesting that TIA immunity extends only to tort claims. *See, e.g.*, *Birkett v. City of Chicago*, 325 Ill. App. 3d 196, 202, 758 N.E.2d 25, 30 (2001); *Firestone v. Fritz*, 119 Ill. App. 3d 685, 689, 456 N.E.2d 904, 908 (1983); *Streeter v. County of Winnebago*, 44 Ill. App. 3d 392, 394–95, 357 N.E.2d 1371, 1373 (1976). Furthermore, the Illinois Supreme Court stated, in *Van Meter v. Darien Park District*, 207 Ill. 2d 359, 368, 799 N.E.2d 273, 279 (2003), that the purpose of the TIA was to "prevent the dissipation of public funds on damage awards in tort cases."[3] The defendants dispute that the TIA covers only tort claims, arguing that (1) injuries covered by the TIA are defined broadly in the statute and (2) at least one state appellate court has concluded

---

[3] The Court notes that the question of whether the TIA applies to non-tort claims is still somewhat unsettled as a matter of Illinois law. The Supreme Court expressly declined to adopt this interpretation of the TIA, stating that "we do not adopt or approve of the appellate court's reasoning that the Tort Immunity Act categorically excludes actions that do not sound in tort." *Raintree Homes, Inc. v. Village of Long Grove*, 209 Ill. 2d 248, 261, 807 N.E.2d 439, 447 (2004). It later clarified, however, that its opinion in *Raintree Homes* did not "impliedly reject" the interpretation, thus leaving the question open. *Rozsavolgyi v. City of Aurora*, 2017 IL 121048, 102 N.E.3d 162, 172. Because the Illinois Supreme Court has not made a definitive ruling, the state appellate court opinions cited earlier are the binding authority on the issue.

that civil rights actions are subject to the TIA.

Although the question is a close one, the Court resolves it in favor of the plaintiffs. Prevailing Illinois state law holds that the TIA does not apply to claims that do not sound in tort. *See Rozsavolgyi*, 2017 IL 121048, ¶ 32, 102 N.E.3d at 172 (finding that there was not substantial disagreement among state appellate courts on the issue and thus declining to answer the question on interlocutory appeal). Although the defendants cite to a couple conflicting opinions,[4] these cases are the exception: the general consensus among state appellate courts is that the TIA applies only to tort claims. See *id.* And claims under the ICRA are not tort claims under Illinois law. *See Blount v. Stroud*, 232 Ill. 2d 302, 313, 904 N.E.2d 1, 9 (2009) ("[A]n action to redress a civil rights violation has a purpose distinct from a common law tort action."); *see also Firestone*, 119 Ill. App. 3d at 689, 456 N.E.2d at 908 (holding that the plaintiff's claim alleging a violation of constitutional rights was not barred by the TIA because it was not a tort action). Moreover, because the general rule under Illinois law is that public entities are liable to the same extent as private parties, the Illinois Supreme Court has held that the scope of the TIA's immunity provisions must be strictly construed. *Van Meter*, 207 Ill. 2d at 368, 799 N.E.2d at 279. For these reasons, the Court overrules the defendants' argument that they are entitled to immunity under the TIA on the plaintiffs' ICRA claims.

Next, the Court overrules the defendants' second argument because it has

---

[4] The Court also notes that the Illinois Supreme Court vacated the entirety of the appellate court's judgment in *Rozsavolgyi v. City of Aurora* and that it disagreed with the appellate court's conclusion that *Raintree Homes* established that the TIA applied to claims outside of tort. *Rozsavolgyi*, 2017 IL 121048, ¶ 31, 102 N.E.3d at 171–172.

concluded that summary judgment is not appropriate on the plaintiffs' Title VII claims. The Court also overrules the defendants' third argument. They argue that they are entitled to summary judgment on the plaintiffs' ICRA claims because they are duplicative of the Title VII claims. But the fact that the claims overlap does not require dismissal of the ICRA claims. *See Smith v. Bd. of Educ. for Waukegan Pub. Sch. Dist. # 60*, No. 20 C 3069, 2021 WL 4459529, at *8 (N.D. Ill. Sept. 29, 2021) ("Courts in this District have declined to dismiss potentially overlapping claims where, as here, '[i]t is too early to tell how the two counts will actually play out.'") (citing *Nardoni v. Moke*, No. 02 CV 944, 2002 WL 1610988, at *4 (N.D. Ill. July 22, 2002)).

None of the cases that the defendants cite suggests otherwise. *Duran v. Town of Cicero*, 653 F.3d 632, 639 (7th Cir. 2011), discusses "double counting" in the context of damages, but a ruling that the plaintiffs cannot receive double damages for the same incident is not the same as a ruling that they cannot bring two sets of claims covering the same misconduct. As the plaintiffs point out, the Court can prevent double recovery by appropriate jury instructions and, if need be, by apportioning jury awards to avoid exceeding the maximum amount legally available under a given statute. The other cases the defendants cite are district court cases that are not binding on this Court. *See Camreta v. Greene*, 563 U.S. 692, 709 n. 7 (2011) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case."). Nevertheless, they do not support the defendants' contention that a court *must* dismiss duplicative state law claims. *See Weiler v. Village of Oak Lawn*, 86 F. Supp. 3d 874, 890 (N.D. Ill. 2015) (recognizing that some courts have dismissed duplicative claims but declining to

dismiss an ICRA claim); *Willborn v. Sabbial,* No. 10 C 5382, 2011 WL 1900455, at *6 (N.D. Ill. May 19, 2011) (declining to dismiss claims as duplicative). For these reasons, the Court denies the defendants' motions for summary judgment regarding the plaintiffs' ICRA claims.

### Conclusion

For the foregoing reasons, the Court grants summary judgment in favor of the defendants with respect to Donnetta Myart's claims but otherwise denies the defendants' motions [dkt. nos. 422 & 425]. The Court defers ruling on the defendants' motion to exclude the testimony of Dr. Susan Jones and will deal with that as part of the motion in limine process regarding the upcoming trials. The case is set for a telephonic status hearing on May 6, 2022 at 9:05 a.m. to discuss the start date for the first bellwether trial, whether that trial will involve both Griggs and Howard or only one of them, and the setting of time limits for the trial.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: May 4, 2022